Senator Mitch McCONNELL, et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION, et al., Defendants.

National Rifle Association of America, et al., Plaintiffs,

v.

Federal Election Commission, et al., Defendants.

Emily Echols, a minor child, by and through her next friends, Tim and Windy Echols, et al., Plaintiffs,

v.

Federal Election Commission, et al., Defendants.

Chamber of Commerce of the United States, et al., Plaintiffs,

v.

Federal Election Commission, et al., Defendants.

National Association Of Broadcasters, Plaintiff,

v.

Federal Election Commission, et al., Defendants.

American Federation of Labor And Congress of Industrial Organizations, et al., Plaintiffs,

v.

Federal Election Commission, et al., Defendants.

Congressman Ron Paul, et al., Plaintiffs,

v.

Federal Election Commission, et al., Defendants.

Republican National Committee, et al., Plaintiffs,

v.

Federal Election Commission,
et al. Defendants.

California Democratic Party,
et al., Plaintiffs,

v.

Federal Election Commission,
et al., Defendants.

Victoria Jackson Gray Adams,
et al., Plaintiffs,

v.

Federal Election Commission,
et al., Defendants.

Representative Bennie G. Thompson,
et al., Plaintiffs,

v.

Federal Election Commission,
et al., Defendants.

No. 02–582 CKK,KLH,RJL, 02–581
CKK,KLH,RJL, 02–633
CKK,KLH,RJL, 02–751
CKK,KLH,RJL, 02–753
CKK,KLH,RJL, 02–754
CKK,KLH,RJL, 02–781
CKK,KLH,RJL, 02–874
CKK,KLH,RJL, 02–875
CKK,KLH,RJL.

United States District Court,
District of Columbia.

May 1, 2003.

See also 251 F.Supp.2d 919.

Edward W. Warren, Kenneth W. Starr, Grant M. Dixton, Kirkland & Ellis, Washington, DC, L. Lynn Hogue, pro hac vice, Harry W. MacDougald, pro hac vice, Valle Simms Dutcher, Southeastern Legal Foun-

dation, Atlanta, GA, G. Hunter Bates, Goshen, KY, for Mitch McConnell, Bob Barr.

Kenneth W. Starr, Kirkland & Ellis, Washington, DC, for Mike Pence, Bill Pryor, Libertarian Nat. Committee, Inc., Alabama Republican Executive Committee, Libertarian Party of Ill., DuPage Politiocal Action Counsil, Jefferson County Republican Executive Committee, Associated Builders and Contractors, Inc., Indiana Family InstituteClub for Growth, Thomas McInerney, Martin Connors, Barret Austin O'Brock.

Mark J. Lopez, Amer. Civ. Liberties Union Foundation, New York City, Kenneth W. Starr, Kirkland & Ellis, Washington, DC, for American Civil Liberties Union.

Edward W. Warren, Kenneth W. Starr, Kannon Kumar Shanmugam, Grant M. Dixton, Kirkland & Ellis, Washington, DC, for Center for Individual Freedom, 60 Plus Ass'n, ProEnglish.

Kenneth W. Starr, Grant M. Dixton, Kirkland & Ellis, Washington, DC, for National Right to Life Committee Educational Trust Fund.

Cleta Deatherage Mitchell, Foley & Lardner, Washington, DC, Charles Justin Cooper, Cooper & Kirk, PLLC, Washington, DC, for National Rifle Ass'n of America, NRA Political Victory Fund.

James Matthew Henderson, Sr., American Center for Law & Justice, Washington, DC, for Tim Echols, Windy Echols, Tim McDow, Donna McDow, Chuck Mitchell, Pam Mitchell, Kevin Solid, Bonnie Solid John White, Cynthia White, Patrick J. Mahoney.

Jan W. Baran, Wiley Rein & Fielding, LLP, Washington, DC, for Chamber of Commerce of U.S., National Ass'n of Manufacturers, U.S. Chamber Political Action Committee, Nat. Ass'n of Wholesaler-Distributors, California Democratic Party, Shawn Steel, Timothy J, Morgan, Barbara Alby, Santa Cruz County Republican Central Committee, Douglas R. Boyd, Sr.

Donald John Mulvihill, Cahill, Gordon & Reindel, Washington, DC, for National Ass'n of Broadcasters.

Laurence Edward Gold, American Federation of Labor, Washington, DC, for American Federation of Labor and Congress of Industrial Organizations, AFL-CIO Committee on Political Educ. Political Contributions Committee.

William J. Olson, William J. Olson, P.C., McLean, VA, Herbert W. Titus, pro hac vice, Troy A. Titus, P.C., Virginia Beach, VA, for Ron Paul, Gun Owners of America, Inc., Gun Owners of America Political Victory Fund, Realcampaignreform.org, Citizens United, Citizens United Political Victory Fund, Michael Cloud, Carla Howell.

Bobby Roy Burchfield, Thomas Overton Barnett, Covington & Burling, Washington, DC, for Republican Nat. Committee, Mike Duncan, Republican Party of Colorado, Republican Party of Ohio, Republican Party of New Mexico, Dallas County (Iowa) Republican County Central Committee.

Jan W. Baran, Wiley Rein & Fielding, LLP, Washington, DC, Deborah B. Caplan, pro hac vice, Lance Herman Olson, pro hac vice, Olson, Hagel, Waters & Fishburn, Sacramento, CA, for Art Torres, Yolo County Democratic Central Committee, California Republican Party.

David A. Wilson, Hale & Dorr, Washington, DC, Brenda Wright, pro hac vice, John C. Bonifaz, pro hac vice, Bonita Tenneriello, pro hac vice, Lisa J. Danetz, pro hac vice, National Voting Rights Institute, Boston, MA, for Victoria Jackson Gray Adams, Carrie Bolton, Cynthia Brown, Derek Cressman, Victoria Fitzgerald, Anurada Joshi, Peter Kostmayer, Nancy Russell, Kate Seely-Kirk, Rose Taylor, Stephanie L. Wilson, California Public Interest Research Group, Massachusetts Public Interest Research Group, New Jersey Public Interest Research Group, U.S. Public Interest Research Group, Fannie Lou Hamer Project, Association of Community Organizers for Reform Now.

Sherri Lynn Wyatt, Washington, DC, Cherlyn F. Freeman-Watkins, Washington, DC, for Bennie G. Thompson, Earl F. Hilliard.

Lawrence H. Norton, Richard B. Bader, Stephen Hershkowitz, David Kolker, Acting Asst. Gen. Counsel, Robert W. Bonham III, Vivien Clair, Holly J. Baker, Colleen T. Sealander, Harry Summers, Benjamin A. Streeter III, Greg Mueller, William Shackelford, Kevin Deeley, Leigh G. Hildebrand, Brant Levine, Michelle Abellera, Mark Goodin, Federal Election Commission, Washington, DC, for Defendant Federal Election Commission.

Roger M. Witten, Seth P. Waxman, Randolph D. Moss, Lynn Bregman, Eric J. Mogilnicki, Edward C. DuMont, Michael D. Leffel, Anja L. Manuel, Stacy E. Beck, A. Krisan Patterson, Jennifer L. Mueller, Wilmer, Cutler & Pickering, Washington, DC, Bradley S. Phillips, Michael R. Doyen, Stuart N. Senator, Deborah N. Pearlstein, Randall G. Sommer, Shont E. Miller, Munger, Tolles & Olson, LLP, Los Angeles, CA, David J. Harth, Charles G. Curtis, Jr., Monica P. Medina, Michelle M. Umberger, Sarah E. Reindl, Heller Ehrman White & McAuliffe LLP, Madison, WI, Frederick A.O. Schwarz, Jr., E. Joshua Rosenkranz, Prof. Burt Neuborne, Elizabeth Daniel, Laleh Ispahani, Adam H. Morse, Brennan Center for Justice, New York, NY, Fred Wetheimer, Alexandra Edsall, Democracy 21, Washington, DC, for Defendant-Intervenors: Senators John McCain, Russell Feingold, Olympia Snowe, James Jeffords, Representatives Christopher Shays, Martin Meehan, James Jeffrods.

Theodore C. Hirt, Douglas N. Letter, James J. Gilligan, Terry M. Henry, Rupa Bhattacharyya, Michael S. Raab, Dana J. Martin, Andrea Gacki, Marc Kesselman, Serrin Turner, Irene M. Solet, Colette G. Matzzie, Ara B. Gershengorn, John Knepper, Robert D. McCallum, Jr., Shannen Coffin, Joseph H. Hunt, U.S. Dept. of Justice, Civ. Div., Washington, DC, for U.S., John Ashcroft, U.S. Dept. of Justice, Federal Communications Comm'n.

Before KAREN LECRAFT HENDERSON, Circuit Judge, and KOLLAR–KOTELLY and LEON, District Judges.

**MEMORANDUM OPINION**

PER CURIAM[1].

Presently before this three-judge District Court are eleven consolidated actions challenging as unconstitutional the Bipartisan Campaign Reform Act of 2002, Pub.L. No. 107–155, 116 Stat. 81 (2002) ("BCRA") and seeking declaratory and injunctive relief to prohibit its enforcement. The wide range of legal challenges raised by this litigation are highly complex, interrelated, and raise issues of fundamental importance not only to the conduct and financing of federal election campaigns but to the other rights involved that we enjoy under the Constitution. Because of the complexity of our positions, this *per curiam* opinion, by Judge Kollar–Kotelly and Judge Leon, includes a schematic description of the three-judge panel's conclusions in regard to each of BCRA's challenged provisions and a chart as to the rulings on each provision's constitutionality. The *per curiam* opinion also includes: (1) a brief history of campaign finance regulation in the United States (pp. 188–201); (2) the legislative history behind BCRA's enactment (pp. 201–206); (3) a procedural history of the litigation in this case (pp. 206–209); (4) a description of the specific provisions in BCRA at issue in these lawsuits (pp. 209–220); (5) certain Findings of Fact relating to the identities of the parties and BCRA's disclosure provisions (pp. 220–227); and (6) conclusions of law relating to claims of the Paul Plaintiffs and most of BCRA's disclosure provisions (pp. 227–233). The separate opinions of each judge hearing this matter follow thereafter.

**I. DESCRIPTION AND CHART OF THE COURT'S RULINGS**

In light of the number of provisions in BCRA being challenged, the complexity of the issues presented by each challenge, and the variety of positions and voting

1. Judge Henderson does not join this opinion.

combinations taken by the three judges on this District Court, we set forth a brief description and a chart, on a section by section basis, of the various rulings.

## A. Title I

Section 323(a) of BCRA bans national parties from soliciting, receiving, directing, transferring, and spending nonfederal funds (i.e., soft money). Judge Henderson strikes this section down as unconstitutional in its entirety. Judge Leon, for different reasons, files a concurrence, joining with Judge Henderson, except with respect to the ban on national parties from using (i.e., "directing," "transferring," and "spending") nonfederal funds (i.e., soft money) for "federal election activity" of the type defined in Section 301(20)(A)(iii). As to that type of conduct, Judge Leon upholds the constitutionality of Congress's ban on the use of nonfederal funds by national parties for Section 301(20)(A)(iii) communications. Judge Kollar–Kotelly upholds Section 323(a) in its entirety. Accordingly, Judge Leon's decision regarding Section 323(a) controls.

Section 323(b) prohibits state parties from using nonfederal money for "federal election activities" as defined in Section 301(20)(A) of BCRA. Judge Henderson strikes these sections down as unconstitutional in their entirety. Judge Leon, for different reasons, joins Judge Henderson in a separate concurrence, but only with respect to those party activities set forth in Subsections (i), (ii), and (iv) of Section 301(20)(A). As to Section 301(20)(A)(iii), Judge Leon upholds the constitutionality of Congress's prohibition on state and local parties from spending nonfederal funds for communications that promote, oppose, attack or support a specific federal candidate. In a separate opinion, Judge Kollar Kotelly finds Section 323(b) constitutional and concurs with Judge Leon's discussion of Section 301(20)(A)(iii).

Section 323(d) prohibits national, state, and local parties from soliciting funds for, or making donations to, § 501(c) organiza-

tions that make expenditures, or disbursements, in connection with federal elections, or to § 527 national organizations. Judge Henderson strikes this section down as unconstitutional in its entirety. Judge Leon, for different reasons, joins in that conclusion in a separate concurrence. Judge Kollar–Kotelly files a separate dissent in which she finds the entire section constitutional.

Section 323(e) prohibits, but for certain enumerated exceptions, federal officeholders and candidates from soliciting, receiving, directing, transferring, or spending, nonfederal money in connection with any local, state, or federal election. Judge Henderson and Judge Kollar–Kotelly, for different reasons, in separate opinions uphold the constitutionality of this section in its entirety. Judge Leon concurs with respect to the restriction on federal officeholders and candidates receiving, directing, transferring or spending any nonfederal funds in connection with any federal or state election, but files a separate dissent with regard to any prohibitions on a federal candidate, or officeholder, from soliciting funds for the national parties.

Section 323(f) prohibits state officeholders and candidates from using nonfederal funds for public communications that refer to a clearly identified candidate for federal office and that promote, oppose, attack, or support a candidate for this office. Judge Leon upholds this section in its entirety. Judge Kollar–Kotelly concurs with Judge Leon's opinion. Judge Henderson, dissents and finds the entire section unconstitutional.

## B. Title II

Section 201 of BCRA sets forth a primary, and "backup" definition, of an "electioneering communication" (i.e., so-called "issue ads"). In addition, it sets forth certain disclosure requirements for those who fund these electioneering communica-

tions. Judge Henderson strikes down both the primary and backup definition as unconstitutional. Judge Leon, for different reasons, concurs in her judgment with respect to the primary definition. Judge Kollar–Kotelly dissents and upholds the primary definition as constitutional as discussed in her separate opinion. With respect to the backup definition, Judge Leon, who writes a separate opinion, upholds its constitutionality with its final clause severed. Judge Kollar–Kotelly, as expressed in her opinion, concurs in that conclusion solely as an alternative to this Court's finding that the primary definition is unconstitutional. Finally, with regard to Section 201's disclosure requirements, Judge Kollar–Kotelly and Judge Leon, for the reasons set forth in the *per curiam* opinion, uphold their constitutionality with one exception. Judge Henderson strikes down the disclosures requirements in a separate dissent.

Section 202 provides that disbursements by persons for electioneering communications, or contracts to purchase the same, that are coordinated with either a federal candidate or a candidate committee, or a political party committee will be treated as contributions to that candidate's campaign or political party committee. Judge Kollar–Kotelly and Judge Leon, for the reasons set forth in the *per curiam* opinion, find this section constitutional. Judge Henderson, in a separate dissent concludes that this Section is unconstitutionally overbroad.

Section 203 of Title II prohibits labor unions, corporations and national banks from using money from their general treasury to fund "electioneering communications," as defined by Section 201. Instead, under Section 203, such communications must be paid from a separately segregated fund ("SSF"). Section 203 also includes an exception from the SSF requirement for certain nonprofit corporations (*i.e.,* the

"Snowe–Jeffords exception"). Judge Kollar–Kotelly upholds this section as constitutional. Judge Leon joins Judge Kollar–Kotelly's opinion upholding the constitutionality of this section as it applies to the backup definition in Section 201. Judge Henderson strikes down this Section as unconstitutional in its entirety. Judge Kollar–Kotelly and Judge Leon additionally uphold the disclosure and SSF requirements as well as the Snowe–Jeffords exemption provision for certain nonprofit corporations organized under Sections 501(c)(4) and 527 of the Internal Revenue Code in their respective opinions.

Section 204 ("The Wellstone Amendment"), in effect, withdraws the Snowe–Jeffords exception of Section 203. Judge Henderson strikes down Section 204 in its entirety. Judge Leon concurs in her result as it applies to MCFL exempt organizations only. As to nonprofit corporations that do not qualify for the MCFL exemption, Judge Leon concurs with Judge Kollar–Kotelly's conclusion, but for different reasons, in upholding Section 204 as it applies to non MCFL organizations.

Section 212 provides certain reporting requirements for independent expenditures. Judge Kollar–Kotelly and Judge Leon, for the reasons set forth in the *per curiam* opinion, conclude that challenge to this provision is not ripe for review, and therefore hold that the Court does not have jurisdiction to resolve the plaintiffs' challenges at this time. Judge Henderson dissents from this view and finds Section 212 unconstitutional in its entirety.

Section 213 requires national parties, in essence, to choose between making coordinated expenditures under the Party Expenditures Provision or unlimited independent expenditures on behalf of their federal candidates. All three judges concur that this section is unconstitutional. Judge Henderson's opinion includes a discussion of her separate reasons. Judge

Kollar–Kotelly concurs in Judge Leon's separate opinion on this section.

Section 214 addresses coordinated expenditures paid for by persons other than party committees and candidate committees. Section 214 repeals the current FEC regulations on coordinated expenditures, and directs the FEC to promulgate new regulations that do not require "an agreement or formal collaboration to establish coordination." Judge Kollar–Kotelly and Judge Leon, for the reasons set forth in the *per curiam* opinion, find that the plaintiffs' challenge under Section 214(b) and Section 214(c) is nonjusticiable and the Court therefore lacks jurisdiction to consider their challenge. As to Sections 214(a) and 214(d), however, they find those sections constitutional for the reasons set forth in the *per curiam* opinion. Judge Henderson dissents, finding the Section unconstitutional in its entirety.

## C. *Title III and V*

Sections 304, 316, & 319, collectively known as the "Millionaire Provisions," allow opponents of self-financed candidates, and in certain circumstances, to raise money in larger increments and accept unlimited coordinated party expenditures. All three judges conclude, for the reasons set forth in Judge Henderson's opinion, that this Court lacks standing to entertain challenges to these provisions.

Section 305 denies a candidate the "lowest unit charge" for broadcast advertisements on radio and television unless the candidate promises not to refer to another candidate in his or her advertisements. For the reasons set forth in Judge Henderson's opinion, all three judges conclude that this Court lacks standing to entertain the plaintiffs' challenge at this time.

As explained in Judge Henderson's opinion, the Court similarly finds that the plaintiffs do not have standing to challenge Section 307, which increases and indexes contribution limits.

Section 311 establishes certain disclosure requirements for the sponsors of electioneering communications. Judge Kollar–Kotelly and Judge Leon, for the reasons set forth in the *per curiam* opinion, uphold this provision as constitutional. Judge Henderson, dissents, and finds this section unconstitutional for the reasons set forth in her opinion.

Section 318 prohibits donations by minors to federal candidates, or to a committee of a political party. All three judges agree that this section is unconstitutional. Each judge writes a separate concurrence setting forth his/her reasoning as to this section.

Section 504 requires broadcast licensees to collect and disclose records of any request to purchase broadcast time for communications that "is made by or on behalf of a legally qualified candidate for public office" or that relates "to any political matter of national importance," including communications relating to "a legally qualified candidate," "any election to federal office," and "a national legislative issue of public importance." Judge Henderson finds this section unconstitutional. Judge Leon and Judge Kollar–Kotelly, concur in that result, but not in her reasoning. Judge Kollar–Kotelly concurs in Judge Leon's separate opinion on this section.

Chart of the Court's Rulings

| BCRA Provision | Constitutional | Unconstitutional | Nonjusticiable |
|---|---|---|---|
| 323(a): nonfederal fund restrictions on national parties | **Judge Kollar–Kotelly** **Judge Leon** (only as to using nonfederal funds for 301(20)(A)(iii) activities) | **Judge Henderson** **Judge Leon** (except as to using nonfederal funds for 301(20)(A)(iii) activities) | |
| 323(b): nonfederal fund restrictions on "federal election activity" by state and local parties | **Judge Kollar–Kotelly** **Judge Leon** (only as to 301(20)(A)(iii) activities) | **Judge Henderson** **Judge Leon** (only as to 301(20)(A)(i), (ii), (iv) activities) | |
| 301(20): definition of "federal election activity" | **Judge Kollar–Kotelly** **Judge Leon** (only as to 301(20)(A)(iii)) | **Judge Henderson** **Judge Leon** (only as to 301(20)(A)(i), (ii), (iv)) | |
| 323(d): nonfederal fund restrictions on tax-exempt organizations | **Judge Kollar–Kotelly** | **Judge Henderson** **Judge Leon** | |
| 323(e): nonfederal fund restrictions on federal candidates | **Judge Henderson** **Judge Kollar–Kotelly** **Judge Leon** (except solicitation of nonfederal funds) | **Judge Leon** (only as to solicitation of nonfederal funds) | |
| 323(f): nonfederal fund restrictions on state candidates | **Judge Kollar–Kotelly** **Judge Leon** | **Judge Henderson** | |
| 201: "electioneering communication" definition | **Judge Kollar–Kotelly** (primary definition and, in the alternative, backup definition) **Judge Leon** (backup definition only) | **Judge Henderson** (primary and backup definitions) **Judge Leon** (only as to primary definition) | |
| 201: disclosure of "electioneering communications" | **Judge Kollar–Kotelly** (severing subsection (5)) **Judge Leon** (severing subsection (5)) | **Judge Henderson** **Judge Kollar–Kotelly** (subsection (5) only) **Judge Leon** (subsection (5) only) | |
| 202: coordinated "electioneering communications" as contributions | **Judge Kollar–Kotelly** **Judge Leon** | **Judge Henderson** | |
| 203: prohibition of "electioneering communications" by corporations and unions | **Judge Kollar–Kotelly** **Judge Leon** (as to backup definition) | **Judge Henderson** | |
| 204: nonprofit organization exception ("Wellstone Amendment") | **Judge Kollar–Kotelly** **Judge Leon** (as to non-MCFL groups) | **Judge Henderson** **Judge Leon** (as to MCFL groups) | |
| 212: disclosure of independent expenditures | | **Judge Henderson** | **Judge Kollar–Kotelly** **Judge Leon** |
| 213: choice between independent and coordinated expenditures | | **Judge Henderson** **Judge Kollar–Kotelly** **Judge Leon** | |
| 214: definition of coordinated communications | **Judge Kollar–Kotelly** (as to 214(a) and 214(d)) **Judge Leon** (as to 214(a) and 214(d)) | **Judge Henderson** | **Judge Kollar–Kotelly** (as to remainder of 214) **Judge Leon** (as to remainder of 214) |

| BCRA Provision | Constitutional | Unconstitutional | Nonjusticiable |
|---|---|---|---|
| 304, 316, & 319: "Millionaire Provisions" | | | Judge Henderson<br>Judge Kollar–Kotelly<br>Judge Leon |
| 305: limitation on lowest unit charge for candidates referring to other candidates | | | Judge Henderson<br>Judge Kollar–Kotelly<br>Judge Leon |
| 307: increased contribution limits and indexing of limits | | | Judge Henderson<br>Judge Kollar–Kotelly<br>Judge Leon |
| 311: identification of sponsors | Judge Kollar–Kotelly<br>Judge Leon | Judge Henderson | |
| 318: prohibition of donations by minors | | Judge Henderson<br>Judge Kollar–Kotelly<br>Judge Leon | |
| 504: disclosure of broadcasting records | | Judge Henderson<br>Judge Kollar–Kotelly<br>Judge Leon | |

## II. BACKGROUND

It is necessary to canvass the history of federal campaign finance regulation in order to provide the appropriate context for understanding the structure and practices of federal campaign finance that Congress confronted when it enacted BCRA. *See United States v. UAW–CIO*, 352 U.S. 567, 570, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) ("*UAW*") ("Appreciation of the circumstances that begot this statute is necessary for its understanding, and understanding of it is necessary for adjudication of the legal problems before us."). Following this overview, the Court will move to a discussion of the legislation enacted by Congress to resolve the perceived shortcomings of the pre-BCRA campaign finance structure and a procedural history of the litigation in this case.

### A. *The Framework of Federal Campaign Finance Regulation*

One might be tempted to agree with Plaintiffs' assertion that the history of federal campaign finance regulation is "relatively short," McConnell Br. at 9, if one were comparing it to the history of Western civilization. In the judgment of Judge Kollar–Kotelly and Judge Leon, however, the history of federal campaign finance regulation, having its origins in the Administration of President Theodore Roosevelt, is a long-standing and recurring problem that has challenged our government for nearly half of the life of our Republic.

At the close of the nineteenth century, the concentration of the nation's wealth in the hands of a "small portion of the population" began to threaten the stability and integrity of the political system. *UAW*, 352 U.S. at 570, 77 S.Ct. 529 (quoting 2 Morrison and Commager, *The Growth of the American Republic* at 355 (4th ed.1950)). At the time, the widely accepted view was that "aggregated capital unduly influenced politics, an influence not stopping short of corruption." *Id.* To that end, many states began experimenting with disclosure laws requiring candidates and their political committees to make public the sources and amounts of contributions to their campaigns and the amounts of their campaign expenditures. *Id.* at 570–571, 77 S.Ct. 529. These laws proved to be largely futile. *Id.* at 571, 77 S.Ct. 529.

Concern with both the size and source of campaign funds relating to the 1904 presidential campaign "crystallized popular sentiment for federal action to purge national politics of what was conceived to be the pernicious influence of 'big money' campaign contributions." *Id.* at 571–72, 77 S.Ct. 529. President Roosevelt's presidential messages to Congress in both 1905 and 1906, strongly encouraged Congress to enact a law prohibiting political contributions by corporations. 40 Cong. Rec. 96 (1905); 41 Cong. Rec. 22 (1906). In response to these concerns, Congress enacted the Tillman Act, Ch. 420, 34 Stat. 864, which prohibited corporations from making any contribution in connection with any election for federal office and which represented "the first concrete manifestation of a continuing congressional concern for elections free from the power of money." *UAW*, 352 U.S. at 575, 77 S.Ct. 529 (internal quotation marks and citation omitted). The Tillman Act demarcates the beginning of the "modern era" of federal campaign finance regulation and is the predecessor of the prohibition on corporate and labor union contributions and expenditures in connection with any federal election from their general treasuries that appears in the Federal Election Campaign Act ("FECA"). *Buckley v. Valeo*, 519 F.2d 821, 904 (D.C.Cir.1975), *aff'd in part, rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).[2] The "underlying philosophy" of the Tillman Act was "to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." *UAW*, 352 U.S. at 575, 77 S.Ct. 529.

In 1909, Congress endeavored to broaden the Tillman Act by including within the Act's scope, state legislative races and in-kind contributions. *See id.* While this effort ended in failure, in 1910, Congress "translated popular demand for further curbs upon the political power of wealth into a publicity law that required committees operating to influence the results of congressional elections in two or more States to report all contributions and disbursements and to identify contributors and recipients of substantial sums." *Id.* (citing Act of June 25, 1910, ch. 392, §§ 5–6, 36 Stat. 822, 823) (disclosure required of all transactions greater than $100). The 1910 law further directed the reporting of expenditures exceeding $50, made independently of a political committee for the purpose of influencing congressional elections in more than one State. Act of June 25, 1910, ch. 392, §§ 7, 36 Stat. 824. In 1911, Congress further amended the 1910 Act, and for the first time, included overall expenditure ceilings on campaigns for the House ($5,000) and for the Senate ($10,-000). *Buckley*, 519 F.2d at 904–905 (citing Act of Aug. 19, 1911, ch. 33, § 2, 37 Stat. 26). Additionally, the 1911 provisions required all candidates for the Senate and the House of Representatives to make detailed reports with respect to their nominating and election campaigns. *UAW*, 352 U.S. at 576, 77 S.Ct. 529. Hence, candidate disclosures included primary, convention, and other pre-nomination periods. *Buckley*, 519 F.2d at 905. The 1911 law also prohibited candidates from promising employment for the purpose of securing an individual's support. *UAW*, 352 U.S. at

---

2. The ban on corporate and labor union contributions and expenditures was eventually codified at 18 U.S.C. § 610, and later transferred to the Federal Election Campaign Act, 2 U.S.C. 441b, when Congress re-evaluated the Act in the aftermath of the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S.

1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Federal Election Campaign Act Amendments of 1976, P.L. 94–283, 90 Stat. 475. *See also* S.Rep. No. 677, 94th Cong., 2d Sess. 2–3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 929, 930–31.

576, 77 S.Ct. 529 (citing 37 Stat. 25). In 1918, Congress again amended the law and added criminal penalties for offering anything of value to influence voting. *Id.* (citing Act of Oct. 16, 1918, ch. 187, 40 Stat. 1013).

In the only instance of a criminal prosecution under the Act, Truman Newberry was convicted in Michigan of violating the expenditure ceiling in his 1918 primary campaign for the United States Senate. Newberry's conviction was overturned by the Supreme Court in 1921. The Court invalidated the law insofar as it extended to Senate primary elections. *Newberry v. United States,* 256 U.S. 232, 258, 41 S.Ct. 469, 65 L.Ed. 913 (1921) ("We cannot conclude that authority to control party primaries or conventions for designating candidates was bestowed on Congress by the grant of power to regulate the manner of holding elections."). Four Justices of the Court held that primaries were intra-party affairs not amenable to congressional regulation under the Elections Clause. *Id.* Justice Joseph McKenna, who provided the crucial fifth vote for judgment, limited the reach of the decision to the facts by concluding that the statute under consideration was enacted prior to the Seventeenth Amendment and, therefore, left open the question of whether that Amendment gave Congress authority to regulate Senate primary elections. *Id.*

In 1925, in the wake of *Newberry,* Congress passed the Federal Corrupt Practices Act of 1925, ch. 368, tit. III, 43 Stat. 1070, which was a comprehensive amalgamation of the surviving provisions of the existing campaign finance laws. *UAW,* 352 U.S. at 576, 77 S.Ct. 529. The Federal Corrupt Practices Act strengthened the Tillman Act by broadening the definition of contribution, extending the ban on corporate contributions to Delegates and Resident Commissioners that were elected to Congress, and punishing the recipient of any illegal contribution in addition to the contributor. *Id.* at 577, 77 S.Ct. 529. The law also generally broadened disclosure provisions. *Buckley,* 519 F.2d at 905.

The Supreme Court upheld the Federal Corrupt Practices Act in the *Burroughs* case of 1934:

> The power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress. If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted, and the end to be attained, are matters for congressional determination alone. Congress reached the conclusion that public disclosure of political contributions, together with the names of contributors and other details, would tend to prevent the corrupt use of money to affect elections. The verity of this conclusion reasonably cannot be denied. When to this is added the requirement contained in section 244, that the treasurer's statement shall include full particulars in respect of expenditures, it seems plain that the statute as a whole is calculated to discourage the making and use of contributions for purposes of corruption.

*Burroughs v. United States,* 290 U.S. 534, 547–48, 54 S.Ct. 287, 78 L.Ed. 484 (1934) (internal citation omitted). As is obvious from this language, the *Burroughs* opinion provided Congress with broad discretion to regulate federal elections including the financing of campaigns.

The next instance of congressional action in the area of campaign finance was in 1940 when Congress amended the Hatch Act, a law which placed restrictions on the political activities of the civil service, by

making it unlawful for any political committee to receive contributions totaling more than $3,000,000 or to make expenditures of more than that amount in any calendar year. *UAW*, 352 U.S. at 577, 77 S.Ct. 529 (citing Act of July 19, 1940, ch. 640, 54 Stat. 767). The Hatch Act amendments also limited gifts to candidates or political committees to $5,000 in any calendar year. *Buckley*, 519 F.2d at 905 (citing Act of July 19, 1940, ch. 640, 54 Stat. 767).

One year later, the Supreme Court again returned to the question it had squarely addressed in *Newberry:* namely whether congressional power under the Elections Clause extended to the pre-election period. *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). This time, the Court upheld the congressional enactment holding that "the authority of Congress, given by [Article I, section 4], includes the authority to regulate primary elections when, as in this case, they are a step in the exercise by the people of their choice of representatives in Congress." *Id.* at 317, 61 S.Ct. 1031. The case involved a Louisiana Democratic primary for the House of Representatives, which history showed was the determinant of who would win the general election. *Id.* at 314, 61 S.Ct. 1031. The Supreme Court in *Classic* disregarded *Newberry* because only four Justices in *Newberry* had adopted the view that the Elections Clause forbade congressional regulation of primary elections. Consequently, as the issue had never "been prejudged by any decision of [the Supreme] Court," *Classic* overruled the *Newberry* plurality. *Id.* at 317, 61 S.Ct. 1031; *see also id.* at 325 n. 8, 61 S.Ct. 1031 ("No conclusion is to be drawn from the failure of the Hatch Act, to enlarge § 19 by provisions specifically applicable to primaries. Its failure to deal with the subject seems to be attributable to constitutional doubts, stimulated by *Newberry v. United States*, which are here resolved.") (internal citations omitted).

Under *Classic*, Congress was given authority to impose criminal penalties for activities of state officials conducting a primary election for federal candidates under the auspices of state law. *See id.* at 307, 61 S.Ct. 1031.

Following the rise of organized labor during World War II, in 1943, Congress passed the Smith–Connally Act which included a section that extended the Federal Corrupt Practices Act to organized labor. *UAW*, 352 U.S. at 578, 77 S.Ct. 529 (citing War Labor Disputes Act (Smith–Connally Act), ch. 144, § 9, 57 Stat. 163, 167) ("Wartime strikes gave rise to fears of the new concentration of power represented by the gains of trade unionism. And so the belief grew that, just as the great corporations had made huge political contributions to influence governmental action or inaction, whether consciously or unconsciously, the powerful unions were pursuing a similar course, and with the same untoward consequences for the democratic process."). Congressman Gerald Landis, the author of this provision in the Smith–Connally Act observed that "[t]he public was aroused by many rumors of huge war chests being maintained by labor unions, of enormous fees and dues being extorted from war workers, of political contributions to parties and candidates which later were held as clubs over the head of high Federal officials." *Id.* at 579, 77 S.Ct. 529 (quoting Hearings before a Subcommittee of the House Committee on Labor on H.R. 804 and H.R. 1483, 78th Cong., 1st Sess. 1, 2, 4).

Despite the provision in the Smith–Connally Act tightening the reins on political activity of labor unions, Congress was prompted to investigate "enormous" financial outlays by some unions in connection with the 1944 national elections. *Id.* The Senate's Special Committee on Campaign Expenditures investigated and concluded

that while there was " 'no clear-cut violation of the Corrupt Practices Act,' " *id.* at 580, 77 S.Ct. 529 (quoting S.Rep. No. 101, 79th Cong., 1st Sess. 23), the law was being evaded by large scale spending by labor unions on expenditures (as opposed to contributions), which were not explicitly prohibited by the Federal Corrupt Practices Act, *id.*[3] Congress, it appears, considered a prohibition on contributions to be equally applicable to expenditures. *Id.* at 582, 77 S.Ct. 529 (" 'The committee is firmly convinced, after a thorough study of the provisions of the act, the legislative history of the same, and the debates on the said provisions when it was pending before the House, that the act was intended to prohibit such expenditures.' ") (quoting H.R.Rep. No. 2739, 79th Cong., 2d Sess. 40). In commenting on how this exception threatened to eviscerate the Federal Corrupt Practices Act, the House Committee studying this problem stated that " '[t]he intent and purpose of the provision of the act prohibiting any corporation or labor organization making any contribution in connection with any election would be wholly defeated if it were assumed that the term 'making any contribution' related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit [directly] contributing to a candidate and yet permit the expenditure of large sums in his behalf?' " *Id.* at 581, 77 S.Ct. 529 (quoting H.R.Rep. No. 2739, 79th Cong., 2d Sess. 40).

Therefore, in order to prevent further "evasion" and to "plug the existing loophole," Congress "again acted to protect the political process from what it deemed to be the corroding effect of money employed in elections by aggregated power." *Id.* at 582, 77 S.Ct. 529 (internal quotation and citations omitted). Accordingly, in 1947, Congress passed the Taft–Hartley Act of 1947, ch. 120, 61 Stat. 136, which amended the Federal Corrupt Practices Act "to proscribe any 'expenditure' as well as 'any contribution' [and] to make permanent [its] application to labor organizations" in addition to corporations. *Id.* at 582–83, 77 S.Ct. 529. The Taft–Hartley Act implemented *Classic* by applying its provisions to primary elections. *Buckley,* 519 F.2d at 906.

Following the Taft–Hartley Act, from the late 1940's through the end of the 1950's, Congress sought unsuccessfully to amend the dollar expenditure limits to reflect more "realistic" costs, but no action was taken. *Id.* In 1960, the Senate passed a bill that strengthened reporting requirements for candidates and political committees, adopted individual contribution limits, rationalized current expenditure limits, and placed ceilings on Presidential campaigns. *Id.* The bill, however, died for lack of a companion in the House of Representatives. *Id.* In 1962, President Kennedy's Commission on Campaign Costs recommended "tax incentives and credits for small political contributions, realistic ceilings, and suspension of the equal time provision as to media debates." *Id.* In

---

**3.** A sampling of the extraordinary size of the expenditures by labor on federal elections demonstrates that "One [labor organization] was found to have an annual budget for 'educational' work approximating $1,500,000, and among other things regularly supplies over 500 radio stations with 'briefs for broadcasters.' Another, with an annual budget of over $300,000 for political 'education,' has distributed some 80,000,000 pieces of litera-

ture, including a quarter million copies of one article. Another, representing an organized labor membership of 5,000,000, has raised $700,000 for its national organizations in union contributions for political 'education' in a few months, and a great deal more has been raised for the same purpose and expended by its local organizations.' " *UAW,* 352 U.S. at 580–81, 77 S.Ct. 529 (quoting H.R.Rep. No.2093, 78th Cong., 2d Sess. 3).

1966, Congress passed a one dollar tax checkoff to provide public funding for Presidential general elections, which was later repealed in 1967. *Id.*

Late in 1971, Congress reinstituted the tax form checkoff to finance Presidential general elections and, in early 1972, passed the Federal Elections Campaign Act of 1971, Pub.L. No. 92–255, 86 Stat. 3 ("FECA"), requiring disclosure of all contributions in excess of $100 and disclosure of expenditures by all candidates and political committees spending more than $1000 per year. *Id.* The 1971 law also expressly provided corporations and unions with the ability to establish and administer separate, segregated funds for the purpose of making political contributions and expenditures. *Pipefitters Local Union No. 562 v. United States,* 407 U.S. 385, 410, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972).

Despite passage of FECA, the "infinite ability" to "eviscerate[ ] statutory limitations on contributions and expenditures," which amounted to "wholesale circumvention" became a source of further congressional concern. *Buckley,* 519 F.2d at 837. Congress concluded that costs for federal elections had increased at an " 'alarming' " rate. *Id.* (quoting H.R.Rep. No.93–1239, 93d Cong., 2d Sess. 3 (1974), U.S.Code Cong. & Admin. News 1974, p. 5587). Congress was further troubled by the "interaction" between large-scale campaign expenditures and a reliance "on large contributions from monied and special interests." *Id.* In Buckley, it was undisputed that "one percent of the people accounted for 90 percent of the dollars contributed to federal candidates, political parties and committees." *Id.* (citing agreed to Findings of Fact). It was also undisputed that illegal contributions to both parties were made in 1972 by Gulf Oil and by American Milk Producers, Inc., a large dairy cooperative. *Id.* at 838. Notably, the circuit court in *Buckley* concluded:

Large contributions are intended to, and do, gain access to the elected official after the campaign for consideration of the contributor's particular concerns. Senator Mathias not only describes this but also the corollary, that the feeling that big contributors gain special treatment produces a reaction that the average American has no significant role in the political process.

*Id.; see also id.* at 872 n. 32 ("Congress found and the District Court confirmed that such contributions were often made for the purpose of furthering business or private interests by facilitating access to government officials or influencing governmental decisions, and that, conversely, elected officials have tended to afford special treatment to large contributors.") (citations omitted). Indeed, the lower *Buckley* court documented the "lavish contributions by groups or individuals with special interests to legislators from both parties." *Id.* at 840 n. 37.

In 1974, in direct response to the 1972 elections which were a "watershed for public confidence in the electoral system," *id.* at 840, and the "shock of its aftermath," *id.* at 837, Congress enacted and President Gerald Ford signed the sweeping FECA Amendments of 1974. *Id.* Broadly speaking, the amendments imposed dollar limitations on contributions by individuals and by political committees to candidates for federal office, to political party committees, and to independent political committees. 2 U.S.C. § 441a(a). The 1974 amendments also imposed limits on expenditures that individuals, candidates, political committees, and political parties could spend to help federal candidates win elections. Moreover, the law treated expenditures that were "coordinated" with a candidate as contributions. 2 U.S.C. 441a(a)(7)(B)(i) ("[E]xpenditures made by any person in cooperation, consultation, or concert, with, or at the request or sugges-

tion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate."). The amendments also included a variety of recordkeeping and disclosure requirements. *See* 2 U.S.C. §§ 432–434. The Federal Election Commission was also created by the amendments and tasked with monitoring and enforcing the campaign finance laws. *See generally* 2 U.S.C. §§ 437c(b)(1), 437d(a), 437g. Finally the law, as amended, provided public funding primarily for qualified presidential candidates and some public funding for nominating conventions of major political parties.

The first day after the FECA amendments went into effect, the law was challenged. *Buckley*, 519 F.2d at 901. In a lengthy opinion, the United States Court of Appeals for the District of Columbia Circuit found all but one of the provisions of FECA constitutional. *Id.* at 843–44 (striking down disclosure provision 2 U.S.C. § 437a). In 1976, the Supreme Court affirmed in part and reversed in part the D.C. Circuit's ruling in its decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Generally speaking, in examining FECA's provisions against the free speech and association provisions of the First Amendment the Supreme Court found constitutional FECA's contribution limitations, *Buckley*, 424 U.S. at 23–38, 96 S.Ct. 612, and unconstitutional those provisions of FECA that imposed expenditure limitations, *id.* at 39–

59, 96 S.Ct. 612. The contribution-expenditure dichotomy first developed in *Buckley* was grounded in the Supreme Court's view that "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." *Id.* at 21, 96 S.Ct. 612 (observing that "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing."). Expenditure restrictions, on the other hand, "while neutral as to the ideas expressed, limit political expression at the core of our electoral process and of the First Amendment freedoms." *Id.* at 39, 96 S.Ct. 612 (internal quotation marks and citation omitted).

In *Buckley*, the Supreme Court upheld as well the general disclosure provisions contained in FECA. *Id.* at 60–84, 96 S.Ct. 612.[4] The Supreme Court likewise found constitutional the public funding scheme for presidential candidates. *Id.* at 85–109, 96 S.Ct. 612. Finally, the Supreme Court struck down the structure of the FEC as it was constituted under FECA in violation of the Appointments Clause of the Constitution. *Id.* at 109–143, 96 S.Ct. 612.

Hence, in the aftermath of Buckley, it was FECA's contribution restrictions that remained intact, while its expenditure provisions were vitiated.[5] Under FECA, as it emerged from Buckley, no "person"[6] was permitted to contribute in excess of $1,000

---

**4.** The D.C. Circuit's decision striking down 2 U.S.C. § 437a was not appealed to the Supreme Court. *Buckley*, 424 U.S. at 11 n. 7, 96 S.Ct. 612.

**5.** Following Buckley, there have been a number of important Supreme Court opinions that have addressed application of *Buckley* in other contexts. It is more appropriate to discuss these cases in the context of each Judge's separate opinion.

**6.** FECA defines "person" as "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government." 2 U.S.C. § 431(11).

to a candidate for federal office, 2 U.S.C. § 441a(a)(1)(A); no person could contribute to the political committees established and maintained by a national political party, in any calendar year which, in the aggregate, exceed $20,000, 2 U.S.C. § 441a(1)(B); and no person could contribute to any other political committee in any calendar year which, in the aggregate, exceed $5,000,2 U.S.C. § 441a(a)(1)(C).[7] In addition, no multicandidate political committee could contribute in excess of $5,000 to a candidate for federal office, 2 U.S.C. § 441a(a)(2)(A); no multicandidate political committee could contribute in excess of $15,000 to the political committees established and maintained by a national political party, 2 U.S.C. § 441a(a)(2)(B); and finally, no multicandidate political committee could contribute to any other political committee in any calendar year which, in the aggregate, exceeded $5,000, 2 U.S.C. § 441a(a)(2)(C). In order to "prevent evasion" of these limitations *Buckley* upheld the Act's $25,000 limitation on total contributions during any calendar year. *Buckley*, 424 U.S. at 38, 96 S.Ct. 612. As a result, under 2 U.S.C. § 441a(a)(3), no individual was permitted to make contributions aggregating more than $25,000 in any calendar year. 2 U.S.C. § 441a(a)(3).[8] In addition, under 2 U.S.C. § 441b, corporations and labor unions are prohibited from using their general treasury funds to "make a contribution or expenditure in connection with any election to any politi-

cal office." 2 U.S.C. § 441b(a). In sum, the Supreme Court found that:

> The overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression.

*Buckley*, 424 U.S. at 21–22, 96 S.Ct. 612. Indeed, what emerged from *Buckley* was a tightly focused regime whereby contributions (and coordinated expenditures) to candidates and political parties and committees were limited or even banned (in the case of corporate and union treasury funds) and independent political advocacy was left unimpeded.

Contribution is defined in FECA as including, "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i).

Since the adoption of FECA, it is clear that the Commission has struggled with interpreting the phrase "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). In 1975, the FEC examined the case of a local party committee that had established separate accounts for federal funds and for corporate contri-

---

**7.** Under BCRA, these contribution limits have been raised. Persons can now contribute $2,000 to candidates and $25,000 to national political party committees. BCRA §§ 307(a)(1), 307(a)(2); FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1). Also under BCRA, Congress has carved state party committees out of § 441a(a)(1)(C) and increased the contribution limit for state party committees from $5,000 to $10,000. BCRA § 102; FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1). Moreover, the contribution limits applicable to

candidates and national party committees have been indexed to the consumer price index and will increase with inflation. BCRA § 307(d); FECA § 315(c); 2 U.S.C. § 441a(c).

**8.** BCRA has increased the aggregate limit on individual contributions from $25,000 per year to $95,000 per two-year election cycle, of which $37,500 may be contributed to candidates. BCRA § 307(b); FECA § 315(a)(3); 2 U.S.C. § 441a(a)(3).

butions which were permitted under state law, but which were prohibited by federal law for use in connection with federal elections. In Advisory Opinion 1975–21, the Commission determined that the appropriate course was to have the local party allocate both its administrative expenses and its voter registration drives between the two accounts, given that these expenses had an impact on both state and federal elections. FEC Advisory Op.1975–21 (allocation based on the ratio of "the total amount which the [local party] directly contributes to and expends on behalf of Federal candidates, to ... the total of all direct contributions to and expenditures on behalf of all candidates-Federal, State, and local"). The FEC slightly reversed course, in Informational Letter 1976–72, where it determined that voter registration efforts could not be paid for from an account containing funds raised from corporate and union general treasuries. FEC Informational Letter 1976–72 ("Thus, even though the Illinois law apparently permits corporate contributions for State elections, corporate/union treasury funds may not be used to fund any portion of a registration or get-out-the-vote drive conducted by a political party.").

However, in its 1977 rulemakings implementing FECA, the Commission permitted any political committee to make a choice between creating a separate federal account for its federal election activities, or to establish a single account containing only funds subject to the federal contribution limits to finance all of its activities with respect to both state and federal elections. 11 C.F.R. § 102.6(a)(2) (1977). To the extent that segregated accounts were created, the committees were required to "allocate administrative expenses on a *reasonable basis* between their Federal and non-Federal accounts in proportion to the amount of funds expended on Federal and non-Federal elections, or on another reasonable basis." 11 C.F.R. § 106.1(e)(1977) (emphasis added). The following year, the Commission essentially reversed its 1976 advisory opinion and in Advisory Opinion 1978–10, determined that "the costs of [voter] registration and get-out-the-vote drives" by a state party committee "should be allocated between" federal and nonfederal accounts "in the same manner as other general party expenditures" under the Commission's 1977 regulations. FEC Advisory Op.1978–10. In Advisory Opinion 1979–17, the Commission extended the conclusions reached in Advisory Opinion 1978–10 regarding separate accounts to the national party committees. FEC Advisory Op.1979–17 ("[Regulations] thus would permit the RNC to establish and administer separate, segregated bank accounts through an auxiliary organization of the national party which accounts could be used for the deposit and disbursement of funds designated specifically and exclusively to finance national party activity limited to influencing the nomination or election of candidates for public office other than elective 'Federal office.'") (citation omitted).

Accordingly, by the middle of 1979, the FEC permitted national and state party committees to solicit and accept donations outside of FECA's source and amount limitations ("nonfederal money")[9] provided

---

9. There is a degree of skirmishing in the briefs over the appropriate terminology for "nonfederal money." Defendants use the phrase "soft money." Plaintiffs refer to "soft money" as "state-regulated" or "nonfederal" money. The Court has, for the most part, adopted the nomenclature "nonfederal" money because that is the term that the FEC has used during the rulemaking process implementing BCRA, Prohibited and Excessive Contributions: Non–Federal Funds or Soft Money, 67 Fed.Reg. 49064 (July 29, 2002) ("Because the term 'soft money' is used by different people to refer to a wide variety of funds under different circumstances, the Commission is using the term 'non-Federal

that these monies were placed in separate accounts from the federal funds. In other words, political committees were permitted to establish two sets of accounts-one for federally-regulated money (federal accounts) and one for non-federally regulated money (nonfederal accounts).[10]

Essentially, the FEC's opinions and rulemakings permitted state and national party committees to pay for the nonfederal portion of their administrative costs and voter registration and turnout programs with monies raised under relevant state laws (not FECA), even if those state laws were in direct contravention of FECA, such as permitting contributions from corporate and labor union general treasury funds. As a result, national and state

parties began to raise so-called "soft money," which described these nonfederal funds, not subject to FECA limits and restrictions, that were used to pay for these administrative and generic voter drive expenses.

With these developments, nonfederal funds became an increasingly important means of party financing. During the 1980 election, the RNC spent approximately $15 million in nonfederal funds and the DNC spent roughly $4 million, constituting 9% of the national parties total spending. Mann Expert Rep. at 12.[11] In 1984, the national parties spent collectively an estimated $21.6 million in nonfederal money, which accounted for 5% of their total spending. *Id.* By 1988, national party non-

funds' in the final rules rather than the term 'soft money.' "), even though BCRA uses the term "soft money," BCRA § 101 (entitled *"Soft money* of political parties") (emphasis added) and even though on occasion the Supreme Court has also used the phrase "soft money," *see, e.g., Colorado Republican Federal Campaign Committee v. FEC ("Colorado I"),* 518 U.S. 604, 616, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ("Unregulated 'soft money' contributions may not be used to influence a federal campaign, except when used in the limited, party-building activities specifically designated in the statute."). Despite the references in the case law and the statute to the term "soft money," for the sake of clarity in an area of law that demands absolute precision, the Court generally eschews the phraseology "hard money" or "soft money" in favor of "federal funds" or "nonfederal funds." Federal funds are those monies regulated under FECA, as amended, and nonfederal funds are those monies that may or may not be regulated under state law, but not federal law.

10. In 1979 Congress again amended FECA to exempt two new sets of activities from the definition of contribution and expenditure. First, state and local party disbursements for campaign materials such as pins, bumper stickers, and yard signs used in connection with volunteer activities on behalf of the party's nominees were exempted from FECA's contribution limits provided that the activity was paid for with federal money. 2 U.S.C.

§§ 431(8)(B)(ix), 9(B)(viii). The second exemption related to a state party's payment for "the costs of voter registration and [GOTV] activities" conducted on behalf of the party's presidential ticket. 2 U.S.C. §§ 431(8)(B)(xi), (9)(B)(ix). This exemption was also conditioned on the use of federal money for the activity. Hence, for both of these activities unlimited federal money could be used to pay for them because they were exempted from the definition of "contribution" and "expenditure." For state and local parties that opted to use nonfederal funds to pay for these activities, allocation was still permitted.

11. As Defense Expert Mann plainly concedes, "Just what amount of soft money activity the parties pursued in the 1980s is less certain [because] '[n]onfederal' funds were not subject to federal disclosure requirements, only to the disclosure laws in states where soft money was spent." Mann Expert Report at 12. It was not until 1992 that the FEC began collecting official data on national parties use of nonfederal funds, so any attempts at pinpointing the amount of nonfederal funds spent by the national parties before 1992 are estimates. Notably, Plaintiffs do not challenge any of the pre–1992 estimates (or any of the post–1992 data collected by the Commission). Therefore, the Court relies on these statistics.

federal money had increased to an approximate $45 million, or 11% of national party spending. *Id.*

In 1990, the FEC promulgated regulations to provide for some consistency in the methods used to determine the relative portions of federal and nonfederal money to be used in financing these generic party activities. Prior to 1990, the regulations specified that the allocation rate between nonfederal and federal accounts was to be done on a "reasonable basis." 11 C.F.R. § 106.1(e) (1977). The regulations promulgated by the Commission were designed to give certainty to this subjective standard and were in response to a district court's decision which held that the allocation rules required specific guidance from the Commission. *Common Cause v. FEC,* 692 F.Supp. 1391, 1396 (D.D.C.1987) ("Indeed, it is possible that the Commission may conclude that no method of allocation will effectuate the Congressional goal that all monies spent by state political committees on those activities permitted in the 1979 amendments be 'hard money' under the FECA. That is an issue for the Commission to resolve on remand.").[12] Under the new regulations, national party committees (other than Senate and House national party committees) were required to allocate at least 65% of their administrative and generic voter drive expenses[13] to their federal accounts in presidential election years and 60% in non-presidential election

years. 11 C.F.R. §§ 106.5(b)(2)(i), (ii)(1991). Senate and House committees were to allocate these expenses on the basis of the ratio of federal expenditures to total federal and nonfederal disbursements made by the committee during the two-year federal election cycle. 11 C.F.R. § 106.5(c)(i). For state and local parties, the allocation between the federal and non-federal accounts for these expenses were determined by the proportion of federal offices to all offices on a state's general election ballot. 11 C.F.R. § 106.5(d) (1991). Generally, the state parties' allocation rate was substantially lower than the national party allocation rate. Mann Expert Rep. at 14. The new rules also mandated that the national party committees disclose the details of their nonfederal accounts. 11 C.F.R. §§ 104.8(e), (f) (1991) (requiring national parties to report for nonfederal and building fund accounts the donating individual's name, mailing address, occupation or type of business, and the date of receipt and amount of any such donation). State parties, however, were exempted from these disclosure requirements. 11 C.F.R. § 104.9(a) (1991) (reporting committees required to disclose information pertaining to "the committee's federal account(s) only"). The Commission's regulations, therefore, provided the national parties with an incentive to channel these expenditures through state party committees, since this approach generally

---

**12.** The Court observes that *Common Cause v. FEC* demonstrates that as early as 1984, before any official statistics on nonfederal funds were kept by the Commission, there was concern over the influence of these monies on federal elections. However, the Commission in 1984 determined that, "Common Cause has not presented evidence of instances in which 'soft money' has been used to influence federal elections sufficient to justify the stringent rules proposed in its petition." *Common Cause,* 692 F.Supp. at 1393 (citing the Commission's April 17, 1986, Notice of Disposition).

**13.** The Commission permitted, *inter alia,* the following expenses to be allocated: administrative expenses, which included rent, utilities, office supplies, and salaries, 11 C.F.R. § 106.5(a)(2)(i) (1991); the direct costs of a fundraising program or event, where federal and nonfederal funds are collected by one committee, 11 C.F.R. § 106.5(a)(2)(ii) (1991); and "generic voter drives," which included voter identification, voter registration, and get-out-the-vote ("GOTV") drives where a specific candidate was not mentioned. 11 C.F.R. § 106.5(a)(2)(iv) (1991).

permitted more nonfederal dollars to be spent than if a national party spent the money without disclosing the sources of the funds.

In 1992, spending of nonfederal money by the national parties reached $80 million, or 16% of the national parties total spending. Mann Expert Rep. at 15 (citing to official figures from the FEC). Of that total amount, the national parties contributed only $2 million directly to state and local candidates. Mann Expert Rep. at 16. In addition, the two national parties transferred over $15 million to state party committees-two thirds of which was transferred to presidential election battleground states. *Id.* Along these lines, the national parties expended $14 million in nonfederal funds for "generic" party advertising, consisting predominantly of television advertisements that did not mention candidates names, but urged viewers to simply vote for a particular party or stressed themes from the presidential campaigns. *Id.* Although the Commission had only approved the use of nonfederal funds by the national parties "for the exclusive and limited purpose of influencing the nomination or election of candidates for nonfederal office," by 1992, with the new allocation rules firmly in place, national parties were using nonfederal money to impact federal elections as permitted by the Commission. FEC Advisory Op.1979–17.

With the 1996 election cycle, the national parties' total nonfederal funds spending reached $272 million, which was 30% of the national party committees' total spending. Mann Expert Rep. at 21. Starting in the Fall of 1995 and continuing through 1996, Democratic party committees used soft money to fund advertisements that either promoted President William J. Clinton by name or criticized his opponent by name, while avoiding words that expressly advocated either candidate's election or defeat.[14] *Id.* at 18. In May of 1996, the Republican National Committee announced its plans to spend $20 million on an "issue advocacy" campaign. *Id.* at 20.

Although many of the advertisements featured the presidential candidates, none of the costs of these advertisements were charged as coordinated expenditures on behalf of the candidate's campaign, which would have subjected the expenditure to FECA's contribution limits. Instead, the parties paid the full cost, with a mix of federal and nonfederal funds as permitted by FEC allocation rules.[15] Often the ad-

---

**14.** The argument that such advertisements could be paid for with nonfederal funds had its origins in Buckley. The Supreme Court in Buckley, in an attempt to save from unconstitutional vagueness the independent expenditure prohibitions, narrowed them to apply "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, 424 U.S. at 44, 96 S.Ct. 612. In a footnote, the *Buckley* Court found that "[t]his [narrowing] construction would restrict the application of § 608(e)(1) to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " *Id.* at 44 n. 52, 96 S.Ct. 612. Even though the Supreme Court narrowed the provision of the law, it struck down the expenditure provision as unconstitutional as

written and as narrowed by the Court. *Id.* at 44, 96 S.Ct. 612.

It was based on this language that the national parties in 1995 and 1996 argued that as long as they ran advertisements that did not mention "express words of advocacy of election or defeat," they could use nonfederal money to run advertisements that supported their presidential candidate or attacked his opponent.

**15.** The FEC had previously ruled that party committees could sponsor issue advocacy advertisements that did not feature a federal candidate and pay for these advertisements with a combination of federal and nonfederal dollars as permitted under the allocation regulations. FEC Advisory Op.1995–25 (discussing that allocation rules were permissible to allocate funding for "RNC plans to produce

vertisements were paid for by state party committees, where the allocation rules permitted greater spending of soft money. Mann Expert Report at 22 (noting over $115 million was transferred from the national parties to the state party committees). In fact, state party nonfederal funds for political communication/advertising went from $2 million in 1992 to $65 million in 1996. *Id.* at 22; *see also* La Raja Expert Report at 18. A similar strategy was also used by the parties to support their candidates for congressional office. Mann Expert Report at 20. Following the 1996 election, the FEC began a series of investigations over the parties' 1996 election practices. Statement of Reasons of Commissioner Scott E. Thomas for MURs 4553 and 4671, 4713, 4407 and 4544 at 2–5 [DEV 51]. In 2000, the FEC deadlocked over whether there was reason to believe that the national parties advertising program constituted an excessive in-kind contribution to the presidential campaigns. *Id.* at 5.

The Senate and House also conducted extensive investigations into the 1996 federal elections. Both the majority and minority reports in the Senate investigation concluded that permitting nonfederal donations to political parties eviscerated FECA's longstanding ability to prevent corporate and labor union treasury funds from influencing federal elections. Investigation of Illegal or Improper Activities in Connection with 1996 Federal Election Campaigns, S.Rep. No. 105–167 (6 vols.), Mar. 10, 1998, ("Thompson Committee Report"); *id.* at 4468 (majority report) ("[S]oft money spending by political party committees eviscerates the ability of the FECA to limit the funds contributed by individuals, corporations, or unions for the

defeat or benefit of specific candidates."); *id.* at 4572 (minority report) ("The soft money loophole undermines the campaign finance laws by enabling wealthy private interests to channel enormous amounts of money into political campaigns."). In the House, the Committee on Government Reform and Oversight conducted a wide ranging investigation, which culminated in public hearings during 1997, into, *inter alia,* campaign fundraising by political parties from foreign sources. *See* Campaign Finance Investigation: Hearings Before the House Committee on Government Reform and Oversight, 105th Cong. 6 (October 8, 1997) (statement of Chairman Dan Burton) ("This Committee's hearings will cover many subjects . . . . Our initial focus has been how political parties took or raised contributions from foreign sources. I am gravely concerned about foreign governments, foreign companies or foreign nationals trying to influence our electoral processes."); Conduit Payments to the Democratic National Committee: Hearings Before the House Committee on Government Reform and Oversight, 105th Cong. 6 (October 9, 1997) (statement of Chairman Dan Burton) ("Today, marks the first day of hearings into illegal foreign fundraising and other violations of law during recent campaigns.").

Nevertheless, without any congressional action, nonfederal funds emerged as a significant source of party resources. With these strategies firmly in place, the national parties spent $221 million of nonfederal money on the 1998 midterm elections, or 34% of their total spending, which was more than double the amount of nonfederal funds spent during the previous midterm election. Mann Expert Report at 23.

---

and air media advertisements on a series of legislative proposals being considered by the U.S. Congress, such as the balanced budget debate and welfare reform"). The national

parties used this advisory opinion as justification for their issue advocacy campaigns featuring candidates for federal office and paid for with nonfederal money.

With the 2000 elections, the national parties spent $498 million worth of nonfederal funds, which was 42% of their total spending. *Id.* at 24.

The use of nonfederal funds by the political parties was paralleled to some degree by a similar development in the rise of issue advocacy by corporations and labor unions. Aside from the political parties making advertisements that supported their candidates or attacked the opponent without using words of direct "express advocacy," unions and corporations began to mount "issue advocacy" campaigns, particularly beginning with the 1996 election, that were paid directly from their general treasuries. For example, in 1996 the AFL–CIO ran the following advertisement from September 26 to October 9 in the district of House Republican incumbent Steve Stockman:

> [Narrator] What's important to America's families? [Middle-aged man] "My pension is very important because it will provide a significant amount of my income when I retire." [Narrator] *And where do the candidates stand?* Congressman Steve Stockman voted to make it easier for corporations to raid employee pension funds. Nick Lampson opposes that plan. He supports new safeguards to protect employee pension funds. When it comes to your pension, there is a difference. Call and find out.

AFL–CIO 000593; [DEV 124] (emphasis added); *see also* AFL–CIO 000602.

Advertisements such as the above illustration were permitted by the Supreme Court's ruling in *FEC v. Massachusetts Citizens for Life, Inc.* In that case, the Supreme Court found that the prohibition on corporate and union treasury spending on expenditures found in 2 U.S.C. § 441(b) needed to be narrowly construed to only apply to express advocacy. *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539

(1986) (*"MCFL "*) ("We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b."). As a result, corporations and labor unions were free to use general treasury funds to finance issue advocacy campaigns. It does not appear that prior to 1996, the practice of using issue advertising to influence federal elections was a widespread practice.

In addition, the issue advocacy campaigns by corporations and labor unions were free from the disclosure provisions upheld in *Buckley* because they were considered outside of FECA's regulatory purview. This lack of disclosure permitted various interest groups to conceal the true identity of the source behind the advertisement. Thus, following both the 1996 and 2000 elections, corporations and unions used their general treasury funds to run advertisements apparently aimed at influencing federal elections and avoiding FECA's longstanding disclosure provisions.

With regard to both political party spending of nonfederal funds and political party, corporate, and labor union issue advocacy, there does not appear to be any dispute among the litigants to the fact that much of this behavior was not regulated or was permitted by the FEC. Rather, the dispute between the parties centers around the effect of engaging in these tactics, whether the measures needed addressing, and how Congress ultimately remedied what it perceived to be a problem. It is the congressional response to which the Court now turns.

## B. *The Bipartisan Campaign Reform Act of 2002*

In response to what it perceived were burgeoning problems with federal campaign finance laws, Congress began to consider reform legislation over six years

ago, during the 105th Congress.[16] The overhaul of our Nation's existing campaign finance laws—culminating with the enactment of BCRA—would consume the attention of three separate Congresses[17] and require navigation through atypical parliamentary procedures.

During the 105th Congress, the House of Representatives considered House Bill 2183, the Bipartisan Campaign Integrity Act of 1997, offered by Representative Asa Hutchinson. The bill was first considered on May 22, 1998.[18] 144 Cong. Rec. H3774 (daily ed. May 22, 1998). On August 3, 1998, during consideration of Representative Hutchinson's bill on the House floor, the Committee of the Whole[19] adopted an amendment in the nature of a substitute offered by Representatives Christopher Shays and Martin Meehan.[20] 144 Cong. Rec. H6947 (daily ed. Aug. 3, 1998). Finally, on August 6, 1998, the House passed House Bill 2183, as amended (the Biparti-

san Campaign Reform Act of 1998), by a vote of 252–179. 144 Cong. Rec. H7330 (daily ed. Aug. 6, 1998). The bill was referred to the Senate on September 9, 1998, 144 Cong. Rec. S10,114 (daily ed. Sept. 9, 1998), but was not considered prior to adjournment, *sine die,* on October 21, 1998. As a result, the Bipartisan Campaign Reform Act of 1998 died in the Senate during the 105th Congress.

On January 19, 1999, during the 106th Congress, Representative Shays introduced House Bill 417, the Bipartisan Campaign Reform Act of 1999, which attracted the support of 96 original cosponsors. *See* H.R. 417, 106th Cong. (1999). Upon introduction, the bill was referred to the Committee on House Administration, where it received an unfavorable report. H.R. Rept. 106–297, pt. 1, at 17 (1999). Nonetheless, the proponents of campaign finance reform secured floor consideration through the threat of a discharge petition.

16. *See* Bipartisan Campaign Finance Reform Act of 1998, H.R. 2183, 105th Cong. (1998), *available at* http://thomas.loc.gov.

17. *See id.;* Bipartisan Campaign Reform Act of 1999, H.R. 417, 106th (1999); Bipartisan Campaign Finance Reform Act of 2002, H.R. 2356, 116 Stat. 81 (2002).

18. According to *Congressional Quarterly* reporter David Mark, the House Leadership only allowed floor consideration of House Bill 2183 after it appeared that supporters of the bill had nearly secured the requisite 218 signatures on a discharge petition to automatically bring the bill to the floor, which did not require the consent of the leadership. *See* David Mark, *Campaign Finance Discharge Petition Off to Fast Start,* Congressional Quarterly Daily Monitor (July 31, 2001).

19. When considering most major legislation, the House of Representatives typically adopts a rule, in the form of a House Resolution, that governs, and generally limits, debate on the underlining bill. In order to expedite consideration of the underlining bill, the rule suspends the proceedings of the House of Representatives, and the body operates as one large committee, the Committee of the Whole House on the State of the Union ("Committee of the Whole"). Walter J. Oleszek, *Congressional Procedures and the Policy Process* 151–53 (5th ed., CQ Press 2001). This parliamentary mechanism enables the House to act with a quorum less than the requisite 218 members; only 100 members are needed to constitute a quorum in the Committee of the Whole. *Id.* at 152. (There are numerous other technical distinctions between the Committee of the Whole and the House of Representatives that enable expeditious consideration of legislation). *Id.* at 152–53. After the Committee of the Whole considers the underlining legislation, generally, the rule governing debate automatically dissolves the Committee of the Whole, and the House of Representatives reconvenes to vote on the underlining bill for final passage.

20. Beyond making numerous substantive changes to the underling bill, the Shays–Meehan substitute amendment changed the title of the bill from the "Bipartisan Campaign Integrity Act of 1997," 144 Cong. Rec. H3774 (daily ed. May 22, 1998), to the "Bipartisan Campaign Reform Act of 1998," 144 Cong. Rec. H4790–96 (daily ed. June 18, 1998).

*See* David Mark, *Campaign Finance Discharge Petition Off to Fast Start,* Congressional Quarterly Daily Monitor (July 31, 2001). When the Bipartisan Campaign Reform Act of 1999 reached the floor for a vote, it passed comfortably, by a vote of 252–177. 145 Cong. Rec. H8286 (daily ed. Sept. 14, 1999). On September 16, 1999, the Senate received House Bill 417, and on September 29, the Senate referred it to the Senate Committee on Rules and Administration, 145 Cong. Rec. S11,638 (daily ed. Sept. 29, 1999), where it would remain for the balance of the 106th Congress. The Senate responded to the House's action by considering Senate Bill 1593, also titled the Bipartisan Campaign Reform Act of 1999, which was introduced on September 16, 1999, by Senators McCain and Feingold, shortly after House Bill 417 secured passage. S. 1593; *see also* 145 Cong. Rec. H8286 (daily ed. Sept. 14, 1999). The Senate, however, failed to invoke cloture,[21] thereby failing to limit debate on two separate amendments to Senate Bill 1593, and the bill floundered. 145

Cong. Rec. S12,800 (daily ed. Oct. 19, 1999); *id.* at S12,803. As a result, for the second time in as many years, the campaign finance reform bill died in the Senate.

Circumstances changed during the 107th Congress; this time it was the Senate that acted first and passed campaign finance reform legislation, Senate Bill 27,[22] by a vote of 59–41. 147 Cong. Rec. S3258 (daily ed. Apr. 2, 2001). The bill was then transferred to the House of Representatives.

Representatives Shays and Meehan had already introduced House Bill 380, the Bipartisan Campaign Reform Act of 2001, when the Senate secured passage of Senate Bill 27. *See* H.R. 380, 106th Cong. (1999). On June 28, 2001, in an effort to make their legislation conform with the Senate-passed bill,[23] Representatives Shays and Meehan introduced new legislation, House Bill 2356, also titled the Bipartisan Campaign Reform Act of 2001. The House Leadership, which, through the Speaker of the House, controls access to the House floor,[24] agreed to consider

**21.** While debate on the Senate floor does not always lead to an all-out filibuster, on controversial legislation, the Senate typically invokes cloture to end the threat of unlimited debate or simply to gauge support for the underlining bill. *See* Walter J. Oleszek, *Congressional Procedures and the Policy Process* 231–34 (5th ed., CQ Press 2001). Under Rule XXII of the Standing Rules of the Senate, if "three-fifths of the Senators duly chosen and sworn" (60 Senators if the Senate is at its full membership) vote in the affirmative on a motion for cloture, further debate on the question shall be limited to no more than one hour for each Senator, and the time for consideration of the matter shall be limited to 30 additional hours, unless increased by another three-fifths vote. *See* Standing Rules of the Senate, Rule XXII, *available at* http://rules.senate.gov/senaterules/rule22.htm.

**22.** Bipartisan Campaign Reform Act of 2001, S. 27, 107th Cong. (2001).

**23.** Faced with the fact that Senate Bill 27 was unlikely to garner the support of a majority of

the House, and given the fact that House Bill 380 differed from Senate Bill 27, Representatives Shays and Meehan met with members of the Senate to work out a compromise bill. The agreement they reached was reflected in House Bill 2356. *See* David Mark & John Cochran, *House Panel to Mark Up Dueling Campaign Finance Bills,* Congressional Quarterly Daily Monitor (June 27, 2001) ("The revisions are designed to encourage the Democratic-controlled Senate to accept a House-passed bill, thus avoiding the need for a conference committee. 'We're trying to pre-conference with supporters of the bill, rather than going to conference with opponents,' Shays said.").

**24.** The Speaker of the House picks the 9 majority-party members that serve on the powerful House Committee on Rules—the gateway to the House floor. The Rules Committee writes the rules that govern debate and determines which amendments will be considered. The committee currently consists of 13 members, 9 majority-party mem-

House Bill 2356. However, in a last minute effort to tweak the legislation, Representatives Shays and Meehan proposed several amendments. John Cochran, *Not Victory but Vitriol for Campaign Finance Bill,* Congressional Quarterly Weekly (July 13, 2001). The package of amendments offered by Shays and Meehan reflected the need for additional changes to ensure that House Bill 2356, if passed by the House, would be considered without amendment by the Senate, thereby eliminating the need for a conference committee.[25] *See id.* In addition, Shays and Meehan requested that the Rules Committee write a rule for consideration and debate on the House floor that would treat this package as a single amendment, which could be considered in one vote. *Id.* The Rules Committee refused, drafting a resolution for consideration and debate that would treat each change, fourteen in total, as separate amendments. *Id.; see also* H.R. Res. 188, 107th Cong. (2001). Shays, Meehan, and their supporters opposed the rule, claiming that the House Leadership used "technicalities" to defeat the bill, and called upon their colleagues to reject the rule. 147 Cong. Rec. H3984 (daily ed. July 12, 2001) (statement of Rep. Meehan). The House voted and the rule failed.[26] In the aftermath, however, the bill's proponents and the House Lead-

ership were unable to come to an agreement over a compromise rule for the consideration and debate of House Bill 2356, John Cochran, *Not Victory but Vitriol for Campaign Finance Bill,* Congressional Quarterly Weekly (July 13, 2001), and the bill was pulled from the House Floor.

On July 30, 2001, Representative Jim Turner filed a discharge petition to bring House Bill 2356 to the floor for consideration. H.R. Discharge Pet. No. 3, *available at* http://clerkweb.house.gov/107/lrc/pd/Petitions/Dis3.htm. As congressional procedure scholar Walter J. Oleszek noted:

> [t]he discharge procedure, adopted in 1910, provides that if a bill has been before a standing committee for thirty legislative . . . days, any member can introduce a motion to relieve the panel of the measure. . . . If the requisite number of members (218) sign the petition, this procedure permits a majority of the House to bring a bill to the floor even if it is opposed by the committee that has jurisdiction over the measure, the majority leadership, and the Rules Committee.

Walter J. Oleszek, *Congressional Procedures and the Policy Process* 138 (5th ed., CQ Press 2001). While the discharge petition permits a majority of the House to

---

bers chosen by the Speaker of the House and 4 minority-party members chosen by the House Minority Leader. *See* Walter J. Olszek, *Congressional Procedures and the Policy Process* 119 (5th ed., CQ Press 2001).

**25.** Members of a conference committee are formally appointed by the Speaker of House and the presiding officer of the Senate. Walter J. Oleszek, *Congressional Procedures and the Policy Process* 252–54 (5th ed., CQ Press 2001). In the House, after initial appointment, the Speaker retains the authority to add and remove members. *Id.* at 254. Although the House rules provide that the Speaker shall "appoint no less than a majority [of conferees] who generally supported the

House position [on the legislation] as determined by the Speaker," Rules of the House of Representatives, 108th Cong. (2003) *available at* http://www.house.gov/rules/house_rules.htm, in practice, the Speaker is vested with significant discretion to ensure that the House delegates are amicable to the leadership's position. *See* Walter J. Oleszek, *Congressional Procedures and the Policy Process* 252–54 (5th ed., CQ Press 2001).

**26.** This marked the first occasion in which Speaker J. Dennis Hastert lost a vote on a rule during his first two years as Speaker of the House. Karen Foerstel, *A Bitter Day for the GOP,* Congressional Quarterly Weekly (July 13, 2001).

circumvent a stacked committee or the House Leadership, it has not been a highly effective tool for passing legislation, let alone securing its enactment into law. As Walter Oleszek went on to observe:

> Few measures are discharged from committee. From 1931 through 1994 (approximately the period during which the modern version of the rule has been in effect), more than five hundred discharge petitions were filed, but only forty-six attracted the required signatures and only nineteen bills were discharged and passed by the House. Of those, only two became law: the Fair Labor Standards Act of 1938 and the Federal Pay Raise Act of 1960.

*Id.* at 139. Despite this history of failure, on January 24, 2002, Representative Turner's petition attracted 218 signatures, the requisite number to achieve discharge. *See* H.R. Discharge Pet. No. 3. Consequently, the bill was sent to the floor and scheduled for debate. *See* H.R. Res. 203, 107th Cong. (2001); H.R. Res. 344, 107th Cong. (2002); 148 Cong. Rec. H266 (daily ed. Feb. 12, 2002). On February 13, 2002, the House began to consider House Bill 2356. During consideration, the House rejected three substitute amendments—one offered by House Majority Leader Dick Armey [27] and two offered by House Administration Committee Chairman Robert Ney [28]—before agreeing to Representative Shays' substitute amendment by a vote of 240–191, 148 Cong. Rec. H411 (daily ed. Feb. 13, 2002). Like the earlier amendment package, the Shays Substitute was designed to avoid a conference committee, where opponents would have another opportunity to scuttle the bill,[29] by making changes likely to garner the support of a majority of the Senate without forcing them to alter the text of the House-passed bill. *See* 148 Congr. Rec. H402 (daily ed. Feb. 13, 2002) (statement of Rep. Shays) (observing that the Shays substitute amendment was drafted after having "met with Senators from both sides of the aisle to learn what was needed in that bill in order to pass [BCRA]").[30] After considering a series of amendments to the newly amended, underlining bill (House Bill 2356), the House passed BCRA by a vote of 240–189. 148 Cong. Rec. H465–66 (daily ed. Feb. 13, 2002). On March 20, 2002, the Senate followed suit, passing BCRA by a vote of 60–40. 148 Cong. Rec. S2160–61 (daily ed. Mar. 20, 2002).

On March 27, 2002, President George W. Bush signed BCRA into law; the first major overhaul of the Federal Election Campaign Act since the 1974 Amendments and their revision following *Buckley.* Broadly speaking, Title I attempts to regulate political party use of nonfederal funds, while Title II seeks to prohibit labor union and corporate treasury funds from being used to run issue advertisements that have

**27.** The Armey Substitute, Amendment 415, failed by a vote of 179–249. 148 Cong. Rec. H376–77 (daily ed. Feb. 13, 2002).

**28.** The first Ney Substitute, Amendment 416, failed by a vote of 53–377. 148 Cong. Rec. H392 (daily ed. Feb. 13, 2002). The second Ney Substitute, Amendment 430, failed by a vote of 181–248. *Id.* at H464–65.

**29.** The process of going to conference creates three additional hurdles to the enactment of legislation. First, the conferees must come to an agreement, and in addition, the Confer-

ence Report must pass both the House and the Senate. Moreover, the House and Senate Leadership appoint members to the conference committee and enjoy considerable discretion over its composition. *See* Walter J. Oleszek *Congressional Procedures and the Policy Process* 252–54 (5th ed., CQ Press 2001); *see also supra* note 25.

**30.** The Shays Substitute, Amendment 417, also amended the title of the bill to its present form: the "Bipartisan Campaign Reform Act (BCRA) of 2002." 148 Cong. Rec. H393 (daily ed. Feb. 13, 2002).

an ostensible federal electioneering purpose.

## C. *Procedural History of the Litigation of this Case*

On the morning of March 27, 2002, President Bush signed BCRA into law. Within hours, Senator McConnell and the National Rifle Association ("NRA") filed complaints challenging the constitutionality of various provisions in BCRA. On April 16, 2003, pursuant to Congress's directive, BCRA § 403(a)(1),[31] those cases were assigned to a district court of three judges consisting of District Court Judge Colleen Kollar–Kotelly, District Court Judge Richard J. Leon, and Circuit Court Judge Karen LeCraft Henderson. A week later, on April 23, 2002, the three-judge court held a status conference, in which it heard the parties' proposals on consolidation, intervention, discovery, and the filing of motions.

The primary issue confronting the Court at the status conference was the scope of discovery required to develop a satisfactory factual record. The defendants, in their pleading, argued that "wide-raging discovery" was necessary "even in the context of a facial challenge, ... [in order to] look to the record of the case for evidence substantiating the governmental interests asserted in support of legislation said to violate the First Amendment." Def.'s Report in Response to the Court's Order of April 16, 2002, at 9 (quoting *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 664–68, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Colorado Republican Fed. Campaign Comm. v. FEC ("Colorado I")*, 518 U.S. 604, 618–19, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality opinion)).[32] Mindful that the Supreme Court remanded a First Amendment case to a three-judge district court in *Turner Broadcasting* to "permit the parties to develop a more thorough factual record," 512 U.S. at 668, 114 S.Ct. 2445,[33] this Court agreed with the

**31.** BCRA § 403(a)(1) states: "The action shall be filed in the United States District Court for the District of Columbia and shall be heard by a 3–judge court convened pursuant to section 2284 of title 28, United States Code."

**32.** The plaintiffs did not disagree that some discovery was necessary:

JUDGE KOLLAR–KOTELLY: So, as I understand it, then, everybody wants to do depositions, everybody wants to do some exchange of expert reports, and everybody wants to have some sort of lay statement, affidavits or statements. Is that accurate? ... If somebody disagrees with that, let me know.

MR. ABRAMS: That's entirely accurate from our point of view, Your Honor. Status Conference Tr., April 23, 2002, at 13; see also Status Report and Proposed Schedule of Plaintiffs Senator Mitch McConnell et al., April 22, 2002 (stating that their proposed schedule "is designed to ensure that a full record is compiled for submission to this Court, and ultimately to the United States Supreme Court").

**33.** At issue in *Turner* was a constitutional challenge to the "must-carry" provisions that

required carriage of local broadcast stations on cable systems. The Supreme Court remanded the case to the three-judge district court, explaining that in order to assure that Congress drew "reasonable inferences based on substantial evidence" that a harm truly existed, the Court needed "substantial elaboration in the District Court of the predictive or historical evidence upon which Congress relied, or the introduction of some additional evidence." *Id.* at 667, 114 S.Ct. 2445 (emphasis added). Because of the "paucity of evidence" and "lacking" of findings on the effect of the regulations, the Court could also not undertake the narrow tailoring step: "unless we know the extent to which the must-carry provisions in fact interfere with protected speech, we cannot say whether they suppress 'substantially more speech ... than necessary' to ensure the viability of broadcast television." *Id.* at 667–68, 114 S.Ct. 2445. What followed was "another 18 months of factual development on remand" to the three-judge panel, *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 187, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (citation and internal quotations omitted), and, here, the defendants in this case warned that "[t]he factual inquiry

defendants that extensive discovery was necessary[34] to review the evidentiary grounds for BCRA, and in part, to avoid the "disaster" of remand. Status Conference Tr., April 23, 2002, at 51 (statement of James Gilligan).[35] Notwithstanding Congress's directive "to expedite to the greatest possible extent the disposition of the action and appeal," BCRA § 403(a)(4), it was also clear from the legislative record that Congress did not want this Court to "compromise informed and deliberate judicial decisionmaking in the process." *See* Def.'s Report in Response to the Court's Order of April 16, 2002, at 8. Indeed, Senator Feingold, one of the principal Senate sponsors, explained during the Senate debate:

> Finally, and most importantly, although [Section 403(a)(4) ] provides for the ex-

pedition of these cases to the greatest possible extent, we do not intend to suggest that the courts should not take the time necessary to develop the factual record ... This case will be one of the most important that the Court has heard in decades, with ramifications for the future of our political system for years to come. By expediting the case, we in no way want to rush the Court into making its decision without the benefit of a full and adequate record.

147 Cong. Rec. S3189 (March 30, 2001) (statement of Sen. Feingold); *see also id.* at S3189–90 (statement of Sen. Dodd) (supporting the expedition provision, but stating "I do not want to suggest that the Court should not take adequate time to review any such challenge").[36]

---

**34.** This Court recognizes that "we've got to have an adequate factual record." Status Conference Tr., April 23, 2002, at 10 (statement of Judge Henderson).

**35.** In *Colorado I*, the Supreme Court remanded the issue of whether coordinated party expenditures are constitutional, *Colorado I*, 518 U.S. at 623–26, 116 S.Ct. 2309; *see also* 2 U.S.C. § 441a(d)(3), and the Tenth Circuit subsequently passed the case on to the district court, stating that

> [T]he issues are too important to be resolved in haste. It seems inevitable that not only this court but the Supreme Court itself will have to address these issues. We will both benefit by the parties fleshing out the record with any evidence they and the district court deem relevant to the issues' resolution.

*FEC v. Colorado Republican Fed. Campaign Comm.*, 96 F.3d 471, 473 (1996). The district court then allowed the parties to conduct discovery for eleven and a half months, significantly longer than our total discovery schedule for many issues of similar complexity. Status Conference Tr., April 23, 2002, at 63

... could be on a scale similar to that of *Turner*," Status Conference Tr., April 23, 2002, at 48 (statement of James Gilligan).

(statement of James Gilligan); *cf. FEC v. Colorado Republican Fed. Campaign Comm.*, 41 F.Supp.2d 1197 (D.Co.1999); *see also* 213 F.3d 1221, 1225 (10th Cir.2000) (stating that the parties "compiled an extensive record").

**36.** Judge Henderson maintains that the *Buckley* case was handled with much greater efficiency than the three-judge panel here. Henderson Op. at 6 n. 1. In *Buckley v. Valeo*, the lawsuit was filed on January 2, 1975, but a decision was not issued by the D.C. Circuit until seven and a half months later on August 15, 1975. *Buckley*, 519 F.2d at 821, 901. While this case required thirteen months from filing to disposition, the parties also undertook six months of discovery-at least four months of discovery and fact-finding more than that undertaken in Buckley. *Id.* at 902–03. That four months of discovery alone accounts for most of the discrepancy in the two expedited, yet complicated, campaign finance cases. Moreover, given the vast record developed through the six months of discovery in this case, it is not surprising that this Court required a few more months than the *Buckley* court to arrive at a decision after the arguments-for only careful consideration of the record before us could reduce the risk of committing clear error in our findings. *See Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001).

Accordingly, the next day, the Court issued a unanimous order outlining a discovery and briefing schedule, which allowed for over five months of discovery and almost an additional month for cross-examination of fact and expert witnesses; set May 7, 2002, as a deadline by which all other actions would be filed; and decided that briefing was to take place between November 4 and November 25, 2002. In a highly unusual accommodation to Congress's request for expedition, the Court set oral arguments to begin on December 4, 2002, just over a week after the parties submitted their final briefs. *See* Scheduling Order of April 24, 2002. By May 10, 2002, 101 parties were involved in the consolidated action, with the eighty-four plaintiffs challenging twenty-three provisions of BCRA.[37] After the Court dismissed seven plaintiffs from the suit without prejudice, *see infra* note 55, seventy-seven plaintiffs and seventeen defendants remained. *See id.* (listing all plaintiffs and defendants).

During the discovery process, the parties filed a total of twenty-three motions with the Court, including motions to compel responses to document requests, motions to compel responses to interrogatories, and motions for protective orders. At a hearing on July 25, 2002, the Court heard arguments as to many of the discovery disputes. Thereafter, the Court resolved the disputes with memorandum opinions. *See, e.g.*, Order Denying Federal Election Commission's Motion for Entry of Protective Orders, August 12, 2002; Order Denying in Part and Granting in Part

Plaintiffs' Motions to Compel Interrogatory Responses, August 15, 2002; Order Denying Adams Plaintiffs' Motion to Compel Intervenors to Respond to Interrogatories and Produce Documents, September 10, 2002.

On October 7, 2002, the Court ordered the parties to meet and confer and to deliver a proposed format on the briefing and proposed findings of fact. *See* Order, October 7, 2002. In their joint response, the plaintiffs (absent the Adams and Thompson plaintiffs) requested 751 pages, the Adams Plaintiffs requested 115 pages, and the defendants requested 750 pages. *See* Joint Submission in Response to the Court's Order of October 7, 2002. The Court ordered that the plaintiffs, including the Adams and Paul plaintiffs, submit three rounds of briefs not to exceed 840 pages and that the defendants' briefs submit three rounds of briefs (*i.e.*, opening, opposition, and reply) not to exceed 820 pages.[38] The Court also directed the plaintiffs collectively, and the defendants collectively, to each submit proposed findings of fact of no more than 300 pages. Briefing Order, October 15, 2002; Order, October 19, 2002.

On November 25, 2002, a little over a week before oral arguments were scheduled to begin, the parties filed their last round of briefs, bringing the total briefing to 1,676 pages (not including *amicus curiae* briefs). A day later, the parties submitted 576 pages of proposed findings of fact. The evidentiary submissions

---

**37.** On May 10, 2002, the Court consolidated all cases that were not consolidated on April 24, 2002, *see* Order, May 10, 2002; Order Consolidating Cases, April 24, 2002, and also permitted Senator John McCain, Senator Russell Feingold, Representative Christopher Shays, Representative Martin Meehan, Senator Olympia Snowe, and Senator James Jeffords to intervene as defendants supporting

the constitutionality of BCRA, *see* Order, May 10, 2002.

**38.** Each side was originally given an aggregate of 820 pages, however, the Court, in an Order dated October 29, 2002, granted the Adams and Thompson Plaintiffs the ability to file their own independent briefing which increased the aggregate page amount for Plaintiffs.

themselves included forty-one boxes (plus thirteen additional binders), which, by a conservative estimation, comprised the testimony and declarations of over 200 fact and expert witnesses and over 100,-000 pages [39] of material.[40] With the record and pleadings before it, the Court commenced oral arguments on December 4, 2002. The Court heard six hours of arguments that day, and three hours of oral arguments the following day, from a total of twenty-four attorneys.[41]

### D. Description of the Specific Provisions in BCRA At Issue in These Lawsuits

The Court briefly next sets forth the provision of the law that are at issue in the litigation.

#### 1. Title I: Reduction of Special Interest Influence

##### a. The National Party Soft Money Ban: Section 323(a)

The first provision of Title I involves the addition of a new section to FECA, section 323, entitled "Soft Money Of Political Parties." Section 323(a) states that national party committees (including national congressional campaign committees) "may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act." BCRA § 101(a); FECA § 323(a)(1); 2 U.S.C. § 441i(a)(1). The law applies to "any ... national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee." BCRA § 101(a); FECA § 323(a)(2); 2 U.S.C. § 441i(a)(2). The clear import of this provision is that national party committees are banned from any involvement with nonfederal money.

##### b. The State and Local Party Soft Money Ban: Section 323(b)

In summary terms,-Section 323(b) provides, that subject to certain exceptions, a State, district, or local committee of a political party may not use nonfederal funds to pay for "Federal election activity."

---

**39.** *See* Joint Submission in Response to the Court's Order of October 7, 2002.

**40.** The record in this case was described by one advocate during the oral argument as "elephantine." Oral Argument Tr. at 152 (statement of Floyd Abrams); *see also id.* at 279–80. We agree. Both sides should be commended for their extraordinary efforts in gathering and organizing the evidence in such a short period of time. We agree with Seth Waxman, attorney for the Intervenor–Defendants, who urged us to carefully review the record before us:

> I think it's very, very important for the court to look carefully at the record.... We have worked, all of us on both sides of this case have worked harder than I ever believed I could be made to work in order to give you this record.... I think the ads itself and the reports and affidavits that

have been submitted I think are very, very important. I know everybody feels that way.

*Id.* at 279–80 (statement of Seth Waxman).

**41.** We disagree with Judge Henderson's statement that "there was a consensus [at the hearing] that the [Supreme] Court had to receive the case no later than early February." Henderson Op. at 6 n. 1. A fair reading of former Solicitor General Waxman's colloquy with Judge Henderson, prompted by her questions, in our judgment, would be that the Supreme Court has the ability to adjust the briefing and oral argument schedule, and has done so in the past, to hear cases exactly such as this one. In short, neither former Solicitor General stated his conclusion in categorical terms, and neither provided an estimate of how long after a hearing the Supreme Court would need to issue its opinion. *See generally* Tr. at 18–20; 277–280.

BCRA § 101(a); FECA § 323(b); 2 U.S.C. § 441i(b).

In general, section 323(b)(1) prohibits state and local political parties from spending any money not raised in accordance with FECA on "Federal election activity." BCRA § 101(a); FECA § 323(b)(1); 2 U.S.C. § 441i(b)(1). Federal election activity is defined by the Act as:

(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; (ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot); (iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or (iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

BCRA § 101(b); FECA § 301(20)(A); 2 U.S.C. § 431(20)(A). Federal election activity does not include:

(i) public communication that refers solely to a clearly identified state or local candidate (unless the communication otherwise qualifies as Federal election activity, for instance, as GOTV); (ii) a contribution to a state or local candidate (unless designated to pay for some other kind of Federal election activity); (iii) a state or local political convention; or (iv) grassroots campaign materials (stickers, buttons, etc.) that name only a state or local candidate.

BCRA § 101(b); FECA § 301(20)(B); 2 U.S.C. § 431(20)(B).

### 1) The Levin Amendment

Section 323(b)(2)-commonly referred to as the "Levin Amendment"-carves out an exception to the general rule in section 323(b)(1). BCRA § 101(a); FECA § 323(b)(2); 2 U.S.C. § 441i(b)(2). Section 323(b)(2) permits state and local parties to use an allocation of nonfederal money ("Levin money" or "Levin funds") for voter registration, voter identification, and GOTV activities provided that certain specified conditions are met. First, the permitted activities may not refer to a clearly identified federal candidate. Second, those activities may not involve any broadcast communication except one that refers solely to a clearly identified state or local candidate. Third, no single donor may donate more than $10,000 to a state or local party annually for those activities. Finally, all money (federal and Levin money alike) spent on such activities must be "homegrown"-i.e., raised solely by the spending state or local party-and may not be transferred from or raised in conjunction with any national party committee, federal officeholder or candidate, or other state or local party. See BCRA § 101(a); FECA §§ 323(b)(2)(B), 323(b)(2)(C); 2 U.S.C. §§ 441i(b)(2)(B), 441i(b)(2)(C).

### c. Fundraising Costs: Section 323(c)

Section 323(c) requires national, state, and local parties to use federally-regulated funds to raise any money that will be used on "federal election activities," as defined in the statute. BCRA § 101(a); FECA § 323(c); 2 U.S.C. § 441i(c).

d. *Tax Exempt Organization Soft Money Ban: Section 323(d)*

Section 323(d) prohibits any political party committee-national, state, or local-or its agents from "solicit[ing]" funds for or "mak[ing] or direct[ing]" any donations to either: (i) any tax-exempt section 501 organization, *see* 26 U.S.C. § 501(c), that spends any money "in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)"; or (ii) any section 527 organization, *see* 26 U.S.C. § 527, (other than a state or local party or the authorized campaign committee of a candidate for state or local office). BCRA § 101(a); FECA §§ 323(d)(1), 323(d)(2); 2 U.S.C. §§ 441i(d)(1), 441i(d)(2). A section 501(c) organization is an organization that is tax exempt as described in that section of the tax code-a good example of which is a charity. A section 527 organization is a political committee that is exempt from taxation. *See* 26 U.S.C. § 527(a) ("A political organization shall be subject to taxation under this subtitle only to the extent provided in this section. A political organization shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes."); *see also* 26 U.S.C. §§ 527(e)(1) and (2) (defining a "political organization" as an organization that is "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for ... the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or VicePresidential electors").

e. *Federal Officeholder and Candidate Soft Money Ban: Section 323(e)*

Section 323(e) generally prohibits federal officeholders and candidates from soliciting, receiving, directing, transferring, or spending any soft money[42] (i) in connection with a federal election or (ii) in connection with a state or local election. BCRA § 101(a); FECA § 323(e)(1); 2 U.S.C. § 441(e)(1). There are, however, several exceptions to the general prohibition in section 323(e). First, a federal officeholder or candidate may solicit money for state and local candidates from sources and in amounts that would be allowed by Federal law. BCRA § 101(a); FECA §§ 323(e)(1)(B)(i), 323(e)(1)(B)(ii); 2 U.S.C. §§ 441i(e)(1)(B)(i), 441i(e)(1)(B)(ii). Second, the federal officeholder or candidate ban on nonfederal funds does not apply to the solicitation, receipt, or spending of funds by an individual who is also a candidate for state or local office solely in connection with such election. BCRA § 101(a); FECA § 323(e)(2); 2 U.S.C. § 441i(e)(2). Third, a federal officeholder or candidate may attend or speak at a fundraising event for a state or local political party. BCRA § 101(a); FECA § 323(e)(3); 2 U.S.C. § 441i(e)(3). Fourth, a federal officeholder or candidate may solicit such funds on behalf of any tax-exempt section 501 organization that spends money in connection with federal elections in either of two instances: (i) he

---

**42.** If the federal candidate or officeholder is soliciting, receiving, directing, transferring, or spending funds in connection with an election for federal office, the funds must be "subject to the limitations, prohibitions, and reporting requirements of this Act." 2 U.S.C. § 441(e)(1)(A). However, if the candidate is doing so in connection with a state or local election, then the funds must be "not in excess of the amounts permitted with respect to contributions to candidates and political committees" and "not from sources prohibited by the Act from making contributions in connection with an election for Federal office." 2 U.S.C. § 441(e)(1)(B).

or she may solicit unlimited funds for a section 501 organization whose "principal purpose" is not voter registration, voter identification, or GOTV activity, so long as the solicitation does not specify how the funds will be spent; and (ii) he or she may solicit up to $20,000 per person per year specifically for voter registration, voter identification, or GOTV activity, or for an organization whose "principal purpose" is to conduct any or all of those activities. *See* BCRA § 101(a); FECA §§ 323(e)(4); 2 U.S.C. § 441i(e)(4).

### f. *State Candidate Soft Money Ban: Section 323(f)*

Lastly, Section 323(f) generally prohibits state officeholders or candidates from spending soft money (that is, money not raised pursuant to FECA's regulations) on any public communication that "refers" to a clearly identified candidate for federal office and "promotes," "supports," "attacks," or "opposes" a candidate for that office. BCRA § 101(a); FECA § 323(f); 2 U.S.C. § 441i(f).

### 2. Title II: Noncandidate Campaign Expenditures

### a. *Definition of Electioneering Communication: Section 201*

Section 201[43] of BCRA amends section 304 of FECA by adding the following definition of an "electioneering communication":

(i) The term "electioneering communication" means any broadcast, cable, or satellite communication which—

(I) refers to a clearly identified candidate for Federal office;

(II) is made within—

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A).[44] Under this definition, in order to constitute an electioneering communication, therefore, the communication (a) must be disseminated by cable, broadcast, or satellite, (b) must refer to a clearly identified Federal candidate, (c) must be distributed within certain time periods before an election, and (d) must be targeted to the relevant electorate. *Id.* The fact that the communication must be "targeted to the relevant electorate," means that, in the case of House and Senate races, the communication will not constitute an "electioneering communication" unless 50,000 or more individuals in the relevant congressional district or state that the candidate for the House or Senate are seeking to represent can receive the communication. BCRA § 201; FECA § 304(f)(3)(C); 2 U.S.C. § 434(f)(3)(C). For example, if a broadcast advertisement refers to a federal House candidate within 60 days of the general election, but can only be received by 30,000 individuals, it is not an electioneering communication and permissibly could be made with funds from

---

**43.** Section 201 also contains disclosure provisions which are discussed *infra*.

**44.** The regulations implementing this definition clarify that the operative event for making an electioneering communication is the

"dissemination of the communication, rather than the disbursement of funds related to creating a communication." Electioneering Communications, 67 Fed.Reg. 65190, 65191 (Oct. 23, 2002).

the general treasury of a corporation or labor union.

In the event that a court of competent jurisdiction finds the definition of electioneering communication to be constitutionally infirm, the statute provides a backup definition:

(ii) If clause (i) is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein, then the term "electioneering communication" means any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate.

BCRA § 201(a); FECA § 304(f)(3)(A)(ii); 2 U.S.C. § 434(f)(3)(A)(ii). With the exception of the final clause, the fallback definition essentially tracks the language found in section 301(20)(A)(iii) of FECA which addresses one of the four activities which fall within the definition of the term Federal Election Activity. BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii).

b. *Prohibition of Corporate and Labor Union General Treasury Fund Disbursements for Electioneering Communications: Section 203 Rules Relating to Certain Targeted Electioneering Communications: Section 204*

Section 203 of BCRA extends the prohibition on corporate and labor union general treasury funds being used in connection with a federal election to cover electioneering communications. BCRA

§ 203; FECA § 316(b)(2); 2 U.S.C. § 441b(b)(2) ("[T]he term 'contribution or expenditure' includes a contribution or expenditure, as those terms are defined in [FECA], and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section *or for any applicable electioneering communication.*")(emphasis added). The prohibition on electioneering communications only applies to the general treasury funds of national banks, corporations, and labor unions, or any other person using funds donated by these entities.

Like the original prohibition in section 441b, Section 203 of BCRA, is not an absolute ban on corporate and labor union spending on "electioneering communication." FECA expressly permits corporations and labor unions to create "separate segregated fund[s] to be utilized for political purposes." 2 U.S.C. § 441b(b)(2)(C). These segregated funds are known as political committees under the Act (or PACs). 2 U.S.C. § 431(4)(B) (A political committee is "any separate segregated fund established under the provisions of section 441b(b) of this title."). These segregated accounts are subject to the source and amount limitations contained in FECA. *See, e.g.,* 2 U.S.C. § 441a(a)(1)(C) (providing that no person shall make contributions "to any other political committee in any calendar year which, in the aggregate, exceed $5,000"). To fund the segregated account, a corporation is permitted to solicit contributions from "its stockholders and their families and its executive or administrative personnel and their families." 2 U.S.C. § 441b(b)(4)(A)(i).[45] Likewise, in

45. For membership organizations, cooperatives, or corporations without capital stock,

solicitations of the membership are permitted

establishing their segregated funds, labor unions are allowed to solicit contributions to the fund from their members and their families. 2 U.S.C. § 441b(b)(4)(A)(ii). From these accounts, corporations and labor unions are permitted to make contributions to federal candidates and spend unlimited amounts of segregated funds on electioneering communications and independent expenditures, provided that federal funds are used to pay for these activities.

*Snowe–Jeffords Provision*

BCRA Section 203 provides an exception to certain types of nonprofit corporations from the requirement that corporations, labor unions, and national banks must use separately segregated funds [46]—and not general treasury funds—to pay for electioneering communications. However, this exception, commonly known as the "Snowe–Jeffords Provision" after its sponsors, was later, in effect, withdrawn by Section 204, known as the "Wellstone Amendment," *see infra* at 69; *compare* BCRA § 203; FECA § 316(c)(2); 2 U.S.C. § 441b(c)(2) (Snowe–Jeffords Provision) *with* BCRA § 204; FECA § 316(c)(6)(a); 2 U.S.C. § 441b(c)(6)(A) (Wellstone Amendment).

The Snowe–Jeffords Provision permits nonprofit organizations to use their general treasury funds to pay for electioneering communications if they are incorporated under Section 501(c)(4) and/or Section 527(e)(1) of the Internal Revenue Code. This exception for nonprofit corporations is an expansion of the law as it existed prior to BCRA. While FECA did not provide an exception from its separately segregated fund requirement for nonprofit corporations, the Supreme Court in *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)("*MCFL*") had provided an as-applied exception for nonprofit corporations which satisfied certain criteria set forth by the Supreme Court.[47] Under BCRA, it is not necessary that a nonprofit corporation establish that it has met the three criteria of *MCFL* in order to use its general treasury funds to pay for electioneering communications; instead, it may do so under Snowe–Jeffords simply by virtue of being incorporated under Sections 501(c)(4) or 527(e)(1).

While a nonprofit corporation under Snowe–Jeffords is permitted to use general treasury funds for electioneering communications, it is important to note that

to fund the segregated account. 2 U.S.C. § 441b(b)(4)(C).

**46.** As discussed *supra,* FECA section 304(f)(2)(E) refers to a segregated bank account made up of contributions for electioneering communications from United States citizens, nationals, or permanent residents where all the names and addresses of all contributors who contribute an aggregate amount of $1,000 or more to the account is disclosed. Also as discussed *supra,* FECA section 304(f)(2)(F) refers to electioneering communications paid from a general treasury. If an electioneering communication is paid for with general treasury funds under section 304(f)(2)(F), then all contributors of more than $1,000 in a calendar year have to disclose their name and address. Hence, under the Snowe–Jeffords Provision, 501(c)(4) orga-

nizations and 527(e)(1) organizations, who are permitted to make electioneering communications with money contributed by individuals, must disclose the names and addresses of those individuals who contributed the funds to pay for the electioneering communication. BCRA § 203; FECA § 316(c)(2); 2 U.S.C. § 441b(c)(2).

**47.** That is, 1) whether the corporation is "formed for the express purpose of promoting political ideas, and cannot engage in business activities"; 2) "has no shareholders or other persons affiliated," so that members have "no economic disincentive for disassociating with it if they disagree with its political activity"; and 3) the corporation "was not established by a business corporation," and has a policy of refusing "contributions from such entities." *MCFL* at 264.

these corporations are not permitted to use funds donated by a corporation, labor union, or national bank to purchase them. Under Snowe–Jeffords, a nonprofit corporation may only use funds donated by individuals to pay for electioneering communications. If a nonprofit corporation, for example, has accepted corporate contributions and mixed those contributions with general treasury funds that contained individual donations, the nonprofit corporation would not be permitted to use their general treasury funds to engage in electioneering communications.

Finally, although Snowe–Jeffords exempts nonprofit corporations from the separately segregated fund requirement, they are not similarly exempted from the disclosure requirements set forth in Section 201. Nonprofit corporations, like any other entity engaging in electioneering communications, must make public the names and addresses of all contributors who contributed over $1,000 to the account from which the corporation paid for the communications.

### The Wellstone Amendment

Despite drafting and including the Snowe–Jeffords' provision in the Act, an amendment offered by Senator Paul Wellstone and adopted by the Senate effectively eviscerates the Snowe–Jeffords' Provision from the Act. The "Wellstone Amendment," codified in section 204 of BCRA states that the exemption created by the Snowe–Jeffords Provision for section 501(c)(4) corporations and section 527(e)(1) corporations is inapplicable "in the case of a targeted communication." BCRA § 204; FECA § 316(c)(6)(A); 2 U.S.C. § 441b(c)(6)(A). The Wellstone Amendment describes a "targeted communication" as "an electioneering communication" that is "distributed from a television or radio broadcast station or provider of cable or satellite television service and, in the case of a communication which re-

fers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." BCRA § 204; FECA § 316(c)(6)(B); 2 U.S.C. § 441b(c)(6)(B). The direct consequence of the Wellstone Amendment is that organizations organized under section 501(c)(4) and section 527(e)(1) of the Internal Revenue Code, or those entities who have received funds from corporations, are not permitted to use their general treasury funds for electioneering communications.

The Wellstone Amendment was codified in a separate section of BCRA in order to preserve severability: hence, if the Court finds the inclusion of section 501(c)(4) organizations and section 527 organizations within the ban on electioneering communications to be unconstitutional, the Wellstone Amendment can be cleanly struck from the law and the original Snowe–Jeffords exception for these groups will be restored. *See* BCRA § 401 (discussing that BCRA is subject to severability).

\* \* \*

To briefly summarize, section 201 provides two definitions of "electioneering communication," a primary one and a backup definition in the event a court finds the main definition unconstitutional. Section 203, in conjunction with section 204, prohibits corporations and unions from using general treasury funds to pay for an electioneering communication. Corporations and unions need to establish political action committees if they want to engage in electioneering communication.

### c. *Disclosure of Electioneering Communications: Section 201*

Section 201 amends Section 304 of FECA, 2 U.S.C. § 434, by requiring disclosures related to electioneering communications. Section 201's disclosure requirements mandate the reporting of "disbursements" for the "direct costs of

producing and airing electioneering communications" aggregating more than $10,000 during any calendar year. BCRA 201(a); FECA § 304(f)(1); 2 U.S.C. § 434(f)(1). The reports must be made to the Commission within 24 hours of each "disclosure date." *Id.* The statute defines "disclosure date" as the first time during the calendar year a person's electioneering communication disbursements exceed $10,000, and each subsequent aggregation of $10,000 in electioneering communication disbursements made in the same calendar year. BCRA § 201(a); FECA § 304(f)(4); 2 U.S.C. § 434(f)(4). "Disbursements" under Section 201 include executed contracts to make disbursements for electioneering communications. BCRA 201(a); FECA § 304(f)(5); 2 U.S.C. § 434(f)(5).[48]

The section requires the reports, made under penalty of perjury, to include the following information:

- the identities of the person making the disbursement, any person sharing or exercising direction or control over that person, and the custodian of the books and accounts of the person making the disbursement;
- the person's principal place of business, if not an individual;
- the amount of each disbursement over $200 during the statement's period and the identity of the person who received the disbursement;
- the elections to which the electioneering communications pertain and the names of the candidates identified in the communications, if known;
- if the disbursements are made from a segregated account funded solely by direct contributions by individuals for the purpose of making electioneering

communication disbursements, the names and addresses of all persons who contributed over $1,000 to the account during the calendar year; and

- if the disbursements are made from a different source, the names and addresses of all contributors to that source who contributed over $1,000 during the calendar year.

BCRA 201(a); FECA § 304(f)(2); 2 U.S.C. § 434(f)(2).

### d. *Coordinated Communications as Contributions: Section 202*

Section 202 of BCRA amends Section 315(a)(7) of FECA, 2 U.S.C. 441a(a)(7) by adding the following language:

if—

(i) any person makes, or contracts to make, any disbursement for any electioneering communication . . .; and

(ii) such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee;

such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party

BCRA § 202; FECA § 315(a)(7)(C); 2 U.S.C. § 441a(a)(7)(C). Section 202 essentially makes clear the import of the definitions of "electioneering communication" and "coordination" in Sections 201 and 214; coordinated electioneering communications constitute contributions.

---

**48.** The provision states, "For purposes of this subsection, a person shall be treated as having made a disbursement if the person has executed a contract to make the disbursement." BCRA 201(a); FECA § 304(f)(5); 2 U.S.C. § 434(f)(5).

e. *Reporting Requirements for Certain Independent Expenditures: Section 212*

Section 212 amends Section 304 of FECA (2 U.S.C. § 434) by adding certain disclosure requirements for independent expenditures.[49] The provision requires persons, including political committees, to report independent expenditures, or contracts to make such expenditures, aggregating $1,000 or more after the twentieth day before the date of an election.[50] BCRA § 212; FECA § 304(g)(1)(A); 2 U.S.C. § 434(g)(1)(A). These reports must be made within 24 hours of making the expenditure or the contract to make the expenditure. *Id.* Such reports must be supplemented within 24 hours of making additional expenditure contracts or expenditures aggregating an additional $1,000 toward the same election. BCRA § 212; FECA § 304(g)(1)(B); 2 U.S.C. § 434(g)(1)(B). For expenditure contracts or expenditures made more than twenty days before an election, persons must also file reports but only after the expenditures aggregate to $10,000 or more and they have 48 hours in which to file their disclosure. BCRA § 212; FECA

§ 304(g)(2)(A); 2 U.S.C. § 434(g)(2)(A). These reports must also be supplemented whenever additional expenditure contracts or expenditures aggregate an additional $10,000 toward the same election. BCRA § 212; FECA § 304(g)(2)(B); 2 U.S.C. § 434(g)(2)(B).

f. *Coordination with Candidates or Political Parties: Section 214*

The Supreme Court has found treating coordinated expenditures as contributions constitutionally justifiable under the rationale of preventing circumvention. *Buckley*, 424 U.S. at 47, 96 S.Ct. 612 ("[C]ontribution ceilings ... prevent attempts to circumvent [FECA] through prearranged or coordinated expenditures amounting to disguised contributions."). Section 214 makes changes to FECA's coordinated expenditure regime.

Section 214(a) amends Section 315(a)(7)(B) of FECA, 2 U.S.C. § 441a(a)(7)(B), by adding the following provision:

(ii) expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation,

---

**49.** Section 211 defines "independent expenditure" as:

an expenditure by a person—
(A) expressly advocating the election or defeat of a clearly identified candidate; and
(B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

BCRA § 211; FECA § 301; 2 U.S.C. § 431(17).

**50.** The reports must be filed with the FEC and must include "the name of each candidate whom an expenditure is intended to support or oppose," BCRA § 212; FECA § 304; 2 U.S.C. § 434(g)(3)(B), as well as the name and address of each

person who receives any disbursement during the reporting period in an aggregate

amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure and a statement which indicates whether such independent expenditure is in support of, or in opposition to, a candidate, as well as the name and office sought by such candidate, and a certification, under penalty of perjury, whether such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such committee

2 U.S.C. § 434(b)(6)(B)(iii).

consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee

BCRA § 214(a); FECA § 315(a)(7)(B)(ii); 2 U.S.C. § 441a(a)(7)(B)(ii). This language is virtually identical to that in 2 U.S.C. § 441a(a)(7)(B)(i) [51], passed in 1976 as an amendment to FECA, which defines expenditures made in coordination with candidates.[52]

Section 214 also repeals the FEC's regulations "on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees," and requires the FEC to promulgate new regulations. BCRA § 214(b), (c). Congress instructed that the new regulations "shall not require agreement or formal collaboration to establish coordination." BCRA § 214(c); 2 U.S.C. § 441a note. Congress also instructed that the regulations should address

(1) payments for the republication of campaign materials;

(2) payments for the use of a common vendor;

(3) payments for communications directed or made by persons who previously served as an employee of a candidate or a political party; and

(4) payments for communications made by a person after substantial discussion about the communication with a candidate or a political party.

*Id.*

Lastly, Section 214 amends Section 316(b)(2) of FECA, 2 U.S.C. 441b(b)(2), to include within the meaning of "contributions or expenditures by national banks, corporations, or labor organizations," the definitions of "contribution or expenditure" found in Section 301 of FECA, 2 U.S.C. § 431(8), (9). BCRA § 214(d).

### 3. Title III: Miscellaneous

#### a. *Use of Contributed Amount for Certain Purposes: Section 301*

Section 301 sets forth the permitted and prohibited uses of contributions. For example, a candidate can transfer contributions to political parties but cannot convert contributions to personal use. BCRA § 301; FECA § 313; 2 U.S.C. § 439a.

#### b. *"The Millionaire Provisions": Sections 304, 316, & 319*

In Sections 304, 316, and 319 of BCRA, Congress allowed opponents of self-financed candidates to raise money in larger increments and, in certain circumstances, to accept unlimited coordinated party expenditures. Specifically, the provisions state that if a self-financed candidate's "opposition personal fund amount" [53] exceeds

---

**51.** In *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (*"Colorado II"*), the Supreme Court considered the applicability of Section 441a(a)(7)(B)(i) to political party expenditures. Despite the fact that four Justices found the provision overbroad, *Colorado II*, 533 U.S. at 467, 121 S.Ct. 2351 (Thomas, J., dissenting), the majority found that Section 441a(a)(7)(B)(i) applied to political party expenditures coordinated with candidates, *id* at 465, 121 S.Ct. 2351.

**52.** As presently codified, the provision states: "expenditures made by any person in cooperation, consultation, or concert, with, or at the

request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate". 2 U.S.C. § 441a(a)(7)(B)(i).

**53.** The "opposition personal funds amount" is not simply the amount of personal funds expended by a self-financed candidate. It also takes into account the gross receipts advantage of both candidate's authorized committees so that incumbents with large war chests will not be able to take advantage of the new law unless the self-financed candidate expends an even greater amount of personal funds. BCRA §§ 304(a)(ii); FECA § 315(i)(1)(D); 2 U.S.C. § 441a(i)(1)(D);

a threshold amount,[54] then the candidate's opponent can raise funds through increased contribution limits. BCRA § 304(a); FECA § 315(i); 2 U.S.C. § 441a(i); BCRA § 319; FECA § 315A; 2 U.S.C. § 441a–1. Moreover, if the opposition personal fund amount is ten times the threshold amount in Senate races, or merely exceeds the $350,000 threshold for House races, the self-financed candidate's opponent can also be exempted from limits on coordinated party expenditures imposed by 2 U.S.C. § 441a(d). Any contributions or party expenditures under the increased limits is capped to the amount spent by the self-financed candidate: the enhanced contributions cannot exceed 110% and 100% of the opposition personal funds amount for Senate and House races respectively.

### c. Lowest Unit Charged: Section 305

In the 1972 FECA legislation, Congress added the "lowest unit charge" provision to the Communications Act of 1934. The provision states that, for forty-five days before a primary or sixty days before a general election, the broadcast stations have to sell a qualified candidate the "lowest unit charge of the station for the same class and amount of time for the same period." 47 U.S.C. 315(b)(1). BCRA Section 305, however, denies a candidate the lowest unit charge for broadcast advertisements on radio and television unless the candidate "provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office" in any broadcast. BCRA § 305; FCA § 315(b); 47 U.S.C. § 315(b). The candi-

date can be exempted from this provision, and thus be eligible for the lowest unit charge without such a promise, if the candidate clearly identifies himself at the end of the broadcast and states that he approves of the broadcast. In a television broadcast, this message must include the candidate's image for at least four seconds. Id.

### d. Increased Limits for Contributions and Indexing of Limits: Section 307

Section 307(a)(1) increases the amount individuals can contribute to candidates per election from $1000 to $2000. BCRA § 307(a)(1); FECA § 315(a)(1)(A); 2 U.S.C. § 441a(a)(1)(A). It also changes the aggregate amount of contributions a donor can give to candidates and political committees (including parties) from $25,000 in a calendar year to $37,500 in a two-year period to candidates and $57,500 in a two-year period to political committees. BCRA § 307(b); FECA § 315(a)(3)(A); 2 U.S.C. § 441a(3)(A). Congress also increased the limits to a national party committee by $5,000 and doubled the amount of money individuals can donate to a state party committee, so that individuals may now contribute no more than $25,000 per calendar year to a national party committee, no more than $10,000 per calendar year to a state committee, and no more than $5,000 per calendar year to a local committee. BCRA §§ 102, 307(a)(2); FECA § 315(a)(1)(B), (D); 2 U.S.C. 441a(a)(1)(B), 441a(a)(1)(C), 441a(a)(1)(D). Finally, Congress also indexed all contributions for inflation, except for limits on contributions to state and

---

BCRA § 316; FECA § 315(i)(1)(E); 2 U.S.C. § 441a(i)(1)(E); see also BCRA § 319(a); FECA § 315A(a)(2); 2 U.S.C § 441a–1(a)(2).

**54.** The threshold amount in Senate races is equal to the sum of $150,000 plus $.04 multi-

plied by the voting age population in the candidate's state, BCRA § 304(a)(2); FECA § 315(i)(1)(B); 2 U.S.C. § 441a(i)(1)(B), while in House races the threshold amount is simply $350,000. BCRA § 319(a)(1); FECA § 315A(a)(1); 2 U.S.C. § 441a–1(a)(1).

local party committees. BCRA § 307(d); 2 U.S.C. § 441a(c).

e. *Identification of Sponsors: Section 311*

Section 311 requires that "whenever any person ... makes a disbursement for an electioneering communication," the communication, if it was authorized by a candidate or the candidate's political committee, must clearly identify the candidate or the candidate's political committee. If the communication was not authorized by the candidate or the candidate's political committee, then the communication "shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee." BCRA § 311; FECA § 318(a)(3); 2 U.S.C. § 441d(a)(3).

f. *Prohibition of Donations by Minors: Section 318*

In Section 318, Congress prohibited minors, defined as any children under eighteen years of age, from making donations, regardless of the amount, to candidates or political parties. BCRA § 318; FECA § 324; 2 U.S.C. § 441k.

**4. Title V: Additional Disclosure Provisions**

a. *Public Access to Broadcasting Records: Section 504*

In Section 504, Congress requires broadcast licensees to collect and disclose records of any "request to purchase broadcast time" that "is made by or on behalf of a legally qualified candidate for public office" or that relates "to any political matter of national importance," including communications relating to "a legally qualified candidate," "any election to Federal office," and "a national legislative issue of public importance." BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1). The record must include whether the request to purchase was accepted or rejected; the rate charged for the broadcast; the date and time on which the communication aired; the class of time that is purchased; the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers; in the case of a request on behalf of a candidate, the name of the candidate, the authorized committee, and the treasurer of the committee; and in the case of any other request, the name of the person purchasing the time, the name and contact information for such person, and a list of chief executive officers or members of the executive committee or board of directors. *Id.*

## III. FINDINGS OF FACT

The Findings of Fact include a description of the identities of the parties and include findings related to the disclosure provisions included in this *per curiam* opinion.

**A. *Parties to the Litigation*** [55]

1. Senator Mitch McConnell is the sen-

---

55. As of the May 7, 2002, deadline for amendment of pleadings, intervention or joinder of additional parties and consolidation of additional cases, *see* Scheduling Order of 4/24/02, 84 plaintiffs were parties to the consolidated actions. Since then, seven plaintiffs-the Alabama Republican Executive Committee, Martine J. Connors, the Jefferson County Republican Executive Committee, the Christian Coalition of America, Inc., the Libertarian Party of Illinois, Inc., the DuPage Political Action Council, Inc., and the National Association of Wholesaler–Distributors–have been dismissed from the suit without prejudice. *See generally* Orders of 8/15/02, 9/13/02, 9/18/02, and 9/30/02 Dismissing Pls. Without Prejudice.

ior United States Senator from the Commonwealth of Kentucky and is a member of the Republican Party. McConnell Aff. ¶ 1. He has long been active in the Republican Party at the national, state and local levels. *Id.* ¶ 2. Senator McConnell was first elected in 1984, was reelected in 1990, 1996, and was a candidate for election in 2002. *Id.* ¶ 7.

2. William H. Pryor, Jr. is Alabama Attorney General and was a candidate for reelection as Alabama Attorney General in 2002. Pryor Decl. ¶ 2.

Remaining in the suit are 77 plaintiffs in 11 actions: in No. 02–CV–0582 are Senator Mitch McConnell, Representative Bob Barr, Representative Mike Pence, Alabama Attorney General William H. Pryor, the Libertarian National Committee, Inc., the American Civil Liberties Union, Associated Builders and Contractors, Inc., Associated Builders and Contractors Political Action Committee, the Center for Individual Freedom, Club for Growth, Inc., Indiana Family Institute, Inc., the National Right to Life Committee, Inc., National Right to Life Educational Trust Fund, National Right to Life Political Action Committee, the National Right to Work Committee, 60 Plus Association, Inc., Southeastern Legal Foundation, Inc., U.S. d/b/a ProEnglish, Thomas McInerney, Barret Austin O'Brock and Trevor M. Southerland (collectively, the *McConnell* plaintiffs); in No. 02–CV–0581 are the NRA and National Rifle Association Political Victory Fund (collectively, the *NRA* plaintiffs); in No. 02–CV–0633 are Emily Echols, Hannah McDow, Isaac McDow, Jessica Mitchell, Daniel Solid and Zachary C. White (collectively, the *Echols* plaintiffs); in No. 02–CV–0751 are the Chamber of Commerce of the United States, the National Association of Manufacturers, National Association of Wholesaler–Distributors, and U.S. Chamber Political Action Committee (collectively, the *Chamber of Commerce* plaintiffs); in No. 02–CV–0753 is the National Association of Broadcasters; in No. 02–CV–0754 are the American Federation of Labor and Congress of Industrial Organizations and AFL–CIO Committee on Political Education Political Contributions Committee (collectively, the *AFL–CIO* plaintiffs); in No. 02–CV–0781 are Congressman Ron Paul, Gun Owners of America, Inc., Gun Owners of America Political Victory Fund, RealCampaignReform.org, Citizens United, Citizens United Political Victory Fund, Michael Cloud and Carla Howell (collectively, the *Paul* plaintiffs); in No. 02–CV–0874 are the Republican National Committee, Mike Duncan, Republican Party of Colorado, Republican Party of Ohio, Republican Party of New Mexico, and Dallas County (Iowa), Republican Central Committee (collectively, the *RNC* plaintiffs); in No. 02–CV–0875 are the California Democratic Party, Art Torres, Yolo County Democratic Central Committee, California Republican Party, Shawn Steel, Timothy J. Morgan, Barbara Alby, Santa Cruz County Republican Central Committee, and Douglas R. Boyd, Sr., (collectively, the *CDP* plaintiffs); in No. 02–CV–0877 are Victoria Jackson Gray Adams, Carrie Bolton, Cynthia Brown, Derek Cressman, Victoria Fitzgerald, Anurada Joshi, Nancy Russell, Kate Seely–Kirk, Peter Kostmayer, Rose Taylor, Stephanie L. Wilson, California Public Interest Research Group, Massachusetts Public Interest Research Group, New Jersey Public Interest Research Group, United States Public Interest Research Group, the Fannie Lou Hamer Project, and Association of Community Organizers for Reform Now (collectively, the *Adams* plaintiffs); and in No. 02–CV–0881 are Representative Bennie G. Thompson and Representative Earl F. Hilliard (collectively, the *Thompson* plaintiffs).

The 17 defendants in these consolidated actions are the Federal Election Commission; the United States of America; the United States Department of Justice; the Federal Communications Commission; John Ashcroft, in his official capacity as Attorney General of the United States of America; David M. Mason, Karl J. Sandstrom, Danny L. McDonald, Bradley A. Smith, Scott E. Thomas and Michael E. Toner, in their official capacities as Commissioners of the FEC; and Senators John McCain, Russell Feingold, Olympia Snowe and James Jeffords and Representatives Christopher Shays and Martin Meehan (collectively, the Intervenors), as intervening defendants.

The Court finds it unnecessary to make findings with respect to all 77 Plaintiffs and 17 Defendants in these actions and therefore the Findings of Fact reflect the primary parties in this litigation.

3. The Libertarian National Committee, Inc. ("LNC") is the governing body of the Libertarian Party at the national level. Dasbach Decl. ¶ 4. The LNC is a nonprofit corporation incorporated in the District of Columbia and governed by section 527 of the Internal Revenue Code. *Id.* The LNC represents and advocates the principle that all individuals have the right to live in whatever manner they choose so long as they do not forcibly interfere with the right of others to do the same. *Id.*

4. The American Civil Liberties Union ("ACLU") is a tax-exempt corporation incorporated in the District of Columbia and is governed by section 501(c)(4) of the Internal Revenue Code. Romero Decl. ¶ 1. The ACLU is a nationwide, non-profit, non-partisan organization with approximately 300,000 members "dedicated to the principles of liberty and equality embodied in the Constitution." *Id.*

5. Associated Builders and Contractors, Inc. ("ABC") is a non-profit tax-exempt organization governed by section 501(c)(6) of the Internal Revenue code, incorporated in Maryland, and is funded primarily by membership dues. Monroe Direct Test. ¶ 3. It is a national trade association representing more than 23,000 contractors and related firms in the construction industry. *Id.* ABC's members, which include both unionized and non-union employers, "share the philosophy that construction work should be awarded and performed on the basis of merit, regardless of labor affiliation." *Id.*

6. Associated Builders and Contractors Political Action Committee ("ABC PAC") is a connected political committee governed by 2 U.S.C. § 431(4) and section 527 of the Internal Revenue Code and is a separate segregated fund of ABC pursuant to 2 U.S.C. § 441b(b). *Id.* ¶ 22. ABC PAC makes contributions to federal candidates who support the principles of ABC and funds independent expenditures for communications on their behalf. *Id.*

7. The Club for Growth, Inc. ("The Club") is a nationwide membership organization dedicated to advancing public policies that promote economic growth. Keating Decl. ¶ 5. The Club is a Virginia corporation organized under section 527 of the Internal Revenue Code. McConnell Second Am. Compl. ¶ 29. The Club "is dedicated to promoting the election of pro-growth, pro-freedom candidates through the bundling of political contributions and issue advocacy campaigns." Keating Decl. ¶ 6. The Club for Growth advocates tax rate reduction, fundamental tax reform, tax simplification, capital gains tax reduction, estate tax repeal, overall reduction in government spending, school choice, and personal investment of Social Security. *Id.* ¶ 5.

8. The National Right to Life Committee ("NRLC") is a tax-exempt corporation incorporated in the District of Columbia and is governed by section 501(c)(4) of the Internal Revenue Code. O'Steen Decl. ¶ 4. The NRLC is a nationwide, non-profit, non-partisan organization with approximately 3,000 local chapters and fifty state affiliates dedicated to "promoting respect for the worth and dignity of all human life from conception to natural death." *Id.* ¶¶ 5, 3.

9. The National Right to Life Educational Trust Fund ("NRL–ETF") is an organization governed by section 501(c)(3) of the Internal Revenue code. *Id.* ¶ 16. NRL–ETF sponsors educational advertising and develops materials detailing "fetal development, abortion's impact on America, and the threat of euthanasia." *Id.* ¶ 17.

10. The National Right to Life Political Action Committee ("NRL PAC"), organized in 1979, is an internal § 527 fund of NRLC that is registered with the FEC as

a PAC subject to FECA. O'Steen Decl. ¶ 24.

11. Thomas E. McInerney is a U.S. citizen, a registered voter in the State of New York and a member of and contributor to various Republican Party organizations and committees at the national, state and local levels. McInerney Aff. ¶ 1.

12. Barret Austin O'Brock is a U.S. citizen and a resident of the State of Louisiana. O'Brock Decl. ¶ 1. He is fourteen years of age and intends to make contributions to federal candidates in future elections, including the 2004 election. *Id.* ¶¶ 2–3.

13. The National Rifle Association ("NRA") is a tax-exempt corporation governed by section 501(c)(4) of the Internal Revenue Code and incorporated in the State of New York. NRA Compl. ¶ 8. The primary purpose of the NRA is to preserve and protect the Second Amendment's guarantee that individuals shall have the right to "keep and bear arms." LaPierre Decl. ¶ 2. In addition, the NRA promotes public firearm safety, trains law enforcement agencies in the use of firearms, sponsors shooting competitions, and advances hunter safety. *Id.* The NRA has approximately four million members and represents their views on legislative and public policy issues before federal, state and local officials and the general public. NRA Compl. ¶ 8.

14. The National Rifle Association Political Victory Fund ("NRA PVF") is a connected political committee governed by 2 U.S.C. § 431(4) and section 527(e)(1) of the Internal Revenue Code and is a separate segregated fund of the NRA pursuant to 2 U.S.C. § 441b(b). NRA Compl. ¶ 9.

15. Emily Echols, Hannah and Isaac McDow, Zachary White, Daniel Solid and Jessica Mitchell are U.S. citizens who range in age from twelve to sixteen. Echols Pls.' Proposed Findings of Fact ¶ 45. They intend to seek out and contribute to federal candidates "who represent their views and beliefs on important questions like the right to life of children before birth, and on the size of government." *Id.* ¶ 44.

16. The Chamber of Commerce ("The Chamber") is a tax-exempt corporation governed by section 501(c)(6) of the Internal Revenue Code. Josten Direct Trial Test. ¶ 3. The Chamber is the world's largest not-for-profit business federation, representing over 3,000,000 businesses and business associations. *Id.*

17. The U.S. Chamber Political Action Committee ("U.S. Chamber PAC") is a connected political committee organized under section 527(e)(1) of the Internal Revenue Code and is registered with the FEC. Josten Direct Trial Test. ¶ 26. U.S. Chamber PAC is funded by contributions voluntarily made by individual Chamber of Commerce executives, administrative employees, members and their families. *Id.* ¶ 27.

18. The National Association of Manufacturers ("NAM") is a tax-exempt corporation governed by section 501(c)(6) of the Internal Revenue Code and is the oldest and largest broad-based industrial trade association in the United States. Huard Direct Trial Test. ¶ 2. Its membership comprises 14,000 companies and 350 member associations. *Id.*

19. The National Association of Broadcasters ("NAB") is a non-profit corporation that serves as a trade association of radio and television stations and broadcasting networks in the United States. Goodman Decl. ¶ 3. NAB serves and represents the American broadcasting industry, composed of approximately 7,300 member stations. *Id.* All of NAB's voting members are broadcast licensees within the meaning of the Communications Act. *Id.*

20. The American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO") is a national labor federation comprised of 66 national and international labor unions that, collectively, have a total of approximately 13 million members. G. Shea Decl. ¶ 3. The AFL–CIO is a tax-exempt organization under Section 501(c)(5) of the Internal Revenue Code. *Id.* The AFL–CIO also includes 51 state labor federations, nearly 580 area and central labor councils and numerous trade and industrial departments. *Id.* ¶¶ 6,7, 9. One of the four major missions of the AFL–CIO is to provide "an effective political voice to workers on public issues that affect their lives." *Id.* ¶ 4b.

21. Congressman Ron Paul is a Member of the United States House of Representatives from the Fourteenth Congressional District of Texas and is a member of the Republican Party. Paul Decl. ¶ 1. He was first elected to represent the Fourteenth Congressional District of Texas in 1996, *id.,* and also served as a Member of the House of Representatives for the Twenty–Second Congressional District of Texas, first elected in 1976 and to successive terms until 1984, *id.* ¶ 2. Congressman Paul is a registered voter in the state of Texas, a donor to the campaigns of candidates for federal office, and a fundraiser and recipient of campaign contributions. Paul Pls.' Compl. ¶ 11. He will face re-election in 2004. Paul Decl. ¶ 1.

22. Gun Owners of America, Inc. is a not-for-profit, tax-exempt corporation governed by section 501(c)(4) of the Internal Revenue Code. Pratt Decl. ¶ 2. It is dedicated primarily to defending the rights that its members believe are guaranteed by the Second Amendment to the Constitution; its principal function is the dissemination of information concerning such rights through educational programs and advocacy. *Id.* ¶ 3.

23. Gun Owners of America Political Victory Fund is a connected political committee governed by 2 U.S.C. § 431 and is a separate segregated fund of Gun Owners of America. *Id.* ¶ 4.

24. RealCampaignFinance.Org is a not-for-profit, tax exempt corporation governed by section 501(c)(4) of the Internal Revenue Code. Babka Decl. ¶ 2. It is dedicated to defending the campaign and election-related rights its members believe are guaranteed by the First Amendment to the Constitution through educational programs and advocacy. *Id.* ¶ 3.

25. Citizens United is a not-for-profit, tax exempt corporation governed by section 501(c)(4) of the Internal Revenue Code. Bossie Decl. ¶ 2. It is dedicated to the principles of limited government and national sovereignty and to defending the rights its members believe are secured in the United States Constitution; its principal function is the dissemination of information concerning such beliefs and advocacy. *Id.* ¶ 3.

26. Citizens United Political Victory Fund is a connected political committee governed by 2 U.S.C. § 431 and is a separate segregated fund of Citizens United. *Id.* ¶ 4.

27. Michael Cloud was the Libertarian Party's candidate for United States Senate from the Commonwealth of Massachusetts in the 2002 election and is a registered voter. Cloud Decl. ¶ 1.

28. Carla Howell was the Libertarian Party's candidate for Governor of the Commonwealth of Massachusetts in the 2002 election and is a registered voter. Howell Decl. ¶¶ 1–2. She was also the Libertarian Party's candidate for election to the United States Senate for the Commonwealth of Massachusetts in the 2000 election. *Id.* ¶¶ 2–3.

29. The Republican National Committee ("RNC") is an unincorporated association created and governed by The Rules of the Republican Party. Josefiak Decl. ¶ 13. It consists of three members from the Republican Party in each of the fifty States, the District of Columbia, Puerto Rico, American Somoa, Guam, and the U.S. Virgin Islands. Duncan Decl. ¶ 4; *see also* Josefiak Decl. ¶ 15. Each state and territorial Republican Party elects a national committeeman and a national committeewoman. Duncan Decl. ¶ 4; Josefiak Decl. ¶ 15. In addition, the state and territorial Republican Party chairmen serve as members of the RNC. Duncan Decl. at ¶ 4; Josefiak Decl. ¶ 15.

30. Mike Duncan is a member of the RNC from the State of Kentucky and currently serves as the General Counsel of the RNC. Duncan Decl. ¶ 5. Prior to becoming General Counsel, he was Treasurer of the RNC and in that capacity signed all RNC reports filed with the FEC. *See id.* In both his official capacity as an officer of the RNC and in his personal capacity, Duncan has participated in and (unless prohibited by BCRA) will continue to participate in national, state and local political party activities. *Id.* ¶¶ 6, 9. He will also (unless prohibited by BCRA) continue to solicit, receive, or direct non-federal funds to other persons. *See id.* ¶¶ 8–9.

31. The Republican Party of New Mexico is the state party committee of the Republican Party in New Mexico. *See* Dendahl Decl. ¶¶ 3–4. It supports federal, state and local candidates for office in New Mexico and promotes Republican positions on public policy issues. *Id.* Under New Mexico law, the Republican Party of New Mexico is permitted to raise and spend corporate, labor union and individual funds in unlimited amounts in support of state and local candidates. *See* N.M. Stat. Ann. §§ 1–19–25 to 1–19–36 (1978); Dendahl Decl. ¶¶ 5–7.

32. The Dallas County (Iowa) Republican County Central Committee is a local political party committee that the FEC has deemed independent of any state or national political party committee. Josefiak Decl. ¶ 21. It is actively involved in supporting state and local candidates for office in Iowa. *Id.*

33. The California Democratic Party ("CDP") is an unincorporated association of approximately seven million members and is the authorized Democratic Party of the State of California. Bowler Decl. ¶ 2. The CDP performs many functions, among them providing financial and material support to federal, state and local candidates; taking positions on public issues (including state and local ballot measures) and publicizing those positions; engaging in voter registration, get-out-the-vote and generic party-building activities; and maintaining an administrative staff and administrative structure to support these goals and activities and to comply with extensive federal and state regulation. *Id.* The CDP is required by state law to govern itself through the Democratic State Central Committee (DSCC). *Id.* ¶ 3. The DSCC is made up of approximately 2,710 members, about 849 of whom are elected by the 58 county central committees. *Id.* Other members serve on the DSCC because of their status as federal or state officials, as nominees of the CDP, as members of the Democratic National Committee (DNC) from California or as elected representatives of 80 Assembly District Committees (AD Committees). *Id.* CDP bylaws provide for local party AD Committees, which elect delegates to the DSCC and are the district level organizational blocks of the CDP. *Id.* ¶ 4. The AD Committees are primarily involved in local voter registration, get-out-the-vote and grassroots activities and they act as liaisons with the campaign organizations of Democratic candidates in their area. *Id.*

34. Art Torres is the elected Chair of the CDP. Torres Decl. ¶ 1. Torres also serves on the DNC and has been elected by the DNC to serve on the DNC Executive Committee. *Id.* ¶ 3. As Chair of the CDP, Torres assists the CDP and county central committees in fundraising efforts by meeting and talking regularly with potential donors and attending fundraising events. *Id.* ¶ 2; *see also* Bowler Decl. ¶ 5

35. The Yolo County Democratic Central Committee is one of the 58 county central committees authorized and governed by the California Elections Code. CDP Pls.' Compl. ¶ 11; *see also* Bowler Decl. ¶¶ 3–4. Members of the county central committees are elected at each statewide primary election. Bowler Decl. ¶ 4. All members of the CDP who are also state senators, members of the state assembly or Members of the Congress serve as *ex officio* members of their respective county central committees. *Id.* The county central committees are primarily involved in local voter registration, get-out-the-vote and grassroots activities and act as liaisons with the campaign organizations of Democratic candidates in their area. *Id.*

36. The California Republican Party ("CRP") is an association of over five million members and is the authorized Republican Party of the State of California. Morgan Aff. ¶¶ 3–4. The CRP performs many functions, among them providing financial and material support to federal, state and local candidates; taking positions on public issues (including state and local ballot measures) and publicizing those positions; engaging in voter registration, get-out-the-vote and generic party-building activities; and maintaining an administrative staff and administrative structure to support these goals and activities and to comply with extensive federal and state regulation. *Id.* ¶ 4. The CRP is governed by the Republican State Central Committee (RSCC). *Id.* ¶ 5. The RSCC consists of about 1,500 regular and appointive members. *Id.* The regular members include federal and state officeholders as well as the CRP's nominees for governor, seven other state constitutional offices, United States Senate, 52 congressional districts, 40 state senate districts, 80 state assembly districts and four State Board of Equalization districts. *Id.* The RSCC also includes the chairmen of the 58 county central committees and the chairmen of volunteer party organizations. *Id.* ¶ 6. The CRP operates as well through (1) a 100–member Executive Committee, which includes federal and state office holders and 16 representatives of county central committees; and (2) a 25–member Board of Directors, which includes a Member of Congress appointed by the delegation, three state elected officeholders and representatives from an association of Republican county central committee chairmen. *Id.* Under the CRP's bylaws and the RNC's rules, the CRP is part of the RNC. *Id.* ¶ 8. The CRP's elected chairman is a member of the RNC. *Id.* The CRP elects two other representatives to the RNC—a national committeeman and national committeewoman, each of whom is a member of the CRP Executive Committee and Board of Directors. *Id.*

37. Timothy J. Morgan is (1) a member of the RNC; (2) a member of the CRP Executive Committee; and (3) a member of the CRP Board of Directors; he also served as (4) Chairman of the Santa Cruz County Republican Central Committee. Morgan Aff. ¶ 1.

38. The Santa Cruz County Republican Central Committee is one of the 58 county central committees authorized and governed by the California Elections Code. CDP Pls.' Compl. ¶ 19; *see also* Morgan Aff. ¶ 6. Federal officials and candidates who were nominated as party nominees for

partisan offices, including State constitutional and legislative offices, the Board of Equalization, and federal offices, including nominees for U.S. Senate and U.S. House of Representatives who represent all or a portion of the area within the county's jurisdiction are *ex officio* members of the Republican county central committee, and participate in its decision-making, either personally or through designated alternates or agents. *Id.*

39. The Federal Election Commission ("FEC") is a government agency headquartered in Washington, D.C., created pursuant to FECA, 2 U.S.C. § 437(c), and is charged with enforcing the Act as amended by BCRA. David M. Mason, Karl J. Sandstrom, Danny L. McDonald, Bradley A. Smith, Scott E. Thomas, and Michael E. Toner serve as the commissioners of the FEC.

40. The United States, through the Department of Justice ("DOJ"), is charged with enforcement of the criminal provisions of the Act as amended by BCRA, and has an interest in defending the constitutionality of duly enacted laws of the Nation. United States Mot. to Intervene at 5. John Ashcroft is Attorney General of the United States.

41. The Federal Communications Commission ("FCC") is a government agency headquartered in Washington, D.C., and is charged with enforcing the FECA as amended by BCRA.

42. The intervenors are Members of the Congress who were principal sponsors and authors of BCRA. Senator John McCain is a Republican United States Senator from the State of Arizona. Senator Russell Feingold is a Democratic United States Senator from the State of Wisconsin. Senators McCain and Feingold face reelection in 2004. Senator Olympia Snowe is a Republican United States Senator from the State of Maine. Senator James Jeffords is an Independent United States Senator from the State of Vermont. Senators Snowe and Jeffords face reelection in 2006. Congressman Christopher Shays is a Republican member of the House of Representatives from the Fourth Congressional District in Connecticut. Congressman Martin Meehan is a Democratic member of the House of Representatives from the Fifth Congressional District in Massachusetts.

## B. Findings Regarding BCRA's Disclosure Provisions

43. The NRA presents evidence that some people have been reluctant to give money to the organization or the NRA PVF, the NRA's PAC, fearing that such contributions would be publicly reported. LaPierre Decl. ¶ 62 [NRA App. at 24–25] ("Throughout the years, hundreds, if not thousands, of NRA members have told me that they do not wish to disclose their contributions to the NRA.... If ... members are forced to disclose their identities, I firmly believe that many will not make contributions that trigger such disclosure."); Adkins Decl. ¶¶ 4–6 [NRA App. at 50] ("A conspicuous and disproportionate number of contributors" to the NRA PVF "contribute just below the $200 disclosure level."). Members who have expressed their desire to keep their contributions confidential have provided a variety of reasons. LaPierre Dep. at 306 ("A lot over the years have said, I donate to you, but gee, I just don't want my neighbors to know. I don't want my school board to know. I don't want my employer to know.... I might lose my job. I might not get my school board thing. I might have—I mean, they fearI mean, when you have as much hate as people have put out on this issue, it's natural for people to fear repercussions."); Adkins Dep. at 15–19 (testifying that notes received from individuals refusing to provide information for disclosure to the FEC did not give the

reasons for their objections, or just stated they did not wish to have the information disclosed to the FEC); *id.* at 21–23 (testifying that she had received 3 telephone calls in the previous five or six years from individuals who feared their employer would find out that they donated to the NRA PVF). The NRA does not know the amount those who did protest disclosure gave to the organization. LaPierre Dep at 309; LaPierre Cross at 91; Adkins Dep. at 23. Of the between five and 50 persons estimated to have voiced disclosure concerns to LaPierre in 2000, LaPierre believes "not a lot" of those persons gave the NRA more than $1,000 in 2000 "[b]ecause we don't . . . get a lot of contributions more than $1,000." LaPierre Dep. at 306–309. The average NRA donor donates approximately $30 per year. LaPierre Cross at 92. Beginning in 2003, the NRA's policy is to "pay for [their] television and broadcast programming exclusively out of funds provided by individual members." *Id.* at 93. Mr. LaPierre states that "NRA's position . . . . is that . . . it ought to be disclosed who is running those ads [run with funds from anonymous donors] . . . . [a]nd who pays for the ads." LaPierre Dep. at 294–95 [JDT Vol. 14].

44. Edward Monroe, Director of Political Affairs for the Associated Builders and Contractors ("ABC") and the Treasurer of ABC's PAC, testifies that he had been told that a number of ABC contributors had suffered substantial vandalism after their names were disclosed and that the contributors believed the vandalism was the result of labor unions learning of their contributions. Monroe Cross at 86. He also testified that two corporations refused his solicitations due to their "policy of not supporting [ABC] based on previous incidents . . . . [T]hey did not elaborate." *Id.* at 87. Some contributors to ABC's PAC "specifically donate" less than $200. *Id.* at 88. Monroe believes this practice is the result of the contributors' desire to prevent public disclosure of the contributors' names. *Id.* Two corporations declined Mr. Monroe's solicitations because of "previous incidents," but did not elaborate. *Id.* at 87. Monroe also "believe[s]" that some companies do not contribute because they "do not trust [ABC's] ability to keep . . . information confidential." *Id.* at 89.

45. Stephen Sandherr, Chief Executive Officer of Associated General Contractors of America ("AGC"), testifies in a deposition that between a dozen and two dozen members had expressed concerns to him about their contributions being publicly disclosed. Sandherr Dep. at 43–44. He believes that the number of members who share this concern is much higher but, because the AGC has made an effort to publicize the fact they do not disclose the names of contributors, concerned members do not feel the need to bring the issue up. *Id.* These members expressed two reasons for concern. Some were concerned that if their contributions were made known, "their local building trades would take offense and would threaten actions on the job site or would threaten to make life miserable for them." *Id.* at 45. Others were concerned that if their union became aware of their contribution, they would "cease bargaining over industry advancement funds," that local chapters depend on to support their activities. *Id.* at 46. The non-unionized members who expressed their concerns about disclosure to Sandherr did not express their reasons for wanting to remain anonymous. *Id.* at 48. No contributor to AGC's PAC ever told Sandherr that they planned to contribute less than $200 in order to prevent disclosure of its identity, and no contributor to the AGC's PAC ever reported being subjected to retaliation from unions for giving money to the PAC. *Id.* at 55–56.

46. Bruce Josten, Executive Vice President for Government Affairs, U.S. Cham-

ber of Commerce, gave deposition testimony that some contributors to "Americans Working for a Real Change," a coalition established to respond to AFL–CIO issue advertisements, did not want to be publicly identified. Josten Dep. at 13–14, 27. The reason these entities gave for not wanting to be identified was that they feared becoming "targets or recipients of corporate campaigns or other types of what some would call union harassment activities." *Id.* at 28.

47. Mr. Romero, the ACLU's legislative director, attests that "[m]any ACLU members and contributors request explicit assurances that their membership will remain confidential and that their contributions will remain anonymous. The ACLU has consistently defended the First Amendment right of its members and donors to remain anonymous if they so choose." Declaration of A. Romero ¶ 5. Mr. Romero notes that "[o]nly 212 individuals contributed more than $1,000 to the organization. *Id.* ¶ 6."

48. A poll conducted by Mark Mellman and Richard Wirthlin, two reputable political pollsters, found that 61 percent of Americans want to know who is paying for political advertisements, while 24 percent say knowing such information does not matter to them. Mark Mellman & Richard Wirthlin, *Research Findings of a Telephone Study Among 1300 Adult Americans* (Sept. 23, 2002) at 20 [DEV 2–Tab 5].

49. At least one study has found that the public has a difficult time determining who is responsible for issue advertisements that identify candidates.

> In response to the question asking who paid for an ad, just over 60 percent of survey participants correctly attributed the candidate ads and the pure issue ads to their actual sponsors. Identification of the sponsors of the candidate-oriented issue ads was much more scattered, with most people (38 to 48 percent) assuming

in each case that they came from candidates and fewest (9 to 18 percent) assuming that they were paid for by an interest group. These results, of course, suggest that the disclaimers that appear on these ads are almost completely ineffective.

Krasno & Sorauf Expert Report at 78–79 (summarizing results from David B. Magleby, Dictum Without Data: The Myth of Issue Advocacy and Party Building, available at http://www.byu.edu/outsidemonev/dictum/index.html).

50. The problem of determining the true sponsors of issue advertisements is not only experienced by the general public; politicians and political strategists also have difficulty determining the source of these commercials. For example, former Senator Dale Bumpers, relates that

> [o]ne of the most insidious things about soft money "issue ads" is that the ordinary viewer doesn't have a clue as to who paid for the ad. I first noticed this problem in 1996, when I saw several issue ads before it ever dawned on me that those ads were not being paid for by the candidate.... At first I just assumed that the ads were paid for by the opposing candidates' campaign funds, though I did think it was very strange that the opposing candidates' names were never mentioned. In those ads, everything is honed in on the candidate the ad is trying to defeat. At that time, I did not know that they were soft money spots.

Declaration of Senator Dale Bumpers ¶ 29 [DEV 6–Tab 10]. Democratic political consultant Terry S. Beckett testifies that

> [t]he Republican Leadership Council ("RLC") also ran so-called "issue ads" on television in the 2000 Congressional campaign.... [Two of t]hese ads accuse [Republican Candidate Ric] Keller of acting "like a liberal." I found it [ ]

ironic, not to mention unsettling, to learn of reports that the hundreds of thousands of dollars the RLC spent on these ads trying to defeat Mr. Keller were actually provided by the Florida sugar industry..... And the fact that I, a general consultant in this same race with long high-level experience in Florida politics, was not aware until earlier this year of whose money was behind these ads strongly underlines the need for disclosure of this kind of stealth electioneering financed with corporate funds.

Declaration of Terry S. Beckett ("Beckett Decl.") ¶ 14 [DEV 6–Tab 3].[56] Similarly, political media consultant Raymond Strother comments that

one of the biggest problems that a candidate's media consultant now faces is the lack of disclosure associated with third parties running these ads. A few years ago, Jill Docking ran for the United States Senate against Sam Brownback in Kansas.... In the last two weeks of a very tight election, an unidentifiable group came in and poured a million dollars into the race. They ran television, radio, direct mail, and push polls throughout Kansas telling voters that Jill wasn't a Christian, and all we could find was a fax machine. We had no idea where the money came from. I have had similar experiences in other races as well. Without knowing who is funding the groups that run these ads, we are often unable to correct the distortions.

Declaration of Raymond D. Strother ¶ 15 [DEV 9–Tab 40]. Joe Lamson, campaign manager for Bill Yellowtail's 1996 campaign, testified that

The Yellowtail campaign had trouble finding out who was running the 1996 Citizens for Reform ads in Montana [which portrayed Yellowtail in a negative light]. As I recall, a local television station pointed us to a group in New Orleans. That group said they didn't know anything, but gave us a telephone number in Oklahoma that turned out to be connected to the J.C. Watts campaign. I believe someone there then flipped us to a phone number in Washington, D.C., and we finally found Citizens for Reform. We later learned that Citizens for Reform was actually a front for Triad, a group that ran broadcast attack ads against many Democrats nationwide in the 1996 election cycle.

Declaration of Joe Lamson ¶ 12 [DEV 7– Tab 26]; *see also* Declaration of Larry LaRocco (former Member of Congress, stating he was never able to find the source of attack advertisements run against him in the 1994 campaign because none of the sponsoring organizations were registered with the FEC); Magleby Expert Report at 29 [DEV 4–Tab 8] (providing examples illustrating the point that "even candidates and their campaign managers are unable to ascertain who some of the groups running ads [in the 2000 campaign] were").

51. Krasno and Sorauf find that:

Secrecy is one of the outstanding characteristics of issue advertisements, especially those financed by interest groups. As a result, we—and regulators—are

---

56. The following is an audio transcript from one of these "Florida sugar industry"-sponsored advertisements:

Ric Keller has become an embarrassment. He claims to be a conservative but got caught getting help from liberal Democrat Linda Chapin, and Keller's law firm coughed up campaign contributions for liberal Democrat Buddy McKay. Ric Keller even supported the Clinton–Gore billion dollar tax on food. Ric Keller, who proclaims to be a conservative but gets caught acting like a liberal. How embarrassing. How wrong. How Clinton.

Beckett Decl. Ex. 5 [DEV 6–Tab 3].

hampered by a remarkable paucity of information about them. The media tracking data we have referred to throughout our report fill in some of the blanks, but many key factual questions remain unanswered or may only be answered after painstaking investigation. . . . This secrecy, by itself, creates enormous opportunities for wrongdoing, for favors to be exchanged between issue advocates and public officials. . . . Among its various advantages, disclosure is thought to combat corruption by illuminating the dark corners in which undue influence may be exerted far from public view. The idea is that politicians eager for popularity and votes will be loath to enter into situations that cast doubt on their probity; thus, the more these situations are revealed, the stronger the politician's impulse to avoid them. One of the ironies of this litigation is that many of BCRA's opponents are otherwise champions of disclosure. . . . The public's interest in revealing these transactions is countered by the private interest of many groups and donors to keep them secret. Thus, the ability to route money to groups for candidate-oriented issue ads without disclosure has attracted an increasing amount of money to this activity. In the growing opaqueness of campaign financing, the opportunity for donors and officeholders to forge close relationships or strike deals without risk of detection increases, too.

Krasno & Sorauf Expert Report at 73–75 [DEV 1–Tab 2 at 146]. According to Plaintiffs' expert Sidney Milkis, a professor at the University of Virginia, "the names of these [issue advertising] groups did little to tell viewers who the sponsors of these messages were; indeed, in some cases they were misleading." Milkis Decl. ¶ 49.

52. Defendants' Expert Report, produced by Professor David Magleby, finds that

[t]he current system places an unreasonable burden on voters to ascertain who is attempting to persuade them in an election. Our focus groups and survey data from 2000 show that to voters, party and interest group electioneering advertisements are indistinguishable from candidate advertisements. (See Table 2.) Even the candidates and their campaign managers are unable to ascertain who some of the groups running ads were. . . . And in the CSED national survey, I found that respondents were often confused as to whether party ads were paid for by candidates or parties. More than 40 percent of the time, the respondents thought the party ads were paid for by a candidate. . . . Voters, when asked, have consistently indicated that they would like to know who it is that is conducting electioneering. In 2000 voters in Montana faced a competitive U.S. Senate and a competitive U.S. House race. A late October Montana State University–Billings Poll found that, "78 percent of the survey respondents reported that it was 'very' or 'somewhat important' for them to know who 'pays for or sponsors a political ad.'" Our focus group participants in 2000 had very similar views on the question of the importance of their knowing who is paying for or sponsoring an ad. More than four-fifths (81%) said it was very or somewhat important to know the identity of the sponsor. In the national Knowledge Networks Survey in 2000, 78 percent said the same thing.

David B. Magleby, *Report Concerning Interest Group Electioneering Advocacy and Party Soft Money Activity*, at 29–30 [DEV 4–Tab 8].

53. The Annenberg Public Policy Center finds that

[b]ecause issue ads are not federally regulated, sponsors are not subject to disclosure requirements. As a result,

who paid for an ad may not be apparent to viewers when they see it. Some organizations do identify themselves in the course of an advertisement, but their names may be unfamiliar to viewers and/or deliberately vague. For example, "Citizens for Better Medicare" is not a grass-roots generated group of citizens, but an arm of the Pharmaceutical Research and Manufacturers Association (PhRMA).

Annenberg Report 2001 at 18; *see also id.* at 3 (commenting that "[t]racking spending on issue advocacy is far from an exact science" because of the lack of disclosure). One of the conclusions the Center has reached after seven years of study is that "[i]ssue advocacy masks the identity of some key players and by so doing, it deprives citizens of information about source of messages which research tells us is a vital part of assessing message credibility." *Id.* at 2.

54. A prominent example of an organization running advertisements that influenced a federal election but were able to skirt FECA's disclosure provisions is the "Republicans for Clean Air" campaign. The issue advocacy campaign sponsored by Republicans for Clean Air during the 2000 Republican primary highlights how groups can use candidate-centered issue advocacy to avoid FECA's disclosure requirements. Defendants' experts Krasno and Sorauf provided uncontroverted testimony that:

[a]mong the mysterious groups sponsoring issue ads or the mysterious donors funding various organizations-all without making information known to the public-the example of "Republicans for Clean Air" stands out. This group sponsored ads praising then-Governor Bush and criticizing Senator McCain before the 2000 Republican presidential primaries in three states. Eventually, after the first of these primaries (South Carolina's) reporters uncovered that Republicans for Clean Air consisted of two

brothers, Charles and Sam Wyly, longtime friends and supporters of Governor Bush. Charles Wyly, in fact, was an authorized fundraiser for the Bush campaign.... According to press estimates, the Wylys spent $25 million on their ads for Governor Bush .... When the Wylys' involvement was later uncovered during the New York primary, the news qualified as a small bombshell and led to a wave of publicity critical of the brothers and the Bush campaign, which in turn distanced itself from "Republicans for Clean Air." ... In sum, we have a major campaign conducted in secrecy during a key part of the 2000 Republican primary campaign, and a marked change in the level of scrutiny once its sponsors became known. Much as we applaud the ingenuity of the reporters who eventually broke the story, we strongly believe that there is a compelling governmental interest in making these facts known to all from the start.

Krasno and Sorauf Report at 75–76 (footnotes omitted) [DEV 1–Tab 2]; *see also* FEC MUR 4982, Statement of Reasons, Comm'rs Thomas and McDonald, April 2002, INT 003684 [DEV 133–Tab 1] ("The week before the 'Super Tuesday' primaries, a $2 million advertising campaign praising presidential candidate George W. Bush and attacking his opponent, John McCain, ran in the important primary states of California, New York, and Ohio. The ads stated that they were paid for by a group calling itself 'Republicans for Clean Air.' In actuality, the ads apparently were financed mostly by two brothers, both of whom were strong financial supporters of then Governor Bush and one of whom was an authorized fundraiser for the Bush presidential campaign. At issue in MUR 4982 was whether there should have been some disclosure to the voting public of who really paid for the ads; whether the ads were coordinated with any agent of the Bush campaign and, thus, should be

viewed as an in-kind contribution to the Bush campaign, and finally, whether the advertising effort should have registered with the Federal Election Commission as a 'political committee' subject to the reporting requirements and funding restraints."). Even Plaintiffs' expert agrees that the candidate-centered issue advocacy of the Republicans for Clean Air highlights the fact that this technique can be used to influence federal elections without complying with FECA's disclosure provisions. La Raja Decl. ¶ 25(b) ("We could not determine the sponsors of this ad until reporters in Washington discovered that brothers from Texas, who strongly supported George W. Bush, paid for the advertisements using a P.O. Box in Herndon, Virginia. . . . This direct personal experience trying to monitor outside electoral activity revealed to me the potential difficulties of identifying the source of interest group campaign activities, including issue ads.").

## IV. CONCLUSIONS OF LAW

As part of the *per curiam* opinion, the Court resolves the Paul Plaintiffs' discrete claims and most of the new disclosure provisions of BCRA.

### A. *Paul Plaintiffs' Press Clause Challenge*

Paul Plaintiffs [57] focus their complaint on the guarantees of free press embodied in the First Amendment. Paul Pls.' Br. at 8. Specifically, Paul Plaintiffs contend that BCRA imposes certain restrictions on their "press" activities, which violate the basic tenets on which the freedom of the press rests.[58] *See id.* at 10, 13–18. In doing so, Plaintiffs advance a new, if not novel, challenge—a tack that has not been used in the campaign finance realm. *See id.* at 11 ("To date, however, [campaign finance challengers] that are engaged in non-exempt press activities have not invoked the freedom of the press in their numerous challenges to the constitutionality of federal campaign finance regulations . . . .").[59] While the Court recognizes the import of Paul Plaintiffs' innovative legal theory, it finds their arguments unpersuasive.

In essence, Paul Plaintiffs characterize their activities (for example, candidate press releases, broadcast and radio advertisements, and campaign literature) [60] as

57. "Paul Plaintiffs" include: United States Representative Ron Paul, Gun Owners of America, Inc., Gun Owners of America Political Victory Fund, RealCampaignReform.Org, Citizens United, Citizens United Political Victory Fund, Michael Cloud, and Carla Howell.

58. According to Paul Plaintiffs, BCRA imposes unconstitutional licensing restrictions, economically burdensome regulations, editorial control, and prior restraint on their "press" activities.

59. As discussed at oral argument:

MR. TITUS: Now, if that's true of the institutional press, that a prior restraint has to be tested by such a high standard, all the more true for the Paul plaintiffs who in this particular case are indicating to you, Your Honors, that what they are engaged in are press activities, they are entitled to the same immunity from prior restraint as the institutional press.
JUDGE LEON: Is that a novel theory?
MR. TITUS: No, I don't believe it's a novel theory. I don't think it has ever been pressed.
JUDGE LEON: Do you have any Supreme Court cases that support it or Circuit cases?
MR. TITUS: In financial campaign law cases, no. No one has argued this claim in any campaign finance case that I know of. Tr. at 340–41 (Titus).

60. The vast majority of activities cited by Paul Plaintiffs fall well-outside the scope of BCRA's prohibition on "electioneering communications." *See* BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A) (not applying to press releases or campaign literature). Moreover, Paul Plaintiffs bring a facial challenge to the constitutionality of this statute, and have clearly not met their burden of

falling under the constitutional protections afforded to the press. The freedom of the press, as Plaintiffs contend, "was never designed as a special privilege of the institutional media," Paul Pls.' Br. at 11; rather it extends to "every freeman," *see id.* at 12 (citing *Near v. Minnesota,* 283 U.S. 697, 713–14, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)). They argue further that while other First Amendment rights—of speech and association, for example—may be limited by a compelling governmental interest, the freedom of the press is insulated from such limitations.[61] *Id.* at 9 n. 3. Under Plaintiffs' theory, the same governmental interests that survive a constitutional challenge in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), may not be used to justify any limitation on the general press, which includes all persons and organizations disseminating information. *See id.* at 28 ("[T]he Paul Plaintiffs urge this Court not to follow *Buckley v. Valeo* here, because the press guarantee lays down a different and more stringent standard . . . .").

■ In order for Paul Plaintiffs' arguments to prevail, however, they must demonstrate that the freedom of the press provides rights superior to those under the Speech and Association Clauses of the First Amendment. If Paul Plaintiffs cannot demonstrate that their claims warrant separate and unique guarantees—guarantees that are not provided under the other clauses of the First Amendment—then there is no need for the Court to treat their grievances separately.

The Supreme Court has not explicitly stated whether the freedom of the press affords greater protections than that of speech or association; two leading First Amendment scholars have observed, however, that the Press Clause provides no greater rights. 2 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech,* § 22:10 (2002) ("Does the Press Clause today have jurisdictional significance distinct from the Speech Clause? For the most part, the answer appears to be 'no.'"); *see also* Laurence H. Tribe, *American Constitutional Law* § 12–1, at 785 n. 2 (2d ed.1988).[62] Part of the prob-

demonstrating that the law is substantially overbroad.

**61.** Paul Plaintiffs fail to provide the Court with a standard to apply where the government obstructs "press" activities, nor do they delineate the additional, substantive rights provided under the First Amendment Freedom of the Press Clause. Plaintiffs contend that "[t]he freedom of the press provides guarantees that are distinct from, and significantly greater than, the guarantees of free speech and association, and of equal protection . . . ." Paul Pls.' Br. at 9 n. 3. Moreover, they note that "[w]hile the compelling government interest test has been applied to free speech, association, and equal protection claims, it is not applicable to the freedom of the press." *Id.* Plaintiffs do not, however, explicitly state instances where the freedom of the press has been found to be superior to the other guarantees provided under the First Amendment. Nonetheless, Paul Plaintiffs ask—although not explicitly—that the Court review any government interference with

"press" activities under a more stringent standard than "exacting scrutiny," which would normally be applied where a law burdens core political speech. *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (holding that state restrictions on political speech are subject to "exacting scrutiny"). Without guidance from the parties, the Court, therefore, assumes that Paul Plaintiffs request the application of a standard on par with strict scrutiny.

**62.** Professor Tribe, in his chapter on "Rights of Communication and Expression," does not allude to any greater or distinct rights afforded by the First Amendment Freedom of the Press Clause. In fact, Tribe states: "Throughout this chapter, 'freedom of speech' will be employed as shorthand for the entire collection of freedoms (other than those pertaining specifically to religion) secured from government interference by the first amendment." Laurence H. Tribe, *American Constitutional Law* § 12–1, at 785 n. 2 (2d ed.1988).

lem, as Professor Smolla has observed, is that "in modern First Amendment jurisprudence, the Press Clause has largely been subsumed into the Speech Clause." *Id.* at § 22:6.

The Supreme Court's treatment of the First Amendment in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), illustrates this point. In *Bellotti,* the Supreme Court considered a Massachusetts criminal statute that prohibited corporations "from making contributions or expenditures for the purpose of influencing or affecting the vote on any question submitted to the voters." *Bellotti,* 435 U.S. at 768, 98 S.Ct. 1407 (internal quotations and ellipses omitted). The plaintiff-bank wanted to spend money to publicize its views on a proposed state constitutional amendment that was to be submitted to the voters as a ballot question in an upcoming election. *Id.* at 769, 98 S.Ct. 1407. After being informed that the state Attorney General would enforce the statute, the bank sought declaratory relief. *Id.* The case was not exclusively framed around the Press Clause, *see id.* at 779, 98 S.Ct. 1407, yet the Supreme Court engaged in a careful discussion of the freedom of the press and entertained whether media corporations enjoy superior rights as compared to those of general corporations. *Id.* at 781, 98 S.Ct. 1407. The majority deemed that the "institutional" media "does not have a monopoly on the First Amendment," *id.* at 781–82, 98 S.Ct. 1407, but went on to consider whether the state could "show[ ] a subordinating interest which is compelling" to justify the statute's impact on First Amendment rights, *id.* at 786, 98 S.Ct. 1407. The Supreme Court then determined that the state's concern failed to meet the compelling interest test.[63] *Id.* at 788–91, 98 S.Ct. 1407.

*Bellotti* is significant because, despite considering rights under the Press Clause, the Supreme Court nonetheless applied the compelling interest test. *Id.* In other words, in the context of an election law statute, as it applied to a non-media corporation, the Supreme Court treated the Press and Speech Clauses as indistinct.[64] What is more, the Supreme Court alluded to no rights under the Press Clause that are superior to or different than those under the other clauses of the First Amendment.

Even if the Court were to find that the Press Clause provides greater or different protections than the other provisions of the First Amendment, Plaintiffs' arguments must fail.[65] As noted above, Paul

---

**63.** The Supreme Court distinguished the statute in *Bellotti* from traditional campaign finance laws, which involve expenditures directed towards or otherwise contributed to *candidates. Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407. "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involved in candidate elections simply is not present in a popular vote on a public issue." *Id.* (citation omitted).

**64.** The Supreme Court did not, however, consider whether the media exemption under most campaign finance laws, *see, e.g.,* BCRA § 201(a); FECA § 304(f)(3)(B)(i); 2 U.S.C. § 434(f)(3)(B)(i), violates the First Amendment or the Equal Protection Clause. That is, by exempting the "institutional" media, do such provisions unfavorably discriminate against the rights of the general press? The Supreme Court settled this question in *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), when it simply stated: "Although the [institutional] press' unique societal role may not entitle the [institutional] press to greater protection under the Constitution, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations." *Austin,* 494 U.S. at 668, 110 S.Ct. 1391.

**65.** If the Press Clause affords greater or different rights, it might force the courts to make a distinction between the "institutional" and "general" press. The difficulty in making this distinction compelled Chief Justice Burger to write his concurring opinion in *Bellotti. See Bellotti,* 435 U.S. at 796, 98 S.Ct. 1407 (Burg-

Plaintiffs have failed to identify any case that has applied "press" guarantees in the campaign finance context. Tr. at 341 (Titus); *see also* Paul Pls.' Br. at 11. To hold for Paul Plaintiffs would be to invite a new and wholly unsupported theory of First Amendment jurisprudence; litigants could besiege the courts with a host of challenges to laws previously upheld by the Supreme Court on First Amendment grounds, merely by characterizing themselves in their complaints as members of the "press" because their purpose is to disseminate information to the public. As Chief Justice William Rehnquist and Associate Justice Antonin Scalia observed in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), "of course, if every partisan cry of 'freedom of the press' were accepted as

valid, our Constitution would be unrecognizable." *McIntyre*, 514 U.S. at 373, 115 S.Ct. 1511 (Scalia, J., dissenting).[66]

Paul Plaintiffs can cite no precedent in support of their claims. Since the Supreme Court has not affirmatively provided superior rights under the Press Clause, and has suggested that such claims fall under the general First Amendment compelling interest test, this Court rejects the argument that Paul Plaintiffs' claims under the Press Clause warrant a higher level of constitutional protection.[67] Therefore, this Court will apply the same scrutiny to all First Amendment claims, whether presented under the Speech or Press Clauses, and subsumes all of Paul Plaintiffs' Title I, and essentially all of their Title II, arguments into the First Amendment challenges advanced by the other litigants in this case.[68]

---

er, C.J., concurring) (noting the "difficulty, and perhaps impossibility, of distinguishing, either as a matter of fact or constitutional law, media corporations from [non-media] corporations"). Nonetheless, this Court refuses to resolve Plaintiffs' Press Clause claims in this context.

66. In *McIntyre*, the Supreme Court applied the *Speech Clause* to invalidate an Ohio statute that prohibited the anonymous distribution of campaign literature on general, referendum questions. *McIntyre*, 514 U.S. at 336–37, 349–51, 115 S.Ct. 1511. Justice Thomas concurred in judgment, but "would [have applied] ... a different methodology to [the] case." *Id.* at 358–59, 115 S.Ct. 1511. According to Justice Thomas, the "practices and beliefs held by the Founders" provided for an author's right to publish anonymously under the Press and Speech Clauses. *Id.* at 360, 115 S.Ct. 1511. Justice Scalia, with whom Chief Justice Rehnquist joined, was not persuaded by Justice Thomas's arguments. *Id.* at 373, 115 S.Ct. 1511. As Justice Scalia observed, "not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional, or else modern election laws such as those involved in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) would be prohibited, as would ...

modern antinoise regulation ..., and modern parade permitting regulation." *Id.* (citations omitted).

67. Given this conclusion, the Court holds that there is no reason to remand the Paul Plaintiffs' separate challenges to FECA's pre-BCRA provisions under this theory to a single-judge court. *See* Paul Pls.' Compl. ¶ 1 ("This is an action for declaratory and injunctive relief with respect to certain provisions of [BCRA] as it amends the [FECA], *as well as certain related provisions of the FECA* ... on the grounds that these integrally related provisions deprive the Plaintiffs of the Freedom of the Press in violation of the First Amendment of the Constitution of the United States.") (emphasis added) (citations omitted).

68. Paul Plaintiffs briefly challenge the constitutionality of section 301 of Title III in their pleadings—most notably and independent of their Press argument, that section 301 discriminates against non-incumbent office holders by placing limitations on personal use expenditures. Paul Pls.' Br. at 25. However, the Court is not able to discern any basis for these arguments in their Amended Complaint. Accordingly, the Court does not address this issue.

## B. *BCRA's Disclosure Provisions*

*Section 201: Disclosure Provisions*

### 1. *Introduction*

With one exception, the Court also finds the disclosure provisions relating to "electioneering communications" constitutional. The factual record demonstrates that the abuse of the present law not only permits corporations and labor unions to fund broadcast advertisements designed to influence federal elections, but permits them to do so while concealing their identities from the public. BCRA's disclosure provisions require these organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections. Plaintiffs' disdain for BCRA's disclosure provisions is nothing short of surprising. Plaintiffs challenge BCRA's restrictions on electioneering communications on the premise that they should be permitted to spend corporate and labor union general treasury funds in the sixty days before the federal elections on broadcast advertisements, which refer to federal candidates, because speech needs to be "uninhibited, robust, and wide-open." McConnell Br. at 44 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: "The Coalition–Americans Working for Real Change" (funded by business organizations opposed to organized labor), "Citizens for Better Medicare" (funded by the pharmaceutical industry), "Republicans for Clean Air" (funded by brothers Charles and Sam Wyly). Findings ¶¶ 44, 51, 52. Given these tactics, Plaintiffs never satisfactorily answer the question of how "uninhibited, robust, and wide-open" speech can occur when organizations hide themselves from the scrutiny of the voting public. McConnell Br. at 44. Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace. As a result, the Court finds Section 201 facially constitutional, with the exception of one subsection which the Court determines to be broader than necessary to achieve the legitimate governmental interest at stake.

### 2. *Discussion*

The provision's disclosure requirements are challenged by the McConnell, AFL–CIO, Chamber of Commerce, NAB, NRA, and Paul Plaintiffs. Plaintiffs' challenge to Section 201's disclosure provisions focuses on two aspects of the law: (1) its requirement of disclosure prior to the airing of electioneering communications; and (2) its requirement that disbursers disclose the names of contributors who gave over $1,000 to the disbursing fund. The Court addresses each in turn.

#### a. Prior Disclosure

The McConnell Plaintiffs, AFL–CIO, Chamber of Commerce, and NAM object to Section 201's disclosure requirements on the ground that they mandate disclosure of not only actually aired electioneering communications, but also contracts to make such communications. *See* McConnell Br. at 56 n. 22; AFL–CIO Br. at 14–17; Chamber/NAM at 20 n. 13. This advance disclosure, Plaintiffs argue, "serve[s] no governmental interest and will chill the exercise of free speech by forcing groups . . . to disclose ongoing and confidential political strategies and decision-making processes, and by giving adversaries the

opportunity to try to thwart broadcasts or counter them with their own messages." AFL–CIO Br. at 16.[69]

Defendants argue that the then-pending (and now final) regulations interpret the notice requirements as not mandating disclosure until after the advertisements have been publicly distributed. Gov't Opp'n at 111. The content of the regulations, argue Defendants, "moot plaintiffs' concerns, [make] plaintiffs' claims to injury ... wholly speculative[,] and their challenge to this aspect of BCRA's disclosure provisions is therefore unfit for judicial resolution." *Id.*

[2] The Court cannot agree that Plaintiffs' challenge to the disclosure requirements in Section 201 is not ripe for review. Unlike the situation confronted by the Court in examining the disclosure requirement of Section 212, discussed *infra* at 250, the regulations promulgated for Section 201 do not eliminate Plaintiffs' prior disclosure concerns. The regulations, despite the FEC's explanation of the provision,[70] appear to still require prior disclosure of electioneering communications that have not yet aired. Specifically, the definition of "disclosure date" leaves uncertain what must be disclosed after the airing of

**69.** McConnell Plaintiffs, the Chamber of Commerce and NAM make a passing suggestion that Section 201 might constitute a "prior restraint" in violation of the First Amendment. McConnell Plaintiffs Br. at 55–56 ("But if this Court agrees that the electioneering communications provisions cannot stand, the attendant disclosure provisions should likewise fall, because the disclosure provisions constitute a regulation of-and in some cases a prior restraint onspeech that the government may not regulate in the first place."); Chamber/NAM Br. at 20 n. 13 ("The timing of the BCRA's electioneering communication disclosure requirement is an unconstitutional prior restraint.").

This argument cannot be squared with the Supreme Court's definition of "prior restraint." *See Ward v. Rock Against Racism,* 491 U.S. 781, 795 n. 5, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("[T]he regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.'") (*citing Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)); *see also Blue Canary Corp. v. City of Milwaukee,* 251 F.3d 1121, 1123 (7th Cir. 2001) ("By 'prior restraint' ... modern courts ... mean censorship—an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive. The censor's concern is with the content of speech, and the ordinary judicial safeguards are lacking. 'Prior restraints' that do not have this character are reviewed under the much more permissive standard applica-

ble to restrictions merely on the time, place, or manner of expression.") (citations omitted); *Wisconsin Realtors Ass'n v. Ponto,* 233 F.Supp.2d 1078, 1091 (W.D.Wis.2002) (subjecting Wisconsin statute's prior reporting requirements to "time, place, or manner of expression" analysis); FEC Opp'n at 112.

Given the paucity of Plaintiffs' briefing on this matter and the precedent cited above, this Court believes further analysis of "prior restraint" in this context is not warranted.

**70.** In issuing the final regulations, the FEC noted that

All of the commenters who addressed this issue ... advocated adopting a final rule that would define "disclosure date" as the date of the public distribution of the electioneering communication. They argued that there is no electioneering communication, and therefore no reporting requirement, until the communication is actually publicly distributed....

This [adopted definition of disclosure] date reflects the Commission's concerns that there are legal and practical issues associated with compelling disclosure of potential electioneering communications before they are finalized and publicly distributed, and premature disclosure may require reporting entities to divulge confidential strategic and political information about their possible future activities.

Explanation and Justification of 11 C.F.R. 104.20, Reporting Electioneering Communications, 68 Fed.Reg. at 404, 409 (Jan. 3, 2003).

an electioneering communication when the disburser has executed contracts for electioneering communications aggregating over $10,000.[71] The regulations suggest that if a person has executed $10,000 in electioneering communications contracts, 24 hours after the first such communication is aired, the disburser must make a disclosure encompassing all of the electioneering communications under the contract(s). The Court notes that its jurisdiction does not extend to the FEC's BCRA regulations, *see* BCRA § 403 (providing this Court with jurisdiction to hear challenges to "the constitutionality of any provision of this Act or any amendment made by this Act"), and therefore it makes no determination on their validity or proper construction. However, given the uncertainty it finds with regard to the scope of the regulations, the Court cannot conclude that Plaintiffs' challenge is not ripe.[72] "[T]he extent of the chill upon first amendment rights induced by vague or overbroad statutes is the most significant fac-

tor in determining whether an otherwise premature or abstract facial attack ... is ripe for decision." *Martin Tractor Co. v. FEC,* 627 F.2d 375, 384 (D.C.Cir.1980). Where other cases have found facial First Amendment challenges ripe for review, "either the activities in which the complainants wished to (or had) engaged or the enforcing authority's particular intent to enforce the statute, or both, were clear enough to show the adversarial posture assumed by the parties and the contours of their dispute." *Id.* at 387. Here, Plaintiffs have clearly engaged in "electioneering communications" in the past, and the FEC regulations promulgated on January 3, 2003, indicate that the agency intends to enforce BCRA Section 201, including its "contracts" provision. Given these facts, the Court finds that Plaintiffs "have alleged an actual and well-founded fear that the law will be enforced against them," which threatens the danger of "self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).[73]

---

**71.** The regulations provide in part:
 (1) Disclosure date means:
 (i) The *first date* on which *an* electioneering communication is *publicly distributed* provided that the person making the electioneering communication has made one or more disbursements, *or has executed one or more contracts to make disbursements,* for the direct costs of producing or airing one or more electioneering communications aggregating in excess of $10,000; or
 (ii) Any other date during the same calendar year on which *an* electioneering communication is *publicly distributed* provided that the person making the electioneering communication has made one or more disbursements, *or has executed one or more contracts to make disbursements,* for the direct costs of producing or airing one or more electioneering communications aggregating in excess of $10,000 since the most recent disclosure date during such calendar year.
 BCRA Reporting; Coordinated and Independent Expenditures; Final Rules, 68 Fed.Reg.

404, 419 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 104.20) (emphasis added).

**72.** In analyzing Section 212, *infra* at 140, the Court finds that the FEC's final regulations completely and unequivocally address Plaintiffs' concerns and therefore renders their challenge to that provision unripe for adjudication at this time. In the analysis of Section 214(c), *infra* at 250, the Court finds that the regulations related to Section 214, promulgated after briefing and oral argument in this case, have affected the contours of the dispute between the parties to such an extent that the challenge is not ripe for review.

**73.** The Court notes that arguments could be made that the FEC's regulations do render Plaintiffs' challenge unripe. For example, under the regulations, to be an "electioneering communication" the broadcast must be "publicly distributed within 60 days before a general election." BCRA, FCC Database on Electioneering Communications; Final Rules, 67 Fed.Reg. 65190, 65210 (Oct. 23, 2002) (to be codified at 11 C.F.R. § 100.29(a)(2)).

■ Analysis of Section 201 commences with the guidance that disclosure provisions "in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley*, 424 U.S. at 68, 96 S.Ct. 612. However, disclosure provisions are subject to exacting scrutiny analysis "because compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Id.* at 66, 96 S.Ct. 612. The Supreme Court has found three categories of "governmental interests sufficiently important to outweigh the possibility of infringement." *Id.* The Supreme Court stated:

First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return . . . .

Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

*Id.* at 66–68, 96 S.Ct. 612 (citations omitted). *Buckley* upheld the constitutionality of Section 434(e) of FECA, which required disclosure of independent expenditures, although the Supreme Court did limit the provision to only those expenditures used for "communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. 612. The provision was found to be "part of Congress' effort to achieve total disclosure . . . in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence as possible." *Id.* at 76, 96 S.Ct. 612 (footnote and quotation marks omitted). The Supreme Court deemed the measure "responsive to the legitimate fear that efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues

---

Therefore, it could be argued that a broadcast is not an "electioneering communication" until it is aired, and therefore contracts to make broadcasts are not contracts to make electioneering communications unless and until the broadcasts have been publicly disseminated.

This reasoning leads to the conclusion that one cannot have $10,000 in electioneering communications contracts to disclose until $10,000 worth of advertisements have been publicly disseminated. However, as this analysis demonstrates, such a conclusion is not unequivocally apparent, and therefore could lead to the chilling of First Amendment rights. Again, had the FEC promulgated regulations which clearly addressed this issue as it did for Section 212, the Court's ripeness determination for Section 201 would likely have been different. Given the possibility of different interpretations of the regulations, the chilling effect of that uncertainty, and the fact this Court lacks jurisdiction to rule on the regulations, the Court has determined that Plaintiffs' challenge to Section 201's disclosure provisions is ripe.

not explicitly covered by the general provisions of FECA." *Id.* at 76, 96 S.Ct. 612 (footnote omitted). The Supreme Court also determined that

> it is not fatal that [section] 434(e) encompasses purely independent expenditures uncoordinated with a particular candidate or his agent. The corruption potential of these expenditures may be significantly different, but the informational interest can be as strong as it is in coordinated spending, for disclosure helps voters to define more of the candidates' constituencies.

*Buckley,* 424 U.S. at 81, 96 S.Ct. 612.

Addressing Plaintiffs' prior disclosure concerns, Defendant FEC maintains that even with the "contracts" language, Section 201 is constitutional because it "does not prevent anyone from speaking," and "[t]he reports themselves would not have to reveal the specific content of the advertisements, yet they would perform an important function in informing the public about various candidates' supporters *before* election day." FEC Opp'n at 112 (emphasis in original). Although the Court agrees that the function cited is a substantial one, *see Buckley,* 424 U.S. at 67, 96 S.Ct. 612 ("[F]ull disclosure during an election campaign tends to prevent the corrupt use of money to affect elections.") (citation and quotation marks omitted), the FEC does not explain how this goal is any less served by requiring disclosures only after the expenditures for electioneering communications have been publicly disseminated. Information concerning contracts that have not been performed, and may never be performed, may lead to confusion and an unclear record upon which the public will evaluate the forces operating in the political marketplace. By limiting disclosures to expenditures actually made, the government's legitimate interest is served without the constitutional and practical shortcomings implicated by requiring prior disclosures. This is so because Section 201 requires disclosure within 24 hours of the disbursement.[74] The Court finds that Section 201, by including subsection 5 of Section 201, BCRA § 201(a); FECA § 304(f)(5); 2. U.S.C. § 434(f)(5), which equates contracts to make disbursements with actual disbursements requiring disclosure of contracts to make electioneering communications prior to their public dissemination, lacks a "relevant correlation" or "substantial relation,"

---

**74.** The Court does not address the question of whether or not the 24–hour disclosure deadline included in Section 201 is constitutional, as this provision was not challenged nor its constitutionality briefed by Plaintiffs and consequently not responded to by Defendants. *See* McConnell Plaintiffs Br. at 56 n. 22; AFL–CIO Br. at 14–17; ACLU Br. at 17–19; Chamber/NAM Br. at 18–20; NRA Br. at 48–50; FEC Opp'n at 112 n. 116 ("In *Citizens for Responsible Gov't State Political Action Comm* ... the court invalidated a 24–hour notice requirement because it believed 'such immediate notice' was unduly burdensome *claim [sic ] not raised by plaintiffs here* ....") (emphasis added); *McConnell v. FEC,* No. 02–582 (D.D.C. Oct. 15, 2002) (Briefing Order) ("*All* legal arguments shall be presented on a title-by-title basis, with a discrete section of each brief devoted to each title.") (emphasis added); *see also Tri–State Hosp. Supply Corp. v. United States,* 142 F.Supp.2d 93, 101 n. 6 (D.D.C.2001) ("The court makes no ruling on such acts, however, because the United States has not briefed the issue."); *Carter v. Cleland,* 472 F.Supp. 985, 989 n. 4 (D.D.C.1979) ("This issue was not briefed by the parties. No decision will be rendered on it."); *cf. Kattan v. District of Columbia,* 995 F.2d 274, 276 (D.C.Cir.1993) ("[T]his Court has recognized that a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously."). Circuit Courts of Appeal routinely consider issues that are not briefed as "abandoned." *United States v. Wade,* 255 F.3d 833, 839 (D.C.Cir.2001) (*citing Terry v. Reno,* 101 F.3d 1412, 1415 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997)).

*Buckley,* 424 U.S. at 64, 96 S.Ct. 612, to a legitimate governmental interest.

This constitutional flaw, however, does not render Section 201 unconstitutional in its entirety. BCRA provides that "[i]f any provision of this Act . . . or the application of a provision . . . to any person or circumstance[ ] is held to be unconstitutional, the remainder of this Act . . . and the application of the provisions . . . to any person or circumstance, shall not be affected by the holding." BCRA § 401; 2 U.S.C. 454 note. As the Supreme Court noted in *Buckley,* "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley,* 424 U.S. at 108–09, 96 S.Ct. 612 (quoting *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932)); *see also Consumer Energy Council of America v. Federal Energy Regulatory Comm'n,* 673 F.2d 425, 441 (D.C.Cir.1982) ("The presence of a severability clause, which expressly sets forth congressional intent that a statute stand in the event one of its provisions is struck down, makes it extremely difficult for a party to demonstrate inseverability."), *aff'd,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 77 L.Ed.2d 1403 (1983); *Buckley,* 424 U.S. at 108–09, 96 S.Ct. 612 (finding that unconstitutional provisions did not render all of Subtitle H of FECA unconstitutional); *Carlin Communications, Inc. v. FCC,* 837 F.2d 546, 560–61 (2d Cir.1988) (finding that "the words 'or indecent' are separable so as to permit them to be struck and the statute otherwise upheld. . . . [T]he invalid part of section 223 may be dropped and . . . the remainder of the statute is fully operative."), *cert. denied,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). Given this guidance and the clear import of Section 401 of BCRA, the Court holds that the

remainder of Section 201 is severable from subsection (5). It is clear that the value of disclosing electioneering communications disbursements is not dependent on their disclosure prior to broadcast, and the Court cannot say that it is "evident that the legislature would not have enacted" the remaining disclosure provisions of Section 201 in the absence of subsection (5). *Buckley,* 424 U.S. at 108–09, 96 S.Ct. 612. The remainder of Section 201 adequately serves the purpose of "informing the public about various candidates' supporters *before* election day," FEC Opp'n at 112 (emphasis in original), without requiring advance disclosures that could potentially chill the exercise of free speech rights.

The Court therefore finds that Section 201's requirement that electioneering communications that have not yet aired but have been contracted for is unconstitutional, but that by severing subsection (5), the provision's prior disclosure concerns are remedied and the remainder of the section is constitutional.

b. Disclosure of $1,000 Contributors

Plaintiffs ACLU, Chamber of Commerce, NAM, and NRA challenge Section 201's requirement that electioneering communications disbursers disclose the names of persons who have given $1,000 or more to the disbursing fund. Plaintiffs argue that for "controversial groups, such threatened disclosure can have a deadly chilling effect on the group's advocacy." ACLU Br. at 19; *see also* Chamber/NAM Br. at 19; NRA Br. at 50. The NRA argues that the provision suffers from the same infirmities as those in FECA struck down by the D.C. Circuit, as BCRA's "disclosure requirements reach the very same outside 'groups engaging in nonpartisan discussion.'" NRA Br. at 49–50 (quoting *Buckley,* 519 F.2d at 873). Finally, the Chamber of Commerce argues that Section 201's disclosure requirements are overbroad, be-

cause at least "[w]hen the advertiser is the Chamber [of Commerce], the interest served by the ad is reasonably clear." Chamber/NAM Br. at 20 (quoting Deborah Goldberg & Mark Kozlowski, *Constitutional Issues in Disclosure of Interest Group Activities,* 35 Ind. L.Rev. 755, 757 (2002)).

Defendants argue that the disclosure of individual contributors is necessary because many sponsors of issue advertisements conceal "their identity from the public by electioneering pseudonymously, through front organizations such as 'The Coalition: Americans Working for Real Change,' [*sic*] 'Citizens for Reform.'" FEC Br. at 173.[75] Indeed, the Supreme Court has observed that "when individuals or corporations speak through committees, they often adopt seductive names that may tend to conceal the true identity of the source." *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 298, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (rejecting the argument that a limit on contributions to committees formed to support or oppose ballot measures was necessary "to make known the identity of supporters and opponents" of such measures, given that another provision of the ordinance "requires publication of lists of contributors in advance of the voting"). This observation has been buttressed by the evidence presented in this case. *See* Findings ¶¶ 48–

52. For example, PhRMA, a pharmaceutical industry trade group, the Chamber of Commerce, and two brothers from Texas, have produced issue adds under the names "Citizens for Better Medicare," "Americans Working for a Real Change," and "Republicans for Clean Air," respectively. *Id.* ¶¶ 51, 44, 52. A recent poll showed that 61 percent of Americans want to know who is behind these issue advertisement organizations. *Id.* ¶ 46. Plaintiffs' briefs provide no evidence to the contrary and do not attempt to argue that the government lacks a legitimate interest related to the disclosure requirements; in fact, many of their experts voice the same concerns. *Id.* ¶¶ 49 (Milkis), 52 (La Raja). The Court finds that the evidence presented establishes that a legitimate governmental interest is served by the donors disclosure requirement, and reaffirms the *Buckley* observation that "[t]he corruption potential of [independent uncoordinated] expenditures may be significantly different [than coordinated expenditures], but the informational interest can be as strong as it is in coordinated spending, for disclosure helps voters to define more of the candidates' constituencies." *Buckley,* 424 U.S. at 81, 96 S.Ct. 612. Without disclosure of donors, it is difficult, if not impossible for the voting public to know who is sponsoring political advertisements under amor-

---

75. In justifying the provision, one Senator commented:

> We deter the appearance of corruption by shining sunlight on the undisclosed expenditures for sham issue advertisements. Corruption will be deterred when the public and the media are able to see clearly who is trying to influence the election: In addition our provisions will inform the voting public of who is sponsoring and paying for an electioneering communication.

147 Cong. Rec. S3034 (daily ed. Mar. 28, 2001) (Sen. James Jeffords). In a similar vein, a Representative stated:

> No one is trying to gag anybody. If they want to do a political ad that essentially

wants people to vote for or against, what they say is [*sic*] fall within the independent expenditure and other provisions of the law, which has limits on what can be expended and has requirements for disclosure, which is not true of these ads that are clearly campaign ads, that are clearly political ads. But the people do not know who put the money up. They are hidden. They are endless. There is a flood of hidden, in terms of its support, of hidden money. That is what we say should not happen.

144 Cong. Rec. H4866 (daily ed. June 19, 1998) (statement of Rep. Sander Levin).

phous and nondescript pseudonyms. *See* Findings ¶¶ 47, 50–51. Indeed, even those experienced in politics, political scientists, and members of the media find it difficult to know who is behind some political advertisements. *Id.* ¶¶ 48, 52. Without Section 201's disclosure requirements, it will continue to be extremely difficult for the public to learn that groups, such as PhRMA, or individuals, like the Wylys, are the true source of millions of dollars in potential advertisements run under banners such as "The Coalition" or "Citizens for Better Medicare." *Id.*

This conclusion, however, does not end the inquiry. The Supreme Court has been mindful of the chilling effect disclosure can have on associational rights, and has declared that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488(1958). "The strict test established by *NAACP v. Alabama* is necessary because compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Buckley,* 424 U.S. at 66, 96

S.Ct. 612. Although disclosure requirements are often "the least restrictive means" of regulating campaign finance practices, "[i]n some instances disclosure may even expose contributors to harassment or retaliation." *Buckley,* 424 U.S. at 68, 96 S.Ct. 612.

In Buckley, the Supreme Court considered the argument that contributions made to independent candidates and minor parties should be exempt from FECA's disclosure requirements. The Supreme Court rejected the challenge, concluding that the evidence presented was "not of the sort proffered in *NAACP v. Alabama.*" [76] *Buckley,* 424 U.S. at 71, 96 S.Ct. 612. The evidence that was presented in *Buckley* was found by the Supreme Court to be "at best ... the testimony of several minorparty officials that one or two persons refused to make contributions because of the possibility of disclosure," and therefore failed to persuade the Supreme Court that "the substantial public interest ... outweighs the harm generally alleged." *Id.* Buckley instructs that when a legitimate government interest is served by a disclosure provision, constitutional challenges

**76.** In *NAACP,* the NAACP challenged a court order forcing the group "to reveal to the State's Attorney General the names and addresses of all of its Alabama members and agents." *NAACP v. Alabama,* 357 U.S. 449, 451, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The State had obtained a restraining order, enjoined the group from operating in Alabama due to its failure to file a corporate charter with the Secretary of State. *Id.* In response, the NAACP sought to dissolve the restraining order, but refused to comply with Alabama's request for the production of documents including the NAACP's "records containing the names and addresses of *all* Alabama members and agents of the Association." *Id.* at 453, 78 S.Ct. 1163 (quotation marks omitted) (emphasis added). The court then ordered the NAACP to comply. *Id.* The evidentiary record before the Supreme Court consisted of uncontroverted evidence "showing that on past occasions rev-

elation of the identity of [the NAACP's] rank-and-file members has exposed these member to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462, 78 S.Ct. 1163. Based on this evidence, the Court found that

> compelled disclosure of [the NAACP's] membership is likely to affect adversely the ability of [the NAACP] and its members to pursue their collective effort to foster beliefs which, they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

*Id.* at 462–63, 78 S.Ct. 1163. As such, the Supreme Court found that Alabama's interest in the information was insufficient to justify the disclosure. *Id.* at 466, 78 S.Ct. 1163.

claiming the disclosure will chill associational rights must be accompanied by evidence which shows

> a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient.

*Buckley*, 424 U.S. at 74, 96 S.Ct. 612; *see also Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (finding Ohio disclosure provisions could not be constitutionally applied to the Socialist Workers Party ("SWP") due to the "substantial evidence of both governmental and private hostility toward and harassment of SWP members and supporters").[77]

For this reason, the ACLU's facial challenge to Section 201 is unavailing. Neither *NAACP* nor *Brown* stand for the proposition that disclosure laws that apply to organizations "whose positions are often controversial and whose members and contributors frequently request assurances of anonymity" are facially unconstitutional. ACLU Opp'n at 10. Rather, as explained above, the statutes in those cases were held inapplicable to the groups in question based on the facts presented, not invalid on their face. *See NAACP*, 357 U.S. at 462–63, 78 S.Ct. 1163 ("[W]e think it apparent that compelled disclosure of *petitioner's* Alabama membership is likely to affect adversely the ability of *petitioner and its members* to engage in their freedom to associate.") (emphasis added); *Brown*, 459 U.S. at 102, 103 S.Ct. 416 ("Ohio's campaign disclosure requirements cannot be constitutionally applied *to the Ohio SWP*.") (emphasis added). The Court is given no information as to why these donors wish to maintain their confidentiality and no indication is given that revelation of their affiliation with the group would result in harassment, threats or reprisals. Since the ACLU has presented the Court with no facts that place it in the same category of threatened associations such as the NAACP or the Socialist Workers Party ("SWP"), *see* Finding ¶ 45 [78] the Court finds no basis for invali-

---

77. In *Brown*, the Supreme Court examined an Ohio election campaign law which required "every candidate for political office to file a statement identifying each contributor and each recipient of a disbursement of campaign funds." *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 89, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982). The District Court in the case had found "substantial evidence of both governmental and private hostility toward and harassment of [Socialist Workers Party ("SWP")] members and supporters." *Id.* at 98–99, 103 S.Ct. 416. The evidence presented included specific incidents which took place within four years of the trial, and included "threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office. There was also evidence that in the 12–month period before trial 22 SWP members, including four in Ohio, were fired because of their party membership." *Id.* at 99, 103 S.Ct. 416. This evidence was found to present a reasonable probability that disclosing the names of contributors and recipients will subject them to threats, harassment, and reprisals. *Id.* at 100, 103 S.Ct. 416. The Supreme Court concluded that "[i]n light of the substantial evidence of past and present hostility from private persons and government officials against the SWP, Ohio's campaign disclosure requirements cannot be constitutionally applied to the Ohio SWP." *Id.* at 102, 103 S.Ct. 416.

78. The ACLU provides no information as to why ACLU's donors wish to maintain their confidentiality and no indication is given that revelation of their affiliation with the group would result in harassment, threats or reprisals. As an aside, the Court notes that ac-

dating the statute on its face or as applied to the ACLU based on the present record.

Plaintiffs have also provided evidence regarding the effect disclosure under Section 201 would have on four other organizations. The Court considers each in turn.

The NRA provides testimony that some of its members do not wish to have their contributions to the group disclosed, and estimates that between five and 50 persons voiced their concerns in the year 2000. *Id.* ¶ 41. The group also provides testimony that a "conspicuous and disproportionate number of contributors" to its PAC contribute "just below the $200 disclosure level." *Id.* Although Mr. LaPierre testified that one reason given for members not wanting their contributions disclosed was fear of losing one's job, many other reasons were given as well, such as a desire not to have one's neighbors or school board know about their affiliation with the organization. *Id.* Some simply stated that they did not wish to have such information provided to the government. *Id.* No evidence of the basis for these fears is presented to the Court, only speculations. Nor is any evidence presented to the Court of actual instances of retaliation due to the disclosure of someone's membership in the NRA. These fears are the result of conjectures by those expressing them, but unless there is a reasonable probability that these fears will be realized as a result of disclosure, *Buckley* instructs that such worries do not overcome the state's legitimate interest in disclosure.

Edward Monroe, Director of Political Affairs for the Associated Builders and Contractors ("ABC") and the Treasurer of ABC's PAC, testified that *he had been told* that a number of ABC contributors had suffered substantial vandalism after their names were disclosed and that the contrib-

utors *believed* the vandalism was the result of labor unions learning of their contributions. *Id.* ¶ 42. This evidence is essentially hearsay and no evidence is presented showing that the vandalism was actually retaliation in response to the disclosure as opposed to speculation on the part of contributors. Although some contributors to ABC's PAC donate less than $200, the Court has no way of knowing why they donate at this level other than Mr. Monroe's belief that it is to prevent disclosure of their names. *Id.* The same is true for the two companies that declined Mr. Monroe's solicitations. *Id.* On the basis of this evidence alone, the Court cannot find that ABC meets the *Buckley* standard.

The Court also considers evidence regarding the membership of the Associated General Contractors of America ("AGC") and the Chamber of Commerce's coalition titled "Americans Working for a Real Change." Between a dozen and two dozen AGC members expressed concern to its Chief Executive Officer, Stephen Sandherr, that if their contributions to AGC are disclosed publicly they will be subjected to union action that "would threaten to make life miserable for them." *Id.* ¶ 43. Although this testimony demonstrates that AGC members may "fear" the potential consequences of their names being disclosed in connection with AGC, there is no evidence before the Court that these feared consequences have been, or would be, realized. Similarly, the Chamber of Commerce provides evidence that some contributors to its coalition, "Americans Working for a Real Change," did not want to be publicly identified due to fears of "what some would call union harassment activities." *Id.* ¶ 44. Once again, the Court was not presented with evidence of a rea-

cording to the ACLU, "[o]nly 212 individuals contributed more than $1,000 to the organiza-

tion. Findings ¶ 45."

sonable basis for these fears. Furthermore, no member ever told Mr. Sandherr they were contributing $200 or less to AGC's PAC in order to avoid disclosure, and no contributor to AGC's PAC has reported union retaliation in response to their contribution to the PAC. *Id.* ¶ 43. Neither group's evidence meets the *Buckley* standard.

In sum, although many deponents relate what they believe, or have been told, were the reasons contributors did not want to have their names disclosed, that is union retaliation or employment termination, the lack of specific evidence about the basis for these concerns leaves the Court unable to find there exists "a reasonable probability that the compelled disclosure of [any of these organizations'] contributors' names will subject them to threats, harassment, or reprisals from either government officials or private parties." *Buckley*, 424 U.S. at 74, 96 S.Ct. 612. Furthermore, no Plaintiff cited to evidence, and the Court has found none, that their organization, as opposed to the organization's members or contributors, has been subjected to threats, harassment or reprisals. Although these groups take stands that are controversial to segments of the public, and may believe that they are targeted because of the positions they take, none has provided the Court with a basis for finding that their organization, and thereby their membership, faces the hardships that the NAACP and SWP were found to suffer by the Supreme Court. However, nothing in this Court's decision affects the ability of groups in the future from challenging, as the NAACP and the SWP did in the past, the application of Section 201's disclosure provisions to their organization.

The Court addresses next the NRA's argument that the D.C. Circuit's invalidation of FECA's Section 437a, *Buckley*, 519 F.2d at 878, renders Section 201's requirements invalid as well. In *Buckley*, the D.C. Circuit found FECA's independent expenditure disclosure provision [79] unconstitutional. The Court of Appeals stated that "issue discussions unwedded to the cause of a particular candidate hardly threaten the purity of elections . . . . [and] are vital and indispensable to a free society and an informed electorate. Thus the interest of a group engaging in nonpartisan discussion ascends to a high plane, while the governmental interest in disclosure correspondingly diminishes." *Buckley*, 519 F.2d at 873. Even so, the D.C. Circuit rested its decision on the overbreadth of Section 437a's "crucial terms[:] 'purpose of influencing the outcome of an election' and 'design[ ] to influence' individuals in voting at an election." *Buckley*, 519 F.2d at 875. Unable to find a "readily available narrowing interpretation" of the crucial terms in light of Congress's manifested intent, *Buckley*, 519 F.2d at 877, the Court of Appeals held the section unconstitutional, *id.* at 878.

Given that the basis for the D.C. Circuit's invalidation of Section 437a rested on the provision's language and legislative history, the Court does not accept the NRA's suggestion that the Court of Appeals's decision controls this Court's analy-

---

**79.** Section 437a's "demand for disclosure is activated-without any expending of any funds whatever-(1) by any act directed to the public for the purpose of influencing the outcome of an election; or (2) by any material published or broadcast to the public which refers to a candidate (by name, description, or other reference) and which (a) advocates the election or defeat of such candidate, or (b) sets forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office), or (c) is otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate." *Buckley*, 519 F.2d at 870 (paraphrasing FECA § 437a) (internal punctuation and footnotes omitted).

sis of Section 201's disclosure requirements. NRA Br. at 50. Section 201 only requires disclosure of "electioneering communications," the definition of which this Court finds is constitutional. The disclosure trigger is much narrower and more definite than that of FECA Section 437a, and does not include its invalidating "crucial terms." In addition, the record before the Court clearly demonstrates that contrary to the situation facing the Court of Appeals in 1975, where "issue discussions" were indeed "unwedded to the cause of a particular candidate," the evolving present use of issue advertisements, specifically the use of "issues" to cloak supportive or negative advertisements clearly identifying a candidate for federal office, "threaten the purity of elections." *Buckley*, 519 F.2d at 873.[80] For these reasons, the Court declines to find the Court of Appeals's decision on FECA Section 437a binding on this Court's disposition of the challenges to BCRA Section 201's disclosure requirements.

■ Finally, the Chamber of Commerce argues that Section 201 as applied to its electioneering communications, is overbroad because the public knows that the Chamber represents the interests of American business. Chamber/ NAM Br. at 20. The Court interprets the Chamber's position, encompassing all of three sentences, to mean that under BCRA it should be sufficient that the Chamber report that it is behind advertisements sponsored by, for example, "Americans Working for a Real Change" and that listing its $1,000 contributors would be unnecessary for the voting public to know the interest behind the advertisement. The Court first notes that the Chamber does not provide,

and the Court cannot formulate, a disclosure rule that would take into account the notoriety of the groups involved (for example, a law that exempts "well-known" groups from disclosing the names of their $1,000 contributors, while "less well-known" groups would be required to make the disclosures). In addition, the Chamber provides no legal support for its theory, and the Court declines to consider its argument based on a record comprised of a single quotation from the Indiana Law Review and the Chamber's statement that it "is a well-known association of American businesses that has been in existence for 90 years." Chamber/NAM Br. at 20. The Court therefore rejects the Chamber of Commerce's argument.

In conclusion, the Court states what Section 201's disclosure requirements do and do not require. First, they apply only to electioneering communications, which we find constitutional. Second, Section 201 does not prevent anyone from making electioneering communications; it only requires that when persons do make such advertisements that they disclose the source of the communication's funding after they are broadcast. Lastly, the provision does not require the wholesale disclosure of all donors to the sponsoring organization, rather only donors contributing $1,000 to the disbursing account must be disclosed. Organizations are free to set up "segregated bank account[s]," funded by individuals' contributions, for electioneering communication disbursements. BCRA § 201(a); FECA § 434(f)(2)(E); 2 U.S.C. § 434(f)(2)(E). If electioneering communication disbursements made from such segregated accounts then reach the $10,000 threshold,

---

**80.** For example, as mentioned above, the "group" "Republicans for Clean Air" spent $2 million the week before the "Super Tuesday primaries" in advertisements supporting presidential candidate George W. Bush and attacking his opponent John McCain. Findings ¶ 52. "Republicans for Clean Air" was actually a front for two brothers who had ties to the Bush campaign. *Id.*

only the names of the segregated account's $1,000 contributors will have to be disclosed. Lastly, any group can file suit to challenge the constitutionality of the *application* of Section 201's disclosure provisions to their contributors based on a showing such as "threats, harassment, or reprisals from either government officials or private parties." *Buckley,* 424 U.S. at 74, 96 S.Ct. 612.

In conclusion, the Court finds Section 201 constitutional on its face, with the exception of subsection (5), which the Court determines to be broader than necessary to achieve the legitimate governmental interest at stake because of its inclusion of future contracts for electioneering communications. For that reason, the Court severs subsection (5) and finds the remainder of Section 201 constitutional.

*Sections 202, 212, and 214* [81]

1. *Section 202*

Section 202 is challenged by the Chamber of Commerce, NAM, and the McConnell Plaintiffs. Plaintiffs' arguments with regard to Section 202 relate to those made with respect to Sections 201 and 214.[82] For example, Plaintiffs argue that the definition of "electioneering communication" is unconstitutional, and for that reason Section 202 must also be found unconstitutional. Chamber/NAM Br. at 12; McConnell Br. at 83 n. 42. As this argument was addressed and rejected in this Court's examination of Section 201's definition of "electioneering communication," it is rejected here as well.

Plaintiffs also contend that "the First Amendment limits the coordination concept to express advocacy," and for that reason Section 202 should be found unconstitutional. Chamber/NAM Br. at 12. Although Plaintiffs cite to FEC Commissioner Smith for support, *id.,* this view has been rejected by courts in this Circuit. *See Orloski v. FEC,* 795 F.2d 156, 167 (D.C.Cir.1986) (finding the "express advocacy" limitation "not constitutionally required for those statutory provisions limiting contributions"); *Christian Coalition,* 52 F.Supp.2d at 86–87 n. 50 (finding the argument that "the 'express advocacy' limitation must apply to expressive coordinated expenditures" to be "untenable" in light of *Orloski* and *Buckley* ).

Finally, the AFL–CIO contends that "the BCRA § 202 ban on coordinated 'electioneering communications' inevitably will criminalize efforts by the AFL–CIO to coordinate legislative public advocacy with Members of Congress, and interfere with ordinary and necessary lobbying contacts and the AFL–CIO's use of them to plan broadcast and other advocacy. For that reason alone, § 202 violates the First Amendment." AFL–CIO Br. at 14 (citing to the Declaration of Gerald M. Shea ¶¶ 57–59). The Court notes first that Section 202 *bans* nothing. What the Court presumes the AFL–CIO complains of is the effect of Section 202 on some entities as read in conjunction with BCRA Section 203. This issue is dealt with in this Court's examination of Section 203. The group's allegation that Section 202 will criminalize AFL–CIO contacts with Mem-

---

**81.** Although Plaintiffs ask for judgment as to BCRA's Section 211, described *supra,* at oral argument they stated that they were not challenging the provision. *See* Tr. at 341–42 (Judge Henderson: Mr. Starr, I've got down that you all are challenging [Section] 211. Am I wrong about that? .... Baran: We are not challenging section 211...). Furthermore, other than a description of the provi-

sion, McConnell Br. at 82, Plaintiffs' briefs are silent on the provision.

**82.** In addition, the Court observes that Plaintiffs' arguments blur Section 202's provisions with those of Sections 201 and 214, making the Court's task of discerning and addressing their arguments more difficult.

bers of Congress and subsequent advocacy activities is conclusory and is asserted without any legal support. Similarly, the declaration of Gerald M. Shea, the AFL–CIO's Assistant to the President for Governmental Affairs, does nothing to help the Court discern the legal basis for its argument. Mr. Shea states that "[a]ny legal restrictions on the ability of an organization like the AFL–CIO to coordinate legislative and policy communications and activities with federal officeholders who happen to be candidates could substantially interfere with our ability to maintain ordinary and necessary working relationships with Members of Congress and their staffs." Shea Decl. ¶ 58. The fact that Mr. Shea believes that the AFL–CIO's current activities *may* be affected by Section 202 does not provide the Court with a legal basis for invalidating the provision. Furthermore, to the extent that the AFL–CIO challenges the scope of activities covered by BCRA's definition of "coordination," the Court finds, *infra,* that such arguments are not ripe given the statutory construction of Section 214 and the recent promulgation of final regulations on coordination by the FEC.[83]

The Court therefore finds that Plaintiffs' arguments are unavailing and the Court has been presented with no basis for finding Section 202 unconstitutional.

### 2. *Section 212*

Section 212 is challenged by the AFL–CIO and the McConnell Plaintiffs. Plaintiffs object to Section 212 on the grounds that it requires disclosure of not only actual expenditures, but also contracts to make

independent expenditures. *See* McConnell Br. at 56 n. 22; AFL–CIO Br. at 14–17. This advance disclosure, Plaintiffs argue, "serve[s] no governmental interest and will chill the exercise of free speech by forcing groups ... to disclose ongoing and confidential political strategies and decision-making processes, and by giving adversaries the opportunity to try to thwart broadcasts or counter them with their own messages." AFL–CIO Br. at 16.[84]

A Court may not entertain a suit that is not ripe for review. The basic rationale behind the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Furthermore, "[t]he power of courts ... to pass upon the constitutionality of acts of Congress arises only when the interests of the litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough." *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *see also id.* at 90 n. 22, 67 S.Ct. 556 ("It has long been this Court's 'considered practice not to decide abstract, hypothetical or contingent questions, ... or to de-

---

**83.** In the Court's discussion of Section 214, *infra,* it is noted that the regulations contain an explicit "safe harbor for responses to inquiries about legislative or policy issues." *See* Final Rules; Coordinated and Independent Expenditures, 68 Fed.Reg. 421, 455 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 109.21(f)).

**84.** As they did for Section 201, McConnell Plaintiffs, the Chamber of Commerce and NAM make a passing suggestion that Section 212 might constitute a "prior restraint" in violation of the First Amendment. The Court addresses this argument in its discussion of Section 201. *See supra* note 69.

cide any constitutional question in advance of the necessity for its decision, ... or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, ... or to decide any constitutional question except with reference to the particular facts to which it is to be applied ....'") (*citing Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945)). In situations where a statute is challenged on First Amendment grounds, the Supreme Court has found that litigants need not wait for actual enforcement if the existence of the law would chill the exercise of First Amendment rights "even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). However, in those cases, plaintiffs must "allege[ ] an actual and well-founded fear that the law will be enforced against them" in order to assuage the troubling aspects of "the preenforcement nature of [such] suits." *Id; see also Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183, 1185 (7th Cir.1998) (Easterbrook, J.) (observing that if a group's concern that a law will be enforced is not well-founded, "Article III of the Constitution precludes a federal court from ruling."), *cert. denied,* 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998); *Nat'l Treasury Employees Union v. Kurtz,* 600 F.2d 984, 988 (D.C.Cir.1979) ("[E]ven where allegations of unconstitutionality on the face of a regulation are made, a concrete factual dispute is required to make the case justiciable."); *Nat'l Student Ass'n v. Hershey,* 412 F.2d 1103, 1113–14 (D.C.Cir.1969) ("[W]e are not persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy.").

■ The Court finds that Plaintiffs' challenge to Section 212 is not ripe for review. At the time of briefing in this case, the FEC had proposed regulations that required disclosure only *after* independent advertisements have been "publicly disseminated." These proposals were recently promulgated as final regulations. *See* BCRA Reporting; Coordinated and Independent Expenditures; Final Rules, 68 Fed.Reg. 404, 452 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 109.10).[85] This fact makes the challenge unfit for judicial resolution, as the regulations provide Plaintiffs with the exact remedy they seek: the FEC will not require disclosure of independent express advocacy expenditures prior to their "public[ ] disseminat[ion]." This situation presents the Court with the question Judge Easterbrook posed in *Wisconsin Right to Life:* "How can a suit present a 'case or controversy' when all the litigants are on the same side?" *Wisconsin Right to Life,* 138 F.3d at 1185.

This conclusion is bolstered by the decisions of other courts faced with similar circumstances. For example, the Seventh Circuit Court of Appeals rejected a group's

---

**85.** The regulations provide in part:
The person making the independent expenditures [more than 20 days before an election] aggregating $10,000 or more must ensure that the Commission receives the report or statement by 11:59 p.m. Eastern Standard/Daylight Time on the second day *following the date on which a communication is publicly distributed or otherwise publicly disseminated....*
Every person making, after the 20th day, but more than 24 hours before 12:01 a.m.

of the day of an election, independent expenditures aggregating $1,000 or more with respect to a given election must report those independent expenditures and ensure that the Commission receives the report or signed statement by 11:59 p.m. Eastern Standard/Daylight Time on the day *following the date on which a communication is publicly distributed or otherwise publicly disseminated.*
68 Fed.Reg. at 452 (to be codified at 11 C.F.R. § 109.10(c), (d)) (emphasis added).

claim that it had a "well-founded" fear of prosecution under Wisconsin campaign finance laws, where an advisory opinion of the Attorney General of Wisconsin and the Election Board's regulations codified the interpretation of the law the group sought. *Wisconsin Right to Life,* 138 F.3d at 1185–86; *see also Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1193 (10th Cir.2000) (describing the *Wisconsin Right to Life* holding and distinguishing the case from the one before it, which lacked "such administrative regulations"). Similarly, in *Shoemaker v. Handel,* the Third Circuit Court of Appeals upheld the lower court's determination that amended regulations, put into effect before becoming final, cured the challengers' privacy concerns, and thus made "[t]heir privacy contentions . . . not ripe for adjudication." *Shoemaker v. Handel,* 795 F.2d 1136, 1144 (3d Cir.1986), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). There was no need to enforce the amendments through injunctive or declaratory relief, because "[i]f the Commission cease[d] to comply with the proposed confidentiality rules, the [challengers could] return to court with a new lawsuit." *Id.*

Plaintiffs do not contest the import of the regulations. Instead, Plaintiff AFL–CIO argues that the FEC regulations do not remedy BCRA's alleged constitutional defect, as the regulations "may not be approved by Congress[,][a]nd there is nothing to prevent the Commission itself from reversing its position as soon as this litigation is over, as part of a litigation settlement or independently." AFL–CIO Reply at 10; *see also* AFL–CIO Br. at 17 n. 16 ("[G]iven the statutory text at issue plaintiffs have no assurance as to how the FEC will interpret or enforce it in the future."). These uncertainties amount to a "hypothetical threat" which the Supreme Court has stated "is not enough" to warrant judicial consideration. *United Public*

*Workers of America,* 330 U.S. at 89–90, 67 S.Ct. 556. Should this hypothetical threat manifest itself as a "concrete factual dispute," *Nat'l Treasury Employees Union,* 600 F.2d at 988, nothing prevents Plaintiffs from "return[ing] to court with a new lawsuit," *Shoemaker,* 795 F.2d at 1144.

As Plaintiffs have presented "a controversy that has not yet arisen and may never arise," *Wisconsin Right to Life,* 138 F.3d at 1187–88, the Court lacks jurisdiction to resolve their challenge to Section 212 at this time.

### 3. *Section 214*

Section 214 is challenged by the McConnell Plaintiffs, the Chamber of Commerce, NAM, the RNC and the AFL–CIO. Plaintiffs' basic argument is that Section 214, "[b]y repealing the FEC's current regulation and failing to supply any clear statutory definition of what constitutes prohibited coordination, . . . will chill First Amendment speech and association." Chamber/NAM Br. at 11; *see also* ACLU Br. at 19–20; AFL–CIO Br. at 13 ("BCRA's vague and overbroad coordination standards will inevitably spur . . . wide-ranging and burdensome investigations" by the FEC.). Plaintiffs also charge that the directive of Section 214(c) that " 'agreement or formal collaboration' not be a prerequisite to considering an expenditure 'coordinated,' . . . exceeds the constitutional bounds established in *Buckley.*" McConnell Br. at 83; *see also* Chamber/NAM Opp'n at 8; RNC Br. at 72 (Section 214 "can only be understood as an impermissible effort to overrule this court's decision in *FEC v. Christian Coalition* . . . which warned against overbroad definitions of 'coordination.' "). The Chamber of Commerce and NAM, in their Opposition brief, argue that Section 214(a)(2), by classifying coordinated expenditures with parties as contributions, will

"chill both party contacts, and contacts with legislators," and that Section 214(d) expands the definition of what may constitute a coordinated contribution or expenditure. Chamber/NAM Opp'n at 8.[86]

a. Section 214(a)

Under Section 214(a)(2), expenditures by a person, other than a candidate or a candidate's authorized committee, made in "cooperation, consultation, or concert with, or at the request or suggestion of, a national, State or local committee of a political party," are considered to be contributions to those party committees. BCRA § 214(a)(2); FECA § 315(a)(7)(B)(ii); 2 U.S.C. § 441a(a)(7)(B)(ii).[87] As noted *supra*, this same definition has been applied to expenditures coordinated with political candidates for over 25 years and was recently found by the Supreme Court to apply to political party expenditures. *See* 2 U.S.C. § 441(a)(7)(B)(i); *Colorado II*, 533 U.S. at 467, 121 S.Ct. 2351.

Plaintiffs argue that the definition of coordination in Section 214(a) is "unconstitutionally vague." McConnell Br. at 85 n. 44. This lack of precision, Plaintiffs allege, violates the First Amendment's "demand[ ] that the conduct that constitutes coordination be precisely, objectively, and narrowly defined," and leaves citizens unsure of what contact they may have with political parties without having future speech regulated as "coordinated." Chamber/NAM at 12. Plaintiffs discount the fact that BCRA orders the promulgation of clarifying regulations because regulations are "subject to the ebb and flow of administrative practice," and speakers "will thus be forced to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'" *Id.* (quoting *Buckley*, 424 U.S. at 41 n. 48, 96 S.Ct. 612).[88] Finally, Plaintiffs maintain that the

**86.** The Court notes at this juncture that Plaintiffs' Section 214 arguments, especially those involving Defendants' justiciability arguments, were sparse and in many instances difficult to discern. Although the Court understands that the page limitations imposed on the parties may have been a contributing factor, the lack of clarity has made the Court's task more difficult.

**87.** For the sake of clarity, the Court points out that contrary to Plaintiffs' description, Section 214(a) does not establish a "ban" on coordination, Chamber/NAM at 8, or a "year round prohibition on all communications made by a corporation," ACLU Br. at 20. Section 214(a) classifies such contacts as contributions, but does not prevent coordination from taking place.

**88.** The Chamber of Commerce and NAM also allege that regulations cannot save Section 214(a)

> for four key reasons: (i) some unconstitutional aspects such as its inclusion of 'electioneering communication' are clearly mandated and are beyond the FEC's power to change; (ii) the vagueness as to what con-

duct may constitute coordination, and hence make future speech unlawful, is chilling association and petitioning activities right now; and [sic] (iii) there is no assurance that the FEC will be able to agree on new regulations at all, [sic] and (iv) there is no assurance that any regulations that may be adopted will survive Congressional and judicial review.

Chamber/NAM Br. at 13. These arguments can be disposed of with expedition. First, the Court does not understand how Section 214(a), on its face, includes "electioneering communication" and Plaintiffs have not explained their statement. Second, alleged chilling of rights incurred prior to the promulgation of the FEC's regulations, as well as the uncertainty over whether the FEC would be able to agree on new regulations, are rendered moot by the promulgation of the final regulations in early January 2003. FECA also provides protection for those who act in good faith reliance on FEC regulations. *See* 2 U.S.C. § 438(e). Finally, the possibility that the regulations may be struck down by Congress or a court is the type of speculative injury that does not rise to the level of a present case or controversy required for Article III standing. *See infra* at 257–58.

existence of an "agreement" is a constitutional prerequisite to finding an expenditure to be "coordinated" with political parties.[89] The Court analyzes each concern in turn.

### 1) Vagueness

■ As the Court noted above, the campaign finance system has been functioning for over 25 years despite the presence of the very same "vague" language to which Plaintiffs object. *See* 2 U.S.C. § 441a(a)(7)(B)(i). Plaintiffs have provided no explanation as to why the application of this coordination formula to the context of political parties chills political speech any more than when applied to expenditures coordinated with political candidates. Furthermore, the Court notes that the FEC's regulations have now been promulgated in final form. It is therefore possible that many, perhaps even all, of Plaintiffs' vagueness concerns have been remedied by the regulations' contents. *See* Chamber/NAM Br. at 13 (stating that

while the FEC's now-repealed regulations on coordination "did not solve all the vagueness problems, it took useful steps toward alleviating them").[90] Although Plaintiffs discount the value of such regulations because of the "ebb and flow of administrative practice," they provide no support for their theory that laws restricting speech cannot be shaped by regulations because of the nature of administrative practices. In addition, as described in more detail below, *see infra* at 167, any issues arising from the enforcement of these regulations can be challenged via lawsuit under the Administrative Procedure Act (APA), or clarified through the advisory opinion procedure codified at 2 U.S.C. § 437f.[91]

### 2) Agreement

■ The Court addresses next Plaintiffs' argument that Section 214(a) violates the Constitution because it does not require the existence of an "agreement" as a predicate to the finding of coordination.

**89.** Although Plaintiffs have not directed this argument specifically at Section 214(a) (it is directed more explicitly at Section 214(c)), it is a central theme of the McConnell Plaintiffs' briefing and the Court presumes that they intend for it to be applied to Section 214(a) as well.

**90.** The regulations promulgated by the FEC define coordinated communications as those not paid for by the candidate or the political party, that meet one content and one conduct standard. *Final Rules; Coordinated and Independent Expenditures*, 68 Fed.Reg. 421, 453 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 109.21). The conduct standards include: (1) communications made, produced, or distributed at the request or suggestion of the candidate or party, or at the request or suggestion of a payor who receives the candidate or party's assent; (2) material involvement by the candidate or party in decisions regarding the content, intended audience, means or mode, media outlet used, the timing or frequency, or the size or prominence of the communication; (3) one or more substantial

discussions about the communication between the payor and the candidate clearly identified in the communication which concern the candidate's or political party committee's campaign plans, projects, activities, or needs that are material to the creation, production or distribution of the communication. *Id.* at 454. The regulation also creates a safe harbor for responses to inquiries about legislative or policy issues. *Id.* at 455. The content standards can be found at 68 Fed. Reg. 421, 453 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 109.21(c)).

**91.** The statute provides in part:

*Not later than 60 days* after the Commission receives from a person a complete written request concerning the application of [FECA] ... or a rule or regulation prescribed by the [FEC], with respect to a specific transaction or activity by the person, the [FEC] *shall* render a written advisory opinion relating to such transaction or activity to the person.

2 U.S.C. § 437f(a)(1) (emphasis added).

Plaintiffs cite to four cases in support of their theory that an agreement is required for an expenditure to be coordinated. The Court addresses each in turn, finding that none support Plaintiffs' argument.

In Buckley, the Supreme Court found that Congress could limit coordinated expenditures to "prevent attempts to circumvent [FECA] through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, 424 U.S. at 47, 96 S.Ct. 612. In rejecting FECA's limitation on independent expenditures, the Supreme Court distinguished independent from coordinated expenditures, noting that expenditures "made *totally* independently of the candidate and his campaign .... may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." *Id.* (emphasis added). The Supreme Court noted that "[t]he absence of prearrangement and coordination of an expenditure with the candidate ... not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Buckley*, 424 U.S. at 47, 96 S.Ct. 612. The coordinated expenditure provision *Buckley* upheld defined coordinated expenditures as those "authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate." *Id.* at 47 n. 53, 96 S.Ct. 612 (quoting FECA § 608(c)(2)(B)). The Supreme Court cited to the House and Senate reports, especially the more detailed Senate report which included the following "example illustrating the distinction between 'authorized or requested' expenditures ... and independent expenditures":

"(A) person might purchase billboard advertisements endorsing a candidate. If he does so completely on his own, and not at the request or suggestion of the candidate or his agent's (sic) that would constitute an 'independent expenditure on behalf of a candidate' under section 614(c) of the bill. The person making the expenditure would have to report it as such."

"However, if the advertisement was placed in cooperation with the candidate's campaign organization, then the amount would constitute a gift by the supporter and an expenditure by the candidate just as if there had been a direct contribution enabling the candidate to place the advertisement himself. It would be so reported by both."

*Id.* (quoting S.Rep. No. 93–689, p. 18 (1974), U.S.Code Cong. & Admin. News 1974, p. 5604) (alteration in original). Based on this guidance, the Supreme Court found that "the 'authorized or requested' standard of the Act operates to treat all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate as contributions." *Id.*

In *Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ("*Colorado I* "), the Supreme Court found that an advertisement made by a political party was not a coordinated expenditure, in part because of "uncontroverted evidence that this advertising campaign was developed by the Colorado Party independently and not pursuant to any general or particular understanding with a candidate." *Colorado I*, 518 U.S. at 614, 116 S.Ct. 2309 (plurality opinion) ("[W]e therefore treat the expenditure, for constitutional purposes, as an 'independent' expenditure, not an indirect campaign contribution.").

This District Court grappled with the troublesome First Amendment line between coordinated and independent expenditures in *FEC v. Christian Coalition*, 52 F.Supp.2d 45 (D.D.C.1999). In her decision, which was not subjected to appellate

review, Judge Joyce Hens Green explained:

> This Court is bound by both the result and the reasoning of Buckley, even when they point in different directions. While Buckley confidently assured that coordinated expenditures fell within the Act's limits on contributions, it also reasoned that spending money on one's own political speech is an act entitled to constitutional protection of the highest order. Expressive coordinated expenditures bear certain hallmarks of a cash contribution but also contain the highly-valued political speech of the spender. I take from *Buckley* and its progeny the directive to tread carefully, acknowledging that considerable coordination will convert an expressive expenditure into a contribution but that the spender should not be deemed to forfeit First Amendment protections for her own speech merely by having engaged in some consultations or coordination with a federal candidate.

*Christian Coalition*, 52 F.Supp.2d at 91 (citations omitted). In addressing "coordination as it applies to expressive coordinated expenditures by corporations," *id.*, Judge Green noted that "[t]he fact that the candidate has requested or suggested that a spender engage in certain speech indicates that the speech is valuable to the candidate, giving such expenditures sufficient contribution-like qualities to fall within the Act's prohibition on contributions." *Id.* at 92. However, the absence of such overtures would not, in Judge Green's view, prevent an expenditure from being coordinated.

> In the absence of a request or suggestion from the campaign, an expressive expenditure becomes "coordinated" where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1)

contents; (2) timing; (3) location, mode, or intended audience (e.g., choice between newspaper or radio advertisement); or (4) "volume" (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners. This standard limits § 441b's contribution prohibition on expressive coordinated expenditures to those in which the candidate has taken a sufficient interest to demonstrate that the expenditure is perceived as valuable for meeting the campaign's needs or wants.

*Id.* Judge Green acknowledged that this standard still left "room for factual dispute," which in turn could "chill some speech." *Id.* But such deficiencies were deemed acceptable given that "expressive coordinated expenditures present real dangers to the integrity of the electoral process." *Id.*

In *Colorado II*, the Supreme Court expounded on the difficulty in determining the point at which an expenditure becomes a coordinated expenditure. The Supreme Court also commented on the functional approach which Congress had adopted, and the *Buckley* Court accepted, to balance First Amendment rights and the state's interest in preventing campaign finance corruption.

> The First Amendment line between spending and donating is easy to draw when it falls between independent expenditures by individuals or political action committees (PACs) without any candidate's approval (or wink or nod), and contributions in the form of cash gifts to candidates. But facts speak less clearly once the independence of the spending cannot be taken for granted, and money spent by an individual or

PAC according to an arrangement with a candidate is therefore harder to classify. As already seen, Congress drew a functional, not a formal, line between contributions and expenditures when it provided that coordinated expenditures by individuals and nonparty groups are subject to the Act's contribution limits, 2 U.S.C. § 441a(a)(7)(B)(i). In *Buckley*, the Court acknowledged Congress's functional classification, and observed that treating coordinated expenditures as contributions "prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, in fact, enhanced the significance of this functional treatment by striking down independent expenditure limits on First Amendment grounds while upholding limitations on contributions (by individuals and nonparty groups), as defined to include coordinated expenditures.

*Colorado II*, 533 U.S. at 442–443, 121 S.Ct. 2351 (citations omitted). Also, in that case, the Supreme Court found that "coordinated spending ... covers a spectrum of activity." *Id.* at 445, 121 S.Ct. 2351.

This Court agrees that "First Amendment clarity demands a definition of 'coordination' that provides the clearest possible guidance to candidates and constituents, while balancing the Government's compelling interest in preventing corruption of the electoral process with fundamental First Amendment rights to engage in political speech and political association." *Christian Coalition*, 52 F.Supp.2d at 91. However, the Court finds nothing in the cited precedent, or

Plaintiffs' arguments, demanding that for an expenditure to be coordinated there must be an agreement. The Court's reading of these cases suggests the very opposite. At the very least, the cases state that substantive requests and suggestions, or "wink or nod" arrangements, can render subsequent expenditures to be "coordinated," a standard that does not equate to agreement.[92] Therefore, the Court rejects the argument that agreements are a constitutional prerequisite to the finding that an expenditure is coordinated, and finds that Plaintiffs have not demonstrated that Section 214(a) violates the Constitution.

b. Section 214(b)

Section 214(b) repealed the FEC regulations on coordination in effect at the time BCRA was enacted. BCRA § 214(b). Plaintiffs concede that Congress has the power to repeal the regulations. What Plaintiffs argue, however, is that "Congress had a duty to provide a narrow, precise, and objective definition for the coordination concept" but failed to do so and "by repealing the FEC's regulatory definition, Congress substantially aggravated the constitutional violation." Chamber/NAM Br. at 13 n. 6. Since the FEC promulgated regulations on January 3, 2003, this "aggravation" claim is moot.

c. Section 214(c)

Because Defendants argue that Plaintiffs' challenge to Section 214(c) is nonjusticiable, Gov't Br. at 183–85; Int. Br. at 139–40, the Court will address this issue first as its resolution may preclude consid-

---

**92.** Defendants offered this hypothetical to illustrate the type of coordination the "request or suggestion" standard is intended to cover:

A candidate suggests to a wealthy individual, "If you want to help, you might finance some political advertisements advocating my election"; the individual does not reply, but a week later, buys $100,000 worth of

air time to advocate the candidate's election.

Gov't Br. at 185. According to the Chamber of Commerce, this hypothetical "is realistic.... Candidates and their parties routinely make general requests for public support." Chamber/NAM Opp'n at 6.

eration of the merits of the Plaintiffs' other arguments. Preliminarily, the Court notes that BCRA provides this Court with jurisdiction to hear "any action brought for declaratory or injunctive relief to challenge the constitutionality of any provision of this Act or any amendment made by this Act," and instructs it to "expedite to the greatest possible extent the disposition of the action." BCRA § 403; 2 U.S.C. § 437h note. This grant does not extend to the consideration of FEC regulations, and it does not permit the Court to go beyond its Article III powers to address claims that are nonjusticiable. *Clark v. Valeo*, 559 F.2d 642, 650 n. 11 (D.C.Cir. 1977) ("To the extent [the dissent's] language may be read as suggesting a view that Congress may 'command' the judiciary to act contrary to the rules relative to ripeness the Supreme Court has developed 'for its own governance in the cases confessedly within its jurisdiction,' we respectfully disagree.") (citations omitted). Cognizant of its authority, the Court now turns to each of Defendants' justiciability claims.

1) Article III Standing

 Plaintiffs have the burden of establishing standing to bring their suit by demonstrating that they have: (1) suffered an "injury in fact;" (2) which is "fairly traceable to the conduct complained of;" and (3) is capable of judicial redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In the First Amendment context, the standing requirements are somewhat relaxed. Parties have

> standing to challenge a statute on grounds that it is facially overbroad, regardless of whether [their] own conduct could be regulated by a more narrowly drawn statute, because of the danger of

tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.

Of course, in order to have standing, an individual must present more than allegations of a subjective chill. There must be a claim of specific present objective harm or a threat of specific future harm.

*Bigelow v. Virginia*, 421 U.S. 809, 816–17, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (citation and internal quotation marks omitted).

In terms of the "injury in fact" prong, it is true that Plaintiffs have "not alleged any concrete and particularized injury from [Section] 214(c)'s instructions to the Commission to promulgate a new regulation." Gov't Br. at 184. However, *Bigelow* instructs that Plaintiffs do not have to allege a particularized injury, they must only show a specific objective harm. *Bigelow*, 421 U.S. at 816–17, 95 S.Ct. 2222. Plaintiffs allege that the Constitution requires an agreement before an expenditure may be considered coordinated. McConnell Br. at 84; Chamber/NAM Opp'n at 8 n. 10 (stating that Section 214(c) "fairly read, rejects the constitutional holding" that the "First Amendment demanded a narrow agreement standard of coordination"). The fact that Section 214(c) directs that the FEC's regulations on coordination not require "agreement or formal collaboration," from Plaintiffs' perspective, presents a specific future harm of impermissibly overbroad regulations. McConnell Opp'n at 53 n. 24 (arguing that "since" no constitutional regulation consistent with BCRA can be promulgated (because of the statute's disavowal of an 'agreement' standard) it would be futile to delay "litigation until regulations are promulgated, litigation is appropriate now").[93] This argument was

---

93. Plaintiffs, despite purporting to have standing to challenge Section 214(c), have not clearly articulated the basis for their position.

This theory represents what the Court has gleaned from their terse briefings. *See* Cham-

addressed above and found to be inconsistent with the holdings of *Buckley* and its progeny.[94] Therefore, Plaintiffs' allegation that they will be injured by regulations which by Congressional direction will be constitutionally overbroad, is not an injury-in-fact.[95]

Even if this Court were to find that Plaintiffs have alleged an injury-in-fact, Plaintiffs would still lack standing to bring their Section 214(c) challenge because their claim lacks redressability. To establish standing, Plaintiffs are required to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Even if this Court were to strike Section 214(c) from BCRA, other provisions dealing with coordinated expenditures to candidates and

ber/NAM Opp'n at 7–8; Chamber/NAM Reply at 7–10; McConnell Opp'n at 53 ("For reasons discussed fully in the submission of the Chamber of Commerce Plaintiffs . . . this assertion [that plaintiffs' coordination arguments are not justiciable at this time] are meritless.").

94. McConnell Plaintiffs argue that the language of Section 214(c) violates the Constitution because it does not require *"some form of agreement* with the candidate [to] be present to find coordination. BCRA, of course, forbids the FEC from requiring that any sort of agreement—*formal or otherwise*—be required." McConnell Opp'n at 54 n. 26. The Court disagrees with Plaintiffs, interpreting Section 214(c) under the doctrine of *noscitur a sociis.* "The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). Given that "agreement" in Section 214(c) is immediately followed by the words "or formal collaboration," narrows the Court's reading of the term to cover formal agreements. This interpretation also appears to match the intent of Congress. *See* 148 Cong. Rec. S2144 (daily ed. Mar. 20, 2002) (Sen. Russ Feingold) ("Unfortunately, based on a single district court decision, the Federal Election Commission's current regulation defining when general public political communications funded by outside groups are considered coordinated with candidates or parties fails to account for certain types of coordination that may well occur in real-world campaigns. The FEC regulation is premised on a very narrowly defined concept of 'collaboration or agreement' between outside groups and candidates or parties. This

current FEC regulation fails to cover a range of *de facto* and *informal* coordination between outside groups and candidates or parties that, if permitted, could frustrate the purposes of the bill.").

95. The AFL–CIO, the Chamber of Commerce and NAM assert that "BCRA's vague and overbroad coordination standards will inevitably spur more . . . wide-ranging and burdensome investigations." AFL–CIO Br. at 13; Chamber/NAM at 14 ("[T]he Chamber and NAM[ ] know from painful, first-hand experience how a vague and overbroad concept of 'coordination' permits unfounded charges and investigations that seriously burden and chill participation in legislative initiatives.") These Plaintiffs point to the FEC's investigations into their broadcasts made in 1995 and 1996 (the Chamber of Commerce's advertisements were run in response to those aired by the AFL–CIO) to support this proposition. The Court finds a harm that may be caused by potential future investigations to be the type of speculative injury *Lujan* rejects as a basis for standing. Furthermore, the Court notes that the regulatory regime under which these investigations were conducted was far broader than that which BCRA appears to endorse. *See Christian Coalition*, 52 F.Supp.2d at 89–91 (rejecting the FEC's "insider trading" or "conspiracy" standard for coordination). The regulations in place prior to 2000 considered expenditures to be coordinated when they were "[m]ade by *or through* any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent." 11 C.F.R. § 109.1(b)(4)(i)(B) (1999 ed.) *(repealed* 2001) (emphasis added).

parties would still govern and count contributions as any expenditures made at the request or suggestion of a candidate-covering behavior which falls short of formal collaboration or agreement. *See* 2 U.S.C. § 441a(a)(7)(B)(i), (ii). As the Court explained above in finding Section 214(a) constitutional, there is nothing inherently unconstitutional about the "cooperation, consultation, or concert with, or at the request or suggestion of" language found in FECA § 441(a)(7)(B)(i) or (ii), 2 U.S.C. § 441(a)(7)(B)(i), (ii). Therefore, Plaintiffs' challenge to Section 214(c) cannot redress their claimed injury of having coordination defined as something broader than an agreement.

Based on the foregoing, the Court concludes that Plaintiffs have failed to establish the injury in fact and redressability elements required for Article III standing with regard to their challenge to Section 214(c).

2) Ripeness

■ In the alternative, the Court examines Defendants' assertion that Plaintiffs' Section 214(c) claims are not ripe for judicial review at this time. Defendants maintain that since Section 214(c) does not require or prohibit any actions by Plaintiffs, but merely directs the FEC to promulgate new regulations which were not final until after briefing and oral arguments in this case were completed, "neither the Court nor plaintiffs can know how the revised regulations will affect plaintiffs or have any basis for evaluating whether those regulations will contravene constitutional principles." Gov't. Br. at 183–84; *see also* Int. Br. at 140 ("[T]here is nothing meaningful for this Court to review ... until there is actually a new definition in place."). This defect, Defendants argue, renders Plaintiffs' claims not yet ripe.

It is presumed that "federal courts lack jurisdiction unless the contrary appears affirmatively from the record," and "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 315, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). In commencing the ripeness analysis, the Eighth Circuit provides guidance:

> In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy. Ripeness is peculiarly a question of timing, intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. In short, the doctrine of ripeness is intended to forestall judicial determinations of disputes until the controversy is presented in clean-cut and concrete form....
>
> [The] ripeness inquiry in the context of this [First Amendment] facial challenge ... focuses on three elements: (1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review. Our ripeness inquiry is not to be applied mechanically but rather, with flexibility.

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499–1500 (10th Cir. 1995) (citations and quotation marks omitted).

Plaintiffs' arguments focus on the first two prongs of the ripeness analysis. They allege that Section 214 creates a situation whereby it is unclear what actions may render an expenditure "coordinated" under BCRA. This predicament, Plaintiffs claim, chills their speech and associational rights, which is the direct and immediate hardship they assert. *See* Chamber/NAM Opp'n at 10. Since BCRA is "self-enforcing," in

that "it can be used against people in its current form," Plaintiffs maintain that the case is fit for judicial review. Tr. at 296 (Baran).

In light of the authority presented by the D.C. Circuit, the Court disagrees with Plaintiffs and finds their challenge to Section 214(c) not ripe for review. In *Martin Tractor Co. v. FEC*, a number of parties sought declaratory and injunctive relief from certain provisions of FECA. *Martin Tractor Co. v. FEC*, 627 F.2d 375, 377 (D.C.Cir.), *cert. denied sub nom. Nat'l Chamber Alliance for Politics v. FEC*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). Limited to "soliciting" its hourly employees twice a year, the Martin Tractor Company complained that Section 441b(b)(4)(B) of FECA had restricted, in a constitutionally impermissible manner, its ability to communicate with its hourly employees about its PAC. *Id.* at 382. Neither the statute nor the regulations defined "solicit" or "solicitation." *Id.* at 383. The Court of Appeals determined, despite the vagueness of the undefined term "solicit" and the lack of clarifying regulatory language, that "the extent of the chill induced by the statutory provision at issue . . . is a very limited one." *Id.* at 384. This conclusion was based on two factors. First, the statute provided an "advisory opinion (AO) mechanism . . . authorized to give advice concerning the Act's application to specific factual situations," and mandated that such counsel be provided within 60 days of a request for advice. *Id.* 384–86. Second, the D.C. Circuit found that the legal rights alleged by Martin Tractor were "uncertain," *id.* at 386, and that unlike cases which had found ripeness in similar circumstances, the "adversarial posture assumed by the parties and contours of their dispute" were not clear, *id.* at 387. Specifically, the fact that the FEC "has said or done nothing . . . to indicate how it construes the term 'solicit,'" left the court "without substantial guidance to decide this case or even to frame the constitutional issues at stake." *Id.* at 387.

The situation this Court faces is virtually identical to that of *Martin Tractor*. Plaintiffs here similarly complain about the chilling effect of an ambiguous term. Plaintiffs, like those in *Martin Tractor*, have the option of seeking a chill-reducing AO if they fear their actions may be construed as "coordination." [96] In addition,

---

**96.** Plaintiffs' argument that *Buckley* should be construed as rejecting the opportunity for AO guidance as a factor in determining ripeness is completely incorrect, and in their own words, is "[n]onsense." Chamber/NAM Reply at 8. *Buckley* found that since the AO procedure in FECA *at that time* was available *only* to "candidates, federal officeholders, and political committees," the AO mechanism did "not assure that the vagueness concerns will be remedied prior to the chilling of political discussion by individuals and groups in this or future years." *Buckley*, 424 U.S. at 41 n. 47, 96 S.Ct. 612. This is no longer the case. *See Martin Tractor*, 627 F.2d at 386 n. 44 (explaining why *Buckley* rejected the AO rationale and noting that "[b]oth of these aspects of the AO mechanism have been amended and the susceptibility of the FECA to challenge on the grounds of vagueness has consequently been reduced.").

Section 437f of FECA requires the FEC to provide an advisory opinion within 60 days of receiving a "written request concerning the application of [FECA] . . . or a rule or regulation prescribed by the" FEC. 2 U.S.C. § 437f(a)(1). The advisory opinions may be relied upon by the requester or any other person involved in an "identical transaction or activity with respect to which such advisory opinion is rendered." *Id.* at § 437f(c)(1). Such persons who "act[ ] in good faith in accordance with the provisions and findings of such advisory opinion, shall not, as a result of any such act, be subject to any sanction provided by" FECA. *Id.* § 437f(c)(2).

Plaintiffs also assert that it is "wildly implausible" and "impractical" to believe that the FEC could handle the thousands of AO requests they envision would result from the Court's decision today. Chamber/NAM Reply at 8. Whether or not there would be such an influx of requests, and whether or not the

since briefing and oral argument in the case occurred prior to the FEC's promulgation of final regulations and the regulations affect the vagueness alleged, the Court does not know the "contours of [the] dispute." In other words, the Court does not know to what extent the regulations have clarified the vagueness Plaintiffs contend would chill their rights. Regulations in the past have clarified this very issue, Chamber/NAM Br. at 13 (stating that the FEC's now-repealed regulations on coordination "took useful steps toward alleviating" vagueness problems), and it is therefore likely that some, if not all, of Plaintiffs concerns have been addressed. For example, the ACLU maintains that because of Section 214 it "may not be able to discuss a . . . vote or position with a Representative or Senator if the ACLU will subsequently produce a box score that praises or criticizes the official's stand. This feature of BCRA acts as a continuing prior restraint . . . ." ACLU Br. at 20. However, the FEC's recently promulgated regulations appear to assuage this fear, creating a safe harbor for "inquiries about legislative or policy issues." Final Rules; Coordinated and Independent Expenditures, 68 Fed.Reg. at 455 (Jan. 3, 2003) (to be codified at 11 C.F.R. § 109.21(f)). To decide Plaintiffs' claims at this juncture would entangle the Court in a dispute that has not been "presented in a clean-cut and concrete form," the exact situation the ripeness doctrine is designed to avoid. *Gonzales,* 64 F.3d at 1499.

The Chamber of Commerce and NAM seek to distinguish *Martin Tractor* from the current case on its facts. Chamber/NAM Reply at 8. First, they state that "[p]laintiff there did not claim immediate injury." *Id.* This is not the case. Martin

Tractor alleged that "but for the [section] 441b restrictions and the threat of sanctions, [it] would resume the extent and manner of communication [it] engaged in previously." *Martin Tractor,* 627 F.2d at 382. Second, Plaintiffs presume, based on the fact the court stated that the AO mechanism "argues against constitutional adjudication on a barren record," *Id.* at 385, that the appellants in that case had "provided no factual record." Chamber/NAM Reply at 8. If the Plaintiffs had referred to the footnote immediately following the court's statement, they would have seen that the court meant a record bare of any indication of how the FEC planned to enforce the provision, as opposed to a barren factual record. *See Martin Tractor,* 627 F.2d at 385 n. 39 (citing cases holding "equitable relief inappropriate where administrative intent has not come to fruition or is unknown" and "case ripe where pertinent regulations *and AO* have been issued") (emphasis added). Next, the Chamber of Commerce and NAM appear to suggest that the *Martin Tractor* decision was the product of prudential concerns, and not an Article III ripeness determination. Chamber/NAM Reply at 8. Although the court stated, "we find the cases nonjusticiable as a constitutional matter and inappropriate for adjudication as a prudential matter," if Plaintiffs had looked at the footnote immediately following that statement, they would have read the Court's conclusion that "[s]ince we hold that these appellants present no justiciable 'case or controversy' we need not decide or consider the circumstances under which a court might decline for prudential reasons alone to reach the merits of a constitutional challenge to FECA." *Martin Tractor,* 627 F.2d at 378 n. 5. Lastly, the Chamber of Commerce and

FEC would be in a position to handle them, are not questions before this Court and Plaintiffs have provided the Court with no basis,

other than their unsupported assertion, for finding that the AO mechanism would be unworkable for solving coordination problems.

NAM point out that *Martin Tractor* discounted *Buckley's* ripeness holding for "lack of a broad package of expedited challenges such as exist here." Chamber/NAM Reply at 8. The *Martin Tractor* court did note that the case before it provided "no similar urgency of decision ... that outweighs the inadvisability of premature constitutional adjudication," although its decision was also informed by "the comparative speed with which an advisory opinion on specific conduct can be secured." *Martin Tractor,* 627 F.2d at 388.[97] Accordingly, the Court finds that *Martin Tractor* is applicable to the pending cases.

The cases at bar do differ from *Martin Tractor,* in one material respect. Unlike the case before the *Martin Tractor* court, where there was no indication the FEC would ever promulgate regulations to reduce the vagueness of the undefined term, Congress in this instance has explicitly ordered the FEC to promulgate regulations on this very matter in an expedited fashion, and the FEC did so on January 3, 2003. This fact argues against finding these cases ripe for adjudication. As the Eighth Circuit explained,

> [m]any ripeness cases require finality of the government action that is challenged. This requirement is intended, in part, to guard against courts passing

on the legality of actions that do not, in and of themselves, alter or burden the rights, duties or obligations of the claimant. For example, orders that merely embody a precursor to the later formulation of actual regulations will, as a general rule, not support a finding of ripeness.

*Gonzales,* 64 F.3d at 1504 n. 5 (citations omitted) (finding that, unlike the cases presented here, since the "challenged provision itself delineates the proscribed conduct and neither directs nor requires further administrative or legislative enactments for its effect" the case was ripe for adjudication); *see also El Dia v. Hernandez Colon,* 963 F.2d 488, 496 (1st Cir. 1992) (finding the "policies that underscore the ripeness doctrine militate strongly against granting discretionary (declaratory) relief" where the executive order challenged was "merely a precursor to the later formulation of actual regulations"). Moreover, as long as Plaintiffs abide by the regulations in good faith, they will not be subject to sanctions under FECA. 2 U.S.C. § 438(e) ("[A]ny person who relies upon a rule or regulation proscribed by the [FEC] ... and who acts in good faith in accordance with such rule or regulation, shall not, as a

---

**97.** The Court also notes that although the *Martin Tractor* court took *Buckley's* statement that "ripeness is peculiarly a question of timing," *Buckley,* 424 U.S. at 114, 96 S.Ct. 612, to describe the timing of that case in relation to the 1976 Presidential election, *Martin Tractor,* 627 F.2d at 388, a close reading of *Buckley* shows that the Supreme Court was referring to developments that had taken place in "the passage of months between the time of the decision of the Court of Appeals and our present ruling," *Buckley,* 424 U.S. at 114, 96 S.Ct. 612. The Supreme Court made its ripeness determination in the context of a separation of powers challenge to FECA's establishment of the FEC. *Id.* at 113, 96 S.Ct. 612. The Court finds that the challenge considered

here differs greatly from that *Buckley* faced when it conducted the ripeness analysis described above. The separation of powers concerns raised in *Buckley* did not depend on the future promulgation of regulations, but focused solely on the constitutionality of the powers granted to the FEC. *See id.* at 113, 96 S.Ct. 612. The *Buckley* defendants could not claim that future regulations would shape the contours of the plaintiffs' claims. As such, this Court finds that the *Buckley* ripeness determination was made under circumstances that distinguish it from the case at bar and that its reasoning does not require the Court to forego Article III justiciability requirements in this case.

result of such act, be subject to any sanction provided by [FECA].").

The Court acknowledges that the regulations may still be vetoed by Congress [98] or face a court challenge. Regardless, the regulations shape the "contours" of Plaintiffs' complaints regarding Section 214(c). However, since the regulations are not properly before this Court, Plaintiffs' claims in this regard are not ripe. Again, it is possible that many, perhaps all, of Plaintiffs' concerns have been remedied by the recently promulgated regulations. The proper venue for any complaints Plaintiffs believe have not been addressed by the new regulations is not this special court, but in a single-judge court pursuant to a lawsuit brought under the Administrative Procedure Act (APA). *See* BCRA § 403. Although Plaintiffs decry the lengthy nature of suits brought under the APA, the Court lacks the jurisdiction to rule on the regulations and cannot ignore the absence of Article III ripeness in order to provide Plaintiffs with the forum they prefer.[99]

Accordingly, the Court does not reach the merits of Plaintiffs' challenges to Section 214(c), as they are not ripe for adjudication.

### d. Section 214(d)

In their Opposition Brief, the Chamber of Commerce and NAM claim that Section 214(d)

> specifies that coordination applies not only to a "contribution or expenditure" in the defined sense that requires express advocacy, but "*also* includes any direct or indirect payment ...." (emphasis added). BCRA § 214(d) extends coordination to an "electioneering communication." These provisions remove express advocacy as a *content* standard and give no substitute.

Chamber/NAM Opp'n at 8 (emphasis in original). The Court does not find Section 214(d) to have the effect on FECA that Plaintiffs assert. Section 214(d) amends FECA Section 441b, which limits contributions or expenditures by national banks, corporations, or labor organizations, so that the definition of "contribution or expenditure" under that section "includes a contribution or expenditure, as those terms are defined in section 301" of FECA, 2 U.S.C. § 431(8), (9). BCRA § 214(d); FECA § 441b(b)(2); 2 U.S.C. § 441b(b)(2). The definitions of "contribution" and "expenditure" in FECA Section 301 have not been amended by BCRA.[100]

---

**98.** Under the Administrative Procedures Act, 5 U.S.C. 553(d), and the Congressional Review of Agency Rulemaking Act, 5 U.S.C. 801(a)(1), the FEC's regulations must be submitted to Congress and do not take effect until 60 days after Congress receives the FEC's report on the regulations or the rule is published in the Federal Register, whichever is later. 5 U.S.C. § 801(a)(3). The regulations were transmitted to Congress on December 18, 2002 and published in the Federal Register on January 3, 2003. Final Rules; Coordinated and Independent Expenditures, 68 Fed.Reg. 421 (Jan. 3, 2003). Congress can veto the regulations within 60 days by passing a joint resolution disapproving the regulations. *See* 5 U.S.C. § 802.

**99.** Plaintiffs should also be aware that should they challenge the FEC's regulations, they may seek a stay from the FEC or a court to prevent the application of the rule pending its review. 5 U.S.C. § 705. The law provides: "When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.*

**100.** BCRA Section 203 adds "electioneering communication" to FECA Section 441b(b)(2)'s definition of "contribution or expenditure."

Plaintiffs' complaints about the definition's inclusion of "direct or indirect payment" are also misplaced as this provision preexisted BCRA and is therefore not subject to this Court's review.

Given the fact that Plaintiffs' understanding of Section 214(d) is mistaken, the Court has no basis upon which to review the provision, cannot fathom the nature of their claims, and therefore does not find the provision unconstitutional.

## C. BCRA Title III

*Section 311: Clarity Standards for Identification of Sponsors of Election–Related Advertising*

Section 311 amends Section 318 of FECA, 2 U.S.C. 441d, adding details and requirements for the identification of sponsors of political advertising. Included in the provision is the extension of FECA's requirements to electioneering communications, as defined in BCRA Section 201. BCRA § 311(1); FECA § 318(a); 2 U.S.C. § 441d(a). Pursuant to Section 318 of FECA, such communications must clearly state information about the sponsor, 2 U.S.C. § 441d(a); Section 311 adds various requirements related to the identification of the sponsor in the communication itself which are not challenged in the present litigation. *See* BCRA § 311(2), FECA § 318(c)-(d); 2 U.S.C. § 441d(c)-(d).

Plaintiffs' briefing on Section 311 is limited to a single sentence in a footnote in the McConnell Plaintiffs' Opening Brief:

> BCRA's requirement that political ads contain information identifying the candidate supported by the communica-

tion,[101] the party responsible for the content of the information, and/or an indication that the candidate approves the content of the communication ... is ... invalid, at least when applied to electioneering communications (and, for that matter, anything other than express advocacy).

McConnell Pls.' Br. at 56 n. 22; *see also* Tr. at 303 (Baran).[102] This argument is presented as a corollary to Plaintiffs' contention that if the Court agrees that the electioneering communications provisions cannot stand, the attendant disclosure provisions should likewise fall, because the disclosure provisions constitute a regulation of ... speech that the government may not regulate in the first place. *Id.* at 55–56. Given that the Court finds BCRA's electioneering communication definition constitutional, Plaintiffs' argument is rejected.

## V. CONCLUSION

Accordingly, the Court finds that the Paul Plaintiffs' challenge is without merit. The Court finds that the disclosure requirements in Section 201, with one exception, are constitutional, as well as Sections 202, 214(a), 214(d) and 311. The Court concludes that a challenge to Sections 212 and the remainder of Section 214 is not justiciable.

In contrast with Judge Henderson's characterization of our approach, we believe that the resolution of these eleven suits required a careful and judicious review of all the evidence, pleadings, and arguments in a fair manner to all the parties. We are satisfied that we accom-

---

**101.** It is not clear to the Court where the Plaintiffs find this purported requirement from the text of Section 311.

**102.** JUDGE HENDERSON: ... Jumping to 311, only because I think this is the last time we're going to hear from the omnibus [Plaintiffs], and I think you all are the only

ones challenging 311, and it's not down here to be argued in Title 3 and I just want to make sure that it has been challenged....

MR. BARAN: I'd have to rely on the briefs on that, Your Honor. I'm not in a position to address that today.

TR. at 303 (Baran).

plished this goal in an as expedited a manner as possible and thereby served "the strong public interest in election law clarity and stability." Henderson Op. at 6 n. 1.

Three separate opinions by the members of this three-judge panel follow this *per curiam* opinion. Given the complexity of the rulings, and the fact that not any one opinion is fully dispositive, the opinions are presented in order of seniority of the members of this three-judge panel. Accordingly, Judge Henderson's opinion appears first, followed by Judge Kollar–Kotelly's opinion and then Judge Leon's opinion.

## KAREN LECRAFT HENDERSON, Circuit Judge, concurring in the judgment in part and dissenting in part.

"To an imagination of any scope the most far-reaching form of power is not money, it is the command of ideas."

—Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 478 (1897).

I believe the statute before us is unconstitutional in virtually all of its particulars; it breaks faith with the fundamental principle—understood by our nation's Founding Generation, inscribed in the First Amendment and repeatedly reaffirmed by the United States Supreme Court—that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). My colleagues' *per curiam* opinion and their other opinions ignore the statute's transparent infirmity and leave standing its most pernicious provisions, apparently on the ground that candidate-focused political speech inevitably "corrupts" the individuals to whom it refers. Their reasoning and conclusions treat a First Amendment with which I am not familiar. *See Renne v. Geary*, 501 U.S. 312, 349, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (Marshall, J., dissenting) ("[T]he prospect that voters might be persuaded by ... endorsements is not a *corruption* of the democratic political process; it *is* the democratic political process." (emphasis in original)). Further, the opinions are similarly flawed in their dissection of the statute's dense and interlocking provisions, upholding a portion here and striking down a fragment there until they have drafted legislation the Congress would never have enacted—all in the name of *deference* to that body. *See, e.g.,* Per Curiam Op. at Part I; Memo Op., RJL, at Parts I.A.2, I.A.3, I.B, II.C.[1]

---

1. To the extent this opinion overlaps with or is non-responsive to the other opinions, the disconnect is necessitated by the statute's mandate that we "advance on the docket and ... expedite to the greatest possible extent the disposition of the action[s]." BCRA § 403(a)(4); FECA § 310 note; 2 U.S.C. § 437h note.

In light of that mandate, the panel held a status hearing on April 23, 2002—now over one year ago—at which the court and the parties discussed expedition and the significance of the statute's delayed effective date. *Compare* Status Hearing Tr. at 23, 39, 82 (counsel for plaintiffs suggesting parties "ought to do our best" to "put[ ] this court in a position where, if it can, it can resolve everything by the effective date of the statute"), *with id.* at 58–61 (counsel for defendants disagreeing with "assumption ... that section 403, the expedition section, requires some type of decision by this court by November 6th [of 2002]"); *see also id.* at 61 (court stating "I read [the statute] to mean that they want it to happen before [November 6th]" (Henderson, J.)). At that time, the parties differed somewhat as to the latest date on which the Supreme Court could receive the case and still decide it during the Court's October 2002 Term. *Compare, e.g., id.* at 60, 69–70, 73–74 (counsel for government and intervenors proposing that "this court ... resolve all the issues by early February" so that "the Supreme Court of the United States could in the ordinary course resolve this [case] by the end of the 2002 [T]erm"), *with id.* at 76, 82 (counsel for plaintiffs suggesting "the schedule that is being proposed by the government does place an extraordinary burden on the Supreme Court" and that "things should be done before November 6th if at all

On March 27, 2002—after nearly seven years of congressional wrangling—the

possible"); *see also id.* at 60 (court stating "[t]hat's putting an awful lot on the Supreme Court to decide this if we don't hear it until February. . . . As far as I'm concerned, I'd rather put the burden somewhere [other than on the Supreme Court] [as] an inferior court." (Henderson, J.)). All agreed, however, that the Supreme Court had to receive the case no later than the first week of February. *See id.* at 23, 39–40, 58, 60, 69–71, 73–74, 82.

On April 24, 2002 the panel issued a scheduling order setting out a discovery and "paper trial" timetable that fixed an argument date of December 4, 2002. During the next eight months—a necessarily-compressed discovery and trial period—the parties conducted extensive discovery and submitted an "elephantine" record, Oral Arg. Tr. Vol. 1, Afternoon Session, at 152 (counsel for Senator McConnell), an impressive achievement due in no small measure to their extraordinary efforts to keep delay to a minimum. At the oral argument held on December 4 and 5, the parties again gave their estimates of the latest date on which an appeal could reach the Supreme Court in time for a final decision by June 30, 2003. Again there was consensus that the Court had to receive the case no later than early February. *See* Oral Arg. Tr. Vol. 1, Morning Session, at 19 (counsel for Senator McConnell stating "it would be very helpful to the [C]ourt" if district court issued its judgment "as of the end of January or as soon into February as possible"); *id.,* Afternoon Session, at 277–78 (counsel for intervenors stating Court could hear the case "in the regular course of briefing" if district court issued its judgment during "the third week in January"); *see also id.,* Morning Session, at 19 ("I estimated actually less [time] than that, but, all right." (Henderson, J.)).

The panel's subsequent delay in resolving these actions has not only defied the statute's expedition mandate but, regrettably, has ill-served the strong public interest in election law clarity and stability. In my view, the delay could have been avoided—as it was avoided in *Buckley v. Valeo*—by the Congress's lodging judicial review of constitutional questions in an *en banc* court of appeals instead of a three-judge district court. By contrast to BCRA section 403, which provides for judicial review "by a 3-judge court convened pursuant to section 2284 of title 28, United States Code," BCRA § 403(a)(1); FECA § 310 note; 2 U.S.C. § 437h note, FECA's judicial review provision provided—

and still provides—that the Federal Election Commission, any national political party committee or any eligible voter "may institute such actions in the appropriate district court of the United States ... as may be appropriate to construe the constitutionality of any provision of [FECA]" and that such court "immediately shall certify all questions of constitutionality of [FECA] to the United States court of appeals for the circuit involved, which shall hear the matter sitting *en banc,*" 2 U.S.C. § 437h. Pursuant to 2 U.S.C. § 437h, and noting a comment of the provision's sponsor that "it is in the interest of everyone" to have "serious question[s] as to the constitutionality of this legislation ... determined by the Supreme Court at the earliest possible time," *Buckley v. Valeo,* 387 F.Supp. 135, 139 (D.D.C.1975) (quoting 120 CONG. REC. S5707 (daily ed. April 10, 1974) (statement of Sen. Buckley)), *remanded by Buckley v. Valeo,* 519 F.2d 817 (D.C.Cir.1975), the district court in *Buckley* certified 28 such questions to the *en banc* D.C. Circuit, *see Buckley v. Valeo,* 519 F.2d 821 (D.C.Cir.1975). The D.C. Circuit, in turn, resolved the questions—which were no less novel than the ones the panel decides today—two months after oral argument. *See Buckley,* 519 F.2d at 821. A similarly swift resolution here would have yielded a decision by the first week of February.

That the *Buckley* en banc panel consisted of eight members, not three—and that it did not have, as we. have had, the benefit of a statutorily-prescribed eight-month stay in the effective date of the legislation—did not prevent it from issuing a decision more expeditiously than has this panel. Although the actions before us have produced a large (but probably unnecessary) record, *see infra* pages 296–97, we have decided the constitutional questions presented in the same manner as the *Buckley* panel did—after briefing and oral argument and in lieu of a full-blown trial. While both the district court and the circuit court have their strengths, the circuit court is more familiar with, and far better equipped to handle, the briefing-and-argument mode of judicial decision-making than is the trial court— as the excessive prolongation of these actions manifests. The Congress would do well to leave 28 U.S.C. § 2284 out of any future amendment to FECA. *See also infra* note 55.

President signed into law the Bipartisan Campaign Reform Act of 2002, Pub.L. No. 107–155, 116 Stat. 81 (BCRA) (codified at 2 U.S.C. §§ 431 *et seq.*),[2] which amends and supplements the Federal Election Campaign Act of 1971 (FECA or Act), Pub.L. No. 92–225, 86 Stat. 3 (1971 Provisions) (codified as amended at 2 U.S.C. §§ 431 *et seq.*). Among BCRA's most significant and controversial features are provisions: prohibiting any corporation or labor organization from making a disbursement for any "electioneering communication," BCRA § 203, which is defined as "any broadcast, cable, or satellite communication which . . . refers to a clearly identified candidate for Federal office . . . [and which] is made within . . . 60 days before a general, special, or runoff election . . . or . . . 30 days before a primary or preference election . . . for the office sought by the candidate," *id.* § 201; requiring any person who "makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year" to file certain disclosures with the Federal Election Commission (FEC or Commission), *id.;* limiting the source and amount of disbursements that are "coordinated" with a federal candidate or a national, state or local political party committee, *id.* §§ 202, 214; severely restricting any national, state or local political party committee and its agents from soliciting, receiving or transferring non-federal (i.e., "soft money") funds, which are not subject to FECA's source-and-amount limitations and reporting requirements but are subject to state regulation, *see id.* § 101; and prohibiting any individual who is 17 years old or younger from making any contribution whatsoever to any candidate for federal office or any

contribution or donation to any political party committee, *see id.* § 318. The Congress enacted these and other innovations in response to perceived regulatory gaps in the Act. By many popular accounts, a "soft money loophole" had allowed corporations, unions, wealthy individuals and political parties themselves to distort the political process in violation of the spirit, if not the letter, of the Act. 148 Cong. Rec. S2104 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold); *see* Gov't Br. at 3 (contending "soft money loophole has grown from a narrow exception to FECA's limitations into a huge and ever-growing means of circumventing" them). More troubling, according to BCRA's proponents, was that corporations and unions had used vast portions of their treasury funds—and political parties had used a large percentage of their non-federal funds—to pay for campaign advertisements that steered clear of FECA's limits only by "masquerading" as ads about issues of public concern. *E.g., Regarding the First Amendment and Restrictions on Issue Advocacy: Hearings Before the Subcomm. on the Constitution of the House Judiciary Comm.,* 105th Cong. (1997) (statement of Donald J. Simon), *available at* http://www.house.gov/judiciary/22343.htm; *see* Intervenors Br. at 72 ("The parties spent much of [the] soft money on broadcast advertising that supposedly addressed only 'issues,' but in fact was designed to influence the election of candidates for federal office." (citing Mann Expert Report at 18–26)).

As soon as BCRA was signed into law, Senator Mitch McConnell and the National Rifle Association (NRA) filed separate suits in this court challenging the statute's constitutionality. Since then, nine addi-

---

**2.** A full copy of the statute is available online at http://www.fec.gov/pages/bcra/major_ resources_bcra.htm.

tional complaints have been filed and a total of 75 additional plaintiffs have joined Senator McConnell and the NRA in challenging the validity of the new law.[3] The

plaintiffs pray for relief in the form of (1) an order and judgment declaring the challenged provisions of BCRA unconstitutional; (2) an order and judgment permanently enjoining the defendants[4] and their

3. As of the May 7, 2002 deadline for amendment of pleadings, intervention or joinder of additional parties and consolidation of additional cases, *see* Scheduling Order of 4/24/02, 84 plaintiffs were parties to the consolidated actions. Since then seven plaintiffs—the Alabama Republican Executive Committee, Martin J. Connors, the Jefferson County Republican Executive Committee, the Christian Coalition of America, Inc., the Libertarian Party of Illinois, Inc., the DuPage Political Action Council, Inc. and the National Association of Wholesaler–Distributors—have been dismissed from the suit without prejudice. *See generally* Orders of 8/15/02, 9/13/02, 9/18/02 and 9/30/02 Dismissing Pls. Without Prejudice.

Remaining in the suit are 77 plaintiffs in 11 actions: in No. 02–CV–0582 are Senator McConnell, former Representative Bob Barr, Representative Mike Pence, Alabama Attorney General Bill Pryor, the Libertarian National Committee, Inc. (LNC), the American Civil Liberties Union (ACLU), Associated Builders and Contractors, Inc. (ABCI), Associated Builders and Contractors Political Action Committee (ABC PAC), the Center for Individual Freedom, Club for Growth, Inc., Indiana Family Institute, Inc., the National Right to Life Committee, Inc. (NRLC), National Right to Life Educational Trust Fund (NRL ETF), National Right to Life Political Action Committee (NRL PAC), the National Right to Work Committee, 60 Plus Association, Inc., the Southeastern Legal Foundation, Inc., U.S. d/b/a ProEnglish, Thomas McInerney, Barret Austin O'Brock and Trevor M. Southerland (collectively, the *McConnell* plaintiffs); in No. 02–CV–0581 are the NRA and the National Rifle Association Political Victory Fund (NRA PVF) (collectively, the *NRA* plaintiffs); in No. 02–CV–0633 are Emily Echols, Hannah McDow, Isaac McDow, Jessica Mitchell, Daniel Solid and Zachary C. White (collectively, the *Echols* plaintiffs); in No. 02–CV–0751 are the Chamber of Commerce of the United States (Chamber of Commerce), the National Association of Manufacturers (NAM) and U.S. Chamber Political Action Committee (collectively, the *Chamber of Commerce* plaintiffs); in No. 02–CV–0753 is the National Association of Broadcasters (NAB); in No. 02–CV–

0754 are the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO) and the AFL–CIO Committee on Political Education Political Contributions Committee (COPE PCC) (collectively, the *AFL–CIO* plaintiffs); in No. 02–CV–0781 are Congressman Ron Paul, Gun Owners of America, Inc., Gun Owners of America Political Victory Fund, RealCampaignReform.org, Citizens United, Citizens United Political Victory Fund, Michael Cloud and Carla Howell (collectively, the *Paul* plaintiffs); in No. 02–CV–0874 are the Republican National Committee (RNC), Mike Duncan, the Republican Party of Colorado, the Republican Party of Ohio, the Republican Party of New Mexico and the Dallas County (Iowa) Republican County Central Committee (collectively, the *RNC* plaintiffs); in No. 02–CV–0875 are the California Democratic Party (CDP), Art Torres, the Yolo County Democratic Central Committee, the California Republican Party (CRP), Shawn Steel, Timothy J. Morgan, Barbara Alby, the Santa Cruz County Republican Central Committee and Douglas R. Boyd, Sr. (collectively, the *CDP* plaintiffs); in No. 02–CV–0877 are Victoria Jackson Gray Adams, Carrie Bolton, Cynthia Brown, Derek Cressman, Victoria Fitzgerald, Anurada Joshi, Nancy Russell, Kate Seely–Kirk, Peter Kostmayer, Rose Taylor, Stephanie L. Wilson, the California Public Interest Research Group, the Massachusetts Public Interest Research Group, the New Jersey Public Interest Research Group, the United States Public Interest Research Group, the Fannie Lou Hamer Project and the Association of Community Organizers for Reform Now (collectively, the *Adams* plaintiffs); and in No. 02–CV–0881 are Representative Bennie G. Thompson and Representative Earl F. Hilliard (collectively, the *Thompson* plaintiffs).

4. The defendants in these consolidated actions are the FEC; the United States of America (United States); the United States Department of Justice (DOJ); the Federal Communications Commission (FCC); John Ashcroft, in his official capacity as Attorney General of the United States of America; Ellen L. Weintraub, Bradley A. Smith, David M.

agents from enforcing, executing or otherwise applying the challenged provisions; (3) costs and attorneys' fees pursuant to any applicable statute or authority; and (4) any other relief the court in its discretion deems just and appropriate. *See, e.g.,* McConnell Second Am. Compl. (McConnell Compl.) at 51. In my view, all of the challenged provisions except the one discussed in Part IV.D.4 (which I believe must be sustained) and those discussed in Parts IV.F and IV.G (as to which I would pass no judgment[5]) are unconstitutional. Accordingly, and for the reasons stated *infra* in Parts III and IV of this opinion, I would (1) declare that BCRA sections 201, 202, 203, 204, 212, 213, 214, 311, 318 and 504 violate the First Amendment to the United States Constitution; (2) declare that new FECA sections 301(20), 323(a), 323(b), 323(c), 323(d) and 323(f)—as added by BCRA section 101—violate the First Amendment to the United States Constitution; (3) permanently enjoin the defendants and their agents from enforcing, executing or otherwise applying BCRA sections 201, 202, 203, 204, 212, 213, 214, 311, 318 and 504;

and (4) permanently enjoin the defendants and their agents from enforcing, executing or otherwise applying new FECA sections 301(20), 323(a), 323(b), 323(c), 323(d) and 323(f), as added by BCRA section 101.

\* \* \*

This opinion begins with a factual recitation divided into two Parts.[6] Part I provides a history of congressional efforts to regulate campaign finance and discusses the Supreme Court's seminal decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the jurisprudential starting point of my analysis. Part II describes BCRA's interwoven provisions; it details the ways in which BCRA changes the existing regulatory scheme and it catalogues the constitutional bases upon which the plaintiffs in these consolidated actions challenge the new statute. With that foundation established, Part III addresses *in limine* matters including, most importantly, the findings of fact that I would make (in lieu of those of the majority) and the standards of review that guide my substantive analyses. Part IV then addresses the myriad constitution-

---

Mason, Danny L. McDonald, Scott E. Thomas and Michael E. Toner, in their official capacities as Commissioners of the FEC; and Senators John McCain, Russell Feingold, Olympia Snowe and James Jeffords and Representatives Christopher Shays and Martin Meehan (collectively, the intervenors), as intervening defendants.

5. I believe that no plaintiff who challenges BCRA section 305 has standing to do so. *See infra* Part IV.F. Likewise, I am convinced that no plaintiff has standing to challenge the increased contribution limits set out in BCRA sections 304, 307, 316 and 319. *See infra* Part IV.G. Therefore, I would not decide the constitutionality of those provisions even though upon examination of the record and despite BCRA's severability provision, *see* BCRA § 401, I doubt that the Congress, upon elimination of the numerous provisions I believe are invalid, would have been "satisfied" with the contribution limit increases.

*Champlin Ref. Co. v. Corp. Comm'n,* 286 U.S. 210, 235, 52 S.Ct. 559, 76 L.Ed. 1062 (1932) (severability clause "discloses an intention to make [a statute] divisible and creates a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained"); *see Buckley v. Valeo,* 424 U.S. 1, 255, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (Burger, C.J., concurring in part and dissenting in part) ("To invoke a severability clause to salvage parts of a comprehensive, integrated statutory scheme ... exalts a formula at the expense of the broad objectives of Congress.").

6. In the interest of rendering an opinion that reads as a coherent whole—and, again, for the sake of expedition—I have retained introductory sections that overlap (but only somewhat) with scattered portions of the *per curiam* opinion. *Compare infra* Part I *with* Per Curiam Op. at Part II.A; *compare also infra* Part II *with* Per Curiam Op. at Part II.B.

al questions raised by the new law. Part V provides a brief conclusion. Given the complexity of the undertaking, the number of issues to be addressed, the plain need for clarity and the length of this opinion, I provide a table of contents below.

\* \* \* \* \* \*

## Table of Contents

I. A Brief History of Campaign Finance Regulation ............................271

II. A Catalogue of BCRA's Provisions and the Challenges Thereto................281
 A. *The Ban on Corporate and Labor Disbursements for "Electioneering Communications"* ............................................................282
 B. *Disclosure and Reporting Requirements* ...................................284
 C. *Limits on "Coordinated Expenditures"* ....................................287
 D. *Restrictions on Non–Federal Funds* ......................................289
 E. *The Ban on Minors' Contributions and Donations* .......................292
 F. *The Conditions on the Lowest Unit Broadcast Charge* ..................292
 G. *Increased Contribution Limits* ..........................................292
 1. General Increases ................................................293
 2. The "Millionaire Provisions" ....................................294

III. *In Limine* Matters ..........................................................295
 A. *Procedural Posture* ......................................................295
 B. *Alternative Findings of Fact* ............................................296
 1. The Litigants ...................................................297
 2. The Ban on Corporate and Labor Disbursements for "Electioneering Communications" and the Disclosure and Reporting Requirements ......................................................302
 3. Limits on "Coordinated Expenditures" ...........................326
 4. Restrictions on Non–Federal Funds .............................331
 5. The Ban on Minors' Contributions and Donations ...............356
 C. *Standards of Review* .....................................................356

IV. Constitutional Analyses .....................................................360
 A. *The Ban on Corporate and Labor Disbursements for "Electioneering Communications"* ............................................................360
 B. *Disclosure and Reporting Requirements* ...................................374
 C. *Limits on "Coordinated Expenditures"* ....................................381
 D. *Restrictions on Non–Federal Funds* ......................................388
 1. The Party Restrictions: New FECA Sections 301(20) and 323(a) and (b) ..........................................................388
 a. The Party Restrictions are Subject to Strict Scrutiny ............389
 b. Section 323(a) Fails Strict Scrutiny ...........................394
 c. Sections 301(20) and 323(b) Fail Strict Scrutiny ...............402
 2. Fundraising Costs: New FECA Section 323(c) .....................412
 3. Tax–Exempt Organizations: New FECA Section 323(d) .............412
 4. Federal Candidates: New FECA Section 323(e) .....................417
 5. State Candidates: New FECA Section 323(f) .......................422
 E. *The Ban on Minors' Contributions and Donations* .......................422
 F. *The Conditions on the Lowest Unit Broadcast Charge* ..................426
 G. *Increased Contribution Limits* ..........................................429
 1. General Increases ................................................429
 2. The "Millionaire Provisions" ....................................431

V. Conclusion...................................................................432

\* \* \* \* \* \*

## I. A Brief History of Campaign Finance Regulation

Although federal campaign finance legislation dates back at least to the late nineteenth century,[7] federal campaign con-

---

7. *See Ex parte Curtis*, 106 U.S. 371, 375, 1 S.Ct. 381, 27 L.Ed. 232 (1882) (upholding constitutionality of Act of Aug. 15, 1876, 19 Stat. 169, which prohibited non-appointed

tributing and spending were not heavily regulated until the 1970s. In 1971, following an expensive 1968 presidential election, the Congress enacted FECA, which relied upon public disclosure of campaign contributions[8] and expenditures[9] as the primary method of identifying and weeding out political *quid pro quos*.[10] *See* 1971 Provisions §§ 301–311; *see also ACLU v. Jennings*, 366 F.Supp. 1041, 1054 nn. 18–20 (D.D.C.1973) (three-judge court) (describing FECA's Title III, which "establishe[d] an elaborate system of record keeping and public disclosure of campaign contributions and expenditures"), *vacated as moot sub nom., Staats v. ACLU*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975). By 1974 many legislators who were not content to rely exclusively on a "disclosure-centered regime" to prevent

corruption called for tighter campaign finance restrictions. Joel M. Gora, *"No Law ... Abridging,"* 24 HARV. J.L. & PUB. POL'Y 841, 856–57 (2001) ("Even though not all of the abuses that we put under the rubric of 'Watergate' involved illegal or questionable campaign funding, Watergate seemed to have become at least in part a poster child for campaign finance excess and corruption."). The resulting amendments to FECA, *see* Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, 88 Stat. 1263 (1974 Amendments) (codified as amended at 2 U.S.C. §§ 431 *et seq.*), included several innovations warranting a detailed recitation here.

The 1974 Amendments prohibited any person[11] from contributing more than

federal employees from requesting or receiving anything of value for political purposes); *see also id.* at 376–77, 1 S.Ct. 381 (Bradley, J., dissenting) (voting to strike down statute on First Amendment grounds because "deny[ing] to a man the privilege of associating and making joint contributions with such other citizens as he may choose, is an unjust restraint of his right to propagate and promote his views on public affairs").

**8.** Under FECA, the term "contribution" includes

 (i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

 (ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

2 U.S.C. § 431(8)(A); *see also id.* § 431(8)(B) (exemptions from definition of "contribution").

**9.** Under FECA, the term "expenditure" includes

 (i) any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

 (ii) a written contract, promise, or agreement to make an expenditure.

2 U.S.C. § 431(9)(A); *see also id.* § 431(9)(B) (exemptions from definition of "expenditure").

**10.** Previous disclosure requirements, which FECA replaced entirely, can be found in the Act of June 25, 1910, 36 Stat. 822, *see United States v. UAW*, 352 U.S. 567, 575, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) (describing how 1910 Act "translated popular demand for ... curbs upon the political power of wealth into a publicity law that required [political] committees ... to report all contributions and disbursements and to identify contributors and recipients of substantial sums"), and in the Federal Corrupt Practices Act of 1925, 43 Stat. 1070, *see Burroughs v. United States*, 290 U.S. 534, 540–42, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934) (upholding requirement that political committees accepting contributions or making expenditures "for the purpose of influencing" presidential and vice-presidential elections report totals donated and spent as well as names of donors contributing $100 or more).

**11.** FECA defines "person" broadly to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons." 2 U.S.C. § 431(11).

$1,000 per election [12]—and any political committee [13] from contributing more than $5,000 per election—to any one candidate [14] for federal office. *See* 1974 Amendments § 101. They also barred any person from contributing more than an aggregate of $25,000 to all recipients per election cycle. *See id.*

In addition, the 1974 Amendments sharply curtailed the amount of money that could be *spent* for the purpose of influencing any election for federal office. For instance, they prohibited any person from spending more than $1,000 "relative to a clearly identified candidate" during any calendar year. *Id.* They precluded any candidate from spending more than a given amount of personal funds—$50,000 in the case of a presidential or vicepresidential candidate, $35,000 in the case of a senatorial candidate and $25,000 in the case of any other congressional candidate [15]—"in connection with his campaigns

during any calendar year." *Id.* And they placed restrictions on overall campaign spending by candidates: a presidential candidate could spend a maximum of $10,000,000 in seeking nomination for office and a maximum of an additional $20,000,000 in the general election campaign; in any senatorial primary election, a candidate was limited to spending either $100,000 or eight cents times the relevant voting-age population, whichever was greater; in the general election, a senatorial candidate could spend either $150,000 or 12 cents times the relevant population, whichever was greater; in both the primary campaign and the general election campaign for the House of Representatives, the limit was $70,000.[16] *See id.*

Finally, the 1974 Amendments expanded the disclosure and reporting requirements of the 1971 Provisions. *See id.* §§ 201–209. Together with the earlier provisions, the 1974 Amendments mandated, *inter alia,* that each political committee [17]: reg-

---

**12.** An "election" is, statutorily speaking, a "general, special, primary, or runoff election," a "convention or caucus of a political party which has authority to nominate a candidate," a "primary election held for the selection of delegates to a national nominating convention of a political party" or a "primary election held for the expression of a preference for the nomination of individuals for election to the office of President." 2 U.S.C. § 431(1).

**13.** In order to qualify for the higher contribution ceiling as a "political committee," an entity (that would otherwise be a "person" subject to the lower limit) must register with the FEC and meet certain statutory requirements. *See* 2 U.S.C. § 433; *see also infra* note 17 (defining "political committee").

**14.** Under FECA, the term "candidate" means

an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election—
(A) if such individual has received contributions aggregating in excess of $5,000

or has made expenditures aggregating in excess of $5,000; or
(B) if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.
2 U.S.C. § 431(2).

**15.** Under the 1974 Amendments, a candidate for the office of Representative from a State entitled to only one Representative was permitted to spend up to $35,000 in personal funds.

**16.** The senatorial ceilings applied to those candidates seeking nomination or election to the office of Representative from a State entitled to only one Representative.

**17.** Under FECA, a "political committee" is

(A) any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes

ister with the FEC, *see id.* §§ 208–209; keep detailed records of both contributions and expenditures, *see* 1971 Provisions §§ 302–304, 1974 Amendments §§ 202–204; include in its records the name and address of anyone who made any contribution in excess of $10,[18] together with the date and amount of the contribution, *see* 1971 Provisions § 302, 1974 Amendments § 202; and include as well the occupation, employer and/or principal place of business of anyone contributing more than $100[19] during any calendar year, *see* 1971 Provisions § 302, 1974 Amendments § 202. The disclosure provisions also required each candidate to file with the FEC quarterly reports containing detailed financial information, including the full name, mailing address, occupation and principal place of business of each person contributing more than $100[20] during any calendar year, as well as the amount and date of the contributions. *See* 1971 Provisions § 304, 1974 Amendments § 204. Further, the provisions required the Commission to make the reports "available for public inspection ... and copying." 1971 Provisions § 311, 1974 Amendments § 208. Finally, they mandated that any individual or group (other than a political committee) making independent expenditures of over

$100[21] during any calendar year file a statement to that effect with the Commission. *See* 1974 Amendments § 204.

A diverse group of plaintiffs—including United States Senator James L. Buckley, who was seeking re-election, a candidate for the presidency of the United States, a potential contributor, the Committee for a Constitutional Presidency, the Conservative Party of the State of New York, the Mississippi Republican Party, the Libertarian Party and the New York Civil Liberties Union—challenged FECA's provisions on a variety of constitutional grounds, spawning the massive and now-legendary litigation known as *Buckley v. Valeo.* What follows is a synopsis of the United States Supreme Court's decision in *Buckley.*[22]

Although the *Buckley* Court recognized that monetary contributions to candidates and political committees play an "important role ... in financing political campaigns," *Buckley,* 424 U.S. at 21, 96 S.Ct. 612, that contribution limitations "implicate fundamental First Amendment interests," *id.* at 23, 96 S.Ct. 612, and that such limitations "could have a severe impact on political dialogue if [they] prevented candidates and political committees from amassing the resources necessary for effective

expenditures aggregating in excess of $1,000 during a calendar year; or

(B) any separate segregated fund established under the provisions of section 441b(b) of this title; or

(C) any local committee of a political party which receives contributions aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure ... aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

2 U.S.C. § 431(4); *see also Jennings,* 366 F.Supp. at 1054 (explaining how "[c]ategorization as a political committee sets into mo-

tion certain detailed disclosure and reporting requirements").

**18.** The figure has been raised and is currently $50. *See* 2 U.S.C. § 432(c)(2).

**19.** The figure has been raised and is currently $200. *See* 2 U.S.C. § 432(c)(3); *see also id.* § 431(13).

**20.** The figure has been raised and is currently $200. *See* 2 U.S.C. § 434(b)(3).

**21.** The figure has been raised and is currently $250. *See* 2 U.S.C. § 434(c)(1).

**22.** The legal framework laid out by *Buckley* and its progeny is discussed in greater detail *infra* in Part IV.

advocacy," *id.* at 21, 96 S.Ct. 612, it upheld all three of the Act's major contribution limits because there was "no indication" that they would have "any dramatic adverse affect on the funding of campaigns," *id.* More specifically, the Court rejected free speech and equal protection challenges to the provision barring any person from contributing more than $1,000 per election to any one candidate. *See id.* at 23–35, 96 S.Ct. 612. "[U]nder the rigorous standard of review established by our prior decisions," the Court held, "the weighty interests served by restricting the size of financial contributions to political candidates"—namely, "limit[ing] the actuality and appearance" of *quid pro quo* corruption of federal candidates and officeholders—"are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.* at 26, 29, 96 S.Ct. 612. It upheld as well the provision prohibiting any political committee from contributing more than $5,000 per election to any one candidate, *see id.* at 35–36, 96 S.Ct. 612, concluding that it "serve[s] the permissible purpose of preventing individuals from evading the applicable contribution limitations by labeling themselves committees," *id.* And it sustained the provision prohibiting any person from contributing more than $25,000 in the aggregate per election cycle, *see id.* at 38, 96 S.Ct. 612, holding that "this quite modest restraint upon protected political activity" likewise "serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party," *id.*

The Court found, however, that in contrast to the Act's contribution restrictions, the limits on expenditures "impose[d] direct and substantial restraints on the quantity of political speech." *Id.* at 39, 96 S.Ct. 612; *see id.* at 19–20, 96 S.Ct. 612 (expenditure ceilings "would appear to exclude all citizens and groups except candidates, political parties, and the institutional press from any significant use of the most effective modes of communication" (footnotes omitted)). Rejecting the notion that "the dependence of a communication on the expenditure of money operates itself to ... reduce the exacting scrutiny required by the First Amendment," *id.* at 16, 96 S.Ct. 612, the Court held that

[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

*Id.* at 19, 96 S.Ct. 612; *see id.* at 19 n. 18, 96 S.Ct. 612 ("Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline.").[23] Addressing first the $1,000 limit

---

**23.** *Cf. Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (*Shrink Missouri*) (Breyer, J., concurring) (even "a decision to *contribute* money to a campaign is a matter of First Amendment concern—not because money is speech (it is

on any person's expenditure "relative to a clearly identified candidate," the Court observed that no provision of the Act lent potential spenders (and, therefore, speakers) any interpretive aid in discerning what "relative to" might mean. *Id.* at 41, 96 S.Ct. 612. Because the use of such an "indefinite phrase" failed to "clearly mark the boundary between permissible and impermissible speech," *id.,* offered "no security for free discussion," *id.* at 43, 96 S.Ct. 612 (quotation omitted), "blanket[ed] with uncertainty whatever may be said," *id.* (quotation omitted), and would "compel[ ] the speaker to hedge and trim," *id.* (quotation omitted), the Court—in order to preserve the provision from invalidation—construed it to apply only to expenditures "*for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office,*" *id.* at 44, 96 S.Ct. 612; *see id.* at 44 n. 52, 96 S.Ct. 612 ("This construction would restrict the application of [the provision] to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' "). Even so construed, however, the provision failed the Court's scrutiny:

> [T]he governmental interest in preventing corruption and the appearance of corruption is inadequate to justify [the $1,000] ceiling on independent expenditures.... The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.... [Moreover, the ceiling] heavily burdens core

First Amendment expression.... Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation.

*Id.* at 45–48, 96 S.Ct. 612; *see id.* at 39–51, 96 S.Ct. 612. For similar reasons, the other expenditure restrictions under review failed the First Amendment test as well. The limit on a candidate's spending of personal resources was *not* justified given that: (1) "[t]he candidate, no less than any other person, has a ... right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates," *id.* at 52, 96 S.Ct. 612; and (2) "the use of personal funds *reduces* the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which the Act's ... limitations are directed," *id.* at 53, 96 S.Ct. 612 (emphasis added); *see id.* at 51–54, 96 S.Ct. 612. Likewise infirm were the limits on overall candidate campaign spending—which, the government stressed, were designed to reduce allegedly "skyrocketing" costs of campaigns, *id.* at 57, 96 S.Ct. 612—because "[t]he First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise," *id.; see id.* at 54–59, 96 S.Ct. 612.

Finally, although the *Buckley* Court recognized that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," *id.* at 64, 96 S.Ct. 612 (citing, *inter alia, NAACP v. Button,* 371

not); but because it enables speech." (emphasis altered)); *id.* at 416 n. 4, 120 S.Ct. 897 (Thomas, J., dissenting) ("[T]he First Amendment protects the right to pay others to help

get a message out."); *but see id.* at 398, 120 S.Ct. 897 (Stevens, J., concurring) ("Money is property; it is not speech.").

U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)), it upheld the Act's numerous disclosure and reporting requirements, *see id.* at 60–84, 96 S.Ct. 612, concluding that they vindicated three governmental interests "sufficiently important" to outweigh their infringement of First Amendment freedoms:

First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.... The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office. Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.... Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the [Act's] contribution limitations ....

*Id.* at 66–68, 96 S.Ct. 612 (quoting, *inter alia,* LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY 62 (National Home Library Foundation ed. 1933) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.")). Specifically, the Court sustained the disclosure provisions against the plaintiffs' contentions that they were overbroad both in their application to minor-party and independent candidates and in their extension to *de minimis* contributions, *see id.* at 68–74, 82–84, 96 S.Ct. 612; the Court found that "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors" was

"highly speculative," *id.* at 70, 96 S.Ct. 612. Not without apparent misgivings, it also sustained the provision requiring any individual or group (other than a political committee or candidate) making expenditures of over $100 during any calendar year (other than by contributions to political committees or candidates) to file a statement with the FEC. *See id.* at 74–82, 96 S.Ct. 612. The plaintiffs had contended that the provision would impose "very real, practical burdens ... certain to deter individuals from making expenditures for their independent political speech." *Id.* at 75, 96 S.Ct. 612. Noting that the Act's definition of "expenditure" spoke in terms of funds used "for the purpose of ... influencing" the nomination or election of any candidate for federal office, *id.* at 77, 96 S.Ct. 612, the Court recognized that the $100 disclosure provision could indeed have a drastic chilling effect on protected speech in the form of campaign spending, *see id.* at 76–77, 96 S.Ct. 612. Thus, in order to steer the provision clear of the "shoals of vagueness," *id.* at 78, 96 S.Ct. 612, and "[t]o insure that [its] reach [was] not impermissibly broad," *id.* at 80, 96 S.Ct. 612, the Court construed the term "expenditure" under the disclosure provision in the same way it construed the Act's $1,000 spending cap—"to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate," *id.* (footnote omitted).

*Buckley* left in its wake a regime that has been described as a "nonsensical, loophole-ridden patchwork," *FEC v. National Conservative Political Action Committee,* 470 U.S. 480, 518, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (*NCPAC*) (White, J., dissenting), one that some observers believed was not worth the regulatory candle. *See, e.g., Buckley,* 424 U.S. at 236, 96 S.Ct. 612 (Burger, C.J., concurring in part and dissenting in part) ("[W]hat remains after today's holding leaves no more than a

shadow of what Congress contemplated. I question whether the residue leaves a workable program."); *see also, e.g.*, Sanford Levinson, *Regulating Campaign Activity: The New Road to Contradiction?*, 83 MICH. L. REV. 939, 939 n. 1 (1985) (expressing doubt that "a rational legislature would ever have passed" as "a unified package" the "crazy quilt" of statutes and regulations governing campaign finance after *Buckley* ).[24] The following paragraphs describe the regulatory scheme that unfolded after *Buckley;* the discussion is included to provide a context for BCRA's enactment and to help make clearer what BCRA is designed to accomplish.

As noted, the *Buckley* Court left in place several of the Act's major components. Significantly, *all* of the Act's contribution limits remained (and, indeed, the Congress even added some more in the 1976 amendments): no person could contribute to any candidate more than $1,000 per election,[25] *see* 2 U.S.C. § 441a(a)(1)(A); no person could contribute to the committees of a national political party more than $20,000 during any calendar year,[26] *see id.*

§ 441a(a)(1)(B); no person could contribute to any political committee (other than a national political party committee) more than $5,000 during any calendar year,[27] *see id.* § 441a(a)(1)(C); no political committee could contribute to any candidate more than $5,000 per election, *see id.* § 441a(a)(2)(A); no political committee could contribute to the committees of a national political party more than $15,000 during any calendar year, *see id.* § 441a(a)(2)(B); and no political committee could contribute to any other political committee more than $5,000 during any calendar year, *see id.* § 441a(a)(2)(C). Moreover, if any national or state political party committee coordinated its *expenditures* with a specific candidate for the purpose of benefiting the candidate, i.e., if the committee spent funds "in connection with" the candidate's campaign, the expenditures were treated like contributions—they were subject to formula-driven monetary ceilings, albeit ones that were slightly higher than the $5,000 limit on any political party committee's contributions to any candidate.[28] *Compare id.* § 441a(a)(2)(A),

**24.** When faced with the task of enacting emergency amendments in response to *Buckley,* the Congress had little time to reevaluate the combination of provisions the decision left standing. As then Assistant Attorney General Antonin Scalia put it, the "whole purpose of our [amendments] is to submerge those issues that are controversial and to do the minimum amount necessary to enable the 1976 elections to proceed." Office of Legal Counsel Statement accompanying § 2911, Legislative History of FECA Amendments of 1976, at 142 (Feb. 18, 1976).

**25.** BCRA raises the limit to $2,000 per election. *See* BCRA § 307(a)(1); *see also infra* Part II.G.

**26.** BCRA raises the limit to $25,000 during any calendar year. *See* BCRA § 307(a)(2).

**27.** BCRA amends the Act to permit a person to contribute up to $10,000 per year to a state political party committee. *See* BCRA § 102;

FECA § 315(a)(1)(D); 2 U.S.C. § 441a(a)(1)(D).

**28.** National political party committees could not (and still cannot) make any expenditure "in connection with" the general election campaign of any candidate for President "which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States." 2 U.S.C. § 441a(d)(2). National and state political party committees could not (and still cannot) make any expenditure "in connection with" the election campaign of any candidate for the office of Senator—or of Representative from a State which is entitled to only one Representative— "which exceeds ... the greater of ... 2 cents multiplied by the voting age population of the State ... or ... $20,000." *Id.* § 441a(d)(3)(A). And, finally, the national and state political party committees could not (and still cannot) make any expenditure "in connection with" the election campaign of any candidate for the office of Representative,

*with id.* § 441a(d); *see FEC v. Colo. Republican Fed. Campaign Comm.,* 533 U.S. 431, 465, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (*Colorado Republican II*) (holding section 441a(d) not facially unconstitutional because "a [political] party's *coordinated* expenditures ... may be restricted to minimize circumvention" of FECA's contribution-to-candidate limits (emphasis added)); *Colo. Republican Fed. Campaign Comm. v. FEC,* 518 U.S. 604, 613–23, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (*Colorado Republican I*) (plurality opinion) (holding section 441a(d) unconstitutional as applied to political party's *independent* expenditures). Finally, a sweeping source restriction not challenged in *Buckley* prohibited (and still prohibits) any national bank, corporation or labor organization from making—or any officer thereof from approving—a contribution "in connection with" any federal election.[29] 2 U.S.C. § 441b(a). The same provision also forbade (and still forbids) "any candidate, political committee, or other person knowingly to accept or receive" any corporate or labor contribution. *Id.*

FECA's post-*Buckley* source-and-amount provisions thus restricted all of the money contributed—and much of the money spent—"in connection with" or "for the purpose of influencing" federal elections. In a 1978 advisory opinion, however, the FEC made clear that these "federal" or "hard" money restrictions extended only so far and that the Act permitted political parties to use funds, including corporate and union funds, not subject to source-and-amount limits to pay for activities benefiting both federal and state candidates. *See generally* FEC Advisory Op.1978–10: Allocation of Costs for Voter Registration, *available at* http://herndon3.sdrdc.com/ao/ao/780010. html. Commission regulations then in effect permitted parties to "allocate" administrative expenses—including rent, utilities and supplies—between federal and state candidates based upon the proportionate benefit received. Under the allocation regime, amounts spent on administrative expenses for state candidates were not subject to FECA's source-and-amount restrictions. That is, administrative expenses could be paid for with state-regulated "non-federal" funds—a.k.a. "soft money"[30]—because such funds were not

---

Delegate or Resident Commissioner "which exceeds ... $10,000." *Id.* § 441a(d)(3)(B).

**29.** For a brief history of the ban on corporate and labor funds, *see Buckley,* 519 F.2d at 904–07 (noting Tillman Act of 1907, War Labor Disputes Act of 1943 and Taft–Hartley Act of 1947 barred corporate and labor contributions). *See also* Gov't Br. at 12–15 (citing, *inter alia,* WILLIAM A. WHITE, THE OLD ORDER CHANGETH 11–15 (1910)).

**30.** As the FEC recently observed in regulations promulgated pursuant to BCRA, "the term 'soft money' is used by different people to refer to a wide variety of funds under different circumstances." Prohibited and Excessive Contributions: Non–Federal Funds or Soft Money, 67 Fed.Reg. 49064, 49064–65 (July 29, 2002). The Commission's *Twenty Year Report, see* FED. ELECTION COMM'N, TWENTY

YEAR REPORT (1995) (hereinafter TWENTY YEAR REPORT), *available at* http://www.fec.gov/pages/20year.htm, provides a helpful, rough-and-ready definition of a commonly misunderstood term:

> [S]oft money—*n.* (slang): funds raised and/or spent outside the limitations and prohibitions of the FECA. Sometimes called nonfederal funds, soft money often includes corporate and/or labor treasury funds, and individual contributions in excess of the federal limits, which cannot legally be used "in connection with" federal elections, but can be used for other purposes.

TWENTY YEAR REPORT, *supra,* at ch. 3. Because the FEC itself has chosen to use the term "non-federal funds"—and because such funds *are* regulated by *state* law, *see* 67 Fed.Reg. at 49065—this opinion generally uses the terms "federal funds" and "non-federal funds" in lieu of "hard money" and "soft money."

given or spent "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i), (9)(A)(i) (defining "contribution" and "expenditure"). When the Kansas Republican State Committee asked the FEC whether it was permitted to allocate expenses for voter registration and get-out-the-vote drives that benefited both the state and federal candidates on a given ticket, the FEC responded that

> the costs of [such activities] should be allocated between Federal and non-Federal elections in the same manner as other general party expenditures.... That portion of the costs allocable to Federal elections ... must come from funds ... contributed in accordance with the limitations and prohibitions contained in 2 U.S.C. §§ 441a, 441b, 441c, 441e, 441f and 441g.... The costs allocable to non-Federal elections may be paid out of party funds raised and expended pursuant to applicable Kansas law.... [W]ith respect to an election in which there are candidates for [both non-Federal] and Federal office, expenditures for registration and get-out-the-vote drives need not be attributed as contributions to [Federal] candidates unless the drives are made specifically on their behalf.

FEC Advisory Op.1978–10. Because "applicable Kansas law" did not prohibit corporate and union donations and placed no ceilings on donations for state and local campaigns, federal candidates in Kansas were able to benefit—albeit indirectly—from such donations. *See* TWENTY YEAR REPORT, *supra*, at ch. 3 (detailing history and pre-BCRA treatment of non-federal funds and explaining "[t]he origins of 'soft money' lie in the United States' federal system of government," under which "each [S]tate may establish its own rules for financing the nonfederal elections held within its borders").

The use of non-federal funds grew during the 1980s. New FEC regulations permitted political committees to allocate expenses between federal and non-federal accounts on a "reasonable basis." Proponents of tighter campaign finance restrictions criticized the standard, claiming that committees underestimated the federal share of their contributions and expenditures and thereby influenced federal elections with funds that would otherwise be subject to FECA's source-and-amount restrictions. In 1984 Common Cause petitioned the FEC to promulgate more stringent regulations to close the perceived loophole. After the FEC denied its petition, Common Cause sought relief in this court, which ordered the Commission to clarify its rules. *See generally Common Cause v. FEC,* 692 F.Supp. 1391 (D.D.C. 1987).

The amended regulations—which took effect on January 1, 1991—served as the basis of the federal/non-federal funding system until BCRA's enactment. The regulations set forth several formulae fixing the maximum amount of money a political committee could use for an activity benefiting both federal and non-federal candidates, *see* 11 C.F.R. § 106.5(b)-(d) (1997), and required expanded reporting of mixed federal and non-federal giving and spending, *see* TWENTY.YEAR REPORT, *supra*, at ch. 3. "Despite the new rules," the Commission reported in 1995, some legislators and "reform" groups remained troubled by the growing influence of non-federal funds:

> They say, for example, that soft money spending—even for the non-federal share of expenses—influences federal elections because it permits committees to conserve federal funds that can later be spent to support federal candidates. Many are also concerned about the way committees raise soft money. They believe that the active role federal candidates and their associates play in raising large sums of soft money, at the very least, creates an appearance of undue

influence by the contributors on the federal candidates involved.

*Id.* at ch. 3. Non-federal donations to the two major political parties did, in fact, grow exponentially during the 1990s— from $86.1 million in the 1992 election cycle to $487.5 million in the 2000 cycle. *See infra* Findings of Fact (Findings) 65– 66 at page 331.

Proponents of tighter restrictions were disturbed by this trend not simply because, in their view, corporations and unions were effectively contributing funds to federal campaigns. *See* Mann Expert Report at 15 & Tbl. 4. They worried as well about the parties' spending of non-federal funds on "issue ads"—issue-based but, at least to their ears, candidate-focused advertisements that do not expressly advocate the election or defeat of an identifiable federal candidate. *See* Intervenors Br. at 8–9 (discussing expanded role of non-federal funds in issue advertising during 1996 campaign); *see infra* note 75 (defining "issue ad" for purposes of this opinion). They lamented that permitting such ads—which might discuss, for example, a candidate's record, ideological bent, accomplishments or failures but do not "exhort the viewer to take a specific electoral action for or against a particular candidate"—would "allow[ ] individuals and organizations to circumvent [FECA's restrictions] simply by omitting from their communications the genre of words and phrases" found in *Buckley*'s famous foot-

note 52. *Chamber of Commerce v. Moore*, 288 F.3d 187, 195 (5th Cir.) (holding that, under *Buckley*, political advertisement may be regulated constitutionally only if it contains explicit words advocating election or defeat of clearly identified candidate), *cert. denied,* —— U.S. ——, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002); *see Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. 612 (express words of advocacy include " 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject' ").

BCRA's provisions, to which I now turn, embody the first congressional response to these and other perceived dropped stitches in the federal election law patchwork.

## II. A Catalogue of BCRA's Provisions and the Challenges Thereto

BCRA contains 38 sections that, *inter alia*, prohibit corporate and labor disbursements for "electioneering communications," require certain disclosures to the FEC, limit the source and amount of "coordinated expenditures," severely restrict the use of non-federal funds, bar minors from making contributions or donations, condition the lowest unit charge for broadcast ads on their content and increase the Act's existing contribution limits. The plaintiffs in these consolidated actions challenge—on free speech, free association, free press, right-to-petition, vagueness, equal protection and federalism grounds—nearly half of them. The following sections describe the provisions at issue and catalogue all of the plaintiffs' constitutional challenges to the new law.[31]

---

**31.** I discuss the statutory provisions here in the same sequence that I analyze them in Part IV. I address the "electioneering communications" provisions of Title II *before* analyzing Title I's restrictions on non-federal funds not simply because several plaintiffs initially raised their constitutional challenges in that order, *see generally* McConnell Compl., but because, under the Supreme Court's jurisprudence, any analysis of restrictions on non-federal funds must take account of the case law (discussed in the context of Title II) hold-

ing that issue advocacy cannot constitutionally be restricted. *See* Bradley A. Smith, *Soft Money, Hard Realities: The Constitutional Prohibition on a Soft Money Ban*, 24 J. LEGIS. 179, 199 (1998) (hereinafter Smith, *Hard Realities* ) ("[C]lear Supreme Court precedent instructs us that not only is party spending on issue advocacy protected, but so are donations, including corporate donations, to parties to engage in that advocacy."); *see also infra* Part III.C (courts are to apply "exacting" (i.e., strict) scrutiny to campaign finance

## A. The Ban on Corporate and Labor Disbursements for "Electioneering Communications"

Section 203 of BCRA amends the Act to prohibit any corporation or labor organization from making any disbursement "for any applicable electioneering communication." BCRA § 203(a); FECA § 316(a), (b)(2); 2 U.S.C. § 441b(a), (b)(2). Under BCRA section 201,

[t]he term "electioneering communication" means any broadcast, cable, or satellite communication which—

(I) refers to a clearly identified candidate for Federal office;

(II) is made within—

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

BCRA § 201(a); FECA § 304(f)(3)(A)(i); 2 U.S.C. § 434(f)(3)(A)(i). Section 201 provides a fallback definition set to take effect in the event the primary definition is invalidated:

[T]he term "electioneering communication" [in that event] means any broadcast, cable, or satellite communication which promotes or supports a candidate for [Federal] office, or attacks or opposes a candidate for [Federal] office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive

of no plausible meaning other than an exhortation to vote for or against a specific candidate.

BCRA § 201(a); FECA § 304(f)(3)(A)(ii); 2 U.S.C. § 434(f)(3)(A)(ii). Additionally, section 201 exempts from either definition of electioneering communication

(i) a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate;

(ii) a communication which constitutes an expenditure or an independent expenditure under [FECA]; [or]

(iii) a communication which constitutes a candidate debate or forum conducted pursuant to regulations adopted by the Commission, or which solely promotes such a debate or forum and is made by or on behalf of the person sponsoring the debate or forum . . . .

BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B). While section 201 purports to authorize the Commission to exempt by regulation certain communications from either definition, see BCRA § 201(a); FECA § 304(f)(3)(B)(iv); 2 U.S.C. § 434(f)(3)(B)(iv), the Commission may not under any circumstances exempt

a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)[.]

BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii). Because the

restrictions on donations to political party committees that make independent expendi-

tures in order to engage in collective issue advocacy).

language of section 101(b) prohibits promulgation of a regulation that retreats from either the primary or fallback definition of electioneering communication, it leaves the Commission no room to adopt a more permissive restriction than that set forth in section 201.[32]

BCRA's ban on corporate and labor disbursements for electioneering communications applies to entities other than unions and for-profit corporations. Section 203(a) extends to *any* incorporated entity and therefore bars both incorporated non-profit organizations (as defined by section 501(c) of the Internal Revenue Code) and incorporated political organizations (as defined by section 527 of the Internal Revenue Code) from making disbursements for electioneering communications.[33] True, section 203(b) provides that

> the term "applicable electioneering communication" does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of the Internal Revenue Code of 1986) ... if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence[.]

BCRA § 203(b); FECA § 316(c)(2); 2 U.S.C. § 441b(c)(2). But section 204—referred to by the parties as the "Wellstone Amendment"—eliminates the section 203(b) exception:

> EXCEPTION DOES NOT APPLY.—[FECA section 316(c)(2) ] shall not apply in the case of a targeted communication that is made by an organization described in such paragraph.... [T]he term "targeted communication" means an electioneering communication (as defined in [FECA] section 304(f)(3)) that is distributed from a television or radio broadcast station or provider of cable or satellite television service and, in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.[34]

BCRA § 204; FECA § 316(c)(6)(A), (B); 2 U.S.C. § 441b(c)(6)(A), (B). By definition, an "electioneering communication" is "distributed from a television or radio broadcast station or provider of cable or satellite television service" and either refers to a candidate for President or Vice President or is "targeted to the relevant electorate" of any other candidate. The Wellstone Amendment therefore ensures

**32.** It should come as no surprise, then, that "[t]he definition of 'electioneering communication' at 11 C.F.R. 100.29(a)"—adopted by the FEC pursuant to BCRA—"largely tracks the definition in BCRA at 2 U.S.C. 434(f)(3)." Electioneering Communications, 67 Fed.Reg. 65,190, 65,191 (October 23, 2002).

**33.** Under section 203's "special operating rules,"

> [a] section 501(c)(4) organization that derives amounts from business activities or receives funds from [a national bank, corporation or labor union] shall be considered to have paid for any communication out of [prohibited funds] unless such organization paid for the communication out of a segregated account to which only individuals can contribute ....

BCRA § 203(b); FECA § 316(c)(3)(B); 2 U.S.C. § 441b(c)(3)(B). Section 204 makes the "special operating rule" irrelevant because, under that provision, a section 501(c)(4) organization is treated like any other corporation and will be "considered to have paid for any communication out of [prohibited funds]" even where it does *not* receive funds from a national bank, for-profit corporation or labor union.

**34.** Under BCRA section 201, a communication is "targeted to the relevant electorate" if it "can be received by 50,000 or more persons ... in the district the candidate seeks to represent, in the case of a candidate for Representative [or] ... in the State the candidate seeks to represent, in the case of a candidate for Senator." BCRA § 201(a); FECA § 304(f)(3)(C); 2 U.S.C. § 434(f)(3)(C).

that no electioneering communication made by an incorporated political organization or non-profit corporation can shelter under section 203(b)—if a communication is an "electioneering communication," it fails *a fortiori* to qualify for the exception.

The *McConnell, NRA, Chamber of Commerce, NAB* and *AFL–CIO* plaintiffs challenge the ban on corporate and labor disbursements for electioneering communications on several interrelated constitutional grounds. First, they allege that the ban abridges their First Amendment rights to engage in core political speech and expressive association by "limiting speech that does not expressly advocate the election or defeat of a clearly identified candidate, either under the original definition or the fall-back definition of 'electioneering communication,'" McConnell Compl. at ¶¶ 48, 62; *see also, e.g.,* McConnell Br. at 44–56; Chamber of Commerce Br. at 4–5; AFL–CIO Br. at 3–11; ACLU Br. at 4–7, 11–16; and by failing to exempt non-profit advocacy organizations like those identified in *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL*), *see, e.g.,* McConnell Compl. at ¶ 49; *see also, e.g.,* ACLU Br. at 16–17.

Second, these plaintiffs claim that the ban—under either the primary or the fall-back definition and even without reference to *Buckley*'s express advocacy test—is unconstitutionally overbroad, void for vague-

ness and so underinclusive that it fails to serve a compelling governmental interest. *See, e.g.,* McConnell Br. at 56–77; NRA Br. at 14–39.

Third, these plaintiffs assert that the ban violates the First Amendment and the equal protection component of the Fifth Amendment by (1) prohibiting non-media corporations, labor organizations, section 501(c) non-profit organizations and section 527 political organizations from engaging in certain broadcast speech while permitting individuals, unincorporated organizations and corporations that own broadcast stations to engage in the same or similar speech, *see, e.g.,* NRA Br. at 39–48; and (2) prohibiting disbursements for broadcast, satellite and cable communications while permitting disbursements for other communications, including the printed word, *see, e.g.,* NAB Compl. at ¶ 24; McConnell Br. at 77–81.[35]

I consider the constitutionality of the ban on corporate and labor disbursements for electioneering communications in Part IV. A *infra.*

### B. Disclosure and Reporting Requirements

Section 201 of BCRA amends the Act to require "[e]very person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year" to file with the FEC, under penalty of perjury and "within 24 hours of each disclosure date," [36] BCRA § 201(a); FECA

---

**35.** In a somewhat similar vein, the *Paul* plaintiffs claim that the ban violates the First Amendment's guarantee of a free press by imposing upon them "unconstitutional editorial control through discriminatory ... economic burdens and penalties" not placed upon certain media organizations. Paul Am. Compl. (Paul Compl.) at ¶ 53; *see id.* at ¶¶ 47, 50; Paul Br. at 17–18, 21–24.

**36.** Under BCRA section 201, the term "disclosure date" means

(A) the first date during any calendar year by which a person has made disbursements

for the direct costs of producing or airing electioneering communications aggregating in excess of $10,000; and

(B) any other date during such calendar year by which a person has made disbursements for the direct costs of producing or airing electioneering communications aggregating in excess of $10,000 since the most recent disclosure date for such calendar year.

BCRA § 201(a); FECA § 304(f)(4); 2 U.S.C. § 434(f)(4).

§ 304(f)(1); 2 U.S.C. § 434(f)(1), a "statement" containing, *inter alia:*

- The identification of the person making the disbursement;
- The principal place of business of the person making the disbursement, if the person is not an individual;
- The amount of any single disbursement over $200;
- The identification of persons to whom any disbursement over $200 is made;
- The election to which an electioneering communication pertains;
- The candidate identified, or to be identified, in an electioneering communication; and
- If an organization makes the disbursement from funds donated by individuals, the names and addresses of any individuals donating $1,000 or more.

*See* BCRA § 201(a); FECA § 304(f)(2); 2 U.S.C. § 434(f)(2).[37] A person must disclose the foregoing information not only when he makes a disbursement for electioneering communications but also when he *contracts* to make the disbursement.[38]

*See* BCRA § 201(a); FECA § 304(f)(5); 2 U.S.C. § 434(f)(5).[39]

BCRA section 212 contains disclosure requirements pertaining not to electioneering communications but to "independent expenditures."[40] Amending section 304 of the Act, section 212 requires any person (including any individual) who disburses more than $1,000 in independent expenditures within 20 days of an election, BCRA § 212(a); FECA § 304(g)(1); 2 U.S.C. § 434(g)(1)—or more than $10,000 at any time up to and including the twentieth day before an election, BCRA § 212(a); FECA § 304(g)(2); 2 U.S.C. § 434(g)(2)—to file with the FEC, under penalty of perjury, a "report" specifying:

- The name and address of the recipient of any expenditure(s);
- The date, amount and purpose of the expenditure(s); and
- The name of, and office sought by, the candidate supported or opposed by the expenditure(s).

*See* BCRA § 212(a); FECA § 304(g)(3)(B), (b)(6)(B)(iii); 2 U.S.C.

---

**37.** BCRA directs the FCC to "compile and maintain" the information filed with the FEC and to "make such information available to the public on the [FCC's] website." BCRA § 201(b); FECA § 304 note; 2 U.S.C. § 434 note.

**38.** Thus, in some circumstances (i.e., if a contract to disburse is not performed), BCRA mandates disclosure about planned disbursements for communications that never air.

**39.** Under another Title (Title III), BCRA section 311 similarly amends the Act to provide that "whenever any person ... makes a disbursement for an electioneering communication," the communication itself (1) if authorized by a candidate or an authorized political committee of a candidate, "shall clearly state that the communication is paid for by [the] person[ ] and authorized by such authorized political committee," BCRA § 311; FECA § 318(a)(2); 2 U.S.C. § 441d(a)(2); or (2) if *not* authorized by a candidate or an authorized political committee of a candidate,

"shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee," BCRA § 311; FECA § 318(a)(3); 2 U.S.C. § 441d(a)(3).

**40.** As amended by BCRA section 211, the Act states that

the term "independent expenditure" means an expenditure by a person—
(A) expressly advocating the election or defeat of a clearly identified candidate; and
(B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.
BCRA § 211; FECA § 301(17); 2 U.S.C. § 431(17).

§ 434(g)(3)(B), (b)(6)(B)(iii). A report on an independent expenditure made within 20 days of an election must be filed with the FEC within 24 hours of the expenditure; a report on an independent expenditure made at any time up to and including the twentieth day before an election must be made within 48 hours of the expenditure. *See* BCRA § 212(a); FECA § 304(g)(1), (2); 2 U.S.C. § 434(g)(1), (2). Just as a contract to make a disbursement for an electioneering communication triggers the pertinent disclosure requirements, · *see* BCRA § 201(a); FECA § 304(f)(5); 2 U.S.C. § 434(f)(5), so does a contract to make an independent expenditure, *see* BCRA § 212(a); FECA § 304(g)(1), (2); 2 U.S.C. § 434(g)(1), (2).[41]

A final cluster of new disclosure rules under challenge is found in Title V of BCRA. Section 504, which amends section 315 of the Federal Communications Act of 1934(FCA), mandates disclosure of certain broadcast records. It requires broadcast licensees to "maintain, and make available for public inspection, a complete record" of any "request" of any person "to purchase broadcast time" for communications "relating to any political matter of national importance."[42] BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1). Each record maintained must include the following information:

- Whether the request to purchase broadcast time is accepted or rejected by the licensee;[43]

- The rate charged for the broadcast time;

- The date on which and the time at which the communication is to be aired;

- The name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers or the issue to which the communication refers;

- In the case of a request made by or on behalf of a candidate, the name of the candidate, his authorized committee and the treasurer of that committee; and

- In the case of any other request, the name of the person seeking to purchase the time, the name, address and phone number of "a contact person for such person" and a list of the chief executive officers or members of the board of directors of the person (if the person is not an individual).

BCRA § 504; FCA § 315(e)(2); 47 U.S.C. § 315(e)(2).

The *McConnell, NRA, Chamber of Commerce, NAB* and *AFL–CIO* plaintiffs challenge BCRA's disclosure and reporting requirements on three First Amendment grounds. First, they allege that the provisions mandating detailed statements about disbursements for electioneering communications, *see* BCRA §§ 201 and 311, violate their First Amendment rights to free political expression and association by restrict-

---

**41.** Thus, in some circumstances (i.e., if a contract to make expenditures is not performed), BCRA mandates disclosure about expenditures that are never made. *Cf. supra* note 38.

**42.** Under section 504, a "political matter of national importance" includes any matter regarding "a legally qualified candidate," "any election to Federal office" or "a national legislative issue of public importance." BCRA § 504; FCA § 315(e)(1)(B); 47 U.S.C. § 315(e)(1)(B).

**43.** Because section 504's requirements are triggered not when the communication in question is broadcast but instead when any person makes "a *request* to purchase broadcast time," BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1) (emphasis added), BCRA in some circumstances (i.e., if a request is denied) mandates disclosure about communications that never air. *Cf. supra* notes 38, 41.

ing in an overbroad, vague and underinclusive fashion their airing of communications that do not contain express advocacy. *See, e.g.,* McConnell Br. at 44–77; NRA Br. at 48–50; Chamber of Commerce Br. at 18–20; ACLU Br. at 11–19.

Second, these plaintiffs claim that the reporting requirements of BCRA section 212, pertaining to independent expenditures, impermissibly burden their First Amendment rights to free political expression and association by requiring "*advance* disclosures of planned and prospective communications, including communications that ultimately are never made." AFL–CIO Compl. at ¶ 35 (emphasis added); *see, e.g.,* AFL–CIO Br. at 14–17.

Third, these plaintiffs assert that the disclosure requirement of section 504, pertaining to requests to purchase broadcast time, burdens their First Amendment rights to engage in political expression and association by, *inter alia,* imposing vague and overbroad recordkeeping requirements that "lack[ ] any rational relationship to a legitimate governmental objective." McConnell Br. at 99; *see, e.g., id.* at 98–100; AFL–CIO Br. at 18–20.

I consider the constitutionality of the disclosure and reporting provisions in Part IV.B *infra.*

### C. Limits on "Coordinated Expenditures"

BCRA section 202 amends the Act to provide that if

(i) any person makes, or contracts to make, any disbursement for any elec-

tioneering communication (within the meaning of [FECA] section 304(f)(3)); and

(ii) such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal [sic], State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee;

then the disbursement or contract to disburse "shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party." BCRA § 202(2); FECA § 315(a)(7)(C); 2 U.S.C. § 441a(a)(7)(C). By treating a "coordinated" disbursement for an electioneering communication as a "contribution" to the supported candidate, section 202 subjects it to the Act's source-and-amount limitations.[44] Moreover, as amended by BCRA, the Act equates "cooperation," "consultation," "concert" and "suggestion" with "coordinat[ion]"—a disbursement made in any such fashion will be treated as a contribution. *See* BCRA § 214(a); FECA § 315(a)(7)(B); 2 U.S.C. § 441a(a)(7)(B). BCRA directs the FEC to define "coordination" broadly; section 214, which repeals the Commission's existing regulations on coordinated communications, provides that in prescribing the prerequisites for coordination, the new regulations "shall not require agreement or formal collaboration to establish coordination" between a candidate (or political party committee) and a person making a disbursement.[45] BCRA

**44.** For a recap of FECA's major source-and-amount limitations, *see supra* Part I, especially the text accompanying notes 25–29. It bears emphasizing that because any corporation or labor organization is prohibited from making a "contribution or expenditure in connection with any election" for federal office, 2 U.S.C. § 441b(a), it is likewise banned under BCRA from making "coordinated" disbursements.

**45.** In accordance with that mandate, the FEC on January 3, 2003 promulgated a final rule on "coordinated expenditures." *See generally* Coordinated and Independent Expenditures, 68 Fed.Reg. 421 (Jan. 3, 2003); *see also infra* Finding 57 at pages 326–28. Not surprisingly, the rule provides that a disbursement for an electioneering communication is "coordinated" with a candidate or political party committee—"whether or not there is agreement or formal collaboration" between the

§ 214(c); FECA § 315(a)(7) note; 2 U.S.C. § 441a(a)(7) note.

The other "coordinated expenditure" provision at issue, BCRA section 213, amends the Act to provide that

[o]n or after the date on which a political party nominates a candidate, no committee of the political party may make—

(i) any coordinated expenditure under this subsection with respect to the candidate during the election cycle at any time after it makes any independent expenditure (as defined in [FECA] section 301(17)) with respect to the candidate during the election cycle; or

(ii) any independent expenditure (as defined in [FECA] section 301(17)) with respect to the candidate during the election cycle at any time after it makes any coordinated expenditure under this subsection with respect to the candidate during the election cycle.

BCRA § 213; FECA § 315(d)(4)(A); 2 U.S.C. § 441a(d)(4)(A). In other words, section 213 compels a political party committee, at the time the party's candidate is nominated, to make a binding choice between independent expenditures and "coordinated" disbursements in support of the candidate. In addition, "all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State com-

mittee) shall be considered to be a single political committee" under the provision. BCRA § 213; FECA § 315(d)(4)(B); 2 U.S.C. § 441a(d)(4)(B). That is, regardless whether any of the related political committees has any control over, influence on or knowledge of the disbursement decisions of the others, the first disbursement decision made on behalf of the "single political committee" binds the other component committees.

The *McConnell, Chamber of Commerce, AFL–CIO, RNC* and *CDP* plaintiffs challenge BCRA's "coordinated expenditure" provisions primarily on two constitutional grounds. First, they allege that sections 202 and 214 infringe their First Amendment rights to free speech, association and petition for redress of grievances by defining coordination too broadly. *See, e.g.,* McConnell Br. at 82–85; Chamber of Commerce Br. at 6–18; AFL–CIO Br. at 12–14; ACLU Br. at 7–9, 19–20.

Second, the political party plaintiffs claim that the binding choice provision, section 213, burdens their First Amendment freedoms of speech, association and petition by requiring them to forgo "future coordinated expenditures as the 'price' of exercising their constitutional right to make independent expenditures." RNC Compl. at ¶ 60; *see, e.g.,* McConnell Br. at 85–88; RNC Br. at 72; CDP Br. at 47–49.

I consider the constitutionality of the limits on "coordinated expenditures" in Part IV. C *infra.*

---

disburser and the candidate or committee—if (1) "[t]he communication is created, produced, or distributed at the request or suggestion" of the candidate or committee; (2) the candidate or committee "is materially involved in decisions regarding" the communication; or (3) "[t]he communication is created, produced, or distributed after one or more substantial discussions about the communica-

tion" between the disburser and the candidate or committee. 68 Fed.Reg. at 453–55. Under the rule, "[a]greement means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination" and "[f]ormal collaboration means planned, or systematically organized, work on the communication." *Id.* at 455 (emphasis omitted).

### D. Restrictions on Non–Federal Funds

The most publicized provision of BCRA, section 101, is also the statute's lengthiest and most complex. Section 101, in a nutshell, curtails political party committees' use of non-federal funds—funds not subject to FECA's source-and-amount limitations, *see supra* note 30 and accompanying text—in order to reduce such funds' allegedly corrupting influence on federal officeholders. In the following paragraphs, I discuss in turn (and, for the sake of precision, reproduce at length) the provision's major components.

Adding section 323 ("Soft Money of Political Parties") to the Act, section 101 first prohibits, in FECA section 323(a), any national political party committee from soliciting, receiving, directing or spending non-federal funds for any purpose whatsoever:

A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

BCRA § 101(a); FECA § 323(a)(1); 2 U.S.C. § 441i(a)(1). The ban, which has no exceptions, applies broadly to

any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

BCRA § 101(a); FECA § 323(a)(2); 2 U.S.C. § 441i(a)(2).

Adding section 323(b) to the Act, BCRA further prohibits any state, district or local political party committee from spending or disbursing non-federal funds for any "Federal election activity":

[A]n amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

BCRA § 101(a); FECA § 323(b)(1); 2 U.S.C. § 441i(b)(1). "Federal election activity" is defined to include:

(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

(ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);

(iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

(iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during

that month on activities in connection with a Federal election.

BCRA § 101(b); FECA § 301(20)(A); 2 U.S.C. § 431(20)(A). The definition of "Federal election activity" *excludes* any "amount expended or disbursed by a State, district, or local committee of a political party" for

(i) a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);

(ii) a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity described in subparagraph (A);

(iii) the costs of a State, district, or local political convention; and

(iv) the costs of grassroots campaign materials, including buttons, bumper stickers, and yard signs, that name or depict only a candidate for State or local office.

BCRA § 101(b); FECA § 301(20)(B); 2 U.S.C. § 431(20)(B). At paragraph (2)—commonly known as the "Levin Amendment"—section 323(b) provides a narrow exception to the general rule against state-party spending of non-federal funds on "Federal election activity." The Levin Amendment allows state and local parties to use an FEC-specified amount of federally-regulated "Levin funds" for voter registration, voter identification, "generic campaign activity" and get-out-the-vote activity as long as

(i) [such] activity does not refer to a clearly identified candidate for Federal office;

(ii) the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which refers solely to a clearly identified candidate for State or local office;

(iii) ... *no person* ... *donate[s] more than $10,000* to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

(iv) the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement ....

BCRA § 101(a); FECA § 323(b)(2)(B); 2 U.S.C. § 441i(b)(2)(B) (emphasis added); *see* RNC Br. at 22–23 (discussing Levin Amendment's conditions, including "homegrown" funds requirement of subsection (iv), which prohibits a state party committee from receiving transferred funds from a national party committee or another state or local committee of a political party).

At new FECA section 323(c), BCRA requires every political party committee—national, state or local—to use federal funds to raise any money that will be used, in turn, on "Federal election activity." BCRA § 101(a); FECA § 323(c); 2 U.S.C. § 441i(c).

Under new FECA section 323(d), BCRA prohibits any political party committee—national, state or local—or its agents from "solicit[ing] any funds for, or mak[ing] or direct[ing] any donations to" (1) any organization that is described in section 501(c) of the Internal Revenue Code of 1986, is exempt from taxation and "makes expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)"; or (2) any organization (other than a political committee) that is described in section 527 of such Code. BCRA § 101(a); FECA § 323(d); 2 U.S.C. § 441i(d).

At new FECA section 323(e), the statute prohibits any federal candidate or officeholder (or any agent of a federal candidate

or officeholder) from soliciting, receiving, directing, transferring or spending non-federal funds "in connection with an election for Federal office, including funds for any Federal election activity."[46] BCRA § 101(a); FECA § 323(e)(1)(A); 2 U.S.C. § 441i(e)(1)(A).

Finally, at new FECA section 323(f), the statute bars any *state* candidate or officeholder (or any agent of a state candidate or officeholder) from spending any non-federal funds for

a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate).

BCRA § 101(a); FECA §§ 323(f)(1), 301(20)(A)(iii); 2 U.S.C. §§ 441i(f)(1), 431(20)(A)(iii).

The *McConnell, RNC* and *CDP* plaintiffs challenge BCRA's restrictions on non-federal funds on three grounds. First, they allege that the restrictions "intrud[e] upon the sovereign power of the [S]tates to regulate the financing of their own elections" and thereby violate the Tenth Amendment to the United States Constitu-

tion. RNC Compl. at ¶ 39; *see, e.g.,* McConnell Br. at 9–25 (challenging restrictions on their face and as applied to Libertarian National Committee); RNC Br. at 25–37; CDP Br. at 20–27.

Second, these plaintiffs assert that section 101 violates their rights to engage in free speech and expressive association by, *inter alia:* preventing "the funding of core political speech that does not expressly advocate the election or defeat of a clearly identified federal candidate," RNC Compl. at ¶ 48, restricting "the amount of speech in which political parties are able to engage," *id.,* preventing political parties from "pooling the resources of party members and contributors in support of campaigns for office," McConnell Compl. at ¶ 100, and precluding them from raising funds for or accepting funds from "like-minded party committees and non-party organizations and individuals," *id. See, e.g.,* McConnell Br. at 25–40; RNC Br. at 37–56; CDP Br. at 27–46.

Third, these plaintiffs charge that section 101 denies them equal protection (and violates their First Amendment rights) to the extent that it subjects them to speech restrictions not placed upon similarly situated entities.[47] *See, e.g.,* McConnell Br. at 40–43; RNC Br. at 57–70.

---

**46.** Notwithstanding the general ban on any federal candidate or officeholder's connection with non-federal funds, such a candidate or officeholder may "attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party," BCRA § 101(a); FECA § 323(e)(3); 2 U.S.C. § 441i(e)(3), or "make a general solicitation of funds on behalf of any organization that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from taxation ... where such solicitation does not specify how the funds will or should be spent," BCRA § 101(a); FECA § 323(e)(4)(A); 2 U.S.C. § 441i(e)(4)(A); *see also* BCRA § 101(a); FECA § 323(e)(4)(B); 2 U.S.C.

§ 441i(e)(4)(B) (permitting certain other solicitations).

**47.** Additionally, the *Thompson* plaintiffs contend that "[a]s Federal office holders and candidates" they are "unfairly prejudiced" by section 101—in violation of their rights to free speech, association and equal protection—to the extent that the provision has a "disproportionate effect on minority communities" in their districts. Thompson Compl. at ¶ 41; *see* Thompson Br. at 1–12. And the *Paul* plaintiffs claim that section 101 abridges their freedom of the press "by exercising editorial control of their press activities." *E.g.,* Paul Br. at 18 (capitalization altered).

I consider the constitutionality of section 101 in Part IV.D *infra*.

### E. The Ban on Minors' Contributions and Donations

In contrast to most of BCRA's provisions, section 318 is quite simple—it prohibits any person under the age of 18 from making (1) any contribution whatsoever to any federal candidate; or (2) any contribution or non-federal "donation" to any political party committee. *See* BCRA § 318; FECA § 324; 2 U.S.C. § 441k ("An individual who is 17 years old or younger shall not make a contribution to a candidate or a contribution or donation to a committee of a political party."). Period.

The *McConnell* and *Echols* plaintiffs contend that such a "sweeping restriction" on an entire class of expressive and associational activity by minors cannot be upheld under the First Amendment's guarantees or the Fifth Amendment's equal protection component.[48] *E.g.*, Echols Am. Compl. at ¶¶ 55, 57, 62, 65; *see also, e.g.*, McConnell Compl. at ¶ 93; McConnell Br. at 91–95. I address this challenge in Part IV. E *infra*.

### F. The Conditions on the Lowest Unit Broadcast Charge

Until BCRA's enactment, section 315 of the FCA required licensed broadcast stations to provide a candidate for public office—during the 45 days before a primary election and the 60 days before a general or special election—the benefit of "the lowest unit charge of the station" on any broadcast advertisement "in connection with" the candidate's campaign. FCA § 315(b); 47 U.S.C. § 315(b). BCRA section 305, however, amends the FCA to deny a candidate the lowest unit charge for television or radio broadcast advertisements unless the candidate "provides written certification to the broadcast station

that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office." BCRA § 305(a)(3); FCA § 315(b)(2)(A); 47 U.S.C. § 315(b)(2)(A). If the candidate *does* make a direct reference to another candidate, he can nonetheless meet the content requirements for the lowest unit charge if, in the case of a television broadcast,

> at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds—
>
>> (i) a clearly identifiable photographic or similar image of the candidate; and
>>
>> (ii) a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast[;]

or if, in the case of a radio broadcast,

> the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast.

BCRA § 305(a)(3); FCA § 315(b)(2)(C), (D); 47 U.S.C. § 315(b)(2)(C), (D).

The *McConnell* plaintiffs contend that BCRA section 305 violates the First Amendment's guarantee of free speech by "conditioning the cost of advertisements on their content." McConnell Compl. at ¶ 96; *see* McConnell Br. at 89–91. I discuss section 305 in Part IV.F *infra*.

### G. Increased Contribution Limits

BCRA contains two types of provisions that increase the contribution limits of the Act. The first type raises the "hard money" ceilings of the Act by permitting individual donors to contribute greater amounts to candidates and national and

---

**48.** Similarly, one of the *Thompson* plaintiffs alleges that section 318 violates his First and Fifth Amendment rights to the extent that it

prevents him from "protect[ing] the rights" of one of his minor constituents. Thompson Compl. at ¶ 48; *see* Thompson Br. at 13–18.

state political party committees. The second type permits a candidate for either house of the United States Congress to accept and spend contributions in excess of otherwise applicable limits if his opponent expends a substantial amount in personal funds. I discuss these two types of provisions, and the plaintiffs' challenges thereto, in turn.

### 1. General Increases

BCRA section 307 raises the Act's limit on any individual's contribution to any given candidate (or his authorized political committee) from $1,000 to $2,000.[49] *See* BCRA § 307(a)(1); FECA § 315(a)(1)(A); 2 U.S.C. § 441a(a)(1)(A). It also changes the aggregate limit an individual contributor may give to all candidates from $25,000 during any calendar year to $37,500 over a two-year period and changes the aggregate limit an individual contributor may give to all political party committees to $57,500 over a two-year period.[50] *See* BCRA § 307(b); FECA § 315(a)(3); 2 U.S.C. § 441a(a)(3). Together with BCRA section 102, section 307 increases as well the Act's limits on an individual's contributions to a national political party committee (from $20,000 to $25,000 per calendar year) and to a state political party committee (from $5,000 to $10,000 per calendar

year). *See* BCRA §§ 102, 307(a)(2); FECA § 315(a)(1)(B), (D); 2 U.S.C. § 441a(a)(1)(B), (D). The provisions leave in place, however, the Act's $5,000 limit on an individual's contributions to "any other political committee." *See* 2 U.S.C. § 441a(a)(1)(C). Finally, BCRA section 307 indexes for inflation all but the $10,000 limit on any individual's contributions to a state political party committee and the $5,000 cap on any individual's contributions to "any other political committee."[51]

The *Adams* and *CDP* plaintiffs challenge BCRA's general contribution increases on rather novel constitutional grounds. The *Adams* plaintiffs charge that the higher ceilings violate their Fifth Amendment right to equal protection by "precluding equal participation in the political process on the basis of economic status." Adams Compl. at ¶ 60; *see* Adams Br. at 9–18. The *CDP* plaintiffs allege that to the extent BCRA indexes for inflation the limits on contributions to national party committees and federal candidates but does not index the limits on contributions to state and local party committees, it "severely erode[s]" their ability to engage in political communications and thus deprives them of equal protection.[52] CDP Compl. at ¶ 105; *see* CDP Br. at 50.

---

**49.** The Act now provides that "no person shall make contributions ... to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000." 2 U.S.C. § 441a(a)(1)(A).

**50.** The Act now provides that

[d]uring the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than—

(A) $37,500, in the case of contributions to candidates and the authorized committees of candidates;

(B) $57,500, in the case of any other contributions, of which not more than

$37,500 may be attributable to contributions to political committees which are not political committees of national political parties.

2 U.S.C. § 441a(a)(3).

**51.** The Act's indexing guidelines, as amended by BCRA section 307(d), appear at 2 U.S.C. § 441a(c).

**52.** In a similar vein, the *Paul* plaintiffs assert that by "failing to raise ... and to index [contribution] limits with respect to political committees functioning independently from candidates, their authorized campaign committees, or political parties," BCRA violates the First Amendment's guarantee of a free press. Paul Compl. at ¶ 57; *see* Paul Br. at 27 n. 11.

## 2. The "Millionaire Provisions"

BCRA section 304 amends the Act to permit a candidate for the United States Senate to accept and spend individual contributions in excess of otherwise applicable "hard money" limits in order "to allow response to expenditures from personal funds" of a wealthy opponent. BCRA § 304(a)(2); FECA § 315(i); 2 U.S.C. § 441a(i) (capitalization altered). For example, if a candidate's opponent spends over two but less than four times a specified "threshold amount"[53] in "opposition personal funds,"[54] the candidate may accept individual contributions of $6,000 per donor per election. See BCRA § 304(a)(2); FECA § 315(i)(1)(C)(i); 2 U.S.C. § 441a(i)(1)(C)(i) ("[I]f the opposition personal funds amount is over ... 2 times the threshold amount, but not over 4 times that amount ... the increased limit shall be 3 times the applicable limit ...."). If the opponent spends from four to ten times the threshold amount in personal funds, the candidate may accept individual contributions of $12,000 per donor per election. See BCRA § 304(a)(2); FECA § 315(i)(1)(C)(ii); 2 U.S.C.

§ 441a(i)(1)(C)(ii). And if the opponent spends over ten times the threshold amount in personal funds, not only may the candidate accept individual contributions of $12,000 per donor per election but also, significantly, the restrictions on any political party committee's spending "in coordination with" the candidate are lifted. See BCRA § 304(a)(2); FECA § 315(i)(1)(C)(iii); 2 U.S.C. § 441a(i)(1)(C)(iii).

Likewise, BCRA section 319 amends and supplements the Act to permit a candidate for the United States House of Representatives to accept and spend individual contributions of $6,000 per donor per election if his opponent spends over $350,000 in personal funds. See BCRA § 319(a); FECA § 315A(a)(1)(A); 2 U.S.C. § 441a–1(a)(1)(A). Again, significantly, in that same circumstance the restrictions on any political party committee's spending "in coordination with" the candidate are lifted. See BCRA § 319(a); FECA § 315A(a)(1)(C); 2 U.S.C. § 441a–1(a)(1)(C).

Finally, BCRA sections 304 and 319 impose reporting requirements on Senate

---

**53.** The subparagraph pertaining to "threshold amount" provides as follows:

(i) STATE-BY-STATE COMPETITIVE AND FAIR CAMPAIGN FORMULA.—In this subsection, the threshold amount ... is an amount equal to the sum of—

(I) $150,000; and

(II) $0.04 multiplied by the voting age population.

(ii) VOTING AGE POPULATION.—In this subparagraph, the term "voting age population" means in the case of a candidate for the office of Senator, the voting age population of the State of the candidate (as certified under [FECA] section 315(e)).

BCRA § 304(a)(2); FECA § 315(i)(1)(B); 2 U.S.C. § 441a(i)(1)(B).

**54.** The "opposition personal funds" amount is "an amount equal to the excess (if any)" of

(i) the greatest aggregate amount of expenditures from personal funds (as defined in

[FECA] section 304(a)(6)(B)) that an opposing candidate in the same election makes; over

(ii) the aggregate amount of expenditures from personal funds made by the candidate with respect to the election.

BCRA § 304(a)(2); FECA § 315(i)(1)(D); 2 U.S.C. § 441a(i)(1)(D); see BCRA § 316; FECA § 315(i)(1)(E); 2 U.S.C. § 441a(i)(1)(E) ("aggregate amount of expenditures from personal funds" includes "gross receipts advantage" of candidate's authorized committee). In turn, an "expenditure from personal funds" is

(I) an expenditure made by a candidate using personal funds; and

(II) a contribution or loan made by a candidate using personal funds or a loan secured using such funds to the candidate's authorized committee.

BCRA § 304(b)(2); FECA § 304(a)(6)(B)(i); 2 U.S.C. § 434(a)(6)(B)(i).

and House candidates who intend to expend substantial personal funds in support of their candidacy. Section 304 requires a Senate candidate to file with his opponent(s) and the FEC—within 15 days of becoming a candidate—"a declaration stating the total amount of expenditures from personal funds that [he] intends to make, or to obligate to make, with respect to the election that will exceed the State–by–State competitive and fair campaign formula." BCRA § 304(b); FECA § 304(a)(6)(B)(ii); 2 U.S.C. § 434(a)(6)(B)(ii). It also requires the candidate to file with his opponent(s) and the FEC a notification if and when he spends more than twice the threshold amount and, thereafter, each and every time he spends more than $10,000 in additional personal funds. *See* BCRA § 304(b); FECA § 304(a)(6)(B)(iii), (iv); 2 U.S.C. § 434(a)(6)(B)(iii), (iv). Section 319 imposes similar requirements on a candidate for the House of Representatives. *See* BCRA § 319(a); FECA § 315A(b)(1); 2 U.S.C. § 441a–1(b)(1).

The *RNC* and *Adams* plaintiffs challenge BCRA's "millionaire provisions" on separate constitutional grounds. The *RNC* plaintiffs claim that the provisions "discriminate among similarly situated federal candidates and thereby violate the equal protection component of the Fifth Amendment." RNC Br. at 73 (capitalization altered); *see id.* at 73–75; RNC Compl. at ¶ 74. The *Adams* plaintiffs assert that they are denied equal protection as well, to the extent that the millionaire provisions "preclud[e] [their] equal participation in the political process on the basis of economic status." Adams Compl. at ¶ 62; *see* Adams Br. at 9–18.

I discuss the two types of increased contribution limits in Part IV.G *infra*.

### III. *In Limine* Matters

Before reaching the merits of the plaintiffs' claims, I first attend to important preliminary matters.

#### A. *Procedural Posture*

In these consolidated actions, the panel is asked to declare most of BCRA unconstitutional and to enjoin the defendants and their agents from enforcing, executing or otherwise applying several of its provisions to anyone. *See, e.g.,* McConnell Compl. at 51. In other words, the plaintiffs bring a facial challenge to the statute. As the Supreme Court emphasized in *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a facial challenge is "the most difficult challenge to mount successfully" because, in the usual case, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid," *id.* at 745, 107 S.Ct. 2095. The case before us, however, is not the usual case. Where, as here, First Amendment freedoms are at stake, a facial challenge will succeed if there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (citing, *inter alia, Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)); *see Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (facial invalidation "is, manifestly, strong medicine" that will be invoked only if statute's provisions are substantially overbroad when "judged in relation to the statute's plainly legitimate sweep"); *see also Salerno*, 481 U.S. at 745, 107 S.Ct. 2095 (recognizing First Amendment overbreadth doctrine as exception to general "no-set-of-circumstances" principle). In my view, all of the challenged provisions of BCRA—

except the one discussed in Part IV.D.4 (which I believe must be sustained) and those discussed in Parts IV.F and IV.G (as to which I would pass no judgment)—are substantially overbroad when "judged in relation to [their] plainly legitimate sweep" and are therefore facially unconstitutional. *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908.

Because my view that most of BCRA is unconstitutional rests squarely and solely on First Amendment free association and free speech grounds, I would not reach the merits of the plaintiffs' federalism, free press or equal protection claims except with respect to the provision discussed in Part IV.D.4. Thoroughgoing discussion of these subjects would further complicate an already difficult task; more importantly, it would be unnecessary to the disposition of these actions and, as such, would fly in the face of the "venerable principle of [federal] adjudicatory processes," *Webster v. Reproductive Health Services*, 492 U.S. 490, 525, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring in part and concurring in judgment), to abstain from "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it," *Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quotation omitted).

### B. Alternative Findings of Fact

Before proceeding to the facts, I emphasize the Supreme Court's teaching that "casual statements from the floor debates" in the Congress—not to mention "post-legislation legislative history" like that constructed during discovery in these actions—merit little evidentiary weight. *See United States v. Carlton*, 512 U.S. 26, 39, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (Scalia, J., concurring in judgment) ("post-legislation legislative history" is an "oxymoron"); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("[P]ost-passage remarks of legislators, however explicit, can-

not serve to change the [expressed] legislative intent of Congress...."). And while the Congress's factual findings and committee reports are entitled to somewhat greater weight, *see Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (Court "eschew[s] reliance on the passing comments of one Member" and has "stated that Committee Reports are more authoritative than comments from the floor" (quotations omitted)); *but cf. Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 715, 718 (D.C.Cir.1987) (Buckley, J., concurring) (because "Congress is a political as well as a legislative body, and [because] its members will put the privileges and facilities of their respective chambers to political as well as legislative uses," "not every utterance to be found [even] in committee reports ... may be assumed to represent statutory gold"), such evidentiary sources are negligible or non-existent in the case of BCRA. I point out as well the Court's reminder that "[t]he justification" for a restriction on constitutionally protected liberties "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Finally, I would note that I am in substantial agreement with the plaintiffs' observation that, especially with respect to Title II, their facial challenges to BCRA's provisions are based upon established First Amendment jurisprudence in the campaign finance realm. *See, e.g.*, McConnell Br. at 44 ("[T]his [c]ourt need not go beyond *Buckley v. Valeo* to determine that Title II cannot possibly stand under the First Amendment."). Accordingly, I believe the constitutional challenges discussed in Part IV can be resolved even without extensive reference to the record. Nonetheless, in recognition of the fact that the Supreme Court may see things differently and may indeed revisit

established jurisprudence, I offer the following set of findings—as an alternative to those of the majority—based on my view of the record as a whole.[55]

55. To be clear, I do not join in the *per curiam* statement of facts, nor do I join the factual findings set forth in the other opinions. This does not mean, however, that the filing of an alternative set of findings is necessarily for naught. While the Supreme Court made clear as recently as two years ago that it will review a three-judge district court's factual findings for "clear error" only, it reversed the three-judge court's findings in that case because "on the entire evidence" it was "left with the definite and firm conviction that a mistake ha[d] been committed." *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (quotation omitted).

The majority's view of the factual record—not to mention the record's legal significance—is quite different from mine, leaving me "with the definite and firm conviction that a mistake has been committed" with respect to several of its findings. *See, e.g.,* Memo Op., CKK, Finding 2.13 ("[I]t is entirely possible to distinguish pure issue advocacy from candidate-centered issue advocacy . . . ."); Memo. Op., RJL, Finding 292 ("[G]enuine issue advertisements are less likely to refer to a federal candidate by name."); *see also, e.g.,* Memo. Op., CKK, Findings 1.82–1.83 ("The immense quantity of testimonial and documentary evidence in the record demonstrates that large nonfederal contributions provide donors special access to influence federal lawmakers. . . . [I]t is clear that large donations, particularly unlimited nonfederal contributions, have corrupted the political system. The record [also] demonstrates that . . . [l]arge donations made by groups or persons with an interest in pending legislative activity . . . create an appearance of corruption."); Memo. Op., RJL, Finding 250 ("The defendants have offered substantial evidence that the public believes there is a direct correlation between the size of a donor's contribution to a political party and the amount of . . . influence with . . . the officeholders of that party . . . ."). If the Supreme Court concludes as it did in *Easley* that the majority's "key findings are mistaken," *Easley,* 532 U.S. at 243, 121 S.Ct. 1452, it may be helpful for the Court to have an alternative set of findings that reads as a cohesive whole. I note that several factors common to *Easley* and the consolidated actions before us suggest the Court may be

## 1. The Litigants

As to the litigants in the consolidated actions before us,[56] I would find that:

more willing here than in the normal case to undertake an "extensive review" of the record and to set aside findings with which it disagrees:

> Where an intermediate court reviews, and affirms, a trial court's factual findings, this Court will not "lightly overturn" the concurrent findings of the two lower courts. *E.g., Neil v. Biggers,* 409 U.S. 188, 193 n. 3, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). But in this instance there is no intermediate court, and we are the only court of review. Moreover, the trial here at issue was not lengthy and the key evidence consisted primarily of documents and expert testimony. . . . Accordingly, we find that an extensive review of the District Court's findings, for clear error, is warranted. See *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 500–501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

*Easley,* 532 U.S. at 242–43, 121 S.Ct. 1452. I note as well that an additional factor, absent in *Easley,* may justify an extensive review of the record here—the factfinders are not of one mind. *Cf. Wright v. Rockefeller,* 376 U.S. 52, 68, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (Goldberg, J., dissenting) ("My difficulty with [the Court's] conclusion is that the record does not support [its] treatment of the District Court's finding. The District Court was a three-judge court and the three judges did not agree upon . . . express findings of fact.").

56. I believe that we lack jurisdiction over the *Adams* plaintiffs' claims. *See infra* Part IV.G. Accordingly, I would make no findings with respect to any of the *Adams* plaintiffs. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869))). Moreover, in the interest of avoiding unnecessary or cumulative findings, I would not make findings of fact with respect to each and every litigant over whose claims the court *does* have jurisdiction.

1. Senator Mitch McConnell is the senior United States Senator from Kentucky and is a member of the Republican Party. He has long been active in the Republican Party at the national, state and local levels. He was first elected in 1984 and was re-elected in 1990, 1996 and 2002. *See* McConnell Aff. at 1–3.

2. The National Rifle Association (NRA) is a non-partisan, tax-exempt organization governed by section 501(c)(4) of the Internal Revenue Code. It is dedicated primarily to defending the rights its members believe are guaranteed by the Second Amendment to the United States Constitution; its principal function is to disseminate information regarding those rights. The NRA has approximately four million members and represents their views on legislative and public policy issues before federal, state and local officials and the general public. *See* LaPierre[57] Decl. at 1; NRA App. at 106 (setting forth NRA by-laws).

3. The NRA Political Victory Fund (NRA PVF) is a political committee governed by 2 U.S.C. § 431(4) and section 527 of the Internal Revenue Code and is a separate segregated fund of the NRA pursuant to 2 U.S.C. § 441b(b).

4. Bill Pryor is the current Alabama Attorney General and was a candidate for reelection as Alabama Attorney General in 2002. *See* Pryor Decl. at 1.

5. The Libertarian National Committee, Inc. (LNC) is the governing body of the Libertarian Party at the national level.

The LNC is a non-profit organization incorporated in the District of Columbia and is governed by section 527 of the Internal Revenue Code. The LNC advocates the principle that all individuals have the right to live in whatever manner they choose so long as they do not forcibly interfere with the right of others to do the same. *See* Dasbach[58] Decl. at 2.

6. The American Civil Liberties Union (ACLU) is a tax-exempt organization incorporated in the District of Columbia and is governed by section 501(c)(4) of the Internal Revenue Code. The ACLU is a nationwide, non-profit, non-partisan organization with approximately 300,000 members "dedicated to the principles of liberty and equality embodied in the Constitution." Romero[59] Decl. at 1.

7. Club for Growth, Inc. is a nationwide membership organization governed by section 527 of the Internal Revenue Code. It is dedicated to advancing, *inter alia*, school choice, overall reduction in government spending, personal investment of social security, tax rate reduction, capital gains tax reduction and estate tax repeal. *See* Keating[60] Decl. at 2.

8. The National Right to Life Committee (NRLC) is a tax-exempt organization incorporated in the District of Columbia and is governed by section 501(c)(4) of the Internal Revenue Code. The NRLC is a nationwide, non-profit, non-partisan organization with approximately 3,000 local chapters and fifty state affiliates dedicated to "promoting respect for the worth and dignity of all human life from conception to natural death." O'Steen[61] Decl. at 1.

57. Wayne LaPierre is the Executive Vice President of the NRA and is responsible for the organization's operations. *See* LaPierre Decl. at 1.

58. Stephen Dasbach is Senior Advisor and former National Chairman of the LNC. *See* Dasbach Decl. at 1.

59. Anthony Romero is the Executive Director of the ACLU and is responsible for the organi-

zation's operations, including its legislative activities. *See* Romero Decl. at 1.

60. David Keating is the Executive Director of Club for Growth and is familiar with the day-to-day operation of the organization. *See* Keating Decl. at 1.

61. David O'Steen is the Executive Director of the NRLC and is familiar with the day-to-day

9. The National Right to Life Educational Trust Fund (NRL ETF) is an organization governed by section 501(c)(3) of the Internal Revenue Code. NRL ETF sponsors educational advertising and develops materials detailing "fetal development, abortion's impact on America, and . . . euthanasia." O'Steen Decl. at 3.

10. The National Right to Life Political Action Committee is a political committee governed by 2 U.S.C. § 431(4) and section 527 of the Internal Revenue Code and is a separate segregated fund of the NRLC pursuant to 2 U.S.C. § 441b(b). *See* O'Steen Decl. at 5.

11. Thomas E. McInerney is a U.S. citizen, a registered voter in the State of New York and a member of and contributor to various Republican Party organizations and committees at the national, state and local levels. *See* McInerney Aff. at 1.

12. Barret Austin O'Brock is a U.S. citizen and a resident of the State of Louisiana. He is 14 years of age and intends to make contributions to federal candidates in future elections, including the 2004 election. *See* O'Brock Decl. at 1.

13. Emily Echols, Hannah and Isaac McDow, Zachary White, Daniel Solid and Jessica Mitchell are U.S. citizens who range in age from 12 to 16. They intend to seek out and contribute to federal candidates "who represent their views and beliefs on important questions like the right to life of children before birth, and on the size of government." Echols Pls.' Proposed Findings of Fact at 11.

14. The U.S. Chamber of Commerce is a tax-exempt corporation governed by section 501(c)(6) of the Internal Revenue Code. It is the world's largest not-for-profit business federation, representing over 3,000,000 businesses and business associations. *See* Josten [62] Direct Test. at 1.

15. The U.S. Chamber Political Action Committee (U.S. Chamber PAC) is a political committee governed by 2 U.S.C. § 431(4) and section 527 of the Internal Revenue Code and is a separate segregated fund of the Chamber of Commerce pursuant to 2 U.S.C. § 441b(b). U.S. Chamber PAC is funded by contributions voluntarily made by individual Chamber executives, administrative employees, members and their families. *See* Josten Direct Test. at 5.

16. The National Association of Manufacturers (NAM) is the oldest and largest broad-based industrial trade association in the United States. Its membership comprises 14,000 companies and 350 member associations. Like many trade associations, NAM is a tax-exempt corporation governed by section 501(c)(6) of the Internal Revenue Code. *See* Huard [63] Direct Test. at 1.

17. Associated Builders and Contractors, Inc. (ABCI) is a non-profit tax-exempt organization governed by section 501(c)(6) of the Internal Revenue Code and is funded primarily by membership dues. It is a national trade association representing more than 23,000 contractors and related firms in the construction industry. ABCI's members, which include both union and non-union employers, "share the philosophy that construction work should be awarded and performed on the basis of merit, regardless of labor affiliation." Monroe [64] Direct Test. at 1–2.

---

operation of the organization. *See* O'Steen Decl. at 1.

62. R. Bruce Josten is Executive Vice President for Government Affairs of the U.S. Chamber of Commerce and has supervisory responsibility for the organization's government affairs activities. *See* Josten Direct Test. at 1.

63. Paul Huard is NAM's Senior Vice President for Finance and Administration and has served as the organization's chief lobbyist. *See* Huard Direct Test. at 1.

64. Edward Monroe is Director of Political Affairs for ABCI and also serves as Treasurer of ABC PAC. *See* Monroe Direct Test. at 1.

18. Associated Builders and Contractors Political Action Committee (ABC PAC) is a political committee governed by 2 U.S.C. § 431(4) and section 527 of the Internal Revenue Code and is a separate segregated fund of ABCI pursuant to 2 U.S.C. § 441b(b). ABC PAC makes contributions to federal candidates who support the principles of ABCI and makes independent expenditures for communications on their behalf. *See* Monroe Direct Test. at 9.

19. The National Association of Broadcasters (NAB) is a non-profit, incorporated trade association of radio and television stations and broadcasting networks in the United States. *See* Goodman [65] Decl. at 2.

20. The AFL–CIO is a national labor federation comprised of 66 national and international labor unions that, collectively, have a total of approximately 13 million members. The AFL–CIO also includes 51 state labor federations, nearly 580 area and central labor councils and numerous trade and industrial departments. A core mission of the AFL–CIO is to provide "an effective political voice to workers on public issues that affect their lives." G. Shea [66] Decl. at 2–3.

21. The Republican National Committee (RNC) is an unincorporated association headquartered in Washington, D.C. It consists of three members each from the Republican Party in each of the fifty States, the District of Columbia, Puerto Rico,

American Somoa, Guam and the U.S. Virgin Islands. Each state and territorial Republican Party elects a national committeeman and a national committeewoman. In addition, the state and territorial Republican Party chairmen serve as members of the RNC. *See* Josefiak [67] Decl. at 4; Duncan Decl. at 3.

22. Mike Duncan is a member of the RNC from the State of Kentucky and currently serves as the General Counsel of the RNC. Prior to becoming General Counsel, he was Treasurer of the RNC and in that capacity signed all RNC reports filed with the FEC. *See* Duncan Decl. at 3. In both his official capacity as an officer of the RNC and his private capacity, Duncan has participated in and (unless prohibited by BCRA) will continue to participate in national, state and local political party activities. He will also (unless prohibited by BCRA) continue to solicit, receive or direct non-federal funds to other persons. *See id.* at 3–6.

23. The Republican Party of New Mexico is a state committee of the Republican Party under BCRA. It supports federal, state and local candidates for office in New Mexico and promotes Republican positions on public policy issues. *See* Dendahl [68] Decl. at 1. Under New Mexico law, the Republican Party of New Mexico is permitted to raise and spend corporate, labor union and individual funds in unlimited

---

**65.** Jack Goodman is Senior Vice President and General Counsel of the NAB and is involved in developing the organization's regulatory and policy objectives. *See* Goodman Decl. at 1–2.

**66.** Gerald Shea serves as Assistant for Government Affairs to the President of the AFL–CIO and, as such, is responsible for oversight and coordination of all of the AFL–CIO's policy-related activities. *See* G. Shea Decl. at 2.

**67.** Thomas Josefiak is Chief Counsel of the RNC and is primarily responsible for the day-

to-day legal operations of the RNC, including ensuring that all of the RNC's activities, officers and employees comply with applicable federal and state election laws. *See* Josefiak Decl. at 1–2.

**68.** John Dendahl is the State Chairman of the Republican Party of New Mexico and is responsible for recruiting and supporting federal, state and local candidates in the State and for raising funds to support the state committee's operations. *See* Dendahl Decl. at 1.

amounts in support of state and local candidates. *See* N.M. STAT. ANN. §§ 1–19–25 to 1–19–36 (1978); *see also* Dendahl Decl. at 2.

24. The Dallas County (Iowa) Republican County Central Committee is a local political party committee the FEC has deemed independent of any state or national political party committee. It is actively involved in supporting state and local candidates for office in Iowa. *See* Josefiak Decl. at 5.

25. The California Democratic Party is an unincorporated association of approximately seven million members and is the authorized Democratic Party of the State of California. Similarly, the California Republican Party is an unincorporated association of over five million members and is the authorized Republican Party of the State of California. The CDP and the CRP perform many functions, among them providing financial and material support to federal, state and local candidates; taking positions on public issues (including state and local ballot measures) and publicizing those positions; engaging in voter registration, get-out-the-vote activities and generic party-building activities; and maintaining an administrative staff and structure to support the parties' goals and activities and to comply with extensive federal and state regulation. *See* Bowler [69] Decl. at 2–3; Morgan Aff. at 2–3.

a. Pursuant to state law, the CDP is governed by the Democratic State Central Committee (DSCC). The DSCC is made up of approximately 2,710 members, about 849 of whom are elected by the 58 county central committees. Other members serve on the DSCC in their capacities as federal or state officials, as nominees of the CDP, as members of the Democratic National Committee (DNC) from California or as elected representatives of 80 Assembly District Committees (AD Committees). *See* Bowler Decl. at 2–3. CDP bylaws provide for local party AD Committees, which elect delegates to the DSCC and are the district-level organizational blocks of the CDP. The AD Committees are primarily involved in local voter registration, get-out-the-vote and grassroots activities and they act as liaisons with the campaign organizations of Democratic candidates in their area. *See id.* at 3.

b. The CRP is governed by the Republican State Central Committee (RSCC). The RSCC consists of about 1,500 regular and appointive members. The regular members include federal and state officeholders as well as the CRP's nominees for governor, seven other state constitutional offices, United States Senate, 53 congressional districts, 40 state senate districts, 80 state assembly districts and four state board of equalization districts. The RSCC also includes the chairmen of the 58 county central committees and the chairmen of volunteer party organizations. *See* Morgan Aff. at 3–5. The CRP operates as well through (1) a 100–member Executive Committee, which includes federal and state officeholders and 16 representatives of county central committees; and (2) a 25–member Board of Directors, which includes a Member of the Congress [70] appointed by the delegation, three state elected officeholders and representatives from an association of Republican county central committee chairmen. *See id.* at 3–4. Under the CRP's bylaws and the RNC's rules, the CRP is part of the RNC. The CRP's elected chairman is a member

---

69. Kathleen Bowler is the Executive Director of the CDP and oversees the day-to-day administrative operations of the organization. *See* Bowler Decl. at 1–2.

70. As it is used in these alternative findings and throughout this opinion, the term "Members of the Congress" includes both United States Representatives and United States Senators.

of the RNC. The CRP elects two other representatives to the RNC—a national committeeman and national committeewoman, each of whom is a member of the CRP Executive Committee and Board of Directors. *See id.* at 5–6.

26. Art Torres is the elected Chair of the CDP. Torres also serves on the DNC and has been elected by the DNC to serve on the DNC Executive Committee. As Chair of the CDP, Torres assists the CDP and county central committees in fundraising efforts by meeting and talking regularly with potential donors and attending fundraising events. *See* Bowler Decl. at 4; Torres Decl. at 1–2.

27. The Yolo County Democratic Central Committee and Santa Cruz County Republican Central Committee are two of the 58 county central committees authorized and governed by the California Elections Code. Members of the county central committees are elected at each statewide primary election. All members of the CDP who are also state senators, members of the state assembly or Members of the Congress serve as *ex officio* members of their respective county central committees. *See* Bowler Decl. at 3. The county central committees are primarily involved in local voter registration, get-out-the-vote activities and grassroots activities and they act as liaisons with the campaign organizations of Democratic candidates in their area. *See id.*

28. Timothy J. Morgan is (1) a member of the RNC; (2) a member of the CRP Executive Committee; (3) a member of the CRP Board of Directors; and (4) Chairman of the Santa Cruz County Republican Central Committee. *See* Morgan Aff. at 1.

29. The FEC is a government agency headquartered in Washington, D.C., constituted pursuant to FECA, 2 U.S.C. § 437c, and charged with enforcing the Act as amended by BCRA.

30. The United States, through the DOJ, is charged with enforcing the criminal provisions of the Act as amended by BCRA.

31. The FCC is a government agency headquartered in Washington, D.C., and is charged with enforcing the FCA as amended by BCRA.

32. The intervenors are Members of the Congress who were principal sponsors and authors of BCRA. Senator John McCain is a Republican United States Senator from the State of Arizona. Senator Russell Feingold is a Democratic United States Senator from the State of Wisconsin. Senators McCain and Feingold face reelection in 2004. Senator Olympia Snowe is a Republican United States Senator from the State of Maine. Senator James Jeffords is an Independent United States Senator from the State of Vermont. Senators Snowe and Jeffords face reelection in 2006. Congressman Christopher Shays is a Republican member of the House of Representatives from the 4th Congressional District in Connecticut. Congressman Martin Meehan is a Democratic member of the House of Representatives from the 5th Congressional District in Massachusetts.

2. **The Ban on Corporate and Labor Disbursements for "Electioneering Communications" and the Disclosure and Reporting Requirements**

As to BCRA's ban on corporate and labor disbursements for "electioneering communications" and the statute's disclosure and reporting requirements, *see generally supra* Parts II.A and II.B, I would find that:

33. After the *Buckley* decision in 1976 and subsequent amendments to the Act, the Act's prohibition on the use of corporate and union treasury money and its disclosure requirements applied to independent political spending only if it funded

express advocacy of the election or defeat of a clearly identified candidate. *See* 2 U.S.C. § 431(17).

34. Few candidate or party advertisements use words of express advocacy. In the 1998 election cycle only four per cent of ads sponsored by candidates used words of express advocacy. In 2000 only 11.4 per cent of ads sponsored by candidates and only 2.2 per cent of ads sponsored by political parties used words of express advocacy. *See* Krasno[71] & Sorauf[72] Expert Report at 53; Goldstein[73] Expert Report at 16, 31.

35. Before BCRA was enacted, interest groups[74] running issue advertisements[75] often did not disclose the sources of their funding. *See* Krasno & Sorauf Expert Report at 72; Magleby[76] Expert Report at 18–19. Among the groups that did not disclose their sources was Citizens for Better Medicare, which is funded by the pharmaceutical industry. In 1999 and 2000 Citizens for Better Medicare was one of the top sponsors of issue advertisements that also name federal candidates; it spent approximately $65 million on television advertising during that period. *See* Magleby Expert Report at 18–19; Ryan[77] Dep. at 13–15.

36. From 1996 to 2000 the majority of advertisements run by interest groups were not regulated by the Act because they did not use words of express advocacy. By 2000, for every interest group ad covered by the Act, 20 interest group ads mentioning federal candidates were not covered. *See* Krasno & Sorauf Expert Report at 53; Goldstein Expert Report at 10; ANNENBERG PUBLIC POLICY CENTER, ISSUE ADVERTISING IN THE 1999–2000 ELECTION CYCLE 12–15 (2000) (hereinafter ANNENBERG STUDY).

37. From 1996 to 2000 the number of issue advertisements—as well as the number of organizations sponsoring issue ads and the amounts spent on issue advocacy—increased.

a. In the 1996 election cycle a total of approximately $135 million to $150 million was spent on national and local television

71. Defense expert Jonathan Krasno is a visiting fellow at Yale University's Institution for Social and Policy Studies.

72. Defense expert Frank Sorauf is Regents' Professor Emeritus at the University of Minnesota.

73. Defense expert Kenneth Goldstein is an Associate Professor of Political Science at the University of Wisconsin–Madison, where he specializes in the study of interest groups and political advertising. *See* Goldstein Expert Report at 1.

74. As it is used in these alternative findings and throughout this opinion, the term "interest group" refers to any person or entity—whether a corporation, union, trade association, advocacy group or the like (but not a political party)—that (1) is interested in a particular issue; (2) participates in the political process; and (3) associates with others of like mind. *See infra* Finding 79 at pages 348–49.

75. As they are used in these alternative findings and throughout this opinion, the terms "issue advertisement" and "issue ad" are interchangeable and refer to an advertisement that does not contain words of express advocacy. *See Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. 612 (express words of advocacy include " 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject' ").

76. Defense expert David Magleby is a Distinguished Professor of Political Science at Brigham Young University, where he also serves as Dean of the College of Family, Home and Social Sciences and as Director of the Center for the Study of Elections and Democracy. *See* Magleby Expert Report at 7.

77. Timothy Ryan currently serves as Vice President for Advertising at Sawyer Miller Weber Shandwick, an advertising firm in Washington, D.C., and was formerly Executive Director of Citizens for Better Medicare. *See* Ryan Dep. at 6–7.

and radio broadcasts of about 100 distinct ads on national issues sponsored by relatively few organizations. In the 1998 election cycle approximately 77 organizations aired 423 distinct ads at a cost of between $250 million and $341 million. In the 2000 election cycle approximately 130 organizations aired over 1,100 distinct ads at a cost of more than $500 million. In the 2000 cycle the Republican and Democratic parties accounted for almost $162 million (32 per cent) of the spending on issue advocacy; Citizens for Better Medicare accounted for $65 million (13 per cent); the Coalition to Protect America's Health Care accounted for $30 million (six per cent); the Chamber of Commerce accounted for $25.5 million (five per cent); and U.S. Term Limits accounted for $20 million (four per cent). *See* Annenberg Study at 1, 4.

**b.** By way of comparison, a total of approximately $100 million was spent in 1995 alone to advertise syndicated reruns of "Seinfeld," a television sitcom. *See* Bradley A. Smith, Unfree Speech: The Folly of Campaign Finance Reform 42 & n. 4 (2001).

**38.** In some competitive races, interest group issue advocacy often rivals and even outpaces advertising by federal candidates themselves. *See* Krasno & Sorauf Expert Report at 51; Goldstein Expert Report at 12, 22; Magleby Expert Report at 20, 22.

**39.** Many of the interest group issue ads that also name a federal candidate and air near an election avoid using words of express advocacy but end with an exhortation to "call" the named candidate and "tell" him something or "thank" him for his stance on a particular issue. *See, e.g.,* Magleby Expert Report at App. G. Both the Chamber of Commerce and the AFL–CIO agree that "the ultimate way to tell an elective official to do something is through the voting process." G. Shea Dep. at 46; *see* Josten Dep. at 230.

**a.** Republican political consultant Rocky Pennington testified that "[t]he usual final tag line [of an issue ad] is to 'call' or 'ask' or 'tell' a candidate to stop or continue doing something, often something vague like fighting for the right priorities. This is pretty silly, because it's hard to imagine thousands of people calling the candidate in response to the ad and saying, keep doing this, this is wonderful." Pennington Decl. at 6. Senator Feingold testified similarly, stating that the plea to "call somebody's office" is at "the heart of the phony issue ad." Feingold Dep. at 14. Senator Feingold acknowledged, however, that his constituents often do contact him in response to television advertisements. *See id.* at 238–39.

**b.** In 1996 Citizens for Reform, an interest group, spent $2 million on television issue ads that did not expressly advocate the election or defeat of any candidate but were directed at influencing congressional races. That year it sponsored the notorious "Bill Yellowtail" ad, which aired during the final weeks of a Montana congressional race and accused Yellowtail, the challenger, of spousal abuse: "He preaches family values but he took a swing at his wife." Thompson Comm. Rep. at 6301–05. In addition to its television and radio ads opposing Yellowtail, Citizens for Reform "did direct mail and phone banking against [him]," which would not be prohibited by BCRA. Lamson[78] Decl. at 3.

**c.** The NAB "admits that a [p]olitical [a]dvertisement might conceivably influence a federal election without the use of any particular words as might many other factors depending upon the circumstances of each individual race." Resp. of NAB to FEC's First Reqs. for Admis. at 5.

---

**78.** Joe Lamson managed Bill Yellowtail's 1996 campaign. *See* Lamson Decl. at 1.

**d.** Republican political consultant Douglas Bailey testified that "[i]n the modern world of 30 second political advertisements, it is rarely advisable to use such clumsy words as 'vote for' or 'vote against.' ... All advertising professionals understand that the most effective advertising leads the viewer to his or her own conclusion without forcing it down their throat. This is especially true of political advertising, because people are generally very skeptical of claims made by or about politicians." Bailey Decl. at 1–2.

**40.** Interest group issue advertisements that air near election time more frequently refer to federal candidates than do interest group ads that air at all other times. For example, from January 1, 2000 until September 4, 2000 Citizens for Better Medicare sponsored 28,867 television ad spots, none of which named a federal candidate. *See* Goldstein Expert Report at App. A & Tbl. 17A. During the three weeks preceding the 2000 election, by contrast, Citizens for Better Medicare sponsored 6,000 ad spots that identified a federal candidate. *See id.*

**41.** Beginning in 1996 corporations, unions and interest groups—to which the defendants refer as "outside groups," *e.g.*, Intervenors Proposed Findings of Fact at 31—began large-scale use of their treasury funds to sponsor issue advertisements that to some observers "looked and sounded like campaign ads," *id.* (citing ANNENBERG STUDY at 3, 7–8; Thompson Comm. Rep. at 5927 & n. 4).

**42.** Issue advertisements are heavily concentrated in the final weeks leading up to an election and are often intensely partisan. They are concentrated most heavily in jurisdictions with competitive election contests—commonly known as "battleground states"—where a small change in voter preference can affect the outcome of the election. Interest groups often broadcast ads in competitive contests where

their investment is most likely to make a difference. *See* Goldstein Expert Report at 21 Tbl. 5; Magleby Expert Report at 20, 31 ("Interest groups ... take aim at particular states with competitive U.S. Senate races or congressional districts where the outcome is in doubt.... This tendency has been reinforced by the exceedingly close margin of party control in Congress in recent years."); LaPierre Dep. at 24–25, 118, 157–59. The following subparagraphs contain representative examples of such ads.

**a.** During the 60 days leading up to the 2000 general election the NRA ran a 30–minute infomercial known as "Union/Gore" which would constitute an "electioneering communication" under BCRA. The infomercial opened with NRA President Charlton Heston stating that "[t]his election could come down to battleground states like Pennsylvania, Michigan, Ohio and Missouri, states with lots of union members where the union vote could decide the outcome. But not all union members will vote as political observers might expect. So we sent NRA correspondent Ginny Simone deep into the heart of union country to talk with union members about this election, about the candidates, about the issues, and what to them really matters most. Here's Ginny's report." The infomercial then focused on union members' comments in response to the NRA reporter's questions:

- "All this union leadership, they send you stuff all the time [telling you to] vote for Al Gore. Well, I don't see it that way. It's—you know, I—I want my freedom, I want to hold onto my guns, I want to vote for Bush."

- "I have a hand gun, and I've had NRA training, and I'm a survivor of domestic violence, and I believe in self-protection, and I do not want my guns taken away."

• "A loss of my gun rights is what Al Gore represents. There's no ifs, ands, or buts about that. In my mind, ... if Al Gore and his administration is [sic] voted in, we will lose firearm rights."

• "Yes, it's nice being part of my union, it helps protect me. But having my right to bear arms is something that's extremely important to me. It's something that's kind of just been engrained [sic] in me."

The infomerical then turned back to Heston, who urged voters "to protect your freedoms on November 7th. It's one way you can thank the many souls sacrificed in freedom's name over the past couple hundred years.... And that includes carefully considering which candidates promise to defend our freedoms and which candidates promise to diminish or even destroy them." McQueen Dep. at 113–23.

**b.** During the 60 days leading up to the 2000 general election the interest group Planned Parenthood aired an ad called "Bush Doesn't Say Much," which under BCRA is an "electioneering communication." The ad claimed that "[a]s President, Bush could appoint Supreme Court Justices who could take away our right to choose. Get the facts about George W. Bush's Texas record." Defs.' Exhs. Vol. 48, Tab 3 (CMAG Storyboard No. 29).

**c.** During the 60 days leading up to the 2000 general election the interest group Handgun Control Inc. ran an ad called "Handgun/Martin Sheen," an "electioneering communication" under BCRA. Actor Martin Sheen stated in the ad that "[b]etween now and election day, at least two thousand Americans will die from gunfire. Should the next president be a candidate of the gun lobby? Should he have signed a bill that allows hidden handguns in churches, hospitals, and amusement parks? ... That's Governor Bush's record. Find out more at bushandguns.com." Defs.'

Exhs. Vol. 48, Tab 3 (CMAG Storyboard No. 32).

**d.** RNC political operations director Terry Nelson testified that, as a general rule, issue advocacy is not as effective in August of an election year as it is in October or early November. *See* Nelson Dep. at 90–91 ("I would tell candidates that they needed to spend their money when people are paying attention, which tends to be towards the election.").

**e.** The 2000 United States Senate race between Spencer Abraham and Debbie Stabenow is illustrative of recent issue advocacy campaigns across the country.

**1)** During the 60 days preceding the general senatorial election between Abraham and Stabenow interest groups aired 4,323 ad spots. During the other ten months of the year the groups aired only 926 ad spots, for a year-long total of 5,249 ad spots.

**2)** By way of comparison, Abraham and Stabenow themselves ran (together) a total of 11,381 ad spots during the year 2000 and the political parties ran 7,905 ad spots in the same period.

**3)** The AFL–CIO ran one ad critical of Abraham 269 times from October 16 to October 22. On October 20 the ad aired 26 times in Detroit and 29 times each in the markets of Grand Rapids, Battle Creek and Kalamazoo. The Michigan and U.S. Chambers of Commerce ran five distinct ads against Stabenow a total of 1,635 times between September 20 and November 6.

**4)** During the 60 days preceding the general election not a single candidate-sponsored ad and only one party-sponsored ad (accounting for ten per cent of party ad airings during that period of time) employed words of express advocacy. The issue ads regularly criticized Abraham and Stabenow for votes they had taken in

the past and did not focus heavily on forthcoming legislative initiatives. *See* Intervenors Proposed Findings of Fact at 37–38.

5) A Michigan Chamber of Commerce issue ad entitled "Stabenow Against Local Schools"—now an "electioneering communication" under BCRA—stated: "Local schools, local teachers, local parents electing local school boards. That is the way our schools work best. So why did Debbie Stabenow vote against a bi-partisan plan to make our schools better? To reduce federal red tape and increase student performance in five years? Why did she vote against allowing teachers to control their own classrooms? . . . Call Debbie Stabenow and tell her we want to run our own neighborhood schools." Defs.' Exhs. Vol. 48, Tab 3 (CMAG Storyboard No. 6).

43. No credible evidence in the record supports the defendants' assertion that BCRA's "electioneering communication" provisions will affect "very few genuine discussions of policy matters." *E.g.,* FEC's Am. Proposed Findings of Fact at 153. To the contrary, credible record evidence indicates that BCRA will actually capture a *vast* number of "genuine" issue advertisements. *See, e.g., infra* Findings 43f–43h, 51d at pages 308–12, 317.

a. The Brennan Center for Justice (Brennan Center) played a "central role" in the adoption of BCRA. Holman[79] Dep. at 14–15, Exh. 3. The Brennan Center helped "craft the design of the McCain–Feingold bill," *id.* at 11, and provided "legal opinions" on what it believed would be "constitutionally defensible," *id.* at 13.

b. The Brennan Center promoted campaign finance regulation by, *inter alia:* drafting for legislators memoranda that "directly addressed concerns that were being debated in the Congress concerning

the McCain–Feingold and Shays–Meehan bills," *id.* at 11; meeting with Members of the Congress to review research findings, *see id.* at 16–17; drafting and publishing a "scholars' letter" and a signed statement by former leadership figures of the ACLU, which documents deemed the bills constitutional and were "very influential in the Senate debate and in influencing media perceptions," *id.* at 11, 12, 19–20, Exh. 3.

c. In addition to undertaking these wide-ranging activities in support of new campaign finance regulation, the Brennan Center published two reports: CRAIG B. HOLMAN & LUKE P. MCLOUGHLIN, BUYING TIME 2000: TELEVISION ADVERTISING IN THE 2000 FEDERAL ELECTIONS (Brennan Center 2001) (hereinafter *Buying Time 2000* ), and JONATHAN S. KRASNO & DANIEL E. SELTZ, BUYING TIME 1998: TELEVISION ADVERTISING IN THE 1998 CONGRESSIONAL ELECTIONS (Brennan Center 2000) (hereinafter *Buying Time 1998* ). *See generally* Defs.' Exhs. Vols. 46, 47.

d. The *Buying Time* reports were based on data gathered by Kenneth Goldstein with the help of his political science students at Arizona State University (for the 1998 report) and the University of Wisconsin (for the 2000 report). Goldstein's students were shown "storyboards"—prepared by the Campaign Media Analysis Group (CMAG)—of certain political advertisements broadcast during 1998 and 2000. The students were asked to "code" the ads based on their content. *See* Defs.' Exhs. Vol. 46 at 19; Defs.' Exhs. Vol. 47 at 7. According to the Brennan Center, the *Buying Time* reports were "the central piece of evidence marshaled by defenders of" BCRA's electioneering communication provisions "in support of [their] constitutional validity." Holman

---

**79.** Craig Holman was a senior policy analyst at the Brennan Center and the principal co-author of *Buying Time 2000.* *See* Holman Dep. at 8; *see also infra* Finding 43c at page 307.

Dep. Exh. 3 at 2. While the government claims that "[t]he *Buying Time* databases show that ... BCRA will correctly capture" almost all so-called "sham" issue advertisements "but very few genuine issue advertisements," FEC's Am. Proposed Findings of Fact at 192, the *Buying Time* reports are flawed. *See infra* Findings 43e–43h at pages 308–12.

e. The Brennan Center and the authors of the *Buying Time* reports sought to achieve a certain result and therefore sacrificed scientific objectivity.

1) Funds to underwrite *Buying Time 1998* were solicited on the basis of the explicit promise that the study would be abandoned midstream if the results being obtained were not helpful to the cause for more stringent campaign finance regulation. *See* Goldstein Dep. Exh. 2 at 6 ("Whether we proceed ... will depend on the judgment of whether the data provide a sufficiently powerful boost to the reform movement."). Money to fund *Buying Time 2000* was solicited on the promise that the study would be "design[ed] and execute[d]" to achieve "reform" and the study was so designed and executed. Goldstein Dep. (Vol. 1) at 37–38 ("Q: So I take it that it was your goal to design and execute the study in a way that would help move the campaign reform ball forward: is that right?" "A: Yes.").

2) The Brennan Center submitted a grant proposal to the Pew Charitable Trusts (Pew) to gain funding for *Buying Time 1998* and, later, *Buying Time 2000*. *See* Krasno Dep. at 51, 55–56, Exh. 4. The Brennan Center understood that Pew's "bottom line" was "regulating sham issue advocacy." *Id.* at 52–53, Exh. 3. Most of the funding Pew subsequently agreed to provide was to be put toward publicity and

advocating "reform" rather than purchasing and analyzing data. *See id.* at 63–64, Exh. 5.

3) The grant proposal to Pew was authored by Jonathan Krasno, who—before he had approached Pew or had performed any studies—had already "come to believe that political parties were using the magic words test as cover to sponsor thinly-veiled campaign ads masquerading as issue advocacy." Krasno Dep. at 66, Exh. 6, Exh. 13 at 2.

4) Each element of the Brennan Center's grant proposal to Pew was aimed at "overcoming the obstacles to reform" and at "influencing at least one of the four critical audiences that [would] play a pivotal role in determining the success or failure of any reform: Legislators, journalists, academics and courts." Holman Dep. Exh. 4 at 2–3; *see id.* ("[T]he purpose of our acquiring the data is not simply to advance knowledge for its own sake, but to fuel a continuous and multi-faceted campaign to propel reform forward."). According to the proposal, the Brennan Center planned to implement the 1998 study in two "phases," during the first of which the Center would "acquire" the data and "adapt it so that it might be easily used" to "develop a strategy for responding to the threat posed by issue advocacy." Goldstein Dep. Exh. 2 at 3.

f. *Buying Time 1998* miscalculates the percentage of so-called "genuine" issue advertisements that would have been regulated in 1998 by a statute like BCRA.

1) The key question included in the 1998 study was Question 6,[80] which asked coders: "In your opinion, is the purpose of this ad to provide information about or urge action on a bill or issue, or is it to

---

**80.** Question 6 was not included in the original coding protocol that was pre-tested before the study began. *See* Goldstein Dep. (Vol.2) at 29, Exh. 11; Krasno Dep. at 115. Krasno added the question to the coding protocol in an attempt to help student coders "avoid confusion" on subsequent questions. Krasno Dep. at 116–17, 121.

generate support or opposition for a **particular candidate?**[81] Defs.' Exhs. Vol. 47 at 193 (emphasis in original); *see* Seltz[82] Dep. at 184–85. If coders concluded that an ad provided information about or urged action on a bill or issue, the ad was to be coded as a "genuine" issue ad. If the coders concluded that the ad generated support for or opposition to a particular candidate, the ad was to be coded as a "sham" issue ad.

2) The authors of *Buying Time 1998* claimed that just seven per cent of "genuine" issue advertisements aired during 1998 would be regulated by a statute like BCRA. In arriving at this figure, the authors counted as "genuine" only two ads in the source database. *See* Seltz Dep. at 77–80, 101–02, Exh. 1 at 109–110, Exh. 4; Krasno Dep. at 149–50; Holman Dep. at 51–52, Exh. 6.

3) Joshua Rosenkranz, Executive Director of the Brennan Center, testified before the Congress in April 2000 and highlighted the seven per cent figure. He asserted that "[w]ith solid empirical data of this type, Congress can be confident that the major campaign finance reform proposals currently before it do not inhibit true issue advocacy." Holman Dep. Exh. 25 at 5 (Rosenkranz testimony). In January 2001, however, Rosenkranz discovered the seven per cent figure to be "flat out false." *Id.* Exh. 28 (e-mail from Rosenkranz); *see id.* Exh. 27 (e-mail from Holman stating that "[w]hile only 7% of groups placing genuine issue ads would be captured, those groups bought about 40%

of all issue ads within [60 days of the 1998 general election]. So, in reality, according to the 1998 database, about 40% of genuine issue ads would be deemed electioneering within a 60–day regulatory period."); *id.* Exh. 29 (e-mail from McLoughlin[83] stating the seven per cent finding was "either false or so vague as to mislead the reader"); *id.* Exh. 31 (subsequent e-mail from McLoughlin reporting correct percentage to be 11.38 per cent); *id.* Exh. 36 (subsequent memo from Holman reporting correct percentage to be 13.8 per cent).

4) Craig Holman, a co-author of *Buying Time 2000*, "decided that since *Buying Time* [was] already published and distributed," he would not "rekindle the issue" even though he had concluded that "[t]here was no mistake in the reassessment" that the seven per cent figure was false. *Id.* Exh. 30.

5) Although the Brennan Center now claims that it "is sticking by the 7 percent figure," *id.* at 142, Holman apparently still believes that 13.8 per cent is the correct percentage "with respect to airings," *id.* at 155–56; *see also id.* at 154 (stating that authors of *Buying Time 1998* should have been clear "whether [the study was] referring to airings or unique ads").

6) According to two of the defendants' experts, if the formula used by the Brennan Center in *Buying Time 2000* had been applied to the data underlying *Buying Time 1998*, the *Buying Time 1998* study would have reported that the percentage of "genuine" 1998 issue ads that would be

---

**81.** The words "particular candidate" were printed in boldface type because the authors "wanted [students] to be thinking of candidates" when answering the question. Krasno Dep. at 122–23.

**82.** Daniel Seltz was a research associate and later a project coordinator in the Democracy Program at the Brennan Center in the late 1990s; during that time he co-authored *Buy-*

*ing Time 1998*. *See* Seltz Dep. at 4–5; *see also supra* Finding 43c at page 307.

**83.** Luke McLoughlin, now a first-year law student, was a research associate in the Democracy Program at the Brennan Center from 2000 to 2002 and during that time co-authored *Buying Time 2000*. *See* McLoughlin Dep. at 3–6; *see also supra* Finding 43c at page 307.

regulated by BCRA was 14.7 per cent. *See* Krasno & Sorauf Expert Report at 60 n. 143.

7) Goldstein's students originally coded as "genuine" at least eight of the ads the Brennan Center later counted as "sham" issue ads in *Buying Time 1998*. Analysis of the handwritten student coding sheets—produced pursuant to a subpoena issued to Goldstein—demonstrates that the students determined that the eight ads "provide[d] information about or urge[d] action on a bill or issue." Goldstein Dep. (Vol. 2) at 65–69 & Exhs. 19–21, 78–79 & Exhs. 22–23, 79–80 & Exhs. 24–25, 80–82 & Exhs. 26–27, 83 & Exhs. 28–29, 84–85 & Exhs. 30–32, 85–87 & Exhs. 33–35, 87–88 & Exhs. 36–37.

8) According to one of the plaintiffs' experts, James Gibson,[84] *Buying Time 1998* would have shown—if the students' original codings had not been disregarded—that 64 per cent of all group-sponsored issue ads aired during the last 60 days of the 1998 election were "genuine" and would have been covered by BCRA. *See* Gibson Expert Report at 42–43.

9) Although the defendants' experts filed three rebuttal reports in response to Gibson's expert report, none challenged his 64 per cent finding. In his rebuttal expert report, Gibson reconsidered his analysis using the methodology used in Krasno's expert report. *See* Gibson Rebuttal Report at 23. Crediting the students' judgments once again, Gibson concluded that no less (and likely more) than 50.5 per cent of "genuine" issue ads aired within 60 days of the 1998 general election would have been regulated by BCRA. *See id.*

g. Like *Buying Time 1998, Buying Time 2000* is based on a flawed methodology and is therefore unreliable as evidence of how many "genuine" 2000 issue adver-

tisements would have been regulated by BCRA.

1) The authors of *Buying Time 2000* concluded that only three "genuine" issue ads in the 2000 database—numbers 627, 1389 and 2862—would have been "unfairly caught by [BCRA]" in the 2000 election season. Holman Dep. at 89–90, Exh. 18.

2) But at least six distinct ads were originally coded as "genuine" by the student coders for *Buying Time 2000*. *See* Goldstein Dep. (Vol. 2) at 126–27; Goldstein Expert Report at 26 n. 21. These included numbers 627, 1389 and 2862 and three others as well. *See* Goldstein Dep. (Vol. 2) at 131–33; Goldstein Expert Report at App. J. That is, three of the six ads were changed from being coded as "genuine" issue ads to "sham" ads in the *Buying Time 2000* database. *See* Goldstein Rebuttal Report at 16; Holman Dep. Exh. 15; McLoughlin Dep. at 44, 47–48, Exh. 13. The students' original coding decisions for the 2000 report have not been preserved and Goldstein has no way of determining precisely how each of the ads was originally coded. *See* Goldstein Dep. (Vol. 2) at 129; Goldstein Rebuttal Report at 16.

3) In March 2001—shortly before *Buying Time 2000* went to press—the Brennan Center called Goldstein on his cell phone at the West Palm Beach airport seeking his judgment on an unknown number of ads aired within 60 days of the 2000 election, all of which were coded by the students as "genuine." After the text of each ad was read to him over the phone, Goldstein overruled the students' judgments and reclassified each ad as an "electioneering" ad. *See* Goldstein Dep. (Vol. 2) at 57–59, 147–150 ("Q: What was the urgency?" "A: I think the book was going to press.... Feingold was being debated

---

84. Plaintiffs' expert Gibson is the Sidney W. Souers Professor of Government at Washing-

ton University. *See* Gibson Expert Report, Exh. 2.

the next week, and Brennan wanted to be able to write a report.... [T]he Brennan Center was trying to get a report out the door around that debate.").

**h.** Both of the *Buying Time* reports contain additional flaws that further undermine their evidentiary value.

1) As plaintiffs' expert Gibson testified, the 1998 and 2000 databases upon which the *Buying Time* studies are based are "subject to continuous alteration by Professor Goldstein, in consultation with the Brennan Center staff." Gibson Expert Report at 46 ("No documents have been produced that indicate how Professor Goldstein has [exercised] or should exercise his enormous discretionary powers to change or recode the data."). There are approximately 12 versions of databases connected to the *Buying Time* reports. *See* Gibson Dep. at 210. These databases have been repeatedly changed so that "[n]o database has been ... produced that will generate the specific numbers found in [the *Buying Time* reports]." Gibson Expert Report at 5, 44.

2) *Buying Time 1998*, in particular, is a "fundamentally flawed" study. Gibson Expert Report at 4. Because the study contains little, if any, explanation or analysis of the data upon which it relies, even members of the Brennan Center have had difficulty understanding it. *See, e.g.,* Holman Dep. at 32 ("To tell the truth, I couldn't understand much of *Buying Time 1998*."); Krasno Rebuttal Report at 8 (co-author of *Buying Time 1998* acknowledging data set upon which study is based is "maddeningly complex"); Goldstein Dep. Exh. 17 (e-mail from Holman stating "[t]he missing data category is uncomfortably large in the 1998 database").

3) Daniel Seltz, a co-author of the 1998 study, has had little if any training in the methods of quantitative analysis. *See* Seltz Dep. at 8 (Seltz received a B.A. in 1996 in history and East Asian studies);

*see also* Gibson Expert Report at 6, 45 (neither 1998 nor 2000 study has been subject to scrutiny of objective peer reviewers and methodology underlying each study "has not been judged to be acceptable by the social scientific community").

4) In each of the studies, student coders were all of a "certain educational level" and "certain age level" and were all "[l]iving in a certain geographical area." Holman Dep. at 228–29. The Brennan Center conceded that the coders were "not representative of the general population" and, therefore, intercoder reliability—i.e., the technique of using multiple respondents to code the same ad "to try to weed out any kind of bias that may be present in one of the coders versus another," *id.* at 189—could at most establish that "this particular group of students roughly of [the same] age roughly of the same educational background living in roughly the same part of the country with contacts to the same professors tend to see things about the same way," *id.* at 228, 232, Exh. 1 at 19.

5) One finding from the *Buying Time* data that was *not* described in the two reports stemmed from a question asking student coders to determine whether the "primary focus" of a particular advertisement was (1) "personal characteristics"; (2) "policy matters"; (3) "both"; or (4) "neither." Gibson Expert Report at 31–32. The students' answers to this question differed significantly from their answers to Question 6 (in the 1998 study) and Question 11 (in the 2000 study), which asked them to evaluate the "purpose" of a particular ad. In 1998 98.1 per cent of the interest group-sponsored ads broadcast within 60 days of the general election and mentioning a candidate were coded as having policy matters as their "primary focus." *See id.* at 32–33. In 2000 98.7 per cent of the group-sponsored ads broadcast within 60 days of the general election and

mentioning a candidate were coded as having policy matters as their "primary focus." *See id.* at 59–60. One defense expert acknowledged—and it would be difficult not to acknowledge—that "a very large percentage of the advertisements . . . had policy issues as their primary focus." Lupia[85] Rebuttal Report at 12. Plaintiffs' expert Gibson concluded that the "primary focus" question was superior to Question 6 of the *Buying Time 1998* study because it included the option "both" and therefore did not force the student coders into an artificial choice between candidate speech and issue speech. *See* Gibson Expert Report at 34; *see also Buckley,* 424 U.S. at 42, 96 S.Ct. 612 ("[T]he distinction between discussion of issues and . . . advocacy of election or defeat of candidates may often dissolve in practical application.").

6) Seltz acknowledged that "many ads both provide information about or urge action on a bill or issue and generate support or opposition for a candidate." Seltz Dep. at 188. Krasno, his co-author, acknowledged that the test established by the Supreme Court in *Buckley* does not distinguish between "candidate-oriented" issue ads and "genuine" or "pure" issue ads. Krasno & Sorauf Expert Report at 58. When asked if he would have designed his studies any differently had he known that speech about *both* candidates and issues was constitutionally protected, Goldstein conceded that he would have. *See* Goldstein Dep. (Vol. 2) at 186–89.

7) The reports' authors and the database's creator cannot seem to agree about what constitutes a "genuine" issue ad and what constitutes a "sham" issue ad. An ad sponsored by the National Pro Life Alliance entitled "Feingold Kohl Abortion 60,"

which aired within 60 days of the 2000 election, announced that

America was outraged when two New Jersey teenagers checked into a Delaware hotel and delivered and exposed [sic] of their newborn baby in a dumpster. Most Americans couldn't believe that this defenseless human life could be so coldly snuffed out. But incredibly, if a doctor had been present that day in Delaware and delivered the infant, all but one inch from full birth and then killed him it would have been perfectly legal. Instead of murder or manslaughter, it would have been called a partial-birth abortion. Killing late in the third trimester, killing just inches away from full birth. Partial-birth abortion puts a violent death on thousands of babies every year. Your Senators, Russ Feingold and Herb Kohl voted to continue this grizzly [sic] procedure. Contact Senators Feingold and Kohl today and insist they change their vote and oppose partial birth abortion. Their number in Washington is 202–224–3121.

Defs.' Exhs. Vol. 48, Tab 3 (CMAG Storyboard No. 80). McLoughlin testified that the ad was "genuine" because "[t]he ad's focus is primarily on the issue of partial birth abortion." McLoughlin Dep. at 42. Holman disagreed with his co-author, concluding that the ad was an "electioneering issue ad." Holman Dep. at 67–69. Goldstein—who was so certain in 2000 that the ad was not "genuine" he reversed a student determination that it was—concluded during the course of this litigation that the ad was indeed a "genuine" issue ad. Goldstein Dep. at 135.

44. The ACLU engages in non-partisan political activities designed to influence federal legislation involving civil rights and

---

85. Defense expert Arthur Lupia is a Professor of Political Science at the University of Michi-gan. *See* Lupia Rebuttal Report, App. A.

civil liberties issues of national importance. *See* Romero Decl. at 1.

**a.** The ACLU has never taken a position in a partisan political election in its 82–year history, although it frequently takes positions on public issues of significance to the organization and its members. *See id.* at 2.

**b.** As an advocacy organization, the ACLU actively lobbies for its positions and frequently talks with federal officials and candidates about civil liberties issues. Although the ACLU does not endorse or oppose the election of particular candidates, its public statements, member communications and other similar activities frequently and necessarily refer to, praise, criticize, set forth, describe or rate the conduct or actions of clearly identified public officials who often are also candidates for federal office. *See id.*

**c.** The ACLU regularly publicizes in its membership mailings—and through pamphlets and other publications—the civil liberties voting records, positions and actions of elected officials, all of whom are at some point candidates for federal office. It sends out over 6.7 million pieces of mail each year to its members and potential members. *See id.*

**d.** The ACLU has never operated a political action committee and has no interest in establishing one. The creation of a political action committee would be inconsistent with the ACLU's mission and identity as a non-partisan organization. Establishing a political action committee would also have adverse consequences for the organization's members. Under FECA political action committees are required to disclose the identities of their contributors. Many ACLU members and contributors seek explicit assurances that their membership will remain confidential and that their contributions will remain anonymous. *See id.* at 2–3.

**e.** The ACLU is primarily a membership-driven organization. Membership dues are not tax deductible. The basic membership fee is $35, although many members contribute more than that. A reduced membership rate is available for students and other low-income individuals. Membership dues accounted for $9,393,948 of the $13,625,051 contributed to the organization by individuals in 2001. Only 212 individuals contributed more than $1,000. Although the ACLU does not maintain records on the corporate status of non-individual donors, less than $85,000 of the ACLU's total revenues were contributed by business entities and other organizations in 2001. None of the contributions from businesses exceeded $500. Contributions from non-individual donors represent less than one per cent of the ACLU's total annual funding. *See id.* at 3.

**f.** Many of the ACLU's public statements involving legislation or executive branch policies—including print and broadcast communications—necessarily refer to clearly identified federal candidates, Members of the Congress or executive branch officials because high profile legislation (like "McCain–Feingold" or "Shays–Meehan") is often publicly identified with its sponsors. Likewise, the ACLU's public statements supporting or opposing the President's policies invariably refer to the President by name. *See* Murphy Decl. at 4.

**45.** The NRLC regularly pays to broadcast what BCRA defines as "electioneering communications." *See* O'Steen Decl. at 1–2.

**a.** The primary purpose of the NRLC's electioneering communications is to affect legislation. *See id.* at 3.

**b.** The NRLC qualifies as an *MCFL*-type organization under the Supreme Court's decision in *FEC v. Massachusetts Citizens for Life. See* O'Steen Decl. at 2.

c. The NRLC has received donations from political party committees in the past and persons associated with political parties have assisted the NRLC in raising funds. *See id.* at 3.

d. The NRLC strongly supports a partial-birth abortion ban. It helped initiate the Partial–Birth Abortion Ban Act and published numerous print ads, press releases and educational materials in support of the Act and in an effort to override President Clinton's veto. Some of the ads and materials mentioned federal officials and some mentioned President Clinton after April 10, 1996 while he was a candidate for the 1996 presidential election. *See id.* at 7–10, Exhs. A–1 to A–12.

e. The NRLC has a long history of opposing campaign finance legislation like BCRA. *See id.* at 10–21, Exhs. B–1 to B–44.

1) In November 1995 the NRLC sent to all United States Senators a letter opposing newer and stricter campaign finance legislation on grounds that it would "almost entirely eliminate involvement in the political process for ordinary citizens who are not independently wealthy" and would regulate issue advocacy such that groups not organized as political action committees would be unable to inform the public about candidates' positions and voting records. *See id.* at 11.

2) The NRLC has broadcast advertisements in opposition to campaign finance legislation like BCRA. Many such ads mentioned federal candidates and were broadcast within 30 days of a primary or within 60 days of a general election. *See id.* at 15–19, Exhs. B–14 to B–19, B–21 to B–25, B–27, B–30, B–31, B–33, B–36 to B–39.

3) In January 2000, when Governor Bush and Senator McCain were seeking the Republican presidential nomination, the NRLC used the national attention focusing on the two candidates to continue its long-term battle against campaign finance legislation like BCRA, just as Senator McCain used the national attention to promote the McCain–Feingold legislation. *See id.* at 19.

46. Common Cause, an interest group not a party to these consolidated actions, has a long history of supporting campaign finance legislation like BCRA.

a. Since its creation in 1970 Common Cause has promoted and supported a strict regulatory regime over campaign finance. *See* Keller[86] Dep. at 17–18. While it has not run electioneering communications in support of campaign finance restrictions, it has engaged in a variety of activities mentioning federal candidates in the weeks leading up to elections. For example, as the 2000 New Hampshire presidential primary approached, Common Cause "staged an event with both Senator McCain and former Senator Bradley around the issue of [c]ampaign [f]inance [r]eform generally," an event at which the candidates were to pledge their support for campaign finance legislation like BCRA. *Id.* at 105. At that time, an opinion editorial published on Common Cause's website extolled Senators McCain and Bradley as presidential candidates who uniquely understood the need for campaign finance reform. *See id.* Exh. 20. The purpose of the editorial "was to raise the visibility of the issue" of campaign finance, not to influence a federal election. *Id.* at 106. A Common Cause official acknowledged it was "possible" that the editorial influenced the 2000 election but he made clear "that was not [its] intent." *Id.* at 106–07.

b. During the 2000 election season Common Cause financed a number of "Town Hall Meetings" or "Town Hall Fo-

---

86. Matt Keller serves as Common Cause's Legislative Director. *See* Keller Dep. at 7–9.

rums" in New Hampshire and other States to promote campaign finance legislation. At least one of the events coincided with active primary campaigns. Several other events mentioned Members of the Congress who would be candidates in the general election and, at still others, Members themselves were present. A Common Cause official stated that while the events might have affected the outcome of the 2000 election, their purpose was not to influence any election or to promote or oppose any candidate. *See id.* at 116–17, Exh. 23; *id.* at 132–36, Exh. 30; *id.* at 136–39, Exh. 31; *id.* at 139–42, Exh. 32.

c. Within 30 days of a primary election and while Vice President Gore was a presidential candidate, Common Cause distributed a nationwide press release subtitled "Gore Sets Forth Innovative Plan for Reform." *Id.* at 113–15, Exh. 23. The press release described Gore's proposal as "innovative and promising" and commented that "Gore is again putting forth strong reform proposals in contrast to Governor George W. Bush." *Id.* Exh. 23. Common Cause stated that the purpose of the press release was not to influence the election but to highlight that "yet another candidate for President was making [c]ampaign [f]inance [r]eform a primary issue in his campaign." *Id.* at 115. A Common Cause official did not believe the press release promoted or supported Gore but he acknowledged that the statement "could affect a federal election." *Id.*

d. On October 18, 2000 (shortly before the 2000 general election) Common Cause issued a nationwide press release announcing a "Reform Report Card" that graded Members of the Congress on their support for tighter campaign finance restrictions and listed legislators who had signed a "Public Integrity Pledge," which promised to support campaign finance legislation. *See id.* at 119–21, Exhs. 25–27. While a Common Cause official acknowledged that

the press release could be interpreted to promote particular candidates, he stated that the press release's purpose was not to influence any election or to promote any candidate but to "encourage ... Members of Congress to vote for the Shays–Meehan, McCain–Feingold Bill." *Id.* at 122–23.

47. NRL ETF has spent and intends to spend funds on broadcast and print communications that do not refer to a candidate but do (1) appear within 60 days of a general election and (2) discuss issues that are contested and on which the candidates have taken a position. *See* O'Steen Decl. at 4. NRL ETF qualifies as an *MCFL*-type organization under the Supreme Court's decision in *FEC v. Massachusetts Citizens for Life. See* O'Steen Decl. at 4.

48. NRL PAC regularly enters contracts for independent expenditure communications days, weeks and months in advance of the time the actual expenditures are made. *See id.* at 5.

49. Club for Growth's goal is to help its members identify races to which their contributions—combined with those of many other members—should be sent so that they can influence public policy in accord with the Club's values of economic freedom. *See* Keating Aff. at 3.

a. Club for Growth is involved in the political process in two major ways; it bundles contributions to candidates and it engages in broadcast issue advocacy. *See id.* at 4–5.

b. Club for Growth's television and radio ads do not contain express words of advocacy but identify candidates' positions on tax cuts, tax reform, free-market issues and other economic issues of concern to the Club. *See id.* The Club's ads are frequently broadcast during the 30 days before a primary election and the 60 days before a general election and are intended to educate voters about federal and state

candidates' records and platforms. *See id.* at 5–6.

50. The NAB serves and represents the American broadcasting industry and has approximately 7,300 member stations throughout the country. All of the NAB's voting members are broadcast licensees within the meaning of the FCA. *See* Goodman Decl. at 2.

a. The NAB's members broadcast, on television and radio, an extensive number of political advertisements that take positions on issues of public importance. The ads are funded by individuals, groups, labor unions, incorporated entities and others. They often refer to a candidate for federal office and are broadcast in that candidate's district within 60 days of a general election or within 30 days of a primary. Thus, many of the ads fall within BCRA's definition of "electioneering communication." *See id.* at 3.

b. The NAB's Annual Report and Member Resource Guide and its "Political Broadcast Catechism" publication provide member stations with guidance as to their obligations under the rules of political broadcasting. *See id.* at 2–3, Exhs. 2–3.

c. Although the precise amount of money paid to the NAB's member stations by the sponsors of electioneering communications is not specifically known, NAB members collectively receive millions of dollars every election cycle to air such ads. *See id.* at 3.

d. BCRA section 504 requires the personnel at NAB member stations to make what will often be a difficult and sensitive decision about whether a particular communication relates to a "political matter of national importance," a decision for which station sales personnel are not trained.

Section 504 will also materially add to the amount of records NAB members must maintain. *See id.* at 6.

e. NAB members are likely to have difficulty discerning whether a particular communication relates to a "political matter of national importance" and are therefore likely to have difficulty discerning whether and under what circumstances recordkeeping and disclosure are required. *See id.* at 7.

51. The NRA's frequent references to candidates for federal office in the programming it broadcasts throughout the election cycle—including the periods immediately preceding primaries and general elections—are essential to its political mission of educating the public about Second Amendment and related firearm issues. *See* LaPierre Decl. at 1–3. They also enable the NRA to respond directly and effectively to frequent criticism by politicians and the media. *See id.* at 12, 15–17; McQueen [87] Decl. at 9–14; *see also, e.g.,* NRA App. at 223–44 (examples of ads criticizing NRA).

a. The NRA 30–minute news magazine entitled "California" aired more than 800 times in California from August 29, 2000 through November 5, 2000 and 595 of the airings were in one of the nation's top 75 television markets. *See* LaPierre Decl. at 5; NRA App. at 216. Although the program pictured Vice President Gore, it focused primarily on the history of gun confiscation in California. *See* LaPierre Decl. at 5–6 (only reference to federal candidate occurred when "a cover of an issue of the NRA's magazine 'First Freedom' depicting Vice President Gore, then a presidential candidate, flashed on the screen for several seconds").

---

[87]. Angus McQueen is the Chief Executive Officer of Ackerman McQueen, Inc., a communications and advertising firm headquartered in Oklahoma City, Oklahoma. *See* McQueen Decl. at 1. Ackerman McQueen has provided communications advice and services to the NRA and NRA PVF for approximately 22 years. *See id.* at 2.

**b.** In 2000—on at least 438 occasions in the 60 days prior to the general election— the NRA aired a 30–minute news magazine entitled "It Can't Happen Here." *See* NRA App. at 1005–49. The program contained the same brief depiction of Vice President Gore as the "California" news magazine did. *See* LaPierre Decl. at 6.

**c.** In response to the media's coverage of the Million Mom March, the NRA aired a 30–minute news magazine that examined the forces and influences behind the March. *See id.* at 17. The news magazine aired dozens of times in the 60 days prior to the 2000 general election. *See* NRA App. at 245–48. The program made references to Senators Hatch and Feinstein and senatorial candidate Clinton and several of the references would have been covered by BCRA if the statute had then been in effect. *See id.* at 245–51; *id.* at 931 (Senator Hatch stating "[i]t's hypocritical" for Rosie O'Donnell's bodyguard to carry a gun); *id.* at 933 (woman stating candidate Clinton was at the March "for [her] own political gain").

**d.** The 60,623 airings of all issue ads (whether "genuine" or "sham") considered in *Buying Time 2000* ran for 31,069 minutes. *See* NRA App. at 1005–49. "California" and "It Can't Happen Here" aired in top television markets for 25,140 minutes in the 60 days prior to the 2000 general election. *See id.* at 216, 1005–49. The "Union/Gore" program featuring Charlton Heston, *see supra* Finding 42a at page 305, ran for 17,220 minutes in top television markets in the 60 days prior to the 2000 general election. *See* NRA App. at 108 (NRA infomercial data). If *Buying Time 2000* had considered these airings— and had coded them as "genuine"—at least 34 per cent (by duration) of the issue advertising that BCRA would have regulated in the 60 days prior to the 2000 general election would have been "genuine."

**e.** On March 2, 2000 President Clinton appeared for a 15–minute interview on NBC's "Today Show," during which he repeatedly criticized the NRA by name and stated that "most Americans have [no] idea what a stranglehold the NRA has had on [the] Congress." *Id.* at 907 (interview transcript). In order to respond to what it believed were unfair comments, the NRA developed a series of 30– and 60–second paid television ads in which NRA President Heston responded to President Clinton by name. *See id.* at 914 ("Mr. Clinton, you say … the NRA is 'against anything that requires anybody to do anything as a member of society that helps to make it safer.' Are you talking about the NRA whose gun accident prevention program has been distributed to 12 million school kids? Are you talking about the millions of NRA members who pay for it all?"). The NRA intended this series of ads to highlight the controversy with the President and to gain a forum in the national news media. The NRA's strategy succeeded in large measure because of the NRA's ability to purchase broadcast time and to respond to the President by name. *See* LaPierre Decl. at 11–12; McQueen Decl. at 9–14.

**f.** The NRA's financial strength is derived from pooling the resources of millions of Americans who seek to preserve what they believe is their constitutional right to keep and bear arms. *See* LaPierre Decl. at 23. Almost all of the NRA's net revenues are derived from individual contributions, which averaged $30 per person in 2000. *See id.* at 23–24. Corporate contributions account for less than one per cent of the NRA's funds. *See id.* at 24.

**g.** The NRA's political action committee, NRA PVF, is unable to raise funds that fairly reflect individuals' support for the NRA's political mission and message.

1) While NRA PVF raised $17.5 million during the 2000 election cycle, the NRA received over $300 million in contributions from individuals during the same period. *See* NRA App. at 198; Cross Exam. of Pl. Witness Adkins[88] at 41. The disparity stems from the inability of NRA members—most of whom are individuals of modest means—to pay the NRA's membership fees and then contribute beyond that amount to NRA PVF. *See* LaPierre Decl. at 15.

2) Political action committees cannot finance more than a small fraction of the electioneering communications that corporations and unions have been able to fund from their treasury funds. *See id.* at 14–15; Boos[89] Decl. at 4–13; Keating Decl. at 11; Pratt[90] Decl. at 13–20.

3) Because many NRA members believe they face a risk of retaliation and harassment as a result of their views, they would not donate to NRA causes if doing so required them to disclose their identities. *See* LaPierre Decl. at 24–25; Adkins Decl. at 2; NRA App. at 884 (letter from member to NRA PVF Treasurer upon being informed that FEC requires information about all persons who contribute $200 and over: "I am 73 years old and retired [but] I do not want to expose my current part-time employer to retaliation, so could you please send me a penny so that my contribution will be $199.99?").

52. Business associations need to be able to communicate their views to the public. Accordingly, many businesses regularly sponsor television, radio, cable and other public communications about matters

of public interest. *See* Josten Direct Test. at 1; Monroe Direct Test. at 7.

a. Sometimes business associations sponsor broadcast communications directly and in their own names. In 1999, for example, Chamber of Commerce President Tom Donohue delivered a series of radio talks entitled "Speaking of Business." *See* Josten Direct Test. at 1. On two occasions in the late 1990s NAM sponsored in its own name issue ads supporting the President's tax proposals. *See* Huard Direct Test. at 1.

b. On other occasions business associations contribute to coalitions of like-minded organizations that prepare and air the communications. *See* Josten Direct Test. at 1–2; Huard Direct Test. at 1–2.

1) In March 2000 the Chamber of Commerce supported issue ads run by American Business for Legal Immigration. *See* Josten Direct Test. at 2.

2) "The Coalition: Americans Working for Real Change" is one example of a coalition joined by many businesses. In early 1996 the AFL–CIO announced that it would spend a large sum—allegedly $35 million—on issue advertisements attacking the Republican legislative agenda. The business community immediately decided that a response was necessary. In April 1996 five leading business associations—including the Chamber of Commerce and NAM—formed the Coalition. *See* Huard Direct Test. at 1–2. The Coalition recruited about 30 organizations as public members, in addition to many contributors who asked not to be identified publicly. The Coalition ultimately raised and spent about

---

88. Mary Rose Adkins is the Treasurer of the NRA PVF and is responsible for maintaining records and accounting information on contributions thereto. *See* Adkins Decl. at 1.

89. Michael Boos is Vice President and General Counsel of Citizens United, a non-profit

tax-exempt interest group organized under the laws of Virginia. *See* Boos Decl. at 1.

90. Lawrence Pratt is the Executive Director of Gun Owners of America, a non-profit tax-exempt interest group organized under the laws of Virginia. *See* Pratt Decl. at 1.

$5 million on broadcast issue ads during 1996. *See* Josten Dep. at 29; Huard Dep. at 66.

c. The Chamber of Commerce, NAM and ABCI find that their ability to assure contributors that contemplated advertisements will not be "express advocacy"—and that the contributors' identities, therefore, will not be required to be disclosed—is vital to obtaining contributions. Contributors seek anonymity with respect to particular issue ads for a wide range of reasons. Some fear that the ads may provoke or exacerbate difficulties with opposing groups such as labor organizations. Others fear that state or federal officials may retaliate. *See* Huard Direct Test. at 4; Josten Direct Test. at 4; Monroe Direct Test. at 5.

1) The Chamber of Commerce's Bruce Josten testified that members who support ads do "not want to be identified out of concerns that they may become targets or recipients of corporate campaigns or other types of what some would call union harassment activities." Josten Dep. at 28.

2) Stephen Sandherr, Chief Executive Officer of the Associated General Contractors of America, said his members "were concerned that if their contributions were publicly disclosed ... their local building trades would take offense and would threaten actions on the job site or would threaten to make life miserable for them." Sandherr Dep. at 45.

3) ABCI's Edward Monroe testified that ABCI lost members who suffered acts of vandalism after their contributions were publicly disclosed. *See* Monroe Direct Test. at 5. Monroe also testified that potential members sometimes decline to join ABCI because they "do not trust our ability to keep [their] information confidential." Cross Exam. of Pl. Witness Monroe at 88–89.

d. In a rapidly moving communications environment, BCRA's requirement that a public report be filed within 24 hours each time a business association or its agent executes a contract to disburse a certain amount of funds for an electioneering communication imposes a severe burden on businesses' political advertising efforts, as does BCRA's requirement that all contributors of more than $1,000 be publicly identified. *See* Josten Direct Test. at 4; Monroe Direct Test. at 6.

1) Because expenditure amounts often become clear only as an advertising project progresses, it can be difficult to determine whether a particular contract (or subcontract or addendum) requires disbursements of more than $10,000. It can also be difficult to determine which of an ad's revisions is a new contract requiring disbursements of more than $10,000. *See* Huard Direct Test. at 4; Josten Direct Test. at 4; Monroe Direct Test. at 6.

2) BCRA's requirement of public notice when a contract to disburse is executed informs other associations and individuals what is being planned. Ideological opponents may take preemptive measures to render the planned communication impossible or ineffective. *See* Josten Direct Test. at 5.

e. Business associations' issue ads often, and of necessity, refer to federal candidates.

1) Federal officeholders and candidates are prominent individuals whose support of or opposition to a particular policy or bill may have important persuasive and informational effects. Calling proposed legislation a "Gingrich tax proposal" or a "Kennedy labor bill" often reveals more to the electorate than does a complex description of the policy or bill. *See* Huard Direct Test. at 2–3 ("[M]any people understand the general political inclinations of prominent officials or candidates better than they understand the intricacies of legislative policy.").

2) A flurry of legislative action often occurs near the end of a congressional session, *see* Cross Exam. of Def. Expert Mann at 176, and often, therefore, within 60 days of a general election. If business associations and coalitions cannot air near-election ads mentioning federal candidates or officeholders, they will have greater difficulty educating the public about, and motivating it to take action on, legislative proposals of interest to the business community. *See* Monroe Direct Test. at 3; Monroe Dep. at 60.

f. Some business associations have chosen to establish political action committees. For example, the Chamber of Commerce and ABCI have established, respectively, U.S. Chamber PAC and ABC PAC. *See* Josten Direct Test. at 5; Monroe Direct Test. at 9. Other business associations, including NAM, have considered sponsoring a political action committee but have concluded that the regulatory and financial burdens of doing so outweigh the political utility. *See* Huard Direct Test. at 3.

53. Two of the AFL–CIO's primary missions are to provide an effective political voice to workers on public issues that affect their lives and to fight for an agenda at all levels of government for working families. *See* G. Shea Decl. at 3. BCRA's ban on corporate and labor disbursements for electioneering communications and the statute's disclosure and reporting requirements significantly interfere with the AFL–CIO's missions.

a. The AFL–CIO maintains an active lobbying program aimed at influencing federal and state legislation and executive branch decisions affecting workers and their families. *See id.* at 5–23, Exhs. 2–18. The AFL–CIO's lobbying activities focus on a broad range of domestic and foreign policy matters of importance to union members, non-union workers, retirees and their families. *See id.*

b. The AFL–CIO relies on an extensive, year-round broadcast advertising program to gain public support for its legislative and policy agendas.

1) Between 1995 and 2001 the AFL–CIO sponsored in its own name over 70 "flights"[91] of television or radio advertisements, including seven flights in 1995, 25 in 1996, 10 in 1997, 12 in 1998, six in 1999, 13 in 2000 and four in 2001. *See* D. Mitchell[92] Decl. Exh. 1. During the same period the AFL–CIO co-sponsored seven flights of radio ads with other organizations under the name of a coalition or a coalition partner. *See id.*

2) The primary focus of the AFL–CIO's broadcast advertising in 1999 and 2000 was the "Patient's Bill of Rights," which had failed to gain approval in the previous Congress. *See id.* at 28, 30, Exhs. 117–123, 137–138; G. Shea Decl. at 21–22. The AFL–CIO also aired several flights of ads from February 2000 through June 2000 in opposition to President Clinton's proposal for permanent, normalized trade relations with China.[93] *See* D. Mitchell Decl. at 29–30, Exhs. 127–136; Cross Exam. of Pl. Witness D. Mitchell at 98; G. Shea Decl. at 20–21.

3) The timing of the AFL–CIO's broadcast advertisements is often dictated by

---

91. A "flight" is a series of virtually identical ads broadcast during the same period of time in multiple media markets.

92. Denise Mitchell is Special Assistant for Public Affairs to the President of the AFL–CIO and oversees all public relations activities of the AFL–CIO, including use of broadcast and print media. *See* D. Mitchell Decl. at 1–2.

93. When President Bush reintroduced similar legislation in 2001 the AFL–CIO again ran broadcast advertisements opposing the proposal. *See* D. Mitchell Decl. at 35, Exhs. 154–58; G. Shea Decl. at 21.

upcoming votes in the Congress or by other events related to the legislative process. *See* D. Mitchell Decl. at 16–35 (providing specific examples); G. Shea Decl. at 9–23 (providing specific examples); *see also* D. Mitchell Dep. at 27–29, 31–32. During the weeks and months following an election or when the Congress adjourns its annual session, the AFL–CIO does not generally air ads because the public's attention usually turns to the upcoming holidays. *See* G. Shea Dep. at 55–57. When the Congress was in session in December 1995 during the federal budget crisis, however, the AFL–CIO broadcast a series of ads to influence its resolution. *See* D. Mitchell Decl. at 16–17.

4) While the AFL–CIO often broadcasts advertisements to influence short-term legislative action, it also broadcasts them to create long-term support for its positions. *See* D. Mitchell Dep. at 30–32; G. Shea Dep. at 52–53.

5) The "targets" of the AFL–CIO's broadcast advertisements are selected on the basis of substantive and tactical factors, including the legislative issue involved; a legislator's committee assignments, prior voting record on similar legislation or leadership role with respect to particular legislation; the extent to which the target might help generate "free media" for the AFL–CIO's political message; and the concentration of union members in the jurisdiction targeted. *See* D. Mitchell Decl. at 7–8; D. Mitchell Dep. at 20–21, 205–06, 209–12; Cross Exam. of Pl. Witness D. Mitchell at 198–200.

(A) The AFL–CIO's ads have targeted both Democratic and Republican officeholders and candidates. *See* D. Mitchell Decl. at 7–8, Exhs. 1–22; Cross Exam. of Pl. Witness D. Mitchell at 100, 179–80; Cross Exam. of Pl. Witness G. Shea at 31–32.

(B) The AFL–CIO's ads have targeted more Republicans than Democrats because Republicans generally favor legislation opposed by organized labor. *See* D. Mitchell Decl. at 7–8; Cross Exam. of Pl. Witness D. Mitchell at 100, 127–28; G. Shea Decl. at 13.

(C) The AFL–CIO's ads have targeted Democrats when Democrats have taken positions opposed by organized labor or when Democrats have been undecided on issues such as trade policy. *See* G. Shea Decl. at 12; Cross Exam. of Pl. Witness G. Shea at 31–32; D. Mitchell Dep. at 26–28, Exh. 2; Cross Exam. of Pl. Witness D. Mitchell at 100–01, 180–81.

6) With respect to advertisements run in the weeks and months immediately preceding a general election, the AFL–CIO sometimes selects jurisdictions in which the candidates named in the advertisements are expected to be involved in close races. Based on experience and on advice it receives, the AFL–CIO believes that policymakers and the public are far more likely to pay attention to the organization's political message when an election is competitive than when an officeholder has no significant opposition. *See* D. Mitchell Decl. at 8; D. Mitchell Dep. at 17–20, 74, 205–06; Cross Exam. of Pl. Witness D. Mitchell at 128, 199; *see also* Rosenthal[94] Dep. at 95–97 (asserting that "if you are trying to help shape public debate, if you are helping to move elected officials to support a certain issue agenda, [issue] ads work best if they are run in a place where there is a competitive political environment").

**94.** Steven Rosenthal serves as Political Director of the AFL–CIO, oversees the organization's Political Department and is responsible for its day-to-day operations. *See* Rosenthal Decl. at 1.

7) The AFL–CIO's broadcast advertisements identify the AFL–CIO as their sponsor by using phrases like "paid for by the working men and women of the AFL–CIO." D. Mitchell Decl. Exhs. 2–22; *see* D. Mitchell Dep. at 103–04; G. Shea Dep. at 58–59; Rosenthal Dep. at 18. There have been only a few exceptions to this practice, all of which involved the AFL–CIO's sponsorship of advertisements under the name of coalitions created with other organizations. In those circumstances, it was not appropriate to list only the AFL–CIO as the sponsor. *See* D. Mitchell Dep. at 101–06; G. Shea Dep. at 59–60.

8) For cost reasons, the AFL–CIO runs virtually identical broadcast advertisements in several jurisdictions, often changing only the name of the targeted officeholder or candidate. *See* D. Mitchell Decl. at 5–6, Exh. 1.

c. Pre–BCRA, 18 flights of AFL–CIO issue ads were broadcast within 60 days of a general federal election in which the officeholders named in the ads were candidates. If BCRA had been in effect at the time the ads aired, the AFL–CIO would be subject to civil and criminal penalties for spending any funds on any of the ads in the 18 flights, including the following ads.

1) "No Two Way"—a television and radio advertisement focusing on an incipient fight in the Congress over the education budget—ran between September 5 and September 17, 1996 in media markets serving approximately 35 congressional districts. *See id.* at 21–22, Exh. 1; Cross Exam of Pl. Witness D. Mitchell at 27. The ad informed viewers and listeners that the named congressman in their area had voted with House Speaker Newt Gingrich to cut the college loan program in October 1995 and that the "Congress will vote again on the budget." D. Mitchell Decl. at 22. It ended by urging viewers and listeners to "Tell [the named congressman] 'don't write off our children's future.' ... Tell him his priorities are all wrong." *Id.* The ad included a toll-free number to be used in contacting the named congressman.

2) "Deny," another flight of television and radio ads, ran between September 10 and September 23, 1998, shortly before the Senate was scheduled to vote on an HMO reform bill the AFL–CIO considered "extremely inadequate." *Id.* at 27, Exh. 1. "Deny" referred to approximately 17 Senators the AFL–CIO and its allies believed could be persuaded to vote for a stronger version of the bill. Thirteen of the Senators were not candidates in the 1998 election but four were. *See id.* at 27.

3) "Barker," an AFL–CIO radio advertisement, ran in eight congressional districts beginning on September 21, 1998 after a vote on "Fast Track" trade legislation was hastily scheduled for September 25. The ad urged listeners to call their congressman to "tell him to vote no on Fast Track. Tell him we're still paying attention. And Fast Track is still a bad idea." *Id.* at 28.

d. The AFL–CIO's broadcast advertisements would be significantly less effective if they did not mention legislative events. *See id.* at 16–35; G. Shea Decl. at 9–23; *see also* D. Mitchell Dep. at 27–29, 31–32. Furthermore, many of the AFL–CIO's broadcast advertisements would be significantly less effective if they had to be aired outside of the weeks immediately preceding primary and general federal elections—during which period a substantial amount of legislative business occurs and citizens, officeholders and candidates are more likely to pay attention to the AFL–CIO's political message. *See* D. Mitchell Decl. at 8; Mitchell Dep. at 17–20, 74, 205–06; Cross Exam. of Pl. Witness D. Mitchell at 128, 199; Rosenthal Dep. at 95–97; Gibson Rebuttal Report at 26–28

(refuting defense expert Goldstein's assertion that "a reasonable interest group would not air its issue ads during an electoral period").

e. The AFL–CIO's broadcast advertisements would be significantly less effective in influencing legislation and policy if they did not identify federal officeholders and candidates by name. Issue advertisements that identify policymakers by name and describe in detail their records can have greater impact on those policymakers than do issue ads that refer to issues more generically. Likewise, an ad that urges viewers or listeners to contact a specific policymaker regarding a political issue is more likely to engage them on the issue than is an ad that does not ask them to take any action. *See* D. Mitchell Decl. at 8; D. Mitchell Dep. at 33–34; G. Shea Dep. at 33–34; *see also* Feingold Dep. at 238–39 (acknowledging that constituents often call in response to television advertisements).

f. If the AFL–CIO is prohibited from using its general treasury funds to sponsor broadcast issue advertisements of the kind it has run in the past, it will be unable to finance such ads to the same degree using federal contributions to its federally-registered political action committee, the AFL–CIO Committee on Political Education Political Contributions Committee (COPE PCC). *See* Rosenthal Decl. at 7–9; Rosenthal Dep. at 57–65.

1) Contributions to COPE PCC may be made only by union members and their families—or by certain employees of the AFL–CIO itself—and the amount of money that can be raised from these sources is generally limited and unlikely to increase to the extent necessary to replace the treasury funds now spent on issue advocacy. *See* Rosenthal Decl. at 7–8.

2) During 1998 and 2000 the AFL–CIO *spent* $8.4 million and $17.9 million, respectively, on its broadcast advertising program, *see* D. Mitchell Decl. at 15, while COPE PCC *raised* only $1.4 million and $1.1 million during those years, *see* Rosenthal Decl. at 8.

3) Any amount of funds COPE PCC spends on issue advertising necessarily reduces the amount of funds available for cash and in-kind contributions made directly to candidates, as well as the money available to support independent expenditures on behalf of candidates. *See id.* at 7–9.

4) Union members and other workers are generally unable to make large contributions of federal funds to political action committees or similar entities to support broadcast advertising. *See id.* at 9. Also, in contrast to many corporate officials and other wealthy individuals, union members and other workers are generally unable to afford the high cost of personally sponsoring broadcast issue advertisements.

g. Since 1996 the AFL–CIO's political adversaries have made numerous efforts to pressure broadcast stations into refusing to run the AFL–CIO's ads. Some of the stations have given in to the pressure. *See* D. Mitchell Decl. at 12–13, Exh. 24; D. Mitchell Dep. at 174–76. If the AFL–CIO is required to file reports with the FEC regarding its proposed broadcast advertisements—or if broadcast stations are required to obtain such information and make it available to the public in advance of actually running the ads—efforts to interfere with the AFL–CIO's advertising program will likely intensify. *See* D. Mitchell Decl. at 13–15.

h. Advance disclosure of the AFL–CIO's advertisements will interfere with and have a chilling effect on the organization's broadcasting program by forcing it to reveal its plans and strategies before they are finalized and by giving opponents the opportunity to prepare counter-messages. *See id.*

**i.** For similar reasons, BCRA's requirement that a committee like COPE PCC disclose to the FEC within 24 to 48 hours its contracts to make independent expenditures will deter COPE PCC from making such expenditures. *See* Rosenthal Decl. at 9–10.

**54.** The record reflects that BCRA's ban on corporate and labor disbursements for electioneering communications will not prevent actual or apparent corruption of federal candidates.

**a.** To the extent that corporate and labor disbursements for electioneering communications corrupt or appear to corrupt federal candidates—and little or nothing in the record suggests that they do, *see infra* Finding 54b at page 325—BCRA leaves unregulated many communications that pose as great a risk of actual or apparent corruption.

1) Newspaper ads often dwarf broadcast ads, especially radio ads, in terms of their expense. For instance, a full-page ad in the *New York Times* can cost $65,000 whereas a 60–second radio broadcast that recites precisely the same text in a small market such as Peoria would cost only $75. *See* McQueen Decl. at 8; NRA App. at 256–57.

2) Direct mail is a vital, expensive and effective component of mass advertising campaigns designed to influence federal elections. *See* Magleby Expert Report at 25, 53; LaRocco[95] Decl. at 2 (in 1994 election "the Christian Coalition circulated 370,000 'voter guides' in the 1st District of Idaho that were intended to create negative impressions among voters and influence the outcome of the election"); Pennington Decl. at 2–3.

3) Ads broadcast over the internet are comparable to those broadcast over television and radio in terms of their public

reach and impact and will almost certainly grow in influence in the coming years. *See* McQueen Decl. at 6–7.

(A) More than 168 million Americans, or 60 per cent of the general public, use the internet. *See* NRA App. at 348–49. More Americans use the internet than read a daily newspaper, *see id.,* and internet usage is growing rapidly, *see id.* at 352. This trend is likely to continue because internet usage has grown at close to a rate of 100 per cent per year in recent years. *See id.*

(B) As a source of news and information, the internet rivals and is displacing the broadcast media. *See id.* at 443–99 (Pew Research Center study entitled "Internet Sapping Broadcast News Audience"). The rapid growth in internet usage is one of the reasons for the dramatic decline in broadcast news program viewing. *See id.* The internet has also become an increasingly popular source of political news during election periods. *See id.* at 408, 427.

(C) Numerous websites provide an alternative source of daily news that challenges the market dominance previously enjoyed by the traditional media. *See id.* at 500–01, 505–08. For example, the Drudge Report—an internet news service started by a single individual unaffiliated with any media company—receives up to five million visits per day. *See id.* at 507.

4) Issue ads broadcast outside the 30–day window preceding a primary election and the 60–day window preceding a general election can influence the election. *See* Milkis Rebuttal Report at 5.

5) The media industry is no longer "unique" in the way that it was 10 or 15 years ago.

**95.** From 1990 to 1995, Larry LaRocco served as a member of the House of Representatives from the 1st Congressional District of Idaho. *See* LaRocco Decl. at 1.

**(A)** Over the past decade the role of the traditional media in informing and educating the public has been profoundly altered by the emergence of the internet. *See supra* Finding 54a.3 at pages 243–44.

**(B)** Since the mid–1980s many media entities have been subsumed within larger corporate conglomerates and have devoted their resources to bottom-line profits. *See* NRA App. at 620, 625–26, 631–39, 671–72. CBS has been acquired twice in the past decade, first by Westinghouse and then by Viacom; it is now a subsidiary of a conglomerate that runs oil companies, farms, theme parks and mining companies. *See id.* at 546–50, 554–56. Similarly, ABC is now part of the entertainment empire of Walt Disney Corporation, *see id.* at 522–26, NBC is owned by General Electric, *see id.* at 541–45, and Fox Television is part of Rupert Murdoch's global News Corporation, which owns transportation companies and sports teams, *see id.* at 532–38.

**(C)** Media subsidiaries in some circumstances have been pressured by their non-media parent corporations to advance the interests of the parent or of the affiliated non-media businesses. *See id.* at 600, 861–81. Some media companies have refused to cover stories that might compromise the interests of the parent or of the affiliated entities. *See id.* at 687–93.

6) The media industry is better able to influence elections than are corporations in any other industry because it can use its news reporting and editorial functions to influence public opinion about politicians and political candidates. *See id.* at 714–803.

**b.** None of the evidence the defendants have offered materially supports the proposition that corporate and labor disbursements for issue advocacy corrupt or appear to corrupt federal candidates. Nor does the evidence show that BCRA would alleviate actual or apparent corruption "in a direct and material way" to the extent that either exists. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The defendants submit only unexamined anecdotal accounts of political consultants, legislators and former legislators for three propositions that, even if true, do not demonstrate that corporate and labor disbursements for issue advocacy corrupt or appear to corrupt federal candidates:

- "Unlike the general public, federal candidates and parties know who runs advertisements covered by the BCRA, sometimes because those running the ads make sure they know." FEC's Am. Proposed Findings of Fact at 214 (capitalization altered); *see id.* at 214–15.

- "Federal candidates who benefit from advertisements covered by the BCRA are grateful for the outside help." FEC's Am. Proposed Findings of Fact at 215 (capitalization altered); *see id.* at 215–18.[96]

- "Parties whose candidates benefit from advertisements covered by the BCRA are grateful for the outside help." FEC's Am. Proposed Findings of Fact at 218 (capitalization altered); *see id.* at 218–19 (citing Resp. of AFL–CIO and COPE PCC to FEC's First Reqs. for Admis. at 10 (acknowledging that "[a]t least one [p]olitical [p]arty has expressed appreciation or gratitude for [the AFL–CIO's] financing of at least one" electioneering communication)).

---

**96.** A portion of this cited material remains sealed pursuant to a separate order by Judge Kollar–Kotelly.

### 3. Limits on "Coordinated Expenditures"

As to BCRA's limits on "coordinated expenditures," *see generally supra* Part II.C, I would find that:

55. Since 1976 the Act has treated an expenditure that is "coordinated" with a candidate as a contribution. *See* 2 U.S.C. § 441a(a)(7)(B)(i).

56. In December 2000 the FEC promulgated new regulations that defined "coordination" narrowly in the context of "general public political communications." *See* General Public Political Communications Coordinated with Candidates and Party Committees; Independent Expenditures, 65 Fed.Reg. 76138 (Dec. 6, 2000). Under the FEC's December 2000 regulations, a disbursement for a communication was "coordinated" with a candidate if the communication was created, produced or distributed (1) "[a]t the request or suggestion of" the candidate or party committee; (2) after the candidate or party committee had "exercised control or decision-making authority" over the content or distribution of the communication; or (3) after "substantial discussion or negotiation" resulting in a "collaboration or agreement" between the creator, producer, distributor or payer of the communication and the candidate or party committee about the content or distribution of the communication. 11 C.F.R. § 100.23(c)(2).

57. BCRA section 214 repealed the FEC's December 2000 coordination regulations because, according to one of BCRA's sponsors, they were "far too narrow to be effective in defining coordination in the real world of campaigns and elections and threaten[ed] to seriously undermine the soft money restrictions contained in [BCRA]." 148 CONG. REC. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain). The provision directed the FEC to promulgate new regulations that "shall not require agreement or formal collabora-tion to establish coordination" between a candidate (or political party committee) and an entity making a disbursement. BCRA § 214(c); FECA § 315 note; 2 U.S.C. § 441a note. In accordance with that mandate, the FEC on January 3, 2003 promulgated a final rule on "coordinated communications." *See supra* note 45. The rule provides as follows:

§ 109.21 What is a "coordinated communication"?

(a) *Definition.* A communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when the communication:

(1) Is paid for by a person other than that candidate, authorized committee, political party committee, or agent of any of the foregoing;

(2) Satisfies at least one of the content standards in paragraph (c) of this section; and

(3) Satisfies at least one of the conduct standards in paragraph (d) of this section.

. . . . .

(c) *Content standards.* Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(1) A communication that is an electioneering communication . . . .

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b) . . . .

(3) A public communication that expressly advocates the election or

defeat of a clearly identified candidate for Federal office.

(4) A communication that is a public communication ... about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section are true.

(i) The communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(d) *Conduct standards.* Any one of the following types of conduct satisfies the conduct standard of this section whether or not there is agreement or formal collaboration, as defined in paragraph (e) of this section:

(1) *Request or suggestion.*

(i) The communication is created, produced, or distributed at the request or suggestion of a candidate or an authorized committee, political party committee, or agent of any of the foregoing; or

(ii) The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, political party committee, or agent of any of the foregoing, assents to the suggestion.

(2) *Material involvement.* A candidate, an authorized committee, a political party committee, or an agent of any of the foregoing, is materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(3) *Substantial discussion.* The communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

. . . . .

(e) *Agreement or formal collaboration.* Agreement or formal collaboration between the person paying for the communication and the candidate clearly identified in the communication, his or her authorized committee, his or her opponent, or the opponent's authorized committee, a political party committee, or an agent of any of the foregoing, is not required for a communication to be a coordinated communication. *Agreement* means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination. *Formal collaboration* means planned, or systematically organized, work on the communication.

(f) *Safe harbor for responses to inquiries about legislative or policy issues.* A candidate's or a political party committee's response to an inquiry about that candidate's or political party committee's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in paragraph (d) of this section.

68 Fed.Reg. at 453–55.

58. The ACLU's legislative efforts include many activities directly associated with lobbying but do not involve contributions to candidates, political parties, political committees or participation at fundraising functions sponsored by candidates or political organizations. *See* Murphy[97] Decl. at 2.

a. The ACLU regularly meets, speaks or corresponds with Members of the Congress and executive branch officials regarding proposed or pending legislation or executive action that may affect civil liberties. *See id.*

b. The ACLU routinely testifies before the Congress, conducts staff briefings for the Congress and provides Members with ACLU position papers. *See id.*

c. The ACLU holds press conferences, issues press releases, offers public commentary and makes regular media appearances and other public appearances asserting the organization's civil liberties positions on different legislative and executive initiatives. *See id.*

d. The ACLU works to build coalitions around common issues. It associates with at least 20 coalitions in a combined membership of over 250 organizations. The ACLU's legislative activities are frequently coordinated with other coalition partners. *See id.*

e. The ACLU maintains a congressional scorecard on important civil liberties issues and periodically publishes different guides on such issues. *See id.* at 3.

f. The ACLU and other organizations often work with Members of the Congress to ensure that proposed legislation is consistent with civil liberties principles. *See id.*

59. Under BCRA's definition of "coordination," as implemented by the FEC's regulations, many of the ACLU's legislative activities are subject to the prohibitions and limitations of FECA even though the ACLU does not engage in those activities for the purpose of influencing federal elections. *See id.* at 3–4.

60. The NRLC regularly lobbies federal legislators, consults with federal candidates about their positions on certain issues, disburses funds for electioneering communications and publishes printed communications, including what are known

---

**97.** Laura Murphy is the Legislative Director of the ACLU. *See* Murphy Decl. at 1.

as "voter guides." Some of these activities are undertaken without communication with candidates and some are undertaken after communication with candidates. *See* O'Steen Decl. at 2.

61. A given business association's broadcast advertisements often address issues the association has discussed with Members of the Congress, representatives of political parties and various cooperating organizations of all types. *See* Josten Direct Test. at 2. Business associations want to maintain contacts with Members of the Congress while participating in issue advocacy at the same time. *See* Huard Direct Test. at 3.

a. An association operating under a vague or overbroad definition of coordination faces serious risks each time it sponsors public communications either directly or through groups of like-minded organizations or individuals because any discussion with a legislator may later serve as the basis for an allegation that an association has coordinated a particular communication's content with the legislator. Likewise, a meeting with a legislator whose policy views are consistent with the association's views and with its advertisements may lead to a charge of coordination. *See* Josten Direct Test. at 3; Monroe Direct Test. at 3–4; DeFrancis [98] Dep. at 12, 21, 35, 43, 57.

b. The threat posed by a vague or overbroad definition of "coordination" is illustrated by the experience of the Chamber of Commerce, NAM and other business associations that were investigated in FEC Matter Under Review (MUR) 4624.

The investigation in MUR 4624 pertained to the 1996 activities of an issue advocacy group called "The Coalition: Americans Working for Real Change." All of the Coalition's members were instructed to avoid any contact that could be perceived as coordination of the content, location or frequency of certain broadcast ads. Alleging that the Coalition's issue ads were coordinated with federal candidates, campaigns and political committees, however, the FEC pursued the investigation for years and, in the Chamber of Commerce's and NAM's judgment, it deterred the Coalition's members from supporting a similar advertising effort in 1998.[99] *See* Huard Direct Test. at 3–4; Josten Direct Test. at 2; Josten Dep. at 12–13.

1) On June 9, 1998—18 months after the Coalition's ads were broadcast—the FEC instituted MUR 4624 to investigate charges by the DNC that the Coalition, 28 of its members and R. Bruce Josten (Executive Vice President of the Chamber of Commerce) had coordinated their efforts with the National Republican Congressional Committee (NRCC), its treasurer and seven candidate committees. Parallel charges were leveled against candidates and committees with whom the Coalition had allegedly coordinated its advertising efforts.

2) The crux of the FEC's coordination charge was that Coalition members—who met regularly with Congressman John Boehner to discuss and promote pro-business legislative aspects of the "Contract With America"—had the opportunity to coordinate issue ads with Congressman Boehner, who was then the fourth-ranking

---

98. Suzanne DeFrancis is a former Deputy Director of Communications at the RNC and currently serves as Senior Vice President, Director of Public Affairs at Porter Novelli, an advertising firm. *See* DeFrancis Dep. at 5–7.

99. Although most records relating to MUR 4624 are confidential under 2 U.S.C. § 437g(a)(12), the FEC's public file contains a General Counsel's Report (Apr. 23, 2001) (General Counsel Report), a Statement for the Record by Commissioner Scott E. Thomas and Chairman Danny L. McDonald (Sept. 7, 2001), and a Statement for the Record by Commissioner Bradley A. Smith (Nov. 6, 2001) (Smith Statement).

Republican House member, the Republican Conference Chair and an *ex officio* board member of the NRCC. *See* Josten Direct Test. at 2.

3) After four years of extensive discovery, the FEC's General Counsel concluded there was "circumstantial evidence that the activities of the Coalition were loosely coordinated with the Republican Party leaders, specifically Representative John Boehner and other candidates." General Counsel Report at 2. The General Counsel conceded, however, that "loosely coordinated" was not a viable standard in light of recently-enacted FEC regulations defining coordination, *see id.*, and therefore recommended that the case be dismissed. *See id.* at 3.

4) MUR 4624 was disruptive, burdensome and expensive. As a result of the investigation, Coalition members' willingness to participate in or support the Coalition evaporated. The Coalition financed only a few ads in 1998 and is now defunct. In his Statement for the Record, Commissioner Smith observed:

> Despite the fact that the Commission has found no violations in this case, I strongly suspect that the original complainant, the Democratic National Committee, considers its complaint to have been a success. The complaint undoubtedly forced [the DNC's] political opponents to spend hundreds of thousands, if not millions of dollars in legal fees, and to devote countless hours of staff, candidate, and executive time to responding to discovery and handling legal matters. Despite our finding that their activities were not coordinated and so did not violate the Act, I strongly suspect that the huge costs imposed by the investigation will discourage similar participation by these and other groups in the future.

Smith Statement at 2.

62. The AFL–CIO does not discuss its decisions regarding the content or placement of its broadcast advertising with any candidate, candidate committee, party or party official. *See* D. Mitchell Decl. at 9; D. Mitchell Dep. at 229–32, 235, 238; G. Shea Dep. at 71–72, 80–81.

a. The AFL–CIO's Political Department—and other persons who have regular contact with candidates and political party officials—played no role in broadcasting decisions during the period from 1995 to 1998 and virtually no role during the period from 1999 to 2000. *See* Rosenthal Decl. at 10–11; D. Mitchell Decl. at 9–10.

b. On the few occasions over the years that a candidate or a candidate's agent has approached the AFL–CIO and has encouraged it to run ads in a particular State or congressional district, the AFL–CIO has declined. *See* D. Mitchell Decl. at 9; D. Mitchell Dep. at 232–35, 243, Exh. 20; G. Shea Dep. at 91–92.

c. As a matter of policy, the AFL–CIO has likewise declined to honor requests from candidates *not* to air ads identifying them or their opponents because the AFL–CIO believes it has both the right and the ability to decide whether and what kind of broadcast advertising will advance its legislative and policy agenda. *See* D. Mitchell Decl. at 12, Exh. 23; D. Mitchell Dep. at 169.

63. Lobbyists from the AFL–CIO's Legislative Department regularly meet with Members of the Congress and employees of the executive branch on a host of issues. The AFL–CIO's executive officers and other staff also meet with Members on policy matters.

a. The AFL–CIO seeks through such contacts to influence the policy positions of legislators and officials.

b. The AFL–CIO also relies on such contacts to gather information about the status of particular legislation and the po-

sitions of other Members. Such information has often been a significant factor in deciding whether or not to run broadcast issue advertisements on particular issues and in determining the timing, placement and content of the ads. *See* G. Shea Decl. at 23–24; G. Shea Dep. at 82–85, 89–90; D. Mitchell Dep. at 253–57.

**64.** If the AFL–CIO is prohibited from sponsoring broadcast ads because of its lobbying contacts with Members of the Congress, it will be forced either to curtail its lobbying activities or to refrain from airing public communications during elections.

**a.** The AFL–CIO is likely to refrain even from permissible lobbying contacts if it is unable to determine with utmost confidence that it can legally engage in them. *See* D. Mitchell Decl. at 9.

**b.** Even when the AFL–CIO *is* confident that a lobbying contact is permitted, it may nonetheless refrain therefrom if the contact can be construed by political opponents as improper or illegal. The AFL–CIO has been the target of complaints of improper coordination by its political adversaries in the past. Throughout 1996, for example, the AFL–CIO's political opponents filed a series of complaints with the FEC charging that the AFL–CIO had coordinated its broadcast advertisements and other activities with the Democratic Party and with certain Democratic candidates for federal office. *See* Rosenthal Decl. at 11; D. Mitchell Decl. at 8–9, 11. After a four-year investigation, the Commission concluded that no violation of FECA had occurred. *See* Rosenthal Decl. at 11; *see also AFL–CIO v. FEC*, 177 F.Supp.2d 48, 52–53 (D.D.C.2001).

**100.** Defense expert Thomas Mann is the W. Averell Harriman Chair and Senior Fellow in

### 4. Restrictions on Non–Federal Funds

As to BCRA's restrictions on non-federal funds, *see generally supra* Part II.D, I would find that:

**65.** The FEC began tracking non-federal donations in the 1992 election cycle. During that cycle the Democratic and Republican parties together raised $86.1 million in non-federal funds. During the 1994 election cycle the two major parties raised $101.6 million in non-federal funds; during the 1996 cycle they raised $263.5 million in non-federal funds; during the 1998 cycle they raised $222.5 million in non-federal funds; during the 2000 cycle they raised $487.5 million in non-federal funds; and during the 2002 cycle they raised $495.8 million in non-federal funds. *See* FED. ELECTION COMM'N, NEWS RELEASE: PARTY FUNDRAISING REACHES $1.1 BILLION IN 2002 ELECTION CYCLE (Dec. 18, 2002), *available at* http://www.fec.gov/press/20021218 party/20021218party.html.

**66.** During the 1996 election cycle the 50 donors who gave the most in non-federal funds to the national political party committees each contributed between $530,000 and $3,287,175. During the 2000 election cycle the top 50 non-federal donors to the national committees each gave between $955,695 and $5,949,000. During the 2000 cycle 800 donors—435 corporations, unions and other organizations and 365 individuals—each gave a minimum of $120,000 to the national committees and accounted for almost $300 million, or 60 per cent, of all non-federal money raised by the committees. *See* Mann [100] Expert Report at 22–25, Tbls. 5, 6.

**67.** Senator McConnell routinely participates in political and fundraising events for state and local candidates and party committees.

Governance Studies at the Brookings Institution. *See* Mann Expert Report at 1.

**a.** For example, on July 5, 2002 Senator McConnell participated in an election strategy conference call with Kentucky state senator Robert Leeper; on August 15 he headlined a state party fundraiser to benefit state senate candidates; on August 20 he participated in a fundraiser for a state senate candidate; and on September 28 he attended a rally for the Republican candidate for judge-executive in Butler County, Kentucky. *See* McConnell Aff. at 2.

**b.** Since his election to the Senate, Senator McConnell has been a member of the National Republican Senatorial Committee (NRSC), which advocates Republican principles and supports Republican candidates at the federal, state and local levels. Senator McConnell chaired the NRSC in the 1998 and 2000 election cycles and, as chairman, he raised non-federal funds. These funds were used for voter registration, identification and get-out-the-vote activities, issue advocacy, building projects and national support for state and local candidates. During his tenure as NRSC Chairman, Senator McConnell also directed non-federal NRSC donations to dozens of state and local candidates, including Virginia Republican gubernatorial candidate Jim Gilmore (in 1997); California Republican gubernatorial candidate Dan Lungren (in 1998); and the Republican candidate for mayor of Warwick, Rhode Island (in 2000). *See id.* at 3.

**c.** BCRA prohibits Senator McConnell from raising money for state or local parties or candidates from corporate or union donors, or in excess of $10,000 from individual donors. Absent BCRA, Senator McConnell would raise money for state and local parties in compliance with applicable state laws. *See id.* at 4–5.

**d.** During his 18 years in the United States Senate, Senator McConnell has met thousands of Americans with whom he has shaken hands, posed for photographs, answered questions and discussed legislative issues. The overwhelming majority of the meetings were with people who do not donate funds to the Republican Party at the national, state or local level. Senator McConnell is usually unaware of the donation history of individuals with whom he meets. *See id.* at 8.

**68.** Plaintiff Thomas McInerney shares the Republican Party's general philosophy on policy issues. He has pursued his political and public policy goals by pooling his resources with like-minded Americans in Republican organizations at the national, state and local levels to promote Republican principles and candidates at the federal, state and local levels. *See* McInerney Aff. at 1–2.

**a.** Prior to BCRA's enactment McInerney donated amounts in excess of $57,500 per cycle to the national political party committees of the Republican Party and in excess of $10,000 per year to state and local Republican Party organizations. His donations were intended to support state and local candidates; voter registration activities for state and local parties; near-election voter identification activity; get-out-the-vote activity; generic campaign activity for state and local parties, including broadcast communications that promote the Republican Party when a federal candidate is on the ballot; slate cards, palm cards and sample ballots for state and local parties; absentee ballot programs for state and local parties; phone bank programs for state and local parties; public communications discussing policy issues, including communications that mention federal candidates in a manner that could be construed to "promote, support, attack or oppose" such candidates; and staff salaries of employees who spend 25 per cent of their paid time in any given month on any of these activities. *See id.* at 2–3.

**1)** In the 2002 election cycle McInerney donated more than $57,500 to Republican Party organizations at the national, state and local levels—funds that were spent on many or all of the activities described above. *See id.* at 5.

**2)** In the 2000 election cycle McInerney donated more than $57,500 to Republican Party organizations at the national, state and local levels—funds that were spent on many or all of the activities described above. *See id.* at 6.

**b.** The laws of the State of New York permit McInerney to donate funds in excess of what BCRA permits him to donate.

**1)** New York law permits McInerney to donate $76,500 per year to state and local political party organizations—funds that may be spent on any of the activities listed *supra* in Finding 68a at page 332, including state and local candidate support, voter identification activity, slate cards, palm cards, sample ballots and phone bank programs for state and local parties. *See* McInerney Aff. at 3; *see also* N.Y. ELEC. LAW §§ 14–100 to 14–124 (West 2003).

**2)** New York law permits McInerney to make unlimited non-federal donations to the housekeeping accounts of state and local political party organizations—funds that may be spent on administrative expenses such as rent, utilities, printing costs, supplies and legal and accounting services; salaries and benefits, including the salaries of individuals who spend 25 per cent of their paid time in any given month on grassroots activities; activities that are not for the express purpose of promoting the candidacy of specific candidates, including issue advocacy referring to federal candidates and near-election voter registration activity. *See* McInerney Aff. at 4; *see also* N.Y. ELEC. LAW §§ 14–100 to 14–124 (West 2003).

**3)** New York law permits McInerney to make unlimited non-federal donations to the RNC, the NRSC, the Republican National State Elections Committee of the Republican National Committee (RNSEC), among others—funds that may be spent on any of the activities listed *supra* in Finding 68a at page 332. *See* McInerney Aff. at 4; *see also* N.Y. ELEC. LAW §§ 14–100 to 14–124 (West 2003).

**4)** BCRA prohibits McInerney from donating amounts in excess of $57,500 per cycle to Republican Party organizations at the national, state and local levels and in excess of $10,000 per year to state and local Republican party organizations—funds that McInerney would like to be used on the political activities listed *supra* in Finding 68a at page 332. *See* McInerney Aff. at 5.

**c.** McInerney's support for Republican Party organizations at the national, state and local levels reflects his shared philosophy and values with the Republican Party, not any corrupt motive.

**1)** Nothing in the record suggests that McInerney has ever attempted to make a non-federal donation to change the vote or official action of any federal official; has ever been solicited by any federal officeholder or agent of a national political party based on a promise or offer of any official action; or has ever donated funds that, to his knowledge, affected the vote or official action of any public official, including a federal official. *See id.* at 7.

**2)** Nothing in the record suggests that McInerney's support for the Republican Party at the national, state and local levels is dependent upon gaining access to federal officeholders. *See id.* at 8.

**d.** BCRA permits McInerney to make unlimited non-federal donations to interest groups that engage in many or all of the activities listed *supra* in Finding 68a at page 332, while prohibiting him from making similar donations to Republican Party organizations at the national, state and local levels. Absent BCRA, McInerney

would continue to make such donations to Republican Party organizations in compliance with the laws of the relevant States. *See* McInerney Aff. at 8.

e. Under BCRA, McInerney would be subject to criminal fines and imprisonment of up to five years for funding—at the same level and using non-federal funds— the same political activities he has funded in the past. *See id.* at 10.

69. Attorney General Pryor has sponsored public communications that refer to federal candidates and promote, support, attack or oppose such candidates, including communications that do not expressly advocate a vote for or against any such candidate. *See* Pryor Decl. at 1–3, Exhs. A–F. Pryor has received and hopes in the future to receive contributions from the RNSEC. *See id.* at 4. As a candidate for state office, Pryor has raised and spent funds for voter registration activities conducted within 120 days of a federal election and for voter identification, get-out-the-vote and generic campaign activities conducted in connection with elections in which a federal candidate has also appeared on the ballot. He intends to continue raising and spending funds for such activities, on his own and in association with other candidates for state and local office. *See id.* at 4–6.

70. Political parties have played and continue to play at least four critical roles in our country's political process.

a. First, the parties have coordinated the political activities and messages of various national, state and local entities within the federal system. *See* Milkis [101] Expert Report at 13–14; Keller [102] Expert Report at 6–7.

b. Second, the parties encourage "democratic nationalism" by nominating and electing candidates and by engaging in discussions about public policy issues of national importance. Milkis Expert Report at 14–19. For example, the RNC has recently participated in public policy debates regarding a balanced budget amendment, welfare reform and education policy. *See* Josefiak Decl. at 27–29; RNC Exhs. 1711, 2428, 2440.

1) The parties recruit and nominate candidates, aggregate public preferences and provide a means of democratic accountability. *See* Green [103] Expert Report at 7; Magleby Expert Report at 33; Mann Expert Report at 28. Political scientists also credit parties with increasing voter turnout, encouraging volunteer grassroots political participation, fostering broader electoral competition by supporting challengers against incumbents and diluting the influence of organized interests. *See* Cross Exam. of Def. Expert Green at 83–84; Cross Exam. of Defense Expert Mann at 53; Keller Expert Report at 5–6; Milkis Expert Report at 12–13; La Raja [104] Expert Report at 5, 7–8.

---

101. Plaintiffs' expert Sidney Milkis is the James Hart Professor of Politics at the University of Virginia; he is also a Senior Scholar and Co–Director of the American Political Development Program at the Miller Center of Public Affairs. *See* Milkis Expert Report at 1.

102. Plaintiffs' expert Morton Keller was a Professor of American History from 1956 until 2001; he taught at the University of North Carolina at Chapel Hill, the University of Pennsylvania and Brandeis University. *See* Keller Expert Report at 1.

103. Defense expert Donald Green is a Professor of Political Science at Yale University, where he also serves as Director of the Institution for Social and Policy Studies. *See* Green Expert Report at 1.

104. Plaintiffs' expert Raymond La Raja is an Assistant Professor of Political Science at the University of Massachusetts, Amherst. *See* La Raja Expert Report at 1.

2) Party competition in general is healthy for democracy; it was a major force behind the expansion of the electorate through the enfranchisement of blacks in the South, reduction of the voting age to eighteen and the elimination of poll taxes and other constraints on voting registration. *See* Keller Expert Report at 15.

c. Third, the parties act as critical agents in developing consensus in the United States. *See* Milkis Expert Report at 19. In the words of one defense expert, parties are "the main coalition building institution[s] ... by a good measure." Cross Exam. of Def. Expert Green at 84; *see* Cross Exam. of Def. Expert Mann at 53, 56 ("[n]o other group could come close to political parties" in moderating extreme views); Krasno & Sorauf Expert Report at 24 ("Parties with their necessary 'big tent' compete for the allegiances of multiple groups ....").

d. Fourth, the parties cultivate a sense of community and collective responsibility in American political culture. *See* Milkis Expert Report at 19–21; La Raja Expert Report at 3–4. Parties have been integral in forming a consensus on such divisive issues as social welfare policy. *See* Milkis Expert Report at 4.

71. As a national political party committee, the RNC has historically participated and participates today in electoral and political activities at the federal, state and local levels. *See* Josefiak Decl. at 5, 11–17; *see also* Milkis Expert Report at 28–29. The RNC seeks to advance its core principles by advocating Republican positions, electing Republican candidates and encouraging governance in accord with Republican views at the federal, state

and local levels. *See* Josefiak Decl. at 6; *see also* La Raja Expert Report at 20–22.

a. In pursuit of its objectives, the RNC engages in frequent communications with its members, officeholders, candidates, state and local party committees and the general public. These communications occur both during campaign seasons and at all other times. *See* Banning[105] Decl. at 11–13; Josefiak Decl. at 26, 32.

b. The RNC engages in activities intended to influence federal elections and supports those activities with federal funds. *See* Josefiak Decl. at 6, 26. The RNC spends federal funds on recruiting and training candidates; contributing to federal candidate campaign committees; coordinated expenditures on behalf of federal candidates; communications calling for the election or defeat of federal candidates; the federal share of research and issue development; and the federal share of voter registration, voter identification and get-out-the-vote campaigns. *See* Banning Decl. at 11; Josefiak Decl. at 7, 10, 26; La Raja Expert Report at 5–6; Magleby Expert Report at 48.

1) In 1996, following the Supreme Court's ruling in *Colorado Republican I* that political parties have a constitutionally protected right to make unlimited independent expenditures, the NRSC made independent expenditures on behalf of several candidates for the United States Senate while the RNC simultaneously made coordinated expenditures on behalf of the same candidates.

(A) The NRSC disbursed approximately $10.5 million in independent expenditures in 17 States where the RNC disbursed more than $4.3 million in coordinated ex-

---

105. Jay Banning is Director of Administration and Chief Financial Officer of the RNC and his responsibilities include managing the RNC's budget, overseeing its finance and accounting personnel, maintaining books and records, overseeing the RNC's annual audit, paying all bills and (before BCRA) serving as assistant treasurer for the RNC's various nonfederal accounts. *See* Banning Decl. at 1–2.

penditures: Alabama, Arkansas, Colorado, Georgia, Iowa, Kansas, Louisiana, Maine, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, North Carolina, Rhode Island, South Dakota and Wyoming. *See* Josefiak Rebuttal Decl. at 3.

(B) As part of its efforts, the NRSC took measures to assure no coordination with candidates, including the removal from the NRSC's office building of any staff working on the independent expenditures. *See id.*

2) Under BCRA, if the RNC decides to make a coordinated disbursement with respect to a candidate, it must first confirm that *no* other political committee—whether national, state or local—has made or is about to make an independent expenditure with respect to the same candidate. Likewise, if the RNC decides to make an independent expenditure with respect to a candidate, it must first confirm that no other political committee—national, state or local—has made or is about to make a coordinated disbursement with respect to the same candidate. The RNC's Chief Counsel, who is responsible for giving legal approval to all RNC coordinated disbursements, believes it will be difficult or even impossible under BCRA for a national party to police every party entity to make sure none has made or is about to make a coordinated or independent disbursement. *See id.* at 2.

c. The RNC also undertakes activities exclusively in connection with state and local elections. These activities are substantial both in their importance to the RNC's mission and in their resource commitment.

1) For elections in which there is a federal candidate on the ballot, the RNC trains state and local candidates, donates to state and local candidates and candidate campaign committees, funds communications calling for the election or defeat of state and local candidates and engages in get-out-the-vote activities.

(A) In 2000 the RNC donated approximately $5.6 million in non-federal funds to state and local candidates for such activities. *See* Josefiak Decl. at 17.

(B) The RNC devotes substantial resources to state and local political activities during federal election years even when the federal races are not competitive in a particular State (as in California in 2002 and Indiana in 2000). *See id.* at 18; Peschong [106] Decl. at 4.

2) Even for elections in which there is *no* federal candidate on the ballot, the RNC trains state and local candidates, donates to state and local candidate campaign committees, funds communications calling for the election or defeat of state and local candidates and engages in get-out-the-vote activities. *See* Banning Decl. at 8–14; Josefiak Decl. at 5, 11–17.

(A) Five States—Kentucky, Louisiana, Mississippi, New Jersey and Virginia—hold elections for state and local office in odd-numbered years when there are normally no federal candidates on the ballot. *See* Josefiak Decl. at 11–12. Likewise, numerous cities—including Houston, Indianapolis, Los Angeles, Minneapolis and New York City—hold mayoral elections in odd-numbered years. *See id.* at 12.

(B) For the 2001 election, an "off-year" election with no federal candidates on the ballot, the RNC spent more than $15.6 million in non-federal funds on state and

---

**106.** John Peschong is currently the RNC's Regional Political Director for the Western Region and works in that capacity with Republican Party organizations in Alaska, American Samoa, California, Guam, Hawaii, Idaho, Nevada, Oregon, Puerto Rico, the Virgin Islands and Washington to assist them in their objective to elect federal, state and local Republican candidates. *See* Peschong Decl. at 1–2.

local election activity through donations to state and local candidates, transfers to state parties and direct spending. *See* Banning Decl. at 8–9. In the last two off-year elections combined, the RNC spent over $21 million in non-federal funds to support state and local election activity, not including substantial commitments of staff time and other resources. *See id.* at 7–15; Duncan Decl. at 9; Josefiak Decl. at 5, 11–17; Cross Exam. of Defense Expert Mann at 71; *see also* La Raja Expert Report at 15.

**3)** The RNC supports its non-federal activities with funds raised pursuant to the laws of the pertinent States and localities.

**(A)** Until BCRA's effective date the RNC maintained twelve non-federal accounts, known as RNSEC accounts. *See* Banning Decl. at 5.

**(B)** Because of the variations among state campaign finance laws, the RNC set up different rules to govern each RNSEC account according to the type and amount of donations that could be deposited therein and the type of disbursements that could be made therefrom. *See id.* at 3.

**(C)** Some RNSEC accounts were reserved for corporate funds, which were used to make donations or expenditures in States permitting the use of such funds in connection with state and local elections. *See id.*

**(D)** Other RNSEC accounts were reserved for individual funds, which were used to make donations or expenditures in States not permitting the use of corporate funds in connection with state and local elections. *See id.* at 4.

**(E)** Still other RNSEC accounts held funds raised and spent pursuant to the unique legal requirements of particular States; the RNC set up state-specific

RNSEC accounts for California, Massachusetts, Michigan, Missouri, New York, North Carolina and Rhode Island. *See id.* at 4–5.

**d.** Prior to BCRA's effective date the RNC also engaged in "mixed" activities—that is, activities undertaken in connection with both federal and state or local elections.

**1)** The RNC supported voter registration, get-out-the-vote, generic party-building and grassroots activities that benefited all Republican candidates—federal, state and local—on the ballot in any given election. *See* Benson [107] Decl. at 4; Duncan Decl. at 7–8.

**2)** Pursuant to the Act and FEC regulations in force prior to BCRA's effective date, the RNC and other political parties paid for mixed activities using an "allocation" of federal and non-federal funds. Josefiak Decl. at 6.

**(A)** During presidential election years the RNC was required to pay and did pay for its mixed activities with at least 65 per cent in federal funds. *See* 11 C.F.R. § 106.5 (2001).

**(B)** During non-presidential election years the RNC was required to pay and did pay for its mixed activities with at least 60 per cent in federal funds. *See id.*

**3)** Recognizing that the RNC, like other national political party committees, is heavily involved in activities at both the federal and state levels, the FEC historically allowed the RNC to pay its administrative overhead—including salaries, employee benefits, equipment and supplies for party operations at RNC headquarters in Washington, D.C.—with a mix of federal and non-federal funds. *See* Banning Decl. at 8; Josefiak Decl. at 6.

---

**107.** Bruce Benson is the Chairman of the Colorado Republican Party and oversees the organization's party building programs and candidate support efforts. *See* Benson Decl. at 1.

4) The RNC used a mix of federal and non-federal funds to pay for a wide range of activities not directly connected to the election of federal, state or local candidates. *See* Banning Decl. at 9–14; Josefiak Decl. at 27–29 (describing numerous "instances in which the RNC [paid] for broadcast issue advertising for the exclusive purpose of influencing the legislative and policy debate"). During the 2000 election cycle the RNC spent $43.6 million in non-federal funds and $27.6 million in federal funds—either directly or through state parties—on issue advertising. *See* Banning Decl. at 7. Thus, the RNC spent about one-third (approximately $43.6 million) of its total non-federal resources (approximately $130 million) on issue advocacy in that cycle. *See id.* at 8 (noting RNC spent almost as much non-federal money, $35.6 million, on administrative overhead costs in 2000 cycle); *see also* B. Shea Decl. at 3; RNC Exh. 2429.

5) The RNC used a mix of federal and non-federal funds to engage in significant non-broadcast communications with its supporters. For example, through the magazine "Rising Tide," the RNC provided a more in-depth explanation of the Republican issues agenda than is possible in a 30–second television advertisement. *See* Josefiak Decl. at 31; RNC Exh. 977. Also, the RNC uses the internet, e-mail and direct mail to spread its message. *See* La Raja Expert Report at 21; Magleby Expert Report at 42.

6) The RNC used a mix of federal and non-federal funds to support redistricting efforts, including redistricting litigation. In 2002, for example, the RNC budgeted approximately $4.1 million on redistricting. Seventy per cent of the redistricting budget was to be funded with non-federal money. *See* Banning Decl. at 14; Josefiak Decl. at 21–22. The RNC spends more overall on state legislative redistricting than on congressional redistricting. *See* Josefiak Decl. at 22.

7) The RNC used a mix of federal and non-federal funds to conduct training seminars for Republican candidates, party officials, activists and campaign staff, many of whom are involved in state and local campaigns and elections. Topics included grassroots organizing, fundraising and compliance with campaign finance regulations. During the 2000 election cycle at least 10,000 people attended RNC-sponsored training sessions, including 117 "nuts-and-bolts" seminars on grassroots organizing and get-out-the-vote activities. During the same cycle the RNC spent $391,000 in non-federal funds and $671,000 in federal funds on such training and support. *See* Banning Decl. at 10–11; *see also* La Raja Expert Report at 11 (parties "help candidates by training them and their campaign staff," support which is particularly important "in an era of . . . campaigning that requires skillful application of advanced campaign technologies").

8) The RNC used a mix of federal and non-federal funds to promote grassroots initiatives and to support interstate cooperation on state issues among Republican state and local officials. For example, the RNC provided $100,000 of seed money for the formation of a Republican state attorneys general association that focuses on state issues. *See* Josefiak Decl. at 25; RNC Exh. 978. During the 2000 election cycle the RNC spent $199,000 in non-federal funds and $33,500 in federal funds on state and local governmental affairs. *See* Banning Decl. at 9–10.

9) The RNC used a mix of federal and non-federal funds to support efforts to increase minority involvement and membership in the Republican Party. During the 2000 election cycle the RNC spent $1,211,000 in non-federal funds and $2,163,000 in federal funds on minority

outreach and support of allied groups. *See id.* at 12.

**e.** The RNC provides considerable direct and indirect financial assistance to state and local parties. The RNC assists state and local parties in and through fundraising training, candidate training, fund transfers, advertising, policy discussions, polling, forums, coalition building, research and consulting support, voter mobilization and list sharing. *See* B. Shea[108] Decl. at 14–16; Josefiak Decl. at 18–21; Banning Decl. at 8–14.

**1)** During the 2000 election cycle the RNC made transfers of approximately $129 million—$93.2 million in non-federal funds and $35.8 million in federal funds— to state and local parties. *See* FED. ELECTION COMM'N, NATIONAL PARTY TRANSFERS TO STATE/LOCAL COMMITTEES: JANUARY 1, 1999 TO DECEMBER 31, 2000, *available at* http://www.fec.gov/press/051501partyfund/ tables/nat2state.html.

**2)** Prior to BCRA's effective date the RNC also provided significant fundraising assistance to state and local candidates and parties through a variety of means.

**(A)** The RNC helped state and local parties through donor list exchanges; joint fundraising events; promotion of state party fundraising events; facilitating contributions from interested donors; providing matching incentives to encourage state parties to develop their in-house fundraising capabilities through the RNC's "Finance PLUS" program; and devoting personnel to state party fundraising needs. *See* Dendahl Decl. at 3; Duncan Decl. at 8–9; Josefiak Decl. at 12–13, 19–21; B. Shea Decl. at 14–17; *see also* La Raja Expert Report at 7, 11–12, 53.

**(B)** RNC officers sent fundraising letters on behalf of state and local candidates and parties, including during election off-

years. *See, e.g.,* RNC Exh. 292; RNC Exh. 1762; RNC Exh. 1766; Feingold Dep. Exh. 12.

**(C)** RNC officers were substantially involved in helping state and local parties and candidates raise money in accordance with state and federal law.

**(i)** After becoming Chairman of the RNC in February 2002, Marc Racicot made 82 trips to 67 cities in 36 States in 2002. Virtually all of these trips involved fundraising assistance to state and local parties and candidates. *See* Josefiak Decl. at 21.

**(ii)** RNC Co–Chairwoman Ann Wagner and Deputy Chairman Jack Oliver made 31 and 33 trips, respectively, the majority of which involved fundraising assistance to state and local parties and candidates. *See id.; see also, e.g.,* RNC Exh. 301.

**(iii)** Mike Duncan, current General Counsel and former Treasurer of the RNC, was actively involved in fundraising activities for the Republican Party of Kentucky and for Kentucky state candidates. In the past few years Duncan sponsored a reception to support the reelection of a Kentucky state senator and he also hosted and attended numerous fundraising dinners in support of the Kentucky Republican Party. *See* Duncan Decl. at 3–5.

**f.** The RNC cooperates and works closely with state and local political parties to support the entire Republican platform and ticket at the federal, state and local levels.

**1)** Political scientists agree that "relationships among local, state, and national organizations have strengthened in the past three decades" and they attribute the cohesion to "the role of the national parties in providing resources and expertise to

---

108. Beverly Ann Shea is the Finance Director for the RNC and oversees all of the RNC's fundraising activities. *See* B. Shea Decl. at 1–3.

lower levels of the party." La Raja Expert Report at 7 (citations omitted); see Mann Expert Report at 30 ("The relationship between the national parties and their state parties has never been closer than it is today.").

2) Cooperation among national, state and local parties is generally healthy for American democracy:

Cohesive parties enhance electoral accountability by linking the campaigns and platforms of federal, state and local candidates. In this way, they provide voters with clear signals about what the party stands for collectively. The joint campaigns of political parties across federal, state and local candidates also generate electoral economies of scale that mobilize greater numbers of voters. The national parties have been the catalysts for party integration because they possess the resources to coordinate such activity.

La Raja Rebuttal Report at 5.

3) Perhaps the best examples of national, state and local political party cohesion are the Republican Party "Victory Plans" and the Democratic Party "Coordinated Campaigns." All levels of the Republican Party structure actively participate in the design, funding, fundraising and implementation of Victory Plans, see Josefiak Decl. at 7–11, just as all levels of the Democratic Party participate in the design, funding, fundraising and implementation of Coordinated Campaigns, see Bowler Decl. at 23–24.

(A) The RNC's Victory Plans are voter contact programs designed to support the entire Republican ticket at the federal, state and local levels. The RNC works with every state party to design, fund and implement the Plans. See Benson Decl. at

3; Josefiak Decl. at 7; Peschong Decl. at 2–3.

(B) Victory Plans are formulated and implemented after collaboration between the RNC and the state parties; each Plan is tailored to the unique needs of each State and designed to stimulate grassroots activism and to increase voter turnout with the goal of benefiting candidates at all levels of the ticket. See Josefiak Decl. at 7–11. The involvement of RNC national and regional field personnel in developing, funding and implementing the plans is essential for their success. See Benson Decl. at 3; Peschong Decl. at 4.

(C) In 2000 the RNC transferred $42 million to state parties to use in Victory Plan programs, 60 per cent (about $25 million) of which was non-federal money and none of which was spent on broadcast issue advertising. See Josefiak Decl. at 9.

(D) Although Victory Plans are designed to benefit Republican candidates at the federal, state and local levels, they often place the greatest emphasis on state and local races because in most instances there are far more state and local candidates than federal candidates on the ballot. See Bennett [109] Decl. at 15 (ratio of state and local candidates to federal candidates on ballot in Cuyahoga County, Ohio in 2002 was 18 to 1); Benson Decl. at 3.

(E) The Victory Plans are long-term programs spanning the entire election calendar year and are not limited to the 60 or 120 days prior to an election. See Peschong Decl. at 2–3.

(F) The Victory Plans generally include rallies, direct mail, telephone banks, brochures, slate cards, yard signs, bumper stickers, door hangers and door-to-door volunteer activities. See id.

---

**109.** Robert Bennett is the Chair of the Republican State Central and Executive Committee of Ohio and oversees the organization's party building programs and candidate support efforts. See Bennett Decl. at 1.

**g.** With regard to the RNC's fundraising activities generally, I would find that:

1) In 2000 the RNC raised $99,178,295.61 in non-federal funds and $152,127,759.12 in federal funds. *See* RNC Exh. 2259.

2) The RNC engages in fundraising through direct marketing—i.e., direct mail, telemarketing and internet solicitations—and through "major donor" programs. In 2000 the RNC raised $105,860,700 through direct marketing and $146,929,900 through major donor programs. *See* B. Shea Decl. at 3. In 2001 the RNC raised $56,117,600 through direct marketing and $25,909,700 through major donor programs. *See id.*

(A) On average, 60 per cent of the total amount the RNC raises each year is obtained through direct marketing. *See id.*; Knopp [110] Decl. at 3. The direct marketing messages that "perform the best are those that emphasize the Republican Party's core political philosophy of lower taxes and less government and the RNC's important role in federal and state elections. In short, the RNC's fundraising success depends on its appeal to persons desiring to associate with its governing philosophy." Knopp Decl. at 19.

(B) "Major donors" are defined as individuals who give $1,000 or more per year. *See* B. Shea Decl. at 3. Like its smaller donors, the RNC's major donors are most responsive to appeals based on the RNC's ideology. *See id.* at 10–11. The RNC has six major donor programs: the President's Club is designed to raise federal contributions of $1,000 per person or $2,000 per couple per year, *see id.* at 6; the Chairman's Advisory Board is designed to raise federal contributions of $5,000 per year, *see id.*; the Eagles program, the RNC's oldest major donor program, is designed

for donors who either contribute $15,000 in federal funds or donate $20,000 in non-federal funds per year, *see id.*; the Majority Fund is directed at PACs that donate $15,000 in either federal or non-federal funds per year, *see id.* at 6–7; Team 100 is designed for donors who donate $100,000 in non-federal funds upon joining and then donate $25,000 in each of the three subsequent years, *see id.* at 7; and the Regents program is designed for donors who give an aggregate amount of $250,000 in non-federal funds per two-year election cycle, *see id.* In addition, every four years the RNC establishes a special "Presidential Trust," designed for contributions of $20,000 in federal funds. *See id.*

3) The RNC raises the bulk of its non-federal money from individuals—not corporations—and the average corporate donation of non-federal funds is significantly lower than the average individual donation. In 2000, for example, the average corporate donation of non-federal funds was $2,226, while the average individual donation of non-federal funds was $10,410. *See id.* at 5.

4) It is "exceedingly rare" for the RNC to rely on federal officeholders for personal or telephonic solicitations of major donors. *See* B. Shea Decl. at 8. By RNC policy and practice, the RNC Chairman, Co–Chairwoman, Deputy Chairman, fundraising staff and members of major donor groups—not federal officeholders—undertake initial contact and solicitation of major donors of both federal and non-federal funds. *See id.*

72. The CDP and the CRP are subject to extensive federal and state regulation with respect to their campaign activities.

**a.** The CDP and the CRP each maintain a federal committee registered with

---

**110.** Janice Knopp is the Deputy Director of Finance and Marketing Director for the RNC, in which capacities she oversees the RNC's direct marketing fundraising efforts. *See* Knopp Decl. at 1.

the FEC. The federal committee maintains a federal account, contributions to which comply with FECA's source-and-amount limitations and reporting requirements. *See* Bowler Decl. at 5–6; Morgan Decl. at 2.

**b.** The CDP and the CRP are registered as political party committees in accordance with California law. Each maintains a non-federal account into which donations permissible under California law are deposited. The parties' non-federal campaign activities are subject to regulation by the California Fair Political Practices Commission and each party regularly files disclosure reports of receipts and expenditures with the California Secretary of State. *See* Bowler Decl. at 6–7; Morgan Decl. at 2.

**c.** Prior to BCRA's effective date the costs of the CDP's and the CRP's "mixed" activities were "allocated" between each party's federal account and non-federal account.

1) The CDP and the CRP were required to allocate funds for administrative expenses such as rent or employee salaries; generic voter identification activities; voter registration activities; get-out-the-vote activities that were not candidate-specific; fundraising expenses; and communications on behalf of both federal and non-federal candidates. *See* Bowler Decl. at 8.

2) The CDP and the CRP allocated funds in accordance with the FEC's regulations. They allocated funds for administrative expenses, generic voter identification activities, voter registration activities and get-out-the-vote activities based on a "ballot composition" formula that calculated the ratio of federal offices and non-federal offices expected to appear on the general election ballot in a given election cycle. They allocated funds for public communications supporting or opposing federal and non-federal candidates using a "time-and-space" formula. And they allocated funds for fundraising expenses on a "funds raised" basis. *See id.* at 8–9.

**d.** In November 2000 California voters adopted Proposition 34 to govern campaign donations in the State.

1) Under Proposition 34, expenditures by political party committees on behalf of state candidates are unlimited. Donations by political party committees to state candidates are likewise unlimited, although donations by other donors to state candidates are limited depending upon the elective office. Donations to state and local political parties for the purpose of making donations to state candidates are limited to $25,000 per donor per year. Donations to state and local political parties for other purposes—e.g., funding administrative and overhead costs, voter registration or get-out-the-vote activities or supporting ballot measures or issue advocacy—are unlimited. Donations to state and local political parties are not source-limited; that is, corporations and labor unions may donate funds in accordance with generally applicable limits. *See id.* at 6–7; Erwin [111] Decl. at 7; *see also, e.g.,* CAL. GOV'T CODE §§ 85301, 85303 (West 2003).

2) In adopting Proposition 34, California voters made a specific policy choice to increase the role of political parties in California elections. The voters determined that "[p]olitical parties play an important role in the American political process and help insulate candidates from the potential corrupting influence of large contributions." *See* CDP App. at 1193 ("Proposition 34: Text of Proposed Law").

---

**111.** Ryan Erwin is the Chief Operating Officer of the CRP and oversees its day-to-day operations. *See* Erwin Decl. at 1.

**73.** State and local political party committees generally, and the CDP and the CRP specifically, focus the majority of their resources on supporting state and local candidates, participating in state and local elections and influencing state and local policies.

**a.** The CDP and the CRP are more actively involved in state and local races than in federal races.

**1)** In States simultaneously holding their elections with federal elections, including California, state and local races on any particular ballot substantially outnumber federal races, of which there will ordinarily be a maximum of three in any election cycle. *See* Bowler Decl. at 8.

**2)** California holds elections for 120 legislative officers, eight statewide-elected officers ·and four members of the state board of equalization. It holds still more elections for local offices and for judicial offices and ballot measures at both the state and local levels. *See id.* at 5; Erwin Decl. at 5.

**3)** During the 2002 election cycle—in which there was only one competitive congressional race in California—the CDP was actively involved in eight statewide non-federal races and one dozen state legislative races. *See* Bowler Decl. at 5.

**4)** The CDP actively participates in municipal elections. In recent years the CDP has spent several million dollars in non-federal funds supporting candidates in major cities such as Los Angeles and San Francisco. *See* CDP Pls.' Proposed Findings of Fact at 6.

**5)** The CDP actively supports and opposes state and local ballot measures. In the March 2002 primary, for example, the CDP contributed over $3 million to a 501(c)(4) statewide ballot measure committee in an effort to extend term limits for members of the state legislature. *See id.*

**b.** The CDP and the CRP register voters primarily to influence state and local races.

**1)** The CDP registered over 300,000 new Democratic voters throughout California during 2002 when there was only one competitive congressional race. *See* Bowler Decl. at 13.

**2)** The CDP's expenditures on voter registration—consisting of a mix of federal and non-federal funds—were approximately $145,000 in the 1996 election cycle; $300,000 in the 1998 cycle; $100,000 in the 2000 election cycle; and $185,000 during the period from January 1, 2001 to June 30, 2002. *See id.*

**3)** The CDP's expenditures for voter registration were higher in 1998 (a year with eight statewide elections) than in 2000 (a presidential election year). *See id.*

**4)** The CRP has paid for voter registration—with a mix of federal and non-federal funds—through its Operation Bounty program, in which Republican county central committees, Republican volunteer organizations and Republican candidates for federal and state office participate. Through Operation Bounty drives, the CRP has typically registered over 350,000 Republican voters in each election cycle since the 1984 cycle. *See* Erwin Decl. at 13; *see also* CDP App. at 1185 (charting CRP's voter registration activity by election cycle since 1984 cycle).

**c.** The CDP and the CRP conduct direct mail campaigns primarily to influence state and local races.

**1)** The CDP typically spends approximately $7 million to $8 million in non-federal funds on its mail program in support of state and local candidates.[112] *See* Bowler Decl. at 14–15.

---

**112.** The cost of communicating with voters by mail in California is staggering. The average

2) The CDP's mailing materials typically do not mention federal candidates; instead, they mention the date of a given election, the locations of polling places and the hours the polls are open. *See id.*

3) In 2000 the CDP produced and sent out over 350 different mail pieces in support of state and local candidates and ballot measures. *See id.* at 15.

4) In most election cycles the CRP mails an absentee ballot application to registered Republican voters. In the 1994, 1996 and 1998 cycles the CRP sent between 2.25 and 2.5 million absentee ballot mailers to Republican voters. In the 2000 cycle the CRP sent approximately 5.2 million absentee ballot mailers. *See* Erwin Decl. at 15.

d. The CDP conducts get-out-the-vote telephone banks primarily to influence state and local races.

1) Approximately 40 to 50 per cent of the CDP's paid phone banking is conducted in connection with a specific state or local race and does not make reference to any federal candidate. *See* Bowler Decl. at 15–16.

2) Prior to BCRA's effective date, to the extent the CDP's phone banking mentioned both federal and non-federal candidates, expenditures therefor consisted of a mix of federal and non-federal funds. *See id.* at 15.

3) Prior to BCRA's effective date, to the extent the CDP's phone banking did not endorse any federal candidate, expenditures therefor consisted entirely of non-federal funds. *See id.*

e. The CDP and the CRP conduct get-out-the-vote door-to-door canvassing campaigns primarily to influence state and local races.

1) The CDP and the CRP routinely mail slate cards and hand deliver door hangers listing endorsed candidates, urging voters to vote on election day and informing voters of the date of the election and the polling place. *See id.* at 16; Erwin Decl. at 15–16.

2) Slate cards and door hangers are usually tailored for a particular local area. State and local races dominate numerically over federal races and in some instances no federal candidate is listed at all. *See* Bowler Decl. at 16; Erwin Decl. at 15–16.

3) Prior to BCRA's effective date, to the extent slate cards or door hangers mentioned both federal and non-federal candidates, expenditures therefor consisted of a mix of federal and non-federal funds. *See id.* Bowler Decl. at 16.

74. The CDP and the CRP cooperate with their national counterparts to support their candidates and platforms at all levels of the ticket.

a. The CDP works with the DNC in planning and implementing a Coordinated Campaign, the purpose of which is to allocate resources and coordinate plans for the benefit of Democratic candidates up and down the entire ticket. Party officials, candidates at all levels of the ticket and their agents participate in the Coordinated Campaign and collectively make decisions regarding the solicitation, receipt, directing and spending of the CDP's funds, both federal and non-federal. *See id.* at 4, 23–24.

b. The CRP works with the RNC in planning and implementing a Victory Plan, the purpose of which is to allocate resources and coordinate plans for the benefit of Republican candidates up and down

---

cost of a CDP mail piece is approximately $0.25 to $0.35. (Postage alone is at least $0.10 per piece.) The average number of mail pieces for a state senate district is 150,-000; the average number for a state assembly district is 90,000. *One* statewide mail piece costs approximately $260,000. *See* Bowler Decl. at 19–20.

the entire ticket. The Victory Plan is implemented in the general election cycle with the involvement of RNC staff, CRP staff and state legislative leadership. *See* Erwin Decl. at 3–4.

75. With regard to the CDP's and the CRP's fundraising activities generally, I would find that:

a. The CDP has always raised more non-federal money than federal money.

1) The CDP raises a relatively constant amount of federal money. It raised $4,316,528 in federal funds in the 1996 election cycle; $4,076,870 in federal money in the 1998 cycle; $4,837,967 in federal money in the 2000 cycle; and $3,455,887 in federal money during the period from January 1, 2001 to June 30, 2002. The funds were raised directly by the CDP; the figures do not include any transfers from other party committees or from candidates. *See* Bowler Decl. at 6, Exh. A.

2) Even with increased efforts, it will be difficult for the CDP to raise more federal money under BCRA than it has in the past. *See id.* at 6.

(A) Over the years the CDP has tried many methods of raising more federal money, with little success. Through its telemarketing program, which has been the most successful method of raising federal funds, the CDP has raised between $800,000 and $2 million with an average contribution of $27. The telemarketing program is expensive to run; it costs approximately $0.40 to $0.50 for every dollar raised. *See id.* at 28.

(B) Since 1995 the number of contributions made to the CDP at the $5,000 level—the pre-BCRA federal maximum—was very small, usually accounting for less than five per cent of the CDP's total in federal contributions. The total amount the CDP has received from maximum federal contributions ranged from $170,000 (in the 2000 election cycle) to $355,000 (in the 1996

cycle). Because the number of contributions at the $5,000 level is insignificant, BCRA's doubling the limit from $5,000 to $10,000 will not likely cause a substantial increase in federal funds contributed to the CDP. *See id.* at 28–29.

3) Prior to BCRA's effective date the CDP raised a relatively constant amount of non-federal money. It raised $12,991,251 in non-federal funds in the 1996 election cycle; $15,957,831 in non-federal money in the 1998 cycle; $15,617,002 in non-federal money in the 2000 cycle; and $13,928,496 in non-federal money during the period from January 1, 2001 to June 30, 2002. The funds were raised directly by the CDP; the figures do not include any transfers from other party committees or from candidates. *See id.* at 7, Exh. A.

4) Approximately 76 per cent to 86 per cent of the total amount in non-federal funds the CDP has received has been from donations exceeding the $10,000 "Levin Amendment" limit. *See id.* at 11–12, Exh. A; Torres Decl. at 3.

b. The CRP has always raised more non-federal money than federal money and it has employed several fundraising techniques to raise more federal money, with little success. *See* Erwin Decl. at 17–18.

1) The CRP raises federal funds through direct mail. To maintain a current and effective direct mail fundraising donor list, the CRP must continually spend funds prospecting for new donors. Such prospecting is expensive and often loses money. *See id.* at 18. Federal returns on direct mailings range, on average, from $20 to $40 per contributor. CRP direct mail returns reached a high in 1986 of over $2 million and have declined to under $1 million since 1997. *See id.;* CDP App. at 1189 (charting CRP's major funding sources by year since 1985).

2) The CRP also uses telemarketing to raise federal funds. Federal returns on the CRP's telemarketing range, on average, from $20 to $40 per contributor. Like direct mail prospecting, telemarketing prospecting is expensive and often unproductive. *See Erwin Decl.* at 19; *CDP App.* at 1189.

c. BCRA's prohibition against national party transfers of non-federal funds will impair the CRP's ability to engage in grassroots, voter identification, voter registration and get-out-vote activities, as well as issue advocacy.

1) BCRA's ban on national party transfers will reduce the CRP's available budget by approximately 40 per cent in presidential election cycles and 20 per cent in non-presidential election cycles. *See Erwin Decl.* at 29.

2) Had BCRA been in effect in the 1994, 1996, 1998 and 2000 election cycles, its ban on national party transfers would have reduced the CRP's overall spending from $30 million to $18 million during presidential election cycles and from $17.5 million to $14 million during non-presidential election cycles. *See id.*

d. Under BCRA, Torres (who, as Chair of the CDP, serves on the DNC Executive Committee) and Morgan (who serves as the CRP's National Committeeman to the RNC) may solicit, receive or direct *federal* funds only. *See* Bowler Decl. at 21–22; Torres Decl. at 5; Morgan Decl. at 7–8.

76. BCRA's definition of "Federal election activity" restricts a large amount of state and local party activity undertaken primarily—and in many instances, *solely*—in support of state and local candidates. *See* Bowler Decl. at 14.

a. The term "get-out-the-vote" is not defined in BCRA. As interpreted by *new* FEC regulations, the term includes a significant amount of state and local party activity that is directed at state and local candidates and ballot measures and has little effect on federal elections. *See* Erwin Decl. at 25–26.

1) The CDP, the CRP and local party committees regularly send mass mailings addressed to individual voters within 72 hours of an election to provide information about the date and location of the election and to endorse non-federal candidates or ballot measures without referring to any federal candidate. Under BCRA, the mailings will be considered get-out-the-vote activity—and, therefore, "Federal election activity"—if a federal candidate is listed on the ballot. *See* Bowler Decl. at 14–15; Erwin Decl. at 15.

2) The CDP, the CRP and local party committees regularly deliver door hangers to individual voters on election day to provide information about the location of the election and to endorse non-federal candidates or ballot measures without referring to any federal candidate. Under BCRA, the door hangers will be considered get-out-the-vote activity—and, therefore, "Federal election activity"—if a federal candidate is listed on the ballot. *See* Bowler Decl. at 16; Erwin Decl. at 15–16.

3) The CDP, the CRP and local party committees regularly place phone calls to individual voters within 72 hours of an election to provide information about the date and location of the election and to endorse non-federal candidates or ballot measures without referring to any federal candidate. Under BCRA, the phone calls will be considered get-out-the-vote activity—and, therefore, "Federal election activity"—if a federal candidate is listed on the ballot. *See* Bowler Decl. at 15–16; Erwin Decl. at 14–15.

4) The CDP and the CRP regularly send mass mail addressed to individual voters to provide them with absentee ballot information and to endorse non-federal candidates or ballot measures without re-

ferring to any federal candidate. Under BCRA, the mailings will be considered get-out-the-vote activity—and, therefore, "Federal election activity"—if a federal candidate is listed on the ballot. *See* Bowler Decl. at 14–15; Erwin Decl. at 15.

**b.** The CDP, the CRP and local party committees conduct the vast majority of their voter registration activities within 120 days of elections in which a federal candidate is listed on the ballot. Under BCRA, the registration activities must be funded with 100 per cent federally-regulated money even if the activities do not expressly promote or oppose any federal (or non-federal) candidate. *See* Bowler Decl. at 12–14; Erwin Decl. at 13–14. Voter registration activities will have to compete with candidate-support activities for federally-limited contributions and it is likely that the CDP's registration activities will be significantly reduced or eliminated as a result. *See* Bowler Decl. at 14.

**c.** The CDP and the CRP regularly send mass mailings that contrast one party's position on an issue with that of the other. Under BCRA, the mailings will most probably be considered generic party activity and will have to be funded with 100 per cent federally-regulated money. *See id.* at 14–17. The CDP routinely sends a postcard to newly-registered Democratic voters explaining the principles of the Democratic Party and urging them to support the Party. Under BCRA, although the postcard does not refer to a federal candidate, it will most probably be considered generic party activity and will have to be funded with 100 per cent federally-regulated money. *See id.* at 16–17.

**d.** The CDP and the CRP regularly broadcast public communications that promote or oppose a political party but do not refer to federal or non-federal candidates. Under BCRA, the communications will most probably have to be funded with 100 per cent federal funds. *See id.* at 17.

**77.** BCRA prohibits the CDP and the CRP from donating *any* funds (federal or non-federal) to (1) any organization that is described in section 501(c) of the Internal Revenue Code of 1986, is exempt from taxation and "makes expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)"; or (2) any organization (other than a political committee) that is described in section 527 of the Code. BCRA § 101(a); FECA § 323(d); 2 U.S.C. § 441i(d).

**a.** Most committees that are organized to support or oppose ballot measures in California are tax-exempt entities organized under section 501(c) of the Code. Virtually all of the ballot measure committees in California engage in activity that can be characterized as get-out-the-vote activity under BCRA. *See* Bowler Decl. at 24.

**b.** Section 527 organizations include political clubs. The CDP has contributed to Democratic political clubs engaged solely in state-focused grassroots, voter registration and get-out-the-vote activities. *See id.* at 24–25. Likewise, most of the organizations participating in the CRP's Operation Bounty program, *see supra* Finding 73b.4 at page 343, are section 527 organizations, *see* Erwin Decl. at 13.

**78.** Under BCRA, the CDP and the CRP will have to reduce their communications with voters. Not only will some administrative costs have to be reduced, accounting costs will increase because of BCRA's additional monthly reporting requirements. Moreover, fundraising costs will increase because only federal money can be used to raise federal or Levin funds. Thus, simply to maintain current fundraising efforts, the parties' program and candidate-support activities will most probably have to be reduced. Because candidate support and get-out-the-vote ac-

tivities are likely to remain the parties' priorities, voter registration, generic party-building and grassroots activities will likely be reduced or perhaps even eliminated. *See* Bowler Decl. at 18–19; Torres Decl. at 4.

79. Interest groups include persons and entities—whether corporations, unions, trade associations, advocacy groups or the like (but not political parties)—that (1) are interested in a particular issue; (2) participate in the political process; and (3) associate with others of like mind.

a. Interest groups normally do not build broad-based political coalitions but instead use discrete and issue-specific alliances to address issues at hand. In contrast, political parties generally seek to construct the broad-based coalitions necessary to achieve electoral victories and stability over longer periods of time. *See* La Raja Expert Report at 12–13.

b. Interest groups are subject to less regulation than are political parties. For example, unlike political parties, interest groups are rarely required to make public disclosure of their receipts, donors, disbursements or activities. *See* Beinecke[113] Decl. at 2, 4 (National Resources Defense Council is not required to file disclosure forms with FEC or disclose to the public amounts donated by foundations or individuals); Callahan[114] Decl. at 2–3 (certain amounts donated to League of Conservation Voters do not have to be reported to FEC); Gallagher[115] Decl. at 5–6 (National Abortion and Reproductive Rights Action League (NARAL) is not required to track whether it receives donations from persons outside United States and it respects

rights of donors to remain anonymous); Sease[116] Decl. at 4 (Sierra Club is generally not required to report identity of individual donors to any government entity); *see also* Keller Expert Report at 22 (political activities of interest groups "are far less transparent than those of parties").

c. Interest groups engage in a wide array of political activities paralleling the activities of political parties.

1) Interest groups engage in voter registration, voter identification, get-out-the-vote activities and lobbying of officeholders. *See* Bennett Decl. at 4; Benson Decl. at 4–5; Dendahl Decl. at 3–4; Cross Exam. of Def. Expert Green at 158–59.

2) Interest groups have increased their grassroots, direct mail, telephone bank and door-to-door mobilization efforts and they increasingly distribute absentee ballots and provide supporters with transportation to the polls. *See* Peschong Decl. at 6–7; Cross Exam. of Def. Expert Green at 21–22.

3) During the closing weeks of the 2000 campaign the NAACP National Voter Fund registered over 200,000 people, put 80 staff in the field, contacted 40,000 people in each target city, promoted a get-out-the-vote hotline, ran three newspaper print ads on issues, made seven separate direct mailings, operated telephone banks and provided grants to affiliated organizations. *See* Cross Exam. of Def. Expert Green at 15–20, Exh. 3; Cross Exam. of Def. Witness McCain at 70–72. The NAACP reports that its efforts turned out one million additional voters and increased turnout (over 1996 numbers) among targeted groups by 22 per cent in New York, 50 per

---

113. Frances Beinecke is the Executive Director of the National Resources Defense Council. *See* Beinecke Decl. at 1.

114. Debra Callahan is the President of the League of Conservation Voters. *See* Callahan Decl. at 1.

115. Mary Jane Gallagher is the Executive Vice President of NARAL. *See* Gallagher Decl. at 1.

116. Deborah Sease is the Legislative Director of the Sierra Club. *See* Sease Decl. at 1.

cent in Florida and 140 per cent in Missouri. *See* Cross Exam. of Def. Expert Green Exh. 3. The NAACP's effort, which cost approximately $10 million, was funded in large part by a single $7 million donation by an anonymous individual. *See id.* at 20, Exh. 3; Cross Exam. of Def. Witness McCain at 73–74.

4) In 2000 NARAL spent $7.5 million to mobilize 2.1 million pro-choice voters by making 3.4 million phone calls and mailing 4.6 million pieces of election mail. *See* Gallagher Decl. at 8.

**d.** Because FECA and BCRA place few restrictions on the sources or amounts of money that interest groups may receive,[117] numerous interest groups have announced their intention to solicit donations from donors who prior to BCRA's implementation made non-federal donations to political parties.

1) Kate Michelman, the President of NARAL, has stated that non-federal donors seeking to "elect people who embody their values will be looking to [donate to] groups like NARAL, which do serious political work and are seasoned operatives." Gallagher Decl. at 16 ("If [non-federal donors] can't give to the parties ... they are going to find other means." (quoting Michelman)); *see* Lux[118] Dep. at 50–52 ("There will be organizations who will be able to raise more money because folks who used to give to the party will now give to outside groups. And hopefully I will be involved in many of those projects.").

2) Several defense witnesses acknowledge that the non-federal donations previously made to political parties will now be made to interest groups. *See* Cross Exam. of Def. Expert Mann at 164–65; Cross Exam. of Def. Expert Green at 24; Cross Exam. of Def. Witness Bok[119] at 55 ("Congress ... cannot keep powerful interests from wanting to have an influence on government [and] so long as that desire remains[,] added limits on political donations will simply cause interest groups to seek other ways of exerting leverage that are not prohibited and may even be immune from any restriction under the Constitution. It is always possible that the new ways will be even more dangerous than the old.").

80. There is no record evidence that non-federal donations to political party committees result in actual *quid pro quo* corruption of federal candidates and officeholders.[120] *See generally* FEC's Am. Proposed Findings of Fact at 20–134;[121] *see*

---

**117.** The Act as amended by BCRA *does* restrict certain tax-exempt interest groups from receiving transfers from political party committees. *See* BCRA § 101(a); FECA § 323(d); 2 U.S.C. § 441i(d); *see also supra* Finding 77 at page 347; *see generally infra* Part IV.D.3.

**118.** Michael Scott Lux is the President and co-founder of Progressive Strategies, LLC, a consulting firm that assists for-profit and non-profit groups, individuals and labor unions to engage in issue advocacy. *See* Lux Dep. at 5, 16.

**119.** Derek Bok is currently the University Professor at the Kennedy School of Government at Harvard University; he is a former Dean of the Harvard Law School and President of Harvard University. *See* Bok Decl. at 1.

**120.** The government's theory of actual (as opposed to apparent) corruption rests on two different propositions: (1) "soft money is often given to build or maintain relationships with federal candidates and officeholders that become the basis for future influence," FEC's Am. Proposed Findings of Fact at 20 (capitalization altered); and (2) "political party committees use soft money to influence federal elections," *id.* at 61 (capitalization altered). Neither proposition, assuming its accuracy, establishes that non-federal donations to political party committees result in *quid pro quo* corruption of federal candidates and officeholders.

**121.** Portions of this cited material remain sealed pursuant to a separate order by Judge Kollar–Kotelly.

*also* Intervenors Proposed Findings of Fact at 6–7 (alleging "[t]he record reflects various specific instances that reflect actual corruption" but citing no instances of *quid pro quo* ).

a. Nothing in the record suggests that any Member of the Congress has ever cast or changed his vote on any legislation in exchange for a donation of non-federal funds to his political party. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 2–3 (conceding lack of evidence); McCain Dep. at 171–74 (unable to identify any federal officeholder engaged in *quid pro quo* corruption); Snowe Dep. at 15–16 (same); Jeffords Dep. at 106–07 (same); Meehan Dep. at 181–83 (same); Shays Dep. at 171 (same); *see also* 148 CONG. REC. S2099 (daily ed. March 20, 2002) (statement of Sen. Dodd) ("I have never known of a particular Member whom [sic] I thought cast a ballot because of a contribution."); 147 CONG. REC. S3048 (daily ed. Mar. 28, 2001) (statement of Sen. DeWine) (BCRA's proponents "have failed in their burden" of proving corruption); 147 CONG. REC. S2936 (daily ed. Mar. 27, 2001) (statement of Sen. Wellstone) ("I want to say again that I don't know of any individual wrongdoing by any Senator of either party.").

b. No valid statistical evidence suggests that non-federal donations corrupt federal candidates or officeholders.

1) No valid statistical evidence supports the conclusion that non-federal donations influence roll call votes.

(A) Defense expert Green testified that there are no statistically valid studies showing a correlation between political donations (federal or non-federal) and legislative voting behavior. *See* Cross Exam. of Def. Expert Green at 58–61. Indeed, Green acknowledged that "[s]ome studies

have even found a negative correlation." *Id.* at 54–55; *see* Cross Exam. of Def. Expert Sorauf at 132 ("political scientists lack the means to observe ... such things"); Cross Exam of Def. Witness Bok at 18–21, 35–36 (existing studies erroneously assume "that because money goes to people who vote a particular way, the money must have caused the vote").

(B) Defense expert Mann testified that "[t]here is little statistical evidence that campaign contributions to members of Congress directly affect their roll call decisions. Party, ideology, constituency, mass public opinion and the president correlate much more with voting behavior in Congress than do ... contributions." Mann Expert Report at 32; *see* Milkis Expert Report at 34–35 (political parties prevent *quid pro quo* corruption by providing a "protective layer of decision makers between candidates and donors").

2) No valid statistical evidence supports the conclusion that non-federal donations influence other legislative actions such as committee voting, offering amendments or filibustering. *See* Cross Exam. of Def. Expert Green at 55, 68–72, 95 (noting the one study that attempts to marshal such evidence fails to take lobbying and other activities into account); Cross Exam. of Pl. Expert Primo [122] at 136–38, 142–43 (only study's findings are mathematically unsupported).

c. Federal candidates and officeholders are typically unaware of who donates money to their parties. *See, e.g.,* Feingold Dep. at 115–16 ("Q: How generally are ... Senators made aware of, if at all, the amounts and identities of soft money donors to the national committees? A: I don't know exactly how that's done or how much it's done."); Snowe Dep. at 223–24

---

**122.** Plaintiffs' expert David Primo is an Assistant Professor of Political Science at the University of Rochester in Rochester, New York. *See* Primo Expert Report at 1.

(unaware of non-federal donors to RNC); Jeffords Dep. at 94–97 (generally unaware of non-federal donors to RNC and DNC); Meehan Dep. at 179 (aware of some non-federal donors to national party committees only because "from time to time I read who they are in the newspaper"); *see also, e.g.,* Rudman Dep. at 76 (unaware); Wirth Dep. at 66–67 (unaware); Hickmott Dep. at 66–68 (noting that as Deputy Chief of Staff to former Senator Wirth he was unaware who donated non-federal funds to national party committees).

**d.** There is no record evidence that political parties lobby federal officeholders and nothing in the record suggests that the RNC or any other party committee has ever attempted through the use of non-federal funds to persuade a federal officeholder to formulate or change his position on legislation. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 6; Vosdingh[123] Dep. at 89 (FEC unaware of any national party committee using non-federal funds to induce federal officeholder to support or oppose specific legislation); *see also, e.g.,* Meehan Dep. at 171–72 ("I am not aware of any occasions on which the Democratic Party, at the federal or state level, has sought to lobby Members of Congress."); *compare* Shays Dep. at 172–84 (stating Republican Party never attempted to change his vote; asserting someone had threatened to withhold funding from Republican Congressmen who voted in favor of BCRA; acknowledging he did not know who made the threat; and refusing to provide names of threatened officeholders), *with* Cross Exam. of Def. Expert Mann at

113–15 ("I would be shocked if [the RNC] ever did such a thing.... [T]he point is to win the marginal seat, to control the majority for the party, not to weaken a potentially vulnerable candidate.... It would be self-defeating. That isn't how it works.").

**81.** The defendants' contention that "party committees provide soft money donors with special access to federal office holders," *e.g.,* FEC's Am. Proposed Findings of Fact at 24 (capitalization altered); *see id.* at 24–37;[124] Intervenors Proposed Findings of Fact at 7–9,[125] is supported only by unconvincing anecdotal evidence. More importantly, there is no record evidence that "access" to federal candidates and officeholders itself corrupts.

**a.** The RNC does not offer non-federal donors unique access to federal candidates and officeholders.

**1)** The RNC does not arrange meetings with government officials for any of its donors—federal or non-federal—and whenever a donor attempts to condition a donation on securing such a meeting, the RNC rejects the donation. *See* B. Shea Decl. at 19–20.

**2)** Based upon a review of the RNC's donor files, the RNC's Finance Director testified that, during the typical two-year election cycle, the RNC receives no more than 15 requests—most of them from contributors of *federal* funds—for meetings with Members of the Congress. For its part, the RNC passes the request on to the Member's scheduling staff without further input or follow-up. *See id.* at 20.

---

**123.** Rhonda Vosdingh is an employee of the FEC and was deposed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. *See* Vosdingh Dep. at 6.

**124.** A portion of this cited material remains sealed pursuant to a separate order by Judge Kollar–Kotelly.

**125.** A portion of this cited material remains sealed pursuant to a separate order by Judge Kollar–Kotelly.

3) Federal candidates and officeholders appear at RNC-sponsored events for donors of federal funds as well as for donors of non-federal funds. *See id.* at 22; *see also* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4–5 (both federal and non-federal donors attend political party fundraisers and all six major national political party committees' fundraisers are open to both types of donors).

**b.** No valid statistical evidence supports the conclusion that non-federal donations secure special access to federal candidates and officeholders. Experts for the plaintiffs and for the defense—and other experts who have not testified in this case—agree that there exists no valid study linking donations and "access" or "legislative effort." Cross Exam. of Def. Expert Green at 55, 69–72 (existing studies fail to control for effect of lobbying expenditures and are not "statistically sound"); *id.* at 95 (studies make no effort to "track access specifically"); Krasno & Sorauf Expert Report at 5 ("[T]he absence of systematic data on access . . . prevents political scientists from searching for relationships between access and policy-makers' behavior."); Primo Expert Report at 8–9 (noting only "scant evidence in the political science literature that money secures access" and stating that existing literature is statistically flawed); *see also RNC v. FEC,* Civ. No. 98–CV–1207 (D.D.C.) (Herrnson Dep. at 300 (testifying on behalf of FEC that existing studies on "access" are "kind of weak and wishy washy")).

**c.** There is no record evidence that federal officeholders are more likely to meet with non-federal donors than with

federal contributors. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4 (conceding lack of evidence); *see also* Feingold Dep. at 116 ("I cannot imagine a situation where . . . I would meet with somebody because they gave soft money."); Snowe Dep. at 210–11 (stating she has never given preferential access to any donor, federal or non-federal, and that "[e]verybody has access to my office to the extent that I have time available"); Jeffords Dep. at 96–97 (stating person's status as donor to national party committee does not "affect [his] decisions as to who [he] meet[s] with or give[s] access to"); Meehan Dep. at 180 (stating he provides no preferential access to non-federal donors); Cross Exam. of Def. Witness Shays at 20–21 (acknowledging that, like most congressmen, he "pretty much [has] an open door policy to meet with people who want to talk to [him] about important legislative issues"). The evidence the defendants have offered to support their contention that non-federal donations secure "access" is unconvincing and fails to establish corruption.

1) The defendants rely on the testimony of several lobbyists for the proposition that corporations donate non-federal funds to gain "access." *See, e.g.,* FEC's Am. Proposed Findings of Fact at 27, 124–25 (citing, *inter alia,* Andrews [126] Decl.; Hickmott [127] Decl.; Rozen [128] Decl.).

2) These witnesses testified in depositions and on cross-examination that their corporate clients hire them in large part because of their contacts on Capitol Hill and because they have access to federal officeholders whether or not their clients

---

**126.** Wright Andrews is a lobbyist with the firm Butera & Andrews.

**127.** Robert Hickmott is Senior Vice President of the Smith–Free Group, a "governmental affairs" firm located in Washington, D.C. Hickmott Decl. at 1–2.

**128.** Robert Rozen is a partner at Washington Council Ernst & Young, a lobbying firm. *See* Rozen Decl. at 1.

have donated money to candidates, office-holders or parties. *See* Hickmott Dep. at 46–47, 50–51; Cross Exam. of Def. Witness Andrews at 19–20; *compare* B. Shea Decl. at 20 ("It is obvious why major donors to the RNC do not regularly use their donations as a means to obtain 'access.' All or virtually all who have personal or organizational business with the federal government retain or employ professional lobbyists.").

3) Lobbying is far more effective in securing "access" to federal officeholders than is donating campaign funds.

(A) As former Senator Bumpers, a defense witness, testified previously, lobbying expenditures are more likely to secure non-incidental contact with a federal officeholder than are campaign donations. *See RNC v. FEC*, Civ. No. 98–CV–1207 (D.D.C.) (Bumpers Dep. at 38–40).

(B) Many entities and individuals who donate non-federal funds to political parties also spend money lobbying federal officeholders. The amount of money spent by such organizations on lobbying is often larger than the amount they donate to political parties. *See* Resp. of Intervenors to RNC's First and Second Reqs. for Admis. at 23–24 (admitting that top five corporate donors of non-federal funds during 1995 and 1996 donated $9,009,155 to national party committees and same five corporations spent $27,107,688 on lobbying during 1996 alone); *see id.* at 24–25 (admitting that top five corporate donors of non-federal funds during 1997 and 1998 donated $7,774,020 to national party committees and same five corporations spent $42,000,000 on lobbying during same period).

d. Even if the defendants could establish that the donation of non-federal funds secures access to federal candidates and officeholders, they have not established that such access corrupts.

1) Two of the intervenors testified that they could remember few, if any, of the attendees of major donor events they had attended.

(A) Senator McCain has attended and spoken at a number of Republican Party "Team 100" events but does not recall the individuals who were present at the events nor the questions they asked. *See* McCain Dep. at 236–38 (like many Members of the Congress, Senator McCain "give[s] 20 speeches a week" and "[o]f course" does not remember donors).

(B) Similarly, Congressman Shays has attended numerous events at which non-federal donors were present. When shown a list of names of persons with whom he sat at a then-recent event, however, he could not recall a single one. *See* Cross Exam. of Def. Witness Shays at 20.

2) Contact between federal candidates or officeholders and the electorate is inherent in the democratic process. *See RNC v. FEC*, Civ. No. 98–CV–1207 (D.D.C.) (Herrnson Dep. at 302 (acknowledging that "access by interest groups to a congressman is an important facet of democracy")); Cross Exam. of Pl. Expert Primo at 150 ("[I]f it were the case that money influenced who got seen by a legislator[,] . . . you can't make a claim that that is necessarily bad for democracy, precisely because it could be that the ones that give money are the ones most informed about the issues at hand."); *see generally* U.S. CONST. amend I ("Congress shall make no law . . . abridging the freedom . . . to petition the Government for a redress of grievances.").

82. There is no credible record evidence that "solicitation and use of soft money by political parties . . . has created an appearance of corruption," *e.g.*, FEC's Am. Proposed Findings of Fact at 87 (capitalization altered); *see id.* at 87–134; Intervenors Proposed Findings of Fact at 9–

12 (anecdotal evidence in support of assertion that non-federal donations "appear to shape and skew . . . governmental decision making"),[129] nor, more significantly, any evidence that BCRA will remedy whatever perception of corruption exists.

a. Public opinion surveys purporting to show an appearance of corruption of federal candidates and officeholders arising from non-federal donations in particular are equivocal at best. *See, e.g.,* Mellman[130] & Wirthlin[131] Expert Report at 6 ("Over three in four Americans (77%) believe that *big contributions* to political parties have a great deal of impact (55%) or some impact (23%) on decisions made by the federal government." (emphasis added)).[132]

1) The surveys are poorly worded. *See* Primo Expert Report at 18–23; Cross Exam. of Pl. Expert Primo 112–14 (stating "the claim made by defense and proponents of campaign finance reform that the American public views the [campaign finance] issue as . . . a high priority . . . is not supported by the public opinion evidence," which "does not force a comparison with other issues"); Cross Exam. of Def. Expert Mellman at 38 ("Q: What does 'big' mean? A: Larger than small. Even larger than medium. Q: Can you give me a more precise definition? A: No.

Q: In connection with campaign contributions, what does 'big' mean? A: Larger than medium, larger than small. Q: Can you give me an amount? A: Well, it's sort of like what the Supreme Court says about pornography, people know [it] when they see it. Even if I can't actually give you a precise amount."); *id.* at 38–41, 60–62 (acknowledging imprecision of survey).

2) It appears that the public does not understand the distinction between federal and non-federal funds and is not aware of campaign finance regulations. *See* Ayres[133] Expert Report at 3–4 (citing evidence that "public opinion about campaign finance regulations is shallow and poorly informed").

3) The Mellman and Wirthlin study upon which the defendants rely did not measure the public's understanding of the campaign finance system, did not ask if the respondents understood the difference between federal and non-federal funds and did not ask if BCRA would change the respondents' view of the campaign finance system. *See* Cross Exam. of Def. Expert Mellman at 31–35.

b. There is no record evidence that BCRA will remedy whatever appearance of corruption exists.

---

129. A portion of this cited material remains sealed pursuant to a separate order by Judge Kollar–Kotelly.

130. Defense expert Mark Mellman is the Chief Executive Officer of the Mellman Group, a polling and consulting firm. *See* Mellman & Wirthlin Expert Report at 2.

131. Defense expert Richard Wirthlin is Chairman of the Board of Wirthlin Worldwide, a public opinion research firm. *See* Mellman & Wirthlin Expert Report at 2.

132. According to Mellman and Wirthlin's expert report, 46 per cent of respondents agreed that "individuals and/or groups should be free

to give as much money to political parties as they want" and 49 per cent agreed that "it is important for individuals, issue groups, corporations and labor unions to have the freedom to express their views by making large political contributions." Mellman & Wirthlin Expert Report at 13. The report's authors have largely dismissed these findings, however, because "Americans are more likely to agree with any statement that includes . . . the words 'free' or 'freedom'" than with a statement that does not use them. *Id.*

133. Plaintiffs' expert Q. Whitfield Ayres is the President of Ayres, McHenry & Associates, Inc., a public opinion research firm. *See* Ayres Decl. at 1.

1) To the extent that the defendants' evidence of an appearance of corruption is based on legislative access afforded non-federal donors, similar access is granted to and through interest groups and lobbyists.

(A) Representatives of EMILY's List, NARAL, the League of Conservation Voters, the New Democratic Network and the Sierra Club have all stated that federal officeholders appear at their group-sponsored events. *See* Callahan Decl. at 2; Gallagher Decl. at 6–7, Exh. D; Rosenberg [134] Aff. at 3, Tab B; Sease Decl. at 5; Solmonese [135] Aff. at 5, Tab F.

(B) BCRA does not prohibit interest groups from providing access to federal officeholders; indeed, it appears BCRA may result in an enhancement of such access.

(C) BCRA does not prohibit interest groups from lobbying federal officeholders.

2) To the extent the public believes that non-federal donations corrupt, federal contributions are subject to the same public cynicism. *See* Ayres Rebuttal Report at 1–5; Milkis Rebuttal Report at 10–11 (any cynicism that exists will continue under BCRA).

(A) Under BCRA, individual donors can contribute up to $57,500 in federal funds to the political party committees during each two-year election cycle. Defense expert Green testified that a typical American would believe $57,500 is an amount that (in the words of Mellman and Wirthlin) "ha[s]

a great deal of impact ... on decisions made by the federal government." *See* Cross Exam. of Def. Expert Green at 267.

(B) Plaintiffs' expert Ayres replicated the survey conducted by defense experts Mellman and Wirthlin but substituted BCRA limits for the word "big." He found that "every conclusion that the Wirthlin–Mellman report reached about 'large' or 'big' contributions and contributors applies with equal force to the new ... hard money limits in BCRA." Ayres Rebuttal Report at 4–5.

3) Among the "corruptions" the defendants' witnesses identify are negative campaign ads, *see, e.g.,* Williams [136] Decl. at 3; intense fundraising efforts, *see, e.g.,* Meehan Dep. at 128; high campaign costs generally, *see, e.g.,* Cross Exam. of Def. Witness Strother [137] at 38–39; and the FEC itself, *see, e.g.,* McCain Dep. at 15–16, 89.

4) Defense expert Shapiro [138] conceded that he knows of no public opinion evidence showing that BCRA will reduce the appearance of corruption, *see* Cross Exam. of Def. Expert Shapiro at 114–17, and that any public cynicism about the role of money in politics is longstanding, existed before the 1990s and has been stable over time, *see id.* at 39–41.

5) Defense expert Mann testified that "a major restructuring of campaign finance law"—which BCRA plainly is—"would not dramatically reduce corruption and purify

---

**134.** Simon Rosenberg is the President of the New Democrat Network and is familiar with its day-to-day operations. *See* Rosenberg Aff. at 1.

**135.** Joe Solmonese is the Chief of Staff of EMILY's List and is familiar with its day-to-day operations. *See* Solmonese Aff. at 1.

**136.** From 1979 to 1997, Pat Williams served as a member of the United States House of Representatives from the State of Montana. *See* Williams Decl. at 1.

**137.** Raymond Strother is a professional media consultant at the firm Strother Duffy Strother. *See* Strother Dep. at 12–14.

**138.** Defense Expert Robert Shapiro is a Professor in the Department of Political Science at Columbia University and currently serves as Chairman of the Department. *See* Shapiro Expert Report at 1.

politics and government." Cross Exam. of Def. Expert Mann at 31.

6) Defense expert Sorauf acknowledged that "it's speculative" whether BCRA will remedy whatever perception of corruption exists. Cross Exam. of Def. Expert Sorauf at 191.

### 5. The Ban on Minors' Contributions and Donations

Finally, as to BCRA's ban on minors' contributions and donations, *see generally supra* Part II.E, I would find that:

83. Barret Austin O'Brock contributed his own money (not received from any other person for purposes of the contribution) to John Milkovich, who was his Sunday school teacher for two years and was a candidate for United States Representative for the 4th Congressional District of Louisiana. O'Brock intends to contribute to federal candidates in the future unless prohibited by BCRA. *See* O'Brock Decl. at 1.

84. None of the parents of the *Echols* plaintiffs has used his or her child's name—or any other person's name—to make a contribution that FECA would otherwise prohibit. *See* T. Echols Decl. at 6; B. Solid Decl. at 2; D. McDow Decl. at 2; P. Mitchell Decl. at 3; C. White Decl. at 2. All of the *Echols* plaintiffs plan to contribute funds within their own direction and control—earned from allowances and part-time jobs—to federal candidates who share their views on political issues like abortion, divorce and the size of government. *See* E. Echols Decl. at 4–6; D. Solid Decl. at 4–5; H. McDow Decl. at 4–5; I. McDow Decl. at 4–5; J. Mitchell Decl. at 5–6; Z. White Decl. at 4–5.

### C. Standards of Review

In *Buckley*, the Supreme Court began its constitutional analysis of FECA by iterating some "General Principles," *Buckley*, 424 U.S. at 14–23, 96 S.Ct. 612, that necessarily serve as the starting point for the analyses set forth in Part IV of this opinion:

[C]ontribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.... [T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, ... of course includ[ing] discussions of candidates.... This no more than reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open .... In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.... [I]t can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.

*Buckley*, 424 U.S. at 14–15, 96 S.Ct. 612 (quoting, *inter alia, Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); *New York Times Co.*, 376 U.S. at 270, 84 S.Ct. 710) (internal quotations omitted); *see Republican Party v. White*, 536 U.S. 765, 122 S.Ct. 2528, 2538, 153 L.Ed.2d 694 (2002) ("[T]he notion that the special context of electioneering justifies an *abridgment* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. [D]ebate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges." (quotation omitted) (emphasis in original)); *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the

essence of self-government."). In proceeding below to apply an "array of formulas, tests, prongs, and tiers, often phrased in highly abstract legal jargon—'overinclusiveness and underinclusiveness,' 'narrow tailoring,' 'intermediate scrutiny,' and so on," it will be important to bear these "first principles" in mind. Akhil Reed Amar, *The Supreme Court, 1999 Term—Foreword: The Document and the Doctrine,* 114 HARV. L. REV. 26, 46 (2000); *see United States v. Lopez,* 514 U.S. 549, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (in evaluating constitutionality of congressional enactment, "[w]e start with first principles"); L.A. Powe, Jr., *Mass Speech and the Newer First Amendment,* 1982 SUP. CT. REV. 243, 258 ("let us not lose sight of the speech"); *see generally* U.S. CONST. amend. I ("Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). With that said, I turn now to the standards of review that *Buckley* and its progeny have established—and which the panel must follow—in evaluating governmental restrictions on campaign financing.

Under the Supreme Court's jurisprudence, the rigor of our review of BCRA's provisions varies according to the type of campaign financing restricted. It has long been understood that, consistent with *Buckley,* courts are to apply a slightly lower level of scrutiny in evaluating a restriction on contributions to candidates than in analyzing a restriction on expenditures. *See, e.g., Colorado Republican II,* 533 U.S. at 440, 121 S.Ct. 2351 ("ever since we first reviewed the 1971 Act, we have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions" to candidates); *but see Colorado Republican I,* 518 U.S. at 640, 116 S.Ct. 2309 (Thomas, J., concurring in judgment and dissenting in part) (declaring that "there is no

constitutionally significant difference between campaign contributions and expenditures," that "[b]oth forms of speech are central to the First Amendment" and that curbs on either "must be strictly scrutinized"). The Court held in *Buckley* that a ceiling on campaign expenditures "impose[s] direct and substantial restraints on the quantity of political speech," *Buckley,* 424 U.S. at 39, 96 S.Ct. 612, and that its constitutionality therefore "turns on whether the governmental interests advanced in its support satisfy the *exacting scrutiny* applicable to limitations on core First Amendment rights of political expression." *Id.* at 44–45, 96 S.Ct. 612 (emphasis added); *see NCPAC,* 470 U.S. at 496, 105 S.Ct. 1459 (restriction on expenditures, which are "entitled to full First Amendment protection," must be "narrowly tailored" to serve a "strong governmental interest").

"[B]y contrast," the Court stated in *Buckley,* a limit on contributions to candidates and their campaign committees imposes only a modest restraint upon contributors' ability to engage in free speech because

> [a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in

any way infringe the contributor's freedom to discuss candidates and issues. *Buckley*, 424 U.S. at 20–21, 96 S.Ct. 612; *see Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 196, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (*Cal–Med*) (plurality opinion) ("The 'speech by proxy' that [a contributor] seeks to achieve through its contributions ... is not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection."). Thus, the Court recognized in *Buckley* that "the primary First Amendment problem raised by ... contribution limitations" is not their encroachment upon direct expression but "their restriction of one aspect of the contributor's freedom of political association." *Buckley*, 424 U.S. at 24–25, 96 S.Ct. 612. Pointing out that "[m]aking a contribution ... serves to affiliate a person with a candidate" and his ideas, *id.* at 22, 96 S.Ct. 612, the Court held that a contribution-to-candidate limitation can be sustained only if the state affirmatively "demonstrates a sufficiently important interest" and "employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. 612; *see Shrink Missouri*, 528 U.S. at 387–88, 120 S.Ct. 897.

A court, therefore, is to apply "exacting scrutiny" [139] to an expenditure cap [140] and something just short of that in examining a contribution-to-candidate limit. Nonetheless, the boundary between expenditures and donations does not place the two types of funding into "watertight compartments." *Springer v. Philippine Islands*, 277 U.S. 189, 209, 211, 48 S.Ct. 480, 72 L.Ed. 845 (1928) (Holmes, J., dissenting) (declaring, in separation-of-powers context, that "[t]he great ordinances of the Constitution do not establish and divide fields of black and white"). Not all expenditures are precisely alike, nor are all donations; accordingly, the distinction between the two is a fluid one. For example, in holding that the Congress may constitutionally limit a party expenditure that is coordinated [141] with a federal candidate by treating it as a contribution, *see Colorado Republican II*, 533 U.S. at 465, 121 S.Ct. 2351, the Court observed:

> The First Amendment line between spending and donating is easy to draw when it falls between independent expenditures by individuals or political action committees (PACs) without any candidate's approval (or wink or nod), and contributions in the form of cash

**139.** In the campaign finance context, the Court has placed "exacting scrutiny" on an even plane with the more familiar "strict scrutiny." *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (in determining constitutionality of restriction on independent expenditures, Court "must ascertain ... whether it is narrowly tailored to serve a compelling state interest"); *MCFL*, 479 U.S. at 251–52, 107 S.Ct. 616 (burdens on independent expenditures, which are reviewed with exacting scrutiny, must be "justified by a compelling state interest"). In no case of

which I am aware does the Court hold that exacting scrutiny is any *less* rigorous than strict scrutiny.

**140.** Courts are also to apply exacting (i.e., strict) scrutiny to disclosure and reporting requirements triggered by expenditures. *See Buckley*, 424 U.S. at 64, 96 S.Ct. 612; *see also infra* Part IV. B.

**141.** Under the Act, as amended by BCRA, an expenditure is coordinated with a candidate or with a party committee—and is treated as a contribution thereto—if it is made "in cooperation, consultation, or concert, with, or at the request or suggestion of" the candidate or committee. BCRA § 214; FECA § 315(a)(7)(B)(i), (ii); 2 U.S.C. § 441a(a)(7)(B)(i), (ii).

gifts to candidates.... But facts speak less clearly once the independence of the spending cannot be taken for granted, and money spent by an individual or PAC according to an arrangement with a candidate is therefore harder to classify.... [We have] observed that "[t]he independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees." ... But [we have] also observed that "many [coordinated expenditures] are ... virtually indistinguishable from simple contributions."

*Id.* at 442–45, 121 S.Ct. 2351 (quoting *Colorado Republican I*, 518 U.S. at 616, 624, 116 S.Ct. 2309 (plurality opinion)). Under *Colorado Republican II*, then, if a coordinated expenditure is "virtually indistinguishable from [a] simple contribution[ ]," we review any limit placed thereon by the same standard we use to review a contribution-to-candidate cap—both must be "'closely drawn' to match a 'sufficiently important interest.'" *Colorado Republican II*, 533 U.S. at 446, 121 S.Ct. 2351 (quoting *Shrink Missouri*, 528 U.S. at 387–88, 120 S.Ct. 897).

By the same token, however, the Court has recognized that in some instances a contribution restriction will function, for all intents and purposes, as a limit on fully-protected independent expenditures. In *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), for example, the Court struck down a Berkeley, California ordinance that placed a $250 limit on contributions to *committees* making independent expenditures in support of, or in opposition to, ballot measures submitted to popular vote. In doing so, the Court strongly reaffirmed its commitment to protecting the right of individuals and entities to associate in order to engage in political issue advocacy, a right that is undermined by limiting the amount of money that can be given to committees spending funds on such advocacy:

> *Buckley* identified a single narrow exception to the rule that limits on political activity [are] contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate* .... Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression.... [A]n individual may make expenditures without limit under [the ordinance] on a ballot measure but may not contribute beyond the $250 limit when joining with others to advocate common views. The contribution limit thus automatically affects expenditures, and limits on expenditures operate as a direct restraint on freedom of expression of a group or committee desiring to engage in political dialogue .... A limit on contributions in this setting need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression.

*Id.* at 296–300, 102 S.Ct. 434 (emphasis in original). Subjecting the $250 contribution-to-committee limit to the same "exacting judicial scrutiny" that *Buckley* had applied to the *expenditure* limits, *Citizens Against Rent Control*, 454 U.S. at 294, 298, 102 S.Ct. 434, the Court struck it down, finding that it intolerably "hobble[d] the collective expressions of a group." *Id.* at 296, 102 S.Ct. 434. I can only conclude from the *Citizens Against Rent Control* decision—and the rest of the Court's free association jurisprudence—that the courts are to apply "exacting scrutiny" to laws limiting donations to associations that make independent expenditures in order to

engage in collective political issue advocacy. Because my analysis of BCRA's restrictions on party use of non-federal money is shaped in large measure by this particular conclusion—and because the decision about which standard of review to apply often proves outcome-determinative, see *Shrink Missouri*, 528 U.S. at 400, 120 S.Ct. 897 (Breyer, J., concurring) (observing that "a strong presumption against constitutionality [is] often thought to accompany the words 'strict scrutiny'")—I explain in greater detail in Part IV.D.1.a, *infra*, my view that the restrictions are subject to "exacting" (i.e., strict) review.

## IV. Constitutional Analyses

With the foregoing precepts in mind, I turn now to the plaintiffs' constitutional challenges.

### A. The Ban on Corporate and Labor Disbursements for "Electioneering Communications"

The First Amendment provides, in pertinent part, that the "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. The text itself prompts a few observations that are particularly relevant to an analysis of BCRA's ban on corporate and labor disbursements for electioneering communications. First, the Amendment does not restrict its protection of political speech to natural persons only. As the Supreme Court recognized in *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), political speech

> is the type of speech indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corpo-

ration, association, union, or individual.... The proper question therefore is not whether corporations "have" First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [a law] abridges expression that the First Amendment was meant to protect.

*Id.* at 776–77, 98 S.Ct. 1407; *see also Austin*, 494 U.S. at 657, 110 S.Ct. 1391 ("mere fact" of being corporation "does not remove its speech from the ambit of the First Amendment").

Second, the Amendment's command that the "Congress shall make no law" means that, however benign its intentions, the Congress has no license to decide how best to ensure that the electorate's deliberation about candidates is rational or balanced. *See Brown v. Hartlage*, 456 U.S. 45, 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) ("It is simply not the function of government to select which issues are worth discussing or debating ... in the course of a political campaign." (quoting *Police Dep't v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972))); *see also White*, 122 S.Ct. at 2538 (same, quoting *Brown*, 456 U.S. at 60, 102 S.Ct. 1523); *Austin*, 494 U.S. at 679, 110 S.Ct. 1391 (Scalia, J., dissenting) ("[G]overnment cannot be trusted to assure, through censorship, the 'fairness' of political debate."); Lillian R. BeVier, *The First Amendment and Political Speech: An Inquiry Into the Substance and Limits of Principle*, 30 STAN. L. REV. 299, 317 (1978) (hereinafter BeVier, *Political Speech*) ("[I]t is the *fact* of participation in the political process that the amendment protects, not its qualities of sanity and objectivity." (emphasis in original)). Instead, the First Amendment delegates to the populace at large the responsibility of conducting an "uninhibited, robust, and wide-open" debate about government affairs and political candidates. *See Buckley*, 424 U.S. at 14, 57, 96 S.Ct.

612 ("In the free society ordained by our Constitution it is not the government, but the people—individually as citizens and candidates and collectively as associations and political committees—who must retain control over the quantity and range of debate on public issues in a political campaign."); *see also Riley v. Nat'l Fed'n of the Blind, Inc.,* 487 U.S. 781, 790–91, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it."); *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (First Amendment places "the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry"); *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and falla-

cies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence."). This time-honored "marketplace" conception of the First Amendment, *see Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), "derives its instrumental justification in part from straightforward mistrust of the motives of elected officials (and the suspicion that they are relentlessly incumbent-protective) and in part from skepticism about the competence of even the best-motivated politicians to design and to craft legal rules" tailored so that they do not dampen the debate. Lillian R. BeVier, *The Issue of Issue Advocacy: An Economic, Political, and Constitutional Analysis,* 85 VA. L. REV. 1761, 1774 (1999) (hereinafter BeVier, *Issue Advocacy* ).

Drawing support from these observations—and from the "express advocacy" test announced in *Buckley*—the plaintiffs contend, *inter alia,* that BCRA's ban [142] on

---

**142.** The defendants emphasize throughout their briefs that section 203 "is not a ban on speech." *E.g.,* Gov't Br. at 129; *see also, e.g.,* Gov't Opp. Br. at 55; Intervenors Opp. Br. at 56 (provision "is not a ban—although it is an important restriction"); Gov't Reply Br. at 53–62; Intervenors Reply Br. at 63–70. Their contention is constitutionally irrelevant under the Supreme Court's decision in *MCFL,* as the Fourth Circuit recently observed in striking down FECA's restriction on corporate contributions as applied to a non-profit advocacy corporation:

> [The FEC] submits that the Act ... allows all corporations to make campaign contributions through a separate segregated fund, and corporations that do not fall within 11 C.F.R. § 114.10's exception to make independent expenditures through such a fund. *See* [2 U.S.C.] §§ 441b(a) and (b)(2)(C). Given the availability of this alternative avenue through which to make contributions and expenditures, the FEC maintains that it is factually incorrect to contend that an absolute ban is at issue in this case.

However, the FEC's view has already been rejected by the Supreme Court in *MCFL.*

While restricting MCFL's campaign spending to use of a separate segregated fund "is not an absolute restriction on speech, it is a substantial one. Moreover, even to speak through a segregated fund, MCFL must make very significant efforts." *MCFL,* 479 U.S. at 252, 107 S.Ct. 616.... A segregated fund is a "political committee" under the Act. 2 U.S.C. § 431(4)(B). As a consequence, organizations that use a segregated fund must adhere to significant reporting requirements, staffing obligations, and other administrative burdens. These burdens stretch far beyond the more straightforward disclosure requirements on unincorporated associations. *See MCFL,* 479 U.S. at 252–53, 107 S.Ct. 616....

[Thus,] "while [the statute] does not remove all opportunities for independent spending ..., the avenue it leaves open is more burdensome than the one it forecloses. The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an infringement on First Amendment activities." *MCFL,* 479 U.S. at 255, 107 S.Ct. 616[.] ... Accordingly, we have little difficulty concluding that the prohibitions of [2 U.S.C]

corporate and labor disbursements for electioneering communications violates the First Amendment because it restricts, in both overbroad and underinclusive fashion, speech that does not expressly advocate the election or defeat of a clearly identified candidate. I agree.

\* \* \*

As I have mentioned, *see supra* Part I, the Court in *Buckley* held that the government's interest in "limit[ing] the actuality and appearance of corruption" arising from large campaign donations to candidates was sufficiently compelling to justify the Act's limits on contributions. *Buckley,* 424 U.S. at 26, 96 S.Ct. 612. The Court has acknowledged several times since then that funds given (and, in certain narrow circumstances, spent) on expressly advocating the election or defeat of federal candidates can be restricted to prevent corruption of federal candidates and officeholders.[143] *See Shrink Missouri,* 528 U.S. at 389, 120 S.Ct. 897 (citing cases); *see*

*also Austin,* 494 U.S. at 658–60, 110 S.Ct. 1391. Nonetheless, in *Buckley* the Court rejected the government's contention that an interest in preventing corruption justified the Act's $1,000 limit on any person's "expenditures relative to a clearly identified candidate." *Buckley,* 424 U.S. at 39–51, 96 S.Ct. 612. Expressing concern that the expenditure cap imposed criminal penalties "in an area permeated by First Amendment interests," *id.* at 41, 96 S.Ct. 612, and emphasizing that "First Amendment freedoms need breathing space to survive," *Id.* at 41 n. 48, 96 S.Ct. 612 (quoting *NAACP v. Button,* 371 U.S. at 433, 83 S.Ct. 328), the Court found that the phrase "relative to" lacked sufficient specificity to be sustained. *Id.* at 41, 96 S.Ct. 612·("The use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech ...."). Likewise, it found that the Court of Appeals' narrowing construction—under which the $1,000 limit applied to money spent on

§ 441b(a) and 11 C.F.R. §§ 114.2(b) and 114.10 burden the exercise of political speech and association.
*Beaumont v. FEC,* 278 F.3d 261, 269, 271 (4th Cir.) (Wilkinson, C.J.), *cert. granted,* —— U.S. ——, 123 S.Ct. 556, 154 L.Ed.2d 441 (2002); *see Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) ("That [speakers] remain free to employ other means to disseminate their ideas does not take their speech ... outside the bounds of First Amendment protection.... That [a restriction] leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." (citing *MCFL,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539)); *see also supra* Finding 44d at page 313 (explaining how ACLU's speech would be burdened if ACLU were forced to establish political action committee), 51g at pages 317–18 (stating NRA's political action committee is incapable of raising funds that fairly reflect NRA members' support for NRA's political message), 53f at page 323 (same, with respect to AFL–CIO and its political contributions committee). I can put it no better than the Fourth Circuit, although I

note that *MCFL* and *Beaumont* addressed "expenditures" and "contributions" made "for the purpose of influencing" federal elections, *not* disbursements for issue advocacy, which under *Buckley* and its progeny merit even greater First Amendment protection and make rejecting the defendants' argument even easier.

**143.** It bears noting, however, that the Court has held preventing actual or apparent corruption of federal candidates and officeholders is the *only* possible justification for restricting campaign finances. *See NCPAC,* 470 U.S. at 496–97, 105 S.Ct. 1459 ("We held in *Buckley* and reaffirmed in *Citizens Against Rent Control* that preventing corruption or the appearance of corruption are the only legitimate and compelling government interests[.]"); *see also Colorado Republican I,* 518 U.S. at 623, 116 S.Ct. 2309 (plurality opinion) ("where there is no risk of 'corruption' of a candidate, the Government may not limit even contributions" (citing *Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407)); *cf. infra* note 148 and accompanying text (noting Court's definition of "corruption" is somewhat unclear).

"advocating," expressly or otherwise, "the election or defeat of [a] candidate," *Buckley*, 519 F.2d at 853—was also too imprecise and sweeping to eliminate vagueness and overbreadth problems because it failed to account for the fact that

> the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.

*Buckley*, 424 U.S. at 42, 96 S.Ct. 612. Emphasizing the need for a bright line to ensure proper "breathing space" for political issue advocacy—the funding of which cannot be regulated even though it may affect the outcome of elections and, therefore, potentially could be used to obtain *quid pro quos* from candidates, *see id.* at 45–46, 96 S.Ct. 612—the Court formulated the "express advocacy" test:

> [I]n order to preserve the [$1,000 expenditure limit] against invalidation on vagueness grounds, [it] must be construed to apply only to expenditures for communications that *in express terms* advocate the election or defeat of a clearly identified candidate for federal office.... This construction would restrict the application of [the provision] to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."

*Id.* at 44 n. 52, 96 S.Ct. 612 (emphasis added); *see id.* at 80 n. 108, 96 S.Ct. 612 (express advocacy construction of "expenditure" necessary "[t]o insure that the reach of [the statute] is not impermissibly broad").

In focusing on the precise *words* used in a political message, the Court declined to adopt a standard that would require discerning the intent of the speaker or the message's effect on a given listener because such a standard would not fully alleviate vagueness and overbreadth problems or their "chilling" effect on political speech:

> [W]hether words intended and designed to fall short of invitation [to vote for a candidate] would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject [of politics] would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.... [A] distinction [based on intent or effect] offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

*Id.* at 43, 96 S.Ct. 612 (quoting *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)); *see also id.* at 80, 96 S.Ct. 612.

The defendants contend that "*Buckley* does not prohibit Congress from enacting narrowly tailored anti-corruption measures simply because they are not limited to communications containing express advocacy." Gov't Br. at 148 (capitalization altered); *see id.* at 148–53; Intervenors Br. at 99–103. Several courts of appeals have held, however, that the express advocacy

test is not simply the Supreme Court's interpretation of FECA but an irreducible constitutional minimum that no campaign finance restriction can diminish. *See, e.g., Moore,* 288 F.3d at 190 (holding Mississippi statute could constitutionally extend only to political advertisements "advocat[ing] *in express terms* the election or defeat of a candidate" (emphasis in original)); *Citizens for Responsible Gov't State PAC v. Davidson,* 236 F.3d 1174, 1187, 1193–95 (10th Cir.2000) (stating "distinction between permissible restrictions on 'express advocacy' and impermissible restrictions on 'issue advocacy' remains viable" and holding Colorado statute regulating "political messages" unconstitutional because it extended to issue advocacy); *Perry v. Bartlett,* 231 F.3d 155, 162 (4th Cir.2000) (per curiam) (North Carolina statute was unconstitutionally overbroad because it regulated "political expression ... which on its face [was] issue advocacy"), *cert. denied,* 532 U.S. 905, 121 S.Ct. 1229, 149 L.Ed.2d 138 (2001); *Vt. Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 386 (2d Cir.2000) (provisions of Vermont statute "necessarily unconstitutional unless they apply only to advertising and mass media activities that expressly advocate the election or defeat of a clearly identified candidate" (quotation omitted)).

In the conspicuous absence of contrary precedent, I would be loath to hold that the Congress was free to reject the express advocacy test in enacting Title II, even if I agreed with the defendants—and I do not—that the test "ha[s] become all but meaningless." Intervenors Br. at 100 (citing Thompson Comm. Rep. at 4564 (ability of corporations and unions to influence federal elections with ads that do not use words of express advocacy is "biggest ... loophole[ ]" in federal election law)). The defendants assert that, since *Buckley,* federal elections have seen "a full-fledged effort by outside groups to use 'issue advocacy' as a means of evading both

FECA's limitations on corporate and union campaign spending as well as its disclosure requirements, beginning a trend that continued and accelerated through the 2000 election cycle." Gov't Br. at 37. Even if the defendants' assertion is accurate—and on this record I am not convinced that it is—it is beside the point. The Court in *Buckley* was well aware that the express advocacy test would permit loophole-seekers to influence elections: "It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." *Buckley,* 424 U.S. at 45, 96 S.Ct. 612; *see* McConnell Br. at 48 ("[T]he *Buckley* Court recognized that this construction would not capture all electorally-motivated or related advocacy."). Nonetheless, the Court held that the express advocacy construction of FECA was constitutionally necessary to ensure that protected issue advocacy had the requisite "breathing space." *See* McConnell Br. at 49 ("*Buckley's* message is clear: the government must err on the side—the First Amendment side—of leaving protected political speech unregulated."); *see also Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 1404, 152 L.Ed.2d 403 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse."). I cannot agree with the defendants, *see, e.g.,* Intervenors Br. at 99–109, that the electoral experience since *Buckley* justifies abandoning the express advocacy test, especially when: (1) no court of which I am aware, from the Supreme Court to the state courts, has ever explicitly held that

the test is a statutory one tied only to FECA;[144] (2) several courts of appeals have held to the contrary,[145] *see supra;* and (3) the Court, in adopting the test, foresaw its costs and dismissed them as insufficient to justify overbroad restrictions on issue-driven speech at the core of the First Amendment.

I point out as well that express advocacy is itself entitled to full constitutional protection in the absence of a sufficiently compelling governmental interest in limiting it. *See Buckley,* 424 U.S. at 48, 96 S.Ct. 612 ("Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation."). After narrowing the $1,000 expenditure limit's applicability

to express advocacy only, the Court in *Buckley* nonetheless found that the provision failed the "exacting scrutiny" applicable to expenditure restrictions because

the independent advocacy restricted by the provision does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions.... Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given

**144.** *But cf. Wis. Realtors Ass'n v. Ponto,* 233 F.Supp.2d 1078, 1084–87 (W.D.Wis.2002) (district court was "not convinced that *Buckley* ... establish[ed] an unalterable principle of constitutional law" but observed nonetheless that "[e]ven if *Buckley* did not establish *the* definitive test for determining what types of political communications are subject to regulation, [it] recognized that 'groups engaged purely in issue discussion' were beyond the reach of regulators" (quoting *Buckley,* 424 U.S. at 79, 96 S.Ct. 612) (emphasis in original)); *Nat'l Fed'n of Republican Assemblies v. United States,* 218 F.Supp.2d 1300, 1325 (S.D.Ala.2002) ("*Buckley* articulated an express electoral advocacy benchmark in order to *avoid* deciding the permissible reach of disclosure requirements." (emphasis in original)).

**145.** A number of district courts and state courts have followed the lead of the courts of appeals. *See, e.g., Kansans for Life, Inc. v. Gaede,* 38 F.Supp.2d 928, 936 (D.Kan.1999) (holding Kansas statute unconstitutional because it attached disclosure requirements to ads that "discuss[ ] an issue while disparaging one candidate and commending his opponent ... without expressly advocating the election or defeat of [either] candidate"); *Right to Life, Inc. v. Miller,* 23 F.Supp.2d 766, 769 (W.D.Mich.1998) (holding Michigan statute prohibiting use of candidate's name or like-

ness in corporate communications within 45 days of election facially overbroad because it did "not merely prohibit communications that expressly advocate[d] the election or defeat of a clearly identified candidate" but "prohibit[ed] *any* mention of the name of a candidate ... *regardless* of the context in which that name [was] mentioned" (emphasis in original)); *Planned Parenthood Affiliates, Inc. v. Miller,* 21 F.Supp.2d 740, 746 (E.D.Mich. 1998) (same); *W. Virginians for Life, Inc. v. Smith,* 919 F.Supp. 954, 959 (S.D.W.Va.1996) ("By creating a presumption [of] express advocacy, the West Virginia Legislature attempts to change the definition of express advocacy laid down by the United States Supreme Court.... Obviously, a state legislature cannot alter the Supreme Court's interpretation of the Constitution."); *see also, e.g., Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n,* 141 Wash.2d 245, 4 P.3d 808, 824 (2000) ("[U]nder *Buckley* issue advocacy is not subject to regulation, and our conclusion that the advertisement in question is issue advocacy necessarily means that [the statute in question] is unconstitutional insofar as it restricts [an] expenditure for the ad."); *Osterberg v. Peca,* 12 S.W.3d 31, 50–54 (Tex.), *cert. denied,* 530 U.S. 1244, 120 S.Ct. 2690, 147 L.Ed.2d 962 (2000).

as a *quid pro quo* for improper commitments from the candidate.

*Id.* at 46–47, 96 S.Ct. 612. Not all restrictions on independent expenditures for express advocacy have failed the Court's exacting scrutiny, however; in *Austin* the Court upheld a Michigan statute that prohibited any corporation from spending its treasury funds in support of or in opposition to any state candidate because the State had articulated a compelling interest to support the ban:

> Regardless of whether [the] danger of "financial *quid pro quo* " corruption ... may be sufficient to justify a restriction on independent expenditures, Michigan's regulation aims at a different type of corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.

*Austin,* 494 U.S. at 659–60, 110 S.Ct. 1391. Nonetheless, it bears emphasizing that the Court's holding in *Austin* was limited to corporate expenditures on *express* advocacy.

*Buckley* and its progeny have thus established a rough framework for measuring a campaign finance restriction's constitutionality. If by its vagueness the restriction appears to limit both express advocacy and issue advocacy, the reviewing court must (if possible) construe the provision narrowly to restrict only the former and not the latter. *See Buckley,* 424 U.S. at 40–44, 96 S.Ct. 612; *see also Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (federal court will uphold statute if it is "readily susceptible [of] a narrowing construction that would make it constitutional" (internal quotations omitted)). Of course, not every speech restriction can be refashioned to prevent

its invalidation; as the Court admonished in *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), it must be remembered that

> although [the courts] will often strain to construe legislation so as to save it against constitutional attack, [they] must not and will not carry this to the point of perverting the purpose of a statute ... or judicially rewriting it.... To put the matter another way, [the courts] will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects.

*Id.* at 515, 84 S.Ct. 1659 (quotation omitted); *see Erznoznik,* 422 U.S. at 216, 95 S.Ct. 2268 (statute must be "easily susceptible" of narrowing construction); *see also* Frederick Schauer, Ashwander *Revisited,* 1995 SUP. CT. REV. 71, 74 ("[I]t is by no means clear that a strained interpretation of a federal statute that avoids a constitutional question is any less a judicial intrusion than the judicial invalidation on constitutional grounds of a less strained interpretation of the same statute."). Accordingly, if a restriction plainly limits issue advocacy, the reviewing court will strike down the provision as unconstitutionally overbroad because "the statute's very existence may cause others not before the court to refrain from [that form of] constitutionally protected speech." *Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908 (discussing reach of overbreadth doctrine); *see Perry,* 231 F.3d at 160–62. If the provision—either by its text or by fair construction—relates only to express advocacy, the court must then ask what sort of campaign financing the provision restricts. If the provision restricts independent spending, or if it limits donations to committees engaged in such spending, the court is to apply exact-

ing (i.e., strict) scrutiny, *see supra* Part III.C; if the provision restricts contributions to candidates, the court asks whether the restriction is "closely drawn to match a sufficiently important interest," *Shrink Missouri*, 528 U.S. at 387–88, 120 S.Ct. 897 (quotation omitted). No matter which standard of review is applied, the restriction passes constitutional muster only if it serves the government's interest in preventing the actual or apparent corruption of federal candidates and officeholders. *See NCPAC*, 470 U.S. at 496–97, 105 S.Ct. 1459.

 Returning to the text of BCRA's ban on corporate and labor disbursements for electioneering communications, *see generally supra* Part II.A, I believe that it cannot survive *Buckley*. The constitutionality of the ban turns, of course, upon the definition of "electioneering communication," which BCRA section 201 furnishes:

The term "electioneering communication" means any broadcast, cable, or satellite communication which—

(I) refers to a clearly identified candidate for Federal office;

(II) is made within—

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

BCRA § 201(a); FECA § 304(f)(3)(A)(i); 2 U.S.C. § 434(f)(3)(A)(i). Because a knowing violation of BCRA can result in substantial fines and/or prison time, *see* BCRA § 312(a), FECA § 309(d)(1)(A), 2 U.S.C. § 437g(d)(1)(A), any careful corporation or labor union will want to know what "refers to" means before it expends money to broadcast *any* political communication within two months of an election. But BCRA does not define "refers to" or otherwise describe the communications that are covered.

On its face, then, the term "electioneering communication" can include any near-election communication that merely *mentions* a clearly identified candidate (whether by name or not). Indeed, under one common dictionary definition of "refer," BCRA prohibits near-election disbursements for broadcast communications "relative to" a given candidate. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 1907 (1993) (including "relate" as synonym of "refer"). But "[t]he use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech." *Buckley*, 424 U.S. at 41, 96 S.Ct. 612. The synonym "refers to," then, suffers from the same flaw. And just like the $1,000 expenditure limit at issue in *Buckley*, BCRA section 203 would appear to prohibit (through BCRA section 201) near-election corporate and union broadcasting of both express advocacy *and* issue advocacy, an overbroad regulation that the First Amendment will not tolerate. *See Buckley*, 424 U.S. at 40–44, 80, 96 S.Ct. 612.

It must be determined, therefore, whether BCRA sections 201 and 203 are "readily susceptible [of] a narrowing construction that would make [them] constitutional." *Am. Booksellers*, 484 U.S. at 397, 108 S.Ct. 636 (quotation omitted). One way to get the provisions over the express advocacy hurdle of *Buckley* would be, of course, to limit their application "to communications that include explicit words of advocacy of election or defeat of a candi-

date." *Buckley*, 424 U.S. at 43, 96 S.Ct. 612. When read as a whole,[146] however, the statute will not bear such a construction. The wording—indeed the very inclusion in the statute—of the fall-back definition informs any interpretation of the primary definition:

> If [the primary definition] is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein, then the term "electioneering communication" means any broadcast, cable, or satellite communication which promotes or supports a candidate for [Federal] office, or attacks or opposes a candidate for [Federal] office (*regardless of whether the communication expressly advocates a vote for or against a candidate*) and which also is suggestive of *no plausible meaning other* than an exhortation to vote for or against a specific candidate.

BCRA § 201(a); FECA § 304(f)(3)(A)(ii); 2 U.S.C. § 434(f)(3)(A)(ii) (emphasis added). I presume the Congress would not have inserted the fall-back definition if it did not believe the provision would "support the regulation provided" by section 203 and effectuate the same legislative purpose as the primary definition. *Cf. Pub. Employees Ret. Sys. v. Betts*, 492 U.S. 158, 182, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) (similar provisions should be read *in pari materia*). The text of the alternate definition, as well as the rest of BCRA section 201, reveals that the legislative purpose is to reduce what the Congress believes to be the corrupting influence of issue ads that affect elections but

do *not* expressly advocate a vote for or against a candidate. Notably, section 201 enumerates several exceptions to both definitions but does not exempt issue advocacy,[147] *see* BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B), and it precludes the FEC from exempting from either definition

> [any] public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (*regardless of whether the communication expressly advocates a vote for or against a candidate*)[.]

BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii) (emphasis added); *see* BCRA § 201(a); FECA § 304(f)(3)(B)(iv); 2 U.S.C. § 434(f)(3)(B)(iv). The legislative history—to which the defendants extensively refer—bolsters the conclusion that the Congress sought to regulate issue advocacy, not to have it read ôf the primary definition:

> The Shays–Meehan bill [provides] a reasonable solution to the problem of unlimited and undisclosed advertising that fails to qualify as "express advocacy" under federal election law, even though it clearly is designed to influence the outcome of an election.... Since these ads stop just short of using the magic words [of express advocacy], their sponsors are not subject to full public disclosure, the ads need carry no disclaimer,

---

**146.** The Supreme Court's "whole act rule" reminds reviewing courts that "[s]tatutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *see* William N. Eskridge, Jr. et al.,

Legislation and Statutory Interpretation 263 (2000).

**147.** *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (*"Expressio unius est exclusio alterius."*).

and they may be paid for with unlimited dollars from any source.... [The bill] addresses the problem[.]

H.R.REP.No. 107–131, pt. 1, at 50 (2001) (minority views); *see, e.g.,* 147 CONG. REC. S3118 (daily ed. Mar. 29, 2001) (statement of Sen. Specter) ("If left unchecked, the explosive growth in the number and frequency of advertisements that are clearly intended to influence the outcome of Federal elections yet are masquerading as issue advocacy has the potential to undermine the integrity of the electoral process."); 147 CONG. REC. S2457 (daily ed. Mar. 19, 2001) (statement of Sen. Snowe) (discussing need to regulate electioneering communications because candidates and interest groups "believed the nonmagic words ... were more effective in getting their campaign message across" than was express advocacy); *see generally* Intervenors Br. at 75 et seq. (detailing at length "the legislative history ... regarding sham 'issue' ads run by corporations, unions, and other interest groups" (capitalization altered)). Accordingly, because the primary definition is not "readily susceptible" of a narrowing construction that would limit its applicability to express advocacy only, this panel cannot undertake to interpret it in a way that will save it from invalidation. *Am. Booksellers,* 484 U.S. at 397, 108 S.Ct. 636 (quotation omitted); *see Fawn Mining Corp. v. Hudson,* 80 F.3d 519, 523 (D.C.Cir.1996) ("Neither lawyers nor judges serve as back-seat lawmakers who may extend statutes beyond their bounds or change the rules that Congress has set."). When read together with the rest of the statute, the primary definition is impermissibly overbroad; while we do not know with precision what its boundaries are, we do know that it prohibits near-election issue advocacy and that, therefore, its "very existence may cause

[persons] not before the court to refrain from [that form of] constitutionally protected speech." *Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908; *see Perry,* 231 F.3d at 160–62; *Vt. Right to Life Comm.,* 221 F.3d at 386.

BCRA's alternate definition of "electioneering communication" is constitutionally flawed as well; it states explicitly that it includes any broadcast communication (not merely one broadcast near election time) that "supports" or "opposes" a candidate but does not expressly advocate "a vote for or against [the] candidate." BCRA § 201(a); FECA § 304(f)(3)(A)(ii); 2 U.S.C. § 434(f)(3)(A)(ii). For reasons I have already stated, the First Amendment will not tolerate regulation of independent issue advocacy, even if (or, perhaps, especially if) intended to influence a federal election. *See Renne,* 501 U.S. at 349, 111 S.Ct. 2331 (Marshall, J., dissenting).

But suppose I am wrong about *Buckley.* Even if the express advocacy test is not constitutionally required, BCRA's ban on corporate and labor disbursements for electioneering communications nonetheless fails First Amendment review because it prohibits too much political speech and not enough corruption. Section 203 forbids any corporation or labor organization to *spend* any funds on any electioneering communication. *See* BCRA § 203; FECA § 316(a), (b)(2); 2 U.S.C. § 441b(a), (b)(2). Because the provision restricts spending, it must satisfy strict scrutiny—that is, it must serve a compelling governmental interest and do so in a narrowly tailored way. It does neither.

First, section 203 fails to serve a compelling governmental interest. To be clear, I do not deny that preventing the mere *appearance* of corruption is a compelling interest under the Supreme Court's case law.[148] *See, e.g., Shrink Missouri,* 528

---

**148.** The Court has not settled on a precise definition of "corruption." Some of its cases

suggest that the government's interest in pre-

U.S. at 390, 120 S.Ct. 897 ("Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance."). Yet even if I were to accept as a fact that corporate and labor disbursements for electioneering communications corrupt or appear to corrupt federal candidates—and I do not, *see supra* Finding 54b at page 325—it would not necessarily follow that BCRA provides the solution. *See Turner*, 512 U.S. at 664, 114 S.Ct. 2445 ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' ... It must demonstrate that ... the regulation will in fact alleviate these harms *in a direct and material way.*" (citations omitted) (emphasis added)).

Under either of the definitions contained in section 201, "electioneering communication[s]" include only "broadcast, cable, or satellite communication[s]." BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A). Thus, any print, direct mail or internet advertisement—even a "targeted" one that refers to a clearly identified candidate, is made within 60 days before a general election and is *intended to influence* the election—gets "a free pass." NRA Br. at 34; *see* 67 Fed.Reg. at 65,196 ("[E]xemption[s] include[ ] communications appearing in print media, including a newspaper or magazine, handbills, brochures, bumper stickers, yard signs, posters, billboards, and other written materials, including mailings; communications over the Internet, including electronic mail; and telephone communications."). With television and radio "electioneering" foreclosed, corporations and unions wishing to "exploit" BCRA's "loopholes" for "sham" issue advertising to "distort" federal elections will have every incentive, and the means, to do so through print and electronic media. *See* Samuel Issacharoff & Pamela S. Karlan, *The Hydraulics of Campaign Finance Reform*, 77 Tex. L. Rev. 1705, 1705 (1999) ("[E]very reform effort to constrain political actors produces a corresponding series of reactions by those with power to hold onto it."). Moreover, to the extent issue advertising may corrupt federal candidates, it is no less corrupting when disseminated through exempted print and electronic channels. As the NRA points out,

> [n]ewspaper advertisements often dwarf radio advertisements in terms of their expense, potency, and overall impact

---

venting corruption is limited to *quid pro quo* arrangements, while others speak more broadly in terms of "improper influence." *Compare Shrink Missouri*, 528 U.S. at 389, 120 S.Ct. 897 ("In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo* arrangements,' we recognized [in *Buckley*] a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors."), *with id.* at 422, 120 S.Ct. 897 (Thomas, J., dissenting) (Court in *Buckley* "repeatedly used the word 'corruption' in the narrow *quid pro quo* sense, meaning '[p]erversion or destruction of integrity in the discharge of public duties by bribery or favour' " (quoting 3 Oxford English Dictionary 974 (2d ed.1989))), *and NCPAC*, 470 U.S. at 497, 105 S.Ct. 1459 ("The hallmark of corruption is the financial *quid pro quo*: dollars for political favors."). *Amici* Cato Institute and the Institute for Justice argue cogently that, given the First Amendment interests at stake, the panel should be careful to define precisely and narrowly the government's interest in preventing "corruption." *See* Br. of *Amici Curiae* Cato Institute et al. at 2, 16–21. Because I believe BCRA does not serve to prevent actual or apparent "corruption" even in the broadest sense of the word, however, I also believe the panel need not decide today on a precise definition.

upon the public, particularly the *voting* public; they therefore promise to "spread by other means" the same electioneering speech, to the same mass audience, that was supposedly of utmost concern to Congress.... Thus, a corporation such as the Campaign for America may run a full-page political ad in the *New York Times* at a cost of $65,000, whereas a radio broadcast reciting the same text in a small market such as Peoria would cost a grand total of $75. The notion that only the latter expenditure implicates a concern about political corruption is preposterous.

NRA Br. at 35 (citation and footnotes omitted) (emphasis in original); *see also Reno v. ACLU*, 521 U.S. 844, 853, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (internet "constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers [and] viewers"). It does not "require a wild flight of imagination," *McCain v. Lybrand*, 465 U.S. 236, 254, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984), to envision that the very same "sham" ads that aired on television in the past election will be webcast, telemarketed, postmarked, e-mailed or prominently displayed in the Sunday newspaper in the next. *See supra* Findings 54a.1–54a.3 at page 324.

And not only will the same ads be seen and heard everywhere else, they will *still* be aired on the television and the radio; the only difference is that they will be sponsored by a smaller (and less diverse) class of privileged speakers. *See supra* Finding 54a at pages 324–25. BCRA does not prohibit wealthy individuals, PACs or unincorporated associations from making disbursements for electioneering communications. *See* BCRA § 203(a); FECA § 316(a), (b)(2); 2 U.S.C. § 441b(a), (b)(2). Nor does it prohibit media corporations from endorsing specific candidates by name, at any time, expressly or through "sham" editorializing. *See* BCRA

§ 201(a); FECA § 304(f)(3)(B)(i); 2 U.S.C. § 434(f)(3)(B)(i) (exempting from coverage "a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station"). "This means that the Disney Corporation may through its subsidiary ABC (or General Electric through NBC) broadcast the very same 'electioneering communications' that Congress has forbidden the NRA from funding." NRA Br. at 39.

The statute's underinclusion, in my view, is fatal to BCRA's ban on corporate and labor disbursements for electioneering communications. Although campaign finance legislation "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," *Buckley*, 424 U.S. at 105, 96 S.Ct. 612 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)), even an incremental restriction on campaign expenditures must serve a compelling governmental interest. BCRA's ban on corporate and labor electioneering falls short of the mark; its underbreadth "diminsh[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); *see also White*, 122 S.Ct. at 2537, 2539 (restriction prohibiting candidate for judicial office from announcing his political views—but "only at certain times and in certain forms"—failed strict scrutiny because it was "so woefully underinclusive as to render belief in [its stated] purpose a challenge to the credulous"). While BCRA's sponsors may have intended the ban to be a first step only, *see, e.g.,* Press Release, Senator John McCain, McCain Declares Reform Crusade Continues (November 14, 2002) ("Reform is a process. It is not a one-time fight."), *available at* http://mccain.senate.gov/, its negligible utility in battling corruption or

its appearance cannot justify the statute's ham-handed regulation of core First Amendment activity.

Even were I convinced that the ban served the government's interest in preventing the actual or apparent corruption of federal candidates and officeholders, it would not do so narrowly enough. The fact that an ad is aired within 60 days of a general election and mentions a federal candidate may in many instances suggest that the ad is designed to affect the electorate's view of that particular candidate.[149] Yet that fact alone does not justify prohibiting disbursements for the ad. *See Bellotti,* 435 at 790, 98 S.Ct. 1407 ("[T]he fact that advocacy may persuade the electorate is hardly a reason to suppress it[.]"). Nor does that fact alone establish that the ad raises a danger of corrupting, or of appearing to corrupt, the target candidate. Money and ads *themselves* are not a corruption of the system; instead, "a subversion of the political process" occurs when "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459. That a particular ad may influence the outcome of an election does not mean it will influence the legislative actions or positions of the candidate it supports or opposes. In many instances, a victorious candidate may not

know which groups funded ads that sunk his opponent; plainly, then, he could hardly feel obligated to those groups. More importantly, many organizations support candidates with electioneering ads because they believe, often correctly, that the candidate will share their legislative agenda once he is elected or reelected *whether or not* they have "infus[ed]" his campaign with money. In short, they want him to win simply because, in their view, he best represents them. *See Colorado Republican I,* 518 U.S. at 640 (Thomas, J., concurring in judgment and dissenting in part) (groups "spend money in support of ... candidates ... because they share social, economic, and political beliefs and seek to have those beliefs affect governmental policy"). BCRA's electioneering provisions ignore the simple fact—acknowledged by the defense—that advertising disbursements often follow a candidate's legislative preferences, not the other way around. *See* Cross Exam. of Def. Witness Bok at 19 (testifying that in contribution context, legislators' roll call "votes influence the gifts rather than the gifts influencing the votes").

Additionally, BCRA's ban on corporate and labor disbursements for electioneering communications is not narrowly tailored because it extends to non-profit and political advocacy corporations. In *MCFL,* the Court held that a non-profit advocacy cor-

---

**149.** The parties quarrel at length over what percentage of "genuine" issue ads—ads not intended to influence the outcome of a federal election—BCRA's electioneering provisions would prohibit. Two studies upon which the defendants and the statute's sponsors place considerable weight suggest that BCRA would have prohibited between one per cent and seven per cent of any "genuine" issue ads aired during the 1998 and 2000 elections. *See generally Buying Time 2000; Buying Time 1998.* Yet neither study has any significant evidentiary weight. *See supra* Findings 43e–43h at pages 308–12. Moreover, like the *McConnell* plaintiffs, I reject the studies' distinction between "genuine" issue advocacy and "sham" issue advocacy because it is "subjective, immune to empirical proof, and totally antithetical to *Buckley.*" McConnell Br. at 66 n. 29. Finally, even if I accepted the distinction, the record as a whole suggests that BCRA would prohibit too much protected expression—anywhere from 11.38 per cent to 50.5 per cent of (what even the defendants characterize as) "genuine" issue ads broadcast during the 60 days before an election in a typical election year. *See supra* Findings 43f–43h, 51d at pages 308–12, 317.

poration which poses no danger of "unfair deployment of wealth for political purposes" cannot constitutionally be prohibited from making expenditures even for *express* advocacy.[150] *MCFL,* 479 U.S. at 259, 107 S.Ct. 616. The Wellstone Amendment (BCRA section 204) prevents any such corporation, from the ACLU to the NRA to MCFL itself, from making a disbursement for any electioneering communication. *See* BCRA § 204; FECA § 316(c)(6)(A), (B); 2 U.S.C. § 441b(c)(6)(A), (B); *see also supra* Part II.A (explaining operation of Wellstone Amendment). The government contends that the prohibition's extension to non-profits "does not impair its constitutionality," citing the Court's decision in *Austin:*

> The Supreme Court's decision in *Austin* is dispositive. In that case, the Michigan Chamber of Commerce, a nonprofit corporation, challenged a statute which, like FECA § 441b, required for-profit and nonprofit corporations alike to make independent expenditures through a separate segregated fund. In upholding the statute, the Court rejected the argument that the statute was "overinclusive, because it includes within its scope closely held corporations that do not possess vast reservoirs of capital." ...
> The Court found that, due to the "special benefits conferred by the corporate structure," all corporations present the potential to distort the electoral process ....

Gov't Br. at 165 (citations omitted). Before the Court in *Austin,* as in *MCFL,* was a limit on expenditures disbursed for *express* advocacy and, were a similar limit before us here, the government's argument would be more persuasive. But BCRA restricts near-election *issue* advocacy. The claim that organizations like the ACLU—which "has never taken a position in a partisan political election" and relies almost exclusively on individual membership dues, ACLU Br. at 2–3 & n. 2; *see supra* Finding 44e at page 313—corrupt or appear to corrupt particular federal candidates with non-partisan, issue-based ads is an "undifferentiated fear" insufficient to justify BCRA's overreach in curtailing protected speech. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("[I]n our system, undifferentiated fear or apprehension ... is not enough to overcome the right to freedom of expression."); *see FEC v. NRA,* 254 F.3d 173, 191 (D.C.Cir.2001) (under First Amendment as interpreted in *MCFL* and *Austin,* government "must demonstrate that the recited harms are real, not merely conjectural" (quoting *Turner,* 512 U.S. at 664, 114 S.Ct. 2445)).

\* \* \*

I would hold, therefore, that BCRA sections 201, 203 and 204 are facially invalid because they are overbroad under *Buckley* and cannot pass strict scrutiny in any event.[151] Corporations and unions no less

---

**150.** The Court considered three factors in deciding that MCFL could "not constitutionally be bound by [2 U.S.C.] § 441b's restriction on independent spending," *MCFL,* 479 U.S. at 263–64, 107 S.Ct. 616: (1) the corporation "was formed for the express purpose of promoting political ideas, and [could] not engage in business activities," *id.* at 264, 107 S.Ct. 616; (2) no "persons connected with the organization [would] have [an] economic disincentive for disassociating with it if they disagree with its political activity," *id.;* and (3) it

"was not established by a business corporation or a labor union, and it [was] its policy not to accept contributions from such entities," *id.*

**151.** In light of this disposition, I would not reach the *McConnell, NRA, Chamber of Commerce, NAB* and *AFL–CIO* plaintiffs' equal protection claims or the *Paul* plaintiffs' claim that the provisions "abridge[ ] the freedom of the press by imposing discriminatory editorial control upon [their] press activities." Paul Br. at 21 (capitalization altered).

than individuals are entitled to spend money for the sake of engaging by broadcast in "uninhibited, robust, and wide-open . . . [d]iscussion of public issues and debate on the qualifications of candidates," *Buckley*, 424 U.S. at 14, 96 S.Ct. 612; *see Bellotti*, 435 U.S. at 776–77, 98 S.Ct. 1407, *especially* during the weeks immediately preceding an election, *see Mills*, 384 U.S. at 219, 86 S.Ct. 1434 (Alabama statute prohibiting newspaper editor from publishing election day editorial urging particular outcome on ballot measure unconstitutional because it "silence[d] the press at a time when it [would] be most effective"); *see also* Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 IND. L.J. 1, 27–28 (1972) (emphasizing need to protect "speech about how we are governed," including "a wide range of evaluation, criticism, *electioneering* and propaganda" (emphasis added)); *see generally* Kirk L. Jowers, *Issue Advocacy: If It Cannot Be Regulated When It is Least Valuable, It Cannot Be Regulated When It is Most Valuable*, 50 CATH. U.L. REV. 65 (2000).

## B. Disclosure and Reporting Requirements

The Supreme Court in *Buckley* took pains to emphasize that provisions requiring disclosure and reporting of election-related disbursements are no less the subject of First Amendment concern than are restrictions on the disbursements themselves. *See Buckley*, 424 U.S. at 64, 96 S.Ct. 612. Indeed, the Court recognized that in some circumstances

> compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment. . . . It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who might otherwise contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not

insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by [its] legislation.

*Id.* at 64, 68, 96 S.Ct. 612 (citations omitted). It is well-established, therefore, that the government's interests in mandating disclosure "must survive exacting scrutiny." *Id.* at 64 n. 73, 96 S.Ct. 612 (citing *NAACP v. Alabama*, 357 U.S. at 463, 78 S.Ct. 1163; *Gibson v. Fla. Legislative Comm.*, 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Button*, 371 U.S. at 438, 83 S.Ct. 328; *Bates v. Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960)). The Court in *Buckley* found three governmental interests sufficiently compelling to support FECA's disclosure and reporting provisions:

> First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office. Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. . . . Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect

violations of the [Act's] contribution limitations.

. . . . .

*Buckley,* 424 U.S. at 66–68, 96 S.Ct. 612 (footnotes and citations omitted).[152] BCRA's disclosure and reporting provisions, however, are far more intrusive than the requirements upheld in *Buckley.* Sections 201, 311 and 504 require disclosure and reporting not of expenditures and contributions "made for the purpose of influencing" a federal election but of disbursements for "electioneering communications" and of requests to broadcast communications "relating to any political matter of national importance." My belief that *Buckley*'s express advocacy test is constitutionally required, *see supra* Part IV.A, leads me to conclude that these provisions impermissibly abridge protected speech by inhibiting in an overbroad fashion the airing of near-election broadcasts containing only issue advocacy. Furthermore, I do not believe that the provisions serve any of the three interests discussed in *Buckley;* I would hold, therefore, that they cannot survive "exacting scrutiny" in any event. Finally, I would likewise invalidate BCRA section 212, which places advance reporting requirements on independent expenditures; although the provision limits only

express advocacy, it imposes an unconstitutional prior restraint.

\* \* \*

A complete examination of BCRA's disclosure and reporting requirements must first consider the D.C. Circuit's unanimous holding in *Buckley* invalidating one of FECA's reporting requirements, then codified at 2 U.S.C. § 437a,[153] as unconstitutionally vague and overbroad. *See Buckley,* 519 F.2d at 869–78. Because the government did not appeal the holding, *see Buckley,* 424 U.S. at 10 n. 7, 96 S.Ct. 612, it remains controlling authority for this court to this day:

> Section 437a, with a "purpose of influencing" and a "design[ ] to influence" [federal elections] as criteria undertaking to partially shape its operation, does not meet the governing [vagueness and overbreadth] standards. These criteria do not mark boundaries between affected and unaffected conduct with narrow specificity; they do not clearly inform . . . [of] what is being proscribed. Rather, they leave the disclosure requirement open to application for protected exercises of speech, and to deterrence of expression deemed close to the line. Public discussion of public issues which

**152.** Acknowledging these benefits, even critics of recent campaign finance proposals have suggested that *carefully constructed* reporting provisions would be the least problematic method of regulating campaign spending and giving. *See, e.g., Gora, supra,* at 892 & n. 103 (explaining ACLU's support for "disclosure of large contributions to mainstream party candidates"); Issacharoff & Karlan, *supra,* at 1736–37.

**153.** Section 437a, which was strikingly similar to BCRA's electioneering disclosure requirements, provided in part that

[a]ny person (other than an individual) who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any

material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office), or otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate shall file reports . . . set[ting] forth the source of the funds used in carrying out any activity described in [this] sentence in the same detail as if the funds were contributions within the meaning of [the Act], and payments of such funds in the same detail as if they were expenditures within the meaning of [the Act].

*Buckley,* 519 F.2d at 869–70.

also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, as well as more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections. In this milieu, where do "purpose" and "design[ ]" "to influence" draw the line? ... [W]hile we have continued our struggle for an interpretation of section 437a which might bypass its vagueness and overbreadth difficulties, we have been unable to [find one].

*Buckley*, 519 F.2d at 875 (quotations omitted). The appeals court's recognition that the imprecise disclosure requirement intolerably chilled protected issue advocacy is notable given that the court upheld every other provision of FECA (including its expenditure limitations). Its observations about section 437a foreshadowed the Supreme Court's subsequent holding that the FECA provision requiring disclosure by individuals making contributions or expenditures over $100 annually "other than by contribution to a political committee or candidate" could be salvaged only by construing it, like the Act's $1,000 spending limit, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80 n. 108, 96 S.Ct. 612

As I have discussed, the federal courts of appeals have reached a consensus that *Buckley's* express advocacy test is constitutionally required, whether in the context of disbursement ceilings or disclosure. *See supra* Part IV.A. They have held, and I agree, that any statute permitting issue advocacy only on the condition that the speaker submit to cumbersome disclosure and reporting requirements must be invalidated on the ground of overbreadth. *See Moore*, 288 F.3d at 190 (state disclosure provision could constitutionally extend only

to political advertisements "advocat[ing] *in express terms* the election or defeat of a candidate" (emphasis in original)); *Davidson*, 236 F.3d at 1187, 1193–94 (same); *Perry v. Bartlett*, 231 F.3d at 162 (same); *Vt. Right to Life Comm.*, 221 F.3d at 386 (same); *cf. Talley v. California*, 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (finding "void on its face" ordinance barring distribution of any handbill that did not contain name and address of writer and distributor); *Thomas*, 323 U.S. at 539, 65 S.Ct. 315 ("As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly."). As a noted law professor has put it, "the *Buckley* bottom line" is that

[w]hile independent expenditures for speech that expressly advocates the election or defeat of a clearly identified candidate—i.e., expenditures for "express advocacy"—may not be limited in amount, such spending may be subjected to disclosure requirements. [But][e]xpenditures for speech that does *not* expressly advocate the election or defeat of a candidate—i.e., expenditures for issue advocacy—may neither be limited in amount *nor* subjected to disclosure requirements.

BeVier, *Issue Advocacy, supra*, at 1769 (emphases added). Thus, BCRA's disclosure requirements are subject to a doctrinal framework similar to the one I applied to the statute's ban on corporate and labor disbursements for electioneering communications. *See supra* Part IV.A. That is, if by its vagueness a disclosure requirement appears to stifle both express advocacy and issue advocacy, the reviewing court must (if possible) construe the provision narrowly to apply only to the former and not the latter. *See Buckley*, 424 U.S. at 80, 96 S.Ct. 612. If the requirement is not readily susceptible of such a construc-

tion—and thereby causes individuals and entities to refrain from engaging in constitutionally protected issue advocacy, *see Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908— the reviewing court will strike down the provision as overbroad. *See, e.g., Perry,* 231 F.3d at 161–62. Even if a provision can be construed to require disclosure of express advocacy only, it is subject nonetheless to "exacting scrutiny." *Buckley,* 424 U.S. at 64, 96 S.Ct. 612; *see also Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 202, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) ("[E]xacting scrutiny is necessary when compelled disclosure of campaign-related payments is at issue." (quotations omitted)). Under that standard of review, a court must determine whether a given requirement is narrowly tailored— i.e., whether there exists a "substantial relation" between, on the one hand, the government's "subordinating interests" in informing the electorate and preventing corruption, and, on the other, "the information required to be disclosed." *Buckley,* 424 U.S. at 64, 96 S.Ct. 612 (quoting *Gibson,* 372 U.S. at 546, 83 S.Ct. 889). I note, as the Supreme Court has noted, that such scrutiny is warranted "even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." *Id.* at 65, 96 S.Ct. 612.

Sections 201, 311 and 504 fail the express advocacy test. Section 201 requires any person who makes, or contracts to make, "a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year" to file within 24 hours after making each disbursement (or entering a contract to make a disbursement) a statement containing: the person's name and, in some instances, the person's address; the person's place of business, if the person is not an individual; the amount disbursed; the names of recipients; and the election to which the communication pertains. BCRA § 201(a); FECA § 304(f)(1), (2); 2 U.S.C. § 434(f)(1), (2). All of these details are then made public on the internet, at the FCC's website. *See* BCRA § 201(b); FECA § 304 note; 2 U.S.C. § 434 note. Section 311 amends the Act to mandate that "whenever any person ... makes a disbursement for an electioneering communication," the communication *itself* must state whether it was authorized by a candidate and, if it was not, it must "clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication." BCRA § 311; FECA § 318(a); 2 U.S.C. § 441d(a); *see supra* note 39 (discussing section 311). Along the same lines, section 504 requires broadcast licensees to "maintain, and make available for public inspection, a complete record" of any "request" of any person "to purchase broadcast time" for communications "relating to any political matter of national importance." BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1). Many, if not most, communications "relating to any political matter of national importance" do not contain words expressly advocating the election or defeat of a candidate. And both of BCRA's definitions of "electioneering communication" sweep within their purview ads that do not expressly advocate the election or defeat of a candidate. *See supra* Part IV.A. Thus does section 201 require individuals spending funds on issue ads independent of a candidate's campaign to jump through a set of hoops that *Buckley* held could be required only of express advocates. Thus does section 311 require that disclosures be included in protected issue ads themselves. And thus does section 504 attach disclosure requirements to issue advocacy sent over the airwaves. Under *Buckley,*

these provisions are unconstitutionally overbroad unless they can reasonably be construed to apply only to express advocacy.

Limiting the application of sections 201, 311 and 504 (if possible) to express advocacy is mandated not only by *Buckley* but by the Framers' intention—confirmed by longstanding tradition—to protect the right to express one's views on political issues and candidates anonymously and without fear of retaliation. *See McIntyre*, 514 U.S. at 343 n. 6, 115 S.Ct. 1511 (First Amendment "embrace[s] a respected tradition of anonymity in the advocacy of political causes" (citing, *inter alia*, ENCYCLOPEDIA OF COLONIAL AND REVOLUTIONARY AMERICA 220 (J. Faragher ed.1990); 2 THE COMPLETE ANTI-FEDERALIST (H. Storing ed.1981))); *see also id.* at 369, 115 S.Ct. 1511 (Thomas, J., concurring in judgment) ("Records from the first federal elections indicate ... that anonymous political pamphlets and newspaper articles remained the favorite media for expressing views on candidates." (citing, *inter alia*, 15 PAPERS OF JAMES MADISON 66–73 (T. Mason, et al. eds.1985); 1 DOCUMENTARY HISTORY OF THE FIRST FEDERAL ELECTIONS 246–362 (M. Jensen & R. Becker eds.1976); 15 PAPERS OF ALEXANDER HAMILTON 33–43 (H. Syrett ed.1969)))); *Talley*, 362 U.S. at 65, 80 S.Ct. 536 (because "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance," the state in certain circumstances "may not compel members of groups engaged in the dissemination of ideas to be publicly identified"). In striking down an Ohio statute that required the writer of any campaign literature tending to influence the outcome of an election to include his name on the material itself, the Court in *McIntyre* reaffirmed that *Buckley*'s approval of disclosure requirements has no application to issue advocacy independent of a candidate's campaign, especially if such advocacy is anonymous. *See McIntyre*, 514 U.S. at 354, 115 S.Ct. 1511;

*Buckley*, 424 U.S. at 80, 96 S.Ct. 612. But, plainly, neither of BCRA's definitions of "electioneering communication" can be interpreted reasonably to exclude protected issue advocacy. *See supra* Part IV.A. Nor can "any political matter of national importance" be construed fairly to exclude issue advocacy. Accordingly, sections 201, 311 and 504 run afoul of the First Amendment.

Even if *Buckley*'s express advocacy test were not constitutionally required, sections 201, 311 and 504 would not survive "exacting scrutiny" because they do not serve any of the three "subordinating interests" mentioned in *Buckley*. The provisions make no distinction between independent issue advocacy and advocacy coordinated with a candidate. To the extent that a corporation, union or individual *independently* disburses funds for an electioneering communication, the government's interest in preventing corruption is lacking because the requisite arrangement of, or even opportunity for, a *quid pro quo* is lacking. *See Buckley*, 424 U.S. at 47, 96 S.Ct. 612 (independent disbursements and ads "may well provide little assistance to the candidate's campaign and indeed may prove counterproductive"); *see also Colorado Republican I*, 518 U.S. at 615, 116 S.Ct. 2309 (plurality opinion) ("[T]he absence of prearrangement and coordination of an expenditure with the candidate ... not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." (quoting *Buckley*, 424 U.S. at 47, 96 S.Ct. 612)); *Buckley*, 519 F.2d at 873 ("[I]ssue discussions unwedded to the cause of a particular candidate hardly threaten the purity of elections. Moreover, and very importantly, such discussions are vital and indispensable to a free society and an informed electorate. Thus the interest of a group engaging in nonpartisan discussion ascends to a high plane, while the govern-

mental interest in disclosure correspondingly diminishes."). Similarly absent in the independent electioneering context is the government's interest in informing the electorate about how political funds are spent by the candidate, *see Buckley*, 424 U.S. at 66, 96 S.Ct. 612, because the funds disbursed are not given to, coordinated with or spent by the candidate himself. Also attenuated is the government's interest in informing the electorate by "alert[ing] the voter to the interests to which a candidate is most likely to be responsive." *Id.* at 67, 96 S.Ct. 612. The bare fact that an individual or organization disburses funds to broadcast an advertisement "referring to" a particular candidate does not, without more, lead a voter to a confident conclusion that the candidate (or his opponent) will be "responsive" to the interests of that individual or organization. Therefore, to put the matter as the Court did in *McIntyre*,

> [i]nsofar as the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a [communication], we think the identity of the speaker is no different from other components of the [communication's] content that the [speaker] is free to include or exclude.... The simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit.

*McIntyre*, 514 U.S. at 348, 115 S.Ct. 1511.

The reporting requirements contained in BCRA section 212, relating to independent expenditures, are infirm for a different reason. Section 212 requires any person (including any individual) who disburses more than $1,000 in "independent expenditures" within 20 days of an election, or more than $10,000 in "independent expenditures" at any time up to and including the twentieth day before an election, to file

with the FEC a "report" specifying: the name and address of any recipient of any expenditure; the date, amount and purpose of any expenditure; and the name of, and office sought by, the candidate supported or opposed by the expenditure. *See* BCRA § 212(a); FECA § 304(g), (b)(6)(B)(iii); 2 U.S.C. § 434(g), (b)(6)(B)(iii). As amended by BCRA section 211, the Act defines "independent expenditure" to include

> an expenditure by a person—
>
> > (A) expressly advocating the election or defeat of a clearly identified candidate; and
> >
> > (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

BCRA § 211; FECA § 301(17); 2 U.S.C. § 431(17). Because section 212 requires reporting of express advocacy only—reporting that sufficiently serves anti-corruption and informational interests—it is fully consistent with *Buckley*. Because it is not consistent with the First Amendment's prohibition on prior restraint, however, it cannot be sustained.

Under section 212, reports regarding independent expenditures made within 20 days of an election must be filed with the FEC within 24 hours "after each time [a] person makes or *contracts to make* [such] expenditures." BCRA § 212(a); FECA § 304(g)(1); 2 U.S.C. § 434(g)(1) (emphasis added). Reports on independent expenditures made at any time up to and including the twentieth day before the election must be filed with the FEC within 48 hours "after each time [a] person makes or *contracts to make* [such] expenditures." BCRA § 212(a); FECA § 304(g)(2); 2 U.S.C. § 434(g)(2) (emphasis added). These deadlines—which in many instances will require reporting of expenditures not

yet made—are constitutionally problematic. Consider two recent cases from other circuits. In *Davidson*, the Tenth Circuit struck down a Colorado statute that required "[a]ny person making an independent expenditure in excess of [$1,000]" to notify the secretary of state and each candidate in the race—and to forward thereto a detailed description of the expenditure—"within twenty-four hours after obligating [the] funds." *Davidson*, 236 F.3d at 1196 n. 9. Although the court acknowledged that "[a] state may constitutionally require that independent expenditures be reported to some governmental entity and made available to the public," *id.* at 1197 (citing *Buckley*, 424 U.S. at 80–81, 96 S.Ct. 612), it nonetheless invalidated the statute because of the "patently unreasonable" 24–hour notice requirement:

> To require such immediate notice severely burdens First Amendment rights, and the provision is a far cry from being narrowly tailored. None of the State's compelling interests in informing the electorate, preventing corruption and the appearance of corruption, or gathering data would be at all compromised by a more workable deadline.

*Id.* Likewise, in *Florida Right to Life, Inc. v. Mortham*, 1998 WL 1735137 (M.D.Fla.), a Florida district court struck down a state statute requiring any individual or organization "making an independent expenditure in excess of $1,000 on behalf of or in opposition to a candidate" to provide notice and a general description of the expenditure to every candidate in the race. *Id.* at *8 (quotation omitted). Under the law, "[a]n expenditure [was] obligated upon the purchase of any political advertising or the *entering into any agreement* ... to purchase any political advertising." *Id.* (quotation omitted) (emphasis added). While the district court recognized that *Buckley* "upheld an after-the-fact reporting requirement for independent expenditures," *id.*, it nonetheless found the law unconstitutional because "[t]he requirement of giving advance notice to the government of one's intent to speak inherently inhibits free speech," *id.* (quotation omitted), and because "a prior disclosure requirement is not necessary to satisfy the state's interests, as articulated by the *Buckley* Court," *id.*

These cases are consistent with the Supreme Court's longstanding declaration that advance reporting and registration requirements are "quite incompatible with the requirements of the First Amendment." *Thomas*, 323 U.S. at 540, 65 S.Ct. 315; *see generally Watchtower Bible & Tract Soc'y, Inc. v. Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (striking down ordinance requiring individuals to obtain permit prior to engaging in door-to-door advocacy). BCRA section 212 is similarly "incompatible with the requirements of the First Amendment"; while this panel "cannot substitute [its] own judgment for that of the legislature as to a more appropriate and reasonable time frame," *Davidson*, 236 F.3d at 1197, it should be able to say with confidence that the provision's advance disclosure requirements are not necessary to serve the government's subordinating anti-corruption, informational and enforcement interests.[154] *See Wis. Realtors*, 233 F.Supp.2d at 1090–

---

154. *Davidson* makes clear that even if the phrase "or contracts to make" is read out of section 212 in an effort to save the provision—which would itself be a dubious proposition, *see, e.g., Erznoznik*, 422 U.S. at 216, 95 S.Ct. 2268 (statute must be "easily susceptible" of narrowing construction)—the provision would nonetheless fail exacting scrutiny because of its "patently unreasonable" 24– and 48–hour notice requirements. *Davidson*, 236 F.3d at 1197. The defendants do not explain how such a short time frame is even related—much less narrowly tailored—to serving the governmental interests that *Buckley* recognized. Instead, they argue that the FEC has rendered the prior restraint problem

91 (Wisconsin statute prohibiting group from sponsoring communication featuring candidate within 30 days of election "unless it has filed a report detailing the name of each candidate who *will be* supported or whose opponent *will be* opposed and the total disbursements *to be* made" violated First Amendment (quotation omitted) (emphasis in original)). As the AFL–CIO points out, the provision's advance deadlines will serve only to "chill the exercise of free speech by forcing groups ... to disclose ongoing and confidential political strategies" and to "giv[e] adversaries the opportunity to ... thwart broadcasts." AFL–CIO Br. at 16; *see supra* Findings 48, 52d, 53g–53i at pages 105, 114–15, 123–24. Accordingly, I believe that section 212 cannot stand.

\* \* \*

I would hold that the disclosure and reporting requirements included in sections 201, 311 and 504 are facially invalid because they are overbroad under *Buckley* and cannot withstand "exacting scrutiny" in any case. I would find as well that section 212 is facially invalid because it imposes an impermissible prior restraint and is not narrowly tailored to serve the government's interests in preventing corruption and informing the electorate.[155]

### C. Limits on "Coordinated Expenditures"

I have thus far concluded that the Congress may not regulate issue advocacy by

banning, or attaching disclosure and reporting requirements to, independent disbursements on "electioneering communications." *See supra* Parts IV.A and IV.B. In the following paragraphs, I conclude that BCRA sections 202, 213 and 214 are facially invalid because, by defining "coordinat[ion]" in an overbroad way, they tote the same impermissible restrictions through the back door.

\* \* \*

BCRA section 202 treats as a "contribution"—and therefore subjects to the Act's source-and-amount limits and disclosure requirements—any disbursement made by any person for any electioneering communication where "such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal [sic], State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee." BCRA § 202(2); FECA § 315(a)(7)(C); 2 U.S.C. § 441a(a)(7)(C); *see supra* text accompanying notes 25–29 (detailing several of FECA's source-and-amount limits). Section 202 therefore prohibits, *inter alia:* (1) any corporation or labor organization from disbursing any amount for a "coordinated" electioneering communication, *see supra* note 29 and accompanying text; and (2) any individual from disbursing more than $2,000 per election for "coordinated"

moot by issuing "regulations [that] interpret [BCRA's disclosure] provisions not to require disclosure until after 'the date on which a communication is publicly distributed.' " Gov't Opp. Br. at 111 (quoting BCRA Reporting, 67 FED. REG. 64,555, 64,565–66 (Oct. 21, 2002)). Even assuming the regulations can be sustained as a reasonable interpretation of section 212 with respect to prior disclosure, neither the FEC nor this court is free to disregard the plainly mandated and plainly unconstitutional 24– and 48–hour notice requirements. *See Davidson,* 236 F.3d at 1197; *see also Locke,* 471 U.S. at 96, 105 S.Ct. 1785

("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." (quoting *Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933) (Cardozo, J.))).

**155.** In light of this disposition, I would not reach the *Paul* plaintiffs' claim that BCRA's disclosure provisions "abridge[ ] the freedom of the press by imposing discriminatory editorial control upon [their] press activities." Paul Br. at 21 (capitalization altered).

electioneering communications, *see supra* note 25 and accompanying text.

At first blush, these restrictions might not appear constitutionally suspect. With support from *Buckley* and *Colorado Republican II*, the defendants correctly point out that an expenditure arranged between the spending organization and the supported candidate raises the specter of *quid pro quo* corruption and, if unregulated, can subvert the Act's contribution limits. *See* Gov't Br. at 186–89; Intervenors Br. at 135–36. In *Buckley*, the Court upheld a FECA provision treating as a contribution any expenditure "authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate" because the provision "prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, 424 U.S. at 46–47 n. 53, 96 S.Ct. 612; *see FEC v. Christian Coalition*, 52 F.Supp.2d 45, 85 (D.D.C.1999) (while *Buckley* introduced notion of "coordinated expenditures" and, for constitutional analysis, treated such expenditures as contributions, it reserved for another day the task of defining "coordinated expenditures" for constitutional purposes). And in *Colorado Republican II* the Court sustained against a facial attack the Act's party expenditure provision, 2 U.S.C. § 441a(d), because "a [political] party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of [the Act's] contribution limits." *Colorado Republican II*, 533 U.S. at 465, 121 S.Ct. 2351. The Court has recognized, however, that "coordinated expenditures ... share some of the constitutionally relevant features of independent expenditures." *Colorado Republican I*, 518 U.S. at 624, 116 S.Ct. 2309 (plurality opinion); *see id.* at 626–31, 116 S.Ct. 2309 (Kennedy, J., concurring in judgment and dissenting in part); *id.* at 631–40, 116 S.Ct. 2309 (Thomas, J., con-

curring in judgment and dissenting in part). Indeed, it has made clear that any coordinated expenditure analysis must "ultimately turn[ ]" on whether the regulated expenditures are "potential alter egos for contributions" or "functionally true expenditures, qualifying for the most demanding First Amendment scrutiny." *Colorado Republican II*, 533 U.S. at 463, 121 S.Ct. 2351.

The statutory definition of "coordinat[ion]," then, is critically important; it must clearly and precisely draw a line between "alter ego" expenditures and "functionally true" expenditures. Because a bare *allegation* of coordination can subject any given spender to a series of costly and intrusive enforcement proceedings—whether the spender is in compliance with the law or not, *see* Smith Statement at 2 (cited in note 99, *supra* )—the definition "must be restrictive, limiting the universe of cases triggering potential enforcement actions to those situations in which the coordination is extensive enough to make the potential for corruption through legislative *quid pro quo* palpable without chilling protected contact between candidates and corporations and unions." *See Christian Coalition*, 52 F.Supp.2d at 88–89. That is, in the absence of a clear and narrow definition of coordination, an organization's ideological opponents need only assert that it is engaged in such activity to initiate a crippling litigation process that could prevent the organization from participating, legally, in protected lobbying or speech activities. *See* 2 U.S.C. § 437g(a)(1), (2) (FEC authorized to investigate potential election law violations brought to its attention by private-party complaints); *supra* Findings 61b, 64b at pages 329–31; *see also* Chamber of Commerce Br. at 14 et seq. (explaining how "coordination allegations seriously burden and chill speech" (capitalization altered)). A properly-drawn definition is especially

important where, as here, "coordinated expenditures" for *issue advocacy* are restricted—"as long as the Supreme Court holds that expenditures for issue advocacy have broad First Amendment protection, the [government] cannot use the mere act of communication between a corporation and a candidate to turn a protected expenditure for issue advocacy into an unprotected contribution to the candidate." *Clifton v. FEC,* 927 F.Supp. 493, 500 (D.Me.1996), *modified on other grounds and remanded,* 114 F.3d 1309 (1st Cir. 1997), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998). But that is precisely what BCRA does.

Under the Act as amended by BCRA section 214, any electioneering disbursement made "in cooperation, *consultation,* or concert, with, or at the request or suggestion of" a candidate or his agents is thereby "coordinated" with the candidate and treated as a contribution thereto. BCRA § 214(a); FECA § 315(a)(7)(B)(i); 2 U.S.C. § 441a(a)(7)(B)(i) (emphasis added). Likewise, any electioneering disbursement made in like fashion with a national, state or local committee of a political party is thereby "coordinated" with the committee and treated as a contribution thereto. *See* BCRA § 214(a); FECA § 315(a)(7)(B)(ii); 2 U.S.C. § 441a(a)(7)(B)(ii). BCRA section 214 repeals the FEC's existing coordination regulation [156] and provides that any new regulations "shall not require agreement or formal collaboration to establish coordination" between a candidate (or political party committee) and an entity making a dis-

bursement. *See* BCRA § 214(c); FECA § 315 note; 2 U.S.C. § 441a note. In accordance with section 214's mandate, the FEC recently promulgated a final rule on "coordinated communications." *See supra* Finding 57 at page 326; *see also supra* note 45 and accompanying text. The rule provides that a disbursement for an electioneering communication is "coordinated" with a candidate or political party committee—"whether or not there is agreement or formal collaboration" between the disburser and the candidate or committee— when (1) "[t]he communication is created, produced, or distributed at the request or suggestion" of the candidate or committee; (2) the candidate or committee "is materially involved in decisions regarding" the communication; or (3) "[t]he communication is created, produced, or distributed after one or more substantial discussions about the communication" between the disburser and the candidate or committee. *See* 68 Fed.Reg. at 453–55. Under the regulation, "[a]greement means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination" and "[f]ormal collaboration means planned, or systematically organized, work on the communication." *Id.* at 455 (emphases omitted). Finally, the regulation purports to provide a "[s]afe harbor" for "responses to inquiries about legislative or policy issues":

> A candidate's or a political party committee's response to an inquiry about that candidate's or political party committee's positions on legislative or policy

---

**156.** Before BCRA became effective, an expenditure for a communication was "coordinated" under 11 C.F.R. § 100.23(c)(2) if the communication was created, produced or distributed (1) "[a]t the request or suggestion of" the candidate or party; (2) after the candidate or party had "exercised control or decision-making authority" over the content or distribution of the communication; or (3) after

"substantial discussion or negotiation" resulting in a "collaboration or agreement" between the creator, producer, distributor or payer of the communication and the candidate or party regarding the content or distribution of the communication. *Supra* Finding 56 at page 326 (quoting 11 C.F.R. § 100.23(c)(2)); *see* Gov't Br. at 183.

issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards . . . of this section.

*Id.*

The district court in this circuit recently confronted the question whether, and to what extent, the government may regulate "coordinated expenditures [on communications] not limited to express advocacy." *Christian Coalition,* 52 F.Supp.2d at 86 (capitalization altered) (quotation omitted). The court's views on the matter are worth quoting at length:

> This Court is bound by both the result and the reasoning of *Buckley,* even when they point in different directions. While *Buckley* confidently assured that coordinated expenditures fell within the Act's limits on contributions, it also reasoned that spending money on one's own political speech is an act entitled to constitutional protection of the highest order. Expressive coordinated expenditures bear certain hallmarks of a cash contribution but also contain the highly-valued political speech of the spender. . . . I take from *Buckley* and its progeny the directive to tread carefully, acknowledging that *considerable* coordination will convert an expressive expenditure into a contribution but that the spender should not be deemed to forfeit First Amendment protections for her own speech merely by having engaged in some *consultations* . . . with a federal candidate.

*Id.* at 91 (emphases added). Pointing to the *Christian Coalition* decision—and, more importantly, to the Supreme Court's decision in *Colorado Republican I*—the plaintiffs argue that BCRA's coordination provisions are overbroad. *See, e.g.,* McConnell Br. at 82–85; Chamber of Commerce Br. at 11–14. I agree; many of the expenditures BCRA defines as "coordinated" are not "disguised contributions" of

the sort described in *Colorado Republican II* and *Buckley.* *Colorado Republican II,* 533 U.S. at 443, 121 S.Ct. 2351; *see Clifton,* 927 F.Supp. at 495, 499 (despite its contact with candidate to "seek explanation of particular votes or statements," Maine Right to Life Committee's publication of voting records and guides represented "direct issue advocacy" as opposed to "the mere third-party billpaying for a *candidate's* media advertisements or a volunteer's incidental expenses that *Buckley* was talking about when it treated coordinated spending as a contribution under different statutory language" (emphasis added)). Suppose, for example, that a corporation purchases broadcast time for an electioneering communication that does not expressly advocate the election (or defeat) of candidate Smith but, instead, favorably compares Smith's voting record on tax cuts to that of his opponent. Governed by "both the result and the reasoning of *Buckley,*" *Christian Coalition,* 52 F.Supp.2d at 91, I think it clear that the ad would "communicate the underlying basis for the [corporation's] support" of Smith. *Buckley,* 424 U.S. at 21, 96 S.Ct. 612. Just as significantly, the ad would provide the electorate with a degree of "knowledge of the comparative merits and demerits of the candidates for public trust," 4 DEBATES ON THE ADOPTION OF THE FEDERAL CONSTITUTION 575 (Jonathan Elliot ed. 1888) (hereinafter ELLIOT'S DEBATES) (eighteenth century speech of James Madison to General Assembly of Virginia), and would assist voters in "mak[ing] informed choices" about the candidates, *Buckley,* 424 U.S. at 14–15, 96 S.Ct. 612. If the corporation "consult[s]" with Smith's office before purchasing the ad—perhaps to confirm Smith's voting record and to ensure the ad's accuracy—does that fact, by itself, render the information in the ad less independent or less valuable as an expression of a political position? I do not think so; the corporation's disbursement for the ad

would constitute direct speech by the corporation itself and a "functionally true expenditure[ ] qualifying for the most demanding First Amendment scrutiny."[157] *Colorado Republican II*, 533 U.S. at 463, 121 S.Ct. 2351; *see Clifton*, 927 F.Supp. at 499 (where "both the disbursements and the speech are *direct political speech by the [corporation]*, not by the candidate," they are "at the heart of the Court's First Amendment's concerns" notwithstanding their allegedly "coordinated" nature (emphasis in original)). Nor would the minimal "consultation" be "extensive enough to make the potential for corruption through legislative *quid pro quo* palpable." *Christian Coalition*, 52 F.Supp.2d at 89. Yet without sufficient regard for the corporation's speech interest or the electorate's interest in information, BCRA restricts such a disbursement.

Evidently, the FEC envisioned this very scenario and was concerned that BCRA's definition of coordination was overbroad—as I mentioned, the Commission in its final rule on "coordinated communications" attempted to provide a "[s]afe harbor" for "responses to inquiries about legislative or policy issues." 68 Fed.Reg. at 455. While sections 202 and 214 are indeed overbroad, *see infra*, the FEC's attempt to narrow them cannot save them from invalidation. The statute declares that any electioneering expenditure made "in cooperation, con-

sultation, or concert" with a candidate or his agents is "coordinated" with the candidate and treated as a contribution thereto. *See* BCRA § 214(a); FECA § 315(a)(7)(B)(i); 2 U.S.C. § 441a(a)(7)(B)(i) (emphasis added). Under two common definitions, to "consult" means to "discuss" or "refer to esp. [sic] for information." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 490 (1993); *cf. Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C.Cir.1997) (in Endangered Species Act context, "consultation ... includes all discussions, correspondence, etc." (quoting 50 C.F.R. § 402.13(a))). The FEC's safe-harbor provision appears to contravene the plain language of sections 202 and 214, which need not be stretched in the slightest in order to reach an electioneering communication that a corporation, union or individual merely "discuss[es]" with (through "inquiries" of and "responses" from) a candidate like Smith. Thus, the corporation wishing to "consult[ ]" with Smith "about legislative or policy issues" cannot be sure that the safe-harbor provision will provide any shelter at all against the statute, given the rule's variance from the statute's text. The corporation is on the horns of a dilemma. It can choose to (1) "consult[ ]" with Smith and hope the safe harbor rule is eventually upheld on Administrative Procedure Act (APA) review;[158] (2) forgo the

---

**157.** The four dissenters in *Colorado Republican II* concluded similarly in the political party context:

Take, for example, a situation in which the party develops a television advertising campaign touting a candidate's record on education, and the party simply "consult[s]," 2 U.S.C. § 441a(a)(7)(B)(i), with the candidate on which time slot the advertisement should run for maximum effectiveness. [We] see no constitutional difference between this expenditure and a purely independent one. In the language of *Buckley*, the advertising campaign is not a mere "general expression of support for the can-

didate and his views," but a communication of "the underlying basis for the support." ... It is not just "symbolic expression," ... but a clear manifestation of the party's most fundamental political views.

*Colorado Republican II*, 533 U.S. at 468, 121 S.Ct. 2351 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia and Kennedy, JJ.).

**158.** As the Chamber of Commerce points out, "ordinary APA review [is] a process that can take years [and it would] thus defeat[ ] BCRA's mandate that constitutional issues presented by the statute be resolved in a special ... expedited proceeding." Chamber of Commerce Br. at 13–14 n. 7.

consultation and risk the ad's inaccuracy; or (3) forgo the communication itself in an act of self-censorship.

In their briefs—filed before the FEC's final rule was promulgated—the plaintiffs focus primarily on section 214's declaration that the FEC "shall not require agreement or formal collaboration to establish coordination" between a candidate (or political party committee) and an entity or individual making a disbursement. *See* BCRA § 214(c); FECA § 315 note; 2 U.S.C. § 441a note. They claim, essentially, that any rule promulgated pursuant to that mandate will inevitably violate the Constitution. *See, e.g.,* Chamber of Commerce Br. at 6–14. The defendants respond that (1) the assertion that "unconstitutional rules are inevitable" is faulty because the Constitution does not require agreement or formal collaboration, Intervenors Br. at 140–42; and (2) the plaintiffs' coordination challenges are non-justiciable in any event, *see* Gov't Br. at 183–85. The defendants are mistaken on both counts.

*First,* the Supreme Court has never suggested that the Congress can define "coordinat[ion]" so broadly that it can occur absent at least *some* type of agreement. Quite the contrary, the Court has made clear that the government's "simply calling an independent expenditure a 'coordinated expenditure' cannot (for constitutional purposes) make it one." *Colorado Republican I,* 518 U.S. at 621–22, 116 S.Ct. 2309 (plurality opinion). Although the Court has recognized that "general . . . understand-

ing[s]" and "wink or nod" arrangements may be regulated, *see Colorado Republican II,* 533 U.S. at 442, 121 S.Ct. 2351; *Colorado Republican I,* 518 U.S. at 614, 116 S.Ct. 2309 (plurality opinion), these are themselves "agreements." I therefore reject the notion that section 214's directive—and the FEC's final rule, *see supra* Finding 57 at pages 326–28; *see also supra* note 45—requiring no "agreement or formal collaboration" to establish coordination "is materially more narrow than the 'general understanding' and 'wink or nod' approaches recognized in the *Colorado* decisions." Intervenors Br. at 142 n. 521. Read in conjunction with the statute's equating of "coordinat[ion]" with "consultation," the regulation will inevitably deter contact between independent spenders and their elected representatives, a result "patently offensive to the First Amendment." *Clifton,* 114 F.3d at 1314 (FEC regulation limiting organization's oral contact with candidate unconstitutional because it "tread[ed] heavily upon the right of citizens, individual or corporate, to confer and discuss public matters with their legislative representatives").

*Second,* sections 202 and 214 are impermissibly overbroad without reference to any regulation that eventually takes hold. The provisions explicitly and *unambiguously* equate "consultation" and "coordinat[ion]." [159] I agree with the district court's statement in *Christian Coalition* that a "spender should not be deemed to forfeit First Amendment protections for

---

159. While section 202 does not itself use the word "consultation," it incorporates by reference section 214's overbroad definition of "coordinat[ion]":

[I]f . . . any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of [FECA] section 304(f)(3)) [and] such disbursement is *coordinated* with a candidate or an authorized committee of such candidate, a Federal [sic], State, or local political

party or committee thereof, or an agent or official of any such candidate, party, or committee[,] such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party. . . .

BCRA § 202(2); FECA § 315(a)(7)(C); 2 U.S.C. § 441a(a)(7)(C) (emphasis added).

her own speech merely by having engaged in some *consultations* ... with a federal candidate." *Christian Coalition,* 52 F.Supp.2d at 91 (emphasis added); *see id.* (only *"considerable* coordination will convert an expressive expenditure into a contribution" (emphasis added)). I am constrained to conclude, therefore, that sections 202 and 214 will violate the First Amendment no matter what the Commission does, for no regulation it promulgates may depart (as the safe-harbor rule does) from the provisions' plain text. *See Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the ... agency ... must give effect to the unambiguously expressed intent of Congress."). Were sections 202 and 214 "readily susceptible" of a saving construction, *Am. Booksellers,* 484 U.S. at 397, 108 S.Ct. 636, we could simply read the word "consultation" out of the statute or give it a meaning narrower than "discuss" or "refer to ... for information." But the Congress clearly intended the broader interpretation—why else would it have directed the FEC to repeal its current rules and promulgate regulations that do not require agreement or formal collaboration? *See* BCRA § 214(c); FECA § 315 note; 2 U.S.C. § 441a note; *see also* 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain) ("[T]he [former] FEC regulation [was] far too narrow to be effective in defining coordination in the real world of campaigns ...."). As the ACLU demonstrates, this inclusion of spender-candidate "consultation[s]" will undoubtedly have perverse and impermissible effects:

> Section 214 ... effectively impose[s] a year round prohibition on all communi-cations made by a corporation like the ACLU where there has been ... "discussion" about the communication with a candidate. [Thus], the ACLU may not be able to discuss a civil liberties vote or position with a Representative or Senator if the ACLU will subsequently produce a box score that praises or criticizes that official's stand.

ACLU Br. at 20. And, as the Chamber of Commerce argues, the dilemma facing the plaintiffs—i.e., choosing between "consultation" with and communication about a candidate—"has bite right now because contacts with legislators or political party officials today may lead to claims that future speech is 'coordinated' and, hence, is an unlawful contribution." Chamber of Commerce Br. at 7. Accordingly, under the first part of the pre-enforcement review test enunciated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the plaintiffs' challenges to sections 202 and 214 are "appropriate for judicial resolution at this time" because the outcome of any further FEC rule-making will not affect this court's merits analysis.[160] *Id.* at 149, 87 S.Ct. 1507. Under the second prong of *Abbott Laboratories,* moreover, the "hardship to the parties of withholding [judicial] consideration," *id.,* would be extreme because ordinary APA review of the regulations could take several months or even years.

\* \* \*

I would hold, therefore, that BCRA's definition of "coordinat[ion]" is overbroad. Sections 202 and 214 subject to the Act's source-and-amount limitations disbursements for electioneering communications made merely in "consultation" with a candidate or political party. In my view, the provisions impermissibly restrict *indepen-*

---

**160.** Additionally, as the plaintiffs suggest, *see supra* note 158, piecemeal and delayed review of their constitutional claims would defeat BCRA's mandate that judicial consideration of such claims "shall be ... expedite[d] to the greatest possible extent." BCRA § 403(a)(4).

*dent* disbursements and are therefore facially invalid.

■ Likewise invalid, I believe, is BCRA section 213, which compels a political party committee, at the time the party's candidate is nominated, to make a binding choice between disbursing either independent or "coordinated" disbursements in support of the candidate. *See* BCRA § 213; FECA § 315(d)(4)(A); 2 U.S.C. § 441a(d)(4)(A); *see also supra* Part II.C. Under BCRA's overbroad definition of "coordinat[ion]," section 213 is necessarily unconstitutional because it restricts political parties in exercising their First Amendment "right to make unlimited independent expenditures." *Colorado Republican I*, 518 U.S. at 618, 116 S.Ct. 2309. If *any* national, state or local committee of a political party makes an expenditure in "consultation" with a candidate, BCRA brands the expenditure "coordinated" instead of independent and, for the rest of the election cycle, *every other* committee of the party—national, state and local—is prohibited from making independent disbursements "with respect to the candidate." BCRA § 213; FECA § 315(d)(4)(B); 2 U.S.C. § 441a(d)(4)(B) ("For purposes of this paragraph, all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee."). That section 213 *compels* party committees to work together in this fashion—as though the hand of one were the hand of all—is espe-

cially perverse in light of the fact that the statute elsewhere severely *restricts* them from working together to raise certain kinds of funds and to decide how such funds should be used. *See, e.g.,* ·BCRA § 101(a); FECA § 323(a), (b)(2)(B)(iv); 2 U.S.C. 441i(a), (b)(2)(B)(iv); *see generally infra* Part IV.D. I believe that, in light of *Colorado Republican I*, the provision cannot stand.

## D. Restrictions on Non–Federal Funds

I turn now to BCRA Title I, "Reduction of Special Interest Influence," and, in particular, to section 101, which regulates "[s]oft money of political parties." BCRA § 101. In a five-part analysis, I examine in turn the provision's restrictions on (1) the national, state and local political party committees, *see* FECA §§ 301(20), 323(a), (b); (2) fundraising, *see* FECA § 323(c); (3) any political party committee's solicitation of "any funds" for, or transfer of "any funds" to, certain tax-exempt organizations, FECA § 323(d); (4) any federal candidate's solicitation or transfer of non-federal funds, *see* FECA § 323(e); and (5) any state candidate's spending of non-federal funds on certain "public communication[s]," FECA § 323(f).[161] I would hold that new FECA section 301(20) and sections 323(a), (b) and (d) violate the First Amendment's guarantee of expressive association; sections 323(c) and (f) are inseverable from section 301(20); and section 323(e) is constitutionally sound.[162]

### 1. The Party Restrictions: New FECA Sections 301(20) and 323(a) and (b)

In the following subsections, I first explain at some length my reasons for con-

**161.** Although I recognize that my references to FECA sections as opposed to BCRA section 101 may be distracting, I use FECA references in this Part because of BCRA section 101's regulatory complexity and its division into six separate components—new FECA sections 323(a), (b), (c), (d), (e) and (f).

**162.** Accordingly, I would not reach the merits of various plaintiffs' federalism, free press or equal protection claims except with respect to section 323(e). *See infra* Part IV.D.4.

cluding that BCRA's restrictions on a party committee's use of non-federal funds are subject to strict scrutiny under *Citizens Against Rent Control* and other Supreme Court First Amendment jurisprudence. I then discuss the constitutionality of new FECA section 323(a)—which forbids the national party committees to use non-federal funds in any way whatsoever—and conclude that it fails strict scrutiny. Finally, I discuss the constitutionality of FECA sections 301(20) and 323(b)—which severely diminish the ability of state and local party committees to spend non-federal funds on so-called "Federal election activity"—and conclude that they likewise fail strict review.

### a. The Party Restrictions are Subject to Strict Scrutiny

The *McConnell, RNC* and *CDP* plaintiffs claim that FECA sections 301(20) and 323(a) and (b) are subject to strict scrutiny; they contend, *inter alia,* that the provisions severely burden their right to expressive association by prohibiting the political parties from pooling non-federal donations and spending them on speech that does not expressly advocate the election or defeat of, and is not coordinated with, any federal candidate.[163] *See*

McConnell Br. at 25–26 & n. 9, 33; RNC Br. at 51–53; CDP Br. at 27–31; McConnell Opp. Br. at 17–19; RNC Opp. Br. at 35–39; CDP Opp. Br. at 14–15. I agree.

When it comes to the right of expressive association, one must start with the baseline announced in *NAACP v. Alabama:* "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama,* 357 U.S. at 460–61, 78 S.Ct. 1163. Seeking to justify a departure from this standard, the defendants argue that sections 323(a) and (b) are straightforward contribution limits akin to the ones the Supreme Court sustained in *Buckley* and, as such, need only be "closely drawn" to further a "sufficiently important interest." Intervenors Br. at 51 (quotations omitted); *see id.* at 14–16, 96 S.Ct. 612; Intervenors Opp. Br. at 17–23; Gov't Opp. Br. at 3–4. More specifically, they claim that *Buckley*'s decision to uphold FECA's $25,000 ceiling on aggregate contributions to committees and candidates was "premised on the Court's understanding that virtually *all* donations of value to a national political party were 'contributions' within the meaning of FECA." Gov't Br. at 64 (emphasis in original); *see* Intervenors Opp. Br. at 18.

---

**163.** Relying on *California Democratic Party v. Jones,* 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000), *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), and *Sweezy v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), the plaintiffs argue as well that sections 301(20) and 323(a) and (b) are subject to strict review because they irretrievably "splinter[] the various elements of the political party apparatus" and thereby burden the political parties' associational rights. RNC Br. at 37 (capitalization altered); *see, e.g., id.* at 37–44; McConnell Br. at 28, 31–32 (restrictions "work[] an unprecedented intrusion into the ability of political party committees to coordinate strategy on a na-

tionwide basis, and to associate among each other and with their principal officeholders and candidates"); CDP Br. at 35; RNC Opp. Br. at 22–24; McConnell Opp. Br. at 15–17. And relying on *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), and *Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), they urge the court to apply strict scrutiny to the extent that sections 301(20) and 323(a) and (b) prohibit political parties and their agents from soliciting campaign funds. *See, e.g.,* RNC Br. at 46–49; McConnell Br. at 26–27; CDP Br. at 40; RNC Opp. Br. at 34–35; CDP Opp. Br. at 21–22; RNC Reply Br. at 17–18. In light of the discussion *infra,* I would not reach the merits of these claims.

Rending from context a snippet of a footnote, the government suggests the Court held that all " '[f]unds provided to a candidate *or political party* or campaign committee either directly or indirectly ... constitute a contribution.' " Gov't Br. at 64 n. 57 (quoting *Buckley,* 424 U.S. at 23 n. 24, 96 S.Ct. 612) (emphasis the government's). But *Buckley* held no such thing. The footnote upon which the government relies states (with the omission included) that, under the Act, "[f]unds provided to a candidate or political party or campaign committee either directly[,] or indirectly *through an intermediary* [,] constitute a contribution." *Buckley,* 424 U.S. at 23–24 n. 24, 96 S.Ct. 612 (emphasis added). Thus, as the *McConnell* plaintiffs contend, the footnote

> stands only for the proposition that funds that would *otherwise* constitute a contribution still constitute a contribution if provided through an indirect *source*—not that [non-federal] funds constitute a contribution. Indeed, if the Court had interpreted the FECA definition of "contribution[ ]" in the manner defendants suggest, the FEC allocation regulations, treating [non-federal] funds as a discrete category from federally regulated "contributions," would have been flatly inconsistent with the language of the statute.

McConnell Opp. Br. at 19 (first emphasis added). The Act defines a "contribution" as a donation made "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). But non-federal donations to political parties are *not* made for that purpose; they are made instead to pay for grassroots campaign materials, voter registration efforts, get-out-the-vote drives and issue advocacy, much of which is directed toward elections for *state* office. *See Jacobus v. Alaska,* 182 F.Supp.2d 881, 888 n. 8 (D.Alaska 2001) (" 'Soft money' describes [donations] to political parties (as opposed to candidates) that solely sup-

port party-building activities, such as: voter registration, 'get out the vote' drives, issue advocacy, and the purchase of campaign items such as slate cards, bumper stickers, and yard signs." (citation omitted)). That is precisely why such funds are called *non-federal* funds. *See* TWENTY YEAR REPORT, *supra,* at ch. 3 (FEC recognizing "Constitution grants each [S]tate the right to ... establish its own rules for financing the nonfederal elections held within its borders" and therefore funds used "in connection with" state, and not federal, elections are not subject to federal regulation); *see also supra* note 30 and accompanying text. If the Court had adopted the "contribution" definition the defendants say that it did, *see* Gov't Br. at 64, there would have been no need for the Congress's hard-fought effort to enact BCRA; proponents of tighter restrictions simply could have brought suit under the APA to overturn the FEC's allocation regulations. *See* 5 U.S.C. § 706(2)(A) (reviewing court shall "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Next, the defendants claim that the Supreme Court's *Cal–Med* judgment reduces our review to less-than-strict scrutiny. *See* Gov't Br. at 65–66; Intervenors Opp. Br. at 18–19. I recognize that their position finds some support in the plurality of *Cal–Med,* which involved a challenge to FECA's limits on contributions to non-party, multi-candidate committees. The plurality reasoned that

> [i]f the First Amendment rights of a contributor are not infringed by limitations on the amount he may contribute to a campaign organization which advocates the views and candidacy of a particular candidate, the rights of a contributor are similarly not impaired by limits on the amount he may give to a multi-

candidate political committee ... which advocates the views and candidacies of a number of candidates.

*Cal–Med,* 453 U.S. at 197, 101 S.Ct. 2712 (plurality opinion). Although the defendants acknowledge that Justice Blackmun (the fifth member of the majority) did not concur in the above analysis, *see* Gov't Br. at 66, they downplay the significance of his separate opinion. Unlike the plurality, which limited its discussion to conduit committees established for the purpose of passing contributions to candidates, Justice Blackmun suggested that "a different result would follow if [FECA] were applied to contributions to a political committee established for the purpose of making *independent expenditures,* rather than contributions to candidates." *See Cal–Med,* 453 U.S. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring in part and concurring in judgment) (emphasis added).

In any event, whatever confusion may have existed after *Cal–Med* regarding the applicable standard of review was resolved less than six months later when a majority of the Court held that *Buckley* and *Cal–Med* carved out only "a single narrow exception to the rule that limits on political activity [are] contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate.*" *Citizens Against Rent Control,* 454 U.S. at 296–97, 102 S.Ct. 434 (emphasis in original); *see supra* Part III.C. In a footnote, the intervenors dismiss *Citizens Against Rent Control* as "inapposite" to the actions at bar because "the recipient committee had been formed to support a local ballot measure ... rather than to advocate the election or defeat of candidates for public office" and because "the Court found [that] there was no risk of actual or apparent corruption" in that setting. Intervenors Opp. Br. at 20 n. 49. But the fact that political party committees are not formed for the sole purpose of supporting ballot measures does not deter-

mine our standard of review. *Buckley* itself would suggest that, if anything, the constitutional necessity of protecting associational speech is *more* acute in the candidate context than in the ballot measure context; because "the ability of the citizenry to make informed choices among candidates for office is essential, ... it can hardly be doubted that the constitutional guarantee [of associational speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley,* 424 U.S. at 14–15, 96 S.Ct. 612 (quotation omitted). And although I recognize the risk of *quid pro quo* corruption in the candidate context—a risk absent in the ballot measure context, *see Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407—the governmental interest in preventing corruption enters the constitutional equation only *after* one has decided upon the appropriate standard of review.

Returning to the strict-scrutiny baseline of *NAACP v. Alabama,* I acknowledge that the simple grouping of individuals or entities is not protected for its *own* sake:

Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.... It is beyond debate that freedom to engage in association *for the advancement of beliefs and ideas* is an inseparable aspect of ... freedom of speech.

*NAACP v. Alabama,* 357 U.S. at 460, 78 S.Ct. 1163 (citations omitted) (emphasis added). In other words, not all associations are created equal under the First Amendment; only those groups that are organized to engage in protected speech are guaranteed full constitutional shelter. *See Boy Scouts of Am. v. Dale,* 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554

(2000) ("To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'"); *N.Y. State Club Ass'n v. City of New York,* 487 U.S. 1, 13, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (to recognize right of expressive association "is not to say, however, that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution"). Put specifically in campaign finance terms, *see Beaumont,* 278 F.3d at 267 ("[L]anguage from non-funding decisions does not suddenly become inoperative when contributions and independent expenditures are at issue." (citing, *inter alia, Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Mills,* 384 U.S. at 218, 86 S.Ct. 1434; *New York Times Co.,* 376 U.S. at 270, 84 S.Ct. 710; *NAACP v. Alabama,* 357 U.S. at 460, 78 S.Ct. 1163)), this straightforward observation explains the differing levels of scrutiny in *Buckley,* which dealt with contribution-to-candidate limits, and *Citizens Against Rent Control,* which involved a donation-to-committee limit. While the association between donor and candidate produces a type of expression—i.e., it lets the rest of the world know that the donor is behind the candidate and presumably supports what he stands for—the First Amendment *value* of the association is not particularly significant because, most often, the purpose of the association is the election of the candidate and not "the advancement of beliefs and ideas." *NAACP v. Alabama,* 357 U.S. at 460, 78 S.Ct. 1163; *see* Daniel D. Polsby, Buckley v. Valeo: *The Special Nature of Political Speech,* 1976 SUP. CT. REV. 1, 23 (under *Buckley,* contribution to candidate "is an expression of solidarity with the candidate and little more"). It logically follows, and *Buckley* holds, that restrictions on contributions to candidates receive heightened scrutiny but not full protection. *See Shrink Missouri,* 528 U.S. at 387–88, 120 S.Ct. 897 ("under *Buckley's* standard of scrutiny," contribution-to-candidate limit survives review if "[g]overnment demonstrate[s] that [the] regulation [is] 'closely drawn' to match a 'sufficiently important interest'" (quoting *Buckley,* 424 U.S. at 25, 96 S.Ct. 612)).

In contrast, "[c]ontributions by individuals ... to political committees ... permit the pooling of resources. This amplifies the contributors' individual voices." Lillian R. BeVier, *Money and Politics: A Perspective on the First Amendment and Campaign Finance Reform,* 73 CAL. L. REV. 1045, 1064 (1985) (hereinafter BeVier, *Money and Politics* ). And unlike restricting the "undifferentiated, symbolic act of contributing" to a candidate, *Buckley,* 424 U.S. at 21, 96 S.Ct. 612, restricting donations to a political party "automatically affects" the amount of protected expression in which the party may then engage on behalf of its adherents, *Citizens Against Rent Control,* 454 U.S. at 299, 102 S.Ct. 434. Here I return to first principles. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley,* 424 U.S. at 14, 96 S.Ct. 612. Therefore, political parties that make independent expenditures—to engage in issue advocacy referring to candidates, to support ballot measures or to fund voter registration and get-out-the-vote activities—provide a service essential to our representative democracy by accepting donations for the sake of amplifying and channeling the political speech of other organizations and individual citizens. *See Citizens Against Rent Control,* 454 U.S. at 294, 102 S.Ct. 434 ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost."); *Kusper,* 414 U.S. at 57, 94

S.Ct. 303 ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom."); *see also Colorado Republican I*, 518 U.S. at 618, 116 S.Ct. 2309 (plurality opinion) ("[P]ooling resources from many ... contributors is a legitimate function and an integral part of party politics." (quoting S. REP. No. 93–689, at 7 (1974))); *id.* at 629, 116 S.Ct. 2309 (Kennedy, J., concurring in judgment and dissenting in part) ("[p]olitical parties have a unique role in serving" principle that "debate on public issues should be uninhibited, robust, and wide-open" because "they exist to advance their members' shared political beliefs" (quotation omitted)). As the Court explained in *NCPAC*:

> the 'proxy speech' approach is not useful ... [where] the contributors obviously like the message they are hearing from [an] organization[ ] and want to add their voices to that message; otherwise they would not part with their money. To say that their collective action in pooling their resources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources.

*NCPAC*, 470 U.S. at 495, 105 S.Ct. 1459; *see* THE FEDERALIST No. 35, at 214 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (contributors "are aware that however great the confidence they may justly feel in their own good sense, their interests can be more effectually promoted by [another] than by themselves"). Thus does the collective input of donor-participants—and, in turn, the output of recipient political parties—assist fellow voters in "mak[ing] informed choices among candidates for office," i.e., the individuals who "will inevitably shape the course that we follow as a nation." *Buckley*, 424 U.S. at 14–15, 96 S.Ct. 612; *see United States v.*

*CIO*, 335 U.S. 106, 144, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) (Rutledge, J., concurring in judgment) ("There is ... an effect in restricting expenditures for the publicizing of political views not inherently present in restricting other types of expenditure, namely, that it necessarily deprives the electorate ... of the advantage of free and full discussion[.]"); 4 ELLIOT'S DEBATES, *supra*, at 575 (speech of James Madison) ("value and efficacy" of right to vote "depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively"); *see generally* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948) (free speech necessary for informed electorate).

As Alexis de Tocqueville cautioned long ago, the courts have special reason in the issue advocacy context to scrutinize strictly any governmental interference with any step of the process:

> If once the [state] has a general right of authorizing associations of all kinds upon certain conditions, [it] would not be long without claiming the right of superintending and managing them, in order to prevent them from departing from the rules laid down by [it].

ALEXIS DE TOCQUEVILLE, 2 DEMOCRACY IN AMERICA 312 (Phillips Bradley ed., 1990) (1840). That is, a reviewing court should be especially wary of any restriction that might stifle issue-driven evaluation (and sometimes criticism) of the law's enactors by preventing a party's pooling of resources collected, at least in part, for that very activity. *See Eu*, 489 U.S. at 223–24, 109 S.Ct. 1013 ("A 'highly paternalistic approach' limiting what people may hear is generally suspect, ... but it is particularly egregious where the State censors the

political speech a political party shares with its members." (citations omitted)); *see also Shrink Missouri*, 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring) (no deference to legislature warranted "where that deference ... risk[s] such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge"); HARRY KALVEN, JR., A WORTHY TRADITION 63 (1988) ("[P]olitical freedom ends when government can use its powers and its courts to silence its critics."); JOHN HART ELY, DEMOCRACY AND DISTRUST 106 (1980) ("Courts must police inhibitions on [protected] political activity because we cannot trust elected officials to do so: ins have a way of wanting to make sure the outs stay out.").

In sum, *Citizens Against Rent Control* requires no less than strict scrutiny of limits on non-federal donations to political party committees and neither *Buckley* nor *Cal–Med* holds to the contrary. *See Citizens Against Rent Control*, 454 U.S. at 294, 296–98, 102 S.Ct. 434; *Lincoln Club v. City of Irvine*, 292 F.3d 934, 936–39 (9th Cir.2002) (applying strict scrutiny to ordinance imposing limit on amount of donations person or committee may receive from single source during election campaign); *see also Colorado Republican I*, 518 U.S. at 627–28, 116 S.Ct. 2309 (Kennedy, J., concurring in judgment and dissenting in part) ("[W]e cannot allow the Government's suggested labels to control our First Amendment analysis.... We had no occasion in *Buckley* to consider possible First Amendment objections to limitations on ... parties."); *see generally* John C. Eastman, *Strictly Scrutinizing Campaign Finance Restrictions (and the Courts that Judge Them)*, 50 CATH. U.L. REV. 13 (2000). By banning the national political party committees from receiving or spending any non-federal funds whatsoever, section 323(a) operates as a restriction on those who would donate non-federal funds to the parties for the sake of participating in collective, protected issue advocacy *via* a party's independent expenditures. And to the extent that section 323(b) prohibits state, district and local party committees from spending non-federal funds on "Federal election activity" such as

> a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (*regardless of whether the communication expressly advocates a vote for or against a candidate* ),

BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii) (emphasis added), it operates to restrict collective speech in much the same manner as the national party ban. BCRA § 101(a); FECA § 323(b)(1); 2 U.S.C. § 441i(b)(1). By arguing that section 323(b) is not subject to strict scrutiny because it "simply requires that the money used to fund 'Federal election activity' [as defined by section 301(20) ] be raised in compliance with the longstanding federal contribution restrictions," Gov't Opp. Br. at 3, the defendants merely beg the First Amendment issue before us—whether and to what extent the Congress may limit donations *not* made "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(8)(A)(i), *not* expended on advocating the election or defeat of a federal candidate and *not* coordinated with the candidate. In my view, sections 301(20) and 323(a) and (b)—which plainly restrict such donations—survive First Amendment review only if they serve, in a narrowly tailored fashion, the government's compelling interest in preventing actual or apparent corruption of federal candidates and officeholders.

**b. Section 323(a) Fails Strict Scrutiny**

██ Having decided the applicable standard of review, I conclude in the fol-

lowing sections that (1) the national party ban does not serve the government's interest in preventing actual or apparent corruption; and (2) even if the ban did alleviate corruption, it would sweep too broadly to be sustained in any event.

### (1)

The defendants refer us to a mountain of discovery—mostly anecdotal in nature—gathered to support the Congress's judgment that "soft money has been used to evade the law and, in actuality and appearance, corrupts the political process." Intervenors Br. at 20 (capitalization altered); *see, e.g., id.* at 6–12, 20–50; Gov't Br. at 22–36, 68–86. I note at the outset, however, that they have identified not a single discrete instance of *quid pro quo* corruption attributable to the donation of non-federal funds to the national party committees. *See supra* Finding 80a at pages 349–50; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 2–3 (conceding lack of evidence that any United States Senator or Representative "changed his or her vote on any legislation in exchange for a donation of non-federal money to that [person's] political party"); McCain Dep. at 170–71 (same); Feingold Dep. at 132 (same); Snowe Dep. at 206–07 (same); Jeffords Dep. at 107 (same); *see also, e.g.,* 148 Cong. Rec. S2098 (daily ed. Mar. 20, 2002) (statement of Sen. Dodd) ("I have never known of a particular Member whom [sic] I thought cast a ballot because of a contribution."); *cf.* McConnell Aff. at 8 ("During my 18 years in the United States Senate, I have never witnessed any colleague who changed his vote or took any official action as a result of either a federal contribution or a nonfederal donation to a political party at the national, state or local level."). Nor have they supported with credible evidence their contention that "party committees

provide soft money donors with special access to officeholders." FEC's Am. Proposed Findings of Fact at 24 (capitalization altered); *see supra·* Findings 80c, 81 at pages 350–53; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4 (conceding lack of evidence that "officeholders are more likely to meet with donors of non-federal money than with donors of federal money"); Cross Exam. of Def. Witness Fowler at 45 (same). Although the defendants point to certain notorious incidents they believe underscore the corrupting effect of non-federal funds, *see, e.g.,* Intervenors Br. at 11 & n. 33 (noting Enron "gave over $400,000 to each political party" but not asserting funds affected any federal official's decision-making); *id.* at 29 (noting Roger Tamraz "made enormous soft money contributions" to DNC and was granted six meetings with President Clinton to obtain backing for pipeline project but "never received the backing he sought"), they have not identified any empirical link between large non-federal donations and legislative voting behavior. *See supra* Finding 80b at page 350; *see also, e.g.,* Cross Exam. of Def. Expert Green at 58 ("Q: ... What statistical work are you aware of that you think is statistically valid since 1990 that correlates contributions ... to roll call votes? A: None."). Given the Supreme Court's working definition of corruption—i.e., "a subversion of the political process" that occurs when "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain," *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459—I would need to see far more powerful evidence to accept the defendants' claim that non-federal donations corrupt or appear to corrupt federal candidates.

Likewise, the defendants have not established a convincing correlation between the "explosion" of non-federal funds on the one hand and an intensified public sense—i.e.,

appearance—of corruption on the other. *See supra* Finding 82 at page 353; *see also, e.g., The Constitution and Campaign Reform: Hearings on S.522 Before the Comm. on Rules and Admin.*, 106th Cong. (2000) (sharpest decline in voter turnout, from 60.84 per cent to 50.11 per cent, occurred between 1968 and 1988, when non-federal funds were mostly *absent* from party fundraising). Nor have they persuasively rebutted evidence indicating that, to the extent the voting public *does* perceive corruption, that perception has been fueled not only by non-federal donations but also by lobbying efforts, *see supra* Finding 81 c. 3 at page 353, federal contributions, *see supra* Finding 82b.2 at page 355, and the mass media's "populist demonologies" of politics in general, Frank J. Sorauf, *Politics, Experience, and the First Amendment: The Case of American Campaign Finance*, 94 COLUM. L. REV. 1348, 1356 (1994). *See* Primo Rebuttal Report at 11–25; *see generally* Ayres Rebuttal Report.

Turning to the defendants' broader assertions of massive national party "soft money" laundering, *see, e.g.,* Gov't Br. at 70 ("[S]oft money has become the conduit through which wealthy individuals, labor unions and corporations have in many ways seized control of our political process." (quoting 147 CONG. REC. S2449 (daily ed. Mar. 19, 2001) (statement of Sen. Collins))); Intervenors Br. at 35 (arguing that national, state and local political parties serve as "offshore banks, whose principal activity [is] to shuttle money back and forth ... to pay for expensive mass media campaigns orchestrated by the national parties" in aid of federal candidates (quotation omitted)), I find that they are largely discounted by the Supreme Court's

decision in *Colorado Republican I*. Acknowledging that "FECA permits individuals to contribute more money ... to a party than to a candidate" and that it also allows "unregulated 'soft money' contributions to a party for certain activities, such as electing candidates for state office, see § 431(8)(A)(i), or for voter registration and 'get out the vote' drives, see § 431(8)(B)(xii)," the plurality in *Colorado Republican I* observed nonetheless that *the opportunity for corruption posed by these greater opportunities for contributions is, at best, attenuated.* Unregulated 'soft money' contributions may not be used to influence a federal campaign, except when used in the limited, party-building activities specifically designated in the statute. See § 431(8)(B). *Colorado Republican I*, 518 U.S. at 616, 116 S.Ct. 2309 (plurality opinion) (emphasis added); *see id.* at 647, 116 S.Ct. 2309 (Thomas, J., concurring in judgment and dissenting in part) ("[T]here is little risk that an individual donor could use a party as a conduit for bribing candidates."). Although a majority of the Court in *Colorado Republican I* dismissed the defendants' parties-as-conduits theory, neither the intervenors nor the government discusses the case at any length. The government mentions the decision but once in its opposition discussion of Title I. *See* Gov't Opp. Br. at 4 n. 2 (citing decision for ironic proposition that "the government interests supporting BCRA are plainly compelling"). The intervenors treat the case primarily in footnotes, once to note that the Justices used the term "soft money" instead of "non-federal funds," *see* Intervenors Opp. Br. at 5 n. 14; twice to suggest that the plurality's observations were dicta based on an inadequate evidentiary record,[164] *see*

---

**164.** I do not disagree that the plurality's statement about the attenuated influence of non-federal funds was *obiter dictum*. I am mindful, however, that while "the Court sometimes

changes its tune when it confronts a subject directly," we would be prudent as an inferior court to "take its assurances seriously" and to

*id.* at 28 n. 73; *see also* Intervenors Reply Br. at 38 n. 114; and once to point out that the "plurality stated that it could understand how Congress, were it to conclude that the potential for evasion of individual contribution limits was a serious matter, might decide to change the statute's limitations on contributions to political parties," Intervenors Opp. Br. at 50 n. 146 (quoting *Colorado Republican I*, 518 U.S. at 617, 116 S.Ct. 2309 (plurality opinion)). While the intervenors assert that "precisely what Congress did" in enacting the national party ban was change the contribution-to-party limit, *id.*, they neglect the key distinction between federal and non-federal funds. The plurality in *Colorado Republican I* did state that it "could understand how Congress ... might decide to change the statute's limitations on *contributions* to political parties," *Colorado Republican I*, 518 U.S. at 617, 116 S.Ct. 2309 (plurality opinion) (emphasis added), but it was not speaking—as the intervenors are—in terms of *non-federal* donations to parties. Indeed, it had just explained that such donations present only an "attenuated" danger of corruption. *Id.* at 616–17, 116 S.Ct. 2309 (plurality opinion). Instead, the plurality was speaking in terms of *federal* "contributions," i.e., donations that are made "for the purpose of influencing an[ ] election for Federal office," 2 U.S.C. § 431(8)(A)(i), and that might therefore have a corrupting effect on federal candidates. *See Colorado Republican I*, 518 U.S. at 616–17, 116 S.Ct. 2309 (plurality opinion).

Even were I to infer from the record that the use of non-federal funds has to some extent promoted actual or apparent corruption of federal candidates—and I do not, *see supra* Findings 80–82 at pages 349–56—the defendants have offered only

scant and contradictory support for the proposition that the national party ban "will in fact alleviate these harms in a direct and material way." *Turner,* 512 U.S. at 664, 114 S.Ct. 2445. Although the statute aims explicitly at the "reduction of special interest influence," much evidence in the record indicates that the ban will in fact *magnify* that influence.

*First,* while prohibiting national political party committees from raising or spending non-federal funds for issue advocacy—whenever the advocacy occurs, whether or not it refers to a federal candidate and whether or not it is broadcast—BCRA continues to permit other groups to raise and spend non-federal funds at any time for non-broadcast, candidate-focused issue advertising. To the extent that *any* candidate-focused issue ad is corrupting—as the defendants would have us believe—single-issue ads sponsored by interest groups are no less likely (and perhaps more likely) to buy political influence than are more broad-based party-sponsored ads. *See Colorado Republican I*, 518 U.S. at 617, 116 S.Ct. 2309 (plurality opinion) ("If anything, an independent expenditure made possible by a $20,000 donation, but controlled and directed by a party rather than the donor, would seem less likely to corrupt than the same (or a much larger) independent expenditure made directly by that donor."); La Raja Expert Report at 19–20, 46 (because interest groups "are not linked at the ballot box with the candidate," they "can air ads without facing reprisals from voters, an arrangement that undermines accountability in the campaign process"); Milkis Expert Report at 25 (interest groups "push government to enact policies that benefit small constituencies at the expense of the general public"); *RNC*

---

"respect what the majority says rather than read between the lines." *Sherman v. Cmty. Consol. Sch. Dist. 21,* 980 F.2d 437, 448 (7th

Cir.1992) ("If the Justices are pulling our leg, let them say so."), *cert. denied,* 508 U.S. 950, 113 S.Ct. 2439, 124 L.Ed.2d 658 (1993).

*v. FEC*, Civ. No. 98–CV–1207 (Herrnson Dep. at 208–09 (parties' use of non-federal funds "does not create such strong policy-oriented IOU's between contributors and legislators as those created by narrowly-focused interest groups that spend soft money to help only a few candidates")); *see also* Keller Expert Report at 27 (political parties have historically countered undue influence of groups with narrow agendas by mediating political processes and "bend[ing] public policy toward a larger, national influence"); Issacharoff & Karlan, *supra*, at 1714 ("groups that engage in independent advocacy have strong incentives to stress one issue around which to mobilize supporters and contributors as opposed to the range of programmatic positions" that candidates and political parties must take); *The Supreme Court, 1995 Term—Leading Cases: Political Party Expenditures,* 110 HARV. L. REV. 236, 242–43 (1996) ("In a country of diverse views and competing interests, political parties . . . enable[ ] the electorate to transcend the parochial interests of PACs and voluntary associations, which are usually united by self-interest, narrow ideologies, or particular issues."); *compare supra* Finding 70 at pages 334–35 (political parties exert moderating influence on public policy), *with supra* Finding 79 at pages 348–49 (interest groups arrange discrete and temporary alliances to address narrow issues and their political activities "are far less transparent than those of parties" (quoting Keller Expert Report at 22)).

*Second,* both the record and common sense suggest that if BCRA section 101 passes constitutional muster, the supply of non-federal funds currently flowing to the political parties will be channeled to interest groups. *See supra* Finding 79d at page 349; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 7 (admitting "[d]efendants have no evidence establishing that current donors of nonfederal money to national political par-

ty committees will, after the effective date of BCRA, cease donating or spending non-federal money in ways that might influence federal elections"); Gallagher Decl. at 16 (expecting increased contributions to NARAL after BCRA); La Raja Expert Report at 40 ("Interest groups will take advantage of the vacuum left by the national committees to raise the nonfederal funds that parties have raised in the past."); Lux Dep. at 51 (agreeing with "widely discussed" prediction of increased non-federal donations to interest groups); Cross Exam. of Def. Witness Bok at 61 (same); Issacharoff & Karlan, *supra,* at 1713 (observing that speakers "spend money on politics because they care about political outcomes" and that "[t]he money reform squeezes out of the formal campaign process must go somewhere"); *cf. SEC v. Int'l Loan Network, Inc.,* 968 F.2d 1304, 1305 (D.C.Cir.1992) ("Money is always there but the pockets change." (quoting Gertrude Stein)).

*Third,* the record indicates as well that non-federal funds made available to interest groups will be used for a wide range of election-related activities, including grassroots and get-out-the-vote activities, voter registration and fundraising events with federal officeholders. *See supra* Finding 79c at pages 348–49; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 18–19; Cross Exam. of Def. Expert Green at 15–24; Cross Exam of Def. Expert Mann at 164–65; Milkis Rebuttal Report at 11; Gallagher Decl. at 6 (NARAL uses federal officeholders to raise funds); Rosenberg Aff. at 3 (New Democrat Network uses federal officeholders to raise funds); Sease Decl. at 5 (Sierra Club uses federal officeholders to raise funds); Solmonese Aff. at 5 (EMILY's List uses federal officeholders to raise funds). To the extent that any one or any combination of these activities is corrupting when sponsored by the national party com-

mittees—although, in light of *Colorado Republican I,* 518 U.S. at 616–17, 116 S.Ct. 2309 (plurality opinion), I do not presume that they are—they are no less corrupting when sponsored by interest groups. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 19–20; Cross Exam of Def. Expert Mann at 148–49.

I do not suggest that the record, as a whole, supports the proposition that BCRA *encourages* corruption. In light of the strict scrutiny applicable here, however, the record *does* "diminish the credibility of the government's rationale for restricting [non-federal funds] in the first place." *City of Ladue,* 512 U.S. at 52, 114 S.Ct. 2038. Just last Term the Court reminded us that a speech restriction "cannot be regarded as protecting an interest of the highest order"—and will therefore fail strict scrutiny—if "it leaves appreciable damage to that supposedly vital interest unprohibited." *White,* 122 S.Ct. at 2537 (quoting *Florida Star v. B.J.F.,* 491 U.S. 524, 541–42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring in judgment)). Indeed, the evidence I have just described leads me to conclude that "the interest given in justification of [section 323(a)] is not compelling." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *see Blount v. SEC,* 61 F.3d 938, 946 (D.C.Cir. 1995) (speech restriction will be struck if it "provides only ineffective or remote support for [its] asserted goals" (quotations omitted)), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996); Cross Exam of Def. Expert Sorauf at 191 ("it's speculative" whether "banning soft money will . . . restore public confidence").

(2)

Even were I convinced that new FECA section 323(a) materially served to prevent actual or apparent corruption, I am not persuaded that it would do so narrowly enough to comport with the First Amendment's guarantees. Surprisingly, the defendants engage in only a half-hearted attempt to convince the court otherwise.[165] *See* Gov't Br. at 86–87; Intervenors Br. at 55–57; Gov't Opp. Br. at 44–46; Intervenors Opp. Br. at 24–27; Gov't Reply Br. at 35–36; Intervenors Reply Br. at 25–29. Boiled down to its essence, their tailoring argument rests on a single, flawed premise—namely, that under the Supreme Court's jurisprudence, we owe substantial deference to the Congress's conclusion that "anything less" than BCRA's broad prophylactic ban on the national party committees' use of non-federal funds "would not adequately reduce the appearance and reality of corruption." Gov't Opp. Br. at 44; *see* Intervenors Br. at 55–57. This hardly seems like a tailoring argument at all, *see NAACP v. Button,* 371 U.S. at 438, 83 S.Ct. 328 ("Broad prophylactic rules in the area of free expression are suspect."), and, in any case, I would reject it.

The defendants believe that *Colorado Republican II* supports the ban on grounds of "loophole closing" or "evasion prevention." Gov't Br. at 60–61, 71–72; *see* Intervenors Br. at 53–55; Intervenors Opp. Br. at 24–27. The Court in *Colorado Republican II* sustained against a facial attack FECA's party expenditure provision, 2 U.S.C. § 441a(d), because "a party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of

---

**165.** Arguing that strict scrutiny is inapplicable, the defendants make *no* attempt to establish that section 323(a) is narrowly tailored. While they do contend that the ban is "closely drawn to achieve its objectives," *e.g.,* Gov't Br. at 86, they collectively spend fewer than 20 pages (out of 800) in briefing that claim.

contribution limits." *Colorado Republican II*, 533 U.S. at 465, 121 S.Ct. 2351. Perceiving "no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate," the Court found "good reason to expect that a party's right of unlimited coordinated spending would attract increased contributions to parties to finance exactly *that kind* of spending." *Id.* at 464, 121 S.Ct. 2351 (emphasis added). Quoting selectively from the decision, the defendants parrot the Court's concern that, "whether they like it or not," political parties "act as agents for spending on behalf of those who seek to produce obligated officeholders" because donors "give to the party with the tacit understanding that the favored candidate will benefit." *Id.* at 452, 458, 121 S.Ct. 2351. The Court's observation, however, related only to the danger of corruption presented by *coordinated* expenditures. *See id.* at 449–60, 121 S.Ct. 2351. While upholding the party expenditure provision because it targets precisely *that* danger, *see id.* at 452, 464, 121 S.Ct. 2351, the Court was careful to limit its "anticircumvention" rationale to party spending that functions like a direct donor-to-candidate contribution. *See id.* at 464, 121 S.Ct. 2351; *see also* McConnell Opp. Br. at 23 ("To the extent that the Court has recognized an anti-circumvention rationale, ... it has only used it to justify limits on contributions that can be used for all of the same purposes as direct contributions to federal candidates themselves."). The Court was also careful to distinguish *Colorado Republican I*, which held that a party's *independent* expenditures present little or no danger of "corruption-by-conduit." *Colorado Republican II*, 533 U.S. at 463–64, 121 S.Ct. 2351. Thus, the Court advised, its decision did *nothing to* upset a party's "right under *Colorado I* to spend money in support of a candidate without legal limit so long as it spends in-

dependently." *Id.* at 455, 121 S.Ct. 2351. Indeed, the Court emphasized that "[a] party may spend independently *every cent it can raise* wherever it thinks its candidate will shine, on every subject and any viewpoint." *Id.* (emphasis added). But that is precisely what the ban on national party non-federal funds intends to prevent. The defendants' response that a party may spend independently every cent it can raise *subject to federal limits* is insufficient. *See* Gov't Br. at 63 (BCRA requires "merely" that independent party expenditures "be financed by funds that are subject to the 'contribution' limits of FECA"). While the ban will slow if not stop coordinated activity, it also "automatically affects" a national party's ability to engage in issue advocacy and party-building activities independent of any candidate's campaign. *Citizens Against Rent Control*, 454 U.S. at 299, 102 S.Ct. 434. Thus does the ban impermissibly fail to distinguish between fully-protected and less protected associational activity. *See Colorado Republican I*, 518 U.S. at 617, 116 S.Ct. 2309 (plurality opinion) ("the constitutionally significant fact" in donation-to-party context "is the lack of coordination between the candidate and the source of the expenditure"); RNC Opp. Br. at 38 ("fundamental error" underlying ban "is the assumption that *all* funds received by the party can be subjected to a federal contribution limit just because *some* of the party's activities are regulable" (emphasis in original)); *see also Free Speech Coalition*, 122 S.Ct. at 1404 (notion that "protected speech may be banned as a means to ban unprotected speech ... turns the First Amendment upside down").

I note finally that the defendants, like BCRA's sponsors, have suggested that it is primarily the *size* and *source* of certain non-federal donations that corrupts or appears to corrupt federal candidates. *See,*

*e.g.,* Gov't Br. at 68 (emphasizing top 50 donors of non-federal funds in 1996 election cycle gave more than $500,000 each); Gov't Opp. Br. at 16 (emphasizing "common sense proposition that the problem of corruption and perceived corruption grows with the size of the contributions at issue"); Feingold Dep. at 123 ("I have been very clear that I consider the soft money contributions to be extremely corrupting because of their size."); *see also supra* Findings 65–66 at page 331. The government points out that in the 2000 election cycle, "[a]pproximately 60 percent of the parties' total soft money receipts were donated by approximately 800 entities, with more than 400 of those corporations and unions." Gov't Br. at 68 (citing Mann Expert Report at 24–25). Coupling that statistic with the sensible proposition that "[t]he diversity of [similar sized] financial contributions to parties is itself a check on the influence of special interests," Keller Expert Report at 29, one would think a *cap* on the amount of non-federal donations from any single source would serve to root out the most corrupting influences while attempting to honor the First Amendment at the same time. The Congress rejected such a proposal, *see* 147 CONG. REC. S2908 (daily ed. Mar. 26, 2001) (Hagel amendment proposing aggregate cap of $60,000), and the defendants—returning to their "deference axiom," Intervenors Br. at 56—confidently assure us that we may not "second-guess" that judgment:

In determining whether campaign finance regulations are closely drawn, the Supreme Court has consistently refused to second-guess Congress either as to the need for prophylactic measures or the particularities of those measures. Thus, in responding to the claim that a $1,000 contribution limit was "unrealistically low," the *Buckley* Court held that it would neither second-guess Congress's "failure to engage in such fine tuning" nor use a "scalpel" to scrutinize Congress's judgment about the appropriate limit. *Buckley,* 424 U.S. at 30, 96 S.Ct. 612.... This principle of deference to Congress's expert judgment has since *Buckley* become firmly embedded in the Supreme Court's jurisprudence.

Intervenors Opp. Br. at 24. I disagree. Strict scrutiny *mandates* that we second-guess the Congress's means-ends judgment where the means chosen restrict at least some degree of protected speech. *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."); *see also MCFL,* 479 U.S. at 265, 107 S.Ct. 616 (courts must be "vigilant against [even] the modest diminution of speech" and ensure the Congress "curtail[s] speech only to the degree necessary to meet the particular problem at hand"); BeVier, *Money and Politics, supra,* at 1084–85 (Court's strict scrutiny jurisprudence cautions "reluctance to yield passively to legislative determinations of 'the need for prophylactic measures' " and requires courts "to assure in every case that the legislatively chosen means bear a relation of imminence and likelihood to the harm sought to be prevented"); BeVier, *Political Speech, supra,* at 314 (while "Court's general doctrine allows legislatures a relatively free choice of means," Congress's choice of means is greatly limited in cases where "strict review" is applicable (citing *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960))). For reasons I have explained in detail, *see supra* Part IV. D.1.a, whatever "principle of deference" *Buckley* announced in the contribution-to-candidate context is inapposite here. The Congress fashioned a broad prophylactic ban on non-federal donations to any na-

tional political party committee in *any* amount from *any* entity or individual, irrespective whether the party spends the funds *independently*. That handiwork reflects the use not of a sharp and sure legislative scalpel but a blunt and misdirected bludgeon. *See NCPAC*, 470 U.S. at 501, 105 S.Ct. 1459 ("We are not quibbling over fine-tuning ... but are concerned about wholesale restriction of clearly protected conduct."). The ban is not narrowly tailored; indeed, it is not tailored at all.

\* \* \*

New FECA section 323(a)'s ban on national party use of non-federal funds fails to serve the government's interest in preventing actual or apparent corruption of federal candidates and, worse, it indiscriminately restricts independent expenditures disbursed for protected issue advocacy and non-corrupting party-building activities. In my opinion, the ban is substantially overbroad, *see supra* Part IV.D.1.b.(2), and represents an impermissible burden on the expressive associational rights of the national political party committees and their donors, *see Sweezy*, 354 U.S. at 250, 77 S.Ct. 1203 (plurality opinion) ("Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents."). Accordingly, I would hold that it is unconstitutional on its face.

### c. Sections 301(20) and 323(b) Fail Strict Scrutiny

▆ Under strict scrutiny, sections 301(20) and 323(b)—which restrict state and local party spending of non-federal funds for "Federal election activity"—likewise fall far short of passing constitutional muster. I conclude below that (1) the state and local party restrictions do not serve the government's interest in preventing actual or apparent corruption of *federal* candidates; and (2) even if the restrictions did retard corruption, they are not narrowly tailored.

### (1)

The plaintiffs suggest that to the extent section 323(a) is constitutionally invalid, section 323(b) must be struck down on grounds of inseverability. *See, e.g.,* RNC Br. at 71 ("[W]ere § 323(a) struck down and national parties freed to use nonfederal money, § 323(b) would cease to have any real effect...."); RNC Opp. Br. at 48. At least one defense expert opined to the same effect:

> Q: ... If the provision[ ] restricting national party committees were struck down, would it make sense to continue the restrictions on state and local parties?

> A: In this case, the whole effort would be lost.... [The national parties] would no longer need state and local parties as, as vehicles.... [Y]ou have already lost the whole show if the national party soft money ban is declared unconstitutional. If it's gone, it's hard for me to see how the court would then find a rationale for maintaining the limits in the law [on] state and local parties.

Cross Exam. of Def. Expert Mann at 110. While I am inclined to agree, I do not believe it necessary to decide whether the state party restrictions are severable—sections 301(20) and 323(b) cannot be sustained even on their own terms.

To repeat, *see supra* Part II.D, sections 301(20) and 323(b) limit state and local party committee spending of non-federal funds on "Federal election activity," which is defined broadly as (1) any voter registration activity within 120 days of a regularly scheduled federal election; (2) voter identification, get-out-the-vote activity or generic campaign activity conducted "in connection with" any election in which a federal candidate appears on the ballot; (3) issue advocacy which "refers to" a clearly identified candidate for federal office and which "promotes," "supports," "at-

tacks" or "opposes" a candidate for that office, regardless when the advocacy occurs and how it is transmitted; and (4) services provided by a state or local party employee who spends more than 25 per cent of his paid time during any one month on activities "in connection with" a federal election. BCRA § 101(b); FECA § 301(20)(A); 2 U.S.C. § 431(20)(A). As a general rule, a state or local party committee must pay for such activities solely with funds subject to FECA's source-and-amount restrictions, *see* BCRA § 101(a); FECA 323(b)(1); 2 U.S.C. § 441i(b)(1), which are substantially more stringent than those of many States. *See* Br. of *Amici Curiae* Delaware et al. at 5–8 (discussing "diverse array" of state campaign finance laws and noting 29 States permit corporate treasury contributions to state candidates (capitalization altered)); *see also* CDP Br. at 8 (current California campaign finance law "was specifically designed to allow the political parties . . . to play a greater role in State and local elections, on the theory that empowering the parties to raise and spend more money relative to candidates reduced the appearance and threat of corruption by providing an 'insulating' effect between large contributors and candidates"). The Levin Amendment carves out a heavily-conditioned exception to the general rule against state-party spending of non-federal funds on the four classes of "Federal election activity." Under the Levin Amendment, a state or local party committee may spend an FEC-specified amount of federally-regulated "Levin funds" on voter registration, voter identification, generic campaign activity and get-out-the-vote activity as long as (1) the activity does not refer to a federal candidate; (2) the funds are not spent on any broadcast communication, unless the broadcast refers solely to a state or local candidate; (3) no person donates more than $10,000 to the committee; and (4) the funds spent are raised exclusively

by the spending committee itself. *See* BCRA § 101(a); FECA § 323(b)(2)(B); 2 U.S.C. § 441i(b)(2)(B). If any *one* of these conditions is unmet, all bets are off; the committee may not reap the narrow benefits of the Levin Amendment and must pay for the listed activities with funds subject to FECA's source-and-amount limits.

The defendants assert that the restrictions on state and local party committees "are supported by the same interests as the ban on [the use of] soft money by national party committees." Gov't Br. at 100. I think it more accurate to say that sections 301(20) and 323(b) are *unsupported* by the same interests. The defendants could not cite a single instance of "dollars-for-political-favors" corruption, *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459, stemming from donation of non-federal funds to the national party committees. *See supra* Part IV.D.1.b. They fail again with respect to state and local party committees. *See supra* Finding 80 at pages 349–51; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 2–4; McCain Dep. at 170–71; Feingold Dep. at 132; Snowe Dep. at 206–07; Jeffords Dep. at 107. And while they repeatedly recount as an exhaustive set of corruptive examples the "access and . influence afforded Roger Tamraz, James Riady and Carl Linder [sic] after they made large contributions to various state Democratic parties," Intervenors Opp. Br. at 13 n. 38 (citing Intervenors Br. at 32–33), they have not established a convincing link between non-federal donations to state parties on the one hand and "access" to federal candidates on the other. *See supra* Findings 80c, 81b–81c at pages 350–53; *see also, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4 (conceding lack of evidence that "officeholders are more likely to meet with donors of non-federal money than with donors of federal money"). It is not surprising, then, that

the defendants barely attempt to justify the state party restrictions as a *direct* means of preventing actual or apparent *quid pro quo,* or even "access," corruption; their primary contention instead is that the restrictions are necessary to prevent circumvention of the constitutionally flawed national party ban. *See, e.g.,* Gov't Br. at 103 ("If BCRA only regulated soft money contributed to national party committees, donors would simply funnel soft money in unlimited amounts to state and local party committees to influence federal elections . . . ."); Intervenors Br. at 13, 59 (same); Intervenors Opp. Br. at 29–30 (same); *see also* 147 CONG. REC. S2928 (daily ed. Mar. 27, 2001) (statement of Sen. Schumer) ("[R]egulating soft money without dealing with the soft money that goes to State parties is like the person who drinks a Diet Coke with his double cheeseburger and fries: It does not quite get the job done."). As the *CDP* plaintiffs point out, however, "the circumvention rationale is only valid to the extent that [BCRA] prevents violation of the [Act's] underlying contribution limits," which are designed to prevent actual or apparent corruption of federal candidates. CDP Opp. Br. at 16 (emphasis omitted). Although the defendants would have us believe the "Congress recognized that allowing state-level party committees to expend unlimited amounts of unregulated funds on activity that influences federal elections would . . . promote the appearance and reality of political corruption," Gov't Br. at 100, their assertion is flawed in at least four respects, *see infra;* indeed, the record leads me to conclude that sections 301(20) and 323(b) are not targeted to prevent actual or apparent corruption.

*First,* the Congress *qua* Congress made no findings of fact in support of BCRA generally or the state- and local-party restrictions specifically. Accordingly, and especially through the lens of strict scrutiny, I view with a good deal of skepticism the defendants' reliance on sound-bite legislative history thought to support the notion that sections 301(20) and 323(b) are "necessary . . . to protect the integrity of Federal elections." Gov't Br. at 100 (citing 148 CONG. REC. S2138–39 (daily ed. Mar. 20, 2002) (statement of Sen. McCain)); *see Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 89, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (deriding congressional "evidence consist[ing] almost entirely of isolated sentences clipped from floor debates and legislative reports," most of which was anecdotal or resembled *ipse dixit* reasoning); *see also supra* page 296. As evidenced by the House Committee on Administration's "Adverse Report" on both the national and state provisions, the legislative history is, at the very least, inconsistent on the necessity of sections 301(20) and 323(b):

> No evidence has been produced to this Committee of a "corruption" problem stemming from soft money contributions to political parties. Even if there had been such a showing, H.R. 2356 does not even attempt to be a narrowly tailored remedy. If it were ever to become law, it would have precisely the opposite effect its proponents intend. Rather than diminish the power of "special interest" groups, it would actually make those groups even more powerful than they are today.

H.R. REP. No. 107–131, pt. 1, at 2 (2001).

*Second,* donations to state and local party committees are neither unlimited nor unregulated. If such funds are directed to influencing state elections, they are ordinarily regulated by state law. *See generally* Br. of *Amici Curiae* Delaware et al. More importantly, if such funds are donated "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(8)(A)(i), they are "contributions" already subject to FECA's source-and-

amount restrictions. *See, e.g.,* BCRA § 102; FECA § 315(a)(1)(D); 2 U.S.C. § 441a(a)(1)(D) ("[N]o person shall make contributions ... to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000."); 2 U.S.C. § 441a(a)(2)(C) ("No multicandidate political committee shall make contributions ... to any other political committee in any calendar year which, in the aggregate, exceed $5,000."); 2 U.S.C. § 441a(a)(8) ("[A]ll contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate."); 2 U.S.C. § 441b(a) ("It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any [federal] election ...."). In light of preexisting federal law, the defendants' charge that state-party use of non-federal funds "distort[s] the legislative process" and "is inherently, endemically, and hopelessly corrupting," Gov't Br. at 81 (quoting Rudman Decl. at 4), is hyperbolic. In litigation involving a state political party committee, the Supreme Court itself recognized that under FECA "[u]nregulated 'soft money' [donations] may not be used to influence a federal campaign, except when used in the limited, party-building activities specially designated in the statute." *Colorado Republican I,* 518 U.S. at 616, 116 S.Ct. 2309 (plurality opinion) (citing 2 U.S.C. § 431(8)(B)). It observed further that "[a] party may not simply channel unlimited amounts of even undesignated contributions to a candidate, since such direct transfers are also considered contributions." *Id.* at 616–17, 116 S.Ct. 2309.

*Third,* the defendants resist the plain import of FECA and *Colorado Republican I,* asserting that "soft money, by definition, is nothing more than a donation that exceeds FECA's contribution limits or comes from a source that the statute prohibits." Gov't Opp. Br. at 1. As the *CDP* plaintiffs demonstrate, however, much non-federal money is raised at the state and local levels, *see supra* Finding 75a.3 at page 345, and little if any of it is used "for the purpose of influencing" a federal election, *see supra* Finding 73 at pages 343–44; *see also, e.g.,* CDP Br. at 4 (California Democratic and Republican parties have traditionally spent majority of non-federal resources on state and local ballot measures and elections for state and local offices (citing Bowler Decl. at 5; Erwin Decl. at 5)); CDP Opp. Br. at 5–6. Quoting former Senator Thompson, the defendants nonetheless insist that state party spending of non-federal funds—especially on issue advocacy that happens to mention a federal candidate—"affects" federal elections and therefore has the "potential" to corrupt federal candidates:

> Republican and Democratic Senate candidates set up joint fundraising committees, joining with party committees, to raise unlimited soft money donations. The joint committees then transferred the soft money funds to their Senate party committees, which transferred the money to their state parties, which spent the soft money on "issue ads" ... promoting ... federal candidates[.]

Gov't Br. at 101 (quoting 147 Cong. Rec. S3251 (daily ed. Apr. 2, 2001) (statement of Sen. Thompson)). Against the backdrop of FECA, the defendants' assertions and BCRA's restrictions on state and local parties reflect little more than frustration with First Amendment principles firmly rooted in *Buckley, Citizens Against Rent Control* and *Colorado Republican I.* Taken together, these cases hold that the Con-

gress cannot constitutionally regulate non-federal donations to political parties if the funds are then spent independently of a candidate—whether for issue advocacy or for generic party-building activities—given that "the opportunity for corruption posed by" such funds "is, at best, attenuated." *Colorado Republican I,* 518 U.S. at 616, 116 S.Ct. 2309 (plurality opinion); *see Buckley,* 424 U.S. at 45, 96 S.Ct. 612 ("So long as persons and groups eschew expenditures that in express terms advocate the election or defeat of a clearly identified candidate, they are free to spend as much as they want to promote the candidate and his views."); *see also Citizens Against Rent Control,* 454 U.S. at 299, 102 S.Ct. 434 ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression.").

*Fourth,* the defendants' evidence that non-federal donations to state and local parties "raise the possibility of the *appearance* of corruption," Feingold Dep. at 196 (emphasis added), is no stronger than their evidence (or notable lack thereof) that such donations have in fact produced political favors from federal candidates. *See supra* Finding 82 at pages 353–56. Characteristic "evidence" of apparent corruption can be found in a string cite in the government's opposition brief:

> [D]efendants have presented considerable evidence of soft money donations that at the very least appear to have been made to secure political *quid pro quos. See* ... Simon Decl. ¶ 13 ("[I]t is not unusual for large contributors to seek legislative favors in exchange for their contributions."); Simpson Decl. ¶ 10 ("[D]onations from the tobacco industry to Republicans scuttled tobacco legislation, just as contributions from the trial lawyers to Democrats stopped tort reform."); Hickmott Decl. ¶ 9 (corporate donors frequently give soft money to parties to "influence the legislative process for their business purposes");

Andrews Decl. ¶ 7 ("Those who are able to provide the largest sums of money are often more likely to have more consideration given to their views. Not only does it help provide a foot in the door into a federal elected official's office and a chance to make the donor's pitch, but also it naturally may tend to foster a more sympathetic hearing."). Congress noted similar concerns. *See, e.g.,* 147 CONG. REC. S3107–10 (daily ed. Mar. 29, 2001) (Sen.Feingold) ("[I]t is important for us to acknowledge that millions of dollars are given in an attempt to influence what we do.").

Gov't Opp. Br. at 16 n. 18 (bracketed evidentiary citations omitted); *see* Gov't Br. at 79–81 (quoting similar sources); *see also, e.g.,* McCain Decl. at 3 ("I believe, based on my experience, that elected officials do act in particular ways in order to assist large soft money donors and that this skews and shapes the legislative process."). Of course, the statute's sponsors and supporters are not the Congress itself. And, as I have mentioned, the Congress made no finding that non-federal donations to state and local parties appear to corrupt federal elections; indeed, it made no findings in support of BCRA whatsoever. The Supreme Court views with skepticism evidence that "consists not of legislative findings, but of unexamined, anecdotal accounts." *Bd. of Trustees v. Garrett,* 531 U.S. 356, 370, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *see Kimel,* 528 U.S. at 89, 120 S.Ct. 631 (same); *City of Boerne v. Flores,* 521 U.S. 507, 530–31, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (same); *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624 (striking down provision of Gun Free School Zones Act because, *inter alia,* "[n]either the statute nor its legislative history contain[ed] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone"). Skepticism is particularly appropriate in the context of

First Amendment strict scrutiny, where "the usual presumption of constitutionality afforded congressional enactments is reversed." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817, 822, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (to carry burden of strict scrutiny under First Amendment, government "must present more than anecdote and supposition"); *see Landmark Communications*, 435 U.S. at 841, 98 S.Ct. 1535 (striking down speech restriction subject to strict scrutiny where government "offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined"); *see also CIO*, 335 U.S. at 145, 68 S.Ct. 1349 (Rutledge, J., concurring in judgment) (First Amendment "forces upon [a speech restriction's] authors the burden of justifying the contraction by demonstrating indubitable public advantage arising from the restriction outweighing all disadvantages, thus reversing the direction of presumptive weight [applicable] in other cases"). As I have mentioned, *see supra* page 296, the Court has also made clear that the Congress may not justify the infringement of constitutionally protected liberties with rationalizations that are "hypothesized or invented post hoc in response to litigation." *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264. Accordingly, the post-enactment anecdotal record amassed in this court to suggest that non-federal donations to state parties appear to corrupt federal candidates, see Intervenors Br. at 32–38; see generally Andrews Decl.; Feingold Decl.; Geshke Decl.; Hassenfeld Decl.; Hiatt Decl.; Hickmott Decl.; Kirsch Decl.; McCain Decl.; Rudman Decl.; Simon Decl.; Simpson Decl.; Wirth Decl., is no substitute for the record that should have been assembled down the street in the years leading up to BCRA's passage.

In the campaign finance context, the courts "have never accepted mere conjecture as adequate to carry [the] First Amendment burden." *Shrink Missouri*, 528 U.S. at 392, 120 S.Ct. 897. I am unwilling to start now. The defendants' hypothesis that non-federal donations to state and local political party committees appear to corrupt federal candidates is an especially novel one given that such donations, by definition, are *not* made "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). Thus, because the defendants have proffered no convincing empirical evidence in support of their theory, *cf.* McCain Dep. at 195 ("I've campaigned all over America, and I've seen the air waves inundated with soft money attack ads, and that was not the way it was before the loopholes were opened. *So I don't have to have statistics.*" (emphasis added)), I believe that they have failed to carry their substantial evidentiary burden. *See Shrink Missouri*, 528 U.S. at 391, 120 S.Ct. 897 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). Sections 301(20) and 323(b) cannot withstand strict scrutiny because they do not serve a compelling governmental interest; on this record, actual or apparent corruption of federal candidates "remains a hypothetical possibility and nothing more." *NCPAC*, 470 U.S. at 498, 105 S.Ct. 1459; *see Austin*, 494 U.S. at 689, 110 S.Ct. 1391 (Scalia, J., dissenting) ("[T]he mere potential for harm does not justify a restriction upon speech . . . ."); *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.) ("The question in every case is whether the [speech is] used in such circumstances and [is] of such a nature as to create a clear and present danger that [it] will bring about the substantive evils that Congress has a right to prevent.").

### (2)

Sections 301(20) and 323(b) apply wholesale to state and local party expenditures for state-focused election activities that barely affect federal elections on the theory that they may *potentially* corrupt a given federal candidate. *See, e.g.,* Intervenors Opp. Br. at 13; Feingold Dep. at 196 (unlimited non-federal donations to state and local parties "raise the *possibility* of the appearance of corruption" (emphasis added)). I conclude in the following discussion that even if sections 301(20) and 323(b) served in some instances to prevent corruption or its appearance, *but see supra* Part IV.D.1.c.(1), they could not survive strict scrutiny because they are not narrowly tailored. In my view, the provisions restrict too much non-corrupting political speech.

It is undisputed that state and local party committees undertake "mixed" activities on behalf of both state and federal candidates; they pay overhead expenses, mobilize full-ticket voting, communicate with party supporters and engage in certain "joint" advertising. *See supra* Findings 72a, 72c, 73b–73e, 74 at pages 341–45, 166–69; *see also, e.g.,* Benson Decl. at 3 (describing Colorado Republican Party programs that "support the entire ticket" but "often place a greater emphasis on state-wide and state legislative races than on federal races"); Cardenas Decl. at 3–4 (describing Florida Republican Party's payment of mixed activities); Dendahl Decl. at 6–12 (describing certain "ticket-wide" activities of New Mexico Republican Party). And it is no doubt true, as the defendants repeatedly assert, that "[b]ecause the partisan proclivities of the electorate express themselves toward *both* state and federal candidates, state parties influence federal elections directly even when they mobilize their supporters on behalf of a candidate for state office." *E.g.,* Gov't Opp. Br. at 27 (quoting Green

Expert Report at 13 (emphasis in original)). Manifesting this fact, the FEC's pre-BCRA allocation regulations required that a certain percentage of federal funds be used on mixed activities to the extent that voter identification, voter registration, get-out-the-vote drives and "other activities that urge the general public to register, vote or support candidates of a particular party" affected simultaneous federal elections. 11 C.F.R. § 106.5(a)(2)(iv) (2001); *see supra* Findings 72a, 72c at pages 341–42; *see also* TWENTY YEAR REPORT, *supra,* ch. 3 ("Some expenses incurred by [state and local party] committees ... may in fact relate to both federal and nonfederal elections. Party committees, for example, may purchase generic get-out-the-vote advertisements that benefit both their federal and nonfederal candidates. To pay for these ads, committees must use federal funds for the portion that benefits federal candidates, but may use soft money for ... the portion that benefits nonfederal candidates[.]"); CDP Opp. Br. at 6 n. 5 (in 2000 election cycle FEC regulations required the CDP "to pay all administrative, generic [get-out-the-vote] and general party-building activities with at least 43% *federal* money" (emphasis in original)). Sections 301(20) and 323(b), however, abandon the rough balance struck by the allocation regulations. They require state parties to spend federal funds on activities that will not plausibly corrupt any federal candidate. Consider an example the *CDP* plaintiffs raised at oral argument. In 1996 the CDP used non-federal funds to pay for the following radio ad urging the California electorate to vote against a controversial ballot initiative:

Tuesday is the day we decide whether we let them turn back the clock on us. Because Tuesday is election day, the day we can vote down Governor Wilson's scheme to take away our civil rights and

end our chance for fairness. The Republican scheme is Prop. 209 and it would eliminate affirmative action which helps make our society fair and gives every one of us a fair chance at the American dream. But to say yes to fairness and no to mean-spirited Prop. 209, we have to say yes to voting. On Tuesday, we must go to the polls and cast a most important vote for fairness, for affirmative action—a vote against Prop. 209. Vote No on 209. Vote no on the Republican scheme to turn the clock back and shut down equal opportunity for all. On Tuesday, vote yes for our future and no on Prop. 209. Don't let the Republicans get away with it. Don't stay home. That's what they're counting on. Paid for by the California Democratic Party.

Feingold Dep. Exh. 15. Conceding that sections 301(20) and 323(b) would require the CDP to fund the foregoing ad with federal money,[166] the intervenors contend that "it is inconceivable that an ad like this, which encourages voters to go to the polls to ensure that 'Republicans [don't] get away with it,' would have no effect on the contemporaneous federal election." Intervenors Opp. Br. at 11 n. 30, 31–32. Their contention, even if correct, is irrelevant. The Congress cannot, consistent with First Amendment strict scrutiny, limit a political party's pooling of individual, corporate or union donations to pay for an ad that so plainly has no corrupting effect, real or imagined, on any federal candidate or officeholder. As the Court held in *Bellotti,*

[t]he risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue. To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it[.]

*Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407; *see* Intervenors Opp. Br. at 20 n. 49 (noting that Court invalidated contribution-to-committee limit in *Citizens Against Rent Control* because "the recipient committee had been formed to support a local ballot measure" and "the Court found [that] there was no risk of actual or apparent corruption" (citing *Citizens Against Rent Control,* 454 U.S. at 292, 298, 102 S.Ct. 434)). I note a few more of the *CDP* plaintiffs' examples of state-oriented, non-corrupting "Federal election activit[ies]" the non-federal funding of which sections 301(20) and 323(b) restrict:

1. A generic get-out-the-vote mailer stating: "Our Vote is Our Voice. Keep Asian Pacific American families moving forward. Vote Democrat." CDP App. at 177; *see* Resp. of Intervenors to CDP's First Set of Reqs. for Admis. at 3 (admitting mailer is "Federal election activity" under BCRA and FEC regulations and must be paid for either entirely with federal funds or with a combination of federal funds and Levin funds).

2. A generic get-out-the-vote newspaper advertisement stating: "On Nov. 5th, We're Voting for Ourselves. Vote

---

**166.** The government contends that under the FEC's newly-issued regulations, the radio ad would not constitute get-out-the-vote activity because it was not disseminated by *"individualized* means." Gov't Opp. Br. at 31 (quoting 11 C.F.R. § 100.24(a)(3) (emphasis the government's)). As the *McConnell* plaintiffs demonstrate, however, if the CDP simply " 'broadcast' the same advertisement via a phone bank, rather than the radio, and did so within 72 hours of the election, it would still constitute get-out-the-vote activity even under the FEC's regulations." McConnell Reply Br. at 9–10. The CDP ad would be no less speech and no more corrupting of a federal candidate if transmitted by phone than if broadcast on the radio.

Democratic '96. It's Too Important Not To." CDP App. at 180; *see* Resp. of Intervenors to CDP's First Set of Reqs. for Admis. at 4 (admitting advertisement is "Federal election activity" under BCRA and FEC regulations and must be paid for entirely with federal funds).

3. A get-out-the-vote phone script featuring Jesse Jackson urging voters: "On November 7th, your vote is not just about candidates. We need everyone in our community voting to defeat Prop. 38[,] the school voucher initiative. Prop. 38 brings new discrimination to our schools. Our children can be turned away based on test scores, religion or even family income. I urge you to get out to vote on November 7th. Vote no on Prop. 38, KEEP HOPE ALIVE!!!" CDP App. at 197; *see* Resp. of Intervenors to CDP's First Set of Reqs. for Admis. at 5 (admitting phone script is "Federal election activity" under BCRA and FEC regulations and must be paid for entirely with federal funds).

4. A get-out-the-vote mailer urging addressees to "Give Anaheim two strong voices" by voting for Gray Davis and Tom Daly for state office "on November 3," a date on which a candidate for Federal office also appeared on the ballot. CDP App. at 51.

*See generally* CDP Br. at 17–20 & nn. 16–20. The first of these communications features the name and likeness of Norman Y. Mineta and notes (in very small print) that he is the "[f]irst Asian Pacific American in history to be appointed to a cabinet posi-

tion." CDP App. at 177. None of the other communications mentions anyone even remotely tied to federal office, much less a federal candidate. Thus, none of them poses anything more than a "hypothetical possibility" of *corrupting* a federal candidate. *NCPAC,* 470 U.S. at 498, 105 S.Ct. 1459. Yet every one of these core speech activities must be funded either entirely with federal funds or with strictly-limited Levin funds.[167]

If the Congress was concerned about the allegedly corrupting effect of state-oriented "Federal election activit[ies]" that might (or might not) incidentally affect a federal election, it was troubled for naught. Nothing in the record remotely suggests that the "Federal election activit[ies]" listed above corrupt or appear to corrupt federal candidates. And whether or not BCRA's sponsors and supporters have also overstated their concern that state and local parties have operated as "pass-through accounts for ... large, direct contributions from corporations, unions, and wealthy individuals," *e.g.,* Intervenors Br. at 35 (quoting 148 CONG. REC. S2138–39 (daily ed. Mar. 20, 2002) (statement of Sen. McCain)), sections 301(20) and 323(b) do not represent a narrowly tailored response. If conduit corruption is indeed a problem at the state-party level, the most measured solution is stronger enforcement of provisions that already regulate "contributions" made "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). As I noted earlier,

---

**167.** The government claims that certain of these flyers and mailers would be excepted from section 323(b) by FEC regulation, "particularly if [they are] 'mass mailing[s]' of over 500 pieces." Gov't Opp. Br. at 31. The intervenors make no such argument because some of them are currently challenging the regulation on which the government relies. *See Shays v. FEC,* No. 02–CV–1984 (D.D.C., filed Oct. 8, 2002). Even if the government is

correct about the regulation (and the regulation withstands APA review), its argument has little bearing on the outcome of the facial challenge before us; as the RNC demonstrates, if a state-focused flyer or mailer "is mailed to 499 homes, or is 'individualized' by hand-delivery to 10,000, or if the [same] message is by phone, it *is* covered by § 323(b)" even under the regulations. RNC Reply Br. at 9–10 n. 5 (emphasis in original).

the Court itself has observed that under FECA

> [a]ny contribution to a party that is earmarked for a particular campaign is considered a contribution to the candidate and is subject to the contribution limitations. § 441a(a)(8). A party may not simply channel unlimited amounts of even undesignated contributions to a candidate, since such direct transfers are also considered contributions and are subject to the contribution limits on a "multicandidate political committee." § 441a(a)(2).

*Colorado Republican I,* 518 U.S. at 616–17, 116 S.Ct. 2309 (plurality opinion); *see Colorado Republican II,* 533 U.S. at 481, 121 S.Ct. 2351 (Thomas, J., dissenting) ("Vigilant enforcement of [the earmarking] provision is a precise response to . . . circumvention concerns. If a donor contributes [$4,000] to a candidate (the maximum donation in an election cycle), he cannot direct the political party to funnel another dime to the candidate without confronting the Federal Election Campaign Act's civil and criminal penalties . . . ."). Finally, if the problem is that "the six national political party committees transferred over $420 million in hard and soft money to state and local parties during the 2000 election cycle, principally for the purpose of influencing federal elections through 'issue ads,' " Intervenors Opp. Br. at 13; *see* McCain Dep. at 193 ("It's the broadcast television and

radio ads that we believe are what is the problem."), it is one problem the Congress lacks the constitutional authority to solve. Under the Court's case law, party issue advocacy is entitled to full First Amendment protection and may not be regulated (even on the supply side) if expenditures therefor are disbursed independently of a candidate's campaign.[168] *See Colorado Republican I,* 518 U.S. at 618, 116 S.Ct. 2309 (plurality opinion) ("We do not see how a Constitution that grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures could deny the same right to political parties."); *Citizens Against Rent Control,* 454 U.S. at 299–300, 102 S.Ct. 434; *Buckley,* 424 U.S. at 45–47, 96 S.Ct. 612; *see also* Smith, *Hard Realities, supra,* at 199. And even if issue advocacy funded by transfers from the national parties were within the Congress's regulatory reach, sections 301(20) and 323(b) must target that "problem" more precisely than they do, perhaps by prohibiting *only* national party transfers[169] and permitting state parties to raise non-federal funds without limit. *See* CDP Br. at 32. Moreover, as the *CDP* plaintiffs aptly point out,

> a cap on [non-federal] spending (i.e., the $10,000 Levin limit) that is not adjusted in any way for the size of the [S]tate or the population to be reached presents particular problems for large [S]tates

---

**168.** Significantly, new FECA sections 301(20) and 323(b) are substantially broader than the facially overbroad "electioneering communication" provisions of BCRA Title II inasmuch as they restrict party issue advocacy transmitted at any time and by any means (besides the internet). *See* BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii) (definition of "Federal election activity" includes "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of wheth-

er the communication expressly advocates a vote for or against a candidate)"); *see also* 67 Fed.Reg. at 49111 ("The term public communication shall not include communications over the Internet.").

**169.** Of course, even this restriction would raise serious constitutional questions. *See, e.g.,* CDP Br. at 36 et seq. (arguing that BCRA's "prohibitions on transfers" themselves "impose substantial burdens that are not narrowly tailored to meet a compelling government interest" (capitalization altered)).

such as California. With all due respect to Senator McCain, when the cost of one statewide mail piece is approximately $260,000 (Bowler Decl. [at] 20), $10,000 does *not* allow for a lot of communication. McCain Dep. [at] 278 ("You can print a lot of handouts for $10,000.")... The [California] parties cannot possibly raise the money under the federal limits necessary to reach a massive California audience in a meaningful way.... Congress has failed to properly narrow the focus of "federal" activities in any meaningful way, and has imposed a limit upon the parties' abilities to spend state funds that is completely unrelated to the likelihood of corruption or the appearance of corruption of federal candidates.

CDP Br. at 32, 34 (emphasis in original). I agree. In unrestrained fashion, sections 301(20) and 323(b) "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley,* 424 U.S. at 19, 96 S.Ct. 612. They fail the narrow tailoring requirement of First Amendment strict scrutiny.

\* \* \*

New FECA sections 301(20) and 323(b)'s restrictions on state and local party use of non-federal funds fail to serve the compelling governmental interest in preventing the actual or apparent corruption of federal candidates. Moreover, they invalidly inhibit core political speech directed in the main toward state and local candidates and issues. I believe that the provisions are substantially overbroad, *see supra* Part IV. D.1.c.(2), and impermissibly burden the expressive associational rights of state and local political party committees and their donors, *see Sweezy,* 354 U.S. at 250, 77 S.Ct. 1203 (plurality opinion). Therefore, I would hold that they are unconstitutional on their face.

### 2. Fundraising Costs: New FECA Section 323(c)

New FECA section 323(c) requires any national, state or local political party committee to use federal funds to raise any money that is expended or disbursed for "Federal election activity." BCRA § 101(a); FECA § 323(c); 2 U.S.C. § 441i(c). The provision demands only passing attention. Having concluded that FECA section 301(20)'s definition of "Federal election activity" cannot be sustained, *see supra* Part IV.D.1.c., and despite BCRA section 401 ("If any provision of this Act ... is held to be unconstitutional, the remainder ... shall not be affected by the holding."), I would hold that section 323(c) is inseverable and therefore invalid as well. As the Supreme Court made clear long ago, a statutory provision

> cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.... [A severability clause] provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command.

*Dorchy v. Kansas,* 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924) (Brandeis, J.). Because the purpose for which section 323(c) fundraising is intended—that is, for "Federal election activity"—cannot be met, no coherent legal effect can be given to section 323(c), which I believe must be struck down with section 301(20).

### 3. Tax–Exempt Organizations: New FECA Section 323(d)

■ I analyze at greater length section 323(d), which prohibits any national, state or local political party committee or its agents from "solicit[ing] *any* funds for, or mak[ing] or direct[ing] *any* donations to" (1) an organization that is described in section 501(c) of the Internal Revenue

Code of 1986, is exempt from taxation and "makes expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)"; or (2) an incorporated political organization (other than a political committee) described in section 527 of the Code.[170] BCRA § 101(a); FECA § 323(d); 2 U.S.C. § 441i(d) (emphases added). Like section 323(c), section 323(d) incorporates the term "Federal election activity." I would not decide whether section 323(d) is severable, however, because I believe the provision would fail First Amendment review even if it did not include that tainted term.

\* \* \*

Like its counterparts at sections 323(a) and (b), section 323(d) limits the associational activities of any national, state or local political party committee by prohibiting it from giving non-federal funds to groups engaged—*independently* of any federal candidate—in core political activities like voter identification and registration, get-out-the-vote drives and, of course, unbridgeable issue advocacy. *See supra* Part IV.D.1. But the provision does not stop there. Section 323(d) prohibits any political party committee or its agents from donating even *federal* funds to a tax-exempt 501(c) organization making expenditures "in connection with" a federal election, or to a section 527 organization *whether or not* the organization spends the funds "in connection with" a federal election. As I have discussed, *see supra* Part IV.D.1.a, the Supreme Court has been quite clear that in the campaign finance context there exists only "a single narrow exception to the rule that limits on political

activity [are] contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate.*" *Citizens Against Rent Control,* 454 U.S. at 296–97, 102 S.Ct. 434 (emphasis in original). Accordingly, I have strictly scrutinized BCRA's restrictions on non-federal funds insofar as they operate to inhibit the political speech of those who donate non-federal funds to the parties in order to participate in collective, protected issue advocacy *via* a party's independent expenditures. Strict scrutiny is no less appropriate when a political party committee donates funds to a tax-exempt organization than when it accepts donations from corporations, labor unions and individual citizens. In both instances, the party facilitates the "[d]iscussion of public issues and debate on the qualifications of candidates [that is] integral to the operation of the system of government established by our Constitution." *Buckley,* 424 U.S. at 14, 96 S.Ct. 612. Moreover, a party's political speech is often "undeniably enhanced by [its] group association" with a tax-exempt organization. *NAACP v. Alabama,* 357 U.S. at 460, 78 S.Ct. 1163.

Consider once again a concrete example from the State of California. In any given election, California voters consider a large number of state and local ballot measures pertaining to any number of legislative matters. *See supra* Findings 73a.5, 76a at pages 343, 346; *see also, e.g.,* Bowler Decl. at 15 (San Francisco general ballot in November 2002 contained seven statewide measures and 20 local measures). Recently, such issues as affirmative action, education of immigrant children, welfare reform, restrictions on union membership and term limits have been the subject of

**170.** Two examples of section 527 organizations covered by new FECA section 323(d) are (1) the Democratic clubs to which the CDP donates funds for state-focused grassroots, voter registration and get-out-the-vote activities, *see supra* Finding 77b at page 347; and (2) the organizations participating in the CRP's Operation Bounty voter registration drives, *see supra* Findings 73b.4, 77b at pages 343, 347.

ballot initiatives. *See* Bowler Decl. at 24. Significantly, most committees formed to support or oppose ballot measures in California are tax-exempt 501(c)(4) organizations. *See supra* Finding 77a at page 347; *see also, e.g.,* Bowler Decl. at 24. Under section 323(d), the CDP is prohibited from giving *any* funds (federal or non-federal) to a 501(c)(4) ballot-measure organization that purchases a radio ad like the one urging the California electorate to vote against Proposition 209, a ballot measure that would eliminate affirmative action in the State. *See* Feingold Dep. Exh. 15; Resp. of Intervenors to CDP's First Set of Reqs. for Admis. at 10 (admitting that section 323(d) would prohibit such a donation). It is hard to imagine speech more eligible for First Amendment protection. But by barring the CDP from donating non-federal funds to the ballot-measure organization, section 323(d) stifles such speech; it "automatically affects" the organization's expenditures, *Citizens Against Rent Control,* 454 U.S. at 299, 102 S.Ct. 434, which are "in connection with an election for Federal office" only because a federal candidate appears on the same ballot as the state initiative. BCRA § 101(a); FECA § 323(d)(1); 2 U.S.C. § 441i(d)(1). The defendants argue that the provision's broad restraint on the trade of political ideas is justified as a means to "prevent the parties from collecting soft money and laundering it through other organizations engaged in federal electioneering." Gov't Br. at 117 (quoting 148 CONG. REC. S1992 (daily ed. Mar. 18, 2002) (statement of Sen. Feingold)). Under settled First Amendment jurisprudence, however, section 323(d) cannot be justified on this ground or any other.

*First,* as the government acknowledges, section 323(d) operates as a "restriction on the general freedom to [use] *hard money.*" Gov't Reply Br. at 27 (emphasis added). Therefore, even if the Congress enacted the provision with an eye toward preventing the "laundering" of "soft money," section 323(d) goes well beyond circumvention prophylaxis, which is itself a questionable governmental objective in the realm of political speech. *See NAACP v. Button,* 371 U.S. at 438, 83 S.Ct. 328 ("Broad prophylactic rules in the area of free expression are suspect.").

*Second,* to the extent the Court has recognized an "anti-circumvention" rationale, it has carefully limited the application of that governmental interest to circumstances in which the disbursement of funds may corrupt a federal candidate. *See Colorado Republican II,* 533 U.S. at 464–65, 121 S.Ct. 2351 (while coordinated party expenditures have "power to corrupt" candidates, independent party expenditures do not "form[ ] a link in a chain of corruption-by-conduit" and do not subvert Act's contribution limits (citing *Colorado Republican I,* 518 U.S. at 617, 116 S.Ct. 2309 (plurality opinion))); *NCPAC,* 470 U.S. at 496–97, 105 S.Ct. 1459; *see also Colorado Republican I,* 518 U.S. at 623, 116 S.Ct. 2309 (plurality opinion) ("where there is no risk of 'corruption' of a candidate, the Government may not limit even contributions" (citing *Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407)). The intervenors' exaggerated assertion to the contrary notwithstanding, *see* Intervenors Opp. Br. at 46 ("[B]allot measure committees are just as susceptible to the parties' campaign finance machinations as any other group."), I believe that a *state* party's donation to a *state* ballot measure organization that opposes a *state* initiative poses no risk of corrupting (or appearing to corrupt) any *federal* candidate.[171] *See Citizens Against Rent Con-*

---

171. The government, which wisely makes no attempt to minimize the First Amendment value of speech regarding ballot measures, observes that "although BCRA regulates [donations] by political parties to tax-exempt

*trol,* 454 U.S. at 297–98, 102 S.Ct. 434; *Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407; *see also* Gov't Opp. Br. at 36 ("The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue." (quoting *McIntyre,* 514 U.S. at 352 n. 15, 115 S.Ct. 1511)).

*Third,* the defendants' "evidence" of section 323(d)'s prophylactic necessity is insufficient to support the provision:

> Congress recognized that tax-exempt organizations served as virtual arms of party committees, conducting federal electioneering activities to benefit candidates of a particular party without being subject to any of the funding source or contribution limitations or disclosure requirements that are applicable to party committees. For example, the RNC infused Americans for Tax Reform ("ATR"), a 501(c)(4) tax-exempt organization, "with over $4.5 million in the weeks leading up to the 1996 election," and ATR then paid "its bills for a direct mail and phone bank campaign involving four million calls and 19 million pieces of mail explicitly disputing the Democrats' position on Medicare as it related to the November 5th election." 144 CONG. REC. S840 (Feb. 23, 1998) (Sen.Lieberman). The DNC engaged in similar conduct.... Moreover, donations solicited or directed by national party committees to benefit tax-exempt organizations that conduct political activities create the

same *potential* problems of corruption that other unregulated fund-raising by the national parties engenders, i.e., the creation of obligated officeholders, and of donors who feel compelled to contribute in order to obtain access to, and consideration from, federal officials.

Gov't Br. at 117–18 (emphasis added); Gov't Opp. Br. at 38 n. 39 (citing 144 CONG. REC. S1048 (daily ed. Feb. 26, 1998) (statement of Sen. Glenn) (in 1996 "soft money" "supplied the funds parties used to make [donations] to tax-exempt groups, which in turn used the funds to pay for election-related activities"); 144 CONG. REC. S977 (daily ed. Feb. 25, 1998) (statement of Sen. Levin) ("These soft money and issue ad loopholes are used to transfer millions of dollars to outside organizations to conduct allegedly independent election-related activities that are, in fact, benefiting parties and candidates."); 144 CONG. REC. S898 (daily ed. Feb. 24, 1998) (statement of Sen. Ford) ("[W]e now know that many of these so-called independent organizations, many claiming tax-exempt status, are established, operated, and financed by parties and candidates themselves—and their finances are totally unregulated.")); *see* Intervenors Opp. Br. at 47 (recounting that CDP in 1999 violated FEC regulations by contributing more than $700,000 to tax-exempt organization opposing state spending reduction referendum). If this is the best the defendants have to offer, I am unimpressed. The

---

organizations, the statute leaves the party committees entirely free to make *independent expenditures* to support or oppose a ballot measure." Gov't Reply Br. at 28 (emphasis in original). The Court has made clear, however, that the danger of corruption is absent in the ballot-measure context, *see Citizens Against Rent Control,* 454 U.S. at 297–98, 102 S.Ct. 434; *Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407, and that "[t]he First Amendment ... presume[s] that speakers, not the government, know best both what they want to say and how they want to say it." *Riley,*

487 U.S. at 790–91, 108 S.Ct. 2667; *see Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). Therefore, if the CDP believes its message about affirmative action will be more effective if channeled through a ballot-measure organization than if funded directly, the First Amendment guarantees it that choice.

Congress *qua* Congress has never "recognized that tax-exempt organizations serve[ ] as virtual arms of party committees." Gov't Br. at 117. As I have mentioned, it made no findings of fact on that or any other matter. But even if the generalized opinions of three former or current Senators constituted an institutional recognition that tax-exempt organizations conduct "electioneering activities" without being subject to FECA's limits, it would not matter. In relying on an anti-circumvention rationale, the defendants assume that "electioneering activities" like voter registration, get-out-the-vote drives and protected issue advocacy are properly the subject of FECA's limits. But such activities are *not* restricted under FECA, *see* 2 U.S.C. § 431(8)(A)(i) (regulated "contributions" include only donations made "for the purpose of influencing any election for Federal office"), for good reason—they *cannot* be restricted, constitutionally, given the conspicuous lack of evidence suggesting that they corrupt federal candidates or officeholders. *See Colorado Republican I*, 518 U.S. at 616–17, 623, 116 S.Ct. 2309 (plurality opinion). Are we to presume (absent any evidence whatsoever) that candidates and officeholders are corrupted by "direct mail and phone bank campaign[s] involving four million calls and 19 million pieces of mail explicitly disputing [a] position on Medicare"? Gov't Br. at 117–18. I do not think there is anything inherently subversive about such activity, *see Renne*, 501 U.S. at 349, 111 S.Ct. 2331 (Marshall, J., dissenting); *CIO*, 335 U.S. at 145, 68 S.Ct. 1349 (Rutledge, J., concurring in judgment) (" '[U]ndue influence' . . . may represent no more than convincing weight of argument fully presented, which is the very thing the [First] Amendment and the electoral process it protects were intended to bring out."), and the defendants do not seriously contend that there is. Any *"potential* problems" associated with the transfer of *federal*

funds from a party committee to a tax-exempt organization—"i.e., the creation of obligated officeholders, and of donors who feel compelled to contribute in order to obtain access to, and consideration from, federal officials," Gov't Br. at 118 (emphasis added)—are insufficient to sustain section 323(d). *See NCPAC*, 470 U.S. at 498, 105 S.Ct. 1459 (statute restricting expenditures of independent political committees unconstitutional because, on record before Court, "an exchange of political favors for uncoordinated expenditures remain[ed] a hypothetical possibility and nothing more"); *Tinker*, 393 U.S. at 508, 89 S.Ct. 733 ("undifferentiated fear or apprehension . . . is not enough to overcome the right to freedom of expression").

*Fourth*, section 323(d) prohibits any national, state or local political party committee from transferring any funds (federal or non-federal) to any section 527 organization *whether or not* that organization makes expenditures or disbursements "in connection with" a federal election. *See* BCRA § 101(a); FECA § 323(d)(2); 2 U.S.C. § 441i(d)(2). For example, the provision prohibits the CDP from giving a single dollar—even for "very basic administrative and organizational costs"—to a local California Democratic club engaged solely in state-focused voter registration and get-out-the-vote activities. Bowler Decl. at 24–25. The government insists that the restriction can be justified "in light of the fungibility of money" and the fact that "receipt of such funds by an organization's treasury may effectively serve as a subsidy for other political activities during federal election years that benefit federal candidates." Gov't Reply Br. at 28. Not even the most expansive definition of "corruption" can accommodate the government's theory, however, because nothing in the record, or in law, even remotely suggests that those "other political activities"—such as voter registration, get-out-the-vote activity and issue advoca-

cy—would corrupt any federal candidate. *See supra* Findings 80–82 at pages 349–56.

\* \* \*

In sum, section 323(d) is an impermissible restriction on the expressive associational rights of party committees and their would-be donees. *See Tashjian,* 479 U.S. at 214–15, 107 S.Ct. 544 ("[A] [p]arty's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association. . . . [A] prohibition of potential association with nonmembers would clearly infringe upon the rights of the [p]arty's members under the First Amendment to organize with like-minded citizens in support of common political goals."); *see also Jones,* 530 U.S. at 574, 120 S.Ct. 2402 (same). Prohibiting the transfer of funds from a party committee to a tax-exempt organization, to my way of thinking, does not serve the government's compelling interest in preventing actual or apparent corruption of candidates for federal office.[172] Even if it did, I believe section 323(d) would prohibit too much non-corrupting political speech. Accordingly, I would find the provision unconstitutional on its face.

### 4. Federal Candidates: New FECA Section 323(e)

■ Section 323(e) prohibits any federal candidate or officeholder from soliciting, receiving or transferring non-federal funds "in connection with" a federal, state or local election.[173] *See* BCRA § 101(a); FECA § 323(e)(1); 2 U.S.C. § 441i(e)(1). The provision admits of numerous exceptions, however, and so there are numerous ways in which a federal candidate or officeholder can participate in fundraising. Specifically, a candidate or officeholder may (1) solicit, receive or transfer *federal* funds, *see* BCRA § 101(a); FECA § 323(e)(1)(A), (B); 2 U.S.C. § 441i(e)(1)(A), (B); (2) "at-

---

**172.** Nor does prohibiting a party committee's *solicitation* of funds for a tax exempt organization—even if section 323(d)'s prohibition on transfers could be severed from its prohibition on solicitation, the latter would be invalid nonetheless (and whatever the standard of review) because it serves no legitimate governmental interest whatsoever.

**173.** More specifically, section 323(e)(1) provides that a federal candidate or officeholder shall not

(A) solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, *including funds for any Federal election activity,* unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or (B) solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds—
 (i) are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of [FECA] section 315(a); and

 (ii) are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

BCRA § 101(a); FECA § 323(e)(1); 2 U.S.C. § 441i(e)(1) (emphasis added). I would hold that section 301(20)'s definition of "Federal election activity" cannot be sustained. *See supra* Part IV.D.1.c. I believe, however, that section 323(e)(1)(A) can be read permissibly to exclude the non-essential phrase "including funds for any Federal election activity" because—in light of BCRA's severability clause, *see* BCRA § 401—"it appears both that, standing alone, legal effect can be given to [section 323(e)(1)(A)] and that the legislature intended the provision to stand, in case others included in the act and held bad should fall." *Dorchy,* 264 U.S. at 290, 44 S.Ct. 323. Thus, under a congressionally-mandated saving construction, section 323(e)(1)(A) would provide that no federal candidate or officeholder shall "solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act."

tend, speak, or be a featured guest at a fundraising event" for a state or local political party committee, BCRA § 101(a); FECA § 323(e)(3); 2 U.S.C. § 441i(e)(3); (3) solicit unlimited non-federal funds on behalf of a tax-exempt 501(c) organization whose "principal purpose" is *not* to conduct voter registration, voter identification or get-out-the-vote activity if the "solicitation does not specify how the funds will or should be spent," BCRA § 101(a); FECA § 323(e)(4)(A); 2 U.S.C. § 441i(e)(4)(A); and (4) solicit up to $20,000 per individual per calendar year *specifically for* voter registration, voter identification and get-out-the-vote activity, or for an organization whose "principal purpose" *is* to conduct any or all of those activities, BCRA § 101(a); FECA § 323(e)(4)(B); 2 U.S.C. § 441i(e)(4)(B). It bears emphasizing that the plaintiffs do not challenge this provision with the same vigor as they do

BCRA's other restrictions on non-federal funds. In three briefs, the *McConnell* plaintiffs spend scarcely more than a paragraph on the provision, arguing without full analysis that it "seriously impinges upon the right of free association between state and local committees and [federal] officeholders and candidates, many of whom until now played a significant role in state and local politics." McConnell Br. at 30. The *RNC* and *CDP* plaintiffs raise similar associational claims in lukewarm fashion, see, e.g., RNC Br. at 41–42; CDP Br. at 42, and only incidentally assert that the provision unconstitutionally infringes a federal candidate's First Amendment right of solicitation, see, e.g., CDP Br. at 39–40 (mentioning prohibition on candidate solicitation in conjunction with section 323(a) and 323(b)'s restrictions on national party leaders). I believe these claims lack merit,[174] *see infra*, and I am inclined to agree

---

**174.** I would reject as well the *McConnell* plaintiffs' federalism claim and the *Thompson* plaintiffs' equal protection claim.

The *McConnell* plaintiffs allege that "[b]y restricting the activities of federal officeholders and candidates with respect to state and local election campaigns and processes, [section 323(e)] violates the Tenth Amendment and principles of federalism." McConnell Compl. at ¶ 115; see McConnell Br. at 23 (section 323(e) "dramatically limits the ability of federal officeholders and candidates to raise money for state and local candidates" where they would otherwise be permitted to do so under state law). While I express no opinion on the *McConnell* plaintiffs' other federalism challenges to BCRA's non-federal fund provisions, *see supra* Part III.A, I reject the notion that the Congress's power does not reach the solicitation and transfer of non-federal funds where a *federal candidate* is the one soliciting. *See* U.S. Const. art. I, § 4, cl. 1 (granting Congress power to regulate "Times, Places and Manner of holding Elections for Senators and Representatives," except as to "the Places of chusing Senators"); *Burroughs*, 290 U.S. at 546–47, 54 S.Ct. 287 (recognizing broad congressional authority to regulate elections for President and Vice-

President); *see also* U.S. Const. art. I, § 8, cl. 3 (granting Congress power to "regulate Commerce ... among the several States"). The D.C. Circuit has held that the Tenth Amendment does not deny the federal government the authority to restrict municipal securities professionals from soliciting contributions for the political campaigns of state officials from whom they obtain business:

> [The regulation] neither compels the [S]tates to regulate private parties, as the Tenth Amendment prohibits, *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), nor regulates the [S]tates directly, a question on which the Supreme Court's Tenth Amendment jurisprudence "has traveled an unsteady path," *id.* at 160, 112 S.Ct. 2408. Further, the rule does not have anything resembling the kind of preemptive effect on [S]tates' ability to control their own election processes that might be perceived as "destructive of state sovereignty." *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 554, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *cf. Gregory v. Ashcroft*, 501 U.S. 452, 460–62, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

*Blount*, 61 F.3d at 949. I believe that each of the D.C. Circuit's observations is applicable

with the RNC's assessment that because "[i]t is the corruption of federal officeholders and candidates—not the corruption of political parties—that the Supreme Court has recognized as a legitimate interest in its campaign finance cases," section 323(e) is the one component of BCRA section 101 that actually makes constitutional sense. *See* RNC Br. at 51; *see also* Oral Arg. Tr. Vol. 1, Morning Session, at 46 (RNC counsel arguing the same).

\* \* \*

I first consider the standard by which the court is to review section 323(e). The plaintiffs contend that the provision should be subject to strict scrutiny because it drives an association-inhibiting wedge between political parties and their candidates, *see, e.g.,* McConnell Br. at 31 (citing, *inter alia, Jones,* 530 U.S. at 582, 120 S.Ct. 2402; *Eu,* 489 U.S. at 231, 109 S.Ct. 1013), and because restrictions on the solicitation of funds are always "subject to exacting First Amendment scrutiny," *e.g.,* CDP Br. at 40 (quotation omitted). The defendants argue, however, that section 323(e) passes muster if it is "closely drawn to further an important [c]ongressional interest." *E.g.,* Intervenors Opp. Br. at 23. The case law on the subject is mixed. *Compare Jones,* 530 U.S. at 582, 120 S.Ct. 2402 (burden on

political party's associational freedom is "unconstitutional unless it is narrowly tailored to serve a compelling state interest"), *with Colorado Republican II,* 533 U.S. at 448 n. 10, 121 S.Ct. 2351 (noting uncertain nature of political parties' associational rights under Court's First Amendment jurisprudence); *compare also Riley,* 487 U.S. at 788, 108 S.Ct. 2667 (because solicitation "involve[s] a variety of speech interests ... that are within the protection of the First Amendment," government's restriction thereof must be "narrowly tailored to achieve [its] principal asserted interest" (quotation omitted)), *with Schaumburg,* 444 U.S. at 632, 100 S.Ct. 826 ("Soliciting financial support is undoubtedly subject to *reasonable* regulation ...." (emphasis added)). In view of unclear precedent, I would take the same cautious approach as the D.C. Circuit did in a fairly recent solicitation case:

> The proper categorization of [the regulation] is not clear-cut.... We are uncertain [about what level of scrutiny to apply.] ... If the rule can withstand strict scrutiny there is no need to decide the issue. Accordingly we turn to applying such scrutiny and ask ... whether the rule is narrowly tailored to serve a compelling government interest.

here and that the broader, more invasive power of the federal government to regulate *municipal securities professionals* who solicit funds for state officials includes the narrower power to regulate *federal candidates* who solicit funds for state officials.

With respect to the *Thompson* plaintiffs' claim that section 323(e) violates equal protection principles and the First Amendment by preventing them from competing effectively in the political process, *see* Thompson Compl. at ¶¶ 40–41, the government's response is sufficient:

> BCRA's restrictions on federal officeholders make no distinctions on the basis of race or any other suspect classification. The statute accords exactly the same treatment to all federal candidates, regardless of their race or ethnicity. Indeed, [the *Thompson*]

plaintiffs allege no intent by Congress to discriminate on the basis of race; they allege only a "disproportionate effect" on "minority communities." Thompson ... Compl. [at] ¶ 41. In the absence of intentional discrimination, however, plaintiffs can state no equal protection claim. *See, e.g., Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). And plaintiffs' claim of discrimination on the basis of wealth ignores the fact that equal protection principles do "not require absolute equality or precisely equal advantages," and do not "require the State to equalize economic conditions." *Ross v. Moffitt,* 417 U.S. 600, 612, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (citations omitted).

Gov't Br. at 127.

*Blount,* 61 F.3d at 942–43. For the following reasons, I agree with the defendants that section 323(e) is constitutional even if viewed through the lens of strict scrutiny. *See* Intervenors Opp. Br. at 23 n. 55.

*First,* it is hardly a novel or implausible proposition that a federal candidate's solicitation of large donations from wealthy individuals, corporations and labor organizations—whether or not the funds are used "for the purpose of influencing" a federal election—can raise an *appearance* of corruption of the candidate. *See UAW,* 352 U.S. at 576, 77 S.Ct. 529 ("Many believe that when an individual or association of individuals makes large contributions ... they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions ...." (quotation omitted)). Accordingly, I am more willing in the candidate context than in the party context to consider the defendants' generalized, anecdotal evidence in support of BCRA's restrictions. *See Shrink Missouri,* 528 U.S. at 391, 120 S.Ct. 897 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."). Moreover, I believe the evidence is sufficient for the court to conclude that section 323(e) may alleviate, "in a direct and material way," *Turner,* 512 U.S. at 664, 114 S.Ct. 2445, at least the appearance of federal candidate and officeholder corruption:

- Gerald Greenwald, the former Chairman and CEO of United Airlines, testified that "sitting Members of Congress ... who solicit large corporate contributions sit on committees that directly affect the corporation's business. Similarly, these Members' actions affect issues of interest to labor unions[,] ... from tax legislation to industry deregulation, to environmental legislation, to list just a few examples." Greenwald Decl. at 3.

- Wade Randlett, CEO of Dashboard Technology, hosted and helped organize over 100 fundraising events featuring federal candidates and officeholders from 1996 to 2000, and "raised seven-digit sums in both federal funds ... and non-federal funds." Randlett Decl. at 2. Randlett testified that "[t]he core transaction is an elected official talking to an individual who may write a soft money check in order to receive positive attention for an issue. When you take thàt out of the equation, a great deal of the inappropriate influence leaves the system." *Id.* at 6.

- Senator McCain testified that "Members of Congress interact with donors at frequent fundraising dinners, weekend retreats, cocktail parties, and briefing sessions that are held exclusively for large donors .... When, as a result of a Member's solicitation, someone makes a significant soft money donation, and then the donor calls the Member a month later and wants to meet, it's very difficult to say no, and few of us do say no." McCain Decl. at 3–4; *but cf.* McCain Dep. at 236–38 (acknowledging that he could not "recall any of the individuals who were present" at fundraising events and that no donor "made enough of an impression ... to influence any legislative judgments").

- Senator Zell Miller once publicly described how he "locked himself in a room with an aide, a telephone, and a list of potential contributors. The aide would get the 'mark' on the phone, then hand me a card with the spouse's name, the contributor's main interest, and a reminder to 'appear chatty.' I'd remind the agri-businessman that I

was on the Agriculture Committee; I'd remind the banker I was on the Banking Committee. And then I'd make a plaintive plea for soft money.... I always left that room feeling like a cheap prostitute who'd had a busy day." 147 CONG. REC. S2445 (daily ed. Mar. 19, 2001) (statement of Sen. Feingold) (quoting Zell Miller, *A Sorry Way to Win*, WASH. POST, Feb. 25, 2001, at B7).

- Defense expert Robert Shapiro testified about a recent survey "reveal[ing] that fully 77 percent of the public in 2001 [viewed] the way in which candidates raised money as unethical if not fully corrupt, with 31 percent viewing [it] as corrupt." Shapiro Expert Report at 12; *but cf.* Ayres Rebuttal Report at 4–5 (appearance of corruption stems not only from large donations of non-federal funds but of federal funds as well).

These statements (and others in the record like them) are hardly evidence that federal candidate and officeholder solicitation of non-federal funds results in actual *quid pro quo* corruption. But in severing the most direct link between the federal candidate and the non-federal donor, *see* Gov't Br. at 123, section 323(e) can serve to prevent the appearance of corruption where it is most acute. *See Stretton v. Disciplinary Bd.*, 944 F.2d 137, 146 (3d Cir.1991) ("[W]e cannot say that the state may not draw a line at the point where the coercive effect, or its appearance, is at its most intense—personal solicitation by the candidate."). Although the defendants have again offered the court no *empirical* evidence, "no smoking gun is needed where, as here, the conflict of interest is apparent." *Blount,* 61 F.3d at 945.

*Second,* if BCRA's "key purpose" is indeed to prevent "the use of soft money as a means of buying influence [over] federal officials," *e.g.,* 148 CONG. REC. H408 (daily ed. Feb. 13, 2002) (statement of Rep. Shays); *see also, e.g.,* Meehan Dep. at 128 ("My view is that the appearance of corruption comes from the totality of the system that allows *federal officials* to raise unlimited amounts of money ...." (emphasis added)), section 323(e) may be the least restrictive means of meeting the objective. Unlike sections 323(a), (b) and (d)—which target non-corrupting, core political activities of national, state and local political party committees, *see supra* Parts IV.D.1 and IV.D.3—section 323(e) does not unnecessarily inhibit protected political speech or association. It is true that by limiting a federal candidate or officeholder's solicitation of non-federal funds, section 323(e) burdens his association with the party with whom he is linked by ideology and with whom he engages "in the common enterprise of electing candidates up and down the ticket." CDP Br. at 40. Nonetheless, the provision leaves him free to associate with his party—and with other like-minded organizations—in significant ways. As I have mentioned, he may still solicit, receive or transfer *federal* funds, *see* BCRA § 101(a); FECA § 323(e)(1)(A), (B); 2 U.S.C. § 441i(e)(1)(A), (B); "attend, speak, or be a featured guest at a fundraising event" for a state or local political party committee, BCRA § 101(a); FECA § 323(e)(3); 2 U.S.C. § 441i(e)(3); solicit unlimited non-federal funds on behalf of a tax-exempt 501(c) organization whose "principal purpose" is *not* to conduct voter registration, voter identification or get-out-the-vote activity if the "solicitation does not specify how the funds will or should be spent," BCRA § 101(a); FECA § 323(e)(4)(A); 2 U.S.C. § 441i(e)(4)(A); and solicit up to $20,000 per individual per calendar year *specifically for* voter registration, voter identification and get-out-the-vote activity, or for an organization whose "principal purpose" *is* to conduct any or all of those activities, BCRA

§ 101(a); FECA § 323(e)(4)(B); 2 U.S.C. § 441i(e)(4)(B). Thus, section 323(e) "permits federal candidates to solicit money in connection with state or local elections, but minimizes the dangers of corruption" by setting source-and-amount limits analogous to those in FECA. Gov't Br. at 125. To my way of thinking, this moderate cap on federal candidate and officeholder solicitation is not nearly so troubling as an outright ban would be. The Court has held that solicitation

> involve[s] a variety of speech interests— communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that *without* solicitation the flow of such information and advocacy would likely cease.

*Schaumburg*, 444 U.S. at 632, 100 S.Ct. 826 (emphasis added). Because section 323(e) does not flatly prohibit a federal candidate or officeholder from soliciting campaign funds, it does not preclude him from expressing the full range of his "particular views on economic, political, or social issues." *Id.* Whether he is soliciting $10 or $10,000—or for that matter, whether he is soliciting federal or non-federal funds—a candidate or officeholder may, as vigorously as he wishes, "seek[ ] support

for particular causes." *Id.* The provision therefore seems to present little danger of stifling the flow of candidate-to-donor advocacy; I would conclude that it is no more restrictive of political speech than may be necessary to prevent apparent corruption of the federal candidates and officeholders it regulates.

\*　　\*　　\*

Section 323(e), therefore, is consistent with the First Amendment's guarantees [175] and, I believe, must be sustained.

### 5. State Candidates: New FECA Section 323(f)

Under new FECA section 323(f), a state candidate or officeholder "may not spend any funds for a communication described in section 301(20)(A)(iii) unless the funds are subject to the limitations, prohibitions, and reporting requirements" of the Act. BCRA § 101(a); FECA § 323(f); 2 U.S.C. § 441i(f); *see also* BCRA § 101(b); FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii). In light of my conclusion that FECA section 301(20) cannot be sustained, *see supra* Part IV.D.1.c, I would conclude as well that no coherent legal effect can be given to section 323(f), which I would strike down on the ground of inseverability. *See Dorchy*, 264 U.S. at 290, 44 S.Ct. 323 (statutory provision "cannot be deemed separable unless it appears ... that, standing alone, legal effect can be given to it"); *cf. supra* Part IV.D.2.

### E. The Ban on Minors' Contributions and Donations

■ Turning finally from BCRA section 101's restrictions on non-federal funds, I next examine BCRA section 318, which,

---

**175.** This includes the guarantee of a free press. The *Paul* plaintiffs claim that section 323(e) violates their right to a free press to the extent that it prohibits Representative Paul from "signing solicitation letters on behalf of" Gun Owners of America, Citizens United or RealCampaignReform.org. Paul Br. at 18–19. But because the provision narrowly may serve the government's compelling interest in preventing the appearance of corruption—and does not exert "editorial control" on anyone's press activities, *id.* at 18 (capitalization altered)—the *Paul* plaintiffs' free press claim is without merit.

as the *Echols* plaintiffs' counsel aptly observed at oral argument, "falls into the category of 'who knows where it came from.'" Oral Arg. Tr. Vol. 2 at 326 (counsel for *Echols* plaintiffs). Section 318 bans any person under the age of 18 from making (1) any contribution whatsoever to any federal candidate; or (2) any contribution or non-federal "donation" to a political party committee. BCRA § 318; FECA § 324; 2 U.S.C. § 441k ("An individual who is 17 years old or younger shall not make a contribution to a candidate or a contribution or donation to a committee of a political party."). The *McConnell* and *Echols* plaintiffs contend that the provision runs afoul of the First Amendment. *See* McConnell Br. at 91–95; McConnell Opp. Br. at 59–61; McConnell Reply Br. at 47–48. For the following reasons, I agree.[176]

\* \* \*

It is well-settled that minors are entitled to the full range and force of the First Amendment's guarantees. *See Tinker*, 393 U.S. at 511–13, 89 S.Ct. 733; *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *cf. Bellotti*, 435 U.S. at 784–85, 98 S.Ct. 1407 ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the *speakers* who may address a public issue." (emphasis added)). While the Supreme Court's case law reflects that the government often possesses an especially strong interest in regulating the activities of minors, *see, e.g., Ginsberg v. New York*, 390

U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ("[E]ven where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.'" (quoting *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645 (1944))), no case of which I am aware holds that a minor's speech is less valuable to himself—or to the political marketplace—simply because of his youth. Therefore, the fact that section 318 restricts the speech of minors as opposed to adults does not affect the standard by which the court is to review the provision.

I believe section 318 is subject to strict scrutiny for the same reasons I have strictly scrutinized BCRA's limits on non-federal donations to political party committees—the ban operates to restrict the political speech of minors who would donate non-federal funds to the political parties in order to participate in collective advocacy *via* independent party expenditures. *See* BCRA § 318; FECA § 324; 2 U.S.C. § 441k ("An individual who is 17 years old or younger shall not make a ... *donation* to a committee of a political party." (emphasis added)); *see also Citizens Against Rent Control*, 454 U.S. at 296–97, 299, 102 S.Ct. 434; *see generally supra* Part IV. D.1.a. Because the plaintiffs do not press this point at any sustained length,[177] however, and because the government has not even demonstrated under *Buckley*'s contribution-to-candidate standard of review that section 318 serves "a sufficiently important interest" by means "closely drawn

---

**176.** Accordingly, I would not reach the *McConnell* and *Echols* plaintiffs' claim that the ban violates the Fifth Amendment's equal protection component, *see* McConnell Br. at 95, nor would I decide the *Thompson* plaintiffs' claim that the provision violates their First and Fifth Amendment rights to the extent that it prevents them from "protect[ing] the rights" of their minor constituents, Thompson Compl. at ¶ 48.

**177.** *But see* McConnell Br. at 95 n. 48 ("To the extent that section 318 not only limits contributions of federally regulated funds to candidates and party committees, but also limits donations of *state-regulated* funds to party committees, it is also unconstitutional for the reasons given above in [the discussion of BCRA section 101]." (emphasis in original)).

to avoid unnecessary abridgement of [First Amendment] freedoms," *Buckley,* 424 U.S. at 25, 96 S.Ct. 612, there is no need to decide whether strict scrutiny or *"Buckley* scrutiny" applies. *Cf. Blount,* 61 F.3d at 942–43 (where outcome of First Amendment challenge does not depend upon standard of review, no need to settle upon applicable standard).

*First,* section 318 does not serve *any* governmental interest, much less a "sufficiently important" or "compelling" one. Repeatedly citing one floor statement of one Senator, the government claims the "Congress recognized that some parents use their influence over their children and their control over their children's assets to circumvent the limits on contributions to candidates and parties." Gov't Br. at 199 (citing 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain) (provision added "to prevent evasion of the contribution limits")). The court is told that "[t]he need for the prophylactic measure adopted by Congress here is clear." *Id.* at 200. But the government's evidence of corruption-by-conduit, *see id.* at 200–02 & nn. 137–141, is remarkably thin:

- A decade-old FEC report to the Congress states without further explanation that "contributions are sometimes given by parents in their children's names." Fed. Election Comm'n, Annual Report 1992, at 64 (1993).
- The Thompson Committee Report resulting from an investigation of "improper activities in connection with 1996 federal election campaigns" states—once again, without further explanation—that "[t]here is ... substantial evidence that minors are being used by their parents, or others, to circumvent the limits imposed on contributors." Thompson Comm. Rep. at 4506.
- Senator Dodd, "an experienced fundraiser," Gov't Br. at 201 n. 138, stated

on the Senate floor that "[n]ormally when we go out and solicit campaign contributions we do not limit it to the individual. We also want to know whether or not their spouse or their minor or adult children would like to make some campaign contributions." 147 Cong. Rec. S2933 (daily ed. Mar. 27, 2001) (statement of Sen. Dodd).

- Articles ranging from "The Kiddie–Cash Caper" on *Slate.com* to "The Young and the Generous" in the *Washington Post* have asserted that "gifts from minors are the next big campaign loophole." Gov't Br. at 201 n. 139 (capitalization altered).
- Senator McCain, relying on other newspaper articles, reported on the Senate floor that "some" contributions have been made by infants and toddlers, although he provided no examples. 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain). He cited only two adolescents' contributions specifically. *See id.* (stating *Los Angeles Times* "found that two high school sisters contributed $40,000 to the Democratic Party in 1998" based on a " 'family decision' ").

Were I convinced by the government's evidence that "wealthy individuals are easily circumventing contribution limits ... by directing their children's contributions," 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain)—and I am not—section 318 does nothing more to alleviate the problem than do federal laws already on the books. FECA prohibits any person from "mak[ing] a contribution in the name of another person" or "knowingly accept[ing] a contribution made by one person in the name of another person." 2 U.S.C. § 441f. And an FEC regulation that remained in effect until January 1, 2003 ensured that a minor child could make a contribution only if he did so

"knowingly and voluntarily," with "funds, goods, or services ... owned or controlled exclusively" by him, and *not* with "the proceeds of a gift, the purpose of which was to provide funds to be contributed." 11 C.F.R. § 110.1(i)(2). By the government's own admission, all section 318 adds to the statutory landscape is a provision that will (we are told) be easier to administer than existing laws:

> [C]ontributions by minors of all ages, even adolescents, present ... practical difficulties. The Commission either can accept at face value self-serving, conclusory, and sometimes lawyer-crafted statements of family members, or it can probe for the truth by querying youngsters about their knowledge of politics and their relationship with their parents in ways that may threaten the privacy of the family.

Gov't Br. at 207. The government's "interest" in the smoothest possible enforcement of campaign finance restrictions is not one articulated in the legislative record. *See* 148 Cong. Rec. S2145–48 (daily ed. Mar. 20, 2002). Neither is it one the Supreme Court has recognized as "sufficiently important" or "compelling" to justify limiting campaign contributions (much less banning them), *see NCPAC,* 470 U.S. at 496–97, 105 S.Ct. 1459, nor one I am prepared to accept for the first time today, *see Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) ("[W]hen we enter the realm of strict judicial scrutiny, there can be no doubt that 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality." (quotations omitted)).

*Second,* even if section 318 served to prevent actual or apparent corruption of federal candidates in a material way not served by existing law, the provision could not be sustained because—far from being "closely drawn" or "narrowly tailored"—it is grossly overbroad. The government

contends "[i]t makes no difference that § 318 is a limited prohibition of contributions rather than a limit on their dollar amount." Gov't Opp. Br. at 125 n. 133. I disagree; that section 318 is a prohibition makes *all* the difference. True, the Court has rejected the argument that the Act's $1,000 contribution ceiling employs "unrealistically low" dollar limits and has held that the "Congress' failure to engage in ... fine tuning does not invalidate the legislation." *Buckley,* 424 U.S. at 30, 96 S.Ct. 612 (dismissing assertion that "much more than [$1,000] would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or officeholder"). And the Court has reminded us that we have "no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." *Id.* (quoting *Buckley,* 519 F.2d at 842). But the Court has also taught us that in the contribution-to-candidate context, "distinctions in degree become significant ... when they can be said to amount to differences in kind." *Id.* The Congress's decision to enact a prophylactic ban on minors' contributions rather than capping them was not one that involved "fine tuning." *Buckley* makes clear that "[a] *limitation* on the amount of money a person may give to a candidate ... involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution." *Id.* at 21, 96 S.Ct. 612 (emphasis added). In contrast, section 318 prohibits even the "symbolic expression" of a minor donor's support for a candidate, whether or not (1) the minor makes a contribution or donation from funds he has earned himself, *see supra* Findings 83–84 at page 356; (2) the minor's parents have "maxed out" on their federal contributions and might therefore seek to use the minor as a conduit contributor, *see supra* Finding 84 at page 356; (3) the contribution or donation is *de minimis*

and cannot even remotely corrupt or appear to corrupt any federal candidate; or (4) the minor makes a non-federal donation to a *state* political party committee that spends the funds on voter registration, voter identification, get-out-the-vote activity or issue advocacy relating solely to *state* candidates. The government defends section 318 by calling the prohibition "limited" and pointing out that it leaves open alternative channels for a minor's speech. *See* Gov't Br. at 204–05 (minors may still "volunteer their services to a candidate for federal office or to a political committee," "make unlimited independent expenditures to express their views" and "contribute to independent political committees"). Under longstanding First Amendment principles, however, this is no defense at all. *See Texas v. Johnson,* 491 U.S. 397, 416 n. 11, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (rejecting notion that defendant's flag-burning could be criminalized simply because "his act ... conveyed nothing that could not have been conveyed ... just as forcefully in a dozen different ways" (quotation omitted)); *Riley,* 487 U.S. at 791, 108 S.Ct. 2667 ("[S]peakers, not the government, know best both what they want to say and how to say it."); *Schneider,* 308 U.S. at 163, 60 S.Ct. 146 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

\*　　\*　　\*

Notwithstanding the government's insupportable assertions to the contrary, *see, e.g.,* Gov't Opp. Br. at 124 (section 318 embodies "a reasonable policy choice by Congress [that] easily survives judicial review"), the minors' ban reflects a profound congressional disregard of the First Amendment and settled jurisprudence thereunder. I would hold that the provision is invalid on its face.

### F. The Conditions on the Lowest Unit Broadcast Charge

■ Until the enactment of BCRA section 305, the Federal Communications Act (FCA) required a licensed broadcast station to provide a federal candidate—during the 45 days preceding a primary or runoff election and during the 60 days preceding a general or special election—the benefit of the "lowest unit charge of the station" on any broadcast advertisement "in connection with" the candidate's campaign. FCA § 315(b); 47 U.S.C. § 315(b). BCRA section 305 amends the FCA to deny a candidate the lowest unit charge unless the candidate either certifies in writing that he will not "make any direct reference to another candidate for the same office," BCRA § 305(a)(3); FCA § 315(b)(2)(A); 47 U.S.C. § 315(b)(2)(A), or, if he does so refer, he includes a statement in the advertisement clearly identifying himself, *see* BCRA § 305(a)(3); FCA § 315(b)(2)(C), (D); 47 U.S.C. § 315(b)(2)(C), (D). The *McConnell* plaintiffs challenge section 305 on First Amendment free speech grounds, claiming that it impermissibly "condition[s] the cost of advertisements on their viewpoint." McConnell Br. at 89 (capitalization altered). I believe that we lack Article III jurisdiction to consider their claim, however, and I would not pass upon it or upon the constitutionality of section 305.

\*　　\*　　\*

Under Article III of the United States Constitution, our "judicial Power" extends only to live "Cases" or "Controversies." U.S. CONST. art. III. As the Supreme Court held in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), "an essential and unchanging part of the case-or-controversy requirement of Article III" is the "core component" of standing:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" . . . Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." . . .

The party invoking federal jurisdiction bears the burden of establishing these elements. . . . Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. . . . At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. . . . In response to a motion for summary judgment, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts." . . . And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130 (citations omitted). I believe that the *McConnell* plaintiffs—the only plaintiffs in these consolidated actions who challenge section 305—are unable on the record before us to carry their burden of establishing that the provision causes them an "actual or imminent, not 'conjectural' or 'hypothetical'" injury sufficient to confer standing. *Id.*

Section 305 applies exclusively to candidates for federal office. Thus, only three of the *McConnell* plaintiffs—Senator McConnell, Representative Pence and former Representative Barr—are conceivably affected by the provision.[178] *See* McConnell Compl. at ¶¶ 15–17. Neither Pence nor Barr has alleged or provided evidence that he intends in a future campaign to run a broadcast advertisement that will both "make any direct reference to another candidate for the same office," BCRA § 305(a)(3); FCA § 315(b)(2)(A); 47 U.S.C. § 315(b)(2)(A), and omit his own identification, *see* BCRA § 305(a)(3); FCA § 315(b)(2)(C), (D); 47 U.S.C. § 315(b)(2)(C), (D). Indeed, Representative Pence testified that he ran nine advertisements during the period from January 1, 1999 to December 31, 2001, *see* Resp. of Rep. Pence to Defs.' First Set of Interrogs. at 6–7, that none of the ads "made direct reference to another [c]andidate for the same office," *id.*, and that he does not "believe that [he] will wage a campaign differently . . . after BCRA than [he] did before," Pence Dep. at 36. And although Senator McConnell has testified without contradiction that in the future he intends to run campaign ads critical of his opponent and "will be subject to . . . BCRA's discriminatory penalty for doing so," McConnell Aff. at 8, he is not "*immediately* in danger of sustaining some direct

---

**178.** To the extent that any of the other individual plaintiffs in the *McConnell* action might someday become federal candidates, my observation that Senator McConnell, Representative Pence and former Representative Barr (all of whom might in the future *again* become federal candidates) are the only plaintiffs "conceivably" affected by section 305 is something of an overstatement. Nevertheless, like the Senator and the two Congressmen, none of these plaintiffs has alleged (much less adduced "specific facts" to demonstrate) "actual or imminent injury" stemming from section 305.

injury as [a] result" of section 305, *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (emphasis added), because the earliest date he could feel the effect of the provision is 45 days before the Republican primary election in 2008. *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (under Article III, litigant must "clearly demonstrate" injury is "imminent" in "temporal sense") (quoted in *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130). Accordingly, I would hold that no plaintiff has constitutional standing to challenge the provision.

The *McConnell* plaintiffs resist this conclusion on two interrelated grounds. They observe that BCRA section 403(c) specifically contemplates a facial challenge to any provision of the statute by any member of the Senate, *see* McConnell Reply Br. at 46 n. 28, and they argue that, under relaxed First Amendment standing rules, Senator McConnell has standing to challenge section 305 "on a facial basis with respect to all its unconstitutional applications," *Id.* Neither assertion is availing. First, while I recognize the importance of effectuating the Congress's clearly-expressed intent to resolve expeditiously and in a single proceeding any facial challenge to the statute, *see* BCRA § 403(a), the legislature cannot grant us authority we are not constitutionally entitled to exercise. *See Raines v. Byrd,* 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."); *see also Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 65, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (it is "fundamental that Congress [may] not expand the jurisdiction of the federal courts beyond the bounds of Article III" (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803))). That BCRA permits "[a]ny Member of

Congress [to] bring an action ... for declaratory or injunctive relief to challenge the constitutionality of any [of its] provision[s]," BCRA § 403(c), is therefore beside the point with respect to Article III standing to challenge section 305. Second, the relaxed standing rules to which the plaintiffs refer, *see* McConnell Reply Br. at 46 n. 28 (citing *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)), are applicable only to claims of First Amendment *overbreadth* (like the many I addressed *supra* at Parts IV. A to IV. E). The overbreadth doctrine embodies an exception to the general rule against third-party standing, *see Board of Trustees v. Fox,* 492 U.S. 469, 482–83, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), one that may be invoked only where there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent,* 466 U.S. at 801–02, 104 S.Ct. 2118; *see generally* RICHARD H. FALLON, JR. ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 202–13 (4th ed.1996) (discussing relation of overbreadth and standing doctrines). The case on which the plaintiffs rely for a relaxed standard makes clear that the overbreadth doctrine is generally reserved for situations in which potential speakers "may well refrain from exercising their rights for fear of *criminal sanctions* provided by a statute susceptible of application to protected expression." *Gooding,* 405 U.S. at 521, 92 S.Ct. 1103 (emphasis added). Unlike the provisions analyzed above, however, *see supra* Parts IV. A to IV. E, section 305 imposes no criminal sanction for a violation thereof. Instead, it simply denies the lowest rate to a federal candidate who runs a broadcast advertisement (1) referring to another candidate for the same office, and (2) omitting the speaker's identification. *See* BCRA § 305(a)(3); FCA

§ 315(b)(2); 47 U.S.C. § 315(b)(2). Whatever other First Amendment infirmities may accompany section 305, the provision raises only a marginal danger of chilling the speech of parties not before the Court. *See Taxpayers for Vincent*, 466 U.S. at 801, 104 S.Ct. 2118. Thus, in my view, the court cannot ignore the standard jurisdictional requirements of Article III to consider the plaintiffs' challenge, nor has it any authority to say anything more on the matter. *See Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003.

### G. Increased Contribution Limits

BCRA contains two sets of provisions that increase the contribution limits of the Act. *See supra* Part II.G. I would hold that no plaintiff who challenges either set of provisions has standing to do so.

#### 1. General Increases

■ In sections 102 and 307, BCRA (1) raises the Act's "hard money" ceilings by permitting individual donors to contribute greater amounts to candidates and national and state political party committees, *see* BCRA §§ 102, 307; FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1); and (2) indexes for inflation all but the Act's $10,000 limit on an individual's contributions to a state political party committee and the $5,000 cap on an individual's contributions to "any other political committee," *see* BCRA § 307(d); FECA § 315(c); 2 U.S.C. § 441a(c); *see generally supra* Part II.G.1. The *Adams* plaintiffs claim that the higher ceilings violate the equal protection component of the Fifth Amendment by "multiplying the hard money contributions of the wealthy" and thereby "depriv[ing] nonwealthy voters and candidates of the ability to participate" in the electoral process "on an equal basis" and with a "meaningful voice." Adams Br. at 9 (capitalization altered); Adams Opp. Br. at 5. In passing, the *CDP* and *Paul* plaintiffs raise similar claims with respect to BCRA's failure to index for inflation the Act's limits on con-

tributions to state political party committees and "other political committee[s]." *See* CDP Br. at 50 ("By ... severely disadvantaging state and local party committees [in] their ability to engage in political communication and otherwise participate in the political process, BCRA deprives [them] of the equal protection of the laws guaranteed by the Due Process Clause of the Fifth Amendment."); Paul Br. at 27 n. 11 (arguing that "disparate treatment" of political action committees with respect to increases and indexing violates freedom of press). None of these plaintiffs, however, has Article III standing to challenge the general increases or indexing.

Under Article III, the plaintiffs must set forth "specific facts"—as opposed to "mere allegations"—establishing the elements of constitutional standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" ... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (alterations in original) (citations omitted). To my mind, no plaintiff has carried his burden. Indeed, the *Adams* plaintiffs have failed on at least two elements. First, they have not suffered an invasion of a *legally protected* interest. As the Eleventh Circuit recently held—in finding that the plaintiffs had no standing to raise an equal protection claim identical to that of

the *Adams* plaintiffs—no one has a "right to equal influence in the overall electoral process." *Ga. State Conference of NAACP Branches v. Cox,* 183 F.3d 1259, 1263–64 (11th Cir.1999) (quoting *MCFL,* 479 U.S. at 257, 107 S.Ct. 616 ("Political 'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources.")). And none of the *Adams* plaintiffs has been, or conceivably will be, stripped of his right to vote or of access to the ballot. Second, even if one of the plaintiffs did suffer such an injury, it would not be "fairly ... trace[able]" to BCRA. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. As the Second Circuit has observed—once again, in finding that the plaintiffs had no standing to raise an equal protection claim identical to that of the *Adams* plaintiffs—contribution limits, high or low, do not *"require"* that contributions be made to any candidate." *Albanese v. FEC,* 78 F.3d 66, 68 (2d Cir.) (emphasis added), *cert. denied,* 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996). Thus, any inequality the *Adams* plaintiffs may suffer would be at the hands of other individuals, not BCRA. *See Cox,* 183 F.3d at 1264 (plaintiffs' "alleged inability meaningfully to participate in and influence elections is attributable to the conduct and resources of private individuals, not the state"); *NAACP, Los Angeles Branch v. Jones,* 131 F.3d 1317, 1323 (9th Cir.1997) (rejecting equal protection claim similar to that of *Adams* plaintiffs because "no state action put[s] wealthy voters in a better position to contribute to campaigns than nonwealthy voters"), *cert. denied,* 525 U.S. 813, 119 S.Ct. 48, 142 L.Ed.2d 37 (1998); *see also Kruse v. City of Cincinnati,* 142 F.3d 907, 917 n. 17 (6th Cir.) (rejecting equal protection argument similar to that of *Adams*

plaintiffs and refusing to "attribute societal differences in income or the high cost of running a ... campaign to the State" (quoting *NAACP, Los Angeles Branch,* 131 F.3d at 1323)), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998); Gov't Br. at 209 (aptly describing plaintiffs' "real claim" as notion that "the Constitution requires the government to prevent other citizens from raising and contributing more than they do"); *cf. Citizens Against Rent Control,* 454 U.S. at 295, 102 S.Ct. 434 (*"Buckley* ... made clear that contributors cannot be protected from the possibility that others will make larger contributions[.]"). Relying upon a wealth of inapposite voting rights cases, the *Adams* plaintiffs insist they have standing to raise their "meaningful voice" claim. Adams Opp. Br. at 1–5; *see Buckley,* 424 U.S. at 49 n. 55, 96 S.Ct. 612 (voting rights cases do not support "abridg[ing] the rights of some persons to engage in political expression in order to enhance the relative voice of other segments of our society"). In doing so, however, they confront none of the case law I have just discussed.[179]

For the same reasons, the *CDP* and *Paul* plaintiffs lack standing to challenge BCRA's failure to index certain contribution limits for inflation. Additionally, in the less than two pages of collective briefing on the matter, *see* CDP Br. at 50; Paul Br. at 27 n. 11, neither the *CDP* nor the *Paul* plaintiffs have cited to us any "specific facts," *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130, tending to show that BCRA's indexing scheme will "severely disadvantag[e]" them in "their ability to engage in political communication," CDP Br. at 50. Their "mere allegations," *see, e.g.,* Boos Decl. at 14 (indexing scheme "arbitrarily limit[s]"

---

179. The plaintiffs' failure even to *acknowledge* the applicable case law until their reply brief—in which they curtly dismiss any reliance upon it as "misplaced," Adams Reply

Br. at 4—is disturbing given that counsel for the *Adams* plaintiffs represented the unsuccessful equal protection claimants in each of the four circuit decisions cited above.

Citizens United Political Victory Fund's "activities in supporting or opposing federal candidates" and "unfairly discriminate[s] against" Fund); Pratt Decl. at 22 (indexing scheme "arbitrarily limit[s]" Gun Owners of America Political Victory Fund's "activities in supporting or opposing federal candidates" and "unfairly discriminate[s] against" Fund), are insufficient to confer constitutional standing at this (the trial) stage of the litigation. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

### 2. The "Millionaire Provisions"

■ Likewise, neither the *Adams* plaintiffs nor the *RNC* plaintiffs have constitutional standing to challenge BCRA's so-called "millionaire provisions," which collectively provide for a series of staggered increases in otherwise applicable contribution-to-candidate and coordinated expenditure limits if the candidate's opponent spends a "personal funds amount" over a sum certain. *See* BCRA §§ 304, 316, 319; FECA § 315(i); 2 U.S.C. § 441a(i); *see generally supra* Part II.G.2.

As they did with respect to section 307, the *Adams* plaintiffs claim that the millionaire provisions violate the equal protection component of the Fifth Amendment · by "multiplying the hard money contributions of the wealthy" and thereby "depriv[ing]" non-wealthy voters and candidates of the ability to participate" in the electoral process "on an equal basis" and with a "meaningful voice." Adams Br. at 9 (capitalization altered); *see id.* at 17–18; Adams Opp. Br. at 5, 8–9. For reasons I have already explained, *see supra* Part IV.G.1, the *Adams* plaintiffs are unable to carry their Article III burden of demonstrating that they have suffered or will imminently suffer "an invasion of a legally protected interest" which is "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560, 112 S.Ct.

2130 (alterations in original) (citations omitted). Moreover, none of the *Adams* plaintiffs is a candidate in an election affected by the millionaire provisions—i.e., one in which an opponent chooses to spend the triggering amount in his own funds—and it would be purely "conjectural" for the court to assume that any plaintiff ever will be. *Id.* at 560, 562, 112 S.Ct. 2130 (noting difficulty in establishing standing if one or more of essential elements "depends on the unfettered choices made by independent actors ... whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (quoting *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989))).

Raising an equal protection claim of their own, the *RNC* plaintiffs contend that the millionaire provisions "discriminate among similarly situated federal candidates." RNC Br. at 73 (capitalization altered); *see id.* at 73–75. Yet none of the RNC plaintiffs *is* a federal candidate. Mike Duncan, the only individual plaintiff in the *RNC* action, does not allege that he will ever be a federal candidate, much less a candidate running in an election affected by the millionaire provisions. *See* RNC Compl. at ¶ 20; *see also McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936) (plaintiff "must allege in his pleading the facts essential to show jurisdiction"). And to the extent the *RNC* plaintiffs allege that the provisions "interfere[ ] with the right of political party committees to support and associate equally with their candidates," RNC Compl. at ¶ 74—a claim nowhere argued in their briefs—they will suffer no injury "fairly ... trace[able]" to BCRA because even in circumstances where the provisions *permit* a party committee to engage in unlimited coordinated

spending, they do not *require* a committee to do so. *See Albanese,* 78 F.3d at 68.

\* \* \*

I would hold that on the record and pleadings before us, we lack jurisdiction to entertain any of the plaintiffs' challenges to BCRA's general increased contribution limits and millionaire provisions. I would therefore refrain from deciding the provisions' constitutionality. *See Steel Co.,* 523 U.S. at 94, 118 S.Ct. 1003.

## V. Conclusion

For the reasons stated in Parts III and IV of this opinion, I believe that all of the challenged provisions of BCRA—except the one discussed in Part IV.D.4 (which, in my view, must be sustained) and those discussed in Parts IV.F and IV.G (as to which I would pass no judgment)—violate the First Amendment to the United States Constitution. Accordingly, I would permanently enjoin the defendants and their agents from enforcing, executing or otherwise applying sections 201, 202, 203, 204, 212, 213, 214, 311, 318 and 504 of BCRA, and from enforcing, executing or otherwise applying new FECA sections 301(20), 323(a), 323(b), 323(c), 323(d) and 323(f), as added by section 101 of BCRA.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

## I. INTRODUCTION

The recent issues confronting Congress related to campaign finance are neither novel nor unfamiliar:

> The idea is to prevent ... the great aggregations of wealth from using their corporate funds, directly or indirectly, to send members of the legislature to these halls in order to vote for their protection and the advancement of their interests as against those of the public. It strikes at a constantly growing evil which has done more to shake the confidence of the plain people of small means of this country in our political institutions than any other practice which has ever obtained since the foundation of our Government. And I believe that the time has come when something ought to be done to put a check to the giving of $50,000 or $100,000 by a great corporation toward political purposes upon the understanding that a debt is created from a political party to it.

Elihu Root, *Addresses on Government and Citizenship* 143 (Bacon and Scott ed.1916) (original statement made before the Constitutional Convention of the State of New York in 1894).

> Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning the elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions which not infrequently is harmful to the general public interest.

65 Cong. Rec. 9507–9508 (1924) (Statement of Sen. Joseph Robinson).

> We all know that money is the chief source of corruption. We all know that large contributions to political campaigns not only put the political party under obligation to the large contributors, who demand pay in the way of legislation, but we also know that large sums of money are used for the purpose of conducting expensive campaigns through the newspapers and over the radio; in the publication of all sorts of literature, true and untrue; and for the purpose of paying the expenses of campaigners sent out into the country to spread propaganda, both true and untrue.

86 Cong. Rec. 2720 (1940) (Statement of Sen. John Bankhead).

The unchecked rise in campaign expenditures coupled with the absence of limitations on contributions and expenditures, has increased the dependence of candidates on special interest groups and large contributors.

H.R.Rep. No. 93–1239, at 3 (1974).

We have gone from basically a small donor system in this country where the average person believed they had a stake, believed they had a voice, to one of extremely large amounts of money, where you are not a player unless you are in the $100,000 or $200,000 range, many contributions in the $500,000 range, occasionally you get a $1 million contribution.... Many Members are tired of picking up the paper every day and reading about an important issue we are going to be considering, one in which many interests have large sums at stake and then the second part of the story reading about the large amounts of money that are being poured into Washington on one side or the other of the issue—the implication, of course being clear, that money talks and large amounts of money talk the loudest.

147 Cong. Rec. S2958 (daily ed. March 27, 2001) (statement of Senator Fred Thompson). Although these statements each reflect discrete points in the history of campaign finance regulation in this country, they reflect the same sentiment: over the course of the last century, the political branches have endeavored to protect the integrity of federal elections with carefully tailored legislation addressing corruption or the appearance of corruption inherent in a system of donor-financed campaigns.

In the area of campaign finance regulation, congressional action has been largely incremental and responsive to the most prevalent abuses or evasions of existing law at particular points in time. For example, consistent with the Constitution, Congress has been permitted to prohibit the use of corporate treasury funds for contributions and expenditures to federal candidates and their parties, forbid the use of union dues in connection with federal elections, cap contributions by individuals to candidates and parties, offer presidential candidates the option of financing their general election campaigns with money from the public fisc, and subject coordinated expenditures to contribution limitations. This process has been evolutionary, and the deliberative nature of the legislative effort is not unexpected given the fact that campaign finance is an extraordinarily challenging area to legislate, particularly given the strong First Amendment interests at stake. On the one hand, congressional action in this area plainly implicates an individual's right to be free from government regulation, a right that is unquestionably at its apogee in the context of political speech. On the other hand, legislation in this area is designed to embolden public confidence in the political system, which thereby ultimately encourages individuals to participate and engage in the electoral process. *See Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n ("Colorado I")*, 518 U.S. 604, 609, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (per curiam) (observing that in assessing the constitutionality of FECA's various provisions the Supreme Court "essentially weigh[s] the First Amendment interest in permitting candidates (and their supporters) to spend money to advance their political views against a 'compelling' governmental interest in assuring the electoral system's legitimacy, protecting it from the appearance and reality of corruption"); *see also Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) ("Perhaps foremost among these serious issues are cases that force us to reconcile our commitment to free speech with our commitment to other

constitutional rights embodied in government proceedings.").

Mindful of these competing constitutional interests, Congress has moved deliberately and often slowly to address evasion or abuse of the law. Building a consensus in an area so penetratingly close to the heart of the First Amendment requires serious consideration. In fact, in the case of the legislation presently before the Court, the legislative process took over six years of study and reflection by Congress.[1] This thoughtful and careful effort by our political branches, over such a lengthy course of time, deserves respect. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 223–224, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (O'Connor, J., dissenting) ("This Court acts at the limits of its power when it invalidates a law on constitutional grounds. In recognition of our place in the constitutional scheme, we must act with great gravity and delicacy when telling a coordinate branch that its actions are absolutely prohibited absent constitutional amendment.") (internal quotation marks and citations omitted); *see also FEC v. Nat'l Right to Work Comm.,* 459 U.S. 197, 209, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("This careful legislative adjustment of the federal electoral laws, in a cautious advance, step by step, to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference.") (citation and

---

**1.** Although campaign finance reform was considered during the 104th Congress, *see, e.g.,* Campaign Reform Act of 1996, H.R. 3820, 104th Cong. (1996) (considered on the House floor, but failed by a vote of 162–259, 142 Cong. Rec. H8,516 (daily ed. July 25, 1996)), deliberations on BCRA's precursors did not begin until the One Hundred and Fifth Congress. The bills introduced in the One Hundred and Fifth Congress, One Hundred and Sixth Congress, and One Hundred and Seventh Congress, relating to campaign finance, include, but are not limited to: "Bipartisan Campaign Reform Act of 1997," H.R. 493 (105th Cong.); "Campaign Reform and Election Integrity Act of 1998," H.R. 3485 (105th Cong.); "Campaign Finance Improvement Act of 1998," H.R. 3476 (105th Cong.); "Bipartisan Campaign Integrity Act of 1997," H.R. 2183 (105th Cong.); "Campaign Reporting and Disclosure Act of 1998," H.R. 3582 (105th Cong.); "Bipartisan Campaign Reform Act of 1997," S. 25 (105th Cong.); "Senate Campaign Financing and Spending Reform Act," S. 57 (105th Cong.); "Campaign Finance Reform and Disclosure Act of 1997," S. 179 (105th Cong.); "Clean Money, Clean Elections Act," S. 918 (105th Cong.); "Grassroots Campaign and Common Sense Federal Election Reform Act of 1998," S. 1689 (105th Cong.); "Voter Empowerment Act of 1999," H.R. 32 (106th Cong.); "Bipartisan Campaign Reform Act of 1999," H.R. 417 (106th Cong); "Clean Money, Clean Elections Act," H.R. 1739 (106th Cong.); "FEC Reform and Authorization Act of 1999," H.R. 1818 (106th Cong.); "Campaign Integrity Act of 1999," H.R. 1867 (106th Cong.); "Citizen Legislature and Political Freedom Act," H.R. 1922 (106th Cong.); "Campaign Reform and Election Integrity Act of 1999," H.R. 2668 (106th Cong.); "PAC Limitation Act of 1999," H.R. 2866 (106th Cong.); "Open and Accountable Campaign Financing Act of 2000," H.R. 3243 (106th Cong.); "FEC Reform and Authorization Act of 2000," H.R. 4037 (106th Cong.); "Campaign Finance Improvement Act of 2000," H.R. 4685 (106th Cong.); "Campaign Finance Disclosure on Sales of Personal Assets Act of 2000," H.R. 4989 (106th Cong.); "Informed Voter Act of 2000," H.R. 5507 (106th Cong.); "Campaign Finance Improvement Act of 2000," H.R. 5596 (106th Cong.); "Bipartisan Campaign Reform Act of 1999," S. 26 (106th Cong.); "Federal Election Enforcement and Disclosure Reform Act," S. 504 (106th Cong.); "Clean Money, Clean Elections Act," S. 982 (106th Cong.); "Bipartisan Campaign Reform Act of 1999," S. 1593 (106th Cong.); "Campaign Finance Integrity Act of 1999," S. 1671 (106th Cong.); "Open and Accountable Campaign Financing Act of 2000," S. 1816 (106th Cong.); "Campaign Finance Reform and Disclosure Act of 2000," S. 2565 (106th Cong.); "Bipartisan Campaign Reform Act of 2001," H.R. 2356 (107th Cong.); "Campaign Reform and Citizen Participation Act of 2001," H.R. 2360 (107th Cong.); and "Bipartisan Campaign Finance Reform Act of 2001," S. 27 (107th Cong.).

quotation marks omitted). Nevertheless, it is the province of the judiciary to intervene when Congress has struck the wrong balance and disproportionately transgressed First Amendment rights in the name of reform. While navigating this balance is undoubtedly complex, such a task is demanded by the dictates of the Constitution and the well worn path of interpretation of congressional action relating to campaign finance legislation by the Supreme Court of the United States.

It is within this historical framework that the incremental changes Congress strives to accomplish in enacting the Bipartisan Campaign Reform Act of 2002, Pub.L. No. 107–155, 116 Stat. 81 (2002) ("BCRA") are properly understood. BCRA is yet another step in the careful evolution of the campaign finance laws targeted at addressing exceptions to the constitutionally permissible laws that are already in force. Indeed, BCRA was enacted in large measure to amend the Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431 *et seq.* ("FECA"), and any constitutional interpretation of BCRA must, as its starting point, recognize the role BCRA plays within the current state of federal law. In other words, it must be remembered that the statutory provisions at issue were designed by Congress as a comprehensive approach to the abuses of FECA that legislators and candidates were acutely aware of in their capacity as political actors.[2] BCRA was designed to ameliorate FECA's most glaring abuses, while staying true to the constitutional boundaries set forth by the judiciary.

Presently before this three-judge District Court are eleven consolidated actions challenging much of BCRA as unconstitutional and seeking declaratory and injunctive relief to prohibit its enforcement. Plaintiffs and Defendants have filed cross motions for judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure. Suffice it to say, the legal challenges raised by this litigation are complex and raise issues of fundamental importance to the conduct and financing of federal election campaigns.

In resolving these challenges, I have endeavored to adopt a cohesive constitutional framework in adjudicating Plaintiffs' claims, premised on the extensive record in this case and Supreme Court precedent. It is an approach that I believe is consistent with our common law traditions: a decision is rooted in the record of this case and guided by the constitutional boundaries established by the Supreme Court's campaign finance jurisprudence. Under this approach, I have only found three of the challenged sections unconstitutional: Sections 213, 318, and 504. The provisions I have found unconstitutional are all provisions of BCRA that are not central to its core mission and are entirely severable without doing injustice to the remainder of the law. The rest of the challenged provisions I find either constitutional or nonjusticiable, with the small exception, as observed in the *per curiam* opinion, of one disclosure provision contained in Section 201. In the case of Section 201, Judge Leon and I have severed subsection (5) of Section 201; a relatively minor change

---

**2.** As Senator Fritz Hollings wryly observed during the Senate debate on BCRA:

It amused me the other day when they said we finally had some debate going on in the Senate. The reason we have a debate is because this is the first subject we know anything about. All the rest of it is canned speeches that the staff gives you, and you come out and you talk about Kosovo, you talk about the defense budget, or you talk about the environment, and you read scientific statements and everything—but we know about money. Oh boy, do we know. 147 Cong. Rec. S2852–53 (daily ed. March 26, 2001) (statement of Senator Fritz Hollings).

that does not impair the remaining disclo-
sure provisions of the Act.[3]

**TABLE OF CONTENTS**

INTRODUCTION .................................................432

TABLE OF CONTENTS .............................................436

FINDINGS OF FACT .............................................438
 TITLE I: BCRA NONFEDERAL MONEY ("SOFT MONEY")
 PROVISIONS ...............................................439
 National Party Nonfederal Money Fundraising and Spending ..............439
 The Rise of Nonfederal Money Spending ..........................443
 The Rise of Nonfederal Money Is Not Related to "Party
 Building" .........................................444
 National Party "Issue Advocacy" Campaigns Funded With
 Nonfederal Money ...................................446
 Get–Out–The–Vote (GOTV) ......................................458
 Voter Registration ...........................................460
 Redistricting ..............................................462
 Other Activities Paid for with Nonfederal Funds ....................462
 The State Parties Have Become "Branches" of the National
 Parties ...........................................465
 *Summary* ..............................................467
 The Role of Federal Lawmakers in Political Party Nonfederal
 Fundraising ..............................................468
 Federal Lawmakers Run the Party Committees ....................468
 Federal Lawmakers Solicit Nonfederal Funds for the National
 Party Committees .......................................471
 Nonfederal Funds are Given with Intent to Assist Specific
 Members of Congress; Political Parties Keep Track of
 Contributions Members of Congress Raise ......................476
 Federal Lawmakers and National Party Committees Solicit
 Nonfederal Funds for State Parties ...........................478
 *Summary* ..............................................480
 Corruption................................................481
 Vote Buying/Bribery ........................................481
 Donors are Pressured to Make Contributions to Political Parties.....484
 Federal Officeholders' Awareness of Who Donates to Parties .........486
 Evidence Regarding Contributions and Access to Federal
 Lawmakers ..........................................488

---

**3.** I cannot agree with Judge Henderson, who appears to characterize my opinion, along with the *per curiam* opinion, and Judge Leon's opinion, as "upholding a portion [of BCRA] here and striking down a fragment [of BCRA] there until *they* [Judge Leon and Judge Kotelly] have drafted legislation the Congress would never have enacted—all in the name of *deference* to that body." Henderson Op. at 5 (first emphasis added, second emphasis in original). I would observe that my opinion does not sift through various sections of BCRA that have been challenged, adopting some and rejecting others. Rather, my decision is predicated on lengthy discussions of both the record and the governing caselaw.

In undertaking this analysis, I have only found three sections unconstitutional in their entirety; the same three sections that Judge Henderson and Judge Leon have each found unconstitutional. I have also, with Judge Leon, severed one section from a disclosure provision in Section 201; but this is no different from Judge Henderson severing a phrase from Section 323(e). Henderson Op. at Part IV.D.4. It is also important to note that I have not "drafted legislation." *Id.* Nothing in my opinion rewrites BCRA in any manner whatsoever. I have accepted the statute on its face, finding its core provisions constitutional, with exceptions noted above as to some ancillary provisions.

Empirical Evidence Linking Donations to Corruption ...............511
*Summary* ........................................................511
Public Perception of Corruption ..................................512
*Summary* ........................................................517
Nonprofit Groups' Involvement in Federal Elections ......................517
The Effect of BCRA on Interest Group Activity .......................520
State Party Fundraising...........................................522
Fundraising By National Party Officials & Federal Officeholders
for State Parties .........................................522
CDP and CRP Fundraising ......................................522
TITLE II: ELECTIONEERING COMMUNICATIONS THAT AFFECT FEDERAL ELECTIONS.....522
The Origins of the Problem Congress Sought to Solve With Title II ........522
The Rise of Issue Advocacy Campaigns Funded by Corporate & Labor
Union General Treasuries ........................................526
Express Advocacy Not Widely Used Nor An Effective Means of
Campaign Advertising .............................................529
Current Federal Law Does Not Distinguish Between Pure Issue
Advertisements and Candidate–Centered Issue Advertisements ..........532
Candidate–Centered Issue Advocacy Has Risen Because it Permits
Corporations & Labor Unions to Influence Federal Elections with
General Treasury Funds While Avoiding FECA's Restrictions............537
Organizations' Use of Candidate–Centered Issue Advocacy................539
Federal Candidates and Political Parties Know and Appreciate Who
Runs Candidate–Centered Issue Advertisements in Their Races ..........555
Candidate–Centered Issue Advertisements Are Empirically Distinguish-
able from "Pure" Issue Advertisements ...........................560
BCRA's Restriction on "Electioneering Communication"...................568
The Primary Definition of Electioneering Communication is Narrowly
Tailored to Radio & Television Advertisements ........................569
The Primary Definition of Electioneering Communication is Narrowly
Tailored by Broadcast Advertisements Appearing Sixty Days Before
a General Election and Thirty Days Before a Primary Election, That
Name a Candidate, and Are Targeted to that Candidate's Electorate.....573
Expert Reports on BCRA's Effect on Political Advertising .................583
*Conclusion* .....................................................587
TITLE III: MISCELLANEOUS ............................................588
CONCLUSIONS OF LAW .................................................590
Title II: NONCANDIDATE CAMPAIGN EXPENDITURES ....................590
Sections 201, 203 and 204: The Prohibition on Electioneering
Communications...........................................590
Introduction ...............................................591
Standard of Review .........................................592
Express Electoral Advocacy is Not a Constitutional Requirement.....594
The Evisceration of Section 441b ...............................605
*Conclusion*.........................................615
Title II of BCRA is Narrowly Tailored to Serve a Compelling
Governmental Interest ......................................616
BCRA's Prohibition on Electioneering Communications;
the Primary Definition Serves Compelling Govern-
mental Interests .......................................616
Sections 201, 203, and 204 of BCRA are Narrowly
Tailored to Serve Compelling Governmental Interests....625
Plaintiffs' Underbreadth Challenge ..............................644
Plaintiffs' Challenge Relating to Exemption for News Stories,
Commentaries or Editorials from a Broadcast Station .............648
*Conclusion Regarding Title II* ...................................650
Section 213 ................................................650
TITLE I: REDUCTION OF SPECIAL INTEREST INFLUENCE .............651
Section 101: Soft Money of Political Parties ..............................651

Background: The Rise of Nonfederal Money as a Means of
Financing Federal Elections ....................................653
Plaintiffs' First Amendment Challenges ..........................656
Standard of Review ......................................656
Title I is Constitutional Under the First Amendment ........657
Title I Is Closely Drawn ...............................693
*Conclusion*....................................................708
Plaintiffs' Equal Protection and Underbreadth Claims ..............709
Plaintiffs' Federalism Challenge ................................712
*Conclusion* ...............................................716
Title III: MISCELLANEOUS..........................................716
Sections 304, 305, 307, 316, and 319 ......................................716
Section 318: Prohibition of Contributions by Minors ....................717
Title V: ADDITIONAL DISCLOSURE PROVISIONS ........................718
Section 504 .............................................718

CONCLUSION ...............................................718

APPENDIX ..........................................................719
Expert Reports on BCRA's Effect on Political Advertisements ..................719
The CMAG Data Set........................................719
The Annenberg Public Policy Center Reports ..........................722
The Goldstein Expert Report .........................................723
Buying Time Studies........................................728
AFL–CIO Advertisements Run Within 30 Days of a Primary Election .............752
Empirical Studies on Corruption..........................................755

## II. FINDINGS OF FACT

Reviewing a record in a case involving protected First Amendment rights requires serious examination and analysis of the underlying testimony and documentary evidence. Therefore, with few exceptions, I have not relied on or cited to the Findings of Fact proposed by the litigants. To ensure accuracy and to eliminate any gloss or characterizations added by the parties, I have reviewed and cited the underlying documents, depositions, or declarations and have, in many instances, chosen to quote directly from the original sources.[4]

I have endeavored to develop a factual record that is commensurate with my legal

approach. Accordingly, even though in regard to my Conclusions of Law I am in dissent on most of Title I, as well as in dissent with regard to the primary definition of electioneering communication in Title II, I have found it appropriate to adequately set forth the bases of my Factual Findings to assist the appellate review of the three-judge District Court's decisions, and because the nature of my legal positions demand it.

Having set forth the following preliminaries, I now turn to my Findings of Fact. While the record is exhaustive-replete with multiple sources for each point-I have focused on selecting from the complete rec-

4. Almost exclusive reliance on the litigants' proposed findings of fact, which I have already indicated is a method of fact finding that I do not employ, should lead to a careful examination by the reviewing Court of the adopted findings. *See Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1404 (D.C.Cir.1988) (per curiam) ("While 'the fact that the trial judge has adopted proposed

findings does not, by itself, warrant reversal,' 'it does raise the possibility that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that his position has not been given the consideration it deserves.' ") (quoting *Photo Elecs. Corp. v. England,* 581 F.2d 772, 777 (9th Cir.1978)); *id* at 1408.

ord, facts that are probative in supporting my legal conclusions, distinguishing, where appropriate, between disputed and uncontroverted evidence. In short, I have exercised my discretion to be selective without sacrificing, to the best of my ability, my due diligence.[5]

**TITLE I: BCRA NONFEDERAL MONEY ("SOFT MONEY") PROVISIONS**

*National Party Nonfederal Money Fundraising and Spending*

1.1 As discussed both in the *per curiam* opinion and my own conclusions of law, FECA was silent on how to draw lines around money raised outside of FECA's source and amount limitations for political parties to spend on activities that were expected not to be used for the purpose of influencing a federal election. The FEC's opinions and rulemakings drew that line by permitting state and national party committees to pay for the nonfederal portion of their administrative costs and voter registration and turnout programs with monies raised under relevant state laws (not FECA), even if they permitted contributions from sources such as corporations

and labor unions that were prohibited under FECA. As a result, national and state parties began to raise so-called "soft money," which described these nonfederal funds-not subject to FECA limits and restrictions-to pay for a share of election-related activities.

1.2 It is undisputed that over the past two decades the parties have raised and spent an increasing amount of nonfederal funds.

1.3 In 1980 the national Republican party spent roughly $15 million in soft money, the Democrats $4 million. This constituted 9% of total spending by the two national parties. In 1984 the amount of soft money spent by the national parties increased marginally to $21.6 million but it constituted a smaller share (5%) of total national party activity. In 1988 .... [p]arty soft money spending more than doubled to $45 million, which was 11% of national party totals .... By 1988, both parties had developed effective means of courting large soft money donors. After the election, Republicans revealed that they had received gifts of $100,000 each

**5.** I am compelled to respond to Judge Henderson, who, without *any elaboration,* has criticized three of my Findings in particular as leaving her " 'with the definite and firm conviction that a mistake has been committed.' " Henderson Op. at 67 n.55 (quoting *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001)) (citing my Findings ¶¶ 2.13; 1.82–1.83). In the examples Judge Henderson cites, she points to two summaries and an introduction; ignoring the surrounding Findings in support of the evidentiary record. I have in my Findings discussed in great detail the foundation and basis for the particular Findings she cites. *See infra* Findings ¶¶ 2.8, 2.8.1–2.8.3.5; 1.73–1.81; 1.83.1–1.83.7. Judge Henderson does not assail that analysis nor does she in any way indicate a reasoned basis for her disagreement. As such, I must respectfully disagree with her view that a "mistake has been committed" in regard to these three Findings of Fact.

In addition, although Judge Henderson determines that the record is largely superfluous to her legal conclusions, *see* Henderson Op. at 7 n.1 ("[a]lthough the actions before us have produced a large (*but probably unnecessary* ) *record* ") (emphasis added), she seemingly urges the Supreme Court to adopt her "Alternative Findings of Fact" "as an alternative to those of the majority," *id.* at 67, and in conclusory fashion alleges mistakes in the Findings of Fact of the "majority," without any specificity. *Id.* Given that Judge Henderson's findings are "an alternative to those in the majority," I have not found it prudent to catalogue each instance where I disagree with her factual conclusions. I would simply observe that I respectfully disagree that Judge Henderson's "Alternative Findings of Fact" are a more appropriate and accurate "alternative to those [Findings of Fact] of the majority." *Id.*

from 267 donors; Democrats counted 130 donors contributing $100,000 or more. . . . Mann[6] Report at 12–13 [DEV 1–Tab 1] (citations omitted).

1.4 The FEC began tracking nonfederal donations in the 1992 election cycle. During that cycle the Democratic and Republican parties together raised $86.1 million in nonfederal funds. During the 1994 election cycle the two major parties raised $101.6 million in nonfederal funds; during the 1996 election cycle they raised $263.5 million in nonfederal funds; during the 1998 election cycle they raised $222.5 million in nonfederal funds; during the 2000 election cycle they raised $487.5 million in nonfederal funds; and during the 2002 election cycle they raised $495.8 million in nonfederal funds. *See* FEC, News Release: Party Fundraising Reaches $1.1 Billion in 2002 Election Cycle (Dec. 18, 2002), *available* at http://www.fec.gov/press/20021218party/20021218party.html.

1.4.1 There was a threefold increase in national party soft money activity between 1992 and 1996—from $80 million to $272 million. Soft money as a share of total national party spending jumped from 16% to 30%. Both parties and their elected officials worked hard to solicit soft money donations from corporations, wealthy individuals, and labor unions. During the 1996 election the national party committees received . . . approximately 27,-000 contributions from federally prohibited sources . . . Less than $10 million of the $272 million was contributed directly to state and local candidates in the 1996 cycle. . . . The two parties transferred a total of $115 million in soft money to state party committees, which financed two-thirds of state party soft money expenditures. . . . State party soft money

expenditures for political communication/advertising jumped from less than $2 million in 1992 to $65 million in 1996. Mann Report at 21–22 [DEV 1–Tab 1] (citation omitted). During the 1996 election cycle, the top 50 nonfederal money donors made contributions ranging from $530,000 to $3,287,175. *Id.* at 22. Three of the top 50 nonfederal money donors to the national political parties in 1996 were state political parties. Mann Expert Report Tbl. 5 [DEV 1–Tab 1].

1.4.2 The total amount of soft money spent [in the 1998 midterm election cycle]—$221 million—was less than in 1996 but more than double the previous midterm election. And soft money as a share of total spending by the national parties jumped to 34%. The congressional party campaign committees put a premium on raising and spending soft money to advance the election prospects of their candidates. . . . Both national party committees had discovered they could finance campaign activity on behalf of their senatorial candidates with soft money in the form of "issue advocacy." The same pattern, more pronounced with the Democrats than the Republicans, was evident in the House campaign committees. Mann Report at 23 [DEV 1–Tab 1] (citation omitted).

1.4.3 [S]oft money financing of party campaigning exploded in the 2000 election cycle. Soft money spending by the national parties reached $498 million, now 42% of their total spending. Raising a half billion dollars in soft money [in 2000] took a major effort by the national parties and elected officials, but they had the advantage of focusing their efforts on large donors. . . . The top 50 soft money donors . . . each contributed between $955,695 and $5,949,000. Among the many soft money

6. Thomas Mann is one of Defendants' experts. I note that neither Plaintiffs nor Defendants have challenged the qualifications of any of the designated experts in this case.

donors who gave generously to both parties were Global Crossing, Enron and WorldCom.

Mann Report at 24–25 [DEV 1–Tab 1] (citation omitted). "A total of $280 million in soft money—well over half the amount raised by the six national party committees—was transferred to state parties [in 2000], along with $135 million in hard money." *Id.* at 26. "By contrast, the national parties contributed … only $19 million directly to state and local candidates, less than 4% of their soft money spending and 1.6% of their total financial activity in 2000." Mann Report at 26 [DEV 1–Tab 1] (citation omitted). The table below "shows the trend in hard and soft money donations to the political parties since the 1991–1992 election cycle, when the FEC first began tracking these figures. Soft money donations rose from $86.1 million to $495.1 million between 1991–2 and 1999–2000, but hard money contributions rose markedly as well, from $445 million to $741 million." Green [7] Expert Report at 30 [DEV 1–Tab 3].

| | 1991–92 | 1993–94 | 1995–96 | 1997–98 | 1999–2000 |
|---|---|---|---|---|---|
| **Hard Money** | $445.0 | $384.7 | $638.1 | $445.0 | $ 741.0 |
| **Soft Money** | $ 86.1 | $101.6 | $262.1 | $224.4 | $ 495.1 |
| **Total** | $531.1 | $486.3 | $900.2 | $669.4 | $1,236.1 |

*Id.* (Tbl. 1: National Party Receipts 1992–2000) (figures in millions) (based on "FEC Reports Increase in Party Fundraising for 2000" release of May 15, 2001). Defendants' expert Donald Green points out that while the amount of money flowing into the campaign finance system has continued to grow, "the lawmakers subject to its influence remain constant in number." Green Rebuttal Report at 22 [DEV 5–Tab 1].

1.4.4 During the first 18 months of the 2001–2002 election cycle the parties reported nonfederal receipts of $308.2 million, which is a 21 percent increase over the same period during the 1999–2000 cycle. The FEC notes that this increase is "all the more significant given that typically parties raise more in Presidential campaign cycles than in non-presidential campaigns." Press Release, Federal Election Commission, Party Fundraising Growth Continues (Sept. 19, 2002) FEC141–0001 [DEV 28]. By October 16, 2002, the parties had raised over $421 million in nonfederal funds. News Release, Federal Election Commission, National Party Fundraising Strong in Pre–Election Filings, *available at* http://www.fec.gov/press/20021030 partypre.html/20021030party pre.html.

*The Rise of Nonfederal Money Spending*

1.5 The figures above demonstrate that although nonfederal receipts and spending began to grow in the 1980s, this trend accelerated beginning in 1996.

1.6 Experts from both parties attribute the accelerated rise in nonfederal money spending to President Bill Clinton and his political consultant Dick Morris' use of such funds during the 1996 campaign to fund

television ads designed to promote Clinton's reelection. While the ads prominently featured the President, none of these costs were charged as coordinated expenditures on behalf of Clinton's campaign. Instead the party paid the entire cost, based on a legal argument never before made: that party communications which did not use explicit words advocating the election or defeat of a federal

---

**7.** Donald Green is one of Defendants' experts.

candidate could be treated like generic party advertising and financed, according to the FEC allocation rules, with a mix of soft and hard money.

Mann Report at 18 [DEV 1–Tab 1]. In the words of Plaintiffs' expert Raymond La Raja, this "maneuver . . . catapulted soft money." La Raja Cross Exam. Ex. 3 at 45 [JDT 15] (Raymond Joseph La Raja, American Political Parties in the Era of Soft Money) (2001) (unpublished Ph.D. dissertation, University of California at Berkeley).

> The strategy to deploy soft money for [political advertising] is described in a series of memos from Dick Morris. . . . Morris says, "I met with . . . attorney[s] . . . and explained the kinds of ads I had in mind. Fortunately, they said the law permitted unlimited expenditures by a political party for such 'issue-advocacy' ads. By the end of the race, we had spent almost thirty-five million dollars on issue-advocacy ads (in addition to about fifty million dollars on conventional candidate-oriented media), burying the Republican proposals and building a national consensus in support of the president on key issues."

Magleby[8] Expert Report at 11 (quoting Dick Morris, Behind the Oval Office: Getting Reelected Against All Odds 141, 624 (1999)) [DEV 4–Tab 8]. "The national Democratic party managed to finance two-thirds of its pro-Clinton 'issue ad' television blitz by taking advantage of the more favorable allocation methods available to state parties. They simply transferred the requisite mix of hard and soft dollars to party committees in the states they targeted and had the state committees place the ads." Mann Expert Report at 22 [DEV 1–Tab 1]; *see also* La Raja Cross Exam. Ex. 3 at 14, 37–48 [JDT 15] (discussing the

emergence of "party soft money"); Finding ¶ 1.26.1 (discussing allocation regime).

1.7 Experts for both sides agree that "[i]t did not take the Republican party long to respond in kind by promoting Bob Dole and Jack Kemp." Magleby Expert Report at 11 [DEV 4–Tab 8]; *see also* La Raja Cross Exam. Ex. 3 at 46 [JDT Vol. 15] ("The Dole–Kemp campaign responded to the Morris plan with its own party-based media strategy.").

> In May of 1996, the Republican National Committee announced a $20 million "issue advocacy" advertising campaign. Its purpose, in the words of the chairman, would be "to show the differences between Dole and Clinton and between Republicans and Democrats on the issues facing our country, so we can engage full-time in one of the most consequential elections in our history." These presidential candidate-specific ads, like the Democratic ones, were targeted on key battleground states and financed with a mix of hard and (mostly) soft money. Both parties were now financing a significant part of the campaigns of their presidential candidates outside of the strictures of the FECA and well beyond the bounds of the 1979 FEC ruling that national parties may raise corporate and union funds and solicit unlimited donations from individuals "for the exclusive and limited purpose of influencing the nomination or election of candidates for nonfederal office."

Mann Expert Report at 20 (citation omitted) [DEV 1–Tab 1]; *see also infra* Findings ¶ 1.20.1 (Republican consultants' discussion about whether such advertisements met the "issue advocacy test").

1.8 This approach for the use of nonfederal funds spilled over into congressional races. Mann Expert Report at 20 [DEV 1–Tab 1]; *see also* Lamson[9] Decl.

---

8. David Magleby is an expert for Defendants.

9. Since January 2001, Joe Lamson has served as the Communications Director for the Office of Public Instruction of the State of Mon-

¶ 9 (describing both parties' national committees' use of nonfederal money to run advertisements in a race for Congress in Montana).

1.9 By the end of the 2000 election cycle, it was clear that although "[s]cholars might differ about how best to change the campaign finance system, ... they could not avoid the conclusion that party soft money and electioneering in the guise of issue advocacy had rendered the FECA regime largely ineffectual." Mann Expert Report at 26.

*The Rise of Nonfederal Money Is Not Related to "Party Building"*

1.10 "The parties' expanding use of soft money for the promotion or attack of particular candidates .... [runs] counter to the stated purposes of soft money which were to permit parties to raise unlimited amounts of money for 'party building' purposes, unlike hard money which is subject to the contribution limits given to the parties to help elect or defeat candidates." Magleby Expert Report at 11 [DEV 4–Tab 8]. Magleby notes that "[t]he content of such ads does nothing to foster party infrastructure. Those who make the ads and manage the campaigns are consultants, who often do not even reside in the state where the election is taking place." Magleby Expert Report at 49 [DEV 4–Tab 8]. Plaintiffs' expert La Raja concurs, finding that the political parties "exploit federal campaign finance laws by using soft money for candidate support even though federal laws require them to use it for generic party building." La Raja Cross Exam. Ex. 3 at 74–75; *see also* La Raja Cross Exam. at 67 [JDT Vol. 15] (finding that "more non-federal funds in the allocation accounts are used for media rather than what I call party building").

1.11 As former Senator Brock[10] attests, nonfederal money

by and large is not used for 'party building.' To the contrary, the parties by and large use the money to help elect federal candidates—in the Presidential campaigns and in close Senate and House elections. Far from reinvigorating the parties, soft money has simply strengthened certain candidates and a few large donors, while distracting parties from traditional and important grassroots work.

Brock Decl. ¶ 6 [DEV 6–Tab 9]; *see also* Boren[11] Decl. ¶ 4 [DEV 6–Tab 8] ("[S]oft money is not used purely for 'party building' activities"); Buttenwieser[12] Decl. ¶ 15 [DEV 6–Tab 11] (explaining that there is

tana, a post he also held from early 1997 until January 2000. During 2000, Lamson managed Nancy Keenan's campaign to represent Montana's Congressional district. During 1996, Lamson managed Bill Yellowtail's campaign to represent Montana's Congressional district. From 1983 through 1996, Lamson served as the state director for United States Representative Pat Williams' Congressional office in Montana. During this same period, Lamson also managed Congressman Williams' election campaigns in Montana. From 1981 to 1983, Lamson was Executive Director of the Montana Democratic Party. Lamson provided a sworn declaration in *FEC v. Colorado Republican Fed. Campaign Comm.*, 41 F.Supp.2d 1197 (D.Colo.1999), *aff'd*, 213 F.3d 1221 (10th Cir.2000), *rev'd*, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). Lamson Decl. ¶¶ 2–3 [DEV 7–Tab 26].

10. Senator William Brock he served as United States Representative from Tennessee from 1963 until 1971. From 1971 until 1977, he served as a United States Senator from the State of Tennessee. From 1977 until 1981, he served as Chairman of the Republican National Committee. Brock Decl. ¶ 2 [DEV 6–Tab13].

11. Senator David Boren served as a United States Senator from Oklahoma from 1979–1994. Boren Decl. ¶ 2 [DEV 6–Tab 8]

12. Peter Buttenwieser is a large contributor to the Democratic Party. He estimates that from the 1996 election cycle through the 2002 cycle, he has donated over $2.8 million in non-federal funds to national committees of the Democratic Party, including over $1.2 million in the 2000 election cycle. Also from

little difference between federal and non-federal money beyond the source and amount limitations on federal money, because national and state political parties use nonfederal money to influence federal elections).

*National Party "Issue Advocacy" Campaigns Funded With Nonfederal Money*

1.12 As the experts for both parties note, the rise in nonfederal money fundraising was spurred by the new-found ability to run "issue advertisements" designed to affect federal elections.

1.13 Witnesses involved in the political process all agree that political party "issue advocacy" includes communications, paid for in whole or part with nonfederal money, that attack or support a candidate by name while claiming to be an issue discussion *outside the reach of federal election laws and do not use the Buckley express advocacy* language referred to as "magic words." [13]

Members of Congress and candidates for federal office agree that political party advertisements paid for with nonfederal funds often influence elections. *See* 146 Cong. Rec. H428 (Feb. 15, 2000) (Rep. Ganske) (noting that parties in the 1996 election cycle "took ... [nonfederal] mon-

ey and they did not use it to just go out and get a voter registration guide, they used that money for issue ads on TV that were nothing less than full campaign attack ads. Independent surveys have shown that 80 percent of those, quote, issue ads were actually attack ads."); Shays Decl. in *RNC* ¶¶ 7, 8 [DEV 68–Tab 40] ("The political parties ... use these [nonfederal] funds not for general party-building activities, but instead on television advertisements that are designed to influence the outcome of federal elections and are often indistinguishable from candidate-sponsored campaign ads."); Meehan Decl. in *RNC* ¶ 13 [DEV 68–Tab 30] ("I believe that 'issue ads' by party committees are designed to and do affect the outcomes of elections, that they defeat candidates, and that they drive up the costs of elections."); Rudman [14] Decl. ¶ 12 [DEV 8–Tab 34] ("The parties use soft money to help federal candidates get elected by running so-called 'issue ads' funded with soft money in closely contested federal races."); McCain Decl. ¶¶ 15, 17 (describing political party advertising demonstrating that political "parties circumvent federal contribution and spending limits by running candidate ads under the guise of 'issue advocacy.'"); Chapin [15] Decl. ¶ 11 [DEV 6–Tab 12] (stat-

the 1996 election cycle through the current cycle, he estimates that he and his wife have contributed approximately $100,000 per cycle *in federal funds to federal candidate committees* and other federal political committees not affiliated with political parties. During this same period, he has also hosted many hard money fundraising events for federal candidates in Philadelphia. Buttenwieser Decl. ¶ 6 [DEV 6–Tab 11].

**13.** *See Buckley v. Valeo,* 424 U.S. 1, 44 n. 52, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**14.** Senator Warren Rudman was elected to the United States Senate from New Hampshire in 1980 where he served two terms. Rudman Decl. ¶¶ 1, 3 [DEV 8–Tab 34].

**15.** Since early 2001, Linda Chapin has been the Director of the Metropolitan Center for Regional Studies at the University of Central Florida. Chapin Decl. ¶ 2 [DEV 6–Tab 12] received about 49% of the votes cast. *Id.* ¶ 4. From 1998 to 2000, Chapin directed the Orange County (Florida) Clerk's Office. *Id.* ¶ 2. Prior to that, Chapin was elected to two successive four-year terms, in 1990 and 1994, as County Chairman of Orange County. *Id.* The County Chairman is a strong executive position roughly equivalent to a mayoral office. *Id.* In recognition of Chapin's work as County Chairman, she received a Public Service Excellence Award from then-President Bill Clinton in 1997, and an Alumni Achievement Award from the Kennedy School of Government at Harvard University in 1999. *Id.* Prior to her tenure as County Chairman,

ing that the National Republican Campaign Committee ("NRCC") ran television advertisements during her 2000 Congressional campaign designed to influence the result of the election); Bloom Decl. ¶ 10 [DEV 6–Tab 7].

Political consultants agree as well. *See* Beckett [16] Decl. ¶ 11 ("The NRCC itself ran television ads in the 2000 Congressional campaign. . . . which as I recall were run in the two months prior to the general election . . . . [which] were clearly intended to influence the election result.") & Ex. 3 (storyboards of two of these advertisements) [DEV 6–Tab 3]; *id.* ¶ 9 (describing

Democratic Congressional Campaign Committee ("DCCC") efforts during the same election); Lamson Decl. ¶¶ 9, 17, Ex. 2–4 [DEV 7–Tab 26] (noting that political parties ran "issue ads" designed to influence the outcome of the Montana Congressional election in both 1996 and 2000); Pennington [17] Decl. ¶ 10–11, 13–15 [DEV 8–Tab 31] (discussing how parties can and have used issue advocacy to affect federal elections). The DNC's political director also concurs. Stoltz [18] Decl. ¶ 16 [DEV 9–Tab 39] ("In my experience, issue ads affect elections. The ads can either demoralize or confuse voters so that they do not vote, or they can

---

she was elected to a four-year term on the Orange County Commission in 1986.

16. Terry S. Beckett is a Democratic political consultant who has spent about 25 years working on political campaigns. Beckett Decl. ¶ 2 [DEV 6–Tab 3]. Beckett worked on the 1976 and 1980 Presidential campaigns of Jimmy Carter, the 1978 Bill Nelson Congressional campaign, and she ran Dick Batchelor's 1982 Congressional campaign. *Id.* Beckett also endeavored to establish a House Democratic Caucus within the Alabama legislature in the mid 1980's. *Id.* Beckett ran Gary Hart's 1988 Presidential campaign in Florida and Louisiana, and Dick Gephardt's 1988 Presidential campaign in Florida. *Id.* In 1986, Beckett did the polling on Linda Chapin's campaign for Orange County (Florida) Commissioner, and ran Chapin's 1990 and 1994 campaigns for Orange County Chairman. *Id.* Beckett also served as general consultant on Ms. Chapin's 2000 campaign to represent Florida's Eighth Congressional district, overseeing the work of the campaign manager and the media and polling consultants. *Id.* Beckett has also been involved in government having worked on the Executive Staff for Bob Graham from 1981–82 when he was the Governor of Florida and also serving as Ms. Chapin's Chief of Staff from 1991 to 1994 when she was County Chairman. *Id.* In addition, Beckett worked for a polling firm during the 1980s. *Id.*

17. Rocky Pennington is a Republican political consultant. Pennington Decl. ¶ 2 [DEV 8–Tab 31]. He is the owner and President of three Florida companies engaged in political activi-

ties: Southern Campaign Resources, Direct Mail Systems, Inc., and Summit Communications. *Id.* Southern Campaign Resources, which Pennington founded in 1982, does general consulting primarily for Florida state campaigns, but has also done Congressional races in Florida, including Congressman Cliff Steams' first race in 1988 in Ocala, Bill Sublette's 2000 campaign in the Eighth Congressional district, and Congressman Jeff Miller's 2001 special election in the Panhandle. *Id.* Direct Mail Systems, founded in 1981, is a direct mail company with roughly 100 employees that has done fundraising and has sent voter contact mail for candidates, parties and interest groups in Florida and elsewhere. *Id.* Direct Mail Systems has also sent voter contact mail for some of Florida's Republican Congressional delegation, as well as for state Republican parties in many other states. Finally, Summit Communications, which Pennington founded in 2000, creates political advertising for television and radio and buys airtime for various campaigns, such as Congressman Miller's 2001 general election campaign. *Id.*

18. Gail Stoltz has been employed as the Political Director of the DNC since May 2001. From 1998 through 2001, she worked for the Service Employees International Union as Government Affairs Director. Prior to this she worked as Political Director for the Democratic Senatorial Campaign Committee ("DSCC") and in various capacities for the Democratic National Committee ("DNC"). Stoltz Decl. ¶ 1.

energize a voter base for or against a party or its candidates. During a presidential election year, the ads definitely make a difference when a presidential candidate is featured.").

In addition, experts for both sides agree that these "issue ads" are intended to and do support the campaigns of federal candidates. *See* La Raja Cross Exam. Ex. 3 at 15 [JDT Vol. 15], 101–04; Magleby Expert Report at 40–42 [DEV 4–Tab 8].

*Characteristics of National Party Nonfederal Campaign Advertisements*

1.14 Many national political party committee "issue ads" have focused on the positions, past actions, or general character traits of federal candidates, as part of efforts to influence federal elections.

Scripts of these advertisements confirm this. *See, e.g.,* ODP0021–01393 [DEV 70–Tab 48] (Republican National Committee's ("RNC") advertisement titled "Pledge," discussed *infra* Findings ¶ 1.20.2); ODP0023–02288 to 95 [DEV 70–Tab 48] (sample scripts of "Keep More" with different sponsors) identified (*i.e.* RNC, CRP, "[state party name]"). Some versions of the advertisement end with ("[Member Name] kept his promise and voted for the middle-class tax cut. Clinton vetoed it," while others end with "Congressman [_____] voted for the largest tax increase in American history . . . and against Republican efforts to roll it back."); ODP0023–02308 [DEV 70–Tab 48] (national political party advertisement titled "Fool Me Once," beginning with the line "Compare the Clinton rhetoric with the Clinton record," discussing statements President Clinton made and actions on the same issues, and concluding with the line "Tell President Clinton you won't be fooled again."); ODP0023–02313 [DEV 70–Tab 48] (RNC advertisement titled "Stripes," which states in part: "Bill Clinton . . . He's really something. He's now trying to avoid a sexual harassment lawsuit claiming he is on active military duty. . . . Active Duty? Bill Clinton . . . He's *really* something."); ODP0023–02314 [DEV 70–Tab 48] (script of the RNC's "The Story," discussed *supra* Finding ¶ 1.20.1); ODP0023–02326 (national political party advertisement titled "More," stating that "Under President Clinton, spending on illegal[ ] [immigrants] has gone up. While wages for the typical worker have gone down. . . . Tell President Clinton to stop giving benefits to illegals, and end wasteful Washington spending."); ODP0023–02389–92 [DEV 70–Tab 48] (three versions of a national political party advertisement titled "Control" stating that "Washington labor bosses and liberal special interest groups want to buy control of Congress," and explaining why these groups think a named candidate "will vote their way . . . to return to higher taxes and more wasteful spending"); ODP0029–00010–25 [DEV 70–Tab 48] (national political party advertisement titled "High Taxes" and related documents. "High Taxes" states that a Congressional candidate while "in the state legislature . . . voted to raise corporate and personal income tax rates almost 18 percent. He even supports raising social security tax limits."); ODP0029–00031 [DEV 70–Tab 48] (national political party advertisement titled "Family Budget," stating that a Congressional candidate raised taxes while in state and local government, and concluding: "If you think *your* family pays *enough* in taxes . . . Call [_____]. Tell her to stop raising your taxes.") (emphasis in original); ODP0029–00041 [DEV 70–Tab 48] (national congressional committee advertisement supporting a candidate who "knows you have better things to do with your money than pay higher taxes"); *see also* ODP0029–00114 [DEV 70–Tab 48]; ODP0029–00169 [DEV 71–Tab 48]; ODP0029–00177 to 79 [DEV 71–Tab 48]; ODP0029–00235 to 37 [DEV 71–Tab 48]; ODP0029–00329 [DEV 71–Tab 48];

ODP0029–00339 [DEV 71–Tab 48]; ODP0041–00177 to 78 [DEV 71–Tab 48]; ODP0041–00202 to 06 [DEV 71–Tab 48]; ODP0041–00220 to 23 [DEV 71–Tab 48]; ODP0041–00280 to 82 [DEV 71–Tab 48]; ODP0041–00352 to 54 [DEV 71–Tab 48]; ODP0041–01261 [DEV 71–Tab 48]; ODP0041–01275 [DEV 71–Tab 48]; ODP0029–00138 to 47 [DEV 71–Tab 48]; ODP0036–01403 to 06 [DEV 71–Tab 48]; ODP0036–02931–32 [DEV 71–Tab 48]; ODP0041–00269–71 [DEV 71–Tab 48]; ODP0041–01024 to 27 [DEV 71–Tab 48]; ODP0041–01219 [DEV 71–Tab 48] (other political party advertisements that focus on the positions, past actions, or general character traits of federal candidates, and related documents).

1.15 Many political party committee "issue ads" have compared the positions or past actions of competing federal candidates, portraying one position negatively and the other positively, as part of efforts to influence federal elections. Scripts provided to the Court confirm this fact. *See, e.g.,* ODP0023–02387 [DEV 70–Tab 48] (national political party advertisement comparing candidate positions on issues, stating that "Congressman [_____] voted for our plan to give families a $500 per child tax credit. . . . [Opponent] voted for Jim Florio's $2.8 billion tax increase which increased your income, sales and gas taxes."); ODP0029–00149 [DEV 71–Tab 48] (national political party advertisement stating that one candidate "support[s] the $500 per child tax credit and ending the tax penalty on married couples," while the other "voted against" those ideas); ODP0029–00159 [DEV 71–Tab 48] (national political party advertisement stating that one candidate "wants Washington *bureaucrats* to decide what's right for our kids," while the other "supports local school control") (emphasis in original); ODP0041–00585–86 [DEV 71–Tab 48] (national congressional campaign committee advertisement stating that one candidate

"supports a program" that "spends millions to hire more bureaucrats," while the other "supports proposals that spend less on bureaucrats and more on local schools"); ODP0041–00729–32 [DEV 71–Tab 48] (national political party advertisement stating that one candidate supports a welfare program that "is restoring responsibility, pride and self-worth," while the other "voted *against* moving able-bodied welfare recipients from welfare to work") (emphasis in original); ODP0041–01152 [DEV 71–Tab 48] (national political party advertisement stating that one candidate "doesn't support tax cuts for Idaho working families," while the other "has a different view"); ODP0041–01177 [DEV 71–Tab 48] (national political party advertisement stating that one candidate was "the only member of Congress who did not want to tell parents when a child molester moved into their neighborhood," while the other "supports laws that protect our children and keep violent criminals in jail for their full terms"); ODP0041–01189 [DEV 71–Tab 48] (national political party advertisement stating that one candidate voted against a measure to "abolish the tax code to force meaningful reform," while the other "wants to abolish the tax code, so we can create a tax code that is fairer and simpler for working families"); ODP0041–01198 [DEV 71–Tab 48] (national political party advertisement noting that one candidate "supports tax cuts for working families," while the other "voted against billions worth of tax cuts for working families"); ODP0041–01266 [DEV 71–Tab 48] (national political party advertisement noting that one candidate "pushed for tax increases" while the other "knows lower taxes and responsible government spending are better policies"); ODP0041–01337 [DEV 71–Tab 48] (national political party advertisement noting that one candidate "supports Senator Kennedy's ultra liberal plan to mandate spending increases of 25 billion

dollars over the next five years," while the other "supports lower taxes").

1.16 Political parties aim their nonfederal money largely at competitive races. The political party committees spend millions of nonfederal dollars in competitive U.S. Senate races and hundreds of thousands of dollars or more in competitive U.S. House races. Magleby Report at 39 [DEV 4–Tab 8]. *See also* McConnell Dep. at 237 [JDT Vol. 19] ("I think every Senator realizes that the resources of the National Republican Senatorial Committee ['NRSC'] are going to be deployed to the ... maximum extent in places where there are competitive races"); Bumpers [19] Decl. ¶ 4 [DEV 6–Tab 10] ("Party committees focus their resources on competitive races."); McCain Decl. ¶ 22 [DEV 8–Tab 29] ("[P]arties generally focus their soft money spending first on taking care of the parties' current officeholders and on the candidates running for open seats and after that on the challengers running against incumbents").

1.16.1 For example, television and radio electioneering advertising by political parties played an important role in the 2000 Congressional elections in Florida's Eighth District, "a very close open-seat race." Beckett Decl. ¶¶ 4, 9 [DEV 6–Tab 3] (noting that the winning candidate garnered 51% of the vote). Political parties on both sides of these campaigns ran so-called "issue ads" that were financed partly with nonfederal money but clearly directed at influencing the outcome of the election. The DCCC ran television advertising praising Linda Chapin, the Democratic candidate, or criticizing the Republican candidates, through the Democratic State Party in order to take advantage of the more favorable hard money-soft money allocation ratios enjoyed by state parties.[20] Beckett Decl. ¶ 9, Ex. 1 [DEV 6–Tab 3]; Chapin Decl. ¶ 9 [DEV 6–Tab 12]; *see also* Bloom Decl. ¶ 10, Ex. 1–1, 1–4, (describing a similar situation for the 2000 election campaign in Florida's 22nd Congressional District) [DEV 6–Tab 7]. The NRCC and the Florida Republican Party also ran television advertisements in the two months prior to the general election, most of which criticized Chapin's record or positions, and which witnesses testify were clearly intended to influence the election results.[21]

---

**19.** Senator Dale Bumpers served two terms as Governor of Arkansas, from 1971 to 1975. Bumpers Decl. ¶ 2 [DEV 6–Tab 10]. After his time as Governor, Bumpers served as a Member of the United States Senate, representing the State of Arkansas, from 1975 to 1999. *Id.* After he retired from the Senate, Senator Bumpers spent one year directing the Center for Defense Information, a nonprofit think-tank based in Washington, D.C. *Id.* He currently practices law in Washington D.C. at the law firm Arent Fox Kintner Plotkin & Kahn, PLLC. *Id.* ¶ 3.

**20.** One advertisement run during the final 60 days of the election campaign, paid for by the DCCC through the Florida Democratic Party, attacked Chapin's challenger, stating the following:

Announcer: "I'm pro-gun." That's how he described himself to the Orlando Sentinel. Pro-gun. He wants to get rid of the Brady Bill, the common-sense law that says we

should just wait 5 days before purchasing a handgun. Pro-gun. He even opposes mandatory trigger locks to keep children safe from harm. "I'm pro-gun." He's Ric Keller, and you should tell him to support sensible gun safety for a change.

Chapin Decl. ¶ 9 & Ex. 1–2 [DEV 6–Tab 12]; Beckett Decl. ¶ 9 [DEV 6–Tab 3].

**21.** One advertisement paid for by the NRCC ran within 60 days of the election and stated the following:

Announcer: It was Tyson vs. McNeeley, the fight shown on Pay–Per–View, bought and paid for by the county jail system. Linda Chapin's county commission ran the jail system that paid for Cable TV for convicts at [its] work-release center. Under Chapin, Convicts also got new TVs and VCRs. The Sentinel wrote cells are carpeted. The day room has padded furniture, such is life for hundreds of Orange County Jail prisoners. Ask Chapin why convicts got Cable TV.

Chapin Decl. ¶ 10, Ex. 2 [DEV 6–Tab 12]; Beckett Decl. ¶ 10, Ex. 2 [DEV 6–Tab 3]; Pennington Decl. ¶ 14, Ex. 3 [DEV 8–Tab 31]; *see also* Bloom [22] Decl. ¶ 11, Ex. 2 (Republican party ads in 2000 Florida 22nd District Congressional race) [DEV 6–Tab 7].

1.16.2 Most interest groups, in contrast [to political parties], seek to build relationships with officeholders as a way of improving access to the legislative process and lobbying their position. In political science, there is strong empirical support for the theory that interest groups allocate resources primarily to pursue the "access" strategy, meaning they give to candidates who are most likely to win office, which is usually the incumbents (see, for example, Herrnson 2000). Political parties, however, allocate resources for electoral strategies, meaning they contribute money to a party candidate who is in a potentially close election.

La Raja Expert Report ¶ 14 [RNC Vol. VII].

1.17 "Almost 92% of party ads in the 2000 election never even identified the name of a political party, let alone encouraged voters to register with the party, to volunteer with the local party organization, or to support the party." *Buying Time 2000* at 64 [DEV 46]. Defense Expert Magleby concurs, finding "only 15 percent of the ads in 1998 and 7 percent of the ads

in 2000 mentioned the party by name in the ad, except in the tag line indicating which party committee paid for the ad." Magleby Expert Report at 49 [DEV 4–Tab 8].

1.18 Out of the estimated $25.6 million spent by political parties on advertisements in the 1998 election cycle, $24.6 million went to fund advertisements that referred to a federal candidate. *See* Krasno & Sorauf [23] Expert Report at Table 1. Out of 44,485 commercials, 42,599 referred to a federal candidate. *Id.* Viewers perceived 94 percent of these advertisements as electioneering in nature. *Id.* at Table 7.

1.19 Plaintiffs' own experts and witnesses testify that "[i]ssue advertising outside the context of electioneering by political parties is rare." RNC expert Nelson Polsby Dep. in *RNC v. FEC*, 98–CV–1207 (D.D.C) (hereinafter *"RNC"*) Ex. 3, at 5 [DEV 66–Tab 5]. In this case, the Plaintiffs' expert, Professor Raymond La Raja, acknowledges that "issue advertisements" are intended to and do support the campaigns of federal candidates. La Raja Cross Exam. Ex. 3 at 14–15 [JDT Vol. 15] ("[I]ssue ads, however, have been designed with the intent of boosting the campaigns of targeted candidates.... Rather than use soft money to shore up weak state and local organizations, or enforce party discipline in government, parties invest primar-

---

Chapin Decl. ¶ 11 & Ex. 3–2 [DEV 6–Tab 12]; Beckett Decl. ¶ 11; Pennington Decl. ¶ 14.

**22.** Elaine Bloom is currently engaged in consulting, public speaking, and community activities. Bloom Decl. ¶ 2 [DEV 6–Tab 7]. In 2001, Bloom was a candidate for Mayor of Miami Beach, Florida. *Id.* In 2000, Bloom was the Democratic candidate in the general election to represent Florida's 22nd Congressional district, running against the incumbent Republican Clay Shaw, who had served in Congress for nearly 20 years. *Id.* (Shaw won the race by approximately 500 votes out of over 200,000 cast). Prior to the 2000 race,

Bloom served as a member of the Florida House of Representatives for over 18 years, from 1974 to 1978 (representing Northeast Dade County) and from 1986–2000 (representing Miami Beach and Miami). *Id.* Bloom was Speaker Pro–Tempore of the Florida House from 1992 to 1994, and also served as chair of several legislative committees, including the Health Care Committee, the Joint Legislative Management Committee, the Joint Legislative Auditing Committee, and the Tourism and Cultural Affairs Committee. *Id.*

**23.** Jonathan Krasno and Frank Sorauf are experts for Defendants.

ily in issue ads that help candidates.") [JDT Vol. 15]; La Raja Decl. ¶ 16(b) [RNC Vol. VII] ("Political parties use nonfederal money to develop and disseminate political messages."). RNC political operations director Terry Nelson[24] testifies that the RNC engages in "issue advocacy in order to achieve one of our primary objectives, which is to get more Republicans elected." Nelson Dep. at 191 [JDT Vol. 24]. This conclusion is echoed by Defense Expert Magleby. Magleby Expert Report at 45 [DEV 4–Tab 8] ("The content, tactics and strategy [of political party advertisements] are generally indistinguishable from the candidate campaigns, except that party campaign communications are generally more negative in tone.")

1.19.1 An RNC official provides examples of advertisement campaigns he claims the RNC ran for "the exclusive purpose of influencing the legislative and policy debate." Josefiak[25] Decl. ¶ 91 [RNC Vol. I]. These campaigns dealt with the issues of the balanced budget amendment, welfare reform, and education. *Id.* One of these advertisements' purpose

> was to communicate the Republican Party's position that the federal government must control its reckless appetite for deficit spending. This particular advertisement featured President Clinton, and included numerous clips of him stating a different number of years in which he would balance the budget. The advertisement explained, "Talk is cheap. Double talk is expensive. Tell Mr. Clinton to support the Balanced Budget Amendment".

*Id* ¶ 91(c). Josefiak calls this advertisement "one of the most memorable and effective broadcast advertisements in [RNC] history." *Id.* This commercial was run in May 1996, *id.*, the same time the

RNC was running very similar so-called "issue advertisements" attacking President Clinton as part of an effort to assist the Dole presidential campaign which was low on funds, *see infra* Findings ¶ 1.20. RNC advertisements addressing welfare reform were also run in the summer of 1996, "comparing Clinton's rhetoric on welfare reform with his record on welfare reform." Josefiak Decl. ¶ 91(d)[RNC Vol. I]. Comparing President Clinton's statements with his record was a major theme of RNC advertisements run during this period in aid of the Dole campaign. *See infra* Findings ¶¶ 1.20, 1.20.2.

Another RNC advertisement ran in October 2002, the month before a federal election, "nationwide in support of the Republican Party's education agenda," and had the following script:

> Male: Every child can learn . . .
>
> Female: . . . and deserves a quality education in a safe school.
>
> Male: But some people say some children can't learn . . .
>
> Female: . . . so just shuffle them through.
>
> Male: That's not fair.
>
> Female: That's not right.
>
> Male: Things are changing. A new federal law says every child deserves to learn.
>
> Female: It says test every child to make sure they're learning and give them extra help if they're not.
>
> Male: Hold schools accountable. Because no child should be in a school that will not teach and will not change.
>
> Female: The law says every child must be taught to read by the 3rd grade. Because reading is a new civil right.

---

24. Terry Nelson is the RNC's Deputy Chief of Staff and Executive Director of Political Operations. Nelson Dep. at 8–9 [JDT Vol. 24]

25. Thomas Josefiak is Chief Counsel of the RNC. Josefiak Decl. ¶ 1 [RNC Vol. I].

Male: President Bush's No Child Left Behind Law.

Female: The biggest education reform and biggest increase in education funding in 25 years.

Male: Republicans are working for better, safer schools . . .

Female: . . . so no child is left behind.

Male: That's right . . . Republicans.

Announcer: Learn how Republican education reforms can help your children. Call 1–800–843–7620. Help President Bush and leave No Child Behind.

Paid for by the Republican National Committee.

Josefiak Decl. ¶ 91(e) & RNC Ex. 2428 [RNC Vol. I]. The decision by the RNC to run this advertisement, about legislation that had already passed, within one month of a federal election raises questions about whether promoting education policy was the only goal of this advertisement.

These presumably are the best examples the RNC had of its "genuine issue advocacy." I find that two of these commercials, when viewed in context, clearly had an electioneering purpose in addition to any policy goal. The third, concerning education, may also have sought to promote Republican candidates. These examples reinforce the determination of the RNC's own experts: genuine issue advocacy on the part of political parties is a rare occurrence. *See supra* Findings ¶ 1.19.

1.20 Political parties also engage in "issue advocacy" to help their candidates whose campaigns are low on funds. For example, the RNC spent $20 million on issue advertisements from March 18, 1996, through the Republican National Convention in August, designed to boost Senator Dole's image at a time when he had virtually run out of federal matching primary funds. The RNC paid for a portion of these issue advertisements with nonfederal funds, including the costs of creating and/or disseminating advertisements that attacked President Clinton's record on welfare reform, taxes, and budgetary policy. Thompson Comm. Report at 4014–16, 7520, 8294; Annenberg Report 1997 at 66; Huyck[26] Decl. in *Mariani v. United States*, 3: CV–1701 (M.D.Pa) (hereinafter *Mariani*) ¶¶ 3, 5 [DEV 79–Tab 60]; *see also* Huyck Decl. in *Mariani* Attach. A [DEV Supp.-Tab 9] (text of advertisements paid for by the RNC and other Republican party committees in part with nonfederal money).

The RNC conducted a detailed analysis of several advertisements it was planning to run in various markets. The advertisements consisted of two themes: build up then-Senator and Republican presidential candidate Bob Dole, and attack President Bill Clinton. These advertisements were tested in focus groups to see the effect they had on undecided voters. The advertisement used to build up Senator Dole told his life story and never mentioned the words "vote for," "elect," or any of the "magic words" of express advocacy. The second set of advertisements showed President Clinton speaking on a certain issue, then publicly stating the opposite. All of the commercials were tested to see which would give help Senator Dole and hurt President Clinton in the polls. Memorandum to Haley Barbour from Charlie Nave and Joel Mincey, dated May 28, 1996, FEC MUR 4553, Fabrizio Dep. Ex. 5 [DEV 55–Tab 113] (INT011830); FEC MUR 4553, Fabrizio Dep. at 83–94 [DEV 55–Tab 113] (despite working as a consultant for Senator Dole, Fabrizio McLaughlin and Associates were sharing their data with the RNC, NRSC, and NRCC).

26. Pat Huyck was the RNC's Director of Accounting as of 1999. Huyck Decl. in *Mariani v. United States,* 3: CV–1701 (M.D.Pa) ¶¶ 3, 5 [DEV 79–Tab 60].

1.20.1 One example from this effort is "The Story":

Audio of Bob Dole: We have a moral obligation to give our children an America with the opportunity and values of the nation we grew up in.

Voice Over: Bob Dole grew up in Russell, Kansas. From his parents he learned the value of hard work, honesty and responsibility. So when his country called ... he answered. He was seriously wounded in combat. Paralyzed, he underwent nine operations.

Audio of Bob Dole: I went around looking for a miracle that would make me whole again.

Voice Over: The doctors said he'd never walk again. But after 39 months, he proved them wrong.

Audio of Elizabeth Dole: He persevered, he never gave up. He fought his way back from total paralysis.

Voice Over: Like many Americans, his life experience and values serve as a strong moral compass. The principle of work to replace welfare. The principle of accountability to strengthen our criminal justice system. The principle of discipline to end wasteful Washington spending.

Voice of Bob Dole: It all comes down to values. What you believe in. What you sacrifice for. And what you stand for.

Fabrizio Dep. Ex. 2; McCain Decl. ¶ 15. The RNC paid for "The Story," in part with nonfederal money, and it was intended to help Senator Dole in the Presidential election. Huyck Decl. in *Mariani* ¶ 3 [DEV 79–Tab 60]; FEC MUR 4553, Fabrizio Dep. at 50 [DEV 55–113]; McCain Decl. ¶ 15 [DEV 8–Tab 29].

The RNC's Curt Anderson and Wes Anderson wrote to the RNC Chairman regarding the Dole "Story" advertisement, stating: "We could run into a real snag with the Dole Story spot. Certainly, all the quantitative and qualitative research strongly suggests that this spot needs to be run. Making this spot pass the issue advocacy test may take some doing." ODP0025–02018–20 [DEV 70–Tab 48]. Senator Levin commented: "[a]ny reasonable person looking at that ad at that particular time in the Presidential season would say: It's not an ad about welfare or wasteful spending; it is an ad about why should we elect that particular nominee." 145 Cong. Rec. S12747 (1999) (Sen.Levin). Senator Dole himself stated that "The Story" "never says I'm running for President. I hope that it's fairly obvious since I'm the only one in the picture." Center for Responsive Politics, A Bag of Tricks: Loopholes in the Campaign Finance System (1996) at 13, ODP0018–00172 [DEV 69–Tab 48].

1.20.2 Another example from the RNC's 1996 issue advocacy campaign is "Pledge"

Clinton: I will not raise taxes on the middle class.

Announcer: We heard this a lot.

Clinton: We gotta give middle class tax relief, no matter what else we do.

Announcer: Six months later, he gave us the largest tax increase in history. Higher income taxes, income taxes on social security benefits, more payroll taxes. Under Clinton, the typical American family now pays over $1,500 more in federal taxes. A big price to pay for his broken promises. Tell President Clinton: You can't afford higher taxes for more wasteful spending.

Annenberg Report 1997 at 66; *see also* Huyck Decl. in *Mariani* ¶¶ 3 & Attach. A [DEV 79–Tab 60].

1.21 The political parties understand that their issue advocacy campaigns affect federal elections, and they sponsor them with that purpose. This fact is evident from the 1998 "Operation Breakout" issue advocacy campaign mounted by the NRCC

in cooperation with the RNC. "Operation Breakout" was touted as an effort to "ensure that the [Republican] party not only maintains, but expands our majorities in Congress." ODP0031–00299 [DEV 71–Tab 48] (September 25, 1998, letter from RNC Chair Nicholson to donor thanking him for his donation to "Operation Breakout"); *see also* ODP0033–00534 [DEV 71–Tab 48] (RNC Solicitation letter for "Operation Breakout," describing it as an effort to "hold onto our majority in the House").

1.22 The nature of the political parties' issue advertisements, detailed *supra,* demonstrates what any observer of politics has come to know: political party "issue advocacy" campaigns are targeted at federal elections, particularly competitive races, and are intended to, and do affect the outcome of those contests.

*National Parties Expend A Large Proportion of their Nonfederal Funds for "Issue Advocacy"*

1.23 The national political parties spend a large proportion of their budgets on "issue advertisements" that are designed to help elect federal officeholders and candidates. In 2000, for example, the RNC spent an estimated $70–75 million dollars on the production and broadcasting of television and radio advertisements, including both issue advocacy and coordinated expenditures. Oliver [27] Dep. at 148–49 [DEV Supp.-Tab 1]. *Id.* "During the 2000 presidential election year, the largest single portion of the DNC budget was used for issue advertising." Marshall Decl. ¶ 3 [DEV 8–Tab 28].

1.24 Defense expert David Magleby's study estimates that "over half, and sometimes as much as three-quarters, of soft money expenditures go to broadcast advertising." Magleby Expert Report at 49 [DEV 4–Tab 8].

1.25 As Defendants' expert Donald Green, relying on an article by Plaintiffs' expert La Raja, observes:

[T]he original exemptions for soft-money were justified partly on the grounds that get-out-the-vote activity would help strengthen parties. As it happened, only a small fraction of the soft money (or hard money, for that matter) that flowed to state and national parties was spent on voter mobilization activity, even broadly conceived to include direct mail and commercial phone banking. According to the classification system presented by La Raja and Jarvis–Shean (2001, p.3), 8.5% of national party soft money expenditures went to 'mobilization' and 'grassroots.' The figures for state and local parties are each 15%.

D. Green Report at 14 n.17 [DEV 1–Tab 3] (citing Raymond La Raja and Elizabeth Jarvis–Shean, Assessing the Impact of a Ban on Soft Money: Party Soft Money Spending in the 2000 Elections). (Unpublished manuscript: Institute of Governmental Studies and Citizens' Research Foundation 2001).

*National Parties Funnel Nonfederal Funds Through State Parties for the Purchase of Advertisements Designed to Affect Federal Elections*

1.26 The evidence clearly demonstrates that a large proportion of nonfederal funds transferred from the national to the state parties is targeted for the purchase of specific issue advertisements designed by the national parties. These advertisements are overwhelmingly intended to affect federal elections. This is done in large part because the state parties have better federal/nonfederal allocation ratios which allows such state-bought advertisements to be purchased with a greater proportion of nonfederal funds.

27. John Oliver is Deputy Chairman of the RNC.

1.26.1 Defense expert Magleby explains how the FEC's allocation regime makes nonfederal fund transfers to the state parties attractive to the national parties.

Parties can stretch their soft money even further by transferring soft and hard money to state parties where they can achieve a better ratio of soft to hard dollars than if they spent the money themselves. This is because the ratio of soft to hard dollars for party spending if done by the national patty committees is 35 percent soft and 65 percent hard for presidential years, and 40 percent soft and 60 percent hard for off years, but if done by state parties the ratio of soft to hard dollars is greater. The reason for this difference is state parties are allowed to calculate their soft/hard ratio based on the ratio of federal offices to all offices on the ballot in any given year. Both political parties have found spending soft money with its accompanying hard money match through their state parties to work smoothly, for the most part, and state officials readily acknowledge they are simply "pass throughs" to the vendors providing the broadcast ads or direct mail.

Magleby Expert Report at 37 [DEV 4–Tab 8]. Other witnesses and evidence support this contention, which no one disputes. *See, e.g.*, Marshall Decl. ¶ 3 [DEV 8–Tab 28] (testifying that in 2000 the DNC transferred funds to the state parties to take advantage of their allocation rates); *see also* 11 C.F.R. § 106.5(b)(2)(i) (2001) (during presidential election years national party committees required to pay for their mixed activities with at least 65 percent in federal funds); *id.* at § 106.5(b)(2)(ii) (during nonpresidential election years national party committees required to pay for their mixed activities with at least 60 percent in federal funds).

1.26.2 The national political parties take advantage of this allocation regime when planning and executing their advertising budgets. One RNC memorandum contains a chart which

clearly demonstrates what we already clearly know, that any media we place in the target presidential states should be placed through state parties. The average ballot allocation in the top 17 target states is 37% federal—63% non-federal, this obviously contrasts very well with our 65% federal—35% non-federal allocation.

RNC Memorandum dated March 18, 1996, titled "Ballot Allocation of Target States" ODP0025–02720 to 21 [DEV 70–Tab 48]. The memorandum concludes that by using the state political parties, rather than directly making the purchase, the RNC would save $2.8 million in federal funds on a $10 million media buy. *Id. see also* ODP0021–1365 to 1367 [DEV 70–Tab 48] (memorandum from Haley Barbour to the California House Republicans, discussing the need to make a media buy in California and stating that "[t]o accomplish this buy, the [RNC] would transfer funds to the California Republican Party, which would actually buy the advertising. Under FEC regulations, the California Republican Party must pay for the advertising with one-third FEC contributions and two thirds nonfederal dollars"); McConnell Dep. at 267–77 [JDT Vol. 19] (stating that the NRSC prefers to transfer funds to state parties who then purchase NRSC advertisements with a more favorable federal/nonfederal fund allocation ratio); Nelson Dep at 76–77 [JDT Vol. 24] (stating that purchasing political advertisements through state parties has two advantages: (1) better federal/nonfederal fund allocation ratios and (2) "having [a] state disclaimer [on the advertisement] is generally better than having a national disclaimer on it"); Marshall Decl. ¶ 3 [DEV 8–Tab 28] (noting that in 2000, the largest single portion of the DNC budget was used for

issue advertising, but that "[t]he DNC typically did not expend money for these issue ads itself, but instead transferred both federal and non-federal money to the state parties to make these expenditures"); ODP0023–02358 to 65 [DEV 70–Tab 48] (RNC tally of "1996 Media Buys," listing advertisements purchased, price, and the amount of federal and RNSEC funds used); ODP0023–03560 to 660 [DEV 70–Tab 48] (RNC report of 1996 fund transfers to state parties used for "party building/media buy"); ODP0025–01560 [DEV 70–Tab 48] (memorandum from the Republican National Finance Committee dated May 24, 1996, titled "California T.V. Money," discussing the need to raise $4 million in nonfederal funds in two weeks which would then be transferred to the CRP in order to *get on the air and stay on the air* for the next three months in CA") (emphasis in original); *supra* Findings ¶¶ 1.6 (in 1996 the DNC financed two-thirds of its Clinton presidential campaign issue advocacy through state party transfers), 1.4.3 (Mann) (over half of the nonfederal money raised by the national party committees was transferred to the state parties during the 2000 election cycle).

1.26.3 The national political party committees transferred $9,710,166 in federal funds to state political party committees during the 1992 election cycle, $9,577,985 during the 1994 election cycle, $49,967,893 during the 1996 election cycle, $30,475,897 during the 1998 election cycle, and $131,016,957 during the 2000 election cycle. The national political party committees transferred $18,646,162 in nonfederal funds to state political party committees during the 1992 election cycle, $18,442,749 during 1994 election cycle, $113,738,373

during the 1996 election cycle, $69,031,644 during the 1998 election cycle, and $265,927,677 during the 2000 election cycle. Biersack[28] Decl. Tbls. 4, 8 [DEV 6–Tab 6].

1.26.4 State political parties use a large portion of the transferred nonfederal money to finance public communications that support or oppose a federal candidate. *See* Bowler[29] Decl. ¶ 15 (explaining that "[t]he majority of [national transfers to the CDP] were for issue advocacy"). According to Plaintiffs' expert La Raja, "[i]t appears that both parties ... use soft money transfers primarily to execute national campaign strategy through state parties." La Raja Cross Exam. Ex. 3 at 103 [JDT Vol. 15]. La Raja finds that "more nonfederal funds in the allocation accounts are used for media rather than what I call party building," La Raja Cross Exam. at 67 [JDT Vol. 15] (La Raja's definition of "party building" does not include administrative spending); La Raja Expert Report ¶ 22 [RNC Vol. VII] (finding that in 2000, 44 percent of transferred nonfederal funds were used for media expenditures and 30 percent for administrative overhead). La Raja concludes that "state parties invest most soft money from the national parties in federal races," but notes that "these investments have considerable effects on races further down the ticket." La Raja Cross Exam. Ex. 3 at 139 [JDT Vol. 15] (La Raja dissertation) [JDT Vol. 15]; *see also* La Raja Cross Exam. 17–18 (stating that he stands by the conclusions reached in his dissertation).

1.26.4.1 A good example of this system comes from the Republican Party of New Mexico ("RPNM"). A 1998 financial state-

---

**28.** Robert W Biersack served as the Supervisory Statistician for the FEC from 1983 to February 2002. As the Supervisory Statistician, he was responsible for evaluating the quality, reliability, and validity of information contained in the FEC disclosure databases.

Currently, he is Deputy Press Officer for the FEC, a position he has held since February 2002. Biersack Decl. ¶ 1 [DEV 6–Tab 6].

**29.** Kathleen Bowler is the Executive Director of the CDP. Bowler Decl. ¶ 1.

ment from the state party shows that it received revenues of $1,524,634 in nonfederal transfers from other Republican organizations, $1,110,987 in individual contributions, and just $389,552 in federal transfers from Republican organizations. The RPNM spent over one-third of its 1998 revenues, $1,062,095, on "issue advocacy—television, radio and mail." INT810–1605 to 12 (RNC NM0406326—33) [DEV 114].

1.26.5 These issue advertisements funded by nonfederal transferred funds are mainly intended to support federal candidates. Plaintiffs' expert La Raja notes that "one of the goals" of national party allocation of nonfederal funds to state parties is to help federal candidates in close elections, and that his "impression" is that it is their primary goal. La Raja Cross Exam. at 73–74 [JDT Vol. 15]; *see also* Magleby Expert Report at 39 ("[National party s]oft money is largely aimed at competitive [federal] races."). La Raja finds that the parties "are highly functional rather than responsible. Rather than use soft money to shore up weaker organizations, or reward state party members for moving closer to national party ideology, the national organizations use soft money like hard money—to pursue the short-term goal of winning elections." La Raja Cross Exam. Ex. 3 at 75 [JDT Vol. 15]; *see also id.* at 15 (stating that parties invest soft money primarily "in issue ads that help candidates"). According to La Raja, the national parties' spending of nonfederal funds is proof that "they are functional parties dedicated to winning elections." *Id.* at 25; *see also* La Raja Cross Exam. Ex. 1 (La Raja Decl.) ¶ 11(a) ("American political parties have focused primarily on winning elections . . . .") [JDT Vol. 15].

1.26.6 Representatives of the Congressional committees acknowledge that fund transfers from their committees to state parties are used primarily for federal election advertising. *See* Jordan[30] Decl. ¶ 68 [DEV 7–Tab 21] ("In my experience, the large majority of the DSCC's nonfederal transfers to state and local party committees have been to support the nonfederal share of issue advocacy communications. Frequently, these communications refer to Democratic Senate candidates or their Republican opponents, while not expressly advocating any candidate's election or defeat."); Vogel[31] Decl. ¶ 63 [DEV 9–Tab 41] ("In my experience, the large majority of the NRSC's nonfederal transfers to state and local party committees have been to support the nonfederal share of issue advocacy communications. Frequently, these communications refer to Republican Senate candidates or their Democratic opponents, while not expressly advocating any candidate's election or defeat."); McGahn[32] Decl. ¶ 55 [DEV 8–Tab 30] ("In my experience, the large majority of the NRCC's nonfederal transfers to state and local party committees have been to support the nonfederal share of issue advocacy communications. . . . Frequently, these communications refer to Republican House candidates or their Democratic opponents, while not expressly advocating any candidate's election or defeat."); Wolfson[33] Decl. ¶ 63 [DEV 9–Tab 44] ("In my experience, the large majority of the DCCC's nonfederal transfers to state and local party committees have been to support the nonfederal share of issue advocacy communications. Frequently, these communications refer to Democratic House candidates or their Republican opponents, while

**30.** James Jordan is the Executive Director of the DSCC. Jordan Decl. ¶ 1 [DEV 7–Tab 21].

**31.** Alexander Vogel is General Counsel for the NRSC. Vogel Decl. ¶ 1 [DEV 9–Tab 41].

**32.** Donald McGahn is General Counsel for the NRCC. McGahn Decl. ¶ 1 [DEV 8–Tab 30].

**33.** Howard Wolfson is Executive Director of the DCCC. Wolfson Decl. ¶ 1 [DEV 9–Tab 44].

not expressly advocating any candidate's election or defeat.") *see also* La Raja Cross Exam. Ex. 3 at 69 (La Raja dissertation) [JDT Vol. 15] ("It would be particularly surprising for congressional campaign committees to venture outside their traditional scope of helping candidates and invest in state party organizations.").

1.26.7 Representatives of the congressional campaign committees also admit that they retain control over the advertisements their nonfederal money transfers are used to purchase. Jordan Decl. ¶¶ 72–73 [DEV 7–Tab 21] ("When the DSCC transfers funds to state party committees, including nonfederal funds, for the purpose of disseminating issue advocacy communications, it first develops the communications in consultation with media consultants, who are generally retained by the state party at the request or suggestion of the DSCC, and then provides the communications to the state party, together with the necessary funds to distribute them locally. State parties may, but generally do not, reject the communications.... The DSCC does not permit issue advocacy communications it supports to be recorded or produced until they have been approved by DSCC counsel and DSCC senior employees."); Vogel Decl. ¶ 67–68 [DEV 9–Tab 41] ("When the NRSC transfers funds to state party committees, including nonfederal funds, for the purpose of disseminating issue advocacy communications, it first develops the communications in consultation with the state party and media consultants, who are generally retained by the state party at the request or suggestion of the NRSC, and then provides the communications to the state party, together with the necessary funds to distribute them locally. State parties may, but generally do not, reject the communications.... The NRSC does not permit issue advocacy communications it supports to be recorded or produced until they have been approved by NRSC counsel and NRSC senior employees."); McGahn Decl. ¶¶ 58–59 ("When the NRCC transfers funds to state party committees, including nonfederal funds, for the purpose of disseminating issue advocacy communications, it first develops the communications in consultation with the state party and media consultants, and then provides the communications to the state party, together with the necessary funds to distribute them locally. State parties may, but generally do not, reject the communications.... The NRCC does not permit issue advocacy communications it supports to be recorded or produced until they have been approved by me, as NRCC counsel, and NRCC senior employees."); Wolfson Decl. ¶¶ 66–67 ("When the DCCC transfers funds to state party committees, including nonfederal funds, for the purpose of disseminating issue advocacy communications, it first develops the communications in consultation with media consultants, who are generally retained by the state party at the request or suggestion of the DCCC, and then provides the communications to the state party together with the necessary funds to distribute them locally. State parties may, but generally do not, reject the communications.... The DCCC does not permit issue advocacy communications it supports to be recorded or produced until they have been approved by DCCC counsel and DCCC senior employees.").

1.26.7.1 On September 28, 1998, NRSC Executive Director Steven Law wrote then-NRSC Chairman Senator Mitch McConnell recommending that the NRSC fund an issue ad playing off an article that appeared in Nevada's largest newspaper. Democratic Senatorial candidate Harry Reid "got bad reviews for an over-the-top, hostile performance, suggesting a line of attack that builds on our six-month-long message that Harry Reid says one thing in Nevada and does the opposite in Washington.... If we went in this direction, I

would suggest running this spot for one week at 1000 [gross ratings point], to be followed with our last ad in the Nevada issue advocacy campaign, on lawyers' fees." ODP0036–02931–32 [DEV 71–Tab 48]. Law's idea was later implemented in an advertisement paid for by the Republican State Central Committee of Nevada. ODP0036–01403 to 06 [DEV 71–Tab 48].

1.26.7.2 Documents in the record also demonstrate that the state political parties are merely conduits between the national political parties and their media consultants. *See, e.g.,* CRP 00367 [IER Tab 28] (fax from the NRCC to the CRP's Victory 2000 project proving CRP "wiring info" and informing the state party that the "[m]oney will be in your account today .... Please wire back to Strategic Media"); CDP 02095–101, 2103–04, 2106 [IER Tab 12] (wire transfer instructions from the DNC to the CDP for media buys); CDP 02984–89 [IER Tab 12] (detailing transfer of funds from DCCC to CDP for media buy).

1.26.7.3 The RNC and DNC also transfer nonfederal funds to state parties to pay for advertisements over which the national party committees retain control. *See* Castellanos Dep. (Sept. 27, 2002) at 111–12 (stating that when working on advertisements for state parties, National Media dealt with an RNC representative, not a state party member); Marshall Decl. ¶ 4 (noting that the DNC normally approved the content of the advertisement and the amount of money to be spent before calling the state party in question "to let it know that an ad was coming"); Josefiak Dep. at 97–98 [JDT Vol. 11] (acknowledging that the RNC transfers funds to state parties to pay for RNC advertisements); Huyck Decl. in *Mariani* ¶ 4 (stating that in 1995–1996 the RNC transferred funds to state party committees to pay for issue advertisements related to the 1996 Presidential

election campaign) [DEV 79–Tab 60]; Hazelwood [34] Dep. at 118–19 (RNC transfers funds to state parties to pay for issue advertisements). In 2000, the RNC raised over $254 million, a majority of which was transferred to the state parties for various activities. Josefiak Dep. at 76 [JDT Vol. 11]; *see also* FEC, National Party Transfers to State/Local Committees: January 1, 1999 to December 31, 2000, *available at* http://www.fec.gov/press/051501party fund/tables/nat2state.html (during the 2000 election cycle the RNC made transfers of approximately $129 million—$93.2 million in nonfederal funds and $35.8 million in federal funds—to state and local parties). The greatest expenditures from these transfers were for political advertising and administrative expenses. Josefiak Dep. at 76–77 [JDT Vol. 11].

1.27 The evidence above clearly demonstrates that the national political parties transfer nonfederal money through their state party affiliates for the purpose of buying so-called "issue advertisements" at a better allocation ratio. These advertisements are created and controlled by the national political parties, with the state political parties merely accepting the nonfederal money transfers and passing the funds on to media consultants as directed by the national political parties. These advertisements are intended to affect federal elections without using express advocacy terminology.

*Get–Out–The–Vote (GOTV)*

1.28 It is undisputed that GOTV efforts, paid for with nonfederal funds by national party committees and targeted at federal elections, *directly* assist federal candidates, as well as state and local candidates of the same party whose elections are held on the same day. Declarations from representatives of the four major

---

**34.** Elizabeth Blaise Hazelwood is the RNC's political director. Hazelwood Dep. at 10.

congressional campaign committees attest to the fact that these committees "transfer[ ] federal and nonfederal funds to state and/or local party committees for ... get-out-the-vote efforts. These efforts have a significant effect on the election of federal candidates." Jordan Decl. ¶ 69 [DEV 7–Tab 21]; Wolfson Decl. ¶ 64 [DEV 9–Tab 44]; Vogel Decl. ¶ 64 [DEV 9–Tab 41]; McGahn Decl. ¶ 56 [DEV 8–Tab 30] (emphasis added); see also Josefiak Decl. ¶ 26 [RNC Vol. I] (Republican Party "Victory Programs" which include GOTV components are designed to benefit candidates at the *federal,* state and local levels)(emphasis added); Philp [35] Dep. at 47, 49 (when asked "[are there a]ny other services that the party provides to federal candidates," answering that the Colorado Republican Party's GOTV "program is designed to benefit all candidates.").

1.28.1 Documentary evidence corroborates the testimony that GOTV efforts assist federal candidates. *See, e.g.,* CDP 00859 [IER Tab 1.I] (letter thanking a CDP donor and noting that CDP's *"get-out-the-vote efforts"* would help "increase the number of Californian Democrats in the United States Congress, continue Democratic leadership in the State Senate, take back the State Assembly—and deliver California's 54 electoral votes for President Bill Clinton's and Vice President Al Gore's re-election.") (emphasis added); CRP 07164 [IER Tab 1.F] (letter from the Executive Director of the Dole–Kemp campaign, stating in part: "Unfortunately, federal law prohibits the Dole/Kemp campaign from accepting any contributions after the last day of the national convention. However, you can still support the Dole/Kemp ticket by sending your contribution

to the Victory '96 fund, which will support the party's *'get out the vote'* operation and help us ensure a successful campaign in California ...") (emphasis added); *infra* Findings ¶ 1.60 (McConnell letter noting that the Kentucky Victory 2000 campaign, which included a GOTV component, "was an important part of President George W. Bush's impressive victory in Kentucky last year, and it will be critical to my race and others next year").

1.28.2 Defendants' expert Donald Green concludes that

[t]he evidence from California, as well as from numerous opinion surveys and exit polls that demonstrate the powerful correlation between voting at the state and federal levels, shows quite clearly that a campaign that mobilizes residents of a highly Republican precinct will produce a harvest of votes for Republican candidates for both state and federal offices. A campaign need not mention federal candidates to have a direct effect on voting for such a candidate. That parties recognize this fact is apparent, for example, from the emphasis that the Democrats place on mobilizing and preventing ballot roll-off among African–Americans, whose solidly Democratic voting proclivities make them reliable supporters for office-holders at all levels. As a practical matter, generic campaign activity has a direct effect on federal elections.

Green Expert Report at 14 [DEV 1–Tab 3].

1.28.3 The RNC transfers nonfederal funds to state political parties to subsidize voter mobilization activities of the state parties. Banning [36] Decl. ¶ 31 [RNC Vol.

---

**35.** Alan Philp testified on behalf of the Colorado Republican Party. Philp Dep. at 9 [JDT Vol. 26].

**36.** Jay Banning has served as the RNC's Director of Administration and Chief Financial

Officer since 1983, and has been employed by the RNC in these and other capacities for twenty-six years. Banning Decl. ¶ 1 [RNC Vol. III].

III]; *see also* Duncan [37] Decl. ¶¶ 11–12 [RNC Vol. VI]. According to Josefiak, the RNC also helps state and local parties fundraise for these voter mobilization efforts. *See* Josefiak Decl. ¶¶ 63, 65–72 [RNC Vol. I]; *see also* Benson [38] Decl. ¶ 10 [RNC Vol. VIII] ("[T]he Republican national party committees also assist [the Colorado Republican Party] in raising money for these party building programs.").

1.29 The CDP and the CRP conduct GOTV door-to-door canvassing campaigns, phone banks and mailings. Since federal, state and local candidates are on the same ballot in California, these efforts affect all the candidates on the ballot. This fact explains why these efforts usually required the state parties to use a mix of federal and nonfederal money to pay for such activities. *See, e.g., Bowler* Decl. ¶ 20.b. (noting that CDP slate cards and door hangers often mention both federal and nonfederal candidates and thus were funded with the mix of funds); *id.* (50 to 60 percent of CDP's paid phone banks make reference to a federal candidate and must therefore be paid for with a mix of funds); *see also* Erwin Aff. ¶ 10. It is important to note, however, that under BCRA's Levin Amendment state political parties may still use a mix of nonfederal and federal funds to pay for GOTV efforts for elections that include federal candidates, as long as they use nonfederal funds raised in accordance with the provision. Of course, for elections without a federal candidate on the ballot, BCRA does not impose any restrictions.

1.30 It is clear that nonfederal funds used to finance GOTV efforts for elections with federal candidates on the ballot affect federal elections. It is clear that GOTV activities target a certain political party's likely voters and attempts to get them to the polls. Even if the intent behind such efforts were to only affect state and local contests, increasing the number of Democrats, for example, who vote in a state and local election will undoubtedly increase the number of votes for the federal Democratic candidates who share the same ballot. This fact is well-known and appreciated by the national political parties and federal candidates.

*Voter Registration*

1.31 It is undisputed that voter registration efforts, paid for with nonfederal funds by the national party committees in the period before federal elections, *directly* assist federal candidates, as well as state and local candidates from the same party whose elections are held on the same day. As Dr. Mann notes:

In a series of advisory opinions, the Commission sought to ensure that a portion of state party activities benefiting [sic] both federal and nonfederal candidates be paid for with hard money. In Advisory Opinion 1975–21, *the Commission ruled that a local party committee had to use hard dollars to pay for a part of its administrative expenses and voter registration drives, on the grounds that these functions have an indirect effect on federal elections.* It used this opinion in regulations it issued in 1977 governing allocation of administrative expenses between federal and nonfederal accounts. The allocation was to be made "in proportion to the amount of

---

**37.** Robert Duncan is a Member of the RNC from the State of Kentucky. At the time the RNC's Complaint in this case was filed, he served as Treasurer of the RNC, but as of July 2002 he became its General Counsel. Duncan Decl. ¶ 1 [RNC Vol. VI].

**38.** Bruce Benson is Chairman of the Colorado Republican Party. Benson Decl. ¶ 1 [RNC Vol. VIII].

funds expended on federal and non-federal elections, or on another reasonable basis." (11 C.F.R. 106.1(e) 1978). Mann Expert Report at 9 [DEV 1–Tab 1] (emphasis added).

1.32 Representatives of the four major congressional campaign committees, confirm that the four committees "transfer[ ] federal and nonfederal funds to state and/or local party committees for . . . *voter registration* . . . efforts. These efforts have a significant effect on the election of federal candidates." Jordan Decl. ¶ 69 [DEV 7–Tab 21]; Wolfson Decl. ¶ 64 [DEV 9–Tab 44]; Vogel Decl. ¶ 64 [DEV 9–Tab 41]; McGahn Decl. ¶ 56 [DEV 8–Tab 30] (emphasis added); *see also* CDP 00859 [IER Tab 1.I] (letter thanking a CDP donor and noting that CDP's *"voter registration* . . . efforts" would help "increase the number of Californian Democrats in the United States Congress, continue Democratic leadership in the State Senate, take back the State Assembly—and deliver California's 54 electoral votes for President Bill Clinton's and Vice President Al Gore's re-election.") (emphasis added); *see also* Findings ¶ 1.60 (McConnell letter noting that the Victory 2000 campaign, which included a voter registration component "was an important part of President George W. Bush's impressive victory in Kentucky last year, and it will be critical to my race and others next year"); Philp Dep. at 49 (when asked "[are there a]ny other services that the party provides to federal candidates," answering that the Colorado Republican Party's GOTV "program is designed to benefit all candidates. That could include voter registration and so on and so forth.").

1.33 CRP official Erwin[39] testifies that "[t]he overwhelming amount of [voter registration] activity is 'generic' voter registration activity urging potential registrants to 'Register Republican.' " Erwin Aff. ¶ 9.

Erwin testifies that the CRP has paid for voter registration—with a mix of federal and nonfederal funds—through its Operation Bounty program, in which Republican county central committees, Republican volunteer organizations and Republican candidates for federal and state office participate. Through its Operation Bounty drives, the CRP has typically registered over 350,000 Republican voters in each election cycle since the 1984 election cycle (except 1997–98). *See* Erwin Aff. ¶ 9; *see also* CDP App. at 1185 [PCS 4] (charting CRP's voter registration activity by election cycle since 1984 cycle).

Ms. Bowler states that the CDP's expenditures on voter registration—consisting of a mix of federal and nonfederal funds—were approximately $145,000 in the 1996 election cycle; $300,000 in the 1998 cycle; $100,000 in the 2000 election cycle; and $185,000 during the period from January 1, 2001 to June 30, 2002. *See* Bowler Decl. ¶ 20.a. Ms. Bowler notes that the CDP's expenditures for voter registration were higher in 1998 (a year with eight statewide elections) than in 2000 (a presidential election year). *Id.* CRP and CDP officials testify that "it is often the case that these voter registration activities are primarily driven by the desire to affect State and local races." Erwin Aff. ¶ 14a; Bowler Decl. ¶ 20.a.

Whatever their intention, the evidence *supra*, makes clear that these efforts affect federal elections; particularly as demonstrated by the CDP's fundraising materials. (*See* Findings ¶ 1.32). Moreover, under the Levin Amendment state political parties may still use a mix of nonfederal and federal funds to conduct voter registration efforts for elections that include federal candidates, as long as they use nonfederal funds raised in accordance with the provision. Of course, for those elec-

---

**39.** Ryan Erwin is the Chief Operating Officer of the CRP. Erwin Aff. ¶ 1.

tions without a federal candidate on the ballot, BCRA does not impose any restrictions.

*Redistricting*

1.34 The national parties use nonfederal funds, as well as federal funds, toward their redistricting efforts, and these efforts are of value to Members of Congress because the changes in the composition of a Member's district can mean the difference between reelection and defeat.

1.34.1 As Defendants' expert Donald Green notes:

The most important legislative activity in the electoral lives of U.S. House members takes place during redistricting, a process that is placed in the hands of state legislatures. The chances that a House incumbent will be ousted by unfavorable district boundaries are often greater than the chances of defeat at the hands of the typical challenger. Thus, federal legislators who belong to the state majority party have a tremendous incentive to be attuned to the state legislature and the state party leadership. For example, in early 1999 the Republican National Committee, recognizing that state legislatures in Tennessee and Georgia would soon control redistricting, transferred substantial sums of money to those states' Republican parties in an effort to win the few seats necessary to gain the majority. As Edwin Bender, in a report for the National Institute on Money in State Politics explains: "In a number of states with legislatures that are controlled by narrow margins, a win or two in the state House or Senate in 2000 could mean the difference between a redistricting committee controlled by Democrats or Republicans, and districts that favor one party over the other . . . . As a result, national party organizations have been flooding the states with campaign donations, both soft money and

hard, to influence the redistricting process".

Green Expert Report at 11–12 [DEV 1–Tab 3].

1.34.2 The RNC uses a mix of federal and nonfederal funds to support redistricting efforts, including redistricting litigation. Josefiak Decl. ¶ 74 [RNC Vol. I]. In 2002, for example, the RNC budgeted approximately $4.1 million on redistricting. Seventy percent of the redistricting budget was to be funded with nonfederal money. Banning Decl. ¶ 28.i [RNC Vol. III]. The RNC spends more overall on state legislative redistricting than on congressional redistricting. Josefiak Decl. ¶ 74 [RNC Vol. I]; *see also infra* Findings ¶ 1.78.1 (Fortune 100 Company nonfederal money budget request noting that "because both [national] parties will be working to influence redistricting efforts during the next two years, we anticipate that we will be asked to make soft money contributions to these efforts. Redistricting is a key once-a-decade effort that both parties have very high on their priority list.").

1.34.3 Mr. Alan Philp, of the Colorado Republican Party, testifies that his party and the Colorado Democratic Party played a significant role in the state's legislative redistricting process. Philp Dep. at 65 [JDT Vol. 26]. Philp states that the results of the redistricting process "[c]an have a significant impact" on candidates for federal office. *Id.* at 66. He notes that the Colorado Congressional delegation discussed redistricting with the Colorado Republican Party. *Id.*

*Other Activities Paid for with Nonfederal Funds*

1.35 *Administrative Expenses:* The FEC allowed the RNC to pay for its administrative overhead—including salaries, benefits, equipment, and supplies for party operations at RNC headquarters in Washington, D.C.—with a mix of federal and

nonfederal funds. *See* Banning Decl. ¶ 27 [RNC Vol. III]; Bowler Decl. ¶ 15. "During the 2000 election cycle, the RNC spent $35.6 million of nonfederal funds and $52.9 million of federal funds on administrative overhead." Banning Decl. ¶ 27 [RNC Vol. III]. "Administrative overhead includes the operating costs of RNC facilities, such as utility bills and maintenance, fundraising costs, and routine expenses for travel and supplies. Administrative overhead also includes the salaries of RNC employees." *Id.* According to Plaintiffs' expert La Raja, the RNC spent about one-quarter of their nonfederal disbursements on administration and overhead during the 2000 election cycle and transferred 67 percent to the state parties. La Raja Expert Report ¶ 14(c) [RNC Vol. VII]. State parties spent about 30 percent of their nonfederal money disbursements during the 2000 election cycle on administrative expenses and overhead. La Raja Expert Report ¶ 22 [RNC Vol. VII]; *see also* Bowler Decl. ¶ 15 (stating that allocation is required for administrative expenses like rent, utilities, and salaries). The fact these expenditures required a mix of federal and nonfederal funds demonstrates that these activities affect federal elections. *See also supra* Findings ¶ 1.26.4 (Plaintiffs expert La Raja stating administrative expenses are not "party building" activity).

1.36 *Training Seminars:* Banning testifies that the RNC used a mix of federal and nonfederal funds to conduct training seminars for Republican candidates, party officials, activists and campaign staff, many of whom are involved in state and local campaigns and elections. Topics included grassroots organizing, fundraising and compliance with campaign finance regulations. During the 2000 election cycle at least 10,000 people attended RNC-sponsored training sessions, including 117 "nuts and bolts" seminars on grassroots organizing and get-out-the-vote activities. During the same cycle the RNC spent $391,000 in

nonfederal funds and $671,000 in federal funds on such training and support. *See* Banning Decl. ¶ 28(c) [RNC Vol. III]; *see also* La Raja Expert Report at 11 [RNC Vol. VII] (parties "help candidates by training them and their campaign staff," support which "can make an important difference in whether a candidate chooses to run for office, particularly in an era of cash-intensive campaigning that requires skillful application of advanced campaign technologies"). According to La Raja, the RNC spent $8.5 million in nonfederal funds directly on all of its grassroots and voter mobilization activities for the 2000 election cycle. La Raja Expert Report ¶ 14(c) [RNC Vol. VII]. This constitutes about one-half of one percent of all RNC nonfederal spending during the 2000 election cycle. *See* Biersack Decl. Table 2 [DEV 6–Tab 6] (showing the RNC spent $163,521,510 in nonfederal funds during the 2000 election cycle). Furthermore, by virtue of the fact these activities were paid for with a mix of federal and nonfederal funds demonstrates that they affect federal elections.

1.37 *State and Local Governmental Affairs:* The RNC provided $100,000 of seed money for the formation of a Republican state attorneys general association that focuses on state issues. RNC Ex. 978; *see also* Josefiak Decl. ¶¶ 82–84 [RNC Vol. I]. According to Banning, during the 2000 election cycle the RNC spent $199,000 in nonfederal funds and $333,500 in federal funds on state and local governmental affairs. *See* Banning Decl. ¶ 28.b [RNC Vol. III]. The nonfederal funds the RNC spent on state and local governmental affairs constituted a minuscule percentage of the RNC's $163,521,510 nonfederal budget for the 2000 election cycle. *See* Biersack Decl. Table 2 [DEV 6–Tab 6]. Furthermore, by virtue of the fact these activities were paid with a mix of federal and nonfederal funds

demonstrates that they affect federal elections.

1.38 *Minority Outreach:* Banning states that the RNC used a mix of federal and nonfederal funds to support efforts to increase minority involvement and membership in the Republican Party. During the 2000 election cycle the RNC spent $1,211,000 in nonfederal funds and $2,163,000 in federal funds on support of allied groups and minority outreach. *See id.* ¶ 28.e. This nonfederal expenditure also constituted a minuscule percentage of the RNC's total nonfederal spending for the 2000 election cycle. *See* Biersack Decl. Table 2 [DEV 6–Tab 6]. Furthermore, by virtue of the fact these activities were paid for with a mix of federal and nonfederal funds demonstrates that they affect federal elections.

1.39 *State and Local Elections:* The RNC's Josefiak testifies that "the RNC actually focuses many of its resources on purely state and local election activity," Josefiak Decl. ¶ 19 [RNC Vol. I]; however, the figures provided to the Court do not support this contention. For example, in 1999 and 2000 the RNC donated approximately $7.3 million in nonfederal funds to state and local candidates. Josefiak Decl. ¶ 61 [RNC Vol. I]; Banning Decl. ¶ 28(a) [RNC Vol. III]. However, this amount is a small fraction of the $163,521,510 in nonfederal funds it spent during the 2000 election cycle. Biersack Decl. Table 2 [DEV 6–Tab 6]. Plaintiffs' expert La Raja finds that the Republican Party allocated just seven percent ($9.5 million) of their nonfederal funds during the 2000 election cycle for contributions to state and local candidates. La Raja Expert Report ¶ 14(b) [RNC Vol. VII]. Furthermore, according to Defense expert Mann, the two national parties donated "only $19 million directly to state and local candidates, less than 4% of their soft money spending and 1.6% of their total financial activity in 2000."

Mann Report at 26 [DEV 1–Tab 1] (citation omitted).

1.39.1.1 The RNC also provides testimony that it "sometimes devotes significant resources toward states with competitive gubernatorial races even though the races for federal offices are less competitive." Josefiak Decl. ¶ 62 [RNC Vol. I]. According to Josefiak, in 2000, most observers believed that Indiana was a "safe" state for George W. Bush and that it did not have a competitive Senate race. "Nevertheless, the RNC committed significant resources to the state in hopes of influencing the gubernatorial race." Josefiak Decl. ¶ 62 [RNC Vol. I].

Josefiak's declaration provides no figures to allow the Court to determine what constitutes "significant resources." Furthermore, although Indiana may have been a "safe" state for the Republican presidential candidate and the Republican candidate for U.S. Senate, the Indiana ballot provided voters with three federal races in which to vote, meaning that many expenditures, even if intended to only influence a single state race, affected federal election races. Most importantly, nothing in BCRA prevents the RNC from using unlimited amounts of federal funds to affect any state election.

1.39.1.2 Five States—Kentucky, Louisiana, Mississippi, New Jersey and Virginia—hold elections for state and local office in odd-numbered years when there are typically no federal candidates on the ballot. *See* Josefiak Decl. ¶ 41 [RNC Vol. I]. Likewise, numerous cities—including Houston, Indianapolis, Los Angeles, Minneapolis and New York City—hold mayoral elections in odd-numbered years. *See id.* RNC officials state that for elections in which there is no federal candidate on the ballot, the RNC frequently trains state and local candidates, contributes to state and local candidate campaign committees,

funds communications calling for election or defeat of state and local candidates, and supports get-out-the-vote activities. *See* Banning Decl. ¶ 28(a) [RNC Vol. III]; Josefiak Decl. ¶¶ 19, 41–59 [RNC Vol. I]. The RNC's CFO Jay Banning testifies that in 1999 and 2001, including transfers to state parties, direct contributions to local and state campaigns, and direct RNC expenditures, the RNC spent approximately $21 million in nonfederal funds in 1999 and 2001 (approximately $5.7 million in 1999, $15.7 million in 2001). Banning Decl. ¶ 28(a) [RNC Vol. III]; *see also* Duncan Decl. ¶¶ 14–15 [RNC Vol. VI] (discussing RNC contributions to Kentucky state and local races). Defendants' expert Mann states that donations to gubernatorial candidates in an odd numbered year is not something intended to affect a Federal election. Mann Cross Exam. at 71. Again, BCRA does not preclude the national political parties from spending unlimited federal funds on such activities. Furthermore, state political parties can spend nonfederal funds on such campaigns without limit as long as no federal election is held at the same time. *See, e.g.,* Torres [40] Decl. ¶ 8 [3 PCS] (stating that the CDP has spent millions of dollars in nonfederal funds supporting candidates in Los Angeles).

1.40 With the exception of administrative expenses, the activities paid for with nonfederal funds listed *supra* constituted a very small portion of the political parties' nonfederal expenditures during the 2000 election cycle. Furthermore, administrative expenses, training seminars, expenditures on state and local governmental affairs, and minority outreach, were all paid for with a mixture of federal and nonfederal funds meaning that these activities have some impact on federal elections.

*The State Parties Have Become "Branches" of the National Parties*

1.41 The evidence *supra* clearly demonstrates that nonfederal money has not been used primarily for "party building" activities as the authorizing rationale envisioned; rather, the funds are being used by the national parties for electioneering activities and the state parties have been coopted as part of this effort.

1.42 The emergence of nonfederal money as a potent force in national politics has made the state political parties, according to Plaintiffs' expert La Raja, "more reliant on the national parties. They have worked more with the national parties. They have become what I term branch organizations, which to me is not a pejorative. It means they work more closely with the national organization," "they still retain autonomy. However, they're integrated more with the national party structure." La Raja Cross Exam. at 43–44, 60 [JDT Vol. 15]. This has lead to a "nationalized party system, [where] state parties use national party resources to advance national party goals." *Id.* at Ex. 3 at 88, 101. "The national parties employ the state parties as instruments to pursue federal electoral goals, particularly through issue ads sponsored by state organizations [paid for with nonfederal money transferred from the national political parties]." *Id.* at 104.

1.43 The close affiliation between the state, local and national parties is clear from their cooperation during election campaigns that include state and federal elections.

1.43.1 Ms. Bowler testifies that the CDP works closely with the DNC in planning and implementing "Coordinated Campaigns," the purpose of which is to allocate resources and coordinate plans for the

---

**40.** Art Torres is the elected chair of the CDP. Torres Decl. ¶ 1 [3 PCS].

benefit of Democratic candidates up and down the entire ticket. Party officials, candidates at all levels of the ticket and their agents participate in Coordinated Campaigns and collectively make decisions regarding the solicitation, receipt, directing, and spending of the CDP's funds, both federal and nonfederal. Bowler Decl. ¶¶ 5, 29 [3 PCS]. According to Bowler, the CDP is "integrally related to the [DNC]." *Id.* ¶ 5.

1.43.2 The RNC's "Victory Plans" are voter contact programs designed to support the entire Republican ticket at the federal, state, and local levels. The RNC works with every state party to design, fund and implement the Plans. *See* Benson Decl. ¶ 8 [RNC Vol. VIII]; Josefiak Decl. ¶ 26 [RNC Vol. I]; Peschong Decl. ¶¶ 4–5 [RNC Vol. VI].

1.43.2.1 According to RNC Chief Counsel Josefiak, Victory Plans are formulated and implemented after extensive and continuous collaboration between the RNC and the state parties; each Plan is tailored to the unique needs of each State and designed to stimulate grassroots activism and increase voter turnout in the hopes of benefitting candidates at all levels of the ticket. Josefiak Decl. ¶¶ 25–40 [RNC Vol. I]. According to Mr. Erwin, the CRP works closely with the RNC in planning and implementing a Victory Plan. The Victory Plan is implemented in the general election cycle with the full involvement of RNC staff, CRP staff, state legislative leadership and representatives from the top of the ticket campaigns. *See* Erwin Aff. ¶ 4 [3 PCS]. "By their nature, the Victory Plans and the programs specified in them span the calendar year, not just the 60 or 120 days prior to the election." Peschong Decl. ¶ 4 [RNC Vol. VI]. The Victory Plans generally incorporate rallies,

direct mail, telephone banks, brochures, state cards, yard signs, bumper stickers, door hangers, and door-to-door volunteer activities. *Id.*

1.43.2.2 According to Josefiak, in 2000 the RNC transferred approximately $42 million to state parties to use in Victory Plan programs, 60 percent (about $25 million) of which was nonfederal money, not including money spent on broadcast "issue advertising." Josefiak Decl. ¶ 31 [RNC Vol. I]; *see also* Peschong[41] Decl. ¶¶ 4, 8–9 [RNC Vol. VI] (stating that "[t]he RNC typically provides a very substantial share of the funding of state victory programs.").

1.43.2.3 State Republican party officials observe that because there are often numerically more state and local races than federal races during a given election, Victory Plans "often place greater emphasis" on the non-federal races. *See* Benson Decl. ¶ 8 [RNC Vol. VIII]; Bennett Decl. ¶ 17.k [RNC Vol. VIII] (stating that the average ratio of state and local candidates to federal candidates in Ohio in 2002 is 18 to 1). This observation does not change the fact that Victory Plans are designed to "support the entire ticket." Benson Decl. ¶ 8 [RNC Vol. VIII] (emphasis added).

*Efforts to Address the Role of Nonfederal Funds in Campaign Finance Must Limit State Party Use of Nonfederal Funds that Affect Federal Elections*

1.44 It is clear that state political party electoral activities affect federal elections, especially when state and federal elections are held on the same date. The record establishes that federal officeholders value these services and that they solicit nonfederal donations for the state political parties in order to assist their own campaigns. National political parties also solicit non-

---

**41.** John Peschong is the RNC's Regional Political Director for the Western Region. Pes-

chong Decl. ¶ 1.

federal donations for their state counterparts and transfer nonfederal funds as part of their efforts to affect federal elections. *See infra* Findings ¶ 1.59. The workings of this campaign finance system demand that if one wants to address the impact of nonfederal money, one cannot ignore the state role in the system. Former Members of Congress concur. Former Senator Rudman states clearly:

> To curtail soft-money fundraising and giving, it is necessary to have a comprehensive approach that addresses the use of soft money at the state and local party levels as well as at the national party level. The fact is that much of what state and local parties do helps to elect federal candidates. The national parties know it; the candidates know it; the state and local parties know it. If state and local parties can use soft money for activities that affect federal elections, then the problem will not be solved at all. The same enormous incentives to raise the money will exist; the same large contributions by corporations, unions, and wealthy individuals will be made; the federal candidates who benefit from state party use of these funds will know exactly whom their benefactors are; the same degree of beholdenness and obligation will arise; the same distortions on the legislative process will occur; and the same public cynicism will erode the foundations of our democracy—except it will all be worse in the public's mind because a perceived reform was undercut once again by a loophole that allows big money into the system.

Rudman Decl. ¶ 19 [DEV 8–Tab 34]. Former Senator Brock comments:

> It does no good to close the soft money loophole at the national level, but then allow state and local parties to use money from corporations, unions, and wealthy individuals in ways that affect federal elections. State and local parties use soft money to help elect federal candidates both by organizing voter registration and get-out-the-vote drives that help candidates at all levels of the ticket, and by using soft and hard money to run 'issue ads' that affect federal elections. Therefore, for soft money reforms to be truly effective, it is vitally important to require the use of hard money at the state level to pay for activities that affect federal elections.

Brock Decl. ¶ 8 [DEV 6–Tab 9].

*Summary*

1.45 The evidence *supra* clearly demonstrates that nonfederal money has become an increasingly important part of the national political parties' campaign efforts. The increase in nonfederal fundraising and spending, especially since 1994, has been dramatic, and is due to the advent of the so-called "issue advertisement." Political party issue advertisements do not include words of express advocacy, but are engineered to still have an impact on federal elections. Despite their effect, the fact that these advertisements do not constitute express advocacy has allowed the political parties to use nonfederal money, raised in part from the treasuries of corporations and labor unions, to fund these commercials and thereby skirt campaign finance laws. Furthermore, these advertisements make a mockery of the original justification for allowing the political parties to raise these funds, as they have nothing to do with "party building." Plaintiffs' own expert finds that these funds have been spent primarily on electioneering and not on strengthening the political parties.

The fact that the national political parties found a huge loophole through which to circumvent the federal campaign finance regime was only the first step. In order to maximize the power of this new-found political tool, the national political parties

coopted their state party affiliates, or branches as Plaintiffs' expert calls them, and funneled nonfederal funds through them in order to take advantage of the state political parties' more attractive allocation ratios. By doing so, the national parties minimized the amount of federal funds needed to purchase advertisements designed to affect federal elections-advertisements that in the spirit of FECA should have been paid for completely with federal funds. As a result, the state political parties became an integral part of the national political parties' nonfederal money strategy, and therefore any effort to deal with the use of nonfederal funds in the campaign finance regime requires addressing the state political parties.

Not all nonfederal funds are spent on political advertisements, but these advertisements constitute the largest category of nonfederal spending of the national and state political parties. Furthermore, other activities, such as voter registration and GOTV, that are paid for in part with nonfederal funds clearly affect federal elections when state and local elections are held on the same day as the federal election. Redistricting efforts affect federal elections no matter when they are held. In sum, the political parties used nonfederal funds to circumvent FECA and affect federal elections.

### The Role of Federal Lawmakers in Political Party Nonfederal Fundraising

1.46 Unlike other entities, political parties have uniquely close relationships with candidates they nominate and support, and who, in turn, lead the party. *See* D. Green Expert Report at 7–9 [DEV 1–Tab 3]; McCain Decl. ¶¶ 22–23 [DEV 8–Tab 29]. The Colorado Republican Party has stated in past litigation: "A party and its candidate are uniquely and strongly bound to one another because: [a] party recruits and nominates its candidate and is his or her first and natural source of support

and guidance[;][a] candidate is identified by party affiliation throughout the election, on the ballot, while in office, and in the history books[;][a] successful candidate becomes a party leader, and the party continues to rely on the candidate during subsequent campaigns[;][a] party's public image largely is defined by what its candidates say and do[;][a] party's candidate is held accountable by voters for what his or her party says and does[;][a] party succeeds or fails depending on whether its candidates succeed or fail. No other political actor shares comparable ties with a candidate." Brief of Colorado Republican Party in *FEC v. Colorado Republican Fed. Campaign Comm. ("Colorado II")*, 533 U.S. 431, 457, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001), at 19–20; *see also id.* at 7–8, 26–31; Philp Dep. at 47–54 [JDT Vol. 26].

### Federal Lawmakers Run the Party Committees

1.47 The national committees of the two major political parties are: the Republican National Committee ("RNC"); the National Republican Senatorial Committee ("NRSC"); the National Republican Congressional Committee ("NRCC"); the Democratic National Committee ("DNC"); the Democratic Senatorial Campaign Committee ("DSCC"); and the Democratic Congressional Campaign Committee ("DCCC"). Vogel Decl. ¶ 6 [DEV 9–Tab 41]; McGahn Decl. ¶ 6 [DEV 8–Tab 30]; Jordan Decl. ¶ 6 [DEV 7–Tab 21]; Wolfson Decl. ¶ 6 [DEV 9–Tab 44]. The primary purpose of the congressional committees is to ensure the election of candidates from their respective parties to their respective legislative body and otherwise support the goals of their party. *Id.*

The national party committees are dominated by elected public officials—the president or presidential candidate in the case of the Republican and Demo-

cratic National Committees, the top House and Senate party leaders for the congressional campaign committees.... There is no meaningful separation between the national party committees and the public officials who control them. Mann Expert Report at 29 (citations omitted) [DEV 1–Tab 1]; *see also* Krasno & Sorauf Expert Report at 9–10 ("Simply put, no wall between the national parties and the national government exists."), 12–13 ("Party committees are headed by or enjoy close relationships with their leading officials, individuals who by virtue of their positions, reputations, and control of the legislative machinery have special influence on their colleagues.") [DEV 1–Tab 2]; Green Expert Report at 9–10 [DEV 1–Tab 3] ("Political parties, it should be noted, are structured along very different principles from the American government. One such principle is the separation and dispersal of power, of which one finds many examples in the Constitution.... Leaders of legislative party caucuses may also serve as members or leaders of party campaign committees. Furthermore, party leaders are drawn disproportionately from the ranks of those who hold important legislative leadership posts.... [T]he internal structure of parties permits, for example, former U.S. Senator D'Amato, who chaired the [RSCC] from 1995–97, to at the same time serve as chair of the Senate Banking, Housing, and Urban Affairs Committee. Parties, in contrast to the lawmaking institutions they inhabit, are organized in ways that concentrate authority, entrusting multiple roles to particular individuals."); Rudman Decl. ¶ 6 [DEV 8–Tab 34]; Vogel Decl. ¶ 4 [DEV 9–Tab 41] (NRSC is comprised of sitting "Republican Members of the United States Senate .... The chair of the NRSC is elected by the Republican Caucus of the United States Senate."); Jordan Decl. ¶ 4 [DEV 7–Tab 21] (the DSCC "is comprised of sitting Democratic Members of the United States Senate .... The chair of the DSCC is appointed by the Democratic Leader of the United States Senate."); McGahn Decl. ¶ 4 [DEV 8–Tab 30] (the NRCC includes the "entire elected Republican leadership" and its executive committee includes "the Speaker of the House, the Majority Leader, the Republican Whip, Conference Chairman, the Conference Vice–Chairman, the Conference Secretary, the Policy Chairman and the NRCC Chairman"); Wolfson Decl. ¶¶ 4 [DEV 9–Tab 44] (the DCCC is comprised of sitting Democratic Members of (or Delegates to) the United States House of Representatives, and the Chair of the DCCC is elected by the Democratic Caucus of the United States House of Representatives).

1.48 "For at least a century [the national party committees] have been melded into their party's presidential campaign every four years, often assuming a subsidiary role to the presidential candidate's personal campaign committee. The presidential candidate has traditionally been conceded the power to shape and use the committee, at least for the campaign." Sorauf/Krasno Report in *Colorado Republican* at 27 [DEV 73–Tab C].

Political parties are primarily concerned with electing their candidates and the money they raise is spent assisting their candidates' campaigns. As Congressman Meehan explained:

The ultimate goal of a political party such as the Democratic Party is to get as many Party members as possible into elective office, and in doing so to increase voting and Party activity by average Party members. The Party does this by developing principles on public policy matters the Party stands for, and then by finding candidates to run for the various political offices who represent those principles for the Party. When the Party finds its candidates, it tries to raise money to help get like-minded peo-

ple to participate in the elections, and to try to get the Party's candidates the resources they need to get their message out to voters. In my experience, political parties do not have economic interests apart from their ultimate goal of electing their candidates to office.

Meehan Decl. in *RNC* ¶¶ 3–4 [DEV 68–Tab 30]. Senator Bumpers testifies that he is "not aware that the [Democratic] party has any interest in the outcome of public policy debates that is separate from its interest in supporting and electing its candidates." Bumpers Decl. ¶ 6 [DEV 6–Tab 10]. Senator McCain testifies that "[t]he entire function and history of political parties in our system is to get their candidates elected, and that is particularly true after the primary campaign has ended and the party's candidate has been selected." McCain Decl. ¶ 23 [DEV 8–Tab 29].

1.49 In general, the RNC espouses three core principles as guiding the mission of the national Republican Party, which includes electing candidates to national, state and local offices who represent the RNC's political views. In practice, electing these candidates is the RNC's primary focus.

1.49.1 The RNC's Chief Counsel, Thomas Josefiak, attests that

[t]he Republican Party has a long and rich history advocating some core principles: a smaller federal government, lower taxes, individual freedom, and a strong national defense. The RNC achieves these principles through three primary means: (1) promoting an issue agenda advocating Republican positions on issues of local, state, regional, national and international importance; (2) electing candidates who espouse these views to local, state and national offices;

and (3) governing in accord with these views. Although these efforts sometimes overlap, they also frequently occur independently of one another.

Josefiak Decl. ¶ 22 [RNC Vol. I]. Other documents in the record, however, show that the RNC and Republican state parties' primary purpose is to elect Republican candidates to office. *See, e.g.,* RNC's Resp. to FEC RFA's in *RNC,* No. 40 [DEV 68–Tab 35]; ODP0021–02003 [DEV 70–Tab 48] (RNC Memorandum in which Chairman Haley Barbour states: "The purpose of a political party is to elect its candidates to public office, and our first goal is to elect Bob Dole president. . . . Electing Dole is our highest priority, but it is not our only priority. Our goal is to increase our majorities in both houses of Congress and among governors and state legislatures."); Knopp[42] Cross Exam. at 10 [JDT Vol. 13] (stating that the primary purpose of the RNC is "to elect Republicans to state, local, and national office"); Brister[43] Decl. ¶ 4 [RNC Vol. VIII] ("The Republican Party of Louisiana's primary purpose is to help elect Republicans to office 'from the courthouse to the White House' "). Whether the Republican Party's "core principles" drive its pursuit of electoral majorities, or vice versa, is a chicken-or-the-egg type quandary that I need not resolve at this juncture. What is clear from the evidence, however, is that regardless of whether or not it is done to advocate the party's principles, the Republican Party's primary goal is the election of its candidates who will be advocates for their core principles. As Dr. Green observes: "In order to obtain power a party must win elections; and in order to win elections, elected officials scramble to claim credit for good legislative deeds while publicizing the misdeeds of the oppo-

---

**42.** Janice Knopp is the RNC's Deputy Director of Finance/Marketing Director. Knopp Decl. ¶ 1 [RNC Vol. V].

**43.** Pat Brister is the Chairman of the Republican Party of Louisiana. Brister Decl. ¶ 1 [RNC Vol. VIII].

sition party." Green Expert Report at [DEV 1–Tab 3].

1.50 The evidence makes clear that the national party committees are creatures of their elected federal politician members, who run them and set their priorities. It is clear that the national party committees are focused on electing their candidates to federal office, and in the case of the DNC and RNC are actually subsumed by their respective Presidential candidates' campaigns. Given these facts, it is not surprising that the national party committees use their elected officials to solicit donations.

*Federal Lawmakers Solicit Nonfederal Funds for the National Party Committees*

1.51 It is a common practice for Members of Congress to be involved in raising both federal and nonfederal dollars for the national party committees, sometimes at the parties' request. The personal involvement of high-ranking Members of Congress is a major component of raising federal and nonfederal funds.

Current and former Members of Congress acknowledge this fact. *See, e.g.,* Rudman Decl. ¶ 12 [DEV 8–Tab 34]; Bumpers Decl. ¶¶ 7–9 [DEV 6–Tab 10]; Simon [44] Decl. ¶ 7 [DEV 9–Tab 37] ("While I was in Congress, the DCCC and the DSCC would ask Members to make phone calls seeking contributions to the party. They would assign me a list of names, people I had not known previously, and I would just go down the list. I am certain they did this because they found it more effective to have Members make calls."); Simpson [45] Decl. ¶ 4 [DEV 9–Tab 38]; McCain Decl. ¶¶ 2, 21 [DEV 8–Tab 29]

("Soft money is often raised directly by federal candidates and officeholders, and the largest amounts are often raised by the President, Vice President and Congressional party leaders."); Feingold Dep. at 91–93 [JDT Vol. 6]; Shays Decl. ¶ 18 [DEV 8–Tab 35] ("Soft money is raised directly by federal candidates, officeholders, and national political party leaders. National party officials often raise these funds by promising donors access to elected officials. The national parties and national congressional campaign committees also request that Members of Congress make the calls to soft money donors to solicit more funds."); Meehan Decl. in *RNC* ¶ 6 [DEV 68–Tab 30] ("Members of Congress raise money for the national party committees, and I have been involved in such fund-raising for the Democratic Party. At the request of the Party Members of Congress go to the [DCCC] and call prospective donors from lists provided by the Party to ask them to participate in Party events, such as DCCC dinners or [DNC] dinners. These lists typically consist of persons who have contributed to the Democratic Party in the past.").

Representatives of the House and Senate congressional campaign committees testify that their committees and their leadership ask Members of Congress to raise funds in specified amounts or to devote specified periods of time to fundraising. Jordan Decl. ¶ 33 [DEV 7–Tab 21]; Vogel Decl. ¶¶ 32–33 [DEV 9–Tab 41]; McGahn Decl. ¶¶ 34–35 [DEV 8–Tab 30]; Wolfson Decl. ¶ 35 [DEV 9–44] (stating that the DSCC, NRSC, NRCC, and DCCC ask members of Congress to raise money for the committees).

---

**44.** Senator Paul Simon served as a United States Senator for Illinois from 1985 to 1997, and was a Member of the House of Representatives from 1975 to 1985. Prior to being elected to Congress, Senator Simon served as Lieutenant Governor of Illinois from 1968 to 1972, and served in the Illinois House of Representatives from 1954 to 1962 and in the Illinois State Senate from 1962 to 1966. Simon Decl. ¶ 1 [DEV 9–Tab 37].

**45.** Senator Alan Simpson served as United States Senator from Wyoming from 1979 to 1997. Simpson Decl. ¶ 2 [DEV 9–Tab 38].

Political donors also testify that Members of Congress solicit nonfederal money. *See, e.g.,* Randlett [46] Decl. ¶¶ 6–9 [DEV 8–Tab 32] ("I've been involved in political fundraising long enough to remember when soft money had little value to federal candidates. Ten years ago, a Senator might call a potential donor and the donor would say something like, 'I would love to write you a check; I'm a big fan of yours; but I'm federally maxed, so I can't do it. If you like, I could write a soft money check to your state party.' And the Senator might say, 'Don't bother. The soft money just doesn't do me any good.' However, in recent election cycles, Members and national committees have asked soft money donors to write soft money checks to state and national parties solely in order to assist federal campaigns. Most soft money donors don't ask and don't care why the money is going to a particular state party, a party with which they may have no connection. What matters is that the donor has done what the Member asked.").

Lobbyists also find that Members of Congress are involved in fundraising for their political parties. *See* Rozen [47] Decl. ¶ 15 [DEV 8–Tab 33] ("Even though soft money contributions often go to political parties, the money is given so that the contributors can be close to, and recognized by, Members, Presidents, and Administration officials who have power. Members, not party staffers or party chairs, raise much of the large soft money contributions. Party chairs do not have that much power because the DNC and the RNC by themselves don't have power to do anything. So people are not giving to be close to the party chairs. The Members of Congress and the President are the heart of the national parties. The elected officials are the ones who are really raising the money, either directly or through their agents."); *see also* Murray [48] Dep. in *Mar-*

**46.** Wade Randlett is Chief Executive Officer of Dashboard Technology, a World WideWeb *technology consulting firm based in San Francisco, California.* Prior to founding Dashboard Technology, Mr. Randlett served on the management teams of two other software companies. He was the Democratic political director at the Technology Network, also known as TechNet, a Palo Alto-based non-profit corporation and political service organization which he co-founded in 1996. Prior to starting TechNet, he spent many years as a political fundraiser and general political consultant, working primarily in the Silicon Valley area of Northern California, but also throughout California and to some extent in major metropolitan areas in other parts of the nation. Randlett Decl. ¶ 2 [DEV 8–Tab 32].

**47.** Robert Rozen worked as a lobbyist for various interests at the law firm Wunder, Diefenderfer, Cannon & Thelen from 1995 until 1997. For the last six years, he has been a partner in a lobbying firm called Washington Counsel; now Washington Council Ernst & Young. Mr. Rozen represents a variety of corporate, trade association, non-profit, and individual clients before both Congress and the Executive Branch. His work includes preparing strategic plans, writing lobbying papers, explaining difficult and complex issues to legislative staff, and drafting proposed legislation. He also organizes fundraisers for federal candidates and from time-to-time advises clients on their political contributions. Rozen Decl. ¶ 4 [DEV 8–Tab 33]

**48.** Daniel Murray served as a government relations specialist for Sprint, GTE and BellSouth Corporations from 1982 until 1995. As Executive Director of those companies, he assisted them and their PACs in selecting candidates and political groups for financial support in both federal and nonfederal funds. During this period he also served on the Democratic Business Council of the DNC, the Advisory Council of the Democratic Leadership Council, the 1998 and 1992 DNC Convention Site Selection Committees, the DSCC Leadership Circle, the DCCC Annual Dinner Committee, the RSCC Annual Dinner Committee, and steering committees for many House and Senate campaigns. Since 1995, he has acted

*iani* at 41–42 [DEV 79–Tab 58]; Rozen Decl., Ex. A ¶ 7 [DEV 8–Tab 33].

Finally, documentary evidence corroborates this testimony. ODP0037–00062 [DEV 71–Tab 48] (Letter to NRSC Chairman's Foundation member seeking a renewal contribution signed by Senator McConnell); ODP0037–00884 [DEV 71–Tab 48] (letter from Senator McConnell thanking donor for $5,000 federal and $25,000 nonfederal donation to NRSC's issue advocacy campaign); ODP0031–00821 (letter from contributor to RNC with contribution, stating "Congressman Scott McInnis deserve [sic] most of the recruitment credit"); ODP0037–00882 (a solicitation letter from Senator McConnell to potential donor at the Microsoft Corporation, expressing the hope that this person would "take a leadership role with [McConnell] at the NRSC in support of the Committee's issue advocacy campaign. The resources we raise now will allow us to communicate our strategy through Labor Day. . . . Your immediate commitment to this project would mean a great deal to the entire Republican Senate and to me personally."); ODP0037–01171 to 72 [DEV 71–Tab 48] (correspondence referencing solicitations by federal officeholders and candidates); *infra* Finding ¶ 1.74.3 (Fortune 100 company's documents stating that Members of Congress had requested nonfederal donations).

1.52 "The parties often ask Members to solicit soft money from individuals who have maxed out to the Member's campaign." Simpson Decl. ¶ 6 [DEV 9–Tab 38]; *see also* Meehan Decl. in *RNC* ¶ 6 ("Party leaders also ask a Member to call his or her own 'maxed out' donors—those who have contributed to that Member the maximum amount of 'hard money' allowed under the [FECA]—in order to request further donations to the Party including those which are not restricted by the Act ('soft money').") [DEV 68–Tab 30]; Billings Decl., Ex. A ¶ 12 [DEV 6–Tab 5]; Jordan Decl. ¶ 20 [DEV 7–Tab 21] ("When donors have reached their federal contribution limit, the DSCC frequently encourages them to make additional donations to the DSCC's nonfederal account."); Wolfson Decl. ¶ 21 (same for DCCC); Vogel Decl. ¶ 20 (same for NRSC); McGahn Decl. ¶ 21 (same for NRCC); Sorauf/Krasno Report in *Colorado Republican*, at 13–14 [DEV 68–Tab 44]; ODP0018–00620 to 21 [DEV 69–Tab 48] (federal candidate noting that he "recently sent a letter to [his] maxed out donors suggesting contributions to the NRCC"); Kirsch [49] Decl. ¶ 8 ("[O]nce a federal candidate understands that a donor has maxed out, there will often be a request that the donor make soft money donations to a national party committee, as has been suggested when I have been in that situation.") [DEV 7–Tab 23]; La Raja Cross Exam. Ex. 3 at 54 [JDT Vol. 15] ("[I]t is common practice for a candidate to encourage donors to give to the party when they have 'maxed' their federal contributions to his or her committee").

1.53 Mr. Vogel, General Counsel of the NRSC, testifies that "[s]ometimes, the NRSC urges Republican Senators to contact particular donors because of shared public policy views, such as outreach efforts to the high-tech community by Senators with an interest in those issues." Vogel Decl. ¶ 28 [DEV 9–Tab 41]; *see also id.*

---

as a government relations consultant for business and other clients. Murray Aff. in *Mariani* ¶¶ 3–5 [DEV 79–Tab 59].

49. Steven T. Kirsch is founder and Chief Executive Officer of Propel Software Corporation. He has donated millions of dollars to the Democratic Party and to "progressive candidates and groups." Kirsch Decl. ¶¶ 2, 4 [DEV 7–Tab 23].

Tab D at NRSC 066–000009 (draft letter from chairmen of the NRSC and NRCC Technology Committees inviting High Technology CEOs to the 1998 Republican House–Senate Dinner in response "to your industry's plea for a voice on the cutting edge issues so important to the future of high technology" and noting that the dinner is the "most prestigious annual event, and all Republican members of the U.S. House and Senate will be in attendance.") [DEV 9–Tab 41]. The DCCC engages in similar practices. Wolfson Decl. ¶ 31 [DEV 9–Tab 44] ("Sometimes, the DCCC urges Democratic House Members to contact particular donors because of shared public policy views. For example, the DCCC has sought and received assistance from particular Democratic House Members in fundraising from the labor community, because those Members had a strong public record of support for labor."); *see also* Randlett Decl. ¶ 6 [DEV 8–Tab 32] ("National party committees often feel they need to raise a certain amount of soft money for a given election cycle. To reach that overall goal, they may divide up potential donors by geography, affiliated organization, or issue interests. The party committees decide which Members of Congress should contact these potential donors, and these Members then put in a certain amount of call time at the national committee soliciting the money. A Member and a potential donor may be matched because the Member is on a legislative committee in which the donor has a particular interest, whether economic or ideological.").

1.54 Despite the foregoing evidence, the Finance Director of the RNC states that it is "exceedingly rare" for the RNC to rely on federal officeholders for personal or telephonic solicitations of major donors. *See* B. Shea[50] Decl. ¶ 17 [RNC Vol. V]. She states that by RNC policy and practice, the RNC Chairman, Co–Chairwoman, Deputy Chairman, fundraising staff or members of major donor groups— not federal officeholders—undertake initial contact and solicitation of major donors of both federal and nonfederal funds. *Id.* Whether or not initial solicitations by federal officials on behalf of the RNC are rare, the record shows that they are made. RNC0178497 (May 10, 1996, letter from RNC Chairman Haley Barbour to Senators, asking to use their name for a "membership recruitment package," which while "not directly solcit[ing] funds," "will serve as a set-up letter for the membership invitation package that will be mailed several days after this letter."). Furthermore, Members of Congress solicit funds for the RNC from those who have donated in the past. *See, e.g.,* RNC0266088–91 (handwritten notes determining which Member of Congress would call particular potential donors); RNC0250514–15 (April 1997 solicitation letter from Speaker Gingrich asking donors "to continue [their] support [for] the President's Club"); Moreover, it is clear that Ms. Shea does not speak for the NRSC or the NRCC which clearly use Members to solicit funds. *See, e.g.,* Findings ¶ 1.51.

1.55 Raising nonfederal funds for the political parties can be in a Member's interest. For example, the amount of money a Member of Congress raises for the national political party committees often affects the amount the committees give to assist the Member's campaign. *See, e.g.,* Boren[51] Decl. ¶ 4 [DEV 6–Tab 8] ("[T]he DSCC and other national party organizations kept records, or 'tallies' of how much soft money a Senator had raised for the

---

50. Beverly Shea is the RNC's Finance Director. Shea Decl. ¶ 1 [RNC Vol. V].

51. Senator David Boren served as a United States Senator from Oklahoma from 1979–1994. Boren Decl. ¶ 2 [DEV 6–Tab 8]

party. The DSCC then gave little [non-federal] money to the campaigns of those Senators who had not raised adequate [nonfederal] party funds. In my view, this practice demonstrates very clearly that soft money is not used purely for 'party building' activities, but that there is at least a working understanding among the party officials and Senate candidates that the money will benefit the individual Senators' campaigns."); *id.* (explaining that because he "minimized" the amount of time he spent raising soft money for the DNC, he "received almost no money from the Democratic Party for my campaigns."); Bumpers Decl. ¶ 11 [DEV 6–Tab 10] ("Members who raise money for the DSCC expect some of that money to come directly back to them. Part of this unwritten but not unspoken rule is that if you do not raise a certain amount of money for the DSCC, you are not going to get any back. The DSCC does not give a candidate the maximum allowed unless he or she has raised at least a certain amount for the DSCC."); *infra* Findings ¶ 1.56.1 (statement of Senator Simpson).

Members also have an interest in a strong party that can assist its federal officeholders. *See, e.g.,* Bumpers Decl. ¶ 10 [DEV 6–Tab10] ("When a Member raises money for the party, there is a sense on the part of the Member that he or she is helping his or her own campaign by virtue of raising that money. When Members raise funds for the DNC, it helps the DNC perform its function of keeping tabs on statements, policies, and votes of opposition party members and groups.").

Former DNC and DSCC official and current lobbyist Robert Hickmott [52] testifies that even incumbents with safe seats have incentives to raise money for the parties. He explains:

Incumbents who were not raising money for themselves because they were not up for reelection would sometimes raise money for other Senators, or for challengers. They would send $20,000 to the DSCC and ask that this be entered on another candidate's tally. They might do this, for example, if they were planning to run for a leadership position and wanted to obtain support from the

**52.** In 1980, during President Carter's re-election campaign, Robert Hickmott worked at the Democratic National Committee ("DNC") as an Associate Finance Director. Hickmott Decl. ¶ 2 [DEV 6–Tab 19]. Following the general election, Hickmott became the Executive Director of a new DNC entity, the Democratic Business Council ("DBC"), where he served until 1983. *Id.* During 1985–86, Hickmott served as National Finance Director for then-Congressman Timothy Wirth's Senate campaign, and from 1987 until early 1989, on Senator Wirth's Senate staff. *Id.* After that, Hickmott was in private practice as an attorney until January 1991, when he joined the Democratic Senatorial Campaign Committee ("DSCC") as Deputy Executive Director. *Id.* In 1993, Hickmott worked for four years as the Associate Administrator for Congressional Affairs at the Unites States Environmental Protection Agency, then for two years as a counselor to then-Secretary Andrew Cuomo at the United States Department of Housing

and Urban Development ("HUD"). *Id.* In 1999, Hickmott left HUD and joined The Smith–Free Group ("Smith–Free"), a small governmental affairs firm located in Washington, D.C. *Id.* ¶ 3. Hickmott is currently a Senior Vice President at Smith–Free and one of the six principals in the firm. *Id.* Hickmott is a regular contributor to candidates for Congress, for President, and the national party committees, primarily to Democratic candidates, but also to several Republicans, as well. *Id.* In the 1999–2000 cycle, he contributed just over $7,000 and in the 2001–2002 cycle, he has contributed a little more than $10,000. *Id.* Hickmott provided a declaration in *Federal Election Commission v. Colorado Republican Federal Campaign Committee,* 41 F.Supp.2d 1197 (D.Colo.1999), *aff'd,* 213 F.3d 1221 (10th Cir.2000), *rev'd,* 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ("*Colorado II*"); *See Colorado II,* 533 U.S. at 458, 121 S.Ct. 2351.

Senators they assisted. This would personally benefit them, in addition to doing their part to retain Democratic control of the Senate, which would preserve the legislative power of all Democratic Senators.

Hickmott Decl., Ex. A ¶ 18 [DEV 6–Tab 19]; *see also id.* ¶ 13 (attesting that Senators were very concerned about whether or not donors' checks were tallied to them); *infra* Findings ¶ 1.56.3 (describing the DSCC tallying/credit system). Senator McCain attests that

> [t]he parties encourage Members of Congress to raise large amounts of soft money to benefit their own and others' re-election. At one recent caucus meeting, a Member of Congress was praised for raising $1.3 million dollars for the party. James Greenwood, a Republican Congressman from Pennsylvania, recently told the New York Times that House leaders consider soft money fundraising prowess in assigning chairmanships and other sought-after jobs.... I share Mr. Greenwood's concerns.

McCain Decl. ¶ 7 [DEV 8–Tab 29]. Finally, the political parties' power over Members of Congress provides additional incentive to fundraise for the national party committees. As Dr. Green notes: "The ubiquitous role that parties play in the lives of federal officials means that no official can ignore the fundraising ambitions of his or her party." Green Expert Report at 15 [DEV 1–Tab 3].

*Nonfederal Funds are Given with Intent to Assist Specific Members of Congress; Political Parties Keep Track of Contributions Members of Congress Raise*

1.56 Nonfederal money is often given to national parties with the intent that it will be used to assist the campaigns of particular federal candidates, and it is often used for that purpose.

1.56.1 Senator Simpson testifies that "[d]onors do not really differentiate between hard and soft money; they often contribute to assist or gain favor with an individual politician. When donors give soft money to the parties, there is sometimes at least an implicit understanding that the money will be used to benefit a certain candidate. Likewise, Members know that if they assist the party with fundraising, be it hard or soft money, the party will later assist their campaign." Simpson Decl. ¶ 6 [DEV 9–Tab 38]. "Although soft money cannot be given directly to federal candidates, everyone knows that it is fairly easy to push the money through our tortured system to benefit specific candidates." *Id.* ¶ 7. Senator Wirth [53] understood that when he raised funds for the DSCC, donors expected that he would receive the amount of their donations multiplied by a certain number that the DSCC had predetermined, assuming that the DSCC had raised other funds. Wirth Decl. Ex. A ¶¶ 5, 8 [DEV 9–Tab 43]; *see also FEC v. Colorado Republican Fed. Campaign Comm.* (*"Colorado II"*), 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001); Bumpers Decl. ¶¶ 10–12 [DEV 6–Tab 10]; Simon Decl. ¶ 10 [DEV 9–Tab 37].

1.56.2 Individual nonfederal money donors have made specific requests that the national political party apply their nonfederal money gifts to particular federal campaigns. *See, e.g.,* RNC0035464 [DEV99], RNC0032733–34 [DEV 92] (fundraising letters requesting that nonfederal money donations be used for particular federal elections). As one experienced donor ob-

---

**53.** Senator Timothy Wirth served in the U.S. House of Representatives from 1974 to 1986, representing the Second Congressional District of the State of Colorado. From 1987 through 1992 he served as Senator for the State of Colorado in the United States Senate. Wirth Decl. Ex. A ¶ 2 [DEV 9–Tab 43].

serves: "The committee receiving … a soft money donation [solicited by a Member of Congress from a 'maxed out' contributor] understands that it has been raised by or for a particular federal candidate, and this affects how much the committee spends on behalf of that candidate. I have discussed with national party committees the spending of such soft money to benefit federal candidates." Kirsch Decl. ¶ 8 [DEV 7–Tab 23]; *see also* Hiatt [54] Dep. at 114–18 (explaining that anyone donating nonfederal money is indirectly giving it to the campaigns of federal candidates and officeholders, and stating that his soft money donations were earmarked for particular candidates but that he does not know if the money was actually spent on those candidates).

1.56.2.1 Plaintiff Thomas McInerney, a large individual contributor to the Republican Party, states that he donated amounts in excess of $57,500 per election cycle to Republican organizations at the national, state and local levels. For example, in 2002, he donated $250,000 to the RNC, in addition to other donations to national, state and local political committees. He states that his donations were intended to support state and local candidates and political parties. McInerney Aff. ¶¶ 4, 10, 12 [9 PCS]. Mr. McInerney's affidavit does not state whether or not these funds were used in the manner he desired, only that "it is his understanding" that they were used for such activities. *Id.* ¶¶ 11, 13, 15. Regardless of whether his donations were used for state and local political activities, the record is clear that Mr. McInerney represents an exception to the general rule that donors give money to the national parties with the intent that they will be used to assist federal candidates. Furthermore, if Mr. McInerney wants to donate funds to state parties for activities that affect state and local elections, nothing in BCRA prevents him from doing so. *See also infra* Findings ¶ 1.61.

1.56.3 The DSCC maintains a "credit" program that credits nonfederal money raised by a Senator or candidate to that Senator or candidate's state party. Jordan Decl. ¶¶ 36–39 [DEV 7–Tab 21]. Amounts credited to a state party can reflect that the Senator or candidate solicited the donation, or can serve as a donor's sign of tacit support for the state party or the Senate candidate. Jordan Decl. ¶¶ 37–40, Tabs F, G [DEV 7–Tab 21]. According to former DSCC official Hickmott, Senators were very concerned about whether or not donors' checks were tallied to them. Hickmott Decl., Ex. A ¶ 13 [DEV 6–Tab 19]; *see also supra* Findings ¶ 1.55 (Senator Boren commenting on the tallying system and effect of a candidate's fundraising for the national political committee on the support the candidate's campaign received from the national party).

1.56.4 Both the NRCC and NRSC are aware of which Members have raised funds for their committees, and may advise Members of amounts they have raised, in order to encourage Members to aid the collective interest of preserving or obtaining a majority in the House or Senate. McGahn Decl. ¶¶ 34–35 [DEV 8–Tab 30]; Vogel Decl. ¶¶ 33, 36 [DEV 9–Tab 41]. Similarly, although the DCCC uses "no formal credit or tally program," it "advises Democratic House Members of the

---

**54.** Arnold Hiatt engaged in substantial political spending for a number of years. He estimates that from the 1992 election cycle through 1997, he donated approximately $60,000 in federal funds, mostly to federal candidates, with a few contributions to federal political action committees ("PACs"). In October of 1996, he gave a $500,000 nonfederal donation to the DNC. In February of 2001, he made a $5000 hard money donation to the League of Conservation Voters' PAC, and believes that is the only hard money donation he has given since 1997. Hiatt Decl. ¶ 5 [DEV 6–Tab 18].

amounts they have raised for the DCCC, ascribing particular contributions to the fundraising efforts of the Member in question." Wolfson Dec. ¶ 36 [DEV 9–Tab 44]; Thompson Dep. at 28–29 [JDT Vol. 32] (testifying that the DCCC "provide[s] the entire Democratic Caucus with the amounts of money raised by name of every Democratic member of Congress.... [a]t the Democratic Caucus meeting.... I think it's a method used to let people know that if the DCCC is going to be successful all members should participate.").

1.57 Federal candidates also raise nonfederal money through joint fundraising committees formed with national committees. *See* Buttenwieser Decl. ¶¶ 8–14 [DEV 6–Tab 11]. One common method of joint fundraising is for a national congressional committee to form a separate joint fundraising committee with a federal candidate committee. A joint fundraising committee collects and deposits contributions, pays related expenses, allocates proceeds and expenses to the participants, keeps required records, and discloses overall joint fundraising activity to the FEC. Wolfson Decl. ¶ 40 [DEV 9–Tab 44]; Vogel Decl. ¶¶ 39–45 [DEV 9–Tab 41]; Jordan Decl. ¶¶ 41, 50 [DEV 7–Tab 21]; Oliver Dep. at 258 [DEV Supp.-Tab 1].

> A typical allocation formula for joint fundraising between the [congressional campaign committees] and a federal candidate will allocate the first $2,000 of every contribution from an individual to the participating candidate, with $1,000 designated to the primary election and $1,000 to the general election; and the next $20,000 to the [congressional campaign committee's] federal account. Because the [congressional campaign committee] is normally the only participant eligible to receive nonfederal funds, any remaining amounts of an individual contribution will be allocated to the [congressional campaign committee's] nonfederal account, as will the entirety of

any contribution from a federally prohibited source.

Wolfson Decl. ¶ 42 [DEV 9–Tab 44]; Vogel Decl. ¶ 41 [DEV 9–Tab 41]; Jordan Decl. ¶ 45 [DEV 7–Tab 21]. Two experts characterize the joint fundraising system as one "in which Senate candidates in effect raise[ ] soft money for use in their own races." Krasno and Sorauf Expert Report at 13 [DEV 1–Tab 2].

1.58 It is clear from the record that in practice Members of Congress actively solicit large nonfederal donations to their political parties, often at the behest and direction of the political parties. The political parties encourage Members to solicit such donations and reward those who are successful by assisting their campaigns. Furthermore, although the raising of nonfederal funds is rationalized as an effort to pay for "party building" activities, it is clear that this money is solicited by Members and given by donors with the understanding that it will be used to assist the campaigns of particular federal candidates.

*Federal Lawmakers and National Party Committees Solicit Nonfederal Funds for State Parties*

1.59 National party committees direct donors to give nonfederal money to state parties in order to assist the campaigns of federal candidates. *See, e.g.,* Kirsch Decl. ¶ 9 [DEV 7–Tab 23] ("The national Democratic party played an important role in my decisions to donate soft money to state parties in [the 2000 election] cycle, recommending that I donate funds to specific state parties just before the election. They said, essentially, if you want to help us out with the Presidential election, these particular state parties are hurting, they need money for get-out-the-vote and other last minute campaign activities."). Robert Hickmott, a former DNC and DSCC official testifies:

Once you've helped a federal candidate by contributing hard money to his or her campaign, you are sometimes asked to do more for the candidate by making donations of hard and/or soft money to the national party committees, the relevant state party (assuming it can accept corporate contributions), or an outside group that is planning on doing an independent expenditure or issue advertisement to help the candidate's campaign. These types of requests typically come from staff at the national party committees, the campaign staff of the candidate, the candidate's fundraising staff, or former staff members of the candidate's congressional office, but they also sometimes come from a Member of Congress or his or her chief of staff.... Regardless of the precise person who makes the request, these solicitations almost always involve an incumbent Member of Congress rather than a challenger. As a result, there are multiple avenues for a person or group that has the financial resources to assist a federal candidate financially in her or her election effort, both with hard and soft money.

Hickmott Decl. ¶ 8 [DEV 6–Tab 19]; *see also* Buttenwieser Decl. ¶ 16 [DEV 6–Tab 11] ("The DSCC has also requested that I provide assistance to state parties."); Hassenfeld[55] Decl. ¶ 9 [DEV 6–Tab 17] ("In 1992, when I told the Democratic Party that I wanted to support then-Governor Bill Clinton's presidential campaign, they suggested that I make a $20,000 hard money contribution to the DNC, which I

did. The Democratic Party then made clear to me that although there was a limit to how much hard money I could contribute, I could still help with Clinton's presidential campaign by contributing to state Democratic committees. There appeared to be little difference between contributing directly to a candidate and making a donation to the party. Accordingly, at the request of the DNC, I also made donations on my own behalf to state Democratic committees outside of my home state of Rhode Island.... Through my contributions to the political parties, I was able to give more money to further Clinton's candidacy than I was able to give directly to his campaign."); Randlett Decl. ¶ 9 [DEV 8–Tab 32] ("[N]ational committees have asked soft money donors to write soft money checks to state and national parties solely in order to assist federal campaigns."); Josefiak Decl. ¶ 68 [RNC Vol. I] ("It is ... not uncommon for the RNC to put interested donors in touch with various state parties. This often occurs when a donor has reached his or her federal dollar limits to the RNC, but wishes to make additional contributions to the state party. When this happens, the RNC will often suggest that the donor make contributions to certain state parties that are most in need of funds at that time.").

1.60 Federal officeholders have directed contributors to the state parties when the contributors have "maxed out" to the candidate or when it appears that the state party can most effectively use additional money to help that officeholder or other

---

**55.** Alan G. Hassenfeld has served as Chairman of the Board and Chief Executive Officer of Hasbro, Inc. since 1989, a global company based in Rhode Island with annual revenues in excess of $3 billion. Hasbro designs, manufactures, and markets toys, games, interactive software, puzzles and infant products. He also sits on a number of civic and philanthropic boards. He is a member of the Board

of Trustees of the University of Pennsylvania and Deerfield Academy, he serves on the Dean's Council of the Kennedy School of Government at Harvard, and sits on the board of Refugees International. He also run three charitable foundations: the Hasbro Charitable Trust, the Hasbro Children's Foundation. and a family foundation. Hassenfeld Decl. ¶¶ 2–3 [DEV 6–Tab 17].

federal candidates. As one candidate's solicitation letter stated, "you are at the limit of what you can directly contribute to my campaign," but "you can further help my campaign by assisting the Colorado Republican Party." *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 458, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (quoting an August 27, 1996 fundraising letter from then-Congressman Allard); *see also* Philp Dep. Ex. 14 [JDT Vol. 26] (same letter); MMc0014 [DEV 117–Tab 2] (letter to a contributor stating: "Since you have contributed the legal maximum to the McConnell Senate Committee, I wanted you to know that you can still contribute to the Victory 2000 program . . . . This program was an important part of President George W. Bush's impressive victory in Kentucky last year, and it will be critical to my race and others next year" signed by Senator McConnell with the handwritten note: "This is important to me. Hope you can help"); Buttenwieser Decl. ¶¶ 15–16 [DEV 6–Tab 11] ("Federal candidates have often asked me to donate to state parties, rather than the joint committees, when they feel that's where they need some extra help in their campaigns. I've given significant amounts to the state parties in South Dakota and North Dakota because all the Senators representing those states are good friends, and I know that it's difficult to raise large sums in those states."); Hickmott Decl. ¶ 8 [DEV 6–Tab 19] (quoted *supra* Findings ¶ 1.59); Randlett Decl. ¶ 9 [DEV 8–Tab 32] ("Members [of Congress] . . . have asked soft money donors to write soft money checks to state and national parties solely in order to assist federal campaigns.").

1.61 Plaintiff Thomas McInerney states that he donates over $10,000 per year to state and local political party organizations to be spent on state and local organizations and elections. McInerney Aff. ¶¶ 4, 10, 12 [9 PCS]. Mr. McInerney's affidavit does not state whether or not

these funds were used in the manner he desired, only that "it is his understanding" that they were used for such activities. *Id.* ¶¶ 11, 13, 15. Regardless, nothing in BCRA prevents Mr. McInerney from donating funds to state and local party organizations—the law only restricts the types of activities on which these nonfederal funds may be spent. However, if Mr. McInerney's purpose in donating these funds is to assist state and local parties and candidates, BCRA ensures that his funds will be spent only on activities that exclusively affect state and local parties and elections, and not on practices that constitute federal election activity.

*Summary*

1.62 The evidence clearly demonstrates that federal officeholders not only solicit nonfederal donations for the national political committees, but also for state political parties. The testimony and documentary evidence makes clear that candidates value such donations almost as much as donations made directly to their campaigns and that these donations assist federal candidates' campaigns. Furthermore, the evidence makes clear that the national parties also direct nonfederal donations to their state party affiliates for the purpose of affecting federal elections. This evidence also corroborates the findings that GOTV and voter registration efforts by state parties affect federal elections. *See, e.g., supra* Findings ¶¶ 1.28, 1.31. Most importantly, the close nexus between the national political parties and federal officeholders led BCRA's framers to conclude that:

Because the national parties operate at the national level, and are inextricably intertwined with federal officeholders and candidates, who raise the money for the national party committees, there is a close connection between the funding of the national parties and the corrupting

dangers of soft money on the federal political process. The only effective way to address this [soft money] problem of corruption is to ban entirely all raising and spending of soft money by the national parties.

148 Cong. Rec. H409 (daily ed. Feb. 13, 2002) (statement of Rep. Shays).

### Corruption

1.63 The fact that Members of Congress are intimately involved in the raising of money for the political parties, particularly unlimited nonfederal money donations, creates opportunities for corruption. The record does not contain any evidence of bribery or vote buying in exchange for donations of nonfederal money; however, the evidence presented in this case convincingly demonstrates that large contributions, particularly those nonfederal contributions surpassing the federal limits, provide donors access to federal lawmakers which is a critical ingredient for influencing legislation, and which the Supreme Court has determined constitutes corruption. *See Buckley v. Valeo,* 424 U.S. 1, 27 n. 28, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (citing *Buckley,* 519 F.2d at 839 nn.37–38).

*Vote Buying/Bribery*

1.64 No Member of Congress testifying in this case states that he or she has ever changed his or her vote on any legislation in exchange for a donation of nonfederal funds to his or her political party. *See, e.g.,* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 2–3 (admitting lack of evidence); McCain Dep. at 171–74 (unable to identify any federal officeholder who changed his or her vote on any legislation in exchange for a donation of nonfederal money to a political party); Snowe Dep. at 15–16 (same); Jeffords Dep. at 106–07 (same); Meehan Dep. at 181–83 (same); Shays Dep. at 171 (same); *see also* 148 Cong. Rec. S2099 (daily ed. March 20, 2002) (statement of Sen. Dodd) ("I have never known of a particular Mem-

ber whom [sic] I thought cast a ballot because of a contribution."); 147 Cong. Rec. S2936 (daily ed. March 27, 2001) (statement of Sen. Wellstone) ("I don't know of any individual wrongdoing by any Senator of either party.").

1.65 Senator Rudman notes:

I understand that those who opposed passage of the Bipartisan Campaign Reform Act, and those who now challenge its constitutionality in Court, dare elected officials to point to specific [instances of vote buying]. I think this misses the point altogether. [The access and influence accorded large donors] is inherently, endemically, and hopelessly corrupting. You can't swim in the ocean without getting wet; you can't be part of this system without getting dirty.

Rudman Decl. ¶ 10 [DEV 8–Tab 34].

1.66 Consistent with Senator Rudman's testimony, the record, while not containing evidence that nonfederal funds have purchased votes, includes testimony from former and current Members of Congress describing the influence of nonfederal funds on the political system. Former Senator Simpson states:

Too often, Members' first thought is not what is right or what they believe, but how it will affect fundraising. Who, after all, can seriously contend that a $100,000 donation does not alter the way one thinks about—and quite possibly votes on—an issue? ... When you don't pay the piper that finances your campaigns, you will never get any more money from that piper. Since money is the mother's milk of politics, you never want to be in that situation.

Simpson Decl. ¶ 10. Senator Simpson also relates that

Large donors of both hard and soft money receive special treatment. No matter how busy a politician may be during the

day, he or she will always make time to see donors who gave large amounts of money. Staffers who work for Members know who the big donors are, and those people always get their phone calls returned first and are allowed to see the Member when others are not.

*Id.* ¶ 9. Former Senator Simon testifies:

It is not unusual for large contributors to seek legislative favors in exchange for their contributions. A good example of that which stands out in my mind because it was so stark and recent occurred on the next to last day of the 1995–96 legislative session. Federal Express wanted to amend a bill being considered by a Conference Committee, to shift coverage of their truck drivers from the National Labor Relations Act to the Railway Act, which includes airlines, pilots and railroads. This was clearly of benefit to Federal Express, which according to published reports had contributed $1.4 million in the last 2–year cycle to incumbent Members of Congress and almost $1 million in soft money to the political parties. I opposed this in the Democratic Caucus, arguing that even if it was good legislation, it should not be approved without holding a hearing, we should not cave in to special interests. One of my senior colleagues got up and said, 'I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread.' I will never forget that. This was a clear example of donors getting their way, not on the merits of the legislation, but just because they had been big contributors. I do not think there is any question that this is the reason it passed.

Simon Decl. ¶¶ 13–14 [DEV 9–Tab 37]; *see also Colorado II,* 533 U.S. 431, 451 n. 12, 121 S.Ct. 2351 (2001) (quoting Senator Simon); Feingold Dep. at 62 [JDT Vol. 6] (testifying that in the fall of 1996 a senior Senator suggested to Senator Feingold that he support the Federal Express amendment because "they just gave us $100,000"). Former Senator Boren testifies:

Donations, including soft money donations to political parties, do affect how Congress operates. It's only natural, and happens all too often, that a busy Senator with 10 minutes to spare will spend those minutes returning the call of a large soft money donor rather than the call of any other constituent. . . .

As a Member of the Senate Finance Committee, I experienced the pressure first hand. On several occasions when we were debating important tax bills, I needed a police escort to get into the Finance Committee hearing room because so many lobbyists were crowding the halls, trying to get one last chance to make their pitch to each Senator. Senators generally knew which lobbyist represented the interests of which large donor. I was often glad that I limited the amount of soft money fundraising I did and did not take PAC contributions, because it would be extremely difficult not to feel beholden to these donors otherwise. I know from my first-hand experience and from my interactions with other Senators that they did feel beholden to large donors.

Senator Boren Decl. ¶¶ 7–8 [DEV 6–Tab 8]; *see also id.* ¶ 9 ("Many Congressmen vie for positions on particular committees such as Finance and Ways and Means in large part because it makes it much easier for them to raise money. They then spend large amounts of their scarce time raising money for their party from businesses that have specific matters pending before their committees.").

1.67 It is clear that political parties are involved in efforts to influence federal officeholders with regard to the passage or defeat of specific legislation. The motiva-

tion behind these efforts may not be imparted to the officeholder. However, an internal document shows that on at least one occasion the motivation for doing so was associated with donors' interest in the legislation.

1.67.1 Senator Rudman testifies that while the RNC would lobby him to take a position on legislation, it never asked him to take a particular position because a donor had contributed soft money to the party. Rudman Dep. at 77–82 [JDT Vol. 27]. Senator McCain testifies that "there are many times where the Republican National Committee tried to change my votes and other votes of other Republicans ... [T]he Republican National Committee constantly weighs in on legislation before the Congress of the United States," McCain Dep. at 171–72 [JDT Vol. 18], but he also states that he does not "know [if it was] in exchange for donations or not." *Id.* The record, however, also contains a call sheet titled "Team 100 One–On–One with [a national association]," for a call that took place on February 28, 2000, in Chairman Jim Nicholson's office. RNC0159740 [DEV 95]. Included on the sheet were instructions to thank the group for upgrading to Team 100. *Id.* The call sheet includes handwritten comments, including: "Gary Miller sponsoring Brownfield Legislation. Boehlert + Bliley against. Working w/ Speaker. Asked JN help. JN agreed to talk to Boehlert @ the possible time. When appropriate.... Call Sen. Abraham about support homebuilders—Property Rights Bill .... Lott good friend of homebuilders." *Id.*

1.68 Although one Defense expert believes it does not occur, two present Members of Congress testify that threats have been made by the political parties to withhold financial support due to Members' positions on issues. *See* Shays Dep. at 172–84 [JDT Vol. 29] (stating Republican Party never attempted to change his vote, but that "[i]t was made clear to a number of my colleagues if they voted for the campaign finance reform, they would get no campaign contributions"); McCain Decl. ¶ 7 [DEV 8–Tab 29] ("At times, when Members seek to support legislation their congressional leaders oppose, they are threatened with the prospect that their leaders will withhold soft money being spent on their behalf."); Defense Expert Mann Cross Exam. at 113–15 [JDT Vol. 17] ("I would be shocked if [the RNC] ever did such a thing.... [T]he point is to win the margin seat, to control the majority for the party, not to weaken a potentially vulnerable candidate.... It would be self-defeating. That isn't how it works."). The FEC does not investigate or make determinations of national parties using federal money to induce federal legislators to support or oppose specific legislation, and therefore has no knowledge of whether such practices occur. Vosdingh Dep. at 89 [RNC Vol. VIII].

1.69 Plaintiffs' own expert Raymond La Raja recognizes the corruption potential inherent in nonfederal donations to the political parties. In a recently published book, La Raja argues that limiting nonfederal money donations reduces "the potential for corruption by eliminating the super donors." Green Rebuttal Report at 4 [DEV 5–Tab 1] (quoting Raymond La Raja, Sources and Uses of Soft Money: What Do We Know?, *in* A User's Guide to Campaign Reform at 106) (Gerald C. Lubenow ed., 2001). He continues:

If only a modest portion of party soft money goes to fund issue ads, it is worth re-examining the question: how is soft money harmful? The obvious answer is that it permits candidates, contributors, and parties, to circumvent federal laws limiting campaign contributions. If party soft money can help a specific candidate, then corporations, unions, or wealthy individuals can simply funnel

contributions to candidates through the parties. And the potential for quid pro quo exchange between contributor and policymaker escalates with the size of the contribution.

*Id.* (citing same at 105). In fact, La Raja asserts that "[t]o reduce the potential for corruption, I recommend that Congress place a cap on soft money contributions or, if soft money is banned, raise the limits on hard money contributions." *Id.* (citing same at 106). In his dissertation, La Raja makes a similar recommendation. La Raja Cross Exam. Ex. 3 at 147 [JDT Vol. 15]; *see also id.* at 105 ("In a society in which political participation is unequal among socioeconomic groups it is discomforting to think that wealthy people and organizations might have disproportionate influence on government policies simply because they can write large checks to politicians. For this reason alone, policymakers might pause before granting dispensations to political parties though these institutions may perform valuable functions in democratic politics."). La Raja concludes that

> [t]here are two distinct benefits of using soft money. First, the parties can raise these funds in large increments. Although most soft money contributions are relatively small—the average per source is less than $10,000—the parties solicit large amounts from corporations, unions and wealthy individuals . . . .

Another important advantage of soft money is that the parties can concentrate these funds in key races. *By exploiting soft money rules, the parties effectively sidestep the federal ceilings that prevent them from allocating resources efficiently in the closest contests.*

To navigate around the federal restrictions on soft money the parties have developed close ties with their state parties because these affiliates receive special exemptions for party building activity.

*Id.* at 51 (emphasis added); *see also id.* at 74–75 (concluding that parties "exploit federal campaign finance laws by using soft money for candidate support even though federal laws require them to use it for generic party building"); La Raja Cross Exam. 17–18 [JDT Vol. 15] (stating that he stands by the conclusions reached in his dissertation).

*Donors are Pressured to Make Contributions to Political Parties*

1.70 Corporate donors, trade associations, and individual donors are pressured to make large contributions to the parties.

1.70.1 The Committee for Economic Development (CED)[56] released a "survey, which was conducted by the Tarrance Group, . . . drawn from telephone interviews of a random sample of 300 corporate executives employed by major U.S. corporations." Kolb[57] Decl. ¶ 9 [DEV 7–Tab 24]. The survey showed that "[n]early three-quarters of [senior executives of the nation's largest businesses] (74 percent) say pressure is placed on business leaders to make large political donations. The main reasons corporate America makes political contributions, the executives said is fear of retribution and to buy access to lawmakers. Seventy five percent say political donations give them an advantage in shaping legislation; and nearly four-in-five executives (78 percent) called the system 'an arms race for cash that continues to

---

56. CED is "an independent non-partisan research and policy organization of some 200 Trustees who are prominent business leaders and educators." Kolb Decl. I ¶ 1 [DEV–Tab 24].

57. Charles Kolb is CED's president. Kolb Decl. I ¶ 1 [DEV 7–Tab 24].

get more and more out of control.'" *Id.* ¶ 9 & Ex. 6.

1.70.1.1 Plaintiffs challenge these poll results, noting that Kolb, CED's President, could not provide details regarding how the Tarrance Group conducted the survey. *See* Proposed Findings of Fact of the RNC, Republican Party of Colorado, the Republican Party of Ohio, the Republican Party of New Mexico, the Dallas County (Iowa) Republican County Central Committee, and Mike Duncan ("RNC Proposed Findings") ¶ 115(b) (citing Kolb Dep. at 128, 145 [JDT Vol. 13]). They also state that many of the survey questions did not distinguish between federal and nonfederal funds. *Id.* (citing Kolb Dep. Ex. 5). With regard to the first criticism, the fact that a person who commissioned a study could not explain how the polling firm actually conducted the survey, without more, does not render the poll flawed. Plaintiffs have provided no information which indicates that the Court should view the Tarrance Group's work with caution. In fact, in his deposition, Kolb explained that the Tarrance Group is "a professional polling firm. They know how to do their business pretty well and they're fairly well respected from everything we could tell," Kolb Dep. at 145 [JDT Vol. 13], and the RNC did not challenge this assessment in the deposition or in their filings. In fact, the record shows that The Coalitionan organization supported by a number of Plaintiffs used the Tarrance Group for its own polling. *See infra* Findings ¶ 2.6.2.2. As for the second criticism, it is true that the pollsters did not ask those surveyed to distinguish between federal and nonfederal funds; however, the fact that nearly 80 percent called the campaign finance system "an arms race for cash that continues to get more and more out of control" strongly suggests that political party contribution coercion does not stop once a donor reaches the federal contribution limits.

1.70.2 Lobbyist Robert Rozen testifies that

[i]n some cases corporations and trade associations do not want to give in amounts over the hard money limits, but they feel pressured to give in greater amounts and end up making soft money donations as well. They are under pressure, sometimes subtle and sometimes direct, from Members to give at levels higher than the hard money limits. For example, some Members in a position to influence legislation important to an industry naturally wonder why a company in that industry is not participating in fundraising events.

Rozen Decl. ¶ 8 [DEV 8–Tab 33]; *see also* Brian McGrory, Businesses Drawn to Campaign Reform, Boston Globe, February 13, 1997, ODP0018–00457–60 [DEV 69–Tab 48] (quoting Howard Marlowe, a Washington lobbyist, as saying: "We are spending tens of millions of dollars to satisfy the constant craving of congressmen or the parties for money and our own craving for access.... You don't know if you say 'no'—and you may have given five times already—whether they will shut off the access you have been buying with all these other contributions. We need the access.").

1.70.3 A national survey of major congressional donors conducted in 1997 found that a majority were critical of the campaign finance system and supportive of reform. John Green, Paul Herrnson, Lynda Powell, and Clyde Wilcox, *Individual Congressional Campaign Contributors: Wealthy, Conservative and Reform–Minded* (1998), FEC 101–0282, 0283 [DEV 45–Tab 110]. Eighty percent of respondents agreed that "office-holders regularly pressure donors for contributions," while one-half agreed "that contributors regularly pressure office-holders for favors and seek access to government." *Id.* at 0290.

1.70.4 Former Senator Boren testifies that "Donors ... feel victimized. Now that I've left office, I sometimes hear from large donors that they feel 'shaken down.'" Boren Decl. ¶ 10.

*Federal Officeholders' Awareness of Who Donates to Parties*

1.71 Some present and past officeholders, corroborated by separate documentary evidence, testify that many in Congress are aware of the identities of contributors of large donations to the political parties. Some officeholders testify that they personally are unaware of who donates to the political parties, but they are mostly BCRA co-sponsors, aligned against these types of large, unregulated contributions and not active participants in nonfederal fundraising, or Members who have distanced themselves from receiving this information.

1.71.1 Some Members of Congress testifying in this case state that they *personally* are unaware of who donates money to their parties. *See* Feingold Dep. at 115–16 [JDT Vol. 6] ("Q: How generally are ... Senators made aware of, if at all, the amounts and identities of soft money donors to the national committees? A: I don't know exactly how that's done or how much it's done."): Snowe Dep. at 223–24 [JDT Vol. 31] (unaware of nonfederal donors to the RNC); Jeffords Dep. at 96 [JDT Vol. 11] ("somewhat" aware of nonfederal donors to the national political parties); Meehan Dep. at 179 [JDT Vol. 22] (aware of few nonfederal donors to national party committees, only because "from time to time I read who they are in the newspaper"). The record shows that when Members do not know the identity of contributors, it is sometimes because those officeholders made a conscious effort to remain unaware or that their staff handled such information. *See, e.g.,* Senator Feingold Dep. at 115 [JDT Vol. 6] (explaining that while he does not know how Senators

are made aware of the identity of donors of nonfederal money to national parties, it is because he "made a real effort to be far away from that part of the process so [he is] not privy to or aware of exactly how that's done and to what extent it's done."); Congressman Meehan Dep. at 178–79 [JDT Vol. 22] (explaining that he was unaware of the Democratic National Committee's "tallying" process, by which the amount of money the DNC spends on a particular candidate is related to the amount of nonfederal money that candidate raised for the DNC, but that he was "probably one of the last people that they would let know about the tallying process"); Rudman Dep. at 75–78 [JDT Vol. 27] (explaining that while he did not know the identity of contributors who donated "either hard or soft money" to the RNC, that the RNC "probably" provided him with that information but he "didn't have any interest in it. I was the most disinterested candidate in money of anyone you've probably ever run into.... And [if such reports] came to the office, the [administrative assistant] took them and probably read them.").

Senator McConnell has stated that during his 18 years in the United States Senate he has met thousands of Americans with whom he has shaken hands, posed for photographs, answered questions and discussed legislative issues. The overwhelming majority of these meetings were with people who do not donate funds to the Republican Party at the national, state, or local level. Senator McConnell also states that he is typically unaware of the donation history of individuals with whom he meets. McConnell Aff. ¶ 13 [2 PCS]. While Senator McConnell may generally not be aware of the donation history of each of the individuals he meets, he is aware of the donation history of some specific large donors. For example, Senator

McConnell sent the following letter to a contributor which stated in part:

> It was a pleasure seeing you at the Senate–House Dinner last week. The dinner was not a good time to talk, but I wanted to let you know about the August 12 fundraiser I am having at your neighbor['s] ... home....
>
> In addition to your $2,000 contribution in the last election cycle, I was proud to also receive $1,000 each from [five other donors]. Their support again would be greatly appreciated.

McConnell Dep. Ex. 11 [JDT Vol. 19] (MMc0987). The letter is signed "Mitch" and includes the following handwritten note: "As you may recall, any contributions to my '02 campaign will count against your $25,000 annual hard money limit in '02 + not '99. Hope you can help." *Id.*

Another handwritten letter states: "Thanks so much for your continuing friendship and support. Your commitment for $2000 each from you + your lady will be very helpful in my reelection next year. Thanks again + I look forward to hearing from you soon. Mitch." *Id.* Ex. 5 (MMc0753); *see also* Findings ¶ 1.60 (letter to contributor noting that he had given the maximum amount of federal funds to Senator McConnell's campaign); McConnell Dep. at 38–41 [JDT Vol. 19] (explaining that a particular company collected $47,000 for his campaign because its chairman, who is a friend of Senator McConnell's, hosted a fundraiser for the McConnell campaign)

1.71.2 Many others testify that federal officeholders and candidates are typically aware of who donates to their parties.

Former and current Members of Congress state that they and their colleagues are aware of who makes large contributions to their parties. *See, e.g.,* Bumpers Decl. ¶¶ 18, 20 [DEV 6–Tab 10] (explaining that officeholders of both parties are aware of contributors' identities, that he had "heard that some Members even keep lists of big donors in their offices," and that "you cannot be a good Democratic or a good Republican Member and not be aware of who gave money to the party. If someone in Arkansas gave $50,000 to the DNC, for example, I would certainly know that."); 148 Cong. Rec. H352 (daily ed. Feb. 13, 2002) (statement of Rep. Shays) (recognizing that "it's the candidates themselves and their surrogates who solicit soft money. The candidates know who makes these huge contributions and what these donors expect. Candidates not only solicit these funds themselves, they meet with big donors who have important issues pending before the government; and sometimes, the candidates' or the party's position appear to change after such meetings."); Senator Simpson Decl. ¶ 5 [DEV 9–Tab 38] (explaining that "[p]arty leaders would inform Members at caucus meetings who the big donors were. If the leaders tell you that a certain person or group has donated a large sum to the party and will be at an event Saturday night, you'll be sure to attend and get to know the person behind the donation.... Even if some members did not attend these events, they all still knew which donors gave the large donations, as the party publicizes who gives what."); Senator Boren Decl. ¶ 6 [DEV 6–Tab 8] (testifying that "[e]ach Senator knows who the biggest donors to the party are" because "[d]onors often prefer to hand their [nonfederal money contribution] checks to the Senator personally, or their lobbyist informs the Senator that a large donation was just made."); Congressman Bennie G. Thompson Dep. at 28–29 [JDT Vol. 32] (testifying that the DCCC "provide[s] the entire Democratic Caucus with the amounts of money raised by name of every Democratic member of Congress."); McCain Decl. ¶ 6 [DEV 8–Tab 29] ("Legislators of both parties often know who the large soft money contributors to their par-

ty are, particularly those legislators who have solicited soft money," and "[d]onors or their lobbyists often inform a particular Senator that they have made a large donation."); Senator Simon Decl. ¶ 16 [DEV 9–Tab 37] (stating that he was more likely to first return the telephone call of a donor to his campaign than someone who had not donated, and that increased access for those who give large contributions to the party is not fair to those who cannot afford to give contributions at all); Wirth Decl. Ex. A ¶ 17 [DEV 9–Tab 43] ("[C]andidates were generally aware of the sources of the funds that enabled the party committee to support their campaigns.").

Party officials and a political donor state that Members of Congress are made aware of who makes large donations to their party. Vogel Decl. ¶¶ 25–28 [DEV 9–Tab 41] (explaining that the NRSC distributes lists of potential donors to incumbents so that they can solicit donations); McGahn Decl. ¶¶ 21, 34–37 [DEV 8–Tab 30] (same for NRCC); Jordan Decl. ¶¶ 20, 25–28 [DEV 7–Tab 21] (same for DSCC); Wolfson Decl. ¶¶ 21, 28–31 [DEV 9–Tab 44] (same for DCCC); Randlett Decl. ¶ 10 [DEV 8–Tab 32] ("Information about what soft money donors have given travels among the Members in different ways. Obviously the Member who solicited the money knows. Members also know who is involved with the various major donor events which they attend, such as retreats, meetings and conference calls. And there is communication among Members about who has made soft money donations and at what level they have given, and this is widely known and understood by the Members and their staff.").

1.71.3 The record also contains evidence showing that sometimes large donors make their identities known to Members of Congress. This memorandum from a large, influential interest group consisting of major corporations from a particular industry, discusses an upcoming meeting between the group's representatives and Senator McConnell, then head of the NRSC. [citation sealed]. The "objectives" of the meeting included "apprising him of [sic] industry's concern with attention on" an issue directly related to their industry and "expressing [the group's] willingness to be a resource, substantively and politically, to assist in maintaining a Republican majority in 2000." *Id; see also* Findings ¶¶ 1.75.1 (testimony about donors choosing to personally deliver donations to Senator Chuck Robb when he was Chairman of the DSCC), 1.75.2 (Senator McCain statement: "Donors or their lobbyists often inform a particular Senator that they have made a large donation."), 1.75.2 (statement by Sen. McCain).

1.72 It is clear from the evidence *supra* that many Members of Congress know who donates to their political parties, and that those who do not can easily find such information. In fact the record suggests that for a Member not to know the identities of these donors, he or she must actively avoid such knowledge as it is provided by the national political parties and the donors themselves. This finding is not particularly unexpected given that many Members of Congress actively solicit federal and nonfederal contributions for their parties. *See supra* Findings ¶ 1.51.

The fact that some Members know who donates large amounts of money to their political parties is a necessary corollary to the next set of findings which demonstrates that many who give large donations to the political parties, particularly unrestricted nonfederal donations, are provided with access to federal lawmakers. This access provides these donors with the opportunity to influence legislation.

*Evidence Regarding Contributions and Access to Federal Lawmakers*

1.73 The record contains a substantial amount of evidence showing that large do-

nations to the political parties, particularly nonfederal contributions, provide donors with special access to federal lawmakers. This access is valued by contributors because access to lawmakers is a necessary ingredient for influencing the legislative process. Contributors find that nonfederal funds are most effective at obtaining special access, and to ensure that they maintain this access donors contribute to both political parties. The political parties take advantage of contributors' desire for access by structuring their donor programs so that as donations increase, so do the number and intimacy of special opportunities to meet with Members of Congress. The facts below make clear that this effect of nonfederal donations corrupts the political system.

*Donors Give Nonfederal Donations in Order to Obtain Special Access to Federal Lawmakers*

1.74 Testimony in the record from lobbyists, Members of Congress, and individual and corporate donors, demonstrates that major contributors to the political parties give nonfederal donations for the purpose of obtaining increased access to, and strengthening their relationships with federal officeholders.

1.74.1 Lobbyists state that their clients make donations to political parties to achieve access. According to lobbyist, and former DNC and DSCC official, Robert Hickmott "[t]here is a very rare strata of contributors who contribute large amounts to the DSCC because they actually believe in Democratic politics.... The majority of those who contribute to political parties do so for business reasons, to gain access to influential Members of Congress and to get to know new Members." Hickmott Decl., Ex. A. ¶ 46 [DEV 6–Tab 19]; *see also* Rozen Decl. ¶ 10 ("[L]arge political contributions are worthwhile because of the potential benefit to the company's bottom line.") [DEV 8–Tab 33]; Andrews [58] Decl. ¶ 8 (stating that sophisticated political donors "typically are trying to wisely invest their resources to maximize political return.") [DEV 6–Tab 1]. Wright Andrews explains:

Sophisticated political donors—particularly lobbyists, PAC directors, and other political insiders acting on behalf of specific interest groups—are not in the business of dispensing their money purely on ideological or charitable grounds. Rather, these political donors typically are trying to wisely invest their resources to maximize political return. Sophisticated donors do not show up one day with a contribution, hoping for a favorable vote the next day. Instead, they build longer term relationships. The donor seeks to convey to the member that he or she is a friend and a supporter who can be trusted to help the federal elected official when he or she is needed. Presumably, most federal elected officials recognize that continued financial support from the donor often

---

58. Mr. Andrews is an attorney and lobbyist at the Washington, D.C. firm of Butera & Andrews, specializing in government relations and federal legislative representations. He has been an active lobbyist before Congress since 1975. Prior to that time, he served as Chief Legislative Assistant to then United States Senator Sam Nunn. Prior to forming Butera & Andrews, he worked in the government relations practice at the Washington office of the law firm of Sutherland, Asbill & Brennan. During his career, he has represented clients from throughout the nation and abroad, and they have included major corporations, trade associations, coalitions, and state governmental entities. He has worked with clients on a broad array of issues including environmental matters, federal taxation, banking, financial services, housing, and many others. He has served two terms as President of the American League of Lobbyists, and Washingtonian magazine named him as [sic] of "Washington's Top 50 Lobbyists." Andrews Decl. ¶ 1 [DEV 6–Tab 1]

may be contingent upon the donor feeling that he or she has received a fair hearing and some degree of consideration or support.

Andrews Decl. ¶ 8 [DEV 6–Tab 1]. Lobbyist Robert Rozen testifies that

[t]ypically, a contributor gives money to establish relationships, to be able to lobby on an issue, to get close to Members, to be able to have influence. While an elected official of course does not have to do something because somebody gave, a contribution helps establish a relationship, and the more you give the better the relationship. It is not that legislation is being written in direct response to somebody giving a lot of money. Rather, it is one step removed: relationships are established because people give a lot of money, relationships are built and are deepened because of more and more money, and that gets you across the threshold to getting the access you want, because you have established a relationship.

Rozen Decl., Ex. A ¶ 12 [DEV 8–Tab 33].

1.74.2 Some former and current Members of Congress testify that donors expect to establish relationships with officeholders in return for their nonfederal donations to the national political parties. Former Senator Rudman explains:

("By and large, the business world, including corporations and unions, gives money to political parties . . . [because] they believe that if they decline solicitations for such contributions, elected and appointed officials will ignore their views or, worse, that competing business interests who do make large contributions to the party in question will have an advantage in influencing legislation or other government decisions. The same is true in the preponderance of cases where wealthy individuals give $50,000, $100,000, $250,000, or even more to political parties in soft money donations.").

Rudman Decl. ¶ 5 [DEV 8–Tab 34]; *see also* Bumpers Decl. ¶ 14 [DEV 6–Tab 10] ("Although some donors give to Members and parties simply because they support a particular party or Member, the lion's share of money is given because people want access. If someone gives money to a party, out of friendship with a Member, that donor may never ask for anything in return. However, although many people give money with no present intention of asking for anything in return, they know that if they ever need access they can probably get it. Donations can thus serve as a type of insurance."); *id.* ¶ 13 (testifying that people give money to party committees feel that they are "ingratiating themselves" with the federal officeholder who solicits the donation); Wirth Decl., Ex. A. ¶ 5 [DEV 9–Tab 43] (stating that those donors who made contributions to the state party "almost always did so because they expected that the contributions would support my campaign," and that, generally, "they expected that [the Senator] would remember their contributions."); Brock Decl. ¶ 5(a) [DEV 6–Tab 9] (testifying that large givers "for their part, feel they have a 'call' on these officials. Corporations, unions, and wealthy individuals give these large amounts of money to political parties so they can improve their access to and influence over elected party members. Elected officials who raise soft money know this."); Boren Decl. ¶ 9 [DEV 6–Tab 8] ("[Members of Congress] know exactly why most soft money donors give—to get access and special influence based on their contributions.").

1.74.3 Business contributors also testify that nonfederal donations to parties are made to obtain access to federal officeholders. Roger Tamraz, an American businessman involved in investment banking and international energy projects, made donations to the DNC during the 1996 election cycle. When asked during Con-

gressional hearings whether one of the reasons he made the contributions was because he "believed it might get [him] access?," Mr. Tamraz responded: "Senator, I'm going even farther. It's the only reason-to get access...." Thompson Comm. Report at 2913 n.46 (quoting page 63 of Mr. Tamraz's testimony before the committee). Some corporate donors view nonfederal donations as the cost of doing business. *See* Hassenfeld Decl. ¶ 16 ("Many in the corporate world view large soft money donations as a cost of doing business, and frankly, a good investment relative to the potential economic benefit to their business.... I remain convinced that in some of the more publicized cases, federal officeholders actually appear to have sold themselves and the party cheaply. They could have gotten even more money, because of the potential importance of their decisions to the affected businesses.") [DEV 6–Tab 17]; Randlett Decl. ¶ 5 [DEV 8–Tab 32] (stating that "many soft money donations are not given for personal or philosophical reasons. They are given by donors with a lot of money who believe they need to invest in federal officeholders who can protect or advance specific interests through policy action or inaction. Some soft money donors give $250,000, $500,000, or more, year after year, in order to achieve these goals. For most institutional donors, if you're going to put that much money in, you need to see a return, just as though you were investing in a corporation or some other economic venture."); *see also* Kirsch Decl. ¶ 14 (stating that "[major] donors perceive that they are getting a business benefit through their special access, and that it is a good investment for them.") [DEV 7–Tab 23].

Documents submitted show that a Fortune 100 company makes large contributions to national party committees with the expectation that its contributions will cultivate or strengthen its "relationships" with particular Members of Congress. *See, e.g.,* Internal Fortune 100 company memorandum entitled "Justification for donation to [DSCC]" (October 25, 2000) [citation sealed] ("I am requesting a check for $50,000.00 to the Democratic Senatorial Campaign Committee (DSCC). Senator Robert Torricelli is the chairman for the DSCC and in a recent conversation with the Senator, he requested the above amount from [our company]. Senator Torricelli has been a friend to [our company] for many years and he has shown himself to be a thoughtful voice regarding issues in our industry. He currently serves on the Judiciary, Foreign Relations & Governmental Affairs and Rules and Administration Committees. I feel this would be a great opportunity to strengthen our relationship with Senator Torricelli and the DSCC."); Internal Fortune 100 company memorandum entitled "Justification for donation to [DSCC]" (December 12, 2000) [citation sealed] ("I am requesting a check in the amount of $50,000 to the Democratic Senatorial Campaign Committee (DSCC). Senator Patty Murray (D–WA) is the new chairman of the DSCC .... Senator Murray sits on the Senate Committees on Appropriations, Budget, Health, Education, Labor and Pensions, and Veterans Affairs. This donation would further enhance our ties with the DSCC and get our relationship with Senator Murray off to a good start."); Internal Fortune 100 company memorandum entitled "[DCCC]/Congressman Bill Luther" (May 7, 2001) [citation sealed] ("I am requesting a check for $25,000.00 to the [DCCC] to support party building activities in response to a request from Congressman Bill Luther. Congressman Luther has been a friend to [our company] for many years .... He currently serves on the Commerce Committee, the Subcommittees for Telecommunications, Trade & Consumer Protection as well as the Finance and Hazardous Materi-

als. I feel this would be a great opportunity to strengthen our relationship with Congressman Luther."); Internal Fortune 100 company memorandum entitled "Georgia Senate 2002" (July 19, 2001) [citation sealed] ("I am requesting a check for $10,000.00 on behalf of Georgia Senate 2002. Senator Cleland has been reaching out to his key supporters and he has contacted [our company] for financial assistance with Georgia Senate 2002. This is very important to Senator Max Cleland and over the years, Senator Cleland has been a good friend to [our company]. I feel this would be a great opportunity to strengthen our relationship with Senator Cleland."). One legislative advocate from this company described the benefits reaped from contributing $100,000 to the NRCC: "I think we established some goodwill with [Congressman] Tauzin, both by [our company] contributing at the $100,000 level to the NRCC dinner he chaired last month and by my participation in the NRCC Finance Committee for the dinner. Tauzin understood that [our company] participated at the same level as the major ... companies [in our industry] did, and he expressed genuine interest in trying to begin to reach out to the competitive industry. In sum, I think the event was a real positive for [our company]." Internal Fortune 100 company memorandum entitled "NRCC Leadership Dinner 2000," dated April 4, 2000, [citation sealed].

An internal RNC document also shows that donors often give to the national parties to achieve access to lawmakers. RNC0177216 [DEV 95] (note written on stationery of RNC's Team 100 Director, Haley Barbour, stating "they have pretty much decided to join T–100 .... They want access to political players .... Their top issue is tort reform").

1.74.4 One experienced individual donor testifies that "[l]arge soft money donors give in order to obtain access and influence." Hiatt Decl. ¶ 11 [DEV 6–Tab 18].

1.74.5 Plaintiffs' expert La Raja testifies that interest groups probably pursue an access strategy when they give money to political parties. La Raja Cross Exam. at 89 [JDT Vol. 15].

*Large Nonfederal Donations Provide Donors Access to Federal Lawmakers*

1.75 The record demonstrates that large donations, especially nonfederal contributions, to the political parties provide donors with access to Members of Congress. The record is a treasure trove of testimony from Members of Congress, individual and corporate donors, and lobbyists, as well as documentary evidence, establishing that contributions, especially large nonfederal donations, are given with the expectation they will provide the donor with access to influence federal officials, that this expectation is fostered by the national parties, and that this expectation is often realized. As one former Member of Congress puts it: "[A]ccess is it. Access is power. Access is clout." Boren Decl. ¶ 7 [DEV 6–Tab 8] (quoting Rep. Mazzoli).

1.75.1 Testimony from lobbyists demonstrates that large donations, particularly in nonfederal form, are a necessary ingredient for a successful lobbying campaign because they provide their clients with access to federal lawmakers, which allows them to influence legislation.

Lobbyist Robert Rozen testifies that large nonfederal donations are essential for developing relationships with Members of Congress, which in turn lead to access, which in turn lead to influence over policy.

I know of organizations who believe that to be treated seriously in Washington, and by that I mean to be a player and to have access, you need to give soft money. As a result, many organizations do

give soft money.... They give soft money because they believe that's what helps establish better contacts with Members of Congress and gets doors opened when they want to meet with Members. There is no question that money creates the relationships. Companies with interests before particular committees need to have access to the chairman of that committee, make donations, and go to events where the chairman will be. Even if that chairman is not the type of Member who will tie the contribution and the legislative goals together, donors can't be sure so they want to play it safe and make soft money contributions. The large contributions enable them to establish relationships, and that increases the chances they'll be successful with their public policy agenda. Compared to the amounts that companies spend as a whole, large political contributions are worthwhile because of the potential benefit to the company's bottom line.

Rozen Decl. ¶ 10 [DEV 8–Tab 33]; *see also id.* ¶ 14 ("You are doing a favor for somebody by making a large [soft money] donation and they appreciate it. Ordinarily, people feel inclined to reciprocate favors. Do a bigger favor for someone—that is, write a larger check—and they feel even more compelled to reciprocate. In my experience, overt words are rarely exchanged about contributions, but people do have understandings: the Member has received a favor and feels a natural obligation to be helpful in return. This is how human relationships work. The legislative arena is the same as other areas of commerce and life. It is similar to a situation that has been in the news recently: an investment banking firm made shares of hot initial public offerings available to the officers of Worldcom Inc., while Worldcom Inc. executives were giving the firm tens of millions of dollars in investment-banking

business. There doesn't have to be a specific tie-in to achieve the result.").

Lobbyist Robert Hickmott, who is a former DNC and DSCC official, testifies that he advises his clients to make contributions in order to "establish relationships. Having those relationships in many ways then helps us get meetings and continue that relationship." Hickmott Dep. at 50 [JDT Vol. 10]. Hickmott testifies that when Senator Robb was chairman of the DSCC he would go to the DSCC offices where he would "accept checks from individuals or organizations who wanted to give money to the DSCC and they wanted face time with Chairman Chuck Robb." *Id.* at 94–95. Donors would "use this as an opportunity not only to make a contribution to the DSCC, but also to convey to Senator Robb what their group or individual position was on an issue." *Id.* at 95.

Lobbyist Daniel Murray's testimony in a prior case, which has been incorporated into the record of this case, states that

contribut[ing] soft money ... has proven to provide excellent access to federal officials and to candidates for federal elective office. Since the amount of soft money that an individual, corporation or other entity may contribute has no limit, soft money has become the favored method of supplying political support.... [S]oft money begets both access to law-makers and membership in groups which provide ever greater access and opportunity to influence.

Murray Aff. in *Mariani* ¶ 14 [DEV 79–Tab 59].

1.75.1.1 Although there are varying views as to whether lobbying efforts are a more effective means of achieving access to federal officeholders than large nonfederal contributions, there is no dispute that large nonfederal contributions provide an additional means of obtaining access to officeholders and are generally part of

modern lobbying plans. While one lobbyist concedes that his clients hire him because he is able to provide them access to lawmakers regardless of the client's donation history, one of the ways he is able to provide this service is through nonfederal donations he and his firm arrange for Members of Congress and their political parties. Moreover, Plaintiffs have not presented the testimony of a single lobbyist who believes that nonfederal money donations do not assist clients in their efforts to gain access to influence federal lawmakers.

1.75.1.2 Some testimony presents lobbying as a more effective method of obtaining access to federal lawmakers than nonfederal donations. *See* RNC Finance Director B. Shea Decl. ¶ 45 [RNC Vol. V] ("It is obvious why major donors to the RNC do not regularly use their donations as a means to obtain 'access.' All or virtually all who have personal or organizational business with the federal government retain or employ professional lobbyists."); Former Senator Bumpers Dep. in *RNC* at 39 [DEV 63–Tab 1] ("[M]oney really does buy access . . . . [a]t some level that's true of campaign contributions, and it's almost always true in the cases of lobbying") *but see infra* Findings ¶ 1.75.2 (Former Senators Rudman, Boren and Simpson's views on access). Evidence was also presented that many entities that donate nonfederal funds to political parties also spend vast sums of money lobbying federal officeholders, sometimes exceeding their donations by many multiples. *See* Resp. of Intervenors to RNC's First and Second Reqs. for Admis. at 23–24 (admitting that top five corporate nonfederal donors during the 1996 election campaign donated $9,009,155 to national party committees and same five corporations spent $27,107,688 on lobbying during 1996 alone [59]); *id.* at 24–25 (admitting that top five corporate donors of nonfederal funds during 1997 and 1998 donated $7,774,020 to national party committees and same five corporations spent $42,000,000 on lobbying during that same period [60]); *see also* Primo Cross Exam. at 164 [JDT Vol. 27] (noting that nonfederal donations "is a piddling amount of money . . . relative to what corporations spend on lobbying and . . . philanthropy"); Mann Cross Exam. at 49 [JDT Vol. 17] ("It's not either or. Is more money spent on lobbying than soft money donations? Yes. It varies tremendously. In some sectors it's 2–1, in others 4–1, 10–1. You have given an example in a particular case of 15–1, but the fact is most of the organizations and economic interests doing that lobbying, inside and outside lobbying, are also intimately involved in the political financ-

---

**59.** The donors were Philip Morris ($3,017,036 in nonfederal contributions to national political parties, $19,580,000 in lobbying expenditures), Joseph E. Seagram & Sons ($1,938,845 in nonfederal contributions to national political parties, $550,000 in lobbying expenditures), RJR Nabisco ($1,442,931 in nonfederal contributions to national political parties, $1,637,688 in lobbying expenditures), Walt Disney Co. ($1,359,500 in nonfederal contributions to national political parties, $980,000 in lobbying expenditures), and Atlantic Richfield ($1,250,843 in nonfederal contributions to national political parties, $4,360,000 in federal and state lobbying expenditures). Resp. of Intervenors to RNC's First and Second Reqs. for Admis. at 23–24.

**60.** The donors were Philip Morris ($2,446,316 in nonfederal contributions to national political parties, $38,800,000 in lobbying expenditures), Communications Workers of America ($1,464,250 in nonfederal contributions to national political parties, $460,000 in lobbying expenditures), AFSCME ($1,340,954 in nonfederal contributions to national political parties, $2,460,000 in lobbying expenditures), Amway Corp. ($1,312,500 in nonfederal contributions to national political parties, $240,000 in lobbying expenditures), American Financial Group ($1,210,000 in nonfederal contributions to national political parties, $20,000 to $40,000 in lobbying expenditures)

ing game and making large contributions to political parties."). One lobbyist states that his clients hire him in large part because of his contacts on Capitol Hill and because he has access to federal officeholders whether or not their clients have donated money to candidates, officeholders or parties. *See* Hickmott Dep. at 46–47, 50–51 [JDT Vol. 10]; *but see id.* at 50 (noting that his firm gives "contributions to establish relationships. Having those relationships in many ways then helps us get meetings and continue that relationship."); Andrews Cross Exam. at 19–20 [JDT Vol. 1] (acknowledging that some organizations gain access by means other than money, such as by using celebrity individuals).

1.75.1.3 Lobbyists maintain that "basic" or traditional lobbying activities are "alone insufficient to be effective in many instances in lobbying endeavors. To have true political clout, the giving and raising of campaign money for candidates and political parties is often critically important." Andrews Decl. ¶ 5 [DEV 6–Tab 1]; Murray Aff. in *Mariani* ¶¶ 6–7 [DEV 79–Tab 4] (testifying that "[a]long with each … legislative plan [a plan to 'advance the client's legislative agenda'], and essential to achieving the client's goals, I develop a parallel political financial support plan. In other words, I advise my clients as to which federal office-holders (or candidates) they should contribute and in what amounts, in order to best use the resources they are able to allocate to such efforts to advance their legislative agenda. Such plans also would include soft money contributions to political parties and interest groups associated with political issues."); *see also* Meehan Dep. in *RNC* at 40–41 [DEV 66–Tab 4] ("[P]ower and influence in Washington is not just the amount of soft money an industry contributes to the political parties. I would say that also it's the amount of PAC money that they contribute to the political candidates, it's

the amount of hard money they contribute, it's the amount of lobbying money that they expend in order to influence members of Congress."). Furthermore, testimony from lobbyists shows contributions help lobbyists gain access to lawmakers. Lobbyist Wright Andrews comments:

The amount of influence that a lobbyist has is often directly correlated to the amount of money that he or she and his or her clients infuse into the political system. Some lobbyists help raise large "soft money" donations and/or host many fundraising events for key legislators. Some simply represent a single client with very deep pockets and can easily reach into large corporate or union funds for "soft money" donations or other allowable expenditures that may influence legislative actions. Those who are most heavily involved in giving and raising campaign finance money are frequently, and not surprisingly, the lobbyists with the most political clout.

Andrews Decl. ¶ 12 [DEV 6–Tab 1]; *see also* Hickmott Dep. at 50 [JDT Vol. 10]. Andrews testifies that it has become a common practice for lobbyists to "host a number of fundraisers." Andrews Decl. ¶ 16 [DEV 6–Tab 1] He explains that "[w]hereas the political parties periodically organize 'gala' events in large ballrooms filled with hundreds of donors, lobbyists now often prefer attending smaller events hosted by other lobbyists, with only ten or fifteen people participating, all sitting at a dinner or breakfast table with the invited guest elected official. This type event allows lobbyists a better opportunity to build more personal relationships and to exchange views." *Id.*

1.75.2 Former and current Members of Congress testify that contributions provide donors with access to influence federal lawmakers. Former Senator Rudman describes the system bluntly:

Special interests who give large amounts of soft money to political parties do in fact achieve their objectives. They do get special access. Sitting Senators and House Members have limited amounts of time, but they make time available in their schedules to meet with representatives of business and unions and wealthy individuals who gave large sums to their parties. These are not idle chit-chats about the philosophy of democracy. In these meetings, these special interests, often accompanied by lobbyists, press elected officials—Senators who either raised money from the special interest in question or who benefit directly or indirectly from their contributions to the Senator's party—to adopt their position on a matter of interest to them. Senators are pressed by their benefactors to introduce legislation, to amend legislation, to block legislation, and to vote on legislation in a certain way. No one says: 'We gave money so you should do this to help us.' No one needs to say it—it is perfectly understood by all participants in every such meeting

. . . . .

Large soft money contributions in fact distort the legislative process. They affect what gets done and how it gets done. They affect whom Senators and House members see, whom they spend their time with, what input they get, and—make no mistake about it—this money affects outcomes as well

Rudman Decl. ¶¶ 7, 9 [DEV 8–Tab 34]. Senator Simpson testifies that groups used "to give to someone who was for your philosophy," but now "[i]t's giving so you can get access." Simpson Dep. at 11–12 [JDT Vol. 30]. Senator Boren finds the "comments some of [his] colleagues have made about the system are completely consistent with [his] own experience". For example, former Rep. Romano Mazzoli (D–Kentucky) said: "People who contribute

get the ear of the member and the ear of the staff. They have the access—and access is it. Access is power. Access is clout. That's how this thing works..." Similarly, Rep. Jim Bacchus (D–Fla.) has explained: "I have on many occasions sat down and listened to people solely because I know they had contributed to my campaign." Boren Decl. ¶ 7 [DEV 6–Tab 8] (citation omitted). Former Senator Simon attests:

Giving to party committees also helps you gain access to Members. While I realize some argue donors don't buy favors, they buy access. That access is the abuse and it affects all of us. If I got to a Chicago hotel at midnight, when I was in the Senate, and there were 20 phone calls waiting for me, 19 of them names I didn't recognize and the 20th someone I recognized as a $1,000 donor to my campaign, that is the one person I would call. You feel a sense of gratitude for their support. This is even more true with the prevalence of much larger donations, even if those donations go to a party committee. Because few people can afford to give over $20,000 or $25,000 to a party committee, those people who can will receive substantially better access to elected federal leaders than people who can only afford smaller contributions or can not afford to make any contributions. When you increase the amount that people are allowed to give, or let people give without limit to the parties, you increase the danger of unfair access.

Simon Decl. ¶ 16 [DEV 9–Tab 37]. Senator McCain notes:

At a minimum, large soft money donations purchase an opportunity for the donors to make their case to elected officials, including the President and Congressional leaders, in a way average citizens cannot. Many legislators have

been in situations where they would rather fit in an appointment with a soft money contributor than risk losing his or her donation to the party. Legislators of both parties often know who the large soft money contributors to their party are, particularly those legislators who have solicited soft money. Members of Congress interact with donors at frequent fundraising dinners, weekend retreats, cocktail parties, and briefing sessions that are held exclusively for large donors to the party. Donors or their lobbyists often inform a particular Senator that they have made a large donation. When, as a result of a Member's solicitation, someone makes a significant soft money donation, and then the donor calls the Member a month later and wants to meet, it's very difficult to say no, and few of us do say no. McCain Decl. ¶ 6 [DEV 8–Tab 29]; *see also* Shays Decl. ¶ 9 [DEV 8–Tab 35] ("Soft money donations, particularly corporate and union donations, buy access and thereby make it easier for large donors to get their points across to influential Members of Congress. The donors of large amounts of soft money to the national parties are well-known to the leadership and to many other Members of Congress. The access to elected officials that large donors receive goes far beyond an average citizen's opportunity to be heard.").

1.75.2.1 Defendant–Intervenors who testified in this case state that they personally do not provide special access to individuals or corporations that provide large contributions to parties, regardless of whether the donation is in federal or nonfederal funds. *See* Feingold Dep. at 116 [JDT Vol. 6] ("I cannot imagine a situation where ... I would meet with somebody because they gave soft money."); Snowe Dep. at 210–11 [JDT Vol. 31] (stating she has never given preferential access to any donor, federal or nonfederal, and that "[e]verybody has access to my office to the extent that I have time available"); Jeffords Dep. at 96–97 [JDT Vol. 11] (stating person's status as a donor to national party committee does not "affect [his] decisions as to who [he] meet[s] with or give[s] access to"); Meehan Dep. at 180 [JDT Vol. 22] (stating he provides no preferential access to nonfederal donors); Cross Exam. of Shays at 20–21 [JDT Vol. 29] (agreeing he "pretty much [has] an open door policy to meet people who want to talk to [him] about important legislative issues"). Given the efforts these Members of Congress have made over the past years to reform the political system, it is not surprising that they would have such policies. These Members, however, do not claim to speak for the rest of their colleagues.

1.75.3 Corporate donors testify that contributions provide access to influence lawmakers. Wade Randlett testifies that "many members of the business community recognize that if they want to influence what happens in Washington, they have to play the soft money game. They are caught in an arms race that is accelerating, but that many feel they cannot afford to leave or speak out against." Randlett Decl. ¶ 14 [DEV 8–Tab 32].

Chairman Gerald Greenwald[61] testifies that

labor and business leaders are regularly advised that—and their experience directly confirms that—organizations that make large soft money donations to po-

**61.** Mr. Greenwald is currently Chairman Emeritus of United Airlines, the largest employee majority-owned company in the United States. From 1994 through his retirement in 2000, he served as the Chairman and CEO of United. Prior to that, he was vice chairman at Chrysler Corporation and worked at Ford Motor Company. Greenwald Decl. ¶ 2 [DEV 6–Tab 16]

litical parties in fact do get preferred access to government officials. That access runs the gamut from attendance at events where they have opportunities to present points of view informally to lawmakers to direct, private meetings in an official's office to discuss pending legislation or a government regulation that affects the company or union.... [Some unions and corporations] give large soft money contributions to political parties—sometimes to both political parties—because they are afraid to unilaterally disarm. They do not want their competitors alone to enjoy the benefits that come with large soft money donations: namely, access and influence in Washington. Though a soft money check might be made out to a political party, labor and business leaders know that those checks open the doors to the offices of individual and important Members of Congress and the Administration, giving donors the opportunity to argue for their corporation's or union's position on a particular statute, regulation, or other governmental action. Labor and business leaders believe—based on experience and with good reason—that such access gives them an opportunity to shape and affect governmental decisions and that their ability to do so derives from the fact that they have given large sums of money to the parties.

Greenwald Decl. ¶¶ 10, 12 [DEV 6–Tab 16]; *see also* Hassenfeld Decl. ¶¶ 23–24 ("I think companies in some industries have reason to believe that because their activities are so closely linked with federal government actions, they must participate in the soft money system in order to succeed.") [DEV 6–Tab 17].

An Eli Lilly and Company memorandum states that its 1995–96 political "contributions and the related activities we have participated in have been key to our increased role and ability to get our views heard by the right policy makers on a timely basis; in other words, a smart investment." Eli Lilly and Company Memorandum (Jan. 15 1997), ODP0018–00481 to 86 [DEV 69–Tab 48].

1.75.4 The former Chairman of the DNC testifies that "[m]any contributors of large sums of moneyboth Republicans and Democrats—gain access to party and governmental officials that they otherwise would not have. With this access, contributors are able to make their cases to people who make public policy and take official governmental action." Fowler [62] Decl. ¶ 6 [DEV 6–Tab 13]

1.75.5 Individual donors testify that contributions provide access to influence federal officeholders on issues of concern to them. Steven Kirsch testifies that

[p]olicy discussion with federal officials occurs at major donor events sponsored by political parties. I have attended many such events. They typically involve speeches, question and answer sessions, and group policy discussions, but there is also time to talk to Members individually about substantive issues. For example, at a recent event. I was able to speak with a Senator representing a state other than California and we had a short conversation about how our respective staffers were working together on a particular issue.

Kirsch Decl. ¶ 12 [DEV 7–23]. Similarly, Peter Buttenwieser testifies:

Events, meetings and briefings held for soft money donors provide opportunities

---

**62.** Mr. Donald Fowler from 1971 until 1980, he served as Chairman of the South Carolina Democratic Party and from January 1995 un-til January 1997 he served as Chairman of the Democratic National Committee. Fowler Decl. ¶ 2 [DEV 6–Tab 13].

for the donors to hear speeches and engage in policy discussions with federal office holders. There is also a certain amount of politicking and lobbying at these events. This is true particularly in the side discussions, in which donors can approach office holders and discuss their issues.

Buttenwieser Decl. ¶ 25 [DEV 6–Tab 11]. He also observes that

[t]here is no question that those who, like me, make large soft money donations receive special access to powerful federal office holders on the basis of the donations. I am close to a number of Senators, I see them on a very consistent basis, and I now regard the Majority Leader as a close friend. I understand that the unusual access I have correlates to the millions of dollars I have given to political party committees, and I do not delude myself into thinking otherwise. Not many people can give soft money on that scale, and it naturally limits the number of those with that level of access.

*Id.* ¶ 22. Arnold Hiatt testifies that

[a]s a result of my $500,000 soft money donation to the DNC, I was offered the chance to attend events with the President, including events at the White House, a number of times. I was offered special access as a result of the contributions I had made, though I generally never took advantage of that access. One event that I did attend was a dinner at the Mayflower Hotel in Washington, D.C. in approximately March 1997 with President Clinton and Vice–President Gore. The dinner was for the largest donors to the DNC, about thirty people. I did not plan on attending but I went because several people urged me

to use the occasion to speak in favor of campaign finance reform. I used the opportunity to talk to the President about how the campaign finance system in this country had become a crisis, and argued that the crisis provided an opportunity for the President to provide some leadership. I don't think that we got the leadership I was seeking on the campaign finance issue, but I did get the chance to make a personal pitch to the President as a result of my donation.

Hiatt Decl. ¶ 9 [DEV 6–Tab 18]. Hiatt testifies that others in attendance also shared their views on policy matters of importance to them as the event was advertised as an opportunity to "give advice to the president." Hiatt Dep. at 119–21 [JDT Vol. 10]; *see also* Hassenfeld Decl. ¶ 12–13 [DEV 6–Tab 17] ("[W]hen given the opportunity, some donors try to pigeonhole or corner Members, in a less than diplomatic way, to discuss their issues at these events."); Geschke [63] Decl. ¶ 5 [DEV 6–Tab 14] (testifying that in connection with $50,000 in federal and nonfederal donations made to the DNC he and his wife attended a dinner of 10 to 12 people with President Clinton "last[ing] two or three hours, and consist[ing] primarily of a conversation about issues of importance to the nation and the President's program"); RNC 0026901 [IER Tab 7] (note from the director of the RNC's Team 100 program thanking a donor for "facilitating Dow [Chemical]'s generous contribution to the Republican Party. It's a timely donation as we head into the final hours of the campaign. Give me a call ... and we can figure out when is a good time to bring your Dow [Chemical] leadership into town to see [RNC Chairman] Haley [Barbour], [Senate Majority Leader Robert] Dole &

---

**63.** Mr. Charles Geschke is Chairman of the Board of Adobe Systems, Inc., which he co-founded in 1982. Geschke Decl. ¶ 1 [DEV 6–Tab 14]. Since 1994, Mr. Geschke estimates

that he has donated over $150,000 in federal funds to federal political committees, and over $18,000 in nonfederal funds to national party committees. *Id.* ¶ 3 [DEV 6–Tab 14].

[Speaker of the House] Newt [Gingrich].");
RNC 00031843 [IER Tab 7] (letter from
donor to RNC Chairman Jim Nicholson
telling him "I do feel I have benefited [sic]
from Team 100 in the audience it has
afforded me with party leaders"); RNC
0194817 [IER Tab 1.E] (letter from RNC
to a pharmaceutical company asking the
company for its opinion and suggestions on
the enclosed RNC "health care package"
and a $250,000 donation to join the RNC's
Season Pass program).

Thomas McInerney, a large contributor
to the Republican party, states that his
support for the Republican Party at the
national, state, and local levels is not de-
pendent upon gaining access to federal
officeholders. McInerney states that he
would support the Republican Party
whether or not he was solicited by a feder-
al officeholder and whether or not his con-
tribution resulted in attendance at an
event that included federal officeholders.
McInerney Aff. ¶ 17 [9 PCS]. Even so,
McInerney attests that he has been *offered*
access to federal officeholders in exchange
for his donations of nonfederal funds.
*Id.*[64]

*The Political Parties Facilitate Access to
Members of Congress for Their Large
Contributors*

1.76 Party leaders facilitate direct com-
munications on matters of policy between
nonfederal money donors and officehold-
ers. Several documents in the record
demonstrate this fact.

For example, a handwritten note dated
February 21, 1995 from RNC Chairman
Haley Barbour to [a major donor] stated,
in part: "Dear [_____]: Thank you for
your very thoughtful memo on the estate
and gift tax law. I've read it and will pass
it along to appropriate Senators, Repre-

sentatives and staff folks when I'm on the
Hill tomorrow." ODP0031–01403 to 04
[DEV 71–Tab 48]. A March 28, 1995,
letter from House Ways and Means Com-
mittee Chairman Bill Archer (R–TX) to
the donor thanked the donor for his "intri-
guing" proposal, noting Archer's personal
preference that the estate and gift taxes
be repealed completely. ODP0031–01412
[DEV 71–Tab 48]. A March 31, 1995 let-
ter from the donor to Team 100 Director
Timothy Barnes enclosed the donor's 1995
Team 100 membership check and request-
ed that Barnes provide Barbour with a
copy of Archer's March 28, 1995 letter.
ODP0031–01406 to 11 [DEV 71–Tab 48].
Team 100 membership requires a $100,000
donation every four years, with $25,000
donations in each intervening year. Find-
ings ¶ 1.77.1.

A handwritten note dated Oct. 27, 1995,
from RNC Chairman Haley Barbour asks
Senate Majority Leader Bob Dole to meet
with the CEO of Pfizer, a member of the
RNC's "Team 100" nonfederal money do-
nor group, to discuss an extension of the
Section 936 tax credit:

> Dear Bob
>
> [_____], CEO of Pfizer, has asked to see
> you on Wed. 11/1. He is extremely loyal
> and generous. He also is not longwind-
> ed. He'll tend to his business and not
> eat up extra time. They have proposed
> a [Internal Revenue Code § ] 936 solu-
> tion that [Republican Senator William]
> Roth and [Republican Congressman
> Bill] Archer are considering. I'm sure
> that is the issue. I'd appreciate it if
> you'd see Bill. [signed] Haley.

ODP0025–02456 to 57 [DEV 70–Tab 48].

A letter from the chairmen of the Con-
gressional Forum of the NRCC addressed

---

**64.** Mr. McInerney's affidavit includes state-
ments about his understanding of the legal
effect of New York campaign laws which is
irrelevant to the cases at bar. *See* McInerney

Aff. ¶ 8 [9 PCS]. His affidavit also contains
statements which suggest an incomplete un-
derstanding of the impact BCRA will have on
his campaign donations.

to the Association of Trial Lawyers of America discusses an upcoming Congressional Forum Chairman's Dinner, and notes: "[o]ur event will give you an excellent opportunity to meet with the Members of the [Judiciary Committee] to discuss issues relevant to your organization." ODP0042–00025 [DEV 71–Tab 48]; *see also* July 10, 1996 letter from John Palmer to [redacted addressee] (reminding addressee that Palmer had asked him to join the RNC's Team 100, and noting that RNC Chair Barbour escorted new Team 100 member and Energy CEO [_____] on four appointments that were "very significant" in legislation affecting companies like his and made him "a hero in his industry"), ODP0023–02043 [DEV 70–Tab 48]; RNC0044465 [DEV 93] (Memorandum from Tim Barnes of the RNC to Royal Roth noting that someone from [a company] had been "trying to establish a contact in Senator Dole's office for [a company executive]. As you know, [this executive] has been very generous to the RNC. If there is any way you can assist, it would be greatly appreciated."); ODP0030–03512 to 13 [DEV 71–Tab 48] (notes of telephone call between Jim Nicholson of the RNC and a Team 100 member, which states that Nicholson will take up an issue discussed with Senator Trent Lott); [DEV 71] Letter from RNC Chairman Jim Nicholson to [a donor], August 18, 1998, copies to House Speaker Newt Gingrich, House Majority Leader Dick Armey and Congressman John Linder ODP0033–00534(stating "I appreciate your interest in helping us hold onto our majority in the House. . . . I can tell you every single dollar of your contribution will go directly into *Operation Breakout*. . . . If you will make your check out (which can be personal or corporate) to the Republican National Committee and annotate it for *Operation Breakout* I will personally show a copy of it to Newt, Dick Armey and John Linder. Please feel free to accompany it with a transmittal letter containing any other message that you choose."); ODP0042–000654 (memorandum to all Congressional Forum members from the chairmen, informing them of an upcoming dinner featuring members of the Banking Committee, noting that "[o]ur event will give you an excellent opportunity to meet with members of the committee to discuss issues relevant to your organization"); ODP0042–01111 [DEV 71–Tab 48] (letter from NRCC to the Federal Managers' Association, noting an upcoming dinner where the addressee could express "interests and concerns regarding upcoming legislation"); RNC0156717 (letter from RNC to Senator Hagel staffer, asking Senator Hagel to meet with a donor for four "key" reasons including: "[h]e runs [sic] $80,000,000 high tech business," and "[h]e just contributed $100,000 to the RNC.").

In addition to these documents, the record includes corroborating testimony like that of former Senator Wirth who states:

The Democratic national campaign committees sometimes asked me to meet with large donors to the party whom I had not met before. At the party's request, I met with the donors. I understood that the donors' goal in making the large contributions was often to occasion meeting(s) with me or other prominent Democratic congressional leaders to press their positions on legislative issues. On these occasions, sometimes all I knew about the donor would be the issue in which he was interested.

Wirth Decl. Ex. A ¶ 15 [DEV 9–Tab 43]. Former DNC Chairman Donald Fowler testifies:

Party and government officials participate in raising large contributions from interests that have matters pending before Executive agencies, the Congress, and other government agencies. Party officials, who are not themselves elected officials, offer to large money donors

opportunities to meet with senior government officials. Donors use these opportunities—White House and congressional meetings—to press their views on matters pending before the government. Fowler Decl. ¶ 8 [DEV 6–Tab 13].

1.76.1 The RNC's Finance Director attests that the RNC does not arrange meetings with government officials for any of its donors—federal or nonfederal. B. Shea Decl. ¶ 44 [RNC Vol. V]. She states that the RNC Finance Division, "[a]s a matter of policy," passes along requests from donors for meetings with a federal officeholder to that officeholder's scheduling staff "without inquiring into the purpose of the proposed meeting," "neither ... advocate[s] a meeting nor ascertain[s] whether a meeting has been arranged," does not provide to the officeholder's scheduler the amount of the money that donor has contributed to the party. Id. at 44, 46. When asked about this policy during her cross-examination, Ms. Shea testified that the policy is an informal, unwritten policy. B. Shea Dep. at 80 [JDT Vol. 29]. She does not say whether this policy applies only to the RNC Finance Division or to the entire committee. Furthermore, the policy is more nuanced than Ms. Shea's declaration implies. According to Ms. Shea, the RNC Finance Division's "policy" is to not "force" federal officeholders to meet with donors, but that it may pass along requests to a Member's scheduler and say "this is a Team 100 member, could you see if you could fit them in." Id. at 82. Indicating that a person is a Team 100 member, which means they give the RNC $100,000 every four years, with $25,000 donations each intervening year, while not informing the scheduler of the precise amount of money the donor gave the RNC, does give the Member's office the message that the individual interested in a meeting is a major donor. See also supra, Findings ¶ 1.76 (other instances of RNC officials setting up meetings for major donors

with Members of Congress). Furthermore, as Senator Simon has stated, "Staffers who work for Members know who the big donors are, and those people always get their phone calls returned first and are allowed to see the Member when others are not." See supra Findings ¶ 1.66.

1.77 The political parties have structured their donation programs so that donors are encouraged to contribute larger amounts in order to get access to more exclusive and intimate events at which Members of Congress are present. The evidence also shows that the parties use the enticement of access to secure larger donations. For example, a letter from then-RNSC Chairman Senator McConnell explained that a $25,000 nonfederal fund donation would provide the donor membership in the NRSC's Chairman's Foundation whose benefits "include four to five small dinner meetings annually, each focused on a specific Senate Committee. The meetings consist of a briefing with the top committee staff members, followed by a reception and dinner with the staffers and Republican members of the committee to discuss the issues. Foundation members are also invited to all Senatorial Trust events which provide an additional four opportunities year to meet with our Republican Senate Majority." ODP0037–02271 [DEV 71–Tab 48].

1.77.1 RNC documents show that the RNC's donor programs offer greater access to federal office holders as the donations grow larger, with the highest level and most personal access offered to the largest soft money donors. ODP0018–00113 to 36 [DEV 69–Tab 48] (RNC Brochure "Donor Programs"); see also Resps. RNC to FEC's First RFA's, No. 62 [DEV 12–Tab 10]. The RNC offers its donors a range of different donor programs, for a range of different donor financial levels and interests. ODP0025–00375 to 79

[DEV 70–Tab 48] ("Summary of RNC's Donor Programs"). The RNC President's Club required a $1,000 annual contribution, or $2,000 per couple per year, and held a meeting in Washington, D.C. at least once a year which included policy briefings and discussions led by Republican political leaders. *Id.* at ODP0025–00375; B. Shea Decl. ¶ 14.b [RNC Vol. V]. The Chairman's Advisory Board required a $5,000 annual hard money contribution and offered a "vigorous and informal exchange of views among Board members and party leaders.... Board meetings include three or four panel discussions, each chaired by a Congressional leader or senior policy adviser with particular expertise in the area under consideration." ODP0025–00375 to 77 [DEV 70–Tab 48]. According to the document, the Chairman's Advisory Board was established "to enlist the personal energy and professional expertise of Republican leaders in business and community affairs in developing policy and campaign strategies at the highest levels for the party." ODP0025–00375 to 77 [DEV 70–Tab 48]. The Republican Eagles required an annual contribution of $15,000 (individual) or $20,000 (with spouse or nonfederal/corporate). *Id.* ODP0025–00377 to 0378, ODP0025–00429 [DEV 70–Tab 48]. The Eagles program offered a series of national and regional meetings with elected Republican Congressional leaders, special access to Republican events, and other benefits. ODP0025–00428 [DEV 70–Tab 48]; ODP0030–02838 to 39 [DEV 71–Tab 48]. The Team 100 program required a donation of $100,000 upon joining and every fourth year thereafter, with $25,000 donations required in each of the three intervening years. ODP0014–00983, ODP0014–01457 to 58 [DEV 69–Tab 48]. The Team 100 program offered members national and regional meetings with the Republican Party leadership throughout the year, special events, membership in the Eagles program, the opportunity to participate in international trade missions, and other benefits. ODP0025–00377, ODP0025–00424, ODP0025–01705 to 13 [DEV 70–Tab 48]. The Season Ticket program required a donation of $250,000 upon joining and renewals thereafter. ODP0022–03045 to ODP0022–3046, ODP0023–02480, ODP0025–01569 [DEV 70–Tab 48]; ODP0030–03408 [DEV 71–Tab 48]. The "Season Ticket" or "Season Pass" program offered the greatest and most exclusive range of RNC donor program benefits, including one Team 100 membership, two Eagle memberships, special access to a range of Republican Party events, and the assistance of RNC support staff. ODP0025–01569 [DEV 70–Tab 48]. The RNC also offers the Regents program designed for members who give an aggregate amount of $250,000 in nonfederal funds per two-year election cycle. B. Shea Decl. ¶ 14.g [RNC Vol. V].

1.77.2 The NRSC also offered several major donor programs. In 1995 and 1996, the NRSC offered a corporate donor program called "Group 21" or "G21," which required an annual donation of $100,000. ODP0037–02246, ODP0037–02275, ODP0037–02281 [DEV 71–Tab 48]. The "Group 21" program offered donors "small dinners with [then-NRSC Chairman] Senator D'Amato and other senators" and other "VIP benefits." ODP0037–02275 [DEV 71–Tab 48]. The Chairman's Foundation required an annual corporate (meaning nonfederal money) donation of $25,000. ODP0036–03603 [DEV 71–Tab 48]. The Senatorial Trust required an annual donation of $10,000 (personal) or $15,000 (corporate). ODP0036–03873 to 74 [DEV 71–Tab 48]. The Presidential Roundtable required an annual donation of $5,000 in personal or corporate funds. ODP0037–00315 [DEV 71–Tab 48]. *See also* ODP0036–03525 (letter signed by Senator McConnell to NRSC member asking him

to renew his membership, noting that "[y]our non-federal contribution to the Chairman's Foundation will allow us to put our federal dollars directly towards the Senate campaigns, where they are desperately needed."); ODP0036–3562 (letter signed by Senator McConnell thanking addressee for joining the Chairman's Foundation); ODP0036–03595 (letter signed by Senator McConnell soliciting someone to join the Chairman's Foundation); ODP0037–01861 to 69 (NRSC brochure) [DEV 71–Tab 48]; Vogel Decl. ¶ 51 ("The NRSC uses a variety of donor programs to motivate persons to donate funds. These programs tend to be associations of donors and fundraisers, who are grouped by the nature and extent of the funds given or raised."), Tabs A, J [DEV 9–Tab 41] (2002 Senatorial Trust materials).

1.77.3 "The DSCC hosts several different types of events to motivate persons to donate funds. These events are often attended by Democratic Senators, Democratic Senate candidates, other Democratic holders of federal office, Democratic Cabinet officials and other celebrities who neither seek nor hold federal office." Jordan Decl. ¶ 52 [DEV 7–Tab 21]. For example, during the 1996 election cycle, the DSCC offered memberships in its "Leadership Circle." COL0002–00698 [DEV 78–Tab 152]. Membership required a $10,000 annual contribution for individual donors, and $15,000 for PACs. Id. Benefits included "special Leadership Circle weekend retreats and issue seminars with Senators and Washington officials.... Leadership Circle members also receive tickets to the annual Senate Fall Dinner, followed by a day of issue oriented meetings with Senators and political experts." Id. The DSCC also offered memberships to its "Majority Trust," "the premiere donor program of the DSCC for individuals who contribute $20,000 per calendar year." Id. "The Majority Trust offers important programs, weekends and retreats throughout the year attended by Democratic Senators." Id. The DSCC also solicits donations for special events. For example, for the DSCC's 1999 Annual Fall Dinner, a $50,000 nonfederal donation bought the donor benefits including a priority table at the dinner and one ticket to the VIP Reception. Jordan Decl. Attach. L (DSCC–L–0025).

1.77.4 The NRCC offers individuals or PACs that contribute $15,000 annually, or corporations that give $20,000 annually, membership in its Congressional Forum which "has been designed to give its members an intimate setting to develop stronger working relationships with the new Republican Congressional majority," ODP0042–01226 [DEV 71–Tab 48], and the "benefit that attracts most Forum members are the dinners with Committee Chairmen and the Republican members from each Committee," ODO0042–00028 [DEV 71–Tab 48]. These dinners "average about 75 people including Members—that means at least two Committee Members at every table." ODP0042–00171 to 72 [DEV 71–Tab 48]. "In addition to the monthly dinners, we offer two annual meeting weekends, a golf tournament and a dinner with the Elected Leadership and all the Committee Chairs is included as a benefit of .... Forum membership." Id. Forum benefits also include all the Benefits of the NRCC's House Council program. ODP0042–01226 [DEV 71–Tab 48]; see also ATT 000018 [DEV 7–Tab 20] (invitation to 1999 Republican Senate–House Dinner, with escalating benefits including meetings, receptions and a breakfast with Congressional leaders).

1.77.5 "The DCCC uses a variety of donor programs to motivate persons to donate funds. These programs tend to be associations of donors and fundraisers, who are grouped by the nature and extent of the funds given or raised." Wolfson Decl. ¶ 53 [DEV 9–Tab 44]. For the 2002

election cycle, the DCCC's "Major Donor Programs" included the Business Forum, which required an annual contribution of $10,000. *Id.* at Tab J (DCCC–J–0007). Business Forum Members' benefits included "[b]i-monthly political briefings and receptions with the House Democratic Leadership and other Democratic pro-business Members in the House of Representatives[, an a]nnual retreat with Chairwoman Lowey and the House Democratic Leadership[, an] annual Democratic Congressional Dinner event package[, and a] bi-monthly conference call/briefing with Leader Gephardt and Chairwoman Lowey". *Id.* (capitalization altered). The Majority Council required a $50,000 annual contribution, and included the bi-monthly conference call, "complementary invitations to all DCCC fundraising events, including the Annual Democratic Congressional Dinner with private reception and political briefing[, and] complementary invitations to Premiere Retreats with Leader Gephardt, Chairwoman Lowey, House Democratic Leadership and Ranking Members". *Id.* (capitalization altered). Membership to the National Finance Board required a $100,000 annual contribution, and included as benefits all of the "Majority Council" benefits as well as "two private dinners with Leader Gephardt, Chairwoman Lowey, House Democratic Leadership and Ranking Members[ and] two retreats with Leader Gephardt and Chairwoman Lowey in Telluride, CO and Hyannisport, MA." *Id.* (capitalization altered).

1.77.6 The state parties also use the promise of access to federal lawmakers to encourage larger donations. *See, e.g.,* CDP 0098 [DEV 106] (CDP brochure showing that those who contribute $100,000 to the CDP are classified by the party as "Trustees," and that the CDP "recognizes its extraordinary supporters with extraordinary opportunities," providing "Trustees" with "[e]xclusive briefings,

receptions and meetings with officials such as U.S. Senator Dianne Feinstein, U.S. Senator Barbara Boxer, Lt. Governor Gray Davis, Controller Kathleen Connell and other national figures."); CRP–00269 (flyer titled "The California Golden Circle," noting that "[t]hrough Golden Circle contributions, California Republicans have been able to elect leaders from the White House to the State House," that Golden Circle members will assist the CRP "goal . . . to deliver fifty-five electoral votes for our Republican Presidential nominee in 2004, maintain a Republican majority in Congress, and elect a Republican Legislature," and including among Golden Circle "Membership Benefits" "private receptions/meetings held throughout California with local, state and national Republican leaders to discuss current political issues").

1.77.7 Contributors request to be seated with certain lawmakers at these donor events. For example, an RNC "Table Buyer's Guest List" sheet for "The Official 1995 Republican Inaugural Gala" filled out by "Am. Banker's Ass'n/Nation's Bank" contained a request to sit with certain Members of Congress and "anyone on House Banking Comm." ODP0023–3288 [DEV 70–Tab 48]; *see also* 2000 RNC Gala Leadership Levels, undated, RNC0022509 [DEV 92]; 2000 RNC Attendance Forms, April 20, 2000, RNC0236323 [DEV 97] (filled out by Microsoft attendee requesting to be seated with a particular Senator or "Leadership Commerce Comm. or Judiciary"); RNC0145258 [DEV 93] (filled out by Chevron corporation attendee, requesting to be seated with a Member from California, Louisiana or Texas); RNC0202199 [DEV 96] (filled out for the MBNA table, requesting to be seated with five particular Senators); RNC0202200 [DEV 96] (filled out for the Reliant Resources, Inc. table, asking to be seated with one specific Representative and five named Senators); RNC 0032805—06, RNC 0032799 [DEV

92] (request for Burger King Chairman and Team 100 member who donated $100,000 to be seated with Senator Fred Thompson and three other Senators, and document showing Senator Thompson was placed at the Burger King table). PhRMA's Judith Bello testifies that the five Members of Congress PhRMA listed as requested "VIP" to be seated at its table at the 2000 Republican House–Senate dinner were all Members who had responsibility or oversight over issues of importance to the pharmaceutical industry. Bello Dep. at 82 [JDT Vol. 1].

1.77.8 The political parties have used such opportunities to promote their various donor clubs. For example, Senator McConnell, as head of the NRSC, wrote a solicitation letter which noted that the Republican Senate Council ($5,000 annual PAC contribution) and the Chairman's Foundation ($25,000 annual corporate gift) provide "excellent opportunities for both corporate executives and Washington representatives to meet and discuss current issues with leading Republican Senators." ODP0036–03603 [DEV 71–Tab 48]; *see also* RNC 0286400 [IER Tab 4] (offering $250,000 donors to the RNC Gala Co–Chairman status which included a "Breakfast and Photo Opportunity with [Senate Majority Leader] Trent Lott and [Speaker of the House] Newt Gingrich," as well as a "Luncheon with Republican House and Senate Leadership and the Republican House and Senate Committee Chairmen of your choice").

1.77.9 According to lobbyist Robert Rozen:

[S]oft money contributions built around sporting events such as the Super Bowl or the Kentucky Derby, where you might spend a week with the Member, are even more useful. At the events that contributors are entitled to attend as a result of their contributions, some contributors will subtly or not-so-subtly discuss a legislative issue that they have an interest in. Contributors also use the events to establish relationships and then take advantage of the access by later calling the Member about a legislative issue or coming back and seeing the Member in his or her office. Obviously from the Member's perspective, it is hard to turn down a request for a meeting after you just spent a weekend with a contributor whose company just gave a large contribution to your political party. Rozen Decl. ¶ 11 [DEV 8–Tab 33]; *see also* COL0002–00698 (flyer listing DSCC Donor Programs, and including as part of its Majority Trust 1996 program, "a weekend in Aspen, CO in January, Superbowl weekend, Mardi Gras with Senator Breaux, a Jefferson Weekend in Charlottesville, VA in June, and the annual summer retreat on Nantucket Island in July.").

1.77.10 Sometimes the link between large donations and special access to elected federal officials is even more direct. A call sheet prepared for then-DNC Chair Fowler instructs him to call a number of large contributors ask for donations, and invite them for lunch with the President of the United States ("POTUS"). DNC 113–00137 to 38 [DEV 134–Tab 7] ("Ask her to give 80k more this year for lunch with Potus on October 27th.") ("Ask him to write another 100K to become a Managing Trustee for the campaign and come to lunch with POTUS on Oct. 27."). A CDP call sheet entitled "Child Call List, 5/16/96," includes the notation that a potential donor should be asked "if they might be able to do $25,000 for a small mtg with the President, you know it's steep, but want to include them in these types of meetings." CDP 00124 [IER Tab 11].

*Nonfederal Donations are More Effective than Federal Contributions at Procuring Access for Donors*

1.78 Donors give nonfederal money, rather than federal money, to political par-

ties because large nonfederal donations are more effective for obtaining access to federal officials than several small federal contributions. *See, e.g.,* Hickmott Decl., Ex. A. ¶ 47 [DEV 6–Tab 19] (explaining that "[i]f you want to get to know Members of Congress, or new Members of Congress, it is more efficient to write a $15,000 check to the DSCC and to get the opportunity to meet them at the various events than it would be to write fifteen $1,000 checks to fifteen different Senators, or Senators and candidates."); Andrews Decl. ¶ 14 [DEV 6–Tab 1] (stating that "a properly channeled $100,000 corporate soft money donation to the national Republican or Democratic congressional campaign committees can get the corporate donor more benefit than several smaller hard dollar contributions by that corporation's PAC. Although the donations are technically being made to political party committees, savvy donors are likely to carefully choose which elected officials can take credit for their contributions. If a Committee Chairman or senior member of the House or Senate Leadership calls and asks for a large contribution to his or her party's national House or Senate campaign committee, and the lobbyist's client is able to do so, the key elected official who is credited with bringing in the contribution, and possibly the senior officials, are likely to remember the donation and to recognize that such big donors' interests merit careful consideration."); Randlett Decl. ¶ 13 [DEV 8–Tab 32] ("[Soft money donors] get a level of attention that a $1,000 hard money donor never will. Even someone who wrote 25 $1,000 hard money checks but no soft money is going to get much less attention and appreciation than someone who wrote one large soft money check."); Rozen Decl. ¶ 12–13 [DEV 8–Tab 33] ("Donors to the national parties understand that if a federal officeholder is raising soft money—supposedly 'non-federal' money—they are raising it for federal

uses, namely to help that Member or other federal candidates in their elections. Many donors giving $100,000, $200,000, even $1 million, are doing that because it is a bigger favor than a smaller hard money contribution would be. That donation helps you get close to the person who is making decisions that affect your company or your industry. That is the reason most economic interests give soft money, certainly not because they want to help state candidates and rarely because they want the party to succeed. . . . The bigger soft money contributions are more likely to get your call returned or get you into the Member's office than smaller hard money contributions."); Geschke Decl. ¶ 9 [DEV 6–Tab 14] ("Corporations and individuals can use soft money donations to get special access to federal office holders and at least the appearance of influence on issues that are important to them financially or politically. Hard money contributions do not provide the same opportunities for influence on federal policy as soft money donations do."); Simon Decl. ¶ 16 [DEV 9–Tab 37] ("Because few people can afford to give over $20,000 or $25,000 to a party committee, those people who can will receive substantially better access to elected federal leaders than people who can only afford smaller contributions or can not afford to make any contributions."); Kirsch Decl. ¶ 9 [DEV 6–Tab 14] ("Corporations and individuals can use soft money donations to get special access to federal office holders and at least the appearance of influence on issues that are important to them financially or politically. Hard money contributions do not provide the same opportunities for influence on federal policy as soft money donations do.").

1.78.1 In a memorandum to a high-level Fortune 100 company executive outlining a proposed $1.4 million nonfederal fund budget for FY 1999, members of the Company's governmental affairs staff noted that

[w]ith both houses of Congress and the White House hotly contested this cycle, the importance of soft money, and consequently the efforts by the parties to raise even more soft money, is greater than ever. On the Democratic side, [our company's] advocates have already fielded soft money calls from House Democratic Leader Gephardt, House Democratic Caucus Chairman Frost, Democratic Congressional Campaign Chairman Kennedy, and Democratic Senatorial Campaign Chairman Torricelli. Similar contacts to raise soft money have been made by Republican congressional leaders.

In addition to the increased pressure from party and congressional leaders, it is clear that our direct competitors and potential competitors are weighing in with big soft money donations.

Memorandum from a Fortune 100 company's legislative advocate to a high-level executive, dated March 4, 1999, [citation sealed]. The nonfederal budget request was justified by a number of rationales:

First, due to a significant [sic] in the number of events scheduled by the parties for their donors, the number of opportunities ... to develop relationships with elected and administration officials has never been greater. As the parties compete more vigorously for soft money dollars, the number and quality of events for interacting with both the leadership and rank and file Members has been greatly increased. Between the six main committees (DNC, DSCC, DCCC.RNC, NRCC, NRSC) there are events both in and out of [Washington, D.C.] almost every day of the week. Two, ... the parties have become increasingly reliant on soft money and both feel it is critical to their success in coming elections. Not surprisingly, this has made the parties especially sensitive to which companies contribute soft money, and which don't. As noted, our traditional competitors continue to contribute large amounts of soft money and as [our company] expands its business into new areas (e.g. cable, internet, networking) it faces new types of competitors, primarily in the computer and high tech industry, that also contribute heavily. Failure to maintain our soft money participation during this election cycle— given the heightened scrutiny those contributions will receive in the current competitive climate—*may* give our new and traditional competitors an advantage in Washington.

Three, the next Administration will also be determined in this election cycle. Consequently, we will be asked to use soft money contributions to support both national parties at an even greater level than during a non-Presidential year. Funding for the national conventions and next year's national party committee requests should be anticipated in this year's budget and contributed when appropriate to foster the development of relationships with the key officials of the next Administration. Finally, because both parties will be working to influence redistricting efforts during the next two years, we anticipate that we will be asked to make soft money contributions to these efforts. Redistricting is a key once-a-decade effort that both parties have very high on their priority list. Given the priority of the redistricting efforts, relatively small soft money contributions in this area could result in disproportionate benefit.

*Id.*

*Donors Often Contribute Nonfederal Funds to Both Major Political Parties in Order to Ensure Access and Prevent Retaliation*

1.79 The record shows that many large contributors give to both political parties.

Forty of the top 50 nonfederal money donors in 1996 donated to both political parties, as did 35 of the top nonfederal money donors in 2000. Mann Expert Report at Tbls. 5–6 [DEV 1–Tab 1]. Most of the top nonfederal contributors who gave to only one political party were either state political party committees (four in 1996) or labor unions (three in 1996, seven in 2000). *Id.* Those involved in political fundraising explain that this practice is a result of donors' desire to have special access to lawmakers from both parties, and also out of concern that if the contributor gives to only one political party the other will perceive an imbalance and punish the donor.

Evidence from the corporate world demonstrates that major nonfederal donors give to both political parties in order to ensure access to lawmakers from both political parties. CEO Randlett comments that "[a]s a donor with business goals, if you want to enhance your chances of getting your issues paid attention to and favorably reviewed by Members of Congress, bipartisanship is the right way to go. Giving lots of soft money to both sides is the right way to go from the most pragmatic perspective."

Internal corporate documents corroborate Mr. Randlett's testimony. An Eli Lilly and Company memorandum shows that the company was concerned about a *Washington Post* article listing it as a significant donor to the Republican party. The memorandum discusses contributions being made at Democratic party events occurring in the near future. The memorandum concludes with: "[____] has talked to the White House and we can get back into this by giving $50[,000]—100,000 to the DNCsays they would be pleased with this." ODP0018–00463 [DEV 69–Tab 48]; *see also id.* at ODP0018–00461 (the *Washington Post* article), ODP0018–00462 (photocopy of part of the article with handwritten note stating "Dems are upset. Calls

from employees about imbalance. White House stays Dem we are in trouble"). Similarly, an internal Fortune 100 company memorandum states the following:

> Attached please find an invoice from the NRSC for [our company's] commitment of $25,000 in soft money. As you know, this request was approved during the PAC meeting this week. We recently approved a soft money donation to the New Dominion Fund, requested by Senator Chuck Robb. At the time this request was approved, the team determined that our support in this race would be equal. The request attached balances [our company's] support in this race, as a contribution to the RNSC has been requested by George Allen.

Internal memorandum (Oct. 26, 2000), [citation sealed].

One lobbyist explains that many "companies and associations that do give soft money typically contribute to both parties . . . because they want access to Members on both sides of the aisle." Rozen Decl. ¶ 7 [DEV 8–Tab 33]. Members of Congress are also cognizant that donors give nonfederal funds to both parties. As former Senator Bumpers observes: "Giving soft money to both parties, the Republicans and the Democrats, makes no sense at all unless the donor feels that he or she is buying access." Bumpers Decl. ¶ 15; *see also id.* (noting that the "business community makes such donations quite often").

Individual donors also acknowledge that nonfederal money donors give to both parties in order to ensure special access to federal lawmakers on both sides of the aisle. Hiatt Decl. ¶ 12 [DEV 6–Tab 18] (testifying "[p]eople give soft money donations to both parties because they want to make sure they have access regardless of who's in the White House, filling the Senate seat, or representing the Congressional district."); Buttenwieser Decl. ¶ 23 [DEV

6–Tab 11] ("I am aware that some soft money donors, such as some corporations, give substantial amounts to both major political parties. Based on my observations, they typically do this because they have a business agenda and they want to hedge their bets, to ensure they get access to office holders on the issues that are important to them. This occurs at the national and state levels."); Geschke Decl. ¶ 10 [DEV 6–Tab 14] ("In my view, donors who give large amounts of soft money to both major parties are probably hedging their bets in trying to get influence. They may feel that influence with one party is not sufficient to achieve their financial or policy goals, especially now that power in Congress is pretty evenly balanced.").

1.80 The political parties are aware of this practice, as evidenced by an Ohio Republican Party document titled "Why People Give," which lists "so that they will have access to whoever is the winner" as one reason behind contributions. RNC OH 0418778 [IER Tab 1.H]. The record demonstrates that they have parlayed this knowledge into leverage which they use to pressure donors who have given to the other party to give to theirs as well. CEO Randlett explains how the political parties take advantage of this situation:

> [I]f you're giving a lot of soft money to one side, the other side knows. For many economically-oriented donors, there is a risk in giving to only one side, because the other side may read through FEC reports and have staff or a friendly lobbyist call and indicate that someone with interests before a certain committee has had their contributions to the other side noticed. They'll get a message that basically asks: "Are you sure you want to be giving only to one side? Don't you want to have friends on both sides of the aisle?" If your interests are subject to anger from the other

side of the aisle, you need to fear that you may suffer a penalty if you don't give. First of all, it's hard to get attention for your issue if you're not giving. Then, once you've decided to play the money game, you have to worry about being imbalanced, especially if there's bipartisan control or influence in Washington, which there usually is. In fact, during the 1990's, it became more and more acceptable to call someone, saying you saw he gave to this person, so he should also give to you or the person's opponent. Referring to someone's financial activity in the political arena used to be clearly off limits, and now it's increasingly common.

Randlett Decl. ¶ 12 [DEV 8–Tab 32].

1.80.1 Plaintiffs maintain that the record "establishes that organizations and individuals may give to both parties because they desire to be actively involved in the political process." RNC Proposed Findings of Fact ¶ 119 (citing Bello Dep. at 39 [stating that it is "traditional" for PhRMA to "support the convention activities for both Republicans and the Democrats" because "we are good civic participants"] and Hermson [65] Dep. at 495 [DEV 65] [acknowledging "it is possible" that "donors of soft money provide money to political parties because they support some members of . . . one party, and some members of another party"]). This self-serving statement of a PhRMA representative and Dr. Herrnson's acknowledgment that a hypothetical scenario was possible, support the RNC's contention that "organizations and individuals *may* give to both parties because they desire to be actively involved in the political process." The extensive testimony and documentary evidence discussed *supra*, however, shows that the primary reason why entities and individuals *do* give to both parties is to ensure access to federal lawmakers. Moreover, interests

---

**65.** Professor Paul Herrnson is one of Defendant's experts.

in participating in the political process and an interest in obtaining access to legislators to influence them are neither incompatible nor mutually exclusive.

*Empirical Evidence Linking Donations to Corruption*

1.81 Experts testifying in this case agree that no study attempting to statistically or empirically link donations to corruption by federal officials is without flaws. However, even if these studies were universally accepted, it is clear that they would be of limited utility for the purposes of this case. As Defendants' expert Thomas Mann notes, "[m]ost of this research has examined the connections between PAC contributions (a surrogate for interested money) and votes in the House and Senate." Mann Expert Report at 32 [DEV 1–Tab 1]. However, as Mann observes, there are

> a myriad of ways in which groups receive or are denied favors beyond roll-call votes. Members can express public support or opposition in various legislative venues, offer amendments, mobilize support, help place items on or off the agenda, speed or delay action, and provide special access to lobbyists. They can also decline each of these requests.

*Id.* at 33 (citations omitted). In addition, Mann notes that the

> currency of campaign contributions extends well beyond PAC contributions to members' campaign committees. These include brokered if not bundled individual contributions, contributions to leadership PACs controlled by members, contributions to parties and candidates in

targeted races and informally credited to members, soft-money contributions to parties and section 527 committees connected to members, and direct expenditures on 'issue ad' campaigns.

*Id.* at 34. Mann concludes that the "ways and means of potential influence (and corruption) are much more diverse than those investigated in the early scholarly research." *Id.* at 34.[66] Many of these studies also suffer from the fact that the interactions between donations and legislative action are difficult to observe. *See, e.g.,* Sorauf Cross Exam. at 132 [JDT Vol. 31]; *see also* Appendix ¶ III (for more analysis of these studies).

*Summary*

1.82 The immense quantity of testimonial and documentary evidence in the record demonstrates that large nonfederal contributions provide donors special access to influence federal lawmakers. This access is shown to be coveted by these donors because it provides them the opportunity to have their voices heard and to influence legislation on policy matters of concern to them. Testimony from lobbyists, major donors, federal lawmakers and political party officials, as well as internal political party and corporate documents, shows that donors expect to receive this access, that this expectation is fostered by the political parties and federal lawmakers, and that special access is in fact provided to major donors. Corroborating this evidence is the fact that nonfederal money donors often give to both political parties, which demonstrates that in many cases,

---

**66.** Mann notes that where the variables of "[p]arty, ideology, constituency, mass public opinion and the president . . . . are less significant, there is evidence that interest group contributions, particularly to junior members of Congress, have influenced roll call votes—for example, on financial services regulation." Mann Expert Report at 32–33 [DEV 1–Tab 1] (citing Thomas Stratmann, Can Special Inter-

ests Buy Congressional Votes? Evidence from Financial Services Legislation). Paper (prepared for delivery at the 2002 Annual Meeting of the American Political Science Association, Boston, 29 August—1 September), available from the APSA Proceedings Web site: http://apsaproceedings.cup. org/Site/papers/022/022023 StratmannT.pdf.2002.

large nonfederal donations have less to do with political philosophy than with obtaining access to power. The record also makes clear that the best method of obtaining special access to federal lawmakers is through large nonfederal donations, rather than smaller donations under the federal campaign finance regime.

The political parties have taken advantage of the desire of donors for special access by structuring their entire fundraising programs to entice larger donations with the promise of increased and more intimate access to federal officials. The political parties have also pressured donors to give donations, playing off donors' fears of denial of access or political retribution. From this record it is clear that large donations, particularly unlimited nonfederal contributions, have corrupted the political system. This fact has not been lost on the general public, as is explored *infra*.

### Public Perception of Corruption

1.83 The record demonstrates that the public believes there is a direct correlation between the size of a donor's contribution to a political party and the amount of access to, and influence on, the officeholders of that political party that the donor enjoys thereafter.

1.83.1 A research poll of 1,300 adult Americans conducted by two prominent political pollsters, Mark Mellman [67] and Richard Wirthlin,[68] finds that the public perceives that large donations as having a corrupting influence on federal officeholders.[69] *See* Mellman and Wirthlin Report [DEV 2–Tab 5].

---

**67.** Mark Mellman is "CEO of The Mellman Group, a polling and consulting firm.... Mellman has helped guide the campaigns of some fifteen U.S. Senators, over two dozen Members of Congress, and three Governors, as well as numerous state and local officials. In addition, Mellman works with a variety of public interest organizations ... and corporate clients ... He has served as a consultant on politics to CBS News, a presidential debate analyst for PBS, a contributing analyst for The Hotline, National Journal's daily briefing on politics, and is currently on the faculty of The George Washington University's Graduate School of Political Management." Mellman and Wirthlin Report at 2 [DEV 2–Tab 5].

**68.** Richard Wirthlin is "Chairman of the Board of Wirthlin Worldwide", a strategic opinion research firm he founded in 1969, which now is one of the top companies in its field. Wirthin is perhaps best known as President Reagan's strategist and pollster.... Mellman and Wirthlin Report at 2–3 [DEV 2–Tab 5]. He is widely respected in the "field of social science research and one of this country's most respected political and business strategists." *Id.* Wirthlin "was chief strategist for two of the most sweeping presidential victories in the history of the United States. In 1981 he was acclaimed Adman of the Year by Advertising Age for his role in the 1980 campaign and in 2001 was one of four Republicans awarded American University's 'outstanding contribution to campaign consulting.' In the same year, he was designated 'Pollster of the Year' by the American Association of Political Consultants." *Id.* at 3. The *Washington Post* named Wirthlin "the prince of pollsters" and George Gallup, Jr. said Wirthlin is "one of the very best at our craft." *Id.*

**69.** The survey was conducted over a period of five days (August 28, 2002 through September 1, 2002), and the pollsters made an average of 4.58 dialings per telephone number in the sample set in order to ensure that the sample was representative. *See* Mellman and Wirthlin Report at 22–23 [DEV 2–Tab 5]. The study's contact rate was 38 percent, more than double the industry average of 15 percent. *Id.* at 23. The rate of refusal of the respondents who refused to be polled was within the normal range for a random telephone survey conducted in the United States. *Id.* The pollsters took several steps to avoid bias. *Id.* at 24; *see also* Wirthlin Cross Exam. at 40 (explaining that the pollsters took steps to avoid bias by randomly ordering the questions, "so that there is no sequence developed where one question may, if always asked in the same order, affect[] the second question."). The statistical margin of sampling

Mellman and Wirthlin conclude that "[a] significant majority of Americans believe that those who make large contributions to political parties have a major impact on the decisions made by federally elected officials." In addition, Mellman and Wirthlin find that many Americans believe that the "views of these big contributors sometimes carry more weight than do the views of constituents or the best interests of the country." *Id.* at 6 [DEV 2–Tab 5]. The major findings of their poll include:

- Seventy-seven percent of Americans believe that big contributions to political parties have at least some impact on decisions made by the federal government. Fifty-five percent thought big contributions had a great deal of impact; 23 percent thought such donations had some impact. *Id.*
- Seventy-one percent of Americans "think that members of Congress sometimes decide how to vote on an issue based on what big contributors to their political party want, even if it's not what most people in their district want, or even if it's not what they think is best for the country." *Id.* at 7.
- A "large majority (84%) think that members of Congress will be more likely to listen to those who give money to their political party in response to their solicitation for large donations." *Id.* at 8.
- "Over two-thirds of Americans (68%) . . . think that big contributors to political parties sometimes block decisions by the federal government that could improve people's everyday lives." *Id.* at 8.
- "[A]bout four in five Americans think a Member of Congress would be likely to give special consideration to the opinion of an individual, issue group, corporation, or labor union who donated $50,000

or more to their political party (81%) or who paid for $50,000 or more worth of political ads on the radio or TV (80%). By contrast, only one in four Americans (24%) think that a member of Congress is likely to give the opinion of someone like them special consideration." *Id.* at 9.

1.83.1.1 The Mellman and Wirthlin Report did not measure the public's understanding of the campaign finance system, and did not ask if the respondents understood the difference between nonfederal and federal donations. *See* Cross Exam. of Mellman at 31–35 [JDT Vol. 22]. Mellman testifies that the purpose of the poll was to measure the public's perceptions. *Id.* at 31. According to Plaintiffs' expert, Q. Whitfield Ayres, the public does not understand the distinction between federal and nonfederal donations and is not aware of campaign finance regulations. *See* Ayres Expert Report ¶ 8(a). Dr. Shapiro, an expert for Defendants, responds that

[t]he public does not need detailed knowledge about . . . the nuances of existing campaign finance regulations, and the extent to which these regulations are enforced in order to form strong opinions toward campaign finance. The public can easily understand how political donations can lead to political access and influence—how political parties and politicians will pay attention to those who give money to the parties. The public has long questioned the motivations of, and responded with distrust toward labor unions, corporations, special interests more generally, and the government itself. The public is especially troubled and animated by these problems when they become blatantly visible in widely publicized incidents and

---

error, that is, the error due to sampling versus if the pollsters talked to every American in the United States, is 2.7 percentage points:

the actual opinions of Americans will be within 2.7 percentage points of those reported in the study 95 percent of the time. *Id.* at 22.

scandals such as those involving Enron and the large soft money donations to the Democratic Party and the roles played by the Clinton Administration, President Bill Clinton, and Vice President A1 Gore.

Shapiro Rebuttal Report at 9 [DEV 5–Tab 2] (citations omitted). Mr. Ayers also comments that his research finds that "every conclusion that the Wirthlin–Mellman report reached about 'large' or 'big' contributions and contributors applies with equal force to the new, hard money limits in the BCRA." Ayers Rebuttal Report at 4 [RNC Vol. VIII]. Mr. Wirthlin notes that what Mr. Ayers' research demonstrates is that "in the eyes of most Americans ... $50,000 is considered [a] large" contribution, but comments that if that is the case then the nonfederal donations given in the past which far exceed $50,000 would be viewed as even larger. Wirthlin Cross Exam. at 148, 155 [JDT Vol. 32]. And, "as you move up the scale, there's going to be pretty close to unanimity on what constitutes big in the form of campaign contributions." Mellman Cross Exam. at 69 [JDT Vol. 22].

1.83.2 The results of the Mellman–Wirthlin study are confirmed by the research of Robert Shapiro, a professor at Columbia University, who analyzed public perception of nonfederal money contributions to political parties by reviewing all publicly available opinion survey data sources. Shapiro Expert Report at 7–8. [DEV 2–Tab 6]. The survey data Shapiro examined was comprised mostly of telephonic opinion polls. *Id.* at 8. Specifically, Shapiro focused on "public opinion data based on responses to surveys that were fielded since 1990" to determine the public's answers to several questions, including two questions which read: "To what degree has the public perceived corruption in politics connected to the influence of money and large campaign donations?" and "What have been the public's percep-

tions and opinions toward the substantial political donations in the form of soft money contributions to political parties?" *Id.* at 3, 8. According to Shapiro, poll results show that the "public has opposed large unregulated soft money contributions to political parties [and] that the public has been troubled by large soft money donations." *Id.* at 13. In addition, Shapiro concluded that the poll data showed "that a substantial proportion of the public has perceived corruption in the political system, and that we have been losing ground." *Id.* at 11.

1.83.3 Former and current Members of Congress testify that their constituents believe that these large contributions to parties present an appearance of corruption. *See* Simpson Decl. ¶ 14 [DEV 9–Tab 38] (testifying that "[b]oth during and after my service in the Senate, I have seen that citizens of both parties are as cynical about government as they have ever been because of the corrupting effects of unlimited soft money donations."); 144 S. Cong. Rec. S1041 (Feb. 26, 1998) (statement of Sen. Baucus) (stating that "[p]eople tell me they think that Congress cares more about 'fat cat special interests in Washington' than the concerns of middle class families like theirs. Or they tell me they think the political system is corrupt."); 146 Cong Rec. S4262 (May 23, 2000) (statement of Sen. Feingold) (stating that "[t]he appearance of corruption.... We all know it's there. We hear it from our constituents regularly. We see it in the press, we hear about it on the news."); Letter from Representative Asa Hutchinson to RNC Chairman Nicholson dated July 9, 1997, ODP0014–00003–4 (declining to support Nicholson's proposed campaign finance legislation because Hutchinson had to balance Nicholson's concerns "with a concern of my constituents which is that their influence in politics is being diminished by the abuses of soft money .... If our party is

unable to enact meaningful campaign finance reform while we're in control of Congress, then I believe this failure to act will result in more cynicism and create a growing lack of confidence in our efforts."); Congressman Meehan Decl. in *RNC* ¶¶ 15–17 [DEV 66–Tab 4] (stating that "there is a strong feeling in my [Congressional] district that soft money is corrupting the political process and influencing elections. My constituents feel that very large donations to the party committees, on the order of twenty-five, fifty or one hundred thousand dollars from one company or individual, have a corrupting influence."); Rudman Decl. ¶ 13 [DEV 8–Tab 34] ("The soft money system not only distorts the legislative process, it breeds deep cynicism in the minds of the public. I know this from my own experience in talking to citizens and voters over the years.").

1.83.4 Large donations made by groups or persons with an interest in pending legislative activity, even if not corrupting, create an appearance of corruption, especially when the donations are given in close proximity to legislative action on bills of interest to the donors. Senator McCain states:

> While the [generic drug] bill was pending [in 2002], the NRSC and NRCC held a large gala fundraiser to raise almost $30 million in largely soft money contributions, a substantial portion from pharmaceutical companies. According to newspaper reports, among the largest contributors to the gala were GlaxoSmithKline PLC ($250,000), PhRMA ($250,000), Pfizer ($100,000), Eli Lilly & Co. ($50,000), Bayer AG ($50,000) and Merck & Co. ($50,000).

McCain Decl. ¶ 11 [DEV 8–Tab 29].

> [T]here's an appearance [of corruption] when there's a million dollar contribution from Merck and millions of dollars to your last fundraiser that you held,

and then there is no progress on a prescription drug program. There's a terrible appearance there. There's a terrible appearance when the Generic Drug Bill, which passes by 78 votes through the Senate, is not allowed to be brought up in the House shortly after a huge fundraiser with multimillion dollar contributions from the pharmaceutical drug companies who are opposed to the legislation.

McCain Dep. [JDT Vol. 18] at 174–175.

> Senator Feingold commented that members of the National Consumer Bankruptcy Coalition, an industry lobbying group made up of the major credit card companies such as Visa and Mastercard and associations representing the Nation's big banks and retailers, gave nearly $4.5 million in contributions to parties and candidates.... Some of the campaign contributions from these companies seem to be carefully timed to have a maximum effect. It is very hard to argue that the financial largess of this industry has nothing to do with its interest in our consideration of bankruptcy legislation. For example, on the very day [in 1998] that the House passed the conference report last year and sent it to the Senate, MBNA Corporation gave a $200,000 soft money contribution to the National Republican Senatorial Committee.

145 Cong. Rec. S14067–68 (Nov. 5, 1999); *see also* Feingold Dep. at 67 [JDT Vol. 6]. "[A] $200,000 contribution [was] given 2 days after the House marked up a bankruptcy bill by MBNA. OK, it is not illegal. Conceded. Maybe it is not even corrupt, but it certainly has the appearance of corruption to me and I think to many people." 145 Cong. Rec. S12593 (Oct. 14, 1999) (statement of Sen. Feingold). Senator Feingold has also stated that "[t]he appearance of corruption is rampant in our

system, and it touches every issue that comes before us." 147 Cong. Rec. S2446 (Mar. 19, 2001) (statement of Sen. Feingold); *see also* 147 Cong. Rec. S3248–49 (April 2, 2001) (statement of Sen. Levin) ("[P]ermitting the appearance of corruption undermines the very foundation of our democracy—the trust of people in the system.").

1.83.5 The Defendants have also submitted a substantial number of press reports which suggest that large soft money donations present the appearance of corruption. *See, e.g.,* Jackie Koszczuk, *Soft Money Speaks Loudly on Capitol Hill This Season,* Cong. Q., June 27, 1998, at 1736; Jill Abramson, *Money Buys A Lot More Than Access,* N.Y. Times, Nov. 9, 1997, at 4; Jane Mayer, *Inside the Money Machine,* The New Yorker, Feb. 3, 1997, at 32; Don Van Atta, Jr. and Jane Fritsch, *$25,000 Buys Donors "Best Access to Congress",* N.Y. Times, Jan. 27, 1997, at A 1; *see also* Krasno and Sorauf Report at 19–20 [DEV 1–Tab 2]; Primo Rebuttal ¶ 7 [2 PCS] (stating that "[t]he news media reinforces this view [that money distorts the political process] by portraying the political process as being driven by campaign contributions ...."). Senator Rudman states

> Almost every day, the press reports on important public issues that are being considered in Congress. Inevitably, the press draws a connection between an outcome and the amount that interested companies have given in soft money.... Even if a Senator is supporting a position that helps an industry for reasons other than that the industry gave millions to his party, it does not appear that way in the public eye.

Rudman Decl. ¶ 11 [DEV 8–Tab 34].

1.83.6 High-level political contributors testify that large nonfederal donations corrupt the political system or present an appearance of corruption. *See, e.g.,* Has-

senfeld Decl. ¶ 19 [DEV 6–Tab 17] ("It is obvious to me that large soft money donations do buy access, that they can influence federal policy, and that they are corrupting to federal officeholders and to donors. Additionally, these unlimited donations to political parties pose a far greater risk than do hard money contributions to candidates of at least the appearance, if not the reality, of special interest influence on federal policy."); Kirsch Decl. ¶ 15 [DEV 7–Tab 23] ("[T]he current system of financing federal elections permits corruption to flourish."); Buttenwieser Decl. ¶ 30 [DEV 6–Tab 11] ("Large soft money donations can create at least the appearance of influence on federal policy making ... ").

A national survey of major congressional donors conducted in 1997 found that a majority were critical of the campaign finance system and supportive of reform. John Green, Paul Herrnson, Lynda Powell, and Clyde Wilcox, *Individual Congressional Campaign Contributors: Wealthy, Conservative and Reform–Minded* (1998), FEC 101–0282, 0283 [DEV 45–Tab 110]. Seventy-six percent of those surveyed believed the campaign finance system is either "broken and needs to be replaced," or "has problems and needs to be changed." *Id.* Three-quarters of those surveyed supported a "ban on large 'soft money' donations." *Id.* at 0291.

1.83.7 Plaintiff's expert La Raja notes that

> [O]ne cannot ignore the central claim of reformers that the cash-based electoral environment fosters mistrust of the political system. Observing the amounts of money raised and spent in campaigns makes the average American skeptical that the political process is fair. Such doubts raise questions about political legitimacy. Even if politicians are not corrupt—and there has been minimal evidence to prove this claim—there is

certainly the appearance of corruption....

It does not help matters that parties contribute to the arms race in campaigns. By using soft money parties raise the ante in elections. Candidates feel vulnerable to parties and interest groups that sponsor issue ads so they raise more money than ever. Campaign costs increase as each side fights to a draw .... Thus, the foraging for campaign money contributes to the perspective that money corrupts the system.

La Raja Cross Exam. Ex. 3 at 144–45 [JDT Vol. 25].

*Summary*

1.84 It is clear that the effect of large contributions on the political process has not been lost on the public. The polling surveys entered into the record provide powerful proof that the presence of large donations create the appearance of corruption in the eyes of the majority of Americans. Although Plaintiffs point out that BCRA's new federal limits are considered by Americans to constitute large contributions, the fact remains that nonfederal donations made under FECA were often much larger and therefore would be seen by Americans as more corrupting. Major donors who participate and witness nonfederal fundraising believe that these donations present at the very least an appearance of corruption. Members of Congress have seen first-hand the cynicism these large, unregulated donations have bred in the minds of their constituents, and acknowledge the appearance of corruption inherent in large contributions made by those interested in legislation as the legislation is being considered by federal lawmakers. While it is not clear whether or not the public understands the exact contours of the campaign finance system and the nonfederal/federal money distinction, it is clear they view large contributions as corrupting.

### Nonprofit Groups' Involvement in Federal Elections

1.85 Political parties and federal candidates work with nonprofit groups on campaign activities, and they have raised nonfederal money for, and directed and transferred nonfederal money to nonprofit groups for use in activities that affect federal elections.

1.85.1 The national party committees direct donors to donate nonfederal money to certain interest groups that then use such funds for broadcast issue advertisements and other activities that influence federal elections. For example, Steve Kirsch testifies that the national Democratic Party played an important role in his decision to donate soft money to "certain interest groups that were running effective ads in the effort to elect Vice-President Gore, such as NARAL. The assumption was that the funds would be used for television ads or some other activity that would make a difference in the Presidential election." Kirsch Decl. ¶ 10 [DEV 7–Tab 23]; *see also* Buttenwieser Decl. ¶ 18 [DEV 6–Tab 11] ("I estimate that, over the last decade, I have given roughly $2 million to interest groups engaged in political activity, including nonprofit corporations.... [because I believe the field work they do] can have important effects on political campaigns. I decide which of these groups to give to primarily on my own, though I have also discussed with DSCC personnel which groups are effective at these grassroots activities.").

1.85.2 The RNC, NRSC, and NRCC have all made nonfederal donations to the National Right to Life Committee, an independent group that assists Republican candidates through "issue advocacy" activities. Resps. Nat'l Right to Life Pls. To Defs.' First Interrogs., No. 3 [DEV 10–Tab 5]; *see also* RNC0065691A, RNC0065691 [DEV Supp.-Tab 3] (October 18, 1996, let-

ter from the Republican National State Elections Committee to National Right to Life with enclosed $500,000 donation, stating in part "[y]our continued efforts to educate and inform the American public deserves recognition"). After the NRSC's 1994 donation, then-NRSC Chairman Senator Phil Gramm told the *Washington Post* that the party made this donation because it knew the funds would be used on behalf of several specific Republican candidates for the Senate, saying he had "made a decision...to provide some money to help activate pro-life voters in some key states where they would be pivotal to the election." *Id.* at 5975; *see also* RNC 0373365 [IER Tab 31] (letter from the Republican National State Elections Committee to the American Defense Institute notifying the group of a $300,000 donation from the RNSEC's "nonfederal component" to assist the group's "efforts to educate and inform Americans living overseas of their civic responsibilities."); RNC 0373370, 0373376, 0373381 (three letters to Americans for Tax Reform all dated in October 1996, providing the group $1,000,000, $2,000,000, and $600,000 donations in recognition of the group's "efforts to educate and inform the American public"); Thompson Comm. Report at 4013 (majority report) ("In addition to direct contributions from the RNC to nonprofit groups, the senior leadership of the RNC helped to raise funds for many of the coalition's nonprofit organizations."); *id.* at 5934 (minority report) ("[T]he Committee received evidence indicating that both political parties suggested to supporters that they make contributions to sympathetic groups"), 5983 ("Tax-exempt 'issue advocacy' groups and other conduits were systematically used to circumvent federal campaign finance laws".)

1.85.3 The DNC has also made contributions to nonprofit groups to be used on activities that affect federal elections. Marshall Decl. ¶ 9 [DEV 8–Tab 28] (DNC official attesting that "[i]nfrequently, the DNC also makes small contributions to outside groups such as non-profit voter registration and get out the vote organizations focusing their efforts on minority and low-income communities, to assist with these groups' important work in empowering minority and low-income citizens.").

1.85.4 The National Right to Work Committee "pays for its advertising from its treasury, [and] admits that certain Members of Congress or Executive Branch Officials have generally encouraged financial support for the Right to Work cause and, specifically, for the support of NRTWC in advocating for these issues, through lobbying as well as issue advertising." Resp. Nat'l Rt. Work Comm. to Defs. First RFAs, No. 17 [DEV 12–Tab 2].

1.85.5 Members of Congress assist nonprofit groups raise funds for the purpose of affecting national elections. Congressman Ric Keller signed a Club for Growth fundraising letter dated July 20, 2001 which credited the Club for his own 2000 electoral success and assured potential donors that their money would be used to "help Republicans keep control of Congress." CFG00208–10 [DEV 130–Tab 5]; *see also* NRW–2812 [DEV 129–Tab 2] (letter from Congressman Pete Sessions asking the recipient to meet with National Right to Work Committee personnel regarding the Committee's effort to "stop Big Labor from seizing control of Congress in November"). Nonprofit groups have influenced the outcome of federal elections. *See* Pennington Decl. ¶¶ 15, 19 [DEV 8–Tab 31] (discussing the Club for Growth's impact on the 2000 Congressional election in Florida's Eighth District); *see also infra* Findings ¶ ? (Bumpers) ("Members or parties sometimes suggest that corporations or individuals make donations to interest groups that run 'issue ads.'

Candidates whose campaigns benefit from these ads greatly appreciate the help of these groups.").

1.85.6 Ms. Bowler testifies that most committees that are organized to support or oppose ballot measures in California are organized as 501(c)(4) committees. She states that virtually all of the ballot measure committees in California engage in activity that can be characterized as get-out-the-vote activity under BCRA. Bowler Decl. ¶ 30 [3 PCS]. This fact is undoubtedly known to the CDP as summary judgment was entered against the state political party for its nonfederal contribution to a ballot measure committee which was not reported to the FEC and spent almost entirely on voter registration activities. *See FEC v. CDP*, No. S–97–0891 (E.D.Cal. Oct. 14, 1999) (order granting summary judgment). Judge Garland E. Burrell, Jr. of the Eastern District of California found that on the basis of this conduct the CDP had "violated the FECA and the allocation rules by funding a generic voter drive that targeted Democrats." *Id.* at 15. This example shows that ballot measure committees engage in voter mobilization efforts that affect federal elections, *see also* Findings ¶¶ 1.28, 1.32, and that permitting nonfederal donations and solicitations to such groups would allow political parties to circumvent BCRA.

1.85.7 "Virtually every member of Congress in a formal leadership position has his or her own 527 group.... In all, Public Citizen found 63 current members of Congress who have their own 527s. Another 38 members of Congress have a stake in the Congressional Black Caucus [ ] 527. 527 groups are also popular with influential congressional committee chairmen.... And 527s are increasingly popular with other members of Congress, who want to be more influential...." Public Citizen Congress Watch, Congressional Leaders' Soft Money Accounts Show Need for Campaign Finance Reform Bills, Feb. 26, 2002, at 6 [DEV 29–Tab 3]. "For congressional leaders, 527 groups appear to collect about as much money as their campaign committees and often as much as their leadership PACs." *Id.* at 9.

1.85.7.1 "There are basically two kinds of 527s active in federal politics: those that exist to promote certain politicians (which Public Citizen calls 'politician 527s') and those that exist to promote certain ideas, interests and partisan orientations in election campaigns.... Politician 527s generally serve as soft money arms of 'leadership PACs,' which incumbents use to aid other candidates and otherwise further their own careers. Like the campaign committees of members of Congress, leadership PACs can receive only 'hard money' contributions, which are limited in amounts and may not come directly from corporations or unions. Politician 527s use their soft money mainly to sponsor events that promote their own careers, help create a 'farm team' of successful state and local candidates, and spur partisan 'get-out-the-vote (GOTV)' efforts." *Id.* at 6.

1.85.7.2 Many donors to Member 527 organizations donate with the intent of influencing federal elections. For example, Peter Buttenwieser testified that in early 2002 he donated $50,000 to a 527 organization, Daschle Democrats, which ran broadcast ads in South Dakota supporting Senator Tom Daschle in response to the attacks that had been made against him. Mr. Buttenwieser stated: "I was willing to do this because I felt that the attacks were hurting Senator Daschle and Senator Tim Johnson's re-election campaign as well." Buttenwieser Decl. ¶ 20 [DEV 6–Tab 11].

1.85.7.3 Twenty-seven industries (including individuals, such as executives, associated with the industries) contributed $100,000 or more in just a single year to the top 25 politician 527 groups. These

industries accounted for 52 percent of all contributions to the top 25 politician 527s. The top 10 industries contributing were: computers/Internet, securities & investments, lawyers/law firms, telephone utilities, real estate, TV/movies/music, air transport, tobacco, oil & gas, and building materials and equipment. Top corporate contributors included AT & T, SBC Communications, Philip Morris, Mortgage Insurance Companies of America, Clifford Law Offices, U.S. Tobacco and American Airlines. Overall, only 15 percent of total contributions to the top 25 politician 527's came in amounts of less than $5,000. Democratic party committees and unions also contributed over $100,000 to the top politician 527s. In fact, Democratic party committees (mainly the DNC) were the single largest contributor to politician 527s. Almost all of this money (81 percent) went to the Congressional Black Caucus 527. Public Citizen Congress Watch, Congressional Leaders' Soft Money Accounts Show Need for Campaign Finance Reform Bills, Feb. 26, 2002, at 10–11 [DEV 29–Tab 3].

1.85.8 According to Kathleen Bowler of the CDP, Section 527 organizations include political clubs. The CDP has contributed to these groups "to assist [them] with very basic administrative and organizational costs, as well as for voter registration activities." Bowler Decl. ¶ 31. Bowler attests that these groups "traditionally engaged in grass-roots GOTV activity, they are not engaged in direct activities in connection with federal elections." *Id.* Similarly,

> CRP for many election cycles has provided and paid for partisan voter registration, through its Operation Bounty program in which Republican County Central Committees, Republican volunteer organizations and Republican candidates for state and federal office may participate, and through supplementary paid voter registration drives. Most of

these participating groups and organizations are Internal Revenue Code section 527 organizations.

Erwin Aff. ¶ 9.

Since California's state elections are held at the same time as federal elections, GOTV efforts in California will affect federal elections, even if these effects are unintentional. *See supra* Findings ¶ 1.28.

1.86 It is clear that prior to BCRA, the political parties donated nonfederal funds to nonprofit entities which then used those funds to affect federal elections in ways that assisted the political party that donated the money. Furthermore, federal candidates have solicited funds for nonprofit corporations that have assisted them in their campaigns, and donors note that the political parties and federal candidates have directed them to donate to specific nonprofit groups in order to affect federal elections. What the record shows is that BCRA's framers were aware of this budding practice which would become a gaping loophole if not addressed by the campaign finance reform legislation in light of BCRA's other provisions affecting the collection and use of nonfederal funds by the national and state political parties.

### The Effect of BCRA on Interest Group Activity

1.87 Experts expect that little of the nonfederal money donations to political parties barred by BCRA will now be made to interest groups. *See* Mann Cross Exam. at 164–65 [JDT Vol 17] ("I think [BCRA] is going to produce a tremendous shift in resources from television to ground activities—registration, mobilization, get out the vote. Yes, some of this will be by interest groups."); Green Rebuttal Report at 19 [DEV 5–Tab 1] ("I doubt that much of the money that currently goes to parties in the form of soft money will go instead to PACs and other tax-exempt organizations. The money donated to political parties is

given with an eye toward the special favors that only a political party can deliver by dint of its ubiquitous role in all levels of government. No interest group can approximate the scope or influence of a political party; no interest group has the same presence in the lives or careers of politicians. It therefore seems unlikely that money seeking access will flow in appreciable quantities to much less propitious interest group destinations.").

1.88 One interest group and one political consultant predict that some nonfederal money donors will donate their money to interest groups. Kate Michelman, President of NARAL, has stated that nonfederal donors seeking to "elect people who embody their values will be looking to [donate to] groups like NARAL, which do serious political work and are seasoned operatives." Gallagher Decl. ¶ 61 [RNC Vol. XIII] ("If [nonfederal donors] can't give to the parties ... they are going to find other means." (quoting Michelman)). Michael Lux, President and Co-founder of Progressive Strategies, L.L.C., a political consulting firm, testifies that he expects that "[t]here will be organizations who will be able to raise more money because folks who used to give to the party will now give to outside groups. And hopefully I will be involved in many of those projects," although "obviously you never know the unintended consequences of specific pieces of legislation". Lux Dep. at 50–52 and Ex. 2 [RNC Vol. 16].

1.89 One RNC official testifies that she does not believe interest groups can replace political parties. B. Shea Dep. at 90 [JDT Vol. 29] (agreeing that interest groups could never replace political parties).

1.90 Plaintiffs supply the Court with testimony showing that prior to BCRA, interest groups, unlike political parties, were rarely required to make public disclosure of their receipts, donors, disbursements, and activities. *See* Beinecke[70] Decl. ¶¶ 3, 9 [RNC Vol. IX] (prior to BCRA, National Resources Defense Council (NRDC) did not have to file disclosure forms with FEC or disclose to the public amounts donated by foundations); Gallagher Decl. ¶ 15 [RNC Vol. XIII] (prior to BCRA National Abortion and Reproductive Rights Action League (NARAL) was not required to track whether it received donations from persons outside United States); Sease[71] Decl. ¶ 11 [RNC Vol. XIX] (prior to BCRA, Sierra Club was not generally required to report identity of individual donors to any government entity); *see also* Keller[72] Expert Report ¶ 42 [RNC Vol. VIII] (stating that his understanding is that the political activities of interest groups "are far less transparent than those of parties").

While this may have been the case prior to BCRA, BCRA contains provisions addressing the lack of transparency in interest group political activity. *See* BCRA §§ 201, 212. Therefore, this testimony describes conditions under a different campaign finance regime and does little to assist the Court in determining the impact on campaign finance disclosure of any hypothetical future increase in interest group activity.

1.91 State Republican party officials comment that interest groups engage in

---

70. Frances Beinecke is the Executive Director of the NRDC. Beinecke Decl. ¶ 1 [RNC Vol. IX].

71. Deborah Sease is the Legislative Director of the Sierra Club. Sease Decl. ¶ 1 [RNC Vol. XIX].

72. Morton Keller is an experts for the Plaintiffs.

voter registration, voter identification, get-out-the-vote activities, and lobbying of officeholders, Dendahl[73] Decl. ¶ 11 [RNC Vol. VIII]; Bennett[74] Decl. ¶ 11 [RNC Vol. VIII] (declaring he has read about such interest group activities in the media). Bruce Benson, the Chairman of the Colorado Republican Party predicts that "Special Interest Groups will fill the void caused by the reduction in Political Party activity since they will not have to report the unlimited contributions from any source they will be able raise and spend." Benson Decl. ¶ 12 [RNC Vol. VIII].

It appears that Mr. Benson's assessment does not take into account BCRA's new disclosure requirements for certain expenditures made by interest groups. *See* BCRA §§ 201, 212.

1.92 John Peschong, the RNC's Regional Political Director for the Western Region states that "In recent election cycles, I have observed that some of the major interest groups, such as the AFL-CIO, NEA, CTA, and NAACP, have reduced their reliance on broadcast issue advocacy, and shifted reliance to grass-roots voter mobilization activities." Peschong Decl. ¶¶ 13–14 [RNC Vol. VI].

1.93 During the closing weeks of the 2000 campaign, the NAACP National Voter Fund registered over 200,000 people, put 80 staff in the field, contacted 40,000 people in each target city, promoted a get-out-the-vote hotline, ran three newspaper print ads on issues, made several separate direct mailings, operated telephone banks, and provided grants to affiliated organizations. *See* Green Cross Exam. at 15–20, Ex. 3 [JDT Vol. 9]; McCain Cross Exam. at 70–72 [JDT Vol. 18]. The NAACP reports that the program turned out a million additional black voters and increased

turnout (over 1996 numbers) among targeted groups by 22 percent in New York, 50 percent in Florida and 140 percent in Missouri. Green Cross Exam. Ex. 3 [JDT Vol. 9]. The NAACP's effort, which cost approximately $10 million, was funded in large part by a single $7 million donation by an anonymous individual. *Id.* at 20, Ex. 3; McCain Cross Exam. at 73–74 [JDT Vol. 18].

1.94 According to Mary Jane Gallagher, NARAL's Executive Vice President, in 2000, NARAL spent $7.5 million and mobilized 2.1 million pro-choice voters. The group also made 3.4 million phone calls and mailed 4.6 million pieces of election mail. *See* Gallagher Decl. ¶ 24 [RNC Vol. XIII].

1.95 I find the effect BCRA will have on interest group activity unclear. While testimony in the record reveals that some nonfederal donations that went to the national political parties under FECA, and are now barred under BCRA, will go to interest groups, no witness has provided an assessment as to how much nonfederal money will be redirected to interest groups. Furthermore, the evidence regarding the lack of transparency with regard to interest group political activity does not take into account BCRA's new disclosure requirements that apply to such activities, and therefore is not helpful to the Court.

### State Party Fundraising

*Fundraising By National Party Officials & Federal Officeholders for State Parties*

1.96 According to RNC officials, the RNC provides financial and fundraising assistance to state and local candidates and parties through a variety of means.

---

**73.** John Dendahl is the State Chairman of the Republican Party of New Mexico. Dendahl Decl. ¶ 1 [RNC Vol. VIII].

**74.** Robert Bennett has served as Chair of the Ohio Republican Party since 1988. Bennett Decl. ¶ 1–2 [RNC Vol. VIII].

*See* Dendahl Decl. ¶ 10 [RNC Vol. VIII]; Duncan Decl. ¶ 13 [RNC Vol. VI]; Josefiak Decl. ¶ 44, 65–72 [RNC Vol. I]; B. Shea Decl. ¶¶ 32–40 [RNC Vol. V]; *see also* La Raja Expert Report ¶ 12(b) [RNC Vol. VII] (discussing national party support for state parties generally). For example, RNC officers have sent fundraising letters on behalf of state and local candidates during off-year election cycles. *See, e.g.,* RNC Ex. 292 (RNC 0332976) (fundraising letter signed by Deputy RNC Chairman Jack Oliver on behalf of Bret Schundler's New Jersey gubernatorial campaign); Josefiak Decl. RNC Ex. 1162 [RNC Vol. I] (fundraising letter signed by Haley Barbour on behalf of George Allen's Virginia gubernatorial campaign); Josefiak Decl. RNC Ex. 1766 [RNC Vol. I] (fundraising letter signed by Haley Barbour on behalf of New Jersey Republican Party); Feingold Dep. Ex. 12 [JDT Vol. 6] (fundraising letter from Jim Nicholson on behalf of Norm Coleman's Minneapolis mayoral campaign). Robert Duncan, current General Counsel and former Treasurer of the RNC, was actively involved in fundraising activities for the Republican Party of Kentucky and for Kentucky state candidates. He sponsored receptions and hosted and attended fundraising dinners in support of the Kentucky Republican Party. Duncan Decl. ¶¶ 5–6 [RNC Vol. VI].

> The RNC states that prior to BCRA,
>
> RNC officers were intimately and substantially involved in helping state and local candidates raise money in accordance with state and federal law. Since becoming Chairman of the RNC in February 2002, Marc Racicot has made 82 trips in his capacity as Chairman to 67 cites in 36 states. Virtually all of these trips have involved assisting state and local parties and candidates with fundraising. *See* Josefiak Decl. ¶ 70. RNC Co–Chairwoman Ann Wagner and Deputy Chairman Jack Oliver have made 31 and 33 trips respectively since becoming

RNC officers, the majority of which involved providing fundraising assistance to state and local parties and candidates. *Id.* For example, Ann Wagner was the keynote speaker at a fundraising dinner for the Shelby County Tennessee Republican Women's Club on September 8, 2001. *See* RNC Exh. 301.

RNC Proposed Findings of Fact ¶ 42. However, the Josefiak Declaration upon which the RNC relies does not support its contention. Josefiak only states that the "majority of these trips have had significant fundraising components to them," Josefiak Decl. ¶ 70 [RNC Vol. I]; he says nothing about the type of fundraising accomplished during these trips. Only one of these 146 trips is documented to have been for the purposes of state or local party fundraising. *See* RNC Ex. 301.

Nothing prevents RNC officials from raising federal funds for state candidates. *See* BCRA § 101(a); FECA § 323(a); 2 U.S.C. § 441i(a) (barring officers of agents of national political party committees from soliciting or directing contributions "that are not subject to the limitations, prohibitions, and reporting requirements of this Act.").

1.97 Senator McConnell attests that he engages in fundraising activities for state and local candidates, such as speaking at a state party fundraiser or attending a candidate rally. McConnell Aff. ¶ 5 [2 PCS]. Under BCRA, Senator McConnell may continue "to attend, speak, or be a featured guest at a fundraising event for a State, district or local committee of a political party." BCRA § 101; FECA § 323(e)(3); 2 U.S.C. § 441i(e)(3).

*CDP and CRP Fundraising*

1.98 The CDP and the CRP present evidence regarding their general fundraising activities and claim that BCRA will adversely affect their revenues. *See* Bowler Decl. ¶¶ 10, 12, 19, 23, 35 & Ex. A [3

PCS] (discussing CDP's federal and non-federal fundraising achievements, methods, and difficulties, and the impact BCRA will have on CDP fundraising); Torres Decl. ¶ 9 [3 PCS] (discussing the effect of BCRA on CDP fundraising and therefore CDP activities); Erwin Aff. ¶¶ 12, 13, 15(a) & CDP App. at 1189 [3 PCS] (discussing CRP's fundraising programs and activities and the effect BCRA will have on these activities). These claims, however, are speculative and not based on any analysis. Bowler Dep. at 9–14 [JDT Vol. 3] (acknowledging that the CDP had not discussed any strategies for changing either its fundraising or operational activities to adjust to the requirements of the BCRA, that no one at the CDP had talked with any strategists or consultants with respect to ways in which the party might change either its fundraising or operational activities in response to the BCRA, and acknowledging that CDP's assessment of BCRA's effect was based on an analysis on how the law would have affected their past fundraising without looking at different ways money could have been raised); Erwin Dep. at 131–40 [JDT Vol. 5] (admitting the CRP did not conduct an analysis of how it would change its fundraising or operations to adapt to BCRA, that the party does not "know what the ramifications" of BCRA will be on its fundraising receipts, and that he does not know how much of the nonfederal money that was collected by the national parties will now be directed at the CRP); *see also* Philp Dep. at 18–22 [JDT Vol. 26] (testifying that the Colorado Republican Party has done no formal analysis to determine BCRA's effect on the political party's revenue flow, and has not consulted with fundraising experts to determine different ways to fundraise under BCRA).

Furthermore, since the state political parties collect many donations in small increments, they could be classified as either federal or nonfederal contributions.

No party has provided the three-judge panel with analysis taking this fact into account. The CDP and CRP also present testimony and documentary evidence concerning the effect the Levin Amendment will have had on their nonfederal fundraising. *See* Bowler Decl. ¶ 19 & Ex. A [3 PCS]; Torres Decl. ¶ 7 [3 PCS]; Erwin Aff. ¶ 13 [3 PCS]. In addition to not being the product of a serious, forward-looking analysis, the testimony is not sufficiently precise and leaves as many questions as it answers. For example, the CDP's evidence regarding the impact of the Levin amendment on its nonfederal money fundraising does not make clear if the amount of funds it claims will be "reduced" includes the initial $10,000 of these donations which are permitted to be used for federal election activity under BCRA, or deducts those sums to present a more accurate calculation. *See* Bowler Decl. ¶ 19 & Ex. A [3 PCS].

Finally, Plaintiffs' own expert Raymond La Raja finds that "new rules that limit soft money fundraising will not present a problem for parties already constrained by similar limits under state law." La Raja Cross Exam. Ex. 3 at 148 [JDT Vol. 15] (La Raja dissertation). He notes that "in states where campaigns are expensive and where parties rely on major donors" such measures "will hamper party activity and create some confusion. . . . Although state parties will adapt, the middling and weaker state parties might suffer the most. . . ." *Id.* However, he concludes that the "[o]ne thing we can be sure of is that parties will figure out the ground rules and they will find an important role for themselves within the new campaign finance regime." *Id.* at 150.

As such, I find the CDP and CRP's analysis of BCRA's impact on their fundraising activities speculative and lacking probative value.

1.99 The amount of nonfederal money the CRP and CDP raise themselves is much more than the nonfederal funds they receive from transfers from the national parties. CDP/CRP 1171 [3 PCS] (in the 2000 election cycle, 19.1 percent of all CRP nonfederal money came from national party transfers); CDP/CRP 35, 37, 39 [3 PCS] (in 2000, 36 percent of all CDP nonfederal money was from national party transfers). Ms. Bowler states, however, that "the percentage of 'soft money' falling into this category would vary from state to state, as well as by election cycle ..." Bowler Rebuttal Decl. ¶ 3 [3 PCS].

1.99.1 According to Ms. Bowler "[t]he majority of [national transfers] were for issue advocacy, although money has been transferred for voter registration, get-out-the-vote activities, and even administrative expenses. We are able to raise a substantial amount of money for our non-Federal activities and do not rely on national party transfers for those purposes." Bowler Decl. ¶ 16 [3 PCS]; *see also id.* ¶ 12 (explaining that in the 1999–2000 cycle, the CDP raised $15,617,002 in nonfederal funds, which it used to fund state and local activities); Bowler Rebuttal Decl. ¶ 4 [3 PCS] (explaining that the CDP pays for much of its voter registration and get-out-the-vote activities with money raised by the state party). To the extent the CDP uses its nonfederal funds for purely state campaign activity, BCRA has no effect on such expenditures. As noted *supra,* Findings ¶ 1.28, 1.32, GOTV and voter registration activities affect federal elections in states like California that hold their state and local elections in conjunction with federal elections. As such, these activities could be paid for with federal funds or with an FEC-specified allocated mix of federal and nonfederal funds (raised pursuant to the Levin Amendment). *See* BCRA § 101; FECA § 323(b)(2)(a)-(c); 2 U.S.C. 441i(b)(2)(a)-(c).

## TITLE II: ELECTIONEERING COMMUNICATIONS THAT AFFECT FEDERAL ELECTIONS

### 2.1 *The Origins of the Problem Congress Sought to Solve With Title II*

Federal law has long prohibited corporations and labor unions from spending general treasury funds in connection with a federal election. The Supreme Court's interpretation of FECA in a series of cases beginning in 1976 has limited FECA's control over corporate and labor union involvement with federal elections. Prior to BCRA, corporations and labor unions exploited these limitations and spent general treasury funds in massive amounts to influence federal elections with "issue advertising" campaigns.

2.1.1 In *FEC v. Massachusetts Citizens for Life, Inc.,* the Supreme Court held that the prohibition on corporations and labor unions using general treasury funds on expenditures in connection with a federal election was overbroad, narrowing the restriction to corporate and union spending on "express advocacy." *FEC v. Massachusetts Citizens for Life, Inc.* ("*MCFL* "), 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b."). In *Buckley,* the Supreme Court provided examples of express advocacy: " 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " *Buckley,* 424 U.S. at 44 n. 52, 96 S.Ct. 612. These examples have been referred to as the "magic words" because if they are invoked by an organization, they trigger FECA's limitations.

2.1.2 As a result of *MCFL,* corporations and labor unions were permitted to use their general treasury funds on independent expenditures in connection with a federal election, provided that those inde-

pendent expenditures [75] did not contain words of "express advocacy." In other words, corporations and labor unions could use their general treasury funds to pay for an advertisement which influenced a federal election, provided that the corporation or labor union did not use any of *Buckley*'s "magic words" in the advertisement. Magleby Expert Report at 5–6, 9, 10 [DEV 4–Tab 8]; *see also* Krasno and Sorauf Expert Report at 50 [DEV 1–Tab 2].

## 2.2 *The Rise of Issue Advocacy Campaigns Funded by Corporate & Labor Union General Treasuries*

Approximately ten years after *MCFL*, during the 1996 election cycle, corporations and labor unions began aggressively to use general treasury funds to pay for "issue advocacy" campaigns that avoided express advocacy but were designed to influence federal elections.

2.2.1 The Annenberg Center for Public Policy has been studying issue advocacy since the early 1990s. *See* Annenberg Public Policy Center, Issue Advocacy Advertising During the 1999–2000 Election Cycle ("Annenberg Report 2001") at 1 [DEV 38 Tab–22]. In addition to Defendants, Plaintiffs and their experts have cited to and included the Annenberg Study in their materials, and have not specifically challenged any of the Center's findings. *See, e.g.,* NRA 196 [11 PCS]; La Raja Decl. ¶¶ 24(h) [RNC Vol. VII] (quoting Annenberg Study), ¶ 20(b) & Figure 10 (quoting Annenberg data); Milkis [76] Decl. ¶ 49 [RNC Vol. VII] (citing Annenberg Study). *See also infra* App. ¶¶ I.B.1–I.B.6.

Congress also relied on the Annenberg studies. 147 Cong. Rec. S2455 (daily ed. March 19, 2001) (statement of Sen. Olympia Snowe) ("Let there be no mistake. The record I intend to outline will show these advertisements constitute campaigning every bit as much as any advertisements run by candidates themselves or any ad currently considered to be express advocacy and therefore subject to Federal election laws."); *id.* at 2456 (statement of Sen. Olympia Snowe) (citing Annenberg Report 2001). Accordingly, I rely on the Annenberg Center's results as uncontroverted evidence.

2.2.2 According to the Annenberg Center's research, issue advertisements generally fall into three categories: candidate-centered, legislation-centered, and general image-centered. Annenberg Report 2001 at 13. "Candidate-centered advertisements make a case for or against a candidate but do so without the use of the ten words delineated in *Buckley*." *Id.* (noting that these advertisements "usually present a candidate in a favorable or unfavorable light and then urge the audience to contact the candidate and tell him or her to support the sponsoring organization's policy position."). Legislation-centered advertisements "seek to mobilize constituents or policy makers in support of or in opposition to pending legislation or regulatory policy." *Id.* (noting that these advertisements usually mention specific, pending legislation). Finally, general image-centered advertisements are "broadly written to enhance the visibility of an organization or its issue positions, but are not tied directly to a pending legislative or regulatory issue." *Id.*[77] Throughout the Find-

---

**75.** As discussed, *supra,* independent expenditures differ from coordinated expenditures in that coordinated expenditures are treated as contributions under FECA.

**76.** Sidney Milkis is an expert for the Plaintiffs.

**77.** Other commentators have referred to two types of advertisements: candidate-centered (also called electioneering) issue advertise-

ments and genuine issue advertisements. Advertisements designed to genuinely influence debate over a particular issue are known as "true" or "genuine" issue advertisements, while those issue advertisements designed to influence a federal elections are known as "electioneering" or "candidate-centered" issue advertisements. Krasno and Sorauf Expert Report at 65 [DEV 1–Tab 2] ("Advertis-

ings and my opinion. I will generally use the nomenclature candidate-centered issue advertisements (or electioneering issue advertisements) and genuine or pure issue advertisements. Genuine issue advertisements include both legislation-centered and general image-centered issue advertisements.

2.2.3 In discussing the 1999–2000 election cycle, the Annenberg Center found that "[t]he type of issue ad that dominated depended greatly on how close we were to the general election.... Though candidate-centered issue ads always made up a majority of issue ads, as the election approached the percent [of] candidate-centered spots increased and the percent of legislative and image ads decreased, such that *by the last two months before the election almost all televised issue spots made a case for or against a candidate."* *Id.* at 14 (emphasis added).

2.2.4 Overall, the Annenberg Center concludes that "[o]ver the last three election cycles the numbers of ads, groups, and dollars spent on issue advocacy has climbed." *Id.* at 1. During the 1996 election cycle, the Annenberg Center estimated that $135 million to $150 million was spent on multiple broadcasts of about 100 advertisements. Annenberg Report 2001 at 1 [DEV 38–Tab 22]. In the next election cycle (1997–1998), the Annenberg Center found that 77 organizations aired 423 advertisements at a cost of between $250 million and $340 million. *Id.*[78] In the 1999–2000 election cycle, the Annenberg Center found that 130 groups spent over an estimated $500 million on 1,100 distinct advertisements. *Id.* For the 1999–2000

election cycle, the Republican and Democratic parties accounted for almost $162 million (31%) of this spending; Citizens for Better Medicare, $65 million (13%); Coalition to Protect America's Health Care, $30 million (6%); U.S. Chamber of Commerce, $25.5 million (5%); AFL–CIO, $21.1 million (4%); National Rifle Association, $20 million (4%); U.S. Term Limits, $20 million (4%). *Id.* These groups and the two parties accounted for two out of every three (67%) dollars spent on issue ads in the 2000 cycle. *Id.* (noting that other groups spent a combined $166.2 million (33%) on issue advocacy during the 1999–2000 election cycle); *see also* La Raja Decl. ¶ 20(b) & Figure 10 [RNC Vol. VII] (quoting Annenberg data and noting that "[t]hese figures ... closely match my own data on party-based issue ads collected by examining financial reports filed with the FEC").

2.2.5 In addition to the spectacular rise in candidate-centered issue advertising, political scientists and experts testify that by the 2000 election cycle, PAC interest groups ran dramatically fewer advertisements that referred to a federal candidate than non-PAC interest groups.

2.2.5.1 Political Scientist Anthony Corrado found that one of the "most notable direct consequences of the FECA" was the "proliferation of PACs." Anthony Corrado, *A History of Federal Campaign Finance Law* at 18 [DEV 29–Tab 17]. Corrado's historical research concludes that "from 1974 to 1986, the number of committees registered with the FEC increased from 1,146 to 4,157, while the amounts they

ing data show that there are two distinct types of issue ads, those that are basically candidate-oriented and electioneering in nature, and those that only present or urge action on an issue. The former are nearly identical in format, structure, and timing to ads produced by candidates, while the latter bear little or no resemblance to electioneering.").

**78.** The report the Annenberg Study produced following the 1997–1998 election cycle placed this estimate at between $275 million to $340 million. Annenberg Public Policy Center, Issue Advocacy Advertising During the 1997–1998 Election Cycle ("Annenberg Report 1998") at 1 [DEV 66–Tab 6].

contributed to candidates rose from about $12.5 million to $105 million." *Id.* Corrado determined that campaign finance regulation was a major factor in the growth of PACs. *Id.* "The FECA sanctioned PACs, and groups and organizations had an incentive to form PACs since the law established a higher contribution limit for PACs than for individual donors." *Id.* at 18–19; *see also* Keller Decl. ¶¶ 57 [RNC Vol. VIII] ("[T]he unintended consequences of previous campaign finance legislation [has been] the growth of PACs and more powerful advocacy and interest groups."), 42 ("Political action committees (PACs) have rapidly grown in numbers."); Milkis Decl. ¶ 34 [RNC Vol. VII] ("Consequently, during the 1970s, the number of Political Action Committees (PACs) exploded.").

2.2.5.2 Defendants' expert Magleby finds that by the 2000 election cycle, the number of PACs had increased to only 4,499. Magleby Expert Report at 16 [DEV 4–Tab 8]. Plaintiffs' expert Keller notes that by March 31, 2002, the number of federal PACs had dropped to 4,328. Keller Decl. ¶ 42 [RNC Vol. VIII]; *see also* Milkis Decl. ¶ 35 [RNC Vol. VII] (same). By the 2000 election cycle, *non*-PAC interest groups ran 74,024 political advertisements referring to a federal candidate, compared to *only* 3,663 by interest group PACs. Goldstein Expert Report at 10 [DEV 3–Tab 7] (Table 1B); *see also* Rosenthal Decl. ¶ 25 (discussing that since 1995 the AFL–CIO's PAC has not made any independent expenditures); *cf.* Magleby Report at 14–15 [DEV 4–Tab 8] ("If parties and interest groups can effectively communicate a 'vote for' or 'vote against' message with party soft money and electioneering advocacy money, as the studies show they can, then it is not surprising that we have seen so much growth in this form of campaigning in recent election cycles.").

2.2.6 After studying the dramatic rise of candidate-centered issue advertisements over a seven year period, the Annenberg Center concluded *inter alia* that:

1) The amount of money spent on "issue advocacy" is rising rapidly.

2) Instead of creating the number of voices *Buckley v. Valeo* had hoped, issue advocacy allowed groups such as the parties, business and labor to gain a louder voice.

3) The distinction between issue advocacy and express advocacy is a fiction.

4) Issue advocacy masks the identity of some key players and by so doing, it deprives citizens of information about source of messages which research tells us is a vital part of assessing message credibility.

Annenberg Report 2001 at 1 [DEV 38–Tab 22]. As Plaintiffs' expert Raymond J. La Raja states, " 'Over the last three election cycles, the number of groups sponsoring ads has exploded, and consumers often don't know who these groups are, who funds them, and whom they represent.' " La Raja Decl. ¶ 24(h) [RNC Vol. VII] (quoting Annenberg Report 2001 at 1).

2.2.7 It is therefore uncontroverted that "[b]y the early 1990s and especially by 1996, interest groups had developed a strategy to effectively communicate an electioneering message for or against a particular candidate without using the magic words and thus avoid disclosure requirements, contribution limits and source limits." Magleby Expert Report at 10 [DEV 4–Tab 8]. Political consultant Douglas L. Bailey explained why it was not until the 1996 election cycle that corporations and labor unions began to make heavy use of issue advocacy as a tool of electioneering. Political consultant Bailey testifies:

When I consulted on dozens of campaigns in the 1970s and 1980s, we operated under essentially the same set of rules that governed in 1996, but many of today's practices would have been considered dangerous and wrong then, both

politically and legally. In the post-Watergate era, we were worried about not only obeying the rules, but also assuring that our clients were seen as trying to clean up the image of the political process. But due to a lack of enforcement and a willingness on the part of some to win at all costs, these concerns appear to have dissipated.

Bailey Decl. ¶ 14 [DEV 6–Tab 2].

2.2.8 As this section illustrates, the uncontroverted record demonstrates that since the 1996 election cycle, candidate-centered issue advertisements have been used by corporations and labor unions to influence federal elections with general treasury funds.

### 2.3 *Express Advocacy Not Widely Used Nor An Effective Means of Campaign Advertising*

Exacerbating this development, is the undisputed fact that the overwhelming majority of modern campaign advertisements do not use words of express advocacy, whether they are financed by candidates, political parties, or other organizations. It is also uncontroverted that political consultants do not employ express advocacy when making campaign advertisements because they do not view it as an effective means of campaign advertising. As a result, corporations and labor unions are able to pay for the most effective form of political advertisements when seeking to influence federal elections.

2.3.1 Empirical study demonstrates that modern campaign advertisements do not use words of express advocacy. Dr. Goldstein finds, that 11.4 percent of the 433,811 advertisements aired by candidates met the express advocacy test during the 2000 federal election. Goldstein Amended Expert Report at 16 [DEV 3–Tab 7]. Conversely, 88.6 percent of candidate advertisements in 2000 "were technically undetected by the *Buckley* magic words test." *Id.* This result demonstrates "that magic words are not an effective way of distinguishing between political ads that have the main purpose of persuading citizens to vote for .or against a particular candidate and ads that have the purpose of seeking support for or urging some action on a particular policy or legislative issue." *Id.* Former Senator Rudman confirmed these empirical results observing that "[m]any, if not most, campaign ads run by parties and by candidates themselves never use ... 'magic words.' It is unnecessary." Rudman Decl. ¶ 18 [DEV 8–Tab 34].

2.3.2 The uncontroverted testimony of political consultants demonstrates that it is neither common nor effective to use the "magic words" of express advocacy in campaign advertisements. The political consultants' testimony, which I adopt as part of my Findings, is worth repeating *in toto;* particularly given the fact that the testimony of these political consultants is uncontroverted on these points and is not rebutted by the production of *any* contrary political consultant testimony by Plaintiffs discussing this subject.

*Republican Political Consultant Douglas L. Bailey* [79]

In the modern world of 30 second political advertisements, it is rarely advisable

---

79. In 1968, Bailey founded Bailey, Deardourff & Associates, which was among the first national political consulting firms, working for Republican candidates for Governor, Congress, Senate, and President. The firm's clients included Gerald Ford's Presidential Campaign, and over fifty successful campaigns for Governor or the United States Senate in 17 states. Bailey Decl. ¶ 1 [DEV 6–Tab 2]. As campaign consultant, Bailey's job was "to plan the campaign and then create broadcast advertisements that would shape its outcome." *Id.* ¶ 2. In 2000, Bailey was among the first eight recipients of the American University–Campaign Management Institute's "Outstanding Contribution to Campaign Consulting Award" given to the consultants "who

to use such clumsy words as "vote for" or "vote against." If I am designing an ad and want the conclusion to be the number "20," I would use the ad to count from 1 to 19. I would lead the viewer to think "20," but I would never say it. All advertising professionals understand that the most effective advertising leads the viewer to his or her own conclusion without forcing it down their throat. This is especially true of political advertising, because people are generally very skeptical of claims made by or about politicians.

Contrary to what many people would like to believe, it is well known among campaign consultants that the "swing voters" who regularly determine the outcome of elections usually vote on candidate personalities, rather than issues. Regardless of the substantive topic of any particular ad, one of the single most important message [sic] that a political ad can convey is the underlying sentiment that a candidate has values similar to or different than the target viewers of the ad. A campaign commercial is most effective if the candidate is perceived as likeable to the citizens relaxing in their living rooms, and if the viewers feel comfortable that the candidate shares their values. Often, the substantive issue is merely the vehicle used to demonstrate personal qualities.

In the era of the 30 second ad, it is a mistake to view any particular electioneering advertisement as a campaign in and of itself. Over time, a campaign defines a candidate through a combination of style, image, and issues. Even shortly after watching an ad, the target audience usually doesn't remember the ad's substantive details. Rather, the viewers just get a feel for the candidate. It takes a lot of these "feels" to make up a campaign. Thirty second campaign ads, therefore, must be viewed collectively. It is impossible for the political ad consultant to truly close a positive sale until after he has had time to build the candidate's image through a series of 30 second spots.

Even if an electioneering ad aired in August, September, or October used words such as "vote for," "support," or "cast your ballot," it would do little good. People's minds may change from day to day about how they intend to vote, or more likely, they aren't significantly focused on whom to vote for until the days immediately prior to the election. Thus, the only real sale date is on election day in November. In the months leading up to that 'sale date,' the most important positive thing an ad can do is to create a general impression of a candidate that the voters will internalize over time, and that will hopefully sink in by election day.

Even if the goal of an early-September electioneering ad were to make a direct pitch for a vote, it would be nearly impossible to do it effectively. It is amazing how short thirty seconds really is when you are trying to craft a political ad. There is barely enough time to effectively convey a single theme. If you change course in the final five seconds of an ad, you may undo everything that you have attempted to accomplish in the previous 25 seconds. Therefore, it is uncommon that you would see a political advertisement on television that says "Candidate X is tough on crime" and then breaks that flow and switches

have best represented the ideals of the profession and shown concern for the consequences of campaigns on public attitudes about our democratic process." *Id.* Bailey also has done work for political parties and issue advocacy groups. *Id.* ¶¶ 9–12.

to the entirely separate point of "Please vote for Candidate X."

Bailey Decl. ¶¶ 3–4, 6–8 [DEV 6–Tab 2].

*Democrat Political Consultant Raymond Strother* [80]

[M]edia consultants prefer putting across electioneering messages without using words such as "vote for." Good media consultants never tell people to vote for Senator X; rather, you make your case and let the voters come to their own conclusions. In my experience, it actually proves less effective to instruct viewers what you want them to do. They have to come to their own conclusion. Americans like to think they make up their own minds and determine their own fate. Without even mentioning an upcoming election, the media consultant can count on the electoral context and voters' awareness that the election is coming. Voters will themselves link your ad to the upcoming election. When viewed months or years after the election a particular ad might look like pure issue advocacy unrelated to a federal election. However, during the election, political ads-whether candidate ads, sham issue ads, true issue ads, positive ads, negative ads or whatever-are each seen by voters as just one more ingredient thrown into a big cajun stew. Thus, there is precious little difference in how you go about crafting "issue ads" and candidate ads.

Strother Decl. ¶ 4 [DEV 9–Tab 40]. During the cross-examination period, Strother made another observation:

What you're trying to do is give people enough information [sic] they can make up their own minds. Of course, you're leading them to make up their minds in one direction, but I don't call that hard sale. People tend not to vote for issues anyway, most of the time. They tend to vote for the individual, and they measure the individual by issues.

Strother Cross Exam. at 43 [JDT Vol. 32]; *see also id.* at 44 (observing that 90% of candidate advertisements Strother has put together in his career have *not* used express advocacy).

2.3.3 Unrebutted expert testimony confirms the view of political consultants. Krasno and Sorauf state that:

the practices of political advertisers are not dissimilar from those of commercial advertisers. Car ads rarely exhort viewers to "buy" a Chevrolet, nor do soft drink ads urge people to "drink" their product. The most aggressive ads usually urge viewers to do no more than call or visit a website for information.... This atmospheric approach to commercial advertising-where the product is presented in various desirable tableaus-has become increasingly popular. It serves the general strategy of advertisers to present viewers with a variety of reasons to choose their product, hoping that they will latch onto one. Too heavy-handed an approach might interfere with this process by raising viewers' defenses. Political ads seem to follow the same strategy, hoping that citizens will grow to prefer a candidate without

---

80. Strother is a political consultant, and President and founder of Strother/Duffy/Strother. Strother Decl. ¶ 1 [DEV 9–Tab 40]. He is also Chairman of the Board of the American Association of Political Consultants, and last year served as its President. *Id.* Since 1967, he has worked for more than 300 campaigns. *Id.* Representative clients at the presidential, congressional, and gubernatorial levels have included Lloyd Bentsen, Paul Simon, Gary Hart, Bill Clinton, Al Gore, Mary Landrieu, and Zell Miller. *Id.* In the last two decades alone, his firm has "helped elect candidates in 44 states and five countries, including 13 Senators, 8 Governors, and scores of Congress members. [His firm has] won more Democratic Primaries than any other firm." *Id.*

being told to troop to the polls. That may or may not be an effective approach, but it is the one that advertisers use and that regulators and courts must reckon with.

Krasno and Sorauf Expert Report at 54 [DEV 1–Tab 2] (footnote omitted); *see also* Magleby Report at 15 [DEV 4–Tab 8] ("The absence of magic words in electoral communications does not impede the ability of media consultants to craft an electioneering message. In fact, candidates rarely use the magic words in their own ads.").

**2.4 *Current Federal Law Does Not Distinguish Between Pure Issue Advertisements and Candidate–Centered Issue Advertisements***

Not only are words of express advocacy uncommon and ineffective in campaign advertising, it is also undisputed that they are ineffective criteria for distinguishing between genuine issue advertisements and advertisements that do not use express advocacy but are designed to influence a federal election.

2.4.1 Experts provided uncontroverted testimony to support this point. "The 'magic words' defined in *Buckley v. Valeo* do not provide an effective way to determine whether advertisements have the purpose and/or effect of supporting or opposing particular candidates." Magleby Report at 5 [DEV 4–Tab 8]; *see also* Krasno and Sorauf Expert Report at 58 [DEV 1–Tab 2] ("The magic words test, however, does not distinguish between [pure issue advertisements and candidate-oriented issue advertisements]; indeed it does not distinguish between ads sponsored by candidates and any type of issue ad, or even between political and commercial advertising. Whatever its utility might once have been, this standard is now irrelevant to how political ads are designed.").

2.4.2 Present and former officeholders and candidates likewise provide uncontroverted testimony that "magic words" do not distinguish pure issue advertisements from candidate-centered issue advertisements. 147 Cong. Rec. S3072 (2001) (Senator Russ Feingold) ("People didn't need to hear the so-called magic words to know what these ads were really all about."); 147 Cong. Rec. S3036 (Senator John McCain) ("[W]e can demonstrate that the Court's definition of 'express advocacy'-magic words-has no real bearing in today's world of campaign ads."). Senator Carl Levin made the following statement on the floor of the Senate in 1998:

To show the absurd state of the law, at least in some circuits, we can just look at one of the 1996 televised ads that was paid for by the League of Conservation Voters and which referred to House Member Greg Ganske, a Republican Congressman from Iowa, who was then up for reelection. This is the way the ad read:

*It's our land; our water. America's environment must be protected. But in just 18 months, Congressman Ganske has voted 12 out of 12 times to weaken environmental protections. Congressman Ganske even voted to let corporations continue releasing cancer-causing pollutants into our air. Congressman Ganske voted for the big corporations who lobbied these bills and gave him thousands of dollars in contributions. Call Congressman Ganske. Tell him to protect America's environment. For our families. For our future.*

The ad sponsor claimed that was an issue ad, an ad that discussed issues rather than a candidate, and so could be paid for by unlimited and undisclosed funds. If one word were changed, if instead of 'Call Congressman Ganske,' the ad said, 'Defeat Congressman Ganske,' it would clearly qualify as a candidate ad subject to contribution lim-

its and disclosure requirements. In the real world, that one word difference doesn't change the character or substance of that ad at all. Both versions unmistakably advocate the defeat of Congressman Ganske.

144 Cong. Rec. S10073 (1998) (Senator Carl Levin) (advertisement text in italics); *see also* Decl. of Elaine Bloom ¶ 5 [DEV 6–Tab 7] ("In my experience in campaigns for federal, state and local office, including my involvement in the television advertising we ran in my race for Congress, no particular words of advocacy are needed for an ad to influence the outcome of an election. Many so-called 'issue ads' are run in order to affect election results.").[81]

As former Senator Dale Bumpers testifies:

Soft money also finds its way into our system through so-called "issue advertisements" sponsored by outside organizations that mostly air right before an election. Organizations can run effective issue ads that benefit a candidate without coordinating with that candidate. They have experienced professionals analyze a race and reinforce

what a candidate is saying. These ads influence the outcome of elections by simply stating "tell him [the opponent] to quit doing this." The "magic words" test is completely inadequate; viewers get the message to vote against someone, even though the ad may never explicitly say "vote-against-him."

Bumpers Decl. ¶ 26 [DEV 6–Tab 10]; *see also* Chapin Decl. ¶ 7 [DEV 6–Tab 12] ("Based on my experience in campaigns for federal and local office, including the television advertising we ran in my races for County Chairman and Congress, I am familiar with political campaign ads. No particular words of advocacy are needed in order for an ad to influence the outcome of an election.").[82] Congressman Christopher Shays, a Defendant–Intervenor, testifies:

Although the Supreme Court has identified a limited category of "magic words" that make an advertisement a campaign advertisement, my experience as a candidate and a Member of the House is that this limited test is inadequate to identify campaign ads. Campaign ads need not include phrases such as "vote

---

**81.** Elain Bloom is currently engaged in consulting, public speaking, and community activities. Bloom Decl. ¶ 2 [DEV 6–Tab 7]. In 2001, Bloom was a candidate for Mayor of Miami Beach, Florida. *Id.* In 2000, Bloom was the Democratic candidate in the general election to represent Florida's 22nd Congressional District, running against the incumbent Republican Clay Shaw, who had served in Congress for nearly 20 years. *Id* (Shaw won the race by approximately 500 votes out of over 200,000 cast). Prior to the 2000 race, Bloom served as a member of the Florida House of Representatives for over 18 years, from 1974 to 1978 (representing Northeast Dade County) and from 1986–2000 (representing Miami Beach and Miami). *Id.* Bloom was Speaker Pro–Tempore of the Florida House from 1992 to 1994, and also served as chair of several legislative committees, including the Health Care Committee, the Joint Legislative Management Committee, the Joint Legislative Auditing Committee, and the Tourism and Cultural Affairs Committee. *Id.*

**82.** Since early 2001, Linda Chapin has been the Director of the Metropolitan Center for Regional Studies at the University of Central Florida. Chapin Decl. ¶ 2 [DEV 6–Tab 12]. Chapin was the Democratic candidate in the 2000 general election to represent Florida's Eighth Congressional District, which was an open-seat race. *Id.* ¶ 4. In the November 2000 general election, her Republican opponent received about 51% of the votes cast, and Chapin received about 49% of the votes cast. *Id.* ¶ 4. From 1998 to 2000, Chapin directed the Orange County (Florida) Clerk's Office. *Id.* ¶ 2. Prior to that, Chapin was elected to two successive four-year terms, in 1990 and 1994, as County Chairman of Orange County. *Id.* The County Chairman is a strong executive position roughly equivalent to a mayoral office. *Id.* Prior to her tenure as County Chairman, she was elected to a four-year term on the Orange County Commission in 1986.

for," "re-elect" or "vote against" to be effective campaign tools, and the practice of large numbers of so-called "issue ads" before an election proves it.

Shays Decl. ¶ 12 [DEV 8–Tab 35].

2.4.2.1 Federal officeholders and candidates also testify that, based on their experience, the intent behind issue advertisements that mention the name of a federal candidate, are aired right before the election, and broadcast to the candidate's electorate, is to influence the election. Chapin Dep. at 27 [JDT Vol. 5] ("It's possible that you could debate the [fact that issue advertisements run within 60 days of an election can be both intended to influence the outcome of an election and intended to promote a particular perspective on a particular public policy issue], but in my experience those ads are almost entirely intended to influence the outcome of an election."); see also Paul Dep. at 27–28 [JDT Vol. 25] (Plaintiff Congressman Ron Paul testifying that the outside group issue ads run in his 2000 Congressional campaign were intended to influence the election.).

2.4.3 The uncontroverted testimony of political consultants confirms that there is no difference between campaign advertisements that contain words of express advocacy and candidate-centered issue advertisements that are designed to influence federal elections but that do not use the "magic words" of *Buckley*. Consequently, it is uncontroverted that political consultants are able to easily create advertisements designed to influence federal elections that do not use words of express advocacy, and therefore, can be paid for with funds from prohibited sources (corporation and labor union general treasury funds).

*Republican Political Consultant Douglas L. Bailey*

The notion that ads intended to influence an election can easily be separated from those that are not based upon the mere presence or absence of particular words or phrases such as "vote for" is at best a historical anachronism. When I first entered this business, and up through the mid–1980s, we were regularly able to purchase five minute slots of air time. In a five minute spot, I could introduce a candidate, bring the viewer to a comfort level with the candidate, cover a few different substantive issues, and at the end, have the candidate make a direct appeal for a vote. In this by-gone era, it made sense for a candidate to appeal directly for votes using words such as "vote for," "support," or "cast your ballot" on the basis of a more full or substantive story told in a five minute time period. By contrast, in a 30 second ad, there is not enough time to make a positive direct sale.

Bailey Decl. ¶ 5 [DEV 6–Tab 2].

*Democrat Political Consultant Raymond Strother*

Because it is so easy for consultants in my business to make ads that will influence federal elections without triggering the need to use hard dollars to pay for them, the difference between hard money and soft money is a joke. If I want to use soft money to influence an election, there is no real difference in what I do to create the ad. The only thing that is different is the tag line at the end. From the point of view of a media consultant, there is no real difference between ending an advertisement with "Vote for Senator X" versus ending an advertisement with "Tell Senator X to continue working hard for America's families." The public simply does not differentiate between ads that are otherwise identical, but contain these slightly different tag lines at the very end.

When we design, produce, and run "issue ads" that mention specific candidates for federal office and that are aired in proximity to an election, these ads are for only one purpose: to effect [sic] the outcome of an election. To call these ads "issue ads" is a sham. We know that these ads have been paid for with soft money; we know why we have been hired; and we know how easy it is to make sham issue ads that comply with the law, but nevertheless affect federal elections. We know this even without explicit instructions from our clients. Any media consultant who says otherwise isn't telling the truth. This is what everyone in the business does and you know what you are supposed to produce. It is playing within the current set of rules, but these rules need to be changed.

One common trick that makes the job of creating sham issue ads even easier is the two-camera candidate shoot. Sometimes, the media consultant for the candidate's campaign committee will shoot the film and sell it to the media consultant for a third party for a reasonable rate. They simply take 2 cameras on a shoot when they are filming the candidate's ad. Camera A shoots the footage for the candidate's ad, and Camera B takes nearly identical footage that is then sold to other media consultants for a nominal fee. The media consultant for the third party just has to buy the film from Camera B and put on a clever tag line at the end. In this way, the candidate's media consultant gets direct control over the images of the candidate used in the issue groups' ads.

Strother Decl. ¶¶ 3, 8, 11 [DEV 9–Tab 40].

*Republican Political Consultant Rocky Pennington*

Many soft money ads that avoid the magic words are clearly intended to affect federal elections. Parties and interest groups would not spend hundreds of thousands of dollars to runs [sic] these ads 15 days before an election if they were not trying to affect the result. These candidate-specific ads are not usually run the year before the election or the week after. The usual final tag line for soft money electioneering is to "call" or "ask" or "tell" a candidate to stop or continue doing something, often something vague like fighting for the right priorities. This is pretty silly, because it's hard to imagine thousands of people calling the candidate in response to the ad and saying, keep doing this, this is wonderful. These standard final words, like "tell," have become the real "magic words" in modern campaigning. I imagine some smart lawyer came up with them, because the real audience for them is not the voters, but the courts who may be examining the ad after the election.

Pennington Decl. ¶ 10 [DEV 8–Tab 31]. Both the Chamber of Commerce and AFL–CIO admit that "[t]he ultimate way to tell an elective official to do something is through the voting process." G. Shea Dep. at 46 [JDT Vol. 30]; Josten Dep. at 230 [JDT Vol. 12] ("I would say that [voting against a candidate] is probably one of the best ways to tell a politician you don't like what they are doing."). Plaintiffs attempt to challenge this premise by citing text from Senator Feingold's deposition that his constituents do call him about issues they may have seen in issue advertisements; however, a careful reading of the colloquy makes clear that the type of advertisements his constituents may have seen is never clarified. I cannot conclude from this exchange that the advertisements that led to those telephone calls would be covered by Title II of BCRA. During his deposition, Senator Feingold only indicates that he receives calls from constituents in response to television advertisements. Senator Feingold was not

specifically asked if these advertisements were the type covered under Title II of BCRA. Feingold Dep at 238–39 [JDT Vol. 6] ("Q. . . . You mentioned ads, and I have shown you ads which say call Senator so and so, contact Senator so and so. Your constituent sometimes do call you and contact you, do they not? A. Yes, they do. Q. And they sometimes talk about issues including abortion, right to life issues and other issues, do they not? A. Yes, they do. Q. In your opinion, are they sometimes affected by advertisements that they have seen on television? A. I'm sure they are.").

*Democrat Political Consultant Terry S. Beckett*

I am aware of the idea that particular "magic words" might be required in order for an advertisement to influence an election. However, in fact no particular words of advocacy are needed in order for an ad to influence the outcome of an election. No list of such words could be complete: if you list 50, savvy political actors will find 100 more. For example, many so-called "issue ads" run by parties and interest groups just before an election attack a candidate, then end by supposedly urging the viewer to "tell" or "ask" the candidate to stop being that way. These ads are almost never really about issues. They are almost always election ads, designed to affect the election result, and many do affect the election result. You can see this most clearly in the ones that amount to personal attacks, or that criticize a candidate on several unrelated "issues." In fact, in my experience, candidates tend to shy away from such negative attack ads because there would be political repercussions for them. But entities like the DCCC [Democratic Congressional Cam-

paign Committee] and the Club for Growth do not have such constraints. Based on my observations, the candidate ads in the 2000 Congressional race, which were financed with federal funds ("hard money"), were actually more about "issues" than the supposed "issue ads" run by political parties and interest groups, which I understand were financed at least in part with non-federal funds("soft money").

Beckett Decl. ¶ 8 [DEV 6–Tab 3].

*Democrat Political Operative Joe Lamson*

Based on my experience in managing many federal election campaigns, I am familiar with campaign advertising. No particular words of advocacy are needed in order for an advertisement to influence the outcome of an election. When political parties and interest groups run "issue ads" just before an election that say "call" a candidate and tell her to do something, their real purpose is typically not to enlighten the voters about some issue, but to influence the result of the election, and these ads often do have that effect. Parties and groups generally run these pre-election "issue ads" only in places where the races are competitive. These "issue ads" generally stop on the day of the election. For example, these groups could run ads explaining Nancy Keenan's position on the issues after the November general election so that people could discuss them over the Thanksgiving dinner table, but it doesn't seem to work that way.

Lamson Decl. ¶ 6 [DEV 7–Tab 26].

*Former Chair of Plaintiff NRA Political Victory Fund Tanya K. Metaksa* [83]

Today, there is erected a legal, regulatory wall between issue advocacy and po-

---

**83.** Metaksa served as Chairman of the National Rifle Association Political Victory Fund and

as Executive Director of the NRA Institute for Legislative Action. She made the statement

litical advocacy. And the wall is built of the same sturdy material as the emperor's clothing.

Everyone sees it. No one believes it. It is foolish to believe there is any practical difference between issue advocacy and advocacy of a political candidate. What separates issue advocacy and political advocacy is a line in the sand drawn on a windy day.

We engaged in issue advocacy in many locations around the country. Take Bloomington, Indiana, for example. Billboards in that city read,

"Congressman Hostettler is right."

"Gun laws don't take criminals off Bloomington's streets."

"Call 334–1111 and thank him for fighting crime by getting tough on criminals."

Guess what? We really hoped people would vote for the Congressman, not just thank him. And people did. When we're three months away from an election, there's not a dime's worth of difference between "thanking" elected officials and "electing" them.

INT 015987, Opening Remarks at the American Ass'n of Political Consultants Fifth General Session on "Issue Advocacy," Jan. 17, 1997, at 2 [DEV 38–Tab 25].

2.4.4 As a result of these developments, Congress found that FECA, as construed by the Courts to limit only independent expenditures containing *Buckley*-defined express advocacy, was no longer relevant to modern political advertising. *See, e.g.,* 148 Cong. Rec. S2117 (2002)

(Statement of Sen. James Jeffords) ("The 'magic words' standard created by the Supreme Court in 1976 has been made useless by the political realities of modern political advertising. Even in candidate advertisements, what many would say are clearly advertisements made to convince a voter to support a particular candidate, only 10 percent of the advertisements used the 'magic words.' "); *see also* 148 Cong. Rec. S2116 (2002) (Statement of Sen. Carl Levin) ("[T]he Brennan Center study found that of the ads actually run by candidates and paid for with hard money specifically on behalf of their election or defeat, only 9 percent used the seven magic words and phrases identified by the Supreme Court. That is compelling evidence that the magic words identified by the Supreme Court are not a complete test of what constitutes electioneering ads. More is at work here than just the seven magic words identified by the Supreme Court.").

**2.5** ***Candidate–Centered Issue Advocacy Has Risen Because it Permits Corporations & Labor Unions to Influence Federal Elections with General Treasury Funds While Avoiding FECA's Restrictions***

It is uncontroverted that the shift toward using issue advocacy can be explained by three phenomena. "First, it permits groups and individuals to avoid disclosure. Second, it allows them to avoid contribution limits. Third, it permits some groups (such as corporations and labor unions) to spend from generally prohibited sources." Magleby Report at 18 [DEV 4–

above in her opening remarks to the American Association of Political Consultants' Fifth General Session on "Issue Advocacy." INT 015987, Opening Remarks at the American Ass'n of Political Consultants Fifth General Session on "Issue Advocacy," Jan. 17, 1997, at 2 [DEV 38–Tab 25]. During this litigation, NRA Executive Vice President Wayne LaPierre testified that Ms. Metaksa is "someone

who was knowledgeable about NRA's political strategies" and was someone who was "a reliable and trustworthy employee of NRA." LaPierre Dep. at 11 [JDT Vol. 14]. Plaintiffs have not objected to Ms. Metaksa's statement on hearsay grounds and given Mr. LaPierre's comments, I find Ms. Metaksa's statement trustworthy and rely on it for purposes of my Findings.

Tab 8]; *see also* Krasno and Sorauf Expert Report at 50 [DEV 1–Tab 2] ("Avoiding FECA allows advertisers to collect any sum of money from any source they can. Avoiding FECA allows advertisers to conduct their operations without disclosing their activities to the public.").

### 2.5.1 *Avoid Disclosure*

It is not disputed that one advantage to using candidate-centered issue advertising to influence federal elections is that the advertisements are outside FECA's purview. Accordingly, disclosure is not required for the organization paying for these advertisements. Magleby Expert Report at 18 [DEV 4–Tab 8] ("The 1996, 1998 and 2000 election cycles all saw examples of groups who sought to avoid accountability for their communications by pursuing an electioneering advertising/election advocacy strategy rather than limiting their activities to independent expenditures or other activities expressly permitted by the FECA."). Indeed, Plaintiffs' expert Sidney M. Milkis notes:

> It is important to point out, however, that interest groups have also increased their political advertisements that connect, indeed subordinate the discussion of issues to electioneering, much of it negative in tone. As an Annenberg Public Policy Center study indicates, the ads of special interest groups represented 68% of all spending on issue ads in the 1999–2000 cycle; interest groups spent more than $347 million on these issue advertisements. The names of these groups did little to tell viewers who the sponsors of these messages were; indeed, in some cases they were misleading. For example, The Citizens for Better Medicare, which spent $65 million on television ads, is funded primarily by the pharmaceutical industry. Not only were the funding sources of interest groups ads more misleading than party-sponsored ads, they also

tended to be more negative, especially in the early stages of the 2000 campaign.

Milkis Decl. ¶ 49 [RNC Vol. VII] (citing Annenberg Report 2001). Aside from the observation of Plaintiffs' expert Milkis about the lack of disclosure relating to political advertisements, two further examples illustrate this point:

● In 1998, the AFL–CIO helped pay for ads in the Connecticut Fifth Congressional District race through a group named the "Coalition to Make Our Voices Heard." Steven Rosenthal defended campaigning under an obscure name in this case saying, "Frankly we've taken a page out of their book [other interest groups] because in some places it's much more effective to run an ad by the 'Coalition to Make Our Voices Heard' than it is to say paid for by 'the men and women of the AFL–CIO.'"

Magleby Expert Report at 18–19 [DEV 4–Tab 8] (citing Rosenthal's comments at a lunchtime discussion panel at the Pew Press Conference).

● One or more sources of the funds used by Plaintiff NRA to finance at least one political advertisement that identified a candidate and that was broadcast on television or radio within the 60 days preceding a general election in a state or Congressional district in which that candidate was running for federal office has not been publicly disclosed.

Resps. of the NRA and the NRA Political Victory Fund to Def. FEC's First Req. for Admis., No. 12, 5 [DEV 12–Tab 9] ("The NRA is not required under applicable law to disclose the specific individuals who provide it with funding, and it respects the strong desire of many of its members and contributors to remain anonymous.").

### 2.5.2 *Avoid Source Limitations*

Federal law has long prohibited corporations and labor unions from using their

general treasury funds for federal election purposes. Therefore, another advantage to candidate-centered issue advertising is that the advertisements can be paid for with general treasury funds and thereby avoid FECA's source restrictions. Magleby Expert Report at 19 [DEV 4–Tab 8] ("The ability of corporations and trade unions to effectively campaign through electioneering advertisements and election advocacy" under the rubric of issue advocacy by avoiding the magic words, "makes a sham of these longstanding federal laws.").

### 2.5.3 Avoid Contribution Limitations

As donations of nonfederal funds are not limited by federal law, "groups can raise larger amounts of money in less time." Magleby Expert Report at 19 [DEV 4–Tab 8] (For example, "groups like Citizens for Better Medicare, Pharmaceutical Research and Manufacturers of America, NAACP National Voter Fund, and NARAL, were able to far exceed what individuals, PACs or parties could do through hard money contributions."); *id.* at 10 ("[T]his method of advocacy allows groups to accept unlimited contributions to pay for the communications."). This fact provides another advantage of using candidate-centered issue advocacy.

### 2.6 Organizations' Use of Candidate-Centered Issue Advocacy

Examples from the record demonstrate that organizations use candidate-centered issue advertising as a means of avoiding FECA's restrictions.

### 2.6.1 AFL–CIO's Issue Advocacy Media Campaign Surrounding the 1996 Federal Election

The evidence demonstrates that the AFL–CIO's issue advertising campaign in and around the 1996 federal general election was designed to influence the election and was paid for with general treasury funds.

2.6.1.1 Denise Mitchell,[84] Special Assistant for Public Affairs to AFL–CIO President John J. Sweeney, states that she "realize[s] that AFL–CIO advertising could affect how citizens vote.... [T]hey may in some cases have an indirect effect on election outcomes.... This, however, has never been the point of our broadcast advertising program...." Mitchell's statement is controverted by evidence from the record that the AFL–CIO did not attempt to rebut or discount:

- A September 18, 1996, memorandum from a polling firm analyzed the potential impact of five issue advertisements in terms of their likely effect on voters. Memorandum from Guy Molyneux and Molly O'Rourke of the polling firm Peter D. Hart Research Associates, Inc., to the AFL–CIO's Special Assistant for

**84.** Denise Mitchell is the Special Assistant for Public Affairs to AFL–CIO President John J. Sweeney. Mitchell Decl. ¶ 1 [6 PCS]. She was appointed to this position on November 1, 1995, shortly after Sweeney was elected President of the AFL–CIO. *Id.* Prior to assuming this position, Mitchell had worked with Sweeney in a similar role for a number of years when he was President of the Service Employees International Union and she had assisted in his campaign for election to the position of AFL–CIO President. *Id.* Mitchell has worked in marketing and media relations for unions and other non-profit organizations on working family issues for more than 20 years. *Id.* In her current position, Mitchell has the primary responsibility for overseeing all public relations activities of the AFL–CIO including all AFL–CIO use of broadcast and print media. *Id.* ¶ 2. Mitchell is responsible for making the operational decisions as to both the substance and the method of communication of the AFL–CIO's message to union members and to the general public. *Id.* Mitchell makes the strategic and logistical decisions regarding the AFL–CIO's media buys, and, within policy guidelines, makes the editorial decisions regarding the content of the AFL–CIO's communications.

Public Affairs, Denise Mitchell, "Ad Targeting" (Sept. 18, 1996), AFL–CIO 001614–16 [DEV 124] ("[The advertisement] Taxes appears to be the single strongest spot, in terms of *reaching the widest range of voters and affecting people's impression of the incumbent's Issue position.* It should especially be directed to younger voters. [The advertisement] Kids is also very strong, and again should be directed to young people. [The advertisements] Medicare, Homes, and Retire are most effective with older audiences. If you can only run 4 spots, [the advertisement] Retire is probably the one to drop.") (emphasis added); *see also* Memorandum from Geoff Garin and Guy Molyneux of Peter D. Hart Research Associates, Inc. to Denise Mitchell, "AFL–CIO Mall Intercepts Survey" (Sept. 13, 1996), AFL–CIO 001582–84 [DEV 124] (Mall Intercept Survey of individuals' reactions to these advertisements including *how the advertisements made the respondents feel about fictitious congressman's position on each issue*); *see also* Mitchell Cross Exam. at 66–75 [JDT Vol. 23].

● On March 29, 1996, Mitchell received a memorandum from a campaign consultant analyzing political media consultants for the AFL–CIO. The memorandum stated:

Political campaigns are superheated environments where the objective is not, always, to make the best looking spot. The objective is to communicate with the persuadables at the time they are making their decision. Being able to pivot the entire campaign at exactly the right time is the real talent of a media consulting firm. Consequently, there is little reward for great spots.

No one knows better than you how consuming this can be. . . .

[These advertisements can be done], but you must understand that you will be asking these political consultants to do it under rules they have never had to follow before. . . .

What [all of these firms can do] is manage the political message in a volatile environment.

Memorandum from Joe Cowart of Joseph Cowart Campaign Consulting to Denise Mitchell, "Political Media Consultants" (Mar. 29, 1996), AFL–CIO 001702–04 [DEV 124].

● An October 9, 1996, internal memorandum from the AFL–CIO's Brian Weeks to AFL–CIO's Mike Klein discussed where media buys might be placed to help Dick Durbin in his Illinois Senate race, based on Mr. Durbin's lack of resources to air advertisements in certain markets. Memorandum from Brian Weeks to Mike Klein, "Electronic Buy for Illinois Senator" (Oct. 9, 1996), AFL–CIO 005244 [DEV 125].

Accordingly, with regard to the AFL–CIO's issue advertising campaign that aired before the 1996 general election, I find that Mitchell's statement that the indirect effect on election outcomes has never been the point of the AFL–CIO's broadcast advertising program, Mitchell Decl. ¶ 70 [6 PCS], carries no weight in light of these internal documents.

2.6.1.2 It is clear that the AFL–CIO's issue advocacy campaign was designed to influence the 1996 general election and was accomplished through candidate-centered issue advocacy so as to avoid FECA's source limitations. Independent expert testimony, which has not be countered by the AFL–CIO with any contrary expert testimony, demonstrates that the AFL–CIO's 1996 issue advocacy campaign was designed to influence federal elections:

The 1996 initiative by labor into unregulated and unlimited electioneering communications was substantial. The AFL–CIO spent a reported $35 million dollars (see Deborah Beck, Paul Taylor, Jeffrey

Stanger, and Douglas Rivlin, "Issue Advocacy Advertising During the 1996 Campaign: A Catalog," report series by the Annenberg Public Policy Center, no. 16, 16 September 1997, 10), much of it on television, aimed at defeating 105 members of Congress, including 32 heavily targeted Republican freshmen. See Paul Herrnson, *Congressional Elections: Campaigning at Home and in Washington,* (Washington, D.C.: Congressional Quarterly, 1998), 123. Labor broadcast television commercials in forty districts, distributed over 11.5 million voter guides in twenty-four districts and ran radio ads in many others. See "Labor Targets," *Congressional Quarterly Weekly Report,* 26 October 1996, 3084; Jeanne I. Dugan, "Washington Ain't Seen Nothin' Yet," *Business Week Report,* 13 May 1996, 3.

Magleby Expert Report at 10 n.7 [DEV 4–Tab 8] (citation omitted); Mann Expert Report at 28 [DEV 1–Tab 1] ("The AFL–CIO was one of the first nonparty groups in 1996 to seize the opportunity to broadcast electioneering ads under the guise of issue advocacy (Dwyre 1999); they continue to avail themselves of that opportunity today (Magleby 2002)."); Krasno and Sorauf Expert Report at 52 [DEV 1–Tab 2] ("For example, the AFL–CIO in the first issue ad campaign in House elections in 1996 acknowledged its intent to help Democratic candidates, and its results were measured accordingly.") (footnote omitted); *see also* Mitchell Dep. at 96–97 [JDT Vol. 23] (stating that in 1996, in the 60 days before the election, in terms of dollars spent by the AFL–CIO on broadcast advertising, the substantial majority of that money was spent on advertisements that mentioned members of the House of Representatives).

2.6.1.3 In fact, Mitchell admits that some of the AFL–CIO's advertisements were intended to directly or indirectly influence the 1996 general election. Mitchell testi-

fies that after Congress adjourned on October 3, 1996, the AFL–CIO discontinued its broadcast advertisements "aimed at immediately pending legislative issues." Mitchell Decl. ¶ 42 [6 PCS]. The AFL–CIO then began to run "electronic voter guides" which compared the positions of congressional candidates on various issues. *Id.;* Mitchell Cross Exam. at 183–84 [JDT Vol. 23] ("Is there any ad which the AFL–CIO ran in the 60–day period prior to the federal elections of 2000, 1998 and 1996 where you concede that a purpose was to affect the vote in the forthcoming election? ... A Well, would you include indirectly affect? Do you want to ask it that way? Q I will start with that way. A Okay. You know, certainly the voter guides in particular had that as a purpose."); *see also id.* at 184 ("Q You do concede that the ads that you ran in the 60 days prior to 2000, 1998 and '96 might have had the effect of influencing votes in the forthcoming election, don't you? A I don't—right, I don't deny that among other things they might have had an effect on how citizens perceived office holders and had an effect on their vote.").

2.6.1.4 In an FEC investigation into organized labor's role in the 1996 election, the General Counsel found:

In the nine flights broadcast between late June and mid-September, 1996, the advertisements would criticize the incumbent member of Congress named therein, frequently in harsh terms, about his or her record on the issue that was the subject of the advertisement. However, with the exception of a flight of advertisements on the topic of the minimum wage that aired in late June and early July, 1996, there was no clear connection between the content of the advertisements and any legislation that was then the subject of intensive legislative action at the time of the advertisements. The targets of these advertise-

ments were uniformly both Republicans and incumbents. In the eight flights that began in late September and continued through election day, the advertisements took the form of so-called "electronic voter guides," comparing the Republican incumbent and the Democratic challenger (or the Republican and Democratic nominees, in the cases of open seats) on a particular issue; the Democratic candidate's record was uniformly presented more favorably than the Republican candidate's. The scripts of both kinds of advertisements appeared to have been carefully designed to avoid "express advocacy" of the election or defeat of any candidate. . . .

FEC MUR 4291, General Counsel's Report, June 9, 2000, at 5–6, INT003837–38 (footnote omitted) [DEV 52–Tab 3]. The investigation into the AFL–CIO's tactics sought to ascertain whether AFL–CIO had coordinated election-related communications with candidates for Federal office, their campaigns, or with political parties. *Id.* at 1. The investigation "developed no evidence of any instance in which the AFL–CIO made any communication to the general public after coordination with a recipient candidate or party committee that meets the standard for coordination set forth in *FEC v. The Christian Coalition*, 52 F.Supp.2d 45 (D.D.C.1999)." *Id.* at 3. As a result of this conclusion, the General Counsel recommended to the Commission that the investigation into organized labor's role in the 1996 elections be closed. *Id.* at 1. Although the FEC concluded that there was no coordination under governing caselaw, the agency did find that with one exception the issue advertisements were directed at particular officeholders and candidates during the election cycle.

2.6.1.5 Other political organizations viewed the AFL–CIO's issue advertising campaign as designed to influence federal elections. One of the complaints filed with

the FEC against the AFL–CIO was brought by the National Republican Congressional Committee ("NRCC"). McCain Decl., Attach. F [DEV 8–Tab 29] (Complaint in MUR 4307). The NRCC stated in their complaint:

The [AFL–CIO] TV ads are careful not to specifically violate phrases contained in Sec. 100.22(a) such as "vote against Old Hickory" or "defeat accompanied by a picture of one or more candidate/s/" or "reject the incumbent". However there is clearly a violation of Sec. 100.22(b). *If one reads the language of that section and looks at the entire picture including external events it is obvious that any informed American clearly knows that the purpose of these ads is "expressly advocating" defeat of the Republican who is the subject of the ad.*

*Id.* at 1 (emphasis added).

2.6.1.6 The AFL–CIO has presented no uncontroverted evidence to substantiate their claim that the intended purpose of their issue advocacy with regard to the 1996 general election was unrelated to electing or defeating candidates for federal office. The AFL–CIO does concede, in fact, that its issue advocacy does have an affect on voters during the election cycle. Moreover, there is no dispute that the AFL–CIO's advertising campaign did affect the 1996 general election. Of the 32 House Republican freshmen the AFL–CIO targeted in 1996, 12 were defeated. Annenberg Report 1997 at 13 [DEV 38–Tab 21].

2.6.2 *The Coalition–Americans Working for Real Change's Issue Advocacy Media Campaign Surrounding the 1996 Federal Election*

The evidence demonstrates that similar to the AFL–CIO's issue advertising campaign during the 1996 election cycle, business interests (known as The Coalition–Americans Working for Real Change) re-

sponded with their own issue advocacy campaign designed to influence the election and paid for with corporate general treasury funds thereby permitting these corporations to evade FECA's source limitations. The record also demonstrates that by running candidate-centered issue advertisements The Coalition was able to avoid FECA's disclosure requirements and hide its corporate sponsors behind an ambiguous and unobjectionable pseudonym.

2.6.2.1 In their proposed findings, the Chamber of Commerce, NAM, and the Associated Builders and Contractors claim that "Defendants' assertion that The Coalition's 1996 activities show that preelection issue ads are merely candidate ads in disguise is mistaken. Participants in The Coalition were unanimous that its ads were intended to respond to issue ads being run by the AFL–CIO." Proposed Findings of Fact of Chamber, NAM, Associated Builders and Contractors, *et. al.* ¶ 24. Bruce Josten, Executive Vice President for Government Affairs for the U.S. Chamber of Commerce, testifies that the purpose of the advertisements aired during the 1996 federal election was to respond to attack advertisements paid for by the AFL–CIO and organized by its president, Mr. John Sweeney, and not to influence the election of any federal candidate. Josten Dep. at 165 [JDT Vol. 12] ("The purpose of this coalition, specifically, only, uniquely was to respond to [John Sweeney's] ads and the false statements in them, in some cases, up to 75 Congressional districts. That was the mission of this coalition."). Mr. Josten explained that there "were TV markets where John Sweeney ran an ad accusing a member of Congress about their votes on the issues that I mentioned earlier, and in the spring he started running ads that were not true, and we would follow him" with television ads paid for by the Coalition. *Id.* at 44. According to Mr. Josten, the AFL–CIO commercials attacked Members of Congress who had supported pro-

business initiatives and legislation favored by the Coalition. "My objective was to knock down impressions that Mr. Sweeney and his advertisers and campaigns were trying to undertake and express our viewpoints exactly the opposite of that and let the viewers make their own decision about that dialogue that was being imposed on them." *Id.* at 88.

2.6.2.2 Josten's testimony is controverted by specific evidence in the record that indicates that one purpose of the advertising campaign was to influence the 1996 general election:

- In 1996, the Coalition sought proposals from advertising firms for a "campaign to re-elect a pro-business Congress." TC00698 [DEV 121]. Media consultant Alex Castellanos of National Media, Inc. opened his proposal to the Coalition by stating: "Thank you for the opportunity to present two 30 second television and one 60 second radio scripts, as requested, to your campaign to re-elect a pro-business Congress." *Id.*

- The Coalition commissioned firms to conduct polls and focus groups to measure voter responses to their advertisements. AV0024–40, 0046–47, 0060–64, 0106–118, 0139–41 [DEV 121]. The Coalition retained two polling organizations in 1996, the Tarrance Group and American Viewpoint, to test whether specific Coalition and AFL–CIO advertisements would make participants more or less likely to vote for particular federal candidates. FEC MUR No. 4624, General Counsel's Report, April 20, 2001, at 22–23 [DEV 53–Tab 6]; Josten Dep. at 68–114 [JDT Vol. 12]. One firm surveyed "voter attitudes nationwide," TC 00513–37 [DEV 121], and another survey tested possible Coalition ads on focus groups, including one of "Swing Voters." AV0139–41, AV0037–40 [DEV 121].

● A June 28, 1996, Tarrance Group memorandum to the Coalition stated: "The net result among swing voters in Cleveland was that 25% of participants were moved closer to voting for a Republican candidate for Congress and about half of the participants were moved against national labor leaders. In other words, the response ads not only leveled the playing field, but put some points on the board for Republican candidates as well." AV139 [DEV 121] (stating that Republican Members of Congress are "currently under attack by AFL–CIO advertising" and are "outgunned and outclassed" and if "targeted Republicans ever hope to be operating on an even playing field during the 1996 election, it will require that an outside voice come to their defense.").

● A July 12, 1996, memorandum to the Coalition from American Viewpoint on "Key Findings of the Pre–Test in Des Moines Media Market of Iowa 4" concludes that Congressman "Greg Ganske is in deep trouble in the Des Moines Market," and states that "this is one of the most challenging districts that could have been chosen to assess the impact of your advertising. . . . If advertising can move numbers in this district, it should be effective in most other districts. Voters have not yet focused on the union's campaign as only 25% has seen the commercials. As a result, there is still time to reach them with a substantial buy." Memorandum from Gary Ferguson to the Coalition Steering Committee, "Key Findings of the Pre–Test in the Des Moines Market of Iowa 4" (July 12, 1996), NAW0002, 05 [DEV 121].

● One Coalition document included five headings referring to 1996 Congressional races: "Lean/Tilt DEM," "Toss–Up/Tilt GOP," "Lean GOP," "GOP Favored," and "Watch List." TC–00662–63 [DEV 121]. Under each heading is a list of candidates, and next to the names

an indication of whether there has been a single or double media buy, or whether the buy has been pulled. *Id.*

● In late 1996, the Coalition commissioned the Tarrance Group to conduct a detailed post-election analysis. The Tarrance Group, *Coalition Post–Election Survey Analysis,* NAM0206–27, at NAM0213 [DEV 121]. The Tarrance Group reported:

The Coalition commissioned this research to assess the impact of their two-month advertising campaign and its relative effect on voters in the face of the very aggressive, year-long campaign sponsored by the AFL–CIO. Given that four of the six Republican candidates tested in this research won their respective races, one could conclude that the Coalition's efforts were a success-as they were in the vast majority of the targeted districts in which the Coalition was involved.

To be sure, the most compelling empirical evidence that Coalition dollars were spent effectively is the fact that although the AFL–CIO outspent the Coalition by nearly 7 to 1 and began their onslaught almost a year earlier, voters in the tested districts were only twice as likely (36% average) to recall having seen, read, or heard the labor union's advertising as they were the business coalition's advertising (16% average).

Memorandum from Brian Tringali and Gary Ferguson of American Viewpoint and the Tarrance Group to Chuck Greener of the Coalition, "Key Findings from Post–Election Surveys in OH–6, IA–4, WA–1, WA–5, WA–9, and KY–1," (November 22, 1996), NAM0208 [DEV 121]; *see also* "Report on Accomplishments" TC00610–13 [DEV 121] (document Coalition sent to its members noting the suc-

cesses of the Coalition's campaign among swing voters).

Accordingly, as to The Coalition's issue advertising campaign that aired before the 1996 general election, I find that Josten's statement that the purpose of the coalition was "only" to respond to the advertising campaign of the AFL–CIO, Josten Dep. at 165 [JDT Vol. 12], carries no weight in light of these internal documents.

2.6.2.3 It is clear that The Coalition's issue advocacy campaign was designed to influence the 1996 general election and was accomplished through candidate-centered issue advocacy so as to avoid FECA's source and disclosure limitations. Independent evidence confirms that The Coalition's issue advertising campaign surrounding the 1996 general election was designed to influence the election. This expert testimony, which has not been controverted by any contrary expert testimony by Plaintiffs, concludes that:

> The business community responded to [the 1996 initiative by labor into unregulated and unlimited electioneering communications] with their own unlimited and undisclosed communications, again avoiding any of the magic words. Partners in the business response were the National Federation of Independent Business (NFIB), U.S. Chamber of Commerce, the National Association of Wholesaler–Distributors, the National Restaurant Association and the National Association of Manufacturers. Their group, called the "Coalition–Americans Working for Real Change," was active in thirty-seven House races, spent an estimated $5 million on over thirteen thousand television and radio commercials, and mailed over two million letters mainly in support of Republicans, to owners of small business. *See* Paul Herrnson, "Parties and Interest Groups in Postreform Congressional Elections," in *Interest Group Politics*, 5th ed., ed.

Allan Cigler and Burdett A. Loomis (Washington, D.C.: Congressional Quarterly, 1998), 160–61.

Magleby Report at 10 n.7 [DEV 4–Tab 8]; *see also* Josten Dep. at 29 [JDT Vol. 12]; Huard Dep. at 58 [JDT Vol. 11] (both noting that Coalition spent roughly $5 million on the campaign).

2.6.2.4 The FEC likewise concluded that the purpose of the Coalition's 1996 issue advocacy campaign was to influence the federal election. FEC MUR No. 4624, General Counsel's Report, April 20, 2001, at FEC MUR 4624, General Counsel's Rep., April 20, 2001, at 35 [DEV 53–Tab 6] ("The facts set out above establish that the Coalition's communications were undertaken for the purpose of influencing federal elections . . . ."); *id.* at 44–45 (recommending that the case against the Coalition be closed). Like the AFL–CIO, although the FEC recommended that the case be closed, that decision does not change the fact that it found that the Coalition sought to influence the 1996 general election with its issue advertising campaign.

### 2.6.3 *Citizens for Better Medicare*

Citizens for Better Medicare ("CBM") is an organization funded by the pharmaceutical industry that spent heavily on candidate-centered issue advertisements designed to influence the 2000 general election and paid for with the general treasury funds of their corporate members, thereby avoiding the source limitations of FECA. Like The Coalition, CBM also used issue advocacy to avoid FECA's disclosure requirements.

2.6.3.1 Timothy Ryan, former executive director of CBM, testifies that CBM is an organization sponsored by PhRMA, an industry trade association, and its activities were primarily financed by major drug companies. Ryan Dep. at 13 [JDT Vol. 27] ("We solicited funding from the pharmaceutical companies to underwrite our ef-

forts."); *id.* at 10–11 ("PHRMA was really the leading organization to organize and fund CBM."); PH 0379 [DEV 128–Tab 2] (Letter from PhRMA President and CEO to Amgen, "enclosing a contribution form for the grassroots and local media activities of CBM .... All information in your reply will be kept in strict confidence except as required by law or a court of competent jurisdiction."); CBM 0029 [DEV 128–Tab 1] (tally of donations from major drug companies to CBM in FY 2001, totaling $39,586,892.32). Despite the source of its funding, CBM describes itself as "a grassroots organization representing the interests of patients, seniors, disabled Americans, small businesses, pharmaceutical research companies and many others concerned with Medicare reform." *CBM: Who We Are* ... [DEV 128–Tab 1]. Given that it is undisputed that the pharmaceutical industry financed CBM, CBM stands as an example of how FECA's disclosure requirements can be avoided by running candidate-centered issue advertisements behind a misleading name like "Citizens for Better Medicare."

2.6.3.2 At the point in time the House of Representatives was considering a prescription drug benefit bill, Ryan testifies that CBM ran a series of advertisements that did not refer specifically to individual Members of Congress. Ryan Dep. at 42 [JDT Vol. 27]; *see also* Castellanos Dep. at 103–04 [JDT Vol. 4]. This practice changed during the 60 days before the election where CBM's advertising focused on specific federal candidates. *See supra* Findings ¶ 2.6.3.3.

2.6.3.3 Judith Bello, senior adviser to PhRMA, states that PhRMA supported a market-oriented approach to prescription drug coverage, and Republicans typically endorsed that type of plan. Bello Dep. at 149–50 [JDT Vol. 1]. Alex Castellanos, a political consultant with National Media, testifies that CBM understood that the

Democrats planned to use the prescription drug issue as a major theme in the 2000 election. Castellanos Dep. at 94–95. In response, in the *60 days* prior to the 2000 general election, CBM and the U.S. Chamber of Commerce spent heavily on "issue ads" supporting those Members and attacking Democratic candidates. Annenberg Report 2001 at 4, 20–22 [DEV 38–Tab 22]. Castellanos states that these advertisements mentioned Members' names. Castellanos Dep. at 63–66 [JDT Vol. 4]; *see also* Ryan Dep. at 68–72, 79–85 [JDT Vol. 27]; Josten Dep. at 191–97 [JDT Vol. 12]; Bloom Decl. ¶¶ 6, 14, 16 [DEV 6–Tab 7]; Mitchell Dep. at 198–204 [JDT Vol. 23]; USA–CBM 00004 [DEV 128–Tab 1] (October 20, 2000, Memorandum to CBM file outlining "CBM Campaign Summary") (noting that for Fall 2000 the advertising theme was "Keep it Local" and discussing advertising strategy "[a]s the November 2000 elections grew closer").

2.6.3.4 According to Timothy Ryan, much of CBM's advertising strategy leading up to the 2000 election was aimed at supporting candidates attacked in AFL–CIO advertising. Ryan Dep. at 68–72 [JDT Vol. 27]; Castellanos Dep. at 63–66 [JDT Vol. 4]. CBM spent about $65 million on television advertising in the 2000 election cycle. Ryan Dep at 15 [JDT Vol. 27]. "Citizens for Better Medicare ... spent almost as much money on issue ads as either political party," accounting for 13 percent of issue ad spending for the 1999–2000 cycle. La Raja Decl. ¶ 20(b) & Tbl. 10 [RNC Vol. VII] (reproduced from the Annenberg Public Policy Center).

2.6.3.5 The issue advocacy campaign of CBM run in the 60 days prior to the 2000 federal election demonstrates that these advertisements were designed to influence the federal election and evade FECA's source restrictions. This example also illustrates how organizations are able to use

campaign-centered issue advocacy to avoid FECA's disclosure limitations and hide their identities behind euphemistic organizational names.

### 2.6.4 *The National Rifle Association*

In addition to the AFL–CIO, The Coalition, and CBM, the National Rifle Association's ("NRA") use of issue advocacy around the 2000 federal election also clearly establishes that corporations use issue advocacy to directly influence federal elections and evade FECA's source limitations.

2.6.4.1 The NRA used issue advocacy to influence the 2000 federal election. Documentary evidence demonstrates this point:

- The NRA's media consultant, Angus McQueen, wrote an August 2000 memo entitled "NRA National Election Media Recommendations." The memo notes that the NRA's first objective is to "influence [the] outcome of [the] presidential election and other key congressional seats in 10 'battle ground' states." McQueen Cross Exam., Ex. 2, NRA–ACK 17913–15 [JDT Vol. 22]. McQueen is an advertising professional whom the NRA produced to testify specifically about the NRA's paid media program. *See generally* McQueen Decl. [11 PCS].

- Executive Vice President of the NRA, Wayne LaPierre, sent out a fundraising letter from the NRA to its members that stated that he "spent what it took [in 2000] to defeat Al Gore, which amounted to millions more than we had on hand." LaPierre Dep. Ex. 3 at 3 (NRA02575 [DEV 120]) [JDT Vol. 14]. LaPierre testified: "We took some money out of the reserves to cover the deficit that NRA had at the end of the 2000 year.... [The Gore advertising] was probably ... the main contributing factor." LaPierre Dep. at 105 [JDT Vol. 14].

- The fundraising letter from LaPierre also stated that "I could choose to spend as much as the NRA possibly could, to get our message to gun-owning voters in critical swing states—or I could hold funds in reserve for battles during 2001 and beyond." LaPierre Dep. Ex. 3 at 3 (NRA02575 [DEV 120]) [JDT Vol. 14]; *see also* LaPierre Dep. at 95–106 [JDT Vol. 14] (observing that the NRA spent $5 million to defeat Al Gore). During his deposition, Mr. LaPierre was asked repeatedly if he had "spent what it took to defeat Al Gore." *Id.* at 95–102. Mr. LaPierre admitted that the statement was truthful, *id.* at 102, but sought to characterize it as about more than the Presidential election, *id.* at 101–02 ("Q. Is it true that regular NRA 'spent what it took to defeat Al Gore'? A. If you include the culture of the country, yes. Al Gore was trying to change the culture of the country. We prevented him from doing it. That was the battle. It wasn't only an election battle. All these politicians think of this stuff only in election terms. And it's like-it's like they're 30 years out of date. The fact is this is about the air. It's about the airwaves. It's about the hearts and minds of America. And that's where the battle is being fought. And they're not willing to concede that. Yet we live it every day. So I'm not willing to concede the point that this was only about the elections, because the elections were about the air. And the air is what we were fighting for, that people breathe. We didn't want it to be only anti-firearm second amendment air, which is what they were trying to put out there.").

- LaPierre also testifies that he chose to do as much as he could for critical swing voters in swing states, meaning battleground states with respect to the Presidency, and in what were perceived to be close Congressional races. LaPierre Dep. at 157–58 [JDT Vol. 14]; *see also id.* at 159–165, 220–21.

2.6.4.2 The NRA created an advertising campaign in which "infomercials" would be

run from September 1, 2000 to November 6, 2000. Two of the NRA's objectives were to "influence political elections where Republican seats are jeopardized" and "increase awareness of key gun issues as the Presidential election approaches." Memorandum from Jay Finks of the NRA's media firm Ackerman–McQueen to Melanie Hill of the NRA, "NRA Infomercial Fall Focus Campaign," June 5,2000, NRA–PVF 00429–00432, at NRA–PVF 00429 [DEV 120].

2.6.4.3 Wayne LaPierre also testifies that the NRA "hoped [an NRA infomercial critical of Presidential candidate Al Gore] would impact the election." LaPierre Dep. at 177 [JDT Vol. 14]. When asked if the advertisement was designed in part to persuade viewers that they ought to vote against Gore, LaPierre testified: "We're happy if it did that. And, yeah, we're thrilled if it did that." *Id.* at 174–75. La-

Pierre thought that the Gore infomercials would have a "positive" political impact on the election: "Positive impact would mean a vote … against Al Gore." *Id.* at 277.

2.6.4.4 Not only does internal documentation and testimony from NRA officials demonstrate that the purpose of the group's 2000 issue advocacy campaign was to influence the federal election, the text of two radio advertisements illustrates the point as well. Moreover, these radio advertisements demonstrate that there is no meaningful difference between candidate-centered issue advertisements and campaign advertisements that use *Buckley*'s magic words. As the following demonstrates, at least one of the "issue ads" paid for with funds from the NRA's general treasury was virtually identical to express advocacy paid for by the NRA's PAC, with the terms of express advocacy in the PAC advertisement simply being omitted:

| PAC Advertisement | Non–PAC Advertisement |
|---|---|
| <u>MR HESTON:</u> | HESTON: **Other issues may come and go, but no issue is as important as our freedom. And the day of reckoning is at hand.** |
| Did you know that right now in federal court, Al Gore's Justice Department is arguing that the Second Amendment gives you *no* right to own *any* firearm? No handgun, no rifle, no shotgun. | Did you know *that right now in federal court, Al Gore's Justice Department is arguing that the Second Amendment gives you no right to own any firearm? No handgun, no rifle, no shotgun.* |
| And when Al Gore's top government lawyers make it to the U.S. Supreme Court to argue their point, they can have three new judges handpicked by Al Gore if he wins this election. | And when Al Gore's top government lawyers make it to the U.S. Supreme Court to argue their point, they can have three new judges hand-picked by Al Gore if he wins this election. |
| Imagine … what would Supreme Court Justices Hillary Clinton, Charlie Schumer, and Dianne Feinstein do to your gun rights? | Imagine … what would Supreme Court Justices Hillary Clinton, Charlie Schumer and Dianne Feinstein do to your gun rights? |
| And what *you* think wouldn't matter any more. Because the Supreme Court has the final say on what the Constitution means. | And what *you* think wouldn't matter any more. Because the Supreme Court has the final say on what the Constitution means. |
| When Al Gore's Supreme Court agrees with Al Gore's Justice Department and | When Al Gore's Supreme Court agrees with Al Gore's Justice Department and |

bans private ownership of firearms, that's the end of your Second Amendment rights.

Please, vote freedom first. Vote George W. Bush for President.

ANNCR: Paid for by the NRA Political Victory Fund and not authorized by any candidate or candidate's committee.

NRA–ACK 14190 [DEV 120] (emphasis in original).

bans private ownership of firearms, that's the end of your Second Amendment rights.

ANNCR: Paid for by the National Rifle Association.

NRA-ACK 14192 [DEV 120] (emphasis in original).

---

NRA–ACK 14190, 14192 [DEV 120]. When confronted with these two scripts during his cross-examination, Angus McQueen, who created these two advertisements, admitted that one of his purposes in designing the commercials was to influence the results of the federal election. McQueen Cross Exam. at 41 [JDT Vol. 22] ("Insofar as providing information to an informed citizenry, the answer is a qualified yes."). Indeed, Mr. Wayne LaPierre testifies that these two scripts were "exactly the same." LaPierre Dep. at 269 [JDT Vol. 14]; *id.* at 270–71 (observing that in the Non–PAC advertisement, Mr. Heston's reference to the "day of reckoning" is a reference to the 2000 federal election). These two advertisements are emblematic of the meaningless distinction between candidate-centered issue advocacy run in close proximity to a federal election and advertisements that use express words of advocacy and are paid for with federal funds from a corporate or union PAC. Accordingly, I find that the NRA's issue advocacy campaign paid for with general treasury funds and run during the 2000 election was designed to influence that election and evade FECA's restrictions.

### 2.6.5 *The Club for Growth*

2.6.5.1 The Club for Growth provides another example of a corporation using general treasury funds on issue advocacy designed to influence a federal election. *See* CFG 000421 [DEV 130–Tab 5] (Board of Directors' minutes) [document sealed].

2.6.5.2 David Keating, The Club for Growth's Executive Director admits that CFG's issue advocacy, "although educational, may also affect elections." Keating Decl. ¶ 8 [8 PCS]. Keating comments that "CFG has an overarching desire to change public policy which far exceeds any desire to affect elections." *Id.* It is clear from documentary evidence and independent evidence that The Club for Growth aims to change public policy by influencing federal elections.

2.6.5.3 The Club for Growth's mission statement states that the Club "is primarily dedicated to promoting the election of pro-growth, pro-freedom candidates through political contributions and issue advocacy campaigns." CFG 000217 [DEV 130–Tab 5].

2.6.5.4 In a brochure soliciting donations, The Club for Growth noted: "Before the elections, the Club plans to invest $1 million in television advertising in key congressional districts to advance our pro-growth issues. This is a tactic the unions have used so effectively against pro-growth candidates. These issue advocacy campaigns can make all the difference in tight races." CFG 000223 [DEV 130–Tab 5]; *cf.* NRW–02814 [DEV 129–Tab 2] (January 2, 2001, fundraising letter from the National Right to Work Committee noting that it had run "more than 1,000 television ads in Virginia, Nevada, Florida and Nebraska shining a spotlight on the

differences between the candidates in those states on Right to Work").

2.6.5.5 The testimony of political consultant Rocky Pennington, who worked for Republican candidate Bill Sublette is that: [i]nterest group broadcast ads had a very significant effect on the outcome of the 2000 Congressional race [in Florida's Eighth district], especially the ads run by the Club for Growth.... [T]he Club for Growth and [competing Republican candidate Ric] Keller had made their relationship well known, and the Club for Growth ads clearly reflect an intent to help elect Mr. Keller.... In my view, the ad entitled "Keller Sublette Higher Taxes" ... was a very, very effective one, and had it not run just before the primary, I believe Mr. Sublette would have reached 50% and there would have been no run-off. Our polling at that time indicated that we were in good shape, until the Club for Growth ads began.

Pennington Decl. ¶ 15 and Ex. 3–1 [DEV 8–Tab 31]; *see also* Keating Decl. ¶ 17 ("Within thirty days of the 2000 primary election in Florida, [The Club for Growth] ran approximately $90,000 in television and radio voter education advertising discussing the tax voting record of Bill Sublette.").

2.6.5.6 Independent expert testimony confirms that The Club for Growth uses issue advocacy to influence federal elections. Krasno and Sorauf Report at 52 [DEV 1–Tab 2] ("The Club for Growth, a conservative Republican group, bluntly discusses its electioneering activities on its website; they include direct contributions, bundled contributions, and issue ads.").

2.6.5.7 Without question, The Club for Growth aggressively used issue advocacy to influence the 2000 federal elections. The Club for Growth paid for these advertisements with corporate general treasury funds and thereby evaded FECA's restrictions.

2.6.6 *Candidate–Centered Issue Advertisements May Be Run About Issues In Which the Group Running Them Has No Particular Interest*

Aside from the foregoing examples, another indicia that an issue advertisement has an electioneering purpose is that, in certain instances, candidate-centered issue advertisements are run by organizations who have no organizational interest in the advertisement's "issue."

2.6.6.1 Federal candidate Linda Chapin testifies that

[t]he Florida Women's Vote project of EMILY's List also ran a television ad in the [2000 Florida Eighth District Congressional] campaign[,] ... which as I recall was run in the two months prior to the general election[.] The ad praises my record on gun safety and ends with the line: "Tell Linda Chapin to continue fighting." This ad is clearly intended to influence the election result. Based on my observations, EMILY's List is not particularly interested in gun control issues. However, they are interested in supporting pro-choice female candidates like me, and this ad serves that purpose.

Chapin Decl. ¶ 13 [DEV 6–Tab 12]; *id.,* Ex. 4 (advertisement storyboard); *see also* Chapin Dep. at 35–36 [JDT Vol. 5] ("Q. Did the ads [run by EMILY's List] mention your commitment to being pro-choice? A. No, and I think that's one thing that was interesting about these ads was that they were not about choice; they were about other subjects."); Beckett Decl. ¶ 13 [DEV 6–Tab 3] (The advertisement run by EMILY's List "praises Ms. Chapin's record on gun safety .... EMILY's List is all about being pro-choice; gun safety is not their issue. Clearly, this ad is trying to elect Ms. Chapin. And I was not the only one who thought so. This ad was up during a period in the first half of October

2000 when the Chapin campaign was not on the air, in order to save resources. The [Republican candidate Ric] Keller['s] campaign noticed this and complained to a reporter, saying that this was a clear sign of coordination. I explained ... that I had been advised by our consultants in Washington that under the current rules I was allowed to tell anyone what my plans were, as long as no one told me what their plans were. EMILY's List clearly knew what my plans were, they knew I was going dark at that time. I can only surmise that they decided to run this ad at that time based on that information. Obviously, the Keller campaign viewed this ad as one designed to assist Ms. Chapin's candidacy."); *id.* Ex. 4 (advertisement storyboard).

2.6.6.2 The Associated Builders and Contractors' Edward Monroe, in testifying about an ABC issue advertisement that discussed federal candidate Melissa Hart's past actions of pushing for the "strongest possible penalties for child molesters who attempt to lure children over the internet," admitted that pushing for such penalties was not a particular concern of ABC members as compared to the general public. Monroe Dep. at 65–67, 90–91 [JDT Vol. 23]. Indeed, Monroe testifies, "[a]s previously answered, no, [the pushing for strongest possible penalties for child molesters who attempt to lure children over the Internet] is not a particular concern to the general public of contractors or general group of contractors." *Id.* at 91. ABC attempts to explain this away in their proposed findings of fact by citing Monroe's redirect examination where Plaintiffs attempted to rehabilitate his testimony. Proposed Findings of Fact of Chamber, NAM, Associated Builders and Contractors, *et. al.* ¶ 26 ("ABC's membership has a distinctive ethos: 'very strong patriotic red, white and blue God and country association,' so that issues like children and pornography are important and pushed by state affiliates.") (citing Monroe Cross at 100–01). On re-cross examination, Defense counsel confirmed the following:

Q Would you turn to page 66 of your deposition. I will read to you starting with line 20. Do you see that? A Yes. Q Question, "Do your contractor and builders members have any different or special interest in child molestation as compared to the general public?" Answer, "No." Did you give that testimony and was it truthful? A Yes.

Monroe Cross Exam. at 102 [JDT Vol. 23]. Accordingly, I find that Plaintiff ABC has not cast any doubt on the conclusion that ABC ran candidate-centered issue advertisements about issues that were not of greater concern to its membership than to the general public. This conclusion leads me to find that the ABC advertisements relating to Melissa Hart's views on punishment for child molesters were designed to influence the election.

2.6.6.3 David Keating, executive director of The Club for Growth, testifies that during the 2000 election cycle, The Club for Growth gave $20,000 to the American Conservative Union to support an issue advertisement which discussed Senate candidate Hillary Clinton's residency in New York. Keating Dep. at 58–59 [JDT Vol. 12] ("Q. Whether or not Hillary Clinton is a resident of New York State really doesn't have anything to do with the Club for Growth's interest in pro-growth conservative Republican elected officials, does it? A. It doesn't seem to directly, no.").

2.6.6.4 The testimony of Defense expert Magleby notes the following example of an advocacy organization running an issue advertisement not connected to its mission:

An example of an interest group which not only masked its identity through an innocuous name, but ran ads on a topic unrelated to the function or purpose of the group was The Foundation for Responsible Government (FRG). In 1998

FRG spent nearly $300,000. Who was "The Foundation for Responsible Government?" The trucking industry. Upon investigation, Professor Eric Hrzik of the University of Nevada–Reno found that the trucking industry was upset with Senator Reid for supporting legislation that would have banned triple trailer trucks. Rather than discuss their policy difference with Reid on triple-trailer trucks, FRG ran mostly positive ads late in the campaign, discussing Reid's opponent, John Ensign's positions on health care and taxes.

Magleby Report at 28–29 [DEV 4—Tab 8] (footnotes omitted).

2.6.6.5 A Citizens for Life press release, issued on January 9, 2000, about three weeks before the New Hampshire Republican Presidential primary, announced that the organization had begun airing an advertisement entitled "Funny Diseases" on several New Hampshire radio stations with the following script:

> Four million Americans suffer from Alzheimer's disease—a brain disorder that causes progressive mental impairment. According to a September 1, 1999 Associated Press report, here is what Senator John McCain once had to say about the devastating memory loss produced by this disease: "The nice thing about Alzheimer's is you get to hide your own Easter eggs." ... McCain also once jokingly referred to the Leisure World home for senior citizens as "Seizure World." This information is brought to you by Citizens For Life, a New Hampshire pro-life organization.

NRLC–00017 [DEV 130–Tab 1]; see also NRLC–00016 (Press Release) (claiming that the advertisement is timely because the New Hampshire State Senate will be voting in January on a bill to legalize assisted suicide). I find that this advertisement was designed to influence the primary election.

2.6.6.6 These examples indicate that corporations spend general treasury funds on candidate-centered issue advertisements to influence federal elections and thereby avoid FECA's requirements.

2.6.7 *Candidate–Centered Issue Advertisements May Be Run About Past Votes Without Discussing Upcoming Legislation or May Be Run About Issues Not Pending Before the Legislature*

The record indicates that organizations often run candidate-centered issue advertisements about Members' past votes on bills without discussing any future legislation or run advertisements about a Member's position on an issue that is not pending before Congress at the time the advertisement is aired. These kinds of advertisements are another indication of organizations running candidate-centered issue advertisements, paid for with general treasury funds, that are designed to influence a federal election.

2.6.7.1 A series of advertisements run by the AFL–CIO illustrates the point that issue advertisements designed to influence federal elections can focus on a past vote of a particular member and not on encouraging a Member to vote in a particular way on pending or future issues or legislation. Issue advertisements that fall into this category provide strong indicia that these purpose of these commercials is to influence the outcome of a federal election because they only provide analysis of the Member's past vote. *See, e.g.,* Mitchell Decl. ¶ 61 [6 PCS] (AFL–CIO advertisement "Job," which ran between September 13 and 25, 2000, criticized candidates for already having voted "to prevent an important OSHA regulation intended to prevent repetitive motion injuries from being implemented") Ex. 1 at 101–02, 141–42 ("Yet Congressman_____ voted to block federal safety standards that would help protect workers from this risk.") [6 PCS];

*id.* ¶ 58 (AFL–CIO advertisement "Help" targeted "Republican Representatives who had voted against the Patient's Bill of Rights when it passed the House in October, 1999"), Ex. 138 ("Yet Melissa Hart has sided with the insurance companies, opposing the real Patients' Bill of Rights."); *id.* ¶ 59 (AFL–CIO advertisements "Sky" and "Protect," run in July and August of 2000, criticized "twelve different Representatives who had voted at the end of June to pass prescription drug legislation that failed to guarantee drug benefits under Medicare"), Ex. 139 ("Sky") ("Yet Congressman Kuykendall voted *against* guaranteeing seniors prescription benefits under Medicare....") (emphasis in original), Ex. 140 ("Protect") [85] ("Yet Congressman Jay Dickey sided with the drug industry. He voted no to guaranteed Medicare prescription benefits that would protect seniors from runway [sic] prices.").

2.6.7.2 Another example of candidate-centered issue advertisements designed to influence federal elections is Plaintiff U.S. Chamber of Commerce's advertisements run during the 2000 federal election attacking various Members on the prescription drug issue that was not pending before Congress at the time the advertisement was aired. *See* Josten Dep. 191–230 & Exs. 23–23I [JDT Vol. 12]. Most of these advertisements concluded by instructing viewers to tell the targeted Members to "stop supporting a big government prescription drug plan."

*Id.* Exs. 23–23I. However, these same advertisements included no telephone number to call, *see id.* at 194, and by the time the advertisements aired, there was no prescription drug issue then pending before Congress, *id.* at 208–11. Indeed, a few of these advertisements were run against candidates who were not even incumbents. Josten Dep. at 197, 212, 227 & Exs. 23A, 23D, 23E, 23I [JDT Vol. 12]. Hence, the point of these advertisements was likely *not* to influence any pending issue before the Congress, because the candidate mentioned was not even a Member of Congress.

2.6.7.3 These examples demonstrate that organizations run advertisements about past votes or about issues no longer before Congress. The purpose of these types of candidate-centered issue advertisements is to influence a federal election with general treasury funds and to avoid FECA's restrictions.

2.6.8 *Candidate–Centered Issue Advertisements Often Permit the Candidate to Avoid Running "Negative" Advertising or Otherwise Assist the Candidate by Running Advertising While the Candidate is Low on Funds*

Two other indicia that candidate-centered issue advocacy is designed to influence a federal election and thereby avoid FECA's restrictions over organizations (a) helping a candidate by running negative advertisements [86] so as to permit the can-

---

**85.** The full text of "Protect" is:

PHARMACIST: The Senior Citizens today can't afford their medication. They come in and I know they're skipping medication so they can pay for their food. With the rising cost of medication today, it could wipe out anybody at any time.

VOICE: Yet Congressman Jay Dickey sided with the drug industry. He voted no to guaranteed Medicare prescription benefits that would protect seniors from runway [sic] prices. Tell Dickey quit putting special interests ahead of working families.

PHARMACIST: Watching people walk away without the medication takes a little bit out of me every day.

Mitchell Decl. Ex. 140 [6 PCS].

**86.** Two examples of "negative" candidate-centered issue advertisements are:

*Americans For Job Security Advertisement "Are you Taxed Enough Already?"*

In this advertisement, an announcer states that "Gore plans to squeeze more money out of middle class families at the gas pump.... Gore's ideas are so extreme. If

didate to run positive advertisements and (b) helping a candidate by running advertisements where and when the candidate cannot due to budget constraints.

2.6.8.1 Political consultants testify that electioneering issue advertisements often focus on candidates as opposed to issues. Raymond Strother testifies:

> Character ads were once the province of the candidate committees. Now, however, candidates often avoid "going negative" themselves, and rely on third parties to do this dirty work for them. If a trade association or a labor union runs an ad about the honesty and integrity-or lack thereof-of a candidate for federal office, their intent to influence the election is obvious and unmistakable.

Strother Decl. ¶ 9 [DEV 9–Tab 40]; *see also* Beckett Decl. ¶ 8 [DEV 6—Tab 3] ("[I]n my experience, candidates tend to shy away from . . . negative attack ads because there would be political repercussions for them. But entities like the DCCC [Democratic Congressional Campaign Committee] and the Club for Growth do not have such constraints. Based on my observations, the candidate ads in [one] 2000 Congressional race, which were financed with federal funds ('hard money'), were actually more about 'issues' than the supposed 'issue ads' run by political parties and interest groups, which I understand were financed at least in part with non-federal funds ('soft money').").

2.6.8.2 Former Representative Larry LaRocco [87] testifies:

> they ever came to pass, Americans would truly be Gored at the pump." CMAG Storyboards [DEV 48–Tab 3].
> *Cheney Myanmar*
> This advertisement, run by an unknown group, stated that a "brutal military regime in Myanmar . . . forced men, women and children into slave labor to assist the building of an oil pipeline by . . . Haliburton . . . we just can't trust Dick Cheney a heartbeat

In my 1994 Congressional reelection campaign, many outside interest groups targeted me for defeat, and they used soft money to advance their goal. These organizations ran television advertisements in markets my opponent did not. For example, to my knowledge, my opponent did not buy any media in the Spokane market-which covered 40% of my district-but other groups, such as pro-term limit organizations, ran ads in that market which criticized my policies. Unlike my opponent, these outside organizations were not required to disclose the sources of their funding. This tactic suggested there may have been some communication between the advertisers and my opponent's campaign.

LaRocco Decl. ¶ 5 [DEV 7–Tab 27].

2.6.8.3 Evidence in the record also demonstrates that organizations run issue advertisements to assist candidates when their campaigns are low on funds, which is an indication that these advertisements serve an electioneering purpose. For example, an advertisement run during Linda Chapin's campaign for the House of Representatives by EMILY's List, praising Chapin's record on gun safety, was aired "during a period in the first half of October 2000 when the Chapin campaign was not on the air, in order to save resources. . . . EMILY's List . . . knew I was going dark at that time. I can only surmise that they decided to run this ad at that time based on that information." Beckett Decl. ¶ 13 [DEV 6–Tab 3]; *see also supra* Findings ¶ 2.6.1.1 (AFL–CIO

away from the presidency." CMAG Storyboards [DEV 48, Tab 3; IER Tab 15.].

**87.** LaRocco served as a Member of Congress from 1990 to 1995, representing the First Congressional District of Idaho. LaRocco Decl. ¶ 2 [DEV 7–Tab 27]. He served two terms and lost his 1994 reelection campaign. *Id.*

memorandum discussing where media buys could be placed to help the Durbin Senate campaign which could not air advertisements due to a lack of resources).

2.6.8.4 Both negative candidate-centered issue advertisements aired to enable federal candidates to run positive advertisements and candidate-centered issue advertisements run in areas where candidates lack funding to purchase air time, provide additional indicia that corporate and labor union issue advertising is focused on influencing federal elections while avoiding FECA's restrictions.

2.6.9 In sum, I find that these examples and characteristics of electioneering issue advertisements illustrate that corporations and labor unions routinely use candidate-centered issue advocacy as a means of influencing federal elections.

### 2.7 *Federal Candidates and Political Parties Know and Appreciate Who Runs Candidate–Centered Issue Advertisements in Their Races*

Candidate-centered issue advertisements paid for with corporate and labor union general treasury funds and designed to influence the federal election permit corporations and labor unions to inject immense aggregations of wealth into the process. Candidate-centered issue advertisements paid for from the general treasuries of these organizations radically distorts the electoral landscape.

2.7.1 Campaign consultants and a lobbyist testify that candidates are acutely aware of third-party interest groups who run candidate-centered issue advertisements on behalf of their candidates and that candidates appreciate the support of those organizations. Political consultant Strother testifies:

> Campaign consultants, and candidates themselves, pay very close attention to the political advertisements broadcast in their districts. Every campaign that I have been associated with in the past

several years has kept very close watch on who is advertising, and when and where. Candidates, who are often already elected officials, all keep track of who is helping them, who is sitting on the sidelines, and who is attacking them. Candidates in tight races are especially grateful to the issue groups who run ads on the candidate's behalf.

Strother Decl. ¶ 13 [DEV 9–Tab 40]; *see also* Lamson Decl. ¶ 19 [DEV 7–Tab 26]; Beckett Decl. ¶ 16. The uncontroverted testimony of lobbyist Wright Andrews provides:

> Sophisticated political donors-particularly lobbyists, PAC directors, and other political insiders acting on behalf of specific interest groups-are not in the business of dispensing their money purely on ideological or charitable grounds. Rather, these political donors typically are trying to wisely invest their resources to maximize political return. Sophisticated donors do not show up one day with a contribution, hoping for a favorable vote the next day. Instead, they build longer term relationships. The donor seeks to convey to the member that he or she is a friend and a supporter who can be trusted to help the federal elected official when he or she is needed. Presumably, most federal elected officials recognize that continued financial support from the donor often may be contingent upon the donor feeling that he or she has received a fair hearing and some degree of consideration or support.

> Often, corporate clients seek their lobbyists' advice concerning how their money is best spent, whether it be by contributing their PAC's hard money directly to candidates, donating soft money to the political parties, or funding independent expenditures such as broadcast 'issue ads.' Although the answer for each

client will depend upon various circumstances, including the goals that client is working to achieve, unregulated expenditures-whether soft money donations to the parties or issue ad campaigns-can sometimes generate far more influence than direct campaign contributions.

Another practice used to secure influence in Washington is for an interest group to run so called "issue ads." "Issue ads" run in close proximity to elections may influence the outcome of the election. Moreover, such ads may influence the elected official who is seeking reelection to come out in support of or opposition to particular legislation due to the response local voters have to the ads. These ads are noticed by the elected officials on whose behalf, or against whom, these ads are run. An effective advertising campaign may have far more effect on a member than a direct campaign contribution or even a large soft money donation to his or her political party that is used for political purposes in his or her district or state. These ads often have the effect of showing an elected official that a lobbyist's particular issue can have consequences at the ballot box. Given how useful "issue ads" can be in creating political clout with candidates, it is laughable to have a system that prohibits corporations and labor unions from giving even a penny to a candidate, but allows them to funnel millions into positive or negative advertising campaigns that may influence election outcomes and that many candidates are likely to be influenced by. Andrews Decl. ¶ 8, 13, 17 [DEV 6–Tab 1]. Plaintiffs have put forth no contrary evidence to rebut the testimony of these consultants and lobbyist.

2.7.2 Former officeholders and candidates confirm the view of the consultants that Members of Congress and federal candidates are very aware of who ran advertisements on their behalf and feel indebted to those who spend money to help get them elected. Former Senator Bumpers testifies:

> Members or parties sometimes suggest that corporations or individuals make donations to interest groups that run "issue ads." Candidates whose campaigns benefit from these ads greatly appreciate the help of these groups. In fact, Members will also be favorably disposed to those who finance these groups when they later seek access to discuss pending legislation.
>
> Politicians especially love when a negative "issue ad" airs against their opponents. If these politicians did not feel that the issue ads were helping them, they would call the people sponsoring them and tell them to stop, or they would hold a press conference and angrily denounce the ads. But that rarely, if ever, happens.

Bumpers Decl. ¶¶ 27–28 [DEV 6–Tab10]; see also Chapin Decl. ¶ 16 [DEV 6–Tab 12] ("Federal candidates appreciate interest group electioneering ads like those described above that benefit their campaigns, just as they appreciate large donations that help their campaigns. I appreciated the ads run by EMILY's List on my behalf. In general, candidates in the midst of a hard-fought election like mine appreciate any help that comes their way.").

2.7.3 Indeed, interest groups can be the ones who apprise politicians of the advertisements that they run on their behalf. For example, The Coalition sent tapes of the advertisements it aired in 1996 to Joyce Gates, assistant to House Republican Conference Chairman John Boehner. FEC MUR No. 4624, General Counsel's Rep., April 20, 2001, at 30 [DEV 53–Tab 6]. As the General Counsel's Report publicly indicates, the Coalition's Alan Kranowitz testified in an FEC investigation that the Coalition sent the tapes to "show

the Republican Members of the House that we were, indeed, doing something, after the fact." *Id.* The Coalition also provided tapes of the ads to RNC Political Director Curt Anderson. *Id.* at 32; *see also* Josten Dep. at 266–67 [JDT Vol. 12] ("Those ads after they were aired were shown to Congressman Bayner [sic].").

2.7.4 Politicians who benefit from the help provided by corporate and labor union general treasury fund spending on their races raise money for these organizations to demonstrate their appreciation. Congressman Ric Keller, for whose 2000 open-seat campaign the Club for Growth had run issue advertising, signed a Club for Growth fundraising letter dated July 20, 2001. The letter stated:

> The Club for Growth selected my race as one of its top priorities. . . .
>
> *Since the Club targets the most competitive races in the country, your membership in the Club will help Republicans keep control of Congress.*

CFG000208–210, at CFG000208, 09 (emphasis in original) [DEV 130–Tab 5]; *see supra* Findings ¶ 2.6.5.5 (Pennington) (describing how The Club for Growth's candidate-centered issue advertisements helped Keller win the primary election).

2.7.5 Groups aggressively push to be recognized for the role they played in helping a candidate get elected to office. After Election Day, the Coalition listed ideas "on maximizing the credit the Coalition should get for its 1996 activities," including whether to "[m]ake a report to each Member that [it] helped and actively solicit formal thanks." Memorandum to Alan Kranowitz, Bruce Josten and Elaine Graham from Larry McCarthy of Cannon McCarthy Mason Limited, Next Steps for the Coalition, dated Nov. 17, 1996, TC00802–04, at TC00803 [DEV 121].

2.7.6 The AFL–CIO admits that it made the financing of at least one political advertisement that identified a Candidate and was broadcast on television or radio within the 60 days preceding a general election in a state or congressional district in which that Candidate was running for federal office known to a Member or Candidate, and known to a Political Party. Resps. AFL–CIO and COPE to FEC's First RFA's, Nos. 20–21 [DEV 12–Tab 5].

2.7.7 The AFL–CIO admits that at least one candidate or Member of Congress has expressed appreciation or gratitude for its financing of at least one political advertisement that identified a Candidate and was broadcast on television or radio within the 60 days preceding a general election in a state or congressional district in which that Candidate was running for federal office. Resps. AFL–CIO and COPE to FEC's First RFA's No. 22 [DEV 12–Tab 5].

2.7.8 Some candidates or their political committees requested or suggested that the AFL–CIO broadcast advertisements in their districts in 1996. FEC MUR 4291, General Counsel's Rep., June 9, 2000, at 21 [DEV 52–Tab 3].

2.7.9 Mellman and Wirthlin, based on their August–September 2002 poll, state:

> Americans see very little difference between the influence of a soft money donation to a political party and the funding of political ads on television and radio. . . .
>
> *If an individual, issue group, corporation, or labor union paid for 50,000 dollars or more worth of political ads on the radio or TV that benefitted a Member of Congress, how likely would the Member of Congress be to give their opinion special consideration because of the ads-would they be very likely, somewhat likely, somewhat unlikely, or very unlikely to give them special consideration because of the ads, or don't you have an opinion on this?*
>
> *80% TOTAL LIKELY*

*37% Very likely.*

*43% Somewhat likely*

*10% TOTAL UNLIKELY*

*5% Somewhat unlikely*

*5% Very unlikely*

*9% Don't have opinion*

*0% Don't know Refused*

Mellman and Wirthlin Report at 9–10 [DEV 2–Tab 5]; *see also* Resp. NAB to FEC's First RFA's, No. 3. [DEV 12–Tab 7] (admitting "that access to members of Congress and Executive branch officials is one factor out of many that might conceivably affect federal legislation and executive decisions and policies assuming all other circumstances are equal").

2.7.10 Political parties are equally grateful for the support that issue advocacy organizations perform for their candidates.

2.7.10.1 An internal RNC document entitled "Coalitions Plan" states:

The RNC Coalitions effort should be judged by the simple question-will it get us more votes on election day?

Their [sic] will no doubt need to be countless meetings, committees, and tribunals to provide *all the customary access that the myriad of entities have come to expect,* but ultimately every activity that we engage in should be done to win votes

. . . . .

There are many organizations that can routinely deliver measurable influence of behalf of Republicans, but there are five groups that have distinguished themselves. The RNC should give these five organizations a great deal of attention. These groups are the:

National Rifle Association

National Right to Life Committee

National Right to Work Committee

National Federation of Independent Business Christian Coalition

These organizations deliver a disproportionate percentage of the Republican Base on election day. They should receive special and constant attention. We must prioritize our limited resources toward these organizations. . . .

An important aspect of any RNC Coalitions work will be done to engage the many other organizations that work within the political arena. . . .

The RNC will establish a regular meeting of key organizations. This meeting should be held at least three times a year. The emphasis should by on the free exchange of important information about the upcoming elections. Each meeting should be an event featuring the Chairman, Co–Chair, RNC Regional Field Representatives and at least one high pro-file [sic] Member of Congress. Examples would be Newt Gingrich, Trent Lott, Dick Armey, etc.

RNC0275390–RNC0275396, at RNC0275390–91 [DEV 97] (emphasis added).

2.7.10.2 An RNC slide show presented how interest group broadcast issue advocacy was used to help candidates in the 2000 election cycle:

**Outside Help for Democrats in 2000**

Liberal groups spent record amounts assisting Democrats in 2000. Highest Issue Advertising Spenders: Planned Parenthood-$14 million, NAACP-$10.5 million, Sierra Club-$9.5 million. NARAL-$7.5 million.

(Annenberg Public Policy Center of the University of Pennsylvania, "Issue Advertising in the 1999–2000 Election Cycle").

**Outside Help for Republicans**

Business Roundtable-$6 million (2/3rds supporting Republicans), NRA-$15/20 Million

(Annenberg Public Policy Center of the University of Pennsylvania, "Issue Advertising in the 1999–2000 Election Cycle").

### Impact of Third Party Spending for the 2000 Cycle

In 2000 it was estimated that more than $509 million was spent on issue advocacy television and radio advertising. Third parties accounted for almost $347 million (68%) of this spending.

Republican Party-$83.5 million (16%), Democratic Party-$78.4 million (15%).

(Annenberg Public Policy Center of the University of Pennsylvania, "Issue Advertising in the 1999–2000 Election Cycle").

RNC Counsel's Office, " 'Soft' Dollars: What They Mean for the Republican Party," RNC0248802–RNC0248809, at RNC0248808–09 [DEV 97] (emphasis in original).

2.7.10.3 An RNC document states that "third party special interests [sic] groups . . . are permitted to raise and spend soft money for issue advocacy purposes. Liberal special interest groups spent record amounts assisting Democrats in 2000 . . . . In fact, of the $500 million spent on issue advertisements during the 2000 cycle, 68% ($347 million) was spent by third part[y] special interest groups—more than twice the amount spent by both political parties combined." "Issue Updates Campaign Finance Reform Concerns and Effects," RNC0318573–RNC0318576, at RNC0318575 [DEV 98].

2.7.10.4 On October 18, 1996, the RNC, through its non-federal component, the Republican National State Elections Committee, gave $500,000 to the National Right to Life Committee with a cover letter from RNC Chairman Haley Barbour to NRLC Executive Director David O'Steen stating: "Your continued efforts to educate and inform the American public deserves [sic]

recognition." RNC0065691A [DEV ·134– Tab 8]; *see also* RNC0065691 [DEV 134– Tab 8] (copy of the check). In October 1999, the National Right to Life Committee received a $250,000 donation from the NRCC which was "put in NRLC's general fund." Resps. Nat'l Rt. Life Pls. to Defs' First Interrogs., No. 3 [DEV 10–Tab 15]. NRLC representatives "were present at a meeting with Rep. Tom Davis when he presented the check to National Right to Life." *Id.*

2.7.10.5 DNC Political Director Gail Stoltz spoke generally about the recent developments of using issue advertising for electioneering purposes. Stoltz stated: "In my experience, issue ads affect elections. The ads can either demoralize or confuse voters so that they do not vote, or they can energize a voter base for or against a party or its candidates. During a presidential election year, the ads definitely make a difference when a presidential candidate is featured." Stoltz Decl. ¶ 16 [DEV 9–Tab 39].

2.7.10.6 Political parties and candidates have directed donors who have maxed out their federal contributions to give money to nonprofit corporations who can then spend money on issue advocacy. Robert W. Hickmott provides the following uncontroverted testimony:

As both a contributor to candidates and parties, and as a lobbyist who advises clients about political spending, I am personally aware of the fundraising practices of federal candidates. Once you've helped a federal candidate by contributing hard money to his or her campaign, you are sometimes asked to do more for the candidate by making donations of hard and/or soft money to the national party committees, the relevant state party (assuming it can accept corporate contributions), or an outside group that is planning on doing an inde-

pendent expenditure or issue advertisement to help the candidate's campaign. These types of requests typically come from staff at the national party committees, the campaign staff of the candidate, the candidate's fundraising staff, or former staff members of the candidate's congressional office, but they also sometimes comes [sic] from a Member of Congress or his or her chief of staff (calling from somewhere other than a government office). Regardless of the precise person who makes the request, these solicitations almost always involve an incumbent Member of Congress rather than a challenger. As a result, there are multiple avenues for a person or group that has the financial resources to assist a federal candidate financially in his or her election effort, both with hard and soft money.

Hickmott Decl. ¶ 8 [DEV 6–Tab 19].

2.7.11 While the record does not have any direct examples of votes being exchanged for candidate-centered issue advocacy expenditures, I find that the record demonstrates that candidates and parties appreciate and encourage corporations and labor unions to deploy their large aggregations of wealth into the political process. If nothing else, I find that the record presents an appearance of corruption stemming from the dependence of officeholders and parties on advertisements run by these outside groups.

2.7.12 Accordingly, I find that Congress was correct in concluding that a problem existed with the state of FECA. Corporations and labor unions were routinely spending general treasury funds on advertisements designed to influence federal elections and they were able to use general treasury funds to pay for the most potent form of political advocacy-advertisements that do not use words of express advocacy. This conclusion leads to the following question: are candidate-centered issue advertisements objectively distinguishable from pure issue advertisements so that one may distinguish genuine issue advocacy from electioneering without considering subjective factors? The record unequivocally answers that question in the affirmative.

### 2.8 *Candidate–Centered Issue Advertisements Are Empirically Distinguishable from "Pure" Issue Advertisements*

Pure issue advertisements are empirically distinguishable from candidate-centered issue advertisements designed to influence an election on a number of bases: (a) issue advertisements designed to influence federal elections almost always identify a candidate for federal office; (b) issue advertisements designed to influence federal elections are generally run in close proximity to a federal election; and (c) issue advertisements designed to influence a federal election are run in states and congressional districts with close races.

### 2.8.1 *Candidate–Centered Issue Advertisements Almost Always Identify a Candidate for Federal Office*

I find that issue advertisements designed to influence a federal election almost always refer to specific candidates by name. Generally speaking, pure issue advertisements are less likely to refer to a federal candidate by name.

2.8.1.1 The uncontroverted testimony of political consultants who have designed genuine issue advertisements confirms this finding. Plaintiffs failed to produce any political consultants who have designed issue advertisements to rebut directly this testimony.

● Political consultant Doug Bailey testifies:

In addition to the work we did for candidates at Bailey, Deardourff, we also did political ads for political parties and issue groups. When we were creating

true issue ads (e.g., for ballot initiatives ...), and when we were creating true party building ads, *it was never necessary for us to reference specific candidates for federal office in order to create effective ads.* For instance, we created a serious [sic] of ads opposing a ... referendum in Florida which made no reference to any candidates. We were successful in conveying our message, and the referendum failed two to one....

Similarly, issue organizations can design true issue ads without ever mentioning specific candidates for federal office. *In my decades of experience in national politics, nearly all of the ads that I have seen that both mention specific candidates and are run in the days immediately preceding the election were clearly designed to influence elections.* From a media consultant's perspective, there would be no reason to run such ads if your desire was not to impact an election. This is true not only in the 60 days immediately prior to an election, but probably also in the 90 or 120 days beforehand.

Bailey Decl. ¶¶ 9, 11 [DEV 6–Tab 2] (emphasis added); *see also* Strother Decl. ¶ 7 [DEV 9–Tab 40] (emphasis added) (observing that the pure issue advertisements he had made during his career "did not mention any candidates by name. Indeed, there is usually no reason to mention a candidate's name unless the point is to influence an election.").

2.8.1.2 Uncontroverted expert testimony likewise confirms the view that issue advertisements designed to influence a federal election almost always mention the name of a federal candidate. Krasno and Sorauf Expert Report at 55–56 [DEV 1–Tab 2] ("The most obvious characteristic shared by candidate ads and candidate-oriented issue ads is their emphasis on candidates. Candidate names appear in virtually all of these spots, with candidates most likely to identify themselves in their ads and candidate-oriented issue ads most likely to identify the opposing candidate (in some pejorative way). Pure issue ads, on the other hand, were much less likely to mention a candidate for federal office ....").

2.8.1.3 A sampling of issue advertising campaigns demonstrates that candidates are often mentioned in the advertisements only as election day approaches.[88]

- *Citizens for Better Medicare ("CBM")* During the final three weeks before the 2000 federal election, CBM aired 6,010 spots that mentioned a candidate and only eight spots that did not mention a candidate. Goldstein Expert Report, App. A, Tbl. 17A [DEV 3–Tab 7]. In the final 63 days before the election, CBM ran a total of 14,975 advertisements. *Id.* Of these advertisements 10,876 mentioned a federal candidate, while 4,099 did not mention a federal candidate. *Id.* From January 1 through September 4, 2000, CBM ran 23,867 television spots, *none* of which mentioned a candidate. *Id.*

- *Chamber of Commerce* Between January 1, 2000, and Election Day 2000 (November 6, 2000), the Chamber of Commerce ran a total of 7,574 advertisements. *Id.* Tbl. 17B. *All* of these advertisements were run in the

**88.** Evidence for this finding is based on the Expert Report of Kenneth M. Goldstein. Goldstein compiled this information from data supplied by Campaign Media Analysis Group (CMAG). Goldstein Expert Report at 2 [DEV 3–Tab 7]. Although Plaintiffs question the completeness and accuracy of the CMAG data, I accept the CMAG data as a valid database. *See infra* Findings 2.12.1. Moreover, nowhere do Plaintiffs challenge the data of when candidates' names were mentioned in the advertisements.

seven weeks before the election and *all* of these advertisements mentioned a federal candidate. *Id.*

● *Planned Parenthood* [89]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), Planned Parenthood ran a total of 6,523 advertisements. *Id.* Tbl. 17C. In the 63 days before the election, 185 advertisements were run that did not mention a federal candidate, while 5,916 advertisements were run that mentioned a federal candidate. *Id.* (noting that the only time Planned Parenthood ran advertisements that mentioned a federal candidate's name was in the five weeks prior to the election).

● *AFL–CIO*

Between January 1, 2000, and Election Day 2000 (November 6, 2000), the AFL–CIO ran a total of 18,324 advertisements. *Id.* Tbl. 17D. In the 63 days before the election 10,099 advertisements were run and each mentioned a federal candidate. *Id.* During this same time period, the AFL–CIO ran no advertisements that did not mention a federal candidate. *Id.*

● *Women Voters: A Project of Emily's List* [90]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), Emily's List ran a total of 2,680 advertisements. *Id.* Tbl. 17E. In the 63 days before the election, 7 advertisements were run that did not mention a federal candidate, while 2,665 advertisements were run and each mentioned a federal candidate. *Id.* (noting that the only time Emily's List ran advertisements that mentioned a federal candidate's name was in the seven weeks prior to the election).

● *Americans for Job Security* [91]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), Americans for Job Security ran a total of 6,062 advertisements. *Id.* Tbl. 17F. In the 63 days before the election, 5,073 advertisements were run and each mentioned a federal candidate. *Id.* During this same time period, Americans for Job Security ran only advertisements that mentioned federal candidates. *Id.*

● *Business Round Table* [92]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), the Business Round Table ran a total of 8,158 advertisements. *Id.* Tbl. 17G. In the 63 days before the election, 4,571 advertisements were run and each mentioned a federal candidate. *Id.* During this same time period, the Business Round Table ran only advertisements that mentioned federal candidates. *Id.*

● *Handgun Control* [93]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), Handgun Control ran a total of 3,383 advertisements. *Id.* Tbl. 17H. In the 63 days before the election, 3,146 advertisements were run and each mentioned a federal

89. The Annenberg Report describes Planned Parenthood as "a pro-family planning political advocacy group." Annenberg Report 2001 at 24 [DEV 38—Tab 22].

90. The Annenberg Report describes Emily's List as "an organization dedicated to helping Democratic women who support abortion rights get into office." Annenberg Report 2001 at 22 [DEV 38—Tab 22].

91. The Annenberg Report describes Americans for Job Security as a "pro-business lob-

bying group." Annenberg Report 2001 at 23 [DEV 38–Tab 22].

92. The Annenberg Report describes the Business Round Table as "an organization that represents the CEO's of America's largest corporations." Annenberg Report 2001 at 20 [DEV 38–Tab 22].

93. The Annenberg Report describes Handgun Control as an "advocacy group supporting legislation to promote gun safety." Annenberg Report 2001 at 25 [DEV 38–Tab 22].

candidate. *Id.* During this same time period, Handgun Control ran only advertisements that mentioned federal candidates. *Id.*

● *Sierra Club* [94]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), the Sierra Club ran a total of 2,270 advertisements. *Id.* Tbl. 17I. In the 63 days before the election, 22 advertisements were run that did not mention a federal candidate, while 1,707 advertisements were run that did mention a federal candidate. *Id.*

● *League of Conservation Voters* [95]

Between January 1, 2000, and Election Day 2000 (November 6, 2000), the League of Conservation Voters ran a total of 5,027 advertisements. *Id.* Tbl. 17J. In the 63 days before the election, 371 advertisements were run and each advertisement did not mention a federal candidate, while 1,705 advertisements were run that mentioned a federal candidate. *Id.* (noting that the only time the League of Conservation Voters ran advertisements mentioning a federal candidate's name was in the eight weeks prior to the election).

2.8.1.4 Candidate-centered issue advertisements almost always name a federal candidate. This finding is neither surprising nor controverted. As the examples of the interest group advertisements indicate, however, issue advertisements generally start naming a federal candidate only as the election draws near.

2.8.2 *A Majority of Candidate–Centered Issue Advertisements are Run in Close Proximity to a Federal Election*

As the sampling of interest group advertisements above illustrates, as the election draws near, advertisements that name a federal candidate are much more common than issue advertisements that do not name a federal candidate. I find that most candidate-centered issue advertisements appear in close proximity to a federal election. In the case of the general election, which has been most heavily studied, it is clear that candidate-centered issue advertisements are most prevalent within sixty days of a federal election.

2.8.2.1 The Annenberg Public Policy Center found that by the last two months before the election, almost all televised issue spots made a case for or against a candidate. Annenberg Report 2001 at 14 [DEV 38–Tab 22]. The Annenberg Report, a study relied on by Plaintiffs, concluded:

The type of issue ad that dominated depended greatly on how close we were to the general election. During the two-year election cycle 71% of distinct issue ads were candidate-centered, 16% were legislation-centered, and 13% were general-image centered. However, distinct ads from before the final two months of the election were 43% candidate-centered, 35% legislation centered, and 22% general-image oriented. That picture flipped when looking at unique ads from the last two months of the election. In that case fully 89% of unique ads were candidate-centered, while just 3.6% were legislative centered, and 7.4% were general-image issue ads. *In other words candidate-centered issue ads became much more prominent as the election approached . . . .*

---

**94.** The Annenberg Report describes the Sierra Club as "a pro-environment advocacy group." Annenberg Report 2001 at 23 [DEV 38–Tab 22].

**95.** The Annenberg Report describes the League of Conservation Voters as a "pro-conservation advocacy and education group." Annenberg Report 2001 at 23 [DEV 38–Tab 22].

When we took into account how many times these ads aired and not just the number of different ads, we found an even greater percent were candidate-centered. Television spots airing after Super Tuesday were 87% candidate centered, 9.5% legislative-centered, and 3.6% image oriented. By breaking that time period down further and looking only at spots that aired September to November, we found that there was a greater percentage of candidate-centered ads in the last two month of the campaign than in the last eight. *Fully 94% of issue ads aired after August made a case for or against a candidate.* Just 3.1% were legislative ads, and 2.3% were general image ads. Though candidate-centered issue ads always made up a majority of issue ads, as the election approached the percent candidate-centered spots increased and the percent of legislative and image ads decreased, such that *by the last two months before the election almost all televised issue spots made a case for or against a candidate.*

*Id.* (emphasis added).

2.8.2.2 In the sixty days prior to a federal election, interest group advertisements that mention a federal candidate rise dramatically, whereas issue advertisements that do not mention a federal candidate remain fairly constant during the course of the year.[96] A graph using data from the 2000 election cycle compiled by Kenneth Goldstein illustrates this point:

**All Interest Group Advertisements Over Time**

Weeks Prior to the 2000 Federal Election

............... Number of Ads With No Candidate Mention
———— Number of Ads Mentioning a Candidate

2.8.2.3 The uncontroverted testimony of experts confirms that the airing of issue

**96.** The Chart is based on data compiled by Kenneth Goldstein. Goldstein Expert Report, App. A, Table 16 [DEV 3–Tab 7]. Goldstein observed all interest group advertisements run during the forty-four weeks prior to the election using CMAG data. Although Plaintiffs dispute the completeness of his data set, *see* Appendix, none of the experts have criticized that the data demonstrates that in the sixty days prior to a federal election, the clear majority of issue advertisements mention the name of a federal candidate.

advertisements designed to influence a federal election is at its zenith in the final weeks prior to an election. Magleby Expert Report at 18 [DEV 4–Tab 8] ("Genuine issue ads are more generic or 'educational' on their face than ads that are electioneering in nature. They are also rare in the period before an election."); *id.* at 33 ("In the contests we monitored in 1998, most interest group electioneering advocacy came in the final weeks of the campaign. In 2000, 58% of the interest group electioneering advocacy came in the last two weeks of the election."); Goldstein Expert Report at 17 [DEV 3–Tab 7] ("The CMAG database provides empirical evidence of a strong positive correlation between [an advertisement's reference to a federal candidate and the proximity in time of the broadcast of the advertisement to the federal election] and consequently of its validity as a test for identifying political television advertisements with the purpose or effect of supporting or opposing a candidate for public office."). The conclusions of these experts has not been contradicted by any contrary expert testimony introduced by Plaintiffs in this litigation.

2.8.2.4 As the Annenberg Center, experts in this case, and the empirical data establish, candidate-centered issue advocacy is run in close proximity to federal elections.

2.8.3 *A Majority of Candidate–Centered Issue Advertisements Are Run in States and Congressional Districts with Close Races*

2.8.3.1 The empirical data and the uncontroverted testimony of experts and political consultants in this case demonstrate that candidate-centered issue advertisements are run in congressional districts or states where there are close races.

2.8.3.2 Defense expert Magleby states that:

Interest groups ... take aim at particular states with competitive U.S. Senate races or congressional districts where the outcome is in doubt. In 1998, 2000, and 2002, I conducted numerous interviews with key staff in scores of interest groups to assess where they engage in electioneering advertisements.... The widely shared view of interest groups is that they campaign where their investment can make a difference and that is almost always in competitive contests. This tendency has been reinforced by the exceedingly close margin of party control in Congress in recent years. Interest groups routinely do their own polls to inform them on where to spend their electioneering advocacy money. For example, before they sent mailings, the NEA [National Education Association] conducted surveys to determine "if they could make a difference" with their spending.

Magleby Report at 31 (footnotes omitted) [DEV 4–Tab 8]; *see also* Krasno and Sorauf Report at 57 (footnote omitted) [DEV 1–Tab 2] (Candidate and candidate-oriented issue ads "are narrowly targeted to air in only the most closely contested elections.").

2.8.3.3 Political consultants also provide uncontroverted testimony that candidate-centered issue advertisements are concentrated on competitive races in the weeks before a federal election. Political consultant Strother testifies:

In addition to mentioning a candidate and proximity in time to election day, another informative factor is to look at where the ad was run. When media consultants want to influence elections, they air their ads in competitive districts and battleground states. Thus, in addition to looking at the ad itself, to discern electioneering intent you might also look at the Cook Report of competitive or 'toss-up' races. Those are the most likely places where the advertisements

could have an impact on the outcome of an election. Thus, when a political party or an issue group focuses an advertising campaign on competitive districts, the intent to influence the election is clear. By contrast, when the goal is to persuade members of Congress to vote one way or another on a piece of pending legislation, an issue ad campaign will be targeted at the undecided members.

Strother Decl. ¶ 9 [DEV 9–Tab 40]; *see also* Lamson Decl. ¶ 6 [DEV 7–Tab 26] ("Parties and groups generally run these pre-election 'issue ads' only in places where the races are competitive.").

2.8.3.4 Empirical data likewise demonstrates that candidate-centered issue advertisements are concentrated in congressional districts and states with contested elections. "The CMAG database [97] shows that interest group financed television ads that mentioned a candidate and were broadcast within 60 days of an election were highly concentrated in states and congressional districts with competitive races." Goldstein Expert Report at 20 [DEV 3–Tab 7] ("As shown in Table 5, during the 2000 senatorial elections, 89.2 percent of such interest group ads ran in states where the race was competitive. Four states accounted for 77 percent of the ads broadcast by interest groups; political parties broadcast 65 percent of their ads in these four states. Interest group ads were particularly important in Michigan, where interest groups broadcast 22 percent of the total ads broadcast in the race."); [98] *id.* at 21 ("The geographical distribution of interest group ads in Senate elections closely paralleled that of the political parties, which ran 90.6 percent of their ads in those competitive states. The same was true in House elections. As demonstrated in Table 6, during 2000, 85.3 percent of interest group financed ads broadcast within 60 days of the election were aired in congressional districts with competitive elections. Similarly, the political parties ran 98.2 percent of their ads in those districts.") (footnotes omitted); *see generally id.* at 3, 20–24, Tbls. 5–6; Krasno and Sorauf Report, App. Tbls. 4–5 [DEV 1–Tab 2]; *see also Buying Time* 2000 at 53 [DEV 46] ("The competitiveness of candidate races also affects the magnitude and timing of political advertising."). This expert testimony has not been challenged by Plaintiffs with any contrary expert evidence.

2.8.3.5 Indeed, even Plaintiff NRA admits that it targets its issue advocacy campaigns toward competitive races. NRA Executive Vice President Wayne LaPierre testified that " the other thing that makes an impact on what the NRA does is NRA–NRA, in terms of its election efforts-and when I say NRA, I'm including the whole organization-tends to focus on competitive races." LaPierre Dep. at 118 [JDT Vol. 14]; *see also id.* at 105 ("Q. Is it correct that the NRA spent as much as it could to

---

**97.** The CMAG data is discussed in detail in the Appendix to my opinion and Finding ¶ 2.12.1.

**98.** In determining which races were competitive, Goldstein relied on his professional judgment as informed by various media sources including the Cook Report which he attached to his expert report. Goldstein Expert Report at 20 n.17 [DEV 3–Tab 7]. The Cook Report is also used by Plaintiffs to handicap races. LaPierre Dep. at 196 [JDT Vol. 14] ("Q. What were your sources of information from which

you determined which races were close or which races were in battleground states or whatever? A. Newsletters, the media, just the general turning on the television. I mean, everybody-there are no secrets in-when you get into a campaign, I mean, everybody knows. I mean, it's-the columnists, the TV, the radio, the-I mean, every newsletter you pick up, whether it's the Cook Report. . . ."); Ryan Dep. at 76–77 [JDT Vol. 27] (recalling that he would check the Cook Report to find out which races of Congress were competitive).

get its message to gun owning voters in critical swing states? A. That's true.") 196 ("Okay. Now, we've talked a little bit about the location of your ads and that they were at least concentrated on close races or battleground states. You and I may differ on whether that-A. Right. Q.- where the proportion is, but they're concentrated on those races. A. Right."); *supra* Findings ¶ 2.6.4.1 (national election media recommendations by NRA media consultant who proposes focusing issue advocacy on ten congressional seats in "battle ground" states).

2.8.4 In sum, the uncontroverted record establishes that pure issue advocacy is empirically distinguishable from candidate-centered issue advocacy on the basis of (a) whether the federal candidate is named; (b) whether the advertisement is run in close proximity to a federal election; and (c) if the advertisement is run in a competitive race. As the uncontroverted testimony of Defense expert David Magleby states:

A number of indicia make clear that the ads run by individuals and interest groups are in reality electioneering ads that are meant to influence, and do influence, elections: These electioneering ads *generally* name a candidate, run close in time to the election, target the named candidate's district, are run primarily in competitive races, and generally track the themes in the featured candidate's campaign.

Magleby Report at 6 [DEV 4–Tab 8] (emphasis added). Magleby outlines a general rule that candidate-centered issue advertising is distinguishable from pure issue advertising.

2.8.5 Despite being able to empirically distinguish candidate-centered issue advocacy from pure issue advocacy, the record demonstrates that it is very difficult, if not impossible, to determine the objective behind an advertisement by simply listening or viewing the advertisement; particularly when that advertisement is viewed outside the context of the election.

2.8.5.1 Political Consultant Raymond Strother testifies:

None of us, without understanding the context and the time, can tell you what a sham ad is and a nonsham ad. You can't do that by looking at pictures or even looking at the ads. When I was teaching at Harvard, I brought Doug Bailey up to lecture my class. He showed [a] series of commercials, and he said, "Okay, which is the best commercial," and everybody voted. "The worse commercial," and everybody voted. He said, "You're all wrong. There is no best or worse commercial because none of you are qualified to judge these commercials because you don't know the context in which they were run or the problems they were to solve." When I look at storyboards, I have no way of knowing if they're fake, real, et cetera, because I don't know the time—I don't know anything about them.

Strother Cross Exam. at 90–91. Strother's testimony demonstrates that it is difficult to discern the true purpose of an advertisement without viewing it in its context. Rather, as discussed above, the best way to distinguish pure issue advocacy from candidate-centered issue advocacy is through empirical variables dealing with when and where the advertisement is run, and whether it mentions a federal candidate.

2.8.5.2 An example of the difficulty of discerning the objective behind an advertisement is presented by Defendants and comes from the 1998 Senate campaign between incumbent Senator Lauch Faircloth and now-Senator John Edwards. An advertisement run during the campaign by the American Association of Health Plans ("AAHP") told viewers to call Senator

Faircloth "today and tell him to keep up his fight" against trial lawyers' efforts to pass new liability laws. Gov't Opp'n at 82–83; Def.App. C, Tab 1 at 1 ("Look Out for the Lawyers").[99] Defendants point out that this advertisement might appear to be an example of "genuine issue advocacy" if not for the fact that "[a]t the time this ad was run, the airwaves in North Carolina were saturated with millions of dollars of ads run by Senator Faircloth's campaign, by the Republican party, and by interest groups portraying Edwards as a 'deceptive,' truth stretching trial lawyer. Edwards' own campaign ads trumpeted Edwards as a trial lawyer 'fighting for the people.'" Gov't Opp'n at 83; see also Def.App. C, Tab 1 at 2 (Faircloth-sponsored advertisement titled "Stretch the Truth," asking: "Who teaches other lawyers how to stretch the truth? Meet personal injury lawyer John Edwards."); id. at 3 (Faircloth-sponsored advertisement titled "You are," telling voters they were paying for Edwards' campaign because "[h]e makes millions suing people. Our hospitals and family doctors, so we all pay more for medical care"); id. at 4 (Faircloth-sponsored advertisement titled "The Truth," stating Newspapers say "... [Edwards] has the lawyer's habit of stretching the truth."); id at 7 (Edwards-sponsored advertisement titled "Who I Am," which states: "As a young lawyer, I decided to represent people, not big insurance companies."); id at 5–6, 8–12.

## 2.9 BCRA's Restriction on "Electioneering Communication"

As discussed earlier, Congress clearly recognized that labor unions and corporations were easily evading FECA's prohibition on their use of general treasury funds to influence federal elections by running broadcast advertisements that did not use words of express advocacy but were clearly designed to influence federal elections. Moreover, as discussed above, these general treasury funds purchased the most effective form of political communication. In *Buckley*, the Supreme Court observed that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Buckley*, 424 U.S. at 42, 96 S.Ct. 612. For this reason, the Supreme Court made clear that a test distinguishing between a discussion of issues and a discussion of candidates that relied on the subjective intent of the listener was problematic. *Id.* at 44, 96 S.Ct. 612 ("In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. Such a distinction offers no security for free discussion.") (quoting *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). In enacting Title II's restriction on "electioneering communication," Congress recognized the Supreme Court's admonition in *Buckley* that legislation distinguishing between issue advocacy and candidate discus-

99. The text of the advertisement is as follows: Worried about rising healthcare costs? Then look out for the trial lawyers. They want Congress to pass new liability laws that could overwhelm the system with expensive new healthcare lawsuits. Lawsuits that could make the trial lawyers richer. That could make healthcare unaffordable for millions. Senator Lauch Faircloth is fighting to stop the trial lawyers [sic] new

laws. Call him today and tell him to keep up his fight. Because if trial lawyers win, working families lose.
Def.App. C, Tab 1 at 1. This advertisement was submitted by Plaintiffs on a CD as a "powerful illustration of the ... type of issue advocacy that would be prohibited by BCRA's primary definition of 'electioneering communications.'" McConnell Br. at 61.

sion must, if at all possible, avoid reliance on the subjective impressions of the listener. BCRA accomplishes this feat with the primary definition of electioneering communication.

2.9.1 Section 203 of BCRA extends the prohibition on corporate and labor union general treasury funds being used in connection with a federal election to cover "electioneering communication". BCRA § 203; FECA § 316(b)(2); 2 U.S.C. § 441b(b)(2). Section 201 of BCRA amends section 304 of FECA by adding the following definition of an "electioneering communication":

> (i) The term "electioneering communication" means any broadcast, cable, or satellite communication which-
>
> (I) refers to a clearly identified candidate for Federal office;
>
> (II) is made within-
>
> (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
>
> (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
>
> (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A). Under this definition, in order to constitute an electioneering communication, therefore, the communication (a) must be disseminated by cable, broadcast, or satellite, (b) must refer to a clearly identified Federal candidate, (c) must be distributed within certain time periods before an election, and (d) must be targeted to the relevant electorate. *Id.* The fact that the communication must be "targeted to the relevant electorate," means that, in the case of House and Senate races, the communication will not constitute an "electioneering communication" unless 50,000 or more individuals in the relevant Congressional district or state that the candidate for the House or Senate are seeking to represent can receive the communication. BCRA § 201; FECA § 304(f)(3)(C); 2 U.S.C. § 434(f)(3)(C).

2.9.2 By adopting a definition of electioneering communication that by and large is premised on the empirical determinants that Congress found distinguish pure issue advocacy from candidate-centered issue advocacy, Congress adopted a definition of electioneering communication that rejected reliance on the subjective impressions of the listener and focuses on objective variables that do an impressive job, in most circumstances, of distinguishing between candidate-centered issue advertising and pure issue advertising. The lone question remaining is whether the primary definition of electioneering communication is narrowly tailored to capture candidate-centered issue advocacy from pure issue advocacy. After carefully reviewing the evidence in the record, I conclude that it is narrowly tailored.

## 2.10 The Primary Definition of Electioneering Communication is Narrowly Tailored to Radio & Television Advertisements

Electioneering communication is narrowly defined to only include communications disseminated by cable, broadcast, or satellite. By including only the media that were found by Congress to be problematic, the primary definition of electioneering communication is narrowly tailored.

2.10.1 Defense expert Magleby observes that broadcast advertising is the most prevalent form of communicating candidate-centered issue advocacy. Magleby states that

> [b]roadcast advertising is the most visible mode of communicating an electioneering message and is believed to be the

most effective for reaching a mass audience. In all of the contests we monitored in 1998 and 2000, interest groups used broadcast, including television and radio, to communicate with voters.... Broadcast advertising was an especially important element in all of the competitive races we monitored in 2000.... In Senate races, television and radio were also major components of the candidate and outside money campaigns....

Radio is also an effective communications tool for electioneering by interest groups. As with television, if the communications do not use the particular language of express advocacy, the groups do not report the expenditures to the FEC, and stations do not provide the same disclosure that they provide for campaign communications by candidates. Academics monitoring our sample of competitive contests in 2000 found the interest groups making use of radio for electioneering efforts included the NRA, Americans for Limited Terms, U.S. Chamber of Commerce, NFIB, NEA, League of Conservation Voters, Million Mom March PAC, Planned Parenthood and the National Right to Life PAC. Of the 105 radio ads we recorded, only 20 ads contained the magic words.

Magleby Expert Report at 22 [DEV 4–Tab 8].

2.10.2 Those intimately involved in making candidate-centered issue advertisements confirm this expert testimony.

● Denise Mitchell, Special Assistant for Public Affairs to AFL–CIO President John J. Sweeney, confirms this conclusion. Mitchell states:

The AFL–CIO also sometimes purchases newspaper advertising for its issue advocacy. We have usually done so in newspapers with high readership among Members of Congress and their staffs .... When we are seeking to influence and mobilize public opinion, however, we almost always have used broadcast advertising because it is far more cost-effective; most people get their news and information from broadcast sources; newspaper readership is tilted toward higher-income readers, and we try to reach working and middle-class families; and broadcasts simply have a more potent effect, including the ability to generate additional 'free media' .... Also, newspapers are a more passive medium, with less immediacy than broadcast, and are less likely to generate action, and it is far harder to convey in print the human, personal impact of legislative issues—a key part of our strategy and effectiveness.

Declaration of Denise Mitchell ¶ 28 [6 PCS]; see also id. ¶ 29 (explaining why the AFL–CIO does not use direct mail or telephone banks to reach the general public).

● Political consultant Rocky Pennington testifies that

[e]ffective electioneering is crucial in political campaigns. Television, an emotion-based medium, is the most effective. Radio can also be effective, depending on the specific market you're trying to reach. For example, if you're in a Republican primary and want to reach Republican males between the ages of 18 and 45, Rush Limbaugh radio is probably a good buy. Direct mail can also be very effective, in a different way, since it is more of an information-based medium. You're reaching voters at different levels, and it's good to have a good mix. The above media are good for both candidate and third party communications in a campaign.

Pennington Decl. ¶ 9 [DEV 8–Tab 31]. Pennington provides an example of a particularly effective candidate-centered issue advertisement run on the radio:

Other interest groups also ran ads trying to elect Mr. Keller in the Republican primary and the run-off. One ad run against Mr. Sublette that I thought probably cost us a couple points in the primary was a radio spot run, as I recall, primarily on conservative talk radio and maybe some Christian stations by Americans for Limited Terms. This ad attacked Mr. Sublette on tax and other issues, basically calling him a big government liberal, while praising Mr. Keller as a real conservative.

*Id.* ¶ 16.

• Communications consultant Angus McQueen, who has "provided strategic communications advice and services to the" NRA and the NRA PVF for approximately 22 years, states that among the various media outlets "for conveying [NRA's] message, the most powerful is the use of 'paid broadcast media,' which simply refers to paid media that is broadcast over network, cable, or satellite television, or over the radio." McQueen Decl. ¶¶ 3, 10 [11 PCS].

2.10.3 As a result of the following testimony and discussion, I disagree with the NRA's contention that "[a]ds broadcast over the internet are comparable to those broadcast over TV and radio in terms of their public reach and impact." Proposed Findings of Fact of the NRA and NRA PVF ¶ 22. In support of this finding, the NRA cites only to three items of evidence. This evidence does not support the NRA's conclusion.

2.10.3.1 The first piece of evidence is the declaration of Angus McQueen, the NRA's long-time communications consultant, which notes that the Internet has become an *increasingly important* part of how information becomes disseminated in our society," resulting in "information [being] disseminated more rapidly, by a greater variety and multitude of diverse sources,

than in was in the past." McQueen Decl. ¶ 17 [11 PCS] (emphasis added). "Thus, as illustrated by the popularity of the NRA's website and its 'NRA Live!' service [a daily NRA webcast news program], groups like the NRA have in a sense taken over part of the role previously played by the media." *Id.* This testimony only observes that the Internet is becoming an "increasingly important" means of communication. It makes no effort to compare traditional television and radio advertising to Internet communications. With the NRA's webcast, "NRA Live!", viewers make a choice to go to the website and download or watch the program, while advertisements on television and radio are aired throughout programming without any viewer choice. The NRA fails to explain this critical distinction. The Internet and television and radio advertising are completely different forms of media and without testimony comparing the two, I find this evidence does not support the NRA's conclusion.

2.10.3.2 The second piece of evidence is a submission of "NRA Live!" viewership statistics for the periods of March 1999 through March 2000 and March 2001 through August 2002. NRA App. at 322–23. The NRA makes no effort to compare these numbers to traditional television and radio ratings and therefore it is impossible from this submission to determine if the NRA Internet program has a comparable impact to that of traditional television and radio advertising. Moreover, the viewership statistics are missing data during the period of April 2000 through to March of 2001; precisely the period around the 2000 federal election. As a result, the data does not even demonstrate if the NRA program was being viewed more or less during the election cycle.

2.10.3.3 Third, the NRA provides two videotapes containing multiple editions of

"NRA Live!" Broadcasts. NRA App. I. This evidence does absolutely nothing to prove that the Internet has the same impact as television and radio broadcasting.

2.10.3.4 In sum, I do not find that the Internet is now, or was, a comparable medium to television and radio broadcast advertising. Indeed, the NRA's own media consultant testifies that "paid media that is broadcast over network, cable, or satellite television, or over the radio," is the "most powerful" medium for conveying its message. McQueen Decl. ¶ 10 [11 PCS]. If the Internet medium was as effective as the NRA claims, then it is unclear why the NRA spent as much money on candidate-centered broadcast issue advertising as it did during the 2000 elections. Why not just spend the funds on Internet advertising if that were as effective? The NRA does not answer this question.

2.10.4 Although there seems to be agreement that direct mail is an important tool of campaigning, there is no evidence in the record that it is nearly as effective as broadcast advertising. Defendants' expert Magleby states that campaign mail "can be very effective." Magleby Expert Report at 25 [DEV 4–Tab 8]. Rocky Pennington, a political consultant, comments that direct mail is usually a component of political campaign plans. Pennington Decl. ¶ 3 [DEV 8–Tab 31]. Much like newspaper advertising, direct mail is "a more passive medium, with less immediacy than broadcast, and [is] less likely to generate action." Mitchell Decl. ¶ 28 [6 PCS]. Accordingly, I do not find direct mail to be as effective or as problematic as broadcast candidate-centered issue advertising.

2.10.5 For the same reason I do not find newspaper advertising to be as effective as candidate-centered issue advertisements broadcast on radio and television. The NRA proposes the following finding:

Newspaper ads often dwarf broadcast ads, especially radio ads, in terms of their expense. For instance, a full-page ad in the New York Times would cost $65,000 whereas a 60 second radio broadcast that recites precisely the same text in a small market such as Peoria would cost only $75.

Proposed Findings of Fact of the NRA and NRA PVF ¶ 20. In support of this statement, the NRA cites to two pieces of evidence: a statement by their communications consultant, Angus McQueen, that a 60 second radio commercial in a major media market costs $850, while one in a smaller market sells for $75, McQueen Decl. ¶ 24 [NRA App. 34], and a declaration that is unidentified stating that a group called "Campaign for America" purchased a full-page advertisement in July 1998 in the New York Times which cost $64,581.30, NRA App. 256–57 ¶ 12. Simply because a print advertisement is more expensive in the New York Times than a local radio spot in Peoria does not mean that the latter is relatively more effective. The far more useful comparison would be between an advertisement in The New York Times, a newspaper with nationwide circulation, and a broadcast advertisement aired on a national broadcast network. The NRA has not produced any evidence to demonstrate that when the comparison is properly restated it is more effective to communicate in print advertising. Indeed, Plaintiffs concede that it is not as effective. Mitchell Decl. ¶ 28 [6 PCS] ("When we are seeking to influence and mobilize public opinion, however, we almost always have used broadcast advertising [as opposed to newspaper advertising] because it is far more cost-effective; most people get their news and information from broadcast sources; newspaper readership is tilted toward higher-income readers, and we try to reach working and middle-class families; and broadcasts simply have a more potent effect, including the ability to generate additional 'free media' .... Also, newspa-

pers are a more passive medium, with less immediacy than broadcast, and are less likely to generate action, and it is far harder to convey in print the human, personal impact of legislative issues—a key part of our strategy and effectiveness."). Accordingly, I do not find that newspaper advertising poses a comparable problem to that of broadcast advertisements detailed *supra.*

2.10.6 The primary definition of electioneering communication is narrowly tailored to only the communication media that was problematic. The evidence demonstrates that more than any other medium, broadcast advertisements were the vehicle through which corporations and labor unions spent their general treasury funds to influence federal elections. This focus is neither overbroad nor underinclusive in scope as my Findings demonstrate.

2.11 *The Primary Definition of Electioneering Communication is Narrowly Tailored by Broadcast Advertisements Appearing Sixty Days Before a General Election and Thirty Days Before a Primary Election, That Name a Candidate, and Are Targeted to that Candidate's Electorate*

BCRA only applies to broadcast advertisements that refer to a federal candidate, that are targeted at the candidate's electorate, and that are broadcast within sixty days of a general election and thirty days of a primary election. By focusing on these characteristics, the primary definition of electioneering communication demonstrates narrow tailoring.

2.11.1 As an initial matter, it is important to observe that Dr. Milkis, Plaintiffs' expert, testifies that advertising aired *more* than 30 days before a primary or *more* than 60 days before an election "can serve to frame the terms of debate." Milkis Rebuttal Decl. ¶ 9 [RNC Vol. VII]. For example, there are examples of arrangements between political parties and

candidates, whereby political parties have run advertisements for the candidates during the summer months when the candidate was low on funds, which permitted the candidate to save money to be spent on advertisements later in the election cycle. Magleby Expert Report at 47 [DEV 4–Tab 8] (noting such arrangements between Senators Debbie Stabenow and Chuck Robb and their political parties during the 2000 election cycle). Nevertheless, even though advertisements aired outside the thirty and sixty day period can influence voters, Congress recognized that most candidate-centered issue advertisements were targeted in close proximity to a federal election. *See supra* Findings ¶¶ 2.8.1.3, 2.8.2 (discussing the fact that candidate-centered issue advocacy is concentrated in the weeks surrounding federal elections).

2.11.2 It is also important to note that it is unrebutted that advertisements naming federal candidates, targeted to their electorate, and aired in the period before the election, influence voters. Political consultant Raymond Strother, testifies that in his experience consulting for candidates' campaigns, all political advertisements that mention a candidate's name in the weeks leading up to an election, regardless of intent and regardless of whether express advocacy is used, influence voters. Strother Cross Exam. at 70 [JDT Vol. 32] ("I do not believe there are issue ads run immediately before an election that mentioned the candidate that aren't important in the decision-making process of the voter."). Strother's belief is based on his view that voters assimilate and process information from a variety of different sources; creating, in his parlance, a "big cajun stew." *Id.* at Ex. 1 (Strother Declaration) ¶ 4. These various sources ultimately combine to help a voter make a decision. Strother elaborated on this point during cross examination:

[P]eople, although they're interested, they're casually interested voters. Of-

ten you'll run an ad with a certain line in it, and when you poll or go into a focus group, they credit the line to your opponent. That's how casually they watch television, but it's in this climate where they don't know where they get their information. Samuel Popkin wrote a book called, *The Reasoning Voter*, and Popkin says that Americans assimilate information through thousands of different sources to make their opinions, and they're not sure where they came from, but it's a big stew. It's a bit of information here from a brother-in-law, a bit of information here from the barber, a bit of information here from a television ad or a radio ad, and they forget where the information came from.

Strother Cross Exam. at 34–35 [JDT Vol. 32]. This explanation is the reason that Strother concludes that advertisements run immediately prior to a candidate's election that mention the candidate ultimately have some influence on the decision-making process of the voter. *See id.* at 70; *see also* Resp. of NAB to FEC's First RFA's, No. 4 [DEV 12–Tab 7] ("NAB admits that a Political Advertisement might conceivably influence a federal election without the use of any particular words as might many other factors depending upon the circumstances of each individual race."); *supra* Findings ¶ 2.3.2 (Bailey) ("Over time, a campaign defines a candidate through a combination of style, image, and issues. Even shortly after watching an ad, the target audience usually doesn't remember the ad's substantive details. Rather, the viewers just get a feel for the candidate. It takes a lot of these 'feels' to make up a campaign.").

Plaintiffs do not challenge Strother's conclusion with contrary testimony from other political consultants. Instead they rely on their own self-serving testimony

and self-selected advertisements they claim are pure issue advertisements that would be unfairly captured by BCRA's primary definition of electioneering communication. BCRA's primary definition of electioneering communication presents an empirical test that ignores this type of self-serving *ex post facto* rationalization by focusing on purely objective criteria: broadcast advertisements, referring to a federal candidate, targeted to that candidate's electorate, and aired in close proximity to a federal election influence voters.

2.11.3 For example, the McConnell Plaintiffs provide this three-judge District Court with 21 advertisements aired during the 1998 and 2000 election cycles, claiming they serve as "powerful illustrations of the amount and type of issue advocacy that would be prohibited by BCRA's primary definition of 'electioneering communications.'" McConnell Br. at 61; PCS CD 8.

2.11.3.1 With regard to these allegedly "powerful illustrations" of BCRA's overbreadth, Defendants point out that nine of the twenty-one advertisements proffered by the McConnell Plaintiffs would not have been affected by BCRA; eight were not run within 60 days of a general election or 30 days of a primary contest, and one was run in the Washington, D.C. media market where the two Senators mentioned, Senator Jesse Helms of North Carolina, and Senator Joseph Biden of Delaware, were not running for office. Gov't Opp'n at 78 & n.78 (identifying PCS CD 8 at Tracks 5, 7, 10, 12–17). Plaintiffs do not rebut these statements.

2.11.3.2 Of the advertisements that remain, four highlight past votes of the candidate, PCS CD 8 at Tracks 9 ("Stabenow Death Tax," Def.App. C, Tab 2 at 2), 18 ("Job," Mitchell Decl. Ex. 141 [6 PCS]), 19, 20, four urge action on upcoming votes, *id.* at Tracks 2, 3 ("Save," [100] Mitchell Decl.

---

**100.** According to the AFL–CIO, "Save" was run "[a]fter the [Taxpayer Relief Act] passed

Ex. 113 [6 PCS]), 6 ("Label," Mitchell Decl. Ex. 132 [6 PCS]), 11, three criticize candidate positions on term limits, Medicare funding and a prescription drug plan, *id.* at 1, 8, 21, and one commends the candidate's fight against trial lawyers,[101] *id.* at 4 ("Look Out For the Lawyers," Def. App C, Tab 1 at 1).

2.11.3.3 Of this meager showing, I do not consider the four advertisements on a candidate's past votes as probative. Criticizing a candidate on past votes in the period of time immediately before a federal election with no indication of future legislation on the issue likely serves no purpose other than to affect the outcome of the election. As a result I find those four advertisements to be examples of electioneering. *See supra* Findings ¶ 2.6.7.

2.11.3.4 What the McConnell Plaintiffs are left with is *at most* eight advertisements that they claim are pure issue advertisements that would be affected by BCRA. As I have already concluded that it is very difficult, if not impossible, to discern retroactively the true intent of an issue advertisement, *see supra* Finding ¶ 2.8.5, I do not engage in a similar parsing of these advertisements. I would note that it is very likely that these eight advertisements did influence federal elections because they refer to a federal candidate in a broadcast advertisement aired in close proximity to a federal election, and targeted to the candidate's electorate. *See supra* Finding ¶ 2.11.2. Moreover, Defendants, Defendant–Intervenors, and my own Findings cast doubt on Plaintiffs' assertion that these advertisements did not serve an electioneering purpose, *see, e.g., supra* Finding ¶ 2.8.5.2 (discussing trial lawyer advertisements around the Ed-

wards/Faircloth election). Nevertheless, the primary definition of electioneering communication focuses on objective criteria precisely to avoid trying to guess the true intent of an advertisement. For the foregoing reasons even assuming these eight advertisements were pure issue advertisements, I do not find that they demonstrate overbreadth. Simply put, eight advertisements covering a pool of at least two election cycles-including both primaries and general elections-do not serve as "powerful illustrations" of the overbreadth of BCRA's primary definition of "electioneering communications." McConnell Br. at 61.

2.11.4 Defendants identify an additional 39 advertisements Plaintiffs use in their briefings as examples of genuine issue advertisements which would be unfairly affected by BCRA's provisions. Gov't Opp'n at 77–94. Plaintiffs do not rebut this figure. In addition to these advertisements, I have found four additional advertisements alleged in declarations to be examples of legislative-centered advertisements that would be affected by BCRA.

2.11.4.1 For twelve of these advertisements, Plaintiffs provide the Court with no specific information regarding the dates they were run except that they were aired in 1994. These twelve advertisements were sponsored by the NRA and concerned the Brady gun law and a crime bill. NRA App. 885–88 [12 PCS]; *see also* La-Pierre Decl. ¶ 21 [11 PCS] (stating only that the crime bill commercials were run in 1994). Without any information as to their airing dates, I am unable to reach any conclusion about them and therefore do not consider them. Thirteen other com-

---

the House and was being considered in the Senate." Mitchell Decl. ¶ 52 [PCS 6]. This advertisement was "intended to influence House Members in the event that the bill returned for another vote in the Senate [sic]."

*Id.* It was run between October 2 to October 9, 1998. *Id.*

**101.** *See supra* Finding ¶ 2.8.5.2 (discussing this advertisement).

mercials, also sponsored by the NRA, would escape BCRA's effects because they were run in 2000 and referred only to President Clinton who was not a candidate for office at that time. NRA App. 914–16 [12 PCS]. Accordingly, I exclude from consideration these thirteen advertisements as well.

2.11.4.2 Another advertisement, sponsored by the ACLU, I exclude from consideration because it was clearly designed simply to provide the corporation standing to challenge BCRA. The ACLU cites, as an example, an advertising campaign directed at Speaker Dennis Hastert, who represents the fourteenth district of Illinois, run in March of 2002, urging him to bring the Employment Non–Discrimination Act (ENDA) to a full vote in the House. Murphy [102] Decl. ¶ 10 [3 PCS]; *see also* Text of advertisements, 3 PCS/ACLU 14–17. The advertisement was broadcast on multiple Chicago and Aurora, Illinois radio stations throughout the weekend of March 15–March 17, 2002. *Id.* Since the advertisement was run within thirty days of a primary election, the commercial would have constituted an electioneering communication under BCRA and would have violated BCRA because it was paid for with the general treasury funds of a corporation. *Id.* (observing that the "ACLU also hoped to highlight the constitutional flaws of BCRA"). An internal ACLU document demonstrates that the ACLU's purpose in running the advertisement was to create a commercial that would violate BCRA. A March 10, 2002, e-mail from Laura Murphy, legislative director of the ACLU, to her colleagues, explained why the ACLU's March 2002 Hastert ad was run:

> Anthony wants the ACLU to be in a position to challenge Shays–Meehan

when it becomes law as early as during the Easter recess. As you know the issue advocacy restrictions would select groups like the ACLU if we want to take out and [sic] ad 30 days before a primary or 60 days before a general election in broadcast, satellite or cable outlets. These ads would have to reach 50,000 people or more and would have to mention the name of a candidate. *Steve thinks that the ads that we ran during the 2000 election cycle would not qualify to give us clear standing to challenge the law.*

> Anthony wants us to run these ads and he has said that he has 501(c) 4 money to do them! I have a chart in my office, but I can also fax one to you from New York tomorrow 3–1–02, that show all of the primary dates around the country. When You [sic] get that, I need you to look at the states where there are primaries and see if *you can find a candidate whom we could target for an issue ad.* For example it is too soon to do an ad by Tuesday, but Tuesday, March 12 is the Texas primary and we could decide that Chet Edwards is on the fence about something and run an ad that says, "Call Chet Edwards and ask him to support xyz." Anthony said that he has money to pay for such an ad. Or we could target a Senator on election reform. Remember it does not have to be TV, as the broadcast restriction in Shays–Meehan covers radio as well. We would like to run these ads before the bill becomes law. WHICH ONLY GIVES U.S. ABOUT TWO WEEKS TO PULL THIS TOGETHER!!

> Phil, I know you have been busy with the web crisis (which you did not tell me about), so you are probably crazed. But I was hoping that Greg could take the

---

**102.** Laura W. Murphy has served as the ACLU's legislative director since 1993. Mur-

phy Decl. ¶ 1 [3 PCS].

lead on finding the issue that will still be important in tow [sic] weeks where we can target a member and it will make sense. I think that the issue we pick should be a priority so that we do not waste 501(c)(4) money on something we are not really concerned about.

Email Message Attached as Ex. to Resps. of American Civil Liberties Union to Defendant's Second Set of Requests for Production of Documents, Ex. B; USA–ACLU–00003 [DEV 130–Tab 4] (italics added). Defense experts Krasno and Sorauf comment on the ACLU's Hastert advertisement:

In short, BCRA is remarkably successful in differentiating between the vast majority of pure issue ads and candidate-oriented issue ads.

Nevertheless, the ACLU has demonstrated with a commercial about gay rights, aired in House Speaker Dennis Hastert's district last spring before the GOP primary, that it is possible to deliberately create a pure issue ad that runs afoul of BCRA. This episode deserves special scrutiny, and we would emphasize several points. It is telling, from our perspective as students of elections and campaigns, that the ACLU was forced to fabricate its own example of a pure issue ad that would be improperly categorized by BCRA. Given the huge numbers of issue ads broadcast in 1998 and 2000, if plaintiffs are correct in their dire predications about how BCRA would damage free speech rights, it should have been easy to find numerous real-life examples to illustrate the same point. In fact, very few pure issue ads would have been affected by BCRA.

Even more telling, however, the ad that the ACLU ran was designed in a specific way to trigger BCRA. It need not have done so.

Krasno and Sorauf Report at 62–63 [DEV 1–Tab 2]; *see also* Text of ads, 3 PCS/ACLU 16–17 (noting script of advertisement that the ACLU ran in the print media over this issue). Given this information surrounding the background of the ACLU advertisement, I exclude it from consideration.

2.11.4.3 Another advertisement run by the AFL–CIO, titled "Sky," criticized Members of Congress for a past vote. Mitchell Decl. Ex. 139 ("Sky"); *see also id.* ¶ 59 (failing to note whether there was any upcoming legislation related to the past votes that the advertisement might have been targeting). Similar to my conclusion above, I do not consider this advertisement because I find it to be electioneering.

2.11.4.4 Of the remaining twelve advertisements, four commercials are discussed in detail in other paragraphs of my Findings or the appendix to my opinion. *See* Findings ¶¶ 2.6.6.2 (ABC advertisement concerning penalties for child molesters), App. ¶ I.D.7.i, I.D.8.c (Anti-abortion commercial identifying Senators Kohl and Feingold); Findings ¶ 2.11.8.2 ("Deny" and "Barker"). Another advertisement run by CBM was aired in response to commercials aired by the AFL–CIO to "correct the issue debate and counter the distortions in the ads that we just saw." Ryan Dep. at 74–75. Of the remaining seven advertisements, four are NRA-sponsored 30–minute "news magazines" (titled "California," "It Can't Happen Here," [103] "Million Mom March," and "Tribute" [104]), NRA

---

**103.** "California" and "It Can't Happen Here" are discussed in greater detail *supra*, App. ¶ I.D.8.h.

**104.** "Tribute" includes the following statement delivered by Charlton Heston:

The NRA is baaaaaaack. [Much applause] All of this spells very serious trouble for a man named Gore. [Applause]. That leads me to that one mission that is left undone— winning in November.... So, as we set out this year to defeat the divisive forces that would take freedom away, I want to say

Reply at 22–24, one was run by the Southeastern Legal Foundation,[105] 60–Plus Association, the Center for Individual Freedom, and the National Right to Work Committee, praising Senator McConnell's stance on campaign finance reform, McConnell Br. at 63, one was sponsored by the National Right to Life Committee and criticized Senator McCain's position on campaign finance reform, O'Steen Cross Exam. at 52, and one was a Chamber of Commerce-sponsored commercial aired in Utah which pointed out that a candidate had not taken a position on two competing drug prescription plans, Chamber/NAM Br. at 5.[106]

2.11.4.5 I have been able to find an additional four advertisements that were cited by Plaintiffs in declarations as being motivated by pending legislation and happened to run within the 30 or 60–day BCRA windows. (AFL–CIO's "No Two Way," "Spearmint," "Spear," and the Gun Owners of America's armed pilots advertisement). For purposes of this analysis I accept Plaintiffs' characterization of these commercials.

2.11.4.6 Given my finding that it is very difficult to determine the objective behind the advertisement without a thoroughgoing contextual analysis of the advertisement, see supra Finding ¶ 2.8.5, I do not attempt to parse these remaining sixteen advertisements to determine if their true purpose was to affect an election. I make this statement even though I recognize that these advertisements likely did influence the election by virtue of referring to a federal candidate, in close proximity to a federal election, and targeted to the candidate's electorate, see supra Finding ¶ 2.11.2, and even though Defendants, Defendant–Intervenors, and my own Findings demonstrate that some of these advertisements were likely electioneering, See, e.g., supra Finding ¶ 2.6.6.2 (discussing ABC's advertisement on a candidate's record on child molestation legislation). Rather, I simply conclude that the evidence of these advertisements cited in Plaintiffs briefing is not sufficient to render BCRA overbroad. If Plaintiffs were correct, that BCRA would have such an indelible effect on their ability to advertise about issues of importance to their organization, I would have expected a more robust showing; particularly when the examples they submitted are from as far back as 1996 and include advertisements aired in close proximity to both primary and general elections. As a result of all these considerations, I conclude that these remaining sixteen advertisements do not demonstrate BCRA's overbreadth; even if

---

these fighting words for everyone within the sound of my voice to hear and to heed and especially for you, Mr. Gore. "From my cold dead hands." [Much Applause].
NRA App. at 947 (emphasis in the original). The NRA states that this passage "simply reflect[s] the NRA's practice of soliciting members by mentioning anti-gun politicians." NRA Reply at 24.

**105.** The Southeastern Legal Foundation is a 501(c)(3) organization, McConnell Second Amend. Compl. ¶ 36, which is exempt from BCRA's restrictions on electioneering communication. Final Rule, Electioneering Communications, 67 Fed.Reg. 65,190, 65,199–200 (Oct. 23, 2002) (to be codified at 11 C.F.R. 100.29(c)(6)).

**106.** Defendants dispute the argument that this advertisement did not have an electioneering purpose based on the context in which the advertisement was run. Gov't Opp'n at 85–86. Defendants note the commercial was run only between November 1 and 6, 2000, when Congress was not in session. Id. at 85. The race was labeled a "toss-up" by the Cook Report, and the advertisement's "tag line— 'Tell Matheson to make a decision. This issue is too important to ignore.'—played to the overall campaign theme that voters should elect someone who is decisive and who shares their values." Id. The Chamber does not respond to these observations.

taken in conjunction with the eight advertisements raised by the McConnell Plaintiffs and discussed *supra.*

2.11.5 The AFL–CIO Plaintiffs have adopted a similar tactic as the McConnell Plaintiffs in regard to primary elections and attempt through a series of examples to show that BCRA's thirty day window is overbroad. The AFL–CIO Plaintiffs have put forth a number of advertisements which they claim are "genuine issue advertisements" relating to pending legislation that BCRA would capture because they ran on television and radio within 30 days of a primary election. AFL–CIO Br. at 10–11 (citing Mitchell Decl. ¶¶ 32, 34–36, 37–39, 40, 50, 58–59). Instead of discussing these at length in my Findings, I have analyzed them in my Appendix. *See* App. ¶¶ II.A.[107]

2.11.5.1 These AFL–CIO examples constitute 336 cookie-cutter advertisements selected from a pool of at least three different election cycles. Of this number, I determine that only 50 of these advertisements would have been arguably affected by BCRA. *Id.* ¶ II.A.10. While I have some doubt that all of these fifty remaining advertisements were designed purely to influence the pending legislative debate and not a primary election outcome, given my finding that discerning the true intent behind an advertisement is nearly impossible without a fulsome understanding of the context in which the advertisement ran, *see supra* Finding ¶ 2.8.5, I do not attempt to make that judgment with these advertisements even though they likely had that effect given their content and timing. *See supra* Finding ¶ 2.11.2. Given these factors and the fact that at best the AFL–

CIO Plaintiffs were only able to find fifty advertisements that would be affected by BCRA out of federal primary elections covering at least three election cycles, I conclude that the AFL–CIO Plaintiffs have not shown that BCRA's thirty day period is overbroad. Moreover, the record contains other evidence that demonstrates that the thirty day primary window is narrowly tailored.

2.11.5.2 Defendants' experts comment that the

> hodgepodge of different primary dates makes it difficult to factor [the 30 day primary window] into the analysis, but we are confident that it would have little effect on the proportion of pure issue ads incorrectly captured by BCRA for the simple reason that so few of these advertisements mention candidates at all. Indeed, our examination of 1998 shows this to be true: no pure issue ads would have been captured by the 30–day primary period.

Krasno and Sorauf Expert Report at 61 [DEV 1–Tab 2].

2.11.5.3 The experts' thesis is substantiated by empirical evidence regarding the thirty day period. Defendant Intervenors are the only party that conducted a study of the data to determine the impact of BCRA on advertisements run during the 2000 primary election period. Def. Int. Reply at 59. They found 76 distinct advertisements, which aired more than 60 days before the election from the CMAG database, comprising 16,916 airings. *Id.* at 59 & n.201. Of these advertisements, three percent of the airings (522 out of 16,916) named a candidate and were aired within

---

**107.** The AFL–CIO Plaintiffs also cite to a handful of advertisements that they claim are pure issue advertisements that would appear within the sixty-day period. I have already discussed these in my findings on the McConnell Plaintiffs' twenty-one advertisements, in the context of the thirty-nine advertisements spotted by Defendants and Defendant–Intervenors in their briefing, and with regard to the four additional advertisements that I found reviewing Plaintiffs' submissions.

30 days of the candidate's primary. *Id.* at 59 & n. 202. Examining the student codings, the Defendant Intervenors found the majority of the advertisements had been deemed "electioneering," resulting in a finding that of the advertisements identifying a candidate and airing within 30 days of a 2000 primary election, 1.2 percent were "genuine issue advertisements." *Id.* at 59. As none of the other parties submitted any study dismissing these results or objecting to Defendant–Intervenors' study, I accept the conclusions reached therein. As I have already found that candidate-centered issue advertisements are used to influence primary elections, *see* Findings ¶¶ 2.6.5.5, 2.10.2 (Pennington), 2.6.6.5 (New Hampshire Presidential primary advertisement referencing Senator McCain), I conclude that on the basis of my Findings relating to the AFL–CIO advertisements, Defense experts Krasno & Sorauf's results, and Defendant–Intervenors' analysis, BCRA's thirty day window is narrowly tailored.

2.11.6 As discussed in this section, Plaintiffs have focused on examining the intent behind their advertisements to demonstrate BCRA's purported overbreadth. However, Plaintiffs have not been able to provide any evidence to support this position that is not either self-serving testimony or evidence rebutted by contrary evidence.

2.11.7 There is a disputed issue of fact about whether advertisements that name a federal candidate, are aired in that candidate's electorate, and broadcast in close proximity to the candidate's election are ever pure issue advertisements. Given this disputed issue, I cannot agree with Plaintiffs that the primary definition of electioneering communication is overbroad.

2.11.7.1 Political consultants testify that there is minimal utility in running a genuine issue advertisement in the 60 days before a federal election. As a result, issue advertisements run in that time frame are most likely designed to influence the outcome of a federal election. Pennington Decl. ¶ 10 [DEV 8–Tab 31] ("Parties and interest groups would not spend hundreds of thousands of dollars to run these [soft money] ads 15 days before an election if they were not trying to affect the result. These candidate-specific ads are not usually run the year before the election or the week after."); Lamson Decl. ¶ 6 [DEV 7–Tab 26] ("These 'issue ads' generally stop on the day of the election."); Strother Decl. ¶ 7 [DEV 9–Tab 40] ("[T]hese issue advertisements were run when there were no pending elections. For these true issue ads, we specifically avoided the months right before the election because (a) air time would be more expensive; and (b) each ad would just become part of the election season gumbo and viewers would assume that it was just another election-related ad."); Strother Cross Exam. at 70–71 [JDT Vol. 32]; Bailey Decl. ¶ 12 [DEV 6–Tab 2]. Plaintiffs have provided no contrary political consultant testimony to rebut these conclusions.

2.11.7.2 Defense expert testimony confirms the political consultants' view that it is impractical to run genuine issue advertisements in the weeks leading up to an election, unless you are aiming to influence a federal election. Dr. Goldstein states:

One concern sometimes raised by those opposed to the BCRA regulations is that the restriction may harm interest groups by preventing them from advertising on their issues at a time when citizens are supposedly paying the most attention to politics. There is no reason to believe that BCRA would significantly hinder interest groups from effectively getting out their messages on public policy issues. Running genuine issue ads near an election does not increase the effectiveness of those ads; in fact, it is

likely that the ads' effectiveness actually decreases

. . . . .

In addition to being less effective at conveying their messages, issue ads run close to an election are also less cost-effective, since the price of scarce television and radio air time is higher near an election than during the rest of the year. Goldstein Expert Report at 32–33 [DEV 3–Tab 7]; see also infra App. ¶ I.C.8; Magleby Expert Report at 20 [DEV 4–Tab 8] ("In contrast, genuine issue ads are more likely to run earlier since rates are cheaper and proximity to an election is less important."); Krasno and Sorauf Expert Report at 57 [DEV 1–Tab 2] ("Pure issue ads are more likely to respond to the congressional calendar or an advertising strategy unrelated to an election.").

2.11.7.3 Plaintiffs' experts dispute the Defense experts' position and contend that it is effective and necessary for corporations and labor unions to spend general treasury funds on broadcast advertisements in the weeks before an election that mention the name of a federal candidate and are targeted to the candidate's electorate. Monroe Decl. ¶¶ 18–19 [10 PCS] ("The defendants in this proceeding have argued that ads run near the time of an election are evidence that the association's actual intent is to advocate the election of one candidate or another. However, there are other, more valid, explanations for the timing of our advertising. One is that serious legislative initiatives or regulatory proposals often are considered near the time of elections. Also, it is clear that members of the public are generally more receptive to and engaged in considering government policy ideas and issues as elections near. If that is the time when people will listen, that is the time to speak. And once an election occurs, there seems to be a period of fatigue during which political matters are of less interest, making issue ads then less effective."); Huard Decl. ¶ 10 [10 PCS] ("NAM has run issue ads at times when no election was impending. In broad terms, however, Americans tend to have greater interest in political matters as an election approaches. At the same time, elected officials are most attuned to the views of their constituents in the pre-election period. Thus, for many purposes, the pre-election season is a critical time for issue ads. Conversely, after an election public interest in public policy matters fades, perhaps due to fatigue. Then, few issue ads are run soon after an election."); Murphy Decl. ¶ 12 [3 PCS] ("Finally, it is important to emphasize that the blackout periods imposed by the BCRA–60 days before a general election and 30 days before a primary-are often periods of intense legislative activity. During election years, the candidates stake out positions on virtually all of the controversial issues of the day. Much of this debate occurs against the backdrop of pending legislative action or executive branch initiatives. Some of the President's or Attorney General's boldest initiatives are advanced during election years-often within 60 days of a general election. This year, for instance, legislation creating a new federal department of Homeland Security is under consideration during this pre-election period."); but see supra Finding ¶ 2.11.4.2 (only example of a pure issue advertisement created by ACLU that would be effected by BCRA was intentionally created to violate BCRA in order to provide ACLU with standing to challenge law).

2.11.7.4 Plaintiffs' expert Dr. Gibson agrees that running issue advertisements in proximity to federal elections is effective; however, he does not respond to Defendants' expert's view that commercials aired close to an election are more expensive, or the fact that genuine issue advertisements tend to air in conjunction with the legislative calendar as opposed to

the federal election cycle. *See infra* App. ¶ I.C.8.

2.11.8 On the basis of this dispute and my earlier Findings, I disagree with Plaintiffs' claim that the legislative calendar can necessitate the running of issue advertisements during the final days of an election campaign that refer to a federal candidate and are targeted to the candidate's electorate.

2.11.8.1 Many deponents merely state that "serious legislative initiatives or regulatory proposals often are considered near the time of elections," without providing actual examples of advertisements run in response to the legislative activity. Monroe Decl. ¶ 18 [10 PCS]; *see also* Huard Decl. ¶ 11 [10 PCS] ("[I]ssue ads supporting a particular tax bill may well be needed as the bill approaches a vote. If it happens that primaries or elections are imminent, that does not diminish the need to be able to speak out right then."); Murphy Decl. ¶ 12 [3 PCS] (commenting that "the blackout periods imposed by the BCRA ... are often periods of intense legislative activity," noting consideration of the Homeland Security Department bill occurred within 60 days of the 2002 election, but listing political activities conducted that would not have been affected by BCRA). This evidence is so general that, even if I were to consider Plaintiffs' point valid, I would find that it was not probative.

2.11.8.2 While two other organizations provide examples of advertisements run about legislative issues that were actually pending before the legislature, this testimony does not demonstrate that the primary definition of electioneering communication is overbroad. Other than the AFL–CIO and the Gun Owners of America ("GOA"), no other groups examples were provided of advertisements run in the 60 days prior to an election or 30 days prior to a primary directly addressing pending legislative activity. The examples from the AFL–CIO included advertisements regarding an "upcoming budget fight over education programs" in September 1996. Mitchell Decl. ¶ 41 & Ex. 59 [6 PCS] ("No Two Way").[108] The labor group also ran commercials between September 21 and 25, 1998, in eight congressional districts, opposing "fast track" trade legislation, which was scheduled for a vote in the House of Representatives on September 25, 1998. Mitchell Decl. ¶ 52 & Ex. 116 [6 PCS] ("Barker"). During the same month, the AFL–CIO also ran a "flight of broadcasts" aimed at a scheduled Senate vote on HMO legislation that the AFL–CIO considered to be inadequate, *id.* ¶ 51 & Exs. 105–07 ("Deny"), and opposing the Taxpayer Relief Act which had been recently marked up by the House Ways and Means Committee, *id.* ¶ 52 & Exs. 108–09 ("Spearmint" and "Spear"); G. Shea Decl. ¶ 43 [7 PCS]. In 2002, the GOA ran a radio advertisement in New Hampshire within

---

**108.** The FEC's investigation of the AFL–CIO's 1996 political advertisement concluded that [i]n the nine flights broadcast between late June and mid-September, 1996, the advertisements would criticize the incumbent member of Congress named therein, frequently in harsh terms, about his or her record on the issue that was the subject of the advertisement. However, with the exception of a flight of advertisements on the topic of the minimum wage that aired in late June and early July, 1996, there was no clear connection between the content of the advertisements and any legislation that was then the subject of intensive legislative action at the time of the advertisements. General Counsel's Report, MUR 4291 (Jun. 9, 2000) at 5–6 [DEV 52–Tab 3]. The AFL–CIO responds, stating that "No Two Way" was "broadcast in order to influence the 'upcoming budget fight on education programs' and referred to related past votes to make its point." AFL–CIO Reply at 4 n.3 (quoting Mitchell Decl. ¶ 41 [6 PCS]).

30 days of the primary election for the New Hampshire Republican U.S. Senatorial nominee, which supported legislation allowing airline pilots to be armed. Declaration of Lawrence D. Pratt ¶ 5.

2.11.8.3 As I have stated throughout, it is nearly impossible to determine retroactively the objective behind an issue advertisement, see *supra* Finding ¶ 2.8.5, and consequently, I do not attempt to engage in an analysis of the true intent behind these advertisements, even though it is highly likely that these advertisements influenced the election on the basis of their content and timing, see *supra* Finding ¶ 2.11.2. Rather, I conclude that this minimal showing from the AFL–CIO and GOA does not provide a basis for concluding that the primary definition of electioneering communication is overbroad.

### 2.12 *Expert Reports on BCRA's Effect on Political Advertising*

Plaintiffs have not produced any studies of their own analyzing BCRA's purported effect on pure issue advertising. Instead, as discussed above, Plaintiffs prefer to rely on picking out advertisements they claim are pure issue advertisements affected by BCRA and criticizing studies relied on by Congress during their deliberations that Defendants have produced for the litigation. In my Appendix, I describe the various expert reports purporting to demonstrate the problems created by issue advocacy advertisements affecting federal elections, as well as the narrow tailoring BCRA has achieved to avoid affecting federal non-electioneering advertisements. *See infra* Appendix. My Appendix examines the criticism of these studies. *id.* Overall, I find that much, though not all, of the relevant evidence presented by the Defendants has merit and has not been discredited by Plaintiff's expert, Dr. Gibson, whose criticism focused on the *Buying Time* studies.

2.12.1 At the outset, it is clear that the data underling a majority of the studies, provided by CMAG, is not without its limitations. App. ¶ I.A. I am aware that CMAG's coverage is not universal, that advertisements can be, and apparently are missed, and that some information may not be present on the four-second snapshot storyboards. *Id.* ¶ I.A.3. The most notable deficiency in the data appears to be its inability to identify different "cookie cutter" advertisements (advertisements identical except for mentioning different candidates). *Id.* Despite pointing out these gaps, Dr. Gibson has not demonstrated how these shortcomings affect a majority of the conclusions that can be drawn from the CMAG data. *Id.* ¶ I.A.4. Furthermore, Plaintiffs have failed to demonstrate that the efforts taken by experts to remedy the "cookie cutter" effect for their studies were deficient. *Id.* In addition, no evidence has been presented that the data is biased in one way or the other based on the fact that CMAG does not cover 20 percent of American households or local cable channels. *Id.* Dr. Gibson's hypothesis that the CMAG is more likely to miss "genuine issue advertisements" is pure conjecture, and contradicted by Dr. Goldstein's testimony regarding the overinclusive nature of the advertisements provided to CMAG by CMR. *Id.* ¶ I.A.3. Finally, the evidence shows that CMAG is used as the basis for many political science studies which are peer-reviewed and published by the top political science journals in the country, and is a regular resource for politicians and political parties. *Id.* ¶ I.A.5. Given the widespread acceptance of CMAG in academic and political circles, and the fact that Plaintiffs were unable to demonstrate that its flaws result in bias, I accept the CMAG data as a legitimate source of data for use in studies seeking to understand the contours of political adver-

tising, recognizing it has certain limitations.

2.12.2 The Annenberg studies, discussed in Findings ¶¶ 2.2.1, 2.2.2, 2.2.3, 2.2.4, 2.2.6 (conclusions), 2.8.2.1, *supra*, as far as I can discern, have not been challenged by anyone. In fact, as mentioned above, the record shows that Members of Congress, Defendants' experts, and even Plaintiffs' experts rely on the Annenberg Reports, and as such I find no reason not to accept their conclusions as well. *See* Findings ¶ 2.2.6 (Annenberg Center concluding *inter alia* that "[i]nstead of creating the number of voices *Buckley v. Valeo* had hoped, issue advocacy allowed groups such as the parties, business and labor to gain a louder voice" and that the "distinction between issue advocacy and express advocacy is a fiction").

2.12.3 Dr. Goldstein provides an expert report based on his own findings derived from his own version of the CMAG data from the 2000 election, which he had updated since providing it to the *Buying Time 2000* authors. App. ¶ I.C. Unrebutted are his findings that: interest group advertising in 2000 was concentrated in so-called "battleground" states; roughly 11 percent of candidate-sponsored advertisements in 2000 used express advocacy terminology; interest group advertisements, which identified a candidate in 2000, tended to be broadcast within the final 60 days of the election campaign, whereas those that did not identify a candidate were spread more evenly throughout the year; and interest group advertisements that mentioned candidates in 2000 were highly concentrated in "battleground states." *Id.* Dr. Goldstein's uncontroverted conclusions further demonstrate that BCRA's primary definition of "electioneering communication" narrowly focuses on the key empirical determinants that separate genuine issue discussion from

electioneering. I accept these uncontroverted findings.

2.12.4 Plaintiffs have attempted to discredit the *Buying Time* reports specifically through the expert reports of Dr. Gibson. Dr. Gibson presents various criticisms of the reports in an effort to have the Court dismiss them or find Dr. Gibson's alternative conclusions more acceptable. The effort is not unlike that of a piñata party: if one hits the piñata enough, it will eventually crack apart. Although some of these "hits" have merit, I point out that neither Plaintiffs nor Dr. Gibson have attempted to conduct their own similar study, or even replicate a discrete portion of the *Buying Time* studies, despite the fact that the underlying materials were provided to them by Defendants. Presenting the Court with contradictory results from such a study would have been far more persuasive than the recalculations of incorrect versions of the *Buying Time* data sets and the often conjectural and speculative criticism proffered by Plaintiffs and Dr. Gibson.

2.12.5 In terms of the *Buying Time* reports in general, I would not discount the studies because they were approached with a particular result in mind. The testimony shows that policy perspectives and effective scientific research are not mutually exclusive. App. ¶ I.D.7.b. The "cleaning" of the data that Dr. Gibson finds suspicious appears, from the testimony, to be a necessary function for databases of the size produced for the *Buying Time* reports and not the function of bias. *Id.* ¶ I.D.7.n. Fixing miscodings and resolving the "cookie cutter" issues required such actions. *Id.* The confusion among the experts as to the correct database to use to analyze the studies' findings, *see id.* ¶ I.D.7.d, decreases the utility of Dr. Gibson's Expert Report, but also undermines the notion that the *Buying Time* authors

manipulated the data in order to achieve their desired results. The fact that the Brennan Center maintained previous versions of the *Buying Time* data sets suggests that their changes were not part of an effort to introduce bias into the data set.

2.12.6 I also do not take issue with the studies' designers seeking to determine the mental perceptions of ordinary viewers. Studies based on subjective opinions are an accepted practice in the social sciences. *Id.* ¶ I.D.7.i. The evidence also demonstrates that although university students are not necessarily representative of society as a whole, relying on student impressions as the basis for academic conclusions is an accepted scholarly practice. *Id.* ¶ I.D.7.h.

2.12.7 Much, if not all, of the objective findings in the *Buying Time* reports have not been undermined by Plaintiffs' expert. For example, Plaintiffs have not challenged the findings in *Buying Time* that very few advertisements utilize express advocacy terminology, and that interest group advertisements, which identify candidates, are concentrated toward the end of the election campaign. *Id.* ¶ I.D.7.a. I find that this objective data is insulated from the great majority of criticism leveled at the *Buying Time* reports. *Id.* (Dr. Gibson commenting that "[e]ntirely objective characteristics of the ads (e.g., whether a telephone number is mentioned in the text of the ad) present few threats to reliability."). Furthermore, some of these results are supported by those of the unrebutted Annenberg Report 2001. *See id.* ¶ I.B.1.

2.12.8 However, I am troubled by the fact that coders in both studies were asked questions regarding their own perceptions of the advertisements' purposes, and that these perceptions were later recoded. *See, e.g., id.* ¶ I.D.8.c. When such changes are made, it is difficult to determine their ef-

fect on the findings in the reports. The principal casualty in this regard are the conclusions the *Buying Time* studies make regarding the percentage of "genuine" issue advertisements "captured" by BCRA. *Buying Time 1998* finds that seven percent of genuine issue advertisements aired over the course of 1998 were aired in the final 60 days of the election campaign and mentioned a candidate, and Dr. Krasno determined that out of all of the advertisements identifying a candidate sixty days before the election, 14.7 percent were "genuine" issue advertisements. *Id.* ¶ I.D.6.a, I.D.7.r.(2). Dr. Gibson found figures from the *Buying Time 1998* data ranging from 16 percent to 60 percent. *Id.* ¶ I.D.7.r.(3). *Buying Time 2000* finds that 0.6 percent of the advertisements aired in the final sixty days of the 2000 campaign which identified a candidate were "genuine" issue advertisements. *Id.* ¶ I.D.6.b. The results from both *Buying Time* studies are based on coders' answers to the questions asking for their opinions on the commercials' purpose. *Id.* ¶ I.D.4.

2.12.9 For *Buying Time 1998,* it is clear that a small number of advertisements disputed in this litigation, which aired a considerable number of times, were coded as "genuine" issue advertisements, but that the coders continued to fill out the survey sheets as if they had found the advertisements to be "electioneering" commercials. *Id.* ¶ I.D.7.r.(3). This fact undermines Dr. Gibson's, Dr. Krasno's, and *Buying Time 1998*'s conclusions about the impact BCRA would have had on genuine issue advertisements over the course of 1998 or within the final 60 days of the election. I cannot determine based on the record which view of the student coding is correct, and as such I find this matter in dispute and do not accept either side's conclusion on this particular point.

2.12.10 *Buying Time 2000* suffers from a similar infirmity, although the reasons for the changes appear to be more the result of the authors' perceptions than on coding irregularities, *id.* ¶ I.D.8.c, and for that reason, I cannot accept its finding that, of all of the issue advertisements run within 60 days of the 2000 election that mentioned a candidate, 0.6 percent were genuine advertisements, *id.* ¶ I.D.6.b. However, Dr. Goldstein finds that if one includes all of the advertisements that Plaintiffs allege were recoded from genuine to electioneering commercials, the most "conservative" calculation of advertisements aired in the final 60 days of the 2000 election also identifying a candidate, which were "genuine," is 17 percent. *Id.* ¶ I.D.8.c. This figure is not rebutted by Plaintiffs or their expert.

2.12.11 Dr. Gibson also argues that since the majority of advertisements coded as electioneering were also coded as having policy matters as their primary focus, the studies in fact demonstrate that the vast majority of advertisements captured by BCRA are genuine issue advertisements. App. ¶¶ I.D.7.p, I.D.8.e. I reject this argument. As Defendants' experts have clearly demonstrated, the fact that an advertisement may focus on issues does not preclude the possibility that the advertisement is designed to promote a candidate. *Id.* ¶ I.D.7.p. Dr. Lupia's beer commercial analogy illustrates this point effectively. *Id.* (Lupia observes that many beer commercials do not focus on the product, but rather people "engaged in a range of activities that we can call 'wild nights out.'" Accordingly, it is not unreasonable to "perceive that the purpose of the ad is to get" the viewer to buy the beer, "but to judge its primary focus as wild times.") Furthermore, the results for candidate-sponsored advertisements demonstrate that even when a person running for office airs an advertisement in an effort to win election, he or she more often than not focuses those commercials on policy matters as a means of conveying a candidate's values and not directly on the personal characteristics of the candidates. *Id.* ¶ I.D.7.p; *see also supra* ¶ 2.3.2 (Bailey) (Over time, a campaign defines a candidate through a combination of style, image, and issues. Even shortly after watching an ad, the target audience usually doesn't remember the ad's substantive details. Rather, the viewers just get a feel for the candidate. It takes a lot of these "feels" to make up a campaign.).

2.12.12 In any event, I view these calculations as largely an academic exercise. The expert testimony in this case demonstrates the subjective nature of the effort of trying to capture mental impressions of viewers, and illustrates how one person's genuine issue advertisement can be another's electioneering commercial. *Id.* ¶ I.D.7.i, I.D.8.c. Determining the purpose of an advertisement is a subjective enterprise, and that appears to be why BCRA's framers have used objective criteria to define "electioneering communication." Furthermore, as Dr. Lupia explains, these exercises can help us determine what BCRA's impact would have been on past behavior, but they do not necessarily tell us how BCRA will affect non-electioneering issue advertisements in the future. *Id.* ¶ I.D.7.r.(4).

2.12.13 I also address Dr. Gibson's assertion that 30,108,857 group-citizen genuine issue communications would have been affected by BCRA. App. ¶ I.D.7.q. Dr. Gibson applied gross rating point data to 707 of the 713 genuine issue advertisement airings Krasno and Sorauf found would be captured by BCRA to reach this figure. *Id.* Defendants have not responded to Dr. Gibson's calculation, in part because Dr. Gibson raises it for the first time in his rebuttal expert report. *Id.* Although 30

million group-citizen communications is certainly an impressive figure on its face, a closer inspection reveals that the figure is not as oppressive as it sounds.

2.12.13.1 First, these thirty million communications are airings of three distinct advertisements aired 707 times. Therefore, these 30 million communications actually represent only three messages transmitted during programs whose aggregate viewership constitutes 30 million households. As Dr. Gibson has not provided a citation to the source of the gross rating point data he used, I cannot verify his figures. However, it is clear that one advertisement, "HMO said no" represents the majority of the 707 airings, having been broadcast 118 times in Greensboro, 126 times in Raleigh–Durham, and 211 in St. Louis (I cannot determine where the other two advertisements, "CENT/Breaux" and "CCS/No Matter What" were aired). *Id.* ¶ I.D.7.r.(2) n.201. The data shows that even if "HMO said no" had reached every household in Greensboro, Raleigh–Durham, and St. Louis with a television, the number of households receiving the message would be 2,529,450. *Id.* Given this calculation, and the lack of direction provided by the experts in this case, it appears that while 30 million genuine issue *communications* would have been affected by BCRA, the actual number of *households* affected is much lower, although not necessarily insignificant, because many of the 30 million households obviously received the group-citizen communications numerous times.

2.12.13.2 Second, Dr. Gibson provides no context for his 30 million communications figure. He does not discuss whether or not these 707 airings were received by a greater or lesser percentage of households than the other 4140 airings which were run within 60 days of the 1998 election and identified a candidate. If one takes the average number of households that re-

ceived a single airing of one of the three genuine advertisements in 1998, 42,586 (30,108,857/707), and multiplies it by the total airings of commercials mentioning a candidate and run within 60 days of the election, the result is 206,414,342 group-citizen issue communications (42,586 * 4847). This figure, admittedly not precise, demonstrates that the amount of group-citizen genuine issue communications (Dr. Gibson's 30 million figure) is likely a small proportion of the total amount of group-citizen issue communications captured by BCRA's "electioneering communication" definition (represented by the 206 million communications figure above). In fact, this exercise is merely an amplification of the Krasno and Sorauf analysis and results in the same 14 percent figure that Drs. Krasno and Sorauf determined represents the amount of genuine issue advocacy that would be captured by BCRA.App. ¶ I.D.7.r.(2). Again, Dr. Gibson's 30 million communications figure could constitute a greater or lesser percentage of the universe of communications mentioning a candidate and airing within 60 days of the 1998 election, but I am given no basis for making such a determination.

2.12.13.3 Therefore, although I do not reject Dr. Gibson's calculation, I find that the record does not provide me with a sufficient basis for assessing its significance and therefore its utility for determining whether BCRA is overbroad is minimal at best.

### 2.13 *Conclusion*

Based on the extensive evidence presented in the record, it is entirely possible to distinguish pure issue advocacy from candidate-centered issue advocacy without relying on the listener/viewer attempting to discern the "true" intent of the advertisement. These empirical determinants form the basis of the primary definition's objective test: issue advertisements that

mention a federal candidate, are broadcast on radio or television, are aired in the candidate's electorate, and are aired in close proximity to a federal election. While there may be advertisements sharing these characteristics that are not intended to influence an election, the record demonstrates that as an objective matter advertisements sharing these characteristics influence the outcome of federal elections. When corporations and labor unions pay for these advertisements with general treasury funds, they are in violation of longstanding federal policy.

TITLE III: MISCELLANEOUS

3.1 The Federal Election Commission has recommended that Congress take measures to prevent contributors from using their minor children as a method of circumventing campaign finance laws. FEC Annual Report 1992 at 69 (recommending that Congress "establish a minimum age for contributors" due to the FEC's finding that "contributions are sometimes given by parents in their children's names") [DEV 14–Tab 1]; FEC Annual Report 1993 at 50 (recommending that Congress adopt a "presumption that contributors below age 16 are not making contributions on their own behalf" due to the FEC's finding that "contributions are sometimes given by parents in their children's names" and noting that "Congress should address this potential abuse by establishing a minimum age for contributors, or otherwise provide guidelines ensuring that parents are not making contributions in the name of another") [DEV 14–Tab 2]; FEC Annual Report 1994 at 56 (same) [DEV 14–Tab 3]; FEC Annual Report 1995 at 56 (same) [DEV 14–Tab 4]; FEC Annual Report 1996 at 55–56 (same) [DEV 14–Tab 5]; FEC Annual Report 1997 at 54 (same) [DEV 15–Tab 6]; FEC Annual Report 1998 at 44 (same) [DEV 15–Tab 7]; FEC Annual Report 1999 at 50 (same) [DEV 15–Tab 8]; FEC Annual Report 2000 at 43 (same) [DEV 15–Tab 9].

3.2 The Thompson Committee Majority Report recommended precluding "those ineligible to vote ... from making contributions to candidates for federal office." Thompson Comm. Report at 4506. The majority found "substantial evidence that minors are being used by their parents, or others, to circumvent the limits imposed on contributors." *Id.*

3.3 Senator Christopher Dodd stated on the Senate floor: "Normally when we go out and solicit campaign contributions we do not limit it to the individual. We also want to know whether or not their spouse or their minor or adult children would like to make some campaign contributions. As long as such contributions are voluntary, then those individuals may contribute their own limit ...." 147 Cong. Rec. S2933 (daily ed. Mar. 27 2001) (Sen. Christopher Dodd).

3.4 Senator McConnell testifies that he "occasionally" asks donors who have given the maximum level of federal money to his campaign if they have family members who would be willing to contribute to the campaign as well. McConnell Dep. at 99–100 [JDT 19]. He also states that "occasionally" donors send checks on behalf of their children. *Id.* at 132.

3.5 The evidence shows that at least four investigations into contributions made by minors were initiated in response to press articles. *See* Pre–MUR 318, 00890–933 [DEV 43–Tab 4]; *see also* FEC MUR 4254, FEC 119–0016 [DEV 43–Tab 4] (letter from a father under investigation to the FEC stating that the FEC's investigation relied on a newspaper article).

3.6 Defendants cite to 14 newspaper articles which discuss contributions by minors. *See* Alan C. Miller, Minor Loophole, L.A. Times, Feb. 28, 1999, reprinted in 148 Cong. Rec. S2146–S2148 (2002); David Mastio, The Kiddie–Cash Caper: Gifts from minors are the next big campaign

loophole, Slate, May 21, 1997, INT013275–INT013280 [DEV 134–Tab 3]; Rise in student gifts begs question: Was law broken?, USA Today, May 20, 1997, at 12A, FEC101–0001 [DEV 134–Tab 3]; Chris Harvey, The Young and the Generous: Md. Children Give to Campaigns, Wash. Post, Nov. 20, 1995, at B01, FEC137–0009–0011 [DEV 134–Tab 3]; Alex Knott, Members Cash In on Kid Contributions, Roll Call, June 5, 1995, at A–1, reprinted in 148 Cong. Rec. S2146 (2002); Jerry Landauer, Kiddies Go Krazy Over Carter, Break Open Piggy Banks, Wall St. J., July 8, 1976, at 1, 27, FEC137–0008 [DEV 134–Tab 3]; John Kruger, Youths 2–17 follow parents' lead in political contributions, The Hill, Nov. 27, 1999, INT013287 [DEV 42–Tab 2], at 1, 53; Michelle Malkin, Kiddiecase collections open fund-raising loophole, Seattle Times, May 27, 1997, INT013272–INT013274 [DEV 42–Tab 2]; Kid Stuff, Roll Call, June 15, 1995, INT013262 [DEV 42–Tab 2]; Youthful Donors, Political Finance and Lobby Reporter, June 14, 1995 [DEV 42–Tab 2], at 10; Kids count, especially in campaign gifts, The Knoxville News–Sentinel, June 11, 1995, INT013265–INT013266 [DEV 42–Tab 2], at F3; Karin Wahl–Jorgensen, Some Folks Channel Political Gifts Through Children, Plain Dealer, May 28, 1995, INT013282–INT01328 [DEV 42–Tab 2], at 9A; David Mastio, Students Donate to Candidates, Tulsa World, March 11, 1995, INT013258–INT013260 [DEV 42–Tab 2].

3.7 It is clear that not all campaign contributions by minors are in fact donations by their parents. *See, e.g.,* Decl. of Jessica Mitchell ¶ 9 ("... I made a contribution to [Tim Feeney's] campaign just recently, in the amount of Five Dollars.") [1 Echols ES Tab 5]; Decl. of Pamela Mitchell ¶ 20 ("I have never used my daughter's name, or any other person's, in making a political donation, in order to avoid limits that the law places on my ability to support candidates of whom I approve.") [1 Echols ES Tab 10].

3.8 There have been a number of instances where the FEC has found that individuals have made contributions in their children's names in violation of campaign finance laws prohibiting the making of contributions in the name of another person.

3.8.1 The FEC found that an individual violated campaign finance laws by "making four (4) contributions—$1,000 each—to four (4) Federal campaign committees in the name of his infant son during the calendar years 1992 and 1993." FEC MUR 4484, INT 15778 [DEV 52–Tab 5]. The four campaign committees either returned the funds or disclosed the contribution as a debt owed to the contributor in an amended quarterly report in response to inquiries by the FEC. *Id.* at INT 15826–29. The contributor and the FEC entered into a conciliation agreement that included a civil penalty of $4,000. *Id.* at INT 15789–94.

3.8.2 The FEC found that a contributor contributed $1,000 in the names of his two daughters, ages 4 and 8, on November 7, 1988, the same day he made a $1,000 contributions in his own name. FEC MUR 3268, INT 15612 [DEV 43–Tab 3]. The Commission elected not to pursue its case against the contributor, in part because he had pled guilty to criminal charges of defrauding investors and had filed for bankruptcy. *Id.* at INT 15613.

3.8.3 The FEC found that a contributor donated $4,000 in postage stamps in 1993 to a federal campaign committee in the names of his seven and eleven year old children. FEC MUR 4048, FEC119–0008–09 [DEV 43–Tab 5]. The FEC and the contributor entered into a conciliation agreement, pursuant to which the contributor agreed to pay a $7,500 civil fine. *Id.* at FEC 119–0012.

3.8.4 The FEC found that a contributor took money from the bank accounts of his one year old and three year old children to make three $1,000 contributions in their names to federal candidates. FEC MUR 4255, FEC 101–0046–47 [DEV 134–Tab3].

3.9 FECA does not require political committees to seek or report the age of contributors. Gov't Br. at 202.

3.10 The FEC states that it "faces unique and significant practical problems in attempting to investigate and prove whether a child knowingly and voluntarily made a particular contribution and thus whether the child's parent violated the contribution limits". Gov't Amended Proposed Findings of Fact ¶ 794. In some cases, parents have refused to submit their children to FEC questioning. FEC MUR 4254, USA CIV00932 [DEV 43–Tab 4] (report explaining that parents refused to allow their children to be questioned). The Commission maintains that determining whether or not children of a certain age are capable of making "knowing and voluntary" contributions is a subjective undertaking, made more difficult by parental influence and what the FEC deems to be "self-serving affidavits." Gov't Amended Proposed Findings of Fact ¶ 794; FEC MURs 4252–4255, General Counsel's Report at 5, 10, USA–CIV00925, 930–31 [DEV 43–Tab4] ("[I]t is difficult to accept the notion that children as young as eight years old are capable of 'knowingly and voluntarily' making the decisions to contribute to political campaigns. However, in the absence of anything in the Commission's regulations such as a presumption that a young child may not make contributions this becomes a very subjective decision. In this matter there does not appear to be any choice but to accept the assurance affirmed by affidavits that these were knowing and voluntary decisions."). The FEC also claims that "[q]uerying young-sters about their knowledge of politics and their relationship with their parents may threaten the privacy of the family." FEC Findings of Fact ¶ 794. In support of this contention, the Commission proffers a letter from an attorney representing a family investigated by the FEC which states

[my clients] believe that the general process of inquiry of the instant FEC Docket is unduly intrusive into the privacy of their family affairs

. . . . .

By the very act of responding truthfully to the instant Interrogatories and Document requests, [my clients] must open up their efforts to conduct their family affairs, to inculcate civic and political virtues and to teach values to their children to scrutiny by public officials .... The untoward effects are to ... invade privacy and private communications of husband and wife and of parents and children and possibly to create disruption in normal family functioning merely by responding to an apparently legitimate FEC inquiry.

FEC MUR 4254, FEC119–0017, 0021 [DEV 43–Tab 4].

## III. CONCLUSIONS OF LAW

I find it most appropriate to discuss BCRA's Title II first, before turning to my discussion of Title I, and the other remaining provisions of BCRA that are addressed in this opinion.

## I. TITLE II: NONCANDIDATE CAMPAIGN EXPENDITURES

### Sections 201, 203 and 204: The Prohibition on Electioneering Communications

The McConnell, NRA, Chamber of Commerce, NAB, and AFL–CIO Plaintiffs all challenge the prohibition on corporate and labor disbursements for electioneering communications. These Plaintiffs also

challenge both definitions of "electioneering communication" (the primary definition and the fallback definition).

As discussed in the *per curiam* opinion, FECA Section 441b prohibits corporations and labor unions from using their general treasury funds on contributions or expenditures in connection with a federal election. 2 U.S.C. § 441b. Sections 203 and 204 of BCRA extend this prohibition to "electioneering communication." BCRA provides for two definitions of electioneering communication—a primary definition and a backup definition to be substituted in the event the main definition is held to be constitutionally infirm. Given the uncontroverted record of abuse and circumvention of the longstanding prohibition of Section 441b, I find the primary definition of electioneering communication, and the corresponding restrictions in sections 203 and 204, constitutional. As a result, I find BCRA's restriction on the ability of corporations and labor unions to spend general treasury funds on electioneering communications to be facially constitutional as a matter of law, including its application to section 501(c)(4) and section 527(e)(1) corporations that do not receive an *MCFL* exemption.

As my opinion on the constitutionality of the primary definition does not command a majority, I am cognizant that the majority who have found the primary definition unconstitutional must tackle the constitutionality of the backup definition of electioneering communication. To that end, I concur in the judgment reached by Judge Leon's opinion on this question. Accordingly, the final judgment of the three-judge District Court panel reflects my support of his opinion as an alternative to my own finding that the primary definition of electioneering communication is constitutional. Given my view of the constitutionality of the primary definition, I have no further occasion to consider the constitutionality of the backup definition.

## A. *Introduction*

For close to one hundred years the political branches have made the choice, consistent with the Constitution, that individual voters have a right to select their federal officials in elections that are free from the direct influence of aggregated corporate treasury wealth and-for over fifty years-free from the direct influence of aggregated labor union treasury wealth. The rationale for the prohibition is simple, persuasive, and longstanding. First, such a restriction "ensure[s] that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political 'war chests' which could be used to incur political debts from legislators who are aided by the contributions." *FEC v. Nat'l Right to Work Comm. ("NRWC")*, 459 U.S. 197, 207, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). Second, such a prohibition "protect[s] the individuals[,] who have paid money into a corporation or union for purposes other than the support of candidates[,] from having that money used to support political candidates to whom they may be opposed." *Id.* at 208, 103 S.Ct. 552. In other words, when corporations and labor unions spend their general treasury funds to influence federal elections, our coordinate branches have stated that they must use segregated funds voluntarily and deliberately committed by individual citizens for that purpose.

Since 1996, this longstanding prohibition has become a fiction, with abuse so overt as to openly mock the intent of the law. The record persuasively demonstrates that corporations and unions routinely seek to influence the outcome of federal elections with general treasury funds by running broadcast advertisements that skirt the

prohibition contained in section 441b by simply avoiding *Buckley*'s "magic words" of express advocacy. In enacting Title II, Congress responded to this problem by tightly focusing on the main abuse: broadcast advertisements aired in close proximity to a federal election that clearly identify a federal candidate and are targeted to that candidate's electorate. In devising Title II, Congress has returned to a regime where corporations and labor unions must use federal money from a separate segregated fund explicitly designated for federal election purposes when seeking to influence federal elections.[109]

Indeed, the record conclusively establishes that the "magic words" of express advocacy identified in *Buckley* are rarely used in any form of electioneering advertisements in the modern political campaign. Findings ¶ 2.3. The perverse consequence of this situation is that advertisements that avoid express advocacy are not only the type of advertisements that political consultants generally employ for their candidate clients, they are also precisely the advertisements that corporations and labor unions, prior to BCRA, were permitted to run. Accordingly, as the record demonstrates, corporations and labor unions, with minimal effort, were able to influence federal elections with their general treasury funds; a practice long prohibited by Congress and contrary to that enforced by the judiciary.

It is for these reasons, particularly given the overwhelming record in this case, that I find facially constitutional the prohibition in Title II on corporations and labor un-

ions using general treasury funds for electioneering communications.

### B. *Standard of Review*

Plaintiffs first contend that both *Buckley* and *MCFL* foreclose any Congressional regulation of speech that does not constitute express advocacy, and as a result, Title II fails as a matter of law because BCRA's restrictions on electioneering communication apply to broadcast advertisements that do not contain express advocacy. McConnell Br. at 51 ("*Buckley* and *MCFL* condemn Congress' regulation of speech that does not constitute express advocacy."). In other words, Plaintiffs posit that the Court does not even need to reach the question of whether BCRA is narrowly tailored to serve a compelling governmental interest, because both *Buckley* and *MCFL* announce a substantive rule of constitutional law; namely, that Congress may not regulate any speech that does not qualify as express advocacy as that term has become known.

As a matter of law, and as discussed *infra,* I find Plaintiffs' argument on this point unpersuasive. Neither *Buckley* nor *MCFL* create a rule of substantive constitutional law whereby Congress can only regulate political speech containing words of express advocacy. Rather, *Buckley* and *MCFL* used the express advocacy standard as a means of construing otherwise unconstitutionally vague portions of FECA. As I do not view *Buckley* and *MCFL* as prohibiting future Congressional regulation of political speech, I reach the question of whether BCRA is narrowly

---

**109.** In this manner, Title II neatly dovetails with the nonfederal funds prohibitions contained in Title I. Whereas the political parties have expressed their frustration that Title I will diminish their importance relative to special interest groups, *see, e.g.,* RNC Br. at 13, Title II ensures that these special interest organizations, except those explicitly qualifying for *MCFL*-status, will have to run broadcast advertisements that influence a federal election with the same federal dollars that the political parties will have to use to pay for their advertisements (except that BCRA increases the amount of federal money that the parties can raise relative to their special interest counterparts).

tailored to serve a compelling governmental interest.

In turning to that question, it bears pointing out that the parties argue in their briefing about who bears the "burden" in this litigation, with each side pointing the finger at the other. *Compare* Gov't Br. at 131 ("[Plaintiffs] efforts to shoulder [their] burden all fail.") *with* McConnell Reply at 32 ("Defendants incorrectly argue throughout their briefs that *plaintiffs* bear the burden of demonstrating that BCRA's ban on electioneering communications is overly broad.") (emphasis in original). Throughout this litigation, Defendants argue that Plaintiffs bear a burden of demonstrating that the law is substantially overbroad. Defendants contend that as Plaintiffs bring a facial challenge to these sections of BCRA, they must establish that the prohibition on corporate and labor union spending of general treasury funds on electioneering communications is substantially overbroad. *See Ashcroft v. ACLU*, 535 U.S. 564, 122 S.Ct. 1700, 1713, 152 L.Ed.2d 771 (2002); *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 1398–99, 152 L.Ed.2d 403 (2002). As the Supreme Court instructed in *Broadrick v. Oklahoma*, "the Court has altered its traditional rules of standing to permit-in the First Amendment area-attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (internal quotation marks and citation omitted). .

Plaintiffs wait until their reply briefs to address Defendants' salient argument on this point. McConnell Reply at 32, Chamber/NAM Reply at 4–5. Plaintiffs essentially argue that there are two kinds of facial challenges under the First Amendment. The first, involves statutes that injure "third parties," and involves the *Broadrick* line of cases. Chamber Reply at 4. The second facial attack is where "a plaintiff invokes its own First Amendment rights in a way that subjects a statute to strict scrutiny." Chamber/NAM Reply at 5 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 & n. 3, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Sec'y of State of Md. v. Joseph H. Munson, Co.*, 467 U.S. 947, 965–66 & n. 13, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)). Plaintiffs argue that they belong in this latter category.

The difficulty with Plaintiffs' position, however, is that none of their submissions describe in specific detail any advertisements, referring to particular candidates in any races, that Plaintiffs intend to produce or air at any time in the future, and that would fall within BCRA's electioneering communication provisions. As such, it is difficult to argue that Plaintiffs have demonstrated affirmatively and concretely, in any kind of detail, the scope of their claimed First Amendment injuries.

Nevertheless, none of the parties dispute the fact that the framework for reviewing the constitutionality of these sections is strict scrutiny. Tr. at 252 (Waxman) ("The standard is strict scrutiny, there's no doubt about it. This is political speech. This is core political speech."). Moreover, a number of Plaintiffs do have a history of using corporate and labor union general treasury funds to pay for electioneering communications.

In practical terms, given the way Defendants have argued this case, the debate over the "burden" is largely academic. Defendants present their Title II arguments by primarily demonstrating that the law meets a strict scrutiny test. Indeed, to some degree, Defendants have essentially conflated the strict scrutiny and substantial overbreadth inquiries.

*See* Tr. at 251–52 (Waxman) ("And that brings us to the real constitutional issue, whether the burdens that Congress' new law imposes on speech are narrowly tailored to serve compelling public interests; or, more precisely, again because this is a facial challenge, whether plaintiffs have demonstrated that the new provisions are substantially overbroad in relation to their legitimate goals."). Furthermore, as I find that the provisions in Title II are constitutional under this strict scrutiny review, the question of which party bears the burden is also largely irrelevant. Consequently, although I am convinced that Plaintiffs have not demonstrated that the "electioneering communication" provisions in Title II are substantially overbroad, I analyze the law under the strict scrutiny framework consistent with Defendants' presentation in their briefing.

In undertaking this latter analysis, I will examine whether BCRA's restrictions on electioneering communications are narrowly tailored to serve a compelling public interest. Under this strict scrutiny review, I find that the restrictions on corporate and labor union spending on electioneering communications are constitutional at this facial challenge stage, meaning that BCRA's restrictions on political speech are narrowly tailored to serve a corresponding compelling governmental interest.

The remainder of my opinion on this question is divided into four parts. The first section contains my reasons for finding that express advocacy is not a constitutional requirement. On this point, I am joined by Judge Leon and therefore speak for the Court. The second portion provides my dissenting view that the primary definition of electioneering communication is narrowly tailored to serve a compelling governmental interest. In the third and fourth sections, I write for the Court and discuss my reasons for concluding that Plaintiffs' underbreadth argument and

Plaintiffs' challenge to the "media exemption" both lack merit.

## C. *Express Electoral Advocacy is Not a Constitutional Requirement*

### 1. The Origins of the Express Advocacy Test

I conclude that in the context of regulating federal elections, Congress may restrict corporate and union spending on political speech which does not contain words of express electoral advocacy, provided that such restrictions are narrowly tailored to serve a compelling governmental interest. In condemning Title II, Plaintiffs insist that *Buckley* announced a substantive rule of constitutional law, such that Congress is forever prohibited from regulating any political speech that does not contain explicit words of express advocacy-even if the political speech being regulated is paid for with corporate or labor union general treasury funds. McConnell Opp'n at 38 ("*Buckley* thus leaves no doubt that its express advocacy test is a constitutional requirement."). Plaintiffs provide very little textual analysis of the *Buckley* and *MCFL* decisions and instead overstate the extent of the *Buckley* holding to satisfy their purpose.

In reviewing Title II, it should be noted that none of the parties dispute the fact that the electioneering communication restrictions in Title II regulate more political speech than just express advocacy. Therefore, if I conclude that the express advocacy standard is forever enshrined in the Constitution, then the restrictions on electioneering communications in Title II would be condemned as a matter of law before any analysis of substantial overbreadth is even performed. In taking a step back and analyzing *Buckley* and *MCFL*, it becomes apparent, however, that the express advocacy standard devised by the Supreme Court in *Buckley* is not a

substantive rule of constitutional law that operates as a *per se* restriction on future Congressional action.

In *Buckley,* the Supreme Court considered a provision of FECA that limited the amount of money individuals and certain groups could independently expend "relative to" a clearly identified federal candidate.[110] *See Buckley,* 424 U.S. at 39–51, 96 S.Ct. 612 (discussing section 608(e)(1) of FECA). Section 608(e)(1) of FECA provided that "[n]o person may make any expenditure ... relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year *advocating the election or defeat of such candidate,* exceeds $1,000." *Id.* at 39, 96 S.Ct. 612 (omission in original) (emphasis added). Prior to directly considering the constitutionality of section 608(e)(1), the Supreme Court stated that "[b ]efore examining the interests advanced in support of [the provision's] expenditure ceiling, consideration must be given to appellants' contention that the provision *is unconstitutionally vague.*" *Id.* at 40, 96 S.Ct. 612 (emphasis added).

In undertaking the vagueness inquiry, the Supreme Court was particularly troubled by the phrase "relative to" as it appeared in the provision under consideration. *Id.* at 40–44, 96 S.Ct. 612. Observing that the law did not define the phrase, the Supreme Court found that "[t]he use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech unless other portions of [the provision] make sufficiently explicit the range of expenditures covered by the limitation." *Id.* at 41–42,

96 S.Ct. 612. Interpreting the phrase in its context, the Supreme Court stated that the "context clearly permits, if indeed it does not require, the phrase 'relative to' a candidate to be read to mean 'advocating the election or defeat of' a candidate." *Id.* at 42, 96 S.Ct. 612. Accordingly, the Supreme Court, used the context of the provision to make a "first-cut" at construing the vague phrase "relative to."

Even with this clarification, however, the Supreme Court found that the vagueness inquiry was merely "refocuse[d]" and, thus, not completely resolved. *Id.* at 42, 96 S.Ct. 612. Confronted with the challenge of interpreting "advocating the election or defeat of a candidate" the Supreme Court was once again concerned about an interpretation of the wording of the statute that covered more speech than was actually necessary. The Supreme Court remarked that:

> the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various issues, but campaigns themselves generate issues of public interest.

*Id.* In other words, the Supreme Court found that even if it was permissible to construe the phrase "relative to" as the equivalent of "advocating the election or defeat of a candidate," the vagueness inquiry was not complete because such a construction did not provide a bright line

---

110. More specifically, this provision in FECA "prohibit[ed] all individuals, who are neither candidates nor owners of institutional press facilities and all groups, except political parties and campaign organizations, from voicing their views 'relative to a clearly identified candidate' through means that entail aggregate expenditures of more than $1,000 during a calendar year." *Buckley,* 424 U.S. at 39–40, 96 S.Ct. 612.

between permissible speech and impermissible speech and had the potential to cause speakers to self censor genuine issue discussion in order to avoid violating the statute.[111]

In fact, to underscore its apprehension that its first narrowing construction was not satisfactory, the Supreme Court quoted a passage at length from *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945):

[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.

Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

*Id.* at 43, 96 S.Ct. 612 (quoting *Thomas*, 323 U.S. at 535, 65 S.Ct. 315). To satisfy its concerns, therefore, the Supreme Court further construed section 608(e)(1) to apply "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 44, 96 S.Ct. 612. In a footnote, the Supreme

Court observed that "[t]his construction would restrict the application of § 608(e)(1) to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n. 52, 96 S.Ct. 612. These phrases have come to be known as the "magic words," *see* Findings ¶ 2.1.1, because a communication that invokes one of these words unquestionably qualifies as express advocacy and falls within the ambit of FECA. Notably, even with this narrowing construction, the Supreme Court struck down section 608(e)(1) as unconstitutional under the First Amendment. *See id.* at 44–51, 96 S.Ct. 612.

The Supreme Court also imported the "express advocacy" requirement into another provision of FECA that it found unconstitutionally vague. Section 434(e) of FECA required individuals and certain groups to disclose contributions and expenditures. Contributions and expenditures were each defined in terms of the use of money or other valuable assets "for the purpose of influencing" the nomination or election of candidates for federal office. *Id.* at 77, 96 S.Ct. 612. The Supreme Court found that the phrase "for the purpose of influencing" was unconstitutionally vague. *Id.* ("It is the ambiguity of this phrase that poses constitutional problems."). Finding no legislative history to help guide the statutory analysis, the Court turned to construing the disclosure provision in such a manner so as *"to avoid the shoals of vagueness."* *Id.* at 78, 96 S.Ct. 612 (emphasis added).

---

**111.** The McConnell Plaintiffs seize on this quotation as immutable proof that express advocacy is somehow chiseled in stone as a constitutional requirement. McConnell Opp'n at 34 (Buckley's adoption of this bright line test "was not merely an exercise in statutory construction."). However, as is clear

from the context in which this quotation was made, the Supreme Court in making this statement was observing that the phrase "relative to" could not be remedied by a simple reference to the context of the provision, but rather, needed further narrowing before the vagueness concerns would be ameliorated.

When attempting to construe the phrase in relation to expenditures, the Court encountered "line-drawing problems." *Id.* To resolve this difficulty, the Supreme Court, again, interpreted the phrase in the same manner in which it had interpreted the vague portion of section 608(e)(1). *Id.* at 79, 96 S.Ct. 612 ("Although the phrase, 'for the purpose of . . . influencing' an election or nomination, differs from the language used in § 608(e)(1), it shares the same potential for encompassing both issue discussion and advocacy of a political result."). As a result, the Supreme Court found that "[t]o insure that the reach of § 434(e) is not impermissibly broad, we construe 'expenditure' for purposes of that section in the same way we construed the terms of s 608(e) to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. 612. So construed, the Supreme Court held that section 434(e) was narrowly tailored to serve a sufficiently important governmental interest. *Id.* at 80–82, 96 S.Ct. 612.

Ten years later in *MCFL*, the Supreme Court again invoked the express advocacy test. *MCFL*, 479 U.S. at 248–49, 107 S.Ct. 616. In doing so, the Supreme Court gave insight into the reasoning behind the origins and purpose of the express advocacy test. The *MCFL* Court wrote that in *Buckley*, "in order to avoid problems of overbreadth, the Supreme Court held that the term 'expenditure' encompassed 'only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.'" *Id.* (quoting *Buckley*, 424 U.S. at 80, 96 S.Ct. 612). With this in mind, the Supreme Court turned to the question before it, which was whether the term "expenditure," as used in section 441b, was again vague. Having found that *Buckley* had adopted the express advocacy construction for the term "expen-

diture" in the provision requiring disclosure of independent expenditures, it is not surprising that the Court found the term "expenditure" for purposes of section 441b to also require the express advocacy construction. *Id.* at 249, 107 S.Ct. 616 ("We agree with appellee that this rationale *requires a similar construction* of the more intrusive provision that directly regulates independent spending. We, therefore, hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b.") (emphasis added).

### 2. The Express Advocacy Test is Not a Substantive Rule of Constitutional Law

As is clear from the discussion above, both *Buckley* and *MCFL* explicitly invoked the express advocacy test *only* as a means of statutory construction. In *Buckley*, the Supreme Court was confronted with two different provisions of FECA that both presented vagueness challenges for the Court. As a result, the Supreme Court turned to the "'cardinal principle' of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Zadvydas v. Davis*, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)); *see also Frisby v. Schultz*, 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (observing the "'well-established principle that statutes will be interpreted to avoid constitutional difficulties'"). I do not believe that in devising the express advocacy standard, the Supreme Court in *Buckley* was announcing an unalterable principle of constitutional law that would prohibit future congressional action directed toward express

and issue advocacy. *See Wisconsin Realtors Ass'n v. Ponto,* 233 F.Supp.2d 1078, 1085 (W.D.Wis.2002) ("I am not convinced that *Buckley* was intended to work such a significant inhibition on future legislative efforts to address problems raised by the competing state interests and constitutional imperatives inevitably associated with express and issue advocacy."); *Nat'l Fed'n of Republican Assemblies v. United States,* 218 F.Supp.2d 1300, 1325 (S.D.Ala.2002) ("The plaintiffs' second error is their insistence that *Buckley* held that all political speech other than express electoral advocacy lies beyond the reach of constitutional regulation, including disclosure requirements."); *see also Va. Soc'y for Human Life, Inc. v. FEC,* 263 F.3d 379, 392 (4th Cir.2001) ("[W]e are bound by *Buckley* and *MCFL,* which strictly limit the meaning of 'express advocacy.' If change is to come, it must come from an imaginative Congress or from further review by the Supreme Court."). Rather, the *Buckley* Court was particularly concerned with construing vague provisions of a statute in order to avoid reaching difficult questions of constitutional law. In the case of section 608(e)(1), the Supreme Court was unsuccessful-even after construing the statute in an effort to avoid vagueness problems, the provision still failed to satisfy exacting First Amendment scrutiny. *Buckley,* 424 U.S. at 44–45, 96 S.Ct. 612. Whereas, in the case of section

434(e), the statutory construction successfully salvaged the statute which, as narrowed, bore "a sufficient relationship to a substantial governmental interest." *Id.* at 80, 96 S.Ct. 612.

The McConnell Plaintiffs argue that it is "unfathomable" that Defendants would suggest the express advocacy test was not constitutionally ordained. McConnell Opp'n at 35–36 (quoting *Buckley,* 424 U.S. at 80, 96 S.Ct. 612) ("To insure the reach of § 434(e) is not impermissibly broad, we construe 'expenditure' for purposes of that section in the same way we construed the terms of § 608(e) to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.") (emphasis removed). However, as the quoted language explicitly indicates, the Supreme Court *construed* the statutory language in an effort to save the provision from unconstitutional overbreadth. By adopting a narrowing construction to this vague provision, the Supreme Court easily found section 434(e) constitutional. *Buckley,* 424 U.S. at 80–82, 96 S.Ct. 612. Further diminishing the credibility of the McConnell Plaintiffs' argument is the fact that the *Buckley* phrase quoted by the McConnell Plaintiffs appears in the midst of a section the Supreme Court entitled "Vagueness Problems." *Id.* at 76, 96 S.Ct. 612.[112]

---

**112.** The McConnell Plaintiffs also offer the argument that because *Buckley* invoked First Amendment caselaw during its initial discussion of "General Principles," it was clear that *Buckley* was creating a rule of substantive constitutional law when it articulated the express advocacy standard. McConnell Opp'n at 37, McConnell Reply at 27 (citing *Buckley,* 424 U.S. at 14, 96 S.Ct. 612) (noting that *Buckley* cited *Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) and *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). However, Plaintiffs fail to point out that these citations

appear in the section *"General Principles"* and were cited for the uncontroversial proposition that the "First Amendment affords the broadest protection to ... political expression." *Buckley,* 424 U.S. at 14, 96 S.Ct. 612 (emphasis added). It defies logic to argue that because the Supreme Court invoked First Amendment caselaw for the proposition that FECA's restrictions on contributions and expenditures operate in the area of the most fundamental First Amendment rights, that the Court was implicitly-thirty pages later-hewing express advocacy into constitutional stone.

Accordingly, Plaintiffs' reasoning is faulty when they argue that the "express advocacy doctrine reflects more than a concern about vagueness." ACLU Opp'n at 4; *accord* McConnell Opp'n at 37 ("[I]t is nonsensical to read the opinion as merely addressing statutory vagueness."). In adopting the express advocacy doctrine, the Supreme Court was engaging in statutory construction in order to avoid unnecessarily declaring specific portions of FECA unconstitutional. In fact, nowhere in *Buckley* or *MCFL* does the Supreme Court explicitly state that the express advocacy test is a constitutional requirement. Each time the Supreme Court has invoked the express advocacy standard it has done so in the context of construing a vague portion of FECA. I would expect that if the Supreme Court were announcing a substantive rule of constitutional law it would have stated it explicitly in either of these two cases.

Plaintiff ACLU takes a snippet of the *Buckley* opinion, and without offering any textual analysis of the case, argues that *Buckley*'s clear ruling is that "the government's regulation of expenditures can only reach 'communications that in express terms advocate the election or defeat of a clearly identified candidate....'" ACLU Br. at 13 (quoting *Buckley*, 424 U.S. at 44, 96 S.Ct. 612). However, the Supreme Court stated in full: "We agree that in order to preserve the provision against

invalidation on *vagueness grounds*, § 608(e)(1) must be *construed* to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley,* 424 U.S. at 44, 96 S.Ct. 612 (emphasis added). When the quoted portion appears in its full context, it appears obvious the extent to which Plaintiff ACLU has misconstrued *Buckley*'s words. The express advocacy test in *Buckley* was merely an appropriate exercise in statutory construction.[113]

Plaintiffs are correct that the *Buckley* Court "did not posit a bipolar world of issue advocacy and express advocacy." However, they err in concluding that the Supreme Court, therefore, "permitted regulation only where it is unmistakably clear that the speech at issue can only be characterized as express advocacy." McConnell Br. at 49; *see also* ACLU Br. at 15 ("Only 'express advocacy' can be subject to regulation; issue advocacy is free from permissible regulation."). As Judge Richard W. Vollmer recently observed:

> The Supreme Court in *Buckley* employed no such terminology and recognized no such dichotomy. Rather, the *Buckley* Curt [sic] saw political speech as comprised of "issue discussion" and "advocacy of a political result." 424 U.S. at 79, 96 S.Ct. 612. This would represent only a semantic difference if

---

**113.** Plaintiff ACLU also states that Title II of BCRA applies to advertisements "that merely 'refer' to a candidate" and that, as a result, Title II "should be struck down." ACLU Br. at 13. The ACLU's argument lacks merit because the primary definition of BCRA does not place a "ban on communications that merely 'refer' to a candidate." ACLU Br. at 13. Rather, BCRA prohibits corporations and labor unions from funding *broadcast advertisements* with *general treasury funds,* which *refer to a federal candidate, run in close proximity to an election* and are *targeted to the candidate's relevant electorate.* Corporations

and labor unions are, of course, free to fund as many of these prohibited advertisements as they desire from their separate segregated fund. I doubt anyone disputes the proposition that had Congress enacted a law that had banned communications that "merely 'refer' to a candidate" that such a law would be declared overbroad and unconstitutional. *Id.* However, the restriction related to electioneering communications in BCRA is much narrower than Plaintiff ACLU describes in its briefing and is targeted to communications that influence federal elections.

"advocacy of a political result" were confined to express electoral advocacy, for then "issue discussion" would occupy the same territory that the plaintiffs claim for "issue advocacy"—that is, all political speech that is not express electoral advocacy.

The *Buckley* Court, however, recognized that advocacy of a political result extends beyond express electoral advocacy .... The *Buckley* Court introduced express electoral advocacy as a benchmark to provide speakers the clear boundary that the statutory cap on independent expenditures otherwise lacked. *Id.* at 43–44, 96 S.Ct. 612. *If express electoral advocacy were the only form of electoral advocacy that exists, the Court would not have been concerned that speakers could not tell the difference between issue discussion and electoral advocacy;* the Court established the express electoral advocacy standard precisely because other forms of electoral advocacy exist but may prove difficult to distinguish from issue discussion....

*Nat'l Fed'n of Republican Assemblies*, 218 F.Supp.2d at 1324 (emphasis added). Plaintiffs are mistaken in their conclusion that in not establishing a "bipolar world," the Supreme Court has necessarily decreed a rule of substantive constitutional law. As Judge Vollmer points out:

> Electoral advocacy is not automatically immune from regulation *but, to the extent it cannot easily be distinguished from issue discussion,* it may be necessary to exclude electoral advocacy from regulation so as to avoid self-censorship by uncertain speakers and the resulting abridgement of issue discussion. The bright line of express electoral advocacy was required under Section 434(e), not because all speech falling short of express electoral advocacy is immune from regulation, *but because no other means of readily distinguishing electoral advo-*

*cacy from issue discussion presented itself.*

*Id.* at 1328–29 (emphasis added). The point of *Buckley* and *MCFL* was not that Congress can only regulate express advocacy. Rather, the Supreme Court in these cases took a vague statute and construed it in such a manner so as to create a bright line because the statute itself did not provide any "other means of readily distinguishing electoral advocacy from issue discussion." *Id.* at 1329.

### a. Other Cases Cited by Plaintiffs Are Not Relevant or Are Distinguishable

Plaintiffs' briefing, while heavy on hyperbole attacking Defendants' submissions, is incredibly light on textual analysis of the *Buckley* and *MCFL* opinions. Perhaps attempting to shift attention away from their lack of a robust discussion of *Buckley*, Plaintiffs attempt to bolster their position by citing to a series of lower court cases that Plaintiffs claim uphold the express advocacy standard as a rule of constitutional law. McConnell Br. 51–53. I acknowledge that there is some dicta in these cases which suggests that the express advocacy test is a constitutional requirement. Nevertheless, the language in these cases is dicta, is not binding precedent, and for the reasons discussed in this section, is unpersuasive.

The cases cited by Plaintiffs fall mainly into two categories. First, many of their cited cases involve courts striking down FEC regulations attempting to broaden the Supreme Court's express advocacy standard. Not surprisingly, courts rejected the FEC's efforts because neither they nor the Commission has the authority to redefine the statutory test. These courts correctly observed that Congress or the Supreme Court were the appropriate branches to undertake such steps. BCRA is therefore consistent with this

strand of caselaw. The second grouping of cases involve federal courts striking down state statutes and state regulations that had a variety of constitutional defects. In these cases, the state statutes at issue all captured too much pure issue advocacy without fashioning an appropriate test that predominantly regulated electoral advocacy. BCRA differs from these state provisions in that with BCRA, Congress, supported by a plethora of evidence and experience, created a narrowly tailored definition of electioneering communication that is specifically focused on communications that influence federal elections.

With regard to the cases where courts struck down FEC regulations, the Commission, and not Congress, had sought to define express advocacy broader than the Supreme Court had permitted in *Buckley. See, e.g., Va. Soc'y for Human Life,* 263 F.3d at 385, 392 (striking down FEC regulation 11 C.F.R. § 100.22(b) that defined express advocacy in such a manner so as to include communications that "could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidates"); *Maine Right to Life Comm., Inc. v. FEC,* 98 F.3d 1, 1 (1st Cir.1996) (summarily affirming district court decision to strike down same regulation); *Right to Life of Dutchess Cty., Inc. v. FEC,* 6 F.Supp.2d 248, 253 (S.D.N.Y.1998) (striking down same regulation). In relation to this broadly defined FEC regulation, these courts held that neither they nor the FEC had the authority to change the express advocacy test, concluding that to do so required further congressional or Supreme Court action. In fact only one decision concluded that the FEC could make such a regulation, *FEC v. Furgatch,* 807 F.2d 857

(9th Cir.1987), a case that has been largely discredited. *See, e.g., Chamber of Commerce of the United States of America v. Moore,* 288 F.3d 187, 194 (5th Cir.2002) (citing cases disagreeing with *Furgatch* ). In attempting to create these regulations, the FEC's efforts produced provisions plagued with vague terms that raised the same concerns that troubled the *Buckley* Court, placing the speaker at the mercy of the subjective intent of the listener to determine if a communication was covered by FECA. *See Buckley,* 424 U.S. at 43, 96 S.Ct. 612 (" 'In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.' ") (quoting *Thomas v. Collins,* 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Indeed, the consensus among the judiciary has been that courts "are bound by *Buckley* and *MCFL,* which strictly limit the meaning of 'express advocacy.' If change is to come, *it must come from an imaginative Congress or from further review by the Supreme Court." Va. Soc'y for Human Life,* 263 F.3d at 392 (emphasis added).[114] Unlike the present case, the absence of further congressional action led these courts to strike down the FEC's regulation.

With regard to the second category of cases involving state law provisions, Plaintiffs refer to these decisions solely in a footnote. McConnell Br. at 53 n.20. These cited cases are each distinguishable because the state laws and regulations considered by the various courts each disregarded the principles of vagueness and overbreadth articulated in *Buckley* or

---

**114.** Other cases relied on by Plaintiffs concern other FEC regulations relating to voter guides. *Clifton v. FEC,* 114 F.3d 1309, 1317

(1st Cir.1997); *Faucher v. FEC,* 928 F.2d 468, 472 (1st Cir.1991).

reached too far in regulating issue advocacy. In *Chamber of Commerce*, the Fifth Circuit pointed out that the state statute at issue "essentially adopted the language of the Supreme Court's decisions in *Buckley* and *MCFL* [which meant that the only decision that the court needed to reach was] to determine whether the Chamber's advertisements constitute 'express advocacy' under the standard articulated [in the state statute]." *Chamber of Commerce*, 288 F.3d at 196. Accordingly, for the court in *Chamber of Commerce*, the only decision to reach was whether the communications at issue in the case constituted express advocacy. There is some unexplained dicta in the case which states that the "Supreme Court has held that the First Amendment permits regulation of political advertisements, but only if they *expressly* advocate the election or defeat of a specific candidate." *Id.* at 190 (no citation provided). For the reasons articulated in this section, I expressly disagree with such dicta, presented without a thoroughgoing analysis of *Buckley* or any other support. *See Nat'l Fed'n of Republican Assemblies*, 218 F.Supp.2d at 1329–30 (citing *Chamber of Commerce* ) ("While some of these cases contain unexplained dicta arguably suggesting that express electoral advocacy is a universal, constitutional limitation on disclosure requirements, none so holds and none offers any textual analysis of *Buckley* that could support such a proposition.").

In another case cited by Plaintiffs, *North Carolina Right to Life, Inc. v. Bartlett*, the Fourth Circuit invalidated a North Carolina statute requiring political committees to make certain disclosures. *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 712–713 (4th Cir.1999). The *Bartlett* court found "unconstitutionally vague and overbroad" a state statute that reached further than FECA in extending disclosure requirements to (1) groups that only incidentally engage in express advocacy and (2) groups engaging in issue advocacy. *Id.* In the same breath as it struck down the provision, the Fourth Circuit made clear that it would have first endeavored to save the provision like the Supreme Court did in *Buckley*. *Id.* at 712 ("The question then is whether we may similarly construe North Carolina's definition of political committee to save it from being void for vagueness."). The court in *Bartlett*, therefore, only found that the North Carolina statute was not subject to a narrowing interpretation, not that the express advocacy test was a permanent fixture of constitutional law. However, to the extent some language in *Bartlett* could arguably lead in that direction, I find it to be dicta unaccompanied by a serious textual analysis of *Buckley*.[115]

Plaintiffs also cite *Citizens for Responsible Government State Political Action Committee v. Davidson*, a case where the Tenth Circuit severed unconstitutional portions of a Colorado campaign finance law. The state law defined independent expenditure to include not only express advocacy, but also "expenditures for political messages which unambiguously refer

**115.** Indeed in distinguishing *Bartlett*, the court in *National Federation of Republican Assemblies* found:

> Only a single case cited by the plaintiffs clearly stands for the proposition asserted. In *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir.1999), *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000), the Court stated that Buckley "defined political committee as in-

cluding only those entities that have as a *major purpose* engaging in *express advocacy* in support of a candidate." *Id.* at 712 (emphasis in original). The Court offered no authority for this proposition, which is plainly contrary to *Buckley* and which is dicta in any event.

*Nat'l Fed'n of Republican Assemblies*, 218 F.Supp.2d at 1330 (footnotes omitted).

to any specific public office or candidate for such office." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1187–88 (10th Cir.2000). The term "political message" was in turn defined as including messages delivered by telephone, by print or electronic media, or by any other written material that applied not only to express advocacy, but also to unambiguous references to candidates. *Id.* at 1188. The *Davidson* court found that as applied to the plaintiffs, the law encroached on legitimate issue advocacy, which "is a violation of the rule enunciated in *Buckley* and its progeny." *Id.* at 1194 (quoting *Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 387 (2d Cir.2000)). From the plain text of the Colorado statutes, the laws were aimed not just at electioneering, but also at pure issue discussion. No effort was made to draw a different line than had been drawn in *Buckley,* and as a result, the Tenth Circuit severed those constitutionally offensive portions. *Davidson* also contains unexplained dicta that "the [Supreme Court in *MCFL* ] clarified that express words of advocacy were not simply a helpful way to identify 'express advocacy,' but that the inclusion of such words was constitutionally required." *Id.* at 1187. For the reasons set forth above, I disagree with this statement, and consider it to constitute unpersuasive dicta.

The other cases Plaintiffs cite are equally unpersuasive. *See Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 968–970 (8th Cir.1999) (striking down a state regulation defining express advocacy in a similar manner as 11 C.F.R. § 100.22(b) as unconstitutional because the focus of the regulation is on "what reasonable people or reasonable minds would understand by the communication"); *Brownsburg Area Patrons Affecting Change v. Baldwin,* 1999 U.S.App. LEXIS 23325 at *5–*6 (7th Cir.1999) (upholding

Indiana disclosure statute after Indiana Supreme Court certified that statute applied only to organizations engaging in express advocacy). Indeed, the court in *Iowa Right to Life* grounded its decision on the fact that the "State's definition of express advocacy creates uncertainty and potentially chills discussion of public issues." *Iowa Right to Life,* 187 F.3d at 970.

After reviewing these cases, I am convinced that none of the cases cited above offer a convincing argument that express advocacy is a constitutional requirement. The vague and subjective terms associated with the provisions of FECA impelled the *Buckley* court to offer the express advocacy construction. In turning to BCRA, it is clear that the primary definition of electioneering communication does not present this problem.

### 3. The Primary Definition of Electioneering Communication is Not Vague

Unlike the vagueness concerns which motivated the Supreme Court in *Buckley* and *MCFL,* the primary definition of electioneering communication is not vague. Indeed, *none* of the Plaintiffs argued in their briefing or at oral argument that the primary definition presented any vagueness concerns. *See* McConnell Br. at 57–69; Tr. at 264–65 (Waxman) ("No one is arguing—I don't believe that any of the 82 plaintiffs in this case argue that the principal definition that is the four-part test, is vague in any respect. It's hard to imagine how it could be less vague.") (none of the Plaintiffs ever objected to this characterization). In other words, there is no vagueness challenge to the primary definition presently before the Court.

Plaintiffs make a number of general arguments in opposition to the primary definition: first, they contend that the primary

definition fails because it regulates more speech than express advocacy, McConnell Br. at 44–57; second, they argue that even if express advocacy is not a constitutional requirement, the primary definition is unconstitutionally overbroad, McConnell Br. at 57–69; third, they argue that the primary definition of electioneering communications is "woefully" underinclusive, McConnell Br. at 75–77; and fourth, they argue that the primary definition violates the Fifth Amendment, McConnell Br. at 77–81. *Nowhere,* however, do any of the Plaintiffs argue that the primary definition is vague. Given that among all of the seasoned political actors and organizations that comprise the remaining 77 Plaintiffs in this case, not one has argued that vagueness is a problem plaguing the primary definition, I could decline to engage in a vagueness inquiry. *See, e.g., Tri–State Hosp. Supply Corp. v. United States,* 142 F.Supp.2d 93, 101 n. 6 (D.D.C.2001) ("The court makes no ruling on such acts, however, because the United States has not briefed the issue."); *Carter v. Cleland,* 472 F.Supp. 985, 989 n. 4 (D.D.C.1979) ("This issue was not briefed by the parties. No decision will be rendered on it."); *cf. Kattan v. District of Columbia,* 995 F.2d 274, 276 (D.C.Cir.1993) ("[T]his Court has recognized that a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously."); *United States v. Wade,* 255 F.3d 833, 839 (D.C.Cir.2001) (issues that are not briefed are considered "abandoned") (*citing Terry v. Reno,* 101 F.3d 1412, 1415 (D.C.Cir.

1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997)).

However, since Judge Henderson discusses the vagueness question in her opinion, *see* Henderson Op. at Part IV.A, I note that even were I to entertain the vagueness question, I would conclude that the primary definition of electioneering communication is free from any vagueness infirmities. The primary definition of electioneering communication, as set forth in section 201 of the Act, comprises four distinct elements, each designed to be clear, objective, limited in scope, and directly responsive to the evidence concerning recent electioneering by corporations and labor unions with their general treasury funds. An advertisement falls within the definition, and therefore would have to be funded with money from a labor union or corporation's segregated fund, if, *and only if,* it satisfies *each* of the following four elements:

A. It is broadcast by television, radio, cable, or satellite. Newspaper advertisements, direct mail, billboards, phone banks, Internet advertisements, door-to-door canvassing, or leaflets are not covered by the primary definition.

B. It refers to a "clearly identified candidate" for federal office. Broadcast advertisements dealing with issues are not electioneering communications, unless the advertiser chooses to mention or show a particular federal candidate.[116]

---

116. The language in the statute, "refers to a clearly identified candidate for Federal office," BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A), does not suffer the same problems that the *Buckley* court had with FECA's "relative to" language. Although, the definition of "refer" shares "relate" as a synonym, "refer" is a much more precise word. Merriam–Webster's Collegiate Dictionary, Tenth Edition 1997 (defining refer as "1 a: to have relation or connection: RELATE b: to direct attention usu. *by clear and specific mention.*") (emphasis added). Given that "refers to" is a much more exacting word than "relative to," and given that none of the Plaintiffs have complained that there is any ambiguity with this wording, I find that this phrase does not suffer from the same vagueness problems that plagued FECA when the *Buckley* court construed the phrase "relative to."

C. It runs in the 60 days before a general election, or the 30 days before a primary.

D. The advertisement is *targeted* to the identified candidate's electorate. Specifically, the advertisement must reach at least 50,000 voters in a relevant state or district.

BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A); *see also* Def.-Int. Br. at 110. In a case construing a new Wisconsin statutory provision very similar to the primary definition of "electioneering communication," Chief Judge Barbara B. Crabb makes the compelling point that the Wisconsin statute at issue in that case actually posed less of a vagueness problem than the express advocacy standard identified in *Buckley:*

> Whatever the potential constitutional flaws of Wisconsin's new reporting and disclosure scheme, vagueness does not appear to be one of them. In fact, the state legislature's approach appears to draw a line even brighter than the one established in *Buckley*. The law makes clear that once a certain dollar threshold is surpassed, the law's disclosure requirements apply to any communication referring to a clearly identified candidate that appears within 60 days of an election. *A copy of a proposed advertisement and a calendar are all that is necessary to make a conclusive advance determination that the ad is subject to regulation.* By contrast, the *Buckley* approach to express advocacy still leaves room for a degree of uncertainty because, as plaintiffs concede, the list of words and phrases identified in that opinion as constituting express advocacy is illustrative, rather [than] exhaustive. Therefore, in a later case involving the federal statute at issue in *Buckley,* the Court noted that the definition of express advocacy it adopted in *Buckley* would also cover a communication whose message "is marginally less direct than

'Vote for Smith.'" *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Just how "direct" an exhortation must be to qualify as express advocacy under *Buckley* is not free of all uncertainty for would-be political advertisers.

*Wisconsin Realtors,* 233 F.Supp.2d at 1086 (emphasis added). The same could be said of the primary definition of electioneering communication in BCRA. Electioneering communication is more certain and more explicitly defined than *Buckley* 's and *MCFL* 's explanation of express advocacy in that it provides objective criteria for potential political communicators to follow. Although there is no exhaustive list of words falling under the rubric of express advocacy, the electioneering communication definition is precise as to what communications are encompassed by its terms. Accordingly, I find none of the vagueness concerns identified by the *Buckley* Court present with regard to the primary definition of electioneering communication.

### D. *The Evisceration of Section 441b*

#### 1. Introduction

As discussed in the foregoing section, the Supreme Court in *Buckley* and *MCFL* construed FECA's restrictions on independent expenditures to apply only to expenditures containing words of "express advocacy." While the Supreme Court was prescient in observing that such a construction with regard to limits on an *individual's* independent expenditures was bound to create loopholes in the regulatory system, *Buckley,* 424 U.S. at 45, 96 S.Ct. 612 ("It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election

or defeat but nevertheless benefitted the candidate's campaign."), the Supreme Court emphasized in *Buckley* that it was without a record to uphold restrictions that went beyond express advocacy, *id.* at 46, 96 S.Ct. 612 ("[T]he provision does not *presently appear* to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions.") (emphasis added). In keeping with our system of constitutional checks and balances, the Supreme Court effectively sent the issue back to the political branches for further consideration. The Supreme Court, in my view, never conclusively foreclosed reconsideration of a limitation on independent expenditures, provided that such a restriction was not vague and was supported by an adequate record. Indeed, in the context of restricting corporate and labor union independent expenditures, the Supreme Court, after *Buckley*, explicitly left this door open. *See First Nat'l. Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n. 26, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ("Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections.").

The instant case presents such a record to the three-judge District Court and also demonstrates the wisdom of then-Justice Rehnquist's observation that the "careful legislative adjustment of the federal electoral laws, in a cautious advance, step by step, to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *NRWC*, 459 U.S. at 209 (internal citation and quotation marks omitted). Since 1996, corporations and labor unions have used their general treasury funds to influence federal elections in direct contravention of the original intent of Section 441b and its statutory predecessors. Congress responded to this problem by enacting Sections 201, 203, and 204 of BCRA.

Therefore, before turning to a discussion of whether these sections of BCRA are narrowly tailored, I shall briefly discuss the erosion of the express advocacy test as a means of distinguishing between electoral advocacy and issue discussion. The Findings of Fact demonstrate that Congress correctly observed that Section 441b was no longer effective at preventing corporations and labor unions from using their general treasury funds to influence federal elections. Indeed, to quote a former NRA official, the state of the Section 441b prohibition prior to BCRA was "built of the same sturdy material as the emperor's clothing." Findings ¶ 2.4.3 (Metaksa).

The Findings of Fact with regard to the evisceration of Section 441b resemble a mosaic with each piece of evidence building on the next, and when viewed as a whole, present a damaging portrait of corporations and labor unions using their general treasury funds to directly influence federal elections. It is to this picture that I now turn.

2. **The Rise of Spending on Issue Advocacy in Close Proximity to Federal Elections**

As discussed *supra*, in *MCFL*, the Supreme Court construed the prohibition on expenditures in section 441b as only applying to expenditures containing words of "express advocacy." *MCFL*, 479 U.S. at 249, 107 S.Ct. 616 ("We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b."). As a result of *MCFL*, corporations and labor unions were permitted to use their general treasury funds on independent expenditures in connection with a federal election, provided that those independent expenditures did not contain words of "express advocacy." In other words, so long as corporations and labor unions did not use any of *Buckley*'s "magic words" in their adver-

tisement, they could use their general treasury funds to pay for advertisements that influenced a federal election. Of course, if the corporation or labor union chose to use the magic words in an advertisement, it could still do so, provided it paid for such a communication from a segregated fund, thereby ensuring that there was political support for the advertisement.

As a consequence of the Supreme Court's decision in *MCFL*, candidate-centered issue advertisements,[117] funded with corporate and labor union general treasury funds, has dramatically increased in recent election cycles. Findings ¶ 2.2. "By the early 1990s and especially by 1996, interest groups had developed a strategy to effectively communicate an electioneering message for or against a particular candidate without using the magic words and thus avoid disclosure requirements, contribution limits and source limits." *Id.* ¶ 2.2.7 (Magleby).[118] The 2001 Annenberg Report, relied on by Defendants, Plaintiffs, and Congress, establishes that during the 1996 election cycle, an estimated $135 million to $150 million was spent on multiple broadcasts of about 100 distinct advertisements, in the 1997–1998 election cycle, 77 organizations aired 423 distinct advertisements at a cost of between $250 million and $340 million,[119] and in the 1999–2000 election cycle, 130 groups spent over an estimated $500 million on 1,100 distinct advertisements. *Id.* ¶ 2.2.4.[120] Plaintiffs' own expert readily concedes that the number of organizations sponsoring issue advertisements has "exploded" over the last three election cycles. *Id.* ¶ 2.2.6 (La Raja).[121]

117. As the Findings demonstrate, issue advertisements generally fall into three categories: candidate-centered, legislation-centered, and general image-centered. Findings ¶ 2.2.2. Candidate-centered advertisements make a case for or against a candidate but do so without using "magic words." *Id.* These are the advertisements that BCRA seeks to distinguish from other forms of issue advocacy.

118. The reason why it was not until 1996 that this explosion in candidate-centered issue advocacy occurred, as political consultant Bailey explains, was that in post-Watergate campaigns, it was important for candidates to be seen as attempting to clean up the political process. Findings ¶ 2.2.7 (observing that "due to a lack of enforcement and a willingness on the part of some to win at all costs, these concerns appear to have dissipated").

119. The report the Annenberg Study produced following the 1997–1998 election cycle placed this estimate at between $275 million to $340 million. *See supra* note 78.

120. As a representative sample, the Annenberg Report 2001 found that in the 2000 election cycle, the Republican and Democratic parties accounted for almost $162 million (31%) of this spending on issue advocacy; Citizens for Better Medicare, $65 million (13%); Coalition to Protect America's Health Care, $30 million (6%); U.S. Chamber of Commerce, $25.5 million (5%); AFL–CIO, $21.1 million (4%); National Rifle Association, $20 million (4%); U.S. Term Limits, $20 million (4%). Findings ¶ 2.2.4.

121. Interestingly, the huge rise in issue advocacy spending during federal campaigns far outpaces spending on the amount of PAC-sponsored advertising. Under the original intent of FECA, corporations and labor unions that wished to sponsor electioneering advertisements would have had to do so with segregated funds (e.g. "PAC money"). 2 U.S.C. § 441b(b)(2)(C). During the 2000 election cycle, non-PAC interest groups ran 74,024 political advertisements referring to a federal candidate, while PAC interest groups ran only 3,663 advertisements. Findings ¶ 2.2.5.2. Although none of the parties discuss this discrepancy, and although there are likely a number of factors to explain it, it does not take much imagination to conclude that one of the primary reasons that PAC advertising is so low in comparison, is that if a corporation or labor union can fund the most effective form of electioneering with general treasury funds, there is no need to try and raise PAC money or comply with PACs' disclosure provisions simply to run electioneering advertisements that use words of "express advocacy."

From their studies, the Annenberg Public Policy Center concludes that the amount of money spent on "issue advocacy" is increasing rapidly, that this development permits the political parties, corporations, and labor unions to gain a "louder" voice, and that consequently, the "distinction between issue advocacy and express advocacy is a fiction." *Id.* Indeed, even the political parties recognize the value which these outside corporations and labor unions bring to the election with their issue advocacy. *Id.* ¶ 2.7.10.

### 3. "Magic Words" Are Rarely Used in Political Advertisements

As issue advocacy by corporations and labor unions has grown as a means of influencing federal elections, the trend of all forms of political advertisements has been to move away from words of express advocacy-whether they are advertisements produced by candidates, political parties, or corporations and labor unions. Findings ¶ 2.3. The unrebutted expert testimony demonstrates that only 11.4 percent of advertisements purchased by federal candidates that aired during the 2000 election cycle would qualify as electioneering under the "magic words" test. *Id.* ¶ 2.3.1 (Goldstein); *see also id.* ¶ 2.3.2 (Strother) (observing that 90% of candidate advertisements he has put together in his career have *not* used express advocacy). Moreover, the uncontroverted testimony of political consultants establishes that express advocacy is no longer considered an effective tool of political advertising. *Id.* (Strother) ("Good media consultants never tell people to vote for Senator X; rather, you make your case and let the voters come to their own conclusions. In my experience, it actually proves less effective to instruct viewers what you want them to do."); (Bailey) ("In the modern world of 30 second political advertisements, it is rarely advisable to use such clumsy words as 'vote for' or 'vote against.' "). When *Buck-*

*ley* was handed down, express advocacy in political advertising was more common. *Id.* (Bailey). Since the mid–1980s, political advertising has shifted and today the practices of political advertisers-with only a mere 30 seconds to convey their messages-parallel commercial advertisers where a "product is presented in various desirable tableaus . . . present[ing] viewers with a variety of reasons to choose their product." *Id.* ¶ 2.3.3 (Krasno and Sorauf) ("Political ads seem to follow the same strategy, hoping that citizens will grow to prefer a candidate without being told to troop to the polls.").

### 4. Other Advantages of Using Issue Advocacy to Influence Federal Elections

Aside from the fact that candidate-centered issue advocacy is a much more powerful means to convey an electioneering message, it is uncontroverted there are other strong incentives for using "issue advocacy" to influence federal elections. *Id.* ¶ 2.5. First, by running "issue advertisements" in the immediate run-up to a federal election, corporations and unions are able to avoid any of the disclosure requirements that ordinarily attach when these groups use general treasury funds to influence federal elections. *Id.; id.* ¶ 2.5.1. Plaintiffs' Experts Milkis and La Raja equally concur that the rise of issue advocacy has permitted issue organizations to hide their true identities while running these advertisements. *Id.* ¶ 2.5.1 (Milkis); ¶ 2.2.6 (La Raja) ("Over the last three election cycles, the number of groups sponsoring ads has exploded, and consumers often don't know who these groups are, who funds them, and whom they represent."). As Plaintiffs' expert Milkis candidly observes, "For example, The Citizens for Better Medicare, which spent $65 million on television ads [during the 2000 election cycle], is funded primarily by the

pharmaceutical industry." *Id.* ¶ 2.5.1; *see also id.* (citing example of AFL–CIO running advertisements in congressional race under the name "Coalition to Make Our Voices Heard"); *id.* ("Frankly we've taken a page out of their book [other interest groups] because in some places it's much more effective to run an ad by the 'Coalition to Make Our Voices Heard' than it is to say paid for by 'the men and women of the AFL–CIO.'") (Magleby) (citing comments of AFL–CIO representative at a lunchtime discussion panel at the Pew Press Conference). As a result, not only are corporations and unions able to fund the most effective form of political advertising with their general treasury funds, but they are able to create corporations which have euphemistic names and which, in many instances, serve as fronts for injecting corporate general treasury funds into federal elections. *Id.* In addition to avoiding FECA's disclosure requirements, it is uncontroverted that another advantage of running election advertisements as "issue advocacy" is that corporations and labor unions can use their general treasury funds to influence federal elections which, as Defense Expert Magleby observes, "makes a sham of these longstanding federal laws." *Id.* ¶ 2.5.2. The uncontroverted testimony of Defense Expert Magleby also makes clear that by avoiding PACs, these organizations can raise larger amounts of funds more quickly than if they had to raise money to pay for their advertisements using PACs. *Id.* ¶ 2.5.3.

## 5. The Impact of These Developments

Accordingly, when the Supreme Court's construction of Section 441b in *MCFL* is combined with the fact that very few political advertisements use words of express advocacy, the result is obvious: corporations and labor unions, long prohibited from using their general treasury funds to influence federal elections, are able to run the most effective form of political advertising and the most widely used form of political advertising from their general coffers. At the same time, the law constitutionally prohibits corporations and labor unions from using general treasury funds to influence federal elections with advertisements that use express words of advocacy-a style of advertising rarely used and described by political consultants as ineffective. The unintended result of this development is that the longstanding prohibition on the use of corporate and labor union general treasuries to influence federal elections is undermined. Indeed, the role of corporations and labor unions in federal elections is actually enhanced because these corporations and labor unions are able to fund the most potent form of political advertising using treasury funds.

The testimony from political consultants, experts, and officeholders and candidates convincingly bears this point out. The record demonstrates that the express advocacy test is not a useful benchmark for distinguishing between campaign advertising and issue advertising, that no particular words are necessary to create electioneering advertisements, and that corporations and labor unions produce advertisements that directly influence federal elections under the guise of "issue advocacy." *Id.* ¶ 2.4. Despite the fact that *MCFL* interpreted Section 441b as reaching more advocacy than the examples in *Buckley's* footnote 52, *MCFL*, 479 U.S. at 249, 107 S.Ct. 616, the test has proven ineffective at distinguishing between genuine issue advocacy and electioneering paid for with corporate and labor union general treasury funds. Indeed, as the testimony presented in this case convincingly demonstrates, no particular words of advocacy are necessary for effective campaign advertisements; it is easier for corporations and labor unions to skirt the prohibition contained in Section 441b. In sum, Congress found that the express advocacy test, grafted onto

Section 441b by the *MCFL* Court, was no longer preventing corporations and labor unions from spending general treasury funds on federal elections. Findings ¶ 2.4.4.

### 6. Corporations and Labor Unions Routinely Spend General Treasury Funds on Advertisements Designed to Influence Federal Elections

a. *Political Consultants Testify that Candidate–Centered Issue Advertisements are Electioneering*

Advertisements designed to influence a federal election under the guise of issue advocacy usually end by telling the viewer to call, ask, or tell a candidate to do something. Findings ¶ 2.4.3 (Pennington). From the perspective of political consultants, who provide testimony in this case, there is no practical difference between these "issue advertisements" and those advertisements where express advocacy is used. *Id.* (Strother) ("From the point of view of a media consultant, there is no real difference between ending an advertisement with 'Vote for Senator X' versus ending an advertisement with 'Tell Senator X to continue working hard for America's families.'"); (Beckett) ("However, in fact no particular words of advocacy are needed in order for an ad to influence the outcome of an election. No list of such words could be complete....."); (Lamson) ("When political parties and interest groups run 'issue ads' just before an election that say 'call' a candidate and tell her to do something, their real purpose is typically not to enlighten the voters about some issue, but to influence the result of the election, and these ads often do have that effect."). Plaintiffs have provided no contrary political consultant testimony to discredit the testimony of these political consultants. I find the uncontroverted testimony of the political consultants par-

ticularly compelling because it comes from well-known and respected professionals who are engaged in the business of making political advertisements. *See id.*

Ms. Tanya Metaksa, former Chair of the NRA PVF, stated in her opening remarks at the American Association of Political Consultants' Fifth General Session on "Issue Advocacy" that "[i]t is foolish to believe there is any practical difference between issue advocacy and advocacy of a political candidate. What separates issue advocacy and political advocacy is a line in the sand drawn on a windy day." *Id.* (Metaksa); *see also id.* (Strother) ("When we design, produce, and run 'issue ads' that mention specific candidates for federal office and that are aired in proximity to an election, these ads are for only one purpose: to effect [sic] the outcome of an election."). In concrete terms, perhaps the most striking example of this "line in the sand drawn on a windy day," is the two camera shoot, where consultants bring two cameras to shoot an advertisement. *Id.* (Strother). The film in Camera A is used by the candidate, while the nearly identical film in Camera B is sold for a nominal fee to a third party who then "gets direct control over the images of the candidate used in the issue groups ads." *Id.* In my judgment, the testimony of political consultants provides overwhelming evidence that corporations and labor unions spend general treasury funds on advertisements that, while not using words of express advocacy, are designed to influence federal elections.

b. *Current and Former Officeholders and Candidates Testify that Corporations and Labor Unions Use General Treasury Funds to Pay for Advertisements Designed to Influence Federal Elections*

In addition to political consultants, current and former officeholders and candidates testify that the express advocacy test

has become meaningless, that no particular words of advocacy are necessary to convey an electioneering message, and that corporations and labor unions were using their general treasury funds to influence federal elections. *Id.* ¶ 2.4.2. This testimony is particularly compelling given that the political actors supporting BCRA, to borrow words from Justice Byron White, "included many seasoned professionals who have been deeply involved in elective processes and who have viewed them at close range over many years." *Buckley,* 424 U.S. at 261, 96 S.Ct. 612 (White, J., concurring in part, dissenting in part); *see also Colorado I,* 518 U.S. at 650, 116 S.Ct. 2309 (Stevens, J., dissenting) ("Congress surely has both wisdom and experience in these matters that is far superior to ours."). Even Plaintiff Congressman Ron Paul conceded during his deposition that outside group issue advertisements run during his 2000 congressional campaign were intended to influence the election. Findings ¶ 2.4.2.1 (Paul). Politicians from both political parties provide convincing testimony in this case, and also provide important guidance through floor statements made during the debate over campaign finance legislation, that in their considered judgment the express advocacy test was not preventing corporations and labor unions from influencing federal elections using general treasury funds, and that no particular words are necessary to convey an electioneering message. *Id.* ¶ 2.4.2 (including statements and testimony from Feingold, McCain, Levin, Bloom, Bumpers, Chapin, and Shays).

 c. *Examples of Corporations and Labor Unions Demonstrate That These Organizations Use Their General Treasury Funds to Pay for Advertisements Designed to Influence Federal Elections*

The record, however, goes beyond the testimony of experts, political consultants, and present and past officeholders and candidates. The documented behavior of corporations and labor unions also clearly demonstrates that issue advocacy is used as a tool of electioneering by corporations and labor unions. *Id.* ¶ 2.6. The Findings, which culled the most salient examples from the substantial record submitted by the parties, demonstrate that, for example, the AFL–CIO, the Coalition, Citizens for Better Medicare, the NRA, and The Club for Growth all used corporate general treasury funds to influence recent federal elections. *Id.* ¶¶ 2.6.1–2.6.5. Plaintiffs dismiss this evidence as merely "anecdotal," McConnell Opp'n at 32, which is a characterization of the weight of the evidence and not a comment on whether it is rebutted. To the contrary, the examples of corporations and labor unions using general treasury funds to influence federal elections are not "anecdotal," but powerful illustrations of a regulatory regime in paralysis. Indeed, like a mosaic, these "anecdotal" examples when combined with the other evidence in the record relating to the general ineffectiveness of Section 441b, and the failure of the express advocacy test, make a compelling case for the restrictions Congress arrived at in enacting Sections 201, 203, and 204 of BCRA.

 1) The NRA

The Findings relating to the activities of Plaintiff NRA, however, really drive home the point that the express advocacy test has become meaningless and that corporations spend general treasury funds on candidate-centered issue advertisements to influence federal elections. *Id.* ¶ 2.6.4. Aside from the NRA's media consultant who stated that the first objective of the NRA was to influence the outcome of the presidential election and other key congressional races, *id.* at 2.6.4.1, the NRA ran two nearly identical radio advertisements in the 2000 election: one paid for

with PAC money which used express advocacy and one paid for with corporate general treasury funds which did not use express advocacy. *Id.* ¶ 2.6.4.4. The only real difference between the advertisements was that the one paid for with PAC money said "Vote George W. Bush for President" at the end of the advertisement. *Id.* In my view, this advertisement is a perfect example-the poster child-of how pointless the express advocacy test is at distinguishing between genuine issue advocacy and electioneering advertisements. In addition to this evidence, the Findings, particularly those resting on the internal documents of the NRA, *id.* ¶ 2.6.4.1, also demonstrate just how driven the NRA was to use general treasury funds, which fell outside the source and amount limitations of FECA, to directly influence the 2000 federal election. *Id.* ¶ 2.6.4.

### 2) Citizens for Better Medicare and The Club for Growth

Another glaring example from the Findings includes the pharmaceutical industry's uncontroverted efforts to influence the 2000 elections, *id.* ¶ 2.6.3, by admittedly spending over sixty-five million dollars on television advertising which, according to Plaintiffs' expert Dr. La Raja, was almost as much as either of the two political parties spent on issue advocacy, *Id.* ¶ 2.6.3.4. The pharmaceutical industry's efforts were cloaked behind the name "Citizens for Better Medicare." I have concluded from the testimony and documents submitted in this case that this issue advocacy campaign mounted during the 2000 election cycle was designed to influence the federal election with corporate general treasury funds in direct contravention of the historic prohibition on such activity. *See id.* ¶ 2.6.3; *see also id.* ¶ 2.6.3.4 ("Much of CBM's ad strategy leading up to the 2000 election was aimed at supporting candidates attacked in AFL–CIO advertising.").

In addition to CBM's activities, I have also found that Plaintiff The Club for Growth influenced the 2000 federal elections with corporate general treasury funds. *Id.* ¶ 2.6.5. The Club for Growth openly acknowledges in their solicitation materials that "these issue advocacy campaigns can make all the difference in tight races." *Id.* ¶ 2.6.5.4. Moreover, the activity of The Club for Growth in Florida in a 2000 Congressional race demonstrates in an uncontroverted manner the power of a corporation when it uses general treasury funds to influence federal primary elections. *Id.* ¶ 2.6.5.5.

### 3) AFL–CIO

With regard to the AFL–CIO's issue advocacy campaign during the 1996 federal election, I have found that the AFL–CIO used issue advocacy to influence the 1996 general election. Findings ¶ 2.6.1. The internal documents surrounding the AFL–CIO's efforts are particularly revealing and directly contradict the AFL–CIO's self-serving declaration submitted in this case, which attempts to downplay the electoral considerations behind their advertisements. *Id.* ¶ 2.6.1.1 (observing that the indirect effect on election outcomes has "never been the point of [the] AFL–CIO's broadcast advertising program"). The documents demonstrate that media consultants were hired by the AFL–CIO to test how their advertising would resonate with the electorate, how to create advertisements that "manage the political message in a volatile environment," and even how to place a media buy in Illinois to help a Senate candidate when the candidate did *not have the resources to fund advertising* on his own. *Id.* Moreover, other independent evidence, including expert testimony, establishes that the AFL–CIO's 1996 issue advocacy campaign was designed to influence the federal election. *Id.* ¶¶ 2.6.1.2–2.6.1.5. The AFL–CIO does not refute or

explain the discrepancy between its general denial about its issue advocacy and these contrary evidentiary documents. The Findings elaborate on these points and others in more detail, but I conclude from this evidence that during the 1996 election campaign the AFL–CIO used general treasury funds to influence a federal election, and therefore was able to circumvent FECA's requirement that their efforts be paid for with federal funds from a segregated account. *See id.* ¶ 2.6.1.6 (observing that twelve of the thirty-two House Republican freshman targeted by the AFL–CIO were defeated).

#### 4) The Coalition–Americans Working For Real Change

In response to the AFL–CIO, Plaintiffs Chamber of Commerce, National Association of Manufacturers, and National Association of Wholesaler–Distributors, and other business entities, formed a corporation entitled the "Coalition–Americans Working for Real Change" also to influence directly the 1996 federal election. *Id.* ¶ 2.6.2. I have found that The Coalition's issue advocacy campaign around the 1996 election was designed to influence the federal election. *Id.* Like the AFL–CIO, the internal documents of the Coalition demonstrate that electoral strategies, and not "issue advocacy," were at the heart of the Coalition's efforts in 1996. *Id.* ¶ 2.6.2.2. Indeed, the Coalition sought advice from consultants and polling firms on how to maximize their ability to influence federal elections. *Id.* These internal documents, combined with independent expert testimony and the FEC General Counsel's report, *see id.* ¶¶ 2.6.2.3–2.6.2.4, strongly contradict the Coalition's self-serving efforts in this litigation to portray their 1996 advertising campaign as something less than electioneering advertisements in disguise. The Coalition used corporate general treasury funds to directly influence the 1996 election and, therefore, was able to circum-

vent FECA's policy of compelling corporations to use federal money from a segregated account. *See generally id.* ¶ 2.6.2; *see also id.* ¶ 2.6.2.2 (post-election analysis done by Coalition's polling firm).

The AFL–CIO and The Coalition presented no uncontroverted evidence that they did not try to influence the 1996 federal election with issue advertisements. Moreover, these organizations do not contest that they paid for these advertisements with general treasury funds. The effort by the AFL–CIO and The Coalition to portray themselves as engaging in issue advocacy, as opposed to electioneering, is belied by their own internal documents.

#### d. *Other Examples of Advertisements Demonstrate That Corporations and Labor Unions Use Their General Treasury Funds to Pay for Advertisements Designed to Influence Federal Elections*

Aside from the examples above of corporations and labor unions directly using general treasury funds to influence federal elections, the attributes of so-called "issue advertisements" in the Findings demonstrate the electioneering purpose behind these commercials.

#### 1) Organizations Run Issue Advertisements About Which They Have No Particular Organizational Interest

First, the Findings compellingly demonstrate that many candidate-centered issue advertisements are run about issues in which the organization sponsoring the advertisement has no interest. *Id.* ¶ 2.6.6. On this basis, it is clear that these advertisements were designed to influence a federal election. For example, EMILY's List, an organization dedicated to pro-choice female candidates, ran advertisements on gun-control for federal candidate Linda Chapin. *Id.* ¶ 2.6.6.1. Other exam-

ples from the Findings include the Associated Builders and Contractors running an advertisement about a federal candidate that dealt with penalties for child molesters. *Id.* ¶ 2.6.6.2 (admitting that such an advertisement is not of a particular concern of contractors). In another situation, the Club for Growth funneled $20,000 to the American Conservative Union to fund an issue advertisement relating to Hillary Clinton's candidacy which the Club candidly admitted at deposition had nothing to do with the Club's interest in pro-growth conservative Republicans. *Id.* ¶ 2.6.6.3. Another example is an advertisement run by the trucking industry, under the pseudonym "The Foundation for Responsible Government," praising the record of an opponent of a Senator on health care and taxes. *Id.* ¶ 2.6.6.4 (observing that the Senator was a target of the group because he supported legislation banning triple trailer trucks). Finally, the group Citizens for Life, a New Hampshire Pro–Life Organization, ran advertisements in 2000 against John McCain criticizing jokes allegedly made by McCain about Alzheimer's and a home for senior citizens. *Id.* ¶ 2.6.6.5. The New Hampshire group claimed the advertisement was timely because the *New Hampshire State* Senate was close to voting on a bill to legalize assisted suicide. *Id.* I am not persuaded that any of these advertisements were anything other than electioneering advertisements. Rather, these examples demonstrate that corporations spend general treasury funds on candidate-centered issue advertisements to influence federal elections. *Id.* ¶ 2.6.6.6.

2) Organizations Run Issue Advertisements About Past Votes or About Issues No Longer Before Congress

Second, organizations run candidate-centered issue advertisements praising or criticizing candidates for past votes or discussing a Member's position on an issue not pending before Congress. These candidate-centered issue advertisements are clearly designed to influence federal elections. *Id.* ¶ 2.6.7. For example, the AFL–CIO has run a series of advertisements on past votes of particular Members of Congress. *Id.* ¶ 2.6.7.1. As discussed in my Findings, these advertisements are nothing more than campaign advertisements. *Id.* Another example of this practice is the Chamber's advertisements attacking various Members of Congress over the prescription drug issue that was not pending before Congress when the advertisements were aired. *Id.* ¶ 2.6.7.2. Many of these advertisements did not include a phone number to contact the Member, and some of the advertisements were aired against candidates who were not even Members of Congress. *Id.* The Chamber's advertising in this regard was plainly designed to influence the federal election. *Id.* These examples from the AFL–CIO and the Chamber also demonstrate that corporations and labor unions used general treasury funds to pay for candidate-centered issue advertisements designed to influence a federal election. *Id.* ¶ 2.6.7.3.

3) Organizations Air Advertisements When A Candidate Lacks Funds to Run Advertisements and So a Candidate Can Avoid Running Advertisements Attacking an Opponent

Corporations and labor unions also use general treasury funds to pay for candidate-centered issue advertisements (a) when candidates lack funds to put their own advertisements on the air and (b) to attack a candidate's opponent so that the candidate can run only "positive" advertisements. *Id.* ¶ 2.6.8. These indicators provide yet another powerful indication that these "issue advertisements" are nothing short of campaign advertisements designed to affect elections, paid for with the general treasury funds of corpora-

tions and labor unions. *Id.* ¶ 2.6.8.4. The uncontroverted testimony of political consultants is that negative character advertisements are often run by a third party because they shield the candidate from the political repercussions that are likely to result if the candidate actually ran the negative advertisement him or herself. *Id.* ¶ 2.6.8.1. In addition to allowing the candidate to refrain from running negative advertisements, organizations often run such advertisements praising a candidate or criticizing the candidate's opponent when the candidate's campaign does not have resources to run advertising on its own. *Id.* ¶ 2.6.8.2 (former Representative discussing how his opponent did not buy media in a media market that covered 40% of his district, but that other groups filled the void attacking the Representative); *id.* ¶ 2.6.8.3 (beneficial advertisements by EMILY's List ran when the Chapin campaign was not on the air to save resources); *id.* ¶ 2.6.1.1 (internal memorandum of the AFL–CIO discussing advertising buy by the union to help Illinois Senate candidate in markets where the candidate lacked resources to air advertising). I conclude that these advertisements were also clearly designed to influence a federal election and paid for with the general treasury funds of corporations and labor unions.

### 7. *Conclusion*

In sum, it again bears emphasizing that FECA has always permitted corporations and labor unions to run electioneering advertisements, provided that those advertisements were paid for with money that came from a segregated fund dedicated specifically for federal electioneering. As the examples above illustrate, the utility of Section 441b as a tool to prevent corporate and labor union general treasury funds from influencing elections has been effectively blunted. *See id.* ¶ 2.6.9. While the primary purpose of these advertisements

ultimately may be difficult to determine with precision, given the reticence of these organizations to admit they are campaign advertisements, the effect of these advertisements on federal elections is legion. Consequently, as I state in my Findings, "Congress found that FECA, as construed by the Courts, to only limit independent expenditures containing express advocacy, was no longer relevant to modern political advertisements." *Id.* ¶ 2.4.4; *see also id.* ¶ 2.4.3 (unrebutted testimony of political consultant Bailey) ("The notion that ads intended to influence an election can easily be separated from those that are not based upon the mere presence or absence of particular words or phrases such as 'vote for' is at best a historical anachronism."). Congress appropriately concluded that corporations and labor unions were openly violating the intent of its longstanding (and long-upheld) prohibition on the use of corporate and labor union general treasury funds to influence elections.

In crafting the primary definition of electioneering communication, Congress recognized just how difficult the task of discerning a speaker's true intent can be for a court or regulatory agency. Taking heed from *Buckley*'s stringent admonition that a distinction between the discussion of issues and advocacy for the election or defeat of candidates "may often dissolve in practical application" and that a law must be construed in a manner that avoids "'put[ting] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers,'" *Buckley,* 424 U.S. at 42, 43, 96 S.Ct. 612, Congress crafted an objective, impartial, and thoroughly simple test for distinguishing between electioneering and issue advocacy. Congress recognized, as the record in this case indicates, that candidate-centered issue advertisements influence federal elections. Congress thereafter drew an incredibly clear bright-line test that focuses

on the key empirical determinants that distinguish pure issue advertisements from candidate-centered issue advertisements. The result is that broadcast advertisements paid for by corporations or labor unions, aired in close proximity to an election that clearly identify a federal candidate, and are targeted to that candidate's electorate, need to be paid for with federal funds from a segregated account. Congress, therefore, is not prohibiting speech by any corporation or labor union; it is merely requiring these organizations to pay for speech that ostensibly influences federal elections with segregated funds that are regulated under FECA.

The question remaining is whether this bright line that Congress has drawn is narrowly tailored to serve compelling governmental interests. I shall first turn to the compelling governmental interests behind Title II and then shall move to a discussion of whether Title II of BCRA is narrowly tailored to serve those compelling governmental interests.

E. **Title II of BCRA is Narrowly Tailored to Serve a Compelling Governmental Interest**

1. **BCRA's Prohibition on Electioneering Communications; the Primary Definition Serves Compelling Governmental Interests**

As discussed *supra*, Section 203 extends the longstanding prohibition on corporations and labor unions making contributions or expenditures from general treasuries in connection with federal elections to electioneering communications as defined in the primary definition. BCRA § 203; FECA § 316(b)(2); 2 U.S.C. § 441b(b)(2). Corporations and labor unions are now prohibited from spending general treasury funds on electioneering communications, but are permitted to spend unlimited federal money from separate segregated funds on electioneering communications. Even though a corporation or labor union "remains free to establish a separate segregated fund, composed of contributions earmarked for that purpose by the donors ... the corporation [or labor union] is *not* free to use its general funds for campaign advocacy purposes [and w]hile that is not an absolute restriction on speech, it is a substantial one." *MCFL*, 479 U.S. at 253 (emphasis in original) (plurality opinion). As a result, even though the Act permits corporations and labor unions to make electioneering communications with their segregated funds, the prohibition in section 203 must be "justified by a compelling state interest." *Id.*

In discussing the compelling governmental interests in enacting sections 203 and 204, Defendants rely on longstanding precedent of the Supreme Court that has already extensively discussed the compelling interests related to government regulation of corporate and labor union general treasury funds in the context of federal elections. Gov't Br. at 133–134. The Supreme Court's prior discussions of the compelling interests needed to sustain restrictions on corporate and labor union general treasury funds are equally applicable in the context of Sections 203 and 204 of BCRA. Plaintiffs, with the exception of the NRA, do not seriously question this position, but rather focus their energies on the fact that these provisions are not narrowly tailored to serve these compelling governmental interests. As discussed *infra*, I find Plaintiffs' argumentation on that point to be rebutted by the extraordinary record in this case. Before turning to these arguments, however, I shall briefly discuss the compelling governmental interests behind sections 203 and 204 in Title II.

In defending the constitutionality of Title II, Defendants rely on the compelling governmental interest described in *Austin*

*v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), and supported by a rich history of Supreme Court cases discussing Section 441b.[122] Defendants also contend that the compelling governmental interest supporting the prohibition on electioneering communications relates to the potential for the appearance of corruption that occurs when corporations and labor unions pay for electioneering communications with their general treasury funds. Tr. at 252 (Waxman) ("[T]he record in this case of the kind of *Austin* corruption, and even potential *quid pro quo* corruption, absolutely dwarfs the evidentiary record that the Supreme Court has considered in any of the cases it has decided, including *Buckley.*"). As a corollary to this latter theory, Defendants also advance an anti-circumvention rationale to justify these provisions, observing that "BCRA's regulation of electioneering communications furthers the compelling governmental interest in preventing corruption of elected officials, not only on its own terms, but also by helping to ensure that the new limits on soft money will not be easily evaded." Gov't Br. at 146. I conclude that the first two theories of corruption are sufficient to uphold the challenged provisions and therefore do not reach the third.

### a. Corruption Related to Corporations and Labor Unions

The Supreme Court has long indicated that the government has a compelling interest in placing restrictions on corporate and labor union involvement in federal elections so as to prevent "the corrosive and distorting effects of immense aggregations of wealth," facilitated by either the corporate or union forms, on federal elec-

tions. *Austin*, 494 U.S. at 660, 110 S.Ct. 1391. As discussed *supra*, corporations and labor unions routinely seek to influence federal elections with broadcast advertising campaigns, paid for with general treasury funds. Sections 203 and 204 of BCRA, which are plainly designed to combat this development, fulfill the same purposes that the government identified as supporting Section 441b in *NRWC* and that the Supreme Court upheld:

> The first purpose of § 441b, the government states, is to ensure that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political "war chests" which could be used to incur political debts from legislators who are aided by the contributions. *See United States v. United Automobile Workers*, 352 U.S. 567, 579, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957). The second purpose of the provisions, the government argues, is to protect the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed. *See United States v. CIO*, 335 U.S. 106, 113, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). We agree with the government that these purposes are sufficient to justify the regulation at issue.

*NRWC*, 459 U.S. at 207–08, 103 S.Ct. 552. In a nutshell, *NRWC* encapsulates the compelling governmental interests behind Section 441b, which also plainly serve as a basis for upholding BRCA Sections 203 and 204.

**122.** The parties to the litigation have dubbed this compelling governmental interest theory *"Austin* corruption." Even though the statute in *Austin* only applied to corporations, *Austin*, 494 U.S. at 655, 110 S.Ct. 1391, the Supreme Court has long upheld a similar corruption rationale in the case of labor unions. *See Pipefitters*, 407 U.S. at 415–16, 92 S.Ct. 2247; *UAW*, 352 U.S. at 585, 77 S.Ct. 529; *NRWC*, 459 U.S. at 207–08, 103 S.Ct. 552.

The Supreme Court's most recent discussion of these justifications was in *Austin*, where the Supreme Court considered a Michigan state statute which was patterned after section 441b, prohibiting corporations from making independent expenditures in connection with state candidate elections. *Austin*, 494 U.S. at 655 n. 1, 110 S.Ct. 1391. The issue before the Court was the constitutionality of the state's ban on independent expenditures made by corporations, which the Court held to be "constitutional because the provision is narrowly tailored to serve a compelling state interest." *Id.* at 655, 110 S.Ct. 1391. In finding the compelling interest justifying Michigan's statute, the Court recognized a "different type of corruption in the political arena" than the appearance of corruption that had been used to justify *Buckley*'s restrictions on individuals making independent expenditures. *Id.* at 660, 110 S.Ct. 1391.

As a baseline, the *Austin* Court reiterated that " '[p]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.' " *Id.* at 658 (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("*NCPAC* ")) (alteration in original). The plaintiff in *Austin* had argued that because the restriction at issue focused on independent expenditures, as opposed to contributions, the danger of corruption or the appearance of corruption was not present. *See Buckley*, 424 U.S. at 47, 96 S.Ct. 612 ("Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.").

The *Austin* Court responded by distinguishing this language on the basis that it applied to independent expenditures made by *individuals* as opposed to those made by *corporations*. *Austin*, 494 U.S. at 659, 110 S.Ct. 1391. Indeed, *Austin* pointed out that the Court had left open the possibility in *Bellotti*, that "a legislature might demonstrate a danger of real or apparent corruption posed by such expenditures when made by *corporations* to influence candidate elections." *Id.* (emphasis added) (citing *Bellotti*, 435 U.S. at 788 n. 26), 98 S.Ct. 1407 ("The importance of the governmental interest in preventing [corruption of elected representatives through the creation of political debts] has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. *Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections.*") (emphasis added).

Having set forth this analysis, the Supreme Court found that *regardless* of whether the danger of "financial *quid pro quo* corruption," *id.* at 659, 110 S.Ct. 1391 (internal citations and quotation marks omitted), identified in *Buckley* as insufficient to uphold the limitation on independent expenditures made by individual donors, was present in the case of a corporation (a question clearly left open in *Bellotti* ), the Court found that a "different type" of corruption rationale was sufficient to serve as Michigan's compelling interest. *Id.* at 659, 659–60, 110 S.Ct. 1391. The *Austin* Court stated this

rationale as "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Id.* at 660, 110 S.Ct. 1391. The Supreme Court was keen to point out that "the mere fact that corporations may accumulate large amounts of wealth is not the justification for [Michigan's restriction on independent expenditures]; rather, the unique state-conferred corporate structure that *facilitates* the amassing of large treasuries warrants the limit on independent expenditures." *Id.*

This "different" theory of corruption was not new as the *Austin* Court observed. *Id.* at 659, 110 S.Ct. 1391 ("We therefore have recognized that 'the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form.' ") (quoting *FEC v. Nat'l. Conservative Political Action Committee,* 470 U.S. 480, 500–01, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("*NCPAC* ")) (also citing *MCFL,* 479 U.S. at 257, 107 S.Ct. 616). In fact, in *MCFL* the Court pointed out:

> We have described that rationale in recent opinions as the need to restrict "the influence of political war chests funneled through the corporate form," *NCPAC,* 470 U.S. at 501, 105 S.Ct. 1459; to "eliminate the effect of aggregated wealth on federal elections," *Pipefitters,* 407 U.S. at 416, 92 S.Ct. 2247; to curb the political influence of "those who exercise control over large aggregations of capital," [*UAW* ], 352 U.S. at 585, 77 S.Ct. 529; and to regulate the "substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization," *National Right to Work Committee,* 459 U.S. at 207, 103 S.Ct. 552. This concern over the corrosive influence of concentrated corporate

wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas.

*MCFL,* 479 U.S. at 257, 107 S.Ct. 616.

Outside the context of corporations, the Supreme Court has been generally solicitous of a similar rationale for upholding Section 441b as applied to labor unions. In *Pipefitters* and *UAW,* as the *MCFL* Court observed, the Supreme Court found that the compelling governmental interest behind the regulation of corporations was applicable to labor unions. *Pipefitters,* 407 U.S. at 415–16, 92 S.Ct. 2247 ("When Congress prohibited labor organizations from making contributions or expenditures in connection with federal elections, it was, of course, concerned not only to protect minority interests within the union but to eliminate the effect of aggregated wealth on federal elections."); *UAW,* 352 U.S. at 585, 77 S.Ct. 529 ("To deny that [using union dues to sponsor commercial television broadcasts designed to influence the electorate to select certain candidates for Congress in connection with the 1954 elections] constituted an 'expenditure in connection with any [federal] election' is to deny the long series of congressional efforts calculated to avoid the deleterious influences on federal elections resulting from the use of money by those who exercise control over large aggregations of capital."). As noted in *NRWC,* the government's interest in enacting such a provision relates to the fact that labor union members pay money into a union's general treasury and that money may be used to support candidates for office opposed by the individual union member, *NRWC,* 459 U.S. at 208, 103 S.Ct. 552, a justification that applies with equal force to corporate shareholders. *Id.* at 207, 103 S.Ct. 552.

Except for the NRA, none of the Plaintiffs who challenge Title II explicitly contest the asserted compelling governmental

interests relating to preventing corruption or the appearance of corruption that emanates from the particular legal and economic attributes of corporations and labor unions. Given the longstanding history behind section 441b, this is not unexpected. Despite this fact, the NRA Plaintiffs spend significant time in their pleadings asserting that the compelling interest cannot support sections 203 and 204. NRA Br. at 9–14; NRA Opp'n at 6–17, NRA Reply at 12–14. As clarified by their reply brief, the NRA basically argues that this type of corruption only applies to those corporations that "use resources amassed in the economic marketplace, to obtain an unfair advantage in the political marketplace." NRA Reply at 12 (quoting *Austin,* 494 U.S. at 659, 110 S.Ct. 1391 (in turn quoting *MCFL,* 479 U.S. at 257, 107 S.Ct. 616)). In *Austin,* the Michigan Chamber of Commerce, relying on *MCFL,* contended that the Michigan statute could not be applied to it because it was a "nonprofit ideological corporation." *Austin,* 494 U.S. at 661, 110 S.Ct. 1391. The Supreme Court flatly rejected this *as-applied* challenge. *Id.* at 662–65, 110 S.Ct. 1391. In this case, the NRA asserts a similar argument: that it is unlike the Michigan Chamber of Commerce in *Austin,* and therefore, broadly speaking, Title II cannot be justified as preventing *Austin* corruption. NRA Reply at 12 (stating that the NRA does not do business in the economic marketplace, nor derive market profits, nor derive more than a negligible portion of its revenues from corporate contributions). Basically, however, the NRA is using *Austin* as a means of making an as-applied challenge to BCRA.

To begin with, in *MCFL,* the Supreme Court stressed that the rationale for regulating corporations and labor unions was "longstanding" and used to restrict "the corrosive influence of concentrated corporate wealth" on federal elections. *MCFL,* 479 U.S. at 257, 107 S.Ct. 616. The Su-

preme Court went on to explain that "[b]y requiring that corporate independent expenditures be financed through a political committee expressly established to engage in campaign spending, § 441b seeks to prevent this threat to the political marketplace." *Id.* at 258, 479 U.S. 238. The resources available to the segregated fund, the Court reasoned, reflected "popular support for the political positions of the committee." *Id.* As a result, the Court observed that "[r]egulation of corporate political activity thus has reflected concern not about use of the corporate form per se, but about the potential for unfair deployment of wealth for political purposes." *Id.*

Nevertheless, the Supreme Court concluded that the government could not uphold Section 441b *as applied* to the plaintiff in *MCFL* based on this admittedly "longstanding" rationale. *Id.* ("Groups such as MCFL, however, do not pose that danger of corruption. MCFL was formed to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace. While MCFL may derive some advantages from its corporate form, those are advantages that redound to its benefit as a political organization, not as a profit-making enterprise."). Therefore, the Supreme Court never questioned the government's asserted compelling interest in regulating corporations of all types—it merely held that *as applied* to MCFL, the rationale was insufficient to support Section 441b's restrictions.

The NRA would have us believe that this form of corruption is only available to uphold Section 441b restrictions when the corporations being regulated are of the for-profit variety. NRA Reply at 12. In *Austin,* and for that matter in *MCFL,* the Supreme Court made *no* distinctions among different types of corporations

when analyzing the compelling governmental interest. The *Austin* Court thus broadly recognized that all corporations benefit from the "state-conferred corporate structure that facilitates the amassing of large treasuries." *Austin,* 494 U.S. at 660, 110 S.Ct. 1391; *see also MCFL,* 479 U.S. at 268, 107 S.Ct. 616 (Rehnquist, C.J., concurring in part, dissenting in part) ("I do not dispute that the threat from corporate political activity will vary depending on the particular characteristics of a given corporation; it is obvious that large and successful corporations with resources to fund a political war chest constitute a more potent threat to the political process than less successful business corporations *or nonprofit corporations....* These distinctions among corporations, however are distinctions in degree that do not amount to differences in kind.") (emphasis added) (internal citation and quotation marks omitted). The Court in *MCFL* merely held that *as applied* to the plaintiff in *MCFL,* Section 441b could not be upheld by the longstanding compelling governmental interest present in avoiding the corrosive effects of large treasuries of corporations accumulated with the assistance of the corporate form. In *Austin,* the Court held that the state statute could be applied to the plaintiff because the Michigan Chamber of Commerce did not qualify for an *MCFL* exemption.

The NRA never directly disputes this proposition; rather, the organization essentially contends that like the plaintiff in *MCFL,* and unlike the plaintiff in *Austin,* sections 203 and 204 of BCRA cannot be upheld when *applied* to the NRA because as an organization it does not use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace. NRA Br. at 12; *see also* NRA Reply Br. at 12. The NRA implicitly presents the Court with an as-applied challenge couched in *Austin*-terms instead of those of *MCFL.* NRA Br. at 14

("In any event, the NRA satisfies every criterion identified by the *Austin* Court for extending the First Amendment's protection to the independent political expenditures of a nonprofit political advocacy corporation...."). Of course, in making its decision that the Michigan Chamber of Commerce did not qualify for an *MCFL* as-applied exemption, the *Austin* Court was explicitly relying on *MCFL. Austin,* 494 U.S. at 661–62, 110 S.Ct. 1391.

On July 31, 2002, the NRA filed a joint motion to stay, *inter alia,* discovery in this case and agreed that they would also stay any as-applied challenge they had against BCRA under *MCFL* until the Supreme Court resolved the merits of Plaintiffs' challenge to BCRA. NRA Joint Mot. to Stay (Jul. 31, 2002) at 1–2. On August 13, 2002, the three-judge District Court entered an order granting this motion. *NRA v. FEC,* 02cv581 (D.D.C. Aug. 13, 2002) (order on joint motion to stay) ("ORDERED that there will be a stay of discovery and briefing of Plaintiffs' contention that BCRA's restrictions on 'electioneering communications' are unconstitutional as applied to them."). As is clear from their briefing on this point, with the *MCFL* avenue closed to them, Plaintiff NRA uses *Austin* to argue that BCRA, as applied to them, fails to satisfy any compelling governmental interest. NRA Reply at 12 (observing that Title II cannot be justified as designed to present *Austin*-type corruption because it does not amass resources in the economic marketplace.).

The NRA should not be able to litigate an as-applied challenge to Title II in direct violation of the three-judge panel's order, requested by the NRA, by merely cloaking such a challenge under *Austin* as opposed to *MCFL.* Defendants point out that they did not conduct discovery into the NRA's business practices on the basis of this order and therefore are in no position to

discuss whether the NRA deserves an *MCFL*-type exemption. Gov't Opp'n at 107 n.109 ("Defendants have, thus, had no opportunity to discover facts that might refute, *inter alia*, NRA's contention about its profits derived from business activities."); Def.-Int. Opp'n at 67 n.208 ("Indeed, the NRA specifically stipulated with defendants in this case that its as-applied challenge to coverage based on *MCFL* would be stayed pending the outcome of the general facial challenge. *See* Joint Motion to Stay (filed on July 26, 2002), at 2 (granted by the Court on Aug. 13, 2002).").

Any corporation that believes it deserves an *MCFL*-exemption may seek an exemption under the FEC's regulations-and any arguments relating to the strictness of those regulations-are open to a challenge

*at that time*, by making that claim, or by resisting enforcement, just as the plaintiffs did in *Austin* and *MCFL*. Accordingly, the NRA's claim has no merit in this litigation, *NRA v. FEC*, 02cv581 (D.D.C. Aug. 13, 2002) (order on joint motion to stay),[123] and I conclude that the longstanding compelling governmental interests behind Section 441b are equally applicable to Sections 203 and 204 of BCRA.

### b. *Appearance of Corruption*

Moreover, I find that congressional action in this case could be justified under the rationale that electioneering communications made with general treasury funds of corporations and labor unions create an appearance of corruption. The record powerfully demonstrates that electioneer-

---

**123.** In addition to the NRA, the ACLU also hints in its briefing that it fits within the class of corporations deserving of *MCFL*-type protection. *See* ACLU Br. at 16. I am extraordinarily skeptical that the NRA or the ACLU fit within the *MCFL* paradigm, which Justice Brennan, the author of *MCFL* described as a "small" class of exempt organizations. *Austin*, 494 U.S. at 672, 110 S.Ct. 1391 (Brennan, J., concurring). First, each organization accepts corporate funding, ACLU Br. at 2 n.2; NRA Br. at 2. In *MCFL*, the corporation had an explicit policy against accepting corporate contributions. *MCFL*, 479 U.S. at 264, 107 S.Ct. 616. The NRA claims its corporate contributions are "negligible," NRA Br. at 2, while the ACLU argues that their corporate donations are "extremely modest," ACLU Br. at 17. These statements, themselves, indicate that both organizations would be minimally burdened if they were to forgo corporate funding so as to qualify for *MCFL* status. Nevertheless, the *absolute* amounts involved-$85,000 for the ACLU, ACLU Br. at 2 n.2, and $385,000 for the NRA, NRA Br. at 2–are not petty cash; particularly compared with what our Circuit has found to be *de minimis*.

The D.C. Circuit has held, in a case involving the NRA itself, that an organization may qualify for an *MCFL* exemption as long as it is not "a potential conduit for corporate funding of political activity." *FEC v. NRA*, 254 F.3d 173, 192 (D.C.Cir.2001). In *NRA*, the court stated that the appropriate test for this inqui-

ry is whether "[t]he harm contemplated by the statute stems from the absolute amount of corporate money an organization has to spend in the political process, not from the relationship between corporate contributions and the organization's total revenues." *Id.* (finding that $7,000 in corporate contributions in one year precluded the NRA from taking advantage of the *MCFL*-exemption).

Moreover, the NRA openly admits that it engages in business activities. *Compare* NRA Br. at 19 (discussing that it loses money on advertising in its magazines and sale of NRA memorabilia *but that it generates $1.7 million in rental income on leasing its building space) with MCFL*, 479 U.S. at 264, 107 S.Ct. 616 (observing that an *MCFL*-type corporations "cannot engage in business activities."). Furthermore, in *MCFL*, the plaintiff "was formed for the express purpose of promoting political ideas, and cannot engage in business activities." *MCFL*, 479 U.S. at 264, 107 S.Ct. 616. In addition to its primary purpose of Second Amendment advocacy, the NRA also "promotes public firearm safety, trains law enforcement agencies in the use of firearms, sponsors shooting competitions, and advances hunter safety." Findings ¶ 13.

Obviously, until a fuller factual record concerning these two organizations has been developed, an as-applied challenge to Title II of BCRA is inappropriate.

ing communications paid for with the general treasury funds of labor unions and corporations endears those entities to elected officials in a way that could be perceived by the public as corrupting.

In my judgment, the record in this case with regard to interest group issue advocacy substantially demonstrates the potential for the appearance of corruption given the current practices of labor unions and corporations in connection with federal elections. As noted *supra*, the Supreme Court in *Bellotti* left open the possibility that in the context of candidate elections the record in a future case might be sufficient to justify restrictions on independent expenditures paid for with the general treasury funds of corporations and labor unions. *Bellotti*, 435 U.S. at 788 n. 26, 98 S.Ct. 1407 ("The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem ...."); *see also NCPAC*, 470 U.S. at 510, 105 S.Ct. 1459 n.7 (White, J., dissenting) ("The possibility was thus left open, and remains open, that unforeseen developments in the financing of campaigns might make the need for restrictions on 'independent' expenditures more compelling.... The time may come when the governmental interests in restricting such expenditures will be sufficiently compelling to satisfy not only Congress but a majority of this Court as well."). In my view, this case presents just such a record. *See* Findings ¶ 2.7.

The factual findings of the Court illustrate that corporations and labor unions routinely notify Members of Congress as soon as they air electioneering communications relevant to the Members' elections. Findings ¶¶ 2.7.3, 2.7.6. The record also indicates that Members express appreciation to organizations for the airing of these election-related advertisements. *Id.* ¶¶ 2.7.2, 2.7.8. Indeed, Members of Congress are particularly grateful when negative issue advertisements are run by these organizations, leaving the candidates free to run positive advertisements and be seen as "above the fray." *Id.* ¶ 2.7.2. Political consultants testify that campaigns are quite aware of who is running advertisements on the candidate's behalf, when they are being run, and where they are being run. *Id.* ¶ 2.7.1.[124] Likewise, a prominent lobbyist testifies that these organizations use issue advocacy as a means to influence various Members of Congress. *Id.*

The Findings also demonstrate that Members of Congress seek to have corporations and unions run these advertisements on their behalf. *Id.* ¶ 2.7.8. The Findings show that Members suggest that corporations or individuals make donations to interest groups with the understanding that the money contributed to these groups will assist the Member in a campaign. *Id.* ¶ 2.7.10.6; *see also id.* ¶ 2.7.4. After the election, these organizations often seek credit for their support. *Id.* ¶ 2.7.5; *see also id.* ¶ 2.7.4. In a similar manner, political parties are often grateful for the support of these organizations, *id.* ¶ 2.7.10, and parties have sent contributions to these organizations, *id.* ¶ 2.7.10.4. Finally, a large majority of Americans (80%) are of the view that corporations and

---

**124.** On the other hand, it is sometimes the case that when a candidate is attacked, the candidate and his/her consultants are unaware of who is running the negative advertisement because the organization running the advertisement is cloaked behind a misleading name. *See generally* Per Curiam Opinion Findings Related to BCRA's Disclosure Provisions.

other organizations that engage in electioneering communications, which benefit specific elected officials, receive special consideration from those officials when matters arise that affect these corporations and organizations. *Id.* ¶ 2.7.9.

The evidence, therefore, paints a picture of corporations and labor unions targeting particular federal candidates or their opponents-that the organizations have a specific interest in getting these particular candidates elected to federal office. The candidates and political parties are well aware of these corporations and labor unions and are cognizant of which organization is running advertisements supporting their candidacy. It is also quite clear that these candidates are very appreciative of the additional electioneering support provided on their behalf from the general treasuries of corporations and labor unions. All of this creates the appearance of corruption, as is demonstrated by the polling data in the Findings. .

The NRA also challenges this asserted interest, arguing that "gratitude" is not corruption. NRA Opp'n at 8–12. The NRA misses the point of Defendants' argument, which is that the electioneering broadcasts disguised as "issue advocacy," create a very significant *appearance* of corruption. Defendants never argue that "gratitude" is corruption as the NRA would have the Court believe. Rather, Defendant–Intervenors correctly observe that "[t]he result is plain: candidates can be as beholden to corporations or unions that spend money to help them through ad campaigns as they would be if the same entities wrote a check directly to the campaign, or funneled the money through the political party." Def.-Int. Br. at 108–09. In my view, the potential for the appearance of corruption-identified as the compelling justification for sections 203 and 204 of BCRA-relates to the very simple fact that when a corporation or labor union

spends millions of dollars from its general treasury on a campaign, elected officials are likely to feel beholden when matters relating to these organizations arise.

In *Buckley,* the Supreme Court stated with regard to the independent expenditure restrictions on *individuals* that

> quite apart from the shortcomings of § 608(e)(1) in preventing any abuses generated by large independent expenditures, the independent advocacy restricted by the provision *does not presently appear* to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions. The parties defending § 608(e)(1) contend that it is necessary to prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities. They argue that expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and would pose similar dangers of abuse. Yet such controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act. Section 608(b)'s contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions.

*Buckley,* 424 U.S. at 46–47, 96 S.Ct. 612 (emphasis added). The Court in *Buckley* wrote that the threat of independent expenditures made by individuals did not "presently appear" to pose a danger of possible corruption. Therefore, *Buckley* explicitly left open the possibility that a time might come when a record would indicate that independent expenditures

made by individuals to support candidates would raise an appearance of corruption. The Court concluded, in 1976:

> [S]ection 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of pre-arrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608(e)(1) severely restricts all independent advocacy despite its substantially diminished potential for abuse.

*Buckley*, 424 U.S. at 47, 96 S.Ct. 612. This discussion in *Buckley* spoke only of the lack of evidence in that record with regard to restrictions on the independent expenditures of *individuals;* an issue that has clearly not been foreclosed for *corporations* or *labor unions*. *Bellotti*, 435 U.S. at 788 n. 26, 98 S.Ct. 1407 ("Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections."). In my view the record assembled by the parties in this case demonstrates that a compelling governmental interest behind Congress's regulatory effort was to prevent the appearance of corruption. It is a legitimate interest and the NRA's arguments are unpersuasive.[125]

### c. *Conclusion*

The compelling governmental interests identified by the Supreme Court in its campaign finance jurisprudence apply equally to Sections 203 and 204 of BCRA. Plaintiffs, aside from the NRA, do not challenge these bases as a justification for the restrictions on electioneering communications contained in Title II. Rather, Plaintiffs vigorously contend that the primary definition, as prohibited by Sections 203 and 204 of BCRA, is not narrowly tailored to serve that compelling government interest and is overbroad as a matter of constitutional law. It is this contention to which I now turn.

### 2. Sections 201, 203, and 204 of BCRA are Narrowly Tailored to Serve Compelling Governmental Interests

▉ I find that BCRA's prohibition of corporate and labor union spending of general treasury funds on electioneering communications, as defined in the primary definition, is narrowly tailored to serve the aforementioned compelling governmental interests. In reading the floor debates leading up to BCRA's passage, I am impressed by the care with which Congress crafted BCRA's delicate balance between regulation of issue advocacy and electoral advocacy, carefully weighing the serious First Amendment interests at stake. With Title II, Congress created an objective, impartial approach based on empirical data that provides objective indicia for distinguishing between electioneering advertisements and genuine issue discussion.

---

**125.** The NRA also argues that Title II cannot be justified as essential to prevent circumvention of Title I, NRA Opp'n at 13–15. Because I find that the first two rationales asserted by the government are sufficient, I do not need to reach whether this rationale constitutes a compelling governmental interest. Consequently, I decline to reach the NRA's argument on this point.

a. *Introduction*

In briefing this issue, Plaintiffs take great pains to exaggerate the reach of BCRA's electioneering communication provision-a technique no doubt designed to assist their efforts at demonstrating overbreadth. By so doing, Plaintiffs' distort the actual reach and purpose of Title II. *See, e.g.,* NRA Br. at 5 (presenting the law as a close relative of the universally condemned Sedition Acts of 1798). Given the extent to which Plaintiffs contort Title II to serve their own rhetorical purposes, it is necessary to state once again what BCRA does and does not accomplish in Title II.

The primary definition in section 201 is specifically focused on the pressing problem of corporations and labor unions using general treasury funds to directly influence federal elections under the guise of issue advocacy. Plaintiffs dismiss the primary definition in Title II as a "sweeping" "condemnation of core political speech," McConnell Opp'n at 43, and characterize the restrictions in Title II as "staggeringly overbroad." McConnell Br. at 59. Despite these statements, the primary definition of "electioneering communication" includes only communications that fulfill four, very discrete components: (a) they must be disseminated by cable, broadcast, or satellite, (b) they must refer to a clearly identified Federal candidate, (c) they must be distributed within 60 days before a general election or 30 days before a primary election, and (d) they must be target-ed to the relevant electorate. BCRA § 201(a); FECA § 304(f)(3)(A); 2 U.S.C. § 434(f)(3)(A).

Furthermore, Section 201 also contains a provision which expressly exempts four additional classes of communication from both the primary and backup definitions of electioneering communication. The four categories excluded from the definition of electioneering communication are:

(i) a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate;[126]

(ii) a communication which constitutes an expenditure or an independent expenditure under ... [FECA];[127]

(iii) a communication which constitutes a candidate debate or forum conducted pursuant to regulations adopted by the Commission, or which solely promotes such a debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(iv) any other communication exempted under such regulations as the Commission may promulgate (consistent with the requirements of this paragraph) to ensure the appropriate implementation of this paragraph, except that under any such regulation a communication may not be exempted if it meets the requirements of this paragraph and is described

---

**126.** The first statutorily-created exemption is almost identical to a pre-existing provision of FECA, 2 U.S.C. 431(9)(B)(i), that excludes from the definition of "expenditure" news stories and editorials broadcast or published by the media. 2 U.S.C. § 431(9)(B)(i) ("[Expenditure does not include] any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate."). The parties have referred to this carve-out as the "media exemption." *See infra.*

**127.** This exemption prevents double reporting of an electioneering communication if it already constitutes an expenditure or independent expenditure under the Act. Electioneering Communications, 67 Fed.Reg. 65190, 65,197–98 (October 23, 2002) (to be codified at 11 C.F.R. § 100.29(c)(3)).

in section 301(20)(A)(iii) [which is a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) ].

BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B). The final exemption in Section 201 provides the Commission with authority to promulgate further regulatory exemptions to the definition of "electioneering communication." However, the Commission's ability to create further regulatory carve-outs is closely circumscribed. First, any future exemption must be consistent with the requirements of the electioneering communication provision. Second, a communication cannot be exempted if it is a "public communication" "that refers to a clearly identified candidate for Federal office ... and that pro-

motes or supports a candidate for that office, or attacks or opposes a candidate for that office." BCRA § 101(b); FECA § 301(2)(A)(iii); 2 U.S.C. § 431(20)(A)(iii). As this latter limitation essentially tracks the language of the fallback definition, the statute appears to require the Commission not to stray from either definition of electioneering communication when promulgating future exemptions.[128]

Plaintiffs present two overbreadth challenges to Title II. First, Plaintiffs argue that the primary definition of electioneering communication applies to too many genuine issue advertisements to be considered narrowly tailored. McConnell Br. at 57–69; McConnell Opp'n at 42–48; McConnell Reply 33–40; NRA Br. at 17, 24–33; NRA Opp'n at 17–25; NRA Reply at 22–25; ACLU Reply 7–10; AFL–CIO Reply at 8–9. Second, Plaintiffs contend that Title II is unconstitutional because it applies to all corporations and does not contain a special statutory carve-out for non-profit, *MCFL*-type corporations. McConnell Opp'n at 41–42; NRA Br. at

---

**128.** Since the passage of BCRA, the Commission has promulgated two exemptions to the definition of electioneering communication. The first, exempts communications paid for by candidates for state or local office where the mention of a Federal candidate is "merely incidental" and thus not in violation of Section 301(20)(A)(iii) of FECA. Electioneering Communications, 67 Fed.Reg. at 65, 198–99 (to be codified at 11 C.F.R. 100.29(c)(5)). The second, exempts communications paid for by any charitable organization operating under Section 501(c)(3) of the Internal Revenue Code, which by law are not permitted to engage in partisan political activity. *Id.* at 65,199–200 (to be codified at 11 C.F.R. 100.29(c)(6)).

Four of the McConnell Plaintiffs are Section 501(c)(3) organizations. McConnell Second Am. Compl. ¶¶ 30, 32, 36, 37 (identifying the Indiana Family Institute, Inc., the National Right To Life Educational Trust Fund, the Southeastern Legal Foundation, Inc., and U.S. d/b/a Pro–English as 501(c)(3) organizations). Given the FEC's regulations, I find

that Court does not have jurisdiction over these four Plaintiffs on both standing and ripeness grounds. These four Plaintiffs do not demonstrate any injury-in-fact, a necessary prerequisite of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Plaintiffs have the burden of establishing standing to bring their suit by demonstrating that they have: (1) suffered an "injury in fact;" (2) which is "fairly traceable to the conduct complained of;" and (3) is capable of judicial redress.). Moreover, as Plaintiffs have presented "a controversy that has not yet arisen and may never arise," *Wisconsin Right to Life v. Paradise*, 138 F.3d 1183, 1187–88 (7th Cir. 1998), their claim is not ripe and the Court lacks jurisdiction to resolve their specific challenge to the electioneering communications provision. Accordingly, I do not believe that the Court has any jurisdiction over the claims of these four Plaintiffs in relation to the electioneering communication provisions in Title II.

17–24; ACLU Br. at 16–17; *see also* NRA Reply at 14–20; ACLU Reply at 2–7.

b. *BCRA's Restrictions on Electioneering Communication is Narrowly Tailored*

The restrictions in Title II on electioneering communications, as defined in the primary definition, are narrowly tailored. As discussed *supra*, Congress can permissibly regulate beyond express electoral advocacy only by ensuring that the law does not unconstitutionally burden issue discussion. In creating Title II of BCRA, Congress created a bright-line test that focuses on objective criteria common to broadcast advertisements that directly influence federal elections. By constructing this bright-line test, and avoiding a test that rests on subjectivity, Congress not only avoided the vagueness problems that plagued FECA, but also specifically linked their findings of abuse of Section 441b to the provisions in the primary definition. By using the main indicators of abuse—broadcast advertisements, aired in close proximity to a federal election, containing a reference to a candidate, and targeted to the candidate's electorate—Congress created a clear rule that constitutionally distinguishes between electioneering advertisements and genuine issue advertisements in the overwhelming majority of cases.

The Findings conclusively demonstrate that genuine issue advocacy is empirically distinguishable from issue advertisements seeking to influence a federal election. Findings ¶ 2.8. The vast majority of issue advertisements designed to influence a federal election identify a federal candidate, are run sixty days prior to a general election, or thirty days before a primary election, and are run in states or congressional districts with close races. I shall briefly examine each of these in turn.

1) Issue Advertisements Designed to Influence a Federal Election Almost Always Identify a Federal Candidate

The record in this case conclusively establish that issue advertisements designed to influence a federal election almost always refer to a specific federal candidate. *Id.* ¶ 2.8. Political consultants who create genuine issue advertisements present uncontroverted testimony that when designing pure issue advertisements, "it was never necessary ... to reference specific candidates for federal office in order to create effective ads." *Id.* ¶ 2.8.1.1 (Bailey) (discussing examples); *see also id.* (Strother) (pure issue ads did not mention any candidates by name). The flip side of this coin, as the consultants allude to in their testimony, is that when advertisements do mention a candidate's name, particularly in the period preceding an election, the advertisement's primary purpose is usually to influence the election. *Id.* (Bailey) ("In my decades of experience in national politics, nearly all of the ads that I have seen that both mention specific candidates and are run in the days immediately preceding the election were clearly designed to influence elections."); *id.* (Strother) ("Indeed, there is usually no reason to mention a candidate's name unless the point is to influence an election."). Expert testimony concurs in the views of the political consultants. *Id.* ¶ 2.8.1.2 (Krasno & Sorauf) ("The most obvious characteristic shared by candidate ads and candidate-oriented issue ads is their emphasis on candidates.... Pure issue ads, on the other hand, were much less likely to mention a candidate for federal office.... ") (Krasno & Sorauf); ¶ 2.8.4 (Magleby) ("A number of indicia make clear that the ads run by individuals and interest groups are in reality electioneering ads that are meant to influence, and do influence, elections: These electioneering ads generally name a candidate.... ").

This point is driven home by additional evidence, which demonstrates that advertisements run in the sixty days preceding a general election overwhelmingly mention a federal candidate and those run outside that period overwhelmingly do not mention a federal candidate. *Id.* ¶ 2.8.1.3 (discussing advertisements by Citizens for Better Medicare, Chamber of Commerce, Planned Parenthood, AFL–CIO, EMILY's List, Americans for Job Security, Business Round Table, Handgun Control, Sierra Club, and League of Conservation Voters). These facts strongly suggest that true issue advocacy need not mention a candidate's name to be effective, and that when advertisements mention a federal candidate, they are likely to be aired in close, temporal proximity to an election as part of an effort to influence that election. This pattern is manifested repeatedly in other issue advocacy organizations' campaigns, demonstrating in an objective and unbiased manner the fact that most advertisements designed to influence federal elections refer to a federal candidate.[129] *Id.* By focusing on those advertisements that specifically refer to a federal candidate,

Title II of BCRA appropriately targets issue advertisements that are designed to influence an election.[130] *Id.* ¶ 2.8.1.4.

2) A Majority of Candidate–Centered Issue Advertisements are Run in the Sixty Days Prior to a General Election and Thirty Days Prior to a Primary Election

The Findings also overwhelmingly demonstrate the appropriateness of BCRA's sixty and thirty day benchmarks. While advertisements appearing outside these time frames can influence elections, Congress appropriately focused on the periods of time that most directly influence federal elections. *Id.* ¶ 2.11.1. The Annenberg Study, which was not challenged by Plaintiffs, and was relied on by Plaintiffs' experts, as well as by Congress, concluded that during the 2000 federal election "[f]ully 94% of issue ads aired after August made a case for or against a candidate." *Id.* ¶ 2.8.2.1. As the following chart from the findings illustrates, issue advertisements that mention a federal candidate dramatically increase in the period before a federal election. In this case, the picture tells the entire story:

**129.** No similar evidence was presented by Plaintiffs to show an opposite trend or pattern.

**130.** Moreover, BCRA appropriately leaves untouched advertisements paid for with corporate and labor union general treasury funds that do not refer to a federal candidate. For example in the 63 days before the 2000 election, Citizens For Better Medicare ran 14,975 advertisements, of which 4,099 did not men-

tion a federal candidate. Findings ¶ 2.8.1.3. *None* of these advertisements that did not mention a federal candidate would be covered under BCRA. However, the 6,000 advertisements that mentioned a federal candidate and that were aired in the final three weeks of the 2000 election potentially would need to be paid for with segregated funds if the advertisements met the other criteria of the primary definition to be considered "electioneering communication."

## All Interest Group Advertisements Over Time

**Weeks Prior to the 2000 Federal Election**

............... **Number of Ads With No Candidate Mention**
————— **Number of Ads Mentioning a Candidate**

*Id.* ¶ 2.8.2.2. In addition, uncontroverted expert testimony in this case confirms that issue advertisements aimed at influencing federal elections are aired in the period right before an election. *Id.* ¶ 2.8.2.3; *id.* (Goldstein) ("The CMAG database provides empirical evidence of a strong positive correlation between [an advertisement's reference to a federal candidate and the proximity in time of the broadcast of the advertisement to the federal election] and consequently of its validity as a test for identifying political television advertisements with the purpose or effect of supporting or opposing a candidate for public office."). The evidence establishes that Congress was correct to conclude that sixty days before a federal election is the time corporations and labor unions have sought to use their general treasuries to influence federal elections. *See* Findings ¶ 2.8.2.4.

The thirty-day benchmark is similarly narrowly tailored. Plaintiffs complain that no analysis of narrow tailoring "exists as to ads broadcast within 30 days of primaries or conventions, and defendants appear

to have abandoned any contention that there is any basis in experience to prohibit such advertisements." AFL–CIO Reply at 3 n.2. This argument is incorrect; Defendants have put forth evidence concerning BCRA's thirty-day window and Plaintiffs have done nothing to contradict or challenge the evidence. As the Findings establish, Defendant–Intervenors were the only party to actually study the impact of BCRA on advertisements run during the 2000 primary election period. Findings ¶ 2.11.5.3. The Defendant–Intervenors found only 76 distinct advertisements which aired more than 60 days before the general election from the CMAG database, comprising 16,916 airings. *Id.* Of these advertisements, only three percent of the *airings* (522 out of 16,916) named a candidate and were aired within 30 days of the candidate's primary. *Id.* Defendant–Intervenors observed that of the advertisements identifying a candidate and airing within 30 days of a 2000 primary election, only 1.2 percent were coded as "genuine issue advertisements." *Id.* Defendants' experts Krasno and Sorauf make a similar

finding. *Id.* ¶ 2.11.5.2. These experts observe that the "hodgepodge of different primary dates makes it difficult to factor [the 30 day primary window] into the analysis, but we are confident that it would have little effect on the proportion of pure issue ads incorrectly captured by BCRA for the simple reason that so few of these advertisements mention candidates at all. Indeed, our examination of 1998 shows this to be true: no pure issue ads would have been captured by the 30–day primary period." *Id.* Plaintiffs make absolutely *no* effort to challenge this data, and I find the evidence sufficient to demonstrate that the thirty-day time frame is supported by the record in this case.

Indeed, the closest Plaintiffs come to challenging Defendants' on this point is the AFL–CIO's citation to 336 cookie-cutter advertisements aired over three election cycles, only 50 of which would have been even covered by BCRA's provisions. Findings ¶ 2.11.5.1. I discuss these advertisements in more detail, *infra,* however it is clear that this evidence represents the political advertising activity of only one interest group, albeit a particularly active one. As such, this submission does not directly address Defendants' analysis which examines BCRA's effect on issue advocacy during the primary cycle in general. I, therefore, find that this AFL–CIO evidence does not change my finding that BCRA's thirty-day period is supported by the record as being narrowly tailored to achieve the governmental interest at stake.

Moreover, Defendants provide uncontroverted evidence that the effect of advertisements run during a primary can be just as damaging as advertisements run during the general election. The record demonstrates that interest group broadcast advertisements had a substantial effect on the outcome of the 2000 Congressional race in Florida's Eighth district, particularly with the advertisements run by The

Club for Growth during the primary. *Id.* ¶ 2.6.5.5 (Pennington); *see also id.* ¶ 2.10.2 (Pennington) (noting that radio advertisements by Americans for Limited Terms attacking Mr. Keller's opponent on taxes and other issues was quite effective). The Club for Growth and Republican candidate Ric Keller had made their relationship well known, and the Club for Growth ran advertisements particularly helpful to Mr. Keller including one entitled "Keller Sublette Higher Taxes." *Id.* ¶ 2.6.5.5 (Pennington). Keller's Republican primary opponent, Bill Sublette, had been the frontrunner until this advertising campaign by The Club for Growth began. *Id.* Rocky Pennington, Mr. Sublette's campaign consultant, observed that Sublette would have garnered 50 percent of the vote in the Republican primary and not have had to face a run-off primary contest had it not been for The Club for Growth advertisements. *Id.*

After the election, in June of 2001, Congressman Ric Keller signed a Club for Growth fundraising letter stating:

> The Club for Growth selected my race as one of its *top priorities.... Since the Club targets the most competitive races in the country, your membership in the Club will help Republicans keep control of Congress.*

*Id.* ¶¶ 2.7.4 (underline in original, italics added for emphasis). In my judgment, the Keller–Sublette primary election advertising example epitomizes the reason Congress extended the prohibition on electioneering communications to 30 days within primary elections. It also demonstrates that simply because a primary election does not ultimately produce an officeholder, since the winner only receives a chance to run for elected office, the risk of corruption is still clearly present. *See* Findings ¶ 2.6.6.5 (New Hampshire Presidential primary election advertisements referencing

Senator McCain). The thirty-day prohibition around primaries is therefore supported by the record.

The sixty and thirty-day figures are not arbitrary numbers selected by Congress, but appropriate time periods tied to empirically verifiable data. The Findings persuasively demonstrate that advertisements designed to influence a federal election mention the name of a candidate and appear in the sixty and thirty days before a federal election or primary contest. The primary definition of electioneering communication is narrowly tailored because it focuses only on these periods of time, where it has been shown that candidate-centered issue advocacy is at its zenith and the influence of these advertisements on federal elections is at its strongest. Indeed, expert testimony likewise concludes that the majority of issue advertisements that mention a federal candidate appear in the period before an election. *Id.* ¶ 2.8.2.3.

Unlike Judge Leon, I am equally unpersuaded by Plaintiffs' claim that the legislative calendar requires the running of issue advertisements during the periods covered by BCRA. *See, e.g.,* AFL–CIO Br. at 10–11; Findings ¶ 2.11.8. I do not find that Plaintiffs have presented sufficient evidence to demonstrate this proposition. Findings ¶ 2.11.8.3. In many instances, Plaintiffs conclusively allege that legislative activity occurs during this time frame without providing either specific examples from the legislative calendar or examples from their own issue advertising campaigns addressing these legislative issues. *Id.* ¶ 2.11.8.1. The actual examples of some advocacy tied to specific pending legislation Plaintiffs present are comparatively few and I conclude are not sufficient to demonstrate that BCRA is overbroad. *Id.* ¶ 2.11.8.2. Importantly, Plaintiffs never overcome the fact that all issue advertisements that refer to a federal candidate, that are run in close proximity to a federal election, and that are targeted to the candidate's electorate influence the outcome of the federal election. *Id.* ¶ 2.11.2. Nor do they overcome the evidence showing that most "pure" issue advertisements do not mention the name of federal candidates. *Id* ¶ 2.8.1.1. Congress properly concluded that advertisements mentioning a candidate run in this time frame have an electioneering affect, even if they are run for a different purpose, and if these advertisements were paid for by corporations and labor unions, Congress concluded, consistent with longstanding policy, to require that these advertisements be paid for with segregated funds specifically designated for election purposes.

Additionally, the record establishes that it is a disputed issue of fact as to whether it is even effective to run "genuine" issue advertisements in the immediate run-up to a federal election. Findings ¶ 2.11.7. Political consultants, current and former candidates and officeholders, and Defendants' expert witnesses contend that it is ineffective to run issue advertisements in close proximity to a federal election, and as a result, advertisements about issues run during that time frame are likely designed to influence federal elections. *Id.* ¶¶ 2.11.7.1–2.11.7.2. Plaintiffs respond that it is necessary to run issue advertisements that mention the name of a federal candidate close to an election because of the public's greater interest in public affairs during that time frame. *Id.* ¶¶ 2.11.7.3–2.11.7.4. Because this issue is disputed, I reach no conclusion on this matter. What I do conclude is that with the primary definition of electioneering communication, the test does not focus on the objective behind the advertisement but rather objective determinants that have been empirically proven to distinguish issue advertisements that influence federal elections from other types of issue advertising.

Given the record presented to the Court, I conclude that BCRA captures the overwhelming majority of advertisements that are designed to affect federal elections. Even if the primary purpose of a broadcast advertisement is to pressure a Member of Congress on pending legislation, the record demonstrates that advertisements mentioning a federal candidate that run in close proximity to a federal election that are targeted at that candidate's electorate have a serious impact on elections. Still, BCRA only requires that these advertisements be paid for with segregated funds as opposed to general treasury funds.

### 3) Most Candidate–Centered Advertisements That Mention a Candidate for Federal Office Are Run in States and Congressional Districts With Close Elections

The Court's Findings conclusively demonstrate from the evidence that issue advertisements designed to influence a federal election are focused predominantly on close races. Findings ¶ 2.8.3. Expert and political consultant testimony, as well as empirical data, all demonstrate this fact. *Id.* The obvious reason for focusing primarily on close races is that corporations and labor unions endeavor to receive the most value out of each dollar spent on advertising in order to maximize their influence on elections. Even Plaintiff NRA admitted to focusing its advertisements on competitive races. *Id.* ¶ 2.8.3.5.

In my judgment, tailoring BCRA to apply only to "competitive races" would create line-drawing difficulties that would make such a law unconstitutional. However, the primary definition of electioneering communication is narrowly tailored in that it only focuses on broadcast advertisements that are targeted to the relevant electorate of each candidate. This means that, in the case of House and Senate races, the communication will not constitute an "electioneering communication" unless 50,000 or more individuals in the relevant congressional district or state that the candidate for the House or Senate are seeking to represent can receive the communication. BCRA § 201; FECA § 304(f)(3)(C); 2 U.S.C. § 434(f)(3)(C). Broadcast advertisements that target substantial portions of the electorate who decide a candidate's political future are those most likely to influence an election, and earn the candidate's gratitude. I find that by applying only to a candidate's relevant electorate, the primary definition of electioneering communication is narrowly tailored.

### 4) Legal Conclusions Relating To Expert Reports and Plaintiffs' Sample Advertisements

In my Findings and in the Appendix to this Opinion, I have made an effort to describe thoroughly the various expert reports purporting to demonstrate the problems created by issue advocacy advertisements affecting federal elections, as well as the narrow tailoring Congress achieved in BCRA to avoid affecting federal non-electioneering advertisements. I have also devoted a great deal of effort and care to lay out the criticisms of these studies proffered by Plaintiffs' expert, and the responses to that criticism by Defendants' experts. I have done so because the record demonstrates that a number of the reports, such as the *Buying Time* and the Annenberg Center studies, were relied upon by Congress in its consideration of BCRA and the parties have presented the Court with a wealth of material aimed at bolstering or discrediting them. In addition, Plaintiffs have attempted to demonstrate BCRA's overbreadth by discussing a series of advertisements that they claim would be unfairly captured under the primary definition of electioneering communication. The problem with this approach is that it asks the Court to sit as the viewer

and find that these advertisements were pure issue advertisements. The *Buckley* Court warned against a statutory test that relied on the viewer and listener's interpretation of a political message. I have declined, therefore, to engage in this exercise. As my Findings discuss, I have reviewed Plaintiffs' submission, including all of their cited advertisements, and conclude that they do not demonstrate BCRA's overbreadth. *See* Findings ¶¶ 2.11.3–2.11.5.

Turning to the experts, as indicated in my Findings, I find that much, though not all, of the relevant evidence presented by the Defendants has merit and has not been discredited by Plaintiffs' expert, Dr. Gibson, whose criticism focused on the *Buying Time* studies. *Id.* ¶ 2.12. At the outset, it is worth pointing out that the conclusions reached in Dr. Goldstein's Expert Report are unrebutted on the following points: interest group advertising in 2000 was concentrated in so-called "battleground" states; roughly 11 percent of candidate-sponsored advertisements in 2000 used express advocacy terminology; interest group advertisements, which identified a candidate in 2000, tended to be broadcast within the final 60 days of the election campaign, whereas those that did not identify a candidate were spread more evenly throughout the year; and interest group advertisements that mentioned candidates in 2000 were highly concentrated in "battleground states." *Id.* ¶ 2.12.3. Dr. Goldstein's uncontroverted conclusions further demonstrate that BCRA's primary definition of electioneering communications narrowly focuses on the key empirical determinants that separate genuine issue discussion from electioneering.

Plaintiffs have attempted to discredit the *Buying Time* reports primarily through the expert reports of Dr. Gibson. Dr. Gibson presents various criticisms of the reports in an effort to have the Court dismiss them or find Dr. Gibson's alternative conclusions more acceptable. As I mentioned in my Findings, the effort is not unlike that of a piñata party: if one hits the piñata enough, it will eventually crack apart. *Id.* ¶ 2.12.4. Although some of these "hits" have merit, I point out that neither Plaintiffs nor Dr. Gibson have attempted to conduct their own similar study, or even replicate a discrete portion of the *Buying Time* studies, despite the fact that the underlying materials were provided to them by Defendants. Presenting the Court with contrary results from such a study would have been far more persuasive than the recalculations of *Buying Time* data and the often conjectural and speculative criticism proffered by Plaintiffs and Dr. Gibson.

Importantly, much, if not all, of the objective findings in the *Buying Time* reports have not been undermined by Plaintiffs' expert. For example, Plaintiffs have not challenged the conclusions in *Buying Time* that very few advertisements utilize express advocacy terminology, and that interest group advertisements which identify candidates are concentrated toward the end of the election campaign. *Id.* ¶ 2.12.7. I find that this objective data is insulated from the great majority of criticism leveled at the *Buying Time* reports. *Id.* (Dr. Gibson commenting that "[e]ntirely objective characteristics of the ads (e.g., whether a telephone number is mentioned in the text of the ad) present few threats to reliability."). Furthermore, some of these results are supported by those of the unrebutted Annenberg Reports. *Id.*

As my Findings discuss, I have not accepted either side's discussion of the conclusion in *Buying Time 1998* related to the percentage of genuine issue advertisements that would be affected by BCRA. *Id.* ¶¶ 2.12.5–2.12.9. *Buying Time 1998* finds that seven percent of genuine issue

advertisements aired over the course of 1998 were aired in the final 60 days of the election campaign and mentioned a candidate, and Dr. Krasno determined that out of all of the advertisements identifying a candidate sixty days before the 1998 election, 14.7 percent were "genuine" issue advertisements. *Id.* ¶ 2.12.8. Dr. Gibson presented figures from the *Buying Time 1998* data ranging from 16 percent to 60 percent. *Id.* I have found that given the record it is impossible to determine which expert's view of the student coding is correct, and as such I find this matter in dispute and do not accept either side's conclusion on the likely effect BCRA would have based on the *Buying Time 1998* data.

In regard to *Buying Time 2000,* I do not accept its finding that, of all of the issue advertisements run within 60 days of the 2000 election that mentioned a candidate, 0.6 percent were genuine advertisements. *Id.* ¶ 2.12.10. I reached this conclusion primarily because Dr. Goldstein finds that if one includes all of the advertisements that Plaintiffs allege were recoded from genuine to electioneering commercials, the most "conservative" calculation of advertisements aired in the final 60 days of the 2000 election also identifying a candidate, which were "genuine," is 17 percent. *Id.*[131] This figure is not rebutted by Plaintiffs or their expert.

As I also explain in my Findings, I view these calculations as largely an academic exercise. *Id.* ¶ 2.12.12. The expert testimony in this case demonstrates the subjective nature of the effort of trying to capture mental impressions of viewers, and illustrates how one person's genuine issue advertisement can be another's electioneering commercial. *Id.* ¶ 2.8.5. This is why BCRA's framers have used objective criteria to define "electioneering communication." Furthermore, as Dr. Lupia explains, these exercises can help us determine what BCRA's impact would have been on past behavior, but they do not necessarily tell us how BCRA will affect non-electioneering issue advertisements in the future. *Id.* For example, the NRA claims that its 30–minute "news magazine" titled "California," is genuine issue advocacy but it would be unfairly affected by BCRA because it showed an image of the group's periodical, which featured a picture of Vice President A1 Gore on the cover for a few seconds. App. ¶ I.D.8.h. The advertisement was aired within 60 days of the 2000 election, and therefore would fall into BCRA's "electioneering communication" definition. I would note that it is clear that the NRA views Vice President Gore's presence in the advertisement as a coincidence and not a vital part of the commercial. *Id.* ¶ I.D.8.h. As such, one would expect that with the enactment of BCRA, the NRA would change its behavior. The NRA could leave the advertisement unchanged and only air it more than 60 days before an election, or more

---

**131.** Dr. Gibson also argues that since the majority of advertisements coded as electioneering were also coded as having policy matters as their primary focus, the studies in fact demonstrate that the vast majority of advertisements captured by BCRA are genuine issue advertisements. As the Findings demonstrate, I reject this argument. Findings ¶ 2.12.11. Defendants' experts have clearly demonstrated that the fact an advertisement may focus on issues does not preclude the possibility that the advertisement is designed to promote a candidate. *Id.* Dr. Lupia's beer commercial analogy illustrates this point effectively. *Id.* Furthermore, the results for candidate-sponsored advertisements demonstrate that even when a candidate running for office airs an advertisement in an effort to win election, he or she more often than not focuses those commercials on policy matters and not on personal characteristics of the candidates. *Id.; see also supra* ¶ 2.3.2 (Bailey).

than 30 days before a primary, and escape BCRA's coverage. The NRA could also show a periodical with a different cover and air the advertisement whenever it liked. Or, the group could leave the advertisement unchanged, run it within the 60 day window and pay for the commercial from its PAC funds. This is one example, but it illustrates the point that trying to determine the number of advertisements that will be unfairly subjected to BCRA based on past behavior does not account for adaptation of that behavior based on the new reality.

The fact that some genuine issue advertisements identified a candidate and were aired within 60 days of an election in the past does not mean that the candidate's presence was an essential, as opposed to an incidental, aspect of the commercial, or that such a percentage will remain constant. However, even if such conclusions could be drawn, it appears that the least contested figure presented to the Court is that 17 percent of advertisements in 2000 that would have been affected by BCRA were "genuine" issue advertisements. This figure is one of the reasons that Judge Leon finds the primary definition of electioneering communication to be substantially overbroad. I cannot agree with Judge Leon. First, I find these debates over "actual" percentages of genuine issue advocacy illustrative of why the Supreme Court in *Buckley* found that regulations relating to the subjective intent of the listener to be flawed. Trying to discern whether an advertisement is electioneering or issue advocacy is very difficult and open to debate. *See* Finding ¶ 2.8.5. Second, this number is the outermost number of "genuine" issue advertisements that would

be covered under BCRA; strong arguments can be made that the number should be reduced. Given the evidence in this case that broadcast advertisements aired in close proximity to a federal election, that mention the name of a candidate, and that are targeted to the candidate's electorate directly influence federal elections, I find that Congress was correct to establish an objective test for determining what constitutes electioneering. In other words, even if I were to accept the 17 percent figure as a valid metric for determining overbreadth, I find that the any such impact of BCRA is substantially counterbalanced by the record in this case and the objective empirical determinants related to these advertisements. For these reasons, I do not find Dr. Goldstein's conservative estimate of 17 percent to deem BCRA's primary definition of electioneering communication substantially overbroad.

Plaintiffs, as noted above, did not conduct their own empirical study like the *Buying Time* study, but instead provided the Court with examples of advertisements that they claim BCRA would have captured had it been in effect when they were aired. The McConnell Plaintiffs provided a CD–ROM containing 21 advertisements they claim provide "powerful illustrations of the amount and type of issue advocacy that would be prohibited by BCRA's primary definition of 'electioneering communications.' " [132] *Id.* ¶ 2.11.3. However, nine of these advertisements would not fall under BCRA's definition of electioneering communication because they either were not targeted at a relevant electorate or were not aired within 30 or 60 days of a

---

132. As noted numerous times in this opinion, BCRA would not "prohibit" these advertisements. These advertisements can be run, unaltered, if paid for from segregated funds. In addition, if the advertisements are not run in the candidate's electorate, BCRA places no

restrictions on these advertisements. If the advertisements are run more than 30 days before a primary or 60 days before a general election, BCRA imposes no restrictions on these commercials.

primary or general election. *Id.* ¶ 2.11.3.1. Four of the remaining advertisements focus on a candidate's past votes with no reference to any pending or future legislation. *Id.* ¶ 2.11.3.2. I reject the notion that these advertisements are examples of genuine issue advocacy. *Id.* ¶ 2.11.3.3. It is difficult to imagine what purpose an advertisement would have other than to promote the election or defeat of a candidate when it is aired within 60 days of an election or 30 days of a primary, clearly identifies a candidate, runs in that candidate's electoral district, and focuses on the candidate's past voting record without referring to pending future legislation. Take, for example, the AFL–CIO's "Protect" advertisement:

> PHARMACIST: The Senior Citizens today can't afford their medication. They come in and I know they're skipping medication so they can pay for their food. With the rising cost of medication today, it. could wipe out anybody at any time.

VOICE: Yet Congressman Jay Dickey sided with the drug industry. He voted no to guaranteed Medicare prescription benefits that would protect seniors from runaway prices. Tell Dickey quit putting special interests ahead of working families.

PHARMACIST: Watching people walk away without the medication takes a little bit out of me every day.

*Id.* ¶ 2.6.7.1. The argument that this advertisement, and those like it, was aired to promote an issue, and not to attack a candidate, strains credulity. Therefore, out of these 21 self-selected, and presumably most self-serving advertisements McConnell Plaintiffs provided the three-judge panel, eight at most are genuine issue advertisements that would be affected by BCRA.[133] *Id.* ¶ 2.11.3.4.

In addition, Defendants identify 39 advertisements that appear in Plaintiffs' briefings, which Plaintiffs claim are genuine issue advertisements. *Id.* ¶ 2.11.4. In addition to these 39 advertisements, I have

---

**133.** I state "at most" due to the fact that Defendants have provided background for almost all of the advertisements presented by Plaintiffs to the Court as genuine issue commercials. Examining the advertisements with knowledge of the context in which they were aired raises serious doubt in my mind that the true purpose of some of these communications was to promote issues as opposed to candidates. Indeed, the uncontroverted expert testimony states that in assessing the true purpose of an advertisement it is very important to view the advertisement in the context of the election in which it was run, rather than as part of a cold, factual record. Findings ¶ 2.8.5 (Strother). For example, one advertisement submitted by the McConnell Plaintiffs exhorts viewers to "call" incumbent Senator Lauch Faircloth "today and tell him to keep up his fight [against trial lawyers]. Because if trial lawyers win, working families lose." *Id.* ¶ 2.8.5.2. From a detached perspective, this advertisement appears to be advocating an anti-trial lawyer policy; however, when one is informed that Senator Faircloth's opponent was now-Senator John Edwards, a prominent trial lawyer, and that advertisements both supporting and opposing Senator Edwards focused on his trial lawyer credentials to the point that the phrase "trial lawyer" was synonymous with John Edwards, it is difficult to view the advertisement as anything other than electioneering. *Id.* However, as noted *supra*, ascertaining a political advertisement's true purpose is often a subjective exercise, one that Congress elected not to include in BCRA's primary definition of "electioneering communication." As such, unless there is an objective factor indicating that a proposed "genuine" advertisement is in fact an electioneering commercial, I will accept Plaintiffs' characterizations in the interests of a conservative and objective analysis. The conservative figure above also includes "Save," which criticizes a candidate's past vote but urges viewers to call the Member of Congress and "tell him to vote *no* when the Gingrich plan comes up again," intending, according to the AFL–CIO, "to influence House Members in the event that the bill returned for another vote in the [House]." Findings ¶ 2.11.3.2.

found four additional advertisements alleged in declarations to be examples of legislative-centered advertisements that would be affected by BCRA, *id.*, as well as a large number of cookie-cutter advertisements alluded to in the AFL–CIO's Opening Brief, which the group claims would be unfairly affected by BCRA's 30–day primary window, *id.* ¶ 2.11.5. I address the groupings of advertisements in turn.

The 39 advertisements scattered throughout Plaintiffs' briefs include 12 NRA advertisements which the group only identifies as having been aired sometime in 1994, and 13 commercials sponsored by the same group that aired in March of 2000, but mentioned only President Clinton who was not then a candidate for office. *Id.* ¶ 2.11.4.1. On these bases, I exclude these NRA commercials from consideration. I also exclude the ACLU's advertisement as an example of a "genuine issue advertisement" since it is clear that it was engineered to provide the group standing to challenge BCRA and is the only example of a past "electioneering communication" made by the group. *Id.* ¶ 2.11.4.2. I reject another, the AFL–CIO's "Sky," since it, like the four in the McConnell Plaintiffs' 21 advertisement submission described *supra*, criticized a Member of Congress's past vote without reference to any pending or future legislation. *Id.* ¶ 2.11.4.3. Therefore, out of these 39 advertisements Plaintiffs used in their briefings to illustrate the unfairness of BCRA, 12 at most are genuine issue advertisements that

would be affected by BCRA.[134] *Id.* ¶ 2.11.4.6.

Four other advertisements were cited by Plaintiffs in declarations as being motivated by pending legislation and happened to run within the 30 or 60–day BCRA windows. *Id.* ¶ 2.11.4.5 ("No Two Way," "Spearmint," "Spear," and the Gun Owners of America's armed pilots advertisement). For purposes of this analysis I accept Plaintiffs' characterization of these commercials. *But see supra* note 133.

Finally, the AFL–CIO mentions that a number of its legislation-focused advertisements would be affected by BCRA's 30–day window. Looking at the "flights" of advertisements detailed in its submissions, it appears that the vast majority of the "cookiecutter" advertisements that made up these flights would not have been affected by BCRA. Findings ¶ 2.11.5.1; *see also* App. ¶ II.A. Out of 336 cookie-cutter advertisements cited to by the AFL–CIO, 50 would have been regulated by BCRA. Finding ¶ 2.11.5.1; *see also* App. ¶ II.A. The rest were part of the same lobbying efforts, but were not aired within 30 days of a named-candidate's primary. Finding ¶ 2.11.5.1; *see also* App. ¶ II.A.

These Plaintiff-produced advertisements provide very little insight into what effect BCRA would have had on political advertising in the past, or the effect it is likely to have in the future. Of the 400 self-selected advertisements proffered by Plaintiffs as illustrations of the overbreadth of BCRA, presumably the best

---

**134.** Again I use the qualifier "at most" due to the presence of advertisements whose context makes me question the notion that they are genuine issue advertisements and not electioneering commercials. *See supra* note 133. This conservative figure includes: the Associated Builders and Contractor's advertisement on penalties for child molesters, a subject that the group acknowledges "is not [an issue of] particular concern to the general public of contractors or general group of contractors;" Findings ¶ 2.6.6.2, and the NRA's "Tribute" where Charlton Heston discusses "winning in November" and states "as we set out this year to defeat the divisive forces that would take freedom away, I want to say these fighting words for everyone within the sound of my voice to hear and to heed and especially for you, Mr. Gore. 'From my cold dead hands.' " Findings ¶ 2.11.4.4 (emphasis in original).

examples available, less than 20 percent (79/400) would have been affected by BCRA, even if the five advertisements focusing on past votes in the absence of pending legislation are considered genuine issue advocacy. Furthermore, Plaintiffs do not attempt to compare the volume of these advertisements with a comparative total number of advertisements or airings of advertisements. Consequently, I am left with no idea as to what these advertisements represent in terms of the overall quantity of distinct advertisements aired over the *four* election cycles (1994, 1996, 1998, and 2000) in which Plaintiffs' proffered advertisements were aired. These examples do little to convince me of BCRA's overbreadth, and if anything, suggest the opposite conclusion.

### 5) Conclusion Relating to Narrow Tailoring

In my judgment, BCRA's restriction on electioneering communication is narrowly tailored to achieve the related compelling governmental interests. In devising Title II, Congress followed the clear instruction from the Supreme Court in *Buckley*-that limitations upon political speech could not hinge on the subjective intent of the listeners. *Buckley*, 424 U.S. at 43, 96 S.Ct. 612 (quoting *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Instead, Congress focused on objective facts and concluded that issue advertisements designed to influence a federal election shared a number of characteristics: first, the vast majority of issue advertisements run in the period before an election mention a federal candidate; second, these commercials are run in the sixty and thirty days before general or primary elections; and third, these advertisements are targeted at the most competitive races. In devising the primary definition of electioneering communication, Congress constructed a rule that only touched advertisements matching the criteria Congress

found to be problematic: broadcast advertisements, referring to a federal candidate, targeting the candidate's electorate, run in close proximity to a federal election. Corporations and labor unions that desire to spend general treasury funds on advertisements fitting these characteristics can do so; they simply must pay for them with funding committed for that purpose by individuals who agree with the message of the union or corporation.

Congress properly determined that genuine issue advocacy can be discerned empirically from electioneering advocacy. In crafting Title II, it arrived at a definition of electioneering communication that matched its findings. It is very difficult to argue with Congress's conclusion that broadcast advertisements mentioning a federal candidate, run in close proximity to the candidate's election, and targeting the candidate's electorate do not have a significant influence on federal elections. In my judgment, Congress was correct to compel corporations and labor unions to pay for these advertisements with segregated funds committed to the purpose of electioneering in federal elections.

### c. *Section 204 of BCRA Does Not Render Title II Fatally Overbroad*

Plaintiffs also argue that the restrictions on electioneering communications in Title II are not narrowly tailored because they apply to all corporations and do not provide for a specific statutory carve-out for corporations fitting the characteristics of the plaintiff in *MCFL*. With the Snowe–Jeffords' provision, BCRA appeared to provide for an exception to the electioneering communication ban for certain types of corporations; however, this exception has been eliminated by the "Wellstone Amendment," now codified in Section 204. The Snowe–Jeffords Provision would have permitted section 501(c)(4) organizations and

section 527(e)(1) organizations to make electioneering communications provided that the organizations paid for these communications with money contributed by individuals, disclosed the names and addresses of those individuals who had given more than $1,000 to the account that paid for the communication, and, in the case of 501(c)(4) organizations, ensured that corporate and individual contributions were segregated into two separate accounts. The Wellstone Amendment, however, takes this exception away and requires corporations organized under section 501(c)(4) and section 527(e)(1) of the Internal Revenue Code to use segregated funding for electioneering communications. The Wellstone Amendment was codified in a separate section of BCRA in order to preserve severability; however, as I am persuaded that the Wellstone Amendment is constitutional, I do not find it necessary to sever it from BCRA.

Notably, the language in the Snowe–Jeffords Provision is silent as to whether or not corporations of the type identified in *MCFL* would be included within the parameters of its exception. In *MCFL*, the Supreme Court found that the prohibition in Section 441b on making independent expenditures containing words of express advocacy was unconstitutional *as applied* to a certain nonprofit, nonstock corporation. *MCFL*, 479 U.S. at 241, 107 S.Ct. 616. The Supreme Court's decision created an as-applied carve-out for certain nonprofit corporations that met three characteristics of the corporation at issue in the case which were "essential" to the Supreme Court's holding. *Id.* at 263, 107 S.Ct. 616. First, the corporation was "formed for the express purpose of promoting political ideas, and cannot engage in business activities [which] ensures that political resources reflect political support." *Id.* at 264, 107 S.Ct. 616. Second, the corporation did not have any "shareholders or other persons affiliated so as to

have a claim on its assets or earnings [which e]nsures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity." *Id.* Third, the corporation "was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities [which] prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace." *Id.*

The decision in *MCFL* stands for the proposition that the prohibition on independent expenditures containing words of express advocacy is unconstitutional as applied to a "small" group of qualified nonprofit corporations that fit the parameters set out by the majority in *MCFL*. *Austin*, 494 U.S. at 672, 110 S.Ct. 1391 (1990) (Brennan, J., concurring). Although FECA was not amended by Congress in the wake of *MCFL*, the Commission eventually promulgated regulations exempting corporations fitting the criteria of *MCFL*, or Qualified Nonprofit Corporations ("QNCs"), from the prohibition on independent expenditures (expenditures containing words of express advocacy). 11 C.F.R. § 114.10(d)(1) ("A qualified nonprofit corporation may make independent expenditures, as defined in 11 C.F.R. § 100.16, without violating the prohibitions against corporate expenditures contained in 11 C.F.R. part 114."). In defining what kind of corporation can receive QNC status, the Commission has hewed closely to the characteristics of the corporation in *MCFL*. *See* 11 C.F.R. § 114.10(c).

Given that Congress has never expressly codified the *MCFL* characteristics, it is not unexpected that the Snowe–Jeffords Provision never indicates whether QNCs would be included within the ambit of its exception. Nevertheless, the Snowe–Jeffords

Provision, by its terms, appears to include QNCs. The Snowe–Jeffords provision applies to all section 501(c)(4) organizations and all section 527(e)(1) organizations without exception. In addition, the Snowe–Jeffords Provision permits certain section 501(c)(4) organizations and certain section 527(e)(1) organizations to make electioneering communications, provided that the funds used to pay for those communications comes from individuals who disclose their names and addresses. The regulations defining a QNC mandate that for a corporation to receive QNC-status, the corporation cannot receive corporate donations. 11 C.F.R. § 114.10(c)(4)(ii).[135] By its terms, the Snowe–Jeffords Provision would therefore appear to encompass QNCs.[136]

The Wellstone Amendment was added by Congress to force all corporations to fund their electioneering communications through political action committees with federal funds. 147 Cong. Rec. S2847 (daily ed. Mar. 26, 2001) (statement of Sen. Paul Wellstone) ("Let me be clear, this amendment does not say any special interest group cannot run an ad. . . . It only says these groups and organizations need to comply with the same rules as unions and corporations. Groups covered by my amendment can set up PACs, they can solicit contributions, and they can run all the ads they want. All this amendment says is they cannot use their regular treasury money. They can't use the soft money contributions to run these ads."). Under the Snowe–Jeffords Provision, individuals could have given unlimited amounts of nonfederal money to section 501(c)(4) organizations and section 527(e)(1) organizations and these groups would have been permitted to engage in electioneering communications provided that the groups paid for the advertise-

---

**135.** Some courts have found that the regulations establishing the test for which corporations qualify for QNC-status is too rigid and excludes corporations that legitimately deserve recognition under a more functional-based approach (for example, where the corporation has accepted a *de minimis* amount of corporate donations). *See North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 714 (4th Cir.1999), *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000) ("We agree with those circuits that have addressed the question, each of which has held that the list of nonprofit corporate characteristics in *MCFL* was not 'a constitutional test for when a nonprofit corporation must be exempt,' but 'an application, in three parts, of First Amendment jurisprudence to the facts in MCFL.' ") (quoting *Day v. Holahan*, 34 F.3d 1356, 1363 (8th Cir.1994)); *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285, 292 (2d Cir.1995); *see also FEC v. Nat'l Rifle Ass'n*, 254 F.3d 173, 190–91 (D.C.Cir.2001). Even if a QNC were permitted to accept a *de minimis* amount of corporate contributions, it would still be able to qualify for Snowe–Jeffords by paying for its communication with funds from a segregated account that contains funding from individuals only.

**136.** The disclosure of names and addresses of individual contributors is not any more restrictive than the disclosure that the corporation in *MCFL* was forced to make. *MCFL*, 479 U.S. at 262, 107 S.Ct. 616 ("Even if § 441b is inapplicable, an independent expenditure of as little as $250 by MCFL will trigger the disclosure provisions of § 434(c). As a result, MCFL will be required to identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections, will have to specify all recipients of independent spending amounting to more than $200, and will be bound to identify all persons making contributions over $200 who request that the money be used for independent expenditures. These reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions. The state interest in disclosure therefore can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act."). Under the Snowe–Jeffords Provision, only individuals who have contributed $1,000 in the aggregate during a calendar year would have to disclose their names and addresses.

ments with the funding contributed by the individuals. The Wellstone Amendment compels these organizations to fund all of their electioneering communications through a political action committee using federal funds.

The Wellstone Amendment does not explicitly mention the status of corporations fitting the characteristics of an *MCFL* corporation. During the final passage of BCRA in the Senate, Senator McCain indicated that "[j]ust as an *MCFL*-type corporation, under the Supreme Court's ruling, is exempt from the current prohibition on the use of corporate funds for expenditures containing 'express advocacy,' so too is an *MCFL*-type corporation exempt from the prohibition in the Snowe–Jeffords amendment on the use of its treasury funds to pay for 'electioneering communications.' " 148 Cong. Rec. S2141 (daily ed. Mar. 20, 2002) (statement of Sen. John McCain).[137]

Picking up on Senator McCain's statement, the FEC-in the recently promulgated regulations implementing BCRA-has created an exemption for QNCs to make electioneering communications. 11 C.F.R. § 114.10 ("A qualified nonprofit corporation may make electioneering communications, as defined in 11 C.F.R. 100.29, without violating the prohibitions against corporate expenditures contained in 11 C.F.R. part 114."). Although not expressly provided for in the Wellstone Amend-

ment, under Commission regulations, QNCs are permitted, therefore, to spend unlimited amounts of money on electioneering communications based on the implementing regulations by the FEC.

I am convinced that Section 204 is constitutional in its present state and would leave for another day, in the context of an as-applied challenge, a determination of whether the FEC's regulations apply too narrowly and exclude corporations that should qualify for QNC-status. In my judgment, it was permissible for Congress not to exempt nonprofit corporations as a specific class from BCRA's restrictions on the general-treasury funding of electioneering communications. It goes without saying, and even Defendants concede, that *MCFL* establishes that FECA's (and now BCRA's) restrictions on the use of corporate treasury funds cannot constitutionally be applied to certain nonprofit corporations. Def.-Int. Opp'n at 65. However, given the FEC's regulations, I feel any argument relating to an *MCFL* exemption is premature. Any corporation that believes it should fall within *MCFL* may seek exemption under the FEC's regulations.[138] Moreover, if any corporation thinks that the Commission's regulations are too narrow in defining an *MCFL*, they may challenge them on that basis at the appropriate time. As the Defendant–Intervenors nicely phrase the inquiry: "The question is whether the new provisions added to

---

**137.** The reference Senator McCain makes to the Snowe–Jeffords' Provision is to the entire prohibition on corporate and labor union general treasury funds being used for electioneering communications, which was also known as "Snowe–Jeffords" throughout the legislative history. Thus, Senator McCain is not referring to "Snowe–Jeffords" as it has been discussed in this opinion as an exemption for section 501(c)(4) and section 527(e)(1) organizations. Electioneering Communications, 67 Fed.Reg. at 65204 ("Senator McCain specifically referred to that part of the Snowe–Jeffords amendment that prohibits

the use of [a corporation's] treasury funds to pay for electioneering communications, the main provision of this amendment that remains unaltered by the passage of the Wellstone amendment.") (internal citation and quotation marks omitted) (second brackets in original).

**138.** Future reviewing courts will not be writing on a blank slate. The Commission's regulations on the scope of the QNC exemption have been litigated multiple times. *See supra* note 135.

FECA by BCRA may constitutionally be applied to the same set of corporations (and, of course, unions, other groups, and individuals) to which FECA's existing provisions have long applied, and continue to apply." Def.-Int. Opp'n at 67. I answer that question in the affirmative and find that organizations like the NRA or ACLU that desire *MCFL* treatment in order to be exempted under BCRA need to present such a claim in the future as was done by the plaintiffs in *Austin* and *MCFL*. Accordingly, I find that the Wellstone Amendment does not render Title II substantially overbroad.[139]

d. *Conclusion Relating to Compelling Governmental Interests and Narrow Tailoring*

Based on the objective, empirical evidence, I conclude that BCRA is narrowly tailored to address the compelling governmental interests at stake in this case. As the Findings provide, Congress concluded that corporations and labor unions were using their general treasury funds to influence federal elections in violation of years of statutory prohibition. Title II of BCRA addresses the concern of Congress that corporations and labor unions were using their substantial aggregations of wealth to dominate the political environment. In that vein, Title II protects the individuals who have paid money into a corporation or union for purposes other than the support of candidate from having their money used to support political candidates to whom they may be opposed. Finally, Title II also addresses the potential for corruption that exists when corporations and labor unions make independent expenditures that have the potential to create political debts. *See Bellotti*, 435 U.S. at 788 n. 26, 98 S.Ct. 1407.

In addressing both forms of corruption, the primary definition of BCRA creates an objective test that identifies broadcast advertisements that influence a federal election. BCRA focuses only on those broadcast advertisements that mention a federal candidate, which, as demonstrated, is a key determinant of issue advertising that is essentially designed to influence a federal election. In addition, BCRA only applies to broadcast advertisements which, while mentioning a candidate, are targeted to that candidate's electorate. Moreover, BCRA only applies to these advertisements when they appear within the thirty days of a candidate's primary election or sixty days of the date of a general election. Nor is BCRA overbroad because it applies to certain non-profit corporations. It is obvious that the Supreme Court's decision in *MCFL* means that BCRA cannot constitutionally be applied to certain nonprofit corporations and the Commission's regulations provide for this fact. Finally, BCRA does not prohibit corporations and labor unions from making advertisements meeting the afore mentioned criteria. Rather, BCRA only requires that corporations and labor unions pay for these advertisements with funding that comes from those committed to the political ideals of the corporation and labor union; namely through PACs where disclosure is present and where contributors are aligned with the

---

**139.** Judge Leon finds Title II of BCRA unconstitutional only insofar as it applies to *MCFL*-corporations. However, I cannot agree with his conclusion that Sections 203 and 204 are unconstitutional because they do not create a specific statutory carve-out for *MCFL* corporations. *MCFL* was an as-applied challenge, and the Supreme Court did not strike down all of FECA as a result of its decision. Rath-

er, the *MCFL* exemption is litigated on a case-by-case basis. *See MCFL*, 479 U.S. at 271, 107 S.Ct. 616 (Rehnquist, C.J., concurring in part, dissenting in part) (foreshadowing that the result of the *MCFL* decision would be to spur "costly litigation"). Therefore, I do not find a constitutional defect in the fact that BCRA does not create a statutory carve-out for *MCFL* corporations.

political message of the corporation or labor union.

In my view, Title II is narrowly tailored to serve these compelling governmental interests. The primary definition of electioneering communication purposefully creates a new objective test that draws a bright line between issue advocacy and electoral advocacy. At this facial challenge stage, I find that it is narrowly tailored to serve compelling governmental interests and therefore respectfully dissent from the conclusions reached by Judge Henderson and Judge Leon on this point.

### F. *Plaintiffs' Underbreadth Challenge*

A number of Plaintiffs also argue that Title II of BCRA is unconstitutional because it is fatally underinclusive. *See, e.g.,* McConnell Br. at 75–77, 81; NRA Br. at 34–39; Chamber/NAM Br. at 6. For example, Plaintiffs contend that Title II is underinclusive because it does not restrict broadcast advertisements outside the thirty and sixty-day windows. McConnell Br. at 75; NRA Br. at 37–38. The Plaintiffs also contend that BCRA is underinclusive because it does not apply to print advertisements, direct mail, and the Internet, McConnell Br. at 81; NRA Br. 33–37, and because it only applies to corporations and labor unions, NRA Br. at 38.[140]

Given our Circuit's decision in *Blount v. SEC,* I am not persuaded by Plaintiffs arguments on this score. The D.C. Circuit court in *Blount* stated:

> [A] regulation is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be

more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals. While the rule chosen must "fit" the asserted goals, *City of Cincinnati [v. Discovery Network, Inc.,* 507 U.S. 410, 428, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) ], it must also, by virtue of the narrow tailoring requirement discussed below, strike an appropriate balance between achieving those goals and protecting constitutional rights. Because the primary purpose of underinclusiveness analysis is simply to "ensure that the proffered state interest actually underlies the law", *Austin,* 494 U.S. at 677, 110 S.Ct. 1391 (Brennan, J., concurring), a rule is struck for underinclusiveness only if it cannot "fairly be said to advance any genuinely substantial governmental interest", *FCC v. League of Women Voters,* 468 U.S. 364, 396, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), because it provides only "ineffective or remote" support for the asserted goals, *id.* (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)), or "limited incremental" support, *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 73, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). *See also Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (government "must demonstrate its commitment to advancing [its] interest by applying its prohibition evenhandedly. . . . Without more careful and inclusive precautions against alternative forms of [the harm], we cannot conclude that Florida's selective ban . . . satisfactorily accomplishes its stated purpose.").

---

**140.** To the extent that the McConnell Plaintiffs argue in a brief footnote that Title II is underinclusive because it applies to advertisements that make only "passing" references to federal candidates, McConnell Br. at 77 n.37, Plaintiffs fail to state how it would be possible to create a restriction on electioneering communication that would be based on the length of time a reference to a federal candidate is mentioned. I simply do not find this argument persuasive.

Thus, with regard to First Amendment underinclusiveness analysis, neither a perfect nor even the best available fit between means and ends is required. *Blount v. SEC,* 61 F.3d 938, 946 (D.C.Cir. 1995) (emphasis and alterations in original). As concluded *supra,* there is a tight fit between the asserted compelling governmental interests and the statutory provisions in Title II.

Plaintiffs first complain that BCRA is underinclusive because it regulates only advertisements aired within 60 days of a general election or 30 days of a primary, as opposed to advertisements falling just outside those periods. McConnell Br. at 75–77; NRA Br. at 37–38. As extensively discussed *supra,* BCRA focuses on issue advertisements designed to influence a federal election. The law, therefore, regulates advertisements that only fall within periods before federal elections. On the basis of empirical data, Congress concluded that sixty days before a general election and thirty days before a primary election were the periods of time in which issue advertisements were being used most often to influence federal elections. While Plaintiffs expert, Dr. Milkis, observes that advertisements outside the thirty and sixty day period have some effect on federal elections, Findings ¶ 2.11.1, the Findings demonstrate that issue advertisements mentioning a federal candidate are most often aired in the sixty days before a general election and the thirty days before a primary election. *See generally id.* ¶ 2.11. Congress recognized that most candidate-centered issue advertisements were run in close proximity to a federal election. *See supra* Findings ¶¶ 2.8.1.3, 2.8.2 (discussing the fact that candidate-centered issue advocacy is concentrated in the weeks surrounding federal elections). In my judgment, focusing on periods outside the sixty and thirty day windows would have rendered the primary definition fatally overbroad given the empirical evidence presented about the timing of candidate-centered issue advertisements. Accordingly, I find that Title II strikes an appropriate balance between achieving the compelling governmental interests and protecting constitutional rights.

Plaintiffs next challenge Title II as underinclusive on the ground that its definition of electioneering communication covers broadcast advertisements on television and radio, but not advertisements run in other media, such as print, direct mail, or the Internet. McConnell Br. at 81; NRA Br. at 33–36; *see also* Findings ¶ 2.10. As stated, however, by the AFL–CIO Plaintiffs, "broadcast is the most potent medium available in this electronic age, which is precisely why BCRA seeks to decisively impair groups' access to it. Print advertising, telephone banks, direct mail and other forms of non-broadcast communications pale in comparison as mass communications outlet." AFL–CIO Br. at 11. The Findings similarly conclude that broadcast advertising on television and radio are the most potent form of advertising. Findings ¶¶ 2.10.1–2.10.2.[141]

---

**141.** Plaintiffs' citation to *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), is misplaced. McConnell Br. at 76; NRA Br. at 33. In *Republican Party of Minnesota,* the Supreme Court struck down a state law that prohibited candidates for judicial office from announcing their views on disputed legal or political issues. The Court found the law to be underinclusive because it only prohibited a judge from announcing views on a disputed issue during the pendency of his or her candidacy. *Republican Party of Minnesota,* 122 S.Ct. at 2537 (observing that the day before an individual declares his or her candidacy and after he or she is elected are both periods where the statute did not apply). In the case of *Republican Party of Minnesota,* the Supreme Court concluded that if a judge's announcement of his or her legal views threatened his

I disagree with the NRA's conclusion that the other forms of media, like webcasts, telemarketing, direct mail, email, and print advertisements will logically become the next vehicle for corporations and labor unions looking to influence a federal election. In my view, the flaw with this argument lies in the assumption that these other media are just as effective as television and radio advertising for conveying an electioneering message. The evidence at this juncture does not support this conclusion. Therefore, I also respectfully disagree with Judge Henderson's conclusion on this matter.

The NRA, for example, contends that its webcasts of "NRA Live!" which often criticize politicians, are comparable to the NRA's issue advertising campaigns broadcast through radio or television. *See* NRA Br. at 36–37; Findings ¶ 2.10.3. The NRA's evidence in support of this assumption is not sufficient. First, the NRA offers a declaration of their communications consultant Angus McQueen who states that the Internet has become an *"increasingly* important part of how information becomes disseminated in our society." Findings ¶ 2.10.3.1 (emphasis added). However, congressional judgment regarding the "careful legislative adjustment of the federal electoral laws, in a cautious advance, step by step, to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *NRWC*, 459 U.S. at 209, 103 S.Ct. 552 (internal citation

and quotation marks omitted). Merely because the Internet is "increasingly" part of how society receives and disseminates information does not make it comparable to broadcast advertisements over television and radio, which everyone acknowledges was the problem Congress sought to address with BCRA. The other evidence presented by the NRA is a submission of "NRA Live!" viewership statistics and various videotapes containing broadcasts of "NRA Live!." Findings ¶ 2.10.3.2. However, the NRA does not include any expert or other testimony that "NRA Live!" is influencing federal elections to the same degree as the NRA's broadcast advertising campaigns. It is likely that there is no evidence of such a phenomenon because in order to view "NRA Live!," individuals must "opt-in" by going to the NRA website and viewing the program. Those individuals choosing to do so are likely more predisposed to the NRA's views about political candidates than the undecided voter watching a sitcom on a Thursday evening and viewing a thirty-second issue advertisement critical of Al Gore. The risk of corrupting the political process is much more powerful in the latter example than in the former. I cannot agree that Title II is flawed because it did not extend BCRA's restrictions to the Internet.

I reach the same conclusion for direct mail and newspaper advertising. Although everyone agrees that direct mail can be "very effective," *Id.* ¶ 2.10.4 (Magleby), there is no evidence that direct mail

---

or her appearance of fairness, then that threat existed regardless of whether the announcement occurred during his or her campaign. *See id.* at 2537 (observing that "statements in election campaigns are such an infinitesimal portion of the public commitments to legal positions that judges (or judges-to-be) undertake, that this object of the prohibition is implausible"). Such is not the case with regard to the thirty and sixty day windows of BCRA. The evidence in this case demonstrates

that broadcast issue advertisements airing outside the 30 and 60 day periods do not influence federal elections to anywhere near the same degree as those aired within the 30 and 60 day windows. Rather, it is in the immediate run-up to the federal election that issue advocacy · is most often exploited for electioneering purposes. Congress was correct to focus on the problem and not attempt to prohibit more conduct than the record would support.

has reached the degree of effectiveness as broadcast advertising. Until such a conclusion is reached by Congress, I find it appropriate that it did not extend the definition of electioneering communication to direct mail. In regard to newspaper advertising, the NRA presents no testimony that newspaper advertising is as effective as broadcast radio and television advertising. As Denise Mitchell, Special Assistant for Public Affairs for AFL–CIO President John J. Sweeney, observes: "newspapers are a more passive medium, with less immediacy than broadcast, and are less likely to generate action, and it is far harder to convey in print the human, personal impact of legislative issues—a key part of our strategy and effectiveness." *Id.* ¶ 2.10.2 (a conclusion, I note, that is also applicable to direct mail). I agree and find the NRA's arguments regarding print media unpersuasive. To the extent that the NRA cites advertisements that are more expensive to run in newspapers than advertisements run on radio, NRA Br. at 35; Findings ¶ 2.10.5, the NRA misses the point; failing to provide a shred of evidence that the print medium has anywhere near the effect as the broadcast media for conveying electioneering messages. Even the NRA's own communication consultant concedes that "paid broadcast media" is the most powerful means of conveying the NRA's messages. Findings ¶ 2.10.2 (McQueen).

In the final analysis, Congress appropriately tailored the primary definition of electioneering communication to radio and television advertisements. *Id.* 2.10.6. The uncontroverted testimony of experts and political consultants is that broadcast advertising is the most effective form of communicating an electioneering message. *Id.* ¶ 2.10.1–2.10.2 (Magleby, Pennington). Even Plaintiff AFL–CIO concedes this point. AFL–CIO Br. at 11. The fact that Congress did not extend the prohibition on electioneering communication to non-broadcast advertisements does not render Title II unconstitutional as underinclusive under the First Amendment.

Plaintiffs also contend that because the restrictions in Title II only apply to corporations and labor unions, the law is underinclusive as it does not cover unincorporated entities and wealthy individuals. NRA Br. at 38. Section 203 of BCRA amends 2 U.S.C. § 441b, a statute that has long regulated the activities of corporations and labor unions. The Supreme Court has already rejected a similar argument in a footnote to its *MCFL* decision:

> While business corporations may not represent the only organizations that pose this danger, they are by far the most prominent example of entities that enjoy legal advantages enhancing their ability to accumulate wealth. That Congress does not at present seek to regulate every possible type of firm fitting this description does not undermine its justification for regulating corporations. Rather, Congress' decision represents the "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,'" to which we have said we owe considerable deference. *FEC v. National Right to Work Committee*, 459 U.S. 197, 209, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893 (1937)).

*MCFL*, 479 U.S. at 259 n. 11, 107 S.Ct. 616. In *Austin*, the Supreme Court found that the state statute modeled after Section 441b, which did not apply to unincorporated associations or labor unions, was not underinclusive. *Austin*, 494 U.S. at 665, 110 S.Ct. 1391. The Supreme Court in *Buckley* held that Congress had not assembled a record that would permit justifying restrictions on the independent expenditures of individuals, *see Buckley*, 424 U.S. at 46, 96 S.Ct. 612; Congress should not, therefore, be penalized for not limiting the amount that wealthy individuals can

spend on electioneering communications by following the dictates of a Supreme Court decision. *See Austin*, 494 U.S. at 678, 110 S.Ct. 1391 (Brennan, J., concurring) (statute not underinclusive because it adheres to Supreme Court precedent). Given the prior decisions of the Supreme Court, Plaintiffs' underbreadth challenge on this ground fails.

### G. *Plaintiffs' Challenge Relating to Exemption for News Stories, Commentaries or Editorials from a Broadcast Station*

Finally, the NRA Plaintiffs [142] argue that the exemption in Title II of BCRA for news stories, commentaries, or editorials-the "media exemption"-violates the Equal Protection Clause and the First Amendment in that it is underinclusive. NRA Br. at 42.[143] As discussed, *supra*, BCRA, like FECA, exempts certain communications distributed through the facilities of a broadcasting station from regulation. BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B) ("a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate" is not included in the definition of electioneering communication).

In my view, the Supreme Court foreclosed consideration of this issue with its decision in *Austin* and the evidence that the NRA has put forward is not sufficient to alter the conclusion reached in that case. In *Austin*, the Supreme Court found that the Michigan statute's exemption of media corporations from its expenditure restriction did not render the statute unconstitutional. *Austin*, 494 U.S. at 666–67, 110 S.Ct. 1391 (noting that the "media exception" in the Michigan statute excluded from the definition of expenditure any "expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office . . . in the regular course of publication or broadcasting") (citation and footnote observing that the Michigan exemption was similar to the exemption in FECA both omitted). The Supreme Court concluded that the media exemption was bound to impose fewer restrictions on the expression of corporations that are in the media business and therefore needed to be justified by a compelling state purpose. The Supreme Court held:

> Although all corporations enjoy the same state-conferred benefits inherent in the corporate form, media corporations differ significantly from other corporations in that their resources are devoted to the collection of information and its dissemination to the public. We have consistently recognized the unique role that the press plays in "informing and educating the public, offering criticism, and providing a forum for discussion and debate." *Bellotti*, 435 U.S. at

---

**142.** The Paul Plaintiffs also raise this claim. The Paul Plaintiffs argument is discussed in the *per curiam* opinion.

**143.** I disagree with the NRA's argument that the media exemption demonstrates that BCRA is, in essence, a regulation of television programming. *See* NRA Br. at 47. BCRA, in my judgment, is not akin to regulations that burden the editorial discretion of TV companies by requiring them to carry certain programming content. Again, BCRA does not

prohibit speech. The NRA is free to run electioneering communications, provided they are paid for with segregated funds. As Defendants correctly observe, "The amount the NRA can spend on such ads is limited only by the willingness of its millions of individual members to contribute to the NRA's separate segregated fund, which in 2000 spent $17 million to influence federal elections." Gov't Opp'n at 104. I therefore find the NRA's argument on this score unpersuasive.

781, 98 S.Ct. 1407. *See also Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) ("[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve"). The Act's definition of "expenditure," [citation omitted] conceivably could be interpreted to encompass election-related news stories and editorials. The Act's restriction on independent expenditures therefore might discourage incorporated news broadcasters or publishers from serving their crucial societal role. The media exception ensures that the Act does not hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events.... A valid distinction thus exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public. Although the press' unique societal role may not entitle the press to greater protection under the Constitution, *Bellotti, supra,* 435 U.S. at 782, and n. 18, 98 S.Ct. 1407, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations. We therefore hold that the Act does not violate the Equal Protection Clause.

*Austin,* 494 U.S. at 667–68, 110 S.Ct. 1391.

The NRA argues that the decision in *Austin* on this point was somewhat a "close call" and questions whether *Austin* "was correctly decided." NRA Br. at 48. The NRA argues that "the emergence of the internet and the absorption of the broadcast networks by non-media conglomer-

ates" change the role of media corporations in society. *Id.* at 42. According to the NRA, since *Austin* was decided in 1990, there has been such a seismic shift in the structure of the media industry that *Austin* is no longer relevant.

The NRA argues that the emergence of the Internet and the absorption of broadcast networks by nonmedia companies have altered the nature of traditional companies and therefore render Title II facially unconstitutional. NRA Br. at 42. I have discussed the problems with the NRA's Internet arguments, *supra.* With regard to the NRA's arguments about nonmedia companies purchasing media companies, the NRA's entire line of argument ignores the fact that the media exception only applies to the "facilities of any broadcasting *station,*" BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B) (emphasis added), not the facilities of any broadcasting *company.* The NRA provides *no* evidence that the purchase of media corporations by other businesses has any impact on any "news story, commentary, or editorial distributed through the facilities of any broadcasting station." BCRA § 201(a); FECA § 304(f)(3)(B); 2 U.S.C. § 434(f)(3)(B).[144] Furthermore, it is not the role of a district court, in my judgment, to question a binding decision of the United States Supreme Court, particularly when the proffered evidence amounts to no more than a disagreement with the *Austin* result.

Given that the NRA's evidence relating to the media exemption is entirely lacking, there is no reason to engage in a further discussion of their argument. The equal protection argument was settled in *Austin,* and for the same reasons announced in that decision, I find that the NRA's under-inclusiveness argument is also without merit. Simply put, *Austin* is controlling.

---

**144.** Moreover, as the NRA points out in its brief, NBC was acquired in 1985 by General

Electric, a move which *predated* the *Austin* Court's decision. NRA Br. at 44 n.31.

### H. *Conclusion Regarding Title II*

I have considered and rejected Plaintiffs' other arguments made to the three-judge District Court and conclude that the restrictions on electioneering communication, as defined in the primary definition, are facially constitutional. In making this decision, I am extremely cognizant of how rare it is for a decision to uphold a content-based restriction on speech. Nevertheless, in finding these provisions in Title II constitutional I am motivated primarily by the record assembled in this case and the history of government regulation of corporations and labor unions in the context of federal elections.

In this case, the facts tell the story. The record convincingly demonstrates that corporations and labor unions use general treasury funds to influence federal elections in direct violation of years of federal policy. I am not convinced that Congress is powerless to act to channel the corporate and labor union presence in federal elections through PACs where disclosure is present and where contributors are aligned with the political message of the corporation or labor union. The express advocacy test, in my view, is not a constitutional requirement; what is required is an objective, bright-line rule that constitutionally distinguishes between issue advocacy and advocacy intended to influence a federal election.

With the primary definition of electioneering communication, Congress fashioned a test that includes all of the major characteristics of issue advertising designed to influence a federal election: broadcast advertisements, aired in close proximity to a federal election, referring to a federal candidate, and targeted to that candidate's electorate. In Congress's judgment, these advertisements influence federal elections in the overwhelming majority of cases, despite Plaintiffs' self-serving testimony in this case which, in many instances, is belied by prior written statements and documentary evidence. In this facial challenge, on the basis of the record assembled, and on the basis of the longstanding history of congressional regulation of corporate and labor union involvement with federal elections, I find that Congress's decision to prohibit corporate and labor union spending on electioneering communications with general treasury funds is one that meets the standard of strict scrutiny.

By enacting Title II, Congress recognized the paramount importance of having legislation that controls electioneering communication and of preventing corporations and labor unions from using general treasury funds to influence federal elections. After reviewing the law under strict scrutiny review, I have found the primary definition of electioneering communication constitutional. Given the importance of this issue to Congress-*as demonstrated by their enacting a backup definition to ensure that electioneering communications would be regulated even in the event the primary definition is found unconstitutional*-I join, in the alternative, Judge Leon's opinion regarding the constitutionality of the backup definition of electioneering communication. Nevertheless, as my opinion makes plain, I strongly believe that the primary definition is fully consistent with the Constitution, and but for the position of the other judge's on this three-judge District Court, would not reach the backup definition.

### Section 213

The only remaining provision of Title II that has not been addressed in my opinion or the *per curiam* opinion, is Section 213 of BCRA. For the reasons stated in Judge Leon's opinion, I agree that Section 213 is unconstitutional. While the record is replete with evidence related to the close nexus between parties and candidates in

the fundraising process, there is no evidence to demonstrate that a political party's expenditures after nominating its candidate are always coordinated. *See* 148 Cong. Rec. S2144 (daily ed. Mar. 20, 2002) (statement of Sen. John McCain) ("We believe that once a candidate has been nominated a party cannot coordinate with a candidate and be independent in the same election campaign."). *Colorado I* disproves this notion, and Defendants have put forward no additional evidence to demonstrate that there are any special corruption problems with having political parties make independent expenditures on behalf of their candidates. *Colorado I*, 518 U.S. at 618, 116 S.Ct. 2309 ("The Government does not point to record evidence or legislative findings suggesting any special corruption problem in respect to independent party expenditures."). Given the record in this case, I must concur with Judge Leon in finding Section 213 unconstitutional.

## II. TITLE I: REDUCTION OF SPECIAL INTEREST INFLUENCE

### Section 101: Soft Money of Political Parties

The McConnell, RNC, CDP, and Thompson [145] Plaintiffs all present a variety of constitutional challenges to Title I of BCRA, premised on the First, Fifth, and Tenth Amendments of the Constitution. After reviewing the record in this case, the governing caselaw, and the parties' lengthy briefing, I find that Plaintiffs' arguments lack merit and that Title I of BCRA is constitutional.[146]

For well over two decades, the Commission has sought to regulate the use of nonfederal funds by permitting the national, state, and local political party committees to allocate expenses on "nonfederal" activities between their federal and non-federal accounts. The vast record in this case demonstrates that this system-a cobbled-together aggregation of FEC regulations and advisory opinions-is in utter disarray with all of the different political party units spending nonfederal money to influence *federal* elections. Congress was correct in finding that in many instances, the allocation regime was a failure. The only way to return the system to the original design of FECA was to prevent the national party committees from raising money outside of the restrictions in FECA and to restrict the use of nonfeder-

---

**145.** In regard to Title I, the Thompson Plaintiffs, in their briefing, initially presented only an equal protection argument. Thompson Br. at vii; Thompson Opp'n at 1. I concur entirely in Judge Henderson's discussion of the Thompson Plaintiffs' equal protection claim. Henderson Op. at Part IV.D.4. To the extent the Thompson Plaintiffs have attempted to argue a First Amendment claim, the tenor of their argument is that candidates from economically disadvantaged areas need to be able to raise soft money to be competitive. Thompson Reply at 7. First, candidates have never been able to directly raise or spend soft money, so to the extent the Thompson Plaintiffs claim they are deprived of an effective tool of financing, it only further convinces me of the extent to which federal candidates have become dependent on nonfederal funds. Second, the Thompson Plaintiffs'

argument is essentially a policy-based argument, better suited for the legislature than this three-judge District Court panel. It has long been held that Congress has broad authority to set contribution limitation amounts. *See, e.g., Nixon v. Shrink Missouri Government PAC ("Shrink Missouri")*, 528 U.S. 377, 395–97, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Finally, to the extent it is possible, I subsume the Thompson Plaintiffs' general First Amendment claims into the rest of my discussion on the First Amendment.

**146.** Plaintiffs take a scattershot approach in regard to their Title I arguments, and although I have considered all of their arguments, in the interest of both space and time, I address only the ones I have determined are the most salient. The arguments not addressed specifically lack merit.

al funds by the state and local party committees for "Federal election activity." Seen from this perspective, Title I is not a draconian realignment of the role of political parties. *See, e.g.,* RNC Br. at 42. Rather, Title I operates as a fundraising restriction aimed at restructuring the failed allocation regime that has produced a campaign finance system so riddled with loopholes as to be rendered ineffective. Concomitantly, BCRA restores in large measure, the federal campaign finance structure that had functioned effectively prior to the rise of seductive "soft money."

In other words, Congress created Title I of BCRA to fix the contribution limitations of FECA that have fallen into severe disrepair, largely as a result of these aforementioned regulations and advisory opinions. Title I accomplishes this goal by requiring the national committees of the political parties to fund their operations with federally regulated money. Equally important, the law also compels the state and local committees of the national political parties to fund their Federal election activities with money raised in compliance with federal law. Other provisions in Title I are designed to ensure the integrity of Title I, by including restrictions on the ability of the committees of the national parties and their agents to raise money for certain tax-exempt organizations and by placing limitations on federal and state candidates in regard to certain campaign and fundraising activities. At the same time, BCRA raises the limitations on "hard money" contributions to the national, state, and local party committees to facilitate raising funds within this new statutory framework.

When stripped of Plaintiffs' gloss, it becomes evident that Title I basically operates as a contribution limitation on political party fundraising, amply supported by prior Supreme Court caselaw and the immense record in this case. Given the sufficiently important governmental interests long identified by the Supreme Court to support the contribution restrictions like those at issue in Title I, Congress rightfully concluded that the only way to combat the problems related to the abusive use of nonfederal funds was to: (a) limit the funding of national committees of the political parties to money regulated by the federal government, and (b) enact a series of limited, ancillary, prophylactic measures involving state and local committees and candidates to ensure the integrity of the national committee nonfederal funds prohibition. In my judgment, Title I is constitutional.

My opinion presents a concurrence in part and a dissent in part. I concur with Judge Leon's view that in undertaking a First Amendment analysis of Title I, the relevant standard of review is the scrutiny that the *Buckley* Court applied to contribution restrictions, that the limitation in Section 323(b) on state parties' activities described in Section 301(20)(A)(iii) is constitutional, and that the restrictions on state candidates in Section 323(f) is constitutional. I also concur in the judgment of Judge Henderson that Section 323(e) is constitutional. My opinion begins with a brief discussion of the rise of nonfederal money as a tool of national party financing for federal election purposes. Given that the conclusions reached by Judge Henderson and Judge Leon turn primarily on Plaintiffs' First Amendment challenges, I next discuss those arguments, and provide the reasoning for my dissent on the remaining issues. Finally, I provide my reasons for rejecting Plaintiffs' Fifth Amendment arguments and for finding that Plaintiffs lack standing to assert a challenge under the Tenth Amendment to Title I.

### A. Background: The Rise of Nonfederal Money as a Means of Financing Federal Elections

As discussed at length in the *per curiam* opinion, Title I was enacted by Congress to combat the growing problem of the national committees of the political parties raising funds outside of the source and amount restrictions in FECA and using that money to influence federal elections. In creating Title I, Congress attempted to shore-up the decades-old contribution restrictions in FECA, which had been eroded as a result of a series of FEC rulemaking and advisory opinions which established an allocation system. To accomplish this goal, Congress eschewed the failed system of allocation percentages and prohibited national political party committees from raising money that is not subject to federal source and amount limitations.

The 1974 Amendments to FECA placed limitations on the source and the amount of contributions to federal candidates and political parties. The law prohibited corporations and labor unions from making contributions to political parties and federal candidates. 2 U.S.C. § 441b(a). FECA also limited an individual's contributions to $1,000 per election to a federal candidate, $20,000 per year to national political party committees, and $5,000 per year to any other political committee such as a political action committee ("PAC") or a state party committee. 2 U.S.C. § 441a(a)(1). Individuals were likewise subject to an overall annual limitation of $25,000 in total contributions. 2 U.S.C. § 441a(a)(3).[147] These limitations have been consistently upheld by the Supreme Court. *Buckley*, 424 U.S. at 23–38, 96 S.Ct. 612; *NRWC*, 459 U.S. at 207–10, 103 S.Ct. 552. The definitions of contribution and expenditure in FECA were then, and remain now, limited to the donation or use of money or anything of value "for the purpose of influencing an election for Federal office." 2 U.S.C. § 431(8)(A)(i), (9)(A)(i). The statute was therefore silent on how to draw lines around money raised outside of FECA's source and amount limitations for political parties to spend on activities that were expected not to be used for the purpose of influencing a federal election.

As has been set out in much greater detail in the *per curiam* opinion, the FEC's opinions and rulemakings drew that line by permitting state and national political party committees to pay for the nonfederal portion of their administrative costs and voter registration and turnout programs with monies raised under relevant state laws (not FECA), even if they permitted contributions from sources such as corporations and labor unions that were prohibited under FECA. As a result, national and state political parties began to raise so-called "soft money," which de-

---

**147.** Under BCRA, the contribution limits have been raised. BCRA § 307(a); FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(A)-(B) (increasing limit on contributions to candidates and candidates' committees from $1,000 to $2,000 for individuals, and increasing the limit on individual contributions to national political party committees from $20,000 to $25,000); BCRA § 102; FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(D) (increasing limit on contributions to state political party committees from $5,000 to $10,000); BCRA § 307(b); FECA § 315(a)(3); 2 U.S.C. § 441a(a)(3) (increasing aggregate limit on individual contributions from $25,000 per year to $95,000 per two-year election cycle, of which $37,500 may be contributed to candidates); BCRA § 307(c); FECA § 315(h); 2 U.S.C. § 441a(h) (increasing limit on contributions by the Republican or Democratic Senatorial Campaign Committees from $17,500 to $35,000). Moreover, many of these contribution limits are to be increased annually to account for inflation as reflected in changes to the consumer price index. BCRA § 307(d); FECA § 315(c); 2 U.S.C. § 441a(c).

scribed these nonfederal funds-not subject to FECA limits and restrictions-to pay for a share of election-related activities that influenced federal elections. Generally, the state political parties' allocation rate was substantially lower than the national party allocation rate. The rules, therefore, furnished national political parties with an incentive to channel many of these expenditures through state political party committees, since this approach allowed a higher proportion of the parties' expenses to be paid for with nonfederal funds which were much easier to raise than those funds raised subject to FECA's restrictions.

During the 1980 election cycle, the RNC spent approximately $15 million in nonfederal funds and the DNC spent roughly $4 million, constituting nine percent of the national political parties' total spending. Findings ¶ 1.3. In 1984, the national political parties spent, collectively, approximately $21.6 million in nonfederal funds, which accounted for five percent of their total spending. *Id.* By 1988, national party nonfederal funds increased to $45 million or eleven percent of national party spending. *Id.* In 1992, nonfederal fundraising by the national parties reached $86.1 million, and nonfederal funds were used for sixteen percent of the national parties' spending. *Id.* ¶ 1.4, 1.4.1. With the 1996 election cycle, the national parties raised *$263.5 million* in nonfederal funds and nonfederal money spending constituted approximately thirty percent of the national party committees' total spending. *Id.*

The uncontroverted record demonstrates that in 1996 the dramatic rise in spending of nonfederal funds by national political parties was tied to the development of issue advocacy media campaigns. Originated by President William Clinton's political consultant Dick Morris, the move was eventually copied by the Republican Party. *Id.* ¶¶ 1.6, 1.7. Morris used nonfederal funds to pay for advertisements that either promoted President Clinton by name or criticized his opponent by name, while avoiding words that expressly advocated either candidate's election or defeat. *Id.* 1.6. While these advertisements prominently featured the President, none of the costs associated with these advertisements were charged as coordinated expenditures on behalf of President Clinton's campaign, subject to the FECA's contribution limits. *Id.* Rather, the political party paid the entire cost, with a mix of federal and nonfederal funds, arguing that political party communications that did not use explicit words advocating the election or defeat of a federal candidate could be treated like generic party advertising (that is, "Vote Republican!") and financed, according to the FEC allocation rules, with a mix of federal and nonfederal funds.[148] *Id.* In many cases, the national political party committees used the state political party committees as vehicles for implementing the issue advocacy campaign because the allocation rules were much more favorable for state parties, and consequently, the advertisements could be financed with nonfederal funds. *See, e.g., id.* ¶¶ 1.26.1, 1.26.2, 1.26.6. This approach later spread to Congressional campaigns. *Id.* ¶ 1.8.

Political parties were now able to pay for such "issue advertisements" with a mix of federal and nonfederal funds because

---

**148.** As discussed in the *per curiam* opinion, the FEC had ruled that party committees could sponsor issue advocacy advertisements that did not feature a federal candidate and pay for these advertisements with a combination of hard and soft dollars as permitted under the allocation regulations. Federal Election Commission Advisory Opinion 1995–25 (discussing that allocation rules were permissible to allocate funding for "RNC plans to produce and air media advertisements on a series of legislative proposals being considered by the U.S. Congress, such as the balanced budget debate and welfare reform").

the FEC treated these advertisements as "generic" party advertisements. In order to fund these "generic" party advertisements or "issue advertisements," the political parties needed to raise an increasing amount of nonfederal money. With this strategy firmly in place, the national political parties spent $221 million in nonfederal funds on the 1998 midterm elections, or 34 percent of their total spending, which was more than double the amount of nonfederal funds spent during the previous midterm elections. *Id.* ¶ 1.4.2. With the 2000 elections, spending of nonfederal funds by the national political parties reached $498 million, which was now 42 percent of their total spending. *Id.* 1.4.3. The top 50 nonfederal fund donors during the 2000 election cycle each contributed between $955,695 and $5,949,000. *Id.* During the first 18 months of the 2001–2002 election cycle, the political parties reported nonfederal receipts of $308.2 million, which is a 21 percent increase over the same period during the 1999–2000 cycle. *Id.* ¶ 1.4.4. The FEC notes that this increase is "all the more significant given that typically parties raise more in Presidential campaign cycles than in non-presidential campaigns." *Id.*

It was in response to its view that the use of "soft money" was a problem that Congress enacted Title I of BCRA. *See, e.g., Investigation of Illegal or Improper Activities in Connection with 1996 Federal Election Campaigns,* S.Rep. No. 105–167, at 4468 (1998) ("Thompson Committee Report") at 4468 (majority report) ("soft money spending by political party committees eviscerates the ability of FECA to limit the funds contributed by individuals, corporations, or unions for the defeat or benefit of specific candidates"); *id.* at 4565 (minority report) ("Together, the soft-money and issue advocacy loopholes have eviscerated the contribution limits and disclosure requirements in federal election laws and caused a loss of public confidence in the integrity of our campaign finance system."). The original design of the FEC's rules on allocation were to permit the political parties the opportunity to raise nonfederal funds for purposes unrelated to federal elections. The parties were permitted to pay for the nonfederal portion of their expenses with nonfederal funds. Over time, however, what started out as a fairly simplistic approach to cost allocation (nonfederal portions of administrative and get-out-the-vote ("GOTV") activities could be paid for with nonfederal funds), turned into a gaping loophole, which permitted the national political parties to raise enormous sums of money to spend on federal elections-all outside FECA's source and amount limitations. In essence, the actions by the political parties at all levels disproved the assumption that voter registration activity, voter identification, generic campaign activity, and get-out-the-vote activity in relation to a federal election could be allocated between nonfederal and federal accounts without inviting the political parties to circumvent FECA's carefully constructed contribution system and without creating anew the same problems of corruption identified in *Buckley* involving unlimited individual contributions. The parties' actions confirmed the Supreme Court's observation in *Colorado II,* that "[d]espite years of enforcement of the challenged limits, substantial evidence demonstrates how candidates, donors, and *parties* test the limits of the current law ...." *Colorado II,* 533 U.S. at 457, 121 S.Ct. 2351 (emphasis added).

Prior to BCRA, the contribution regime carefully constructed in FECA, and upheld in *Buckley,* had become nothing more than an elaborate fiction with the national political parties and their state counterparts circumventing the restrictions with ease. Prior to BCRA, federal candidates and officeholders, in conjunction with their political party committees, raised large

amounts of nonfederal money for purposes directly related to federal elections. Beginning with issue advocacy strategy employed for the election campaign of President William Clinton in 1996, the system took a turn for the worse as the political parties scrambled to collect as much "soft money" as possible to fund "issue advertisements" that were nothing short of campaign commercials in disguise. While loudly complaining about the other side's tactics, neither side was willing to unilaterally disarm, and the pressure to raise more and more money outside the system became increasingly intense, as the political party committee receipts clearly demonstrate. In the face of what can only be described as FEC lassitude to these problems, the political branches, after years of deliberation and consensus, passed Title I to tackle the threat posed by nonfederal funds. Having set forth these preliminary observations to provide context for my opinion, I now turn to Plaintiffs' various constitutional challenges to Title I and explain why I have concluded that these arguments lack merit. In engaging in the following analysis, I shall discuss the extensive record established in this case, which demonstrates that Title I is a prophylactic measure aimed both at the corruption or the appearance of corruption associated with nonfederal funds and at the evasion of FECA's source and amount limitations.

### B. *Plaintiffs' First Amendment Challenges* [149]

#### 1. *Standard of Review*

Unlike the electioneering communication provisions in Title II, the litigants contest the level of scrutiny that should control the Court's review of Title I for First Amendment purposes. Plaintiffs contend that the restrictions in Title I merit review under the lens of strict scrutiny, *see, e.g.,* McConnell Br. at 31–34; RNC Br. at 37–44, while Defendants argue that the provisions in Title I should be analyzed under the "closely drawn" scrutiny that the *Buckley* Court applied to contribution restrictions, *see, e.g.,* Def. Opp'n at 3–4; Def.-Int. Opp'n at 17–23. In my judgment, Title I is a fundraising restriction that merits review entirely under *Buckley*'s "closely drawn" scrutiny applicable for contribution limitations.

Plaintiffs are mistaken when they argue that the restrictions in Title I partly impose an expenditure cap and, therefore, Title I requires strict scrutiny. McConnell Br. at 33; RNC Br. 51–53. Title I does not in any way limit political party committee spending on *any* activity. These restrictions only indirectly affect expenditures by placing limitations on the source and amount of funds available for the party committees to use in order to make independent expenditures. Accordingly, the scrutiny applicable to contribution restrictions is appropriate for Title I.

Plaintiffs also urge this three-judge panel to apply strict scrutiny because Title I includes restrictions on the solicitation of nonfederal funds. I disagree with this theory as well. From a functional perspective, Title I presents a comprehensive contribution restriction that merits the scrutiny that *Buckley* applied to contribution restrictions. The Supreme Court in *Colorado II,* found that FECA presents "a functional, not formal, definition of 'contribution,'" because it included within the definition of contribution "coordinated expenditures." *Colorado II,* 533 U.S. at 438, 121 S.Ct. 2351. According to the Supreme Court in *Colorado II,* the *Buckley* Court acknowledged Congress's functional classification, and "observed that treating coor-

---

**149.** I consider Plaintiffs' First Amendment underbreadth challenge as part of my analysis of their Equal Protection challenge, discussed *infra.*

dinated expenditures as contributions 'prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions.' " *Colorado II*, 533 U.S. at 443, 121 S.Ct. 2351 (quoting *Buckley*, 424 U.S. at 47, 96 S.Ct. 612) (also noting that *Buckley* "enhanced the significance of this functional treatment by striking down independent expenditure limits on First Amendment grounds while upholding limitations on contributions (by individuals and nonparty groups), as defined to include coordinated expenditures").

A functional view of BCRA's solicitation restrictions demonstrates that they are designed to counter potential evasion of contribution restrictions. As is discussed *infra*, the record in this case is replete with incidents where the solicitation of nonfederal donations by party officials and candidates threatens the integrity of FECA's contribution restrictions. Hence, like the expenditure limitations discussed in *Colorado II*, which are aimed at preventing attempts to circumvent FECA's contribution regime, BCRA's solicitation provisions are also designed to ensure the integrity of FECA's contribution limitations and not limit speech. Title I in its entirety, therefore, is properly considered within *Buckley*'s contribution framework and is reviewed under the scrutiny set out in *Buckley* applicable to contribution restrictions. *See also NRWC*, 459 U.S. at 210–11, 103 S.Ct. 552 (upholding restriction limiting a corporation's solicitation of contributions to corporation's PAC to members of the corporation on the basis of compelling governmental interests supporting the overall ban on corporate contributions to candidates).

Accordingly, I agree entirely with Judge Leon's discussion in his opinion that the three-judge District Court's analysis of the provisions in Title I merits review under the "closely" drawn scrutiny that the *Buckley* Court applied to contribution limitations and not strict scrutiny, and I concur in that portion of his opinion. We both agree that the restrictions will be upheld in Title I, if the Government demonstrates that the provisions in Title I are "closely drawn" to match a "sufficiently important interest." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612; *see also Nixon v. Shrink Missouri*, 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886.[150] With that standard in mind, I now turn to the sections of Title I and my analysis of whether these contribution restrictions are constitutional.[151]

2. *Title I is Constitutional Under the First Amendment*

In my judgment, this three-judge District Court need not go further than *Buckley* to uphold Title I from attack under the First Amendment. It is clear that *Buckley* provides sufficient flexibility for Con-

---

**150.** Like Judge Leon, I observe that if the contribution limitations in Title I survive a claim that it infringes associational rights, then it also survives a speech challenge under the First Amendment. *Shrink Missouri*, 528 U.S. at 388, 120 S.Ct. 897; *see also id.* at n. 3, 120 S.Ct. 897 (observing that contribution standard of review likewise addresses the "correlative overbreadth challenge").

**151.** I also do not conclude that *Buckley*'s contribution-expenditure dichotomy is irrelevant to our review. McConnell Br. at 33 (stating that the "contributions-versus-expen-

ditures dichotomy of *Buckley* does not directly apply"). Plaintiffs assert that the reason for not applying *Buckley* is because Title I "effectively regulates the *uses* for which money is raised and spent." McConnell Br. at 33 (emphasis in original). The problem with this argument is that *all* contribution limitations "effectively regulate" the uses for which money is raised and spent. *See* Tr. at 92 ("All contribution limits have [an] indirect effect on expenditures.") (Bader). Accordingly, this argument fails to convince me that the contribution-expenditure distinction is inapplicable to the restrictions at issue in Title I.

gress to have enacted Title I in order to address the problems associated with political parties using nonfederal funds to influence federal elections. *See Shrink Missouri*, 528 U.S. at 404, 120 S.Ct. 897 (Breyer, J., concurring) ("*Buckley*'s holding seems to leave the political branches broad authority to enact laws regulating contributions that take the form of 'soft money.'"). The primary justifications for Title I are neither original nor unprecedented.

### (a) Title I Serves The Same Sufficiently Important Interests Identified in Buckley and its Progeny

Title I was enacted to fulfill the same interests in "preventing corruption or the appearance of corruption" that the *Buckley* Court had found to support FECA's limitations on contributions.[152] The *Buckley* Court held that FECA's contribution limitations served the sufficiently important interests of "the prevention of corruption and the appearance of corruption spawned by the real or imagined *coercive influence* of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612 (emphasis added). Moreover, under the rubric of "preventing corruption or the appearance of corruption," the Supreme Court has also permitted Congress to enact contribution limitations that serve to "prevent evasion" of the individual financial contribution limitations already found constitutional by the Supreme Court. *Id.* at 38, 96 S.Ct. 612; *see also Colorado II*, 533 U.S. at 456, 121 S.Ct. 2351 (observing that "all members of the [Supreme] Court agree that circumvention is a valid theory of corruption.").

Since *Buckley*, the Supreme Court has consistently reaffirmed the notion of Con-

gress's ability to create reasonable contribution restrictions to stem the tide of corruption and the appearance of corruption that exists in a regime of private candidate financing. *See Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley ("Citizens Against Rent Control")*, 454 U.S. 290, 296–97, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) ("*Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate* .... "); *California Med. Ass'n. v. FEC, ("California Med. Ass'n.")* 453 U.S. 182, 194–195, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (noting that *Buckley* held that contribution limits "served the important governmental interests in preventing the corruption or appearance of corruption of the political process that might result if such contributions were not restrained"); *see also Bellotti*, 435 U.S. at 788 n. 26, 98 S.Ct. 1407 ("The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted.") (internal citation omitted). Hence, the interests behind the restrictions on political party nonfederal funds have long had support in the Supreme Court's campaign finance jurisprudence.

In this case, Congress concluded that donations of nonfederal money to the political party committees had the same "coercive influence" on "candidates' positions and on their actions if elected to office" as the large contributions to candidates permitted prior to the enactment of the indi-

---

**152.** *See NCPAC,* 470 U.S. 480, 496–97, 105 S.Ct. 1459 (1985) (observing that *Buckley* and *Citizens Against Rent Control* held that these

rationales "are the only legitimate and compelling government interests thus far identified for restricting campaign finances").

vidual contribution limitations in 1974. *Buckley,* 424 U.S. at 25, 96 S.Ct. 612. Congress also concluded that the individual contribution limitations were being circumvented by political party committees at all levels who raised nonfederal funds and then spent those funds for federal election purposes.

In advancing these long upheld rationales to support the provisions in Title I of BCRA, I find that the evidence presented by Defendants to support these justifications is more than sufficient. As the Supreme Court observed in *Shrink Missouri*: "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Missouri,* 528 U.S. at 391, 120 S.Ct. 897. Given the Supreme Court's discussion of contribution restrictions beginning with *Buckley,* I find that Defendants do not break from well-established precedent in offering support for Title I because *Buckley* has already established that Congress may legislate: (a) to prevent corruption or the appearance of corruption inherent in the process of raising large monetary contributions; and (b) to prevent circumvention of the valid contribution limitations. As I demonstrate *infra,* the record before this three-judge District Court is *overwhelming* and amply supports both of the asserted rationales. With the foregoing in mind, I shall now briefly describe these interests and the evidence supporting them.

(i) The *Buckley* Court's Explanation of "Prevention of Corruption"

Given that there is such disagreement in the briefing as to what the Supreme Court meant by "prevention of corruption," it is important to take stock of how the *Buckley* Court used that phrase and the evidence it relied on to find that Congress was justified in enacting FECA's contribution restrictions. As the Supreme Court in *Buckley* held:

> It is unnecessary to look beyond the Act's primary purpose to limit the actuality and appearance of corruption resulting from large individual financial contributions in order to find a constitutionally sufficient justification for the $1,000 contribution limitation. *Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign.* The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy. To the extent that large contributions are given *to secure a political quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. *Although the scope of such pernicious practices can never be reliably ascertained,* the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.

*Buckley,* 424 U.S. at 26–27, 96 S.Ct. 612 (footnote omitted) (emphasis added). As this passage illustrates, the *Buckley* Court understood "corruption" as something intrinsic to the fundraising process of large contributions in a "system of private financing of elections." *Id.* at 26, 96 S.Ct. 612. The Supreme Court's rationale was grounded in the realistic and pragmatic understanding that "large contributions are given to secure a political *quid pro quo;*" *Id.* at 26, 96 S.Ct. 612; *see also id.* at 27, 96 S.Ct. 612 (referring to "political *quid pro quo*" as the *"danger* of actual *quid pro quo* arrangements") (emphasis added). Indeed, in introducing the pri-

mary interest behind the individual contribution limitations, the Supreme Court stated that the primary interest in FECA's contribution limitations "is the prevention of corruption and the appearance of corruption spawned by the real or imagined *coercive influence* of large financial contributions on candidates' positions and on their actions if elected to office." *Id.* at 25, 96 S.Ct. 612 (emphasis added). Simply put, *Buckley* equates corruption with the fundraising process where access to elected officials and candidates is provided in exchange for large contributions.[153]

This point is underscored by the evidence relied on in the *Buckley* opinion to support the Supreme Court's discussion of the government's interest in preventing corruption. *See id.* at 27 n. 28, 96 S.Ct. 612 (citing evidence from the Court of Appeals opinion in *Buckley* that relates to access provided to donors who contribute large sums of money). That the *Buckley* Court referred to the record from the Court of Appeals opinion deserves repeating here because it demonstrates that in upholding the individual contribution limitations in FECA, the "corruption" that concerned the *Buckley* Court was the *access* to federal candidates that large contributors receive. As the Court of Appeals found:

> Looming large in the perception of the public and Congressmen was the revelation concerning the extensive contributions by dairy organizations to Nixon fund raisers, *in order to gain a meeting* with White House officials on price supports. The industry pledged $2,000,000 to the 1972 campaign, a pledge known to various White House officials, with President Nixon informed directly by

Charles Colson in September 1970, as acknowledged by the 1974 White House paper.

Since the milk producers, on legal advice, worked on a $2500 limit per committee, they evolved a procedure, after consultation in November 1970 with Nixon fund raisers, to break down the $2 million into numerous smaller contributions to hundreds of committees in various states which could then hold the money for the President's reelection campaign, so as to permit the producers to meet independent reporting requirements without disclosure. On March 23, 1971, after a meeting with dairy organization representatives, President Nixon decided to overrule the decision of the Secretary of Agriculture and to increase price supports. In the meetings and calls that immediately followed the internal White House discussion and preceded the public announcement two days later, culminating in a meeting held by Herbert Kalmbach at the direction of John Ehrlichman, the dairymen were informed of the likelihood of an imminent increase and of the desire that they reaffirm their $2 million pledge.

> *It is not material, for present purposes, to review the extended discussion in the Final Report on the controverted issue of whether the President's decision was in fact, or was represented to be, conditioned upon or "linked" to the reaffirmation of the pledge.*

*Buckley,* 519 F.2d at 839 n. 36 (emphasis added) (internal citations omitted) (cited in *Buckley,* 424 U.S. at 27 n. 28, 96 S.Ct. 612). The Circuit Court in *Buckley,* as affirmed by the Supreme Court, found that it was unnecessary to review the disputed issue

---

**153.** Given *Buckley*'s teaching on constitutional analysis of contribution restrictions, I cannot agree with Judge Leon's theory that a reviewing court should focus its analysis on whether the *use* for which a contribution is put is corrupting. *See generally* Leon Op. *Buckley* and its progeny all instruct that the fundraising process is the focal point of the contribution restriction analysis, as my discussion in this section illustrates.

of whether President Nixon's decision on price supports was actually changed by the $2,000,000 contribution. Instead, the Supreme Court found it sufficient that the dairy farmers were given access to the President and his officials in exchange for a sizable contribution. The corruption, thus, was associated with the fact that the donation was given "in order to gain a meeting with White House officials on price supports." *Id.*

This conclusion is further borne out by other evidence discussed in the Court of Appeals opinion and cited by the Supreme Court:

> The findings document lavish· contributions by groups or individuals with special interests to legislators from both parties, e.g., by the American Dental Association to incumbent Congressmen in California; by H. Ross Perot, whose company supplies data processing for medicare and medicaid programs, to members of the House Ways and Means and Senate Finance Committees, and the House Appropriations Subcommittee for HEW.
>
> The disclosures of illegal corporate contributions in 1972 included the testimony of executives that they were motivated by the perception that this was necessary as a *"calling card, something that would get us in the door and make our point of view heard,"* or *"in response to pressure for fear of a competitive disadvantage that might result."*

The record before Congress was replete with specific examples of improper attempts to *obtain governmental favor* in return for large campaign contributions. *Buckley,* 519 F.2d at 839 n. 37 (emphasis added) (internal citations omitted) (cited in *Buckley,* 424 U.S. at 27, 96 S.Ct. 612); *see also id.* n. 38 (discussing evidence relating to large contributions given in exchange for ambassadorships).[154] The *Buckley* Court, therefore, realized the problems that inhere in a "system of private financing of elections," where contributors who donate large sums of money are given access to officeholders. *Buckley,* 424 U.S. at 26, 96 S.Ct. 612. In making this point, the Supreme Court eschewed relying on evidence that the contribution was connected to the decision-making of the federal official, *Buckley,* 424 U.S. at 27 n. 28, 96 S.Ct. 612 (citing *Buckley,* 519 F.2d at 839 n. 36) (finding such a question "not material"); rather, the provision of a meeting in exchange for the contribution satisfied the *Buckley* Court. The *Buckley* Court therefore equated corruption with the fundraising process and, in particular, the special access given to large contributors. *See Buckley,* 424 U.S. at 30, 96 S.Ct. 612 ("Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that *the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.*") (emphasis added).

**154.** The evidence in the Court of Appeals opinion relating to giving ambassadorships in exchange for large donations discusses the conviction of one fundraiser under 18 U.S.C. § 600 for having promised a current Ambassador a more prestigious post in return for a $100,000 contribution to be split between Senate candidates designated by the White House and the 1972 campaign. *Buckley,* 519 F.2d at 840 n. 38. Notably, the conviction did not involve a federal candidate or officeholder and therefore does not stand for the premise that, in citing this evidence, the Supreme Court requires evidence of bribery to support a contribution restriction. The point was only made to demonstrate that "while the appointment of large contributors [to ambassadorships] is not novel," *id.,* the activity surrounding ambassadorships and the 1972 election "made the 1972 election a watershed for public confidence in the electoral system," *id.* at 840; *see also id.* at 839 n. 36 (declining to rely on evidence that a large contribution was connected to the decision-making of the federal official).

Given the *Buckley* Court's understanding of corruption, it is not surprising that it explicitly did not require evidence of bribery of federal officeholders and candidates to support the contribution limitations in FECA. *Id.* at 27, 96 S.Ct. 612 ("Although the scope of such pernicious practices *can never be reliably ascertained,* the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.") (emphasis added). In linking "corruption" with the fundraising process of large contributions in a donor-financed system of elections and not on specific evidence of bribery, the Supreme Court merely recognized the obvious: large contributions provide a "calling card" and can help "obtain" government favors. *Buckley,* 519 F.2d at 839 n. 37 (cited by *Buckley,* 424 U.S. at 27 n. 28, 96 S.Ct. 612). Contribution limitations served to "prevent corruption" by removing the *"coercive influence"* that large contributions have when "given to secure a *political quid pro quo"* from elected officials or candidates. *Buckley,* 424 U.S. at 25, 26, 96 S.Ct. 612 (emphasis added). In fact, implicit in *Buckley*'s rejection of the argument that bribery laws constituted a less restrictive alternative than FECA's contribution limitations was a recognition that the threat addressed by bribery laws "deal[s] with only the most blatant and specific attempts of those with money to influence governmental action." *Id.* at 28, 96 S.Ct. 612; *see also id.* at 30, 96 S.Ct. 612 ("Not only is it difficult to isolate suspect contributions, but, more importantly, Congress was justified in concluding that the inter-

est in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.").

Hence, it was very clear that in discussing corruption the *Buckley* Court concluded that bribery laws were not simply enough and that contribution restrictions were targeted at reducing the "coercive influence" of large monetary contributions on the political process. *Id.* at 25, 96 S.Ct. 612; *see also NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459 ("Corruption is a subversion of the *political process.* Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo: dollars for political favors.")* (emphasis added). In sum, as the *Shrink Missouri* Court effectively articulated:

> In speaking of "improper influence" and "opportunities for abuse" in addition to *"quid pro quo* arrangements," we recognized a concern not confined to bribery of public officials, *but extending to the broader threat from politicians too compliant with the wishes of large contributors.* These were the obvious points behind our recognition that the Congress could constitutionally address the power of money "to influence governmental action" in ways less "blatant and specific" than bribery.

*Shrink Missouri,* 528 U.S. at 389, 120 S.Ct. 897 (quoting *Buckley,* 424 U.S. at 28, 96 S.Ct. 612) (emphasis added). This statement, in a nutshell, is what *Buckley* meant by "corruption." [155]

**155.** I therefore cannot agree with Judge Henderson, who states that the Supreme Court "has not settled on a precise definition of 'corruption.'" Henderson Op. at Part IV.A n.148. To reach this proposition, Judge Henderson contrasts this quotation from the *Shrink Missouri* majority opinion with Justice

Thomas' dissent in that case and the Supreme Court's statement in *NCPAC* that "[t]he hallmark of corruption is the financial *quid pro quo:* dollars for political favors." *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459. Judge Henderson's footnote does not cite *Buckley* or

(ii) The *Buckley* Court's Explanation of Prevention of the "Appearance of Corruption"

Additionally, the *Buckley* Court observed that it was not only preferential access given to large contributors through the fundraising process that was corrupting. The Supreme Court also recognized that the public perception associated with a regime of large individual contributions undermined faith in the government in the public at large. This concern was another aspect of the corruption thesis that the *Buckley* Court found supported upholding the individual limitations on contributions. As the *Buckley* Court states:

Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the *appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions*.... Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent."

*Buckley*, 424 U.S. at 27, 96 S.Ct. 612 (quoting *Civil Service Comm'n v. Letter Carri-* ers, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)) (emphasis added). Picking up on this discussion from *Buckley*, in *Shrink Missouri*, the Supreme Court observed:

While neither law nor morals equate all political contributions, without more, with bribes, we spoke in *Buckley* of the perception of corruption "inherent in a regime of large individual financial contributions" to candidates for public office, [*Buckley*, 424 U.S. at 27, 96 S.Ct. 612], as a source of concern "almost equal" to *quid pro quo* improbity, *ibid.* The public interest in countering that perception was, indeed, the entire answer to the overbreadth claim raised in the *Buckley* case. *Id.* at 30, 96 S.Ct. 612. This made perfect sense. Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works "only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United*

---

even discuss its text in reaching this conclusion. As I have endeavored to explain at length in this section of my opinion, *Buckley* has clearly provided guidance as to what the Supreme Court meant by "corruption." *See also Colorado II*, 533 U.S. at 441, 121 S.Ct. 2351 (defining "corruption [as] being understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence").

Also on this point, I observe that although Judge Leon recognizes that corruption involves "something more than a quid pro quo arrangement ... as well as improper influence or conduct by a donor that results in a legislator who is too compliant with the donor", Leon Op. at Part I.A.3 (internal quotation marks and citations omitted), Judge Leon-while stating the definition of corrup- tion correctly-refers to corruption in his opinion as something resembling the characteristics of bribery, *id.* ("whether the corruption is actual or perceived, every traditional and accepted definition to date depends on the donor conferring, or being perceived as having conferred a benefit on the candidate in return for something") (citing and quoting to *Black's Law Dictionary*'s definition of "*quid pro quo*"). Thus, while Judge Leon and I apparently agree on the definition of corruption as defined by the Supreme Court, I cannot agree with the way Judge Leon employs his definition of corruption throughout his opinion as something akin to bribery. *See id.* at Part I.B.2 ("there is no evidence in the record of actual quid pro quo corruption") (citing evidence that there is no evidence of vote buying in the record).

*States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 562, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

*Shrink Missouri,* 528 U.S. at 390, 120 S.Ct. 897. More recently, in *Colorado II,* the Supreme Court observed that "corruption [was] understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence." *Colorado II,* 533 U.S. at 441, 121 S.Ct. 2351.

Within the *Buckley* framework, it does not take too much imagination to realize the appearance of corruption associated with nonfederal donations to political party committees, particularly given that *"Buckley* demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Shrink Missouri,* 528 U.S. at 391, 120 S.Ct. 897. In *Buckley* the evidence demonstrated that "corporations, well-financed interest groups, and rich individuals had made large contributions ... [which was] more than sufficient to show why voters would tend to identify a big donation with a corrupt purpose." *Id.* at 391, 120 S.Ct. 897; *see also Buckley,* 519 F.2d at 838–40 (discussing "the trend revealed by the polls" that demonstrated that in 1974, 69.9 percent of individuals found that "the government is pretty much run by a few big interests looking out for themselves"). The *Buckley* Court, therefore, understood the "appearance of corruption" as the public perception that "large donors call the tune" that *inherently* exists in a donor financed election system that permits large contributions.

#### (iii) Circumvention as a Valid Theory of Corruption

Aside from the corruption associated with the preferential access to officeholders that large contributors receive through the fundraising process, and the public perception of corruption inherent in a re-gime of large individual, financial contributions, the Supreme Court recognized in *Buckley* that a circumvention of individual contribution limitations also serves as a basis for justifying contribution restrictions. Prior to BCRA's enactment, a donor was limited to give $1,000 to a candidate and his or her authorized committee for any election for Federal office. 2 U.S.C. § 441a. The same donor was limited to an aggregate of $20,000 to the political committees established and maintained by a national political party in any calendar year. In *Buckley,* the Supreme Court upheld FECA's $25,000 limitation on *total* contributions that an individual could make during any calendar year. In finding this provision constitutional, the Court held that "this quite modest restraint upon protected political activity serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of ... *huge contributions to the candidate's political party." Buckley,* 424 U.S. at 38, 96 S.Ct. 612 (emphasis added).

In upholding the $25,000 total contribution limitation, under this "anti-circumvention" theory, the Supreme Court did not engage in *any* separate constitutional balancing. In other words, the Supreme Court never discussed whether the $25,000 limitation was "closely drawn" to match a "sufficiently important interest." Instead, in one paragraph, the Supreme Court upheld the restriction on the premise that it was "no more than a corollary of the basic individual contribution limitation" that the Supreme Court had already determined to be constitutional. *Id.* at 38, 96 S.Ct. 612. Since *Buckley,* the "anti-circumvention" rationale has been upheld by the Supreme Court and is a well-accepted theory for justifying congressional action in the area of campaign finance. *Colorado II,* 533 U.S. at 456, 121 S.Ct. 2351 (noting that "all

members of the [Supreme] Court agree that circumvention is a valid theory of corruption"); *California Med. Ass'n.*, 453 U.S. at 197–199, 101 S.Ct. 2712 (plurality opinion) (upholding limitations on contributions to nonparty multicandidate political committees under an anti-circumvention rationale). If the provision in FECA limiting the total amount of contributions a donor could make was found constitutional by the *Buckley* Court on the basis that it was designed to keep the individual donor restrictions intact, it follows that the provisions in Title I-which are similarly designed to prevent evasion of the individual contribution limits in FECA-are constitutional.

In *Colorado II*, the Supreme Court powerfully reaffirmed its commitment to the anti-circumvention theory. *Colorado II*, 533 U.S. at 456–65, 121 S.Ct. 2351. In *Colorado II*, the Supreme Court upheld FECA's limitations on coordinated expenditures by state political parties-a question that it had remanded during the *Colorado I* litigation. *Id.* The Court observed in *Colorado II* that "[s]ince there is no recent experience with unlimited coordinated spending, the question is whether experience under the present law confirms a serious *threat* of abuse from the unlimited coordinated party spending." *Id.* at 457, 121 S.Ct. 2351 (emphasis added). Put differently, because unlimited coordinated expenditures had been prohibited since FECA, there was no evidence of whether or not such a system was actually corrupting. The Supreme Court concluded, however, that even though there was no evidence that unlimited coordinated expenditures were corrupting, Congress was empowered to exercise its predictive judgment. In the

words of Defendant–Intervenors, Congress could preemptively act "to close loopholes and to prevent evasion of the contribution restrictions and limits established in FECA, and upheld in *Buckley* even in the absence of past abuses." Def.-Int. Br. at 53. With no evidence of present evasion, the Supreme Court in *Colorado II* found that "[d]espite years of enforcement of the challenged limits, substantial evidence demonstrates how candidates, donors, and parties *test* the limits of the current law, and it shows beyond serious doubt how contribution limits *would be* eroded if inducement to circumvent them were enhanced by declaring parties' coordinated spending wide open." *Colorado II*, 533 U.S. at 457, 121 S.Ct. 2351 (emphasis added).[156]

The anti-circumvention rationale articulated by the *Colorado II* Court clearly supports the idea that Congress is entitled to exercise latitude in forming predictive judgments about possible evasion and circumvention of the law and is able to act accordingly to prevent such abuse. Circumvention of a current statutory regime or congressional prediction that "evasion" will occur if a prophylactic rule is not adopted is consonant with the *Buckley* Court's understanding of corruption. The *Buckley* Court was concerned with the "real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612. Certainly, if an individual or organization is able to evade the law and engage in the kind of large financial giving that FECA was designed to prevent, then the system would be nullified and the "real or imagined coercive influence of large financial contributions" on candidates and of-

---

**156.** Plaintiffs contend that in *Colorado II,* "the Court did not *really apply* an 'anticircumvention' rationale at all (despite some language in the Court's opinion to the con-

trary)." McConnell Opp'n at 23–24 (emphasis added). Plaintiffs' contention is erroneous given my reading of *Colorado II.*

ficeholders would still exist. *Id.* In other words, the corruption would still be present. However, in such a situation, the appearance of corruption would only be worse. Where evasion is present in a carefully regulated regime, faith in the law is undermined when it is widely known that others are skirting the rules—even when what those individuals and organizations may be doing is considered legal. In *Colorado II,* for example, the Supreme Court determined that if unlimited coordinated expenditures were made legal, circumvention of the existing contribution limits *would* occur. *Colorado II,* 533 U.S. at 460, 121 S.Ct. 2351 ("If suddenly every dollar of spending *could be* coordinated with the candidate, the inducement to circumvent would almost certainly intensify."). Circumvention as a theory of corruption, therefore, has a very strong lineage in Supreme Court campaign finance jurisprudence and is simply a logical outgrowth of *Buckley*'s teaching about corruption.

\* \* \* \* \* \*

In sum, the *Buckley* decision represents an understanding that bribery laws are not enough to capture the more subtle and pervasive influences that large financial contributions can have on a donor-financed election system. The Supreme Court has long understood that the fundraising process, itself, is the source of corruption when large donations are given in exchange for access to influence federal officeholders and candidates. In enacting Title I of BCRA, Congress focused on this same problem that had developed with regard to fundraising of nonfederal funds.

(iv) Restrictions on Political Party Committee Fundraising are Necessary to Effectuate These Sufficiently Important Interests

As one scholar observes, "the rise of soft money, the enormous disparity between FECA's limits on individual and PAC do-

nations to candidates and the much larger sums given in soft money, and the role of federal officeholders in soliciting soft money contributions to the parties suggest that donor-to-party-to-candidate conduit corruption is a real possibility." Richard Briffault, *The Political Parties and Campaign Finance Reform,* 100 Colum.L.Rev. 620, 649 (2000) [hereinafter Briffault]. The record in this case demonstrates that the "donor-to-party-to-candidate conduit corruption" is no longer just a "real possibility," but a reality. *Id.*

In *Colorado II,* the Supreme Court recognized that the donor-to-party-to-candidate conduit raised a legitimate concern regarding corruption. The *Colorado II* Court found that "[w]hat a realist would expect to occur has occurred. Donors give to the party with the tacit understanding that the favored candidate will benefit." *Colorado II,* 533 U.S. at 458, 121 S.Ct. 2351. For this proposition, the Supreme Court cited a number of declarations, which Defendants have again included in this litigation. The Supreme Court observed that without a restriction limiting the political parties' coordinated expenditures, the contribution limitations would be rendered ineffective. *Id.* at 460, 121 S.Ct. 2351 ("If suddenly every dollar of spending could be coordinated with the candidate the inducement to circumvent would almost certainly intensify.").

The evidence to support this finding bears repeating briefly here, because as the Supreme Court in *Colorado II* found donations made to the political party, as opposed to directly given to the candidate, can pose the same coercive influence that the restrictions in FECA were targeted to address. In *Colorado II,* the Supreme Court observed that "the record shows that even under present law substantial donations turn the parties into matchmakers whose special meetings and receptions

give the donors the chance to get their points across to the candidates." *Colorado II*, 533 U.S. at 461, 121 S.Ct. 2351. As proof of this proposition, the Supreme Court noted in a footnote that "the DSCC has established exclusive clubs for the most generous donors, who are invited to special meetings and social events with Senators and candidates." *Id.* at 461 n. 25, 121 S.Ct. 2351. This evidence recognizes that large donations to *political party committees* enables contributors to gain access to elected federal officeholders and candidates.[157]

This view of political parties by the Supreme Court is confirmed by their statement in *Colorado II* that "whether they like it or not, [political parties] act as agents for spending on behalf of those who seek to produce obligated officeholders." *Id.* at 452, 121 S.Ct. 2351. One of the pieces of evidence that the Supreme Court relied on to support this view was the testimony of former Senator Paul Simon. *Id.* at 451 n. 12, 121 S.Ct. 2351. Senator Simon stated, "I believe people contribute to party committees on both sides of the aisle for the same reason that Federal Express does, because they want favors. There is an expectation that giving to party committees helps you legislatively." *Id.* (recounting a debate over a bill favored by Federal Express during which a colleague exclaimed, " 'we've got to pay attention to who is buttering our bread").

In *Colorado II*, the Supreme Court also found persuasive the declaration of Robert Hickmott, former Democratic fundraiser and National Finance Director for Timothy Wirth's Senate campaign, who testified that " '[w]e ... told contributors who had made the maximum allowable contribution

to the Wirth campaign but who wanted to do more that they could raise money for the DSCC so that we could get our maximum [Party Expenditure Provision] allocation from the DSCC.' " *Id.* at 458, 121 S.Ct. 2351 (quoting declaration of Robert Hickmott) (second set of brackets in original). The Supreme Court also recounted the testimony of Senator Timothy Wirth that he " 'understood that when [he] raised funds for the DSCC, the donors expected that [he] would receive the amount of their donations multiplied by a certain number that the DSCC had determined in advance, assuming the DSCC has raised other funds.' " *Id.* (quoting declaration of Timothy Wirth). Likewise, Leon G. Billings, former Executive Director of the Democratic Senatorial Campaign Committee (DSCC), testified that " '[p]eople often contribute to party committees because they have given the maximum amount to a candidate, and want to help the candidate indirectly by contributing to the party.' " *Id.* (quoting declaration of Leon G. Billings). In addition, the Supreme Court found merit in a fundraising letter from Congressman Wayne Allard, dated August 27, 1996, explaining to a contributor that " 'you are at the limit of what you can directly contribute to my campaign,' " but " 'you can further help my campaign by assisting the Colorado Republican Party.' " *Id.* (quoting fundraising letter from Congressman Wayne Allard, dated Aug. 27, 1996). In *Colorado II*, the Supreme Court also observed that an "informal bookkeeping" system developed, which in the Democratic Party was known as the "tallying system," that would link donations to the party committees with the candidates that had raised the money. *Id.* at 459, 121 S.Ct. 2351. As explained by Mr. Hickmott

---

**157.** Of course, it bears pointing out that the Supreme Court's discussion of these donations was in the context of contributions that were within the $20,000 limit on donations to national party committees. The record *in*

*this case* conclusively establishes that the nonfederal funds pouring into the national party coffers is from prohibited sources and significantly larger than the federal fund donations at issue in *Colorado II*.

and Senator Paul Simon, the accounting system essentially was an agreement between the DSCC and the candidates' campaign such that candidates were credited with generating donations for the DSCC. The DSCC, in turn, would support the candidate based on the amount of donations the candidate had collected for the DSCC. *Id.; see also id.* at 458 n. 22, 121 S.Ct. 2351 (noting that "tallying is a sign that contribution limits are being diluted and could be diluted further if the floodgates were open").

Accordingly, the Supreme Court has already accepted the proposition that "[p]arties are thus necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors." *Colorado II,* 533 U.S. at 451–52, 121 S.Ct. 2351. Senator Simon's testimony, along with the rest of the *Colorado II* evidence cited by the Supreme Court, has been included in this litigation. Plaintiffs have not made any effort to bring into question any of this evidence, and I accept it and the conclusions reached in *Colorado II* with regard to the evidence.

(v) Evidence from the Record Supporting the Asserted Government Interests

Before turning to the evidence from this record related to the asserted interests discussed above, it is important to make one, brief observation. In the instant case, Plaintiffs contend that the record before this Court, as relied on by Defendants, is nothing short of "an onslaught of anecdotal material about the role of [nonfederal funds] in the political process." McConnell Opp'n at 3. I disagree with Plaintiffs' characterization and find that the evidence in this case is no different from evidence produced in virtually every other campaign finance case that the Supreme Court has heard. Plaintiffs' criticism of the evidence from this record as merely "anecdotal" would have applied with equal force to the evidence the Supreme Court found persuasive in *Buckley* and *Colorado II.* For example, as discussed above, in *Colorado II,* the Supreme Court credited evidence from the FEC's public records, and the testimony of politicians, political consultants, party officials, scholars, and experts. To some degree, Plaintiffs' criticism of the record evidence as "anecdotal" only underscores the difficulty that Plaintiffs have in rebutting the testimony in this record that the fundraising process related to large donations of nonfederal funds to the party committees, particularly at the national level, presents the same problems with corruption and the appearance of corruption that was identified by the Supreme Court in *Buckley.*

(1) Evidence From the Record in this Case Relating to "Corruption" and the "Appearance of Corruption" as Defined in *Buckley*

*Federal Officials Control the National Party Committees and are Intimately Involved in Raising Nonfederal Funds for the National Party Committees*

The record in this case makes it clear that federal officeholders and candidates control the national political party committees and are so deeply involved in raising non-federal funds for the national party committees that there is no meaningful separation between the national committees and the federal candidates and officeholders that control them. Findings ¶¶ 1.50, 1.58. This finding supports the congressional decision to enact a complete ban on nonfederal funds at the national political party level.

All six national political party committees are controlled and dominated by fed-

eral officeholders or candidates. In the case of the DNC or RNC, both are headed by the President or presidential candidate of each party. Findings ¶ 1.47. In the case of the national congressional committees (DCCC, NRCC, DSCC, NRSC), the top leaders of each party in the House and the Senate head the committees and exercise control over them. *Id.* This very fact has led one of Defendants' experts to conclude that "[t]here is no meaningful separation between the national party committees and the public officials who control them." *Id.* Furthermore, "[f]or at least a century [the national party committees] have been melded into their party's presidential campaign every four years, often assuming a subsidiary role to the presidential candidate's personal campaign committee. The presidential candidate has traditionally been conceded the power to shape and use the committee, at least for the campaign." *Id.* ¶ 1.48.

The record also demonstrates that the primary purpose of the political parties is to get as many of its candidates elected to public office. *Id.* ¶ 1.48.[158] This purpose drives the political parties' fundraising efforts. As Congressman Meehan notes, "political parties do not have economic interests apart from their ultimate goal of electing their candidates to office." *Id.*

The national political party committees request and encourage Members of Congress to solicit nonfederal money donations from contributors, and the personal involvement of high-ranking Members of Congress is a major component of the political parties' fundraising programs.[159] *Id.* ¶¶ 1.51, 1.53. The record is replete with testimony from current and former Members of Congress, political contributors, and lobbyists, all recounting examples or personal experiences where Members of Congress actively solicited nonfederal funds for their political parties. *Id.* 1.51. This testimony is corroborated by numerous internal documents from a Fortune 100 company requesting authorization for donations to national party committees in response to requests made by Members of Congress. *Id.* ¶ 1.74.3. An internal memorandum from this company notes that "[o]n the Democratic side, [our] advocates have already fielded soft money calls from House Democratic Leader Gephardt, House Democratic Caucus Chairman Frost, Democratic Congressional Campaign Chairman Kennedy, and Democratic Senatorial Campaign Chairman Torricelli. Similar contacts to raise soft money have been made by Republican congressional leaders." *Id.* ¶ 1.78.1. In addition, the record shows that national political party committees and candidates have formed joint fundraising committees, which share the burdens and the receipts of these joint ventures. *Id.* ¶ 1.57. These joint fundraising committees allow the national committees to collect whatever amount a particular donor gives in excess of the federal funds the candidate is permitted to accept.

---

**158.** The RNC presented testimony suggesting that electing its candidates is only one means of achieving its core political principles. Findings ¶¶ 1.49, 1.49.1. It claims it also strives to achieve its core principles by promoting an issue agenda that reflects its principles and governing in accordance with its principles. *Id.* ¶ 1.49.1. Its own internal documents show that its primary purpose "is to elect its candidates to public office." *Id.* Therefore, the testimony that electing candidates is not the RNC's primary purpose is rebutted and cannot be relied upon.

**159.** The RNC's Finance Director states that it is rare for federal officials to make initial personal or telephonic solicitations of major donors for the RNC because the RNC has a policy against such practices. Findings ¶ 1.54. Whether such practices are rare or not, and whether or not the Finance Department has such a policy, the record is clear that such solicitations, initial and subsequent, do occur. *Id.* It is also clear that the Finance Director's statement does not extend to the NRSC or the NRCC. *See id.* ¶ 1.51.

*Id.* All nonfederal funds raised by such joint committees go to the political party. *Id.*

Members have a number of reasons to oblige. First, as former Senator Dale Bumpers testifies, helping the party benefits the Member because it aids the party in "perform[ing] its function of keeping tabs on statements, politics and votes of opposition party members and groups." *Id.* ¶ 1.55. Former DNC and DSCC official Robert Hickmott observes that raising money for one's political party also helps the political party's efforts to maintain or obtain control of Congress, which serves the Member's own interests. *Id.* Second, the record demonstrates that while there may not be a formal commitment that the amount of money spent by the national party committees on their Members' behalf is connected to the amount of money they raise, there is, in former Senator David Boren's words, "at least a working understanding among the party officials and Senate candidates that the [nonfederal] money [raised by the candidate] will benefit the individual Senators' campaigns." *Id.; see also id.* ¶ 1.56.3, 1.56.4.

In regard to this latter point, as the Supreme Court already observed in *Colorado II,* an "informal bookkeeping" system was developed within the DSCC known as the "tallying system," which was designed to credit different members with collecting donations for the DSCC. *Colorado II,* 533 U.S. at 459, 121 S.Ct. 2351 (observing that based on the members efforts, the DSCC would determine its support for the candidate). The record in this litigation reflects that the DSCC continues to maintain a "credit" program, which credits nonfederal funds raised by a Senator or candidate for that person's party. Findings ¶ 1.56.3. The NRCC, NRSC and DCCC do not have such a system; however, they advise Mem-

bers of the amounts they have raised for the respective committees. *Id.* ¶ 1.56.4. Former Senator Simpson testifies that: "[w]hen donors give soft money to the parties, there is sometimes at least an implicit understanding that the money will be used to benefit a certain candidate. Likewise, Members know that if they assist the party with fundraising, be it hard or soft money, the party will later assist their campaign." *Id.* ¶ 1.56.1.

Former Senator Simpson's observation about the donors' understanding concerning the use of the party donations is supported by other evidence in the record. A letter from an RNC contributor with an enclosed contribution states that "Congressman Scott McInnis deserve [sic] most of the recruitment credit." *Id.* ¶ 1.51. Similarly, a lobbyist testifies that donors are interested in making sure that particular Members of Congress receive "credit" for their contributions:

> Although the [nonfederal] donations are technically being made to political party committees, savvy donors are likely to carefully choose which elected officials can take credit for their contributions. If a Committee Chairman or senior member of the House or Senate Leadership calls and asks for a large contribution to his or her party's national House or Senate campaign committee, and the lobbyist's client is able to do so, the key elected official who is credited with bringing in the contribution, and possibly the senior officials, are likely to remember the donation and to recognize that such big donors' interests merit careful consideration.

*Id.* ¶ 1.78. Additional testimony shows that individual donors request that their nonfederal money contributions to the national party committees be applied to particular federal campaigns. *Id.* ¶ 1.56.2.[160]

---

**160.** The record also contains the testimony of

Plaintiff Thomas McInerney, a major contrib-

Third, at least with regard to the DSCC and its "credit" program, former DSCC official Robert Hickmott testifies that Members can raise money and credit it to other candidates to obtain support from those they assisted if they plan to run for a leadership post. *Id.* ¶ 1.55. Fourth, the relationship between the candidate/Member and the party makes it difficult for the candidate/Member to avoid raising funds for the party. As Defendants' expert Donald Green puts it: "The ubiquitous role that parties play in the lives of federal officials means that no official can ignore the fundraising ambitions of his or her party." *Id.; see also id.* ¶ 1.46 (describing the unique relationship between candidates/Members and their parties).

*Federal Candidates and Officeholders in Most Instances Are Aware of the Largest Contributors of Nonfederal Funds to the National Party Committees*

The fact that federal officeholders are so intimately involved in the solicitation of nonfederal funds suggests that they are cognizant of the identities of the major national party committee donors, which in turn allows them to open their doors to these donors. *Id.* ¶ 1.71–1.72. In fact, the evidence demonstrates that it is difficult for Members of Congress not to know the identities of the large donors to their political parties. *Id.* As former Senator Bumpers testifies: "you cannot be a good Democratic or a good Republican Member and not be aware of who gave money to the party." *Id.* ¶ 1.71.2. Indeed, Members of Congress testify that they and their colleagues are cognizant of donations made to their parties.[161] *Id.* 1.71.2. For example, Congressman Shays stated on the floor of the House that "it's the candidates themselves and their surrogates who solicit soft money. The candidates know who makes these huge contributions and what these donors expect." *Id.* ¶ 1.71.2. Former Senator Simpson testifies:

> Party leaders would inform Members at caucus meetings who the big donors were. If the leaders tell you that a certain person or group has donated a large sum to the party and will be at an event Saturday night, you'll be sure to attend and get to know the person behind the donation.... Even if some members did not attend these events, they all still knew which donors gave the large donations, as the party publicizes who gives what.

*Id.* Similarly, Senator McCain observes that "[l]egislators of both parties often know who the large soft money contribu-

---

utor to the Republican Party. He states that his nonfederal donations to the RNC were intended to go to state and local election activities. Findings ¶ 1.56.2.1. This testimony does not rebut the testimony of others that such donations are often given for use in federal campaigns, *id.* ¶ 1.56.2, and his practice of giving to national political party committees to assist state and local election activity appears to be an exception to the general rule. Furthermore, nothing in BCRA prevents Mr. McInerney from donating nonfederal funds to state and local parties for use in state and local elections.

**161.** Other Members of Congress testify that they are *personally* unaware of who donates to the parties; however, these Members are almost all Defendant–Intervenors who were involved in the efforts to enact BCRA and, like Senator Feingold, have made efforts to distance themselves from nonfederal fundraising or had little interest in such information. *Id.* ¶ 1.71.1. Moreover, these Members do not claim to speak on behalf of all of their colleagues. *Id.*

Senator McConnell attests that he typically does not know the donation history of the individuals with whom he meets. The record demonstrates that he is aware of the donation history of some of the major donors to his campaign, and has sought nonfederal donations from at least one donor who had donated the maximum federal funds to his campaign. *Id.*

tors to their party are, particularly those legislators who have solicited soft money," and that "[d]onors or their lobbyists often inform a particular Senator that they have made a large donation." *Id.* Former Senator Simon candidly testifies that he would likely return a telephone call to a large contributor before making other calls. *Id.* Accordingly, either as a consequence of a donor-based election system, or as a result of federal candidates and officeholders raising large amounts of nonfederal funds for the national parties, federal candidates and officeholders know who makes large donations to the national party committees, which inevitably leads to special access for these donors to influence federal lawmakers.

*Large Nonfederal Funds Donations Provide Contributors Access to Federal Officeholders*

In addition, the record clearly establishes that large nonfederal money contributors are provided with special access to federal officeholders in a manner on par with the large individual donors discussed in *Buckley. Id.* ¶¶ 1.75–1.80.1, 1.81. This access provides these donors with opportunities to influence legislative activity, and is a major reason large donations are made to the political parties. As one Member of Congress put it: "access is it. Access is power. Access is clout. That's how this thing works. . ." *Id.* ¶ 1.75.2.

Although no empirical study has been able to demonstrate this point conclusively, App. ¶ III, testimony from those intimate-ly involved in national political fundraising, as well as documents submitted as part of the record, provide powerful evidence that large nonfederal money donations provide such donors access to influence federal lawmakers.[162] Just like the Supreme Court panel that issued *Buckley*, I find this evidence-of specific examples of access given to large contributors-probative and compelling.

Numerous prominent lobbyists testify that in order to have access to Members of Congress, clients must combine their lobbying efforts with sizeable nonfederal money donations. *Id.* ¶ 1.75.1. Failure to do so, according to lobbyist Robert Rozen, will hinder a client's ability "to be treated seriously in Washington," by which he means, "to be a player and to have access" *Id.* He explains that "relationships [with Members of Congress] are established because people give a lot of money, relationships are built and are deepened because of more and more money, and that gets you across the threshold to getting the access you want, because you have established a relationship." *Id.* ¶ 1.74.1. The other lobbyists who testify in this case concur, including Daniel Murray, who notes that nonfederal funds, "ha[ve] become the favored method of supplying political support," which "begets . . . access to law-makers" because of the lack of any limit on how much may be donated. *Id.* ¶ 1.75.1. *Cf. Buckley,* 519 F.2d at 839 n. 37 ("The disclosures of illegal corporate contributions in 1972 included the testimony

---

**162.** As an aside, I do not find it particularly surprising that an empirical study has not been able to conclusively demonstrate this point. Access to federal officials may be subtle, less open to verification, and therefore less likely to be captured by empirical review. Furthermore, the fact that the FEC does not require nonfederal contributors to disclose these contributions makes the feasibility of such a study even more remote. The inability to empirically assess this matter would be troublesome if not for the record before this three-judge panel, which is rich with testimony from individuals intimately involved in nonfederal fundraising who describe the unprecedented access given to those who contribute large sums of nonfederal funds. In my judgment, the difficulty of being able to study this phenomenon empirically is of little consequence given this evidence. *See* Findings ¶ 1.81–1.82; App. ¶ III

of executives that they were motivated by the perception that this was necessary as a 'calling card, something that would get us in the door and make our point of view heard,' Hearings before the Senate Select Comm. on Presidential Campaign Activities, 93d Cong., 1st Sess. 5442 (1973) (Ashland Oil Co. Orin Atkins, Chairman).") (citation to Findings omitted).

Plaintiffs point out that one of these lobbyists claims that he is hired because of his ability to provide access to lawmakers regardless of whether or not the client has donated money to the parties. Findings ¶ 1.75.1.2. Similarly, an RNC official states that lobbying is a better way to achieve access to lawmakers than donating to their campaigns or parties, and Plaintiffs note that many individuals and entities who donate large sums of nonfederal funds also devote substantial sums to lobbying efforts, which can dwarf their nonfederal fund donations. *Id.* While these observations have merit, it is clear from lobbyists, such as Wright Andrews, that the "amount of influence that a lobbyist has is often *directly correlated* to the amount of money that he or she and his or her clients infuse into the political system." *Id.* ¶ 1.75.1.3 (emphasis added). In fact, Andrews notes that many lobbyists have taken to hosting fundraisers themselves, which provide them with an opportunity to interact with lawmakers in a setting of their choosing and concludes that "[t]hose who are most heavily involved in giving and raising campaign finance money are frequently, and not surprisingly, the lobbyists with the most clout." *Id.* The lobbyist whom Plaintiffs tout as claiming he can achieve special access for his clients regardless of *their* contribution history, can provide that access in part because of po-

litical contributions made or arranged by his firm. *Id.* ¶ 1.75.1.2. Furthermore, lobbyists testify that traditional lobbying alone is not in and of itself sufficient to achieve a client's goals and that contributions are usually part of a lobbyist's "legislative plan." *Id.* ¶ 1.75.1.3. This point is bolstered by the numerous internal documents authored by employees of a Fortune 100 company's internal lobbying department, requesting authorization to make nonfederal donations to national party committees as part of efforts to "strengthen [its] relationship" with various federal lawmakers. *Id.* ¶ 1.74.3. In the words of one expert, "[i]t's not either or .... the fact is most of the organizations and economic interests ... lobbying, inside and outside lobbying, are also intimately involved in the political financing game and making large contributions to political parties". *Id.* ¶ 1.75.1.2.

Numerous former and current Members of Congress also testify that entities and individuals that make large contributions to the political parties do so because it provides them with special access to lawmakers which allows them to influence legislation.[163] *Id.* ¶ 1.75.2. Senator Rudman is blunt:

> Special interests who give large amounts of soft money to political parties do in fact achieve their objectives. They do get special access. Sitting Senators and House Members have limited amounts of time, but they make time available in their schedules to meet with representatives of business and unions and wealthy individuals who gave large sums to their parties. These are not idle chit-chats about the philosophy of democracy. In these meetings, these special interests,

---

**163.** Some Defendant–Intervenors in this case testify that they personally do not provide special access to large donors of nonfederal funds. Findings ¶ 1.75.2.1. These Members

of Congress do not claim to speak for their colleagues or contradict their colleagues' testimony that such access is provided to major donors. *Id.; see also id.* ¶ 1.75.2.

often accompanied by lobbyists, press elected officials—Senators who either raised money from the special interest in question or who benefit directly or indirectly from their contributions to the Senator's party—to adopt their position on a matter of interest to them. Senators are pressed by their benefactors to introduce legislation, to amend legislation, to block legislation, and to vote on legislation in a certain way. No one says: "We gave money so you should do this to help us." No one needs to say it—it is perfectly understood by all participants in every such meeting.

*Id.*

Representatives of corporate nonfederal money donors echo the lobbyists' and former Members' testimony that nonfederal donations beget access. *Id.* 1.75.3. The Chairman Emeritus of United Airlines testifies that large nonfederal donations provide donors with benefits:

> namely, access and influence in Washington. Though a soft money check might be made out to a political party, labor and business leaders know that those checks open the doors to the offices of individual and important Members of Congress and the Administration, giving donors the opportunity to argue for their corporation's or union's position on a particular statute, regulation, or other governmental action.

*Id.* The record contains internal documents which support this view. *Id.* ¶¶ 1.75.3, 1.78.1. One internal corporate memorandum states that "contributions and the related activities we have participated in have been key to our increased ability to get our views heard by the right policy makers on a timely basis; in other words, a smart investment." *Id.* 1.75.3. In addition, a poll of a random sample of 300 corporate executives employed by major U.S. corporations conducted by the Tarrance Group on behalf of the Committee for Economic Development ("CED") found that 75 percent of those surveyed said that "political donations give them an advantage in shaping legislation." *Id.* ¶¶ 1.70.1–¶ 1.70.1.1.

Wealthy individuals who donate large sums of nonfederal funds also share that they were provided with unique access after they made large contributions to the political parties. *Id.* ¶ 1.75.5. One individual testifies that after he made a $500,000 contribution to the DNC he was invited to a number of events where President Clinton was in attendance, including a small dinner with President Clinton and Vice President Gore that was billed as an opportunity to "give advice to the President." *Id.* He used the opportunity to speak in favor of campaign finance reform and to urge the President to take a leadership role in the effort. *Id.* Another donor testifies that $50,000 in political donations provided him and his wife the opportunity to attend a dinner of 10 to 12 people, including President Clinton, which lasted two to three hours and involved "primarily a conversation about issues of importance to the nation and the President's program." *Id.* One wealthy contributor who states that he does not give to the political parties in order to secure special access admits that he has been offered such opportunities. *Id.*

The record establishes in compelling fashion that large nonfederal money donors are provided access to federal officeholders and candidates in exchange for their large contributions. Political parties play a role in facilitating this access to influence.

*The National Party Committees Facilitate Access to Federal Officeholders for Their Large Nonfederal Donors*

Both political parties and their congressional committees have dangled access to Members of Congress as an inducement to

collect larger contributions from donors; these donations often take the form of nonfederal funds. *Id.* ¶¶ 1.76–1.77.10. In fact, the political parties have institutionalized this process by creating clubs for different ranges of donations; as donations escalate, so do the opportunities to attend special events with Members of Congress as well as the intimacy of these events. *Id.* For example, the NRCC's Congressional Forum was "designed to give its members [$15,000 PAC or individual contributors or $20,000 corporate contributors] an intimate setting to develop stronger working relationships with the new Republican Congressional majority." *Id.* ¶ 1.77.2. The NRSC's Group 21 required an annual donation of $100,000 and provided members small dinners with Senators and "VIP benefits." *Id.* The DCCC also had a $100,000 donor club called the "National Finance Board," which provided donors "two private dinners with Leader Gephardt, Chairwoman Lowey, House Democratic Leadership and Ranking Members[ and] two retreats with Leader Gephardt and Chairwoman Lowey ...." *Id.* ¶ 1.77.5. The state political parties have also used the enticement of special access to federal candidates to induce larger donations. *Id.* ¶ 1.77.6. The best example of this is a CDP brochure advertising the CDP's Trustees program, which required a $100,000 donation to the CDP. *Id.* The CDP "recognizes its extraordinary supporters with extraordinary opportunities," and provides "Trustees" with "[e]xclusive briefings, receptions and meetings with officials such as U.S. Senator Dianne Feinstein, U.S. Senator Barbara Boxer ... and other national figures." *Id.*

Large contributions have therefore become the price of admission to attend events where relationships can be formed with Members of Congress and legislative issues can be discussed. Individual wealthy donors testify that "[p]olicy discussion with federal officials occurs at"

these major donor events. *Id.* ¶ 1.75.5. The events "include speeches, question and answer sessions, and group policy discussions, but there is also time to talk to Members individually about substantive issues." *Id.* One witness testifies that, "when given the opportunity, some donors try to pigeonhole or corner Members ... to discuss their issues at these events." *Id.* One donor to the RNC's Team 100, a club that requires a $100,000 donation every four years with $25,000 donations in each intervening year, wrote to the RNC Chairman telling him, "I do feel I have benefitted from Team 100 in the audience it has afforded me with party leaders." *Id.; see also id.* ¶ 1.77.1 (describing the Team 100 program). Lobbyist Robert Rozen describes the access provided by other political party events:

> [S]oft money contributions built around sporting events such as the Super Bowl or the Kentucky Derby, where you might spend a week with the Member, are even more useful. At the events that contributors are entitled to attend as a result of their contributions, some contributors will subtly or not-so-subtly discuss a legislative issue that they have an interest in. Contributors also use the events to establish relationships and then take advantage of the access by later calling the Member about a legislative issue or coming back and seeing the Member in his or her office. Obviously from the Member's perspective, it is hard to turn down a request for a meeting after you just spent a weekend with a contributor whose company just gave a large contribution to your political party.

*Id.* ¶ 1.77.9. A Fortune 100 company's internal lobbying department justified its request for a $1.4 million nonfederal funds budget for FY 1999 (from its general treasury) in part by noting:

due to a significant [sic] in the number of events scheduled by the parties for their donors, the number of opportunities ... to develop relationships with elected and administration officials has never been greater. As the parties compete more vigorously for soft money dollars, the number and quality of events for interacting with both the leadership and rank and file Members has been greatly increased. Between the six main committees (DNC, DSCC, DCCC, RNC, NRCC, NRSC) there are events both in and out of [Washington, D.C.] almost every day of the week. *Id.* ¶ 1.78.1.

These events are touted by the parties as opportunities to meet and discuss issues with Members of Congress. *Id.* ¶ 1.77.8. For example, Senator McConnell, as head of the NRSC, wrote a solicitation letter which noted that the Republican Senate Council ($5,000 annual PAC contribution) and the Chairman's Foundation ($25,000 annual corporate gift) provide "excellent opportunities for both corporate executives and Washington representatives to meet and discuss current issues with leading Republican Senators." The RNC sought $250,000 donations as part of its Annual Gala, and offered such donors breakfast with the Senate Majority Leader and Speaker of the House, as well as a "[l]uncheon with Republican House and Senate Leadership and the Republican House and Senate Committee Chairmen of your choice." *Id.* Furthermore, the political parties accept donor requests as to which Member they would like seated at their table at political party dinners. *Id.* ¶ 1.77.7. The record shows that donors request to be seated with specific Members or with Members who sit on particular committees, and that these requests have been met. *Id.*

The parties also facilitate access to Members of Congress outside of their donor events. According to Ms. Beverly Shea, the RNC Finance Division's "policy" is to not "force" federal officeholders to meet with donors, but that it may pass along requests to a Member's scheduler and say "this is a Team 100 member,[164] could you see if you could fit them in." *Id.* ¶ 1.76.1. This statement appears to be accurate. Nothing in the record demonstrates that meetings have been literally forced on Members of Congress. However, there is ample evidence that RNC officials request meetings with Members of Congress on behalf of large donors, which intimate or state bluntly the donor's generosity to the political party. A few examples illustrate how the RNC Finance Division's policy operates. The Chairman of the RNC handwrote the following note to Senate Majority Leader Robert Dole:

Dear Bob

[_____], CEO of Pfizer, has asked to see you on Wed. 11/1. He is extremely loyal and generous. He also is not longwinded. He'll tend to his business and not eat up extra time. They have proposed a [Internal Revenue Code § ] 936 solution that [Republican Senator William] Roth and [Republican Congressman Bill] Archer are considering. I'm sure that is the issue. I'd appreciate it if you'd see [him]. [signed] Haley.

*Id.* ¶ 1.76. Another appeal for a meeting makes the connection between access and money even more apparent. An RNC letter sent to a staffer to Senator Hagel, asks Senator Hagel to meet with a donor for four "key" reasons including: "[h]e runs [sic] $80,000,000 high tech business," and "[h]e just contributed $100,000 to the RNC." *Id.* It also appears that RNC officials are so confident that their "requests"

---

**164.** Team 100 is an RNC donor club requiring a $100,000 donation every four years, and $25,000 donations each intervening year. Findings ¶ 158.

for meetings with large donors will be granted that they are offered to donors in advance of making such requests to the Member or the Member's staff. A letter from the RNC's Team 100 director thanks a donor for "facilitating Dow [Chemical]'s generous contribution to the Republican Party" and tells the donor: "Give me a call ... and we can figure out when is a good time to bring your Dow [Chemical] leadership into town to see [RNC Chairman] Haley [Barbour], [Senate Majority Leader Robert] Dole & [Speaker of the House] Newt [Gingrich]." *Id.*

This practice is not limited to the RNC. The former head of the DNC testifies:

Party and government officials participate in raising large contributions from interests that have matters pending before Executive agencies, the Congress, and other government agencies. Party officials, who are not themselves elected officials, offer to large money donors opportunities to meet with senior government officials. Donors use these opportunities—White House and congressional meetings—to press their views on matters pending before the government.

*Id.*

On some occasions the connection between access and donations has been made even more obvious. Call sheets in the record from the DNC and the CDP include instructions such as "Ask her to give 80k more this year for lunch with" President Clinton, and ask "if they might be able to do $25,000 for a small mtg with the President." *Id.* ¶ 1.77.10.

In sum, the record reflects that political parties facilitate access to federal candidates and officeholders in exchange for large nonfederal funds donations. It also reflects that some major donors admit that they contribute nonfederal funds, not to help with party building, but to gain access to federal candidates and officeholders.

*Donors Contribute Large Nonfederal Money Donations to the National Party Committees For the Purpose of Obtaining Access to Federal Officeholders*

It is clear that donors understand the system. The record is replete with examples of donors who give donations for the purpose of obtaining access to federal lawmakers and thereby influence government policy. *Id.* ¶¶ 1.74–1.74.5. Perhaps Roger Tamraz—made famous by his testimony during the Thompson Committee Hearings—summed it up best when he was asked if he made contributions to the DNC because he believed it might get him access and responded: "Senator, I'm going even farther. It's the only reason ...." *Id.* ¶ 1.74.3. Mr. Tamraz is not alone. One wealthy political fundraiser observes that "many soft money donations are not given for personal or philosophical reasons. They are given by donors with a lot of money who believe they need to invest in federal officeholders who can protect or advance specific interests through policy action or inaction." *Id.* He notes that some nonfederal money donors give "$250,000, $500,000, or more, year after year," and that for this kind of investment "you need to see a return," just like any other investment. *Id.* Other witnesses experienced with political donations also describe these donations as an "investment" or "the cost of doing business." *Id.* One CEO comments that achieving access is important to corporate givers and that "[f]ederal officeholders actually appear to have sold themselves and the party cheaply. They could have gotten even more money, because of the potential importance of their decisions to the affected businesses." *Id.*

These donors have also discovered that nonfederal donations are more effective at obtaining access to federal lawmakers than federal contributions. *Id.* ¶ 1.78. As for-

mer DNC and DSCC official and current lobbyist Robert Hickmott observes: "If you want to get to know Members of Congress, or new Members of Congress, it is more efficient to write a $15,000 check to the DSCC and to get the opportunity to meet them at the various events than it would be to write fifteen $1,000 checks to fifteen different Senators, or Senators and candidates." *Id.* This sentiment is echoed by various lobbyists and major party contributors, including one lobbyist who notes that "a properly channeled $100,000 corporate soft money donation to the national Republican or Democratic congressional campaign committees can get the corporate donor more benefit than several smaller hard dollar contributions by that corporation's PAC." *Id.* Lobbyist Robert Rozen describes the mentality starkly:

> Donors to the national parties understand that if a federal officeholder is raising soft money—supposedly "nonfederal" money—they are raising it for federal uses, namely to help that Member or other federal candidates in their elections. Many donors giving $100,000, $200,000, even $1 million, are doing that because it is a bigger favor than a smaller hard money contribution would be. That donation helps you get close to the person who is making decisions that affect your company or your industry. That is the reason most economic interests give soft money, certainly not because they want to help state candidates and rarely because they want the party to succeed.... The bigger soft money

contributions are more likely to get your call returned or get you into the Member's office than smaller hard money contributions.

*Id.* As such, it is abundantly clear that, in general, a large majority of major donors of nonfederal funds to the political party committees contribute this money to gain access to federal officeholders and candidates not to support a political philosophy or "party building" activities. The fact that major nonfederal funds donors give to both political parties only underscores this point.

*Contributors of Nonfederal Funds Give to Both Political Parties to Ensure Special Access*

The importance to large contributors of gaining access to federal lawmakers in order to press their individual agendas leads many, in the words of one witness, to "hedge their bets, to ensure they get access to office holders on the issues that are important to them." *Id.* ¶ 1.79; *see also id.* ¶ 1.80. One CEO put it this way: "As a donor with business goals, if you want to enhance your chances of getting your issues paid attention to and favorably reviewed by Members of Congress, bipartisanship is the right way to go. Giving lots of soft money to both sides is the right way to go from the most pragmatic perspective." *Id.* ¶ 1.79. The parties are aware of this view, as one document from the Ohio Republican party entitled "Why People Give" includes the observation: "many people give to both sides so that they will have access to whoever is the winner." *Id.* ¶ 1.80.[165]

**165.** The RNC claims that the record "establishes that organizations and individuals may give to both parties because they desire to be actively involved in the political process." *Id.* ¶ 1.80.1. In support of this statement, the RNC provides a statement by a PhRMA representative that the group gives to the convention activities of both parties because "we are good civic participants," and a deposition statement from one of Defendants' experts acknowledging the *possibility* that donors provide support to both parties because they support some members from each party. *Id.* Although these statements suggest that donors "may" give to both parties for reasons other than access, they do not contradict the numerous statements and documents in the record that demonstrate that special access is the *primary* motivation for many donors who give to both parties. *Id.* Moreover, interests in participating in the political process and in

The record also contains evidence that the political parties exploit contributors' fears of losing access if they back one political party and that party loses control of Congress. One CEO describes the situation this way:

> [I]f you're giving a lot of soft money to one side, the other side knows. For many economically-oriented donors, there is a risk in giving to only one side, because the other side may read through FEC reports and have staff or a friendly lobbyist call and indicate that someone with interests before a certain committee has had their contributions to the other side noticed. They'll get a message that basically asks: "Are you sure you want to be giving only to one side? Don't you want to have friends on both sides of the aisle?" If your interests are subject to anger from the other side of the aisle, you need to fear that you may suffer a penalty if you don't give. First of all, it's hard to get attention for your issue if you're not giving. Then, once you've decided to play the money game, you have to worry about being imbalanced, especially if there's bipartisan control or influence in Washington, which there usually is. In fact, during the 1990's, it became more and more acceptable to call someone, saying you saw he gave to this person, so he should also give to you or the person's opponent. Referring to someone's financial activity in the political arena used to be clearly off limits, and now it's increasingly common.

*Id.* ¶ 1.80; *see also id.* ¶ 1.70–1.70.4 (facts regarding pressure placed on political donors). An internal Eli Lilly and Company document shows these concerns in action.

*Id.* ¶ 1.79. The *Washington Post* had listed the company as a top donor to the Republican party. *Id.* A handwritten notation on a photocopy of the article says "Dems are upset .... White House stays Dem we are in trouble," and an internal memorandum refers to discussions with the White House indicating that Eli Lilly "can get back into this by giving $50[,000]100,000 to the DNCsays they would be pleased with this." *Id.*

Another good example of this practice of giving to both political parties is that in 2000, a Fortune 100 company agreed to contribute $25,000 to the NRSC at the request of George Allen, the then-Republican-candidate in the 2000 Senatorial race in Virginia against incumbent Senator Chuck Robb. An employee noted that the company had donated to Senator Robb's Leadership PAC and that a similar contribution to the NRSC was necessary to balance out the company's support for the candidates. *Id.*

The Tarrance Group/CED poll of business leaders found that 74 percent of respondents "say pressure is placed on business leaders to make large political donations. The main reasons corporate America makes political contributions, the executives said is fear of retribution and to buy access to lawmakers." *Id.* ¶ 1.70.1. Another poll conducted in 1997 of major congressional donors found that 80 percent of those surveyed agreed that "officeholders regularly pressure donors for contributions." *Id.* ¶ 1.70.3.[166] Lobbyist Robert Rozen provides context for this fear:

> In some cases corporations and trade associations do not want to give in

obtaining special access to legislators to influence them are neither incompatible nor mutually exclusive.

**166.** The poll also showed that 76 percent of the major donors surveyed believed the cam-

paign finance system was either "broken and needs to be replaced," or "has problems and needs to be changed." *Id.* ¶ 1.70.3. Three-quarters of respondents supported a "ban on large 'soft money' donations." *Id.*

amounts over the hard money limits, but they *feel* pressured to give in greater amounts and end up making soft money donations as well. They are under pressure, sometimes subtle and sometimes direct, from Members to give at levels higher than the hard money limits. For example, some Members in a position to influence legislation important to an industry naturally wonder why a company in that industry is *not* participating in fundraising events." *Id.* ¶ 1.70.2. Former Senator Boren notes that political donors feel that they are victims of "shake[ ] down[s]." *Id.* ¶ 1.70.4. One internal memorandum from a Fortune 100 company notes that "our traditional competitors continue to contribute large amounts of soft money," and predicted that failure to "maintain our soft money participation during this election cycle—given the heightened scrutiny those contributions will receive in the current competitive climate—*may* give our new and traditional competitors an advantage in Washington". *Id.* ¶ 1.78.1 (emphasis in original); *see also Buckley*, 519 F.2d at 839 n. 37 ("The disclosures of illegal corporate contributions in 1972 included the testimony of executives that they were motivated by the perception that this was necessary ... 'in response to pressure for fear of a competitive disadvantage that might result.'") (quoting statement of former chairman of American Airlines, George Spater) (internal citations omitted) (cited in *Buckley*, 424 U.S. at 27 n. 28, 96 S.Ct. 612).

The evidence detailed above clearly indicates that large donations to political parties, especially nonfederal donations, open doors to federal lawmakers' offices. The record shows that the reverse is also true: failure to provide large nonfederal dona-

tions can effectively block access to federal lawmakers. As one CEO put it: "It is obvious to me that large soft money donations do buy access, that they can influence federal policy, and that they are corrupting to federal officeholders and to donors. Additionally, these unlimited donations to political parties pose a far greater risk than do hard money contributions to candidates of at least the appearance, if not the reality, of special interest influence on federal policy." Findings ¶ 1.83.6; *see generally id.* (testimony and poll results demonstrating wealthy individual donors find the campaign finance system as either corrupt or as creating the appearance of corruption). In sum, the evidence demonstrates that major donors of nonfederal money primarily give these contributions to the national committees to gain access to federal officeholders. Notably, the record also demonstrates that major nonfederal money donors give to the state and local committees for the benefit of federal officeholders and candidates.

*Federal Candidates Are Cognizant of the Benefits of Having Nonfederal Money Donors Contribute to State Parties*

Federal candidates understand that they can benefit from donations made to the state political parties. The evidence discussed *infra* demonstrates that candidates solicit contributions to the state parties to assist their campaigns. *See infra* at 556. However, perhaps the most probative evidence of the importance federal candidates place on such contributions is a letter written by Senator Mitch McConnell to one of his contributors. He writes:

Since you have contributed the legal maximum to the McConnell Senate Committee, I wanted you to know that you can still contribute to the Victory 2000 [167] program .... This program was

---

**167.** Victory programs are programs designed by the state Republican parties in conjunction with the RNC and implemented by the state

party with assistance from the RNC. *See* Findings ¶¶ 1.43.2.

an important part of President George W. Bush's impressive victory in Kentucky last year, and it will be critical to my race and others next year.

*Id.* ¶ 1.60. Senator McConnell also handwrote: "This is important to me. Hope you can help." *Id; see also id.* (letter from Congressman Wayne Allard explaining to a contributor that although maxing out to his campaign, the contributor could further help his campaign by donating to the Colorado Republican Party).

These additional facts confirm that nonfederal donations to the state political parties affect federal elections and are valued by federal candidates. It is therefore clear that such donations to state political parties can result in access to federal officials while also providing a route to circumvent FECA's limitations.

*Political Donations Achieve Political Results*

As discussed at length earlier, in the context of supporting contribution restrictions, *Buckley* and its progeny do not require evidence that large contributions to candidates were conditioned upon a certain decision by a federal officeholder or candidate. *Buckley*, 519 F.2d at 839 n. 36 (cited in *Buckley*, 424 U.S. at 27 n. 28, 96 S.Ct. 612) ("It is not material, for present purposes, to review the extended discussion in the Final Report on the controverted issue of whether the President's decision was in fact, or was represented to be, conditioned upon or 'linked' to the reaffirmation of the pledge."). Nevertheless, a few examples from my Findings of Fact and prior caselaw illustrate that in many instances large nonfederal donations produce the desired result for the donor. Indeed, why else would corporate executives refer to general treasury contributions to the political parties as "investments" or the "cost of doing business" if results were not obtained? *See supra* at 530. Although there is no evidence in the record before this

three-judge panel that federal bribery or gratuity laws have been violated in exchange for nonfederal funds, *see* Findings ¶ 1.64, that is not what *Buckley* requires as a basis for support of a contribution restriction. As *Buckley* observed, bribery laws "deal with only the most blatant and specific attempts of those with money to influence government action." *Buckley*, 424 U.S. at 28, 96 S.Ct. 612. Contribution limitations, like those in Title I and in *Buckley*, target the "opportunity for abuse inherent in the process of raising large monetary contributions." *Id.* at 30, 96 S.Ct. 612. Former Senator Rudman speaks to this point:

I understand that those who opposed passage of the Bipartisan Campaign Reform Act, and those who now challenge its constitutionality in Court, dare elected officials to point to specific [instances of vote buying]. I think this misses the point altogether. [The access and influence accorded large donors] is inherently, endemically, and hopelessly corrupting. You can't swim in the ocean without getting wet; you can't be part of this system without getting dirty.

*Id.* ¶ 1.65. The record in this case confirms Senator Rudman's view that large nonfederal contributions to the national political party committees achieve access. *See id.* ¶¶ 1.75–1.80.1, 1.81. The record also contains an example demonstrating that large nonfederal donations achieve their intended result that is, having an effect "on candidates' positions and on their actions if elected to office." *Id.* ¶ 1.66. Senator Simon testifies:

It is not unusual for large contributors to seek legislative favors in exchange for their contributions. A good example of that which stands out in my mind because it was so stark and recent occurred on the next to last day of the

1995–96 legislative session. Federal Express wanted to amend a bill being considered by a Conference Committee, to shift coverage of their truck drivers from the National Labor Relations Act to the Railway Act, which includes airlines, pilots and railroads. This was clearly of benefit to Federal Express, which according to published reports had contributed $1.4 million in the last 2–year cycle to incumbent Members of Congress and almost $1 million in soft money to the political parties. I opposed this in the Democratic Caucus, arguing that even if it was good legislation, it should not be approved without holding a hearing, we should not cave in to special interests. One of my senior colleagues got up and said, 'I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread.' I will never forget that. This was a clear example of donors getting their way, not on the merits of the legislation, but just because they had been big contributors. *I do not think there is any question that this is the reason it passed.*

Findings ¶ 1.66; *see also Colorado II,* 533 U.S. 431, 451 n. 12, 121 S.Ct. 2351 (2001) (quoting Senator Simon's declaration); *see also* Findings ¶ 1.66 (Senator Feingold testifying that in the fall of 1996 a senior Senator suggested to him that he support the Federal Express amendment because "they just gave us $100,000").

In addition, the record makes clear that the national political parties lobby their Members of Congress on various legislative issues. *Id.* ¶ 1.67. A document in the record suggests that at least on one occasion the political parties have asked Members to take a position on an issue because of a donor's interest in the issue. *Id.*

¶ 1.67.1.[168] Furthermore, Plaintiffs' expert La Raja acknowledges that the "potential for quid pro quo exchange between contributor and policymaker escalates with the size of the contribution," and recommends that "[t]o reduce the potential for corruption, I recommend that Congress place a cap on hard money contributions or, if soft money is banned, raise the limits on hard money contributions." *Id.* ¶ 1.69.

Therefore, while the record contains no evidence that federal bribery laws have been broken-something not required by *Buckley* to support the contribution restrictions at issue in the case-the record does contain certain examples showing that access achieves legislative results and creates the potential for such arrangements. Findings ¶¶ 1.63, 1.68. Even without this evidence, the access provided to federal officeholders and candidates by the political party committees is more than sufficient to justify Congress's decision to enact Title I.

*Polling Data Demonstrates an Appearance of Corruption Relating to Large Donations to the Political Parties*

Evidence in the record demonstrates that the public, in response to the existence of large nonfederal donations, perceives corruption in the nation's campaign finance system. Findings ¶ 1.84. A poll conducted by two prominent political pollsters, Mark Mellman and Richard Wirthlin, shows that Americans believe that large donations to political parties affect the decisions of Members of Congress. *Id.* ¶¶ 1.83.1, 1.83.1.1 The poll found that 77 percent of Americans believe that big contributions to political parties have at least some impact on decisions made by the federal government—55 percent believe the impact is great. *Id.* Results from

---

**168.** There is also testimony in the record suggesting that the political parties threaten to withhold financial support for Members' campaigns if they do not take the political party's position on an issue. Findings ¶ 1.68.

the 2002 Mellman and Wirthlin poll are also strikingly similar to those of a survey conducted in 1974 and cited by the D.C. Circuit in *Buckley*, which reported that 69.9 percent of respondents believed that "the government is pretty much run by a few big interests." *Buckley*, 519 F.2d at 838–39. Mellman and Wirthlin's survey found that 71 percent of those polled believe that Members of Congress make decisions based on what the big contributors to their party want, even if it is not what their constituents want or what the Member thinks is in the best interests of the country. Findings ¶ 1.83.1. An even greater percentage, 84 percent, believe that Members are more likely to listen to large party contributors because of their contributions, and 68 percent think that big contributors to political parties have blocked decisions by the federal government that could improve people's everyday lives. *Id.* The poll also reflects that the public perceives that their views are given less attention than those of large contributors. Eighty-one percent of those polled believe that the views of those corporations, unions, interest groups or individuals who donate $50,000 or more to a political party would likely receive special consideration from Members of Congress, while only 24 percent believe a Member is "likely to give the opinion from someone like them special consideration." *Id.*

Professor Robert Shapiro's review of public opinion polls conducted since 1990 confirms the Mellman and Wirthlin conclusion that large nonfederal contributions are viewed as corrupting by the public. *Id.* ¶ 1.83.2. He concludes that the public is troubled and opposes large unregulated nonfederal contributions to political parties, that "a substantial proportion of the public has perceived corruption in the political system, and that we are losing ground." *Id.*

Another poll shows that 76 percent of high-level political contributors, those who know the campaign finance system first-hand, are critical of the regime. *Id.* ¶ 1.83.6. The polling data is confirmed by the testimony of corporate and individual donors stating that nonfederal donations corrupt the campaign finance system or create the appearance of corruption. *Id.*

This polling data on the appearance of corruption reflects a dispiriting reality. The public's perception of the influence and effect of large nonfederal donations justified Congressional action in enacting Title I.

*Members of Congress Report that Constituents Are Concerned About Large Contributions to Political Parties Which Demonstrates an Appearance of Corruption*

In addition to the polling data, Members of Congress have expressed concern that large contributions to their political parties create the appearance of corruption in the eyes of their constituents. *Id.* ¶ 1.83.3. Among them is former Senator Simpson, who testifies that "[b]oth during and after my service in the Senate, I have seen that citizens of both parties are as cynical about government as they have ever been because of the corrupting effects of unlimited soft money donations." *Id.* Representative Asa Hutchinson wrote to the RNC Chairman that he could not support the RNC's proposed campaign finance bill because he had to balance the RNC's concerns

with a concern of my constituents which is that their influence in politics is being diminished by the abuses of soft money .... If our party is unable to enact meaningful campaign finance reform while we're in control of Congress, then I believe this failure to act will result in more cynicism and create a growing lack of confidence in our efforts.

*Id.*

Members of Congress have also expressed concern over the appearance of

corruption inherent in the intersection of large contributions and legislative action on issues of concern to the contributors. For example, Senator McCain testifies:

[T]here's an appearance [of corruption] when there's a million dollar contribution from Merck and millions of dollars to your last fundraiser that you held, and then there is no progress on a prescription drug program. There's a terrible appearance there. There's a terrible appearance when the Generic Drug Bill, which passes by 78 votes through the Senate, is not allowed to be brought up in the House shortly after a huge fundraiser with multimillion dollar contributions from the pharmaceutical drug companies who are opposed to the legislation.

*Id.* ¶ 1.83.4. In addition, Senator Feingold has remarked that "a $200,000 contribution [was] given 2 days after the House marked up a bankruptcy bill by MBNA. OK, it is not illegal. Conceded. Maybe it is not even corrupt, but it certainly has the appearance of corruption to me and I think to many people." *Id.*

Examples like these are often picked up by the press, as evidenced by the sample press articles provided by Defendants. *Id.* ¶ 1.83.5; *see also id.* (Senator Simpson and Plaintiffs' expert Primo on the effect of press reports on the public's perception of corruption); *cf. Buckley,* 519 F.2d at 839 n. 36 ("Looming large in the perception of the public and Congressmen was the revelation concerning the extensive contributions by dairy organizations to Nixon fund raisers, in order to gain a meeting with White House officials on price supports.").

Plaintiffs' expert La Raja comments:

[O]ne cannot ignore the central claim of reformers that the cash-based electoral environment fosters mistrust of the political system. Observing the amounts of money raised and spent in campaigns makes the average American skeptical that the political process is fair. Such doubts raise questions about political legitimacy. Even if politicians are not corrupt—and there has been minimal evidence to prove this claim—there is certainly the appearance of corruption....

It does not help matters that parties contribute to the arms race in campaigns. By using soft money parties raise the ante in elections. Candidates feel vulnerable to parties and interest groups that sponsor issue ads so they raise more money than ever. Campaign costs increase as each side fights to a draw .... Thus, the foraging for campaign money contributes to the perspective that money corrupts the system.

*Id.* ¶ 1.83.7.

This testimony demonstrates that Members of Congress and political scientists were aware of the public's disaffection with the campaign finance system, and nonfederal money in particular, prior to BCRA's enactment.

*Conclusion*

In enacting Title I, Congress clearly was aware of the parallels between the "coercive influence" of unlimited donations to federal candidates addressed by FECA's contribution limitations, and the "coercive influence" of nonfederal money donations to the national political party committees the government asserts supports Title I. *See, e.g.,* Thompson Committee Report at 4563 (minority report) ("No one can deny that individuals who contribute substantial sums of money to candidates are likely to have more access to elected officials. And most of us think greater access brings greater influence. It was this concern over linkages between money, access and influence—amid allegations that Richard Nixon's 1968 and 1972 presidential campaigns accepted individual contributions of

hundreds of thousands, even millions, of dollars—that spurred Congress to enact the original campaign finance laws. While those laws have evolved over the 20 years since that time, the goals have remained the same: to prevent wealthy private interests from exercising disproportionate influence over the government, to deter corruption, and to inform voters."); *see also id.* at 42–43 (majority report) ("Simply put, 25 years after Congress passed election reform laws intended to insulate the President from an unseemly and potentially corrupting involvement with campaign money, President Clinton spent enormous amounts of time during the 1996 election cycle raising money. In the ten months prior to the 1996 election, President Clinton attended more than 230 fundraising events, which raised $119,000,000. The President maintained such a pace for over a year before the election, often attending fundraisers five and six days each week. According to Presidential campaign advisor Dick Morris, President Clinton would say "I haven't slept in three days; every time I turn around they want me to be at a fundraiser ... I cannot think, I cannot do anything. Every minute of my time is spent at these fundraisers." This frenzied pursuit of campaign contributions raises obvious and disturbing questions. Can any President who spends this much time raising money focus adequately upon affairs of state? Is it even possible for such a President to *distinguish* between fundraising and policymaking?"). Congress appropriately recognized that nonfederal money donations are primarily "given to secure a political *quid pro quo* from current and potential office holders," which undermines "the integrity of our system of representative democracy." *Buckley*, 424 U.S. at 26–27, 96 S.Ct. 612.

The record in this case is impressive and is much more substantial than what was found in *Buckley* to support the contribution limitations at issue in that case.

Prior to BCRA, federal candidates and officials assisted their national political party committees in raising enormous funds not only well outside FECA's amount limitations, but also outside FECA's source limitations. The large nonfederal money donations were primarily given for one purpose: they provided access to federal officeholders in order to exert influence over federal legislative activity. *Buckley* and its progeny hold that Congress has broad authority to combat the corruption associated with this situation. The corruption associated with nonfederal donations to political party committees, and the appearance of corruption in the mind of the public, therefore presents a compelling justification for Congress's enactment of Title I.

(2) Evidence From the Record in this Case Relating to Circumvention

Before turning to the evidence of circumvention in the record, it bears repeating that the record before the Supreme Court in *Colorado II* contained *no* actual evidence of political parties making unlimited coordinated expenditures, but just a hypothesis of what could occur if the "floodgates" to this practice were opened. *Colorado II*, 533 U.S. at 459 n. 22, 121 S.Ct. 2351. In *this case*, the record before the three-judge District Court establishes in compelling fashion that prior to the passage of BCRA, the contribution limitations in FECA were rendered edentulous and that Congress, therefore, had justification to act. With that observation in mind, I turn to the evidence in the record related to circumvention.

*The National Party Committees Collect and Spend Nonfederal Funds Primarily to Avoid FECA's Contribution Limitations*

The record in this case amply demonstrates that the national political parties

have used nonfederal funds to circumvent FECA's contribution limits. The evidence leads me to the same conclusion reached by Plaintiffs' expert Raymond La Raja:

By exploiting soft money rules, the parties effectively sidestep the federal ceilings that prevent them from allocating resources efficiently in the closest contests. To navigate around the federal restrictions on soft money the parties have developed close ties with their state parties because these affiliates receive special exemptions for party building activity.

Findings ¶ 1.69. As La Raja notes, the national political parties have used nonfederal funds themselves, and through their state party counterparts, to affect federal elections, in contravention of the spirit, if not the letter, of FECA.

The national political parties use nonfederal funds for electioneering purposes, despite the fact that such funds are permitted under the rationale that they be used for "party building" activities. *Id.* ¶ 1.41. The evidence shows that political parties spend a great deal of the nonfederal funds that they raise on issue advocacy, *id.* ¶ 1.23–1.25, and testimony from political party officials and experts, as well as documents in the record, show that very few of these advertisements are aimed at party building, but rather are designed to affect federal elections.

*The National Party Committees Spend Nonfederal Funds on "Issue Advocacy" Advertisements That Are Designed to Influence Federal Elections*

The RNC's own experts testify that "issue advocacy outside the context of electioneering by political parties is rare," and that party-sponsored issue advertisements are intended to and do support the campaigns of federal candidates. *Id.* ¶ 1.19–1.19.1. These assertions are supported by the numerous examples of these advertisements submitted for the record, *see, e.g.,* *id.* ¶¶ 1.14, 1.15, as well as the testimony of Members of Congress, federal candidates, political consultants, and an RNC official who acknowledges that the RNC's issue advocacy efforts are aimed at achieving a primary objective of getting more candidates elected, *id.* ¶ 1.19, 1.13. Many of these advertisements focus on a candidate's characteristics or past actions (without reference to a future legislative event), such as one which noted that a Congressional candidate had voted to raise taxes while in state and local government, and concluded with the line: "If you think *your* family pays *enough* taxes . . . Call [____]. Tell her to stop raising your taxes". *Id.* ¶ 1.14. Other advertisements run by political parties compare the past records of competing candidates in a stark and loaded fashion. *Id.* ¶ 1.15. One such advertisement stated that one candidate was "the only member of Congress who did not want to tell parents when a child molester moved into their neighborhood" but that the other "supports laws that protect our children and keep violent criminals in jail for their full terms." *Id.* Another such advertisement told viewers that one candidate supported a welfare program that "is restoring responsibility, pride and self-worth," but that the other "voted *against* moving able-bodied welfare recipients from welfare to work." *Id.* (emphasis in original). The notion that such advertisements are intended to promote issues and not political campaigns strains credulity.

The empirical evidence submitted shows that political party advertisements are overwhelmingly candidate-centered. Ninety-two percent of party-sponsored advertisements aired during the 2000 election did not identify the sponsoring political party by name, or encourage voters to register with or support the party. *Id.* ¶ 1.17. During the 1998 election cycle, of the $25.6 million spent by the political parties on advertisements, $24.6 million went to commercials that referred to a

federal candidate; out of the 44,485 advertisements purchased by the parties, 42,599 identified a federal candidate. *Id.* ¶ 1.18.

Furthermore, it is clear that the political parties run their advertisements largely in competitive races, where the record shows they can have a significant impact on the outcome of the election. *Id.* ¶¶ 1.16–1.16.1. The political parties also run advertisements to assist their candidates' campaigns when they are low on funds. *Id.* ¶ 1.20. For example, the RNC spent $20 million in so-called "issue advocacy" to assist the Dole campaign between March and August 1996 when the campaign had almost run out of money. *Id.* The advertisements run by the RNC at this time included "The Story," *id.* ¶ 1.20.1, and "Pledge," *id.* 1.20.2, which exemplify the two themes of the RNC's campaign: build up then-Senator Dole and attack then-President Clinton, *id.* ¶ 1.20. The record shows that the RNC had done "quantitative and qualitative research [which] strongly suggest[ed] that [ 'The Story']needs to be run," but was concerned that "[m]aking this spot pass the issue advocacy test may take some doing." *Id.* 1.20.1. Nevertheless, the advertisement was run and paid for in part with nonfederal funds. *Id.*

This record convincingly demonstrates that political party advertisements, on which much of the nonfederal funds collected by the national political party committees is spent, influence federal elections and have little to do with "party building." [169] *Id.* 1.10, 1.22. The political parties are well aware of this as demonstrated by the fact one national political party

committee openly solicited funds for an issue advocacy campaign by describing it as an effort "to ensure that the [Republican] party not only maintains, but expands our majorities in Congress." *Id.* ¶ 1.21. This reality, leads inevitably to the "conclusion that party soft money and electioneering in the guise of issue advocacy ha[s] rendered the FECA regime largely ineffectual." *Id.* ¶ 1.9.

*National Party Committees Spend Comparatively Little Nonfederal Money on "Party Building Activities," Most of Which Have Some Impact on Federal Elections*

Plaintiffs have provided examples of where national political parties have used nonfederal, or a mix of nonfederal and federal money, for what they call "party-building" activities. Activities such as state redistricting efforts, *id* ¶¶ 1.34–1.34.3, training seminars for candidates, party officials, activists and campaign staff, *id.* ¶ 1.36, state and local government affairs activities, *id.* ¶ 1.37, and minority outreach, *id.* ¶ 1.38, are all paid for with a mix of federal and nonfederal funds which demonstrates that they have an effect on federal elections, *id.* ¶ 1.40. Furthermore, the figures provided by the RNC show that these activities constituted a very small percentage of their nonfederal and combined spending for the 2000 cycle. *Id.* This finding computes with that of Plaintiffs' expert Raymond La Raja, who finds that only "8.5 percent of national party soft money expenditures went to 'mobilization' or 'grassroots'" activities during the 2000 election cycle. *Id.* ¶ 1.25.[170]

---

169. Indeed, many of the characteristics of political party advertisements mirror those of interest group-sponsored candidate-centered issue advocacy, detailed in my discussion of Title II, *supra.*

170. The national political parties spend more nonfederal money on administrative expenses, which constitute operating expenses

such as salaries, benefits, supplies, and travel expenses; however, Plaintiffs' expert La Raja notes that these efforts do not constitute "party building" activities. Findings ¶¶ 1.35, 1.26.4. Furthermore, these expenses are paid for with a mix of funds demonstrating that they too have an effect on federal elections. *Id.* ¶ 1.35.

The national political parties also spend nonfederal money on contributions to state and local candidate campaigns. *Id.* ¶ 1.39. Defendants' expert Thomas Mann found that during the 2000 election cycle, "the national parties contributed only $19 million directly to state and local candidates, less than 4% of their soft money spending and 1.6% of their total financial activity in 2000." *Id.* The RNC testifies that during the 2000 election campaign, it donated approximately $7.3 million in nonfederal funds to state and local candidates. *Id.* FEC documents show that this represents a very small percentage of the $163,521,510 in nonfederal funds the RNC spent during the 2000 election cycle. *Id.* Again, it is evident that despite Plaintiffs' examples, the vast majority of nonfederal funds are not being used for "party building" activities.

*Nonfederal Money Donations Are Often Made on Behalf of Federal Candidates In Order to Circumvent FECA's Individual Limitations*

Nonfederal donations to the national party committees, despite the fact they are supposed to be used for "party building" purposes, are often solicited and made with the intent that they will be used to assist a federal candidate's campaign. *Id.* 1.56. Senator Simpson observes that

> [d]onors do not really differentiate between hard and soft money; they often contribute to assist or gain favor with an individual politician. When donors give soft money to the parties, there is sometimes at least an implicit understanding that the money will be used to benefit a certain candidate. Likewise, Members know that if they assist the party with fundraising, be it hard or soft money, the party will later assist their campaign.

*Id.* ¶ 1.56.1. The Findings demonstrate that donors who give nonfederal funds to political parties to support federal candidates are doing so to evade the individual contribution limitations. *See id.* ("Although soft money cannot be given directly to federal candidates, everyone knows that it is fairly easy to push the money through our tortured system to benefit specific candidates.") (quoting Senator Simpson). One donor explains that "[t]here appeared to be little difference between contributing directly to a candidate and making a donation to the [state] party.... Through my contributions to the political parties, I was able to give more money to further Clinton's candidacy than I was able to give directly to his campaign." *Id.* ¶ 1.59.

These findings correlate to the record that was before the Supreme Court in *Colorado II,* which stands for the same principle, that for donors the national political parties act as conduits to federal candidates. *See supra* at 508, 121 S.Ct. 2351. In the words of then-RNC Chairman Haley Barbour: "the purpose of a political party is to elect its candidates to public office ...." Findings ¶ 1.49.1. This sentiment is especially true with regard to the national congressional campaign committees. As Plaintiffs' expert La Raja observes, these committees traditionally limit their activities to assisting their candidates' campaigns. *Id.* ¶ 1.26.6. Therefore, the record reflects that major nonfederal money donors use political parties to produce "obligated officeholders." *Colorado II,* 533 U.S. at 452, 121 S.Ct. 2351.

*State and Local Party Committees Play an Integral Role in Helping the National Party Committees Spend Nonfederal Funds on Federal Elections*

The record also demonstrates that the national political parties have used their state political party "branches," as Plaintiff's expert Raymond La Raja terms them, as part of their FECA circumvention scheme. Findings ¶ 1.42. Indeed, the RNC admitted as much in its briefing:

The Republican Party is *a single, unitary organization* that comprises various interrelated parts—the RNC, state and local parties, the RNC's 165 members, candidates identifying themselves as "Republicans," and so forth. Indeed, the state parties select the 165 voting members of the RNC, and the party through its convention and other mechanisms nominates candidates.

RNC Opp'n at 23 (emphasis added). As La Raja concludes, the closeness between the state and national political parties is a result of the attractiveness of using the state political parties' more favorable federal/nonfederal money allocation ratios to fund federal electioneering practices. Findings ¶ 1.42. Large sums of nonfederal funds have been transferred to the state political parties over the past decade. *Id.* ¶ 1.26.3. During the 2000 election cycle, over half of the nonfederal money raised by the national party committees was transferred to the state political parties, a sum reaching $266 million. *Id.* ¶¶ 1.26.3, 1.4.3. Rather than being used for "party-building" activities, as the rationale for nonfederal funds provides, a large proportion of these funds were used to finance issue advertisements intended to influence federal elections. *Id.* ¶¶ 1.26.4; *see also id.* ¶ 1.26. Plaintiffs' expert La Raja finds that when administrative expenses are excluded from the calculus, state political parties invest most nonfederal funds transferred from the national political parties on federal races, *and concludes that more nonfederal funds are used for media rather than party building.* *Id.* Similarly former Senator William Brock, who is also a former Chairman of the RNC, testifies that nonfederal funds are used almost exclusively to help elect federal candidates and not for "party building." *Id.* ¶ 1.11. A 1998 financial statement from the Republican Party of New Mexico shows that it received revenues of $1,524,634 in nonfederal transfers from other Republican organizations, $1,110,987 in individual contributions, and $389,552 in federal transfers from Republican organizations. The state political party spent over one-third of its revenues on "issue advocacy." *Id.* ¶ 1.26.4.1.

Moreover, representatives of all the major national congressional committees testify that they transfer nonfederal funds to state political parties in order to purchase advertisements aimed at influencing federal elections. *Id.* ¶ 1.26.6. They also state that although the state political parties may reject the national party committee's requests that transferred money be wired to specific consultants to pay for specific advertisements, they generally comply with the request. In addition, advertisements supported with congressional committee funds are not produced or recorded until the national party committees provide final approval. *Id.* ¶ 1.26.7. Documentary evidence supports this testimony, and shows that the state political parties are merely conduits in this process. *Id.* ¶ 1.26.7.2 (communications from the NRCC to the CRP providing information about money that was wired to CRP's account with instructions to wire the money to a media consulting firm, and similar documents from the DCCC to the CDP), ¶ 1.26.7.1 (NRSC memorandum suggesting an idea for an attack advertisement, and a copy of an advertisement implementing the idea paid for by the Republican State Central Committee of Nevada). These statements and documents compute with Plaintiffs' expert La Raja's observation that "[i]t would be particularly surprising for congressional campaign committees to venture outside their traditional scope of helping candidates and invest in state party organizations." *Id.* ¶ 1.26.6. The record also demonstrates that the DNC and RNC operate in the same fashion. *Id.* ¶ 1.26.7.3, 1.26.7.2. By purchasing these advertisements through the state political

parties, the national political parties take advantage of the better federal-to-nonfederal spending ratios under which the state political parties operate. *Id.* ¶ 1.26.2, 1.27.

In addition, both national political parties prepare and execute detailed campaign strategies with their state affiliates for election campaigns that include state and federal elections. *Id.* ¶ 1.43. The Democratic national and state political parties implement "Coordinated Campaigns" which aim to allocate resources and coordinate plans for the benefit of Democratic candidates up and down the entire ticket. *Id.* ¶ 1.43.1. The Republican Party develops and implements similar plans with its state party affiliates called "Victory Plans." *Id.* ¶¶ 1.43.2–1.43.2.3. These plans demonstrate the close affiliation and cooperation between the national and state political parties that has led one state political party official to conclude that her state political party and national political party were "integrally related." *Id.* ¶ 1.43.1.

Therefore, it is very apparent that prior to BCRA's enactment national political party committees were using their state branches to assist in their circumvention of FECA, and in the process were integrating the state political parties into the national political party structure. Given this scenario, Congress made an appropriate predictive judgment that the enactment of BCRA's ban on nonfederal donations to the national political parties would escalate the use of nonfederal donations to state political parties to circumvent national campaign finance laws. *Id.* ¶¶ 1.44, 1.45.

It should be noted that Congress's concern—that restrictions on state and local political parties were necessary to prevent evasion of the nonfederal money ban at the national committee level—is justified not only by the record in this case, but by Congress's institutional experience in the area of campaign finance regulation. The evidence before the *Buckley* Court indicat-

ed that the $2 million contribution from the dairy industry to President Nixon's campaign was divided up into smaller amounts among hundreds of *state-level committees* in order to avoid disclosure requirements. *Buckley,* 519 F.2d at 839 n. 36 (cited in *Buckley,* 424 U.S. at 27 n. 28, 96 S.Ct. 612). Therefore, the technique of shifting money used to benefit a federal candidate from the national level to the state level in order to avoid a federal restriction is not new. Congress appropriately recognized the threat to the nonfederal funds prohibition at the national committee level, if the state and local political party committees were not prevented from using nonfederal funds on activities that directly influence federal elections.

*Nonfederal Money Donations Are Provided to State Party Committees on Behalf of Federal Candidates In Order to Benefit the Federal Candidate*

Furthermore, federal candidates and national party committees inform donors who have given the maximum amount of federal funds to their campaigns/committees that they can still help federal candidates by donating funds to state political parties. Findings ¶¶ 1.59, 1.60. An example of this is Congressman Wayne Allard's letter relied on in *Colorado II* and discussed *supra* at 510, 121 S.Ct. 2351. One CEO describes the practice this way:

In 1992, when I told the Democratic Party that I wanted to support then-Governor Bill Clinton's presidential campaign, they suggested that I make a $20,000 hard money contribution to the DNC, which I did. The Democratic Party then made clear to me that although there was a limit to how much hard money I could contribute, I could still help with Clinton's presidential campaign by contributing to state Democratic committees.... Accordingly, at the request of the DNC, I also made dona-

tions on my own behalf to state Democratic committees outside of my home state.... Through my contributions to the political parties, I was able to give more money to further Clinton's candidacy than I was able to give directly to his campaign.

Findings ¶ 1.59. One wealthy contributor provides similar testimony:

Federal candidates have often asked me to donate to state parties, rather than the joint committees, when they feel that's where they need some extra help in their campaigns. I've given significant amounts to the state parties in South Dakota and North Dakota because all the Senators representing those states are good friends, and I know that it's difficult to raise large sums in those states. The DSCC has also requested that I provide assistance to state parties.

*Id.* ¶ 1.60. As former DNC and DSCC official Robert Hickmott explains, "[o]nce you've helped a federal candidate by contributing hard money to his or her campaign, you are sometimes asked to do more for the candidate by making donations of hard and/or soft money to ... the relevant state party ...." *Id.* ¶ 1.59.

In addition, one CEO comments that in the past, donors who had reached their federal limit would ask candidates if a nonfederal contribution would assist the campaign and were told: "Don't bother. The soft money just doesn't do me any good." However,

in recent election cycles, Members and national committees have asked soft money donors to write soft money checks to state and national parties solely in order to assist federal campaigns. Most soft money donors don't ask and don't care why the money is going to a particular state party, a party with which they may have no connection.

What matters is that the donor has done what the Member asked.

*Id.* ¶ 1.51; *see also id.* ¶ 1.61. It is clear that these donations are valued by the national political parties and federal candidates/officeholders who solicit them. *Id.* ¶ 1.62.

The record detailed above demonstrates that both major political parties collect nonfederal funds, and direct nonfederal contributions to their state party "branches," in order to use that money to influence federal elections. The national political parties also transfer nonfederal money through the state parties for the same purpose. The evidence shows the amounts spent on "party building" and in support of state and local candidates is a small fraction of the total amount of nonfederal funds raised by the national political parties. Not including administrative expenses, the majority of these funds are used for so-called "issue advocacy" designed to affect federal elections. After reviewing this record, I find myself in agreement with Plaintiff's expert La Raja: the parties

are highly functional rather than responsible. Rather than use soft money to shore up weaker organizations, or reward state party members for moving closer to national party ideology, the national organizations use soft money like hard money—to pursue the short-term goal of winning elections.

*Id.* ¶ 1.26.5.

*Political Party Committees Suggest Donors Contribute to Issue Advocacy Organizations*

The record also demonstrates that prior to BCRA, political parties and candidates would solicit and donate funds to tax-exempt organizations, which would then fund activities in order to influence federal elections on behalf of the political party or

candidate-donor. *Id.* ¶ 1.85. Former DNC and DSCC official Robert Hickmott testifies that

> [o]nce you've helped a federal candidate by contributing hard money to his or her campaign, you are sometimes asked to do more for the candidate by making donations ... [to] an outside group that is planning on doing an independent expenditure or issue advertisement to help the candidate's campaign.... As a result, there are multiple avenues for a person or group that has the financial resources to assist a federal candidate financially in his or her election effort, both with hard and soft money.

Findings ¶ 1.59.

In addition, the record reflects that each Republican Party national committee has donated funds to the National Right to Life Committee, which Senator Phil Gramm, as NRSC Chairman, explained was done to "help activate pro-life voters in some key states, where they would be pivotal to the election." *Id.* ¶ 1.85.2. Other documents in the record show sizable political party donations have been made to nonprofit groups with common political views in close proximity to federal elections to be used to mobilize the party's voters. *Id* ¶¶ 1.85.2, 1.85.3.

That such donations are used to affect federal elections is also demonstrated by the fact that the national party committees and federal candidates or officeholders solicit donations for tax-exempt groups. The National Right to Work Committee ("NRTWC") admits that "certain Members [of Congress] or Executive Branch Officials have generally encouraged financial support for the Right to Work cause and, specifically, for the support of NRTWC in advocating for these issues, through lobbying as well as issue advertising." *Id.* ¶ 1.85.4. A letter in the record from Congressman Pete Sessions asks a recipient to meet with NRTWC personnel regarding the group's effort to "stop Big Labor from seizing control of Congress in November." *Id.* ¶ 1.85.5. Similarly, Congressman Ric Keller signed a fundraising letter for The Club for Growth, which assured potential donors that their money would be used to "help Republicans keep control of Congress." *Id.* The record also demonstrates that the DSCC and DNC informs donors which tax-exempt organizations are most effective at grassroots activities that affect federal elections. *Id* ¶ 1.85.1. Some of these organizations are organized as ballot measure committees or political clubs that engage in voter mobilization efforts which, when aimed at elections with federal candidates on the ballot, affect federal elections. *See id.* ¶¶ 1.85.6, 1.85.8.

In addition, evidence in the record shows that federal officeholders and candidates themselves have created their own tax-exempt organizations to assist in their election activities. According to Public Citizen, 63 Members of Congress have organizations organized under Section 527 of the Internal Revenue Code, and another 38 "have a stake in the Congressional Black Caucus [ ] 527 organization." *Id.* 1.85.7. These 527 organizations are used to promote the Member's career, as well as encourage strong state and local candidates and spur partisan get-out-the vote efforts. *Id.* ¶ 1.85.7.1. One large DNC contributor testifies that in early 2002 he donated $50,000 to the Daschle Democrats, a 527 organization, which ran advertisements in support of Senator Tom Daschle in response to attacks made against him. The contributor made the donation "because [he] felt that the attacks were hurting Senator Daschle and Senator Tim Johnson's re-election campaign as well." *Id.* ¶ 1.85.7.2. The DNC has made large contributions to Section 527 groups organized by candidates. *Id.* ¶ 1.85.7.3. Corporations also make large

donations to federal officeholder and candidate 527 organizations. *Id.* ¶ 1.85.7.3.

Congress was obviously concerned about this practice when it enacted Title I. For example, legislative history reflects a discussion of Judith Vasquez's contribution to a tax-exempt organization. Ms. Vasquez wanted to contribute $100,000 to the DNC, however because Ms. Vasquez was not a United States citizen, the donation was "problematic." Thompson Committee Report at 3663 (majority report). Therefore, Ms. Vasquez was told to donate the money to "Vote Now '96," "a tax-exempt GOTV organization that focused on traditional Democratic constituencies." *Id.* "Vasquez ultimately donated $100,000 to Vote '96." *Id.* at 7105 (minority report). The legislative history also includes an NRSC document entitled "Coalition Building Manual," issued in 1994, the text of which was included in the congressional record. *Id.* at 5969 (minority report) (discussing the document); *see also id.* at 5987–6015 (Coalition Building Manual). The Manual states in particular that "*[w]hat we say about ourselves is suspect, but what others say about us is credible.*" *Id.* at 5990 (emphasis in original).

It is clear that political parties and candidates have used tax-exempt organizations to assist them in their efforts to win federal elections. *Id.* ¶ 1.86. Given this fact, and the fact that BCRA prohibits state and national political parties from using nonfederal funds to affect federal elections, the attractiveness of using these tax-exempt proxies would become even more attractive to the political parties if nothing had been done by Congress to address this obvious circumvention route. *Id.*

*Conclusion*

The massive record in this case thus clearly demonstrates that the national political party committees raise funds outside of *Buckley* 's source and amount limita-

tions for purposes directly related to federal elections. Moreover, state and local party committees, in addition to nonprofit advocacy organizations, are used by the national party committees as part of their circumvention scheme. Congress was correct to conclude, therefore, that a prohibition on nonfederal funds at the national committee level would be ineffective at ending circumvention of FECA's contribution limitations. Accordingly, given the comprehensive record developed in this case, which presents impressive evidence that nonfederal funds secure easy evasion of the individual contribution limitations, I find that Congress was justified in enacting Section Title I under an anti-circumvention theory of corruption.

(b) *Title I Is Closely Drawn*

(i) Section 323(a) is Closely Drawn

In my view, Section 323(a) is closely drawn to match the sufficiently important governmental interests discussed above. When a court reviews a contribution limitation enacted by a coordinate political branch, the court's review is more deferential than if the restriction at issue were an expenditure. In reviewing contribution restrictions, the Supreme Court has deferred to congressional expertise as to both the need for prophylactic measures or the particularities of those measures. *See NRWC,* 459 U.S. at 210, 103 S.Ct. 552 ("Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared."); *see also NCPAC,* 470 U.S. at 500, 105 S.Ct. 1459 (observing that deference is proper, but that it did "not suffice to establish the validity" of the *expenditure* restriction at issue in that case); Def.-Int. Opp'n at 24. As Justice Breyer wrote in his concurring opinion in *Shrink Missouri:*

In such circumstances-where a law significantly implicates competing constitutionally protected interests in complex ways-the Court has closely scrutinized the statute's impact on those interests, but refrained from employing a simple test that effectively presumes unconstitutionality. Rather, it has balanced interests. And in practice that has meant asking whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative). Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments—at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge. *This approach is that taken in fact by Buckley for contributions* . . . .

*Shrink Missouri,* 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring) (emphasis added). Given my view that this three-judge District Court should give deference to Congress's judgment in the area of contribution restrictions, and finding that no less restrictive alternative would ameliorate the problems Congress sought to address with Section 323(a), I find the provision closely drawn.

Plaintiffs argue that Section 323(a) is overbroad because it does not focus on the amount or source of the national party committees' funding and instead bans donations of all nonfederal funds regardless of the amount. McConnell Br. at 38 ("To the extent that it is the *amount* or *source* of *donations* of [nonfederal] funds which gives rise to actual or apparent corruption, Title I contains no relevant tailoring at all.") (emphasis in original); McConnell Opp'n at 27; McConnell Reply at 21–22;

*see also* RNC Br. at 45. Plaintiffs cite the Hagel amendment as an example of a more narrowly tailored approach that Congress should have adopted. McConnell Br. at 38 n.14. The Hagel amendment would have imposed a $60,000 limit on aggregate donations of federal and nonfederal funds from any one donor to a national party committee. I do not find Plaintiffs' argument persuasive.

In *Buckley,* the challengers to FECA's contribution limitations argued that the $1,000 limitation was "unrealistically low." *Buckley,* 424 U.S. at 30, 96 S.Ct. 612. In flatly rejecting this argument, the Supreme Court adopted the D.C. Circuit's statement that " '[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.' " *Id.* (quoting *Buckley,* 519 F.2d at 842) (observing that "Congress' failure to engage in such fine tuning" by scaling the contribution limitations based on the "differences between congressional and Presidential campaigns was not fatal to the contribution restrictions"). In much the same manner, Congress has made a judgment that contributions of nonfederal funds to national political party committees permits easy circumvention of FECA's contribution limitations and raises an appearance of corruption, and that the only means of addressing this problem is a complete ban at the national political party level. Much as *Buckley* instructed that courts should not use a scalpel to probe to see if a less restrictive means might be available, this three-judge District Court should defer to Congress's judgment that any cap on nonfederal funds would not ameliorate the abuses it sought to be extinguished. Indeed, a cap on nonfederal funds would likely be constitutionally suspect because the potential for circumvention would still exist and the appearance of corruption surrounding $60,000 in dona-

tions to the national political party committees would still be present.

In short, Congress would not have accomplished its goal with such a cap because the national political party committees would still be able to use the allocation percentages to inject nonfederal funds into federal elections. Congress concluded that the FEC's approach for allocation was no longer acceptable at the national political party committee level. In my judgment, Congress is entitled to make that judgment.[171] Moreover, all nonfederal funds, regardless of the source, pose the same potential for corruption. While corporate and labor union donations of nonfederal funds may be more egregious in their use, given longstanding federal policy against their use in federal elections, it is not simply corporate and labor union donations that pose a problem. Contribution limitations are being directly circumvented by individuals as well as corporations and labor unions. Plaintiffs' argument that BCRA could have been tailored better had it focused on particular sources is therefore unavailing.

Plaintiffs also contend that Section 323(a) is overbroad because it bans the receipt and disbursement of nonfederal funds "no matter the purpose for which the funds are being given or spent." McConnell Br. at 39; McConnell Opp'n at 28; *see also* McConnell Reply at 22; RNC Opp'n at 30–31. The critical assumption that Plaintiffs make is that the "use" of nonfederal funds is what creates the actual or apparent corruption. McConnell Br. at 38. The assumption by Plaintiffs is fatal to their argument.

As demonstrated above, the corruption associated with nonfederal funds is much greater than the "uses" for which the money is put. Merely preventing the national political party committees from spending nonfederal funds on certain activities would do nothing to address the corruption associated with the national political party committees soliciting and collecting nonfederal funds. The law is targeted at the *collection and solicitation* of nonfederal funds, which are precisely the types of activities that Congress found posed the greatest threat of corruption. Moreover, simply preventing the national political party committees from using "soft money" to pay for the kinds of "issue" advertisements at which Title II is directed, would do little, if anything, to prevent, in *Buckley*'s words, "the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Buckley*, 424 U.S. at 27, 96 S.Ct. 612. As amply demonstrated above, simply because the political party is the solicitor of the funds is of no import, given that the political party committees are "agents for spending on behalf of those who seek to produce obligated officeholders." *Colorado II*, 533 U.S. at 452, 121 S.Ct. 2351. Regardless of the ultimate use

---

**171.** Plaintiffs also argue that Section 323(a) is particularly overbroad with respect to "minor parties" like the Libertarian Party which receives virtually no donations of large amounts or donations from corporations. McConnell Br. at 38; McConnell Opp'n at 28–29. *Buckley* forecloses this argument. In *Buckley,* the Supreme Court observed that "minor-party candidates may win elective office or have a substantial impact on the outcome of an election." *Buckley,* 424 U.S. at 35, 96 S.Ct. 612; *see also id.* at 70, 96 S.Ct. 612. The *Buckley* Court, therefore, refused to exempt minor parties, one of which was the Libertarian Party, *see id.* at 34 n. 40, 96 S.Ct. 612, from the contribution limitations. Accordingly, I do not find that BCRA is overbroad because it applies to minor party candidates, and I also find that Plaintiffs have not presented sufficient evidence to re-evaluate *Buckley*'s conclusion regarding minor parties.

of nonfederal funds, Congress appropriately concluded that the solicitation and raising of nonfederal funds posed such a significant threat of corruption that the only means of addressing the problem was a complete ban at the national committee level.

In this vein, Plaintiffs argue that "the Supreme Court itself has already concluded that the opportunity for corruption posed by unregulated soft money contributions to a party for certain activities such as electing candidates for state office or for voter registration and get out the vote drives is at best, attenuated." RNC Br. at 45 (quoting *Colorado Republican Fed. Campaign Comm. v. FEC ("Colorado I ")*, 518 U.S. 604, 616, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996)) (emphasis removed) (internal quotation marks omitted). I disagree and find that the plurality opinion in *Colorado I* actually provides authority for Congress's enactment of Section 323(a). Justice Breyer's plurality opinion demonstrates this point:

> We recognize that FECA permits individuals to contribute more money ($20,000) to a party than to a candidate ($1,000) or to other political committees ($5,000). 2 U.S.C. § 441a(a). We also recognize that FECA permits unregulated "soft money" contributions to a party for certain activities, such as electing candidates for state office, see § 431(8)(A)(i), or for voter registration and "get out the vote" drives, see § 431(8)(B)(xii). But the opportunity for corruption posed by these greater opportunities for contributions is, at best, attenuated. Unregulated "soft money" contributions *may not be used to influence a federal campaign, except when used in the limited, party-building activities specifically designated in the statute.* See § 431(8)(B).

*Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309 (emphasis added). As is clear from the emphasized language, the critical assumption behind Justice Breyer's conclusion relating to nonfederal funds is that " 'soft money' contributions may not be used to influence a federal campaign, except when used in the limited, party-building activities specifically designated in the statute." *Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309. However, as the record demonstrates in *this* case, Congress found that nonfederal funds were being used in massive amounts to influence federal campaigns. The pre-BCRA situation obviously changes the fundamental supposition underlying Justice Breyer's statement, which was premised on a factual record developed prior to the rise of soft money as a financing tool for federal election purposes.[172] Indeed, as Justice Breyer more recently observed in

---

172. The Defendant–Intervenors point out that in *Colorado I*

[t]he initial administrative complaint which led to the civil action was filed on June 12, 1986, and the parties' cross-motions for summary judgment in the civil action were filed in 1990, thereby shutting off further discovery. *See FEC v. Colorado Republican Fed. Campaign Comm.,* 839 F.Supp. 1448, 1451 (1993), *rev'd, FEC v. Colorado Republican Fed. Campaign Comm.,* 59 F.3d 1015 (10th Cir.1995), *vacated, Colorado I,* 518 U.S. 604, 116 S.Ct. 2309 (1996). The *Colorado I* plurality was careful to acknowledge that its conclusions about the link between independent expenditures and corruption were premised on the Court's precedents in the absence of contrary factual evidence in the record. *See Colorado I,* 518 U.S. at 617–18, 116 S.Ct. 2309 (Court lacked "convincing evidence"; "Government does not point to record evidence"). The language in the controlling opinion suggests that the Court could revisit its conclusions if faced with evidence calling those conclusions into doubt; for example, the Court did not say that there could not be any "special dangers of corruption associated with political parties," only that it was "not *aware* of any" such dangers. *Id.* at 616, 116 S.Ct. 2309 (emphasis added).

Def.-Int. Reply Br. at 38 n. 114.

his concurrence in *Shrink Missouri*, "After all, *Buckley*'s holding seems to leave the political branches broad authority to enact laws regulating contributions that take the form of 'soft money.'" *Shrink Missouri*, 528 U.S. at 404, 120 S.Ct. 897 (Breyer, J., concurring). Accordingly, I do not find Plaintiffs' argument relating to *Colorado I* to have merit. With BCRA, Congress responded to the wholesale evasion of the contribution limitations and on the basis of empirical evidence and experience, enacted Section 323(a), concluding "that the potential for evasion of the individual contribution limits was a serious matter." *Colorado I*, 518 U.S. at 617, 116 S.Ct. 2309.

Plaintiffs also argue that Section 323(a) is not closely drawn because it "sweeps in activity relating only to state and local elections and therefore does not serve to get federal candidates elected at all." McConnell Br. at 39; McConnell Opp'n at 29; McConnell Reply at 20–21. Plaintiffs' argument, however, ignores the compelling reason behind Section 323(a): namely, that the close relationship between national political parties and federal officials justified nothing else but a complete prohibition on raising nonfederal funds at the national party committee level.[173]

Supreme Court precedent, the legislative history, and the record before this Court powerfully demonstrate the need for the nonfederal funds prohibition at the national political party committee level. As the Supreme Court observed in *Colorado II*, "[w]hat a realist would expect to occur has occurred. Donors give to the

party with the tacit understanding that the favored candidate will benefit." *Colorado II*, 533 U.S. at 458, 121 S.Ct. 2351. The Findings of Fact establish that there is "no wall between the national parties and the national government." Findings ¶ 1.47; *see also* Briffault at 651–52 (observing the web of relations linking major donors, party committees and elected officials) (quoted with approval in *Colorado II*, 533 U.S. at 462–63, 121 S.Ct. 2351). As Congress recognized, given the blurring of the lines between federal officials and the national political party committees, the only way to address the problem with nonfederal funds was to prohibit the national committees from raising it. Findings ¶ 1.62.

As discussed, *supra*, federal officeholders hold positions of power in both the national political parties and the federal government. Briffault at 651 ("Under the current campaign finance system, however, the 'party-as-organization' and the 'party-in-government' are increasingly merged. Members of Congress constitute and control the CCCs [Congressional Campaign Committees] that play the leading role in providing party money and campaign services to congressional candidates. The President typically controls his party's national committee, and once a favorite has emerged for the presidential nomination of the other party, that candidate and his party's national committee typically work closely together. As a result, large donations to the party organization are effectively donations not just to specific candidates but to the party-in-government's

---

173. This point applies equally to Plaintiffs' suggestion that a more narrowly tailored approach would have been to simply prohibit labor unions and corporations from contributing nonfederal funds to the national political party committees. *See* McConnell Opp'n at 27. Such a prohibition would not address the actual or apparent corruption Congress sought to address with Section 323(a). The

record amply demonstrates that the corrupting potential of nonfederal funds donations was not simply confined to a particular source but with the actual or apparent corruption posed by the solicitation of nonfederal funds by federal officeholders and candidates and the problems created by the national committees' efforts to evade federal contribution limitations.

leadership, who use that money to protect or expand their power in government, by spending in congressional races and the presidential election."). Indeed, office-holders and candidates who are successful fundraisers gain enhanced stature in Congress as a result of their fundraising prowess. Findings ¶ 1.66 (statement of Senator Boren). In other words, it is often the case that those who are the best "soft money" fundraisers are the most influential government officials.

Given that the national political party committees and federal officeholders and candidates are "inextricably intertwined," Findings ¶ 1.62; *see also* ¶ 1.46, the national party ban is closely drawn. The record overwhelmingly demonstrates that large "soft money" donors are given access to special meetings with the President and key congressional leaders. *See, e.g., id.* ¶¶ 1.75.5, 1.77.10. Accordingly, Congress was justified in placing a complete ban on the national party committees raising nonfederal funds regardless of the ultimate use of those funds and regardless of who ultimately solicits them.

Finally, Plaintiffs contend that Section 323(a) sweeps too broadly because it will have "an immediate, debilitating, and long-lasting effect" on the national political party committees. RNC Br. at 55. I find this argument implausible. It bears emphasizing that the national political party committees have only been raising large sums of nonfederal funds in recent years. I do not take Plaintiffs to be actually arguing that prior to the explosive growth of nonfederal funds as a means of political party financing, political parties were somehow handicapped and unable to effectively communicate their message. The idea, therefore, that because political parties are now limited solely to federal funds they will be effectively silenced, is nonsensical based on the record developed in this case. *See* RNC Br. at 54 ("The net effects

of BCRA will be massive layoffs and severe reduction of important core political speech at the RNC, and reduction of many state parties to a 'nominal' existence.").

As *Buckley* observed, "[t]he overall effect of [FECA's] contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." *Buckley,* 424 U.S. at 21–22, 96 S.Ct. 612. The same applies to Section 323(a), which will require the national committees of the political parties to raise funds from a greater number of persons. Moreover, BCRA raises the individual contribution limitation to national political parties to $25,000. Now each national political party committee is permitted to receive up to $15,000 from political action committees, 2 U.S.C. § 441a(a)(2)(B), and up to $25,000 from individuals, BCRA § 307(a)(2); FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(B). In addition, in comparing the federal funds raised by the political parties during the 1996 election cycle with the 2000 election cycle, the Findings of Fact demonstrate that the amount of federal funds raised has increased. Findings ¶ 1.4.2. Given that BCRA has *increased* the federal funds limits for the national committees the suggestion that the absence of nonfederal funds from the coffers of the national committees is going to create a "severe reduction of important core political speech," RNC Br. at 54, is simply not credible.

In sum, I am convinced that a ban on nonfederal funds raised by the national political party committees is closely drawn to match the sufficiently important governmental interests. Deference to Congress's

judgment is warranted and appropriate for the contribution restriction in Section 323(a). Moreover, given the record established in this case and judicial precedent on the relationship of political parties and donors, I find that all of Plaintiffs' arguments for why Section 323(a) is not closely drawn are without merit.[174]

### (ii) Section 323(b) is Closely Drawn

Recognizing that the nonfederal funds prohibition on the national party committees in Section 323(a) would be rendered entirely ineffective without some form of corresponding restrictions on state, local, and district party committees use of nonfederal funds-a sensible proposition given the evidence discussed above-Congress enacted Section 323(b). Consistent with Congress's recognition that some state party spending does exclusively affect state elections, Congress doubled the hard money limitations available for state party committees, BCRA § 102; FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(D), and permitted state party committees to raise "Levin" funds to pay for Section 301(20)(A)(i) and (ii) activities, provided that certain conditions are met. BCRA § 101(a); FECA § 323(b)(2)(A)-(C); 2 U.S.C. § 441i(b)(2)(A)-(C).

With Section 323(b), Congress struck a compromise between requiring state and local political parties to use federal funds on "Federal election activity" and leaving to state law the state political party financing of activities related to state and local elections. Indeed, as one of the Senate sponsors stated:

> [BCRA] represents a balanced approach which addresses the very real danger that Federal contribution limits could be evaded by diverting funds to State and local parties, which then use those funds for Federal election activity. At the same time, the bill does not attempt to regulate State and local party spending where this danger is not present, and where State and local parties engage in purely non-Federal activities. We will not succeed in closing the soft-money loophole unless we address the problem at the State and local level. We do this, however, while preserving the rights and abilities of our State and local parties to engage in truly local activity.

148 Cong. Rec. S2138 (daily ed. Mar. 20, 2002) (statement of Sen. John McCain).

The detailed evidence discussed *supra*, convincingly demonstrates that nonfederal funds are funneled to the state political parties by the national political parties or donors at the direction of the national political parties or federal officeholders and candidates, to be used to influence federal elections. The evidence also shows that these contributions are given with the intent and effect of influencing federal elections. In addition to the evidence *supra*, representatives of all four of the national party congressional committees agree that they transfer "federal and nonfederal funds to state and/or local party committees for voter identification, voter registration and get-out-the-vote efforts. These efforts have a significant effect on the election of federal candidates." Findings ¶¶ 1.28, 1.32; *see also id.* ¶ 1.31. These statements are corroborated by documentary evidence, *id.* ¶ 1.28.1, 1.32, as well as by expert Donald Green who finds that

> [t]he evidence from California, as well as from numerous opinion surveys and exit polls that demonstrate the powerful correlation between voting at the state and federal levels, shows quite clearly that a campaign that mobilizes residents of a highly Republican precinct will produce a harvest of votes for Republican candi-

---

174. Given my conclusion that Section 323(a), in its entirety, is constitutional, I need not reach Judge Leon's discussion narrowing Section 323(a).

dates for both state and federal offices. A campaign need not mention federal candidates to have a direct effect on voting for such a candidate. That parties recognize this fact is apparent, for example, from the emphasis that the Democrats place on mobilizing and preventing ballot roll-off among African–Americans, whose solidly Democratic voting proclivities make them reliable supporters for office-holders at all levels. As a practical matter, generic campaign activity has a direct effect on federal elections.

*Id.* ¶ 1.28.2; *see also id.* ¶ 1.30. Therefore these efforts by the state political parties in states that hold their elections on the same day as federal elections, which the record shows are funded in part by the national political parties, *id.* ¶ 1.28.3, 1.43.1, 1.43.2.1, affect federal elections even if they are only intended to affect the state contests, *id.* ¶¶ 1.29, 1.33.

Congress clearly understood that political party committees are essentially one, large interdependent organism and that without legislation targeted at state and local parties, the new campaign finance law would permit easy evasion of the national party committee "soft money" ban. Congress was appropriately concerned that if Title I of BCRA policed only nonfederal donations at the national committee level, donors would simply make those same donations to the state and local "branches" of the national committees, which would then use those funds to influence federal elections. Congress would have accomplished little with a direct prohibition at the national political party level if there was no corresponding restriction on nonfederal funds at the state and local level, given the unitary nature of political parties. Section 323(b) is a key provision of Title I designed to prevent the nonfederal funds prohibition on the national parties in Section 323(a) from being rendered completely ineffective.

In drafting Section 323(b), Congress was aware that under the FEC's previous allocation regime, state and local party committees were permitted to spend a mix of federal and nonfederal funds on certain activities that directly influenced federal elections. Congress found, however, that these allocation rules permitted easy evasion of the federal contribution limitations because political parties at all levels were raising amounts, in many instances, far in excess of federal contribution limitations. Those monies, instead of going to fund a portion of nonfederal activity, were actually going to finance federal election activity. Therefore, for the national political parties, Congress required that they be exclusively financed with money raised according to federal law. With regard to the state and local political parties, Congress refined the allocation rules to require that state parties use exclusively federal funds when spending money on "Federal election activity." Section 323(b), therefore, ensures that the state and local parties are no longer used as conduits for national party spending of nonfederal funds to aid federal election campaigns.

Section 323(b) accomplishes this goal by only limiting or, in some instances, completely prohibiting state, district, and local political party committees' use of nonfederal funds when it is spent on: (1) voter registration activity that occurs within 120 days of a regularly scheduled federal election; (2) voter identification, GOTV activity, or generic campaign activity *conducted in connection* with an election where a federal candidate appears on the ballot; (3) public communications that refer to a clearly identified candidate for federal office and that promotes or supports or attacks or opposes a candidate for that office; or (4) an employee who spends more than 25 percent of his or her time during a given month on activities in connection with a federal election. BCRA § 101(b);

FECA § 301(20)(A)(i)-(iv); 2 U.S.C. § 431(20)(A)(i)-(iv). Plaintiffs argue that "BCRA has imposed a federally dictated clamp on the use of *all* state-regulated money." CDP/CRP Opp'n at 16 (emphasis in original); *see also* McConnell Br. at 40 (Section 323(b) regulates "activity that relates only to state and local elections and does not benefit federal candidates."); CDP/CRP Opp'n at 21 (Federal election activity "encompasses virtually all party activity"). Plaintiffs' statements are clearly inaccurate. The definition of "Federal election activity" and the corresponding restrictions on it in Section 323(b) are closely drawn to match the sufficiently important interests discussed above.[175]

It is true, no doubt, that Section 323(b) affects activity that has an impact on both federal and state elections. However, this, in and of itself, does not instantly pose First Amendment difficulties because the corruption related to nonfederal funds inheres in the fundraising process where major nonfederal donations are provided in exchange for access to federal officeholders and candidates-a process facilitated by the political party apparatus at all levels. The record demonstrates that the state political parties were equal partners and complicit in helping the national political parties raise and spend nonfederal funds for federal election purposes. Recognizing, however, that not every activity in which a state political party engages in affects federal elections, Congress sensibly limited the reach of BCRA to "Federal election activities," which are those activi-

ties at the state and local party level that strongly benefit federal candidates.

Since 1970, Congress has regulated the state and local political parties in this manner by requiring them to pay for many of these "Federal election activities" with federal and nonfederal funds. Plaintiffs' never challenge the constitutionality of having to use allocation percentages when paying for Section 301(20)(A) activities. If, as Plaintiffs' apparently concede, it is consistent with the Constitution to regulate how this activity is paid for in the first instance, then it is difficult for Plaintiffs to offer any compelling First Amendment argument that Congress is unable to require these activities to be paid for solely with federal funds, particularly given the interests articulated in the foregoing section. Plaintiffs' real complaint is that they are unable to continue to use the allocation ratios to pay for Section 301(20)(A) activities as they have done since the late 1970s. However, given the record in this case, I conclude that Congress is entitled to modify the allocation ratios as it has done statutorily in Section 323(b). To reiterate, the Supreme Court instructs that courts should not "second guess a legislative determination as to the need for prophylactic measures where the corruption is the evil feared." *NRWC*, 459 U.S. at 210, 103 S.Ct. 552; *cf. Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("courts must accord substantial deference to the predictive judgments of Congress").

---

175. Throughout their briefing, Plaintiffs proffer various examples of what they claim are "Federal election activit[ies]," which they then use to demonstrate BCRA's unconstitutionality. Many of these examples, however, are not covered under BCRA. For example, the RNC suggests that the Republican Party of Ohio could not use nonfederal funds to pay for printing a mailing of a flyer that reads

"Vote Republican; John Smith for Dogcatcher on November 6." RNC Br. at 27. First, the printing and mailing of the flyer would not be GOTV activity because it is not individualized. Also, it is not "generic campaign activity" because it mentions a specific state candidate. Additionally, because it only mentions a state candidate, it is not covered by Section 301(20)(A)(iii).

In 1987, Judge Thomas Flannery of the United States District Court for the District of Columbia required the FEC to implement regulations standardizing the allocation system. *Common Cause v. FEC*, 692 F.Supp. 1391, 1396 (D.D.C.1987). Judge Flannery observed that "it is possible that the Commission may conclude that *no* method of allocation will effectuate the Congressional goal that *all* monies spent by state political committees on those [volunteer materials, voter registration, and GOTV activities,] be 'hard money' under the FECA." *Id.* In 1987, it was determined that the allocation regime was sufficient. At the time of BCRA's passage, however, Congress determined that the allocation system was ineffective at preventing nonfederal funds from influencing federal elections.

Congress concluded, on the basis of the evidence before it, that the problems related to nonfederal funds already existed at the state political party level and that, prospectively, a national political party "soft money" ban would be entirely ineffective at the national level without some corresponding regulations at the state and local political party level. I shall briefly turn to each of the determinants of "Federal election activity."

(1) Section 301(20)(A)(i) and (ii) Activities

With regard to Section 301(20)(A)(i) and (ii) activities, the Findings compellingly demonstrate that voter registration activities, voter identification, GOTV activities, or generic campaign activity conducted in connection with an election where a federal candidate is on the ballot will have an influence on federal elections. As discussed *supra*, the record includes the testimony of the representatives of all four of the national party congressional committees that they transfer "federal and nonfederal funds to the state party committees for voter identification, voter reg-

istration and GOTV efforts." Findings ¶¶ 1.28, 1.32 (officials observing that "[t]hese efforts have a significant effect on the election of federal candidates"); *see also id.* ¶ 1.28.1, 1.32 (CDP touting impact it has on federal elections with voter registration, vote-by-mail, and get-out-the-vote efforts in a letter it sent to a contributor). Furthermore, it is clear that efforts to encourage a particular political party's partisans to the polls, will assist *all* of that party's candidates on the ballot, state, local and federal alike. Voter mobilization efforts are designed to get a particular political party's faithful to the polls for a particular election.

Moreover, the Levin Amendment provides further evidence that Congress sought to accommodate the interests of the state political party committees in drafting Section 323(b). Given that a majority of states hold their elections at the same time as federal elections, Congress recognized that Section 301(20)(A)(i) and (ii) activities would have a more dramatic effect on state and local elections than on other activities. As a result, Congress found it important to permit the state and local parties to supplement their federal funding with nonfederal funds raised pursuant to the Levin Amendment to pay for these activities. As long as the activity does not refer to a clearly identified candidate for federal office, the funds are not used for certain broadcast communications, and the funds are raised directly by the state or local political party according to the requirements of state law (in increments of $10,000 or less) the state political party committees can use Levin funds to pay for Section 301(20)(A)(i) and (ii) activities. When paying for activities with Levin funds, the FEC's allocation percentages apply to the expenditure.

As a result, the Levin Amendment essentially acts as a modified allocation sys-

tem. Congress determined that Section 301(20)(A)(i) and (ii) activity would often have a significant effect on state elections, given that most states hold elections at the same time as the federal government. By permitting the state and local parties to raise and spend "Levin funds," Congress allowed state and local political parties to continue to raise funds not subject to FECA *in a way that would not jeopardize the rest of the nonfederal money restrictions in Title I.* It can hardly be argued that a $10,000 donation to a state political party committee poses a threat of corruption when the federal limit on individual giving to state parties is also $10,000, BCRA § 102; FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(D), the limit to national parties is $25,000, BCRA § 307(a)(2); FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(B), and the total cap on individual contributions is $95,000 per two-year election cycle, of which $37,500 may be contributed to candidates. BCRA § 307(b); FECA § 315(a)(3); 2 U.S.C. § 441a(a)(3). In other words, even though the Levin Amendment permits some nonfederal money into the political party system, it does so in a way that will not create a new loophole and also serves to accommodate state interests regarding their elections.

Because it was Congress's desire to prevent a new loophole from emerging, when it enacted the Levin Amendment, Congress prohibited transfers among or joint fundraising by state and local political parties with respect to "Levin funds." BCRA § 101, FECA § 323(b)(B)(iv), (C); 2 U.S.C. §§ 441i(b)(2)(B)(iv), (C). I am not persuaded by Plaintiffs' arguments that these provisions are not closely drawn. McConnell Br. at 40; CDP/CRP Br. at 36–39.[176] As stated by Defendant–Intervenors, "[w]ere state and local parties free to transfer $10,000 contributions among themselves, contributors could multiply the amount of their permissible contribution to a particular party simply by funneling additional soft money through other party committees." Def.-Int. Br. at 63 n.228. By way of example, a donor attempting to gain influence with a candidate in one congressional district could make ten $10,000 contributions to ten local parties, on the understanding that the entire $100,000 would be transferred to the one party that was engaged in "Federal election activities" in that candidate's district. Def.-Int. Opp'n at 34. Of course, state and local political parties remain free jointly to raise or transfer as much nonfederal funds as they desire to pay for activities that are not considered "Federal election activity," subject only to state restrictions.

With the Levin Amendment, Congress determined that state and local political party committees should be permitted to spend limited amounts of nonfederal funds on certain "Federal election activities." Enacting this provision further demonstrates that Congress made a significant effort to tailor the nonfederal money restrictions at the state party level. Given

---

**176.** I am also not persuaded by the doomsday scenario described by the CRP and CDP regarding the effect BCRA will have on their fundraising. Findings ¶¶ 1.98–1.99.1 (also describing their fundraising and spending generally). Their estimations of BCRA's impact on their fundraising efforts are not based on any formal analysis, but instead on an application of BCRA to past fundraising efforts which is explained in an imprecise manner that leaves as many questions as it answers. *Id.* ¶ 1.98. It is unrealistic to think

that the state political parties will fundraise in exactly the same fashion under the BCRA regime as they did under FECA. Furthermore, Plaintiffs' own expert Raymond La Raja believes that BCRA will not affect some state parties' fundraising efforts at all, and while others may be affected, "[o]ne thing we can be sure of is that parties will figure out the ground rules and they will find an important role for themselves within the new campaign finance regime". *Id.*

that the provision must only be "closely drawn," I find that Congress's restrictions on Section 301(20)(A)(i) and (ii) activities are constitutional.[177]

### (2) Section 301(20)(A)(iii) Activity

Turning to Section 301(20)(A)(iii)-a public communication that supports or opposes a clearly identified federal candidate-I likewise find this provision constitutional under the First Amendment. In Judge Leon's opinion, he explains why Congress' decision to restrict state and local party organizations to funding Section 301(20)(A)(iii) activities with federal funds is closely drawn to match a sufficiently important interest. I agree with his analysis and concur with him that Section 323(b) is constitutional in restricting the state and local party committees to spending federal funds on Section 301(20)(A)(iii) activities. I would additionally point out that I am particularly persuaded by Judge Leon's discussion of the fact that Section 301(20)(A)(iii) is a restriction on a contribution (as opposed to an expenditure). To the extent that Judge Leon's opinion on

this point is inconsistent with anything that I have discussed in my own opinion-for example, my view of *Buckley*'s definition of corruption or my view of what constitutes pure issue advocacy-I do not join those portions of Judge Leon's discussion.[178]

### (3) Section 301(20)(A)(iv) Activity

Finally, with regard to Section 301(20)(A)(iv) activity-requiring state and local parties to use federal funds to pay the salary of an employee who spends more than 25 percent of his or her compensated time in a month in connection with a Federal election-I find that none of the Plaintiffs have articulated a specific reason for striking the provision down. In other words, Plaintiffs do not provide any specific argument as to why that provision is unconstitutional. Given the paucity of specific briefing on this provision (Defendants have also not spent any time addressing this specific provision), I would not hold Section 301(20)(A)(iv) facially unconstitutional.

---

**177.** In doing so, I am also not persuaded by Plaintiffs' arguments that some of the provisions in Section 301(20)(A)(i) and (ii) are vague; particularly "get-out-the-vote activity." *See, e.g.,* CDP/CRP Br. at 33. First, I am not persuaded that a reasonable person would have difficulty understanding what is meant by these terms, and the fact that these provisions apply to political actors only strengthens my conviction. Second, the FEC has promulgated implementing regulations related to "Federal election activity." Prohibited and Excessive Contributions: Non–Federal Funds or Soft Money, 67 Fed.Reg. 49,064, 49,083 (July 29, 2002). In my judgment, these regulations may mollify any constitutional uncertainties related to these terms. *See Martin Tractor Co. v. FEC,* 627 F.2d 375, 384–387 (D.C.Cir.1980), *cert. denied sub nom. Nat'l Chamber Alliance for Politics v. FEC,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). In *Martin Tractor,* the Court of Appeals determined that the advisory opinion process and the uncertainty of plaintiffs' legal

rights counseled against premature constitutional adjudication because the "adversarial posture assumed by the parties and contours of their dispute," *id.* at 387, lacked clarity, unlike other cases that had found ripeness in similar circumstances. Moreover, the fact the FEC "has said or done nothing ... to indicate how it construes the term 'solicit,'" left the court "without substantial guidance to decide this case or even to frame the constitutional issues at stake." *Id.* at 387. Finally, Plaintiffs have not spent much time briefing this issue, and I am therefore chary to strike these provisions down without waiting to see if the FEC's regulations ameliorate Plaintiffs' vagueness concerns. In the interim, an Advisory Opinion process stands by to prevent any potential chill that might be incurred by Plaintiffs.

**178.** This statement applies with equal force to any of the portions of my colleagues' opinions in which I am concurring.

(4) Conclusion

I find that Section 323(b) is closely drawn to match the sufficiently important governmental interests at stake in this case. Congress was appropriately concerned, as the record in this case tellingly indicates, that a prohibition on nonfederal funds at the national level would be entirely ineffective without corresponding restrictions on the state and local party committees. Section 323(b) is a closely drawn answer to that problem that continues to permit State and local parties to raise as much nonfederal funds as they are able to raise, consistent with state law, to be spent on activity that solely affects state elections.

(iii) Section 323(c)

This provision is not specifically challenged by any Plaintiff. As such, I do not pass on its constitutionality.

(iv) Section 323(d) is Closely Drawn

Section 323(d) is a measure intended to prevent political parties from using tax-exempt groups as a means of evading FECA's source, amount, allocation, and disclosure requirements. BCRA § 101; FECA § 323(d); 2 U.S.C. § 441i(d). Section 323(d) accomplishes this goal by prohibiting any political party committee or its agents from "solicit[ing]" funds for or "mak[ing] or direct[ing]" any donations to either: (i) any tax-exempt section 501 organization, see 26 U.S.C. § 501(c), that spends any money "in connection with an election for Federal office (including expenditures or disbursements for Federal

election activity)"; or (ii) any section 527 organization, see 26 U.S.C. § 527, (other than a state or local party or the authorized campaign committee of a candidate for state or local office). BCRA § 101; FECA § 323(d)(1); 2 U.S.C. §§ 441i(d).

As discussed above, the record clearly indicates that prior to BCRA, the political parties used tax-exempt organizations as a means of evading FECA's requirements. Congress was appropriately concerned that without restrictions on party solicitation and party direction of federal and nonfederal money to tax-exempt interest groups, party committees would continue to use satellite party organizations disguised as tax-exempt groups to continue to circumvent FECA and also help the parties circumvent the new contribution requirements in BCRA. Seen from this perspective, Section 323(d) is a reasonable, prophylactic measure to which this three-judge District Court owes deference. *NRWC*, 459 U.S. at 210, 103 S.Ct. 552.

Section 323(d) is closely drawn because it only applies to Section 501(c) organizations that "make[ ] expenditures or disbursements in connection with an election for *Federal office* (including expenditures or disbursements for Federal election activity)," BCRA § 101; FECA § 323(d)(1); 2 U.S.C. § 441i(d)(1) (emphasis added), and Section 527 organizations, which by definition have been given tax-exempt status because they engage in political activity.[179] BCRA § 101; FECA § 323(d)(2); 2 U.S.C. § 441i(d)(2). Section 323(d), therefore, focuses only on those non-profit orga-

---

**179.** Section 527 of the tax code defines a "political organization" as "a party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function." 26 U.S.C. § 527(e)(1). An "exempt function" is defined as "the function of influ-

encing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." 26 U.S.C. § 527(e)(2).

nizations that have posed a threat to the stability of the campaign finance regime. Parties continue to be permitted to contribute to any 501(c) organization that does not engage in "Federal election activity," BCRA § 101; FECA § 323(d)(1); 2 U.S.C. § 441i(d)(1), and are free to contribute federal funds to PACs formed by tax-exempt organizations that do engage in "Federal election activities," BCRA § 101; FECA § 323(d)(2); 2 U.S.C. § 441i(d)(2).

Despite this tailoring, Plaintiffs make a number of arguments that exaggerate the reach of Section 323(d). For example, the CDP Plaintiffs contend that Section 323(d) "prohibits the parties from participating in ballot measure campaigns." CDP/CRP Br. at 44. This statement is incorrect as state political parties are not in any way prohibited by BCRA from making direct expenditures to support or oppose ballot measures. BCRA does prohibit the state and local committees from soliciting donations on behalf of and directing any donations to an organization that engages in "Federal election activity." To the extent that ballot measure organizations, which the CDP Plaintiffs argue are "typically" Section 501(c)(4) organizations, engage in "Federal election activity," BCRA prohibits the political party committees at all levels from directing monetary contributions to those organizations.

There is no question that ballot measure organizations often engage in GOTV activity in and around federal elections. Indeed, the CDP should understand this fact. On October 19, 1999, Judge Garland E. Burrell, Jr. of the Eastern District of California ordered summary judgment for the Commission against the CDP because the CDP had contributed $719,000 in nonfederal funds to "Taxpayers Against Deception–No On 165," a tax-exempt California political committee opposed to a state spending referendum. *FEC v. CDP*, No. S–97–0891 (E.D.Cal. Oct. 14, 1999) (order granting summary judgment) at 2. None of the CDP's donations were reported to the FEC, *id.* at 7–8, and all but $2,000 of the money contributed by the CDP was knowingly used for partisan voter registration. *Id.* at 2, 13. The ballot committee persuaded the CDP to donate $719,000 to its organization because it promised to target potential registrants that would be predisposed to vote for Democrats based on historic voting patterns. *Id.* at 4. The district court in that case found that on the basis of this conduct, the CDP had "violated the FECA and the allocation rules by funding a generic voter drive that targeted Democrats." *Id.* at 15. Accordingly, contrary to the CDP's contention, ballot measure committees can not only help a party committee avoid disclosure requirements, but they can also help party committees avoid the allocation system. In other words, in the *FEC v. CDP* case, the $719,000 in nonfederal funds transferred to the ballot committee for voter registration did not have to be allocated between federal and nonfederal accounts, as the CDP would have had to do if it had engaged in the same spending. *See also* Findings ¶ 1.85.6.

The CDP Plaintiffs also make the argument that a party official could violate the law "simply for contributing to his or her church, if the church has engaged in nonpartisan activities encouraging (or assisting) its members to vote." CDP/CRP Br. at 46. This statement is incorrect. Section 323(d) only prohibits actions by party officials "on behalf of" the party committee. BCRA § 101; FECA § 323(d); 2 U.S.C. 441i(d). A party official's personal donation of his or her own money to a church, like other donations or solicitations made by party officials individually on their own behalf, are simply not covered under Section 323(d).

Section 323(d) applies to the party committees soliciting and directing federal and nonfederal funds to these tax-exempt organizations. The evidence in this case and the record before Congress demonstrates congressional concern with the role of tax-exempt organizations in circumventing FECA's contribution restrictions. *See* Findings ¶¶ 1.85–1.86. As discussed earlier, the record in this case establishes that prior to BCRA, parties and candidates would solicit and donate funds to tax-exempt organizations which would then be used to influence federal elections on behalf of the party or candidate donor. The legal advantage to employing a tax-exempt organization is that it avoids the source, amount, disclosure, and allocation system of the FECA regime. Therefore, Congress recognized that continuing to permit parties to solicit and direct federal funds to these tax-exempt organizations logically posed a circumvention problem. Notably with BCRA, Congress does permit political party committees to solicit and direct federal funds to PACs, which are regulated under FECA and required to make disclosures and to accept only federal funds. Tax-exempt organizations can establish political committees under the Act to which political parties can direct funds or solicit donations to the PAC.

As the foregoing discussion indicates, I find that Congress acted prophylactically and on the basis of a compelling record to ensure that tax-exempt organizations would not undermine the Title I's restrictions on nonfederal funds. As such, and on the basis of the record before me, I determine that Section 323(d) is closely drawn and facially constitutional.

(v) Section 323(e) is Closely Drawn

I concur with Judge Henderson's conclusion that Section 323(e) is constitutional under the First Amendment, albeit on slightly different grounds. Given my conclusion regarding the definition of Federal election activity, I do not find it necessary to narrowly construe the provision.

As discussed at length, political parties dangle access to federal candidates as bait to lure large nonfederal money donors. In response to this obvious problem, Congress enacted Section 323(e), which prohibits federal candidates and officeholders from soliciting, receiving, directing, transferring, or spending any nonfederal funds in connection with a federal election. BCRA § 101; FECA § 323(e)(1)(A); 2 U.S.C. § 441i(e)(1)(A). The statute permits federal candidates or officeholders to raise nonfederal funds in connection with a state and local election, provided that those funds do not exceed the federal contribution limitations and are from sources permitted under federal law. BCRA § 101; FECA § 323(e)(1)(B)(i) and (ii); 2 U.S.C. § 441i(e)(1)(B)(i) and (ii). Notably, a federal officeholder or candidate "may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party." BCRA § 101; FECA § 323(e)(3); 2 U.S.C. § 441b(e)(3). Also, federal candidates and officeholders may solicit money on behalf of any tax-exempt Section 501(c) organization whose "principal purpose" is not 301(20)(A)(i) or (ii) activity, so long as the solicitation does not specify how the funds will be spent. BCRA § 101; FECA § 323(e)(4)(A); 2 U.S.C. § 441i(e)(4)(A). Concomitantly, a federal candidate is permitted to raise money for a tax-exempt Section 501(c) organization that does engage in Section 301(20)(A)(i) and(ii) activity, subject to the condition that he or she may solicit up to $20,000 per person per year from individuals only. BCRA § 101; FECA § 323(e)(4)(B)(i) and (ii); 2 U.S.C. § 441i(e)(4)(B)(i) and (ii).

BCRA is closely drawn because it permits federal candidates and officeholders to continue to engage and fully participate

in the political process, but closely circumscribes their activities to prevent the kinds of problems that developed with their solicitation of nonfederal funds. For example, under BCRA, a federal officeholder may raise up to $2,000 from an individual for use in a state election, but may not raise money from a corporation for that purpose. However, to avoid undermining traditional political activity, BCRA permits federal candidates and officeholders to appear and speak at state and local party events. *Cf.* Findings ¶¶ 1.97, 1.96. Accordingly, Plaintiffs are simply wrong to claim that, under BCRA, "aside from speaking at and attending fundraising events, federal officeholders and candidates will otherwise be prohibited altogether from raising money directly for state and local candidates." McConnell Br. at 23–24. Rather, BCRA permits federal officeholders and candidates to raise nonfederal funds for state candidates, provided that they are within the federal source and amount limitations.

In my judgment, Defendants have adequately explained why Section 323(e) permits federal officeholders and candidates to make certain solicitations for tax-exempt organizations and why political parties and party officials under Section 323(d) are prohibited from making the same solicitation. *See* RNC Br. at 46 (arguing the "[t]hese provisions subjecting political parties to flat bans while permitting federal candidates and officeholders to engage in the same activities reveal an utter lack of tailoring in the Act's treatment of parties."). The reason for the difference is that unlike political party officials, candidates are subject to limits on solicitation at all times, not whether or not they are acting on behalf of the party. As Defendants suggest, "it was reasonable for Congress to allow candidates to make solicitations under limited circumstances that accommodate the legitimate interests of candidates in providing personal support

for certain organizations, while retaining the monetary limits that help minimize the risk of corruption." Gov't Opp'n at 39. Plaintiffs' offer no real response to this in their filings.

As Judge Henderson has observed in regard to Section 323(e) in her opinion, "[i]t bears emphasizing that the plaintiffs do not challenge this provision with the same vigor as they do BCRA's other nonfederal fund restrictions." Henderson Op. at 323. Given that Plaintiffs have spent little time engaging in a discussion of these issues and the fact that the record before this three-judge District Court amply supports the congressional decision to regulate federal candidates in this manner, I find that under *Buckley*'s scrutiny applicable to contribution restrictions, Section 323(e) is closely drawn and, therefore, consistent with the First Amendment.

### (vi) Section 323(f) is Closely Drawn

For the reasons set forth in Judge Leon's opinion, I similarly find Section 323(f) closely drawn to match the sufficiently important governmental interests discussed above.

### (c) *Conclusion*

In my judgment, Title I is a closely drawn contribution restriction targeted at reducing the corrosive influence of nonfederal funds on federal elections. As Justice Byron White remarked in *Citizens Against Rent Control:* "Every form of regulation-from taxes to compulsory bargaining-has some effect on the ability of individuals and corporations to engage in expressive activity. We must therefore focus on the extent to which expressive and associational activity is restricted by [the law at issue]." *Citizens Against Rent Control*, 454 U.S. at 310, 102 S.Ct. 434 (White, J., dissenting). Taking a comprehensive view of Title I, as I have done in

my discussion above, I conclude that any infringement on First Amendment protections is more than outweighed by the significant state interests behind regulating nonfederal funds. Accordingly, I find Title I consistent with the First Amendment guarantees of speech and association and the ruling in *Buckley*.

### C. *Plaintiffs' Equal Protection and Underbreadth Claims*

Plaintiffs contend that Title I is also unconstitutional because it violates the Fifth Amendment by restricting the activities of political parties without imposing similar restrictions on special interest groups. *See, e.g.*, McConnell Br. at 40–43; RNC Br. at 57. As a corollary to this argument, Plaintiffs contend that in treating political parties differently from special interest organizations, Title I is fatally underinclusive because it "does not begin to address the supposed access enjoyed by hard-money donors to political parties or by special interest groups." RNC Br. at 65. Since I find Title I consistent with the First Amendment guarantees of speech and association, I am required to reach Plaintiffs' arguments on these points. After considering the parties' arguments and the relevant caselaw, I find Plaintiffs' contentions on these points to be without merit.

Assuming that Plaintiffs' equal protection arguments are even viable after my discussion of Plaintiffs' First Amendment issues, *see* 3 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law–Substance & Procedure* § 18.40 (3d ed.1999), I find their arguments unpersuasive.[180] It is a well-worn tenet of equal protection analysis "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). It is well understood, therefore, that the "Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (internal citation and quotation marks omitted). In this case, the record and prior precedent demonstrate that political parties are not "similarly situated" to special interest organizations. The law does not treat political parties "better or worse" than special interest organizations. It only treats them differently because they have different interests that need to be accommodated, and they have a different role in the campaign system and in the government than do special interest organizations.

The record in this case establishes the unique situation of political parties in the political process. As Plaintiffs' expert La Raja concludes, "[m]ost interest groups, in contrast [to political parties], seek to build

---

**180.** As Professors Rotunda and Nowak discuss:

It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights. Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause. Should the laws survive substantive review under the specific guar- antees they are also likely to be upheld under an equal protection analysis, for they have already been found to represent the promotion of government values which override the individual interest in exercising the specific right.... If the Court examines the classification under the First Amendment and finds that the classification does not violate any First Amendment right, the Court is unlikely to invalidate that classification under equal protection principles. 3 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law–Substance & Procedure* § 18.40 (3d ed.1999).

relationships with officeholders as a way of improving access to the legislative process and lobbying their position.... Political parties ... allocate resources for electoral strategies, meaning they contribute money to a party candidate who is in a potentially close election." Findings ¶ 1.16.2; *see also id.* ¶ 1.46 (discussing the special relationship between political parties and their candidates/officeholders). Furthermore, an RNC official agrees that interest groups can never replace political parties. *Id.* ¶ 1.89. As Senator McCain testifies, "[t]he entire function and history of political parties in our system is to get their candidates elected, and that is particularly true after the primary campaign has ended and the party's candidate has been selected." *Id.* ¶ 1.48. In fact, FECA recognizes this difference when it defines a political party as "an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization." 2 U.S.C 431(16). Interest groups are simply not connected to candidates in the same manner. *See Colorado II,* 533 U.S. at 449, 121 S.Ct. 2351 ("[t]here is no question about the closeness of candidates to parties").

It is therefore the case that BCRA treats political parties differently than special interest organizations. For example, political parties are permitted to receive greater contributions from individuals than are interest groups. *Compare* BCRA § 307(a); FECA § 315(a)(1)(B); 2 U.S.C. § 441a(a)(1)(B) *with* 2 U.S.C. § 441a(1)(C). The political parties are permitted to make greater coordinated expenditures in support of federal candidates than special interest organizations. 2 U.S.C. § 441a(d). Moreover, the national political parties and the national Senate committees may make greater contributions to Senate candidates than special interest groups. BCRA § 307(c); FECA

§ 315(h); 2 U.S.C. § 441a(h). Finally, BCRA permits national political parties to transfer federal money (in any amount) to other party committees without being subject to the contribution limits that apply to such transfers by nonparty committees. 2 U.S.C. § 441a(a)(4). At the same time, special interest organizations set up as nonprofit corporations, will have to comply with the electioneering communication provisions in Title II. *See supra.* BCRA presents a symmetrical approach to the problems plaguing the campaign finance system: national political party fundraising of nonfederal funds and interest organizations using general treasury funds to influence a federal election. The law simply recognizes the unique nature of these organizations in the political process and accommodates them in different ways. *Cf. California Med. Ass'n,* 453 U.S. at 201, 101 S.Ct. 2712 ("The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process."). Accordingly, I find that Title I does not violate the Fifth Amendment guarantees of equal protection.

As a corollary of their Fifth Amendment arguments, Plaintiffs also contend that Title I is underinclusive because it does not subject interest groups to the same restrictions on nonfederal money applicable to political party committees. McConnell Br. at 41–43; RNC Br. at 57–58, 65. As the Court of Appeals has held, "a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals."

*Blount v. SEC*, 61 F.3d 938, 946 (D.C.Cir. 1995) (emphasis in original). As "the primary purpose of underinclusiveness analysis is simply to 'ensure that the proffered state interest actually underlies the law,' *Austin*, 494 U.S. at 677, 110 S.Ct. 1391 (Brennan, J., concurring), a rule is struck for underinclusiveness only if it cannot 'fairly be said to advance any genuinely substantial governmental interest,' *FCC v. League of Women Voters*, 468 U.S. 364, 396, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)." *Id.* As I have shown above, the record in this case significantly demonstrates that Title I is carefully tailored to address the problem that was before Congress-nonfederal funds raised by the national committees of the political parties. The rationale underlying Title I simply does not apply with equal force to entities not covered by Title I. Accordingly, an underinclusive challenge is without merit.

I also agree with Defendants when they state that Plaintiffs make a policy argument better suited for the legislature than the judiciary when Plaintiffs argue that "Title I's differential treatment of parties and special interest groups will make matters worse, not better." RNC Br. at 67 (capitalization altered).[181] Def. Opp'n at 52; *Cf. Colorado II*, 533 US. at 454 n. 15, 121 S.Ct. 2351 ("[W]e do not mean to take a position on the wisdom of policies that promote one source of campaign funding or another."). The problem that Congress sought to solve related to the fundraising abuses and access given to large nonfederal money contributors to political parties. Title I accomplishes this goal in a narrowly tailored fashion.

Moreover, the evidence in the record is at best inconclusive as to whether nonfederal funds will suddenly flow to special interest groups. While there is some evidence in the record that interest groups are expected to receive nonfederal funds donations, there is equal evidence in the record that nonfederal funds will not flow to special interest groups since these groups cannot deliver "the special favors that only a political party can deliver by dint of its ubiquitous role in all levels of government." Findings ¶ 1.87.[182] As the Findings demonstrate, the experts are divided on this question. Accordingly, it is the choice of Congress as to whether it should refrain from offering legislation at this time directed at special interest organizations. If special interest groups create problems of corruption worthy of congressional attention, that is always the prerogative of Congress; but such an amendment to campaign finance laws would require a compelling record not present here. *Cf.*

---

**181.** As part of this argument, Plaintiffs present evidence attempting to show that under BCRA, interest group activity will escalate and supplant those activities traditionally done by political parties. Findings ¶¶ 1.87–1.88, 1.91–1.93. This change would be a negative development, Plaintiffs attempt to show, because interest groups do not operate as transparently as political parties. *Id.* ¶¶ 1.90, 1.91. A review of the facts leads to the conclusion that none of them sheds much light on what BCRA's impact will be on the activities of interest groups. *Id.* ¶ 1.95. Furthermore, the evidence regarding the lack of disclosure required of interest group political activity does not take into account BCRA's new disclosure requirements. *Id.*

**182.** Plaintiffs also cite to a series of newspaper articles for the fact that interest groups are now *"gearing up"* to supplant political party committees with respect to nonfederal fundraising. McConnell Br. at 42 (emphasis added). This evidence is highly speculative and since it would not form a basis for congressional action in the first instance, I am not persuaded that Congress needed to grapple with this problem; particularly when expert evidence is largely divided over whether special interest groups will even supplant political party committees in nonfederal funds fundraising.

*NRWC*, 459 U.S. at 209, 103 S.Ct. 552 ("This careful legislative adjustment of the federal electoral laws, in a cautious advance, step by step, to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference.") (internal quotation marks and citations omitted). Accordingly, in my judgment, Plaintiffs' underbreadth challenge fails.

### D. *Plaintiffs' Federalism Challenge*

My colleagues, with two exceptions, do not specifically address Plaintiffs' claims that Title I violates Article I, Section 4, and the Tenth Amendment of the Constitution by "usurping the right of states to regulate their own elections." McConnell Br. at 9 (capitalization altered).[183] Given that I find Title I constitutional in keeping with *Buckley* and the First Amendment, I am also required to reach Plaintiffs' federalism arguments. However, after serious reflection, particularly in regard to the parties' answers to my questions at oral argument, I do not find that any of the Plaintiffs before this three-judge panel have standing to raise a Tenth Amendment challenge to Title I.[184]

It is true that standing for private parties challenging acts of Congress has been found when a plaintiff asserts that Congress has acted in excess of its Article I powers. Most of these cases have focused on situations where Congress plainly exceeded its power under the Commerce Clause and the statutes were declared unconstitutional. *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding that the Gun–Free School Zones Act, making it a federal offense for any individual knowingly to possess a firearm at a place that an individual knows or has reasonable cause to believe is school zone, exceeded Congress's commerce clause authority); *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that the Commerce Clause did not provide Congress with authority to enact civil remedy provision of Violence Against Women Act). On the other hand, courts have been reluctant to provide private parties with standing when they are asserting the rights of a State. *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939) ("As we have seen there is no objection to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, *have no standing in this suit to raise any question under the amendment.*") (emphasis added); *Mountain States Legal Found. v. Costle*, 630 F.2d 754, 761 (10th Cir.1980) ("Only the State has standing to press claims aimed at protecting its sovereign powers under the Tenth Amendment.").

**183.** Judge Henderson rejects Plaintiffs' federalism challenge to Section 323(e). Henderson Op. Part IV.D.4, while Judge Leon rejects Plaintiffs' federalism challenge with regard to Section 301(20)(A)(iii) activities. Leon Op. Part I.B.2. Neither of my colleagues, however, address the question of whether Plaintiffs have standing to present his argument.

**184.** When I refer to standing in this context, I am specifically referring to rules of prudential standing which act as self-imposed limitations on the jurisdiction of Article III courts. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that 'the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' *Warth v. Seldin*, 422 U.S. [490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ].""). It is my view, therefore, that Plaintiffs lack "third-party standing" to assert the constitutional rights of the States.

In *New York v. United States*, the Supreme Court articulated this distinction in the context of a *State* bringing suit:

In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution *See, e.g., Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819). In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. *See, e.g., Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Lane County v. Oregon*, 74 U.S. 71, 7 Wall. 71, 19 L.Ed. 101 (1869). *In a case like these, involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress. See United States v. Oregon*, 366 U.S. 643, 649, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *Case v. Bowles*, 327 U.S. 92, 102, 66 S.Ct. 438, 90 L.Ed. 552 (1946); *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941).

*New York v. United States*, 505 U.S. 144, 155–56, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (emphasis in original). In the context of a State bringing suit, the Supreme Court concluded that the distinction was practically irrelevant. *Id.* at 159, 112 S.Ct. 2408 ("In the end, just as a cup may be half empty or half full, it makes no difference whether one views the question at issue in these cases as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment."). The Supreme Court has not, however, addressed whether this distinction is of no practical difference when a private party challenges a law of Congress and indirectly asserts the Tenth Amendment as a basis for finding the law unconstitutional. Indeed, given *Lopez* and *TVA*, it would appear that this distinction is relevant when someone other than the State or the State's officials are bringing the challenge.

This distinction is the reason Plaintiffs claim at places in their briefing that their federalism challenge involves the argument that Congress lacks the affirmative power to have enacted BCRA under the Elections Clause. *See, e.g.*, McConnell Reply at 4 n.2 ("[P]rivate parties are routinely allowed to bring suit where they are claiming that Congress acted *outside* its delegated powers, rather than merely asserting that Congress violated state sovereignty in acting *under* its delegated powers.") (emphasis in original) (citing *Lopez*). Despite what Plaintiffs state, their briefing shifts between these two poles and is often not clear as to whether they are making a "Tenth Amendment" argument that Congress is transgressing "the province of state authority reserved by the Tenth Amendment," *New York*, 505 U.S. at 155, 112 S.Ct. 2408, or are simply arguing that Congress had exceeded its delegated authority, *id. See, e.g.*, CDP/CRP Br. at 21 ("In this case, plaintiffs' [sic] believe that the two inquiries [identified in *New York*] do indeed converge, but that under either inquiry, BCRA oversteps the boundary between federal and state authority.") (internal citation and quotation marks omitted).

The ease with which Plaintiffs move between these two arguments is problematic.

If it is the case that Plaintiffs are making a Tenth Amendment argument that Congress, in enacting BCRA, was transgressing the province of state authority reserved by the Tenth Amendment, then *TVA* holds that Plaintiffs do not have standing to bring such a challenge.[185] However if, Plaintiffs are arguing that Congress lacks the affirmative authority to enact Title I, then presumably *Lopez* and that line of cases recognizes private parties do have standing to assert such a challenge at least in the context of the Commerce Clause.

In order to make an argument that Congress has acted *outside* its power under the Elections Clause in enacting Title I of BCRA, Plaintiffs are forced to contend that Congress is intruding on the ability of *States* to regulate their own elections. *See, e.g.*, McConnell Br. at 9 ("For the first time in the relatively short history of campaign finance regulation, Congress has enacted legislation that systematically restricts political activity not only in federal elections, but also in state and local elections. *This massive intrusion into a core area of state sovereignty-the ability of States to regulate their own elections*-violates basic principles of federalism.") (emphasis added). To the Plaintiffs in these consolidated cases, therefore, BCRA violates state sovereignty and the focus of their arguments are on the injury to the States.

This result is different from the Supreme Court striking down a law in the Commerce Clause context, like *Lopez*, where the argument is that the legislature focused on a problem unrelated to interstate commerce. *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."). However, given the nature of Title I, and the Elections Clause, Plaintiffs are really contending that Congress was not simply regulating federal elections, *but was impermissibly legislating state elections*. *See, e.g.*, McConnell Br. at 17 ("By imposing federal limits on these activities, BCRA effectively overrides the laws of numerous States...."). The injury in this context is not held by an individual plaintiff, but rather the injury is only held by the State, who organizes the elections pursuant to state law. Since Title I operates as a contribution restriction, the injury to the Plaintiffs in this case rests on an interference with funds specifically regulated or not regulated by their individual States. Premising a Tenth Amendment argument based on the Elections Clause, in the context of BCRA, therefore compels Plaintiffs to present an argument that specifically rests on the rights of their individual States, who have chosen to regulate or not regulate these funds.[186]

---

**185.** I would observe, that the D.C. Circuit in the *Lomont* case recently discussed the issue of private party standing under the Tenth Amendment in a footnote. *Lomont v. O'Neill*, 285 F.3d 9, 13 n. 3 (D.C.Cir.2002). While the D.C. Circuit did not rule on this issue, it certainly hinted that the Supreme Court should be the tribunal to overrule *TVA* and not the lower courts. Accordingly, to the extent Plaintiffs are claiming that they fit into the latter category of cases, I find that *Lomont* cautions against this three-judge panel finding

standing. *See City of Roseville v. Norton*, 219 F.Supp.2d 130, 148 (D.D.C.2002) ("This Court is bound to apply Circuit precedent. *Lomont* implicitly recognizes that the Seventh Circuit's reasoning in *Gillespie* [a case finding private party standing under the Tenth Amendment] cannot be squared with *TVA*'s holding.").

**186.** In another context, therefore, Plaintiffs might have private party standing to assert that Congress exceeded its authority under the Elections Clause. However, in the con-

At oral argument, CDP Plaintiffs' counsel had difficulty explaining this nuanced difference in relation to their legal positions. *See* Tr. at 29–30. RNC Plaintiffs' counsel proffered that under *Oregon v. Mitchell*, Plaintiffs had standing because the Supreme Court decided that case based on "Congress's overreach." Tr. at 43. In *Oregon v. Mitchell*, the Court considered, *inter alia*, amendments to the Voting Rights Act that would have given 18 year-olds the right to vote. The Court upheld the amendments as applied to federal elections, but struck them down as applied to state and local elections. *Oregon v. Mitchell*, 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Black, J.). Justice Black, in striking down that portion of the Act that applied to state elections, stated that "[n]o function is more essential to the separate and independent existence of the *States and their governments* than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices." *Id.* at 125, 91 S.Ct. 260 (emphasis added); *see also id.* at 124–25, 91 S.Ct. 260 (observing that "the Framers of the Constitution intended the *States* to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections") (emphasis added).

It is correct that *Mitchell* found that Congress had acted in excess of its statutory authority, but *Mitchell* involved an *original* action in the Supreme Court brought by a number of *States* who resisted compliance with the Voting Rights Act.

*Id.* at 117, 91 S.Ct. 260; *see also id.* at 117 n. 1, 91 S.Ct. 260 ("No question has been raised concerning the standing of the parties or the jurisdiction of this Court."). Accordingly, in *Mitchell*, there was no question that the plaintiffs in that case were able to argue that Congress exceeded its power under the Elections Clause because the plaintiffs in that action were either the States themselves or the United States, who had each invoked the original jurisdiction of the Supreme Court of the United States. The question in this case is whether a private party can assert that right on behalf of the State. As no States are among the 77 plaintiffs to this case, and as none of the Plaintiffs bring suit as representatives of the States, I find that Plaintiffs' Tenth Amendment challenge to Title I is nonjusticiable.

The issue of third-party standing is particularly weighty in this case, where for example, the State of Kentucky has joined an *amicus* brief in support of BCRA, while Plaintiff Mitch McConnell, who represents Kentucky in the Senate, is a lead Plaintiff challenging BCRA. Moreover, this situation represents a question that the Supreme Court has not definitively addressed. *See Pierce County v. Guillen*, 537 U.S. 129, 123 S.Ct. 720, 732 n. 10, 154 L.Ed.2d 610 (2003) ("[I]n light of our disposition . . ., we need not address the second question on which we granted certiorari: whether private plaintiffs have standing to assert 'states' rights' under the Tenth Amendment where their States' legislative and executive branches expressly approve and accept the benefits and terms of the federal statute in question.").[187]

text of BCRA, the parties are actually asserting the rights of their individual States in this litigation.

**187.** Beside Kentucky, 18 States, the Commonwealth of Puerto Rico, and the Territory of the United States Virgin Islands support BCRA, although they take no position on the standing issue. *See* Am. and Substituted Br.

of *Amici Curiae*–The States of Iowa and Vermont *et al.;* Utah and seven other states oppose BCRA and do not address the standing issue. Br. of *Amici Curiae* Utah, *et al.* The Utah *Amici* point out in a footnote that Alabama did not join the *amici* brief because Alabama's Attorney General William Pryor was a named Plaintiff in the *McConnell* ac-

Since I have found that Plaintiffs lack standing to raise claims under the Elections Clause and Tenth Amendment, I do not proceed further. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act *ultra vires*.").

### E. *Conclusion*

In my judgment Title I in its entirety is constitutional. The evidence put forward in the record provides ample justification for Congress enacting the contribution restrictions at issue in the case. The record demonstrates that FECA's entire contribution structure has been completely gutted by political actors willing to test the limits of the law in a manner that has returned the campaign finance system to a regime equaling the troubling aspects of the 1972 regime. In response, Plaintiffs argue that "BCRA simply goes too far." CDP/CRP Br. at 46. However, reading Plaintiffs' briefing in this case, I am not sure if Plaintiffs would accept any restrictions whatsoever on nonfederal funds. In-

deed, Plaintiffs' view of corruption is so incompatible with the *Buckley* Court's understanding of the term, that under Plaintiffs' governing rationale, FECA's contribution limitations upheld in *Buckley* would be struck down.

The Supreme Court has long recognized Congress' broad authority to enact measures to protect the integrity of federal elections. Title I accomplishes its purpose without unduly transgressing the rights of individuals to engage in the political process. While there may be future challenges which test some of the regulations at issue in this case, at this facial challenge stage, Title I survives constitutional attack.

### III. TITLE III: MISCELLANEOUS

### *Sections 304, 305, 307, 316, and 319*

I concur with Judge Henderson's with regard to: BCRA Section 305, the condition on the lowest broadcast unit charged; BCRA Section 307, regarding increased contribution limitations; and BCRA Sections 304, 316 and 319, special provisions dealing with financing campaigns against wealthy opponents (also known as the "Millionaire Provisions").

---

tion. *Id.* at 2 n. 1. The footnote is silent on whether Pryor brought suit in his official capacity representing the State of Alabama. However, it is clear from the entire record in this case that Pryor did not bring this suit in his official capacity. *See* McConnell Second Am. Compl. ¶ 18. At oral argument, Judge Henderson raised the question with Defendant–Intervenors' counsel whether Attorney General Pryor brought suit in his official capacity on behalf of Alabama. The colloquy was:

> JUDGE HENDERSON: Isn't the Alabama Attorney General, Bill Pryor, a plaintiff in the McConnell?
> COUNSEL: Yes, he is.
> JUDGE HENDERSON: Why isn't he, to the extent that that standing is needed, why doesn't he fill that?

> COUNSEL: Because I don't believe he's bringing the action in his capacity as a representative of the state.
> JUDGE HENDERSON: All right. I don't remember in the complaint.
> COUNSEL: I don't think the State of Alabama is a party in this case.
> JUDGE HENDERSON: Well, the state isn't, but he's not representing the State of Alabama.
> COUNSEL: I don't believe so, no.
> JUDGE HENDERSON: All right.

Tr. at 124–25. Plaintiffs registered no objection to this discussion and, therefore, the only conclusion to be drawn is that Mr. Pryor is not bringing suit in his official capacity on behalf of the State of Alabama.

### Section 318: Prohibition of Contributions by Minors

Section 318 adds Section 324 to FECA, providing that:

> An individual who is 17 years old or younger shall not make a contribution to a candidate or a contribution or donation to a committee of a political party.

BCRA § 318; FECA § 324; 2 U.S.C. § 441k. Section 318 is challenged by the McConnell Plaintiffs.

The Government maintains that this provision is subject to *Buckley*'s "closely drawn" scrutiny standard. Gov't Br. at 199. According to the Government, Section 318 serves the important governmental interest of preventing circumvention of contribution limits and is closely drawn to avoid unnecessary infringement of constitutional rights. *Id.* at 200–08. Plaintiffs disagree, arguing that since the provision works as a complete ban on contributions by minors to candidates and political party committees, it is subject to strict scrutiny. McConnell Pls.' Br. at 92. Plaintiffs maintain that even if exacting scrutiny is the appropriate standard, preventing circumvention is not a cognizable government interest in the campaign finance context, and that even if it were, Defendants have failed to show that Section 318 is tailored to serve that interest. *Id.* at 93.

Given the evidence presented in this case, I need not decide the appropriate standard of review, for even if exacting scrutiny were applied to the present situation, Defendants have failed to present sufficient evidence to establish that parents' use of minors to circumvent campaign finance laws serves an important governmental interest.[188] Although it is clear that the FEC and Congress have been concerned for many years with the potential for campaign finance abuses through the use of minors' contributions,[189] Findings ¶¶ 3.1, 3.2, the evidence presented is insufficient to support government action that abridges constitutional freedoms.

Campaign finance laws prohibit anyone from making "a contribution in the name of another person or knowingly permit[ting] his name to be used to effect such a contribution," or "knowingly accept[ing] a contribution made by one person in the name of another person." 2 U.S.C. 441f. Donations made by minor children are specifically addressed in FEC regulations. *See* 11 C.F.R. 110.1(i)(2) (2002 revised ed.).[190] However, enforcing these provisions with respect to contributions by minors has been difficult due to the fact that FECA does not require reporting of a donor's age. *Id.* ¶ 3.9. The evidence also shows that when the FEC

---

**188.** This reason necessarily precludes discussion of whether the provision is narrowly tailored to meet an important governmental interest.

**189.** The record also demonstrates that not all contributions to political campaigns made by minors are done by their parents in circumvention of campaign finance laws. *See, e.g.,* Findings ¶ 3.7.

**190.** The regulations provide that contributions by minors that do not violate FECA's other provisions are permitted so long as

(i)The decision to contribute is made knowingly and voluntarily by the minor child;

(ii) The funds, goods, or services contributed are owned or controlled exclusively by the minor child, such as in-come earned by the child, the proceeds of a trust for which the child is the beneficiary, or a savings account opened and maintained exclusively in the child's name; and

(iii) The contribution is not made from the proceeds of a gift, the purpose of which was to provide funds to be contributed, or is not in any other way controlled by another individual.

11 C.F.R. 110.1(i)(2) (2002 revised ed.).

has discovered donations given by young children which raised suspicions, their investigations were stymied by the refusal of parents to allow interviews, constitutional privacy concerns, and parental and legal counsel influence. *Id.* ¶ 3.10.

Perhaps due to these difficulties, the Government was able to provide the Court with only four instances where the FEC found contributions were made by parents in the name of their minor children in violation of existing campaign finance laws. *Id.* ¶ 3.8–3.8.4. Some of these investigations have been prompted by newspaper articles discussing contributions made by parents in their young children's names. *Id.* ¶ 3.5, 3.6. Therefore, although the record shows that the threat of circumvention in this manner exists, including statements from lawmakers that fundraising appeals include appeals for contributions from family members, *id.* ¶¶ 3.3, 3.4, the minimal evidence presented does not establish that circumvention of campaign finance laws by parents of minors supports the required governmental interest. If the Government had proffered a more robust record establishing that such corruption exists it likely would have succeeded in establishing this element of the analysis, given that all members of the Supreme Court agree "that circumvention is a valid theory of corruption." *Colorado II,* 533 U.S. at 456, 121 S.Ct. 2351. The Government's failure to do so, however, dooms their arguments and Section 318 of BCRA.

## IV. TITLE V: ADDITIONAL DISCLOSURE PROVISIONS

### Section 504

For the reasons stated in Judge Leon's opinion, I concur that Section 504 is unconstitutional.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, I find Title I in its entire-

ty consistent with the Constitution. Moreover, I conclude that BCRA's restrictions on electioneering communication[as set out in Sections 201, 203, and 204 are constitutional. I also find Section 301 of BCRA constitutional. I further determine that Sections 213, 318, and 504 are unconstitutional. I concur with Judge Henderson's discussion of Plaintiffs' standing with regard to BCRA's condition on the lowest broadcast unit charged, BCRA's increased contribution limitations, and BCRA's "Millionaire's Provisions."

For anyone who has great faith in the purity of this country's democracy, the factual record amassed in this case is bound to depress. The pre-BCRA campaign finance regime saw wealthy individuals, corporations, and labor unions routinely providing donations, far surpassing legal limitations, to the national party committees to influence federal elections. In some instances, this system compelled corporate entities to give massive amounts of nonfederal funds to the national party committees merely to stay on par with their competitors. Of greater concern, corporations and labor unions poured massive amounts of general treasury funds into electioneering communications designed to influence federal elections, despite longstanding federal policy against corporate and labor union general treasury funds being used for these purposes.

Judge Henderson criticizes my reasoning and conclusions as "treat[ing] a First Amendment with which [she is] not familiar." Henderson Op. at 5. My response is that my approach to adjudicating these cases and the constitutional challenges presented therein has been grounded in a textual analysis of *Buckley* and its progeny. My view of the First Amendment emanates from *Buckley*'s teachings and in resolving these cases I have continually

returned to *Buckley* for insight and guidance.

Having spent much time reviewing the record submitted in this case, one thing is very clear: evidence of the wholesale evasion of FECA is not "anecdotal" or "beside the point." Rather, it is evidence of a regulatory regime in disarray. Without BCRA, the major provisions of the Federal Election Campaign Act designed to reduce the corrupting influence of large sums of money channeled into the political process are decimated. The clock will be turned back to close to 100 years of incremental and balanced campaign finance regulation.

Congress, which has concentrated on enacting a law that is true to *Buckley* to address these abuses, should not be left impotent to correct these glaring problems. In reading much of the legislative debate surrounding BCRA's passage, I am struck by the concern of Congress to abide by *Buckley*'s teachings. In my judgment, the fact that Congress was so cognizant of *Buckley* should give this three-judge panel great pause before reaching out to strike down wholesale provisions of BCRA. In declaring much of BCRA's core tenets facially unconstitutional, it is my belief that this panel's approach has strayed from the conservative, measured, and customary approach to adjudicating facial challenges that is demanded by the dictates of our constitutional tradition. Simply put, on the basis of the record assembled, the Constitution does not act as an impermissible barrier to the changes sought by our coordinate branches to improve the democratic process.

With the record firmly before it, the Supreme Court will review this three-judge panel's legal conclusions *de novo. Cf. Colorado II,* 533 U.S. at 458 n. 21, 121 S.Ct. 2351. The constitutional rights of those who participate in the election of federal officeholders are unquestionably of the highest order, but so too is the sanctity of the process that produces those public officials who participate in the governance of our democratic society.

## APPENDIX

### I. *Expert Reports on BCRA's Effect on Political Advertisements*

Defendants have provided a number of expert reports to address the issue of whether BCRA is overbroad in terms of the types of advertisements it affects. *See, e.g.,* Jonathan S. Krasno & Daniel E. Seltz, Buying Time: Television Advertising in the 1998 Congressional Elections (2000) *("BT 1998")* [DEV 47]; Craig B. Holman & Luke P. McLoughlin, Buying Time 2000: Television Advertising in the 2000 Federal Elections (2001) *("BT 2000")* [DEV 46]; Goldstein Amended Expert Report (Oct. 2, 2002) ("Goldstein Expert Report") [DEV 3–Tab 7]; Jonathan S. Krasno & Frank J. Sorauf, Evaluating the Bipartisan Campaign Reform Act (BCRA) [DEV 1–Tab 2] ("Krasno & Sorauf Expert Report"). These studies have been subject to various criticisms, which have been responded to, and I set forth these arguments below.

### A. *The CMAG Data Set*

1. All of these studies relied on data from the Campaign Media Analysis Group ("CMAG"), and for that reason, the Court considers it useful to discuss their underlying data source which becomes a point of criticism for Plaintiffs' expert, Dr. James L. Gibson, before discussing the studies' themselves. Dr. Gibson, Plaintiffs' expert witness, produced "An Analysis of the 1998 and 2000 Buying Time Reports," criticizing both Buying Time studies. James L. Gibson, Expert Report, An Analysis of the 1998 and 2000 Buying Time Reports (Sept. 30, 2002) ("Gibson Expert Report") [1 PCS].

2. CMAG tracks political television advertising in the top 75 media markets, containing more than 80 percent of U.S. residents. *BT 1998* at 6–7 [DEV 47]; *BT 2000* [DEV 46] at 18; Gibson Expert Report at 7 [1 PCS]; *see also* Goldstein Dep. (Vol.1) at 47–49 [JDT Vol. 8] (describing how CMAG compiles its data). These 75 markets are geographically dispersed. Goldstein Rebuttal Report at 23 [DEV 5–Tab 4]; *see also* Goldstein Expert Report App. G at 1–2 [DEV 3–Tab 7] (listing the 75 markets monitored by CMAG). In 1998–1999 New York was the largest media market with 6,812,540 television households representing 6.854 percent of all television households. *See* Dr. James L. Gibson's Rebuttal to the Expert Reports of Kenneth M. Goldstein and Jonathan S. Krasno and Frank J. Sorauf (Oct. 7, 2002) ("Gibson Rebuttal Report") Ex. 2 at 1 [2 PCS] (listing 1998–1999 Nielson estimates of media markets in order of size). Shreveport was the seventy-fifth largest media market, with 370,990 television households, or 0.373 percent of all television households. *Id.* at 2. For each market, CMAG monitors the four major broadcast networks (ABC, CBS, NBC, and Fox), as well as 42 national cable networks. Goldstein Expert Report App. G at 2–3 [DEV 3–Tab 7]. The CMAG data sets include two types of data. First, for every political advertisement aired, CMAG provides a transcript of the audio portion of the advertisement and a storyboard consisting of a still capture of every fourth second of the video portion of the advertisement. Goldstein Expert Report at 6 [DEV 3–Tab 7]. Second, CMAG provides data on each airing of an advertisement, including time, length, station, show and estimated cost. *Id.*

3. The CMAG data set has some "gaps." Goldstein Dep. (Vol.1) at 52 & Ex. 9 at 16. The CMAG does not monitor local cable advertising in the 75 markets it covers. Gibson Expert Report at 8 [1 PCS]; Gibson Rebuttal Report at 24 [2 PCS]. The 1998 and 2000 CMAG data sets did not cover advertisements broadcast in the nation's 140 smallest media markets, which are more rural than the 75 captured by CMAG. Goldstein Dep. (Vol.2) at 9–10 & Ex. 9 at 16 [JDT Vol. 8]. For those markets covered, the evidence shows not all advertisements are captured by CMAG. Dr. Goldstein participated in a validity study of the CMAG data by comparing the CMAG data with a sampling of invoices from eight television stations. *Id.* Ex. 9 at 16. The results show that for seven of the stations, 97 percent or more of the advertisements listed on their invoices correlated with the CMAG data. *Id.* at 16–17 and 28 (Tbl.2). For one station, however, 20 percent of the advertisements accounted for in the station's invoices could not be found in the CMAG data. *Id.* Dr. Goldstein surmises that this could be the result of inadequate record keeping by the station as well as CMAG omissions. *Id.* at 17 n. 3. Dr. Gibson, for the first time in his rebuttal report, finds this to be a major shortcoming of the CMAG data. Gibson Rebuttal Report at 5–6 [2 PCS]. He deduces from these missed advertisements that CMAG "likely missed 1,764 ads," or 5.04 percent of these eight stations' airings, and using these figures estimates "that 48,864 airings that in fact were broadcast [nationwide] ... were not captured by the CMAG methodology." *Id.* (applying the 5.04 percent figure to the total number of advertisements captured by CMAG). Dr. Gibson assumes, without any factual support, that CMAG has missed the same percentage of advertisements in all the covered media markets. Moreover, although Dr. Gibson acknowledges that "we do not know any of the characteristics of these ... missing airings," he nonetheless hypothesizes, without

any factual research or support, that the advertisements missed are most likely those that "did not have a clear 'political purpose' that could be discerned by the CMAG analysts." *Id.* at 6; *but see* Goldstein Dep. (Vol.2) at 12 [JDT Vol. 8] (stating that commercials provided to CMAG by Competitive Media Reporting ("CMR") [191] is "overly inclusive," including "ads for the Red Cross, [and] ads for electric companies"). Another shortcoming of the CMAG data is that although it provides 100 percent of the advertisements' audio, it only provides snapshots at four second intervals of the advertisements' video. As such, twenty-five percent of the advertisement storyboards for the 1998 data set do not display the name of the group sponsoring the advertisement. Goldstein Dep. (Vol.2) at 21 [JDT Vol. 8]; Gibson Expert Report at 8 [1 PCS]. Another perceived shortcoming of CMAG is that it tracks markets not electoral districts, and is unable to distinguish between different versions of advertisements that are identical with the exception of the candidate or officeholder's name (also known as "cookie cutter" advertisements). Gibson Expert Report at 7 [1 PCS]; Gibson Rebuttal Report at 7 [2 PCS]; Goldstein Dep. (Vol.2) at 113 [JDT Vol. 8].

4. In terms of CMAG's underinclusiveness, Plaintiffs' expert, Dr. Gibson, "presents no evidence or reason to believe that ... including advertisements from the markets not covered would change [the] results [of studies based on the data]." Rebuttal Report of Dr. Arthur Lupia (Oct. 14, 2002) ("Lupia Expert Report") at 28 [DEV 5–Tab 5]; *see also* Goldstein Rebuttal Report at 24 [DEV 5–Tab 4] ("Moreover, Professor Gibson does not offer any reason to believe that the ads run on local cable advertising are significantly different than the broadcast ads captured by CMAG."). Dr. Gibson did not suggest that "CMAG's inability to capture local cable spots introduced any systematic bias into the data." Goldstein Rebuttal Report at 24 [DEV 5–Tab 4]. Most importantly, there is no evidence that Dr. Goldstein's efforts to identify the appropriate electoral district for advertisements in general or for "cookie cutter" advertisements in particular were flawed or failed to correct these CMAG deficiencies. Goldstein Rebuttal Report at 25–27 [DEV 5–Tab 4]; *see also* Goldstein Expert Report App. E at 3 [DEV 3–Tab 7] (detailing the process of pairing "cookie cutter" advertisements with the appropriate electoral district); Seltz Dep. at 80–84 [JDT Vol. 28] (detailing how the *Buying Time 1998* authors dealt with the "cookie cutter" issue, including consulting political contacts, experts, newspaper articles, and geographic airing of the advertisements). One of Defendants' experts characterized the filling in of this missing data as "a straightforward though admittedly tedious-exercise to systematically compare the added data in the *Buying Time*/Goldstein database-against available records." Lupia Expert Report at 30 [DEV 5–Tab 5]. According to Dr. Goldstein, the "snapshot" style of the CMAG storyboards does not compromise the "ability to accurately analyze the content of ads, especially because CMAG provides a complete transcription of the audio portion of the ad along with the video captures." Goldstein Rebuttal Report at 24–25 [DEV 5–Tab 4]. Furthermore, Dr. Goldstein states, "there is no reason to believe that there in [sic] any systematic bias associated with the CMAG terminology capturing only one video frame every

---

**191.** CMAG gets [its] data from Competitive Media Reporting, a company that tracked advertising in the top 75 markets in 1998 and 2000, but now tracks advertising in the top 100 markets. Goldstein Dep. (Vol.1) at 47

four seconds." *Id.* at 25. As for the 25 percent of 1998 storyboards which did not indicate the advertisement's sponsor, the *Buying Time 1998* authors were able to remedy this problem by referring to the "CMAG's original coding (which accurately provides the sponsor of the ad in well over 95 percent of cases), examining the content of the ad, and, in a few cases, by phoning television stations." *BT 1998* [DEV 47] at 8.

5. Defendants' expert Goldstein explains that CMAG data is relied on by "[c]andidates and political parties interested in monitoring elections across the nation (including both the Democratic and Republican Executive Committees, not to mention several of the plaintiffs in this litigation)." Goldstein Rebuttal Report at 23–24 [DEV 5–Tab 4]. Dr. Goldstein states that CMAG data has served as the basis for a number of his articles, "which have been published in the top-rank of peer-reviewed political science journals." *Id.* at 39. Dr. Goldstein also states that "[d]uring the peer-review process for these articles, none of the academic reviewers shared Professor Gibson's concerns about the validity or reliability of the CMAG databases," which include reviews conducted by two of "the three most prestigious journals in [the political science] discipline." *Id.* at 39 & n. 21 (quoting Gibson Expert Report at 2 [1 PCS]). Furthermore, Dr. Goldstein notes that during the 2000 and 2002 election cycles, the Wisconsin Advertising Project, which he heads, has provided CMAG data to journalists covering political advertising in real time. *Id.* Although "[m]uch of the data we report can cast the election strategies of particular candidates, parties or interest groups in an unfavorable light . . . . at no time have we been challenged on the accuracy of the factual data we have reported on the content and targeting of political advertis-

ing." *Id.* at 39–40. Dr. Gibson does not contest these statements in his rebuttal report, and does not suggest a better source of data for this type of study. *See* Gibson Expert Report at 6–9 [1 PCS]; Gibson Rebuttal Report at 3–7 [2 PCS].

B. *The Annenberg Public Policy Center Reports*

1. The Annenberg Public Policy Center ("Annenberg Center") "was established by publisher and philanthropist Walter Annenberg in 1994 to create a community of scholars within the University of Pennsylvania that would address public policy issues." Annenberg Report 1997 at 2 [DEV 38–Tab 21].

2. "For much of the last decade the Annenberg Center has been tracking the growth of broadcast issue advocacy advertising." Annenberg Report 2001 at 1 [DEV 38 Tab–22]. The Annenberg Center notes that to "the naked eye, these issue advocacy ads are often indistinguishable from ads run by candidates. But in a number of key respects, they *are* different. Unlike candidates, issue advocacy groups face no contribution limits or disclosure requirements. Nor can they be held accountable by the voters on election day." Annenberg Report 1997 at 3 [DEV 38 Tab–21].

3. The Annenberg Report 1997 reported that more than two-dozen organizations, including "political parties, labor unions, trade associations and business, ideological and single-issue groups" spent an estimated $135 million to $150 million worth of issue advertisements during the 1995–1996 campaign, compared to the $400 million spent on advertising by the federal candidates running for office. Annenberg Report 1997 at 3 [DEV 38 Tab–21]. Almost 86.9 percent of these advertisements mentioned a candidate for office or public official by name. *Id.* at 8.

"Most" of the groups running these advertisements "declined to make known the identities of their donors." *Id.* at 4.

4. The Annenberg Center's 1998 report estimates that at least 77 groups ran issue advertisements during the 1997–1998 election cycle costing between $275 and $340 million." Annenberg Report 1998 at 1 [DEV 66–Tab 6]. Overall, 53.4 percent of these advertisements mentioned candidates by name, although 80.1 percent of those advertisements run in the final two months of the campaign mentioned candidates. *Id.*

5. As also discussed *supra*, the Annenberg Report 2001 finds that during the 1999–2000 election cycle 130 groups aired 1,100 distinct advertisements, at an estimated cost of over $500 million. Annenberg Report 2001 at 1 [DEV 38–Tab 22]. The report found that 60 percent of distinct radio and television issue advertisements (689 out of 1,139) aired from January 1, 1999 to November 7, 2000, were broadcast for the first time during the final two months of the election cycle. *Id.* at 12. In addition, 73 percent of all the distinct advertisements mentioned a candidate. *Id.* at 14. In terms of television advertisements, the closer the advertisement was aired to election day, the more likely it contained a candidate mention. *Id.* at 15. Between March 8 and August 31, 2000, candidates were mentioned in 72 percent of the television issue advertisements aired. *Id.* After August, 95 percent of the television commercials broadcast mentioned a candidate. *Id.* The report found that during the 2000 election cycle, 89 percent of unique advertisements were "candidate-centered," meaning they made "a case for or against a candidate" without using express advocacy. *Id.* at 13, 14.

6. The Annenberg Center reports were relied on by Members of Congress, cited to during the Senate debate, and are relied on by Plaintiffs in this litigation. *See, e.g.,* 147 Cong. Rec. S2456 (daily ed. March 19, 2001) (statement of Sen. Snowe) (citing Annenberg Report 2001); Findings ¶ 2.2.1 (Lupia)

### C. The Goldstein Expert Report

Dr. Goldstein, who was involved in assembling the data sets used in both *Buying Time* studies, produced his own expert report for the purpose of this litigation. *See generally* Goldstein Expert Report. Since Dr. Goldstein did not participate in the writing of either *Buying Time* studies or play a role in "selecting the conclusions that the authors of these reports chose to draw from the database," Goldstein Rebuttal Report at 3–4 [DEV 5–Tab 4], his report constitutes a separate assessment of the data collected. Furthermore, the database he works from differs from that provided to the *Buying Time 2000* authors, as it has corrected omissions and errors discovered after *Buying Time 2000* was completed. *Id.* at 4–5. Dr. Goldstein's study produces nine principal conclusions. Other than his problems with the CMAG database which underlies the study, *see supra* App. ¶ I.A, Dr. Gibson leaves most, but not all, of the conclusions in Dr. Goldstein's Expert Report unchallenged. *See* Gibson Rebuttal Report [2 PCS]. Dr. Goldstein's conclusions and Dr. Gibson's criticisms are discussed *infra.*

1. *Scope of Political Advertising.* The following conclusions are not rebutted, except to the extent that they rely on CMAG data. *See supra,* App. ¶ I.A. In the 2000 election cycle (from January 1, 2000 through election day), interest groups accounted for 16 percent of all political television advertisements at an estimated cost of $93 million.[192] Goldstein Expert Report

---

**192.** Dr. Goldstein notes "[t]hese figures ... underestimate television expenditures because CMAG estimates only cover markets

serving 80 percent of the nation's population and make no attempt to measure the increased cost of advertising during the peak

at 8. Political parties accounted for 27 percent of the political commercials at an estimated cost of $162 million, while candidates accounted for the remaining 52 percent of advertisements at an estimated cost of $338 million. *Id.* Compared to the 1998 campaign, the increase in interest group spending was the most dramatic, "rising from approximately $11 million in 1998 to an estimated $93 million in 2000." *Id.* at 9; *see also id.* at 10 (Tbls.1A–B) (showing the increase in candidate spending (from approximately $136.6 million to approximately $338.4 million) and in political party spending (from approximately $25.6 million to $162.3 million)). The majority of interest group advertising in 2000 was "not sponsored by PACs, and fell outside FECA regulation." *Id.* at 8. According to Dr. Goldstein's figures, interest group PACs spent roughly $2 million on 3,688 political advertisements in federal races in 2000, while interest group non-PAC expenditures constituted $90 million spent on 129,647 commercials. *Id.* at 10 (Tbl.1B).

2. *The Role of Interest Groups and Political Parties in Political Television Advertising for the 2000 Presidential Campaign:* The following conclusions are not rebutted, except to the extent that they rely on CMAG data. *See supra*, App. ¶ I.A. In terms of the presidential campaign, political parties purchased 41 percent of television advertisements aimed at the 2000 presidential race, while candidates accounted for 38 percent of the commercials, and interest groups eight percent. Goldstein Expert Report at 11 &

n.11 [DEV 3–Tab 7] (the remaining advertisements were coordinated expenditures). Interest group advertising in certain "battleground" states,[193] however, "rivaled that of the candidates or parties." *Id.; see also id.* at 12 (Tbl.2). For example, in Missouri, during the last 60 days of the election, "interest groups ran almost three-quarters as many ads" identifying a candidate as did the actual candidates. *Id.* at 11. In House elections, interest group advertisements identifying a candidate and running in the last 60 days of the campaign accounted "for 17 percent of total House ad broadcasts during the 2000 election cycle," while political parties provided 22 percent of advertisements in these races, and candidates 60.6 percent. *Id.* at 13. Dr. Goldstein finds that 99.8 percent of political party-financed television advertising mentioned or depicted a candidate, while only 1.8 percent of the ads "even mentioned the name of the party and many fewer promoted the candidate by virtue of his or her party affiliation." *Id.*[194]

3. *The BCRA Universe of Interest Group Electioneering:* The following conclusions are unrebutted, except to the extent that they rely on CMAG data. *See supra*, App. ¶ I.A. Dr. Goldstein finds that 35 interest groups broadcast commercials on television during the last 60 days of the 2000 election that mentioned a candidate. Goldstein Expert Report at 13 [DEV 3–Tab 7]. These electioneering advertisements were aired 59,632 times at an estimated cost of approximately $40.5 million. *Id.* at 14; *see also id.* at 14–15 (Tbl.3).[195]

---

seasons of political campaigns when the demand for television advertising time pushes up spot prices." Goldstein Expert Report at 8 [DEV 3–Tab 7].

**193.** Dr. Goldstein determined what states constituted "battleground states" "based on a professional review of various media sources," such as CNN.com. Goldstein Expert Report at 12 n.12 [DEV 3–Tab 7].

**194.** This assessment does not include the "tag lines" included in most advertisements identifying the commercial's sponsor that can include the political party's name. Goldstein Expert Report at 13 n.14 [DEV 3–Tab 7].

**195.** This result only reflects the 80 percent of households covered by CMAG, and according to Dr. Goldstein "[n]o comprehensive information is available for the balance of the

The top ten of these groups accounted for 87 percent of these expenditures. *Id.* at 13.

4. *The "Magic Words" Test:* The following findings are not rebutted, except to the extent that they rely on CMAG data. *See supra*, App. ¶ I.A. The so-called "magic words" test derives from *Buckley*'s legal standard for determining whether an advertisement is designed to persuade citizens to vote for or against a particular candidate. Such advertisements were termed "express advocacy" by the Supreme Court, and defined as containing words such as "elect," "defeat" or "support." *See supra* at 211. Dr. Goldstein notes that all candidate-sponsored advertisements must be paid for with federal funds and are considered to be electioneering, regardless of whether they meet the express advocacy test. Therefore, if the use of express advocacy terminology is "an accurate way to classify an ad, then advertisements clearly and obviously created and aired to influence elections would be expected to employ such magic words." Goldstein Expert Report at 16 [DEV 3-Tab 7]. Dr. Goldstein finds, however, that 11.4 percent of the 433,811 advertisements aired by candidates met the express advocacy test. *Id.* Conversely, 88.6 percent of candidate advertisements in 2000 "were technically undetected by the *Buckley* magic words test." *Id.* This result demonstrates to Dr. Goldstein "that magic words are not an effective way of distinguishing between political ads that have the main purpose of persuading citizens to vote for or against a particular candidate and ads that have the purpose of seeking support for or urging some action on a particular policy or legislative issue." *Id.*

5. *Temporal Distribution of Interest Group–Financed Television Advertisements Which Mention a Candidate:* The following conclusions are unrebutted, except to the extent that they rely on CMAG data. *See supra*, App. ¶ I.A. Dr. Goldstein determines that the "CMAG database provides empirical evidence of a strong positive correlation between [advertisements' reference to a candidate and the proximity in time of their broadcast to the election] and consequently of their validity as a test for identifying political television advertisements with the purpose or effect of supporting or opposing a candidate for public office." Goldstein Expert Report at 17 [DEV 3-Tab 7]. He finds that interest group advertisements that "mention or depict a candidate tend to be broadcast within 60 days of the election," while those which do not "tend to be spread more evenly over the year." *Id.* Specifically, his calculations show 78 percent of interest group advertisements mentioning a candidate for federal office aired within 60 days of the election, while 18 percent of those that did not mention a candidate were aired during that time. *Id.* (also finding 85 percent of advertisements mentioning a presidential candidate and 76 percent of commercials mentioning a House candidate aired within 60 days of the election). In addition, Dr. Goldstein finds the distribution of those advertisements mentioning candidates for federal office to be "closely correlated to the distribution of electioneering communications broadcast by candidates and political parties." *Id.* For example, 76 percent of interest group advertisements mentioning a House candidate were broadcast within 60 days of the election, as compared to 79 percent of such advertisements run by

markets or for ads airing on local cable stations." Goldstein Expert Report at 14 n.15

[DEV 3-Tab 7].

candidates, and 94 percent of those purchased by political parties. *Id.* For Senate elections, 74 percent of interest group advertisements that mentioned a candidate were run within 60 days of the election, as were 67 percent of candidate and 81 percent of political party-sponsored commercials. *Id.* at 17–18; *see also id.* at 19 (Tbl 4).

6. *Geographic Distribution of Interest Group–Sponsored Advertisements Which Mention a Candidate and are Aired within 60 Days of an Election:* The following conclusions are unrebutted, except to the extent that they rely on CMAG data. *See supra,* App. ¶ I.A. Dr. Goldstein finds that interest group advertisements that mentioned a candidate and were broadcast within 60 days of the 2000 election "were highly concentrated in states and congressional districts with competitive races." Goldstein Expert Report at 20 [DEV 3–Tab 7]. For Senate races, 89.2 percent of these commercials ran in competitive races, including Michigan where interest groups accounted for "22 percent of the total ads broadcast in the race." *Id.* Political parties were similarly focused, running 90.6 percent of their ads in the competitive states. *Id.* at 21. Four states (Michigan, Virginia, Washington, and Florida) attracted "77 percent of the ads broadcast by interest groups [aimed at Senate races]; political parties broadcast 65 percent of their ads in these four states." *Id.* at 20; *see also id.* at 21 (Table 5). House races demonstrated the same pattern, with 85.3 percent of interest group "electioneering" advertisements, and 98.2 percent of political party "electioneering" advertisements broadcast in competitive districts. *Id.* at 21; *see also id.* at 22–23 (Table 6). In

some competitive congressional districts, interest groups ran more advertisements than the candidates or their parties. *Id.* at 22. Therefore, concludes Dr. Goldstein, the "CMAG database provides strong evidence that the interest group ads covered by BCRA are targeted at competitive electoral contests and closely parallel political party ads in their geographic distribution." *Id.* at 24.

7. *Coders' Perceptions of Interest Group Television Advertisements:* Dr. Goldstein had students code each interest group political television advertisement aired in the 2000 campaign. They could code the commercials' purpose as either to " 'generate support or opposition for candidate,' or to 'provide information or urge action,' " and "were also given the option of 'unsure/unclear.' " Goldstein Expert Report at 24 & n.20 [DEV 3–Tab 7]. Dr. Goldstein finds that "[t]he coders' perceptions provide evidence that BCRA's definition of Electioneering Communication accurately captures those ads that have the purpose or effect of supporting candidates for election to public office." *Id.* at 26. The coders found 97.7 percent of the 60,-623 interest group sponsored television advertisements that mentioned a candidate and were broadcast within 60 days of an election as "electioneering," or supporting or opposing a candidate. *Id; see also id.* at 25 (Tbl.7). Dr. Goldstein finds this result particularly persuasive given the fact that the students coded one-third of all interest group television advertisements run over the course of the 2000 campaign to be genuine issue advertisements. *Id.* at 26. Of the 45,001 advertisements deemed to be "genuine issue advertisements" by the coders, 3.1 percent would have been covered by BCRA in that they were run within 60 days of the election and identified a candidate. *Id.* at 27.[196] Dr. Gold-

---

**196.** Dr. Goldstein contends that this "percentage overstates the proportion of all Genuine Issue Ads covered by BCRA, because it does not take into account the unregulated ads run

in non-election years during a single Congressional Term, such as 1999." Goldstein Expert Report at 27 n.22 [DEV 3–Tab 7].

stein acknowledges that in *Buying Time 2000*, and an article he co-authored with Dr. Jonathan Krasno, fewer than six advertisements were said to be unfairly captured by BCRA. *Id.* at 26 n. 21. In those other publications, "certain of these six ads-particularly those as to which there was disagreement among the student coders-were ultimately treated as electioneering. In fact, [Dr. Goldstein's] own judgment is that five of these six ads were clearly intended to support or oppose the election of a candidate .... However, in this report, [Dr. Goldstein] chose[ ] to take the most conservative approach and count all six as Genuine Issue Ads." *Id.* However, Dr. Goldstein now acknowledges that a "most conservative" estimate would include 6 more advertisements listed in footnote 8 of his Rebuttal Report. Goldstein Dep. (Vol.2) at 160. [JDT Vol. 8]. Adding these six advertisements results in the finding that 17 percent of the advertisements run during the last 60 days of the 2000 campaign identifying candidates were genuine issue advertisements. *Id.* at 169; *see also infra* App. ¶ I.D.8.c (discussing these advertisements in more detail).[197] Dr. Gibson finds fault with the fact that this conclusion relies on a methodology he finds problematic. He insists the conclusion is flawed by focusing "on the highly subjective coding" of the student coders to determine the purpose of the issue advertisements (*i.e.* to promote a candidate or to urge action on an issue). Gibson Rebuttal Report at 20 [2 PCS]; *see also* Holman Dep. at 73 [JDT Vol. 10] (noting that the question asks for a subjective assessment). As discussed *infra* in connection with the *Buying Time* studies, Dr. Gibson also believes that the data shows that a large majority of the advertisements barred by BCRA "have policy matters as their primary focus," thereby destroying the distinction he draws between electioneering and genuine issue advocacy. Gibson Rebuttal Report at 20 [2 PCS]; *see also infra* App. ¶ I.D.8.e.

8. *The Effectiveness of Broadcasting Issue Ads Close to an Election:* Dr. Goldstein's final conclusion is that if an interest group is genuinely interested in promoting an issue, the least desirable time to air such an advertisement is in the final 60 days of an electoral campaign. Goldstein Expert Report at 32 [DEV 3-Tab 7]. This finding runs counter to Plaintiffs' argument that BCRA "may harm interest groups by preventing them from advertising on their issues at a time when citizens are supposedly paying the most attention to politics." *Id.* Dr. Goldstein first comments that "while there is evidence that interest in politics and *elections* rises as Election Day approaches, there is absolutely no evidence to support the position that interest in *public policy* issues rises as well during that time." *Id.* (emphasis in original). Second, he notes that "communication theory has concluded that advertising is likely to be most effective (at informing or persuading) when viewers are exposed to one-sided flows of information in isolation from other advertising." *Id.* (citing William McGuire, The Myth of Massive Media Impact: Savagings and Salvagings, 1 Public Communication and Behavior 173 (1986); John Zaller, The Nature and Origins of Mass Opinion (1992)). Dr. Goldstein notes that since the last two months of an election campaign is when most political advertisements are aired (64.2 percent of all political advertisements run in 2000 were run in the campaign's final 60 days), "an individual interest

---

197. This revelation casts doubts on some of Dr. Goldstein's other conclusions which are

therefore not recounted here.

group's message on a public policy issue is likely to become lost" if aired during that period. *Id.* Dr. Goldstein also posits that "partisan attachments . . . harden during the last two months of a campaign" which makes it "more difficult to persuade otherwise open-minded viewers of the merits of an interest group's policy stance." *Id.* at 32–33 (citing John Zaller, Nature and Origins of Mass Opinion (1992)). Finally, running issue advertisements close to an election, besides being less effective at conveying their messages, is "also less cost-effective, since the price of scarce television and radio air time is higher near an election than during the rest of the year." *Id.* at 33. Dr. Goldstein argues his theory is bolstered by the data from his study. Interest group advertisements not mentioning a candidate are spread over the course of the calendar year and are not concentrated within the last two months of a campaign. In 2000, 17.7 percent of such advertisements were aired in the final 60 days of the election campaign, slightly more than the 16.4 percent "which would have run if the ads had been equally distributed throughout the year." *Id.* at 33; *see also id.* at 31 (Table 9). In contrast, during the months of April through June 2000, 45 percent of such issue advertisements were aired, "as against an expected 25 percent if the ads were spread evenly throughout the year." *Id.* Dr. Goldstein believes this concentration is "a likely result of groups turning on the heat to pass or defeat bills before Congress adjourned for the summer." *Id.* Therefore, Dr. Goldstein finds that the data confirms his theory that the final two months of an election campaign "is probably the worst time for an interest group to educate the public on its particular issue." *Id.* However, Dr. Gibson is critical of this conclusion. Gibson Rebuttal Report at 26 [2 PCS]. According to Dr. Gibson, political psychologists, like William McGuire (whose work

Dr. Goldstein cites), have concluded "that to persuade someone involves two steps. First, one must get the attention of the person one is attempting to persuade. Second, one must overcome the strength of existing attitudes if the attempt at persuasive communication is to result in attitude change." *Id.* Given that "those with strong attitudes tend to pay attention to political communications while those with weak political attitudes tend to ignore them. . . . [t]hose most easily reached are least easily changed; those most easily changed are those most difficult to reach." *Id.* Since those with "weak attitudes" tend to pay attention during "the most extreme circumstances," the period leading up to the election provides the window in which to communication with these difficult to reach, but easily persuaded individuals. *Id.* at 27. Dr. Gibson also rejects the argument that issue advertising close to an election is unproductive because partisan allegiances harden as elections approach. *Id.* He states that this line of reasoning leads to the strange conclusion that "candidates should abandon advertising as the election approaches since these hardened attitudes are difficult to convert." *Id.* Dr. Gibson points out that "that does not happen, since, as the election approaches, candidates try to reach an even greater percentage of marginal voters, who have little interest in politics, and relatively pliable issue views." *Id.*

D. *Buying Time Studies*

1. The Brennan Center for Justice at New York University Law School ("Brennan Center") produced two studies examining television advertising in election campaigns. *See BT 1998* [DEV 47]; *BT 2000* [DEV 46]. The Brennan Center is "primarily a law firm that also does a great deal of research in a variety of social science issues that includes campaign finance along with criminal justice and other elec-

toral issues and poverty issues." Holman Dep. at 10 [JDT Vol. 10]. The Brennan Center was involved in the crafting of BCRA and provided analysis of issues being debated in Congress to legislators, the media and the public. *Id.* at 11. The Center also put together a letter signed by 88 First Amendment scholars, concluding that the McCain–Feingold bill was constitutional. *Id.* at 19 & Ex. 3. Representatives of the Brennan Center testified in favor of the McCain–Feingold bill, *id.* at 22, and during Senate debate on the legislation, Senators cited to *Buying Time* data and Brennan Center analyses. Holman Dep. Ex. 3 at 2 [JDT Vol. 10].

2. The Pew Charitable Trust funded both *Buying Time* studies. *See BT 1998* [DEV 47]; *BT 2000* [DEV 46]. The Brennan Center's funding proposal for *Buying Time 1998* states that the study had an academic purpose, but would also be used "to fuel a continuous and multi-faceted campaign to propel reform forward." Holman Dep. Ex. 4 at 2 [JDT Vol. 10]. The proposal painted the study as part of a strategy to overcome the "obstacles to reform," and noted that the first step in achieving the goal was "to develop a reliable source of information on the nature of the problem." *Id.* at 7. The Brennan Center proposed a two-phased research plan for *Buying Time 1998*. Krasno Dep. Ex. 4 at 1 [JDT Vol. 14]. The first phase, proposed to cost $200,000, entailed acquiring data from CMAG, "adapt[ing] it so that it might be easily used, and us[ing] it to develop a strategy for responding to the threat posed by issue advocacy." *Id.* at 1, 3. The second phase, estimated to require $800,000 to complete, would "focus on convening a formidable group of scholars and activists to create policy recommendations and reports, as well as ... publiciz[ing] these activities on Capitol Hill and beyond." *Id.* at 3. Whether or not the study

would proceed to the second phase, according to the proposal, would "depend on the judgment of whether the data provide[d] a sufficiently powerful boost to the reform movement." *Id.* at 6. In April or May of 2000, Dr. Kenneth Goldstein of the University of Wisconsin, who had worked on the data set for *Buying Time 1998* petitioned the Pew Center for another grant. Goldstein Dep. (Vol.1) at 29 [JDT Vol. 8]. His request stated that he was "happy to work with others in the policy community to make sure that our study is designed and executed in ways that help move the reform ball forward." Goldstein Dep. (Vol.1) at 37 & Ex. 6 at 5 [JDT Vol. 8].

3. Mr. Seltz, co-author of *Buying Time 1998*, states that there were a number of purposes behind the study, but that "the primary purpose was to contribute to the body of knowledge about campaign finance reform and specifically issue advocacy ... and to fill what we viewed to be an empirical void in the literature about issue advocacy". Seltz Dep. at 22 [JDT Vol. 28]. "An independent but related purpose ... was indeed to provide information to ... proponents of campaign finance reform to help them fashion new and better arguments for reform, but arguments that would be based on research that was verifiable, checkable, transparent, reproducible." *Id.* Mr. Holman, a principal co-author of *Buying Time 2000*, did not approach the project with the purpose of producing results that would support campaign reform and had never seen the grant proposal submitted to the Pew Charitable Trust. Holman Dep. at 25–26 [JDT Vol. 10]; *see also id.* at 29–30 ("I was mostly excited about the political science aspect of [the study] .... It was not clear at any point and never explained to me exactly what sort of policy direction that would go in.").

4. Dr. Kenneth Goldstein provided assistance in processing and coding data for the *Buying Time* studies. Goldstein Rebuttal Report at 6 [DEV 5–Tab 4]. As part of this effort, he merged CMAG's two data sets to produce "a single, comprehensive data set." *Id.* He also had university students (at the University of Arizona for *Buying Time 1998* and the University of Wisconsin for *Buying Time 2000* ) "assess[ ] ... the content, tone, issues addressed, whether the ads mentioned a political candidate or provided a toll-free number to call, etc.... In addition to collecting certain specific information concerning each storyboard reviewed, the study also asked coders: 'In your opinion, is the purpose of the ad to provide information about or urge action on a bill or issue, or is it to generate support or opposition for a particular candidate?' " Goldstein Expert Report at 7 [DEV 3–Tab 7]. Advertisements that provided information or urged action on a bill or issue were labeled "genuine issue ads" in both studies, whereas those communications that generated support or opposition for a particular candidate were referred to as "sham issue ads" in *Buying Time 1998, see, e.g., BT 1998* [DEV 47] at 87, and "electioneering issue ad" in *Buying Time 2000, see, e.g., BT 2000* [DEV 46] at 30. Each *Buying Time* database consists of 40 million data points. *Id.* at 37.

5. As noted *supra*, App. ¶ I.A, Dr. Gibson criticizes the CMAG data underlying both reports. Dr. Arthur Lupia was asked by the Brennan Center to evaluate Dr. Gibson's Expert Report and provided a report detailing his findings. *See generally* Lupia Expert Report.

6. *Buying Time Findings*

a. *Buying Time 1998* drew a number of conclusions with regard to the nature and effect of political advertising in the United States. The study's main findings include:

- Four percent of candidate advertisements used "express advocacy" terms. *BT 1998* [DEV 47] at 9.
- The proportion of issue advertisements mentioning a candidate rises as the date of the election approaches. In July and August 1998, 61 percent of issue advertisements mentioned a candidate. By September, the percentage reached 82 percent and for the remainder of the campaign remained at 82 percent or higher, reaching a peak of 97 percent in the first half of October. *Id.* at 87, 103 (Figure 4.15).
- Forty-one percent of issue advertisements that provided information or urged action appeared within 60 days of the election, but only two of those advertisements, or seven percent, referred to a candidate. *Id.* at 109.

b. *Buying Time 2000* 's key findings from the 2000 election cycle included:

- Seven percent of all political advertisements contained express advocacy terms. *BT 2000* [DEV 46] at 73. Candidates used express advocacy terminology in 10 percent of their ads, *id.* at 15, 29, while political parties and interest groups used such terms approximately two percent of the time, *id.* at 73.
- "Genuine issue ads" (those urging action on a public policy or legislative bill) were "rather evenly dispersed throughout the year, while group-sponsored electioneering ads [which promote the election or defeat of a federal candidate] make a sudden and overwhelming appearance immediately before elections." *Id.* at 56.
- The study found that if BCRA had applied to the 2000 campaign, three genuine issue ads (which aired 331 times) would have fallen within the Act's definition of "electioneering communication."

*Id.* at 73. Put another way, of the advertisements run within 60 days of the 2000 election which also depicted a candidate, 99.4 percent constituted electioneering advertisements, while 0.6 percent were genuine issue advertisements. *Id.* at 72 (Figure 8–2).

7. *Criticism of Buying Time 1998*

a. Plaintiffs' expert, Dr. James L. Gibson, while leveling various criticism at both *Buying Time* studies, does not dispute that express advocacy words "are rarely used in political advertising, or that group sponsored ads that mention candidates tended to be concentrated before an election." Goldstein Expert Report at 38–39 [DEV 3–Tab 7]; *see also* Lupia Expert Report at 9 [DEV 5–Tab 5]; Gibson Expert Report at 11 [1 PCS] ("Entirely objective characteristics of the ads ... present few threats to reliability."). Neither does he challenge the conclusions that advertisements sponsored by political parties and interest groups comprise a significant and increasing portion of political advertising broadcast in federal races. Lupia Expert Report at 9 [DEV 5–Tab 5].

b. Dr. Gibson states that *"Buying Time 1998* should not be accepted as the product of scientific inquiry, but is instead policy advocacy written by people with a strong ideological commitment to a particular position on campaign finance reform." Gibson Expert Report at 3 & n.3 [1 PCS] (citing the research proposal and co-author Daniel Seltz's deposition testimony); *see also supra* App. ¶ I.D.2. Dr. Gibson suggests that "[t]he strong policy and ideological commitments of the investigators are not compatible with the conventional cannons of scientific objectivity and may have undermined the integrity of the data collection and analysis." Gibson Expert Report. at 3 n.3 [1 PCS]. He applies this criticism to *Buying Time 2000* as well. *Id.* at 45. Dr. Krasno confirms that *Buying*

*Time 1998* is an advocacy document. Krasno Rebuttal Report at 2 [DEV 5–Tab3]. He admits that he believed that groups and political parties were sponsoring "thinly-veiled campaign ads masquerading as issue advocacy." *Id.* However, Dr. Krasno suggests that "[t]he fact that we expected certain results (and those expectations were largely realized) loads the issue emotionally, but misses the point. Scholars rarely embark upon research without some expectations as to its results. But more than most scholars, we had a compelling reason to insure that our results could withstand allegations of bias." *Id.* Dr. Krasno also notes that Daniel Seltz's responsibilities with regard to *Buying Time 1998* did not include data analysis. *Id.* at 3. Dr. Lupia comments that a "person's political or ideological beliefs need not prevent them from being an effective scientist," and that Dr. Gibson's allegation that *"Buying Time* cannot be the product of scientific inquiry because its authors have an ideological commitment" is erroneous. *Id.* Dr. Lupia also states that he knows of no "conventional canons of scientific objectivity," and that Dr. Gibson fails to produce one. *Id.* Lastly, Dr. Lupia observes that Dr. Gibson's claim that the policy perspective of the *Buying Time 1998* authors "may have undermined the integrity" of the study, "is pure speculation," and Dr. Gibson's report "presents no direct evidence on this point." *Id.* at 11. Dr. Goldstein rejects the charge that he or anyone under his supervision "perverted" the results of the databases, or that his approach to the project was based on anything other than "the spirit of scientific inquiry, and objectivity." Goldstein Rebuttal Report at 8 [DEV 5–Tab 4]. He also claims that his "interest in creating a scientifically valid and reliable database was based on more than just abstract notions of professionalism and objectivity, as important as they were. I always intend-

ed to use-and, in fact, have used-CMAG databases in a wide variety of other scholarly studies having nothing to do with campaign finance reform." *Id.* at 8–9.

c. Dr. Gibson states that *Buying Time 1998* was not part of a peer-review process prior to its publication, meaning it "was not vetted in any way whatsoever prior to its publication, and consequently the normal process of explication of the project methodology, error correction, and review of substantive conclusions prior to publication did not take place." Gibson Expert Report at 4 [1 PCS]. Dr. Gibson maintains that this "seriously limits the confidence one can place in the Report." *Id.* Dr. Gibson makes the same criticism of *Buying Time 2000. Id.* at 45. Dr. Krasno states that this fact was the result of time constraints dictated by the political calendar, the funders of the study, and policymakers, and notes that "subsequent publications by myself and by Professor Goldstein have withstood the peer review process." Jonathan S. Krasno, Rebuttal to Professor James L. Gibson at 3–4 & n.3 (citing to Jonathan Krasno & Kenneth Goldstein, "The Facts About Television Advertising and the McCain–Feingold Bill," 35 Political Science 207 (2002)). Dr. Lupia finds the significance of the lack of peer-review "doubtful ... at best." Lupia Expert Report at 13 [DEV 5–Tab 5]. He notes that Dr. Gibson "displays no apparent knowledge of whether scholars or experts had opportunities to comment on critical aspects of the *Buying Time* reports." *Id.* at 14.

d. Dr. Gibson maintains that "[n]o data base has been (nor can be, it appears) produced that will generate the specific numbers found in [*Buying Time 1998* ].... In the social sciences, we demand that statistical analysis be replicable .... This report is not replicable, and that undermines tremendously any confidence

one should place in the findings produced." Gibson Expert Report at 5 [1 PCS]; *see also id.* at 23–26; Seltz Dep. at 52 [JDT Vol. 28] (stating that the *Buying Time 1998* authors did not "track the evolution of all the changes" or corrections they made to the data set). Dr. Gibson levels the same charges at *Buying Time 2000.* Gibson Expert Report at 47–48 [1 PCS]. Dr. Krasno agrees that "replication is a core precept of science," but states that Dr. Gibson "overstates the case by insisting on 'exact' replication." Krasno Rebuttal Report at 6 [DEV 5–Tab 3]. According to Dr. Krasno, perfect replication "of the results of others, even with their help, is often impossible." *Id.* (quoting Gary King, Replication, Replication, 28 Political Science 444 (1995)). Dr. Gibson was not able to consult with Dr. Krasno in order to discover "the original command files used to produce the numbers in *Buying Time 1998*," which Dr. Krasno maintains replicate the *Buying Time 1998* results. *Id.* at 6–7 & n. 6; *see also id.* at 8 n. 10 ("[I]t appears that Professor Gibson worked with a slightly different version of the data set than that used to create *Buying Time 1998*."); Lupia Expert Report at 18 n.3 [DEV 5–Tab 5]. Despite using the incorrect data set, Dr. Krasno notes that where Dr. Gibson provides examples of the discrepancies between his findings and those of *Buying Time 1998*, the differences are statistically insignificant. *Id.* at 7–8 (referring to Gibson Expert Report at 24 [1 PCS]); *see also* Goldstein Expert Report at 18 n.10 [DEV 3–Tab 7] (stating that the variances in Dr. Gibson's results "are so small as to suggest their own triviality"); Lupia Expert Report at 43 [DEV 5–Tab 5] (stating "the demonstrated discrepancies are small" and the Gibson Expert Report "provides no evidence that such changes affect any of *Buying Time* 's major claims"). Dr. Goldstein contends that the reason Dr. Gibson could not replicate the

results of *Buying Time 2000* was because he was using the wrong data set. Goldstein Rebuttal Report at 18, 19–20 [DEV 5–Tab 4].[198] Using the "federal.sav" data set produced by the Brennan Center, Dr. Goldstein was "able to replicate key findings of the *Buying Time [2000]* study," and correlate others "within a fraction of a percentage point." *Id.* at 20. Dr. Goldstein comments that Dr. Gibson had all the information to "replicate the *Buying Time* studies in the most direct fashion-that is, by re-coding all (or even a sample) of the captured advertisements and comparing the results of his coding exercise with the results of mine. Because Dr. Gibson never attempted to test the conclusions implicit in the database by replicating the coding exercise, most of his assertions about the reliability and validity of the conclusions drawn from the databases are necessarily speculative." *Id.* at 19; *see also* Lupia Expert Report at 17 [DEV 5–Tab 5] ("It is also worth noting that the Plaintiffs and their experts passed up the opportunity to resolve their concerns by replicating the data collection procedure itself."). Dr. Lupia comments that just because "a particular scientist fails in her attempt to *replicate* a study does not show that the study is not *replicable* .... The claim that 'the report is not replicable' is not proved in the [Gibson] report." Lupia Expert Report at 17 [DEV 5–Tab 5] (emphasis in original); *see also id.* at 44.

e. Dr. Gibson charges that the *Buying Time 1998* report "is filled with questionable statistical techniques and applications."

Gibson Expert Report at 5 [1 PCS]. Dr. Lupia observes that nowhere in his report does Dr. Gibson identify mistakes in the application of statistical procedure. Lupia Expert Report at 18–19 [DEV 5–Tab 5]. Dr. Lupia characterizes Dr. Gibson's critique as a "difference in point-of-view on how to categorize certain events that has nothing to do with statistical techniques *per se.*" *Id.* at 19.

f. Dr. Gibson suggests that CMAG's shortcomings, detailed *supra* App. ¶ I.A, affect the level of credence one may give the *Buying Time* reports; however, he advances no hypotheses demonstrating why any of CMAG's shortcomings affect the results of *Buying Time.* Gibson Expert Report at 7–9 [1 PCS] (noting that there are "many limitations to the CMAG data," but not suggesting the impact the limitations have on the results of *Buying Time* studies); Gibson Rebuttal Report at 5–7 [2 PCS] (stating he has no basis for verifying that the CMAG data base is accurate, that there is no way of knowing the characteristics of the missing airings, but concluding that the "apparent[ ]" errors caution against relying on the CMAG data for drawing conclusions on the nature of political communications); *see also* Goldstein Rebuttal Report at 23 [DEV 5–Tab 4] (stating that Dr. Gibson "does not even attempt to explain how these alleged limitations undermine the validity of the conclusions set forth in *Buying Time* "); Krasno Rebuttal Report at 5 [DEV 5–Tab 3].

**198.** The result of this confusion is that instead of the experts arguing from the same data set, each produces conclusions from a different set of numbers. The source of the divergence in data relied upon appears to be the result of the number of data sets provided to the Plaintiffs by Defendants' experts and the late production of additional data sets. *See* Gibson Supplement to Rebuttal Expert Report of Oc-

tober 7, 2002: 1998 Data ("Gibson Supplemental Report") [2 PCS]. Furthermore, since the analysis of the studies occurred in the context of litigation, the two sides' experts could not confer and resolve the resulting confusion regarding the data sets. This fact has made the duel between the parties' experts more confusing, and therefore less helpful to the Court.

g. The division of tasks between the authors of *Buying Time 1998* and Dr. Goldstein also calls into question the results of the study according to Dr. Gibson. Dr. Gibson posits that since the study's authors engaged in secondary analysis of the data provided by Dr. Goldstein their "understanding of the nuances and peculiarities of the data base" was "most likely limit[ed]." Gibson Expert Report at 6 [1 PCS]. Given the size of the database and "various data infirmities," Dr. Gibson finds it "extremely worrisome that the results [of *Buying Time 1998*] are so heavily dependent upon the limited skills of an author [Mr. Seltz] who is a novice analyst." *Id.* Dr. Krasno, as noted *supra*, explains that Mr. Seltz did not engage in data analysis, making "Professor Gibson's fear that he contributed findings to *Buying Time 1998* ... unfounded." Krasno Rebuttal Report at 3 [DEV 5–Tab 3]. Dr. Lupia points out that "secondary analysis of data collected by others" is common in the political science discipline, and has been undertaken by Dr. Gibson himself. Lupia Expert Report at 19–20 [DEV 5–Tab 5] (citing two articles authored by Dr. Gibson which use "country-level electoral data" from a "historical archive" and a study conducted in 1954).

h. Criticism was raised that both studies relied on coding of advertisements conducted by university students. Gibson Expert Report at 9 [1 PCS]; *see also supra* App. ¶ I.D.4 (explaining the coders' role). Dr. Gibson finds troubling the following unanswered questions: "how the students were recruited, what expertise they had prior to being employed for the project, whether the students had been exposed to Dr. Goldstein's classes, whether the students had ideological and/or policy commitments to a particular outcome in the project, etc." *Id.* He also believes the fact the student coders were not trained "is a flaw

of considerable proportion." *Id.* at 10. This is due to the fact that they were asked to make subjective judgments, and without training it is unknown whether or not they were competent to make such judgments. *Id.* at 18; *but see id.* ("[C]oding these advertisements is often simply difficult, irrespective of one's training and experience."); *see also* Holman Dep. at 73, 80 [JDT Vol. 10] (acknowledging the subjective nature of determining the purpose of a political advertisement). Dr. Gibson also notes that undergraduate students at Arizona State University or the University of Wisconsin are "not a representative sample of the 'average viewer,' and in the absence of training, the students were apparently free to exercise unstructured discretion in coding the ads.... [W]ithout training, practice coding, and discussion of coding rules based on the results of the practice coding ... I do not believe that undergraduate student coders can make accurate assessments on highly subjective characteristics of these ads." Gibson Expert Report at 10 [1 PCS]. Dr. Krasno responds, stating that

it is likely a training program would have caused complaints that Dr. Goldstein and I were attempting to impose our standards on the coders. Given the alternatives, I felt [foregoing formal training] was preferable, especially since we were hoping for a (reasonably informed) ordinary viewer's impression of the ads. Limited pre-testing of the coding instrument showed that training was unnecessary because coders were apparently able to understand and answer the questions without further explanation.

Krasno Rebuttal Report at 5 n.4 [DEV 5–Tab 3]. Dr. Goldstein notes that Dr. Gibson's criticism in this regard is speculative, especially given the fact "he chose not to conduct his own survey, using his own coders and his own training techniques,

and compare it to the results reached by the undergraduate coders." Goldstein Rebuttal Report at 31 [DEV 5–Tab 4]; *see also* Lupia Expert Report at 33 [DEV 5–Tab 5] ("In this case, such a replication would have been relatively simple to conduct ... and would have allowed the [Gibson] report to rely less on speculation when alleging that measurable attributes of Goldstein's coders affected the data collection or analysis."). Dr. Goldstein states the lack of training was "a deliberate choice that is well-supported by social science principles .... aimed at getting the untutored common-sense impression of the coders, while minimizing the possibility of biasing coders with any preconceived notions that might have been implicit in a set of instructions." Goldstein Rebuttal Report at 32 [DEV 5–Tab 4]. Formal training, Dr. Goldstein asserts, "would only undermine the independence of the coders' assessments and possibly introduce systematic bias into the survey." *Id.* The lack of training also made it easier to "simulate ... the experience of a typical viewer watching the ads at home." *Id.* In terms of the representativeness of the coders, Dr. Goldstein comments that "the use of undergraduate subjects in studies measuring subjective perceptions of external stimuli is well-established and accepted social science procedure." *Id.* at 33. The students who coded the 1998 data were undergraduate honors students at Arizona State University, while six undergraduate students enrolled in Dr. Goldstein's upper-level Interest Group course at the University of Wisconsin coded the 2000 data. *Id.* According to Dr. Goldstein, the coders were not informed that the Brennan Center would be using their data to study the effects of campaign finance legislation, and he does not believe he "ever expressed to them any policy preference as to the desirability or undesirability of campaign finance legislation, either in the classroom or during the coding process." *Id.* at 34.

Dr. Goldstein notes that if his involvement in the project suggested anything to the coders, it would have been that the project was about the tone of political advertising, one of his primary scholarly interests. *Id.* In terms of the representativeness of the coders, Dr. Lupia states that "only if we had evidence that the way in which the undergraduates were unrepresentative caused *Buying Time*'s claims to differ from what a representative population would have produced" would there be a basis to believe the coders' unrepresentativeness threatened the quality of the data, but the Gibson "report presents no such evidence." Lupia Expert Report at 35 [DEV 5–Tab 5]. Lupia also notes that "in the field of psychology ... important discoveries about mental states such as attitudes are often generated from studies that ask undergraduates to answer opinion questions after viewing paper-based stimuli. This practice has wide acceptance in social science and is the source of many important and socially valuable discoveries." *Id.* at 36; *see also* Holman Dep. at 241–42 [JDT Vol. 10] (noting "it's common practice to use students as survey respondents especially in political work").

i. Dr. Gibson challenges the reliability, or accuracy, of the coded data. Gibson Expert Report at 11 [1 PCS]. Dr. Gibson appears not to be concerned about the coding of objective characteristics of the advertisements. *Id.* ("Entirely objective characteristics of the ads (e.g., whether a telephone number is mentioned in the text of the ad) present few threats to reliability.") (footnote omitted). His main concern is over the coding of "subjective and judgmental" characteristics. *Id.* at 12. He provides Question 6 as an example:

6. In your opinion is the purpose of this ad to provide information about or urge action on a bill or issue, or is it to generate support or opposition for a **particular candidate?**

1. Provide information or urge action (If so, skip to Question # 19)
2. Generate support/opposition for candidate
3. Unsure/unclear

*Id.* at 12 (citing *BT 1998* [DEV 47]) (emphasis in original). This question appears in *Buying Time 2000* as Question 11 except that the Buying Time 2000 version does not bold "particular candidate" and does not ask the coder to skip Questions. *See* Goldstein Expert Report App. F [DEV 3–Tab 7]. Dr. Gibson notes that it is not always readily apparent who the sponsor of the advertisement is, making it difficult for the coder to know whose purpose he or she is supposed to be evaluating. Gibson Expert Report at 12 [1 PCS]. This problem is exacerbated by the lack of "explicit guidelines for how to ascertain an 'ad's purpose.'" *Id.* To demonstrate the subjectivity of the question, Dr. Gibson points to an advertisement run in Wisconsin which highlights Senators Herb Kohl and Russell Feingold's positions on partial birth abortion and asks the viewer to call them. *Id.* at 12–13. To Dr. Gibson "it seems obvious that the central focus of the ad is on the policy issue of whether to ban partial birth abortions.... One might reasonably conclude that one purpose of the ad was to elicit support for the National Pro–Life Alliance. The most reasonable overall assessment of this ad is that it is an example of issue advocacy by an interest group." *Id.* at 13–14. Holman, in an email, wrote that the ad "reads to me like a genuine issue ad," *id.* at 14 (citing Holman Dep. Ex. 14), but he concludes that it is an electioneering advertisement, Holman Dep. at 67 [JDT Vol. 10]. Both *Buying Time* studies treat the advertisement as an electioneering advertisement, but

Dr. Goldstein in his expert report treats the broadcast of the advertisement in 2000 as a genuine issue advertisement.[199] Gibson Expert Report at 14 & n.13 [1 PCS]; *see also* Shays Dep. at 121 [JDT Vol. 29] (noting he finds the advertisement to be "powerful" and that "it should be run, but it was clearly designed to influence an election"); McLoughlin Dep. at 42 [JDT Vol. 20] (stating his personal view is that the advertisement is a "genuine issue ad"). Given the subjective nature of this task, Dr. Gibson states that "certain procedures are essential so that the reliability of the data collected can be assessed." Gibson Expert Report at 16 [1 PCS]. According to Dr. Gibson, there is "no assessment whatsoever of intercoder reliability [for *Buying Time 1998*]. Thus, unlike academic research based on subjective coding, no empirical evidence exists to indicate that the coders' subjective assessments of these ads were accurate." *Id.* at 18. Dr. Gibson finds this to be a "serious flaw." *Id.* Dr. Lupia responds arguing that the "practice of treating answers to opinion questions as objective phenomena is common in science." Lupia Expert Report at 38 [DEV 5–Tab 5] (describing an article co-authored by Dr. Gibson, the main conclusion of which is based on a survey where participants were asked about how they described their own identities). He notes that Question 6 begins with "In your opinion," and seeks to understand how the advertisements are perceived. *Id.* at 37. In addition, Lupia questions the basis for Dr. Gibson's claim that "the most reasonable overall assessment" of the Wisconsin partial birth abortion advertisement is that it is pure issue advocacy, because Dr. Gibson gives no clear explanation of this judgment. *Id.* at 40.

**199.** Dr. Goldstein's explanation for this divergence in treatment is discussed, *supra* App. ¶ I.C.7; *see also infra* App. ¶ I.D.8.c.

j. Dr. Gibson explains the importance of reliability in the *Buying Time* context. He maintains that the miscoding of a single advertisement could have "quite large consequences for the statistical results." Gibson Expert Report at 22–23 [1 PCS]. He proposes that if Advertisement # 11 was coded as promoting issues rather than a candidate, the percentage of pure issue advertisements in the *Buying Time 1998* data set would rise six percentage points. *Id.* This, Dr. Gibson argues, demonstrates the volatility of the data set. *Id.* at 23. As Dr. Gibson notes, he is not claiming for purposes of this argument that Advertisement # 11 was coded in error; he is merely showing how one *hypothetical* error could affect the data. *Id.* at 22 n. 24.

k. Dr. Gibson also challenges the validity of the *Buying Time 1998* data. Gibson Expert Report at 17 [1 PCS]. By this, Dr. Gibson means that coders may be consistent in their coding, but their coding may be incorrect. *Id.* Specifically, he suggests that:

> coders must seek easily discernable 'cues' in the advertisements as a means of making the required judgment. Since the presence of a political figure who seems to be a candidate is a readily accessible cue, the coders then develop an implicit decision rule that says: 'when a political figure is depicted in the ad, the ad involves electioneering.' Using this rule, the variable might be reliably coded. But this does not mean that the data are *valid,* since political figures appearing in ads could well be doing something other than electioneering.

*Id.* (emphasis in original). Dr. Lupia counters that Dr. Gibson's argument misrepresents what the coders were asked to do. Lupia Expert Report at 39 [DEV 5–Tab 5]. He argues that the question seeks the coders' perceptions of the purpose of the advertisements, not the advertise-

ments' true purpose. *Id.* Just because coders' perceptions may not comport with reality does not threaten the validity of the data, because the survey seeks the coders' mental impressions. *Id.* However, when codings were changed on Question 6, the mental impressions of the coders, which were sought by the question, were overruled. Goldstein Dep. (Vol 2) at 208–209 [JDT Vol. 8].

l. Dr. Gibson puts forth the theory that "the confusion in the instructions regarding Questions 7 through 18 may have introduced a degree of bias into how the students coded Question 6 by suggesting that any advertisement that included the name of a candidate should be coded as having a purpose of promoting or opposing a candidate." Gibson Expert Report at 30 [1 PCS]. Dr. Gibson states that

> analysis reveals that *fully 97.7% of* [group-sponsored airings having a 'purpose' of generating support or opposition to a candidate] *were also coded as mentioning candidates.* The most important conclusion I draw from this analysis is that mentioning a candidate and promoting a candidate are virtually the same thing, as these data were coded by the undergraduate students (and/or Professor Goldstein). It seems highly likely to me that the student coders coded these three questions (6, 7, and 8) virtually simultaneously: A candidate (or what the coder thought was a candidate) was observed in the ad, and then Question 6 was coded as electioneering (in part because the coders knew that the presence of a candidate was not coded if Question 6 was coded as providing information), and then the student made the determination of whether the candidate was 'the favored candidate' (Question 7) or the 'favored candidate's opponent' (Question 8). Thus, the entire relationship—empirical and logical—be-

tween Questions 6 and Questions 7, [sic] and 8 renders the data set of little utility for answering important questions about these ads and airings.

Gibson Expert Report at 30 [1 PCS]; *but see id.* at 55–56 (characterizing his own argument as "indirect evidence or conjecture"). Dr. Krasno responds to Dr. Gibson's finding that 97.7 percent of advertisements found to be electioneering commercials mentioned candidates by observing "[g]iven their goal of helping candidates, it would be surprising to discover that electioneering ads do not identify candidates." Krasno Rebuttal Report at 10 n.13 [DEV 5–Tab 3]; *see also* Goldstein Rebuttal Report at 27 [DEV 5–Tab 4] (stating that "it is difficult to imagine an ad intended to promote or oppose a candidate that did *not* mention that candidate") (emphasis in original). He also states that Dr. Gibson's theory that the two items were "cognitively connected . . . . ignores the fact that candidate mentions are coded *after* the purpose of the ad, and that coders did score a number of ads that mentioned actual and apparent candidates in reasonably neutral ways as genuine issue advocacy." Krasno Rebuttal Report at 10 n.13 [DEV 5–Tab 3] (emphasis in original). Dr. Lupia finds Dr. Gibson's theory to be a "wild guess. It has no apparent scientific basis, which matters because the claim in question includes a very detailed statement about an exact sequence in coders' cognitive processes. . . . Moreover, I am quite familiar with the current scientific literature on the psychology of responses to opinion questions and this claim follows nowhere from it." Lupia Expert Report at 45 [DEV 5–Tab 5]; *see also* Goldstein Rebuttal Report at 28 [DEV 5–Tab 4]. He also comments that Dr. Gibson could have easily tested his theory by showing "one set of coders with the

instructions regarding questions 7 through 18 visible while showing another set of coders Question 6 without the instructions or subsequent questions." Lupia Expert Report at 44 [DEV 5–Tab 5]. I observe that Question 6 on the *Buying Time 1998* coding sheets is the last question on the first page of the survey, with Questions 7 and 8 appearing on the following page. *See, e.g.,* Gibson Expert Report Ex. 7 [1 PCS]. The coding sheets provided by Dr. Gibson do not indicate coders changed (*i.e.* crossed out) their coding of Question 6 for advertisements from issue advocacy to electioneering after seeing Questions 7 and 8 on the following page.

m. Plaintiffs challenge other aspects of Question 6 of *Buying Time 1998.* They note that the words "particular candidate" are printed in bold type, which Dr. Krasno states was done because he wanted the coders "to be thinking of candidates" when answering the question. Krasno Dep. at 123 [JDT Vol. 14]. Dr. Krasno explains that the bold type was meant to "make certain that the coders paid special attention to the appearance of candidates in these ads, so that they answered the question with respect to candidates, not with respect to something else." *Id.* at 122–23. The corresponding question used for *Buying Time 2000* did not include the bold type.

n. Dr. Gibson states that "it is apparent to me that no single *Buying Time 1998* Data Set exists. This is in part due to the fact that Dr. Goldstein was (and may still be) continuously making changes in the codes assigned to individual ads and airings." Gibson Expert Report at 11 [1 PCS]; *see also id.* at 5 ("[T]he data set is continuously being manipulated and changed . . ."). Dr. Gibson suggests that the only codes altered were those "undermining the preferred conclusions," intro-

ducing "asymmetrical bias ... in the data set." *Id.* Dr. Gibson makes the same allegation with regard to the *Buying Time 2000* data set. *Id.* at 50 ("[T]his data set, like the 1998 data, is continuously being changed."). Dr. Krasno explains that the short time frame of the study "inevitably meant that small changes to the data set would continue even after the release of *Buying Time 1998.*" Krasno Rebuttal Report at 4 [DEV 5–Tab 3]. He claims that such changes are quite typical, and that "[v]irtually every provider of large data sets, from the National Election Studies to the Commerce Department, prepares versions of their data and continues to fix problems in subsequent releases." *Id.* The changes, Dr. Krasno maintains, reflect "the gradual filling in of missing data and the discovery of internal contradictions. There is no evidence at all in Dr. Gibson's report that any of the changes in the successive versions of the data that he examined had more than a trivial impact on his results or on those reported in *Buying Time 1998.*" *Id; but see* Goldstein Dep. Ex. 17 (email authored by Holman stating that the "missing data category is uncomfortably large in the 1998 database"). Dr. Goldstein also notes that each *Buying Time* database consists of 40 million data points, and that "errors are inevitable in any database of this size." Goldstein Rebuttal Report at 37 [DEV 5–Tab 4]. He claims that Dr. Gibson's suggestion that these errors invalidate the database fails to make the distinction between random error and non-random error (or "systematic" bias). *Id.* Dr. Goldstein claims that it is "universally recognized that random error does not undermine the validity of a data set because random error, by definition, occurs in all directions," and that such errors "are expected to cancel each other out." *Id.* Therefore while random errors "may make the coding of a particular data point inaccurate, their aggregate effect over the whole data set is not expected to undermine conclusions." *Id.* According to Dr. Goldstein, Dr. Gibson "typically does not specify whether ... alleged errors were random or systematic," and concludes that "the great majority of the errors that Dr. Gibson alleges are, at most, the result of random 'noise' which would not have systematically biased the study's results or undermined its validity." *Id.* at 38. Dr. Goldstein states that the production of several versions of the *Buying Time* databases is explained by the fact that "social science researchers, like all prudent people, periodically back up their work when using computers." Goldstein Rebuttal Report at 9 [DEV 5–Tab 4]. Dr. Goldstein provides two explanations for the variances in data between the two data sets. First, some differences may be the result of "routine 'cleaning' of the data sets." *Id.* at 10. Dr. Goldstein says that it is "standard social science practice to clean a data set by correcting apparent errors after the codes have been entered into the database." *Id.* (citing Herbert F. Weisberg, Jon A. Krosnick & Bruce D. Bowen, An Introduction to Survey Research, Polling, and Data Analysis (3d ed.1996)). Corrections were made to "wild codes that is, entries for which no corresponding code existed in our codebook." *Id.* at 11. Dr. Goldstein and his assistants also "corrected logically inconsistent answers ... [and] also filled in missing data for some ads on a number of objective questions, such as candidate mention, in both the 1998 and 2000 databases." *Id.* More substantial differences can be attributed to the fact that Dr. Goldstein "continued updating and revising [his] own copy of the database as part of [his] continuing scholarly work." *Id.* at 11–12. Subsequent discoveries of miscodes of mostly contextual errors and 100 missing advertisements from the CMAG data set were added to Dr. Goldstein's version of the

2000 database. *Id.* at 12. Dr. Lupia reviewed the multiple databases and concludes that the changes are transparent and he finds no reason to conclude that Dr. Goldstein has attempted to hide anything. Lupia Expert Report at 22 [DEV 5–Tab 5]. Lupia agrees that Dr. Gibson's concern is a legitimate one; however, "[l]arge academic databases change for legitimate reasons, so the mere existence of the relative small changes cited in the [Gibson] report provide no basis to negate the project's credibility." *Id.* at 23. To Lupia, the important question is "why and how the changes were made," and Dr. Gibson's suggestions of illegitimacy are, in Lupia's opinion, "of varying and questionable credibility." *Id.*

o. Dr. Gibson examined "the actual student coding sheeting for 25 of the 1998 storyboards and ... compared them to the 'final' version of the 1998 data set." Gibson Expert Report at 15 [1 PCS]. Focusing on Question 6, he found that the original student codings of eight advertisements as "genuine issue advertisements" had been changed to electioneering advertisements. *Id.* These eight advertisements were aired over 2,400 times, significantly changing the results of the survey. *Id.* Dr. Gibson is troubled by the fact that the changes were "entirely asymmetrical: In not a single instance in these storyboards was a change made on an ad originally coded as having candidate support or opposition as its 'purpose.'" *Id.* He asks: "[s]ince no documentation of how individual ads were selected for reconsideration by Professor Goldstein has apparently been produced, one is left wondering why all of these changes could have the same effect." *Id.* Dr. Krasno's explanation of the changes to the advertisements is detailed *infra,* App. ¶ I.D.7.r.(3). Dr. Lupia states that Dr. Gibson's Report is subject to the same criticism with regard to his analysis of this matter. Lupia asks:

> why 25 storyboards and not more or less were examined. We are not told how these 25 cases were selected. Were they selected at random, were they given to Dr. Gibson by counsel (as is true in an analogous replication attempt ...), or were they chosen by some other procedure? ... Indeed, the [Gibson] report provides no basis for rejecting the hypothesis that the 'asymmetry' claim is an artifact of the cases being selected in a way that is biased toward this [sic] generating this particular result.

Lupia Expert Report at 41 [DEV 5–Tab 5].

p. In his report, Dr. Gibson discusses Question 22 on the coding sheet. The Question reads:

> 22. In your judgement, is the primary focus of this ad on the personal characteristics of either candidate or on policy matters?
>
> 1. Personal characteristics
> 2. Policy matters
> 3. Both
> 4. Neither

Gibson Expert Report at 31–32 [1 PCS]. Dr. Gibson observes that 98.1 percent of the advertisements aired within 60 days of the election were found to focus on policy matters, which means that "many ads were coded in Question 6 as promoting candidates but also as being 'primarily' focused on policy matters in Question 22." *Id.* at 32–33. Dr. Gibson finds this result contrary to what one might expect. *Id.* at 32. He then analyzes both questions and finds Question 22 to be more valid and reliable. Question 6, reproduced *supra,* App. ¶ I.D.7.i, does not provide coders the option of finding that the advertisement promotes *both* issues and candidates, forcing coders "to make a dichotomous judgment

about the ad's 'purpose.'" *Id.* at 33–34. Dr. Gibson also observes that "Question 6 does not ask the coder to discern the 'primary' purpose of the ad [it asks coders to provide their opinion on the advertisement's 'purpose']. Indeed, the question provides no guidance whatsoever as to how to code mixed-content ads." *Id.* at 34. For Dr. Gibson, the structure of Question 22 is superior to that of Question 6 because it provides the options of "both" and "neither," not "forcing a choice between different parts of the manifest content of the ad ... by allowing a coding of 'mixed' content." *Id.* Furthermore, he finds Question 22's request for the advertisements' "primary purpose," as opposed to Question 6's request for the commercials' "purpose," "provides at least some guidance for how to make the judgment required." *Id.* Dr. Gibson concludes that "Question 22 is structured in such a way as to provide more reliable information than Question 6." *Id.* Dr. Gibson also observes that the advertisements coded as supporting or opposing candidates have "quite a number of characteristics of what the authors of *Buying Time 1998* refer to as 'genuine issue ads.'" *Id.* at 35. He finds that:

> 95.6 percent of advertisements supporting or opposing candidates urged the viewer to take some action; 74.3 percent of these were coded as providing a toll-free telephone number and only 2.9 percent were coded as providing no telephone number
>
> 45.7 percent were coded as addressing health care issues; 30.1 percent addressed taxes; 27.8 percent addressed Social Security.

*Id.* at 34–35. Based on these findings, Dr. Gibson concludes that: "1) The coding in Question 6 is deeply flawed; 2) When Question 6 and Question 22 clash (i.e., the coding attributes differ), the coding of Question 22 should be considered more valid and reliable; 3) According to the coding, the vast and overwhelming majority of the ads said to be examples of illegitimate electioneering (by virtue of promoting candidates) in fact were judged by their own coders to have 'policy matters' as their 'primary focus.'" *Id.* at 35. Dr. Krasno disputes Dr. Gibson's conclusion that Question 6 is deeply flawed, noting that "coders rated 99 percent of candidate ads (and 93 percent of party ads) as generating support or opposition for a candidate." Krasno Rebuttal Report at 10 [DEV 5–Tab 3] (citing *BT 1998* [DEV 47] at 41). This conclusion is bolstered in Dr. Krasno's opinion by the fact the coders were not asked to determine the sponsor of the advertisement and that the disclaimers on the storyboards provided to the coders were often difficult to read. *Id.* at 10 n. 14. Dr. Krasno contends that an electioneering advertisement does not have to focus primarily on personal characteristics of a candidate. He notes that "political scientists routinely take the view that politicians frequently adopt and advertise policy positions in order to appeal to voters. *Id.* at 11 (citing as an example Anthony Downs, An Economic Theory of Democracy (1957)); *see also* Goldstein Rebuttal Report at 29 n.16 [DEV 5–Tab 4] (citing four articles for the proposition that "policy issues in electioneering ads is widely noted in the political science literature"); Seltz Dep. at 188 [JDT Vol. 28]. Dr. Krasno stated that the:

> best illustration of this point [is the fact that] coders rated 11 percent of candidate[-sponsored] ads as focused on the personal characteristics of the candidates, 64 percent as policy-related, and the remaining 25 percent as neither or both. If one assumes, as both common sense and FECA indicate, that candidates are wholly motivated by their desire to win election, then the problem with using q22 as Dr. Gibson would use it becomes obvious: it miscategorizes at least two thirds of candidate ads as not

being electioneering. This is the same criticism that both editions of *Buying Time* level at the magic words test, that it does not work for the one group of ads whose purpose and category are already known, regardless of their language or style.

*Id.* at 11. Dr. Lupia comments that an advertisement's primary purpose (the question posed in Question 6) and its primary focus (the question posed in Question 22) do not have to be the same. To illustrate his point he notes that many beer commercials do not focus on the product, but rather people "engaged in a range of activities that we can call 'wild nights out.'" Lupia Expert Report. at 47 [DEV 5–Tab 5]. It would not be unreasonable to "perceive that the purpose of the ad is to get" the viewer to buy the beer, "but to judge its primary focus as wild times." *Id.* at 48. Dr. Lupia argues that, contrary to Dr. Gibson's assumption, individuals can make the same distinction for campaign advertisements, *i.e.* that their purpose is to get the person to vote for candidate X, but their focus is on issue Y. *Id.* Lupia also challenges the idea that the qualifier "primary" clarifies matters for the coders. He cites a study co-authored by Dr. Gibson based on a survey question on social identity that did not mention the word "primary," but concluded that the initial responses given revealed *primary* social identities. Lupia Expert Report at 51 [DEV 5–Tab 5] (quoting James L. Gibson & Amanda Gouws, Social Identities and Political Intolerance: Linkages within the South African Mass Public, American Journal of Political Science 278–92 (2000)). This, Lupia states, is "standard practice" and the Dr. Gibson "report provides no tangible evidence or scholarly reference that Question 6 is inconsistent with standard scientific practice." *Id.* at 52. In terms of Dr. Gibson's determination that

Question 22 is superior to Question 6, Lupia notes that Question 6 does provide the coder with a third option of "unsure/unclear" and the Gibson Expert Report "offers no direct evidence on how answers to the questions would have changed had we allowed the responses 'both' and 'neither' in Question 6 or the response 'unsure/unclear' in Question 22." *Id.* at 48, 50. Lupia posits in response to the criticism that Question 6 failed to provide guidance to the coders that providing instructions would open the study up to charges that the instructions themselves biased the coders' responses. *Id.* at 49.

q. Dr. Gibson observes, for the first time in his rebuttal report, that "[m]issing from the entire discussion of ads and airings in the expert reports submitted is any consideration of the people who consume these ads." Gibson Rebuttal Report at 24 [2 PCS]. He uses the "Gross Rating Points" variable in the *Buying Time* databases to assess the impact of BCRA on "the people who consume these ads." "Gross rating points are the sum of ratings for a particular time: if the local news is watched by ten percent of viewers with televisions, an ad run during the program represents ten gross rating points." *Id.* at 25 (quoting *BT 1998* [DEV 47] at 6). Starting with Krasno and Sorauf's Expert Report's finding that there were 713 "genuine issue advertisement" airings during the last sixty days of the 1998 campaign which depicted a candidate, Dr. Gibson found gross rating points for 707 of the airings. He found:

> that these 707 airings represent communications with a staggering number of household—30,108,857. Thus, were these ads (just the ads accepted by Dr. Krasno and Professor Goldstein as 'genuine issue ads') prohibited, over 30 million group-citizen political communications would be affected (and this figure is based on the quite conservative as-

sumption that each household only has a single person viewing television).

*Id.* Dr. Gibson does not make a similar argument in relation to *Buying Time 2000.* For further discussion on this point *see* Findings ¶ 2.12.13.

r. *Buying Time 1998's Seven Percent Figure*

*Buying Time 1998*'s claim that only seven percent of "genuine issue ads" in the 1998 campaign would constitute electioneering communications under BCRA is disputed.

(1) According to Dr. Jonathan Krasno, author of *Buying Time 1998,* the question he sought to answer was "what is BCRA's impact on pure issue ads?" Krasno Rebuttal Report at 12 [DEV 5–Tab 3]. Dr. Krasno aimed to determine if BCRA's framers' attempts to minimize the impact of BCRA on pure issue ads through timing and identification of candidates worked. *Id. Buying Time 1998* found that seven percent of all pure issue advertisements aired in 1998 identified a federal candidate and appeared within sixty days of the campaign. *Id.* at 13. This figure was determined by dividing the number of airings of genuine issue advertisements mentioning a federal candidate within 60 days of the election by the total number of genuine issue advertisements run in 1998. *Id.; see also* Seltz Dep. at 115–16 [JDT Vol. 28]. The Brennan Center stands by the seven percent figure, although for a period of time in 2001 it had questioned its accuracy. Holman Dep. at 142–43 [JDT Vol. 10]. During that period of time, the Brennan Center ran additional analyses and determined that seven percent of "unique issue ads- or in other words, . . . special interest groups placing issue ads" produced in 1998 would be captured unfairly by BCRA, *id.* at 123, 144, and that 13.8 percent of all issue advertisement airings mentioning a candidate and broadcast within 60 days of

the 1998 election were genuine issue advertisements, *id.* at 154–55.

(2) Plaintiffs object to the use of this denominator. Dr. Gibson finds:

using a denominator of all issue ads broadcast in 1998 for these calculations is arbitrary and makes little sense. Why use January 1, 1998, as the starting date for the total pool of issue ads (i.e., the denominator)? Why not include ads from December 1997, or even the entire election cycle beginning in November 1996? Why not limit the denominator to ads shown in the last half of 1998? The . . . selected . . . denominator . . . has no theoretical meaning.

Gibson Expert Report at 38 [1 PCS]; *see also id.* at 41 ("I can see no justification for making the denominator equal to all issue ads aired in 1998."). Furthermore, he argues that given his conclusion that more people are concentrating on political issues as elections draw near, discussed *supra* App. ¶ I.C.8, *Buying Time 1998*'s denominator, by using all issue advertisements run during the course of the year, makes "the assumption that ads aired anytime throughout the year are equally as valuable as ads aired in proximity to the election." Gibson Rebuttal Report at 27 [2 PCS]. He concludes that the "damage of prohibiting an ad within 60 days of an election cannot be ameliorated by allowing that ad to be broadcast at some other point throughout the year." *Id.* at 27–28. Dr. Krasno explains that the denominator reflects only advertisements run in 1998 because "we had no data from 1997 or the last weeks of 1996 to include in the denominator." Krasno Rebuttal Report at 14 [DEV 5–Tab 3]. He notes that the addition of such data into the denominator would simply "*decrease* the percentage of pure issue ads affected by BCRA" because all of those advertisements would have aired more than 60 days before the elec-

tion and would therefore not increase the size of the numerator. *Id.* at 14–15 (emphasis in original); *see also* Krasno & Sorauf Expert Report at 62 [DEV 1–Tab 2] ("The data from which these estimates are derived cover broadcasting only during the 1998 and 2000 calendar years, not the thirteen-plus months preceding them. Were we able to factor in the total number of pure issue ads that appeared between elections, the percentage of pure issue ads affected by BCRA would decline."). Dr. Gibson also suggests the better denominator, and one that is not arbitrary, is that used in *Buying Time 2000;* namely, all airings of issue advertisements during the last sixty days of the campaign which also depict a candidate. Gibson Expert Report at 39 [1 PCS]. The formula answers the question: If one were to assume all issue advertisements mentioning a candidate in the last 60 days of an election campaign had an electioneering purpose, what percentage of the time would this assumption be erroneous? *Id.* at 38–39. By contrast, the *Buying Time 1998* formula answers the question: "What percentage of total ads run throughout the year that mentioned a candidate by name and were coded as providing information

or urging action appeared *within* 60 days of the election, rather than *earlier than* 60 days before the election?" *Id.* at 39 (emphasis in original). Dr. Krasno believes that Dr. Gibson's denominator would vary in size "with the amount of candidate-oriented issue advertising before an election. This is particularly relevant because of the volume of candidate-oriented issue ads devoted to presidential campaigns. The result, of course, is highly unstable estimates of BCRA's impact from year to year." Krasno Rebuttal Report at 15 [DEV 5–Tab 3]. The effect of using the *Buying Time 1998* denominator is that the percentage is affected not only by the amount of genuine issue advertisements run within 60 days of the election, but also the number of electioneering advertisements run during that time. *Id.* at 16 n. 26. When Dr. Krasno applied Dr. Gibson's denominator to the *Buying Time 1998* data he found 14.7 percent of genuine issue advertisements would be unfairly captured.[200] *Id.; see also* Krasno & Sorauf Report at 60 n.143 [DEV 1–Tab 2]; *id.* App. at 3 (providing the calculation: 713 airings of three distinct genuine issue advertisements[201] mentioning a candidate and aired within 60 days of an election

---

**200.** Dr. Gibson, using a different data set than Dr. Krasno, found that by taking *Buying Time 1998*'s "flawed numerator and using the Brennan Center's own figures for calculating the proper denominator (airings within 60 days [of the election]), 16.5 % of the group ads were 'genuine issue ads' (as defined by the Brennan Center)...." Gibson Expert Report at 42 [1 PCS]. He goes on to reject this figure because he "does not accept the numerator." *Id.* He also finds that by using the data set he believed was the "final" version 25.7 percent of issue advertisements aired during 1998 mentioned a candidate and were broadcast within 60 days of the election were "genuine" issue advertisements. *Id.* at 37. Dr. Krasno states that this figure is incorrect because the data set used is incorrect, resulting in a numerator "four times too large," and that based on his study with Sorauf, he

now calculates the correct figure to be 6.1 percent. Krasno Rebuttal Report at 19 & App. [DEV 5–Tab 3]; *see also* Krasno & Sorauf Expert Report at 60 [DEV 1–Tab 2]. Dr. Gibson's problems with the numerator are discussed *infra*, App. I.D.7.r.(3).

**201.** One of these advertisements, "HMO said No" was aired a total of 455 times (118 times in Greensboro, 126 times in Raleigh–Durham, and 211 times in St. Louis). Krasno & Sorauf Expert Report App. at 3, 20 [DEV 1–Tab 2]. We were unable to find additional information about the other two advertisements, "CCS/No Matter Who" and "CENT/Breaux." *Id.* In 1998, St. Louis had 1,110,290 television households, Raleigh–Durham had 834,260, and Greensboro had 584,900. Gibson Rebuttal Report Ex. 2 [2 PCS].

constitutes the numerator; the denominator is the 4847 airings of issue advertisements mentioning a candidate within 60 days of the election). Dr. Krasno also notes that Dr. Gibson's calculations, finding 44.4 percent or more of genuine issue advertisements unfairly captured by BCRA to be, by Dr. Gibson's own report, a result of his changes to the numerator as well as to the denominator. *Id.* at 16; *see also* Gibson Expert Report at 40 [1 PCS]. Dr. Gibson notes that the discrepancy between his figures and that of *Buying Time 1998* "is due in part to the use of different denominators," but does not indicate the extent to which the change to the denominator, as opposed to his changes to the numerator, explains the discrepancy. Gibson Expert Report at 40 [1 PCS]. Dr. Lupia observes that both denominators answer questions that are different but finds both to be reasonable. "If I were asked to assess the proposed regulation's restrictiveness, the [Gibson] report's fraction could provide information about the impact during a particular time period, while *Buying Time* 1998's fraction could provide a better measure of the regulation's impact on issue advocacy more generally." Lupia Expert Report at 25 [DEV 5–Tab 5]. Lupia states that Dr. Gibson's denominator is no less arbitrary than that of *Buying Time 1998. Id.* at 26. Holman comments that the *Buying Time 1998* denominator is "a justifiable way" of determining the impact of BCRA on genuine issue advertisements, although he did not use the same one for *Buying Time 2000.* Holman Dep. at 140 [JDT Vol. 10]. For Holman, the *Buying Time 1998* calculation is "not incorrect. It's a different way of assigning a number to measure a phenomenon." *Id; but see id.* at 153–54 (stating that the text of *Buying Time 1998* relating to the seven percent figure is "[m]isleading" and "ambiguous" in that it did not identify clearly to what it referred).

(3) Plaintiffs' and Defendants' experts also disagree as to what the appropriate numerator should be. Dr. Gibson rejected the *Buying Time 1998* numerator because based on the data he was provided he concluded that eight advertisements aired 2,405 times in the last 60 days of the campaign were originally coded as promoting an issue or urging action (genuine issue advertisements) but were overruled by Dr. Goldstein and recoded as electioneering advertisements. Gibson Expert Report at 42 [1 PCS]. When Dr. Gibson added in these advertisements he found that "nearly two-thirds of the group ads that aired within 60 days of the 1998 election were coded by the students as 'genuine issue ads.'" *Id.* at 43. Dr. Gibson in his Rebuttal Report revises this figure based on information provided during the course of the litigation, which indicated that over a quarter of the advertisements he added to the numerator did mention candidates, resulting in a figure of 50.5 percent. Gibson Rebuttal Report at 23 [2 PCS]; *see also* Krasno Rebuttal Report at 17–18 [DEV 5–Tab 3] (describing this error). Dr. Gibson concludes that "this 50.5 % figure represents the statistical floor ... the 64 % figure cited in my report ... provides the ceiling." Gibson Rebuttal Report at 24 [2 PCS]. Dr. Gibson, in his Supplement Report, states that Dr. Krasno had produced additional data files which included an earlier version of the data set upon which he had relied. Gibson Supplement to Rebuttal Expert Report of October 7, 2002: 1998 Data ("Gibson Supplemental Report") at 1 [2 PCS]. The data showed that one of the eight advertisements Dr. Gibson alleged had been recoded (from "genuine issue" to "electioneering") had originally been coded as promoting the election or defeat of a candidate, and that another was missing data as to the nature of the commercial. *Id.* at 4. As a result of excluding the airings of

these two commercials, Dr. Gibson calculates that his "ceiling" fell to 60 percent, and his "floor" remained unchanged. *Id.* at 5–6. Dr. Krasno rejects the inclusion of any of the airings of these eight advertisements in the numerator. *See* Krasno Response to Professor Gibson's Supplemental Rebuttal (Nov. 13, 2002) ("Krasno Response"). He objects to the notion that the recoding "reflects a deliberate effort to manipulate some of the results reported in *Buying Time 1998*," stating that the recoding aimed to "make the data set as sensible and accurate as possible." *Id.* at 1, 2. Dr. Krasno explains that the decision to recode five of the advertisements was based on their contradictory codings. *Id.* at 2. The survey was constructed so that when a coder found that an advertisement's purpose was to "provide information or urge action" (in other words, was a genuine issue advertisement) in Question 6, the coder was supposed to skip the next 12 questions. *Id.* at 2; Gibson Supplemental Report Ex. 7 [2 PCS]. For five of these advertisements, student coders found the advertisement provided information or urged action, but went on to answer the next 12 questions. Krasno Response at 2. In addition, Dr. Krasno states that "all of these ads were scored in a parallel process on another variable, 'favcan,' as favoring a Democratic or Republican candidate. Again, the potential conflict between question 6 and favcan should have attracted attention as the data set was being prepared." *Id.* Dr. Krasno argues that a review of the storyboards for these five advertisements, as well as other contextual factors such as where and when they were aired, makes it clear that they should be coded as "electioneering." *Id.* at 2–4. As for the final advertisement concerning Senators Herb Kohl and Russell Feingold's positions on partial birth abortion, Dr. Krasno admits that whether or not it is a genuine issue or electioneer-

ing advertisement is a "close call," but the fact that it appeared only six times in 1998 means its coding has "no real effect on any calculations of BCRA's impact." *Id.* at 3; *see also supra* App. ¶¶ I.D.7.i, I.D.8.c (discussing the advertisement). Dr. Krasno believes that the "notion that a small handful of mistakes must be perpetuated because they were once made is both ludicrous and an extraordinary departure from the usual practice of compiling data sets. Dr. Gibson's argument would be more credible if he offered any explanation for why these@ commercials really are pure issue ads." Krasno Response at 5.

(4) Dr. Lupia weighs in on the fraction debate, contending that the Gibson and *Buying Time* reports "are reasonable conceptualizations of the question about how the proposed regulations will affect groups in the present and future if groups act exactly as they did in the past. If, however, we want to evaluate the regulations' likely future impact we should consider the possibility that groups will adapt to the new regulations in different ways." Lupia Expert Report at 26 [DEV 5–Tab 5]. Both sides seek to predict the impact BCRA will have if no one alters their behavior. Lupia concludes that to "the extent that affected groups are able to choose [to alter their behavior], both estimates in the denomination debate may exaggerate the extent to which this aspect of the new regulation will restrict the groups' abilities to express themselves in the future.... To the extent that we agree that such groups will adapt in various ways, the credibility of the high-percentage estimates of the likely future impact of the proposed regulations on interest groups is severely undermined." *Id.* at 27.

8. *Criticism of Buying Time 2000*

a. Many of Dr. Gibson's criticisms of *Buying Time 2000* are similar to those

made of *Buying Time 1998* and are addressed *supra*, App. ¶ I.D.7.

b. Dr. Gibson states that the *Buying Time 2000* data base "has numerous errors and inconsistencies in it," and comments that these changes preclude him from replicating the findings of *Buying Time 2000*. Gibson Expert Report at 46, 47–48 [1 PCS].[202] He is troubled by the fact that Dr. Goldstein changed the coded "purpose" of 62 out of 338 advertisements, *id.* at 52, questions the motivation behind the changes, and asks what standards Dr. Goldstein employed in making the changes, *id.* at 53; *see also id.* at 47 n. 43, 64 (concluding from a review of email correspondence between *Buying Time 2000* researchers that they "were committed to drawing a particular set of substantive conclusions from the data. When the conclusions were not forthcoming, the data was scrutinized further and alterations were made in the data base."). Dr. Goldstein states that "most of the 62 'changes' [Gibson] identifies in the 2000 database are not changes at all, but rather original student coding of additional CMAG storyboards that had not previously been coded at all, and were not part of the database

used by the authors of *Buying Time 2000*." Goldstein Rebuttal Report at 4 [DEV 5–Tab 4]. The problem stems from Dr. Gibson's use of the wrong database; he does not analyze the *Buying Time 2000* database, but rather "a later iteration of [Dr. Goldstein's] own version of the database containing [his] own after-the-fact updates and re-codes, including additional ads later received from CMAG. . . . [N]one of this re-coding ever made its way into the *Buying Time 2000* report."[203] *Id.* at 14–15. Dr. Goldstein also takes exception to the charge that he deliberately changed the data in order to decrease the number of pure issue advertisements, calling it "baseless." *Id.* at 4. In addition, Dr. Goldstein notes that he reevaluated the coding of 30 advertisements in the 2000 database in his post-*Buying Time 2000* academic research having nothing to do with campaign finance or the *Buying Time* studies and "[i]n 26 of these instances, [ ] changed the coding from electioneering to genuine issue." *Id.* at 5, 14–15, App. A (listing advertisements changed or added to the database and the changes made to each). Dr. Goldstein claims that for the *Buying Time 2000* database, he "did not change

**202.** Dr. Goldstein testifies that he does not have the original student coding for this study, explaining that his "political science department ... mistakenly deleted a big chunk of out files, including our access database." Goldstein Dep. (Vol.2) at 129 [JDT Vol. 8].

**203.** For example, Dr. Gibson challenges the *Buying Time 2000* finding that "[o]f all the group-sponsored issue ads that depicted a candidate within 60 days of the election, 99.4 % were found to be electioneering issue ads. In absolute numbers, *only three genuine issue ads (which aired a total of 331 times in the 2000 elections) would have been defined as electioneering communications ....*" Gibson Expert Report at 61 [1 PCS] (quoting *BT 2000* [DEV 46] at 73 (emphasis in original)). Dr. Gibson finds that according to the database

the three advertisements were only aired nine times, but the *Buying Time* authors reported 331 airings and a different data base that Dr. Gibson determines is the "original, student coded version" of Question 11 shows 1,082 airings.. *Id.* at 61–62. He declares that he "has confidence in none of these" figures. *Id.* at 62. Dr. Goldstein claims that if Dr. Gibson had used the correct database, "federal.sav," he would have been able to identify the three advertisements which comprise 331 airings. Goldstein Rebuttal Report at 21 [DEV 5–Tab 4] (finding advertisements # 627 (172 airings), # 1389 (81 airings), and # 2862 (78 airings)). He also used the database to identify "all ads run by interest groups that mentioned a candidate and aired within 60 days of the election," and using that as the denominator arrived at the same percentage as *Buying Time 2000*. *Id.* (dividing 331 by 53,840).

any of the student coders' responses to Question 11 in the data cleaning process." *Id.* at 16; *see also* Goldstein Dep. (Vol.2) at 57–59, 147–50 [JDT Vol. 8] (detailing cell phone conference call from the West Palm Beach Airport asking for his assessment of three advertisements which were subsequently changed from genuine issue to electioneering advertisements based on Dr. Goldstein's assessments). Dr. Lupia comments that Dr. Gibson fails to connect his bias concerns with actual changes in the database or demonstrate the effects directly. Lupia Expert Report at 58 [DEV 5–Tab 5]. As such, Lupia finds the charge that the investigators were committed to reaching a particular outcome to be "at best, premature and, with certainty, not proven in the [Gibson] report". *Id.*

c. Dr. Goldstein does find that three advertisements in the *Buying Time 2000* database "were re-coded on Question 11 from 'promoting a candidate' to 'providing information or urging action on an issue.'" Goldstein Expert Report at 16 [DEV 3–Tab 7]. One was a version of a "cookie cutter" advertisement run by CBM (numbered 1269), which was "extremely similar" to a number of other CBM-sponsored advertisements that (Goldstein thought) had all been coded as "electioneering." *Id.* This fact was brought to Dr. Goldstein's attention by the *Buying Time* authors and, concluding that it was not "meaningfully distinguishable from the other CBM ads, … [he] recoded it as electioneering." *Id.* The second was the National Pro–Life Alliance advertisement (numbered 2107) which mentioned Wisconsin Senators Kohl and Feingold. Again, the *Buying Time* authors told Dr. Goldstein that the advertisement was "virtually identical" to another advertisement run in Virginia mentioning then-Senator Charles Robb. *Id.* at 17. Dr. Goldstein reviewed the storyboards of the two advertisements and found them

"not meaningfully distinguishable, and resolved the inconsistency by re-coding [the commercial] as electioneering." *Id.* The final advertisement changed was sponsored by the Rhode Island Women Voters (numbered 1367). The advertisement was originally coded as a "genuine issue advertisement" but changed by Dr. Goldstein after the *Buying Time* authors disagreed with the coding. *Id.* Dr. Goldstein believes that the advertisement "is clearly electioneering." *Id.* As noted *supra*, App. ¶ I.D.8.c, Dr. Goldstein recently discovered that the six corresponding versions of Advertisement # 1269 were originally coded as "genuine issue advertisements" by the students and later changed by the *Buying Time 2000* authors to "electioneering" commercials. Goldstein Dep. (Vol.2) at 158–59 [JDT Vol. 8]. When these six advertisements are added to the analysis, which Dr. Goldstein terms "the most conservative standard estimate," one finds that 17 percent of the advertisements aired within 60 days of the election which identified a candidate were "genuine issue advertisements." *Id.* at 169. Defendants' experts personally disagree that all of these commercials are "genuine issue advertisements." *See* Holman Dep. at 82–83 [JDT Vol. 10] (stating he considers Advertisement # 1367 to be his "poster child of sham issue advocacy"); Goldstein Expert Report at 26 n.21 [DEV 3–Tab 7] (noting that he considers all the commercials with the exception of Advertisement # 2107 "were clearly intended to support or oppose the election of a candidate").

d. Dr. Gibson raises essentially the same concerns about Question 11 in *Buying Time 2000* as he does for the practically identical Question 6 in *Buying Time 1998*, discussed *supra* App. ¶ I.D.7.i. Gibson Expert Report at 54–55 [1 PCS]. Many of the rebuttal arguments posted in paragraph I.D.7.i, *supra*, are aimed at this

charge as well. *See supra* App. ¶ I.D.7.i. In addition, Dr. Goldstein argues that data from the 2000 election shows that coders "were [not] systematically biased toward coding ads mentioning candidates as electioneering as opposed to issue ads." Goldstein Rebuttal Report at 29 [DEV 5–Tab 4]. Dr. Goldstein states that "79.8 percent of the group-sponsored ads classified as electioneering were coded as having run within 60 days of the election, compared to only 18.7 percent of non-electioneering ads." *Id.* at 28. As one "would expect . . . that ads designed to promote or oppose a candidate would air relatively close to Election Day," this objective data, in Dr. Goldstein's opinion, corroborates the coding in Question 11 and demonstrates that Dr. Gibson's theory is incorrect. *Id.* at 28–29.

e. Dr. Gibson also makes the argument that *Buying Time 2000*'s Question 27, identical to *Buying Time 1998*'s Question 22, is superior to Question 11, for much the same reasons he posits for the superiority of *Buying Time 1998*'s Question 22 over the same study's Question 6. Gibson Expert Report at 56–61 [1 PCS]; *see also* App. ¶ I.D.7.p. He also claims that Question 27 is more reliable "because it does not seem to have been subject to the post-coding manipulations inflicted on Question 11." Gibson Rebuttal Report at 16 [2 PCS]. The coders found 78.8 percent of the group-sponsored advertisements had policy matters as their primary focus, and 17.6 percent had both policy matters and personal characteristics as their primary focus. Gibson Expert Report at 57 [1 PCS]; *see also* Gibson Rebuttal Report at 16 [2 PCS] (applying the denominator used in Dr. Goldstein's Expert Report to conclude 84.4 percent of "electioneering" advertisements had policy matters as their primary focus.) Many of the arguments made in App. ¶ I.D.7.p, *supra*, are directed at this

charge as well. In addition, Dr. Goldstein responds by stating that "most electioneering ads seek to influence votes by portraying the favored candidate as espousing reasonable policy positions on hot-button issues like taxes . . . , and the opponent as having unreasonable or even dangerous positions on the same issues." Goldstein Rebuttal Report at 30 [DEV 5–Tab 4]. The data from the 2000 election shows that "53.3 percent of candidate-sponsored ads focused on policy issues rather than personal characteristics; an additional 35 percent focused on both policy and personal issues. Only 10.8 percent focused just on personal issues." *Id.* Furthermore, in 2000, 47.4 percent of advertisements using express advocacy terminology were coded as having a policy focus, 34.5 percent focused on both policy and personal issues, and 16.5 percent focused only on personal issues. *Id.* at 30–31. Dr. Goldstein concludes that Dr. Gibson's theory is "disproved by the fact that both candidate ads and express advocacy ads, which everyone agrees are electioneering, themselves focus primarily on policy issues." *Id.* at 31.

f. Dr. Gibson attempts to demonstrate "the extent to which changes in a relatively small number of highly subjective codings can affect the results reported and the conclusions reached." Gibson Expert Report at 62 [1 PCS]. He does so by looking at 30 advertisements produced by counsel and assumes that they each "could fairly be coded as 'providing information.'" *Id* at 62–63. By treating them as such and adding them to the Brennan Center's 331 figure (which he rejects) he concludes that the so-called "genuine" airings constitute 24.1 percent of all the airings within 60 days of the election, which did not use express advocacy and mentioned a candidate. *Id.* at 63. He then comments that "if one *assumed* that airings presented within 60 days of the 2000 election, which

mentioned candidates, but which did not mention 'magic words,' were intended to promote candidates ..., one would be wrong, under this scenario, approximately 24% of the time." *Id.* (emphasis added); *see also* Gibson Dep. at 179–80 [JDT Vol. 7](confirming that he made no determination about how the advertisements should be coded); *id.* at 181 (stating he never looked at the storyboards for the 30 advertisements). This exercise leads Dr. Gibson to conclude that "changes in the coding of very small numbers of ads can change the results dramatically," "the current version of the 2000 data base supports many possible estimates of the number of ads with these characteristics," and "given all of the deficiencies of the data base and the coding on which it is based, the wisest course is to draw no conclusions whatsoever about these ads on the basis of the empirical evidence in the data base." Gibson Expert Report at 63 [1 PCS].[204] Dr. Goldstein finds Dr. Gibson's exercise with the 30 counsel-chosen advertisements to be "a remarkably bizarre manipulation of the data in order to artificially inflate *Buying Time 2000*'s 'false positive' count." *Id.* at 22. Dr. Goldstein notes that "if we 'assumed,'" as Dr. Gibson did for the 30 advertisements, "that 100 percent of the BCRA-related group ads were genuine issue ads, then we could arrive at a false positive percentage of 100 percent." *Id.* Dr. Lupia questions the credibility of this argument given that it is based on 30 advertisements chosen by Plaintiffs' counsel, and Dr. Gib-

son does not reveal the method behind their selection. Lupia Expert Report at 57 [DEV 5–Tab 5]; *see also* Gibson Dep. at 180 [JDT Vol. 7](confirming he has no understanding of how the advertisements were selected); Goldstein Expert Report at 22 [DEV 3–Tab 7] ("[W]here-as here-such assumptions are based on nothing more than the self-serving conjecture of plaintiffs' counsel, any such percentage is meaningless.").

g. Dr. Gibson notes that unlike the *Buying Time 1998* study, "it appears that the 2000 project made some serious attempt to assess the reliability of the data collected by the student coders." Gibson Expert Report at 49 [1 PCS]. He evaluates reliability testing as detailed in an article published by Drs. Krasno and Goldstein, where they found that the recoders differed from the original coders on the Question 11 "purpose" inquiry in only one instance. *Id.* (citing "Jonathan Krasno & Kenneth Goldstein, The Facts about Television Advertising and the McCain–Feingold Bill," 35 PS: Political Science and Politics 207 (Jun.2002)).[205] The procedure involved the recoding of 250 advertisements, but Dr. Gibson questions "how these ads were sampled (e.g., random versus non-random selection) and who the coders were (e.g., expert versus novice)," and notes that "variable-by-variable reliability results for the full ad coding data set are not presented." *Id.* Without this information, Dr. Gibson cannot assess whether the "inter-coder reliability methods can be

**204.** In his rebuttal report, Dr. Gibson adds to his 30 advertisement data set four additional commercials deemed by Goldstein's Expert Report to be genuine issue advertisements (Dr. Goldstein found six genuine issue advertisements run in 2000, and two were already in the 30 commercials chosen). Gibson Rebuttal Report at 15 [2 PCS]. By running a similar analysis, Dr. Gibson concludes that Dr. Goldstein's "estimates of the impact of the

three criteria [60 days before the election, candidate mention, not supporting or opposing a candidate] are wholly dependent on subjective assessments of the 'purpose' of individual ads, assessments that are reasonably subject to debate." *Id.*

**205.** The procedures and results of the inter-coder reliability test are produced as Appendix I to the Goldstein Expert Report.

accepted as producing any useful information." *Id.* Dr. Goldstein discusses his efforts to assess inter-coder reliability which appear to be different from that discussed by Dr. Gibson. *See* Gibson Rebuttal Report at 9 n. 14 [2 PCS] ("It is unclear how [this test] relates to" the one described in the article published by Drs. Krasno and Goldstein). Dr. Goldstein describes a procedure whereby he randomly chose 150 unique advertisements, had them coded by five undergraduate students and "[i]n general, [ ] found inter-coder reliability to be extremely high." Goldstein Rebuttal Report at 34 [DEV 5–Tab 4]. Dr. Goldstein also conducted a more recent inquiry into the reliability of the coding of Question 11. He took all 350 advertisements in the data set that were sponsored by interest groups, "randomly selected 50 [206] and asked 10 undergraduate students to code them on three attributes[:] ... 1) whether the ads 'generate support or opposition for a particular candidate' or 'provide information or urge action'; 2) their tone (attack, contrast, or promote); and 3) their focus (a candidate's personal attributes or policy)." *Id.* at 34–35. The original coders had found 64 percent of the sampled advertisements to generate candidate support, 26 percent to provide information or urge action, and for two percent of the advertisements they were unsure or unclear about the commercial's purpose. *Id.* at 35. The recoders agreed with the original codes 75 percent of the time, regardless of whether the original coding was "support or oppose a candidate" or "provide information or urge action." *Id.* at 35–36. The fact "that the coders agreed with the original code in 75 percent of the cases, *regardless of what that original code was,*" Dr. Goldstein asserts, means that "there is no hint of systematic bias in the original coding." *Id.* at

36. Dr. Gibson, in his rebuttal report, challenges this test. Since Dr. Goldstein was unable to discover the original coding database used in *Buying Time 2000,* Dr. Gibson questions whether or not the reliability exercise tested correlation between the recoders and the original coders, or the recoders and a manipulated data set. Gibson Rebuttal Report at 9 [2 PCS]. Next, Dr. Gibson challenges the sample used by Dr. Goldstein. He notes that the pool from which Dr. Goldstein selected the advertisements was "highly skewed" in that very few were coded as genuine issue advertisements. *Id.* at 10. Dr. Gibson finds that "any conclusions about whether this sort of ad [group-sponsored] was in fact reliably coded cannot be accepted on the basis of an examination of such a small number of ads." *Id.* He also posits that since genuine issue advertisements were "exceedingly rare" in the sample set that "it seems quite likely that even after coding only a few ads, the coders developed a strong expectation, implicit or explicit, that the next ad they coded would be an electioneering ad. It is very difficult to make subjective assessments of infrequently occurring events. Once a coder discerns a pattern in the responses to a subjective variable, it becomes difficult indeed for the coder to 'break the habit.'" *Id.*

h. The NRA criticizes the *Buying Time 2000* study for not including two 30–minute "news magazines" in the data which it claims are "genuine issue advertisements." Proposed Findings of Fact of the NRA and the NRA PVF ¶ 9. "If these airings had been considered, 34 % of the total volume of speech that BCRA in 2000 would have covered in the 60 days prior to the general election would have been genuine issue advertisements." *Id.* One of these "news magazines" was titled "Cali-

---

**206.** He later had to drop four because "their codes were missing from the original data-

set." Goldstein Rebuttal Report at 35 [DEV 5–Tab 4].

fornia." LaPierre Decl. ¶ 12 [NRA App. at 5]. "California" was aired 800 times in California from August 29, 2002 to November 5, 2000. *Id.* ¶ 14. "During the entirety of the 30–minute program, there was only one fleeting reference to a federal candidate for office. Specifically, during a short segment urging viewers to join the NRA and describing the benefits of membership, a cover of an issue of the NRA's magazine 'First Freedom' depicting Vice President Gore's image, then a presidential candidate, flashed on the screen for several seconds." *Id.* ¶ 13. One other NRA 30 minute "news magazine" would similarly would be "captured" by BCRA due to the inclusion of the "First Freedom" cover. NRA App. 917, 920, 924, 929 ("It Can't Happen Here") (also referring once to the "Clinton–Gore assault weapons ban"). The NRA does not allege that the study included other 30 minute advertisements, or that the CMAG monitors such commercial broadcasts. It does not indicate how other 30 minute "news maga-

zines" it ran during 2000 would have affected the results of *Buying Time. See* Proposed Findings of Fact of the NRA and the NRA PVF ¶¶ 3–7.

## II. *AFL–CIO Advertisements Run Within 30 Days of a Primary Election*

A. Plaintiff AFL–CIO has put forth a number of examples of what they claim are "genuine issue advertisements" relating to pending legislation that BCRA would capture because the commercials ran on television and radio within 30 days of a primary election. AFL–CIO Br. at 10–11 (citing Mitchell Decl. ¶¶ 32, 34–36, 37–39, 40, 50, 58–59). The advertisements cited to by the AFL–CIO ran in "flights," aimed at particular legislation pending at the time. Practically all of these flights consisted of a variety of "cookie-cutter" advertisements, meaning advertisements that are virtually identical except that they reference different candidates. *See generally* Mitchell Decl. Ex. 1 [6 PCS].[207] Ms. Mitch-

207. Ms. Mitchell provides with her declaration as Exhibit 1 a chart listing all of the advertisements purchased by the AFL–CIO since 1995, which includes the advertisement's title, district where it aired, the candidate or officeholder mentioned, whether it was a radio or television advertisement, the issue(s) discussed, the commercial's audio and visual "call to action," the dates it was broadcast, the dates of the mentioned candidate/officeholder's primary and general election, and whether the advertisement was aired within 30 of the primary, or 60 days of the election date. *See* Mitchell Decl. Ex. 1 [6 PCS]; Mitchell Decl. ¶ 4 [6 PCS] (with some caveats, attesting that "Exhibit 1 is a substantially accurate list of the ads run by the AFL–CIO between 1995 and 2001."). Since the AFL–CIO brief cites to paragraphs from Ms. Mitchell's declaration, and Ms. Mitchell's declaration relies on the information contained in Exhibit 1, I look to both sources for information about these advertisements. In the event of inconsistency between Ms. Mitchell's

testimony and the data in Exhibit 1, I rely on Exhibit 1 as its information is far more detailed and forms the basis for Ms. Mitchell's testimony. For example, in Paragraph 34 of her declaration, Ms. Mitchell states that *"1991"* ran in 28 media markets, identifying 3 candidates within 30 days of their primaries and cites to Exhibit 1 for support. *Id.* ¶ 34. However, Exhibit 1 shows advertisements aired in only 19 markets identifying one such candidate. *Id.* Ex. 1. I give credence to the information in Exhibit 1. In addition, in some cases two forms of the same advertisement were run in the same district against the same candidate. Unless the advertisements were identical, I have treated them as two separate cookie-cutter advertisements. *See e.g. id.* Ex. 1 at 33–34 (listing two "Couples" advertisements run in fourth Congressional district of North Carolina identifying Congressman Fred Heineman, but differing in that one pictured the Congressman and provided a 1–800 number while the other did not).

ell describes advertising campaigns comprising 29 different sets of cookie-cutter advertisements, some of which were run within 30 days of a named candidate's primary election. Mitchell Decl. ¶¶ 32, 34–36, 37–39, 40, 50, 58–59 [6 PCS].[208] In addition, Exhibit 1 shows that four more advertisements would have been captured by BCRA due to their airing within 30 days of the identified candidate's primary, but since all of the airings of three of these commercials would have been captured by BCRA's 60 day-window as well, I address only one of these advertisements in this Finding.[209]

1. "Too Far" was an advertisement which aired nationally on cable television and identified President William J. Clinton within 30 days of the Iowa primary in 1996. Mitchell Decl. ¶ 32, Ex. 1 at 17 [6 PCS].

2. During April 1996, the AFL–CIO ran a flight of advertisements entitled "1991" aimed at increasing the national minimum wage. *Id.* ¶ 34. Exhibit 1 shows that the AFL–CIO produced 19 versions of "1991," three of which ran within 30 days of an identified candidate's primary contest. *Id.* Ex. 1 at 17–20. In May

1996, the AFL–CIO ran four more flights of cookie-cutter advertisements related to legislation that would raise the minimum wage entitled "Raise," "Votes," "People," and "No." *Id.* ¶ 35. According to Exhibit 1, two versions of "Raise" were aired, one of which was aired within 30 days of the named candidate's primary, and 19 versions of "People" were run, two of which mentioned a candidate within 30 days of the candidate's primary. *Id.* Ex. 1 at 21–25. The AFL–CIO's data shows that five versions of "No" were aired, none during the 30 days prior to the primary of an identified candidate, and Exhibit 1 shows no airings of "Votes." *Id.* Ex. 1 at 22. In late June and July of 1996, the AFL–CIO ran two more flights of advertisements entitled "Minimum Wage" and "$5.15" on the same issue. *Id.* ¶ 36. Nine versions of "Minimum Wage" were aired, none of which implicated candidates within 30 days of their primary, while 14 versions of "$5.15" were aired, one which named a candidate within 30 days of the candidate's primary. *Id.* Ex. 1 at 17, 19, 21–22, 32–35.

3. Between late June and early August 1996, the AFL–CIO ran four flights of advertisements entitled "Couple," "Lady," "Peace," and "Whither," "intended to de-

---

**208.** The advertisements are: "Too Far," Mitchell Decl. ¶ 32 & Ex. 31 [6 PCS]; "1991," *id.* ¶ 34 & Ex. 33; "Raise," *id.* ¶ 35 & Ex. 35; "Votes," *id.* ¶ 35 & Ex. 36; "People," *id.* ¶ 35 & Ex. 38; "No," *id.* ¶ 35 & Ex. 39; "Minimum Wage," *id.* ¶ 36 & Ex. 42; "$5.15," *id.* ¶ 36 & Ex. 44; "Couple," *id.* ¶ 37 & Ex. 47; "Lady," *id.* ¶ 37 & Ex. 48; "Peace," *id.* ¶ 37 & Ex. 49; "Whither," *id.* ¶ 37 & Ex. 50; "Another," *id.* ¶ 38 & Ex. 53; "Edith," *id.* ¶ 40 & Ex. 58; "Pass," *id.* ¶ 50 & Ex. 94; "Support," *id.* ¶ 50 & Ex. 95; "Call," *id.* ¶ 50 & Ex. 98; "Failed," *id.* ¶ 50 & Ex. 99; "Liable," *id.* ¶ 50 & Ex. 100; "Soon," *id.* ¶ 50 & Ex. 100; "Basic," *id.* ¶ 50 & Ex. 102; "Label," *id.* ¶ 57 & Ex. 127; "Trust," *id.* ¶ 57 & Ex. 128; "Endure," *id.* ¶ 57 & Ex. 129; "Stand," *id.* ¶ 57 & Ex. 130; "Block," *id.* ¶ 58 & Ex. 137; "Help," *id.*

¶ 58 & Ex. 138; "Sky," *id.* ¶ 59 & Ex. 139; and "Protect," *id.* ¶ 59 & Ex. 140.

**209.** These four advertisements are: "Job," Mitchell Decl. ¶ 61 & Exs. 1 (at 102), 141 [6 PCS] (All airings of "Job" took place within 60 days of the 2000 general election); "Barker," *id.* ¶ 53 & Ex. 116 (All airings of "Barker" took place within 60 days of the 2000 general election); "No Two Way," *id.* ¶ 41 & Ex. 59 (All airings of "No Two Way" took place within 60 days of the 2000 general election); and "Raiders," *id.* Ex. 1 at 36, 38–39, Ex. 58 at 10. Since the "Job," "Barker," and "No Two Way" airings would have been captured by BCRA's 60–day window, they are not addressed here but in Findings ¶¶ 2.11.3.2, 2.11.8.2.

feat the continuing efforts of the Republican Congress to reduce Medicare/Medicaid benefits as part of the FY 1997 federal budget legislation." *Id.* ¶ 37. The group ran 34 versions of "Couple," two of which mentioned candidates within 30 days of their primaries, and 27 versions of "Whither" were run, four of which fell within 30 days of a named candidate's primary contest. *Id.* Ex. 1 at 25–36. Five versions of "Lady," and four versions of "Peace" were run, but none of these advertisements ran within 30 days of an identified candidate's primary. *Id.* Ex. 1 at 29–34.

4. In late August and early September 1996, "the AFL–CIO sponsored another flight of advertisements entitled 'Another' in response to a series of advertisements run by business interest groups that called into question the AFL–CIO's Medicare ads by claiming that the Republican budget would increase, rather than decrease, Medicare budgets." *Id.* ¶ 38. The group ran 26 versions of "Another," six of which ran within 30 days of a named candidate's primary contest. *Id.* Ex. 1 at 39–42.

5. In August of 1996, the AFL–CIO "sponsored a television and radio advertisement entitled 'Edith' which was intended to gain support for legislation to protect the retirement savings of working families by applying the same protections to 401(k) plans as already applied to traditional defined benefit plans." *Id.* ¶ 40. Forty versions of "Edith" were broadcast, 12 of which identified candidates within 30 days of their primaries. *Id.* Ex. 1 at 36–39. Four versions of a radio advertisement on the same topic entitled "Raiders" were aired by the AFL–CIO, one of which would have been captured by BCRA's 30-day rule. *Id.* Ex. 1 at 36, 38–39.

6. In July 1998, the AFL–CIO "sponsored several flights of television and radio advertisements designed to generate support for HMO reform legislation." *Id.*

¶ 50. These advertisements were entitled "Pass," "Support," "Call," "Failed," "Liable," "Soon," and "Basic." *Id.* The group ran two versions of "Pass," six versions of "Support," three versions of "Failed," three versions of "Liable," and seven versions of "Basic." *Id.* Ex. 1 at 78–82. None of these advertisements was run within 30 days of a named candidate's primary. *Id.* Seventeen versions of "Call" were broadcast, two of which named federal candidates within 30 days of their primary, as did one of the three versions of "Soon." *Id.* Ex. 1 at 80–82.

7. From February through June 2000, the "AFL–CIO ran several flights of ads entitled 'Label,' 'Trust,' 'Endure,' and 'Stand' in opposition to President Clinton's proposal to provide permanent normal trade relations to China." *Id.* ¶ 57. The group ran 14 versions of "Label," two within 30 days of a named candidate's primary. *Id.* Ex. 1 at 92–93. Sixteen versions of "Trust" were aired, three during the 30 days before a named candidate's primary. *Id.* Ex. 1 at 93–97. Eighteen versions of "Endure" were broadcast, three of which aired within 30 days of the named candidate's primary. *Id.* Ex. 1 at 94–97. Neither of the two versions of "Stand" aired by the AFL–CIO named candidates within 30 days of their primary elections. *Id.* Ex. 1 at 97.

8. In June and July of 2000, the AFL–CIO "paid for a flight of radio advertisements entitled 'Block' aimed at pressuring the Senate to approve the Norwood–Dingell version of the Patient's Bill of Rights." *Id.* ¶ 58. Exhibit 1 shows one version of "Block" was aired, but not during the 30 days before a named candidate's primary. *Id.* Ex. 1 at 86. "In August and September, with the bill still stalled in Congress, [the AFL–CIO] ran several flights of television advertisements entitled 'Help' targeting Republican Representatives who

had voted against the [bill] when it passed the House in October, 1999, urging viewers to contact each of these Members and 'tell him he's on the wrong side.' . . . One of the flights of 'Help' ran between August 18 and September 6, 2000." *Id.* ¶ 58. Nine versions of "Help" were aired during this flight, two of which aired within 30 days of a named candidate's primary. *Id.* Ex. 1 at 100.

9. Finally, during July and August of 2000, "the AFL–CIO ran television advertisements entitled 'Sky' and 'Protect' naming approximately twelve different Representatives who had voted at the end of June to pass prescription drug legislation that failed to guarantee drug benefits under Medicare." *Id.* ¶ 59. Twelve versions of "Sky" were aired, one of which was broadcast during the 30 days before a named candidate's primary. *Id.* Ex. 1 at 97–98. Fourteen versions of "Protect" aired, three of which aired within 30 days of a named candidate's primary. *Id.* Ex. 1 at 98–99.

10. These examples constitute 336 cookie-cutter advertisements, 50 of which would have been affected by BCRA.

III. *Empirical Studies on Corruption*

In my Title I Findings, I briefly summarize the state of the empirical studies cited to by experts which attempt to demonstrate a link between political donations and political corruption. A more detailed analysis of these studies is presented below.

A. Some studies have attempted to show that PAC donations influence roll call votes. Defense expert Donald Green testifies that he knows of no statistically valid study conducted since 1990 correlating federally-regulated PAC contributions to candidates and roll call votes. Green Cross Exam. at 58 [JDT Vol. 9]; *see also id.* at 54–55 (noting that "the picture of evidence over a range of studies does not suggest a consistent relationship" between contributions and roll call votes); Bok Cross Exam. at 18–19 [JDT Vol. 3] (studies are "flawed"). Green also testifies that some studies have even found a negative correlation between contributions and roll call votes. *Id.* at 55. Defense expert Thomas Mann comments that these studies are

> often used to buttress the argument that political contributions do not corrupt the policy process. This is an odd inference, since it is based on studies of contributions that are limited as to source and size for the very purpose of preventing corruption or its appearance. PAC contributions are capped at $5,000 per election, an amount whose real value has shrunk by two-thirds since it was enacted in 1974. Are we to assume that studies of contributions of $50,000 or $500,000 or $5 million from corporations, unions and individuals would produce the same generally negative findings?

Mann Expert Report at 33. [DEV 1–Tab 1].

The experts testify that part of the reason the existing studies linking contributions to roll call votes are flawed is that "political scientists lack the means by which to observe and determine [*quid pro quo* bribery]." Sorauf Cross Exam. at 132 [JDT Vol. 31]; *see also* Green Cross Exam. at 67–68 [JDT Vol. 9] ("[T]he literature on the relationship between roll call votes and money is murky because the problem is an extremely difficult one to solve, statistically."). Plaintiffs' expert David Primo summarizes the studies linking contributions to roll call votes:

> [I]t is well established that PAC contributions flow disproportionately to incumbent office holders, majority party members, members of powerful committees and to members on committees with jurisdictions relative to the PAC spon-

sor. . . .—and you could say oh, it must be bribes. But in fact, once you get deeper in it, it just can't possibly be a fact that such little money is affecting the political process. Primo Cross Exam. at 143–44 [JDT Vol. 27].

B. Other studies have attempted to link donations to other forms of legislative activity, such as committee voting, offering amendments, or filibustering. Defendants' expert Mann notes that there are "a myriad of ways in which groups receive or are denied favors beyond roll-call votes. Members can express public support or opposition in various legislative venues, offer amendments, mobilize support, help place items on or off the agenda, speed or delay action, and provide special access to lobbyists. They can also decline each of these requests." Mann Expert Report. at 33 [DEV 1–Tab 1]. One of these studies in particular,[210] which examines PAC contributions and legislative activity, has been found to be statistically unsound. *See* Green Cross Exam at 55 [JDT Vol. 9]; *see also id.* at 68–72 (noting the study does not account for lobbying activities); Primo Cross Exam. at 136–37 [JDT Vol. 27] ("I am not convinced by their paper. . ."); Snyder Rebuttal Report at 7–9 [2 PCS] (noting that Hall and Wayman's study "has three notable flaws"). Plaintiffs' expert David Primo concludes that "there is no clear, consistent and systematic evidence that contributions play a major role in the legislative process." Primo Cross Exam. at 142 [JDT Vol. 27]. Defendants' expert Derek Bok explains that "[t]he difficulty is, of course, that the ability of researchers to get at the behavior prior to a vote is severely limited since a lot of that is not public, and therefore, it's . . . inherently difficult to prove one way or another what effect PAC contributions would have on prevoting behavior." Bok Cross Exam. at 21 [JDT Vol. 3].

C. Other studies have attempted to establish empirically a link between donations and access to legislators. Plaintiffs' expert Primo finds "scant evidence in the political science literature that money secures access." Primo Rebuttal Report ¶ 13 [2 PCS]; *see also* FEC expert Herrnson Dep. in *RNC v. FEC* at 300 (testifying that existing studies on "access" are "kind of weak and wishy washy") [DEV 64–Tab 3]; Bok Cross Exam. at 35–37 [JDT Vol. 3] (noting that researchers studying PAC donations have failed to show that access has a significant impact on policy decisions); Green Cross Exam. at 93–95 [JDT Vol. 9] (unable to identify a study that shows PAC contributions lead to access to federal lawmakers). Defendants' experts Krasno and Sorauf note that "the absence of systematic data on access . . . prevents political scientists from searching for relationships between access and policy-makers' behavior." Krasno & Sorauf Expert Report at 5 [DEV 1–Tab 2].

## MEMORANDUM OPINION

LEON, District Judge.

The passage of the Bipartisan Campaign Reform Act of 2002 ("BCRA"),[1] as the record amply indicates, was a considerable legislative achievement that many thought would never come to pass. Indeed, the law constitutes the most comprehensive reform of our national campaign finance system in the past twenty-eight years. As such, it is the latest chapter in the history of a longstanding and recurring problem

**210.** Richard Hall & Frank Wayman, Buying Time: Moneyed Interests and the Mobilization of Bias in Congressional Committees, 84 American Political Science Review 797 (1990).

1. Pub.L. No. 107–155, 116 Stat. 81 (2002).

that our government has been wrestling with since the administration of Theodore Roosevelt.

Titles I and II of BCRA focus principally on a major campaign finance development that has dramatically unfolded over the past decade: the use of corporate and union treasury funds, either directly or through soft money donations to political parties, to finance electioneering communications masquerading, predominantly, as "issue ads." In an attempt to prevent actual and apparent corruption arising from the funding of such sham issue advertisements, Congress enacted a sweeping set of reforms that effectively: alters the methodology of our national, state, and local parties and transforms their relationship with each other; limits the ability of corporations, unions, individuals, and interest groups to engage in communications on public policy; and diminishes the role of federal officeholders in fundraising for political parties and nonprofit interest groups.

For the reasons set forth in the following opinion, I find that the defendants have more than adequately demonstrated the constitutionally necessary basis for Congress: (1) to restrict the use of soft money donations by national, state, and local parties to fund certain types of campaign communications (particularly candidate-advocacy "issue" advertisements) which are designed to, and which do, directly affect federal elections; and (2) to restrict the airing of corporate and union electioneering communications which promote, oppose, attack, or support specific candidates for the office which they seek.

Notwithstanding this conclusion, however, I do not find that the defendants have demonstrated a sufficient constitutional basis to support Congress's decision: (1) to ban the solicitation, receipt, and use of soft money by national parties for purposes that do not directly affect federal elections;

(2) to ban state and local parties from using soft money to fund a variety of election activities that do not directly affect federal elections; (3) to ban the use of corporate and union treasury monies to fund genuine issue advertisements that are aired during a particular time period preceding election even though they do not directly advocate the election or defeat of a federal candidate; (4) to ban national parties from donating to and soliciting soft money for certain Section 501(c) and Section 527 organizations under the Internal Revenue Code; (5) to prohibit federal officeholders from raising soft money for their national parties; and (6) to require broadcast licensees to collect and disclose certain records in connection with requests to purchase broadcast time. To the contrary, I find that in trying to do so Congress has unconstitutionally infringed upon the First Amendment rights of the various political actors and their supporters.

In short, the defendants, in my judgment, have been able to establish in some respects, but not in others, a sufficient basis for Congress's intervention in dealing with these problems. As to those where they succeeded, I believe it would make a mockery of existing Supreme Court precedent and the regulatory scheme that it has heretofore blessed, to hold otherwise. As to those where they have not, the protections accorded the plaintiffs under the First Amendment more than adequately warrant their undoing.

The following is a brief outline of my opinion, which has been organized on a title by title basis. With respect to the opinion itself, to the extent I have agreed with both the judgment and reasoning of either of my colleagues (or both), I have so noted and refrained from writing. As to those sections where I have agreed only in the judgment of one or more of my col-

leagues, I have limited the discussion of my reasoning to that necessary to explain how I reached my holding. To the greatest extent possible I have tried to acknowledge and address any disagreements we have had factually. However, in light of the importance and enormity of the record, I have included in my opinion a complete set of my Findings of Fact which I relied upon in reaching my judgments.

\* \* \* \* \* \*

## Table of Contents

Introduction ................................................... 756

I. Title I: Restrictions on Nonfederal Funds ................................... 758
 A. New FECA Section 323(a): National Party Ban .......................... 758
 1. Standard of Review for Restrictions on Donations to Political
 Parties ................................................... 759
 2. Donations Used to Directly Affect Federal Elections are
 Regulable by Congress ......................................... 763
 3. New FECA Section 323(a) Unconstitutionally Regulates the Use
 of Nonfederal Funds for Nonfederal and Mixed Purposes ........... 768
 4. Severability of New FECA Section 323(a) ......................... 773
 B. New FECA Sections 323(b) and 301(20)(A): Restrictions on "Federal
 Election Activities" ............................................. 777
 1. New FECA Sections 323(b) and 301(20)(A)(i), (ii), and (iv) ............. 778
 2. New FECA Section 301(20)(A)(iii) ................................ 780
 C. New FECA Section 323(d): Restrictions on Tax–Exempt
 Organizations ................................................ 790
 D. New FECA Section 323(e): Restrictions on Federal Candidates ........... 791
 E. New FECA Section 323(f): Restrictions on State Candidates .............. 792

II. Title II: Noncandidate Campaign Expenditures ............................ 792
 A. Section 201: The Primary Definition ................................. 792
 B. Section 201: The Backup Definition ................................. 799
 C. Section 204: The Wellstone Amendment .............................. 803
 D. Section 213: The Party Choice Provision ............................. 805

III. Section 318: Prohibition of Donations by Minors ........................... 808

IV. Section 504: Public Access to Broadcasting Records ......................... 811

V. Findings of Fact ................................................... 813

VI. Conclusion ....................................................... 946

\* \* \*

## I. Title I: Restrictions on Nonfederal Funds New FECA Sections 323(a), 323(b), 301(20)(a), 323(d), 323(e), and 323(f)

### A. New FECA Section 323(a): Nonfederal Fund Restrictions on National Parties

I agree with Judge Henderson's conclusion, although for different reasons, that Congress, in essence, is constitutionally prohibited from regulating a national party's ability to solicit, receive, or use nonfederal funds (i.e., soft money) for nonfederal and mixed purposes. To the extent that Section 323(a) seeks to regulate donations to national parties that are used for purposes that at the most *indirectly* affect federal elections (i.e., nonfederal or mixed purposes), the defendants have failed to demonstrate that Section 323(a) serves an

important government interest, or even if they had, that it is sufficiently tailored to serve that interest.

However, I find that Congress can restrict a national party's use of nonfederal money to directly affect federal elections through communications that support or oppose specifically identified federal candidates. Therefore, like Judge Kollar–Kotelly, I find constitutional Congress's ban on the use of nonfederal funds by national parties for Section 301(20)(A)(iii) communications. As a result, I concur in part in, and dissent in part from, Judge Henderson's judgment and reasoning regarding Section 323(a).

### 1. Standard of Review for Restrictions on Donations to Political Parties

The right to freedom of political association under the First Amendment is a fundamental right of donors to political parties, *see Buckley v. Valeo,* 424 U.S. 1, 24–25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976),[2] and arguably of the political parties themselves, *see FEC v. Colorado Republican Fed. Campaign Comm. ("Colorado II"),*

533 U.S. 431, 448 n. 10, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). Our national political structure is firmly anchored by our two major parties.[3] The role those national parties play in defining wide-ranging political agendas and bringing together individuals (and their financial resources) on behalf of those political agendas is critical to the stability our political system has enjoyed over the past 200 years.[4]

Upon giving money to a political party, or to any political organization for that matter, a donor hopes that the organization will amplify his political perspective or candidate preference.[5] Any number of activities by a political party can amplify the donor's political voice. Some activities, like direct contributions to state candidates, are for a nonfederal purpose because they have no effect on a federal election. Others, like public communications that advocate the election or defeat of a particular federal candidate, are for a federal purpose because they *directly* affect federal elections. And still others, like generic voter registration and genuine issue advertisements,[6] are for "mixed pur-

2. In *Roberts v. United States Jaycees,* the Supreme Court declared that "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (citing *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)).

3. *See FEC v. Colorado Republican Fed. Campaign Comm. ("Colorado I"),* 518 U.S. 604, 618, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (noting that political parties play an "important and legitimate role ... in American elections"); *Davis v. Bandemer,* 478 U.S. 109, 144–45, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (O'Connor, J., concurring in judgment) ("There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound

and effective government."); *see also* Findings of Fact ("Findings") 20–26.

4. *See California Democratic Party v. Jones,* 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views. The formation of national political parties was almost concurrent with the formation of the Republic itself." (citing Noble E. Cunningham, Jr., *The Jeffersonian Republican Party,* in 1 *History of U.S. Political Parties* 239, 241 (Arthur M. Schlesinger, Jr. ed., 1973))).

5. *See, e.g.,* Findings 14–19.

6. For a discussion of the distinction between genuine issue advertisements and "sham" issue ads designed to directly affect a federal candidate's election, see Findings 288–89 and *infra* Parts I.A.3 & I.B.2.

poses" because they *indirectly* affect both state and federal elections. Regardless of the purpose served, all of these party activities, paid for with aggregated donations, express loudly, and often effectively, the donor's political position.[7] For this reason, an individual's donation to a political party is an act of political association protected by the First Amendment. But as important as this right is, it is not absolute.

The Supreme Court, in *Buckley v. Valeo* and ensuing campaign finance cases, has recognized Congress's power through FECA[8] to regulate, in effect, the source and amount of contributions to political parties and candidates that donors could make *for the purpose of influencing federal elections.*[9] In enacting such contribution limitations Congress had to demonstrate that it was doing so in furtherance of the important government interest of preventing actual or apparent corruption of either the officeholder or the federal electoral system. *Buckley,* 424 U.S. at 25, 96 S.Ct. 612; *see, e.g., Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 298–99, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981); *Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).[10] Indeed, in addressing contribution limitations, preventing ac-

---

**7.** See *Colorado II,* 533 U.S. at 453, 121 S.Ct. 2351 ("[A] party combines its members' power to speak by aggregating contributions and broadcasting messages more widely than individual contributors generally could afford to do."); *FEC v. Massachusetts Citizens for Life ("MCFL"),* 479 U.S. 238, 261, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("[I]ndividuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction."); *Citizens Against Rent Control,* 454 U.S. at 294, 102 S.Ct. 434 ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost."); *id.* at 296, 102 S.Ct. 434 (citing *Buckley,* 424 U.S. at 65–66, 96 S.Ct. 612); *Buckley,* 424 U.S. at 15, 22, 96 S.Ct. 612. Alexis de Toqueville observed:

As soon as several of the inhabitants of the United States have conceived a sentiment or an idea that they want to produce in the world, they seek each other out; and when they have found each other, they unite. From then on, they are no longer isolated men, but a power one sees from afar, whose actions serve as an example; a power that speaks, and to which one listens.

2 Alexis de Tocqueville, *Democracy in America* 492 (Harvey C. Mansfield & Delba Winthrop eds., 2000).

**8.** Federal Election Campaign Act of 1971 ("FECA"), Pub.L. No. 92–225, 86 Stat. 3 (1971 provisions) (codified as amended at 2 U.S.C. §§ 431 *et seq.*).

**9.** See *Buckley,* 424 U.S. at 23–35, 96 S.Ct. 612 (upholding contribution limitations to candidates and their political committees); *Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 390–98, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (same); *see also California Medical Ass'n v. FEC ("California Medical"),* 453 U.S. 182, 197–99, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (upholding contribution limitations to PACs). The Supreme Court has never explicitly addressed limitations on contributions to political parties. The $20,000, now $25,000, limit on contributions to national parties was not even added to FECA until the post-Buckley 1976 amendments. See Pub.L. No. 94–283 § 320, 90 Stat. 475 (codified as amended at 2 U.S.C. § 441a(a)(1)(B)); *see also California Medical,* 453 U.S. at 194 n. 15, 101 S.Ct. 2712; BCRA § 307(a)(2) (raising amount individuals can contribute to national parties from $20,000 to $25,000); BCRA § 102 (raising amount individuals can donate to state parties from $5,000 to $10,000); FECA § 315(a)(1); 2 U.S.C. § 441a(a)(1)(D). Contribution limitations to parties, however, have been upheld indirectly, *see Buckley,* 424 U.S. at 38, 96 S.Ct. 612 (upholding FECA's $25,000 limitation on total contributions, which included "huge contributions to the candidate's political party"), and in dictum, *see Colorado I,* 518 U.S. at 617, 116 S.Ct. 2309 (recognizing $20,000 contribution limit to political parties and citing 2 U.S.C. § 441a(a)).

**10.** If a contribution limitation survives a claim that it infringes associational rights, then it also survives a speech challenge. See *Shrink Missouri,* 528 U.S. at 388, 120 S.Ct. 897. Note also that the challenge based on

tual or apparent corruption is the only government interest the Supreme Court has found sufficient to interfere with associational rights. *FEC v. National Conservative Political Action Comm. ("NCPAC")*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). In *Buckley*, the Supreme Court explained:

> To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined .... Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.

424 U.S. at 26–27, 96 S.Ct. 612. In each case where the Supreme Court upheld contribution limitations, *see supra* note 9, the Court reviewed those limits under *Buckley's* "closely drawn" scrutiny, a standard of review somewhat less rigorous than strict scrutiny, by which "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612 (internal quota-

tions omitted); *see also California Medical Ass'n v. FEC ("California Medical")*, 453 U.S. 182, 196, 196 n. 16, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981).

Nevertheless, the plaintiffs argue, and Judge Henderson agrees, that any limitation on a national party's ability to raise and use nonfederal money must pass muster under the strict-scrutiny standard of review that the Supreme Court has traditionally applied to analyze expenditures. *See, e.g.,* Republican National Committee ("RNC") Opening Br. at 51–53. I disagree.

While I agree that Section 323(a)'s prohibitions on soliciting, receiving, and using nonfederal funds restricts a party's ability to spend nonfederal money, their principal effect is to limit the ability of future donors through their contributions to use the national parties to amplify their voices.[11] Therefore, in determining to what extent Congress can limit donations to national and state parties,[12] this Court should review the limitations using the closely-drawn standard of review applied to contribution limitations in *Buckley*, 424 U.S. at 25, 96 S.Ct. 612, and ensuing campaign finance cases,[13] in which the Court specifically acknowledged "that restrictions on contributions require less compelling justification than restrictions on independent spending." *FEC v. Massachusetts Citizens for Life, Inc. ("MCFL")*, 479 U.S. 238,

the donor's associational right is "correlative" to an overbreadth challenge. *See id.* at 388 n. 3, 120 S.Ct. 897.

**11.** That is, Section 323(a) limits an individual, wishing to express his political agenda, to donations of hard money up to $25,000, the limitation on contributions to parties under FECA. 2 U.S.C. § 441a(a)(1)(B); *see also* BCRA § 307(a)(2) (raising how much individuals can contribute to national parties from $20,000 to $25,000).

**12.** This standard of review applies to all donation restrictions under Title I of BCRA.

**13.** Since the practical effect is that any restriction on solicitation is subsumed within the restriction on receipt of donations, which I maintain should be reviewed under closely-drawn scrutiny, there is no reason to apply a different standard of review for the solicitation restriction. In the end, if the political parties are restricted from receiving nonfederal donations for federal purposes, then they are restricted from soliciting funds for those purposes as well.

259–60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); *see also Shrink Missouri*, 528 U.S. at 387, 120 S.Ct. 897. The Supreme Court lowered the hurdle for contributions, *see Shrink Missouri*, 528 U.S. at 387–88, 120 S.Ct. 897, because restrictions on contributions, in its judgment, impact associational rights less by leaving "the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates," *id.* at 387, 120 S.Ct. 897 (quoting *Buckley*, 424 U.S. at 22, 96 S.Ct. 612) (internal quotations omitted), and by not preventing "political committees from amassing the resources necessary for effective advocacy," *Buckley*, 424 U.S. at 21, 96 S.Ct. 612. Surely, these reasons for applying a lower standard of scrutiny for donations to candidates and their political committees are no less persuasive for analyzing contributions to political parties.

The plaintiffs, nevertheless, maintain that in *Citizens Against Rent Control*, which involved limitations on contributions to political committees with the purpose of supporting or opposing ballot measures, 454 U.S. at 291, 102 S.Ct. 434, the Supreme Court settled on strict-scrutiny review for contribution limitations to political organizations.[14] This conclusion is not based on a close enough reading of the case. While the plurality does suggest the undefined standard of "exacting judicial scrutiny," *Citizens Against Rent Control*, 454 U.S. at 294, 298, 102 S.Ct. 434, the three concurring justices either specifically applied closely-drawn scrutiny, *id.* at 301, 102 S.Ct. 434 (Marshall, J., concurring),[15] or equated the plurality's "exacting scrutiny" with *Buckley's* closely-drawn scrutiny, *id.* at 302, 102 S.Ct. 434 (Blackmun, J., & O'Connor, J., concurring).[16] Thus, if anything, *Citizens Against Rent Control* suggests that closely-drawn scrutiny should apply, even if the political organization is established exclusively for a purpose unrelated to federal campaigns. Restrictions on national political parties, which engage

---

**14.** *See* McConnell Opp'n Br. at 17; *see also* J. Henderson Op. at Part IV.D.1.a.

**15.** Justice Marshall observed:

> [T]his Court has *always* drawn a distinction between restrictions on contributions, and direct limitations on the amount an individual can expend for his own speech.... Because the Court's opinion is silent on the standard of review it is applying to this contributions limitations, I must assume that the Court is following our consistent position that this type of government action is subjected to less rigorous scrutiny than a direct restriction on expenditures.

*Citizens Against Rent Control*, 454 U.S. at 301, 102 S.Ct. 434 (Marshall, J., concurring).

**16.** Although "exacting judicial scrutiny" is oft-cited, its parameters are loosely defined in other cases as well. The Supreme Court, for example, employed the phrase "exacting scrutiny" when reviewing FECA's disclosure requirements in *Buckley*, 424 U.S. at 64, 96 S.Ct. 612, explaining that the government interest must be "sufficiently important," *id.* at

66, 96 S.Ct. 612, and "substantial," *id.* at 80, 96 S.Ct. 612. To give another example: in *First National Bank of Boston v. Bellotti*, the Supreme Court applied "exacting scrutiny" to contribution and expenditures limitations on corporations; it stated that the government must show a "compelling" interest, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (quoting *Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960)), and that the interest must be "closely drawn to avoid unnecessary abridgment," *Bellotti*, 435 U.S. at 786, 98 S.Ct. 1407 (quoting *Buckley*, 424 U.S. at 25, 96 S.Ct. 612). In any event, since it is uncontroverted that preventing actual and apparent corruption is a "compelling" government interest, *see, e.g., NCPAC*, 470 U.S. at 496–97, 105 S.Ct. 1459, the only remaining dispute is whether any donation restriction need be "narrowly tailored" or "closely drawn" to serve the compelling government interest in combating corruption. And *Buckley*, coupled with the various opinions in *Citizens Against Rent Control*, seemingly foreclose that question in favor of *Buckley's* closely-drawn scrutiny.

in both candidate-specific *and* issue-oriented activities, do not deserve to be treated with greater vigilance. Indeed, considering the standard of review adopted by the Supreme Court in *Citizens Against Rent Control* and the fact that contribution regulations are less jarring of associational rights than are expenditure restrictions, restrictions on donations to political parties should be similarly regulable if they are closely drawn to serve the compelling government interest of preventing corruption and its appearance.

**2. Donations Used to Directly Affect Federal Elections are Regulable by Congress**

■ Section 323(a) of BCRA seeks to expand Congress's authority to regulate donations that by definition did not appear to be regulable under FECA because, ostensibly, they were not given for the purpose of influencing federal elections.[17] It does so in sweeping fashion: national parties "may not solicit, receive, ... direct ... transfer, or spend any funds that are not subject to the limitations, prohibitions, and reporting requirements of this Act." BCRA § 101; FECA § 323(a); 2 U.S.C. § 441i(b)(1). Congress seeks this expansion, principally, because the national parties have increasingly, over the past dec-

ade, exploited a so-called "loophole"[18] in FECA that fails to regulate the use of these nonfederal funds for various types of electioneering communications that advocate the election or defeat of a specifically identified candidate.[19]

The defendants contend that Congress, in its attempt to close this "loophole," can limit *any* donation to a national party, regardless of the purpose for which it is used thereafter. *See* Intervenors Opp'n Br. at 26. I disagree. The plaintiffs, on the other hand, contend that Congress can only limit donations that are funneled thereafter through the party as coordinated expenditures, direct contributions to candidates, or uncoordinated expenditures for express advocacy as defined by the "magic words." *See, e.g.,* McConnell Opening Br. at 36; McConnell Opp'n Br. at 25–26; *see also Buckley,* 424 U.S. at 44 n. 52, 96 S.Ct. 612 (providing examples of "express words of advocacy"). With that I disagree, as well. Both contentions are calculatingly indifferent to what reason, and precedent, have shown to be the only constitutionally viable antidote to corruption or its appearance: restrictions on donations to political parties based upon their *use to directly affect federal elections.*[20] In this sense, from my perspec-

---

**17.** If they had been intended by the donor to influence federal elections, they should have been treated, at the time they were received, as federal money. As stated earlier, the Supreme Court has, in effect, upheld limitations on contributions to political parties, *see supra* note 9, and a "contribution," as defined by FECA, is a donation "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i).

**18.** This so-called "loophole" was created through Federal Election Commission ("FEC") advisory opinions. *See* McCain Dep. at 63 (stating that BCRA will "close certain loopholes that have been opened by the FEC, not through acts of Congress"); FEC Advisory Op.1995–25; FEC Advisory Op.1979–17; FEC Advisory Op.1978–10.

**19.** *See, e.g.,* McCain Dep. at 192–93 (explaining that grassroots activities are "the fundamentals of a democratic process" and that "it's the broadcast television and radio ads that we believe are what is the problem"); Meehan Dep. at 218–19 (explaining that voter mobilization efforts are "good for the system" and distinguishing those efforts from candidate advocacy).

**20.** Even the plaintiffs acknowledged that "[i]f BCRA limited only party activities directly related to federal candidates, Defendants might have the better argument." California Democratic Party ("CDP")/California Republican Party ("CRP") Reply Br. at 9.

tive, the issue before the Court is not whether Congress can limit donations to political parties,[21] but to what extent it can do so.

In *Shrink Missouri,* the Supreme Court made it clear that the amount of evidence needed to satisfy judicial scrutiny of restrictions on associational rights depends on the "novelty and plausibility of the justification raised." 528 U.S. at 391, 120 S.Ct. 897. Here, Congress relies upon the government interest of preventing actual and apparent corruption to justify the restrictions on nonfederal funds. When nonfederal funds are being used by national parties for nonfederal or mixed purposes, the government's interest in preventing corruption or its appearance to justify this restraint is so novel, and implausible, that it requires a substantial amount of evidence to withstand constitutional scrutiny. However, when nonfederal funds are being used by national parties for the federal purpose of directly benefitting the election of candidates[22] through either express advocacy or "issue" advocacy of the type defined in Section 301(20)(A)(iii),[23] the government's use of that interest to justify congressional intervention is neither novel, nor implausible, because the risk of corruption, *see infra* Part I.B.2, naturally flows from circumstances where a donor's contribution to a party is used thereafter to directly benefit a candidate's campaign. Indeed, as I discuss at length in the later in relation to Section 301(20)(A)(iii), *id.,*

the record overwhelmingly demonstrates that candidates are aware of who makes the large soft money donations, and in many instances, participate in raising money from them. Furthermore, the record clearly establishes that the public perceives that those large soft money donors receive special access to the legislators and have special influence on the legislative process. *Id.*

The notion that using donations for a federal purpose can implicate corruption is consistent with Congress's definition of "contribution" in FECA: "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing any election for Federal office.*" 2 U.S.C. § 431(8)(A)(i) (emphasis added). This definition of contribution was part of FECA when the Supreme Court upheld contribution limitations in *Buckley,* stating that a donation is regulable (that is, a "contribution") because "it is connected with a candidate or his campaign," thus having "a sufficiently close relationship" to the government interest in preventing actual or apparent corruption. 424 U.S. at 78, 96 S.Ct. 612. Additionally, the contention that a party's use of a donation to influence a federal election is conducive to corruption, or its appearance, is also supported by the widely accepted premise that Congress can restrict donations used for party express advocacy as defined by the so-called "magic words" requirement

---

**21.** *See supra* note 9.

**22.** There is no disagreement that political parties use donations for federal purposes. *See* Findings 30–52; *see also Colorado II,* 533 U.S. at 449, 121 S.Ct. 2351 ("Parties are ... necessarily the instruments of some contributors whose object is ... to support a specific candidate for the sake of a position on one, narrow issue, or even to support any candidate who will be obliged to the contributors."). Political parties, *inter alia,* provide direct contributions to candidates, *see* 2

U.S.C. § 441a(a)(2)(A) (setting contribution limit by political committees to candidates at $5,000); *Buckley,* 424 U.S. at 35–36, 96 S.Ct. 612, make expenditures in coordination with a federal candidate, *see* § 441a(d) (setting party expenditure limits); *Colorado II,* 533 U.S. at 464, 121 S.Ct. 2351 (upholding § 441a(d) only as applied to coordinated expenditures), and spend money on uncoordinated candidate advocacy, both express and nonexpress.

**23.** *See infra* Part I.B.2.

of *Buckley*. Indeed, the plaintiffs concede as much,[24] and this is perfectly consistent with the regulatory scheme that was propagated by the FEC.[25] Surely, if donations used for express advocacy can be limited to prevent corruption, then donations used for candidate advocacy that is tantamount to express advocacy—assuming some minimal "quantum of empirical evidence" of corruption or its appearance, *see Shrink Missouri*, 528 U.S. at 391, 120 S.Ct. 897—should be regulable for the same reason.

The notion that Congress may limit donations based on their use for certain purposes is also consistent with Supreme Court precedent which intimates that donations closely connected to a candidate's campaign—even if they are not direct contributions or coordinated expenditures—raise, at a minimum, the specter of corruption. In *First Bank of Boston v. Bellotti*, the Court rejected a Massachusetts statute prohibiting corporations from making contributions or expenditures to influence the vote on referendum proposals. 435 U.S. 765, 787–95, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). In rejecting the statute, the Court explained that the interests in preventing corruption and thus preserving the integrity of the electoral process were not served by limiting contributions and expenditures that affected referendum discussion. *Id.* at 789–92, 98 S.Ct. 1407. The Court stated: "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Id.* at 790, 98 S.Ct. 1407. Alternatively, one can infer that perceived corruption is likely to be present in cases involving candidate elections.

The extent to which certain uses of donations create the risk of corruption was also at issue in both *California Medical*, 453 U.S. at 193–201, 101 S.Ct. 2712, and *Citizens Against Rent Control*, 454 U.S. at 292–300, 102 S.Ct. 434, where the Court considered donations to organizations, not candidates. It is difficult to reconcile these two cases without drawing the conclusion that the Court was primarily concerned with the purpose for which the organizations were using the donations.[26]

---

**24.** *See, e.g.,* RNC Opp'n Br. at 37 (conceding that *Buckley* and its progeny indicate that contributions to a party may be regulated and subjected to a federal contribution limit "only to the extent the entity uses the contributions for regulable activity," which includes "independent expenditures expressly advocating the election or defeat of federal candidates"); *id.* (stating that money political parties receive for express advocacy "may constitutionally be subjected to a federal contribution limit"); McConnell Opening Br. at 36, 37–38 (admitting that a contribution to be used for activities that exclusively serve to get a candidate elected, like express advocacy, can be corrupting).

**25.** *See* FEC Advisory Op.1995–25 (not allowing use of nonfederal funds to pay for any portion of party express advocacy). One of the reasons that parties should not be able to fund uncoordinated express advocacy with nonfederal funds is that if such a restriction did not exist, corporations and labor unions could simply evade the limitations on their use of their general-treasury funds for express advocacy by funneling those funds through the parties. *See* 2 U.S.C. § 441b; *MCFL*, 479 U.S. at 241–64, 107 S.Ct. 616 (upholding prohibition against using corporate treasuries to fund uncoordinated expenditures for express advocacy).

**26.** Not surprisingly, the defendants rely on *California Medical* for the proposition that Congress can regulate *all* donations to political organizations, *see, e.g.,* RNC Opp'n Br. at 36; the plaintiffs equally rely on *Citizens Against Rent Control* for their contention that Congress *cannot* regulate *any* donations to such organizations, *see, e.g.,* Gov't Opening Br. at 65–66. Again, both positions sweep too far and cannot be reconciled without parsing the Supreme Court's rationales in the two cases.

In California Medical, the Court held that Congress can restrict the amount of donations to multicandidate political committees "which advocate[ ] the views and candidacies of a number of candidates." 453 U.S. at 197, 101 S.Ct. 2712. Multicandidate political committees assuredly spend some of their funds on "independent expenditures," as the Court in *California Medical* concedes, *id.* at 195–96, 101 S.Ct. 2712, but the Court seemingly concluded that those uncoordinated expenditures, by a "multicandidate" political committee, are made *on behalf of candidates,* whether direct contributions or uncoordinated expenditures. *See* 2 U.S.C. § 441a(a)(4) (defining multicandidate political committee as a political committee "which has received contributions from more than 50 persons, and ... has made contributions to 5 or more candidates for Federal office."). The Court said as much when it dismissed the ACLU's concerns that donation restrictions would hinder the PAC's efforts to collectively express political views. *California Medical,* 453 U.S. at 197 n. 17, 101 S.Ct. 2712. Restricting contributions to committees like the one at issue in *California Medical,* the Court maintained, is different than efforts to regulate groups expressing common political views. *Id.* In this sense, the nature of the organization— that it is established solely to benefit federal candidates—was enough to conclude that most, if not all, of its contributions and expenditures were for the purpose, and had the effect, of benefitting a federal candidate. Conversely, in *Citizens Against Rent Control,* where the Court found that the City of Berkeley could not restrict donations to political committees

that support or oppose ballot propositions, 454 U.S. at 295–300, 102 S.Ct. 434, the organization was established exclusively to advocate on behalf of a public issue, *id.* at 291, 102 S.Ct. 434 (explaining that the issue before the Court was whether donations to associations "formed to support or oppose ballot measures" could be regulated). That the association was formed only to oppose a public issue and that its speech was unrelated to candidates in any way, *id.* at 296–98, 102 S.Ct. 434, led the Court to find that the restriction "does not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights," *id.* at 299, 102 S.Ct. 434.

Of course, political parties are unique; they are neither super multicandidate political committees formed entirely to support candidates for federal office nor political associations completely uninvolved in candidate advocacy. Justice Kennedy described political parties this way:

> Political parties have a unique role in serving [the principle of open, robust debate on public issues]; they exist to advance their members' shared political beliefs.... A political party has its own traditions and principles that transcend the interests of individual candidates and campaigns; but in the context of particular elections, candidates are necessary to make the party's message known and effective, and vice versa.

*Colorado I,* 518 U.S. at 628, 116 S.Ct. 2309 (Kennedy, J., concurring in the judgment and dissenting in part) (citations omitted).[27] With such varying purposes, na-

---

**27.** One Republican National Committee ("RNC") official explained his party this way: The RNC achieves [its core principles] through three primary means: (1) promoting an issue agenda advocating Republican positions on issues of local, state, regional, national, and international importance; (2) electing candidates who espouse these views to local, state and national offices; and (3) governing in accord with these views.... [T]he RNC often seeks to promote Republican positions on important issues, even in contexts outside elections. Josefiak Decl. ¶ 22.

tional political parties merit a hybrid treatment in regulating the funds donated to them.

Further, *Colorado I* and *Colorado II* do not preclude Congress from regulating donations that directly affect federal elections, even if the parties use those funds independently of the candidates [28] and even if there is no coordination between the donor and the candidate. In Colorado I, the Supreme Court merely found that Congress could not limit uncoordinated party *expenditures*. 518 U.S. at 617, 116 S.Ct. 2309. Indeed, the Court even reiterated that Congress has every power to limit the amount of donations to parties that are "used for independent party expenditures for the benefit of a particular candidate." 518 U.S. at 617, 116 S.Ct. 2309. Thus, if anything, *Colorado I* serves to bolster the proposition that Congress can regulate donations used "for the benefit of a particular candidate" because that is where "the greatest danger of corruption" arises. *Id.*[29] Reading *Colorado I* together with Buckley, *Bellotti, Citizens Against Rent Control,* and *California Medical* leaves one with a clear impression: donations used directly for the purpose of uncoordinated federal activity, like express advocacy, can engender corruption, or the appearance thereof, and are therefore regulable.[30] Finally, Colorado II, in which the Supreme Court determined that Congress could limit the amount of coordinated party expenditures, 533 U.S. at 440–65, 121 S.Ct. 2351, is relevant because it stands for the proposition that a contribution by the party to the candidate, even absent coordination between the donor and candidate, can be regulated. Thus, donations to political parties used thereafter for purposes that directly affect federal elections, such as candidate "issue ads," even if there is no coordination between the donor and the candidates in advance of the donations to the party, should likewise be regulable. Common sense and the evidence introduced by the defendants support that conclusion. *See infra* Part I.B.2. And, until such time as *Buckley* and its progeny are overruled, allowing such donations to occur without regulation is an affront to a regulatory system that has been blessed by the Supreme Court and in place since the

---

**28.** *See* J. Henderson Op. at Part IV.D.1.c (arguing that "Congress cannot constitutionally regulate non-federal donations to political parties if the funds are then spent independently of a candidate").

**29.** The Supreme Court also noted that the opportunity for corruption posed by nonfederal contributions to a party for certain activities, such as supporting state candidates or voter mobilizations efforts, is "at best, attenuated" because "[u]nregulated 'soft money' contributions may not be used to influence a federal campaign." *Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309. That observation implies that if soft money were being used "to influence a federal campaign," the opportunities for corruption would be less attenuated, perhaps even palpable. Also, note that the Supreme Court's observation that "[u]nregulated 'soft money' contributions may not be used to influence a federal campaign," *id.,*

preceded the 1996 explosion of party candidate advocacy financed with nonfederal funds. *See* Mann Expert Report at 17–21. From 1996 until the enactment of BCRA, the parties used nonfederal funds for the exact purpose that the Supreme Court stated those funds cannot be used for: "to influence a federal campaign." *Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309.

**30.** *See Jacobus v. Alaska,* 182 F.Supp.2d 881, 889 (D.Alaska 2001) (explaining that there is no appearance of corruption from political party "donations of time, money and services ... not being made for nominating and electing candidates" and holding that "donations to political parties for purposes other than nominating or electing purposes (e.g., issue advocacy, voter registration) may not constitutionally be considered contributions subject to regulation ....").

adoption of the 1974 amendments to FECA.

### 3. New FECA Section 323(a) Unconstitutionally Regulates the Use of Nonfederal Funds for Nonfederal and Mixed Purposes

As sure as the evidence, legal precedent, and common sense support Congress's power to regulate the use of nonfederal funds for federal purposes, they do *not* support Congress's effort to regulate nonfederal funds used for nonfederal and mixed purposes. National parties need to raise and use nonfederal funds for a variety of purposes. Sometimes they raise and use nonfederal funds for the nonfederal purpose of contributing to state and local candidates in "off-year" elections when there are no federal candidates on the ballot.[31] Other times they need to raise and use funds for mixed purposes that only *indirectly* affect the election of federal candidates, such as generic voter mobilization efforts and genuine issue advertisements.[32] The defendants do not

**31.** As one RNC official testified: "The RNC's national focus should not be misunderstood as a federal focus. Rather, given the RNC's state-based structure, it is not surprising that the RNC actually focuses many of its resources on purely state and local election activity." Josefiak Decl. ¶ 19. I agree. In 1999 and 2001, the RNC contributed over $9.5 million dollars, using nonfederal funds, directly to state and local candidates. Banning Decl. ¶ 28(a); *see also* Findings 57–59 (explaining, *inter alia*, that five states hold elections in odd-numbered years). For example, the RNC contributed approximately $500,000 to the 1999 Republican gubernatorial candidate in Virginia. La Raja Decl. ¶ 14. In the last two off-year elections, the RNC also transferred over $10 million to state parties and made over $1 million dollars in direct expenditures, bringing the total to $21 million dollars, not including administrative overhead, spent on the two elections where no federal candidates appeared on the ballot. Banning Decl. ¶ 28(a). In 2001 alone, the RNC spent $15.6 million on nonfederal activities (contributions to state and local candidates, transfers to state parties, and direct spending). That $15.6 million dollars represented 30 percent of all nonfederal money raised that year by the RNC. *See* Hearing Tr. (Dec. 4, 2002) at 43 (statement of Burchfield). Thus for elections in which there is *no* federal candidate on the ballot, the RNC contributes directly to state and local candidates, trains state and local candidates, and funds communications calling for election or defeat of state and local candidates. *See id.;* Josefiak Decl. ¶¶ 19, 41–59; La Raja Decl. ¶ 14; *see also* Bok Cross Exam. at 34–35. Even defendants' expert Thomas E. Mann agreed that donations to a gubernatorial candidate in an odd-numbered year is not something that is in-

tended to affect a federal election. Cross Exam. of Def. Expert Mann at 71.

Of course, the RNC made direct contributions to state and local candidates during even-numbered years as well, *see* Josefiak Decl. ¶ 61, and "sometimes devote[d] significant resources toward states with competitive gubernatorial races even though the races for federal offices [were] less competitive," Josefiak Decl. ¶ 62.

**32.** Portions of RNC transfers to state and local parties were used for voter mobilization efforts. One RNC official testified that "RNC transfers of non-federal funds to the state parties play a critical role in subsidizing the activities of the state parties. The state parties depend on these funds to pay for everything from their own administrative overhead to voter mobilization, grass roots organizing, and media." Banning Decl. ¶ 31; *see also* Duncan Decl. ¶¶ 11–12. In 2000, for example, the RNC transferred approximately $25 million in nonfederal funds to the Republican's Victory Plans, which were plans tailored to each state's needs and designed to mobilize voters on behalf of all the candidates on the ticket. Josefiak Decl. ¶¶ 25–40. Money for the Victory Plans was not spent on federal candidate "issue ads," Josefiak Decl. ¶ 31, and was used primarily to benefit state and local candidates, *see* Peschong Decl. ¶¶ 4, 8–9 (stating that "the RNC typically provides a very substantial share of the funding of state victory programs," which are "programs designed to support the entire Republican ticket, and frequently place more emphasis on high profile state-wide races than on federal races, especially when no federal candidate is running state-wide"). Other examples of mixed activities include party newsletters, administrative overhead, training seminars on get-out-the-vote activities, and fundraising assis-

deny that the national parties use nonfederal funds for both nonfederal and mixed purposes that at the most indirectly affect federal elections. They contend, nonetheless, that nonfederal donations to national parties—*regardless of their use*—create actual or apparent corruption. *See* Intervenors Opp'n Br. at 26. To support that expansion of Congress's power in contravention of the First Amendment rights of the donors and national parties, the defendants would have to demonstrate that using nonfederal funds for either nonfederal or mixed purposes gives rise to either corruption or an appearance of corruption, such that the blanket restriction on nonfederal funds is not overbroad. For the following reasons, they have not done so.

First, the suggestion that the appearance of corruption, let alone actual corruption, exists regardless of any perceived, or actual, benefit to a federal candidate does not comport with the conventional legal understanding of corruption and apparent corruption. The Supreme Court has defined corruption as something more than a quid pro quo arrangement in which a legislator sells his vote for one or more contributions to his campaign, *see, e.g., Colorado II*, 533 U.S. at 440–41, 121 S.Ct. 2351, as well as "improper influence" or conduct by a donor that results in a legislator who is "too compliant" with the donor, *Shrink Missouri*, 528 U.S. at 389, 120 S.Ct. 897. Of course, the Supreme Court has also recognized that Congress has an equally compelling government interest in preventing the appearance of corruption in the public's mind. *Id.* at 390, 120 S.Ct. 897; *Buckley*, 424 U.S. at 27, 96 S.Ct. 612. The reason for this is simple: like corruption itself, the appearance of corruption undermines the public's confidence in our system of government and frustrates participation in the political process by causing the public to believe elected representatives are not acting independently of the individuals, corporations, and unions who contribute to representatives' campaigns and parties. *Shrink Missouri*, 528 U.S. at 390, 120 S.Ct. 897. Indeed, contribution limits to federal candidates and parties were enacted, and have been upheld by the Supreme Court, to prevent this very perception in the mind of the public. *Id.; Buckley*, 424 U.S. at 23–35, 96 S.Ct. 612. And it has been Congress's province to set the dollar limit above which this perception starts to ferment. *See Buckley*, 424 U.S. at 30, 96 S.Ct. 612; *Shrink Missouri*, 528 U.S. at 397, 120 S.Ct. 897. Thus, whether the corruption is actual or perceived, every traditional and accepted definition to date depends on the donor conferring, or being perceived as having conferred, a benefit on the candidate in return for something.[33] In *NCPAC*, for

---

tance to state and local parties. *See* Findings 71–99.

Considering the national parties' extensive involvement in so many nonfederal and mixed activities, it is not surprising that the Supreme Court has recognized that political parties do not use all of their donations to affect federal elections, explaining in *Colorado I* that FECA permits unregulated 'soft money' contributions for certain nonfederal and mixed purposes. 518 U.S. at 616, 116 S.Ct. 2309 ("We also recognize that FECA permits unregulated "soft money" contributions to a party for certain activities, such as electing candidates for state office, or for voter registration and "get out the vote" drives.") (internal citations omitted).

**33.** *See, e.g., Buckley*, 424 U.S. at 25, 96 S.Ct. 612; *NCPAC*, 470 U.S. at 497, 105 S.Ct. 1459; *see also Black's Law Dictionary* 1261 (7th ed.1999) (translating quid pro quo as "something for something"). Defense expert Donald P. Green explained that corruption, whether quid pro quo or otherwise, "redound[s] to the personal benefit of the candidate seeking to win election." Green Expert Report at 20.

Judge Kollar–Kotelly's belief that, notwithstanding my statements to the contrary, I am narrowly construing the definition of corruption as "something akin to bribery" is, in my judgment, an inaccurate reading of my opinion. *See* J. Kollar–Kotelly Op. at Part III.II.

example, the Supreme Court defined corruption in the following way: "Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." 470 U.S. at 497, 105 S.Ct. 1459. Without financial gain to themselves or money into their campaigns, why would candidates elect to act contrary to their obligations? In short, since donations cannot logically foster corruption, or its appearance, unless the candidate benefits or appears to benefit in some way, donations to a party with no prospect that they will be used to directly affect the candidate's election, cannot, absent substantial evidence to the contrary, give rise to either actual or apparent corruption.

Second, the defendants' contention, in essence, that Congress can regulate the use of soft money donations by national parties for either nonfederal, or mixed, purposes is equally unsupportable by the record and common sense. If a national party uses nonfederal funds to support generic voter registration, or to conduct training seminars for state parties on get-out-the vote activities, the benefit to the federal candidate, assuming his election is even being contested, is attenuated at best, *Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309, because it is generic in nature and diluted among a far greater number of state and local candidates. *See infra* Part I.B.1. No credible evidence has been submitted by the defendants that demonstrates that federal candidates either are, or are perceived to be, indebted to donors as a result of such mixed-purpose party activities.[34] Moreover, donations used for generic issue advertisements that may be helpful to both state and federal candidates, another example of a mixed-purpose activity by a

B.2.a.i. That said, regardless of how you describe the acts by an officeholder that are "contrary to their obligations of office," *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459; *see, e.g.,* Intervenors Opening Br. at 43 ("legislative effort") (quoting Green Expert Report at 23–24); Gov't Reply Br. at 15–16 ("access"); *Shrink Missouri,* 528 U.S. at 389, 120 S.Ct. 897 ("politicians too compliant with the wishes of large contributors"), the more telling portion of the corruption equation for the purpose of understanding my opinion is the Supreme Court's description of the prospective benefit to the officeholder that supposedly influences him to act: "the prospect of financial gain to themselves or infusions of money into their campaign." *NCPAC,* 470 U.S. at 497, 105 S.Ct. 1459. Only an actual or potential benefit of the kind described by the Supreme Court can lure an officeholder into conduct sufficiently corrupting to warrant Congress's regulation.

**34.** Judge Kollar–Kotelly references in her opinion an identical statement by officials of the four national party congressional committees describing as "significant" the effect "that voter identification, voter registration and get out the vote efforts" have on the election of federal candidates. *See* J. Kollar–Kotelly Op. at Part III.II.B.2.b.ii. That "combined" statement is not in my judgment proof *per se* that such efforts (either individually or collectively) *directly* affect federal elections. Indeed, there is no quantitative evidence in the record demonstrating the extent to which voter registration, voter identification, and get-out-the-vote efforts assist federal candidates, as opposed to the far greater number of state and local candidates that appear on the ballot. Determining that, of course, is exacerbated by the practical reality that congressional races in many states are either noncompetitive, or uncontested. Simply stated, there is no way of knowing the election impact value of what is considered "significant" in the eyes of these party officials. Moreover, because these officials do not specify which, if any, of these were "generic" efforts, there is no way of knowing whether the activities to which they are referring were crafted in a way to specifically turn out voters for particular federal candidates. Of course, if they had been, they would not be permissible under this Court's ruling today. *See supra* Part I.A.2 & *infra* Part I.B.2. As a result, I accord limited probative value to these identical statements on this point.

party that indirectly affects federal elections in a way unlinked to any particular candidate's election or re-election, also do not foster actual or apparent corruption. Political parties, like many other political organizations, engage in noncandidate-related speech (i.e., genuine or pure issue ads) to influence public opinion on issues of the day.[35] Just recently, for example, the RNC funded a generic issue advertisement on the radio that touted the Republican's education proposal. It broadcasted the following:

Male: Every child can learn ...

Female: ... and deserves a quality education in a safe school.

Male: But some people say some children can't learn ...

Female: ... so just shuffle them through.

Male: That's not fair.

Female: That's not right.

Male: Things are changing. A new federal law says every child deserves to learn.

Female: It says test every child to make sure they're learning and give them extra help if they're not.

Male: Hold schools accountable. Because no child should be in a school that will not teach and will not change.

Female: The law says every child must be taught to read by the 3rd grade. Because reading is a new civil right.

Male: President Bush's No Child Left Behind Law.

Female: The biggest education reform and biggest increase in education funding in 25 years.

Male: Republicans are working for better, safer schools ...

Female: ... so no child is left behind.

Male: That's right ... Republicans.

Anncr: Learn how Republican education reforms can help your children. Call .... Help President Bush and leave No Child Behind.

Josefiak Decl. ¶ 91(e) & Exhibit X. While pure issue advocacy, like the above advertisement, can *indirectly* affect a federal election,[36] it is unlikely, and there is no evidence to the contrary, that candidates will feel indebted to those who helped fund such advertisements. Moreover, the fact that state and local parties would still be able to use nonfederal money to engage in genuine issue advocacy[37] serves to undermine Section 323(a)'s complete ban on national parties being able to do the same.[38]

**35.** *See* Josefiak Decl. ¶ 91(e) ("The RNC seeks to educate the public about the positions for which the Republican Party stands."); La Raja Decl. ¶ 16 ("Political parties use nonfederal funds to develop and disseminate political messages."); *Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309 (recognizing that "a political party's independent expression ... reflects its members' views about the philosophical and governmental matters that bind them together"); *id.* at 629, 116 S.Ct. 2309 (Kennedy, J., concurring in part and dissenting in part) (explaining that political parties "exist to advance their members' shared political beliefs").

**36.** *See Buckley,* 424 U.S. at 42–43, 43 n. 50, 96 S.Ct. 612 ("Public discussion of public issues ... tend naturally and inexorably to exert some influence on voting at elections."

(quoting *Buckley v. Valeo,* 519 F.2d 821, 875 (D.C.Cir.1975))).

**37.** BCRA § 101; FECA § 323(b); 2 U.S.C. § 441i(b)(1); BCRA § 101; FECA § 301(20)(A); 2 U.S.C. § 431(20)(A). The state and local parties could also presumably use nonfederal funds for all other mixed activities not included within Section 301(20)(A)'s definition of "federal election activity."

**38.** In *United States v. National Treasury Employees Union ("NTEU"),* 513 U.S. 454, 473–75, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the Supreme Court rejected a complete ban on honoraria for government employees because, in part, Congress exempted certain speeches that had no nexus to the government employment, explaining that the exemption "cast serious doubt on the Government's submission" that the honoraria was so "threaten-

Lastly, if the above analysis is true with regard to the inability to demonstrate even an appearance of corruption when nonfederal funds are being used for mixed purposes that indirectly affect a federal election, it is even more true when the purpose is nonfederal and has no effect on any federal candidate's election or re-election. In short, the defendants have provided no legal basis to restrict a national party's use of nonfederal funds for nonfederal purposes.

Third and finally, the defendants' contention that candidates, who raise soft money donations for their national parties, regardless of their subsequent use, are indebted to the donors due to "internal party benefits" they subsequently receive for raising the nonfederal donations,[39] is equally tenuous from both a theoretical and an evidentiary standpoint, and, in any event, Section 323(a) remains insufficiently tailored based on that justification to pass constitutional muster. The defendants' contention is theoretically flawed because it proceeds from the premise that the corruption, or appearance of corruption, necessary to warrant congressional intervention can be satisfied by a federal candidate

receiving a benefit other than personal financial gain or direct assistance, monetary or otherwise, to his election effort. The Supreme Court has never defined corruption, or its appearance, in those terms. As stated previously, the only benefit the Supreme Court has based a finding on is "the prospect of financial gain to themselves or infusions of money into their campaigns." *NCPAC*, 470 U.S. at 497, 105 S.Ct. 1459.[40] Even if the Court did, however, bless the notion that a nonmonetary benefit from someone other than the donor could, under the right circumstances, give rise to an indebtedness that the public could perceive as "corrupting" its legislator's independence, there is no evidence on this record that such corruption has either occurred or is perceived by the public to exist. The evidence relating to the appearance of corruption, such as it is, only establishes that the public believes there is a connection between large donations to national parties and the influence and access the public believes the donors receive. *See infra* Part I.B. It does not, however, establish that this connection exists independent of how the parties use the funds. If anything, the public's regular exposure

---

ing ... as to render the ban a reasonable response to the threat." *Id.* at 473, 115 S.Ct. 1003. The Court thus found that Congress's exemption undermined application of the ban to speeches without a connection to government employment: "[a]bsent such a nexus, no corrupt bargain or even appearance of impropriety appears likely." *Id.* at 474, 115 S.Ct. 1003; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (observing that exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place").

Further, Congress's decision to only restrict state and local parties from using nonfederal funds for candidate advocacy, *see* BCRA § 101; FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii), reinforces the premise that actual or apparent corruption manifests only when there is a nexus to a federal candidate.

39. *See* Intervenors Opp'n Br. at 26–27 (explaining that "without regard to how soft money is ultimately spent, ... the parties reward [federal candidates and officeholders] for raising it" and that "success in the party reinforces stature in the government because federal officeholders attain leadership positions in Congress partly as a result of their success as fundraisers" (citing Bumpers Decl. ¶¶ 7–9)).

40. *Cf.* Vincent Blasi, *Free Speech and the Widening Gyre of Fund–Raising: Why Campaign Spending Limits May Not Violate the First Amendment After All*, 94 Colum. L.Rev. 1281, 1313 (1994) ("If candidates did not stand to gain much for their own campaigns from the money so raised, one doubts that party loyalties (or pressure) would lead to excessive diversion of candidate time to [soft money] fund-raising.").

to so-called "issue ads" sponsored by the parties and crafted to help their candidates,[41] combined with its lack of knowledge of the difference between soft and hard money and its lack of knowledge of the campaign finance regulations (both of which have been demonstrated),[42] should lead this Court to reasonably infer that the public believes that these donations are used in whole, on in part, by the parties to directly help their candidates. It is that perceived benefit, in my judgment, that gives rise to the public's view that office-holders, either out of gratitude, or in hope of similar future contributions, provide increased access and influence to those donors. And in light of the utter absence of evidence on the record establishing any other reason that the public believes accounts for federal officeholders granting increased influence and access to those who give large donations to their party, this Court should infer the same. In any event, the defendants' argument is flawed because their supposed internal-party-benefit rationale was not even relied upon by Congress to limit the national parties use of nonfederal funds. If it had been, Congress would have only restricted nonfederal funds that federal candidates themselves solicited. Thus, Section 323(a)'s sweeping restriction, even if acceptable theoretically and factually based on the internal-party-benefit rationale, is not sufficiently tailored to "alleviate [the] harm in a direct and material way." *Turner Broadcasting Sys., Inc. v. FCC ("Turner I")*, 512 U.S. 622,

664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).[43]

In sum, conduct which only indirectly affects a federal election requires a greater degree of evidence of corruption, or appearance thereof, to warrant congressional regulation. Thus, in the absence of sufficient proof to warrant expanding FECA in this direction, Congress may only prohibit the national parties from using nonfederal money for federal purposes such as those defined in Section 301(20)(A)(iii), which are clearly designed to directly affect federal elections. The use of nonfederal funds for nonfederal or mixed purposes, which at the most indirectly affect federal elections, is simply not regulable by Congress because it does not give rise to corruption or the appearance of corruption. Thus Section 323(a)'s complete ban on the use of nonfederal funds is not closely drawn to serve the designated government interest.

### 4. Severability of New FECA Section 323(a)

Because Section 323(a) prohibits *all* uses of nonfederal funds by national parties, and because I only uphold Congress's power to prohibit the use of nonfederal funds for federal purposes (as defined in Section 301(20)(A)(iii)), *see infra* Part I.B.2, a considerable issue is presented as to whether we can isolate and uphold that prohibition from the remaining undefined, unconstitutional prohibitions in Section 323(a) in a manner consistent with both the severance clause and Supreme Court precedent. For

---

**41.** These advertisements clearly show who funds the advertisements, stating in no uncertain terms at the end of each advertisement: "Paid for by the Republican National Committee" or "Paid for by Republican Party of Florida." *See, e.g.,* Findings 45 & 46.

**42.** *See* Findings 264–67.

**43.** It has also been suggested by one of the defendants' witnesses that Members of Con-

gress raising soft money donations receive the additional benefit of helping their parties retain control of Congress. *See* Hickmott Decl. Exhibit A ¶ 18. Even assuming, *arguendo,* that this benefit is not too attenuated to establish a sense of indebtedness to the large party donors, it is severely undercut if the parties cannot, as we have held, use large nonfederal donations to directly assist the election and re-election of their members. *See supra* Part I.A.2 & *infra* Part I.B.2.

the following reasons, I believe we can and should.

It is a "cardinal principle" of statutory construction to save as much of a statute as possible. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (Hughes, C.J.).[44] Indeed, Congress itself in Section 401 of BCRA provided us with a severability clause which directed us to do as much.[45] In attempting to save a statute, however,

the Supreme Court has made it clear that a court must take great pains to avoid "rewriting" the statute.[46] Thus, a severability clause, due in part to separation of powers concerns, is merely an "aid," not a "command," to the judiciary. Nonetheless, the Supreme Court has frequently found statutory provisions unconstitutional (or constitutional) as to particular applications without invalidating (or validating) the entire provision.[47] In the campaign finance arena, the Supreme Court in *Colorado I*

---

**44.** *See also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (quoting *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895))); *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) ("[A] court should refrain from invalidating more of the statute than is necessary."); *Morse v. Republican Party of Va.*, 517 U.S. 186, 242, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) (Scalia, J., dissenting) (explaining that a court is required to find a "limiting construction or partial invalidation" that will "remove the seeming threat or deterrence to constitutionally protected expression" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973))); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (observing that a statute should be "declared invalid to the extent it reaches too far, but otherwise left intact").

**45.** The severability clause states: "If any provision of this Act or amendment made by this Act, or the application of a provision or amendment to any person or circumstance, is held to be unconstitutional, the remainder of this Act and the amendments made by this Act, and the application of the provisions and amendment to any person or circumstance, shall not be affected by the holding." BCRA § 401.

**46.** *See Chapman v. United States*, 500 U.S. 453, 464, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (Rehnquist, C.J.) ("The canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction is useful in

close cases, but it is 'not a license for the judiciary to rewrite language enacted by the legislature.'" (quoting *U.S. v. Monsanto*, 491 U.S. 600, 611, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989))); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of statute . . . or judicially rewriting it." (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (internal quotations omitted))); *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (explaining any attempt "to rewrite language enacted by the legislature . . . while purporting to be an exercise of judicial restraint, would trench upon the legislative powers vested in Congress by Article I, § 1, of the Constitution" (citing *Heckler v. Mathews*, 465 U.S. 728, 741–42, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984))); *In re Espy*, 80 F.3d 501, 505 (D.C.Cir.1996).

**47.** *See, e.g., Edenfield v. Fane*, 507 U.S. 761, 763, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (rejecting a broad ban on solicitation only as applied to the business context); *Brockett*, 472 U.S. at 502–07, 105 S.Ct. 2794 (partially invalidating moral nuisance law "only insofar as the word 'lust' is to be understood as reaching protected materials"); *United States v. Grace*, 461 U.S. 171, 175, 183, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (invalidating prohibition of speech activities on Supreme Court grounds "as applied to the public sidewalks"); *see also NTEU*, 513 U.S. at 487, 115 S.Ct. 1003 (O'Connor, J., concurring in the judgment in part and dissenting in part) (citing examples).

and *Colorado II* did not object to severing applications of Section 441a(d), a FECA provision that caps how much political parties can spend.[48] In Colorado I, the Supreme Court invalidated Section 441a(d) as applied to uncoordinated, or independent, expenditures. 518 U.S. at 613–20. It then remanded the question of whether Section 441a(d)'s application to coordinated expenditures was constitutional, directing the lower courts to determine "whether or not Congress would have wanted [Section 441a(d)'s] limitations to stand were they to apply only to coordinated, and not to independent, expenditures." *Id.* at 625–26. On remand the district court found that Section 441a(d)'s application to coordinated expenditures was severable from its application to uncoordinated expenditures. 41 F.Supp.2d 1197, 1206–07 (D.Co.1999). The district court found the two applications severable because of the "strong" severability provision, which is almost identical to the provision at issue here, and because there was "no evidence" that Congress would not have rejected Section 441a(d) as applied to coordinated party expenditures. *Id.* at 1207. Both the Tenth Circuit and the Supreme Court, noting that the sever-

ability argument was not renewed upon appeal, let the district court's decision stand. *Colorado II*, 533 U.S. at 440 n. 5, 121 S.Ct. 2351; *FEC v. Colorado Republican Fed. Campaign Comm.*, 213 F.3d 1221, 1225 n. 3 (10th Cir.2000). In the end, though the language in Section 441a(d) makes no reference to coordinated or uncoordinated expenditures, the Supreme Court upheld certain applications of the provision (coordinated party expenditures) but invalidated other applications (uncoordinated party expenditures).

Typically the Supreme Court invalidates specific applications, while letting others stand, when it can confidently discern congressional intent. In one recent case where the Supreme Court refused to limit the application of a statute which banned all honoraria to government employees, *United States v. National Treasury Employees Union ("NTEU")*, 513 U.S. 454, 479, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), it did so because it was faced with considerable uncertainty as to how Congress would have defined the honoraria restriction if it had known the complete ban on honoraria would have been rejected as unconstitutional. *Id.*[49] For a number of

---

**48.** Specifically, Section 441a(d) states that political parties "may not make any expenditure in connection with the general election campaign of a candidate in Federal office in a State who is affiliated with such party which exceeds" $10,000 in a House campaign and, in a senatorial campaign, the greater of $20,000 or "2 cents multiplied by the voting age population of the State." 2 U.S.C. § 441a(d)(3).

**49.** The Court in *NTEU* shied away from a limiting construction, in part, because it could not be sure that it "would correctly identify the nexus Congress would have adopted in a more limited honoraria ban." 513 U.S. at 479, 115 S.Ct. 1003. "[D]rawing one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn, involves a far

more serious invasion of the legislative domain." *Id.* at 479 n. 26, 115 S.Ct. 1003. The Court echoed this concern in *Reno v. ACLU*, where it refused to apply a tailoring construction to provisions seeking to protect minors from "indecent" and "patently offensive" internet communications. 521 U.S. 844, 883–88, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). It found that, in a facial challenge, a court "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Id.* at 884, 117 S.Ct. 2329 (quoting *Virginia v. American Booksellers Ass'n., Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)). The Supreme Court suggested that a statute is "readily susceptible" for a limiting construction when the statute provides "guidance ... for limiting its coverage" and "the text or other source of congressional intent identified a clear line

reasons, we do not have that problem here.

First, with regard to Title I, Congress's intent, based on both the severability clause and the text of the statute, is unambiguous. The clause itself, of course, directs that the Court save "the application of the provisions ... to any person or circumstance." BCRA § 401. However, as stated previously, such a clause only creates a presumption of severability.[50] It does not relieve this Court of its obligation to determine if the limiting construction of Section 323(a) can stand alone, and if Congress would have enacted such a construction knowing that its broader position would be held unconstitutional.[51] With regard to both the former and the latter, Congress, by defining "federal election ac-

tivity" in Section 301(20)(A)(iii) to include certain communications which directly affect federal elections and by constitutionally prohibiting state parties from engaging in such activity in Section 323(b), has unequivocally indicated its intent that such activity—as defined—would be among the undefined uses of nonfederal funds that national parties were similarly being prohibited from engaging in under Section 323(a). To conclude otherwise would be to turn a blind eye to an obvious reason why Sections 323(b) and 301(20)(A) were written in the first place: to prohibit donors (especially corporations and unions) and the national parties from circumventing Section 323(a) by funneling soft money through state and local parties for Section 301(20)(A) purposes.[52] By limiting the prohibited uses of nonfederal funds by na-

that this Court could draw." *Reno,* 521 U.S. at 884, 117 S.Ct. 2329.

Justice O'Connor, in her dissent in *NTEU,* lamented that "a court should not [] throw up its hands and despair of delineating the area of unconstitutionality" and that it is "inconsistent with congressional intent to strike a greater portion of the statute than is necessary to remedy the problem at hand." 513 U.S. at 486–89, 115 S.Ct. 1003 (O'Connor, J., concurring in the judgment in part and dissenting in part); *see also id.* at 501–03, 115 S.Ct. 1003 (Rehnquist, C.J., dissenting) (describing the majority's remedy as an "O. Henry ending").

**50.** *See Reno,* 521 U.S. at 884 n. 49, 117 S.Ct. 2329 (explaining that "[i]n part because of separation-of-powers concerns, we have held that a severability clause is 'an aid merely; not an inexorable command'" (quoting *Dorchy v. Kansas,* 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924))); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987); *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1394 (D.C.Cir.1990) (agreeing that "'the ultimate determination of severability will rarely turn on the presence or absence'" of a severability clause (quoting *United States v. Jackson,* 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968))).

**51.** *See Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) ("Unless it is

evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." (quoting *Champlin Refining Co. v. Corporation Comm'n of Okla.,* 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932))); *Buckley,* 424 U.S. at 108–09, 96 S.Ct. 612 (same).

**52.** *See, e.g.,* 145 Cong. Rec. S2138 (Mar. 20, 2002) (statement of Sen. McCain) ("Closing the [state and local party] loophole is crucial to prevent evasion of the new federal rules."); 147 Cong. Rec. S2928 (Mar. 27, 2001) (Sen.Schumer) ("[R]egulating soft money without dealing with the soft money that goes to State parties is like the person who drinks a Diet Coke with his double cheeseburger and fries: It does not quite get the job done."); 145 Cong Rec. H8275 (Sept. 14, 1999) (statement of Rep. Kaptur) (stating that banning nonfederal funds for national parties but allowing it for state parties is "like bolting the front door to protect yourself from burglars while hanging a neon sign on the back door that says, 'Come on in'"); 144 Cong. Rec. H7323 (Aug. 6, 1998) (statement of Rep. Roukema) (stating that allowing state parties to use federal funds creates a "loophole large enough to drive an armored car stuffed with campaign cash through."); Brock Decl. ¶ 8; Rudman Decl. ¶ 19; *see also* Gov't Opening Br. at 53 ("Section 323 contains several interrelated provisions designed to eliminate so-

tional parties in Section 323(a) to communications of the kind defined by Congress *in its own words* in 301(20)(A)(iii), I am neither employing a saving construction that "rewrites" Section 323(a), nor ignoring Congress's clear intention to save an implicit feature of that section *consistent* with BCRA's severance clause admonition.

Finally, by applying Section 301(20)(A)(iii), which I hold to be constitutionally acceptable for Section 323(b), *see infra* Part I.B.2, to define the prohibited conduct in Section 323(a), I avoid the Supreme Court's additional concern of creating a definition the constitutionality of which has not been decided.[53] Accordingly, for all of the above reasons, I find that Section 323(a)'s implicit prohibition on national parties to use nonfederal money to fund communications of the kind defined in Section 301(20)(A)(iii) is constitutionally severable from its remaining unconstitutional applications.

**B. New FECA Sections 323(b) and 301(20)(A): Restrictions on Nonfederal Funds for "Federal Election Activities"**

Unlike Section 323(a)'s total ban on the use of nonfederal funds by national parties, Section 323(b) only prohibits state parties from using nonfederal funds for certain "federal election activities," BCRA § 101; FECA § 323(b); 2 U.S.C. § 441i(b)(1), which it defines in Section 301(20)(A). BCRA § 101; FECA § 301(20)(A); 2 U.S.C. § 431(20)(A). Thus, in order to assess the constitutionality of the restraint on the state parties in

Section 323(b), we have to simultaneously assess the constitutionality of Section 301(20)(A)'s definition of federal election activity.

Section 301(20)(A) defines federal election activity to include: (1) voter registration activity during the period 120 days before a regularly scheduled federal election; (2) "voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot"; (3) "a public communication that refers to a clearly identified candidate for Federal office ... and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)"; and (4) services provided by a state or local party committee employee who spends more than twenty-five percent of that individual's compensated time "on activities in connection with a Federal election." BCRA § 101; FECA § 301(20)(A); 2 U.S.C. § 431(20)(A).

Only Section 301(20)(A)(iii), however, describes conduct which is targeted exclusively at federal elections and which directly affects federal elections. Accordingly, for the reasons set forth below, I find that Section 323(b) and Sections 301(20)(A)(i), (ii), and (iv) are substantially overbroad in that they seek to restrain state parties from using nonfederal funds for election activities, which only indirectly affect fed-

---

licitation, contribution, and use of unregulated soft money by federal candidates, federal officeholders, and national political parties."); Gov't Opening Br. at 103 ("Any successful attempt to limit national party soft money activity must perforce prevent easy evasion through surrogates such as state and local parties.") (citing Mann Expert Report at 31).

**53.** *See NTEU,* 513 U.S. at 479, 115 S.Ct. 1003 (refusing to adopt a limiting construction, in

part, because its judicial obligation was to avoid "independent constitutional concerns"); *see also Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) ("The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'" (quoting *Liverpool, N.Y. & Phila. Steamship Co. v. Emigration Comm'rs,* 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885))).

eral elections, and thus do not give rise to the appearance of corruption necessary to warrant congressional intervention. As to Section 301(20)(A)(iii), however, I find that it is constitutionally permissible because, by contrast, it focuses on election activities that directly affect federal elections and as such, give rise to the appearance of corruption necessary to warrant Congress's restraint on the First Amendment rights of the donors.

### 1. New FECA Sections 323(b) and 301(20)(A)(i), (ii), and (iv)

Section 323(b) is premised, in part, on the congressional belief that certain mixed-purpose activities by state parties, when funded with nonfederal funds, sufficiently affect federal elections that they give rise to an appearance of corruption between the donors and the candidates whose campaign receives the benefit of these activities. I disagree. Setting aside the considerable issue of whether the Elections Clause, U.S. Const. art. I, § 4; *Buckley,* 424 U.S. at 13 n. 16, 96 S.Ct. 612,[54] can be fairly read to allow Congress to regulate state party activities such as those defined in Sections 301(20)(A)(i), (ii), and (iv), *see* CDP/CRP Opening Br. at 20–27, the justification and evidence submitted here fail to establish that those provisions serve a sufficient government interest to justify an infringement on First Amendment rights.

The Supreme Court pointed out in *Colorado I* that "the opportunity for corruption posed by" nonfederal funds for mixed-purpose activities like voter registration and get-out-the-vote "is, at best, attenuated." 518 U.S. at 616, 116 S.Ct. 2309. Though dictum it may be, it is particularly telling. *See Central Green Co. v. United States,* 531 U.S. 425, 431, 121 S.Ct. 1005, 148 L.Ed.2d 919 (2001) ("dicta 'may be followed if sufficiently persuasive' but are not binding" (quoting *Humphrey's Executor v. United States,* 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935))). One can infer from the Supreme Court's plain statement that the opportunity for corruption is less because there is no clear link between donations used for these predominantly generic activities and whatever benefit accrues to the candidate.

When nonfederal funds go to political parties, not candidates, and are spent for purposes that do not directly affect federal elections, there is less concern about donors having quid pro quo arrangements with candidates. Indeed, given that Section 301(20)(A)(iii) prevents communications that promote federal candidates, the activities defined in Sections 301(20)(A)(i) and (ii) are necessarily "generic" or specific only to a nonfederal candidate: that is, these activities are not directed at a specific federal candidate.[55] Conversely, such

---

54. Because I find these sections and Section 323(a) (aside from nonfederal funds used for federal activities) unconstitutional based on the First Amendment, I need not reach either the federalism or equal-protection claims.

55. Under the pre-BCRA regime, political parties could not use any nonfederal funds if the voter mobilization effort supported or opposed "a specific candidate." *See* 11 C.F.R. § 106.5(a)(2)(iv). And in BCRA, generic campaign activity is defined as "a public communication that promotes or opposes a political party and does not promote or oppose a clearly identified Federal candidate or a non-Federal candidate," BCRA § 101(b); 2 U.S.C.

431(21); 11 C.F.R. § 100.25 (67 Fed.Reg. 49,-111 (July 29, 2002)), and "get-out-the-vote" is defined as "contacting registered voters ... to assist them in engaging in the act of voting," *regardless of a reference to a federal candidate. See* 11 C.F.R. § 100.24(a)(3). In any event, get-out-the-vote or voter registration activities employing a "public communication," which is defined broadly to include everything from telephone banks to mass mailings, *see* BCRA § 101(b); 2 U.S.C. 431(22); 11 C.F.R. § 100.26, that promotes or attacks a clearly identified federal candidate, *see* BCRA § 101; FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii), would not be allowed if Section

activities potentially assist a considerably larger number of state and local candidates that greatly outnumber the one, or possibly two, federal candidates on the ballot,[56] many of whom invariably run unopposed or in clearly noncompetitive races. There is also evidence that state and local parties undertake voter mobilization efforts principally for state and local candidates,[57] mostly from nonfederal money they raised on their own,[58] and in elections where the federal candidates are practically uncontested.[59]

In light of this focus on state and local candidates, there is every reason for this Court to doubt whether the federal candidates themselves would view such generic activities by state and local parties as sufficiently helpful to their campaigns as to warrant even a token sense of indebtedness to the soft money donors to the politi-

cal parties. The evidence, such as it is, regarding Sections 301(20)(A)(i) and (ii) activities fails to demonstrate either the degree of effect such activities have on the federal candidate's re-election, or the existence of a public perception that donations used to fund such efforts create a sense of indebtedness between the federal candidate and those who make large donations to the party. That there is no evidence that the public perceives corruption in these circumstances is not surprising. Since the public would expect state parties to engage in such voter mobilization efforts for the benefit of all of its candidates, we can, and should, reasonably infer that the public would correspondingly view a federal candidate's sense of indebtedness, if any, to be *diluted* among the numerous state and local candidates who equally benefit from these activities. *See* Feingold

301(20)(A)(iii) is upheld. *See also* Bowler Decl. ¶ 20(b) (noting that California Democratic Party's ("CDP's") direct mail programs typically do not mention federal candidates); Erwin Aff. ¶ 9 (explaining that "[t]he overwhelming amount of [voter registration] activity is 'generic' voter registration activity urging potential registrants to 'Register Republican' ").

**56.** *See* Bowler Decl. ¶¶ 13, 15 (explaining that in the 2002 cycle, where the only federal office on the California ballots was a congressional race, administrative expenses were required to be allocated 12.5 percent federal and 87.5 percent nonfederal based on the ballot composition formula). California holds elections for 120 legislative officers, eight statewide-elected officers, and four members of the State Board of Equalization. It also holds elections for judicial offices, local offices, and ballot measures at both the state and local levels. *See id.* ¶ 13; Erwin Aff. ¶ 5.

**57.** *See* Findings 113–37, 150–54. The CDP spent more money for voter registration in 1998, a year with eight statewide elections, than in 2000, a presidential election year. Bowler Decl. ¶ 20.a; *see also* Erwin Aff. ¶ 14.a (stating that "voter registration activities are

primarily driven by the desire to affect State and local races").

**58.** *See also* Bowler Rebuttal Decl. ¶¶ 3–4 (explaining that the CDP pays for much of its voter registration and get-out-the-vote activities with money raised by the state party); Bowler Decl. ¶ 12 (explaining that in the 1999–2000 election cycle, the CDP raised $15,617,002 in nonfederal funds, which it used to fund state and local activities). The amount of nonfederal money the California Republican Party ("CRP") and CDP raised themselves is much more than the nonfederal funds they received from national-party transfers. CDP/CRP 1171 (in the 1999–2000 election cycle, which was a presidential election cycle, only 19.1 percent of all CRP nonfederal money was from national-party transfers); CDP/CRP 35, 37, 39 (in 2000, only 36 percent of all CDP nonfederal money was from national-party transfers). While the state and local parties may spend most of their nonfederal national-party transfers on candidate advocacy, they spend very little of their overall nonfederal funds on such activities.

**59.** For example, the CDP actively registered over 300,000 Democratic voters throughout California during 2002 even though there was only one competitive congressional race out

Dep. at 126–27 (acknowledging that soft money being used for generic campaign activity is less likely to create an appearance of corruption). Such uncertainties are hardly a sufficient basis from which to allege that precluding state and local parties from using nonfederal funds for mixed-purpose activities serves the government interest in preventing corruption, or its appearance. Thus, in the absence of a substantial evidentiary showing to the contrary, it is "mere conjecture," *Shrink Missouri*, 528 U.S. at 392, 120 S.Ct. 897, by the defendants that an appearance of corruption arises from donations to state parties, or transfers from national parties, that are used for these generic or noncandidate-specific activities set forth in Sections 301(20)(A)(i) and (ii).

Finally, even if the defendants had demonstrated that some mixed-purpose activities do somehow create an appearance of corruption, Sections 301(20)(A)(i), (ii), and (iv) are not sufficiently tailored to be constitutionally acceptable. By limiting donations for so many unmistakably noncorrupting activities, like donations for voter registration on behalf of state candidates, these sections extend too far. It is simply not enough to claim that just because the use of a donation has *some* effect on a federal election, it must be completely funded with federal funds.[60] To reach such a conclusion would inevitably sweep in too many activities that deserve First Amendment protection. Section 301(20)(A)(iv)'s percentage based definition

of the amount of time a party official must spend in connection with a federal election, BCRA § 101; FECA § 301(20)(A)(iv); 2 U.S.C. § 431(20)(A)(iv), provides the starkest example of this insufficient tailoring. If a state party employee spends 26 percent of his compensated time "in connection with a Federal election," then his entire salary must be paid using federal funds. Clearly, 74 percent of the employee's compensated time, which has no relation whatsoever to a federal election, is being regulated. There is no adequate basis in the record before us to determine whether the nature of his conduct sufficiently impacts the election to give rise to an appearance of corruption between the donors who may be funding his efforts through the state party and the candidate receiving the benefit of his services. Thus, even if Sections 301(20)(A)(i), (ii), and (iv) served to prevent some appearance of corruption, they are not drawn closely enough to survive scrutiny.

### 2. New FECA Section 301(20)(A)(iii)

██ As I indicated previously, Congress has the power to require both national and state parties to use only federal money for election activities that directly affect federal elections.[61] Section 301(20)(A)(iii) focuses on one such type of activity: "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate *for that*

---

of 52 races. *See* Bowler Decl. ¶ 20.a; Torres Decl. ¶ 8.

**60.** *Cf.* Robert Post, *Regulating Election Speech Under the First Amendment*, 77 Tex. L.Rev. 1837, 1842 (1999) ("It is surely the case that election speech affects elections, but so does all public discourse. If all that were necessary to bring speech within the authority of a managerial domain were that the speech produce effects on the domain, nothing much would be left of public discourse.").

**61.** This analysis of Section 301(20)(A)(iii) is equally applicable to national, state, and local parties. Considering the coordination and financial transfers between the various party levels and that parties at all levels work on behalf of national, state, and local candidates, it is unrealistic to view the parties differently simply based on the fact that one is labeled "national" and another "state." It is the nature of the activities they undertake rather than they label they assume that defines the type of allowable regulations.

*office.*" BCRA § 101; FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii) (emphasis added). Judge Henderson concludes in her opinion that the Supreme Court in *Buckley* required certain "magic words" that specifically advocate the election or defeat of a candidate in order for a communication to be the type of advocacy regulable by Congress. All other communications, even if they directly affect a federal election, from her perspective, are not regulable.[62] I disagree. For the same reasons, in part, set forth by Judge Kollar–Kotelly in her opinion on Title II, I believe that *Buckley* did not set forth a "bright-line test." *See* J. Kollar–Kotelly Op. at Part III.I.C.1. But, even if the Supreme Court did set forth a bright-line test for Congress's regulation of *expenditures by nonparties* in *Buckley*, 424 U.S. at 39–51, 96 S.Ct. 612, that rationale is not necessarily applicable to, and binding on, Congress's power to regulate *donations to political parties* under BCRA.

Therefore, the question before this Court is not so much whether Congress can regulate the use of nonfederal funds for uncoordinated, nonexpress advocacy that directly affects federal elections, but whether Congress has defined such nonex-

press advocacy in Section 301(20)(A)(iii) in a way that will withstand constitutional scrutiny. For the following reasons, I have concluded that Congress not only can regulate uncoordinated, nonexpress advocacy which directly affects federal elections, but has defined that nonexpress advocacy in Section 301(20)(A)(iii) in a way that is sufficiently tailored to serve the government interest of preventing actual or apparent corruption, and in a way that is not unconstitutionally vague.[63]

In defining "candidate advocacy" as it did, Congress chose to couple two concepts together in order for communications to qualify as regulable: (1) the identification of a candidate for a federal office; and (2) words that promote, oppose, attack, or support that candidate *for that office.* BCRA § 101; FECA § 301(20)(A)(iii); 2 U.S.C. § 431(20)(A)(iii). Therefore, unlike genuine issue advocacy, which both national and state parties have every right to participate in with nonfederal funds, and which help all party candidates in a generic sense, Congress in this definition was seeking to focus on parties using nonfederal funds for communications intended to directly help a specific federal candidate. Because such assistance is focused on a specific candidate,[64] it is natural for that

**62.** *See, e.g.,* J. Henderson Op. at Part IV.D.1.a & Part IV.D.1.b (referring repeatedly to "protected issue advocacy"). I do not believe we should assume that just because the party advertisements are currently funded with nonfederal money that they, by definition, have a nonfederal purpose. *See* J. Henderson Op. at Part IV.D.1.c.

**63.** Any attempt to regulate communications that directly affect federal elections, like those regulated in Section 301(20)(A)(iii), does not exceed Congress's authority to regulate federal elections under the Elections Clause, *see* U.S. Const. art I., § 4. For this reason, I do not need to address further the plaintiffs' federalism claims in relation to Section 301(20)(A)(iii). I also reject the plaintiffs' equal-protection challenge because political parties are unique actors in the political sys-

tem, *see supra* note 27 and accompanying text, such that Congress is warranted in treating contributions to them differently. *See California Medical,* 453 U.S. at 200–01, 101 S.Ct. 2712 (rejecting equal-protection challenge to contribution limits for multicandidate political committees, stating that "[t]he differing restrictions placed on [different entities] reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process"). Finally, I concur with Judge Henderson's discussion of the Thompson Plaintiffs' equal-protection claim. *See* J. Henderson Op. at Part IV.D.4.

**64.** *See, e.g., Colorado II,* 533 U.S. at 458, 121 S.Ct. 2351 ("I understood that when I raised

candidate to feel indebted towards those whose donations funded the communication, even if he does not know exactly which soft money donors' funds actually made it possible. Concomitantly, it is natural for the public to perceive that those whose large soft money donations funded the national and state parties' communications are not only known by the parties' staffs, but by the federal candidates who directly benefitted from the donations.

The evidence submitted by the defendants overwhelmingly corroborates these common sense conclusions. The record is clear that many, if not most, of the party so-called "issue ads" refer to a specific federal candidate.[65] And the evidence also demonstrates that the advertisements are designed to, and do, support or oppose those candidates for that office.[66] To illustrate one extreme of this genre: in 1996, the Republican National Committee ("RNC") ran a supposed "issue ad" called "The Story" which requires only a quick reading to discern its true purpose and effect.

> Audio of Bob Dole: We have a moral obligation to give our children an America with the opportunity and values of the nation we grew up in.
>
> Voice Over: Bob Dole grew up in Russell, Kansas. From his parents he learned the value of hard work, honesty

and responsibility. So when his country called ... he answered. He was seriously wounded in combat. Paralyzed, he underwent nine operations.

> Audio of Bob Dole: I went around looking for a miracle that would make me whole again.
>
> Voice Over: The doctors said he'd never walk again. But after 39 months, he proved them wrong.
>
> Audio of Elizabeth Dole: He persevered, he never gave up. He fought his way back from total paralysis.
>
> Voice Over: Like many Americans, his life experience and values serve as a strong moral compass. The principle of work to replace welfare. The principle of accountability to strengthen our criminal justice system. The principle of discipline to end wasteful Washington spending.
>
> Voice of Bob Dole: It all comes down to values. What you believe in. What you sacrifice for. And what you stand for.

Fabrizio Dep. Exhibit 2; McCain Decl. ¶ 15; Huyck Decl. ¶ 3; Fabrizio Dep. at 49–55. Though this advertisement transparently was intended to assist Senator Dole's campaign, it was funded in part with nonfederal funds. It is hard to disagree with Senator Levin, who described the advertisement this way: "It's not an ad about welfare or wasteful spending; it is an ad about why should we elect that particular nominee." [67]

---

funds for the [Democratic Senatorial Campaign Committee ("DSCC")], the donors expected that I would receive the amount of their donations multiplied by a certain number that the DSCC had determined in advance, assuming the DSCC has raised other funds." (quoting Senator Timothy Wirth)); Simpson Decl. ¶ 7 ("Members know that if they assist the party with fundraising, be it hard or soft money, the party will later assist their campaign.... Although soft money cannot be given directly to federal candidates, everyone knows that it is fairly easy to push the money through our tortured system to benefit specific candidates."); McCain Decl. ¶ 7 ("[P]arties encourage Members of Con-

gress to raise large amounts of soft money to benefit their own and others' re-election."); see also Findings 31–35.

**65.** In the 1998 election, $24.6 out of $25.6 million spent by political parties on advertisements were spent on advertisements that referred to a federal candidate. Out of 44,485 advertisements, 42,599 advertisements referred to a specific candidate. See Krasno & Sorauf Expert Report at tbl. 1.

**66.** See Findings 36–52.

**67.** 145 Cong. Rec. S12747 (Oct. 18, 1999) (Sen.Levin); see also Memorandum from

Another and more typical form of sham issue advertisement run by parties is a candidate-centered ad that focuses on the positions, past actions, or general character traits of a given federal candidate; contrasts them to the party's view of the proper outlook on those issues; and encourages the viewers to contact the candidate to ostensibly inquire why he/she is taking those positions or actions. *See* Findings 45 & 46. In the 2000 election, for example, the National Republican Congressional Committee and the Florida Republican Party ran television advertisements criticizing Linda Chapin, the Democratic candidate for Congress:

> Announcer: Linda Chapin. Hard on taxpayers. Soft on convicts. Chapin raised taxes on your utilities, pushed to raise the county sales tax and even tried raising your property tax. Meanwhile, hard time in the county jail turned into "Chapin time." Where convicts received cable tv and lounged on padded furni-

ture in carpeted cells. Chapin's County Commission ran this soft jail ... a jail she called a "national model." Ask Chapin why she's hard on taxpayers and soft on convicts.

Chapin Decl. Exhibit 2; Chapin Decl. ¶ 10; Beckett Decl. ¶ 10; Pennington Decl. ¶ 14.[68] This type of electioneering advertisement, and many others like it, were run by the state party, which used mostly nonfederal funds to pay for it. It takes little convincing to find that these advertisements can, and do, directly influence the outcome of a federal election [69] and that parties engaging in them are "electioneering in the guise of issue advocacy." Mann Expert Report at 26. Moreover, because the amount of money used for candidate advocacy is substantial,[70] the candidates are likely to feel even more indebted to the donors whose contributions to the political parties made possible this form of campaign assistance.[71] Not surprisingly, the use of nonfederal funds for this type of

Charlie Nave to Haley Barbour (May 28, 1996) (explaining that the Dole advertisement was tested to see its effect on Senator Dole's election).

**68.** Another example of negative candidate advocacy funded by parties: "We expect our public officials to be responsible, do their jobs and obey the law. But Corrine Brown missed an astonishing 187 votes in Congress.... Apparently, Corrine Brown thinks she's above the law. A government audit found extensive violations of federal law during her 1992 campaign. Call Corrine Brown .... Tell her public officials should act responsibly, do their job and obey the law." ODP0041–1024. For more examples, see Findings 41, 45, 46.

**69.** *See* Findings 36–52, 138–47. The parties were clearly not using such advertisements for party building purposes since 92 percent of the advertisements did not even mention the name of the party in the body of the advertisement. Buying Time 2000 at 64 (stating that in the 2000 election, almost 92 percent of party advertisements never even identified the name of a political party in the body

of the advertisement, let alone encouraged voters to register with or support the party or to volunteer with the local party organization).

**70.** *See* Oliver Dep. at 148–49 (estimating that the RNC spent around $56–61 million dollars on "issue ads" during the 2000 campaign); Marshall Decl. ¶ 3 (stating that the largest portion of Democratic National Committee ("DNC") budget during the 2000 election cycle was used for "issue ads"). In 2000, the RNC raised $254 million, a majority of which was transferred down to the state parties mostly for "issue advertisements." Josefiak Dep. at 76; Vogel Decl. ¶ 63; McGahn Decl. ¶ 55.

**71.** The donors themselves are not blind to the fact that donations to the parties are used to benefit the federal candidates. *See, e.g.,* Rozen Decl. ¶ 12 ("Donors to the national parties understand that if a federal officeholder is raising soft money—supposedly 'non-federal' money—they are raising it for federal uses, namely to help that Member or other federal candidates in their elections.").

candidate advocacy was, to all appearances, Congress's primary concern in deciding to enact BCRA Sections 323(a) and 323(b).[72]

The record further demonstrates that congressional candidates know who the major soft money donors are.[73] In some cases, they actively assist in helping the party to raise such contributions.[74] And as to those candidates who do not, the parties and the donors keep many of them apprised of who made the large donations. For example, Robert Hickmott, lobbyist and former DNC official, advised donors in the following manner:

> [W]hen one of my clients is going to make a donation to a federal candidate or party, hard or soft money, I advise them on the manner in which they should do that. I tell them not to just send the check to the party committee, for example, to the young staff member who is collecting the checks. Instead I tell my clients that they should personally give the money to a Member of Congress who then can give the money to the Chair of the party committee, who will in turn make sure that the check reaches the young staff member. That way the donor, with one check, gets "chits" with multiple Members of Congress.

Hickmott Decl. ¶ 9.[75]

Finally, while there is no evidence in the record of actual quid pro quo corruption,[76]

---

**72.** *See supra* note 19.

**73.** One donor, and former political fundraiser, observed the following:

Information about what soft money donors have given travels among the Members in different ways. Obviously the Member who solicited the money knows. Members also know who is involved with the various major donor events which they attend, such as retreats, meetings and conference calls. And there is communication among Members about who has made soft money donations and at what level they have given, and this is widely known and understood by the Members and their staff.

Randlett Decl. ¶ 10; *see also* Bumpers Decl. ¶¶ 18, 20 (testifying that "some Members even keep lists of big donors in their offices" and that "you cannot be a good Democratic or a good Republican Member and not be aware of who gave money to the party. If someone in Arkansas gave $50,000 to the DNC, for example, I would certainly know that."); Wirth Decl. Exhibit A ¶ 17 ("[C]andidates were generally aware of the sources of the funds that enabled the party committee to support their campaigns.").

**74.** *See* Findings 169, 170, 172–79; *Colorado II*, 533 U.S. at 458, 121 S.Ct. 2351 ("[Y]ou are at the limit of what you can directly contribute to my campaign," but "you can further help my campaign by assisting the Colorado Republican Party." (quoting then-Congressman Wayne Allard)); *see also* Letter from Senator Mitch McConnell to Potential Donor at the Microsoft Corporation (August 17, 1998) (asking potential donor for an "immediate commitment" in support of the National Republican Senatorial Committee's ("NRSC's") issue advocacy campaign); *see also* Letter Senators Mitch McConnell and Bill Frist to Donor at Steel Service Center Institute (February 25, 1998) (thanking donor for a "nonfederal contribution of $25,000" to the NRSC).

**75.** *See* Findings 176, 208; *see, e.g.,* McCain Decl. ¶ 6 ("Legislators of both parties often know who the large soft money contributors to their party are, particularly those legislators who have solicited soft money," and "[d]onors or their lobbyists often inform a particular Senator that they have made a large donation."); Simpson Decl. ¶ 5 ("Even if some Members did not attend these events, they all still knew which donors gave the large donations, as the party publicizes who gives what."); Boren Decl. ¶ 6 ("Each Senator knows who the biggest donors to his party are" because "[d]onors often prefer to hand their [soft money contribution] checks to the Senator personally, or their lobbyist informs the Senator that a large donation was just made.").

**76.** *See* Findings 201–06, 209–10. Although it is possible—though not established—that the appearance of increased access alone is synonymous in the public's mind with increased influence, there is no evidence in the record

the record does establish that the public not only appreciates that there are many donors giving large sums of money (mostly corporations and unions) to the political parties,[77] but believes and expects that the donors—in return—receive privileged access to the legislators and special influence in the legislative process.[78] It is of little

surprise that Congress was particularly concerned with the consequences of the public's perception of a correlation between large donations to parties and the special access and influence that the public believes are accorded to these donors.[79] There is ample evidence, including polls[80] and press reports,[81] to support Congress's

that increased access necessarily results in actual influence. Since the Supreme Court has never found that access in and of itself constitutes corruption, I believe there is no evidence of actual corruption.

**77.** *See* Buying Time 2000 at 62. In 2000, thirty-five of the top 50 nonfederal donors were corporations, and they gave a total of $29,447,350 to the Republican national committees in the 2000 election cycle which was 11.4 percent of all nonfederal money received by that national party. *See* Mann Expert Report at tbl. 6. Most of the other donors in the top 50 were unions and plaintiff attorneys. *Id.*

**78.** Thus the Court reviews the evidence of actual or apparent corruption against the background of a plausible justification, and, as explained earlier, the more plausible the argument, the less evidence the defendants must marshal. *See Shrink Missouri*, 528 U.S. at 391–95, 120 S.Ct. 897.

**79.** Whether because of the endless examples of donors receiving access in return for donations to parties, *see* Findings 211–43, the many press reports that made public such exchanges, *see infra* note 81, or constituent complaints about them, *see* Finding 269, members of Congress were understandably troubled with the appearance of corruption created by large nonfederal donations to parties. *See, e.g.,* 147 Cong. Rec. S2446 (Mar. 19, 2001) (Sen.Feingold) ("The appearance of corruption is rampant in our system, and it touches virtually every issue that comes before use."); 147 Cong. Rec. S3248–49 (April 2, 2001) (Sen.Levin) ("[P]ermitting the appearance of corruption undermines the very foundation of our democracy—the trust of the people in the system.").

**80.** *See* Findings 251–68; *see, e.g.,* Mark Mellman & Richard Wirthlin, Research Findings

of a Telephone Study Among 1300 Adult Americans 7 (Sept. 23, 2002) (poll result finding that 71 percent of Americans think that members of Congress sometimes decide how to vote on an issue based on what big contributors to their political party want, even if it is not what most people in the district want, or even if it is not what they think is best for the country); Robert Y. Shapiro, Public Opinion & Campaign Finance 13–14 (Sept. 18, 2002) (poll results showing that the public has been troubled by large donations to political parties).

Evidence, like these two reports, need not have been before Congress when it made its predictive judgment. *See Turner I*, 512 U.S. at 667, 114 S.Ct. 2445 (explaining that to ensure that Congress drew "reasonable inferences," the Supreme Court needed "substantial elaboration in the District Court of the predictive or historical evidence upon which Congress relied, *or the introduction of some additional evidence.*" (emphasis added)); *Turner Broadcasting Sys., Inc. v. FCC ("Turner II")*, 520 U.S. 180, 185, 187, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); *cf. City of Erie v. Pap's A.M.*, 529 U.S. 277, 310–17, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (Souter, J., concurring in part and dissenting in part) (advocating a remand for development of the judicial record).

**81.** Senator Rudman observed:

Almost every day, the press reports on important public issues that are being considered in Congress. Inevitably, the press draws a connection between an outcome and the amount that interested companies have given in soft money.... Even if a senator is supporting a position that helps an industry for reasons other than that the industry gave millions to his party, it does not *appear* that way in the public eye.

Rudman Decl. ¶ 11 (emphasis added); *see* Finding 270; *see, e.g.,* Dan Morgan and Juliet Eilperin, *Campaign Gifts, Lobbying Built En-*

judgment that the special access and perceived special influence accorded to those large donors have undermined the public's confidence in the independence of its elected representatives from those donors, and thereby giving rise to an appearance of corruption. The record clearly establishes that those large donations are used in large part by the parties to bombard the public with candidate advocacy of the type defined by Section 301(20)(A)(iii). *See* Findings 36–52, 138–47. Because the advertisements are recognizably sponsored by the parties, *see supra* note 41, it takes little for the public to conclude that candidates are directly benefitting from large donations to the parties. Moreover, the fact that the public neither distinguishes between "soft money" and "hard money," nor is knowledgeable of the restrictions on contributions,[82] does nothing to deter the inference that the special access and influence it perceives are accorded to the donors is in return for the plainly visible assistance the parties provide to candidates' campaigns. Given the high plausibility that federal candidates feel indebted to donors who fund, through the parties, Section 301(20)(A)(iii) communications of which they are the beneficiary, and the equally high plausibility that the public

perceives that the special access and influence it believes are accorded to these donors is in gratitude for that assistance, the evidentiary documentation more than adequately convinces me that an appearance of corruption has arisen from such arrangements. Simply stated, Congress has drawn a reasonable inference of the same based on substantial evidence.[83]

Moreover, any fear that Section 301(20)(A)(iii) is overbroad is cured by the accumulated effects of three circumstances. First, Section 301(20)(A)(iii) only regulates communications that are candidate specific, not issue specific, such that most genuine issue communications should not be subject to regulation. *See* Hearing Tr. (Dec. 4, 2002) at 17. Second, though there are some genuine issue advertisements that do specifically mention candidates,[84] the fact that the Section 301(20)(A)(iii) definition requires the communication to have language that "promotes or supports a candidate for that office, or attacks or opposes a candidate for that office" eviscerates any remaining overbreadth by focusing on advertisements that directly influence "a candidate for that office." Finally, the fact that the "speaker" running this type of advertisement is a national or state party also sup-

ron's Power in Washington, Wash. Post, December 25, 2001, at A01; R.G. Ratcliffe and Alan Bernstein, *Political Donors Have the Money, and Get the Time*, Houston Chron., May 23, 1999, at 1.

82. *See* Findings 264–67.

83. *Turner I*, 512 U.S. at 666, 114 S.Ct. 2445 (explaining that a court's role is to "assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence"). Though courts must "accord substantial deference to the predictive judgments of Congress," *Turner I*, 512 U.S. at 665, 114 S.Ct. 2445, it does not " 'foreclose our independent judgment of the facts bearing on an issue of constitutional law,' " *id.* at 666, 114 S.Ct. 2445 (quoting

*Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)).

84. For example, genuine issue advertisements include: (1) advertisements that support oppose officeholder-named legislation, like the McCain–Feingold bill, which is the common label for the legislation at issue here; (2) advertisements supporting or opposing legislation that simply ends with a call-to-action line asking the viewers to contact their congressional members to vote against or for a particular bill; or (3) even advertisements that criticize a certain political personality in order to energize the party's base on a particular issue, so long as those advertisements are not broadcast within the identified candidate's district or state.

ports the defendants' contention that most of the advertisements, referring to a candidate in this manner, will be intended to promote or attack that particular candidate.[85] A political party, as opposed to corporations and other nonparties, exists to a large extent for the purpose of electing candidates of its party to office.[86] In *Buckley*, the Supreme Court observed that expenditures by political parties, and other political committees with "the major purpose of which is the nomination and election of a candidate ... can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related." 424 U.S. at 79, 96 S.Ct. 612. In interpreting this language by the Supreme Court, the D.C. Circuit observed that "when an *organization* controlled by a candidate or the major purpose of which is election-related makes disbursements, those disbursements will presumptively be *expenditures* within the statutory definition." *Akins v. FEC,* 101 F.3d 731, 742 (en banc) (D.C.Cir.1996).[87] With this understanding of parties and other political committees, it is not surprising that the Supreme Court limited disclosure of expenditures by all other groups to express advocacy, but sanctioned disclosure of *all* expenditures by "political committees." *Buckley,* 424 U.S. at 49, 96 S.Ct. 612. While not all party advertisements are intended to *directly* influence a federal election (i.e., genuine issue advertisements), the presumptively electoralfocus of parties suggests that party communications that do mention candidates are, more likely than not, designed to have some impact on a federal election.[88] For these reasons, Section 301(20)(A)(iii) is closely drawn to serve the government's interest.

**85.** *See generally* Richard Briffault, *The Political Parties and Campaign Finance Reform,* 100 Colum. L.Rev. 620, 655–57 (2000).

**86.** *See* Finding 27; *see, e.g.,* Brister Decl. ¶ 4 ("The Republican Party of Louisiana's primary purpose is to help elect Republicans to office 'from the courthouse to the White House.' "); RNC Chairman Haley Barbour's Update to the Members of the Republican National Committee, August 7, 1996, at 3 (stating that "[t]he purpose of a political party is to elect its candidates to public office, and our first goal is to elect Bob Dole president ... Electing Dole is our highest priority, but it is not our only priority. Our goal is to increase our majorities in both houses of Congress and among governors and state legislatures"); *see also* Hastert Amicus Br. at 20 ("The very purpose of the National Republican Congressional Committee is to maintain Republican control of the House.").

**87.** *See also* Nelson Dep. at 191 (stating that the RNC engages in "issue advocacy in order to achieve one of our primary objectives, which is to get more Republicans elected").

**88.** It bears repeating: Even though donations to political parties may be used *presumptively* for the purpose of influencing a federal election, it is clearly not an irrebuttable presumption, such that all donations should be regulated. While the Court insinuated that Congress could require disclosures for all expenditures by political parties, *Buckley,* 424 U.S. at 79, 96 S.Ct. 612, there is a simple explanation for this outcome—the Constitution affords less protection to less offensive speech infringements, like disclosure requirements, than for more offensive infringements, like expenditure limitations. *Compare id.* at 39–51, 96 S.Ct. 612 (rejecting expenditure limitations, even those on express advocacy), *with id.* at 79–81, 96 S.Ct. 612 (upholding disclosure requirements for express advocacy); *see also* Post, *supra* note 60, at 1843 ("[T]he placement of a line between election speech and public discourse must be sensitive to the nature of the proposed regulation of election speech. Relatively more benign forms of regulation ... may constitutionally reach more deeply into the recesses of public discourse than more draconian requirements, like expenditure limitations."). Surely, the speech handicap imposed by contribution limitations, which simply requires that parties use hard money for certain activities, rests somewhere between that of expenditures limitations and disclosure requirements. *See, e.g., Buckley,* 424 U.S. at 20–23, 64–68, 96 S.Ct. 612; *see also Colorado I,* 518 U.S. at 611–26, 116 S.Ct. 2309 (rejecting expenditure limitation on political parties, even though parties are considered "political committees" that are subject to disclosure of *all* disbursements).

Even so, plaintiffs contend that Section 301(20)(A)(iii) is still defective because its definition of communications that must be funded with federal money is too vague to withstand constitutional scrutiny. They claim that words such as "promote," "oppose," "attack," and "support" are too vague to enable party officials to determine where the line between noncandidate advocacy (i.e., pure issue advertisements) and candidate advocacy lies. Like Section 201's fallback definition, *see* BCRA § 201(a); FECA § 304(f)(3)(A)(i); 2 U.S.C. § 434(f)(3)(A)(i), however, the definition of candidate advocacy in Section 301(20)(A)(iii) is not unconstitutionally vague because: (1) potential party speakers can simply avoid regulation by not identifying a candidate; (2) the formulation Congress chose to use—even for those not expert in the subtleties of campaign advocacy—is anchored in every day words that have to be linked to a specific candidate's election, or re-election, to a *particular office*; (3) to paraphrase defendant's counsel during oral argument, as long as the communication is not neutral—as to the candidate's election or defeat—it is covered by the definition, *see* Intervenors Opp'n Br. at 66; and (4) the opportunity to seek advisory opinions to clarify any ambiguity "mitigates whatever chill may be induced by the statute and argues against constitutional adjudication on a barren record," *see Martin Tractor Co. v. FEC*, 627 F.2d 375, 384–85 (D.C.Cir.1980); *see also*

*United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).[89] Indeed, Section 301(20)(A)(iii), as crafted, "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited," "provide[s] explicit standards for those who apply them," and where First Amendment rights are implicated, does not induce "citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)).

Even if the above factors were not enough to save Section 201 from a vagueness attack, those factors, combined with the identity of the speaker being restricted and the fact that it is a restriction on a contribution (as opposed to an expenditure), would still rescue Section 301(20)(A)(iii). Because political parties are sophisticated participants in the election arena, they are much more likely to recognize the line between candidate advocacy and genuine issue advocacy. *See Colorado II*, 533 U.S. at 453, 121 S.Ct. 2351 ("[T]he party marshals [the power to speak] with greater sophistication than individuals generally could.").[90] Political parties, more than others, are also more likely to assume the risk that they have crossed the line.[91] In short, the argument

---

**89.** When the *Buckley* Court found unconstitutionally vague FECA expenditure provisions, which involved different language, "the vast majority of individuals and groups subject to" the Act did "not have a right to obtain an advisory opinion," 424 U.S. at 41 n. 47, 96 S.Ct. 612. Subsequently, Congress amended the advisory provision to make it available to "any person." 2 U.S.C. § 437f(a)(1).

**90.** *See also* Richard Briffault, *Issue Advocacy: Redrawing the Elections/Politics Line*, 77 Tex. L.Rev. 1751, 1792 (1999) ("[A]s skilled cam-

paign professionals, the major political parties are in the best position to conform their activities to legal requirements.").

**91.** As Justice Holmes observed: "Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk." *United States v. Wurzbach*, 280

that Section 301(20)(A)(iii) is unconstitutionally vague rings hollow as it applies to parties who are experts in the business of discerning what combination of words and images help, or harm, candidates.[92]

Vagueness concerns are also less pronounced with regard to *contributions* than expenditures. When restrictions on expenditures are at issue, one must be concerned that if the potential speaker cannot discriminate between issue advocacy and candidate advocacy, then the speaker will shy away from speaking at all. The restrictions at issue here, however, only require that Section 301(20)(A)(iii) communications be funded with federal money, so if the political parties are afraid that a communication may promote or attack a candidate, they can simply resort to federal funds. In any event, if despite all of the mitigations, some slight potential for vagueness remains, "uncertainty at the periphery" does not render a provision unconstitutionally vague. *See FEC v. National Right to Work Comm.*, 459 U.S. 197, 211, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982).

In sum, Section 301(20)(A)(iii), in its application to Sections 323(a) and 323(b), is neither unconstitutionally vague, nor insufficiently tailored to serve the compelling government interest of combating the appearance of corruption. By seeking only to restrict donations that can give rise to actual or apparent corruption, it sweeps neither too far nor too near. To the extent that "issue ads" are about issues in fact, as well as in name, political parties are free to raise as much soft money as they like for such advertisements. In contrast, soft money donations to political parties used for communications that support or oppose a clearly identified candidate for federal office—that is, candidate advocacy—directly affect a federal election and give rise to an appearance of corruption that Congress has a substantial interest in combating. Such candidate advocacy must be funded with federal money.

A final note on Section 301(20)(A)(iii). Requiring parties to fund Section 301(20)(A)(iii) communications with federal money not only serves the government interest of preventing actual and apparent corruption, but also prevents circumvention of campaign laws and principles. *See NCPAC*, 470 U.S. at 500, 105 S.Ct. 1459 (noting the Court's "deference to a congressional determination of the need for a prophylactic rule").[93] Under Section 441b of FECA, corporations and unions are prohibited from using general treasury funds for independent expenditures expressly advocating the election or defeat of a particular federal candidate. 2 U.S.C. § 441b; *see also MCFL*, 479 U.S. at 241–64, 107 S.Ct. 616. If the backup definition of "electioneering communications" under Section 203 of BCRA is upheld, BCRA § 203(a); FECA §§ 316(a), (b)(2); 2 U.S.C. §§ 441b(a), (b)(2), corporations and

---

U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508 (1930).

**92.** That political parties are the speakers is also relevant because since most of their communications are election-based speech, especially those that identify candidates, there is less potential for chilling pure issue advocacy.

**93.** Title I does not, however, prevent circumvention of existing limitations on contributions to candidates in the manner set forth by the Supreme Court in *Buckley*, 424 U.S. at 38, 96 S.Ct. 612, and *Colorado II*, 533 U.S. at 456

n. 18, 121 S.Ct. 2351. Even before BCRA was enacted, because of existing party limitations on direct contributions to and coordinated expenditures on behalf of candidates, *see* 2 U.S.C. § 441a(d); *Colorado II*, 533 U.S. at 440–65, 121 S.Ct. 2351, donors could not use the parties to funnel large sums of money directly to candidates in the form of contributions. Thus, any reliance on the Supreme Court's anticircumvention rationale in *Buckley* and *Colorado II*, *see* J. Kollar–Kotelly Op. at Part III.II.B.2.a.iii, necessarily dictates a novel application of that precedent.

unions would be additionally prohibited from using their general treasuries to fund candidate advocacy pieces which promote, oppose, attack, or support federal candidates. BCRA § 201(a); FECA § 304(f)(3)(A)(ii); 2 U.S.C. § 434(f)(3)(A)(ii). Most of the largest nonfederal money contributions to parties are by corporations and unions. *See supra* note 77. Thus, if national and state parties were allowed to spend unlimited amounts of nonfederal money on candidate advocacy, corporations and unions could largely circumvent the new BCRA Section 203 by funneling unlimited funds through political parties to pay for advertisements that they are now prohibited from broadcasting under Section 441b of FECA. To allow such a circumvention in that manner would be ludicrous. Finally, to permit national (or state or local) parties to *convert* nonfederal donations, whether from the general treasuries of corporations and unions, or from wealthy individuals and *MCFL* groups, to the federal purpose of directly influencing a federal election through candidate advocacy of the type defined in Section 301(20)(A)(iii) is, in and of itself, a direct circumvention of a fundamental premise of the FECA regulatory scheme relating to donations, blessed by the Supreme Court in *Buckley* and its progeny: *only federal money may be used to directly influence a federal election.* As long as the *Buckley* line of cases remains the law, it would make a mockery of those Supreme Court cases and the current regulatory scheme to allow political parties to use soft money to engage in what Justice Kennedy has aptly described as "covert advocacy." *Shrink Missouri*, 528 U.S. at 406, 407, 120 S.Ct. 897 (Kennedy, J., dissenting).

## C. New FECA Section 323(d): Nonfederal Fund Restrictions on Tax–Exempt Organizations

Section 323(d) prohibits national, state, and local parties from donating either soft or hard money to, or soliciting for, either: (1) a Section 527 organization; or (2) a Section 501(c) organization if that organization makes expenditures in connection with a federal election, including expenditures for "federal election activity" as defined in Section 301(20)(A). BCRA § 101(a); FECA § 323(d); 2 U.S.C. § 441i(d). Judge Henderson strikes down the entire section as unconstitutional. I concur in her judgment, but for different reasons.

First, I would note that the defendants argue that the donation and solicitation restrictions should be reviewed under closely-drawn scrutiny. *See* Intervenors Opp'n Br. at 21–23. While I agree with the defendants that *Buckley's* closely-drawn scrutiny should apply to donation limitations to organizations as well as candidates, it is less clear which scrutiny should apply to the solicitation restriction. *See* J. Henderson Op. at Part IV.D.4. However, if the restriction on solicitation cannot even withstand closely-drawn scrutiny, there is no need to choose between the standards of review. *Cf. Blount v. S.E.C.*, 61 F.3d 938, 942–43 (D.C.Cir.1995).

As to the statute itself, Section 323(d) prevents national parties from donating *any* funds to certain Section 501(c) organizations. This complete ban on donations infringes the various parties' abilities to effectuate their members voices, and because it is not even closely drawn to serve a sufficient government interest, it cannot withstand scrutiny. Section 323(d) is not closely drawn as to Section 501(c) organizations because it prohibits solicitation for and donations to those organizations merely because they have made, in effect, expenditures for federal purposes in the past, and *regardless* of whether those donations will be used again for that very purpose. By not specifying the purpose for which the money will be put, Congress, in effect, is prohibiting solicitation for and

donations to these Section 501(c) organizations that might in turn be used for *nonfederal or mixed* purposes. Congress, of course, can only do this if it could show that a sufficient government interest was being served by doing so. It has not. As discussed at length earlier, the only restrictions on uses of nonfederal funds that can be constitutionally regulated are uses that *directly affect a federal election. See supra* Parts I.A.2 & I.B.2. Any other use of the donation is too tangential to give rise to the risk of corruption, or appearance of corruption, that is necessary to warrant this congressional infringement on First Amendment rights. To say the least, the defendants have not produced sufficient evidence to demonstrate that an appearance of corruption, let alone corruption itself, arises when organizations of this type use donations from national, state, and local parties for nonfederal or mixed purposes.

Section 323(d) is also constitutionally problematic as a result of its treatment of Section 527 organizations. Section 527 organizations, according to the applicable IRS definition, exist, in part, to influence the selection, nomination, election, or appointment of individuals to state and local public offices, as well as to various political organizations. 26 U.S.C. §§ 527(e)(1) and (2). Accordingly, since Section 527 organizations could expend the solicited or donated funds for one of these nonfederal or mixed purposes,[94] the blanket prohibition in Section 323(d) on national, state, and local parties from assisting them in this

manner is similarly not closely drawn. Perhaps if Congress had structured Section 323(d) like Section 323(b) and prohibited these organizations from using nonfederal funds—which they had received from national, state, and local parties—to directly affect federal elections, it might have been able to demonstrate that the restriction was closely drawn to serve the sufficient government interest required under any standard of review to justify these infringements. But it did not. Therefore, for all of the above reasons, I conclude that Section 323(d) is unconstitutionally overbroad.

**D. New FECA Section 323(e): Nonfederal Fund Restrictions on Federal Candidates**

Judge Henderson and Judge Kollar–Kotelly uphold Section 323(e) in its entirety. While I concur to the extent that this section prohibits federal officeholders and candidates from receiving, directing, transferring, or spending any nonfederal funds in connection with any election, including the kind of election activity defined in Section 301(20)(A),[95] I dissent with regard to the prohibition on a federal candidate, or officeholder, from soliciting funds for the benefit of his national party, especially since Congress can and has legally prohibited the parties (national, state, and local) from using nonfederal funds to directly influence federal elections. Accordingly, I am writing separately to dissent in part from, and concur in part in, their opinions.

With regard to the First Amendment rights of federal candidates and office-

---

**94.** For example, the California Republican Party funds Section 527 organizations to engage in voter registration activities in its Operation Bounty program. *See* Erwin Aff. ¶ 9.

**95.** Soft money donations to federal candidates, regardless of whether they are used for nonfederal purposes by the candidates thereafter, can give rise to actual or apparent corruption, especially if the donation is of any

magnitude. In those circumstances, it is natural for the public to presume that the donation will either be used to help the federal candidate get elected or in some other way that directly enures for his/her benefit. Either way, the perception of a personal gain, and the sense of indebtedness that follows therefrom, justly warrants Congress's regulation.

holders to solicit soft money funds for the use of their parties, I would dissent principally on the basis that the defendants have failed to demonstrate that soliciting nonfederal funds to be used by parties for purposes that, at most, indirectly affect federal elections is regulable by Congress. For example, donations used for such activities as party building, newsletters, genuine issue advocacy, and generic voter mobilization so *indirectly* affect federal elections, if at all, that they do not give rise to the minimally necessary appearance of corruption to warrant congressional intervention.

Indeed, soliciting donations to be used for the national party on such mixed (and/or nonfederal) purposes is the kind of conduct by officeholders which the public not only would expect them to participate in, but which is fundamental to the successful operation of the major national parties. To the extent that helping their parties in this way provides officeholders with some added status among other party officials, in my judgment, is too attenuated a benefit to give rise to the appearance of corruption necessary to warrant congressional intervention. *See supra* Part I.A.3. Accordingly, I concur in part in, and dissent in part from, the holding of my colleagues.

### E. New FECA Section 323(f): Nonfederal Fund Restrictions on State Candidates

 Section 323(f) prohibits state candidates from spending funds for a communication of the type discussed in Section 301(20)(A)(iii) unless the funds are subject to the limitation, prohibitions, and reporting requirements of FECA (i.e., hard money). Restricting the use of soft money by state candidates for communications that directly affect federal elections is, of course, consistent with my preceding discussion of the constitutionality of Section 301(20)(A)(iii). By placing this restriction on state candidates Congress is simply guarding against. similar conversions of soft money donations to fund communications that are designed to accomplish the federal purpose of directly influencing a federal election. Since this section is closely drawn to uses of soft money by state candidates exclusively for that purpose, I similarly uphold its constitutionality.

### II. Title II: Noncandidate Campaign Expenditures Sections 201, 204, 213

I join with Judge Henderson, but for different reasons, in holding that the primary definition of electioneering communications set forth in Section 201 is unconstitutional. I do not, however, join in her holding that the backup definition also provided in Section 201 is unconstitutional.

To the contrary, I uphold the backup definition's constitutionality, as does Judge Kollar–Kotelly who joins in my opinion as a necessary alternative to Judge Henderson's and my finding the primary definition unconstitutional. The following are my reasons for rejecting the primary definition and upholding the backup definition.

### A. Section 201: The Primary Definition

Title II of BCRA is Congress's attempt to close certain loopholes in FECA and to regulate certain conduct arising from the use, both directly and indirectly, of corporate and union treasury funds to finance electioneering communications that directly affect federal elections, even though masquerading otherwise as "pure issue advocacy." Because, in part, Judge Henderson believes that *Buckley* and its progeny set forth a bright line test requiring the presence of certain "magic words" advocating the election or defeat of a federal candidate in order for this advocacy to

be regulable by Congress, she strikes down both the primary and backup definitions.[96] Judge Kollar–Kotelly and I disagree with this reasoning, and I join in the portion of her opinion analyzing why the Supreme Court never intended the so-called express advocacy test to be a constitutional rule of law limiting the power of Congress to regulate expenditures for certain uncoordinated advocacy that directly affects federal elections, notwithstanding the absence of these words.[97]

While Judge Kollar–Kotelly and I agree regarding Congress's power to regulate the source of the funds used for these communications and the disclosures that donors must file, I do not agree that the primary definition, as crafted by Congress, is sufficiently tailored to regulate the electioneering advocacy it seeks to cover. To the contrary, the primary definition, which regulates communications referring to clearly identified federal candidates based upon when and where they are broadcast, rather than their effect on federal elections, sweeps so broadly that it captures too much First Amendment protected speech that Congress, in the absence of a demonstrated compelling government interest, has no power to regulate. What type of speech is that?

The plaintiffs have clearly demonstrated that corporations, interest groups, labor unions and other entities air genuine issue advertisements in the periods immediately preceding general and primary elections, the sole purpose of which is educating the viewers about an upcoming vote on pending legislation, and encouraging them to inform their elected representative to vote for or against the bill (i.e., legislation-centered advertisements). Edward Monroe, Director of Political Affairs for Associated Builders and Contractors ("ABC"), explained that "serious legislative initiatives or regulatory proposals often are considered near the time of elections." Monroe Decl. ¶¶ 18–19. Laura Murphy, legislative director for the ACLU, seconds this: "[The] 60 days before a general election and 30 days before a primary ... are often periods of intense legislative activity. During election years, the candidates stake out positions on virtually all of the controversial issues of the day. Much of the debate occurs against the backdrop of pending legislative action or executive branch initiatives." Murphy Decl. ¶ 12. *See also* Mann Cross Exam. at 176 (explaining that a flurry of legislative activity occurs near the end of a congressional session, therefore, often within the 60 day period preceding a general election); Finding 359.[98]

Notwithstanding defendants' expert testimony to the contrary,[99] interest groups

---

96. *See* J. Henderson Op. at Part IV.A.

97. *See* J. Kollar–Kotelly Op. at Part III.I.C.1 & Part III.I.C.2.

98. For example, last fall alone, in the period immediately preceding the 2002 congressional election, Congress considered the following important, and controversial, pieces of legislation: a resolution authorizing the use of armed force against Iraq, (H.J.Res.114, 107th Cong.); an election reform bill to update ballot machines and provide greater access to individuals with disabilities to polling places (H.R.3295, 107th Cong.); legislation to establish the Department of Homeland Security (H.R.5710, 107th Cong.); and various appropriations bills for federal departments, including the Departments of Defense, Justice, and State. While last fall's legislative calendar may not be typical, it nevertheless illustrates BCRA's potential impact on genuine issue advocacy. Murphy Decl. ¶ 12 ("Some of the President's or Attorney General's boldest initiatives are advanced during election years—often within 60 days of a general election. This year, for instance, legislation creating a new federal department of Homeland Security is under consideration during this pre-election period.").

99. *See* Finding 359 n. 224.

believe, and plaintiffs expert agrees,[100] that the periods immediately preceding elections are the most effective times to run issue advertisements discussing pending legislation because the public's interest in policy is at its peak.[101] Edward Monroe of ABC explains that "it is ... clear that members of the public are generally more receptive to and engaged in considering government policy ideas and issues as elections near. If that is the time when people will listen, that is the time to speak. And once an election occurs, there seems to be a period of fatigue during which political matters are of less interest, making issue ads then less effective." Monroe Decl. ¶¶ 18–19; see also Finding 359. Likewise, Paul Huard, Senior Vice President for Finance and Administration for the National Association of Manufacturers ("NAM"), finds that "Americans tend to have greater interest in political matters as an election approaches. At the same time, elected officials are most attuned to the views of their constituents in the pre-election period. Thus, for many purposes, the pre-election season is a critical time for issue ads." Huard Decl. ¶ 10; see also Finding 359.

The mere fact that these issue advertisements mention the name of a candidate (i.e., the elected representative in whose district the advertisement ran) does not necessarily indicate, let alone prove, that the advertisement is designed for electioneering purposes. To the contrary, the testimony of various plaintiffs' witnesses indicates that, in their experience, there are many reasons why it is helpful, if not necessary, to mention a candidate's name in these advertisements in order to focus the public's attention on a particular pending piece of legislation. For example, Paul

Huard of NAM states "[t]here are many reasons that an issue ad may need to refer to the name of an elected official or candidate. Many bills are identified with particular sponsors and may be known by the sponsors' names. Also, both incumbents and candidates may be prominent people whose support or opposition to a bill or policy may have important persuasive effect.... Also, if an issue ad is used to explain why a legislative position of a particular Member of Congress is good for his or her district or state, the member generally must be mentioned. The same is true if the purpose of the ad may be to induce viewers to contact the Member and communicate a policy position." Huard Decl. ¶ 12 (emphasis added); see also Finding 293. Similarly, Denise Mitchell, Special Assistant for Public Affairs to the AFL–CIO, concurred, explaining that it is often necessary to refer to a federal candidate by name because "[t]he express or implied urging of viewers or listeners to contact the policymaker regarding [an] issue is ... especially effective by showing them how they can personally impact the issue debate in question." Mitchell Decl. ¶ 11; see also Finding 293. A quick review of a classic example of a legislation-centered genuine issue advertisement demonstrates these points.

In 1998, the AFL–CIO aired an advertisement entitled "Barker." The advertisement referred to a federal candidate by name only in the call-to-action line at the end of the advertisement where it urged viewers to call their Member of Congress and express their position regarding the pending Fast Track trade legislation. The legislation was scheduled for a vote in the House of Representatives on September 25, 1998—within 60 days of the general

**100.** *See* Finding 358 (statement of Dr. Gibson, rejecting the defendants' argument that it is unproductive to run legislation-centered issue

advertisements focusing on policy matters in the periods before elections).

**101.** *See* Findings 358–60.

election. The text of the advertisement is as follows: [102]

> Paid for by the Working Men and Women of the AFL–CIO. [Barker speaking]: Okay ladies and gents, step right up and see if you can follow the ball. Is it here? Is it there? Where could it be? [Voice over]: They're playing games again in Washington. Without discussion or debate, they're planning another vote on the controversial Fast Track law—special powers to ram through trade deals like NAFTA. Fast Track failed *last* year because working families don't want more trade deals that put big corporations first; deals that ignore our concerns about lost jobs; environmental problems on our borders, and dangerous, imported foods. But Newt Gingrich and the sponsors of Fast Track hope they can sneak it by this fall, while public attention is focused on other issues. [Barker speaking]: Keep your eyes on the ball now … [Voice over]: Call Representative _____ at xxx-xxx-xxxx and tell him to vote *no* on Fast Track. Tell him we're still paying attention. And Fast Track is *still* a bad idea.

Mitchell Decl. Exhibit 116, Exhibit 1 at 86. Defendants' own expert, David Magleby, who stated in his report that he would "presume" an advertisement is electioneering merely because it mentions a federal candidate by name,[103] candidly admitted after reviewing "Barker" that such an advertisement is a "genuine" issue advertisement. He concluded as such—even though it mentions a federal candidate's name—because "[t]he body of the ad has no referent to [a candidate] whatsoever.

The only referent to [the candidate] is the call line." Magleby Cross Exam. at 104.

> [A] generic call your Congressman, call your Senator, when then linked to a legislation and call your Congressman or Senator about this legislation without a referent to their position on the issue, seems to me substantively different than when they are mentioned in view of what their position is on that issue. Q. When you say substantively different, are you referring to a difference with respect to whether the advertisement communicates an electioneering message? A. Yes.

Magleby Cross Exam. at 106.

Because genuine issue advertisements, like "Barker," have been, and will need to be, aired during periods of legislative activity leading up to elections, plaintiffs contend the primary definition, if upheld, will capture them as "electioneering communications." [104] As such, they will be subjected to a host of limitations and regulations which, according to the plaintiffs, will limit and chill their ability to engage in First Amendment protected speech. I agree.

The crux of the problem with the primary definition is that, unlike the backup definition, it does not depend on the effect of the communication's message on a candidate's election. As such, many genuine issue ads, like "Barker," will be treated the same as the sham "issue" ads Congress supposedly was intending to regulate. It is the absence of a link between the advocacy of an issue and a candidate's fitness, or lack thereof, for election that renders congressional intervention with respect to

---

**102.** The advertisement aired in the districts of Congressman Chris John (LA–07); Congressman Scott Klug (WI–02); Congresswoman Jo Ann Emerson (MO–08); Congresswoman Anne Northup (KY–03); Congressman Jack Kingston (GA–01); and Congressman Rick White (WA–01), and referred to those federal candidates by name. *See* Finding 368.

**103.** *See* Finding 290 (discussing the indicia of electioneering advertisements).

**104.** McConnell Opening Br. at 65 (arguing generally that genuine issue advocacy will be regulated by BCRA); NRA Opening Br. at 26.

genuine issue ads of this type unconstitutional. Notwithstanding the absence of this link, defendants contend, and Judge Kollar–Kotelly agrees, that the evidence sufficiently demonstrates that even though some genuine issue advertisements that run in the months leading up to an election will be swept in under this definition, it is too insufficient a number to render the primary definition constitutionally defective. I disagree.

The plaintiffs have met their burden in this facial challenge because they have shown that BCRA's primary definition "reaches a *substantial amount* of constitutionally protected conduct." *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)) (emphasis added). Plaintiffs, in short, have demonstrated from the statute's "text ... and from actual fact that a *substantial number of instances* exist in which the [l]aw cannot be applied constitutionally." *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (emphasis added). These instances are not merely " 'some' overbreadth," *Ashcroft v. ACLU*, 535 U.S. 564, 584, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (quoting *Reno v. ACLU*, 521 U.S. 844, 896, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)), or a "single" or "bare possibility" of an impermissible application. *Members of City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 n. 19, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (Brennan, J., dissenting)). Instead, the plaintiffs have shown, as the Supreme Court aptly put it in *Vincent*, that BCRA presents "a *realistic danger* that the statute will *significantly compromise* recognized First Amendment protections of parties not before the Court." *Id.* at 800–801, 104 S.Ct. 2118.

The evidentiary basis of both the plaintiffs' and defendants' arguments concerning the primary definition's overbreadth is the *Buying Time 1998* and *Buying Time 2000* studies. While the defendants correctly contend that plaintiffs carry the burden to show that BCRA is substantially overbroad,[105] the studies defendants rely upon to show that it is narrowly tailored[106] are, in essence, a highly controversial "survey" of the ads run in the months leading up to the 1998 and 2000 elections. Judge Henderson correctly notes in her opinion, see J. Henderson Op. Part IV.A, that the parties "quarrel at length" regarding the significance of the *Buying Time* studies and, in particular, its conclusions regarding the percentage of genuine issue advocacy that would be improperly regulated by Section 201 of BCRA. Unlike Judge Henderson, I believe that the *Buying Time* studies are entitled to some evidentiary weight.[107]

---

**105.** Gov't Opening Br. at 159; Gov't Opp'n Br. at 68.

**106.** The definition itself—a content-indifferent definition based on time and location alone— is a novel approach to regulating campaign speech. *See* Richard L. Hasen, *Measuring Overbreadth: Using Empirical Evidence to Determine the Constitutionality of Campaign Finance Laws Targeting Sham Issue Advocacy,* 85 Minn. L.Rev. 1773, 1777–78 (2001) (drawing a distinction between " 'intent tests,' " like the backup definition, that usually require a "factfinder to determine whether the person or group sponsoring the advertisement intended to influence the outcome of an election," and the " 'bright line' " tests which "attempt to regulate all advertisements that meet certain objective criteria.").

**107.** Judge Henderson accords no evidentiary weight to the *Buying Time* studies. *See* J. Henderson Op. at Part III.B.2 & Part IV.A. See also Findings 322–33 and 344–48 for a discussion of how the criticisms of the *Buying Time* studies do not preclude this Court from relying on those studies for the purposes of this litigation.

However, I do not believe that the studies' statistical conclusions are the last word in this Court's analysis of whether or not the primary definition is overbroad. With the respect to the percentage of protected, political speech that is, or will be, regulated by BCRA, it is, of course, impossible to quantify the exact percentage with absolute certainty. *See New York v. Ferber*, 458 U.S. 747, 773, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (explaining that "[h]ow often, if ever" the statute at issue in *Ferber* would regulate protected speech "cannot be known with certainty. Yet we seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach."). Thus, it is important not to overstate the significance of the *Buying Time* studies when using them as the basis of a finding of unconstitutional overbreadth. After all, the studies did not analyze every advertisement that ran in every market during the 1998 and 2000 elections. Instead, they analyzed the top 75 media markets, encompassing eighty percent of the advertisements runs during those elections. *See* Findings 315–17. I do not state this fact to suggest that every ad had to be reviewed before the studies could be deemed credible, rather, that the percentages produced by the studies may, in fact, be an overstatement, or understatement, of the statute's overbreadth. *See* Findings 317–18. In addition, I would note that the *Buying Time 2000* study did not analyze advertisements run in the 30 days preceding a primary or preference

election, even though such ads aired during that period are entirely regulable by BCRA's primary definition. *See* Finding 316.

Furthermore, this Court, in my judgment, cannot rely upon the results of the two, *Buying Time* studies without analyzing, to some extent, the parties' dispute regarding the formulas used to produce those results. The defendants favor the formula used in the 1998 study,[108] which compares the total number of genuine issue ads regulated by BCRA to the total number of genuine issue ads run in a calendar year. *See* Findings 335, 336, 337. The result is the percentage of all genuine issue advocacy that would have been regulated by BCRA in the course of that year. The plaintiffs, however, contend that the 1998 formula misstates BCRA's impact because it includes ads that were run *outside* the 60–day period preceding a general election, and therefore would not have been subject to regulation under the primary definition. *See* Findings 336, 338. According to the plaintiffs, the formula applied in the *Buying Time 2000* study more accurately reflects BCRA's impact by focusing on the exact period of time regulated by BCRA: the 60 days preceding a general election.[109] Looking at ads aired only during that 60–day period, the 2000 formula compares the number of genuine issue ads to the total number of ads, thereby calculating the percentage of all ads that would have been regulated by BCRA that were genuine issue ads.[110]

**108.** Gov't Opp'n Br. at 74. Defendants argue that the 1998 formula best "measures the impact of BCRA on the universe of genuine issue ads aired in any particular calendar year and, thus, answers the critical question at the heart of any analysis of BCRA's potential overbreadth, i.e., the amount of genuine issue advocacy that BCRA would subject to regulation." Gov't Reply Br. at 72.

**109.** McConnell Opening Br. at 67; McConnell Reply Br. at 35–36 (offering an analogy to explain the methodology of the two formulas).

**110.** Gov't Opp'n Br. at 73 (explaining the 2000 formula); *see also* Finding 338.

As the Supreme Court in *Broadrick v. Oklahoma* stated that a statute's overbreadth must be "judged in relation to the statute's plainly legitimate sweep," I find that the 2000 formula more accurately measures BCRA's impact. 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The results produced by the 1998 formula do not assist this Court in comparing BCRA's overbreadth to its "plainly legitimate sweep," because it measures ads that never would have been regulated by BCRA.[111] While the 1998 formula shows BCRA's impact on all genuine issue advocacy over the course of a calendar year, that information is of limited value when BCRA's primary definition applies only in the 30 days preceding a primary election and the 60 days before a general election.[112]

Applying the 2000 formula to the data collected during the 1998 and 2000 studies shows that the primary definition's overbreadth is neither speculative nor hypothetical, but real and substantial. In 1998, of the ads that met BCRA's primary definition and were aired in the 60 days preceding a general election, 14.7 percent were genuine issue advocacy. *See* Finding 339. As to 2000, however, the *Buying Time* 2000 study concluded that figure was only 2.33 percent. *See* Finding 357. That percentage, however, was later increased by Professor Goldstein, who compiled the data base that served as the foundation of the *Buying Time* studies. Professor Goldstein testified on cross examination that he had reevaluated the results of the study for the purposes of this litigation and concluded that, in fact, 17 percent of the ads that met BCRA's primary definition and were aired in the 60 days preceding the 2000 general election were genuine issue advocacy. *See* Finding 357; *see also* Goldstein Cross Exam. at 160, 169; McConnell Reply Br. at 36–37. Percentage discrepancies aside, I find that 14.7 percent and 17 percent of the ads run in the months leading up to the 1998 and 2000 elections, respectively, represents a "substantial amount" of protected speech and renders the primary definition defective as constitutionally overbroad.

But these statistics, alone, do not present the full picture of BCRA's impact on genuine issue advocacy in the 60 days preceding a general election. Indeed, determining whether BCRA's primary definition reaches a substantial amount of constitutionally protected issue advocacy is not simply a function of calculating the percentage of pure issue ads that would have been captured by that definition during the 60–day period preceding the 1998 and 2000 federal elections. Because the total amount of issue advocacy likely to be generated in any given election year is a function of both the quantity and nature of the issues Congress chooses to address in that pre-election period, those numbers should not be viewed in a legislative vacuum. Ideally, this court should additionally assess whether the legislative agendas in 1998 and 2000 were unusually active, controversial or both. Regrettably, however, the record does not lend itself to such an analysis. Obviously, the more active and/or controversial the legislative schedule, the greater (or lesser) the amount of issue advocacy one would expect it to have generated. Simply put, the amount of pure issue advocacy captured in a particularly contentious, or active, legislative period, is likely to be higher than that captured in a slow, or

---

111. *See* Finding 336.

112. *See* Lupia Rebuttal Report at 25. Defendants' expert, Dr. Arthur Lupia, concludes that while either formula is reasonable, the 2000 formula "could provide information about the impact during a particular time period," that is, the 60–day period in when BCRA applies. *See also* Finding 340.

routine, legislative period. Furthermore, restricting 14.7 percent of genuine issue advocacy in 1998 would have restricted otherwise protected speech that would have been seen in 30 million American homes, a number that brings into sharp relief the effect BCRA will have on the amount of information available to voters. *See* Finding 335. Accordingly, for the reasons stated previously, there is reason to believe that the amount of issue advocacy likely to be generated in future election cycles will be at least as substantial as it was during those years.

Ever mindful that overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908, I do not lightly find that the primary definition of electioneering communications is substantially overbroad. However, the realistic danger that the primary definition of electioneering communications will significantly compromise genuine issue advocacy necessitates such a finding. In circumstances such as these, "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (quoting *Broadrick*, 413 U.S. at 612, 93 S.Ct. 2908). I therefore find that the primary definition of electioneering communications is unconstitutionally overbroad.

I do not, however, join in Judge Henderson's conclusion that both the primary and backup definitions of electioneering communications are unconstitutional due to underinclusion. Plaintiffs argue, and Judge Henderson agrees, that Section 201 must fail because it regulates only broadcast and cable communications, but does not regulate other mediums of communication such as print, direct mail, and the internet.[113] I disagree and join Judge Kollar–Kotelly's analysis on that issue. *See* J. Kollar–Kotelly Op. at Part III.I.F. However, one point bears emphasizing: Congress is infinitely more familiar than this Court with the circumstances and practical ramifications surrounding federal elections and campaign finance laws. The record thoroughly, and convincingly, demonstrates that Congress's decision to regulate broadcast communications, rather than other forms of communication, was well justified. Congress, as defendants argue, "need not regulate the entire universe of activity intended to influence federal elections" in order to constitutionally regulate electioneering communications. Gov't Opp'n Br. at 96. As Congress, in its expertise, has made this judgment and the record "demonstrates that the recited harms [justifying a statute] are real," plaintiffs' argument that the statute is unconstitutional for underinclusion is unavailing. *Turner I*, 512 U.S. at 664, 114 S.Ct. 2445.

**B. Section 201: The Backup Definition**

 Unlike the primary definition, the backup requires as a link between the identified federal candidate and his election to that office, certain language the purpose of which is advocacy either for, or against, the candidate. For the same reasons that the absence of that link doomed the primary definition, it sustains the backup.

Congress concluded, and the record more than adequately demonstrates, that in the twenty-eight years since *Buckley*, corporations, unions, and interest groups, have increasingly affected federal elections by funding out of their general treasuries uncoordinated "issue ads" that either they, or a political party, ran in the months leading up to an election. *See* Findings

---

**113.** *See* McConnell Opening Br. at 75–77; J. Henderson Op. at Part IV.A.

280–84, 296–301; *see also* Annenberg Study at 1, 4, 3, 7–8 (showing that the number of issue advertisements has increased, as well as the number of groups airing them, from 1996 to 1998, and that corporations, interest groups, and unions began in 1996 to actively use treasury funds to sponsor issue advertisements that "looked and sounded like campaign ads."). In order to avoid regulation as express advocacy, those so-called "issue advertisements" did not contain certain "magic words" designed to support or oppose a specific candidate's election or re-election.[114] The ads, however, were constructed in such a way that they simultaneously presented their sponsors' stand on an issue, identified a specific candidate's positions or track record thereon, and under the guise of admonishing the viewer to inform the candidate of his view, suggested that a candidate who takes (or has taken) the candidate's position should (or should not) be elected to that office. Ads such as these have been typically described as "sham issue advertisements,"[115] or candidate-centered advertisements, and the factual record unequivocally establishes that they have not only been crafted for the specific purpose of directly affecting federal elections, but have been very successful in doing just that. *See* Findings 273–74. Indeed, they have been so successful that it is widely believed in the industry that old fashioned express advocacy of the "magic words" type is far less effective in winning over a viewer's vote. *See* Findings 273–74, 279; *see also* Bailey Decl. ¶¶ 1–2 (stating that "it is rarely advisable to use such words as 'vote for' or 'vote against.' ").

Defendants contend that because these sham issue ads, in essence, directly affect federal elections, candidates are "beholden" to those who fund them.[116] It is that indebtedness, according to the defendants, that if left unregulated, will undermine the public's confidence in the integrity and fairness of our electoral process in the same way that unregulated express advocacy otherwise would, and thereby give rise to corruption or the appearance of corruption. *See* Mellman and Wirthlin at 9–10.[117] For essentially the same reasons that I uphold Congress's definition of federal election activity in Section 301(20)(A)(iii), *see supra* Part I.B.2, I believe that large soft money expenditures to fund this type of covert advocacy, regardless of whether corporations, labor unions, and interest groups produce them themselves, give rise to a public perception that the candidate is being directly benefitted and will naturally reciprocate with either favored access, or increased legislative influence, or both. *See id.* Accordingly, the source of the funds used and the identity

**114.** *See* Krasno & Sorauf Expert Report at 53; Goldstein Report at 10, 16, 31 (noting that in the 1998 election cycle, only four percent of ads sponsored by candidates or parties used words of express advocacy, and in 1996 through 2000, FECA did not regulate a majority of ads aired by interest groups: for every interest group ad regulated by FECA in 2000, twenty ads that mentioned federal candidates were not covered). *See also* Finding 272.

**115.** The ads have also been described as "electioneering ads" or "issue ads." *See* Findings 288–89.

**116.** Intervenors Opening Br. at 108; *see generally* Gov't Opening Br. at 142–46; Intervenors Opening Br. at 104–109.

**117.** The Mellman and Wirthlin poll, which was conducted from August through September 2002, showed that 80 percent of those polled believed a Member of Congress would be likely to give special consideration to a group that had run issue ads on his or her behalf. Mellman and Wirthlin concluded that "Americans see very little difference between the influence of a soft money donation to a political party and the funding of political ads on television and radio." Mellman & Wirthlin Report at 9.

of the sponsors are both, in my judgment, regulable by Congress.

Plaintiffs raise a number of arguments as to why the backup definition of electioneering communications is "impermissibly vague." McConnell Opening Br. at 70. First, they claim that "reasonable people can, and emphatically do, disagree about whether virtually any particular advertisement meets the criteria of BCRA's fallback definition." *Id.* As proof of the definition's vagueness, plaintiffs offer the deposition testimony of one of BCRA's sponsors and one of defendants' expert witnesses, in which they disagree about whether a particular ad is a genuine issue ad, or whether it promotes or supports a particular candidate.[118] Plaintiffs also offer testimony of two Members of Congress, in which one concludes that a particular ad supports a candidate, while the other concludes that the same ad attacks the candidate.[119] While BCRA's sponsors may disagree about the purpose and effect of an ad, that fact alone does not demonstrate unconstitutional vagueness. Perfect clarity, of course, is not required when a law regulates speech. As the Supreme Court said in *Grayned,* "we can never expect mathematical certainty from our language." 408 U.S. at 110, 92 S.Ct. 2294 (1972). For this reason, the Supreme Court has held that a statute's vagueness exceeds constitutional bounds only when "its deterrent effect on legitimate expression is ... both 'real and substantial' and ... the statute is [not] readily subject to a narrowing construction by state courts." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125

(1975)) (emphasis added). Moreover, if a statute "gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited," it is not void for vagueness. *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294.

Next, plaintiffs contend that the definition's use of the words "promote," "support," "attack," and "oppose" to define the sponsor's message causes it to be unconstitutionally vague.[120] I disagree. The backup definition's language, specifically those words, is not void for vagueness because a person of ordinary intelligence would understand what is prohibited. *See Grayned,* 408 U.S. at 108, 92 S.Ct. 2294. Indeed, one need only conclude, in effect, that the ad is *not* neutral as to both candidates for it to have satisfied the backup definition, and thereby have satisfied the objective First Amendment standard that a reasonable person considering the context and nature of the expression at issue is able to evaluate the speech. Such objective tests have routinely been applied in the First Amendment context. *See, e.g., County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (religious expression); *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (fighting words); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscenity); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (fighting words). For example, the following advertisement entitled "No Two Way" and sponsored by the AFL–CIO is not neutral as to a federal candidate, as it attacks his or her position on the federal budget. Mitchell Decl. ¶ 41. While former Congresswoman Andrea

---

118. *See* McConnell Opening Br. at 73 (discussing Senator John McCain's opinion that a particular issue ad was a "sham" ad, while Dr. Holman, an expert witness, believed the ad was genuine issue advocacy).

119. *See id.* at 72 (discussing deposition testimony of Senator Feingold and Representative Meehan).

120. *See* McConnell Opening Br. at 70–75.

Seastrand is named, this advertisement also ran in thirty-five other congressional districts, naming federal candidates from those districts.

> CAROLYN: My husband and I both work. And next year, we'll have two children in college. And it will be very hard to put them through, even with the two incomes. [Announcer]: Working families are struggling. But Congress-woman Andrea Seastrand voted with Newt Gingrich to cut college loans, while giving tax breaks to the wealthy. She even voted to eliminate the Department of Education. Congress will vote again on the budget. Tell Seastrand, don't write off our children's future. CARO-LYN: Tell her, her priorities are all wrong.

Mitchell Decl. Exhibit 114. Congress is not, and should not be, constitutionally confined to "bright line" tests such as the primary definition or the "magic words" formulation in enacting campaign finance restrictions. A person of ordinary intelligence can be expected to understand this test, and know what is prohibited.

▆▆▆ However, while I do not believe that the words used to define the message are vague, I *do* believe that the backup definition's final clause, which requires the message to be "suggestive of no plausible meaning other than an exhortation to vote," is unconstitutionally vague. In my judgment, it is extremely difficult, if not impossible, for a speaker to determine with any certainty *prior to* airing an ad that it meets that requirement. Whether an ad is suggestive of no plausible meaning other than an exhortation to vote depends on a number of variables such as the context of the campaign, the issues that are the centerpiece of the campaign, the timing of the ad, and the issues with which the candidates are identified.[121] The "uncertain meaning[ ]" of this phrase in the

backup definition will, as the Supreme Court stated in *Grayned,* "inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas are clearly marked." 408 U.S. at 109, 92 S.Ct. 2294. The chilling effect of this language does not doom the backup definition as unconstitutionally vague, however, because it is susceptible to a saving construction. *See Edward J. De-Bartolo Corp. v. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1998) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)); *see also Carlin Communications, Inc. v. FCC,* 837 F.2d 546, 560–61 (2d Cir.1988) (finding that as "the presumption is in favor of severability," the court "dropped" the "invalid part" from an FCC regulation, i.e., the words "or indecent," because "the remainder of the statute is fully operative."), *cert. denied,* 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).

The backup definition's susceptibility to a saving construction is a function of how it is written. Because the offending phrase is simply appended to the end of the definition, it' can be excised without rewriting the entire definition. *See Commodity Futures Trading Comm'n,* 478 U.S. at 841, 106 S.Ct. 3245 ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of statute ... or judicially rewriting it.") (quoting *Aptheker v. Secretary of State,* 378 U.S. 500, 515, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (internal quotations omitted)). By so construing the backup definition to avoid vagueness, the defini-

---

121. *See* Finding 291.

tion assures that there will be no real, let alone substantial, deterrent effect on political discourse *unrelated* to federal elections. Genuine issue advocacy thereby remains exempt from both the backup definition and its attendant disclosure requirements and source restrictions. Similarly, genuine issue advocacy, specifically of the legislation-centered type, that mentions a federal candidate's name in the context of urging viewers to inform their representatives or senators how to vote on an upcoming bill will not be regulated by the backup definition because it does not promote, support, attack, or oppose the election of that candidate. *See* Findings 368–73 (providing examples of legislation-centered advertisements that do not promote, support, attack, or oppose the election of a federal candidate).

Indeed, the backup definition of electioneering communications with its final clause severed is very similar to the type of "public communication" defined by BCRA's Section 301(20)(A)(iii) as "federal election activity." *See* BCRA § 301(20)(A)(iii). While the arguments against vagueness applicable to Section 301(20)(A)(iii) are generally applicable to the backup definition, one distinction is important to note: the sophistication in electioneering communications of the parties being regulated is not equally applicable to the backup definition. That said, however, I do not believe it is necessary to make a similar finding here in regard to the comparative sophistication of corporations, labor unions, interest groups, and other participants in political speech. Additionally, whatever chilling effect, if any, the definitions of "public communications" and "electioneering communications" may have are minimized in two, substantial ways: (1) corporations, labor unions, national banks, individuals, and other entities can avoid regulation simply by not mentioning a candidate for federal

office in its ad, and (2) those groups may seek an advisory opinion from the FEC to determine whether a communication is regulated by BCRA.[122]

Thus, the plaintiffs have failed to demonstrate that the vagueness of the backup definition as severed is real and substantial enough to deprive a person of ordinary intelligence a reasonable opportunity to know what is prohibited. As such, the backup definition of electioneering communications is constitutional.

## C. Section 204: The Wellstone Amendment

 While I join Judge Henderson in holding that Section 204 is unconstitutional as it applies to MCFL nonprofit corporations, I do not agree that it is unconstitutional as it applies to those nonprofit corporations that do *not* qualify for *MCFL* status. Therefore, I am writing separately to explain my reasons for joining with Judge Henderson in part, and with Judge Kollar-Kotelly in part who upholds the constitutionality of Section 204 for different reasons.

Defendants concede that Section 204 does not contain an exemption for MCFL organizations. However, defendants argue that an exemption nonetheless exists for those organizations because the Supreme Court in *MCFL* "carve[d] out an *as-applied* exemption to restrictions on corporate election activity." Gov't Opening Br. at 167 (emphasis in original). It is therefore inconsequential, according to the defendants, that BCRA does not codify the *MCFL* exemption. The defendants' reasoning misses the mark.

Under FECA, nonprofit corporations were required to pay for express advocacy expenditures from a separately segregated fund, rather than general treasury funds, unless that corporation met the three re-

122. *See supra* Part I.B.2.

quirements set forth by the Supreme Court in *MCFL*.[123] Section 203 of BCRA expands FECA's separately segregated fund requirement to apply not only to corporate expenditures for express advocacy, but to expenditures by corporations, labor unions, and national banks for electioneering communications (i.e., nonexpress advocacy), as defined by Section 201. Likewise, Section 203 *expands* the exemption for nonprofit corporations from the separately segregated fund requirement of FECA. Whereas only those nonprofit corporations that met the three requirements set forth in *MCFL* were exempt from FECA's separately segregated fund requirement, Section 203 of BCRA ignores completely the *MCFL* criteria and instead provides that *all* nonprofit corporations organized under either Section 501(c)(4) or Section 527(e)(1) of the Internal Revenue Code may pay for electioneering communications using general treasury funds, simply by virtue of their incorporation under those sections. Doing so, in my judgment, was perfectly consistent with both *MCFL* and Congress's power under the Elections Clause, U.S. Const. art. I, § 4.

What Section 203 provides, however, Section 204 takes away. As defendants acknowledge, Section 204 completely cancels out the exemption for all nonprofit corporations provided by Section 203. *See* Gov't Opening Br. at 164, n. 115. Plaintiffs contend, and Judge Henderson agrees, that Section 204 is unconstitutional because, in essence, it contravenes the Supreme Court's decision in *MCFL*.[124] I, too, agree with this conclusion, but I also believe that Section 204 is unconstitutional only in its application to those nonprofit organizations exempted under *MCFL*. Congress, in my judgment, has the authority to withdraw the exemption it provided in Section 203 to those nonprofit corporations *not* exempted by *MCFL*. Thus, the fact that Section 204 applies to nonprofit corporations does not, in and of itself, impair its constitutionality; the critical factor is whether the nonprofit corporation that is being regulated is one protected from such regulation by the *MCFL* holding.

Congress's authority to withdraw the expansion of the exemption rests on the same basis as its authority to require non-*MCFL*, nonprofit corporations to use only separately segregated funds to purchase electioneering communications: the demonstrated appearance of corruption that arises if for-profit corporations and unions are able to funnel their general treasury funds through nonprofit corporations in order to purchase electioneering communications that they cannot otherwise purchase directly.[125] Judge Kollar–Kotelly sets forth this reasoning in the portions of her opinion upholding Section 203's prohibition on the use of corporate and union treasury funds, and Section 201's disclosure requirements, for corporations, unions, and nonprofit corporations. *See* J. Kollar–Kotelly Op. at Part III.I.E.1.a. I concur in her reasoning and it needs no further repetition here.

---

**123.** That is, (1) whether the corporation is "formed for the express purpose of promoting political ideas, and cannot engage in business activities"; (2) "has no shareholders or other persons affiliated," so that members have "no economic disincentive for disassociating with it if they disagree with its political activity;" and (3) the corporation "was not established by a business corporation," and has a policy of refusing "contributions from such entities." *MCFL*, 479 U.S. at 264, 107 S.Ct. 616.

**124.** *See* NRA Opening Br. at 17–24; ACLU Opening Br. at 16–17.

**125.** *See generally Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 656–60, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990); *MCFL,* 479 U.S. at 258–60, 107 S.Ct. 616; *see also* Finding 284 (explaining that corporations and labor unions do not use the "magic words" in sham issue advertisements in order to avoid source restrictions).

Accordingly, for the reasons stated above and the relevant portions of Judge Kollar–Kotelly's opinion, I hold that Section 204 is unconstitutional only in its application to *MCFL*, nonprofit corporations.

## D. Section 213: The Party Choice Provision

Under FECA, as interpreted by the Supreme Court in *Colorado I*, and *Colorado II*, national party committees could make unlimited independent expenditures on behalf of a federal candidate, as well as coordinated expenditures up to the amount provided for by the Party Expenditure Provision, 2 U.S.C. § 441a(d).[126] BCRA, however, changes this by forcing national parties, in effect, to choose between making coordinated expenditures and unlimited independent expenditures on behalf of their federal candidates. The defendants contend that such a choice is necessary, because once a national party coordinates with a candidate, no expenditure thereafter is truly independent.[127] While I agree that Congress can constitutionally place restrictions on the ability of a national party to make coordinated expenditures, Section 213's restriction on national party independent expenditures flies in the face of the Supreme Court's holding in *Colorado I*, and is therefore unconstitutional.[128]

The provisions of Section 213 are, as plaintiffs acknowledge, "relatively straightforward." McConnell Opening Br. at 85. After the date on which a party nominates its candidate, if it first makes an independent expenditure on behalf of that candidate, any subsequent coordinated expenditure will be subject to the same $5,000 limitation that exists for multicandidate committee expenditures, and not under the higher limitation set forth in formula form in the Party Expenditure Provision of Section 441a(d) of FECA. Conversely, if the party chooses to first make a coordinated expenditure on behalf of a candidate, thereby taking advantage of the higher, formula-based dollar limitation under the Party Expenditure Provision, it cannot thereafter make *any* independent expenditures on behalf of that candidate. Additionally, Section 213 treats "all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee)" as a "single political committee." Finally, Section 213 forbids transfers, assignments, and receipt of funds by a committee of a political party that has made a coordinated expenditure for a federal can-

---

126. According to the Party Expenditures Provision, 2 U.S.C. § 441a(d)(3), in elections for the United States Senate, and for elections to the House of Representatives in states entitled to only one House Representative, parties are limited to spending the greater of $20,000, adjusted for inflation, or two cents multiplied by the voting age population of the State where the election is held. In states entitled to more than one House Representative, the coordinated expenditure limit for House campaigns is $10,000, prior to adjustment for inflation. In 2000, the coordinated expenditure limit for House campaigns was $33,780 per party. The limits for Senate races were as high as $1,626,438 (the coordinated expenditure limit for the California Senate race). *See* Press Release, Federal Election Commis-

sion, FEC Announces 2000 Party Spending Limits (Mar. 1, 2000).

127. *See* Intervenors Opening Br. at 147 (citing Senator McCain, who explained that Section 213 "helps to ensure that the expenditure [of the national political party] will be truly independent ... by prohibiting a party from making coordinated expenditures for a candidate at the same time it is making independent expenditures for the same candidate." 149 Cong Rec. S2144 (daily ed. Mar. 20, 2002)).

128. While Judge Henderson agrees with us in the result, she writes separately to state her reasons for doing so. *See* J. Henderson Op. at Part IV.C.

didate to a political party committee "that has made or intends to make an independent expenditure with respect to the candidate." BCRA § 213; FECA § 315(d); 2 U.S.C. § 441a(d).

Plaintiffs argue that the practical effect of Section 213 is to "ban political parties from making independent expenditures *at all* (if they choose to make coordinated expenditures first), and to ban them from making coordinated expenditures *at all* (if they choose to make independent expenditures first)." McConnell Opening Br. at 86. As to the latter claim, plaintiffs undoubtedly exaggerate Section 213's reach. While it is clear that it does prevent national party committees that have made an independent expenditure on behalf of a federal candidate from making coordinated expenditures up to the increased amount as calculated under the formula in 2 U.S.C. § 441a(d), they are still able nonetheless to make coordinated expenditures (or contributions) up to the $5,000 limitation provided in 2 U.S.C. § 441a(a)(2), just like any other multicandidate committee. Thus, since the national political parties may still make coordinated expenditures after making an independent expenditure first, the real issue before this Court is the constitutionality of Congress's new provision prohibiting national political party committees from making independent expenditures if it has first made a coordinated expenditure on behalf of a federal candidate. Applying a strict scrutiny review to this prohibi-

tion,[129] I find that Section 213's restriction on independent expenditures by national political parties is unconstitutional.

The Supreme Court made clear in *Colorado I* that "[t]he independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates or other political committees," 518 U.S. at 616, 116 S.Ct. 2309, and it cannot therefore be restricted unless the expenditures pose "special dangers of corruption."[130] *Id.* Despite the FEC's contention in *Colorado I* that "all party expenditures should be treated as if they had been coordinated *as a matter of law*" because " 'party officials will as a matter of course consult with the party's candidates before funding communications intended to influence the outcome of a federal election,' " the Supreme Court found that no such risk of corruption existed. 518 U.S. at 619, 620, 116 S.Ct. 2309 (citing the brief of the FEC). "[T]he constitutionally significant fact" upon which the Supreme Court relied to determine that national political parties could, like any other political speaker, exercise their First Amendment right to make independent expenditures without posing a risk of corruption, "is the *lack of coordination* between the candidate and the source of the expenditure." *Id.* at 617, 116 S.Ct. 2309 (emphasis added). Absent such evidence, the Supreme Court refused to accept "as a factual matter" the FEC's contention that all expenditures by a party were *ipso facto* coordinated.[131] *Id.* at 621,

---

**129.** In *Colorado I,* the Supreme Court, citing *Buckley,* stated that "restrictions on independent expenditures significantly impair the ability of individuals and groups to engage in direct political advocacy and 'represent substantial ... restraints on the quantity and diversity of political speech.' " *Colorado I,* 518 U.S. at 615, 116 S.Ct. 2309 (citing *Buckley,* 424 U.S. at 19, 96 S.Ct. 612).

**130.** Specifically, the Court considered whether the parties' use of donor contributions to fund independent expenditures, or the possi-

bility that national parties might funnel donors' contributions to candidates through independent expenditures in an effort to evade the individual contribution limits, presented a risk of corruption. *Id.* at 616–17, 116 S.Ct. 2309.

**131.** While acknowledging that national political parties have a First Amendment right to make independent expenditures, the defendants also contend that *Colorado I* narrowly defines that right. According to the defendants, *Colorado I* stands for the proposition

116 S.Ct. 2309.

Section 213 conditions a party's exercise of its First Amendment right to make independent expenditures upon its having refrained from engaging in coordinated expenditures up to the limit of the Party Expenditures Provision. Defendants' argument that "[p]roviding ... an option, which a party committee is free to accept or decline, does not constitute a restriction of First Amendment rights" is, at best, fanciful. Gov't Opening Br. at 180.[132] By mandating that a party that has made a coordinated expenditure cannot thereafter make independent expenditures, BCRA leaves national political parties with the familiar predicament of only being able to make expenditures up to the Party Expenditure Provision limits set forth in 2 U.S.C.

§ 441a(d). Indeed, this is the very situation the Supreme Court found unconstitutional in *Colorado I*.

Defendants have produced no evidence of "special dangers of corruption" posed by national parties making an independent expenditure after having made one or more coordinated ones. At most this Court is presented with defendants' own speculation and suspicion that all expenditures made after a coordinated expenditure are necessarily coordinated between candidate and party. Of course, if they had such evidence of corruption or potential corruption, then restrictions on the independent expenditures of national parties might possibly be warranted. However, the nature of the defendants' concerns about coordination between parties and

that a national political party may make independent expenditures *only if* the party has not yet selected its nominee. *See* Intervenors Opening Br. at 148–49. The defendants further argue that the Supreme Court's opinion in *Colorado II* confirms their interpretation when it states that "the Members of the Court who joined the principal opinion [in *Colorado I*] thought the payments were 'independent expenditures' as that term had been used in our prior cases, owing to the facts that the Party spent the money before selecting its own senatorial candidate and without any arrangement with potential nominees." *Id.* at 439, 121 S.Ct. 2351 (citing *Colorado I*, 518 U.S. at 613–14, 116 S.Ct. 2309). In advocating this argument, however, the defendants have accorded mere dicta in *Colorado I* the power of precedent. I do not find that *Colorado I* conditions a party's First Amendment right to make independent expenditures upon whether or not the party has selected its nominee. While the Supreme Court in *Colorado I* mentions "that at the time of the expenditure, the Party had not yet selected a ... nominee," *id.* at 613–14, 116 S.Ct. 2309, it did so only in its review of the summary judgment record in order to determine if a genuine issue of fact existed as to whether the Party's expenditure was coordinated. Though the fact that the Party had not yet selected its nominee was an important factor in the Court's determination that the expenditure was independent, the

Supreme Court placed equal, if not greater, weight on the lack of interaction between the Party's nominee and the Party at the time the expenditure was made. *See Colorado I*, 518 U.S. at 614, 116 S.Ct. 2309. The fact that the Party had not chosen its nominee is neither the sole underpinning of this factual conclusion, nor of the Supreme Court's holding that national political parties have a First Amendment right to make unlimited independent expenditures. *See id.* at 618–19, 116 S.Ct. 2309 ("We do not see how a Constitution that grants individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures could deny the same right to political parties."). *Colorado II* does not hold or find otherwise.

**132.** The defendants describe the ban on independent expenditures as the price national parties must pay to take advantage of the "special privilege" of making coordinated expenditures at the increased rate set forth in 2 U.S.C. § 441a(d), a privilege available only to national parties and not to individuals, candidates, or other political speakers. Although I do not disagree with the defendants' assessment of the Party Expenditure Provision as a "special privilege," I find unconstitutional BCRA's conditioning of this privilege on the national party forgoing its First Amendment rights.

candidates [133] are such that they can file a complaint with the FEC challenging whether a party's expenditure on behalf of a candidate is, in fact, independent. A complete ban on all party independent expenditures after a coordinated expenditure has occurred is just not sufficiently tailored to deal with that type of problem. Moreover, Section 213's ban on independent expenditures treats national political parties differently than other political actors even though, as mentioned previously, a party's independent expenditures are no less protected as First Amendment activity than that of others. *See Colorado I,* 518 U.S. at 616, 116 S.Ct. 2309.

Having rejected Section 213's ban on independent expenditures for parties that have first made coordinated expenditures, I find it unnecessary to reach the constitutionality of the two remaining provisions of Section 213: the provision treating all committees of a party as a single committee, and the provision forbidding transfers and receipt of funds between committees of a political party. Even if I found those provisions to be constitutional, I do not believe—after finding the ban on independent expenditures unconstitutional—that a saving construction can be applied to Section 213 so that it is consistent with Congress's clear intent to provide a choice to parties between unlimited independent expenditures and coordinated expenditures up to the Party Expenditure Provision limit.[134] Applying a saving construction to the statute that would allow only one option, but not the other, would flout that intent. Therefore, for the reasons set forth above, Section 213 of BCRA is, in our judgment, unconstitutional.

### III. Section 318: Prohibition of Donations by Minors

I concur in the judgment of Judge Henderson and Judge Kollar–Kotelly that Section 318, which prohibits children from making contributions to candidates or donations to political parties,[135] is unconstitu-

---

**133.** *See* Intervenors Opening Br. at 149, 149 n. 537 The defendants only offer anecdotal declarations of former and current Members of Congress as well as documents produced by the national parties to support their contention that the "evidentiary record . . . amply supports Congress's expert judgment that, when a party chooses to coordinate efforts with its nominee, it cannot claim at the same time to be making expenditures that are truly independent of that nominee." *Id.* at 149. For example, defendants point to the declaration of Senator McCain who stated that parties and candidates "generally communicate and coordinate on a regular basis on a variety of topics," so that "[t]he idea that a party could make both 'coordinated' and 'independent' expenditures once the party has nominated a candidate, is not sensible."

**134.** *See* 148 Cong. Rec. S2096–02, S2144 (Mar. 20, 2002) (statement of Senator McCain). Senator McCain stated:

Section 213 of the bill allows the political parties to choose to make either coordinated expenditures or independent expenditures on behalf of each of their candidates, but not both. This choice is to be made after the party nominates its candidate,

when the party makes its first post-nomination expenditure—either coordinated or independent—on behalf of the candidate. . . . This provision fully recognizes the right of the parties to make unlimited independent expenditures. But it helps to ensure that the expenditure will be truly independent, as required by Colorado Republican I, by prohibiting a party from making coordinated expenditures for a candidate at the same time it is making independent expenditures for the same candidate. We believe that once a candidate has been nominated a party cannot coordinate with a candidate and be independent in the same election campaign. After the date of nomination, the party is free to choose to coordinate with a candidate, or to operate independently of that candidate. If it chooses the former, it is subject to the limits upheld in Colorado Republican II. If it chooses the latter, it is free to exercise its right upheld in Colorado Republican I to engage in unlimited hard money spending independent of the candidate.

**135.** Section 318 states: "An individual who is 17 years old or younger shall not make a

tional. I write, however, only to explain why I believe this Court should evaluate this provision under the strict-scrutiny standard of review.

If Section 318 were a complete ban on adults, instead of on minors, Supreme Court precedent would require us to review such a provision under the strictest of scrutiny. Indeed, one of the primary reasons that the Supreme Court reviewed contribution limitations in *Buckley* under the less-demanding closely-drawn standard of review was because contribution limitations permit some expression of support. 424 U.S. at 20–21, 96 S.Ct. 612. A complete ban on donations, on the other hand, prevents even a symbolic expression of support for a candidate or a party's agenda. *Id.* Similarly, Section 318 merits heightened scrutiny regardless of the age of those it silences. Simply stated, the standard of review applied by this Court should be a function of the constitutional rights being infringed upon, rather than the age of those whose rights are being infringed.

Children, like adults, are protected by the Constitution.[136] The Supreme Court, however, has made clear that minors in certain circumstances should not be treated in the same way as adults, repeatedly upholding laws that treat them differently.[137] Because the treatment of minors by

the Supreme Court has varied across a wide range of circumstances, lower courts have had to wrestle with some uncertainty in assessing when the state's power can trump the rights of children, but not those of adults. Indeed, the Supreme Court itself acknowledged that uncertainty: "The question of the extent of state power to regulate conduct of minors not constitutionally regulable when committed by adults is a vexing one, perhaps not susceptible of precise answer." *Carey v. Population Services International,* 431 U.S. 678, 692, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Two years later the Supreme Court shed greater light on the matter in *Bellotti v. Baird,* when it identified certain reasons that justify the disparate treatment:

> We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot equated with those of adults: the peculiar vulnerability of children; their inability to make critical decision in an informed, mature manner; and the importance of the parental role in child rearing.

443 U.S. at 634, 99 S.Ct. 3035.

While these reasons provide clearer guidance on when children can be treated differently from adults, they do not, however, explain whether a court, having found one of those reasons present, should employ a lesser standard of review in

---

contribution to a candidate or a contribution or donation to a committee of a political party." BCRA § 318; FECA § 324; 2 U.S.C. § 441k.

**136.** *See Bellotti v. Baird,* 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ("A child, merely on account of his minority, is not beyond the protection of the Constitution.... 'whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill or Rights is for adults alone.'" (quoting *In re Gault,* 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967))); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)

("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.").

**137.** *See, e.g., Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682–83, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (upholding school's decision to punish student using obscene language); *Ginsberg v. New York,* 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding criminal conviction under New York statute that prohibited the selling of sexually oriented magazines to minors).

evaluating children's constitutional rights or merely rely upon one of the reasons as a factor in recognizing a government interest justifying the regulation. In this jurisdiction, the D.C. Circuit seemingly answered that question for certain circumstances.

In *Hutchins v. D.C.*, where the D.C. Circuit upheld the District of Columbia's imposition of a curfew on minors, 188 F.3d 531, 541 (1999) (en banc), the Circuit Court, in applying the *Baird* reasons, concluded that children may be more "vulnerable to harm during curfew hours than adults," "are less able to make mature decisions in the face of peer pressure, and "are more in need of parental supervision during curfew hours." *Id.* For those reasons, it decided to review the curfew statute under intermediate scrutiny and found the curfew was substantially related to the achievement of important government interests. *Id.* Here, however, I do not believe that we should lower the level of scrutiny. In *Hutchins*, and other cases in which courts applied a lesser standard of review, the courts identified paternalistic state interests in protecting children from harm, or acting *in loco parentis*. The D.C. Circuit, in *Hutchins*, was particularly concerned that children are "vulnerable to harm during curfew hours." *Id.* And in cases concerning decisions by children that affect procreation—cases in which the Supreme Court has applied a lesser standard of review—the Court has been equally concerned that children may make decisions that harm themselves.[138]

Section 318 of BCRA was not drafted out of a concern to safeguard children against harming themselves in the absence of their parents (i.e., the state acting *in loco parentis*), but to prevent parents from using their children to circumvent existing donation limitations to political parties and politicians. Because it involves political expression, this case is not unlike *Tinker v. Des Moines Independent Community School District*, in which the Supreme Court rejected a school district's attempt to discipline students wearing black armbands to express their opposition to the Vietnam War. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Even in a case where the students were in the custody of the state, the Supreme Court recognized that the speech caused no harm to, nor interrupted the learning of, the state's charges. *Id.* at 508–09, 89 S.Ct. 733. It emphasized that "[s]tudents in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect." *Id.* at 511, 89 S.Ct. 733. Such cases involving government interests, unrelated to the protection of children, do not warrant review under any scrutiny less than strict. The political expression of children, especially if they are old enough to work and pay taxes, surely deserves the same level of constitutional scrutiny as a young adult old enough to attend college and vote.

This does not mean, of course, that the government need entirely ignore the fact that some children do not possess "that full capacity for individual choice which is the presupposition of First Amendment guarantees," *Ginsberg*, 390 U.S. at 649–50, 88 S.Ct. 1274, and that they sometimes cannot make "critical decisions in an informed, mature manner," *Baird*, 443 U.S. at 634, 99 S.Ct. 3035. It simply means

---

138. For example, in *Planned Parenthood of Central Missouri*, the Court reviewed a parental consent provision for abortions under lesser scrutiny, explaining that it must "examine whether there is any significant state interest in conditioning an abortion on the consent of a parent or person *in loco parentis* that is not present in the case of an adult." 428 U.S. at 75, 96 S.Ct. 2831; *see also Carey*, 431 U.S. at 693 n. 15, 97 S.Ct. 2010 (applying lesser scrutiny to contraceptive regulation of minors).

that the government, and the courts, can take into account these concerns when evaluating whether there is in fact a compelling government interest. Here, for example, the government could claim that children under thirteen who generally have no means independent of their parents and rarely make financial decisions independent of their parents, are vulnerable to being represented by their parents as having made donations which, in effect, circumvent contribution limits. If there were in fact more substantial evidence of such circumvention, see J. Kollar–Kotelly Op. at Part III.III, and the provision were more narrowly tailored to serve the circumvention concern, see J. Henderson Op. at Part IV.E, then restrictions, which are somewhat more onerous on children than on adults given a child's lack of independence, may be justifiable based on a compelling government interest. That is not the case here. For these reasons and for those set forth, in part, by Judge Kollar–Kotelly and Judge Henderson, I agree that the prohibition on donations by children is unconstitutional.

## IV. Section 504: Public Access to Broadcasting Records

■ Section 504 requires broadcast licensees to collect and disclose records of any "request to purchase broadcast time" that "is made by or on behalf of a legally qualified candidate for public office" or that relates "to any political matter of national importance," including communications relating to "a legally qualified candidate," "any election to Federal office," and "a national legislative issue of public importance." BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1).[139] Since "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights," *Buckley*, 424 U.S. at 66, 96 S.Ct. 612, the Supreme Court insisted that any law compelling disclosure of campaign information must be reviewed under "exacting scrutiny," *id.* at 64, 96 S.Ct. 612, such that the government interest served is "substantial," *id.* at 80, 96 S.Ct. 612, and "sufficiently important to outweigh the possibility of infringement," *id.* at 66, 96 S.Ct. 612. For the following reasons, I find that the record does not establish the existence of a substantial governmental interest necessary to warrant the disclosure requirements set forth in Section 504.

Section 504 is different from the other disclosure provisions in BCRA in two important ways: (1) broadcast licensees, not the purchasers, are required to make the disclosures; and (2) the disclosures are required for broadcasts on "political matters of national importance" as well as on federal candidates. In relation to disclosure of communications by, and relating to, federal candidates, the government has provided no evidence that Section 504 serves any of the government interests specified in *Buckley*.[140] Indeed, Section

---

**139.** The record must include whether the request to purchase was accepted or rejected; the rate charged for the broadcast; the date and time on which the communication aired; the class of time that is purchased; the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers; in the case of a request on behalf of a candidate, the name of the candidate, the authorized committee, and the treasurer of the committee; and in the case of any other request, the name of the person purchasing the time, the name and contact information for such person, and a list of chief executive officers or members of the executive committee or board of directors. BCRA § 504; FCA § 315(e)(1); 47 U.S.C. § 315(e)(1).

**140.** In *Buckley*, the Supreme Court outlined several sufficient government interests justifying disclosure requirements, including informing voters about how candidates spend money so that they can better evaluate candidates, 424 U.S. at 66–67, 96 S.Ct. 612 (noting

201, which this Court finds constitutional in part, already requires purchasers of "electioneering communications" to disclose a wide array of information, including the amount of each disbursement and the elections to which the electioneering communications pertain. BCRA § 201(a); FECA § 304(f)(2); 2 U.S.C. § 434(f)(2). These disclosure requirements for purchasers in Section 201 mirror many of the provisions for broadcast licensees in Section 504, and the defendants have provided no evidence that such a belt-and-suspender approach is necessary. Moreover, they have provided no evidence suggesting, let alone proving, that purchasers have evaded, or will evade, disclosure requirements. And though the defendants made an off-handed reference to the importance of ensuring that broadcast requests are processed in an "even-handed fashion," Gov't Opp'n Br. at 134–35, there is nothing in the record which demonstrates that broadcast licensees have treated purchasers unfairly.

As to noncandidate-focused communications which supposedly relate to "political matters of national importance" (e.g., "a national legislative issue of public importance"),[141] disclosure requests are even more difficult to justify. First, such disclosure requirements fail to serve any of the three sufficient government interests set forth in *Buckley* because those interests are specific to evaluating, and preventing corruption of, federal candidates. *See supra* note 135. Second, the defendants' contention that there is a substantial government interest in helping the public identify the sponsors of political broadcasts and evaluate the credibility of the political message, *see* Gov't Reply Br. at 89–90, does not quite square with the holding in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). In *American Constitutional Law Foundation*, the Supreme Court did recognize a substantial government interest in disclosing the names and addresses of ballot-initiative proponents who pay circulators to collect signatures, explaining that disclosure was "a control or check on domination of the initiative process by affluent special interest groups." *Id.* at 202, 119 S.Ct. 636. Here, however, the defendants have provided no evidence that "special interest groups" have, as yet, dominated or co-opted broadcast communications relating to political issues of national importance. *See id.* at 203, 119 S.Ct. 636 (refusing to require disclosure of petition circulators' names and amounts paid because the "lower courts fairly determined from the record as a whole" that the benefit of such information had not been demonstrated).

Absent such evidence, the government lacks a constitutionally acceptable justification to enact a disclosure provision that imposes an onerous collection and disclosure system on broadcast licensees; infringes the associational rights of groups and their members who engage in broadcasting; and potentially curtails political speech invaluable to an informed electorate. In *Buckley v. Valeo*, the D.C. Circuit

that disclosure "allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches"), deterring actual corruption and avoiding the appearance of corruption, *id.* at 67, 96 S.Ct. 612 (explaining that "exposing large contributions and expenditures to the light of publicity" fights corruption), and gathering data to detect violations campaign finance laws, *id.* at 67–68, 96 S.Ct. 612.

**141.** Any understanding of broadcasts "relating to any political matter of national importance" necessarily includes broadcasts above and beyond those referring to federal candidates. Though, as the plaintiffs contend, the scope of those required disclosures is unclear because of the language's vagueness.

rejected FECA Section 437a, a disclosure requirement that also encompassed "completely nonpartisan public discussion of issues of public importance." *See Buckley v. Valeo*, 519 F.2d 821, 870, 869–78 (D.C.Cir.1975).[142] In so doing, the court explained:

> [I]ssue discussions unwedded to the cause of a particular candidate hardly threaten the purity of elections. Moreover, and very importantly, such discussions are vital and indispensable to a free society and an informed electorate. Thus the interest of a group engaging in nonpartisan discussion ascends to a high plane, while the governmental interest in disclosure correspondingly diminishes.

*Id.* at 873. I could not agree more. In the absence of evidence that disclosure of nonelection-related broadcasts serves a substantial government interest, Section 504 cannot withstand scrutiny.

## V. Findings of Fact

Despite our best efforts to produce a complete set of Findings of Fact, in which two or more members of this Court concur, we were unable to do so.

Because of the critical importance of the facts to the holdings in the case, and the sheer enormity of the record developed by the parties, I believe it necessary to set out, for the most part,[143] those facts which in my judgment are sufficiently relevant and probative to rely upon in reaching my conclusions. Accordingly, while there may be other relevant and probative facts in the record, I do not accord them sufficient weight to warrant either relying on them in my judgments, or including them in my Findings.

Moreover, in some instances where evidence was submitted by one side or another (or both) on a particular point, but in my judgment that evidence did not meet this standard, I have either commented specifically to that effect, or simply stated that there was "no probative evidence in the record" as to that point. In other instances, where I accorded great weight to the relevant and probative evidence submitted on a particular point, I have specifically acknowledged that that evidence was "substantial" or "overwhelming" as to that point. In those limited circumstances where the evidence submitted by one side was not controverted by the other, I have acknowledged the "uncontroverted" nature of the evidence on that point.

Finally, I would be remiss to not acknowledge the herculean effort expended by the parties in assembling this "elephantine"[144] record over a seven-month time period. It is a testament, indeed, to their sense of professionalism and duty on a

**142.** The D.C. Circuit's decision on Section 437a was not appealed. *See Buckley*, 424 U.S. at 10 n. 7, 96 S.Ct. 612.

**143.** In those sections where I have concurred in the judgment and reasoning of one of my colleagues, she may be basing her opinion on her individual Findings of Fact that relate to that section. Unless otherwise necessary, I have, to the extent possible, refrained from repeating those findings in my Findings of Fact. Hence, to that extent, my set of Findings does not include *all* of the facts that I have relied upon in reaching my various judgments. Finally, in a footnote to the introduction of her Findings of Fact, Judge Henderson comments that she has a " 'definite and firm conviction that a mistake has been committed' with respect to several of [the] findings" in Judge Kollar–Kotelly's and my opinions. J. Henderson Op. at Part III.B (citing *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001)). Two of the five examples she lists thereafter are Findings 292 and 250 of my opinion. Because Judge Henderson does not explain why either one or both of these Findings are "mistaken," I am not in a position to respond to her concerns.

**144.** Hearing Tr. (Dec. 4, 2003) at 152 (Abrams).

matter of utmost importance to our system of government. Moreover, the job of reviewing and evaluating this record would have been substantially more difficult, and less reliable, in my judgment, if they had not assembled these factual materials with such extraordinary care.

That said, upon reviewing the record as a whole, I make the following Findings of Fact:

\* \* \*

## Table of Contents

I. Title I: Restrictions on Nonfederal Funds ................................... 815
 A. National Parties and Their Congressional Campaign Committees ........ 815
 B. National Party Nonfederal Fundraising and Spending ................... 816
 C. Senator McConnell ..................................................... 819
 D. Thomas McInerney ..................................................... 819
 E. The Role of Political Parties in Democracies .......................... 820
 F. Republican National Committee ........................................ 821
 G. The RNC's Federal Election Activities ................................. 822
 H. National Party Use of Nonfederal Money to Benefit Federal
 Candidates .......................................................... 822
 I. National Party Use of Nonfederal Money for Federal–Candidate
 Advocacy ............................................................ 824
 J. The RNC's Involvement in Nonfederal Activities ....................... 829
 K. The RNC's Involvement in "Mixed" Activities.......................... 831
 L. The RNC's Assistance to State and Local Parties for Nonfederal and
 Mixed Activities .................................................... 833
 M. RNC Fundraising ...................................................... 835
 N. The California Democratic Party ("CDP") and the California
 Republican Party ("CRP") .......................................... 836
 O. Proposition 34 ........................................................ 837
 P. The CDP's and CRP's Focus on State and Local Activities .............. 837
 Q. CDP & CRP Voter Registration Activities ............................. 838
 R. CDP and CRP Direct Mail Activities ................................... 838
 S. CDP and CRP Get–Out–the–Vote Activities............................ 839
 T. State Party "Issue Ads" that Directly Affect Federal Elections .......... 839
 U. CDP and CRP Cooperation with the National Parties ...................843
 V. Reduction in CDP and CRP Fundraising and Voter Mobilization
 Efforts ............................................................. 844
 W. Federal Officeholder Solicitation of Nonfederal Money ................. 845
 X. Political Parties and Nonprofit Groups................................. 848
 Y. Interest Groups Compared to Political Parties ......................... 851
 Z. The Record Contains No Evidence of Quid Pro Quo Corruption ......... 851
 AA. While Some Federal Candidates Are Aware of the Identities of Party
 Contributors, Others Are Not ....................................... 853
 BB. There is No Probative Evidence That National Parties Use Nonfederal Donations to Induce Federal Officeholders to Support or
 Oppose Legislation ................................................. 855
 CC. The Relationship Between Access and Donations ..................... 856
 1. The RNC ....................................................... 856
 2. Statistical Evidence Regarding Donations and Access ............... 856
 3. Federal Officeholders Are Not More Likely to Meet With
 Nonfederal Donors Than Federal Donors ....................... 857
 4. Lobbyists, Former Members of Congress, Business Leaders, and
 Donors Believe that Soft Money Donations to Parties Increase
 Access to Officeholders ....................................... 857
 5. Party Donation Programs Show That Increased Access
 Corresponds With Larger Donations.............................. 860
 DD. Donors Make Donations to National Parties With the Expectation of
 Building Relationships and Receiving Access ........................ 863

1. Lobbyists Believe That Donations Will Enable Donors to Establish Relationships With Officeholders ........................863
2. Current and Former Federal Officeholders Acknowledge That Donors Expect to Establish Relationships With and Obtain Access to Federal Officeholders ...................................864
3. Donors Hope to Establish Relationships or Receive Access With Their Donations ...............................................864
EE. Effectiveness of Giving Nonfederal Donations as Opposed to Federal Donations ...........................................................866
FF. Donors Often Times Give to Both National Parties in Order to Receive Access to Members of Both Parties..........................868
GG. Lobbying and Donations of Nonfederal Money ..........................869
HH. Public Perception of Corruption ......................................870

II. Title II: NonCandidate Campaign Expenditures ...........................874
A. Issue Advocacy in Modern Campaigns.....................................874
B. The Distinction Between Candidate–Centered Advocacy and Pure Issue Advocacy Is Not a Function of the Presence or Absence of the *Buckley* "Magic Words" ........................................875
C. The Rise of "Issue Advocacy" Campaigns Funded by Corporate and Labor Union General Treasuries.....................................879
D. Explaining the Shift Toward "Issue Advocacy" .........................880
E. Candidate–Centered "Issue Advertisements" That Do Not Contain Words of Express Advocacy Are Distinguishable from "Genuine" Issue Advertisements ......................................................881
F. The Use of Issue Advocacy by Organizations for Electioneering Purposes ................................................................884
1. Electioneering Advertisements Have Been Run About Issues In Which the Group Running Them Has No Particular Interest.....889
G. The *Buying Time* Studies ...............................................890
1. The CMAG Data Set ......................................................892
2. *Buying Time* Findings .................................................893
3. Criticism of *Buying Time 1998* ........................................897
4. *Buying Time 1998's* Calculation of the Percentage of Genuine Issue Advocacy Captured by BCRA ......................................900
5. Criticism of *Buying Time 2000* ........................................904
H. The Goldstein Expert Report ............................................906
I. Genuine Issue Advertisements About Legislation and Public Policy Issues Are Run During the Sixty Days Before a Federal Election Notwithstanding the Competition for Air Time with Candidate–Centered Advertisements ..........................................910
1. Representative Examples of Genuine Issue Advertisements Aired Within 30 Days of a Primary Election, or 60 Days of a General Election, and Mentioning the Name of a Federal Candidate.....914
2. Representative Examples of Candidate–Centered Issue Advertisements Aired Within 30 Days of a Primary Election or 60 Days of a General Election .........................................918

\* \* \*

As to BCRA's restrictions on nonfederal funds, I find that

*National Parties and Their Congressional Campaign Committees*

1. The national committees of the two major political parties are: the Republican National Committee ("RNC"); the Nation-al Republican Senatorial Committee ("NRSC"); the National Republican Congressional Committee ("NRCC"); the Democratic National Committee ("DNC"); the Democratic Senatorial Campaign Committee ("DSCC"); and the Democratic Congressional Campaign Committee ("DCCC"). Vogel[145] Decl. ¶ 6 [DEV 9–

145. Alexander Vogel is General Counsel for the NRSC. Vogel Decl. ¶ 1 [DEV 9–Tab 41].

Tab 41]; McGahn [146] Decl. ¶ 6 [DEV 8–Tab 30]; Jordan [147] Decl. ¶ 6 [DEV 7–Tab 21]; Wolfson [148] Decl. ¶ 6 [DEV 9–Tab 44].

### National Party Nonfederal Fundraising and Spending

2. According to defendants' expert Mann

In 1980 the national Republican party spent roughly $15 million in soft money, the Democrats $4 million. This constituted 9% of total spending by the two national parties. In 1984 the amount of soft money spent by the national parties increased marginally to $21.6 million but it constituted a smaller share (5%) of total national party activity. In 1988 .... [p]arty soft money spending more than doubled to $45 million, which was 11% of national party totals .... By 1988, both parties had developed effective means of courting large soft money donors. After the election, Republicans revealed that they had received gifts of $100,000 each from 267 donors; Democrats counted 130 donors contributing $100,000 or more ....

Mann Report at 12–13 [DEV 1–Tab 1] (citations omitted).

3. The 1992 election cycle was the first in which nonfederal donations were tracked by the FEC. During that cycle the Democratic and Republican parties together raised $86.1 million in nonfederal funds. During the 1994 election cycle the two major parties raised $101.6 million in nonfederal funds. During the 1996 cycle the combined total rose to $263.5 million but dropped to $222.5 million during the 1998 cycle. During the presidential election cycle of 2000 they raised a combined total of $487.5 million in nonfederal funds. In the past election cycle of 2002 cycle they raised $495.8 million in nonfederal funds. See Press Release, FEC, Party Fundraising Reaches $1.1 Billion in 2002 Election Cycle (Dec. 18, 2002), available at http://www.fec.gov/press/20021218party/20021218party.html.

4. There was

a threefold increase in national party soft money activity between 1992 and 1996—from $80 million to $272 million. Soft money as a share of total national party spending jumped from 16% to 30%. Both parties and their elected officials worked hard to solicit soft money donations from corporations, wealthy individuals, and labor unions. During the 1996 election the national party committees received ... approximately 27,000 contributions from federally prohibited sources ... Less than $10 million of the $272 million was contributed directly to state and local candidates in the 1996 cycle.... The two parties transferred a total of $115 million in soft money to state party committees, which financed two-thirds of state party soft money expenditures.... State party soft money expenditures for political communication/advertising jumped from less than $2 million in 1992 to $65 million in 1996.

Mann Report at 21–22 [DEV 1–Tab 1] (citation omitted). During the 1996 election cycle, the top 50 nonfederal money donors made contributions ranging from $530,000 and $3,287,175. Id. at 22.[149] "The total amount of soft money spent [in the 1998 midterm election cycle]—$221 million—was less than in 1996 but more

---

**146.** Donald McGahn is General Counsel for the NRCC. McGahn Decl. ¶ 1 [DEV 8–Tab 30].

**147.** James Jordan is the Executive Director of the DSCC. Jordan Decl. ¶ 1 [DEV 7–Tab 21].

**148.** Howard Wolfson is Executive Director of the DCCC. Wolfson Decl. ¶ 1 [DEV 9–Tab 44].

**149.** Four of the top 50 soft money donors to the national parties in 1999, but not 2000, were state parties. Mann Expert Report at tbl. 5, tbl. 6.

than double the previous midterm election. And soft money as a share of total spending by the national parties jumped to 34%. The congressional party campaign committees put a premium on raising and spending soft money to advance the election prospects of their candidates .... Both national party committees had discovered they could finance campaign activity on behalf of their senatorial candidates with soft money in the form of 'issue advocacy.' The same pattern, more pronounced with the Democrats than the Republicans, was evident in the House campaign committees." Mann Report at 23 [DEV 1–Tab 1] (citation omitted).

5. Defense expert Mann has reported that "soft money financing of party campaigning exploded in the 2000 election cycle. Soft money spending by the national parties reached $498 million, now 42% of their total spending. Raising a half billion dollars in soft money [in 2000] took a major effort by the national parties and elected officials, but they had the advantage of focusing their efforts on large donors. That focus paid substantial dividends: 800 donors (435 corporations, unions and other organizations and 365 individuals), each contributing a minimum of $120,000, accounted for almost $300 million or 60 percent of the soft money raised by the parties. The top 50 soft money donors ... each contributed between $955,695 and $5,949,000. Among the many soft money donors who gave generously to both parties were Global Crossing, Enron and WorldCom." Mann Report at 24–25 [DEV 1–Tab 1] (citation omitted). "A total of $280 million in soft money—well over half the amount raised by the six national party committees— was transferred to state parties [in 2000], along with $135 million in hard money." *Id.* at 26. In 2000, thirty-five of the top 50 donors were corporations. Most of the other top 50 donors were unions and

plaintiff attorneys. Mann Expert Report at tbl. 6.

6. During the first 18 months of the 2001–2002 election cycle the parties reported nonfederal receipts of $308.2 million, which is a 21 percent increase over the same period during the 1999–2000 cycle. The FEC notes that this increase is "all the more significant given that typically parties raise more in Presidential campaign cycles than in non-presidential campaigns." Press Release, FEC, Party Fundraising Growth Continues (Sept. 19, 2002), *available at* http://www.fec.gov/press/20020919party-fund/20020919partyfund.html. By October 16, 2002, the parties had raised over $421 million in nonfederal funds. Press Release, FEC, National Party Fundraising Strong in Pre–Election Filings (Oct. 30, 2002), *available at* http://www.fec.gov/press/20021030partypre.html/20021030partypre.html.

7. Experts attribute the accelerated rise in nonfederal money expenditures to President Bill Clinton and his political consultant Dick Morris' use of such funds during the 1996 campaign to fund

television ads designed to promote Clinton's reelection. While the ads prominently featured the President, none of these costs were charged as coordinated expenditures on behalf of Clinton's campaign. Instead the party paid the entire cost, based on a legal argument never before made: that party communications which did not use explicit words advocating the election or defeat of a federal candidate could be treated like generic party advertising and financed, according to the FEC allocation rules, with a mix of soft and hard money.

Mann Report at 18 [DEV 1–Tab 1]. Defense Expert David Magleby notes that this development

ran counter to the stated purposes of soft money which were to permit parties

to raise unlimited amounts of money for 'party building' purposes, unlike hard money which is subject to the contribution limits given to the parties to help elect or defeat candidates.... The strategy to deploy soft money for these purposes is described in a series of memos from Dick Morris.... Morris says, I met with ... attorney[s] ... and explained the kinds of ads I had in mind. Fortunately, they said the law permitted unlimited expenditures by a political party for such "issue-advocacy" ads. By the end of the race, we had spent almost thirty-five million dollars on issue-advocacy ads (in addition to about fifty million dollars on conventional candidate-oriented media), burying the Republican proposals and building a national consensus in support of the president on key issues.

8. Magleby Expert Report at 11 (quoting Dick Morris, Behind the Oval Office: Getting Reelected Against All Odds 141, 624 (1999) [DEV 4–Tab 8]). "The national Democratic party managed to finance two-thirds of its pro-Clinton 'issue ad' television blitz by taking advantage of the more favorable allocation methods available to state parties. They simply transferred the requisite mix of hard and soft dollars to party committees in the states they targeted and had the state committees place the ads." Mann Expert Report at 22 [DEV 1–Tab 1]; see also Plaintiff's Expert Raymond La Raja Dep. Exhibit 3 at 14, 37–48 [JDT 15] (Raymond Joseph La Raja, American Political Parties in the Era of Soft Money (2001) (unpublished Ph.D. dissertation, University of California at Berkeley) (discussing the emergence of "party soft money")).

9. According to Defense experts, "It did not take the Republican party long to respond in kind by promoting Bob Dole and Jack Kemp." Magleby Expert Report at 11 [DEV 4–Tab 8].

In May of 1996, the Republican National Committee announced a $20 million "issue advocacy" advertising campaign. Its purpose, in the words of the chairman, would be "to show the differences between Dole and Clinton and between Republicans and Democrats on the issues facing our country, so we can engage full-time in one of the most consequential elections in our history." These presidential candidate-specific ads, like the Democratic ones, were targeted on key battleground states and financed with a mix of hard and (mostly) soft money. Both parties were now financing a significant part of the campaigns of their presidential candidates outside of the strictures of the FECA and well beyond the bounds of the 1979 FEC ruling that national parties may raise corporate and union funds and solicit unlimited donations from individuals "for the exclusive and limited purpose of influencing the nomination or election of candidates for nonfederal office."

Mann Expert Report at 20 (citation omitted) [DEV 1–Tab 1].

10. This approach for the use of nonfederal funds spilled over into congressional races. Mann Expert Report at 20 [DEV 1–Tab 1]; see also Lamson [150] Decl.

**150.** Since January 2001, Lamson has served as the Communications Director for the Office of Public Instruction of the State of Montana, a post he also held from early 1997 until January 2000. During 2000, Lamson managed Nancy Keenan's campaign to represent Montana's Congressional district. During 1996, Lamson managed Bill Yellowtail's campaign to represent Montana's congressional district. From 1983 through 1996, Lamson served as the state director for United States Representative Pat Williams' congressional office in Montana. During this same period, Lamson also managed Congressman Williams' election campaigns in Montana. From 1981 to 1983, Lamson was Executive Director of the Montana Democratic Party.

¶ 9 (describing both parties' national committees' use of soft money to run advertisements in a race for Congress in Montana).

### Senator McConnell

11. Senator McConnell routinely participates in political and fundraising events for state and local candidates and party committees.

12. Since his election to the Senate, Senator McConnell has been a member of the NRSC, which promotes the Republican position on a wide range of issues and supports Republican candidates at the federal, state, and local levels. Senator McConnell chaired the NRSC in the 1998 and 2000 election cycles and, as chairman, he raised funds not subject to the restrictions and prohibitions of federal law. These nonfederal funds were used for voter registration and identification, get-out-the-vote activities, "issue advocacy," building funds, and national support for state and local candidates. As NRSC Chairman, Senator McConnell directed nonfederal NRSC donations to dozens of state and local candidates, including Virginia Republican gubernatorial candidate Jim Gilmore (in 1997); California Republican gubernatorial candidate Dan Lungren (in 1998); and the Republican candidate for mayor of Warwick, Rhode Island (in 2000). *Id.* ¶ 8.

13. The overwhelming majority of the people with whom Senator McConnell has met during his tenure in the Senate do not donate funds to the Republican Party at the national, state, or local level. Typically Senator McConnell is unaware of the donation history of the individuals with whom he meets. *Id.* ¶ 13.

Lamson provided a sworn declaration in *FEC v. Colorado Republican Fed. Campaign Comm.,* 41 F.Supp.2d 1197 (D.Colo.1999), *aff'd,* 213 F.3d 1221 (10th Cir.2000), *rev'd,*

### Thomas McInerney

14. Thomas McInerney, a resident of New York, shares the Republican Party's general philosophy on policy issues such as lower taxes, smaller government, free trade, and a strong national defense. He has pursued his political and public policy goals by making donations to Republican organizations at the national, state, and local levels in order to promote Republican principles and candidates at the federal, state, and local levels. McInerney Aff. ¶¶ 2–3.

15. Prior to BCRA's enactment in 2002 McInerney donated amounts in excess of BCRA's aggregate amount limit of $57,500 per cycle to the national political party committees of the Republican Party and in excess of $10,000 per year to state and local Republican party organizations. His donations were intended to support state and local candidates voter registration activities for state and local parties; voter identification activity; get-out-the-vote activity; generic campaign activity for state and local parties, including broadcast communications that promote the Republican party when a federal candidate is on the ballot; slate cards, palm cards, and sample ballots for state and local parties; absentee ballot programs for state and local parties; phone bank programs for state and local parties; public communications discussing policy issues, including communications that mention federal candidates in a manner that could be construed to "promote, support, attack or oppose" such candidates; staff salaries of employees who spend 25 percent of their time in any given month on any of these activities. *Id.* ¶ 4.

533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). Lamson Decl. ¶¶ 2–3 [DEV 7–Tab 26].

16. In the 2002 election cycle McInerney donated more than $57,500 to Republican Party organizations at the national, state, and local levels "to be used on certain activities" described above. *Id.* ¶ 10.

17. In the 2000 election cycle McInerney donated more than $57,500 to Republican Party organizations at the national, state, and local levels "to be used on certain activities" described above. *See Id.* ¶ 12.

18. McInerney's support for Republican Party organizations at the national, state, and local levels reflect his shared philosophy and values with the Party.

19. Nothing in the record suggests that McInerney's support for the Republican Party at the national, state, and local levels is dependent upon gaining access to federal officeholders. McInerney would support the Republican Party whether or not he was solicited by a federal officeholder and whether or not his contribution resulted in attendance at an event that included federal officeholders. *See id.* ¶ 17.

### The Role of Political Parties in Democracies

20. Both sides experts testify that political parties play a critical role in democracies. *See* Mann Expert Report at 28 ("Political parties play an indispensable role in democratic societies . . . ."); Krasno & Sorauf Expert Report at 21–22 ("While most political scientists may not literally agree with E.E. Schattschneider that 'parties created democracy, and . . . democracy is unthinkable save in terms of parties' they would recognize and appreciate the sentiment. We certainly place ourselves in their number."); La Raja Decl. ¶ 11 ("Political parties are essential institutions in democracies."). Experts testify that po-

litical parties have played and continue to play certain critical roles in helping us to maintain a stable political order.

21. First, they note that the parties have coordinated and reconciled various national, state, and local entities within our federal system of government. *See* Milkis Expert Report at 13–14; Keller [151] Expert Report at 6–7.

22. Next, they state that the parties encourage "democratic nationalism" by nominating and electing candidates and by engaging in dialogues concerning public policy issues of national importance. Milkis Expert Report at 14–19. An example of this is the RNC's recent participation in public policy debates concerning a balanced budget amendment, welfare reform, and educational policy. *See* Josefiak [152] Decl. ¶ 91; RNC Exhibit 1711, Exhibit 2428, Exhibit 2440.

23. Experts note that the parties recruit and nominate candidates, aggregate public preferences, and provide a means of democratic accountability. *See* D. Green Expert Report at 7; Magleby Expert Report at 33; Mann Expert Report at 28. Political scientists also credit parties with increasing voter turnout, encouraging volunteer grassroots political participation, fostering broader electoral competition by supporting challengers against incumbents, and diluting the influence of organized interests. *See* Cross Exam. of Green at 83–84; Cross Exam. of Mann at 53; Keller Expert Report at 5–6; Milkis Expert Report at 12–13; La Raja [153] Expert Report at 5, 7–8.

24. Plaintiffs' expert Keller states that party competition in general is healthy for democracy; it was a major force behind

---

**151.** Sidney Milkis and Morton Keller are experts for the plaintiffs.

**152.** Thomas Josefiak is Chief Counsel of the RNC. Josefiak Decl. ¶ 1.

**153.** Raymond La Raja is one of plaintiffs' experts.

the expansion of the electorate through the enfranchisement of blacks in the South, reduction of the voting age to eighteen, and the elimination of poll taxes and other constraints on voting registration. *See* Keller Expert Report at 15. Intense competition among the post-Civil War parties led to increased voter turnout and close presidential elections. *See id.* at 11–12.

25. In addition, experts find that the parties act as critical agents in developing consensus in the United States. *See* Milkis Expert Report at 19. In the words of one defense expert, parties are "the main coalition building institution[s] ... by a good measure." Cross Exam. of Green at 84; *see* Cross Exam. of Mann at 53, 56 ("[n]o other group could come close to political parties" in moderating extreme views); Krasno & Sorauf [154] Expert Report at 24 ("Parties with their necessary 'big tent' compete for the allegiances of multiple groups ...").

26. Furthermore, experts find that the parties cultivate a sense of community and collective responsibility in American political culture. *See* Milkis Expert Report at 19–21; La Raja Expert Report at 3–4. Parties have been integral in forming a consensus on publicly divisive issues. *See* Milkis Expert Report at 4.

27. Finally, it is also noted by experts that it is a major purpose of the political parties to elect candidates to office. *See* Bumpers [155] Decl. ¶ 4 [DEV 6–Tab 10]; Wolfson Decl. ¶ 6 [DEV 9–Tab 44]; Jordan Decl. ¶ 6 [DEV 7–Tab 21]; Shea Dep. Tr. (Sept. 24, 2002) at 15, 88–90; Knopp Cross Tr. at 10; Brister Decl. ¶ 4 ("The Republican Party of Louisiana's primary purpose is to help elect Republicans to office 'from the courthouse to the White House'");

ODP0021–02001–19, ODP0021–02386–90, ODP0025–02641–45 [DEV 70–Tab 48] (internal RNC Memoranda from then-Chairman Haley Barbour); RNC's Resp. to FEC RFA's in RNC, No. 40 [DEV 68–Tab 35]; ODP0021–02003 [DEV 70–Tab 48] (RNC Chairman Haley Barbour stated: "The purpose of a political party is to elect its candidates to public office, and our first goal is to elect Bob Dole president.... Electing Dole is our highest priority, but it is not our only priority. Our goal is to increase our majorities in both houses of Congress and among governors and state legislatures."); *see generally* ODP0021–02001 to 19; ODP0021–02386 to 90; ODP0025–02641 to 45 [DEV 70–Tab 48] (internal RNC memoranda from then-Chairman Haley Barbour).

### Republican National Committee

28. As a national party, the RNC has historically participated and participates today in electoral and political activities at the federal, state, and local levels. According to its general counsel, "[t]he RNC's national focus should not be misunderstood as a federal focus." *See* Josefiak Decl. ¶¶ 19, 41–59. The RNC seeks to advance its core principles—a smaller federal government, lower taxes at all levels of government, individual freedom, and a strong national defense—by promoting an issue agenda advocating Republican positions, electing Republican candidates, and encouraging governance in accord with these Republican views. *See* Josefiak Decl. ¶ 22; *see also* La Raja Expert Report ¶¶ 11, 16.

29. In pursuit of its objectives, the RNC engages in frequent communications with its members, officeholders, candi-

---

**154.** Jonathan Krasno and Frank Sorauf are experts for defendants.

**155.** Senator Dale Bumpers served two terms as Governor of Arkansas, from 1971 to 1975.

After his service as Governor, he served as a Member of the United States Senate, representing the State of Arkansas, from 1975 to 1999. Bumpers Decl. ¶ 2 [DEV 6–Tab 10].

dates, state and local party committees, and the general public. These communications occur both during campaign seasons and at all other times. *See* Banning[156] Decl. ¶¶ 28(d)–28(f); Josefiak Decl. ¶¶ 88–89, 100–101.

### The RNC's Federal Election Activities

30. The RNC, and its national party committees, engage in a wide range of activities that influence federal elections. For example, the RNC spends federal funds on: (i) recruiting and training candidates; (ii) contributing to federal candidate campaign committees; (iii) making coordinated expenditures on behalf of federal candidates; (iv) making communications calling for the election or defeat of federal candidates; (v) funding, in part, research and issue development; and (vi) funding, in part, voter registration, voter identification, and get-out-the-vote campaigns. *See* Banning Decl. ¶ 28(d); Josefiak ¶¶ 26, 35, 89; *see also* La Raja Decl. ¶ 11(d); Magleby Expert Report at 33–34. Prior to the enactment of BCRA, some of these activities were funded only with federal money; others were funded with a combination of federal and nonfederal money.

### National Party Use of Nonfederal Money to Benefit Federal Candidates

31. Nonfederal money is often given to national parties with the understanding that it will be used to assist the campaigns of particular federal candidates, and, indeed, it is often used for that purpose.

32. Senator Simpson[157] testified that "[d]onors do not really differentiate between hard and soft money; they often contribute to assist or gain favor with an individual politician. When donors give soft money to the parties, there is sometimes at least an implicit understanding that the money will be used to benefit a certain candidate. Likewise, Members know that if they assist the party with fundraising, be it hard or soft money, the party will later assist their campaign." Simpson Decl. ¶ 6 [DEV 9–Tab 38]. "Although soft money cannot be given directly to federal candidates, everyone knows that it is fairly easy to push the money through our tortured system to benefit specific candidates." *Id.* ¶ 7; *see also* Bumpers Decl. ¶¶ 10–12 [DEV 6–Tab 10]; McCain Decl. ¶ 7 ("[P]arties encourage Members of Congress to raise large amounts of soft money to benefit their own and others' reelection."); Simon[158] Decl. ¶ 10 [DEV 9–Tab 37]; Beckett[159] Decl. ¶ 6 [DEV6–Tab 3];

---

156. Jay Banning has served as the RNC's Director of Administration and Chief Financial Officer since 1983, and has been employed by the RNC in these and other capacities for twenty-six years. Banning Decl. ¶ 1.

157. Senator Alan Simpson served as United States Senator from Wyoming from 1979 to 1997. Simpson Decl. ¶ 2 [DEV 9–Tab 38].

158. Senator Paul Simon served as a United States Senator for Illinois from 1985 to 1997, and was a Member of the House of Representatives from 1975 to 1985. Prior to being elected to Congress, Senator Simon served as Lieutenant Governor of Illinois from 1968 to 1972, and served in the Illinois House of Representatives from 1954 to 1962 and in the Illinois State Senate from 1962 to 1966. Simon Decl. ¶ 1 [DEV 9–Tab 37].

159. Terry S. Beckett is a Democratic political consultant who has spent about 25 years working on political campaigns. Beckett Decl. ¶ 2 [DEV 6–Tab 3]. Beckett worked on the 1976 and 1980 Presidential campaigns of Jimmy Carter, the 1978 Bill Nelson Congressional campaign, and she ran Dick Batchelor's 1982 Congressional campaign. *Id.* Beckett also endeavored to establish a House Democratic Caucus within the Alabama legislature in the mid 1980s. *Id.* Beckett ran Gary Hart's 1988 Presidential campaign in Florida and Louisiana, and Dick Gephardt's 1988 Presidential campaign in Florida. *Id.* In 1986, Beckett did the polling on Linda Chapin's campaign for Orange County (Florida) Commissioner, and ran Chapin's 1990 and 1994 campaigns for Orange County Chairman. *Id.* Beckett also served as general consultant on Ms. Chapin's 2000 campaign to represent Florida's Eighth congressional dis-

Bloom [160] Decl. ¶ 3 [DEV 6–Tab 7]; Buttenwieser [161] Decl. ¶ 16 [DEV 6–Tab 11]; ODP0018–00501–02 [DEV 69–Tab 48] (letter from federal candidate regarding "how you can further help my campaign by assisting the Colorado Republican Party"); Shays Decl. ¶ 12 [DEV 68–Tab 40]; Hiatt [162] Dep. at 114–16 [JDT Vol. 10] (explaining that anyone donating nonfederal money is indirectly giving it to the campaigns of federal candidates and officeholders); Buttenwieser Decl. ¶ 15 [DEV 6–Tab 11] (explaining that there is little difference between federal and nonfederal money beyond the source and amount limi-

tations on federal money, because national and state political parties use nonfederal money to influence federal elections); Rudman Decl. ¶ 19 [DEV 8–Tab 34].

33. Senator Wirth [163] understood that when he raised funds for the DSCC, donors expected that he would receive the amount of their donations multiplied by a certain number that the DSCC had predetermined, assuming that the DSCC had raised other funds. Wirth Decl. Exhibit A ¶¶ 5, 8 [DEV 9–Tab 43]; see also Colorado II, 533 U.S. at 458, 121 S.Ct. 2351.

34. In 2000, a Fortune 100 company agreed to contribute $25,000 to the NRSC

---

trict, overseeing the work of the campaign manager and the media and polling consultants. Id. Beckett has also been involved in government having worked on the Executive Staff for Bob Graham from 1981–82 when he was the Governor of Florida and also serving as Ms. Chapin's Chief of Staff from 1991 to 1994 when she was County Chairman. Id. In addition, Beckett worked for a polling firm during the 1980s. Id.

160. Elaine Bloom is currently engaged in consulting, public speaking, and community activities. Bloom Decl. ¶ 2 [DEV 6–Tab 7]. In 2001, Bloom was a candidate for Mayor of Miami Beach, Florida. Id. In 2000, Bloom was the Democratic candidate in the general election to represent Florida's 22nd congressional district, running against the incumbent Republican Clay Shaw, who had served in Congress for nearly 20 years. Id. (Shaw won the race by approximately 500 votes out of over 200,000 cast). Prior to the 2000 race, Bloom served as a member of the Florida House of Representatives for over 18 years, from 1974 to 1978 (representing Northeast Dade County) and from 1986–2000 (representing Miami Beach and Miami). Id. Bloom was Speaker Pro–Tempore of the Florida House from 1992 to 1994, and also served as chair of several legislative committees, including the Health Care Committee, the Joint Legislative Management Committee, the Joint Legislative Auditing Committee, and the Tourism and Cultural Affairs Committee. Id.

161. Peter Buttenwieser is a large contributor to the Democratic Party. He estimates that from the 1996 election cycle through the 2002

cycle, he has donated over $2.8 million in nonfederal funds to national committees of the Democratic Party, including over $1.2 million in the 2000 election cycle. Also from the 1996 election cycle through the current cycle, he estimates that he and his wife have contributed approximately $100,000 per cycle in federal funds to federal candidate committees and other federal political committees not affiliated with political parties. During this same period, he has also hosted many hard money fundraising events for federal candidates in Philadelphia. Buttenwieser Decl. ¶ 6 [DEV 6–Tab 11].

162. Arnold Hiatt engaged in substantial political spending for a number of years. He estimates that from the 1992 election cycle through 1997, he donated approximately $60,000 in federal funds, mostly to federal candidates, with a few contributions to federal political action committees ("PACs"). In October of 1996, he gave a $500,000 nonfederal donation to the DNC. In February of 2001, he made a $5000 hard money donation to the League of Conservation Voters' PAC, and believes that is the only hard money donation he has given since 1997. Hiatt Decl. ¶ 5 [DEV 6–Tab 18].

163. Senator Timothy Wirth served in the U.S. House of Representatives from 1974 to 1986, representing the Second Congressional District of the State of Colorado. From 1987 through 1992 he served as Senator for the State of Colorado in the United States Senate. Wirth Decl. Exhibit A ¶ 2 [DEV 9–Tab 43].

at the request of George Allen, the then Republican candidate in the 2000 Senatorial race in Virginia against incumbent Senator Chuck Robb. An employee noted that the company had donated to Senator Robb's Leadership PAC and that a similar contribution to the NRSC was necessary to balance out the company's support to the candidates. Internal memorandum (Oct. 26, 2000) [citation sealed].

35. Individual nonfederal money donors have made specific requests that the RNC apply their nonfederal money gifts to particular campaigns. RNC0035464 [DEV99], RNC0032733–34 [DEV 92] (fundraising letters requesting that soft money donations be used for particular federal elections); see Hiatt Dep. at 90–91, 117–18 [JDT Vol. 10] (stating that soft money donations to the DNC are earmarked for particular candidates, but saying he does not know if the money was actually spent on those candidates).

*National Party Use of Nonfederal Money for Federal–Candidate Advocacy*

36. The national parties spend a large proportion of their nonfederal money on so-called "issue advertisements" that are really designed to help elect specific federal candidates. In 2000, for example, the RNC spent a large portion of their nonfederal money, an estimated $70–75 million dollars, on the production and broadcasting of television and radio "issue ads." Oliver[164] Dep. at 148–49 [DEV Supp.-Tab 1]. Of that amount, approximately $14 million were coordinated expenditures, and the rest were so-called "issue ads." *Id.;* see also Marshall[165] Decl. ¶3 (largest single portion of DNC budget during 2000 election cycle was used for issue ads) [DEV 8–Tab 28].

37. By the end of the 2000 election cycle, it was clear that parties were using corporate and labor union soft money donations to influence federal elections, often through candidate-specific issue ads, and not primarily for state and local elections. Mann Expert Report at 25–26.

38. The RNC has offered to run these so-called "issue ads" for Members of Congress in their districts, and to have the national committees provide the soft money portion of the funds required to place the ads, if those Members provide the federal portion. See ODP0021–01365 to 67 [DEV 70–Tab 48], ODP0025–02936 [DEV 70–Tab 48] (memorandum and email from the RNC offering to pay the soft money portion of political advertisements for Members of Congress who are willing to pay the federal portion).

39. Evidence submitted suggests that during the 2000 election, party ads were not aimed at party building. Almost 92% of party ads never even identified the name of a political party in the body of the advertisement, let alone encouraged voters to register with or support the party or to volunteer with the local party organization. Buying Time 2000 at 64 [DEV 46].

40. Defendants' expert Green states:

[T]he original exemptions for soft-money were justified partly on the grounds that get-out-the-vote activity would help strengthen parties. As it happened, only a small fraction of the soft money (or hard money, for that matter) that flowed to state and national parties was spent on voter mobilization activity, even broadly conceived to include direct mail and commercial phone banking. According to the classification system presented by La Raja and Javish Shean

---

164. John Oliver is Deputy Chairman of the RNC.

165. Brad Marshall has served as Chief Financial Officer of the DNC since 1994. Marshall Decl. ¶1 [DEV 8–Tab 28].

(2001, p. 3), 8.5% of national party soft money expenditures went to 'mobilization' and 'grassroots.' The figures for state and local parties are each 15%. (citing Raymond La Raja and Elizabeth Jarvis–Shean, Assessing the Impact of a Ban on Soft Money: Party Soft Money Spending in the 2000 Elections. (Unpublished manuscript: Institute of Governmental Studies and Citizens' Research Foundation 2001)).

D. Green Report at 14 n. 17 [DEV 1–Tab 3].

41. What has been permitted as "issue advocacy" has not only included genuine issue ads that promote legislation and public policy positions but communications, paid for in whole or part with nonfederal money, that attack or support a candidate by name without using the "magic words" described in *Buckley*.[166] *See* 144 Cong. Rec. S10071–73 (1999) (Sen.Levin) ("issue ads" indistinguishable from candidate ads which are subject to contribution limits and disclosure requirements); 146 Cong. Rec. H428 (2000) (Rep.Ganske); ODP0021–01365–67 [DEV 70–Tab 48]; ODP0022–00277–88 [DEV 70–Tab 48]; ODP0023–02358–65 [DEV 70–Tab 48]; ODP0023–03560–660 [DEV 70–Tab 48]; ODP0025–01560 [DEV 70–Tab 48]; ODP0025–02720–21 [DEV 70–Tab 48]; ODP0031–00424 [DEV 71–Tab 48]; ODP0033–00534 [DEV 71–Tab 48]; ODP0036–03603 [DEV 71–Tab 48]; ODP0037–00062 [DEV 71–Tab 48]; ODP0037–00884 [DEV 71–Tab 48]; ODP0037–02271 [DEV 71–Tab 48] (examples of advertisements); *see also* Shays Decl. in RNC ¶¶ 7, 8 [DEV 68–Tab 40]; Meehan Decl. in RNC ¶ 13 [DEV 68–Tab 30]; Rudman Decl. ¶ 12 [DEV 8–Tab 34]; Beckett Decl. ¶ 11, Exhibit 3 [DEV 6–Tab 3]; Chapin [167] Decl. ¶ 11 [DEV 6–Tab 12]; Lamson Decl. ¶¶ 9, 17, Exhibits 2–4 [DEV 7–Tab 26]; Pennington [168] Decl. ¶ 13 [DEV

---

**166.** *Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. 612. See description of the difference between "genuine issue ads" and "candidate-centered" advocacy ads in *supra* Parts I.A.3 & I.B.2.

**167.** Since early 2001, Linda Chapin has been the Director of the Metropolitan Center for Regional Studies at the University of Central Florida. Chapin Decl. ¶ 2 [DEV 6–Tab 12] received about 49 percent of the votes cast. *Id.* ¶ 4. From 1998 to 2000, Chapin directed the Orange County (Florida) Clerk's Office. *Id.* ¶ 2. Prior to that, Chapin was elected to two successive four-year terms, in 1990 and 1994, as County Chairman of Orange County. *Id.* The County Chairman is a strong executive position roughly equivalent to a mayoral office. *Id.* In recognition of Chapin's work as County Chairman, she received a Public Service Excellence Award from then-President Bill Clinton in 1997, and an Alumni Achievement Award from the Kennedy School of Government at Harvard University in 1999. *Id.* Prior to her tenure as County Chairman, she was elected to a four-year term on the Orange County Commission in 1986.

**168.** Rocky Pennington is a Republican political consultant. Pennington Decl. ¶ 2 [DEV 8–Tab 31]. He is the owner and President of three Florida companies engaged in political activities: Southern Campaign Resources, Direct Mail Systems, Inc., and Summit Communications. *Id.* Southern Campaign Resources, which Pennington founded in 1982, does general consulting primarily for Florida state campaigns, but has also done Congressional races in Florida, including Congressman Cliff Steams' first race in 1988 in Ocala, Bill Sublette's 2000 campaign in the Eighth Congressional district, and Congressman Jeff Miller's 2001 special election in the Panhandle. *Id.* Direct Mail Systems, founded in 1981, is a direct mail company with roughly 100 employees that has done fundraising and has sent voter contact mail for candidates, parties and interest groups in Florida and elsewhere. *Id.* Direct Mail Systems has also sent voter contact mail for some of Florida's Republican congressional delegation, as well as for state Republican parties in many other states. Finally, Summit Communications, which Pennington founded in 2000, creates political advertising for television and radio and buys airtime for various campaigns, such as Congressman Miller's 2001 general election campaign. *Id.*

8–Tab 31]; Brock[169] Decl. ¶ 8 [DEV 6–Tab 9]; Williams[170] Cross Exam. at 47 [JDT Vol. 32].

42. Whether or not party ads used so-called "magic words"—and only about 2.3 percent of party spots did in 2000—all 231,000 party spots viewed by coders in the *Buying Time 2000* study were perceived as electioneering in nature—that is, designed to campaign for or against candidates. These ads—96 percent of which mentioned or depicted a candidate—were focused on electing candidates. Buying Time 2000 at 64 [DEV 46].

43. Defense expert David Magleby finds that over half, and sometimes as much as three-quarters, of party soft money expenditures go to broadcast advertising. The focus and content of these ads is candidate centered. "The content, tactics and strategy are generally indistinguishable from the candidate campaigns, except that party campaign communications are generally more negative in tone." *Id.* at 45.

44. The RNC's expert Professor La Raja acknowledges that so-called "issue ads" are intended to and do support the campaigns of federal candidates. La Raja Cross, Exhibit 3 at 14, 15, 101, n. 11 [JDT Vol. 15]. RNC political operations director Terry Nelson[171] testified that the RNC engages in so-called "issue advocacy in order to achieve one of our primary objectives, which is to get more Republicans elected." Nelson Dep. at 191.

45. Many so-called "issue ads" by political parties were actually electioneering advertisements that focused on the positions, past actions, or general character traits of federal candidates, but not on upcoming federal executive action or pending legislation. *See, e.g.,* ODP0021–01393 [DEV 70–Tab 48]; ODP0023–02288–95 [DEV 70–Tab 48]; ODP0023–02308 [DEV 70–Tab 48]; ODP0023–02312–13 [DEV 70–Tab 48]; ODP0023–02314 [DEV 70–Tab 48]; ODP0023–02326–28, ODP0025–01729–32 [DEV 70–Tab 48]; ODP0025–01811–12 [DEV 70–Tab 48]; ODP0025–01861–64 [DEV 70–Tab 48]; ODP0025–02227–28 [DEV 70–Tab 48]; ODP0023–00327–28 [DEV 70–Tab 48]; ODP0023–02389–92 [DEV 70–Tab 48]; ODP0029–00010–25 [DEV 70–Tab 48]; ODP0029–00031–33 [DEV 70–Tab 48]; ODP0029–00041 [DEV 70–Tab 48]; ODP0029–00114 [DEV 70–Tab 48]; ODP0029–00169 [DEV 71–Tab 48]; ODP0029–00177–79 [DEV 71–Tab 48]; ODP0029–00235–37 [DEV 71–Tab 48]; ODP0029–00329 [DEV 71–Tab 48]; ODP0029–00339 [DEV 71–Tab 48]; ODP0041–00177–78 [DEV 71–Tab 48]; ODP0041–00202–06 [DEV 71–Tab 48]; ODP0041–00220–23 [DEV 71–Tab 48]; ODP0041–00280–82 [DEV 71–Tab 48]; ODP0041–00352–54 [DEV 71–Tab 48]; ODP0041–01261 [DEV 71–Tab 48]; ODP0041–01275 [DEV 71–Tab 48]; ODP0029–00138–47 [DEV 71–Tab 48]; ODP0036–01403–06 [DEV 71–Tab 48]; ODP0036–02931–32 [DEV 71–Tab 48]; ODP0041–00269–71 [DEV 71–Tab 48]; ODP0041–01024–27 [DEV 71–Tab 48]; ODP0041–01219 [DEV 71–Tab 48] (scripts of so-called "issue ads" by political parties).

---

**169.** Senator William Brock he served as United States Representative from Tennessee from 1963 until 1971. From 1971 until 1977, he served as a United States Senator from the State of Tennessee. From 1977 until 1981, he served as Chairman of the Republican National Committee. Brock Decl. ¶ 2 [DEV 6–Tab13].

**170.** Pat Williams was a Member of the U.S. Congress from 1979 to 1997. Williams Dep. at 8.

**171.** Mr. Terry Nelson is the RNC's Deputy Chief of Staff and Executive Director of Political Operations. Nelson Dep. at 8–9 [JDT Vol. 24].

46. Many so-called "issue ads" by political parties were actually electioneering advertisements that compared the positions, or past actions, of two competing federal candidates, rather than focusing on pending federal legislation. *See, e.g.,* ODP0023–02375–80 [DEV 70–Tab 48]; ODP0023–02387 [DEV 70–Tab 48]; ODP0023–02393–94 [DEV 70–Tab 48]; ODP0029–00149 [DEV 71–Tab 48]; ODP0029–00159 [DEV 71–Tab 48]; ODP0029–00329 [DEV 71–Tab 48]; ODP0036–02984 [DEV 71–Tab 48]; ODP0041–00457–61 [DEV 71–Tab 48]; ODP0041–00585–86 [DEV 71–Tab 48]; ODP0041–00729–32 [DEV 71–Tab 48]; ODP0041–01152 [DEV 71–Tab 48]; ODP0041–01164 [DEV 71–Tab 48]; ODP0041–01177 [DEV 71–Tab 48]; ODP0041–01189 [DEV 71–Tab 48]; ODP0041–01198 [DEV 71–Tab 48]; ODP0041–01266 [DEV 71–Tab 48]; ODP0041–01337 [DEV 71–Tab 48]; ODP0041–01474–76 [DEV 71–Tab 48]; ODP0041–01479–81 [DEV 71–Tab 48]; ODP0041–01850 [DEV 71–Tab 48]; ODP0041–01854 [DEV 71–Tab 48]; ODP0041–01859 [DEV 71–Tab 48]; ODP0041–01884 [DEV 71–Tab 48] (scripts of political party advertisements).

47. Parties aim their nonfederal money largely at competitive races. The party committees spend millions of soft dollars in competitive U.S. Senate races and hundreds of thousands of dollars or more in competitive U.S. House races. Magleby Report at 39 [DEV 4–Tab 8]; *see also* Bumpers Decl. ¶ 4 [DEV 6–Tab 10]; McCain Decl. ¶ 22 [DEV 8–Tab 29] ("parties generally focus their soft money spending first on taking care of the parties' current officeholders and on the candidates running for open seats and after that on the challengers running against incumbents"); McConnell Dep. at 237 [JDT Vol. 19] ("I think every Senator realizes that the resources of the [NRSC] are going to be deployed to the ... maximum extent in places where there are competitive races").

48. From late March 1996 through the Republican National Convention, the RNC spent approximately $20 million on advertisements designed to boost Senator Dole's image at a time when he had virtually run out of federal matching primary funds. The RNC paid for a portion of its issue advocacy advertisements with nonfederal funds, including the costs of creating and/or disseminating advertisements that attacked President Clinton's record on welfare reform, taxes, and budgetary policy. Huyck [172] Decl. in *Mariani* ¶¶ 3, 5 [DEV 79–Tab 60]; *see also id.* at Attach. A [DEV Supp.-Tab 9] (text of advertisements paid for by the RNC and other Republican party committees in part with soft money). The RNC conducted a detailed analysis of several advertisements it was planning to run in various markets. The advertisements consisted essentially of two themes: build up Bob Dole and attack Bill Clinton. These advertisements were tested in focus groups to see the effects they had on undecided voters. The advertisement used to build up Bob Dole told his life story and never mentioned the words "vote for," "elect," or any of the so-called "magic words" of express advocacy. The second set of advertisements showed Bill Clinton speaking on a certain issue, then publicly stating the opposite. All of the ads were tested to see which would most help Bob Dole and hurt Bill Clinton in the polls. Memorandum to Haley Barbour from Charlie Nave and Joel Mincey, dated May 28, 1996, FEC MUR 4553, Fabrizio Dep., Exhibit 5 [DEV 55–Tab 113];

---

172. Pat Huyck was the RNC's Director of Accounting as of 1999. Huyck Decl. in *Mar-* *iani* ¶¶ 3, 5 [DEV 79–Tab 60].

FEC MUR 4553, Fabrizio Dep. at 83–94 [DEV 55–Tab 113] (despite working as a consultant for Senator Dole, Fabrizio McLaughlin and Associates were sharing their data with the RNC, NRSC, and NRCC).

49. An example of a 1996 RNC "issue ad" is "The Story":

Audio of Bob Dole: We have a moral obligation to give our children an America with the opportunity and values of the nation we grew up in.

Voice Over: Bob Dole grew up in Russell, Kansas. From his parents he learned the value of hard work, honesty and responsibility. So when his country called ... he answered. He was seriously wounded in combat. Paralyzed, he underwent nine operations.

Audio of Bob Dole: I went around looking for a miracle that would make me whole again.

Voice Over: The doctors said he'd never walk again. But after 39 months, he proved them wrong.

Audio of Elizabeth Dole: He persevered, he never gave up. He fought his way back from total paralysis.

Voice Over: Like many Americans, his life experience and values serve as a strong moral compass. The principle of work to replace welfare. The principle of accountability to strengthen our criminal justice system. The principle of discipline to end wasteful Washington spending.

Voice of Bob Dole: It all comes down to values. What you believe in. What you sacrifice for. And what you stand for.

Fabrizio Dep. Exhibit 2; McCain Decl. ¶ 15. The RNC paid for "The Story," in part with soft money even though it was obviously intended to help Bob Dole in the Presidential election. Huyck Decl. in *Mariani* ¶ 3 [DEV 79–Tab 60]; FEC MUR 4553, Fabrizio Dep. at 50 [DEV 55–113]; McCain Decl. ¶ 15 [DEV 8–Tab 29].

The RNC's Curt Anderson and Wes Anderson wrote to the RNC Chairman regarding the Dole "Story" advertisement, stating: "We could run into a real snag with the Dole Story spot. Certainly, all the quantitative and qualitative research strongly suggests that this spot needs to be run. Making this spot pass the issue advocacy test may take some doing." ODP0025–02018–20 [DEV 70–Tab 48]. "Any reasonable person looking at that ad at that particular time in the Presidential season would say: It's not an ad about welfare or wasteful spending; it is an ad about why should we elect that particular nominee." 145 Cong. Rec. S12747 (1999) (Sen.Levin). Senator Dole himself stated that "The Story" "never says I'm running for President. I hope that it's fairly obvious since I'm the only one in the picture." Center for Responsive Politics, A Bag of Tricks: Loopholes in the Campaign Finance System (1996) at 13, ODP0018–00172 [DEV 69–Tab 48]; *see also* McCain Decl. ¶ 15 (citing Attach. D) [DEV 8–Tab 29].

50. During the 1998 election cycle, the NRCC in coordination with the RNC conducted "Operation Breakout," an "issue advocacy" campaign designed to expand the Republican majorities in Congress. ODP0031–00299 [DEV 71–Tab 48] (September 25, 1998, letter from RNC Chair Nicholson to donor thanking him for his donation to "Operation Breakout," describing it as an issue advocacy campaign designed to expand the Republican majorities in Congress); ODP0043–00679 [DEV 71–Tab 48]. *See generally* ODP0043–00673–703 [DEV 71–Tab 48]; ODP0033–00258 [DEV 71–Tab 48]; ODP0041–00176–78 [DEV 71–Tab 48]; ODP0029–00138–49 [DEV 71–Tab 48]; *see also* ODP0030–00002–3 (fundraising letter requesting support for coalition of Republican state and national campaign organizations to mount the largest issue advocacy campaign in party history) [DEV 71–Tab 48].

51. Television and radio electioneering advertising by political parties played an important role in the 2000 congressional elections in Florida's Eighth and 22nd Districts. Political parties on both sides of these campaigns ran so-called "issue ads" that were financed partly with nonfederal money, but clearly directed at influencing the outcome of the election. In the Eighth District, for example, the DCCC ran television advertising praising Linda Chapin, the Democratic candidate, or criticizing the Republican candidates, through the Democratic State Party in order to take advantage of the more favorable hard money-soft money allocation ratios enjoyed by state parties. Beckett Decl. ¶ 9, Exhibit 1 [DEV 6–Tab 3]; Chapin Decl. ¶ 9 [DEV 6–Tab 12]; *see also* Bloom Decl. ¶ 10, Exhibits 1–1, 1–4, (Democratic party ads in 2000 Florida 22nd congressional district race) [DEV 6–Tab 7]. The NRCC and the Florida Republican Party also ran television ads in the two months prior to the general election, most of which criticized Chapin's record or positions, and which witnesses testify were clearly intended to influence the election results. Chapin Decl. ¶ 10 Exhibit 2 [DEV 6–Tab 12]; Beckett Decl. ¶ 10 Exhibit 2 [DEV 6–Tab 3]; Pennington Decl. ¶ 14 Exhibit 3 [DEV 8–Tab 31]; *see also* Bloom Decl. ¶ 11 Exhibit 2 (Republican party ads in 2000 Florida 22nd district congressional race) [DEV 6–Tab 7].

52. For example, one so-called "issue ad" stated the following:

Announcer: Linda Chapin. Hard on taxpayers. Soft on convicts. Chapin raised taxes on your utilities, pushed to raise the county sales tax and even tried raising your property tax. Meanwhile, hard time in the county jail turned into "Chapin time." Where convicts received cable tv and lounged on padded furni-

ture in carpeted cells. Chapin's County Commission ran this soft jail … a jail she called a "national model." Ask Chapin why she's hard on taxpayers and soft on convicts.

Chapin Decl. Exhibit 2; Chapin Decl. ¶ 10; Beckett Decl. ¶ 10; Pennington Decl. ¶ 14.

### The RNC's Involvement in Nonfederal Activities

53. The RNC also undertakes activities exclusively in connection with state and local elections. RNC General Counsel Josefiak testified that "given the RNC's state-based structure, it is not surprising that the RNC actually focuses many of its resources on purely state and local election activity. This frequently involves significant resources to grassroots activities, some of which exclusively benefit state and local candidates." Josefiak Decl. ¶ 19.

54. Testimony by RNC officials states that for elections in which there is a federal candidate on the ballot, the RNC still funds the training state and local candidates, contributes to state and local candidate campaign committees, and supports get-out-the-vote activities.

55. In 2000 the RNC donated approximately $5.6 million in nonfederal funds to state and local candidates. Josefiak Decl. ¶ 61.

56. The RNC devotes resources to state and local political activities during federal election years even when the federal races are not competitive in a particular state in the hopes of influencing a gubernatorial race (as in California in 2002 and Indiana in 2000). Josefiak Decl. ¶ 62 (testifying that "the RNC sometimes devotes significant resources toward states with competitive gubernatorial races even though the races for federal offices are less competitive"); Peschong [173] Decl. ¶¶ 4,

---

**173.** John Peschong is the RNC's Regional Political Director for the Western Region. Pes-

chong Decl. ¶ 1.

8–9 (stating that "the RNC typically provides a very substantial share of the funding of state victory programs," which are "programs designed to support the entire Republican ticket, and frequently place more emphasis on high profile state-wide races than on federal races, especially when no federal candidate is running state-wide."). In 2000, according to Josefiak, most observers believed that Indiana was a "safe" state for George Bush and that it also did not have a competitive Senate race. Nevertheless, the RNC "committed significant resources to the state in hopes of influencing the gubernatorial race." Josefiak Decl. ¶ 62.

57. For elections in which there is *no* federal candidate on the ballot, the RNC frequently trains state and local candidates, contributes to state and local candidate campaign committees, funds communications calling for the election or defeat of state and local candidates, and supports get-out-the-vote activities. *See* Banning Decl. ¶ 28(a); Josefiak Decl. ¶¶ 19, 41–59; La Raja Decl. ¶ 14; *cf.* Bok[174] Cross Exam. at 34–35.

58. Five States—Kentucky, Louisiana, Mississippi, New Jersey and Virginia—hold elections for state and local office in odd-numbered years when there are normally no federal candidates on the ballot. *See* Josefiak Decl. ¶ 41. Likewise, numerous cities—including Houston, Indianapolis, Los Angeles, Minneapolis and New York City—hold mayoral elections in odd-numbered years. *See id.;* Erwin[175] Decl. ¶ 5; Green Reb. Decl.App. C at 10 (GOTV study conducted on 2001 elections in Bridgeport, Columbus, Detroit, Minneapolis, St. Paul, and Raleigh).

59. For the 2001 election, an "off-year" election with no federal candidates on the ballot, the RNC spent more than $15.6 million in nonfederal funds on state and local election activity through contributions to state and local candidates, transfers to state parties, and direct spending. *See* Banning Decl. ¶ 28(a). In the last two off-year elections combined, the RNC spent over $21 million in nonfederal funds to support state and local election activity, not including substantial commitments of staff time and other resources. *Id.* This includes over $9.5 million in direct contributions to state and local candidates, over $10 million dollars to state parties, and over $1 million dollars in direct expenditures. *Id.; see also* Duncan[176] Decl. ¶¶ 14–15 (discussing RNC contributions to state and local races); Josefiak Decl. ¶¶ 19, 41–59 (discussing RNC electoral activity when no federal candidates appear on the ballot); Cross Exam. of Defense Expert Mann at 71 (agreeing that donations gubernatorial candidate in an odd-numbered year is not something that is intended to affect a federal election); La Raja Expert Report ¶ 15. For example, the RNC contributed approximately $500,000 to the Republican gubernatorial candidate in Virginia in 1999. La Raja Decl. ¶ 14(b).

60. Until BCRA's effective date the RNC maintained twelve nonfederal accounts, known as RNSEC accounts. *See* Banning Decl. ¶¶ 6, 17.

61. Because of the variations among state campaign finance laws, the RNC set up different rules to govern each RNSEC account according to the type and amount of contributions that could be deposited

---

**174.** Derek Bok is an expert for plaintiffs.

**175.** Ryan Erwin is the Chief Operating Officer of the CRP. Erwin Aff. ¶ 1.

**176.** Robert Duncan is a Member of the RNC from the State of Kentucky. At the time the

RNC's Complaint in this case was filed, he served as Treasurer of the RNC, but as of July 2002 he became its General Counsel. Duncan Decl. ¶ 1.

therein and the type of disbursements that could be made therefrom. *See id.* ¶ 7.

62. Some RNSEC accounts were reserved for corporate funds, which were used to make contributions or expenditures in states permitting the use of such funds in connection with state and local elections. *See id.* ¶ 8.

63. Other RNSEC accounts were reserved for individual funds, which were used to make contributions or expenditures in states not permitting the use of corporate funds in connection with state and local elections. *See id.* ¶ 10.

64. Still other RNSEC accounts held funds raised and spent pursuant to the unique legal requirements of particular states; the RNC set up state-specific RNSEC accounts for California, Massachusetts, Michigan, Missouri, New York, North Carolina, and Rhode Island. *See id.* ¶¶ 11–12, 17.

### The RNC's Involvement in "Mixed" Activities

65. Prior to the effective date of BCRA the RNC also engaged in "mixed" activities—that is, activities that *indirectly* influence both federal and state or local elections (e.g., administrative overhead, genuine issue ads, nonbroadcast party building communications, state redistricting litigation, training for state party officials, and generic voter registration and get-out-the-vote activities). As required by the FEC, the RNC paid for these activities with a combination of federal and nonfederal funds.

66. The FEC historically allowed the RNC to pay for its administrative overhead—including salaries, benefits, equipment, and supplies for party operations at RNC headquarters in Washington, D.C.—with a mix of federal and nonfederal funds. *See* Banning Decl. ¶ 27; *see also* Bowler [177] Decl. ¶ 15.

67. "During the 2000 election cycle, the RNC spent $35.6 million of nonfederal funds and $52.9 million of federal funds on administrative overhead." Banning Decl. ¶ 27. "Administrative overhead includes the operating costs of RNC facilities, such as utility bills and maintenance, fundraising costs, and routine expenses for travel and supplies. Administrative overhead also includes the salaries of RNC employees." *Id.; see also* Bowler Decl. ¶ 15 (stating that allocation is required for administrative expenses like rent, utilities, and salaries).

68. The RNC regularly broadcasts ads for the purpose of influencing an issue or policy. *See, e.g.,* Josefiak Decl. ¶ 91(e); La Raja Decl. ¶ 16(b) ("Political parties use nonfederal money to develop and disseminate political me sages.").

69. According to Josefiak: "The RNC seeks to educate the public about the positions for which the Republican Party stands." Josefiak Decl. ¶ 91(e).

70. According to Josefiak: "The RNC is currently airing a 60–second radio spot entitled 'Leave No Child Behind.' This genuine issue advertisement, which features a man and a woman discussing education issues, states the following:

Male: Every child can learn . . .

Female: . . . and deserves a quality education in a safe school.

Male: But some people say some children can't learn . . .

Female: . . . so just shuffle them through.

Male: That's not fair.

Female: That's not right.

Male: Things are changing. A new federal law says every child deserves to learn.

---

**177.** Kathleen Bowler is the Executive Director of the CDP. Bowler Decl. ¶ 1.

Female: It says test every child to make sure they're learning and give them extra help if they're not.

Male: Hold schools accountable. Because no child should be in a school that will not teach and will not change.

Female: The law says every child must be taught to read by the 3rd grade. Because reading is a new civil right.

Male: President Bush's No Child Left Behind Law.

Female: The biggest education reform and biggest increase in education funding in 25 years.

Male: Republicans are working for better, safer schools . . .

Female: . . . so no child is left behind.

Male: That's right . . . Republicans.

Anncr: Learn how Republican education reforms can help your children. Call . . . . Help President Bush and leave No Child Behind."

The advertisement mentions President Bush's name for the purpose of identifying the precise proposal supported by the Republican Party ('President Bush's No Child Left Behind Law'), but mentions no federal candidate currently facing reelection. It concludes with a request that listeners call a toll-free number to learn more about Republican education reform. Josefiak Decl. ¶ 91(e); RNC Exhibit 2428.

71. The RNC has used a mix of federal and nonfederal funds to engage in non-broadcast communications with its supporters. The RNC's magazine "Rising Tide," is designed to provide readers with "a more in-depth education about the Republican issue agenda than is possible in the more traditional 30–second television advertisements." Josefiak Decl. ¶ 99; RNC Exhibit 977. Also, political parties use the internet, e-mail, and direct mail to spread their messages to adherents. *See* La Raja Expert Report ¶ 16(a); Magleby Expert Report at 42.

72. The RNC used a mix of federal and nonfederal funds to support redistricting efforts, including state redistricting litigation. Josefiak Decl. ¶ 74. In 2002, for example, the RNC budgeted approximately $4.1 million on redistricting. Seventy percent of the redistricting budget was to be funded with nonfederal money. Banning Decl. ¶ 28(i). The RNC spends more overall on state legislative redistricting than on congressional redistricting. Josefiak Decl. ¶ 74.

73. The RNC has used a mix of federal and nonfederal funds to conduct training seminars for Republican candidates, party officials, activists and campaign staff, many of whom are involved in state and local campaigns and elections. Topics included grassroots organizing, fundraising and compliance with campaign finance regulations. During the 2000 election cycle at least 10,000 people attended RNC-sponsored training sessions, including 117 "nuts and bolts" seminars on grassroots organizing and get-out-the-vote activities. During the same cycle the RNC spent $391,000 in nonfederal funds and $671,000 in federal funds on such training and support. *See* Banning Decl. ¶ 28(c); *see also* La Raja Expert Report at 11 (parties "help candidates by training them and their campaign staff," support which "can make an important difference in whether a candidate chooses to run for office, particularly in an era of cash-intensive campaigning that requires skillful application of advanced campaign technologies").

74. The RNC has used a mix of federal and nonfederal funds to support interstate cooperation on state issues among Republican state and local activities. For example, the RNC provided $100,000 of seed money for the formation of a Republican state attorneys general association that focuses on state issues. RNC Exhibit 978; *see also* Josefiak Decl. ¶¶ 82–84. In addi-

tion, during the 2000 election cycle the RNC spent $199,000 in nonfederal funds and $33,500 in federal funds on state and local governmental affairs. *See* Banning Decl. ¶ 28(b).

75. The RNC has used a mix of federal and nonfederal funds to support efforts to increase minority involvement and membership in the Republican Party. During the 2000 election cycle, for example, the RNC spent $1,211,000 in nonfederal funds and $2,163,000 in federal funds on support of allied groups and minority outreach. *See id.* ¶ 28(e).

76. Pursuant to FECA and FEC regulations in force prior to BCRA's effective date, the RNC paid for mixed activities using a predetermined "allocation" formula for federal and nonfederal funds. Josefiak Decl. ¶ 23 ("Since the FEC has long recognized that the RNC is heavily involved in activities at the federal and state levels, the RNC has historically paid for its overhead using an allocation, or 'split,' between federal and nonfederal funds: activities that are purely federal are paid for with 100% federal funds; activities that are purely state or local are paid for with 100% nonfederal funds; and activities that relate to both federal and state elections are paid for with a combination of federal and nonfederal funds.").

77. During presidential election years national party committees were required to pay for their mixed activities with at least 65 percent in federal funds. *See* 11 C.F.R. § 106.5(b)(2)(i) (2001).

78. During nonpresidential election years national party committees were required to pay for their mixed activities with at least 60 percent in federal funds. *See id.* at § 106.5(b)(2)(ii).

### The RNC's Assistance to State and Local Parties for Nonfederal and Mixed Activities

79. Prior to BCRA's effective date the RNC also provided financial and fundraising assistance to state and local candidates and parties through a variety of means. *See* B. Shea[178] Decl. ¶¶ 32–40; Josefiak Decl. ¶¶ 63–72; Banning Decl. ¶ 28.

80. During the 2000 election cycle the RNC made transfers of approximately $129 million—$93.2 million in nonfederal funds and $35.8 million in federal funds—to state and local parties. *See* Press Release, FEC, National Party Transfers to State/Local Committees: January 1, 1999 to December 31, 2000, *available at* http://www.fec.gov/press/051501partyfund/tables/nat2state.html.

81. The RNC helped state and local parties through donor list exchanges; joint fundraising events; promotion of state party fundraising events; facilitating contributions from interested donors; providing matching incentives to encourage state parties to develop their in-house fundraising capabilities through the RNC's "Finance PLUS" program; and devoting personnel to state party fundraising needs. *See* Dendahl[179] Decl. ¶ 10; Duncan Decl. ¶ 13; Josefiak Decl. ¶ 44, 65–72; B. Shea Decl. ¶¶ 32–40; *see also* La Raja Expert Report ¶ 12(b) (discussing national party support for state parties generally).

82. RNC officers have sent fundraising letters on behalf of state and local candidates even during off-years. *See, e.g.,* Josefiak Decl. RNC Exhibit 292 (RNC 0332976) (fundraising letter signed by Deputy RNC Chairman Jack Oliver on behalf of Bret Schundler's New Jersey gubernatorial campaign); Josefiak Decl.

---

**178.** Beverly Shea is the RNC's Finance Director. Shea Decl. ¶ 1.

**179.** John Dendahl is the State Chairman of the Republican Party of New Mexico. Dendahl Decl. ¶ 1.

RNC Exhibit 1162 (fundraising letter signed by Haley Barbour on behalf of George Allen's Virginia gubernatorial campaign); RNC Exhibit 1766 (fundraising letter signed by Haley Barbour on behalf of New Jersey Republican Party); Feingold Dep. Exhibit 12 [JDT Vol. 6] (fundraising letter from Jim Nicholson on behalf of Norm Coleman's Minneapolis mayoral campaign).

83. RNC officers have been involved in helping state and local parties and candidates raise money in accordance with state and federal law.

84. After becoming Chairman of the RNC in February 2002, Marc Racicot made 82 trips to 67 cities in 36 states in his capacity as Chairman. "The majority of these trips have had significant fundraising components to them." Josefiak Decl. ¶ 70.

85. RNC Co–Chairwoman Ann Wagner and Deputy Chairman Jack Oliver respectively made 31 and 33 trips. "The majority of these trips have had significant fundraising components to them." See id.

86. Robert Duncan, current General Counsel and former Treasurer of the RNC, was actively involved in fundraising activities for the Republican Party of Kentucky and for Kentucky state candidates. Since 1992 when he became a member of the RNC, Duncan has sponsored a reception to support the reelection of a Kentucky state senator and he also hosted and attended numerous fundraising dinners in support of the Kentucky Republican Party. Duncan Decl. ¶¶ 5–6.

87. RNC support has been used by state and local parties to engage in voter registration, get-out-the-vote, and generic grassroots organizing. See Banning Decl. ¶ 31.

88. "RNC transfers of non-federal funds to the state parties play a critical role in subsidizing the activities of the

state parties. The state parties depend on these funds to pay for everything from their own administrative overhead to voter mobilization, grass roots organizing, and media." Banning Decl. ¶ 31; see also Duncan Decl. ¶¶ 11–12.

89. The RNC also helped state and local parties fundraise for these voter mobilization efforts. See Josefiak Decl. ¶¶ 63, 65–72; Benson[180] Decl. ¶ 10 ("[T]he Republican national party committees also assists [the Colorado Republican Party] in raising money for these party building programs.").

90. Evidence presented shows that the RNC cooperates and works closely with state and local political parties to support the entire Republican platform and ticket at the federal, state, and local levels.

91. Both sides' experts agree that "relationships among local, state, and national organizations have strengthened in the past three decades" and they attribute the cohesion to "the role of the national parties in providing resources and expertise to lower levels of the party." La Raja Expert Report at 7 (citations omitted); see Mann Expert Report at 30–31 ("The relationship between the national parties and their state parties has never been closer than it is today.").

92. Plaintiff's expert La Raja states that cooperation among national, state, and local parties is generally healthy for American democracy:

Cohesive parties enhance electoral accountability by linking the campaigns and platforms of federal, state and local candidates. In this way, they provide voters with clear signals about what the party stands for collectively. The joint campaigns of political parties across federal, state and local candidates also generate electoral economies of scale that

180. Bruce Benson is Chairman of the Colorado Republican Party. Benson Decl. ¶ 1.

mobilize greater numbers of voters. The national parties have been catalysts for party integration because they possess the resources to coordinate such activity. La Raja Rebuttal Report ¶ 9.

93. Examples of national, state, and local political parties working together are the Republican Party "Victory Plans" and the Democratic Party "Coordinated Campaigns." All levels of the Republican party structure actively participate in the design, funding, fundraising and implementation of Victory Plans, *see* Josefiak Decl. ¶¶ 26–40, just as all levels of the Democratic Party participate in the design, funding, fundraising, and implementation of Coordinated Campaigns, *see* Bowler Decl. ¶ 29.

94. The RNC's Victory Plans are voter contact programs designed to support the entire Republican ticket at the federal, state, and local levels. The RNC works with every state party to design, fund, and implement the Plans. *See* Benson Decl. ¶ 8; Josefiak Decl. ¶ 26; Peschong Decl. ¶¶ 4–5.

95. Victory Plans are formulated and implemented after extensive and continuous collaboration between the RNC and the state parties; each Plan is tailored to the unique needs of each state and designed to stimulate grassroots activism and increase voter turnout in the hopes of benefitting candidates at all levels of the ticket. Josefiak Decl. ¶¶ 25–40.

96. In 2000 the RNC transferred approximately $42 million to state parties to use in Victory Plan programs, 60 percent (about $25 million) of which was nonfederal money and none of which was spent on broadcast "issue advertising." Josefiak Decl. ¶ 31.

97. Although Victory Plans are designed to benefit Republican candidates at the federal, state, and local levels, they often place the greatest emphasis on state and local races because in most instances there are far more state and local candidates than federal candidates on the ballot. *See* Benson Decl. ¶ 8; Bennett [181] Decl. ¶ 17.k (stating that the average ratio of state and local candidates to federal candidates in Ohio in 2002 is 18 to 1).

98. "By their nature, the Victory Plans and the programs specified in them span the calendar year, not just the 60 or 120 days prior to the election." Peschong Decl. ¶ 4.

99. The Victory Plans generally incorporate rallies, direct mail, telephone banks, brochures, state cards, yard signs, bumper stickers, door hangers, and door-to-door volunteer activities. *Id.*

### RNC Fundraising

100. In 2000 the RNC raised $99,178,295 in nonfederal funds and $152,127,759 in federal funds. *See* Shea Decl. RNC Exhibit 2259.

101. The RNC engages in fundraising through direct marketing—i.e., direct mail, telemarketing and internet solicitations—and through "major donor" programs. In 2000 the RNC raised $105,860,700 through direct marketing and $146,929,900 through major donor programs. B. Shea Decl. ¶ 7. In 2001 the RNC raised $56,117,600 through direct marketing and $25,909,700 through major donor programs. *See id.*

102. On average, 60 percent of the total amount the RNC raises each year is obtained through direct marketing. *See id.*; Knopp [182] Decl. ¶ 5. Ms. Knopp testifies that she has observed that direct market-

---

181. Robert Bennett has served as Chair of the Ohio Republican Party since 1988. Bennett Decl. ¶¶ 1–2.

182. Janice Knopp is the RNC's Deputy Director of Finance/Marketing Director. Knopp Decl. ¶ 1.

ing messages that "perform the best are those that emphasize the Republican Party's core political philosophy of lower taxes and less government and the RNC's important role in federal and state elections. In short, the RNC's fundraising success depends on its appeal to persons desiring to associate with its governing philosophy." Knopp Decl. ¶ 25.

103. "Major donors" are defined by the RNC as individuals who give $1,000 or more per year. *See* B. Shea Decl. ¶ 6. In Ms. Shea's experience, like its smaller donors, the RNC's major donors are most responsive to appeals based on the RNC's ideology. *See id.* ¶¶ 23–24. The RNC has six major programs: the President's Club is designed to raise federal contributions of $1,000 per person or $2,000 per couple per year, *see id.* ¶ 14.b; the Chairman's Advisory Board is designed to raise federal or nonfederal contributions of $5,000 per year, *id.* ¶ 14.c.; the Eagles program, the RNC's oldest major donor program, is designed for members who either contribute $15,000 in federal funds or donate $20,000 in nonfederal funds per year, *id.* ¶ 14.d; the Majority Fund is directed at PACs that donate $15,000 in either federal or nonfederal funds per year, *id.* ¶ 14.e; Team 100 is designed for members who donate $100,000 in nonfederal funds upon joining and then donate $25,000 in each of three subsequent years, *id.* ¶ 14.f; and the Regents program is designed for members who give an aggregate amount of $250,000 in nonfederal funds per two-year election cycle, *id* ¶ 14.g. In addition, every four years the RNC establishes a special "Presidential Trust," designed for contributions of $20,000 in federal funds. *See id.* ¶ 15.

104. Over the last nine years the average donation to the RNC, including both federal and nonfederal funds, has been approximately $57. Knopp Decl. ¶ 5; RNC Exhibit 2430.

105. In 2000 the RNC raised the majority of its nonfederal money from individuals—not corporations—and the average corporate donation of nonfederal funds is significantly lower than the average individual donation. In 2000, for example, the average corporate donation on nonfederal funds was $2,226, while the average individual donation of nonfederal funds was $10,410. Knopp Decl. ¶ 9. Knopp further testifies that in the 2000 election cycle the RNC raised $65 million in nonfederal funds from individuals, and $51 million from corporations. *Id.*[183] However, it should be noted that out of the top 50 soft money donors to both parties combined, thirty-five corporations gave 11.4 percent ($29,447,350) of all nonfederal money received by the Republican national committees in the 2000 election cycle. *See* Mann Expert Report at tbl. 6.

### *The California Democratic Party ("CDP") and the California Republican Party ("CRP")*

106. The CDP and the CRP each maintain a federal committee registered with the FEC. In turn, the federal committee maintains a federal account, contributions to which comply with FECA's source-and-amount limitations and reporting requirements. *See* Bowler Decl. ¶ 9; Morgan[184] Aff. ¶ 3.

107. The CDP and the CRP are each registered as political party committees in accordance with California law. Each maintains a nonfederal account into which

---

183. These figures, including the corporation/individual breakdown, apparently do not include approximately $134 million in donations to Republican national committees aside from the RNC.

184. Timothy Morgan is the Republican National Committeeman from California, elected by the state central committee of the CRP. Morgan Aff. ¶ 1.

contributions permissible under California law are deposited. The parties' nonfederal campaign activities are subject to direct regulation by the California Fair Political Practices Commission and each party regularly files disclosure reports of receipts and expenditures with the Secretary of State. *See* Bowler Decl. ¶ 11; Morgan Aff. ¶ 3.

108. Prior to BCRA's effective date the costs of the CDP's and the CRP's "mixed" activities were "allocated" between each party's federal account and nonfederal account.

109. The CDP was required to allocate funds for administrative expenses such as rent or employee salaries; generic voter identification activities; voter registration activities; get-out-the-vote activities that were not candidate-specific; fundraising expenses; and communications on behalf of both federal and nonfederal candidates. *See* Bowler Decl. ¶ 15.

110. Bowler testifies that the CDP allocated funds in accordance with the FEC's regulations. They allocated funds for administrative expenses, generic voter identification activities, voter registration activities, and get-out-the-vote activities based on a "ballot composition" formula that calculated the ratio of federal offices and nonfederal offices expected to be on the general ballot in a given election cycle. They allocated funds for public communications supporting or opposing federal and nonfederal candidates using a "time-and-space" formula. And they allocated funds for fundraising expenses on a "funds raised" basis. *See id.* ¶ 15.

### Proposition 34

111. In November 2000 California voters adopted Proposition 34 to govern campaign contributions in the state. Under Proposition 34, expenditures by political party committees on behalf of state candidates are unlimited. Contributions by political party committees to state candidates are likewise unlimited, although contributions by other contributors other than political parties to state candidates are limited depending upon the elective office. Contributions to state and local political parties for the purpose of making contributions to state candidates are limited to $25,000 per year per contributor. Contributions to state and local political parties for other purposes—e.g., funding administrative and overhead costs, voter registration or generic get-out-the-vote activities or supporting ballot measures or issue advocacy—are unlimited. Contributions to state and local political parties are not source-limited; that is, corporations and labor unions may contribute funds in accordance with generally applicable limits. *See id.* ¶ 11; Erwin Aff. ¶ 5; *see also* CAL. GOV'T CODE §§ 85301, 85303(B), 85303(C), 85312.

112. By adopting Proposition 34, California voters approved the statement that "[p]olitical parties play an important role in the American political process and help insulate candidates from the potential corrupting influence of large contributions." CDP App. at 1193 ("Proposition 34: Text of Proposed Law").

### The CDP's and CRP's Focus on State and Local Activities

113. The CDP and CRP focus the majority of their resources on supporting state and local candidates, participating in state and local elections, and influencing state and local policies.

114. In California, state and local races on any particular ballot substantially outnumber federal races, of which there will be, at most, three in any election cycle. *See* Bowler Decl. ¶ 13; *id.* ¶ 15 (explaining that in the 2002 cycle, where the only Federal office on the California ballots was a congressional race, administrative expenses were required to be allocated 12.5 percent federal and 87.5 percent nonfeder-

al based on the ballot composition formula; in the 2000 cycle which included a Presidential race, administrative expenses were required to be allocated 43 percent federal and 57 percent nonfederal).

115. California holds elections for 120 legislative officers, eight statewide-elected officers and four members of the State Board of Equalization. It holds still more elections for judicial office and local office and ballot measures at both the state and local levels. *See id.* ¶ 13; Erwin Aff. ¶ 5.

116. During the 2002 election cycle—in which, according to CDP Chair Art Torres, there was only one "contested" congressional race "as a practical matter"—the CDP was actively involved in eight statewide nonfederal races and a dozen state legislative races. *See* Torres [185] Decl. ¶ 8.

117. The CDP actively participates in municipal elections. In recent years the CDP has spent several million dollars in nonfederal funds supporting candidates in major cities such as Los Angeles and San Francisco. Torres Decl. ¶ 8.

118. The CDP actively supports and opposes state and local ballot measures. Bowler Decl. ¶ 8.

### CDP & CRP Voter Registration Activities

119. Evidence shows that the CDP and the CRP conduct voter registration primarily for state and local elections.

120. Erwin testified that "[t]he overwhelming amount of [voter registration] activity is 'generic' voter registration activity urging potential registrants to 'Register Republican.'" Erwin Aff. ¶ 9.

121. CDP and CRP officials testified that "it is often the case that voter registration activities are primarily driven by the desire to affect State and local races." Erwin Aff. ¶ 14a; Bowler Decl. ¶ 20.a.

122. The CDP actively registered over 300,000 Democratic voters throughout California during 2002 even though there was "only one closely contested Congressional race" among the 52 races for the U.S. House of Representatives. *See* Bowler Decl. ¶ 20.a.

123. The CDP's expenditures on voter registration—consisting of a mix of federal and nonfederal funds—were approximately $145,000 in the 1996 election cycle; $300,000 in the 1998 cycle; $100,000 in the 2000 election cycle; and $185,000 during the period from January 1, 2001 to June 30, 2002. *See id.*

124. The CDP's expenditures for voter registration were higher in 1998 (a year with eight statewide elections) than in 2000 (a presidential election year). *Id.*

125. The CRP has paid for voter registration—with a mix of federal and nonfederal funds—through its "Operation Bounty" program, in which Republican county central committees, Republican volunteer organizations, and Republican candidates for federal and state office participate. Through Operation Bounty drives, the CRP has typically registered over 350,000 Republican voters in each election cycle since the 1984 cycle (except 1997–98). *See* Erwin Aff. at 13; *see also* CDP App. at 1185 (charting CRP's voter registration activity by election cycle since 1984 cycle).

### CDP and CRP Direct Mail Activities

126. The CDP and the CRP conduct direct mail campaigns primarily for state and local elections.

127. The CDP typically spends approximately $7 million to $8 million in nonfederal funds on its mail program in support of state and local candidates that does not include federal candidates. *See* Bowler Decl. ¶ 20(b).

---

**185.** Art Torres is the elected chair of the CDP. Torres Decl. ¶ 1.

128. In 2000, the CDP produced and sent out over 350 different mail pieces for its state and local candidates and ballot measures. These mailings do not reference federal candidates or any federal races. Bowler Decl. ¶ 20(b). This mail often gives both the election date and the person's polling places. *Id.*

129. In most election cycles the CRP mails an absentee ballot application to registered Republican households. In the 1994, 1996, and 1998 cycles the CRP sent between 2.25 and 2.5 million absentee ballot mailers to Republican voters. In the 2000 cycle the CRP sent approximately 5.2 million absentee ballot mailers. Erwin Aff. ¶ 10.b.

### CDP and CRP Get–Out–the–Vote Activities

130. The CDP conducts get-out-the-vote telephone banks primarily for state and local elections.

131. Approximately 40 to 50 percent of the CDP's paid phone banking is conducted in connection with a specific state or local race and does not make reference to any federal candidate. *See* Bowler Decl. ¶ 20.b.

132. Prior to BCRA's effective date, to the extent the CDP's phone banking referred to both federal and nonfederal candidates, expenditures therefor consisted of a mix of federal and nonfederal funds. *Id.*

133. Prior to BCRA's effective date, to the extent the CDP's phone banking did not endorse any federal candidate, expenditures therefor consisted entirely of nonfederal funds. *Id.*

134. The CDP and the CRP conduct get-out-the-vote door-to-door canvassing campaigns primarily to influence state and local elections.

135. The CDP and the CRP routinely mail slate cards and hand deliver door hangers listing endorsed candidates, urging voters to vote on election day, and informing voters of the date of the election and the polling place. *Id.;* Erwin Aff. ¶ 10.c; Bowler Decl. Exhibit H, Exhibit I.

136. Slate cards and door hangers are usually tailored for a particular local area, and state and local races dominate numerically over federal races. Bowler Decl. ¶ 20.b; Erwin Aff. ¶ 10.c.

137. Prior to BCRA's effective date, to the extent slate cards or door hangers mentioned both federal and nonfederal candidates, expenditures therefore consisted of a mix of federal and nonfederal funds. *See id.;* Bowler Decl. ¶ 20.b.

### State Party "Issue Ads" that Directly Affect Federal Elections

138. State parties also use nonfederal money to fund federal-candidate centered "issue ads" that are really electioneering advertisements intended to directly affect federal elections.

139. State parties use a large portion of the transferred nonfederal money to finance public communications (principally broadcast and cable advertisements) that support or oppose a federal candidate. *See* Wolfson Decl. ¶ 63; Marshall Decl. ¶ 3 (noting that in 2000, the largest single portion of the DNC budget was used for issue advertising, but that "[t]he DNC typically did not expend money for these issue ads itself, but instead transferred both federal and non-federal money to the state parties to make these expenditures"); Nelson Dep. Tr. at 121, 123. National party "issue advocacy" advertising focusing on electing federal candidates is often bought by state parties, but funded by national party committees, who transfer the funds needed to the state parties. *See, e.g.,* ODP0021–01365–67, ODP0023–02358–65, ODP0023–03560–660, ODP0025–01560, ODP0025–2720–21 [DEV 70–Tab 48] (internal RNC correspondence referencing "issue ads" to be run through state parties).

140. Defense Expert Magleby states that

Parties can stretch their soft money even further by transferring soft and hard money to state parties where they can achieve a better ratio of soft to hard dollars than if they spent the money themselves. This is because the ratio of soft to hard dollars for party spending if done by the national patty committees is 35 percent soft and 65 percent hard for presidential years, and 40 percent soft and 60 percent hard for off years, but if done by state parties the ratio of soft to hard dollars is greater. The reason for this difference is state parties are allowed to calculate their soft/hard ratio based on the ratio of federal offices to all offices on the ballot in any given year. Both political parties have found spending soft money with its accompanying hard money match through their state parties to work smoothly, for the most part, and state officials readily acknowledge they are simply "pass throughs" to the vendors providing the broadcast ads or direct mail.

Magleby Expert Report at 37 [DEV 4–Tab 8]; *see also* Marshall Decl. ¶ 3 [DEV 8–Tab 28] (testifying that in 2000 the DNC transferred funds to the state parties to take advantage of their allocation rates); ODP0021–1365 to 1367 [DEV 70–Tab 48] (memorandum from Haley Barbour to the California House Republicans, discussing the need to make a media buy in California and stating that "[t]o accomplish this buy, the [RNC] would transfer funds to the California Republican Party, which would actually buy the advertising. Under FEC regulations, the California Republican Party must pay for the advertising with one-third FEC contributions and two thirds nonfederal dollars"); McConnell Dep. at 267–77 [JDT Vol. 19] (stating that the NRSC prefers to transfer funds to state parties who then purchase NRSC advertisements with a more favorable feder-

al/nonfederal fund allocation ratio); Nelson Dep at 76–77 [JDT Vol. 24] (stating that purchasing political advertisements through state parties has two advantages: (1) better federal/nonfederal fund allocation ratios and (2) "having [a] state disclaimer [on the advertisement] is generally better than having a national disclaimer on it").

141. The national party committees transferred $9,710,166 in federal funds to state party committees during the 1992 election cycle, $9,577,985 during the 1994 election cycle, $49,967,893 during the 1996 election cycle, $30,475,897 during the 1998 election cycle, and $131,016,957 during the 2000 election cycle. The national party committees transferred $18,646,162 in nonfederal funds to state party committees during the 1992 election cycle, $18,442,749 during the 1994 election cycle, $113,738,373 during the 1996 election cycle, $69,031,644 during the 1998 election cycle, and $265,927,677 during the 2000 election cycle. Biersack Decl. tbls. 4, 8 [DEV 6–Tab 6].

142. The RNC transferred federal and nonfederal money to state Republican party committees to pay for electioneering "issue ads." Huyck Decl. in *Mariani* ¶ 4 [DEV 79–Tab 60]; Josefiak Dep. at 97; Hazelwood Dep. at 118–19; *see also* INT810–1605 to 12 (RNC NM0406326—33) [DEV 114] (1998 financial statement for the Republican Party of New Mexico ("RPNM") shows that it received revenues of $1,524,634 in nonfederal transfers from other Republican organizations, $1,110,987 in individual contributions, and just $389,552 in federal transfers from Republican organizations; the RPNM spent over one-third of its 1998 revenues, $1,062,095, on "issue advocacy—television, radio and mail"). In 2000, the RNC raised $254 million, a majority of which was transferred down to the state parties for various activities, including issue advertising. Josefiak Dep. at 76 [JDT Vol. 11]. Most of

the transfers are used to pay for issue ads. *See* Vogel Decl. ¶ 63; McGahn Decl. ¶ 55.

143. The DSCC and DCCC support Democratic state political party committees in producing and disseminating electioneering communications, and the large majority of their nonfederal transfers to state and local party committees have been to support the nonfederal share of issue advocacy communications. These communications frequently refer to Democratic Senate or House candidates or their Republican opponents, even though "not expressly advocating any candidate's election or defeat." Wolfson Decl. ¶¶ 63, 71 [DEV 9–Tab 44]; Jordan Decl. ¶¶ 68, 77 [DEV 7–Tab 21]; CDP 02095–101, 2103–04, 2106 [IER Tab 12] (wire transfer instructions from the DNC to the CDP for media buys); CDP 02984–89 [IER Tab 12] (detailing transfer of funds from DCCC to CDP for media buy).

144. When the national parties transfer money to state parties to fund so-called "issue ads," they insist on control of the communications, participate in the creative process, and work with the consultants to determine the content, timing, and placement of the communications. Wolfson Decl. ¶¶ 65–67, 70 [DEV 9–Tab 44]; Jordan Decl. ¶¶ 71–73, 76 [DEV 7–Tab 21]; Vogel Decl. ¶ ¶ 63, 67–68 [DEV 9–Tab 41]; McGahn Decl. ¶ ¶ 55, 58–59 [DEV 8–Tab 30]; Castellanos Dep. Tr. (Sept. 27, 2002) at 111–12 (stating that when working on ads for state parties, National Media dealt with an RNC representative, not a state party member); Marshall Decl. ¶ 4 (noting that the DNC normally approved the content of the ad and the amount of money to be spent before calling the state party in question "to let it know that an ad was coming").

145. These so-called "issue ads" are intended to and do support the campaigns of federal candidates. *See* La Raja Cross Exhibit 3 at 15, 101–04; Pennington Decl. ¶¶ 10, 13, 14 [DEV 8–Tab 31]; *see also, e.g.,* CRP 0369, 371, 373 [IER Tab 12] (transcripts of television advertisements paid for with nonfederal money transferred from NRCC to CRP).

146. Certainly, party communications that promote, support, attack, or oppose a clearly identified candidate for federal office directly affect federal elections. *See* McCain Decl. ¶¶ 15–18; Beckett Decl. ¶¶ 8–9 [DEV 6–Tab 3]; Chapin Decl. ¶¶ 8–10; Lamson Decl. ¶ 9; Pennington Decl. ¶¶ 10, 13–14; 148 Cong. Rec. S2138 (daily ed. Mar. 20, 2002) (statement of Sen. McCain).

147. Out of the estimated $25.6 million spent by political parties on ads in the 1998 election cycle, $24.6 million went to fund ads that referred to a federal candidate. *See* Krasno & Sorauf Expert Report at tbl. 1. Out of 44,485 ads, 42,599 referred to a federal candidate. *Id.* Viewers perceived 94 percent of these ads as electioneering in nature. *Id.* at tbl. 7.

148. National party committees have directed donors to give nonfederal money to state parties in order to assist the campaigns of federal candidates. Kirsch [186] Decl. ¶¶ 6, 9 [DEV 7–Tab 23]; Hassenfeld [187] Decl. ¶¶ 9–10 [DEV 6–Tab 17];

186. Mr. Kirsch is founder and Chief Executive Officer of Propel Software Corporation. He has donated millions of dollars to the Democratic Party and to "progressive candidates and groups." Kirsch Decl. ¶¶ 2, 4 [DEV 7–Tab 23].

187. Mr. Hassenfeld has served as Chairman of the Board and Chief Executive Officer of Hasbro, Inc. since 1989, a global company based in Rhode Island with annual revenues in excess of $3 billion. Hasbro designs, manufactures, and markets toys, games, interactive software, puzzles and infant products. He also sits on a number of civic and philanthropic boards. He is a member of the Board of Trustees of the University of Pennsylvania and Deerfield Academy, serves on the Dean's Council of the Kennedy School of Govern-

Hickmott[188] Decl. ¶ 8 [DEV 6–Tab 19]; Randlett[189] Decl. ¶ 9 [DEV 8–Tab 32].

149. Both federal officeholders and the national parties have directed contributors to the state parties when the contributors have "maxed out" to the candidate or when it appears that the state party can most effectively use additional money to help that officeholder or other federal candidates. *See* Kirsch Decl. ¶¶ 8–9; Philp[190] Dep. Tr. at Exhibit 14 [IER Tab 1.F]; CRP 07164 [IER Tab 1.F]; La Raja Cross Exhibit 3 at 54 ("it is common practice for a candidate to encourage donors to give to the party when they have 'maxed' their federal contributions to his or her commit-

tee"); Josefiak Decl. ¶ 68; MMc0014 [DEV 117–Tab 2] (letter to a contributor stating "Since you have contributed the legal maximum to the McConnell Senate Committee, I wanted you to know that you can still contribute to the Victory 2000 program .... This program was an important part of President George W. Bush's impressive victory in Kentucky last year, and it will be critical to my race and others next year" signed by Senator McConnell with the handwritten note: "This is important to me. Hope you can help"); Buttenwieser Decl. ¶¶ 15–16 [DEV 6–Tab 11] ("Federal candidates have often asked me to donate to state parties, rather than the

ment at Harvard, and sits on the board of Refugees International. He also run three charitable foundations: the Hasbro Charitable Trust, the Hasbro Children's Foundation, and a family foundation. Hassenfeld Decl. ¶¶ 2–3.

**188.** In 1980, during President Carter's re-election campaign, Robert Hickmott worked at the DNC as an Associate Finance Director. Hickmott Decl. ¶ 2 [DEV 6–Tab 19]. Following the general election, Hickmott became the Executive Director of a new DNC entity, the Democratic Business Council ("DBC"), where he served until 1983. *Id.* During 1985–86, Hickmott served as National Finance Director for then-Congressman Timothy Wirth's Senate campaign, and from 1987 until early 1989, on Senator Wirth's Senate staff. *Id.* After that, Hickmott was in private practice as an attorney until January 1991, when he joined the DSCC as Deputy Executive Director. *Id.* In 1993, Hickmott worked for four years as the Associate Administrator for Congressional Affairs at the Unites States Environmental Protection Agency, then for two years as a counselor to then-Secretary Andrew Cuomo at the United States Department of Housing and Urban Development ("HUD"). *Id.* In 1999, Hickmott left HUD and joined The Smith–Free Group ("Smith–Free"), a small governmental affairs firm located in Washington, D.C. *Id.* ¶ 3. Hickmott is currently a Senior Vice President at Smith–Free and one of the six principals in the firm. *Id.* Hickmott is a regular contributor to presidential and congressional candidates and the

national party committees. He donates primarily to Democratic candidates, but also to several Republicans. *Id.* In the 1999–2000 cycle, he contributed just over $7,000 and in the 2001–2002 cycle, he has contributed a little more than $10,000. *Id.* Hickmott provided a declaration in *Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 41 F.Supp.2d 1197 (D.Colo. 1999), *aff'd*, 213 F.3d 1221 (10th Cir.2000), *rev'd*, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ("*Colorado II*"); *See Colorado II*, 533 U.S. at 458, 121 S.Ct. 2351.

**189.** Mr. Randlett is Chief Executive Officer of Dashboard Technology, a World WideWeb technology consulting firm based in San Francisco, California. Prior to founding Dashboard Technology, Mr. Randlett served on the management teams of two other software companies. He was the Democratic political director at the Technology Network, also known as TechNet, a Palo Alto-based nonprofit corporation and political service organization which he co-founded in 1996. Prior to starting TechNet, he spent many years as a political fundraiser and general political consultant, working primarily in the Silicon Valley area of Northern California, but also throughout California and to some extent in major metropolitan areas in other parts of the nation. Randlett Decl. ¶ 2 [Dev 8–Tab 32].

**190.** Alan Philp testified on behalf of the Colorado Republican Party. Philp Dep. at 9 [JDT Vol. 26].

joint committees, when they feel that's where they need some extra help in their campaigns. I've given significant amounts to the state parties in South Dakota and North Dakota because all the Senators representing those states are good friends, and I know that it's difficult to raise large sums in those states. The DSCC has also requested that I provide assistance to state parties."); Hassenfeld Decl. ¶ 9 [DEV 6–Tab 17] ("In 1992, when I told the Democratic Party that I wanted to support then-Governor Bill Clinton's presidential campaign, they suggested that I make a $20,000 hard money contribution to the DNC, which I did. The Democratic Party then made clear to me that although there was a limit to how much hard money I could contribute, I could still help with Clinton's presidential campaign by contributing to state Democratic committees. There appeared to be little difference between contributing directly to a candidate and making a donation to the party. Accordingly, at the request of the DNC, I also made donations on my own behalf to state Democratic committees outside of my home state of Rhode Island.... Through my contributions to the political parties, I was able to give more money to further Clinton's candidacy than I was able to give directly to his campaign."); [IER Tab 9] (letter from Congressman Wayne Allard, paid for by the Colorado Republican Party, informing contributor that he was "at the limit of what you can directly contribute to my campaign" but at a future breakfast the contributor would be told how he could "further help my campaign by assisting the Colorado Republican Party").

150. While state parties invest much of their nonfederal money transferred to them from the national parties into federal races, La Raja Dep. at 139, they spend the majority of the nonfederal money they raise on administrative overhead, voter registration, voter mobilization, and other party building activities and not on "issue ads." *See* La Raja Decl. ¶ 22.a; Bowler Decl. ¶ 15 (explaining that "[t]he majority of [national transfers] were for issue advocacy, although money has been transferred for voter registration, get-out-the-vote activities, and even administrative expenses. We are able to raise a substantial amount of money for· our non-Federal activities and do not rely on national party transfers for those purposes"); Bowler Decl. ¶ 12 (explaining that in the 1999–2000 cycle, the CDP raised $15,617,002 in nonfederal funds, which it used to fund state and local activities); Bowler Rebuttal Decl. ¶ 3–4 (explaining that the CDP pays for much of its voter registration and get-out-the-vote activities with money raised by the state party).

151. The amount of nonfederal money the CRP and CDP raises themselves is much more than the nonfederal funds it receives from transfers from the national party. CDP/CRP 1171 (in 1999–2000, which was a presidential election year, only 19.1 percent of all CRP nonfederal money was from national party transfers); CDP/CRP 35, 37, 39 (in 2000 only 36 percent of all CDP nonfederal money was from national party transfers).

### CDP and CRP Cooperation with the National Parties

152. The CDP and the CRP cooperate and work closely with their national counterparts to support their candidates and platforms at all levels of the ticket.

153. Ms. Bowler testifies that the CDP works closely with the DNC in planning and implementing Coordinated Campaigns, the purpose of which is to allocate resources and coordinate plans for the benefit of Democratic candidates up and down the entire ticket. Party officials, candidates at all levels of the ticket, and their agents participate in Coordinated Campaigns and collectively make decisions regarding the solicitation, receipt, direct-

ing, and spending of the CDP's funds, both federal and nonfederal. Bowler Decl. ¶¶ 5, 29. According to Bowler, the CDP is "integrally related to the [DNC]." *Id.* ¶ 5.

154. The CRP works closely with the RNC in planning and implementing a Victory Plan, the purpose of which is to allocate resources and coordinate plans for the benefit of Republican candidates up and down the entire ticket. The Victory Plan is implemented in the general election cycle with the full involvement of RNC staff, CRP staff, state legislative leadership, and representatives from the top of the ticket campaigns. *See* Erwin Aff. ¶ 4.

### Reduction in CDP and CRP Fundraising and Voter Mobilization Efforts

155. The CDP has always raised more nonfederal money than federal money.

156. The CDP has raised a relatively constant amount of federal money. It raised $4,316,528 in federal funds in the 1996 election cycle; $4,076,870 in federal money in the 1998 cycle; $4,837,967 federal money in the 2000 cycle; and $3,455,887 in federal money during the 2002 election cycle as of June 30, 2002. The funds were raised directly by the CDP; the figures do not include any transfers from other party committees or from candidates. *See* Bowler Decl. ¶ 10, Exhibit A.

157. Ms. Bowler believes that even with increased efforts, it may be difficult for the CDP to raise substantially more federal money than it has in the past. *Id.* ¶ 10.

158. The CDP has tried many methods of raising more federal funds, with little success. Through the telemarketing program, which Bowler states has been its most successful method of raising federal funds, the CDP has raised between $800,000 and $2 million with an average contribution of $27. The telemarketing program, however, is very expensive to run; it costs approximately $0.40 to $0.50 for every dollar raised. *Id.* ¶ 35.

159. Since 1995 the number of contributions made to the CDP at the $5,000 level—the FECA federal maximum—was very small, usually accounting for less than five percent of the CDP's total in federal contributions. The total amount the CDP has received from maximum federal contributions has ranged from $170,000 (in the 2000 election cycle) to $355,000 (in the 1996 cycle). Because the number of contributions at the $5,000 level make up a small percentage of CDP's federal money fundraising, Bowler does not believe BCRA's doubling the limit from $5,000 to $10,000 will result in a substantial increase in federal funds contributed to the CDP. *See id.* ¶ 35.

160. Prior to BCRA's effective date the CDP raised a relatively constant amount of nonfederal money. It raised $12,991,251 in nonfederal funds in the 1996 election cycle; $15,957,831 in nonfederal money in the 1998 cycle; $15,617,002 in nonfederal money in the 2000 cycle; and $13,928,496 in nonfederal money during the 2002 election cycle up to June 30, 2002. The funds were raised directly by the CDP; the figures do not include any transfers from other party committees or from candidates. *See Id.* ¶ 12, Exhibit A.

161. Approximately 76 percent to 86 percent of the nonfederal donations the CDP has received have been from donations exceeding $10,000. *See id.* ¶ 19, Exhibit A; Torres Decl. ¶ 7.

162. The CRP has employed a wide variety of fundraising techniques to raise more federal money. *See* Erwin Aff. ¶ 12.a.

163. The CRP raises federal funds through direct mail. Erwin states that to maintain a current and effective direct mail fundraising donor list, the CRP must continually spend funds prospecting for new donors and that such prospecting is expensive and often loses money. Federal

returns on direct mailings range, on average, from $20 to $40 per contributor and that CRP direct mail returns reached a high in 1986 of over $2 million and have declined to under $1 million since 1997. *Id.;* CDP App. at 1189 (charting CRP's major funding sources by year since 1985).

164. The CRP also uses telemarketing to raise federal funds. Federal returns on the CRP's telemarketing range, on average, from $20 to $40 per contributor. Erwin testifies that like direct mail prospecting, telemarketing prospecting is "expensive and often unproductive." *See* Erwin Aff. ¶ 12.b; CDP App. at 1189. The CRP also relies on "Major Donor Programs" and "Event Fundraising" for its federal money fundraising. Erwin Aff. ¶ 12.c-d.

165. During the 2000 election cycle, the CRP raised $5,397,400 in nonfederal funds from the 166 donors who gave $10,000 or more. Erwin Aff. ¶ 13(B); Erwin Aff. Chart 5. Those donations totaled $5,397,400. The aggregated amount above $10,000 from those donations accounted for $3,737,400 ($5,397,400 minus $1,660,000 (166 donors multiplied by $10,000)). Erwin Aff. Chart 5, Chart 6A. Thus, if the CRP had been limited in funding certain electoral activities with donations raised within the $10,000 limit specified in the Levin Amendment, $3,737,400 of the $5,397,400 raised from donations above $10,000 would have been unavailable for those purposes. Erwin Chart Aff. Chart 6B. This also means that the CRP would have had 10.5 percent less total revenue to use for Levin–Amendment activities (i.e., $3,737,400 of $35,649,993, the total revenue for the 2000 election cycle, could not have been used for those activities). Erwin Aff. Chart 1.

166. Erwin testifies that BCRA's ban on national party transfers will reduce the CRP's available budget by approximately 40 percent in presidential election cycles and 20 percent in nonpresidential election cycles. Erwin Aff. ¶ 15.a.

167. On average, Erwin attests that between 1993 and 2000 BCRA would have reduced the CRP's overall spending from $30 million to $18 million during presidential election cycles and from $17.5 million to $14 million during nonpresidential election cycles. *Id.*

168. Party officials believe that under BCRA the CDP will have to reduce their communications with voters. Not only will administrative costs have to be reduced, accounting costs will likely increase because of BCRA's additional reporting requirements. Moreover, fundraising costs will increase because only federal money can be used to raise federal or Levin funds. Thus, even *maintaining* current fundraising efforts will come at a direct cost to the parties' programmatic and candidate-support activities. Because candidate support and get-out-the-vote activities are likely to remain the parties' first priorities, voter registration, generic party-building and grassroots activities will likely be reduced or even eliminated. Bowler Decl. ¶ 23; Torres Decl. ¶ 9.

### Federal Officeholder Solicitation of Nonfederal Money

169. It is a common practice for Members of Congress to be involved in raising both federal and nonfederal dollars for the national party committees, sometimes at the parties' request. McCain Decl. ¶¶ 2, 21 [DEV 8–Tab 29] ("Soft money is often raised directly by federal candidates and officeholders, and the largest amounts are often raised by the President, Vice President and Congressional party leaders."); Feingold Dep. at 91–93 [JDT Vol. 6]; Shays Decl. ¶ 18 [DEV 8–Tab 35] ("Soft money is raised directly by federal candidates, officeholders, and national political party leaders. National party officials often raise these funds by promising donors

access to elected officials. The national parties and national congressional campaign committees also request that Members of Congress make the calls to soft money donors to solicit more funds."); *see also* Rudman Decl. ¶ 12 [DEV 8–Tab 34]; Bumpers Decl. ¶¶ 7–8 [DEV 6–Tab 10]; Simon Decl. ¶ 7 [DEV 9–Tab 37]; Wolfson Decl. ¶¶ 34–35 [DEV 9–Tab 44]; Randlett Decl. ¶¶ 6–9 [DEV 8–Tab 32]; Murray[191] Dep. in *Mariani* at 41–42 [DEV 79–Tab 58]; Rozen[192] Decl. Exhibit A ¶ 7 [DEV 8–Tab 33]; Simpson Decl. ¶ 4 [DEV 9–Tab 38]; Jordan Decl. ¶¶ 32–33 [DEV 7–Tab 21].

170. Federal officeholders and candidates solicit large nonfederal donations for their parties. ODP0031–00440 (letter from donor to RNC, stating that "I am happy to deliver a check for one hundred thousand dollars to you that fulfills the commitment I made to my good friend Bob Dole in a letter I sent him"); ODP0031–00821 (letter from contributor to RNC with contribution, stating "Congressman Scott McInnis deserve [sic] most of the recruitment credit"), ODP0037–00882 (a solicitation letter from Senator McConnell to potential donor at Microsoft Corporation, expressing the hope that this person would "take a leadership role with [McConnell] at the NRSC in support of the Committee's issue advocacy campaign. The resources we raise now will allow us to communicate our strategy through Labor Day. . . . Your immediate commitment to this project would mean a great deal to the entire Republican Senate and to me personally"); ODP0037–01171–72 [DEV 71–Tab 48] (correspondence referencing solicitations by federal officeholders and candidates); Shays Decl. in RNC ¶ 12 [DEV 68–Tab 40]. In general, the personal involvement of high-ranking leaders of Congress is a significant component of raising federal and nonfederal money from major donors. *See* Bumpers Decl. ¶¶ 8–9 [DEV 6–Tab 10]; Meehan Decl. ¶ 6 [DEV 68–Tab 30]; Simon Decl. ¶ 7 [DEV 9–Tab 37]; Rozen Decl. ¶ 15 [DEV 8–Tab 33]; Kolb Decl. II, Exhibit A ¶ 8 [DEV 7–Tab 25].

171. However, the Finance Director of the RNC stated that it is "exceedingly rare" for the RNC to rely on federal officeholders for personal or telephonic solicitations of major donors. *See* B. Shea Decl. ¶ 17. She states that by RNC policy and practice, the RNC Chairman, Co-Chairwoman, Deputy Chairman, fundraising staff or members of major donor

191. Mr. Daniel Murray served as a government relations specialist for Sprint, GTE, and BellSouth Corporations from 1982 until 1995. As Executive Director of those companies, he assisted them and their PACs in selecting candidates and political groups for financial support in both federal and nonfederal funds. During this period he also served on the Democratic Business Council of the DNC, the Advisory Council of the Democratic Leadership Council, the 1998 and 1992 DNC Convention Site Selection Committees, the DSCC Leadership Circle, the DCCC Annual Dinner Committee, the RSCC Annual Dinner Committee, and steering committees for many House and Senate campaigns. Since 1995, he has acted as a government relations consultant for business and other clients. Murray Aff. in *Mariani* ¶¶ 3–5 [DEV 79–Tab 59].

192. Mr. Robert Rozen worked as a lobbyist for various interests at the law firm Wunder, Diefenderfer, Cannon & Thelen from 1995 until 1997. For the last six years, he has been a partner in a lobbying firm called Washington Counsel; now Washington Council Ernst & Young. Mr. Rozen represents a variety of corporate, trade association, non-profit, and individual clients before both Congress and the Executive Branch. His work includes preparing strategic plans, writing lobbying papers, explaining difficult and complex issues to legislative staff, and drafting proposed legislation. He also organizes fundraisers for federal candidates and from time-to-time advises clients on their political contributions. Rozen Decl. ¶ 4 [DEV 8–Tab 33].

groups—not federal officeholders—undertake initial contact and solicitation of major donors of both federal and nonfederal funds. *Id.*

172. Republican incumbents and candidates solicit donations of federal and nonfederal money for both the NRSC and the NRCC. Vogel Decl. ¶¶ 25–28, 32 [DEV 9–Tab 41]; McGahn Decl. ¶¶ 27–30, 33–37 [DEV 8–Tab 30]; ODP0018–00137 (Victory '96 Brochure outlining the RNC's donor programs and describing the uses of Victory '96 proceeds and Presidential candidate Dole's assistance raising these funds); ODP0018–00139–41, ODP0018–00151–52 [DEV 69–Tab 48] (Victory '96 solicitation letters signed by Senator Dole).

173. "National party committees often feel they need to raise a certain amount of soft money for a given election cycle. To reach that overall goal, they may divide up potential donors by geography, affiliated organization, or issue interests. The party committees decide which Members of Congress should contact these potential donors, and these Members then put in a certain amount of call time at the national committee soliciting the money. A Member and a potential donor may be matched because the Member is on a legislative committee in which the donor has a particular interest, whether economic or ideological." Randlett Decl. ¶ 6 [DEV 8–Tab 32]; *see* Rozen Decl. ¶ 15 [DEV 8–Tab 33]; Krasno and Sorauf Report at 12–13 [DEV 1–Tab 2].

174. The House and Senate congressional campaign committees and their leadership ask Members of Congress to raise funds in specified amounts or to devote specified periods of time to fundraising. Jordan Decl. ¶ 33 [DEV 7–Tab 21]; Vogel Decl. ¶¶ 32–33 [DEV 9–Tab 41]; McGahn Decl. ¶¶ 34–35 [DEV 8–Tab 30]; Wolfson Decl. ¶ 35 [DEV 9–44] (stating that the DSCC, NRSC, NRCC, and DCCC

ask members of Congress to raise money for the committees).

175. The DSCC maintains a "credit" program that credits nonfederal money raised by a Senator or candidate to that Senator or candidate's state party. Jordan Decl. ¶¶ 36–39 [DEV 7–Tab 21]. Amounts credited to a state party can reflect that the Senator or candidate solicited the donation, or can serve as a donor's sign of tacit support for the state party or the Senate candidate. Jordan Decl. ¶¶ 37–40, Tabs F, G [DEV 7–Tab 21].

176. Both the NRCC and NRSC are aware of which Members have raised funds for their committees, and may advise Members of amounts they have raised. McGahn Decl. ¶¶ 34–35 [DEV 8–Tab 30]; Vogel Decl. ¶¶ 33, 36 [DEV 9–Tab 41]. Similarly, although the DCCC uses "no formal credit or tally program," it "advises Democratic House Members of the amounts they have raised for the DCCC, ascribing particular contributions to the fundraising efforts of the Member in question." Wolfson Decl. ¶ 36 [DEV 9–Tab 44]; Thompson Dep. at 28–29 [JDT Vol. 32].

177. Federal candidates of both parties raise nonfederal money through joint fundraising committees formed with national committees. *See* Buttenwieser Decl. ¶¶ 8–14 [DEV 6–Tab 11].

178. One common method of joint fundraising is for a national committee to form a separate joint fundraising committee with a federal candidate committee. A joint fundraising committee collects and deposits contributions, pays related expenses, allocates proceeds and expenses to the participants, keeps required records, and discloses overall joint fundraising activity to the FEC. Wolfson Decl. ¶ 40 [DEV 9–Tab 44]; Vogel Decl. ¶¶ 39–45 [DEV 9–Tab 41]; Jordan Decl. ¶¶ 41, 50 [DEV 7–Tab 21]; Oliver Dep. at 258 [DEV

848

Supp.-Tab 1]. Similarly, the most common method of NRSC joint fundraising activity is for the NRSC to form a separate joint fundraising committee under FEC regulations with a Republican Senate candidate. Vogel Decl. ¶¶ 39–45.

179. Parties often ask officeholders to solicit soft money from individuals who have maxed out to the officeholder's campaign. Simpson Decl. ¶ 6 [DEV 9–Tab 38]. *See* Bumpers Decl. ¶¶ 9–11 [DEV 6–Tab 10]; Meehan Decl. in RNC ¶ 6 [DEV 68–Tab 30]; Billings Decl. Exhibit A ¶ 12 [DEV 6–Tab 5]; Jordan Decl. ¶ 27 [DEV 7–Tab 21]; Oliver Dep. at 188 [DEV Supp.-Tab 1] (pertaining to 2000 Bush/Cheney legal defense fund); Sorauf/Krasno Report in *Colorado Republican*, at 13–14 [DEV 68–Tab 44]; ODP0018–00620–21 [DEV 69–Tab 48] (federal candidate noting that he "recently sent a letter to [his] maxed out donors suggesting contributions to the NRCC"). The parties prefer that donors first "max out" on federal money gifts before contributing nonfederal money. Kirsch Decl. ¶ 8 [DEV 7–Tab 23]. As one candidate stated, "[Y]ou are at the limit of what you can directly contribute to my campaign," but "you can further help my campaign by assisting the Colorado Republican Party." *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 458, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (quoting an August 27, 1996 fundraising letter from then-Congressman Allard).

### Political Parties and Nonprofit Groups

180. Political parties and federal candidates work with nonprofit groups on campaign activities. Moreover, they have raised nonfederal money for, directed nonfederal money to and transferred nonfederal money to nonprofits for use in federal elections.

181. The national party committees direct donors to donate nonfederal money to certain interest groups for broadcast issue advertisements and other activities to influence federal elections. For example, Steve Kirsch testified that the national Democratic Party played an important role in his decisions to donate soft money to "certain interest groups that were running effective ads in the effort to elect Vice-President Gore, such as NARAL. The assumption was that the funds would be used for television ads or some other activity that would make a difference in the Presidential election." Kirsch Decl. ¶ 10 [DEV 7–Tab 23]; *see also* 144 Cong. Rec. S1048 (1998) (Sen. Glenn).

182. Parties raise funds for, or donate nonfederal money to, tax-exempt organizations, which in turn use funds to influence federal elections. Kirsch Decl. ¶ 10 [DEV 7–Tab 23]; Marshall Decl. ¶ 9 [DEV 8–Tab 28].

183. The RNC, NRSC, and NRCC have all made nonfederal donations to the National Right to Life Committee, an independent group that assists Republican candidates through "issue advocacy" activities. Resps. Nat'l Rt. Life Pls. To Defs.' First Interrogs., No. 3 [DEV 10–Tab 5]; RNC0065691A, RNC0065691 [DEV 134–Tab 8, DEV Supp.-Tab 3, DEV 101]. After the NRSC's 1994 donation, then-NRSC Chairman Senator Phil Gramm told The Washington Post that the party made this donation because it knew the funds would be used on behalf of several specific Republican candidates for the Senate, saying he had "made a decision...to provide some money to help activate pro-life voters in some key states where they would be pivotal to the election." *Id.* at 5975; *see also* RNC 0373365 [IER Tab 31] (letter from the Republican National State Elections Committee to the American Defense Institute notifying the group of a $300,000 donation from the RNSEC's "non-federal component" to assist the groups "efforts to educate and inform Americans living over-

seas of their civic responsibilities"); RNC 0373370, 0373376, 0373381 (three letters to Americans for Tax Reform all dated in October 1996 providing the group $1,000,000, $2,000,000, $600,000 donations in recognition of the group's "efforts to educate and inform the American public").

184. The National Right to Work Committee "pays for its advertising from its treasury, [and] admits that certain Members or Executive Branch Officials have generally encouraged financial support for the Right to Work cause and, specifically, for the support of NRTWC in advocating for these issues, through lobbying as well as issue advertising." Resp. Nat'l Rt. Work Comm. to Defs. First RFAs, No. 17 [DEV 12–Tab 2]; see also NRW–2812 [DEV 129–Tab 2] (letter from Congressman Pete Sessions asking the recipient to meet with National Right to Work Committee personnel regarding the Committee's effort to "stop Big Labor from seizing control of Congress in November").

185. Congressman Ric Keller signed a Club for Growth fundraising letter dated July 20, 2001 which credited the Club for his own 2000 electoral success and assured potential donors that their money would be used to "help Republicans keep control of Congress." CFG00208–10 [DEV 130–Tab 5]; see Pennington Decl. ¶¶ 15, 19 [DEV 8–Tab 31].

186. The 2000 Democratic coordinated campaign in Florida's Eighth Congressional District was funded primarily by EMILY's List through its Florida Women's Vote project, though the DCCC and Congressional candidate Linda Chapin also raised funds for it. Florida Women's Vote gave money to the State Party, which then set up the coordinated campaign and hired the staff. EMILY's List also sent some staff to assist in the coordinated campaign, which they also did in their other targeted races throughout the country. Beckett Decl. ¶ 6 [DEV 6–Tab 3]; Chapin Decl. ¶ 6 [DEV 6–Tab 12].

187. Defendants' expert Green testifies that "[n]ational parties ... transferred large sums of money to tax-exempt organizations because, unlike state parties, these tax-exempt organizations are not bound by allocation formulas that specify how much hard money must be spent in conjunction with soft money expenditures." Green Expert Report at 17–18 n. 17 [DEV 1–Tab 3].

188. Most committees that are organized to support or oppose ballot measures in California are organized as 501(c)(4) committees. Bowler states that virtually all of the ballot measure committees in California engage in activity that can be characterized as get-out-the-vote activity under BCRA. Bowler Decl. ¶ 30.

189. Most Members of Congress either in a formal leadership position, or aspiring thereto, have his or her own 527 group. Public Citizen Congress Watch, Congressional Leaders' Soft Money Accounts Show Need for Campaign Finance Reform Bills, Feb. 26, 2002, at 6 [DEV 29–Tab 3]. "For congressional leaders, 527 groups appear to collect about as much money as their campaign committees and often as much as their leadership PACs." Id. at 9.

190. Most of the 527s active in federal politics exist to either promote certain politicians (which Public Citizen calls "politician 527s") or promote certain ideas, interests and partisan orientations in election campaigns. "Politician 527s generally serve as soft money arms of 'leadership PACs,' which incumbents use to aid other candidates and otherwise further their own careers. Like the campaign committees of members of Congress, leadership PACs can receive only 'hard money' contributions, which are limited in amounts and may not come directly from corporations or unions. Politician 527s use their soft money mainly to sponsor events that pro-

mote their own careers, help create a 'farm team' of successful state and local candidates, and spur partisan 'get-out-the-vote (GOTV)' efforts." *Id.* at 6.

191. Many donors to Member 527 organizations donate with the intent of influencing federal elections. For example, Peter Buttenwieser testified that in early 2002 he donated $50,000 to a 527 organization, Daschle Democrats, which ran broadcast ads in South Dakota supporting Senator Tom Daschle in response to the attacks that had been made against him. Mr. Buttenwieser stated: "I was willing to do this because I felt that the attacks were hurting Senator Daschle and Senator Tim Johnson's re-election campaign as well." Buttenwieser Decl. ¶ 20 [DEV 6–Tab 11].

192. Twenty-seven industries (including individuals, such as executives, associated with the industries) contributed $100,000 or more in just a single year to the top 25 politician 527 groups. These industries accounted for 52 percent of all contributions to the top 25 politician 527s. The top 10 industries contributing were: computers/Internet, securities & investments, lawyers/law firms, telephone utilities, real estate, TV/movies/music, air transport, tobacco, oil & gas, and building materials and equipment. Top corporate contributors included AT & T, SBC Communications, Philip Morris, Mortgage Insurance Companies of America, Clifford Law Offices, U.S. Tobacco and American Airlines. Overall, only 15 percent of total contributions to the top 25 politician 527's came in amounts of less than $5,000. Democratic party committees and unions also contributed over $100,000 to the top politician 527s. In fact, Democratic party committees (mainly the DNC) were the single largest contributor to politician 527s. Almost all of this money (81 percent) went to the Congressional Black Caucus 527. Public Citizen Congress

Watch, Congressional Leaders' Soft Money Accounts Show Need for Campaign Finance Reform Bills, Feb. 26, 2002, at 10–11 [DEV 29–Tab 3].

193. Section 527 organizations include political clubs. The CDP has contributed to Democratic clubs engaged solely in state-focused grassroots, voter registration, and get-out-the-vote activities. *See id.* ¶ 31. Likewise, most of the organizations participating in the CRP's Operation Bounty Program are Section 527 organizations. Erwin Aff. ¶ 9.

194. Interest groups are funded by persons and entities—whether corporations, unions, trade associations, advocacy groups, or the like—that (1) are intensely concerned about a particular issue or set of issues; (2) participate in the political process; and (3) associate with others of like mind.

195. "Most interest groups, in contrast [to political parties], seek to build relationships with officeholders as a way of improving access to the legislative process and lobbying their position. In political science, there is strong empirical support for the theory that interest groups allocate resources primarily to pursue the 'access' strategy, meaning they give to candidates who are most likely to win office, which is usually the incumbents (see, for example, Herrnson 2000). Political parties, however, allocate resources for electoral strategies, meaning they contribute money to a party candidate who is in a potentially close election." La Raja Expert Report ¶ 14.

196. Interest groups are subject to less regulation than political parties. Unlike political parties, for example, special interest groups have rarely been required to make public disclosure of their receipts, donors, disbursements, and activities. *See* Beinecke [193] Decl. ¶¶ 3, 9 (prior to BCRA,

---

193. Frances Beinecke is the Executive Director of the NRDC. Beinecke Decl. ¶ 1.

National Resources Defense Council did not have to file disclosure forms with FEC or disclose to the public amounts donated by foundations); Gallagher Decl. ¶ 15 (prior to BCRA National Abortion and Reproductive Rights Action League ("NARAL") was not required to track whether it received donations from persons outside United States); Sease [194] Decl. ¶ 11 (Prior to BCRA, Sierra Club was not generally required to report identity of individual donors to any government entity); *see also* Keller Expert Report ¶ 42 (stating that the political activities of interest groups "are far less transparent than those of parties").

### Interest Groups Compared to Political Parties

197. Interest groups engage in voter registration, voter identification, get-out-the-vote activities, and lobbying of officeholders, Dendahl Decl. ¶ 11, and witnesses predict that under BCRA such activities by interest groups will expand, *see* Bennett Decl. ¶ 11; Benson Decl. ¶ 12; Cross Exam. of Green at 158–59.

198. Interest groups have increased their grassroots, direct mail, telephone bank, and door-to-door mobilization efforts and they increasingly distribute absentee ballots and provide supporters with transportation to the polls. *See* Peschong Decl. ¶¶ 13–14; Cross Exam. of Green at 21–22.

199. During the closing weeks of the 2000 campaign the NAACP National Voter Fund registered over 200,000 people, put 80 staff in the field, contacted 40,000 people in each target city, promoted a get-out-the-vote hotline, ran three newspaper print ads on issues, made several separate direct mailings, operated telephone banks, and provided grants to affiliated organizations. *See* Cross Exam. of Green at 15–20, Exhibit 3; Cross Exam. of McCain at 70–72. The NAACP reports that the program

turned out a million additional black voters and increased turnout (over 1996 numbers) among targeted groups by 22 percent in New York, 50 percent in Florida and 140 percent in Missouri. *See* Cross Exam. of Green Exhibit 3. The NAACP's effort, which cost approximately $10 million, was funded in large part by a single $7 million donation by an anonymous individual. *See id.* at 20, Exhibit 3; Cross Exam. of McCain at 73–74.

200. NARAL's Executive Vice President, in 2000 NARAL spent $7.5 million and mobilized 2.1 million pro-choice voters. The group also made 3.4 million phone calls and mailed 4.6 million pieces of election mail. *See* Gallagher Decl. ¶ 24.

### The Record Contains No Evidence of Quid Pro Quo Corruption

201. The record does not include any evidence that nonfederal donations to political parties have resulted in "actual" quid pro quo corruption, such as vote buying.

202. There is no evidence presented in the record that any Member of Congress has ever changed his or her vote on any legislation in exchange for a donation of nonfederal funds to his or her political party. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 2–3 (conceding lack of evidence); McCain Dep. at 171–74 (unable to identify any federal officeholder in quid pro quo corruption); Snowe Dep. at 15–16 (same); Jeffords Dep. at 106–07 (same); Meehan Dep. at 181–83 (same); Shays Dep. at 171 (same); *see also* 148 Cong. Rec. S2099 (daily ed. March 20, 2002) (statement of Sen. Dodd) ("I have never known of a particular Senator whom *[sic]* I thought cast a ballot because of a contribution."); 147 Cong. Rec. S2936 (daily ed. March 27, 2001) (statement of Senator Wellstone) ("I don't

---

**194.** Deborah Sease is the Legislative Director of the Sierra Club. Sease Decl. ¶ 1.

know of any individual wrongdoing by any Senator of either party.").

203. Testimony from other former Members of Congress describe, at best, their personal conjecture regarding the impact of soft money donations on the voting practices of their present and former colleagues. *See* Simpson Decl. ¶ 10 ("Too often, Members' first thought is not what is right or what they believe, but how it will affect fundraising. Who, after all, can seriously contend that a $100,000 donation does not alter the way one thinks about—and quite possibly votes on—an issue? ... When you don't pay the piper that finances your campaigns, you will never get any more money from that piper. Since money is the mother's milk of politics, you never want to be in that situation."). Senator Simon testifies that

> It is not unusual for large contributors to seek legislative favors in exchange for their contributions. A good example of that which stands out in my mind because it was so stark and recent occurred on the next to last day of the 1995–96 legislative session. Federal Express wanted to amend a bill being considered by a Conference Committee, to shift coverage of their truck drivers from the National Labor Relations Act to the Railway Act, which includes airlines, pilots and railroads. This was clearly of benefit to Federal Express, which according to published reports had contributed $1.4 million in the last 2–year cycle to incumbent Members of Congress and almost $1 million in soft money to the political parties. I opposed this in the Democratic Caucus, arguing that even if it was good legislation, it should not be approved without holding a hearing, we should not cave in to special interests. One of my senior colleagues got up and said, 'I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread.' I will never

forget that. This was a clear example of donors getting their way, not on the merits of the legislation, but just because they had been big contributors. I do not think there is any question that this is the reason it passed.

Simon Decl. ¶¶ 13–14 [DEV 9–Tab 37]; *see also Colorado II*, 533 U.S. 431, 451 n. 12, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001); Feingold Dep. at 62 [JDT Vol. 6] (testifying that in the fall of 1996 a senior Senator suggested to Senator Feingold that he support the Federal Express amendment because "they just gave us $100,000").

204. To the extent that there is any statistical evidence in the record which would support the conclusion that nonfederal donations to political parties or their committees has resulted in actual quid pro quo corruption of federal candidates or officeholders, it has been so seriously called into question that it is of no probative value.

205. Defense expert Green testified that there are no statistically valid studies showing a correlation between political donations (either federal or nonfederal) and legislative voting behavior. *See* Cross Exam. of Green at 58–61. Indeed, Green acknowledged that "[s]ome studies have even found a negative correlation." *Id.* at 54–55; *see also* Cross Exam. of Sorauf at 132 ("political scientists lack the means to observe ... such things"); Cross Exam. of Bok at 18–21, 35–36 (some existing studies erroneously assume "that because money goes to people who vote a particular way, the money must have caused the vote"). Moreover, Green opines in his expert report that "the literature on the relationship between roll call votes and money is murky because the problem is an extremely difficult one to solve, statistically." Cross Exam. of Green at 67–68. Green further explained in his expert report that the "[c]orrelations between contributions

and legislative behavior cannot disentangle whether contributions reward fealty, create it, or merely affect ideological affinity between legislators and their financial backers." Green Expert Report at 24. But Green does note that corruption, whether quid pro quo or otherwise, "redound[s] to the personal benefit of the candidate seeking to win election." *Id.* at 20.

206. To the extent that there is any statistical evidence presented in support of the conclusion that nonfederal donations influence other legislative actions such as committee voting, offering amendments, or filibustering, it is so undermined by challenges to its validity that it has no probative value. *See* Cross Exam. of Green at 55, 68–72, 95 (noting that one study that attempts to find such evidence fails to take lobbying and other activities into account); Cross Exam. of Primo at 136–38, 142–43 (existing study's findings are mathematically unsupported); Snyder Rebuttal Report at 7–9 (existing study critically flawed). Defendants' expert Mann acknowledges that "[t]here is little statistical evidence that campaign contributions to members of Congress directly affect their roll call decisions: Party, ideology, constituency, mass public opinion and the president correlate much more with voting behavior in Congress than do PAC contributions." Mann Expert Report at 32 [DEV 1–Tab 1]; Milkis Expert Report ¶ 41 (political parties reduce the risk of quid pro quo corruption by providing a "protective layer of decision makers between candidates and donors"). However, he notes that "[w]hen these variables are less significant, there is evidence that interest group contributions, particularly to junior members of Congress, have influenced roll call votes—for example, on financial services regulation." *Id.* at 32–33 (citing Thomas Stratmann, Can Special Interests Buy Congressional Votes? Evidence from Financial Services Legislation). Paper (prepared for delivery at the 2002 Annual Meeting of the American Political Science Association, Boston, 29 August—1 September), *available at* http://apsaproceedings.cup.org/Site/papers/022/022023 StratmannT.pdf.2002.

*While Some Federal Candidates Are Aware of the Identities of Party Contributors, Others Are Not*

207. Some federal candidates and officeholders are unaware of who donates money to either their campaigns, the parties, or both. *See e.g.,* Feingold Dep. at 115–16 ("Q: How generally are ... Senators made aware of, if at all, the amounts and identities of soft money donors to the national committees? A: I don't know exactly how that's done or how much it's done."); Snowe Dep. at 223–24 (unaware of nonfederal donors to the RNC); Jeffords Dep. at 94–97 (generally unaware of nonfederal donors to RNC and DNC); Meehan Dep. at 179 (aware of few nonfederal donors to national party committees, and only because "from time to time I read who they are in the newspaper"); *see also,* *e.g.,* Rudman Dep. at 76 (unaware); Wirth Dep. at 66–67 (unaware); Hickmott Dep. at 66–68 (noting that as Deputy Chief of Staff to former Senator Wirth he was unaware who donated nonfederal funds to national party committees).

208. Others, however, not only acknowledged their own awareness but their belief that other federal officeholders and candidates are typically aware of who donates to their campaigns and to their parties. Indeed, one Member of Congress suggested that he did not know the identity of contributors to his party because he made a conscious effort to remain unaware. Bumpers Decl. ¶¶ 18, 20 (explaining that officeholders of both parties are aware of contributors' identities, and that he had "heard that some Members even keep lists of big donors in their offices" and that "you cannot be a good Democratic

or a good Republican Member and not be aware of who gave money to the party. If someone in Arkansas gave $50,000 to the DNC, for example, I would certainly know that"); Senator Rudman Decl. ¶ 6, Rudman Dep. at 75–78 (explaining that while he did not know the identity of contributors who donated "either hard or soft money" to the RNC, that the RNC "probably" provided him with that information and that "if they came to the office, the [administrative assistant] took them and probably read them." Rudman also explains that sitting Members of Congress are the ones raising nonfederal and federal party donations, and that the party committees decide which donors should contact which members); Congressman Shays, 148 Cong Rec. H352 (2002) (recognizing that "it's the candidates themselves and their surrogates who solicit soft money. The candidates know who makes these huge contributions and what these donors expect"); Randlett Decl. ¶ 10 ("Information about what soft money donors have given travels among the Members in different ways. Obviously the Member who solicited the money knows. Members also know who is involved with the various major donor events which they attend, such as retreats, meetings and conference calls. And there is communication among Members about who has made soft money donations and at what level they have given, and this is widely known and understood by the Members and their staff."); Wirth Decl. Exhibit A ¶ 17 ("[C]andidates were gener-

ally aware of the sources of the funds that enabled the party committee to support their campaigns."); Senator Simpson Decl. ¶ 5 (explaining that "[p]arty leaders would inform Members at caucus meetings who the big donors were. If the leaders tell you that a certain person or group has donated a large sum to the party and will be at an event Saturday night, you'll be sure to attend and get to know the person behind the donation .... Even if some members did not attend these events, they all still knew which donors gave the large donations, as the party publicizes who gives what."); Senator Boren Decl. ¶ 6 (testifying that "[e]ach Senator knows who the biggest donors to the party are" because "[d]onors often prefer to hand their [nonfederal money contribution] checks to the Senator personally, or their lobbyist informs the Senator that a large donation was just made."); McCain Decl. ¶ 6 ("Legislators of both parties often know who the large soft money contributors to their party are, particularly those legislators who have solicited soft money," and "[d]onors or their lobbyists often inform a particular Senator that they have made a large donation."); Vogel Decl. ¶¶ 25–28 (explaining that the parties distribute lists of potential donors to incumbents so that they can solicit donations); McGahn Decl. ¶¶ 21, 34–37 (same); Jordan Decl. ¶¶ 20, 25–28 (same); Wolfson Decl. ¶¶ 21, 28–31 (same); Jordan Decl. ¶¶ 52, 58; Wolfson Decl. ¶ 49; Josefiak Dep. at 117–18; Andrews [195] Decl.

195. Mr. Wright Andrews is an attorney and lobbyist at the Washington, D.C. firm of Butera & Andrews, specializing in government relations and federal legislative representations. He has been an active lobbyist before Congress since 1975. Prior to that time, he served as Chief Legislative Assistant to then United States Senator Sam Nunn. Prior to forming Butera & Andrews, he worked in the government relations practice at the Washington office of the law firm of Sutherland, Asbill & Brennan. During his career, he has repre-

sented clients from throughout the nation and abroad, and they have included major corporations, trade associations, coalitions, and state governmental entities. He has worked with clients on a broad array of issues including environmental matters, federal taxation, banking, financial services, housing, and many others. He has served two terms as President of the American League of Lobbyists, and Washingtonian magazine named him as one of "Washington's Top 50 Lobbyists." Andrews Decl. ¶ 1 [DEV 6–Tab 1].

¶ 14; Letter from RNC Chairman Jim Nicholson to Donald Fisher, August 18, 1998, (copies to House Speaker Newt Gingrich, House Majority Leader Dick Armey and Congressman John Linder (stating "I appreciate your interest in helping us hold onto our majority in the House.... I can tell you every single dollar of your contribution will go directly into *Operation Breakout* .... If you will make your check out (which can be personal or corporate) to the Republican National Committee and annotate it for *Operation Breakout* I will personally show a copy of it to Newt, Dick Armey and John Linder. Please feel free to accompany it with a transmittal letter containing any other message that you choose.")); Senator Feingold Dep. at 115 (explaining that while he does not know how Senators are made aware of the identity of donors of nonfederal money to national parties, it is because he "made a real effort to be far away from that part of the process so [he is] not privy to or aware of exactly how that's done and to what extent it's done."); Congressman Meehan Dep. at 178–79 (explaining that he was unaware of the Democratic National Committee's "tallying" process, by which the amount of money the DNC spends on a particular candidate is related to the amount of nonfederal money that candidate raised for the DNC, however, that he was "probably one of the last people that they would let know about the tallying process"). One lobbyist, and former DNC official, observed that

> [W]hen one of my clients is going to make a donation to a federal candidate or party, hard or soft money, I advise them on the manner in which they should do that. I tell them not to just send the check to the party committee, for example, to the young staff member who is collecting the checks. Instead I tell my clients that they should personally give the money to a Member of Congress who then can give the money to the Chair of the party committee, who will in turn make sure that the check reaches the young staff member. That way the donor, with one check, gets "chits" with multiple Members of Congress.

Hickmott Decl. ¶ 9.

### There is No Probative Evidence That National Parties Use Nonfederal Donations to Induce Federal Officeholders to Support or Oppose Legislation

209. There is no probative evidence that national parties have attempted, through the use of nonfederal donations, to get federal officeholders to change their position on legislation. Senator Rudman testifies that the RNC never asked him to take a particular position because a donor had contributed soft money to the party. Rudman Dep. at 77–82. Senator McCain testifies that "there are many times where the Republican National Committee tried to change my votes and other votes of other Republicans ... [T]he Republican National Committee constantly weighs in on legislation before the Congress of the United States," McCain Dep. at 171–72, but he also states that he does not "know [if it was] in exchange for donations or not".

210. There is no probative evidence in the record which suggests that national party committees support or withhold support from federal officeholders based on their voting records. *See, e.g.,* Vosdingh Dep. at 89 (FEC unaware of any national party committee using nonfederal funds to induce federal officeholder to support or oppose specific legislation); Mann Cross Exam. at 113–15 ("I would be shocked if [the RNC] ever did such a thing.... [T]he point is to win the margin seat, to control the majority for the party, not to weaken a potentially vulnerable candidate.... It would be self-defeating. That isn't how it works.").

*The Relationship Between Access and Donations*

211. The record contains substantial probative evidence that donors of both federal and nonfederal donations to parties receive greater access, both in the amount of time they spend with federal officeholders and in the priority with which their interests are accorded in comparison to nondonors. *See* Bumpers Decl. ¶ 14; McCain Decl. ¶ 6; Boren Decl. ¶ 9; Senator Glenn (144 Cong. Rec. S1048 (1998)); Shays Decl. ¶ 9 (the overall message of the statements of these current and former federal officeholders is that the expectation of the donor is that he or she has access when needed by virtue of his contribution, and that donors often give soft money in response to an invitation for an event that will allow them face-to-face access with a federal officeholder); *see also* Senator Simon Decl. ¶ 16 (stating that he was more likely to first return the telephone call of a donor to his campaign than someone who had not donated, and that increased access for those who give large contributions to the party is not fair to those who cannot afford to give contributions at all).

*The RNC*

212. The RNC's Finance Director Beverly Shea testifies that the RNC does not arrange meetings with government officials for any of its donors—federal or nonfederal—and whenever a donor attempts to condition a donation on obtaining such a meeting, the RNC rejects the donation. *See* B. Shea Decl. ¶ 44. Ms. Shea maintains that the RNC Finance Division, "[a]s a matter of policy," passes along requests from donors for meetings with a federal officeholder to that officeholder's scheduling staff "without inquiring into the purpose of the proposed meeting"; to "neither to advocate a meeting nor ascertain whether a meeting has been arranged"; to not provide to the officeholder's scheduler the amount of the money that donor has contributed to the party; and to reject any donation that is conditioned on obtaining a meeting with an officeholder. *Id.* at 44, 46. The record, however, includes examples of documents provided by a national party which suggest a link between contributions to the party and the occurrence of meetings with party leadership. *See e.g.,* ODP0025–02456 to 57 [DEV 70—Tab 48] (RNC Chair asking Senate Majority Leader Dole to meet with the "loyal and generous" CEO of Pfizer); RNC0044465 [DEV 93] (RNC employee asking to establish a contact in Senator Dole's office for a "generous" RNC contributor); ODP0030–03512 to 13 [DEV 71—Tab 48] (notes of RNC Chair Jim Nicholson stating he will take up a donor's issue with Senator Trent Lott).

213. Based upon a review of the RNC's donor files, the RNC's Finance Director, Beverly Shea, testifies that during each two-year election cycle the RNC receives no more than 15 requests—most from contributors of *federal* funds—for meetings with Members of the Congress. *See* B. Shea Decl. ¶ 45.

214. Federal candidates and officeholders appear at events held for donors of federal funds as well as for donors of nonfederal funds. *See id.* at 22; *see also* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4–5 (conceding that both federal and nonfederal donors attend political party fundraisers and that all six major national political party committees' fundraisers are open to both types of donors).

*Statistical Evidence Regarding Donations and Access*

215. No valid statistical evidence supports the conclusion that nonfederal donations secure any different access to federal candidates and officeholders. Experts for the plaintiffs and for the defendants agree

that there exists no valid study linking types of donations and "access" or "legislative effort." Cross Exam. of Defense Expert Green at 55, 69–72 (existing studies fail to control for effect of lobbying expenditures and are not "statistically sound"); *id.* at 95 (studies make no effort to "track access specifically"); Krasno & Sorauf Expert Report at 5 ("[T]he absence of systematic data on access ... prevents political scientists from searching for relationships between access and policy-makers' behavior."); Primo Expert Report at 8–9 (noting only "scant evidence in the political science literature that money secures access" and stating that existing literature is statistically flawed); *see also RNC v. FEC,* Civ. No. 98–CV–1207 (D.D.C.) (Herrnson Dep. at 300 (testifying on behalf of FEC and stating that existing studies on "access" are "kind of weak and wishy washy")).

*Federal Officeholders Are Not More Likely to Meet With Nonfederal Donors Than Federal Donors*

216. The defendants have submitted no probative evidence that federal officeholders are more likely to meet with nonfederal donors than with federal donors. In fact, certain legislators testifying in this case stated that they personally do not provide special access to individuals or corporations that provide large contributions to parties based upon whether the donation was federal or nonfederal. *See* Resp. of FEC to RNC's First and Second Reqs. for Admis. at 4 (conceding lack of evidence); *see also* Feingold Dep. at 116 ("I cannot imagine a situation where ... I would meet with somebody because they gave soft money."); Snowe Dep. at 210–11 (stating she has never given preferential access to any donor, federal or nonfederal, and that "[e]verybody has access to my office to the extent that I have time available"); Jeffords Dep. at 96–97 (stating person's status as a donor to national party committee does not "affect [his] deci-

sions as to who [he] meet[s] with or give[s] access to"); Meehan Dep. at 180 (stating he provides no preferential access to nonfederal donors); Cross Exam. of Shays at 20–21 (acknowledging that, like most congressman, he "pretty much [has] an open door policy to meet people who want to talk to [him] about important legislative issues").

*Lobbyists, Former Members of Congress, Business Leaders, and Donors Believe that Soft Money Donations to Parties Increase Access to Officeholders*

217. Lobbyist Robert Rozen testifies:

I know of organizations who believe that to be treated seriously in Washington, and by that I mean to be a player and to have access, you need to give soft money. As a result, many organizations do give soft money. While some soft money is given for ideological purposes, companies and trade associations working on public policy for the most part give to pursue their economic interests. In some cases, that might limit their contributions to one political party. More often, they give to both. They give soft money because they believe that's what helps establish better contacts with Members of Congress and gets doors opened when they want to meet with Members.

Rozen Decl. ¶ 10 [DEV 8–Tab 33]; *see also id.* ¶ 14.

218. Lobbyist Daniel Murray's testimony in a prior case, which has been incorporated into the records of this case, states that "contribution of soft money ... has proven to provide excellent access to federal officials and to candidates for federal elective office. Since the amount of soft money that an individual, corporation or other entity may contribute has no limit, soft money has become the favored method of supplying political support.... [S]oft money begets both access to law-makers

and membership in groups which provide ever greater access and opportunity to influence." Murray Aff. in *Mariani* ¶ 14 [DEV 79–Tab 59].

219. Senator Rudman explains: "By and large, the business world, including corporations and unions, gives money to political parties ... [because] they believe that if they decline solicitations for such contributions, elected and appointed officials will ignore their views or, worse, that competing business interests who do make large contributions to the party in question will have an advantage in influencing legislation or other government decisions. The same is true in the preponderance of cases where wealthy individuals give $50,000, $100,000, $250,000, or even more to political parties in soft money donations." Rudman Decl. ¶ 5 [DEV 8–Tab 34]; *see also id.* ¶ 6 (stating that sitting members of Congress raise money from these entities knowing that they contribute large sums to the parties in order to achieve such access). Senator Rudman also states that

[s]pecial interests who give large amounts of soft money to political parties do in fact achieve their objectives. They do get special access. Sitting Senators and House Members have limited amounts of time, but they make time available in their schedules to meet with representatives of business and unions and wealthy individuals who gave large sums to their parties. These are not idle chit-chats about the philosophy of democracy. In these meetings, these special interests, often accompanied by lobbyists, press elected officials—Senators who either raised money from the special interest in question or who benefit directly or indirectly from their con-

tributions to the Senator's party—to adopt their position on a matter of interest to them. Senators are pressed by their benefactors to introduce legislation, to amend legislation, to block legislation, and to vote on legislation in a certain way. No one says: 'We gave money so you should do this to help us.' No one needs to say it—it is perfectly understood by all participants in every such meeting.

*Id.* ¶ 7.

220. Chairman Gerald Greenwald[196] testifies that some unions and corporations

give large soft money contributions to political parties—sometimes to both political parties—because they are afraid to unilaterally disarm. They do not want their competitors alone to enjoy the benefits that come with large soft money donations: namely, access and influence in Washington. Though a soft money check might be made out to a political party, labor and business leaders know that those checks open the doors to the offices of individual and important Members of Congress and the Administration, giving donors the opportunity to argue for their corporation's or union's position on a particular statute, regulation, or other governmental action. Labor and business leaders believe—based on experience and with good reason—that such access gives them an opportunity to shape and affect governmental decisions and that their ability to do so derives from the fact that they have given large sums of money to the parties.

---

**196.** Mr. Greenwald is currently Chairman Emeritus of United Airlines, the largest employee majority-owned company in the United States. From 1994 through his retirement in 2000, he served as the Chairman and CEO of United. Prior to that, he was vice chairman at Chrysler Corporation and worked at Ford Motor Company. Greenwald Decl. ¶ 2 [DEV 6–Tab 16]

Greenwald Decl. ¶ 12 [DEV 6–Tab 16]; *see also* Greenwald Decl. ¶ 10 [DEV 6–Tab 16].

> "[L]abor and business leaders are regularly advised that—and their experience directly confirms that—organizations that make large soft money donations to political parties in fact do get preferred access to government officials. That access runs the gamut from attendance at events where they have opportunities to present points of view informally to lawmakers to direct, private meetings in an official's office to discuss pending legislation or a government regulation that affects the company or union.". .

221. Individual donor Peter Buttenwieser testifies:

> Events, meetings and briefings held for soft money donors provide opportunities for the donors to hear speeches and engage in policy discussions with federal office holders. There is also a certain amount of politicking and lobbying at these events. This is true particularly in the side discussions, in which donors can approach office holders and discuss their issues.

Buttenwieser Decl. ¶ 25 [DEV 6–Tab 11]. Arnold Hiatt testifies that

> [A]s a result of my $500,000 soft money donation to the DNC, I was offered the chance to attend events with the President, including events at the White House, a number of times. I was offered special access as a result of the contributions I had made, though I generally never took advantage of that access. One event that I did attend was a dinner at the Mayflower Hotel in Washington, D.C. in approximately March 1997 with President Clinton and Vice-President Gore. The dinner was for the largest donors to the DNC, about thirty people. I did not plan on attending but I went because several people urged me to use the occasion to speak in favor of

campaign finance reform. I used the opportunity to talk to the President about how the campaign finance system in this country had become a crisis, and argued that the crisis provided an opportunity for the President to provide some leadership. I don't think that we got the leadership I was seeking on the campaign finance issue, but I did get the chance to make a personal pitch to the President as a result of my donation.

Hiatt Decl. ¶ 9[DEV 6–Tab 18]. Hiatt testifies that others in attendance also shared their views on policy matters of importance to them as the event was advertised as an opportunity to "give advice to the president." Hiatt Dep. at 119–21 [JDT Vol. 10]; *see also* Hassenfeld Decl. ¶ 12–13 [DEV 6–Tab 17] ("[W]hen given the opportunity, some donors try to pigeonhole or corner Members, in a less than diplomatic way, to discuss their issues at these events."); Geschke Decl. ¶ 5 [DEV 6–Tab 14] (testifying that in connection with $50,000 in donations made to the DNC he and his wife attended a dinner of 10 to 12 people with President Clinton "last[ing] two or three hours, and consist[ing] primarily of a conversation about issues of importance to the nation and the President's program").

222. Evidence shows that party leaders have in some instances facilitated direct communications between soft money donors and officeholders on certain policy matters. A handwritten note dated October 27, 1995, from RNC Chairman Haley Barbour asks Senate Majority Leader Bob Dole to meet with the CEO of Pfizer, a member of the RNC's "Team 100" soft money donor group, to discuss an extension of the lucrative Section 936 tax credit:

> Dear Bob
> Bill Steere, CEO of Pfizer, has asked to see you on Wed. 11/1. He is extremely loyal and generous. He also is not long-

winded. He'll tend to his business and not eat up extra time. They have proposed a [Internal Revenue Code § ] 936 solution that [Republican Senator William] Roth and [Republican Congressman Bill] Archer are considering. I'm sure that is the issue. I'd appreciate it if you'd see Bill. [signed] Haley.

ODP0025–02456 to 57 [DEV 70–Tab 48]; *see also* July 10, 1996, letter from John Palmer to [redacted addressee] (reminding addressee that Palmer had asked him to join the RNC's Team 100, and noting that RNC Chair Barbour escorted new Team 100 member and Energy CEO Lupberger on four appointments that were "very significant" in legislation affecting companies like his and made him "a hero in his industry"); ODP0023–02043 [DEV 70–Tab 48]; RNC0240565–RNC0240566 [DEV 97], Sept. 28 [no year] (discussing an upcoming meeting requested by Bristol–Myers Squibb, *in connection with its consideration of joining the RNC's "Season Pass" major donor program;* scheduled attendees included representatives of major pharmaceutical companies and "Active Team 100 members" Bristol–Myers Squibb, Glaxo Wellcome, and Pfizer; the memo stated: "This group is particularly interested in the White House's proposal to add a prescription drug benefit to the Medicare program. They vehemently oppose it and are helping to fund a million-dollar campaign that began in July and features an older woman named Flo, who declares, 'I don't want bureaucrats in my medicine cabinet.'" The memorandum includes as a "Key Talking Point" the directive to "[l]et them know how crucial it is we have their financial support this election cycle"); *see also* Vogel Decl. Tab D at NRSC 066–000009 (draft letter from chairmen of the NRSC and NRCC Technology Committees inviting High Technology CEOs to the 1998 Republican House–Senate Dinner in response "to your industry's plea for a voice on the cutting edge issues so important to the future of high technology" and noting that the dinner is the "most prestigious annual event, and all Republican members of the U.S. House and Senate will be in attendance") [DEV 9–Tab 41]. Former Senator Wirth testifies:

> The Democratic national campaign committees sometimes asked me to meet with large donors to the party whom I had not met before. At the party's request, I met with the donors. I understood that the donors' goal in making the large contributions was often to occasion meeting(s) with me or other prominent Democratic congressional leaders to press their positions on legislative issues. On these occasions, sometimes all I knew about the donor would be the issue in which he was interested.

Wirth Decl. Exhibit A ¶ 15 [DEV 9–Tab 43]; RNC0177216 [DEV 95] (note written on stationery of RNC's Team 100 Director, Haley Barbour, stating "they have pretty much decided to join T–100 .... They want access to political players.... Their top issue is tort reform"); RNC0044465 [DEV 93] (Memorandum from Tim Barnes of the RNC to Royal Roth noting that someone from Moore Capital Management had been "trying to establish a contact in Senator Dole's office for Mr. Bacon. As you know, Mr. Bacon [of Moore Capital Management] has been very generous to the RNC. If there is any way you can assist, it would be greatly appreciated.").

*Party Donation Programs Show That Increased Access Corresponds With Larger Donations*

223. RNC documents show that the RNC's donor programs offer greater access to federal office holders as the donations grow larger, with the highest level and most personal access offered to the largest soft money donors. ODP0018–00113 to 36 [DEV 69–Tab 48] (RNC Bro-

chure "Donor Programs"); *see also* Resps. RNC to FEC's First RFA's, No. 62 [DEV 12–Tab 10]. The RNC offers its donors a range of different donor programs, for a range of different donor financial levels and interests. ODP0025–00375 to 79 [DEV 70–Tab 48] ("Summary of RNC's Donor Programs"). The RNC President's Club required a $1,000 annual contribution and offered at least one meeting per year, which included policy briefings and discussions led by Republican congressional and other leaders. *Id.* at ODP0025–00375. The Chairman's Advisory Board required a $5,000 annual hard money contribution and offered a "vigorous and informal exchange of views among Board members and party leaders.... Board meetings include three or four panel discussions, each chaired by a Congressional leader or senior policy adviser with particular expertise in the area under consideration." *Id.* at ODP0025–00375 to 77 [DEV 70–Tab 48]. According to the document, the Chairman's Advisory Board was established "to enlist the personal energy and professional expertise of Republican leaders in business and community affairs in developing policy and campaign strategies at the highest levels for the party." *Id.* The Republican Eagles required an annual contribution of $15,000 (individual) or $20,000 (with spouse or corporate). *Id.* at ODP0025–00377–0378, ODP0025–00429 [DEV 70–Tab 48]. The Eagles program offered a series of national and regional meetings with elected Republican congressional leaders, special access to Republican events, and other benefits. ODP0025–00428 [DEV 70–Tab 48]; ODP0030–02838 –39 [DEV 71–Tab 48]. The Team 100 program required a donation of $100,000 upon joining and every fourth year thereafter, with $25,000 donations required in each of the three intervening years; ODP0014–00983, ODP0014–01457 to 58 [DEV 69–Tab 48]. The Team 100 program offered members national and regional meetings with the Republican Party leadership throughout the year, special events, membership in the Eagles program, the opportunity to participate in international trade missions, and other benefits. ODP0025–00377, ODP0025–00424, ODP0025–01705 to 13 [DEV 70–Tab 48]. The Season Ticket program required a donation of $250,000 upon joining and renewals thereafter. ODP0022–03045–46, ODP0023–02480, ODP0025–01569 [DEV 70–Tab 48]; ODP0030–03408 [DEV 71–Tab 48]. The "Season Ticket" or "Season Pass" program offered the greatest and most exclusive range of RNC donor program benefits, including one Team 100 membership, two Eagle memberships, special access to a range of Republican Party events, and the assistance of RNC support staff. ODP0025–01569 [DEV 70–Tab 48].

224. The NRSC offered several major donor programs. In 1995 and 1996, the NRSC offered a corporate donor program called "Group 21" or "G21," which required an annual donation of $100,000. ODP0037–02246, ODP0037–02275, ODP0037–02281 [DEV 71–Tab 48]. The "Group 21" program offered donors "small dinners with [then-NRSC Chairman] Senator D'Amato and other senators" and other "VIP benefits." ODP0037–02275 [DEV 71–Tab 48]. The Chairman's Foundation required an annual corporate (meaning nonfederal funds) donation of $25,000. ODP0036–03603 [DEV 71–Tab 48]. The Senatorial Trust required an annual donation of $10,000 (personal) or $15,000 (corporate). ODP0036–03873—74 [DEV 71–Tab 48]. The Presidential Roundtable required an annual donation of $5,000 in personal or corporate funds. ODP0037–00315 [DEV 71–Tab 48]; *see also* ODP0036–03525 (letter signed by Senator McConnell to NRSC member asking him to renew his membership, noting that "[y]our non-federal contribution to the Chairman's Foundation will allow us to put

our federal dollars directly towards the Senate campaigns, where they are desperately needed."); ODP0036–3562 (letter signed by Senator McConnell thanking addressee for joining the Chairman's Foundation); ODP0036–03595 (letter signed by Senator McConnell soliciting someone to join the Chairman's Foundation); ODP0037–01861–69 (NRSC brochure) [DEV 71–Tab 48]; Vogel Decl. ¶¶ 20 ("When donors have reached their federal contribution limit, the NRSC may encourage them to make additional donations to the NRSC's nonfederal account."), 51, Tabs A, J [DEV 9–Tab 41] (2002 Senatorial Trust materials).

225. The NRCC Congressional Forum "has been designed to give its members an intimate setting to develop stronger working relationships with the new Republican Congressional majority," ODP0042–01226 [DEV 71–Tab 48], and the "benefit that attracts most Forum members are the dinners with Committee Chairmen and the Republican members from each Committee." ODO0042–00028 [DEV 71–Tab 48]; see also CDP 0098 [DEV 106] (CDP brochure showing that those who contribute $100,000 to the CDP are classified by the party as "Trustees," and that the CDP "recognizes its extraordinary supporters with extraordinary opportunities," and provides "Trustees" with "[e]xclusive briefings, receptions and meetings with officials such as U.S. Senator Dianne Feinstein, U.S. Senator Barbara Boxer, Lt. Governor Gray Davis, Controller Kathleen Connell and other national figures.").

226. The evidence shows that contributors request to be seated with certain lawmakers at these donor events. For example, an RNC "Table Buyer's Guest List" sheet for "The Official 1995 Republican Inaugural Gala" filled out by "Am. Banker's Ass'n/Nation's Bank" contained a request to sit with certain Members of Congress and "anyone on House Banking

Comm." ODP0023–3288 [DEV 70–Tab 48]; see also 2000 RNC Gala Leadership Levels, undated, RNC0022509 [DEV 92]; 2000 RNC Attendance Forms, April 20, 2000, RNC0236323 [DEV 97] (filled out by Microsoft attendee requesting to be seated with a particular Senator or "Leadership Commerce Comm. or Judiciary"); RNC 0032805–32806, RNC 0032799 [DEV 92] (request for Burger King Chairman and Team 100 member who donated $100,000 to be seated with Senator Fred Thompson and three other Senators, and document showing Senator Thompson was placed at the Burger King table). PhRMA's Judith Bello testified that the five Members of Congress that PhRMA listed as options for the "VIP" to be seated at its table at the 2000 Republican House–Senate dinner were all Members who had responsibility or oversight over issues of importance to the pharmaceutical industry. Bello Dep. at 82 [JDT Vol. 1].

227. The parties appear to have used such opportunities to promote their various donor clubs. For example, a letter from the chairmen of the Congressional Forum of the NRCC sent a letter to the Association of Trial Lawyers of America regarding an upcoming Congressional Forum Chairman's Dinner, in which they wrote: "[o]ur event will give you an excellent opportunity to meet with the Members of the [Judiciary Committee] to discuss issues relevant to your organization." ODP0042–00025 [DEV 71–Tab 48]; see also ODP0042–000654 (memorandum to all Congressional Forum members from the chairmen, informing them of an upcoming dinner featuring members of the Banking Committee, noting that "[o]ur event will give you an excellent opportunity to meet with members of the committee to discuss issues relevant to your organization"); Fowler Decl. ¶ 8 [DEV 6–Tab 13] (testifying that "[p]arty and government officials participate in raising large contributions

from interests that have matters pending before Executive agencies, the Congress, and other government agencies. Party officials, who are not themselves elected officials, offer to large money donors opportunities to meet with senior government officials. Donors use these opportunities—White House and congressional meetings—to press their views on matters pending before the government."); RNC 0026901 [IER Tab 7] (note from the director of the RNC's Team 100 program thanking a donor for "facilitating Dow [Chemical]'s generous contribution to the Republican Party. It's a timely donation as we head into the final hours of the campaign. Give me a call . . . and we can figure out when is a good time to bring your Dow [Chemical] leadership into town to see [RNC Chairman] Haley [Barbour], [Senate Majority Leader Robert] Dole & [Speaker of the House] Newt [Gingrich]."); RNC 0194817 [IER Tab 1.E] (letter from RNC to a pharmaceutical company asking the company for its opinion and suggestions on the enclosed RNC "health care package" and a $250,000 donation to join the RNC's Season Pass program).

228. According to lobbyist Robert Rozen:

> [S]oft money contributions built around sporting events such as the Super Bowl or the Kentucky Derby, where you might spend a week with the Member, are even more useful. At the events that contributors are entitled to attend as a result of their contributions, some contributors will subtly or not-so-subtly discuss a legislative issue that they have an interest in. Contributors also use the events to establish relationships and then take advantage of the access by later calling the Member about a legislative issue or coming back and seeing the Member in his or her office. Obviously from the Member's perspective, it is hard to turn down a request for a meeting after you just spent a weekend with

a contributor whose company just gave a large contribution to your political party.

Rozen Decl. ¶ 11 [DEV 8–Tab 33].

229. Some evidence shows the connection between large donations and access to elected officials as being even more direct. A call sheet prepared for then-DNC Chair Fowler instructs him to call a number of large givers ask for donations, and invite them for lunch with the President of the United States ("POTUS"). DNC 113–00137 to 38 [DEV 134–Tab 7] ("Ask her to give 80k more this year for lunch with Potus on October 27th.") ("Ask him to write another 100K to become a Managing Trustee for the campaign and come to lunch with POTUS on Oct. 27."). A CDP call sheet entitled "Child Call List, 5/16/96" includes the notation that a potential donor should be asked "if they might be able to do $25,000 for a small mtg with the President, you know it's steep, but want to include them in these types of meetings." CDP 00124 [IER Tab 11].

### Donors Make Donations to National Parties With the Expectation of Building Relationships and Receiving Access

*Lobbyists Believe That Donations Will Enable Donors to Establish Relationships With Officeholders*

230. Lobbyist Robert Hickmott testifies that he advises his clients to make contributions in order to "establish relationships. Having those relationships in many ways then helps us get meetings and continue that relationship." Hickmott Dep. at 50 [JDT Vol. 10]. Hickmott testifies that when Senator Robb was chairman of the DSCC he would go to the DSCC offices where he would "accept checks from individuals or organizations who wanted to give money to the DSCC and they wanted face time with Chairman Chuck Robb." *Id.* at 94–95. Donors would "use this as an opportunity not only to

make a contribution to the DSCC, but also to convey to Senator Robb what their group or individual position was on an issue." *Id.* at 95; *see also* Hickmott Decl. Exhibit A. ¶ 46 (stating that "[t]here is a very rare strata of contributors who contribute large amounts to the DSCC because they actually believe in Democratic politics .... The majority of those who contribute to political parties do so for business reasons, to gain access to influential Members of Congress and to get to know new Members.").

231. As Wright Andrews explains:

Sophisticated political donors—particularly lobbyists, PAC directors, and other political insiders acting on behalf of specific interest groups—are not in the business of dispensing their money purely on ideological or charitable grounds. Rather, these political donors typically are trying to wisely invest their resources to maximize political return. Sophisticated donors do not show up one day with a contribution, hoping for a favorable vote the next day. Instead, they build longer term relationships. The donor seeks to convey to the member that he or she is a friend and a supporter who can be trusted to help the federal elected official when he or she is needed. Presumably, most federal elected officials recognize that continued financial support from the donor often may be contingent upon the donor feeling that he or she has received a fair hearing and some degree of consideration or support.

Andrews Decl. ¶ 8 [DEV 6–Tab 1].

232. Some lobbyists believe that donations to parties are beneficial to their clients' business interests. *See* Rozen Decl. ¶ 10 ("[L]arge political contributions are worthwhile because of the potential benefit to the company's bottom line.") [DEV 8–Tab 33].

*Current and Former Federal Officeholders Acknowledge That Donors Expect to Establish Relationships With and Obtain Access to Federal Officeholders*

233. Some former and current federal officeholders acknowledge that donors expect to establish relationships with officeholders in return for their nonfederal donations to the national parties. Senator Bumpers Decl. ¶ 13 (testifying that people that give money to party committees feel that they are "ingratiating themselves" with the federal officeholder who solicits the donation); Wirth Decl. Exhibit A. ¶ 5 (stating that those donors who made contributions to the state party "almost always did so because they expected that the contributions would support my campaign," and that, generally, "they expected that [the Senator] would remember their contributions"); Brock Decl. ¶ 5(a) (testifying that "contributors ... feel they have a 'call' on ... officials" when they contribute soft money); Senator Boren Decl. ¶ 8 (testifying that he knows from "first hand experience and from [his] interactions with other Senators that they feel beholden to large donors."); Senator Simpson testifies that groups used "to give to someone who was for your philosophy," but now "[i]t's giving so you can get access and kiss butt and do all the rest of the things so you won't get knocked off the perch." Simpson Dep. at 11–12 [JDT Vol. 30].

*Donors Hope to Establish Relationships or Receive Access With Their Donations*

234. Steven Kirsch testifies that:

Policy discussion with federal officials occurs at major donor events sponsored by political parties. I have attended many such events. They typically involve speeches, question and answer sessions, and group policy discussions, but there is also time to talk to Members individually about substantive issues. For example, at a recent event. I was

able to speak with a Senator representing a state other than California and we had a short conversation about how our respective staffers were working together on a particular issue.

Kirsch Decl. ¶ 12 [DEV 7–23]; *see also* Hiatt Decl. ¶ 11 (stating that "[l]arge soft money donors give in order to obtain access and influence."). In fact, corporate donors view nonfederal donations as the "cost of doing business." Hassenfeld Decl. ¶ 16 (testifying that nonfederal donations are viewed by the "corporate world" as "a good investment relative to the potential economic benefit to their business."); Hassenfeld Decl. ¶¶ 23–24 ("I think companies in some industries have reason to believe that because their activities are so closely linked with federal government actions, they must participate in the soft money system in order to succeed.") [DEV 6–Tab 17]; Randlett Decl. ¶ 5 (stating that "many soft money donations are not given for personal or philosophical reasons. They are given by donors with a lot of money who believe they need to invest in federal officeholders who can protect or advance specific interests through policy action or inaction. Some soft money donors give $250,000, $500,000, or more, year after year, in order to achieve these goals. For most institutional donors, if you're going to put that much money in, you need to see a return, just as though you were investing in a corporation or some other economic venture."); Randlett Decl. ¶ 14 (explaining that "many members of the business community recognize that if they want to influence what happens in Washington, they have to play the soft money game. They are caught in an arms race that is accelerating, but that many feel they cannot afford to leave or speak out against."); Kirsch Decl. ¶ 14 (stating that "[major] donors perceive that they are getting a business benefit through their special access, and that it is a good investment for them") [DEV 7–Tab 23].

235. Roger Tamraz, an American businessman involved in investment banking and international energy projects, made donations to the DNC during the 1996 election cycle. When asked during congressional hearings by Senator Levin whether one of the reasons he made the contributions was because he "believed it might get [him] access?," Mr. Tamraz responded: "Senator, I'm going even farther. It's the only reason-to get access...." Thompson Comm. Report at 2913 n. 46 (quoting page 63 of Mr. Tamraz's testimony before the committee).

236. Donor Peter Buttenwieser, a large donor to Democratic party committees, testified that

[t]here is no question that those who, like me, make large soft money donations receive special access to powerful federal office holders on the basis of the donations. I am close to a number of Senators, I see them on a very consistent basis, and I now regard the Majority Leader as a close friend. I understand that the unusual access I have correlates to the millions of dollars I have given to political party committees, and I do not delude myself into thinking otherwise. Not many people can give soft money on that scale, and it naturally limits the number of those with that level of access.

Buttenwieser Decl. ¶ 22.

237. An Eli Lilly and Company memorandum states that its 1995–96 political "contributions and the related activities we have participated in have been key to our increased role and ability to get our views heard by the right policy makers on a timely basis; in other words, a smart investment." Eli Lilly and Company Memorandum (Jan. 15, 1997), ODP0018–00481–86 [DEV 69–Tab 48].

238. Documents submitted indicate that a Fortune 100 company contributes

nonfederal money to national party committees with the expectation that its contributions will cultivate or strengthen its "relationships" with particular Members of Congress. *See* internal Fortune 100 company memorandum titled "Senator Earnest Hollings/South Carolina Democratic Party" (June 29, 2000) [citation sealed] (requesting a "check for $10,000.00 on behalf of Senator Ernest 'Fritz' Hollings to the South Carolina Democratic Party," noting that "Senator Hollings has been a friend to [our company] for many years and he has shown himself to be a thoughtful voice regarding issues in our industry," that "[h]e currently serves on the Commerce, Science and Transportation Committee, the Budget Committee and the Appropriations Committee," and concluding "I feel this would be a great opportunity to strengthen our relationship with Senator Hollings."). An internal Fortune 100 company memorandum entitled "Justification for donation to [DSCC]" (October 25, 2000) [citation sealed], stated

> I am requesting a check for $50,000.00 to the Democratic Senatorial Campaign Committee (DSCC). Senator Robert Torricelli is the chairman for the DSCC and in a recent conversation with the Senator, he requested the above amount from [our company]. Senator Torricelli has been a friend to [our company] for many years and he has shown himself to be a thoughtful voice regarding issues in our industry. He currently serves on the Judiciary, Foreign Relations & Governmental Affairs and Rules and Administration Committees. I feel this would be a great opportunity to strengthen our relationship with Senator Torricelli and the DSCC.

One legislative advocate from this company described the benefits reaped from contributing $100,000 to the NRCC: "I think we established some goodwill with [Congressman] Tauzin, both by [our company] contributing at the $100,000 level to the

NRCC dinner he chaired last month and by my participation in the NRCC Finance Committee for the dinner. Tauzin understood that [our company] participated at the same level as [others in our industry] did, and he expressed genuine interest in trying to begin to reach out to the competitive industry. In sum, I think the event was a real positive for [our company]." Internal Fortune 100 company memorandum entitled "NRCC Leadership Winner 2000," dated April 4, 2000, [citation sealed].

### Effectiveness of Giving Nonfederal Donations as Opposed to Federal Donations

239. Some donors give nonfederal money, rather than federal money to parties or direct contributions to a candidate's campaign, because they believe nonfederal money is more effective than several small contributions in obtaining access. *See, e.g.,* Hickmott Decl. Exhibit A. ¶ 47 (explaining that "[i]f you want to get to know Members of Congress, or new Members of Congress, it is more efficient to write a $15,000 check to the DSCC and to get the opportunity to meet them at the various events than it would be to write fifteen $1,000 checks to fifteen different Senators, or Senators and candidates."); Wright Andrews, a lobbyist, stated that

> a properly channeled $100,000 corporate soft money donation to the national Republican or Democratic congressional campaign committees can get the corporate donor more benefit than several smaller hard dollar contributions by that corporation's PAC. Although the donations are technically being made to political party committees, savvy donors are likely to carefully choose which elected officials can take credit for their contributions. If a Committee Chairman or senior member of the House or Senate Leadership calls and asks for a large contribution to his or her party's national House or Senate campaign committee, and the lobbyist's client is able to do so,

the key elected official who is credited with bringing in the contribution, and possibly the senior officials, are likely to remember the donation and to recognize that such big donors' interests merit careful consideration.

Andrews Decl. ¶ 14; Randlett Decl. ¶ 13 [DEV 8–Tab 32] ("[Soft money donors] get a level of attention that a $1,000 hard money donor never will. Even someone who wrote 25 $1,000 hard money checks but no soft money is going to get much less attention and appreciation than someone who wrote one large soft money check."). Rozen, a lobbyist, stated that

Donors to the national parties understand that if a federal officeholder is raising soft money—supposedly 'nonfederal' money—they are raising it for federal uses, namely to help that Member or other federal candidates in their elections. Many donors giving $100,000, $200,000, even $1 million, are doing that because it is a bigger favor than a smaller hard money contribution would be. That donation helps you get close to the person who is making decisions that affect your company or your industry. That is the reason most economic interests give soft money, certainly not because they want to help state candidates and rarely because they want the party to succeed.... The bigger soft money contributions are more likely to get your call returned or get you into the Member's office than smaller hard money contributions.

Rozen Decl. ¶¶ 12–13 [DEV 8–Tab 33]; Geschke [197] Decl. ¶ 9 [DEV 6–Tab 14] ("Corporations and individuals can use soft

money donations to get special access to federal office holders and at least the appearance of influence on issues that are important to them financially or politically. Hard money contributions do not provide the same opportunities for influence on federal policy as soft money donations do."); Fowler [198] Decl. ¶ 6 [DEV 6–Tab 13] ("Many contributors of large sums of money—both Republicans and Democrats—gain access to party and governmental officials that they otherwise would not have. With this access, contributors are able to make their cases to people who make public policy and take official governmental action. Those who contribute small amounts of money do not have this advantage and thus are unable to influence government with the same effectiveness.").

240. In a memorandum to a high-level Fortune 100 company executive outlining a proposed $1.4 million nonfederal fund budget for FY1999, members of the Company's governmental affairs staff noted that

With both houses of Congress and the White House hotly contested this cycle, the importance of soft money, and consequently the efforts by the parties to raise even more soft money, is greater than ever. On the Democratic side, [our company's] advocates have already fielded soft money calls from House Democratic Leader Gephardt, House Democratic Caucus Chairman Frost, Democratic Congressional Campaign Chairman Kennedy, and Democratic Senatorial Campaign Chairman Torricelli. Similar contacts to soft money have been made by Republican congressional leaders. In addition to the in-

197. Mr. Charles Geschke is Chairman of the Board of Adobe Systems, Inc., which he co-founded in 1982. Geschke Decl. ¶ 1 [DEV 6–Tab 14]. Since 1994, Mr. Geschke estimates that he has donated over $150,000 in federal funds to federal political committees, and over $18,000 in nonfederal funds to national party committees. *Id.* ¶ 3.

198. Mr. Donald Fowler from 1971 until 1980, he served as Chairman of the South Carolina Democratic Party and from January 1995 until January 1997 he served as Chairman of the Democratic National Committee. Fowler Decl. ¶ 2 [DEV 6–Tab 13].

creased pressure from party and congressional leaders, it is clear that our direct competitors and potential competitors are weighing in with big soft money donations.

Memorandum from a Fortune 100 company's legislative advocate to a high-level executive, dated March 4, 1999, [citation sealed].

### Donors Often Times Give to Both National Parties in Order to Receive Access to Members of Both Parties

241. Evidence presented shows that many "companies and associations that do give soft money typically contribute to both parties ... because they want access to Members on both sides of the aisle." Rozen Decl. ¶ 7 [DEV 8–Tab 33]; *see also* Hiatt Decl. ¶ 12 [DEV 6–Tab 18] (testifying "[p]eople give soft money donations to both parties because they want to make sure they have access regardless of who's in the White House, filling the Senate seat, or representing the Congressional district."); RNC OH 0418778 [IER Tab 1.H] (an Ohio Republican Party document entitled "Why People Give," including the observation: "many people give to both sides so that they will have access to whoever is the winner").

242. An Eli Lilly and Company memorandum indicates the company was worried about a *Washington Post* article listing it as a significant donor to the Republican party. The memorandum discusses contributions being made at Democratic party events occurring in the near future. The memorandum concludes with: "Jay has talked to the White House and we can get back into this by giving $50—100,000 to the DNC—says they would be pleased with this." ODP0018–00463 [DEV 69–Tab 48]; *see also id.* at ODP0018–00461 (the *Washington Post* article), ODP0018–00462 (photocopy of part of the article with handwritten note stating "Dems are

upset. Calls from employees about imbalance. White House says Dem we are in trouble").

243. CEO Randlett comments that "[a]s a donor with business goals, if you want to enhance your chances of getting your issues paid attention to and favorably reviewed by Members of Congress, bipartisanship is the right way to go. Giving lots of soft money to both sides is the right way to go from the most pragmatic perspective." Randlett Decl. ¶ 11 [DEV 8–Tab 32]. He explains

[I]f you're giving a lot of soft money to one side, the other side knows. For many economically-oriented donors, there is a risk in giving to only one side, because the other side may read through FEC reports and have staff or a friendly lobbyist call and indicate that someone with interests before a certain committee has had their contributions to the other side noticed. They'll get a message that basically asks: "Are you sure you want to be giving only to one side? Don't you want to have friends on both sides of the aisle?" If your interests are subject to anger from the other side of the aisle, you need to fear that you may suffer a penalty if you don't give. First of all, it's hard to get attention for your issue if you're not giving. Then, once you've decided to play the money game, you have to worry about being imbalanced, especially if there's bipartisan control or influence in Washington, which there usually is. In fact, during the 1990's, it became more and more acceptable to call someone, saying you saw he gave to this person, so he should also give to you or the person's opponent. Referring to someone's financial activity in the political arena used to be clearly off limits, and now it's increasingly common.

*Id.* ¶ 12. *See also* Buttenwieser Decl ¶ 23 [DEV 6–Tab 11] ("I am aware that some

soft money donors, such as some corporations, give substantial amounts to both major political parties. Based on my observations, they typically do this because they have a business agenda and they want to hedge their bets, to ensure they get access to office holders on the issues that are important to them. This occurs at the national and state levels."); Geschke Decl. ¶ 10 [DEV 6–Tab 14] ("In my view, donors who give large amounts of soft money to both major parties are probably hedging their bets in trying to get influence. They may feel that influence with one party is not sufficient to achieve their financial or policy goals, especially now that power in Congress is pretty evenly balanced.").

***Lobbying and Donations of Nonfederal Money***

244. According to some national party officials and former Members of Congress, lobbying is more effective in obtaining access to legislators than donations to campaigns and parties.

245. According to the RNC Finance Director, lobbying is far more effective in securing "access" to federal officeholders than donating campaign funds. *See* B. Shea Decl. ¶ 45 ("It is obvious why major donors to the RNC do not regularly use their donations as a means to obtain 'access.' All or virtually all who have personal or organizational business with the federal government retain or employ professional lobbyists."); *see also* Primo Cross Exam. at 164.

246. As Former Senator Bumpers (who testified on behalf of the defendants in this case) has testified previously, lobbying expenditures are more likely to obtain nonincidental contact with a federal officeholder than are campaign donations. *See RNC v. FEC*, Civ. No. 98–CV–1207 (D.D.C.); Bumpers Dep. at 38–40.

247. Many entities and individuals who donate federal funds to political parties also spend considerable sums of money lobbying federal officeholders. Indeed, the amount of money spent by such organizations on lobbying is often geometrically larger than the amount they donate to political parties. *See* Resp. of Intervenors to RNC's First and Second Reqs. for Admis. at 23–24 (admitting that top five corporate donors of nonfederal funds during 1995 and 1996 donated $9,009,155 to national party committees and same five corporations spent $27,107,688 on lobbying during 1996 along); *see id.* at 24–25 (admitting that top five corporate donors of nonfederal funds during 1997 and 1998 donated $7,774,020 to national party committees and same five corporations spent $42,000,000 on lobbying during that same period).

248. Some of the lobbyists who testified in depositions and on cross examination state that their corporate clients hire them in large part because of their contacts on Capitol Hill and because they have access to federal officeholders whether or not their clients have donated money to candidates, officeholders, or parties. *See* Hickmott Dep. at 46–47, 50–51; Cross–Exam. of Andrews at 19–20. However, the evidence clearly shows that some lobbyists believe that contributions help them gain access to lawmakers. Lobbyist Andrews states:

> The amount of influence that a lobbyist has is often directly correlated to the amount of money that he or she and his or her clients infuse into the political system. Some lobbyists help raise large "soft money" donations and/or host many fundraising events for key legislators. Some simply represent a single client with very deep pockets and can easily reach into large corporate or union funds for "soft money" donations or other allowable expenditures that may influence legislative actions. Those who are most heavily involved in giving and

raising campaign finance money are frequently, and not surprisingly, the lobbyists with the most political clout. Andrews Decl. ¶ 12 [DEV 6–Tab 1]. Andrews testifies that it has become a common practice for lobbyists to "host a number of fundraisers." He explains that "[w]hereas the political parties periodically organize 'gala' events in large ballrooms filled with hundreds of donors, lobbyists now often prefer attending smaller events hosted by other lobbyists, with only ten or fifteen people participating, all sitting at a dinner or breakfast table with the invited guest elected official. This type event allows lobbyists a better opportunity to build more personal relationships and to exchange views." *Id.* ¶ 16.

249. Some lobbyists maintain that "basic" or traditional lobbying activities are alone insufficient to be effective in many instances in lobbying endeavors. To have true political clout, the giving and raising of campaign money for candidates and political parties is often critically important. Andrews Decl. ¶ 5 [DEV 6–Tab 1]. Lobbyist Daniel Murray testified that

> [a]llong with each ... legislative plan [a plan to "advance the client's legislative agenda"], and essential to achieving the client's goals, I develop a parallel political financial support plan. In other words, I advise my clients as to which federal office-holders (or candidates) they should contribute and in what amounts, in order to best use the re-

sources they are able to allocate to such efforts to advance their legislative agenda. Such plans also would include soft money contributions to political parties and interest groups associated with political issues.

Murray Aff. in *Mariani* ¶¶ 6–7 [DEV 79–Tab 58]; *see also* Meehan Dep. in *RNC* at 40–41 [DEV 66–Tab 4] ("[P]ower and influence in Washington is not just the amount of soft money an industry contributes to the political parties. I would say that also it's the amount of PAC money that they contribute to the political candidates, it's the amount of hard money they contribute, it's the amount of lobbying money that they expend in order to influence members of Congress.").

### *Public Perception of Corruption*

250. The defendants have offered substantial evidence that the public believes there is a direct correlation between the size of a donor's contribution to a political party and the amount of access to, and influence with, the officeholders of that party that the donor enjoys thereafter.

251. The principal evidence submitted by the defendants in support of their contention that the public perceives an appearance of corruption due to large nonfederal donations to parties is a research poll of 1,300 adult Americans conducted by two prominent pollsters: Mark Mellman [199] and Richard Wirthlin [200] ("Mellman and Wirthlin Report").

**199.** Mark Mellman is "CEO of The Mellman Group, a polling and consulting firm.... Mellman has helped guide the campaigns of some fifteen U.S. Senators, over two dozen Members of Congress, and three Governors, as well as numerous state and local officials. In addition, Mellman works with a variety of public interest organizations ranging ... and corporate clients ... He has served as a consultant on politics to CBS News, a presidential debate analyst for PBS, a contributing analyst for The Hotline, National Journal's daily briefing on politics, and is currently on the faculty of The George Washington University's Graduate School of Political Management." Mellman and Wirthlin at 2 [DEV 2–Tab 5].

**200.** Richard Wirthlin is "Chairman of the Board of Wirthlin Worldwide, a strategic opinion research firm he founded in 1969, which now is one of the top companies in its field. Wirthlin is perhaps best known as President Reagan's strategist and pollster....." *Id.* at 2–3. He is widely respected

252. The survey was conducted over a period of five days (August 28, 2002, through September 1, 2002), and the pollsters made an average of 4.58 dialings per telephone number in the sample set in order to ensure that the sample was representative. *See* Mellman and Wirthlin Report at 22–23.

253. The study's contact rate was 38 percent, more than double the industry average of 15 percent. *See* Mellman and Wirthlin Report at 23.

254. The rate of refusal of the respondents who refused to be polled was within the normal range for a random telephone survey conducted in the United States. *See* Mellman and Wirthlin Report at 23.

255. The pollsters took several steps to avoid bias. *See* Mellman and Wirthlin Report at 24. *See also* Wirthlin Cross Exam. at 40 (explaining that the pollsters took steps to avoid bias by randomly ordering the questions, "so that there is no sequence developed where one question may, if always asked in the same order, affect[ ] the second question.").

256. The statistical margin of sampling error, that is, the error due to sampling versus if the pollsters talked to every American in the United States, is 2.7 percentage points: the actual opinions of Americans will be within 2.7 percentage points of those reported in the study 95 percent of the time. *See* Mellman and Wirthlin Report at 22. All regions of the United States were represented in the study, based on 2001 Current Population Survey results. *Id.* at 24.

257. No evidence has been presented to show that the methodology used by Mellman and Wirthlin is improper or invalid. *See generally* Wirthlin Cross Exam. (demonstrating that while plaintiffs generally dispute the wording of the questions, they do not contest the validity of the sampling or methodology for conducting the poll).

258. The principal finding of the Mellman and Wirthlin Report relating to whether an appearance of corruption arises out of large contributions to political parties is that: "A significant majority of Americans believe that those who make large contributions to political parties have a major impact on the decisions made by federally elected officials." In addition, Mellman and Wirthlin find that many Americans believe that the "views of these big contributors sometimes carry more weight than do the views of constituents or the best interests of the country." Mellman and Wirthlin Report at 6.

259. The Mellman and Wirthlin Report established that 77 percent of Americans believe that big contributions to political parties have at least some impact on decisions made by the federal government. Fifty-five percent thought big contributions had a great deal of impact; 23 percent thought it had some impact. *Id.*

260. The Mellman and Wirthlin Report established that 71 percent of Americans "think that members of Congress sometimes decide how to vote on an issue based on what big contributors to their political party want, even if it's not what most people in their district want, or even if it's

in the "field of social science research and one of this country's most respected political and business strategists." *Id.* Wirthlin "was chief strategist for two of the most sweeping presidential victories in the history of the United States. In 1981 he was acclaimed Adman of the Year by Advertising Age for his role in the 1980 campaign and in 2001 was one of four Republicans awarded American

University's 'outstanding contribution to campaign consulting.' In the same year, he was designated 'Pollster of the Year' by the American Association of Political Consultants." *Id.* at 3. The *Washington Post* named Wirthlin "the prince of pollsters" and George Gallup, Jr. said Wirthlin is "one of the very best at our craft." *Id.*

not what they think is best for the country." *Id.* at 7.

261. According to the Mellman and Wirthlin Report, a "large majority (84%) think that members of Congress will be more likely to listen to those who give money to their political party in response to their solicitation for large donations." *Id.* at 8.

262. According to the Mellman and Wirthlin Report, "[o]ver two-thirds of Americans (68%) ... think that big contributors to political parties sometimes block decisions by the federal government that could improve people's everyday lives." *Id.* at 8.

263. Further, the Mellman and Wirthlin Report found that "about four in five Americans think a Member of Congress would be likely to give special consideration to the opinion of an individual, issue group, corporation, or labor union who donated $50,000 or more to their political party (81%) or who paid for $50,000 or more worth of political ads on the radio or TV (80%). By contrast, only one in four Americans (24%) think that a member of Congress is likely to give the opinion of someone like them special consideration." *Id.* at 9.

264. The Mellman and Wirthlin Report did not measure the public's understanding of the campaign finance system, and did not ask if the respondents understood the difference between nonfederal and federal donations. *See* Cross Exam. of Mellman at 31–35. Mellman testifies that the purpose of the poll was to measure the public's perceptions. *Id.* at 31.

265. The public does not understand the distinction between federal and nonfederal donations and is not aware of campaign finance regulations. *See* Ayres Expert Report ¶ 8(a).

266. The Mellman and Wirthlin Report did not show, nor is there any evidence to

suggest, that a correlation exists in the public's mind between the amount of a donor's contribution to a party and the amount of access and influence the donors enjoys thereafter with officeholders, exists *independent* of the use to which the money is used by parties.

267. Moreover, there is no evidence, either in the Mellman and Wirthlin Report or elsewhere in the record, that the public would hold to the same conclusion if it believed that no portion of nonfederal donations could be either given to any federal candidate, or used by the parties to directly affect the election of any federal candidates.

268. Robert Shapiro, a professor at Columbia University, also analyzed public perception of soft money contributions to political parties, by reviewing all publicly available opinion survey data sources. *See* Shapiro Expert Report at 7–8. [DEV 2, Tab 6]. The survey data Shapiro examined was comprised mostly of telephone opinion polls. *Id.* at 8. Specifically, Shapiro focused on "public opinion data based on responses to surveys that were fielded since 1990" to determine the public's answers to several questions, including two questions which read: "To what degree has the public perceived corruption in politics connected to the influence of money and large campaign donations?" and "What have been the public's perceptions and opinions toward the substantial political donations in the form of soft money contributions to political parties?" *Id.* at 3, 8. According to Shapiro, poll results show that the "public has opposed large unregulated soft money contributions to political parties [and] that the public has been troubled by large soft money donations." *Id.* at 13. In addition, Shapiro concluded that the poll data showed "that a substantial proportion of the public has perceived corruption in the political system, and that we have been losing ground." *Id.* at 11.

269. The defendants also submitted substantial, anecdotal evidence from former and current Members of Congress that their constituents believe that these large contributions to parties present an appearance of corruption. *See* Simpson Decl. ¶ 14 (testifying that "[b]oth during and after my service in the Senate, I have seen that citizens of both parties are as cynical about government as they have ever been because of the corrupting effects of unlimited soft money donations"); Senator Baucus, 144 S. Cong. Rec. S1041 (1998) (stating that "[p]eople tell me they think that Congress cares more about 'fat cat special interests in Washington' than the concerns of middle class families like theirs. Or they tell me they think the political system is corrupt."); Senator Feingold, 146 Cong Rec. S4262 (2000) (stating that "[t]he appearance of corruption.... We all know it's there. We hear it from our constituents regularly. We see it in the press, we hear about it on the news."); Letter from Representative Asa Hutchinson to RNC Chairman Nicholson dated July 9, 1997, ODP0014-00003-4 (declining to support Nicholson's proposed campaign finance legislation because Hutchinson had to balance Nicholson's concerns "with a concern of my constituents which is that their influence in politics is being diminished by the abuses of soft money .... If our party is unable to enact meaningful campaign-finance reform while we're in control of Congress, then I believe this failure to act will result in more cynicism and create a growing lack of confidence in our efforts."); Senator Feingold stated that "[t]he appearance of corruption is rampant in our system, and it touches every issue that comes before us," 147 Cong. Rec. S2446 (Mar. 19, 2001), but also acknowledged that soft money being used for generic campaign activity is less likely to create an appearance of corruption, Feingold Dep. at 126–27; 147 Cong. Rec.

S3248–49 (April 2, 2001) (Sen.Levin) ("[P]ermitting the appearance of corruption undermines the very foundation of our democracy—the trust of people in the system.").

270. The defendants have also submitted a substantial number of press reports which suggest that large donations present the appearance of corruption. *See, e.g.,* Jackie Koszczuk, *Soft Money Speaks Loudly on Capitol Hill This Season,* Cong. Q., June 27, 1998, at 1736; Jill Abramson, *Money Buys A Lot More Than Access,* N.Y. Times, Nov. 9, 1997, at 4; Jane Mayer, *Inside the Money Machine,* The New Yorker, Feb. 3, 1997, at 32; Don Van Atta, Jr. and Jane Fritsch, *$25,000 Buys Donors 'Best Access to Congress',* N.Y. Times, Jan. 27, 1997. at A1; Dan Morgan and Juliet Eilperin, Campaign Gifts, Lobbying Built Enron's Power in Washington, Wash. Post, December 25, 2001, at A01; R.G. Ratcliffe and Alan Bernstein, Political Donors Have the Money, and Get the Time, Houston Chron., May 23, 1999, at 1; *see also* Rudman Decl. ¶ 11; Krasno and Sorauf Report at 19–20; Primo Rebuttal at ¶ 7 (stating that "[t]he news media reinforces this view [that money distorts the political process] by portraying the political process as being driven by campaign contributions ...."). Senator Rudman has also commented on the press's reporting that soft money donations create an appearance of corruption: "Almost every day, the press reports on important public issues that are being considered in Congress. Inevitably, the press draws a connection between an outcome and the amount that interested companies have given in soft money .... Even if a senator is supporting a position that helps an industry for reasons other than that the industry gave millions to his party, it does not appear that way in the public eye." Rudman Decl. ¶ 11.

271. Finally, the defendants have submitted no evidence that the public either

believes, or perceives, that federal office-holders are motivated by anything other than the receipt of financial assistance for their own campaigns when they raise funds for their respective parties.

As to BCRA's restrictions on noncandidate campaign expenditures, I find that

### *Issue Advocacy in Modern Campaigns*

272. The record convincingly demonstrates that the overwhelming majority of modern political advertisements do not use words of express advocacy,[201] whether they are financed by candidates, political parties, or other organizations. As a result of this development, Congress found that FECA, as construed by the courts to only limit independent expenditures containing express advocacy, as defined by *Buckley*, was no longer relevant to modern political advertisement. *See, e.g.*, 148 Cong. Rec. S2117 (2002) (Senator James Jeffords) ("The 'magic words' standard created by the Supreme Court in 1976 has been made useless by the political realities of modern political advertising. Even in candidate advertisements, what many would say are clearly advertisements made to convince a voter to support a particular candidate, only 10 percent of the advertisements used the 'magic words.' ").

Federal candidate ads appeared nearly 236,000 times in the top 75 media markets in 1998, 430,000 times in 2000. In 1998, just 4 percent of these spots used verbs like 'vote for', 'elect', or 'defeat'; in 2000, just 5 percent did. Including slogans like 'Smith for Congress,' 10 percent of the candidate ads aired in 2000 would qualify as electioneering using the magic words test. The remaining 90 percent could have been categorized as issue advocacy had a party or group sponsored them.

Krasno & Sorauf Expert Report at 53–54 [DEV 1–Tab 2] (citing Jonathan Krasno & Kenneth Goldstein, "The Facts about Television Advertising and the McCain–Feingold Bill," (PS: Political Science and Politics, No. 2:207–212), 2002).

273. The absence of "magic words" does not impede the ability of media consultants to create an electioneering message. "In fact, candidates rarely use the magic words in their own ads.' " Magleby Expert Report at 15 [DEV 4–Tab 8]. Former Senator Warren Rudman observed that "[m]any, if not most, campaign ads run by parties and by candidates themselves never use . . . 'magic words.' It is unnecessary." Rudman Decl. ¶ 18 [DEV 8–Tab 34].

274. Political consultants clearly support the conclusion that modern political advertisements rarely use the "magic words" to convey their message.

*Republican Political Consultant Douglas L. Bailey* [202]

In the modern world of 30 second political advertisements, it is rarely advisable

---

**201.** In *MCFL,* the Supreme Court held that the prohibition on corporations and labor unions using general treasury funds on expenditures in connection with a federal election was overbroad, narrowing the restriction to corporate and union spending on "express advocacy." *MCFL,* 479 U.S. at 249, 107 S.Ct. 616 ("We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b."). In *Buckley,* the Supreme Court provided examples of express advocacy: " ' 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " *Buckley,* 424 at 44 n. 52, 96 S.Ct. 612. These examples have been referred to as the "magic words" because if they are invoked by an organization, they trigger FECA's limitations. *See e.g., FEC v. Christian Action Network,* 110 F.3d 1049, 1052–53 (4th Cir.1997) ("[T]he court declined to 'strictly limit' express advocacy to the 'magic words' of *Buckley's* footnote 52").

**202.** In 1968, Bailey founded Bailey, Deardourff & Associates, which was among the first national political consulting firms, work-

to use such clumsy words as "vote for" or "vote against." If I am designing an ad and want the conclusion to be the number "20," I would use the ad to count from 1 to 19. I would lead the viewer to think "20," but I would never say it. All advertising professionals understand that the most effective advertising leads the viewer to his or her own conclusion without forcing it down their throat. This is especially true of political advertising, because people are generally very skeptical of claims made by or about politicians.

The notion that ads intended to influence an election can easily be separated from those that are not based upon the mere presence or absence of particular words or phrases such as "vote for" is at best a historical anachronism.

Bailey Decl. ¶¶ 3–8 [DEV 6–Tab 2].

*Democrat Political Media Consultant Raymond Strother*[203]

[M]edia consultants prefer putting across electioneering messages without using words such as "vote for." Good media consultants never tell people to vote for Senator X; rather, you make your case and let the voters come to their own conclusions. In my experience, it actually proves less effective to

instruct viewers what you want them to do. They have to come to their own conclusion. Americans like to think they make up their own minds and determine their own fate. Without even mentioning an upcoming election, the media consultant can count on the electoral context and voters' awareness that the election is coming. Voters will themselves link your ad to the upcoming election. When viewed months or years after the election a particular ad might look like pure issue advocacy unrelated to a federal election. However, during the election, political ads-whether candidate ads, sham issue ads, true issue ads, positive ads, negative ads or whatever-are each seen by voters as just one more ingredient thrown into a big cajun stew.

Strother Decl. ¶ 4 [DEV 9–Tab 40]; *see also* Strother Cross Exam. at 44 (observing that 90 percent of candidate advertisements Strother has put together in his career have *not* used express advocacy).

**The Distinction Between Candidate-Centered Advocacy and Pure Issue Advocacy Is Not a Function of the Presence or Absence of the Buckley "Magic Words"**

275. The presence or absence of "magic words," as defined in *Buckley v. Valeo,*

---

ing for Republican candidates for Governor, Congress, Senate, and President. The firm's clients included Gerald Ford's Presidential Campaign, and over fifty successful campaigns for governor or the United States Senate in 17 states. Bailey Decl. ¶ 1 [DEV 6–Tab 2]. As campaign consultant, Bailey's job was "to plan the campaign and then create broadcast advertisements that would shape its outcome." *Id.* ¶ 2. In 2000, Bailey was among the first eight recipients of the American University–Campaign Management Institute's 'Outstanding Contribution to Campaign Consulting' Award given to the consultants "who have best represented the ideals of the profession and shown concern for the consequences of campaigns on public attitudes about our democratic process." *Id.*

**203.** Strother is a political media consultant, and President and founder of Strother/Duffy/Strother. Strother Decl. ¶ 1 [DEV 9–Tab 40]. He is also Chairman of the Board of the American Association of Political Consultants, and last year served as its President. *Id.* Since 1967, he has worked for more than 300 campaigns. *Id.* Representative clients at the presidential, congressional, and gubernatorial levels have included Lloyd Bentsen, Paul Simon, Gary Hart, Bill Clinton, Al Gore, Mary Landrieu, and Zell Miller. *Id.* In the last two decades alone, his firm has "helped elect candidates in 44 states and five countries, including 13 Senators, 8 Governors, and scores of Congress members. [His firm has] won more Democratic Primaries than any other firm." *Id.*

does not alone determine whether the advertisement was designed to, and will, support or oppose a particular candidate. *See* Magleby Expert Report at 5 [DEV 4–Tab 8]; *see also* Krasno & Sorauf Expert Report at 58 [DEV 1–Tab 2] ("The magic words test, however, does not distinguish between [candidate-oriented issue advertisements and pure issue advertisements]; indeed it does not distinguish between ads sponsored by candidates and any type of issue ad, or even between political and commercial advertising. Whatever its utility might once have been, this standard is now irrelevant to how political ads are designed.").

276. Some current and former elected officials also believe that "magic words" no longer help distinguish genuine issue advertisements from electioneering advertisements. 147 Cong. Rec. S3072 (2001) (Senator Russ Feingold) ("People didn't need to hear the so-called magic words to know what these ads were really all about."); 147 Cong. Rec. S3036 (Senator John McCain) ("[W]e can demonstrate that the Court's definition of "express advocacy"-magic words-has no real bearing in today's world of campaign ads.").

277. Indeed, Senator Carl Levin made the following statement on the floor of the Senate in 1998:

To show the absurd state of the law, at least in some circuits, we can just look at one of the 1996 televised ads that was paid for by the League of Conservation Voters and which referred to House Member Greg Ganske, a Republican Congressman from Iowa, who was then up for reelection. This is the way the ad read:

*It's our land; our water. America's environment must be protected. But in just 18 months, Congressman Ganske has voted 12 out of 12 times to weaken environmental protections. Congressman Ganske even voted to let corpora-*

*tions continue releasing cancer-causing pollutants into our air. Congressman Ganske voted for the big corporations who lobbied these bills and gave him thousands of dollars in contributions. Call Congressman Ganske. Tell him to protect America's environment. For our families. For our future.*

The ad sponsor claimed that was an issue ad, an ad that discussed issues rather than a candidate, and so could be paid for by unlimited and undisclosed funds. If one word were changed, if instead of 'Call Congressman Ganske,' the ad said, 'Defeat Congressman Ganske,' it would clearly qualify as a candidate ad subject to contribution limits and disclosure requirements. In the real world, that one word difference doesn't change the character or substance of that ad at all. Both versions unmistakably advocate the defeat of Congressman Ganske.

144 Cong. Rec. S10073 (1998) (Senator Carl Levin) (advertisement text in italics); *see also* Bloom Decl. ¶ 5 [DEV 6–Tab 7] ("In my experience in campaigns for federal, state and local office, including my involvement in the television advertising we ran in my race for Congress, no particular words of advocacy are needed for an ad to influence the outcome of an election. Many so-called 'issue ads' are run in order to affect election results.").

278. In addition, former Senator Dale Bumpers testified:

Soft money also finds its way into our system through so-called 'issue advertisements' sponsored by outside organizations that mostly air right before an election. Organizations can run effective issue ads that benefit a candidate without coordinating with that candidate. They have experienced professionals analyze a race and reinforce what a candidate is saying. These ads

influence the outcome of elections by simply stating "tell him [the opponent] to quit doing this." The "magic words" test is completely inadequate; viewers get the message to vote against someone, even though the ad may never explicitly say "vote-against-him."

Bumpers Decl. ¶ 26 [DEV 6–Tab 10];[204] see also Chapin Decl. ¶ 7 [DEV 6–Tab 12] ("Based on my experience in campaigns for federal and local office, including the television advertising we ran in my races for County Chairman and Congress, I am familiar with political campaign ads. No particular words of advocacy are needed in order for an ad to influence the outcome of an election."); see also Paul Dep. at 27–28 [JDT Vol. 25] (Plaintiff Congressman Ron Paul testified that the outside group issue ads run in his 2000 Congressional campaign were intended to influence the election.). Congressman Christopher Shays also testified:

> Although the Supreme Court has identified a limited category of "magic words" that make an advertisement a campaign advertisement, my experience as a candidate and a Member of the House is that this limited test is inadequate to identify campaign ads. Campaign ads need not include phrases such as "vote for," "re-elect" or "vote against" to be effective campaign tools, and the practice of large numbers of so-called "issue ads" before an election proves it.

Shays Decl. ¶ 12 [DEV 8–Tab 35].[205]

279. Some political consultants believe that there is no difference between politi-

cal advertisements that contain words of express advocacy (i.e., "magic words") and advertisements that are designed to influence federal elections but do not use the "magic words" of *Buckley.*

*Democrat Political Media Consultant Raymond Strother* [206]

Because it is so easy for consultants in my business to make ads that will influence federal elections without triggering the need to use hard dollars to pay for them, the difference between hard money and soft money is a joke. If I want to use soft money to influence an election, there is no real difference in what I do to create the ad. The only thing that is different is the tag line at the end. From the point of view of a media consultant, there is no real difference between ending an advertisement with "Vote for Senator X" versus ending an advertisement with "Tell Senator X to continue working hard for America's families." The public simply does not differentiate between ads that are otherwise identical, but contain these slightly different tag lines at the very end.

Strother Decl. ¶¶ 3, 8, 11 [DEV 9–Tab 40].

*Republican Political Consultant Rocky Pennington*

Many soft money ads that avoid the magic words are clearly intended to affect federal elections. Parties and interest groups would not spend hundreds of thousands of dollars to runs [sic] these

---

**204.** After Bumpers retired from the Senate, he spent one year directing the Center for Defense Information, a nonprofit think-tank based in Washington, D.C. Bumpers Decl. ¶ 2. He currently practices law in Washington

D.C. at the law firm Arent Fox Kintner Plotkin & Kahn, PLLC. *Id.* ¶ 3.

**205.** Shays has served in the House of Representatives since 1987 as a Representative of the Fourth District of Connecticut. Shays Decl. ¶ 1 [DEV 8–Tab 35].

**206.** *See supra* Finding 274 n. 203.

ads 15 days before an election if they were not trying to affect the result. These candidate-specific ads are not usually run the year before the election or the week after.

Pennington Decl. ¶ 10 [DEV 8–Tab 31].[207]

*Democrat Political Consultant Terry S. Beckett*

I am aware of the idea that particular "magic words" might be required in or-. der for an advertisement to influence an election. However, in fact no particular words of advocacy are needed in order for an ad to influence the outcome of an election. No list of such words could be complete: if you list 50, savvy political actors will find 100 more. For example, many so-called "issue ads" run by parties and interest groups just before an election attack a candidate, then end by supposedly urging the viewer to "tell" or "ask" the candidate to stop being that way. These ads are almost never really about issues. They are almost always election ads, designed to affect the election result. You can see this most clearly in the ones that amount to personal attacks, or that criticize a candidate on several unrelated "issues."

Beckett Decl. ¶ 8 [DEV 6–Tab 3].

*Democrat Political Operative Joe Lamson*

Based on my experience in managing many federal election campaigns, I am familiar with campaign advertising. No particular words of advocacy are needed in order for an advertisement to influence the outcome of an election. When political parties and interest groups run "issue ads" just before an election that say "call" a candidate and tell her to do something, their real purpose is typically not to enlighten the voters about some issue, but to influence the result of the election, and these ads often do have that effect. Parties and groups generally run these pre-election "issue ads" only in places where the races are competitive. These "issue ads" generally stop on the day of the election. For example, these groups could run ads explaining Nancy Keenan's position on the issues after the November general election so that people could discuss them over the Thanksgiving dinner table, but it doesn't seem to work that way.

Lamson Decl. ¶ 6 [DEV 7–Tab 26].

*Former Chair of Plaintiff NRA Political Victory Fund Tanya K. Metaksa*[208]

Today, there is erected a legal, regulatory wall between issue advocacy and po-

---

**207.** Senator Feingold, during his deposition indicated that he receives calls from constituents in response to television advertisements. However, Senator Feingold was not specifically asked if these advertisements were the type covered under Title II of BCRA. Feingold Dep. at 238–239 ("Q. . . . You mentioned ads, and I have shown you ads which say call Senator so and so, contact Senator so and so. Your constituents sometimes do call you and contact you, do they not? A. Yes, they do. Q. And they sometimes talk about issues including abortion, right to life issues and other issues, do they not? A. Yes, they do. Q. In your opinion, are they sometimes affected by advertisements that they have seen on television? A. I'm sure they are.").

**208.** Metaksa served as Chairman of the National Rifle Association Political Victory Fund

and as Executive Director of the NRA Institute for Legislative Action. She made the statement above in her opening remarks to the American Association of Political Consultants' Fifth General Session on "Issue Advocacy." INT 015987, Opening Remarks at the American Ass'n of Political Consultants Fifth General Session on "Issue Advocacy," Jan. 17, 1997, at 2 [DEV 38–Tab 25]. During this litigation, NRA Executive Vice President Wayne LaPierre testified that Ms. Metaksa is "someone who was knowledgeable about NRA's political strategies" and was someone who was "a reliable and trustworthy employee of NRA." LaPierre Dep. at 11 [JDT Vol. 14]. Plaintiffs have not objected to Ms. Metaksa's statement on hearsay grounds and given Mr. LaPierre's comments, I find it trustworthy and rely on it for purposes of these findings.

litical advocacy. And the wall is built of the same sturdy material as the emperor's clothing.

Everyone sees it. No one believes it. It is foolish to believe there is any practical difference between issue advocacy and advocacy of a political candidate. What separates issue advocacy and political advocacy is a line in the sand drawn on a windy day.

We engaged in issue advocacy in many locations around the country.

Take Bloomington, Indiana, for example. Billboards in that city read,

"Congressman Hostettler is right."

"Gun laws don't take criminals off Bloomington's streets."

"Call 334–1111 and thank him for fighting crime by getting tough on criminals."

Guess what? We really hoped people would vote for the Congressman, not just thank him. And people did. When we're three months away from an election, there's not a dime's worth of difference between "thanking" elected officials and "electing" them.

INT 015987, Opening Remarks at the American Ass'n of Political Consultants Fifth General Session on "Issue Advocacy," Jan. 17, 1997, at 2 [DEV 38–Tab 25].

### The Rise of "Issue Advocacy" Campaigns Funded by Corporate and Labor Union General Treasuries

280. The Annenberg Center for Public Policy ("Annenberg Center") has been studying "issue advocacy" since the early 1990s. *See* Annenberg Public Policy Center, Issue Advocacy Advertising During the 1999–2000 Election Cycle ("Annenberg Report 2001") at 1 [DEV 38 Tab–22]. Based on their research, the Annenberg Center concluded that "[o]ver the last three election cycles the numbers of ads, groups, and dollars spent on issue advocacy has climbed." *Id.*

281. The Annenberg Center estimated that, during the 1996 election cycle, $135 million to $150 million was spent on multiple broadcasts of about 100 advertisements. Annenberg Report 2001 at 1 [DEV 38–Tab 22]. In the next election cycle (1997–98), the Annenberg Center found that 77 organizations aired 423 advertisements at a cost of between $250 million and $340 million. *Id.*[209] In the 1999–2000 election cycle, the Annenberg Center found that 130 groups spent over an estimated $500 million on 1,100 distinct advertisements. *Id.*

282. After studying "issue advocacy" over a seven year period, the Annenberg Study, which was relied on by Congress in drafting BCRA, concluded *inter alia* that:

1) The amount of money spent on "issue advocacy" is rising rapidly.

2) Instead of creating the number of voices *Buckley v. Valeo* had hoped, "issue advocacy" allowed groups such as the parties, business and labor to gain a louder voice.

3) The distinction between "issue advocacy" and express advocacy is a fiction.

4) "Issue advocacy" masks the identity of some key players and by so doing, it deprives citizens of information about source of messages which research tells us is a vital part of assessing message credibility.

Annenberg Report 2001 at 1 [DEV 38–Tab 22]. As plaintiffs' expert Raymond J. La

---

**209.** The report the Annenberg Study produced following the 1997–98 election cycle placed this estimate at between $275 million to $340 million. Annenberg Public Policy Center, Issue Advocacy Advertising During the 1997–1998 Election Cycle ("Annenberg Report 1998") at 1 [DEV 6–Tab 6].

Raja stated, " 'Over the last three election cycles, the number of groups sponsoring ads has exploded, and consumers often don't know who these groups are, who funds them, and whom they represent.' " La Raja Decl. ¶ 24(h) (quoting Annenberg Report 2001 at 1).

283. The Annenberg Center estimated that in the 1999–2000 election cycle, more than $509 million was spent on television and radio "issue advocacy." Annenberg Report 2001 at 4–5 [DEV 38–Tab 22]. The Republican and Democratic parties accounted for almost $162 million (31%) of this spending; Citizens for Better Medicare, $65 million (13%); Coalition to Protect America's Health Care, $30 million (6%); U.S. Chamber of Commerce, $25.5 million (5%); AFL–CIO, $21.1 million (4%); National Rifle Association, $20 million (4%); U.S. Term Limits, $20 million (4%). *Id.* These groups and the two parties accounted for two out of every three (67%) dollars spent on issue ads in the 2000 cycle. *Id.* (noting that other groups spent a combined $166.2 million (33%) on issue advocacy during the 1999–2000 election cycle); *see also* La Raja Decl. ¶ 20(b) & fig. 10 (quoting Annenberg data and noting that "[t]hese figures ... closely match my own data on party-based issue ads collected by examining financial reports filed with the FEC").

284. Interest groups developed a strategy "by the early 1990s, and especially by 1996... to effectively communicate an electioneering message for or against a particular candidate without using the magic words and thus avoid disclosure requirements, contribution limits and source limits." Magleby Expert Report at 10 [DEV 4–Tab 8]. Indeed, defendants' witness and political consultant Douglas L. Bailey noted that it was not until the 1996 election cycle that corporations and labor unions began to make heavy use of "issue advocacy" as a tool of electioneering. Bailey Decl. ¶ 14 [DEV 6–Tab 2].

### Explaining the Shift Toward "Issue Advocacy"

285. According to defense expert Magleby, the shift toward using "issue advocacy" can be explained by three phenomena. "First, it permits groups and individuals to avoid disclosure. Second, it allows them to avoid contribution limits. Third, it permits some groups (such as corporations and labor unions) to spend from generally prohibited sources." Magleby Expert Report at 18–19 [DEV 4–Tab 8]; *see also* Krasno & Sorauf Expert Report at 50 [DEV 1–Tab 2] ("Avoiding FECA allows advertisers to collect any sum of money from any source they can. Avoiding FECA allows advertisers to conduct their operations without disclosing their activities to the public.").

286. The corresponding rise in "issue advocacy" between the 1996 and 2000 election cycles highlighted the fact that disclosure information relating to the organization purchasing the advertisement was not available because the advertisement was not subject to FECA's restrictions. Magleby Expert Report at 18 [DEV 4–Tab 8] ("The 1996, 1998 and 2000 election cycles all saw examples of groups who sought to avoid accountability for their communications by pursuing an electioneering advertising/election advocacy strategy rather than limiting their activities to independent expenditures or other activities expressly permitted by the FECA.").

287. Groups can raise larger amounts of money in a shorter time frame if they are not bound by FECA's contribution limitations. Magleby Expert Report at 19 [DEV 4–Tab 8] (stating, for example, "groups like Citizens for Better Medicare, Pharmaceutical Research and Manufacturers of America, NAACP National Voter Fund, and NARAL, were able to far exceed what individuals, PACs or parties

could do through hard money contributions.").

### Candidate–Centered "Issue Advertisements" That Do Not Contain Words of Express Advocacy Are Distinguishable from "Genuine" Issue Advertisements

288. "Issue advertisements," according to one study, fall into three categories: candidate-centered, legislation-centered, and general image-centered. Annenberg Report 2001 at 13 [DEV 38–Tab 22]. "Candidate-centered advertisements make a case for or against a candidate but do so without the use of the ten words delineated in *Buckley*." *Id.* (noting that these advertisements "usually present a candidate in a favorable or unfavorable light and then urge the audience to contact the candidate and tell him or her to support the sponsoring organization's policy position."). Legislation-centered advertisements "seek to mobilize constituents or policy makers in support of or in opposition to pending legislation or regulatory policy." *Id.* (noting that these advertisements usually mention specific, pending legislation). Finally, general image-centered advertisements are "broadly written to enhance the visibility of an organization or its issue positions, but are not tied directly to a pending legislative or regulatory issue." *Id.*

289. Other commentators separate "issue advertisements" into two types of categories: candidate-centered (also called electioneering) issue advertisements and genuine issue advertisements. Advertisements designed to genuinely influence debate over a particular issue are known as "true" or "genuine" issue advertisements, while those issue advertisements designed to influence a federal elections are known as "electioneering" or "candidate-centered" issue advertisements. Krasno & Sorauf Expert Report at 65 [DEV 1–Tab 2] ("Advertising data show that there are two distinct types of issue ads, those that

are basically candidate-oriented and electioneering in nature, and those that only present or urge action on an issue. The former are nearly identical in format, structure, and timing to ads produced by candidates, while the latter bear little or no resemblance to electioneering.").

290. Defendant's expert Magleby testified, in effect, that although mentioning a candidate's name is an indicia of an electioneering advertisement, it is not *per se* determinative, as some advertisements that refer to a candidate by name are nonetheless genuine issue advocacy. Defense expert David Magleby wrote:

A number of indicia make clear that the ads run by individuals and interest groups are in reality electioneering ads that are meant to influence, and do influence, elections: *These electioneering ads generally name a candidate, run close in time to the election, target the named candidate's district, are run primarily in competitive races, and generally track the themes in the featured candidate's campaign.*

Magleby Expert Report at 6 [DEV 4–Tab 8] (emphasis added). Later, when questioned about whether the "presence of the name or likeness of a candidate [in an ad] preclude[s] it from being treated a as ... genuine issue" advocacy in his study, Magleby stated that he and his team of academics would "presume [an ad] was electioneering" if it referred to a candidate by name or by image and was aired "within the district or state in which the person named or whose image is represented is the incumbent" and "that person is running for office." Magleby Cross Exam. at 79–80. Upon further questioning, however, it became clear that the type of reference to a candidate to which Magleby was referring was not the type *exclusively* contained in a call-to-action line at the end of an advertisement, but rather one or more

references to the candidate in the "body of the ad" in connection with either what the candidate has said about an issue, or how the candidate has voted on an issue. *See* Magleby Cross Exam. at 103–105.

Q. Didn't you tell me a few minutes ago that there is no such thing as an election issue ad that—well, first of all, haven't you told me that a genuine issue ad, to be characterized as a genuine issue ad, you cannot mention a name of a candidate? A. No. In the context of the ad, not the call lines and so forth. It doesn't mention how [the candidate] voted. It doesn't represent what [the candidate] has said about the issue. The body of the ad has no referent to [the candidate] whatsoever. The only referent to [the candidate] is the call line.

291. Defendants' political consultant Raymond Strother testifies, in effect, that it is very difficult to determine the objective behind an advertisement, particularly when that advertisement is viewed outside the context and time of the election:

None of us, without understanding the context and the time, can tell you what a sham ad is and a nonsham ad. You can't do that by looking at pictures or even looking at the ads. When I was teaching at Harvard, I brought Doug Bailey up to lecture my class. He showed series of commercials, and he said, "Okay, which is the best commercial," and everybody voted. "The worse commercial," and everybody voted. He said, "You're all wrong. There is no best or worse commercial because none of you are qualified to judge these commercials because you don't know the context in which they were run or the problems they were to solve." When I look at storyboards, I have no way of knowing if they're fake, real, et cetera,

because I don't know the time—I don't know anything about them.

Strother Cross Exam. at 90–91.

292. While electioneering issue advertisements almost always refer to specific candidates by name, especially those seeking to influence an officeholder's upcoming vote on pending legislation, genuine issue advertisements are less likely to refer to a federal candidate by name.

Raymond Strother testified:

In addition to our work for candidates, my firm has also done some (though limited) advertising work for the political parties and for third parties. I would characterize these ads as falling into two distinct categories: true issue ads and electioneering or "sham" issue ads.

True issue advocacy does exist. Over the years, I have designed issue advertising campaigns for, among other issue, tightening seat belt laws, education reform, and the removal of the confederate battle cross from the Mississippi state flag. The education reform ads promoted policies such as reducing class sizes and loosening the protections afforded by tenure so that bad teachers could be more easily fired. These ads were run all across the South; and their sole purpose was simply to educate the public. In Mississippi, my client wanted to change attitudes about the confederate cross on the flag, and explain how it was holding back the state economically. These advertisements were not made to elect or defeat anyone.

These true issue ads did not mention any candidates by name. Indeed, there is usually no reason to mention a candidate's name unless the point is to influence an election.

Strother Decl. ¶¶ 5–7 [DEV 9–Tab 40]. During Strother's cross examination, he

candidly admitted that during the course of his 35 year career, less than 10 percent of his work was for issue organizations as opposed to candidates, Strother Cross Exam. at 48 [JDT Vol. 15], and that he had never spent much time working for an ideological organization. *Id.* at 56–59. Indeed, he admitted on cross examination that he did not think he had "ever advised a client who wanted to run an advertisement campaign of some kind that spoke to pending legislation before a sitting legislature." Strother Cross Exam. at 119.

293. Political consultant Raymond Strother, further acknowledged when questioned regarding advertisements that specifically encourage voters to call their legislators regarding pending legislation that a candidate's name would be mentioned in the context of this type of advertisement.[210]

Q. Have you ever advised a client who wanted to run an advertisement campaign of some kind that spoke to pending legislation before a sitting legislature? A. I don't think so, but I could be wrong. Maybe my memory isn't good, but I don't think so. Q. Do you have any reason to believe, if you were to do that, that you would not want to run advertisements that specifically encourage the voters to call their member and to tell them which way they should vote on that pending legislative initiative? A. Yes, there's a good chance we would say, "Call Candidate X and let your views be known."

210. Moreover, Mr. Strother went on to characterize an interest group's need to refer to a candidate in a legislation-centered advertisement during that time as a "loophole," through which interest groups would evade campaign laws. *Id.* at 119–120. Mr. Strother candidly revealed his personal belief that "independent groups" should be taken "out of our election process" because they "taint it with our money." *Id.* at 120–21. He observes:

Q. What I'm getting at here is just that there is a possibility, isn't there, that there will be pending legislation, in a period immediately before a federal election, where a group would like to run a campaign targeted at the legislation and not at the election. But, in order for them to do that, they have to refer to the politician who is also a candidate. Isn't that true? A. I think it's a great loophole. Q. Have you thought about this issue before today's cross examination? A. In the context of what I do for a living, you think about things like that, sure. Q. Given that you've never advised a client who has had a legislative initiative that they were trying to oppose or support, have you given concrete thought to the specific problem that, when there's a legislative initiative pending right before an election issue groups need to refer to the candidates, because they are also the office holders, in advocating for or against that pending legislation? A. There are a lot of ways I can look at that considering my opinion on the First Amendment, et cetera. I would like to see those groups out of our of election process. Q. Why is that? A. Because I think they taint it with their money. I think they can come in and overwhelm an election. I give you the example of somebody sending $1,000 and someone else comes in and spends $1 million on the other side. No matter what you want to call it, they have tainted that election. They have influenced that election. They are going to win that election. I don't care if you call it issue advocacy or what you call it. They're going to overwhelm their opponent with the shear volume of what they're doing. I would rather see these independent groups stay out of our elections completely. I wish there was a law that would keep them from interfering, and I wish there was a law that would keep these night riders, which I would call the Triad and people like that, out of our elections. They sweep in with no address but a fax machine, and spread anti-Semitism and then leave and hide. I think it's insidious. I think there ought to be a law against it. I think candidates should run their own ads. Their names should be on the bottom of them. They should spend their own money. If we have to, let's raise the limit so they can raise money, appreciable money.

Strother Cross Exam. at 119. *See also* Huard Decl. ¶ 12 ("There are many reasons that an issue ad may need to refer to the name of an elected official or candidate. Many bills are identified with particular sponsors and may be known by the sponsors' names. Also, both incumbents and candidates may be prominent people whose support or opposition to a bill or policy may have important persuasive effect.... Also, if an issue ad is used to explain why a legislative position of a particular Member of Congress is good for his or her district or state, the member generally must be mentioned. *The same is true if the purpose of the ad may be to induce viewers to contact the Member and communicate a policy position.*") (emphasis added); Mitchell Decl. ¶ 11 (stating that "[t]he express or implied urging of viewers or listeners to contact the policymaker regarding [an] issue is ... especially effective by showing them how they can personally impact the issue debate in question.").

294. Political consultant Doug Bailey testifies:

In addition to the work we did for candidates at Bailey, Deardourff, we also did political ads for political parties and issue groups. When we were creating true issue ads (e.g., for ballot initiatives or more general issues such as handgun control), and when we were creating true party building ads, it was never necessary for us to reference specific candidates for federal office in order to create effective ads. For instance, we created a serious [sic] of ads opposing a gambling referendum in Florida which made no reference to any candidates. We were successful in conveying our message, and the referendum failed two to one.

Bailey Decl. ¶¶ 9–11 [DEV 6–Tab 2] (emphasis added).

295. In contrast, expert testimony in the record also indicated that candidate-centered issue advertisements almost always mention the name of the federal candidate. Krasno & Sorauf Expert Report at 55–56 ("The most obvious characteristic shared by candidate ads and candidate-oriented issue ads is their emphasis on candidates. Candidate names appear in virtually all of these spots, with candidates most likely to identify themselves in their ads and candidate-oriented issue ads most likely to identify the opposing candidate (in some pejorative way).").

### The Use of Issue Advocacy by Organizations For Electioneering Purposes

296. Defense experts Krasno and Sorauf stated:

Many of [the sponsors of issue advocacy designed to influence federal elections] have been frank about their intent to influence elections. For example, the AFL–CIO in the first issue ad campaign in House elections in 1996 acknowledged its intent to help Democratic candidates, and its results were measured accordingly. The Club for Growth, a conservative Republican group, bluntly discusses its electioneering activities on its website; they include direct contributions, bundled contributions, and issue ads. The goals of the parties, especially in presidential elections where candidates and their agents have been intimately involved in planning and paying for their party's ads, can hardly be doubted. Survey results show that citizens overwhelmingly view these advertisements as intended to influence their support or opposition to particular federal candidates.

Krasno & Sorauf Expert Report at 65 [DEV 1–Tab 2].

297. Defense expert Magleby explains in his expert report that both labor unions and corporations engaged in extensive

electioneering communications during the 1996 election cycle.

The 1996 initiative by labor into unregulated and unlimited electioneering communications was substantial. The AFL–CIO spent a reported $35 million dollars, much of it on television, aimed at defeating 105 members of Congress, including 32 heavily targeted Republican freshmen. Labor broadcast television commercials in forty districts, distributed over 11.5 million voter guides in twenty-four districts and ran radio ads in many others. The labor campaign triggered a complaint to the Federal Election Commission by the National Republican Congressional Committee, which charged that when the AFL–CIO's ads are "heard, read, and seen" as a whole "a reasonable person can only view them as advocating the defeat of a clearly identified candidate in the 1996 Congressional election." *See In the Matter of AFL–CIO Project '95* (complaint filed with the Federal Election Commission Feb. 13, 1996).

The business community responded to this major effort by labor with their own unlimited and undisclosed communications, again avoiding any of the magic words. Partners in the business response were the National Federation of Independent Business (NFIB), U.S. Chamber of Commerce, the National Association of Wholesaler–Distributors, the National Restaurant Association and the National Association of Manufacturers. Their group, called the "Coalition–Americans Working for Real Change," was active in thirty-seven House races, spent an estimated $5 million on over thirteen thousand television and radio commercials, and mailed over two million letters mainly in support of Republicans, to owners of small business. Others using this tactic in 1996 included Triad Management Services. The activity of Triad Management Services is documented at

Center for Public Integrity, "The 'Black Hole' Groups," *The Public–I*, at <www.public-i.org/watch_04_033000. htm>.

Magleby Expert Report at 10 n. 7 [DEV 4–Tab 8] (citations omitted); *see also* Mitchell Dep. at 96–97 [JDT Vol. 23] (stating that in 1996, in the 60 days before the election, in terms of dollars spent by the AFL–CIO on broadcast advertising, the substantial majority of that money was spent on ads that mentioned members of the House of Representatives).

298. Evidence presented in the record demonstrates that electioneering advocacy is, at times, a consideration of the AFL–CIO. For example:

1) Mitchell testified that after Congress adjourned on October 3, 1996, the AFL–CIO discontinued its broadcast advertisements "aimed at immediately pending legislative issues." Mitchell Decl. ¶ 42 [PCS 6]. The AFL–CIO then began to run "electronic voter guides" which compared the positions of congressional candidates on various issues. *Id.; see also* FEC MUR No. 4291, General Counsel's Report, June 9, 2000, at 6, INT003838 [DEV 52–Tab 3].

2) A September 18, 1996, memorandum from a polling firm analyzed the likely impact of five issue advertisements in terms of their likely effect on voters. Memorandum from Guy Molyneux and Molly O'Rourke of the polling firm Peter D. Hart Research Associates, Inc., to the AFL–CIO's Special Assistant for Public Affairs, Denise Mitchell, "Ad Targeting" (Sept. 18, 1996), AFL–CIO 001614–16 [DEV 124] ("[The advertisement] Taxes appears to be the single strongest spot, in terms of *reaching the widest range of voters and affecting people's impression of the incumbent's Issue position.* It should especially be di-

rected to younger voters. [The advertisement] Kids is also very strong, and again should be directed to young people. [The advertisements] Medicare, Homes, and Retire are most effective with older audiences. If you can only run 4 spots, [the advertisement] Retire is probably the one to drop.") (emphasis added); *see also* Memorandum from Geoff Garin and Guy Molyneux of Peter D. Hart Research Associates, Inc. to Denise Mitchell, "AFL–CIO Mall Intercepts Survey" (Sept. 13, 1996), AFL–CIO 001582–84 [DEV 124] (Mall Intercept Survey of individuals' reactions to these advertisements including *how the advertisements made the respondents feel about fictitious congressman's position on each issue* ); *see also* Mitchell Cross Exam. at 66–75 [JDT Vol. 23]. *But see* Proposed Findings of Fact of the AFL–CIO and AFL–CIO COPE PCC ¶ 19 ("[t]he selection of these subjects [for its broadcast advertising campaign between 1995 and 2001] was not motivated by partisan political considerations"); Mitchell Decl. ¶ 70 [6 PCS] ("[The indirect effect on election outcomes] has never been the point of our broadcast advertising program, within or outside the 30–and 60–day periods.").

3) On March 29, 1996, Mitchell received a memorandum from a campaign consultant who analyzed political media consultants for the AFL–CIO. The memorandum stated:

Political campaigns are superheated environments where the objective is not, always, to make the best looking spot. The objective is to communicate with the persuadables at the time they are making their decision. Being able to pivot the entire campaign at exactly the right time is the real talent of a media consulting firm. Consequently, there is little reward for great spots.

No one knows better than you how consuming this can be.... [These advertisements can be done], but you must understand that you will be asking these political consultants to do it under rules they have never had to follow before.... What [all of these firms can do] is manage the political message in a volatile environment.

Memorandum from Joe Cowart of Joseph Cowart Campaign Consulting to Denise Mitchell, "Political Media Consultants" (Mar. 29, 1996), AFL–CIO 001702–04 [DEV 124]. *But see* Proposed Findings of Fact of the AFL–CIO and AFL–CIO COPE PCC ¶ 19 ("[t]he selection of these subjects [for its broadcast advertising campaign between 1995 and 2001] was not motivated by partisan political considerations"); Mitchell Decl. ¶ 70 [6 PCS] ("[The indirect effect on election outcomes] has never been the point of our broadcast advertising program, within or outside the 30–and 60–day periods.").

4) An October 9, 1996, internal memorandum from the AFL–CIO's Brian Weeks to AFL–CIO's Mike Klein discussed where media buys might be placed to help Dick Durbin in his Illinois Senate race, based on Mr. Durbin's lack of resources to air advertisements in certain markets. Memorandum from Brian Weeks to Mike Klein, "Electronic Buy for Illinois Senator" (Oct. 9, 1996), AFL–CIO 005244 [DEV 125]. *But see* Proposed Findings of Fact of the AFL–CIO and AFL–CIO COPE PCC ¶ 19 ("[t]he selection of these subjects [for its broadcast advertising campaign between 1995 and 2001] was not motivated by partisan political considerations"); Mitchell Decl. ¶ 70 [6 PCS] ("[The indirect effect on election outcomes] has never been the point of our broadcast advertising program, within or outside the 30–and 60–day periods.").

5) Denise Mitchell indicated that in 1996, in the 60 days before the election, in terms of dollars spent by the AFL–CIO on broadcast advertising, the substantial majority of that money was spent on ads that mentioned members of the House of Representatives. Mitchell Dep. at 96–97 [JDT Vol. 23].

299. Bruce Josten, Executive Vice President for Government Affairs for the U.S. Chamber of Commerce, testified repeatedly that the purpose of the electioneering communications aired during the 1996 federal election was not to influence the election of any federal candidate, but to respond to attack ads paid for by the AFL–CIO and organized by its president, Mr. John Sweeney. Mr. Josten explained that there "were TV markets where John Sweeney ran an ad accusing a member of Congress about their votes on the issues that I mentioned earlier, and in the spring he started running ads that were not true, and we would follow him" with television ads paid for by the Coalition. Josten Cross Exam. at 44. According to Mr. Josten, the AFL–CIO ads attacked Members of Congress who had supported pro-business initiatives and legislation favored by the Coalition. "My objective was to knock down impressions that Mr. Sweeney and his advertisers and campaigns were trying to undertake and express our viewpoints exactly the opposite of that and let the viewers make their own decision about that dialogue that was being imposed on them." *Id.* at 88. *See also* Proposed Findings of Fact of Chamber, NAM, Associated Builders and Contractors, et. al. ¶ 24 ("Defendants' assertion that The Coalition's 1996 activities show that preelection issue ads are merely candidate ads in disguise is mistaken. Participants in The Coalition were unanimous that its ads were intended to respond to issue ads being run by the AFL–CIO.").

300. There is other probative evidence presented in the record, however, that influencing the elections of federal candidates was also a consideration for the U.S. Chamber of Commerce when crafting "issue advertisements."

In 1996, the Coalition sought proposals from advertising firms for a "campaign to re-elect a pro-business Congress." TC00698 [DEV 121]. Media consultant Alex Castellanos of National Media, Inc. opened his proposal to the Coalition by stating, "Thank you for the opportunity to present two 30 second television and one 60 second radio scripts, as requested, to your campaign to re-elect a pro-business Congress." *Id.;*

The Coalition commissioned firms to conduct polls and focus groups to measure voter responses to their advertisements. AV0024–40, 0046–47, 0060–64, 0106–118, 0139–41 [DEV 121]. The Coalition retained two polling organizations in 1996, the Tarrance Group and American Viewpoint, to test whether specific Coalition and AFL–CIO advertisements would make participants more or less likely to vote for particular federal candidates. FEC MUR No. 4624, General Counsel's Report, April 20, 2001, at 22–23 [DEV 53–Tab 6]; Josten Dep. at 68–114 [JDT Vol. 12]. One firm surveyed "voter attitudes nationwide," TC 00513–37 [DEV 121], and another survey tested possible Coalition ads on focus groups, including one of "Swing Voters." AV0139–41, AV0037–40 [DEV 121].

A June 28, 1996, Tarrance Group memorandum to the Coalition stated that "The net result among swing voters in Cleveland was that 25% of participants were moved closer to voting for a Republican candidate for Congress and about half of the participants were moved against national labor leaders. In other words, the response ads not only leveled the playing field, but put some points on the

board for Republican candidates as well." AV139 [DEV 121] (stating that Republican Members of Congress are "currently under attack by AFL–CIO advertising" and are "outgunned and outclassed" and if "targeted Republicans ever hope to be operating on an even playing field during the 1996 election, it will require that an outside voice come to their defense.").

A July 12, 1996, memorandum to the Coalition from American Viewpoint on "Key Findings of the Pre–Test in Des Moines Media Market of Iowa 4" concludes that Congressman "Greg Ganske is in deep trouble in the Des Moines Market," stating that "this is one of the most challenging districts that could have been chosen to assess the impact of your advertising.... If advertising can move numbers in this district, it should be effective in most other districts. Voters have not yet focused on the union's campaign as only 25% has seen the commercials. As a result, there is still time to reach them with a substantial buy." Memorandum from Gary Ferguson to the Coalition Steering Committee, "Key Findings of the Pre–Test in the Des Moines Market of Iowa 4" (July 12, 1996), NAW0002, 05 [DEV 121].

In late 1996, the Coalition commissioned the Tarrance Group to conduct a detailed post-election analysis. The Tarrance Group, *Coalition Post–Election Survey Analysis*, NAM0206–27, at NAM0213 [DEV 121]. The Tarrance Group reported:

> The Coalition commissioned this research to assess the impact of their two-month advertising campaign and its relative effect on voters in the face of the very aggressive, year-long campaign sponsored by the AFL–CIO. Given that four of the six Republican candidates tested in this research won their respective races, one could conclude that the Coalition's efforts were

a success-as they were in the vast majority of the targeted districts in which the Coalition was involved.

301. There is substantial evidence in the record which shows that candidate advocacy was also a consideration for Citizens for Better Medicare ("CBM"), an organization that was primarily financed by major drug companies and sponsored by PhRMA, an industry trade association. Ryan Dep. at 13 [JDT Vol. 27] ("We solicited funding from the pharmaceutical companies to underwrite our efforts."); *id.* at 10–11 ("PHRMA was really the leading organization to organize and fund CBM."); PH 0379 [DEV 128–Tab 2]; CBM 0029 [DEV 128–Tab 1] (tally of donations from major drug companies to CBM in FY 2001, totaling $39,586,892.32). CBM describes itself as "a grassroots organization representing the interests of patients, seniors, disabled Americans, small businesses, pharmaceutical research companies and many others concerned with Medicare reform." According to the Annenberg Report, CBM spent $65 million on broadcast advocacy in the 60 days prior to the 2000 general election. Annenberg Report 2001 at 4, 20–22 [DEV 38–Tab 22]. There is substantial evidence in the record that this advocacy was candidate-centered. Alex Castellanos, a political consultant with National Media, testified that CBM advertisements often mentioned Members' names. Castellanos Dep. at 63–66; *see also* Ryan Dep. at 68–72, 79–85. Timothy Ryan, former executive director of CBM, testified that much of CBM's ad strategy leading up to the 2000 election was aimed at supporting candidates attacked in AFL–CIO advertising. Ryan Dep. at 68–72; Castellanos Dep. at 63–66.

302. The NRA's media consultant noted that the first objective of its advertising campaign was to "influence outcome of presidential election and other key con-

gressional seats in 10 'battle ground' states." McQueen Cross Exam. Exhibit 2, NRA–ACK 17913–15 [JDT Vol. 22].

303. According to its mission statement, the Club for Growth "is primarily dedicated to promoting the election of pro-growth, pro-freedom candidates through political contributions and issue advocacy campaigns." CFG 000217 [DEV 130–Tab 5]. In a brochure soliciting donations, the Club for Growth noted that "Before the elections, the Club plans to invest $1 million in television advertising in key congressional districts to advance our pro-growth issues. This is a tactic the unions have used so effectively against pro-growth candidates. These issue advocacy campaigns can make all the difference in tight races." CFG 000223 [DEV 130–Tab 5]; *cf.* NRW–02814 [DEV 129–Tab 2] (January 2, 2001, fundraising letter from the National Right to Work Committee noted that it had run "more than 1,000 television ads in Virginia, Nevada, Florida and Nebraska shining a spotlight on the differences between the candidates in those states on Right to Work").

304. More than two-dozen organizations, including "political parties, labor unions, trade associations and business, ideological and single-issue groups" spent an estimated $135 million to $150 million worth of "issue advertisements" during the 1995–96 campaign, compared to the $400 million spent on advertising by the federal candidates running for office. *See* Annenberg Report 1997 at 3 [DEV 38 Tab–21]. Almost 86.9 percent of these advertisements mentioned a candidate for office or public official by name. *Id.* at 8. "Most" of the groups running these advertisements "declined to make known the identities of their donors." *Id.* at 4.

305. The Annenberg Center reported in 1998 that at least 77 groups ran issue advertisements during the 1997–1998 election cycle costing between $275 and $340 million. Annenberg Report 1998 at 1 [DEV 66–Tab 6]. Overall, 53.4 percent of these advertisements mentioned candidates by name, although 80.1 percent of those advertisements run in the final two months of the campaign mentioned candidates. *Id.*

306. The Annenberg Center further finds that during the 1999–2000 election cycle 130 groups aired 1,100 distinct advertisements, at an estimated cost of over $500 million. Annenberg Report 2001 at 1 [DEV 38–Tab 22]. The report found that 60 percent of distinct radio and television issue advertisements (689 out of 1,139) aired from January 1, 1999, to November 7, 2000, were broadcast for the first time during the final two months of the election cycle. *Id.* at 12. In addition, 73 percent of all the distinct advertisements mentioned a candidate. *Id.* at 14. In terms of television advertisements, the closer the advertisement was aired to election day, the more likely it contained a candidate mention. *Id.* at 15. Between March 8 and August 31, 2000, candidates were mentioned in 72 percent of the television issue advertisements aired. *Id.* After August, 95 percent of the television commercials broadcast mentioned a candidate. *Id.* The report found that during the 2000 election cycle, 89 percent of unique advertisements were "candidate-centered," meaning they made "a case for or against a candidate" without using express advocacy. *Id.* at 13, 14.

*Electioneering Advertisements Have Been Run About Issues In Which the Group Running Them Has No Particular Interest*

307. Candidate-centered issue advertisements, designed to directly affect federal elections but not employing the "magic words" of express advocacy, have been run about issues not pending before Congress. *See* Chapin Decl. ¶ 13 [DEV 6–Tab

12] (testifying that "[t]he Florida Women's Vote project of EMILY's List also ran a television ad in the [2000 Florida Eighth district Congressional] campaign[,] which as I recall was run in the two months prior to the general election[.] The ad praises my record on gun safety and ends with the line: 'Tell Linda Chapin to continue fighting.' This ad is clearly intended to influence the election result. Based on my observations, EMILY's List is not particularly interested in gun control issues. However, they are interested in supporting pro-choice female candidates like me, and this ad serves that purpose."). The Associated Builders and Contractors ("ABC") have also run advertisements that discuss issues that are not of concern to its members. *See* Monroe Dep. at 65–67, 90–91 [JDT Vol. 23] (answering a question regarding advertisements run by the Associated Builders and Contractors which discussed penalties for child molesters, Monroe stated "no, [stronger penalties for child molesters] is not a particular concern to the general public of contractors or general group of contractors.") *Id.* at 91; *but see* Proposed Findings of Fact of Chamber, NAM, Associated Builders and Contractors, et. al. ¶ 26 ("In fact, ABC's witness explained that the cited ABC ads [that Defendants assert address subjects distant from the policy concerns of the ABC] reflected public policy concerns of ABC's membership.").

308. During the 2000 election cycle, the Club for Growth gave $20,000 to the American Conservative Union to support an issue advertisement which discussed Senate candidate Hillary Clinton's residency in New York. Keating Dep. at 59 [JDT Vol. 12] ("Q. Whether or not Hillary Clinton is a resident of New York State really doesn't have anything to do with the Club for Growth's interest in pro-growth conservative Republican elected officials, does it? A. It doesn't seem to directly, no.").

### The Buying Time Studies

309. The Brennan Center for Justice at New York University Law School ("Brennan Center") produced two studies entitled *Buying Time 1998* and *Buying Time 2000* which examined television advertising during the 1998 and 2000 election cycles. *See BT 1998; BT 2000.* Both *Buying Time* studies were funded by the Pew Charitable Trust. *See BT 1998; BT 2000.* The Brennan Center is "primarily a law firm that also does research on a variety of social science issues that includes campaign finance along with criminal justice and other electoral issues and poverty issues." Holman Dep. at 10. The Brennan Center was also involved in the crafting of BCRA and providing analysis of issues being debated in Congress to legislators, the media, and the public. *Id.* at 11. Representatives of the Brennan Center testified in favor of the McCain–Feingold bill, *id.* at 22, and during Senate debate on the legislation, Senators cited to *Buying Time* data and Brennan Center analyses. Holman Dep. Exhibit 3 at 2 [JDT Vol. 10].

310. While the Brennan Center's funding proposal for *Buying Time 1998* states that the study had an academic purpose, evidence in the record demonstrates that the primary purpose was "to fuel a continuous and multi-faceted campaign to propel reform forward." Holman Dep. Exhibit 4 at 2 [JDT Vol. 10]. The proposal reveals that the study was part of a larger strategy to overcome the "obstacles to reform," and notes that the first step in achieving the goal was "to develop a reliable source of information on the nature of the problem." *Id.* at 7. The study had two phases, and it would not even proceed to the second phase if it did not "provide a sufficiently powerful boost to the reform movement." *Id.* at 6; Krasno Cross Exam. Exhibit 4 at 1, 3, 6 [JDT Vol. 14] (explaining that the first phase was to acquire data

"and use it to develop a strategy for responding to the threat posed by issue advocacy," and the second phase was to "create policy recommendations and reports, as well as . . . publiciz[ing] these activities on Capitol Hill and beyond").

311. In April or May of 2000, Dr. Kenneth Goldstein of the University of Wisconsin, who had worked on the data set for *Buying Time 1998,* indicated in a request to the Pew Center for another grant that the purpose of the *Buying Time* studies was to further campaign finance reform. Goldstein Dep. (Vol. 1) at 29 [JDT Vol. 8]. Goldstein's request stated that he was "happy to work with others in the policy community to make sure that our study is designed and executed in ways that help move the reform ball forward." Goldstein Dep. (Vol. 1) at 37 & Exhibit 6 at 5 [JDT Vol. 8]. Mr. Seltz, co-author of *Buying Time 1998,* states that while there were a number of purposes behind the study, "the primary purpose was to contribute to the body of knowledge about campaign finance reform and specifically issue advocacy . . . and to fill what we viewed to be an empirical void in the literature about issue advocacy." Seltz Dep. at 22 [JDT Vol. 28]. "An independent but related purpose . . . was indeed to provide information to . . . proponents of campaign finance reform to help them fashion new and better arguments for reform, but arguments that would be based on research that was verifiable, checkable, transparent, reproducible." *Id.* Mr. Holman, a principal co-author of *Buying Time 2000,* did not approach the project with the purpose of producing results that would support campaign reform and had never seen the grant proposal. Holman Dep. at 25–26; *see also id.* at 29–30 ("I was mostly excited about the political science aspect of [the study] . . . . It was not clear at any point and never explained to me exactly what sort of policy direction that would go in.").

312. Dr. Kenneth Goldstein provided assistance in processing and coding data for the *Buying Time* studies. Goldstein Rebuttal Report at 6. In addition to assembling data sets used in the *Buying Time* studies, Dr. Goldstein also produced an expert report for the purpose of this litigation. *See* Amended Expert Report of Kenneth M. Goldstein (Oct. 2, 2002) ("Goldstein Expert Report"). As part of processing and coding data for the studies, he merged CMAG's two data sets to produce "a single, comprehensive data set." *Id.* He also had university students (at the University of Arizona for *Buying Time 1998* and the University of Wisconsin for *Buying Time 2000* ) "assess[ ] the content, tone, issues addressed, whether the ads mentioned a political candidate or provided a toll-free number to call, etc. . . . In addition to collecting certain specific information concerning each storyboard reviewed, the study also asked coders: 'In your opinion, is the purpose of the ad to provide information about or urge action on a bill or issue, or is it to generate support or opposition for a particular candidate?' " Goldstein Expert Report at 7. Advertisements that provided information or urged action on a bill or issue were labeled "genuine issue ads" in both studies, whereas those communications that generated support or opposition for a particular candidate were referred to as "sham issue ads" in *Buying Time 1998, see e.g. Buying Time 1998* at 87; and "electioneering issue ads" in *Buying Time 2000, Buying Time 2000* at 30. Each *Buying Time* database consists of 40 million data points. *Id.* at 37.

313. As noted in Findings 316–317, *infra,* Dr. Gibson criticizes the CMAG data underlying both reports. Dr. Arthur Lupia was asked by the Brennan Center to evaluate Dr. Gibson's Expert Report and provided a report detailing his findings. *See* Rebuttal Expert Report of Dr. Arthur

Lupia (Oct. 14, 2002) ("Lupia Rebuttal Report").

*CMAG Data Set*

314. The CMAG data set is the basis of the *Buying Time* studies as well as the expert report of Dr. Kenneth Goldstein, which was produced for the defendants.

315. CMAG tracks political television advertising in the top 75 media markets, containing more than 80 percent of U.S. residents. *BT 1998* at 6–7; *BT 2000* at 18; Gibson Expert Report at 7; *see also* Goldstein Dep. (Vol. 1) at 47–49 [JDT Vol. 8] (describing how CMAG compiles its data). These 75 markets are geographically dispersed. Goldstein Rebuttal Report at 23; *see also* Goldstein Expert Report App. G at 1–2 (listing the 75 markets monitored by CMAG). In 1998–99 New York was the largest media market with 6,812,540 television households representing 6.854 percent of all television households. Gibson Rebuttal Report Exhibit 2 at 1 (listing 1998–99 Nielson estimates of media markets in order of size). Shreveport was the seventy-fifth largest media market, with 370,990 television households, or 0.373 percent of all television households. *Id.* at 2. For each market, CMAG monitors the four major broadcast networks (ABC, CBS, NBC, and Fox), as well as 42 national cable networks. Goldstein Expert Report App. G at 2–3. The CMAG data sets include two types of data. First, for every political advertisement aired, CMAG provides a transcript of the audio portion of the advertisement and a storyboard consisting of a still capture of every fourth second of the video portion of the advertisement. Goldstein Expert Report at 6. Second, CMAG provides data on each airing of an advertisement, including time, length, station, show, and estimated cost. *Id.*

316. The CMAG data is underinclusive in that it does not track every political advertisement that is aired. Goldstein Dep. (Vol. 1) at 52 & Exhibit 9 at 16.

1) The CMAG does not monitor local cable advertising in the 75 markets it covers. Gibson Expert Report at 8; Gibson Rebuttal Report at 24.

2) The 1998 and 2000 CMAG data sets did not cover advertisements broadcast in the nation's 140 smallest media markets, which are more rural than the 75 captured by CMAG. Goldstein Dep. (Vol. 2) at 9–10 & Exhibit 9 at 16 [JDT Vol. 8]. For those markets covered, the evidence shows not all advertisements are captured by CMAG. Dr. Goldstein participated in a validity study of the CMAG data by comparing the CMAG data with a sampling of invoices from eight television stations. *Id.* Exhibit 9 at 16. The results show that for seven of the stations, 97 percent or more of the advertisements listed on their invoices correlated with the CMAG data. *Id.* at 16–17 & 28 (tbl.2). For one station, however, 20 percent of the advertisements accounted for in the station's invoices could not be found in the CMAG data. *Id.*

3) Another shortcoming of the CMAG data is that although it provides 100 percent of the advertisements' audio, it only provides snapshots at four second intervals of the advertisements' video. As such, 25 percent of the advertisement storyboards for the 1998 data set do not display the name of the group sponsoring the advertisement. Goldstein Dep. (Vol. 2) at 21 [JDT Vol. 8]; Gibson Expert Report at 8.

4) Another perceived shortcoming of CMAG is that it tracks markets not electoral districts, and is unable to distinguish between different versions of ads that are identical with the exception of the candidate or officeholder's name (also known as "cookie cutter" advertise-

ments). Gibson Expert Report at 7; Gibson Rebuttal Report at 7; Goldstein Dep. (Vol. 2) at 113 [JDT Vol. 8].

5) The CMAG Data Set does not measure advertisements aired in the 30-day period preceding primary elections. *See* Krasno Rebuttal Report at 13.

317. In regard to the gaps in station invoices when compared to the number of advertisements captured by CMAG, *see supra* Finding 316, Dr. Goldstein believes it could be the result of inadequate record keeping by the station as well as CMAG omissions. *See* Goldstein Dep. Exhibit 9 at 17 n. 3. Dr. Gibson, however, finds this to be a major shortcoming of the CMAG data. Gibson Rebuttal Report at 5–6. He deduces from these missed advertisements that CMAG "likely missed 1,764 ads," or 5.04 percent of these eight stations' airings, and using these figures estimates "that 48,864 airings that in fact were broadcast [nationwide]... were not captured by the CMAG methodology." *Id.* (applying the 5.04 percent figure to the total number of advertisements captured by CMAG). Dr. Gibson assumes that CMAG has missed the same percentage of advertisements in all the covered media markets. Moreover, although "we do not know any of the characteristics of these ... missing airings," Dr. Gibson believes those airing were missed because they "did not have a clear 'political purpose' that could be discerned by the CMAG analysts." *Id.* at 6; *but see* Goldstein Dep. (Vol. 2) at 12 [JDT Vol. 8] (stating that commercials provided to CMAG by Competitive Media Reporting [211] is "overly inclusive," including "ads for the Red Cross, [and] ads for electric companies").

318. While acknowledging CMAG's underinclusiveness, Dr. Lupia believes that Dr. Gibson, "presents no evidence or rea-

son to believe that ... including advertisements from the markets not covered would change [the] results [of studies based on the data]." Lupia Rebuttal Report at 28; *see also* Goldstein Rebuttal Report at 24 ("Moreover, Professor Gibson does not offer any reason to believe that the ads run on local cable advertising are significantly different than the broadcast ads captured by CMAG."). According to Dr. Goldstein, Dr. Gibson did not suggest that "CMAG's inability to capture local cable spots introduced any systematic bias into the data." Goldstein Rebuttal Report at 24. According to Dr. Goldstein, the "snapshot" style of the CMAG storyboards does not compromise the "ability to accurately analyze the content of ads, especially because CMAG provides a complete transcription of the audio portion of the ad along with the video captures." Goldstein Rebuttal Report at 24–25. Furthermore, Dr. Goldstein states, "there is no reason to believe that there in [sic] any systematic bias associated with the CMAG terminology capturing only one video frame every four seconds." *Id.* at 25. As for the 25 percent of 1998 storyboards which did not indicate the advertisement's sponsor, the *Buying Time 1998* authors were able to remedy this problem by referring to the "CMAG's original coding (which accurately provides the sponsor of the ad in well over 95 percent of cases), examining the content of the ad, and, in a few cases, by phoning television stations." *BT 1998* at 8.

*Buying Time Findings*

319. *Buying Time 1998* drew a number of conclusions with regard to the nature and effect of political advertising in the United States. The study's main findings include:

---

**211.** CMAG gets [its] data from Competitive Media Reporting, a company that tracked advertising in the top 75 markets in 1998 and

2000, but now tracks advertising in the top 100 markets. Goldstein Dep. (Vol. 1) at 47

1) Four percent of candidate advertisements used "express advocacy" terms. *BT 1998* at 9.

2) The proportion of issue advertisements mentioning a candidate rises as the date of the election approaches. In July and August 1998, 61 percent of issue advertisements mentioned a candidate. By September, the percentage reached 82 percent and for the remainder of the campaign remained at 82 percent or higher, reaching a peak of 97 percent in the first half of October. *Id.* at 87, 103 (fig.4.15).

3) Forty-one percent of issue advertisements that provided information or urged action appeared within 60 days of the election, but only 2 of those advertisements, or seven percent, referred to a candidate. *Id.* at 109.

320. *Buying Time 2000*'s key findings from the 2000 election cycle included:

1) Seven percent of all political advertisements contained express advocacy terms. *BT 2000* at 73. Candidates used express advocacy terminology in 10 percent of their ads, *id.* at 15, 29, while political parties and interest groups used such terms approximately two percent of the time, *id.* at 73.

2) "Genuine issue ads" (those urging action on a public policy or legislative bill) were "rather evenly dispersed throughout the year, while group-sponsored electioneering ads [which promote the election or defeat of a federal candidate] make a sudden and overwhelming appearance immediately before elections." *Id.* at 56.

3) The study found that if BCRA had applied to the 2000 campaign, three genuine issue ads (which aired 331 times) would have fallen within the Act's definition of "electioneering communication." *Id.* at 73. Put another way, of the advertisements run within 60 days of the 2000 election which also depicted a candidate, 99.4 percent constituted electioneering advertisements, while 0.6 percent were genuine issue advertisements. *Id.* at 72 (fig.8–2).

321. Plaintiffs' expert, Dr. James L. Gibson, while leveling various criticism at both *Buying Time* studies, does not dispute that express advocacy words "are rarely used in political advertising, or that group sponsored ads that mention candidates tended to be concentrated before an election." Goldstein Expert Report at 38–39; *see also* Lupia Rebuttal Report at 9; *see also* Gibson Expert Report at 11 ("Entirely objective characteristics of the ads . . . present few threats to reliability."). Neither does he challenge the findings that advertisements sponsored by parties and interest groups comprise a significant and increasing portion of political advertising broadcast in federal races. Lupia Rebuttal Report at 9.

*Criticism of Buying Time 1998*

322. Dr. Gibson raises several objections to *Buying Time 1998* and *Buying Time 2000* reports, and ultimately concludes that neither report can "be accepted as accurate and valid descriptions of the nature of political advertising in the 1998 and 2000 elections." Gibson Expert Report at 66. While not listing every objection, Dr. Gibson's chief objections are as follows: (1) *Buying Time* is not a product of scientific inquiry as scientific principles of objectivity were not adhered to, *see* Gibson Expert Report at 3 & n. 3, 45; (2) neither *Buying Time* study was subject to peer review, *id.* at 4, 45; (3) the results of the *Buying Time* studies could not be replicated, and social science demand[s] that statistical analysis be replicable, *id.* at 5. *See also id.* at 47–48; (4) the statistical techniques employed by the *Buying Time* authors were questionable, *id.* at 5; (5) the shortcomings of the CMAG database preclude reliance on the *Buying Time* results,

*id.* at 5–9; (6) the student coders were not trained, and steps were not taken to ensure their impartiality, *id.* at 9–10; (7) the reliability of the coded data due to the lack of guidelines for coders answering questions and the coding of subjective characteristics of the advertisements, *id.* at 11–12; (8) the results cannot be relied upon because the miscoding of a single document can have "quite large consequences for the statistical results," *id.* at 22–23; (9) inaccurate coding of questions, even if the coding was consistent, *id.* at 17; (10) the wording and coding of Question 6 in *Buying Time 1998* is flawed, and Question 22 is superior, *id.* at 32–34; and (11) "no single *Buying Time 1998* Data Set exists" due to continual changes by Dr. Goldstein, *id.* at 11. Defendants' witnesses Dr. Kenneth Goldstein, Dr. Jonathan Krasno and Dr. Frank Sorauf, and Dr. Arthur Lupia each counter Dr. Gibson's allegations in their expert reports and rebuttal reports. *See generally* Goldstein Expert Report; Goldstein Rebuttal Report; Krasno & Sorauf Expert Report; Krasno Rebuttal Report; Lupia Rebuttal Report. After reviewing the expert reports, I find that although the *Buying Time* studies contain some flaws and shortcomings, as pointed out by Dr. Gibson, those shortcomings do not detract from the studies' credibility and reliability. I make the following findings in regard to Dr. Gibson's objections:

323. First, while I agree that the primary purpose of the *Buying Time* studies was to further campaign finance reform, I do not find that this fact has skewed the results of the study. *See* Krasno Rebuttal Report at 2 (admitting that *Buying Time 1998* is an advocacy document, but stating that "[s]cholars rarely embark upon research without some expectations as to its results. But more than most scholars, we had a compelling reason to insure that our results could withstand allegations of bias"); Lupia Rebuttal Report at 10–11 (stating that Dr. Gibson's claim that the

policy perspective of the *Buying Time 1998* authors "may have undermined the integrity" of the study "is pure speculation," and that a "person's political or ideological beliefs need not prevent them from being an effective scientist," and that he knows of no "conventional canons of scientific objectivity"); Goldstein Rebuttal Report at 8 (denying the charge that he or anyone under his supervision "perverted" the results of the databases, and maintaining that his approach to the coding was based on nothing other than "the spirit of scientific inquiry and objectivity").

324. Second, I find that while the submission of statistical studies to peer review processes is preferable, it does not "seriously limit[ ] the confidence one can place in the Report," as Dr. Gibson alleges. Gibson Expert Report at 45; *but see* Lupia Rebuttal Report at 13 (stating that the significance of the lack of peer-review is "doubtful . . . at best").

325. Third, while Dr. Gibson maintains that his inability to replicate the *Buying Time 1998* and *Buying Time 2000* results "undermines . . . any confidence one should place in the findings," Gibson Expert Report at 5, his inability seems attributable to his using the incorrect data set. *See* Krasno Rebuttal Report at 6–7 & n. 6, 8 n. 10 (attributing Dr. Gibson's failure to replicate the results to Dr. Gibson's not using "the original command files used to produce the numbers in *Buying Time 1998*," and maintaining that the original command files replicate the *Buying Time 1998* results); *see also* Goldstein Rebuttal Report at 18, 19–20 (stating that the reason Dr. Gibson could not replicate the results of *Buying Time 2000* was because he was using the wrong data set); *id.* at 20 (using the "federal.sav" data set produced by the Brennan Center, Dr. Goldstein was "able to replicate key findings of the *Buying Time [2000 ]* study," and correlate oth-

ers "within a fraction of a percentage point"); Lupia Rebuttal Report at 17 ("It is also worth noting that the Plaintiffs and their experts passed up the opportunity to resolve their concerns by replicating the data collection procedure itself."). Replication, as Dr. Krasno admits, "is a core precept of science," but Dr. Gibson "overstates the case by insisting on 'exact' replication." Krasno Rebuttal Report at 6. Notwithstanding the debate between the experts on replication, Dr. Krasno finds, and I agree, that the discrepancy between Dr. Gibson's findings using one data set and the findings of the *Buying Time 1998* and *Buying Time 2000* studies are statistically insignificant. *See* Krasno Rebuttal Report at 7–8 (referring to Gibson Expert Report at 24); *see also* Goldstein Expert Report at 18 n. 10 (stating that the variances in Dr. Gibson's results "are so small as to suggest their own triviality"); Lupia Rebuttal Report at 43 (stating "the demonstrated discrepancies are small" and the Gibson Expert Report "provides no evidence that such changes affect any of *Buying Time's* major claims").

326. Fourth, Gibson alleges that the statistical techniques used by the *Buying Time* authors are questionable; despite this charge, Dr. Gibson does not specifically identify how statistical procedure was misapplied. *See* Lupia Rebuttal Report at 18–19; *see also id.* at 19 (characterizing Dr. Gibson's critique as a "difference in point-of-view on how to categorize certain events that has nothing to do with statistical techniques *per se.*").

327. Fifth, I find that although the CMAG database has some shortcomings, Dr. Gibson has not demonstrated that these shortcomings undermine the conclusions of the *Buying Time* studies. *See* Gibson Rebuttal Report at 5–7 (stating he has no basis for verifying that the CMAG data base is accurate, that there is no way of knowing the characteristics of the miss-

ing airings, but concluding that the "apparent[ ]" errors caution against relying on the CMAG data for drawing conclusions on the nature of political communications); *see also* Goldstein Rebuttal Report at 23 (stating that Dr. Gibson "does not even attempt to explain how these alleged limitations undermine the validity of the conclusions set forth in *Buying Time*"); Krasno Rebuttal Report at 5.

328. Sixth, I find that the failure to train the student coders is justified given Dr. Krasno's concerns that a "training program would have caused complaints that Dr. Goldstein and I were attempting to impose our standards on the coders" and that the researchers "were hoping for a (reasonably informed) ordinary viewer's impression of the ads." Krasno Rebuttal Report at 5 n. 4; *see also id.* (explaining that "[l]imited pre-testing of the coding instrument showed that training was unnecessary because coders were apparently able to understand and answer the questions without further explanation."); Goldstein Rebuttal Report at 32 (stating that the lack of training was "a deliberate choice that is well-supported by social science principles .... aimed at getting the untutored common-sense impression of the coders, while minimizing the possibility of biasing coders with any preconceived notions that might have been implicit in a set of instructions," and that formal training "would only undermine the independence of the coders' assessments and possibly introduce systematic bias into the survey."); *id.* (contending that the lack of training also made it easier to "simulate ... the experience of a typical viewer watching the ads at home."). Furthermore, although Dr. Gibson is concerned with the training of the coders, his concerns are, as Dr. Goldstein explains, speculative because Dr. Gibson did not "conduct his own survey, using his own coders and his own training techniques, and compare

it to the results reached by the undergraduate coders." Goldstein Rebuttal Report at 31; *see also* Lupia Rebuttal Report at 33 ("In this case, such a replication would have been relatively simple to conduct ... and would have allowed the [Gibson] report to rely less on speculation when alleging that measurable attributes of Goldstein's coders affected the data collection or analysis."). Finally, I also find that evidence has not been presented to substantiate Dr. Gibson's concern that the student coders were unrepresentative of the general population, thereby threatening the accuracy of the *Buying Time* results. *See* Lupia Rebuttal Report at 35 (stating that "only if we had evidence that the way in which the undergraduates were unrepresentative caused *Buying Time*'s claims to differ from what a representative population would have produced" would there be a basis to believe the coders' unrepresentativeness threatened the quality of the data, but the Gibson "report presents no such evidence."); Holman Dep. at 241–42 (noting "it's common practice to use students as survey respondents especially in political work").

329. Seventh, I find that Dr. Gibson's objections regarding the reliability, or accuracy, of the coded data due to the coding of "subjective and judgmental" characteristics do not prevent this Court from relying on these studies as the *Buying Time* authors were seeking to measure the coders' opinions and perceptions. Gibson Expert Report at 12. Dr. Gibson uses Question 6 as an example.[212] Question 6 appears in *Buying Time 2000* as Question 11, except that the *Buying Time 2000* version does not bold the words "particular

candidate" and does not ask the coder to skip Questions. *See* Goldstein Expert Report App. F [DEV 3–Tab 7]. Dr. Gibson believes that it is not always readily apparent who the sponsor of the advertisement is, making it difficult for the coder to know whose purpose he or she is supposed to be evaluating. Gibson Expert Report at 12. According to Dr. Gibson, this problem is exacerbated by the lack of "explicit guidelines for how to ascertain an 'ad's purpose,'" and, given the subjective nature of this task, "certain procedures are essential so that the reliability of the data collected can be assessed." Gibson Expert Report at 12, 16. Further, Dr. Gibson states that there is "no assessment whatsoever of intercoder reliability [for *Buying Time 1998*]. Thus, unlike academic research based on subjective coding, no empirical evidence exists to indicate that the coders' subjective assessments of these ads were accurate." *Id.* at 18. Dr. Lupia responds arguing that the "practice of treating answers to opinion questions as objective phenomena is common in science." Lupia Rebuttal Report at 38 (describing an article co-authored by Dr. Gibson, the main conclusion of which is based on a survey where participants were asked about how they described their own identities). He notes that Question 6 begins with "In your opinion," and seeks to understand how the advertisements are perceived. *Id.* at 37.

330. Eighth, while I acknowledge that the impact on the *Buying Time 1998* results due to miscoding hypothetically could have, in the words of Dr. Gibson, "quite large consequences for the statistical results," Gibson Expert Report at 22–23, Dr.

---

212. The text of Question 6 in *Buying Time 1998* is as follows:

In your opinion is the purpose of this ad to provide information about or urge action on a bill or issue, or is it to generate support or opposition for a **particular candidate?**

1. Provide information or urge action (If so, skip to Question # 19)
2. Generate support/opposition for candidate
3. Unsure/unclear

Gibson Expert Report at 12 (citing *Buying Time 1998*) (emphasis in original).

Gibson admits he is providing only an example of how one error *could* affect the *results*. *See id.* (explaining that if Advertisement # 11 was coded as promoting issues rather than a candidate, the percentage of pure issue advertisements in the *Buying Time 1998* data set would rise six percentage points). As the evidence regarding the impact of miscoding is hypothetical, or speculative, I find that it does not undermine the conclusions of the study.

331. Ninth, I find that Dr. Gibsons' argument that even though the coders may be consistent in their coding, their coding could still be incorrect, misrepresents the purpose of the *Buying Time* studies and what the coders were asked to do. Gibson contends that:

> coders must seek easily discernable 'cues' in the advertisements as a means of making the required judgment. Since the presence of a political figure who seems to be a candidate is a readily accessible cue, the coders then develop an implicit decision rule that says: 'when a political figure is depicted in the ad, the ad involves electioneering.' Under this rule, the variable might be reliably coded. But this does not mean that the data are *valid*, since political figures appearing in ads could well be doing something other than electioneering.

Gibson Expert Report at 17 (emphasis in original). While Dr. Gibson may be correct that an advertisement may "be doing something other than electioneering," the study instead is seeking the coders' perceptions of the purpose of the advertisements, not the advertisements' true purpose. *See* Lupia Rebuttal Report at 39. Just because coders' perceptions may not comport with reality does not threaten the validity of the data, because the survey seeks the coders' mental impressions. *Id.* However, when codings were changed on Question 6, the mental impressions of the

coders, which were sought by the question, were overruled. Goldstein Dep. (Vol 2) at 208–209 [JDT Vol. 8].

332. Tenth, I reject Dr. Gibson's argument that Question 22 of *Buying Time 1998* is superior to Question 6, and that where the coding of Question 6 and Question 22 are inconsistent, Question 22 should be relied upon. The text of both questions is listed below:

> 6. In your opinion is the purpose of this ad to provide information about or urge action on a bill or issue, or is it to generate support or opposition for a **particular candidate**?
>
> 1. Provide information or urge action (If so, skip to Question # 19)
> 2. Generate support/opposition for candidate
> 3. Unsure/unclear
>
> 22. In your judgement, is the primary focus of this ad on the personal characteristics of either candidate or on policy matters?
>
> 1. Personal characteristics
> 2. Policy matters
> 3. Both
> 4. Neither

Gibson Expert Report at 12 (citing *Buying Time 1998*) (emphasis in original), 31–32. Dr. Gibson notes that, according to Question 6, 55.6 percent of the advertisements were coded as "promoting candidates." *Id.* at 31. Dr. Gibson also notes that, in response to Question 22, 98.1 percent of the advertisements "aired within 60 days of the election and depicting a candidate were coded as having a **"primary focus"** on policy matters." *Id.* at 32 (emphasis in original). While Dr. Gibson finds these results contrary to what one might expect, he also finds it "reasonable" that coders would conclude that almost all (98.1 percent) advertisements have a "primary focus" on policy, but also conclude that half

of those same advertisements have the "purpose" of promoting a candidate. *Id.* at 32–33. Nonetheless, Dr. Gibson argues that coding of Question 6 is "deeply flawed," and where Question 6 and Question 22 "clash ... the coding of Question 22 should be considered more valid and reasonable." *Id.* at 34, 35. Although I acknowledge that Question 6 does not provide coders the option of finding that the advertisement promotes *both* issues and candidates, and "does not ask the coder to discern the 'primary' purpose of the ad" but instead asks coders to provide their opinion on the advertisement's "purpose," *id.* at 33–34, I find that the coding of Question 6 can be relied upon by this Court. As Dr. Krasno points out, "coders rated 99 percent of candidate ads (and 93 percent of party ads) as generating support or opposition for a candidate." Krasno Rebuttal Report at 10 (citing *BT 1998* at 41). This conclusion is bolstered in Dr. Krasno's opinion by the fact the coders were not asked to determine the sponsor of the advertisement and that the disclaimers on the storyboards provided to the coders were often difficult to read. *Id.* at 10 n. 14. An electioneering advertisement does not have to focus primarily on personal characteristics of a candidate; in fact, "political scientists routinely take the view that politicians frequently adopt and advertise policy positions in order to appeal to voters." *Id.* at 10–11 (citing as an example Anthony Downs, An Economic Theory of Democracy (1957)); *see also* Goldstein Rebuttal Report at 29 n. 16 (citing four articles for the proposition that "policy issues in electioneering ads is widely noted in the political science literature"); Seltz Dep. at 188 [JDT Vol. 28]. Moreover, as Dr. Lupia explains, an advertisement's purpose (the question posed in Question 6) and its primary focus (the question posed in Question 22) do not have to be the same. Lupia Rebuttal Report at 46–48. To illustrate this point, Dr., Lupia notes that many beer commercials do not focus on the product, but rather people "engaged in a range of activities that we can call 'wild nights out.'" *Id.* at 47. It would not be unreasonable to "perceive that the purpose of the ad is to get" the viewer to buy the beer, "but to judge its primary focus as wild times." *Id.* at 48. Further, I find that the evidence supports Dr. Lupia's argument that individuals can make the same distinction for campaign advertisements, i.e., that their purpose is to get the person to vote for candidate X, but their focus is on issue Y. *See id.* In addition, I do not believe that Question 6 must include a qualifier, such as the word "primary" in Question 22, in order to be valid. A study co-authored by Dr. Gibson based on a survey question on social identity does not mention the word "primary," but concludes that the initial responses given revealed *primary* social identities. *See* Lupia Rebuttal Report at 51 (quoting James L. Gibson & Amanda Gouws, Social Identities and Political Intolerance: Linkages within the South@ African Mass Public, American Journal of Political Science 278–92 (2000)). Dr. Gibson's report "provides no tangible evidence or scholarly reference" that suggests that Question 6's failure to include a qualifier is "inconsistent with standard scientific practice." Lupia Rebuttal Report. at 52. Similarly, Dr. Gibson "offers no direct evidence on how answers to the questions would have changed had we allowed the responses 'both' and 'neither' in Question 6 or the response 'unsure/unclear' in Question 22." *Id.* at 48, 50.

333. Finally, I do not find that the updating and changing of the *Buying Time 1998* Data Set invalidates the database, such that reliance on the *Buying Time 1998* conclusions is unfounded. As Dr. Krasno explained, the short time frame of the study "inevitably meant that small changes to the data set would contin-

ue even after the release of *Buying Time 1998.*" Krasno Rebuttal Report at 4. Furthermore, the changes in the database reflect "the gradual filling in of missing data and the discovery of internal contradictions. There is no evidence at all in Dr. Gibson's report that any of the changes in the successive versions of the data that he examined had any more than a trivial impact on his results or on those reported in *Buying Time 1998.*" *Id.* Dr. Goldstein attributes the changes in the database to random error inevitable in a database, such as that used in *Buying Time 1998*, which consists of 40 million data points, Goldstein Rebuttal Report at 37; "routine 'cleaning' of the data sets," *id.* at 10; and the "standard social science practice" of cleaning "a data set by correcting apparent errors after the codes have been entered in the database," *id.* (citing Herbert F. Weisberg, Jon A. Krosnick & Bruce D. Bowen, An Introduction to Survey Research, Polling, and Data Analysis (3d ed.1996)). Dr. Lupia reviewed the multiple databases and concludes that the changes are transparent and he finds no reason to conclude that Dr. Goldstein has attempted to hide anything. Lupia Rebuttal Report at 22. Lupia agrees that Dr. Gibson's concern is a legitimate one; however, large academic databases change for legitimate reasons, so the mere existence of the relative small changes cited in the [Gibson] report provide no basis to negate the project's credibility. *Id.* To Lupia, the important question is "why and how the changes were made," and Dr. Gibson's suggestions of illegitimacy are, in Lupia's opinion, "of varying and questionable credibility." *Id.*

*Buying Time 1998's Calculation of the Percentage of Genuine Issue Advocacy Captured by BCRA*

334. *Buying Time 1998*'s claim that only seven percent of "genuine issue ads" in the 1998 campaign would constitute electioneering communications under BCRA is disputed.

335. *Buying Time 1998* found that seven percent of all pure issue advertisements aired in 1998 identified a federal candidate and appeared within sixty days of the campaign. Krasno Rebuttal Report at 13. This figure was determined by dividing the number of airings of genuine issue advertisements mentioning a federal candidate within 60 days of the election by the total number of genuine issue advertisements run in 1998. *Id.; see also* Seltz Dep. at 115–16. According to Dr. Jonathan Krasno, author of *Buying Time 1998*, the question he sought to answer with this formula was "what is BCRA's impact on pure issue ads?" *Id.* at 12. The Brennan Center stands by the seven percent figure, although for a period of time in 2001 it had questioned its accuracy. Holman Dep. at 142–43. During that period of time, the Brennan Center ran additional analyses and determined that seven percent of "unique issue ads—or in other words ... special interest groups placing issue ads" produced in 1998 would be captured unfairly by BCRA, *id.* at 123, 144, and that 13.8 percent of all issue advertisement airings mentioning a candidate and broadcast within 60 days of the 1998 election were genuine issue advertisements, *id.* at 154–55. Dr. Gibson contends in his rebuttal report that the number of genuine issue advertisements aired in 1998 that would have been captured by BCRA represents affects the "communications with a staggering number of household[s]—30, 108, 857. Thus, were these ads ... prohibited, over 30 million group-citizen communications would be affected." Gibson Rebuttal Report at 25. Defendants' experts do not address this point in their expert and rebuttal reports.

336. Plaintiffs object to the use of the total number of genuine issue advertise-

ment run in 1998 as the denominator. Dr. Gibson finds:

> using a denominator of all issue ads broadcast in 1998 for these calculations is arbitrary and makes little sense. Why use January 1, 1998, as the starting date for the total pool of issue ads (i.e., the denominator)? Why not include ads from December 1997, or even the entire election cycle beginning in November 1996? Why not limit the denominator to ads shown in the last half of 1998? The ... selected ... denominator ... has no theoretical meaning.

Gibson Expert Report at 38; *see also id.* at 41 ("I can see no justification for making the denominator equal to all issue ads aired in 1998."). Furthermore, he argues that given his conclusion that more people are concentrating on political issues as elections draw near, discussed *infra* Finding 357, *Buying Time 1998*'s denominator, by using all issue advertisements run during the course of the year, makes "the assumption that ads aired anytime throughout the year are equally as valuable as ads aired in proximity to the election." Gibson Rebuttal Report at 27. Thus, Dr. Gibson concludes that the "damage of prohibiting an ad within 60 days of an election cannot be ameliorated by allowing that ad to be broadcast at some other point throughout the year." *Id.* at 27–28.

337. Dr. Krasno explains that the *Buying Time 1998* denominator reflects only advertisements run in 1998 because "we had no data from 1997 or the last weeks of 1996 to include in the denominator." Krasno Rebuttal Report at 14. Dr. Krasno believes that the addition of such data into the denominator would simply "*decrease* the percentage of pure issue ads affected by BCRA" because all of those advertisements would have aired more than 60 days before the election and would therefore not increase the size of the numerator. *Id.* at 14–15 (emphasis in original); *see also* Krasno & Sorauf Expert Report

at 62 ("The data from which these estimates are derived cover broadcasting only during the 1998 and 2000 calendar years, not the thirteen-plus months preceding them. Were we able to factor in the total number of pure issue ads that appeared between elections, the percentage of pure issue ads affected by BCRA would decline.").

338. Dr. Gibson suggests the better denominator, and one that is not arbitrary, is that used in *Buying Time 2000;* namely, all airings of issue advertisements during the last sixty days of the campaign which also depict a candidate. Gibson Expert Report at 39. The Buying Time 2000 formula answers the question: If one were to assume all issue advertisements mentioning a candidate in the last 60 days of an election campaign had an electioneering purpose, what percentage of the time would this assumption be erroneous? *Id.* at 38–39. By contrast, the *Buying Time 1998* formula answers the question: "What percentage of total ads run throughout the year that mentioned a candidate by name and were coded as providing information or urging action appeared *within* 60 days of the election, rather than *earlier than* 60 days before the election?" *Id.* at 39 (emphasis in original). Dr. Krasno believes that Dr. Gibson's denominator would vary in size "with the amount of candidate-oriented issue advertising before an election. This is particularly relevant because of the volume of candidate-oriented issue ads devoted to presidential campaigns. The result ... is highly unstable estimates of BCRA's impact from year to year." Krasno Rebuttal Report at 15.

339. The effect of using the *Buying Time 1998* denominator is that the percentage is affected not only by the amount of genuine issue advertisements run within 60 days of the election, but also the number of electioneering advertisements run

during that time. *Id.* at 16 n. 26. When Dr. Krasno applied Dr. Gibson's denominator to the *Buying Time 1998* data he found 14.7 percent of genuine issue advertisements would be unfairly captured.[213] *Id.; see also* Krasno & Sorauf Expert Report at 60 n. 143; *id.* App. at 3 (providing the calculation: 713 airings of three distinct genuine issue advertisements [214] mentioning a candidate and aired within 60 days of an election constitutes the numerator; the denominator is the 4847 airings of issue advertisements mentioning a candidate within 60 days of the election).

340. Dr. Lupia concludes that although the *Buying Time 1998* and *Buying Time 2000* denominators answer different questions, either formula is reasonable. "If I were asked to assess the proposed regulation's restrictiveness, the [Gibson] report's fraction could provide information about the impact during a particular time period, while *Buying Time* 1998's fraction could provide a better measure of the regulation's impact on issue advocacy more generally." Lupia Rebuttal Report at 25. Lupia states that Dr. Gibson's denominator is no less arbitrary than that of *Buying Time 1998. Id.* at 26. Holman comments that the *Buying Time 1998* denominator is

"a justifiable way" of determining the impact of BCRA on genuine issue advertisements, although he did not use the same one for *Buying Time 2000.* Holman Dep. at 140. For Holman, the *Buying Time 1998* calculation is "not incorrect. It's a different way of assigning a number to measure a phenomenon." *Id; but see id.* at 153–54 (stating that the text of *Buying Time 1998* relating to the seven percent figure is "[m]isleading" and "ambiguous" in that it did not identify clearly to what it referred).

341. Plaintiffs' and Defendants' experts also disagree as to what the appropriate numerator should be. Dr. Gibson rejected the *Buying Time 1998* numerator because based on the data he was provided he concluded that eight advertisements aired 2,405 times in the last 60 days of the campaign were originally coded as promoting an issue or urging action (genuine issue advertisements) but were overruled by Dr. Goldstein and recoded as electioneering advertisements. Gibson Expert Report at 42. When Dr. Gibson added in these advertisements he found that "nearly two-thirds of the group ads that aired within 60 days of the 1998 election were coded by the students as 'genuine issue

---

**213.** Dr. Gibson, using a different data set than Dr. Krasno, found that by taking *Buying Time 1998*'s "flawed numerator and using the Brennan Center's own figures for calculating the proper denominator (airings within 60 days [of the election]), 16.5% of the group ads were 'genuine issue ads' (as defined by the Brennan Center)...." Gibson Expert Report at 42. He goes on to reject this figure because he "does not accept the numerator." *Id.* He also finds that by using the data set he believed was the "final" version 25.7 percent of issue advertisements aired during 1998 mentioned a candidate and were broadcast within 60 days of the election were "genuine" issue advertisements. *Id.* at 37. Dr. Krasno states that this figure is incorrect because the data set used is incorrect, resulting in a numerator "four times too large," and that based on his study with Sorauf, he now calculates

the correct figure to be 6.1 percent. Krasno Rebuttal Report at 19 & Appendix [DEV 1–Tab 2]; *see also* Krasno & Sorauf Expert Report at 60. Dr. Gibson's problems with the numerator are discussed *infra* Findings 340–341.

**214.** One of these advertisements, "HMO said No" was aired a total of 455 times (118 times in Greensboro, 126 times in Raleigh–Durham, and 211 times in St. Louis). Krasno & Sorauf Expert Report App. at 3, 20. We were unable to find additional information about the other two advertisements, "CCS/No Matter Who" and "CENT/Breaux." *Id.* In 1998, St. Louis had 1,110,290 television households, Raleigh–Durham had 834,260, and Greensboro had 584,900. Gibson Rebuttal Report Exhibit 2.

ads.'" *Id.* at 43. Dr. Gibson in his Rebuttal Report revises this figure based on information provided during the course of the litigation, which indicated that over a quarter of the advertisements he added to the numerator did mention candidates, resulting in a figure of 50.5 percent. Gibson Rebuttal Report at 23; *see also* Krasno Rebuttal Report at 17–18 (describing this error). Dr. Gibson concludes that "this 50.5% figure represents the statistical floor ... the 64% figure cited in my report ... provides the ceiling." Gibson Rebuttal Report at 24. Dr. Gibson, in his Supplement Report, states that Dr. Krasno had produced additional data files which included an earlier version of the data set upon which he had relied. Gibson Supplement to Rebuttal Expert Report of October 7, 2002: 1998 Data ("Gibson Supplemental Report") at 1. The data showed that one of the eight advertisements Dr. Gibson alleged had been recoded (from "genuine issue" to "electioneering") had originally been coded as promoting the election or defeat of a candidate, and that another was missing data as to the nature of the commercial. *Id.* at 4. As a result of excluding the airings of these two commercials, Dr. Gibson calculates that his "ceiling" fell to 60 percent, and his "floor" remained unchanged. *Id.* at 5–6.

342. Dr. Krasno rejects the inclusion of any of the airings of these eight advertisements in the numerator. *See* Krasno Response to Professor Gibson's Supplemental Rebuttal (Nov. 13, 2002) ("Krasno Response"). He objects to the notion that the recoding "reflects a deliberate effort to manipulate some of the results reported in *Buying Time 1998*," stating that the recoding aimed to "make the data set as sensible and accurate as possible." *Id.* at 1, 2. Dr. Krasno explains that the decision to recode five of the advertisements was based on their contradictory codings. *Id.* at 2. The survey was constructed so that when a coder found that an advertisement's purpose was to "provide information or urge action" (in other words, was a genuine issue advertisement) in Question 6, the coder was supposed to skip the next 12 questions. *Id.* at 2; Gibson Supplemental Report Exhibit 7. For five of these advertisements, student coders found the advertisement provided information or urged action, but went on to answer the next 12 questions. Krasno Response at 2. In addition, Dr. Krasno states that "all of these ads were scored in a parallel process on another variable, 'favcan,' as favoring a Democratic or Republican candidate. Again, the potential conflict between question 6 and favcan should have attracted attention as the data set was being prepared." *Id.* Dr. Krasno contends that a review of the storyboards for these five advertisements, as well as other contextual factors such as where and when they were aired, makes it clear that they should be coded as "electioneering." *Id.* at 2–4. Dr. Krasno believes that the "notion that a small handful of mistakes must be perpetuated because they were once made is both ludicrous and an extraordinary departure from the usual practice of compiling data sets. Dr. Gibson's argument would be more credible if he offered any explanation for why these commercials really are pure issue ads." Krasno Response at 5.

343. Dr. Lupia weighs in on the fraction debate, contending that the Gibson and *Buying Time* reports "are reasonable conceptualizations of the question about how the proposed regulations will affect groups in the present and future if groups act exactly as they did in the past. If, however, we want to evaluate the regulations' likely future impact we should consider the possibility that groups will adapt to the new regulations in different ways." Lupia Rebuttal Report at 26. Both sides seek to predict the impact BCRA will have if no one alters their behavior. Lupia concludes that to "the extent that affected

groups are able to choose [to alter their behavior], both estimates in the denomination debate may exaggerate the extent to which this aspect of the new regulation will restrict the groups' abilities to express themselves in the future.... To the extent that we agree that such groups will adapt in various ways, the credibility of the high-percentage estimates of the likely future impact of the proposed regulations on interest groups is severely undermined." *Id.* at 27.

*Criticism of Buying Time 2000*

344. Many of Dr. Gibson's criticisms of *Buying Time 2000* are similar to those made of *Buying Time 1998* and are addressed, *supra.*

345. Dr. Gibson states that the *Buying Time 2000* data base "has numerous errors and inconsistencies in it," and comments that these changes preclude him from replicating the findings of *Buying Time 2000.* Gibson Expert Report at 46, 47–48.[215] He is troubled by the fact that Dr. Goldstein changed the coded "purpose" of 62 out of 338 advertisements, *id.* at 52, questions the motivation behind the changes, and asks what standards Dr. Goldstein employed in making the

changes, *id.* at 53. Dr. Goldstein states that "most of the 62 'changes' [Gibson] identifies in the 2000 database are not changes at all, but rather original student coding of additional CMAG storyboards that had not previously been coded at all, and were not part of the database used by the authors of *Buying Time 2000.*" Goldstein Rebuttal Report at 4. The problem stems from Dr. Gibson's use of the wrong database; he does not analyze the *Buying Time 2000* database, but rather "a later iteration of [Dr. Goldstein's] own version of the database containing [his] own after-the-fact updates and re-codes, including additional ads later received from CMAG.... [N]one of this re-coding ever made its way into the *Buying Time 2000* report."[216] *Id.* at 14–15. Dr. Goldstein also takes exception to the charge that he deliberately changed the data in order to decrease the number of pure issue advertisements, calling it "baseless." *Id.* at 4. In addition, Dr. Goldstein notes that he reevaluated the coding of 30 advertisements in the 2000 database in his post-*Buying Time 2000* academic research having nothing to do with campaign finance or the *Buying Time* studies and "[i]n 26 of these instances, [ ] changed the coding

---

**215.** Dr. Goldstein testifies that he does not have the original student coding for this study, explaining that his "political science department ... mistakenly deleted a big chunk of out files, including our access database." Goldstein Dep. (Vol. 2) at 129 [JDT Vol. 8].

**216.** For example, Dr. Gibson challenges the *Buying Time 2000* finding that "[o]f all the group-sponsored issue ads that depicted a candidate within 60 days of the election, 99.4% were found to be electioneering issue ads. In absolute numbers, *only three genuine issue ads (which aired a total of 331 times in the 2000 elections) would have been defined as electioneering communications* ...." Gibson Expert Report at 61 (quoting *BT 2000* at 73 (emphasis in original)). Dr. Gibson finds that according to the database the three advertise-

ments were only aired nine times, but the *Buying Time* authors reported 331 airings and a different data base that Dr. Gibson determines is the "original, student coded version" of Question 11 shows 1,082 airings.. *Id.* at 61–62. He declares that he "has confidence in none of these" figures. *Id.* at 62. Dr. Goldstein claims that if Dr. Gibson had used the correct database, "federal.sav," he would have been able to identify the three advertisements which comprise 331 airings. Goldstein Rebuttal Report at 21 (finding advertisements # 627 (172 airings), # 1389 (81 airings), and # 2862 (78 airings)). He also used the database to identify "all ads run by interest groups that mentioned a candidate and aired within 60 days of the election," and using that as the denominator arrived at the same percentage as *Buying Time 2000.* *Id.* (dividing 331 by 53,840).

from electioneering to genuine issue." *Id.* at 5, 14–15. Dr. Lupia comments that Dr. Gibson fails to connect his bias concerns with actual changes in the database or demonstrate the effects directly. Lupia Rebuttal Report at 58. As such, Lupia finds the charge that the investigators were committed to reaching a particular outcome to be "at best, premature and, with certainty, not proven in the [Gibson] report." *Id.*

346. Dr. Goldstein does find that three advertisements in the *Buying Time 2000* database "were re-coded on Question 11 from 'promoting a candidate' to 'providing information or urging action on an issue.'" Goldstein Rebuttal Report at 16. One was a version of a "cookie cutter" advertisement run by CBM (numbered 1269), which was "extremely similar" to a number of other CBM-sponsored advertisements that (Goldstein thought) had all been coded as "electioneering." *Id.* This fact was brought to Dr. Goldstein's attention by the *Buying Time* authors and, concluding that it was not "meaningfully distinguishable from the other CBM ads, . . . [he] recoded it as electioneering." *Id.* at 17. The second was a National Pro–Life Alliance advertisement (numbered 2107) which mentioned Wisconsin Senators Kohl and Feingold. Again, the *Buying Time* authors told Dr. Goldstein that the advertisement was "virtually identical" to another advertisement run in Virginia mentioning then-Senator Charles Robb. *Id.* Dr. Goldstein reviewed the storyboards of the two advertisements and found them "not meaningfully distinguishable, and resolved the inconsistency by re-coding [the commercial] as electioneering." *Id.* The final advertisement that was changed was sponsored by the Rhode Island Women Voters (numbered 1367). The advertisement was originally coded as a "genuine issue advertisement" but changed by Dr. Goldstein after the *Buying Time* authors disagreed with the cod-ing. *Id.* Dr. Goldstein believes that the advertisement "is clearly electioneering." *Id.* As noted *infra*, Finding 356, Dr. Goldstein recently discovered that the six corresponding versions of Advertisement # 1269 were originally coded as "genuine issue advertisements" by the students and later changed by the *Buying Time 2000* authors to "electioneering" commercials. Goldstein Dep. (Vol. 2) at 158–59 [JDT Vol. 8]. When these six advertisements are added to the analysis, which Dr. Goldstein terms "the most conservative standard estimate," one finds that 17 percent of the advertisements aired within 60 days of the election which identified a candidate were "genuine issue advertisements." *Id.* at 169. Defendants' experts personally disagree that all of these commercials are "genuine issue advertisements." *See* Holman Dep. at 82–83 (stating he considers Advertisement # 1367 to be his "poster child of sham issue advocacy"); Goldstein Expert Report at 26 n. 21 (noting that he considers all the commercials with the exception of Advertisement # 2107 "were clearly intended to support or oppose the election of a candidate").

347. Dr. Gibson raises essentially the same concerns about Question 11 in *Buying Time 2000* as he does for the practically identical Question 6 in *Buying Time 1998*, discussed *supra*. Gibson Expert Report at 54–55. Dr. Goldstein states that "79.8 percent of the group-sponsored ads classified as electioneering were coded as having run within 60 days of the election, compared to only 18.7 percent of non-electioneering ads." *Id.* at 28. As one "would expect . . . that ads designed to promote or oppose a candidate would air relatively close to Election Day," this objective data, in Dr. Goldstein's opinion, corroborates the coding in Question 11 and demonstrates that Dr. Gibson's theory is incorrect. *Id.* at 28–29.

348. The NRA criticizes the *Buying Time 2000* study for not including two 30–minute "news magazines" in the data which it claims are "genuine issue advertisements." Proposed Findings of Fact of the NRA and the NRA PVF ¶ 9. "If these airings had been considered, 34% of the total volume of speech that BCRA in 2000 would have covered in the 60 days prior to the general election would have been genuine issue advertisements." *Id.* One of these "news magazines" was titled "California." LaPierre Decl. ¶ 12 [NRA App. at 5]. "California" was aired 800 times in California from August 29, 2002, to November 5, 2000. *Id.* ¶ 14. "During the entirety of the 30–minute program, there was only one fleeting reference to a federal candidate for office. Specifically, during a short segment urging viewers to join the NRA and describing the benefits of membership, a cover of an issue of the NRA's magazine 'First Freedom' depicting Vice President Gore's image, then a presidential candidate, flashed on the screen for several seconds." *Id.* ¶ 13.[217] The NRA does not allege that the study included other 30 minute advertisements, or that the CMAG monitors such commercial broadcasts. It does not indicate how other 30 minute "news magazines" it ran during 2000 would have affected the results of *Buying Time. See* Proposed Findings of Fact of the NRA and the NRA PVF at ¶¶ 3–7.

### The Goldstein Expert Report

349. Although Dr. Goldstein was involved in assembling the data sets used in both *Buying Time* studies, he did not participate in the writing of either *Buying Time* study or play a role in "selecting the conclusions that the authors of these reports chose to draw from the database," Goldstein Rebuttal Report at 3–4. His report, therefore, constitutes a separate assessment of the data collected for the *Buying Time* studies. The database he works from differs from that provided to the *Buying Time 2000* authors, as it has corrected omissions and errors discovered after *Buying Time 2000* was completed. *Id.* at 4–5. Dr. Goldstein's study produces nine principal conclusions.

350. *Scope of Political Advertising.* In the 2000 election cycle (from January 1, 2000, through election day), interest groups accounted for 16 percent of all political television advertisements at an estimated cost of $93 million.[218] Goldstein Expert Report at 8. Political parties accounted for 27 percent of the political commercials at an estimated cost of $162 million, while candidates accounted for the remaining 52 percent of advertisements at an estimated cost of $338 million. *Id.* Compared to the 1998 campaign, the increase in interest group spending was the most dramatic, "rising from approximately $11 million in 1998 to an estimated $93 million in 2000." *Id.* at 9; *see also id.* at 10 (tbl.1A–B) (showing the increase in candidate spending (from approximately $136.6 million to approximately $338.4 million) and in political party spending (from approximately $25.6 million to approximately $162.3 million)). The majority of interest group advertising in 2000 was "not sponsored by PACs, and fell outside FECA regulation."

---

217. One other NRA 30 minute "news magazine" would similarly would be "captured" by BCRA due to the inclusion of the "First Freedom" cover. NRA App. 917, 920, 924, 929 ("It Can't Happen Here") (also referring once to the "Clinton–Gore assault weapons ban").

218. Dr. Goldstein notes "[t]hese figures ... underestimate television expenditures because CMAG estimates only cover markets serving 80 percent of the nation's population and make no attempt to measure the increased cost of advertising during the peak seasons of political campaigns when the demand for television advertising time pushes up spot prices." Goldstein Expert Report at 8.

*Id.* at 8. According to his figures, interest group PACs spent roughly $2 million on 3,688 political advertisements in federal races in 2000, while interest group non-PAC expenditures constituted $90 million spent on 129,647 commercials. *Id.* at 10 (tbl.1B).

351. *The Role of Interest Groups and Political Parties in Political Television Advertising for the 2000 Presidential Campaign:* In terms of the presidential campaign, political parties purchased 41 percent of television advertisements aimed at the 2000 presidential race, while candidates accounted for 38 percent of the commercials, and interest groups eight percent. Goldstein Expert Report at 11 & n. 11 (the remaining advertisements were coordinated expenditures). Interest group advertising in certain "battleground" states,[219] however, "rivaled that of the candidates or parties." *Id; see also id.* at 12 (tbl.2). In House elections, interest group advertisements identifying a candidate and running in the last 60 days of the campaign accounted "for 17 percent of total House ad broadcasts during the 2000 election cycle," while parties provided 22 percent of advertisements in these races, and candidates 60.6 percent. *Id.* at 13. Dr. Goldstein finds that 99.8 percent of political party-financed television advertising mentioned or depicted a candidate, while only 1.8 percent of the ads "even mentioned the name of the party and many fewer promoted the candidate by virtue of his or her party affiliation." *Id.*[220]

352. *The BCRA Universe of Interest Group Electioneering:* Dr. Goldstein finds that 35 interest groups broadcast commercials on television during the last 60 days of the 2000 election that mentioned a candidate. Goldstein Expert Report at 13. These electioneering advertisements were aired 59,632 times at an estimated cost of approximately $40.5 million. *Id.* at 14; *see also id.* at 14–15 (tbl.3).[221] The top ten of these groups accounted for 87 percent of these expenditures. *Id.* at 13.

353. *The "Magic Words" Test:* The so-called "magic words" test derives from *Buckley's* legal standard for determining whether an advertisement is designed to persuade citizens to vote for or against a particular candidate. Such advertisements were termed characterized "express advocacy" by the Supreme Court, and defined as containing words such as "elect," "defeat" or "support." *See supra* Finding ¶ 272 n. 57. Dr. Goldstein finds that 11.4 percent of the 433,811 advertisements aired by candidates met the express advocacy test. Goldstein Expert Report at 16. Conversely, 88.6 percent of candidate advertisements in 2000 "were technically undetected by the *Buckley* magic words test." *Id.* This result demonstrates to Dr. Goldstein "that magic words are not an effective way of distinguishing between political ads that have the main purpose of persuading citizens to vote for or against a particular candidate and ads that have the purpose of seeking support for or urging some action on a particular policy or legislative issue." *Id.*

354. *Temporal Distribution of Interest Group–Financed Television Advertise-*

219. Dr. Goldstein determined what states constituted "battleground states" "based on a professional review of various media sources," such as CNN.com. Goldstein Expert Report at 12 n. 12.

220. This assessment does not include the "tag lines" included in most advertisements identifying the commercial's sponsor that can in-

clude the party's name. Goldstein Expert Report at 13 n. 14.

221. This result only reflects the 80 percent of households covered by CMAG, and according to Dr. Goldstein "[n]o comprehensive information is available for the balance of the markets or for ads airing on local cable stations."

*ments Which Mention a Candidate:* Dr. Goldstein determines that the "CMAG database provides empirical evidence of a strong positive correlation between [advertisements' reference to a candidate and the proximity in time of their broadcast to the election] and consequently of their validity as a test for identifying political television advertisements with the purpose or effect of supporting or opposing a candidate for public office." Goldstein Expert Report at 17. He finds that interest group advertisements that "mention or depict a candidate tend to be broadcast within 60 days of the election," while those which do not "tend to be spread more evenly over the year." *Id.* In addition, Dr. Goldstein also finds the distribution of those advertisements mentioning candidates for federal office to be "closely correlated to the distribution of electioneering communications broadcast by candidates and political parties." *Id.*

355. *Geographic Distribution of Interest Group–Sponsored Advertisements Which Mention a Candidate and are Aired within 60 Days of an Election:* Dr. Goldstein finds that interest group advertisements that mentioned a candidate and were broadcast within 60 days of the 2000 election "were highly concentrated in states and congressional districts with competitive races." Goldstein Expert Report at 20. For Senate races, 89.2 percent of these commercials ran in competitive races. *Id.* Political parties concentrated 90.6 percent of their ads in the competitive states. *Id.* at 21. House races demonstrated the same pattern, with 85.3 percent of interest group "electioneering" advertisements, and 98.2 percent of political party "electioneering" advertisements broadcast in competitive districts. *Id.* at 21.

356. *Coders' Perceptions of Interest Group Television Advertisements:* Dr. Goldstein had students code each interest group political television advertisement aired in the 2000 campaign. They could code the commercials' purpose as either to " 'generate support or opposition for candidate,' or to 'provide information or urge action,' " and "were also given the option of 'unsure/unclear.' " Goldstein Expert Report at 24 & n. 20. The coders found 97.7 percent of the 60,623 interest group sponsored television advertisements that mentioned a candidate and were broadcast within 60 days of an election as "electioneering," or supporting or opposing a candidate. *Id; see also id.* at 25 (tbl.7). Dr. Goldstein finds this result particularly persuasive given the fact that the students coded one-third of all interest group television advertisements run over the course of the 2000 campaign to be genuine issue advertisements. *Id.*

357. Of the 45,001 advertisements deemed to be "genuine issue advertisements" by the coders, 3.1 percent would have been covered by BCRA in that they were run within 60 days of the election and identified a candidate. Goldstein Expert Report at 27.[222] Dr. Goldstein acknowledges that in *Buying Time 2000* and an article he co-authored with Dr. Jonathan Krasno fewer than six advertisements were said to be unfairly captured by BCRA. *Id.* at 26 n. 21. In those other publications, "certain of these six ads-particularly those as to which there was disagreement among the student coders-were ultimately treated as electioneering. In fact, [Dr. Goldstein's] own judgment is that five of these six ads were clearly intended to support or oppose the election of a candidate .... However, in this report,

---

**222.** Dr. Goldstein contends that this "percentage overstates the proportion of all Genuine Issue Ads covered by BCRA, because it does not take into account the unregulated ads run in non-election years during a single Congressional Term, such as 1999." Goldstein Expert Report at 27 n. 22.

[Dr. Goldstein] chose[ ] to take the most conservative approach and count all six as Genuine Issue Ads." *Id.* However, Dr. Goldstein now acknowledges that a "most conservative" estimate would include 6 more advertisements listed in footnote 8 of his Rebuttal Report. Goldstein Dep. (Vol. 2) at 160 [JDT Vol. 8]. Adding these six advertisements results in the finding that 17 percent of the advertisements run during the last 60 days of the 2000 campaign which identified candidates were genuine issue advertisements. *Id.* at 169; *see also* Finding 354 *supra.* Dr. Gibson objects to Dr. Goldstein's reliance "on the highly subjective coding" of the student coders to determine the purpose of the issue advertisements (i.e., to promote a candidate or to urge action on an issue). Gibson Rebuttal Report at 20; *see also* Holman Dep. at 73 (noting that the question asks for a subjective assessment).

358. *The Effectiveness of Broadcasting Issue Ads Close to an Election:* Dr. Goldstein's final finding is that if an interest group is genuinely interested in promoting an issue, the least desireable time to air such an advertisement is in the final 60 days of an electoral campaign. Goldstein Expert Report at 32. This finding runs counter to Plaintiffs' argument that BCRA "may harm interest groups by preventing them from advertising on their issues at a time when citizens are supposedly paying the most attention to politics." *Id.* Dr. Goldstein first comments that "while there is evidence that interest in politics and *elections* rises as Election Day approaches, there is absolutely no evidence to support the position that interest in *public policy* issues rises as well during that time." *Id.*

(emphasis in original).[223] Dr. Goldstein notes that since the last two months of an election campaign is when most political advertisements are aired (64.2 percent of all political advertisements run in 2000 were run in the campaign's final 60 days), "an individual interest group's message on a public policy issue is likely to become lost" if aired during that period. *Id.* Dr. Goldstein also posits that "partisan attachments ... harden during the last two months of a campaign" which makes it "more difficult to persuade otherwise open-minded viewers of the merits of an interest group's policy stance." *Id.* at 32–33 (citing John Zaller, Nature and Origins of Mass Opinion (1992)). According to Dr. Goldstein's Expert Report, in 2000, 17.7 percent of such advertisements were aired in the final 60 days of the election campaign, slightly more than the 16.4 percent "which would have run if the ads had been equally distributed throughout the year." *Id.* at 33; *see also id.* at 31 (tbl.9). In contrast, during the months of April through June 2000, 45 percent of such issue advertisements were aired, "as against an expected 25 percent if the ads were spread evenly throughout the year." *Id.* Dr. Goldstein believes this concentration is "a likely result of groups turning on the heat to pass or defeat bills before Congress adjourned for the summer." *Id.* Dr. Gibson is critical of Dr. Goldstein's finding. Gibson Rebuttal Report at 26. According to Dr. Gibson, political psychologists, like William McGuire (whose work Dr. Goldstein cites), have concluded "that to persuade someone involves two steps. First, one must get the attention of the

---

**223.** *But see* Finding 358, *infra.* Edward Monroe, Director of Political Affairs for the Associated Builders and Contractors, testified that "members of the public are generally more receptive to and engaged in considering government policy ideas and issues as elections near ...." Monroe Decl. ¶¶ 18–19. Paul R.

Huard, Senior Vice President for Finance and Administration of the National Association of Manufacturers ("NAM") testified that "[i]n broad terms ... Americans tend to have greater interest in political matters as an election approaches." Huard Decl. ¶ 10.

person one is attempting to persuade. Second, one must overcome the strength of existing attitudes if the attempt at persuasive communication is to result in attitude change." *Id.* Given that "those with strong attitudes tend to pay attention to political communications while those with weak political attitudes tend to ignore them .... [t]hose most easily reached are least easily changed; those most easily changed are those most difficult to reach." *Id.* Since those with "weak attitudes" tend to pay attention during "the most extreme circumstances," the period leading up to the election provides the window in which to communication with these difficult to reach, but easily persuaded individuals. *Id.* at 27. Dr. Gibson also rejects the argument that issue advertising close to an election is unproductive because partisan allegiances harden as elections approach. *Id.* He states that this line of reasoning leads to the strange conclusion that "candidates should abandon advertising as the election approaches since these hardened attitudes are difficult to convert." *Id.* Dr. Gibson points out that "that does not happen, since, as the election approaches, candidates try to reach an even greater percentage of marginal voters, who have little interest in politics, and relatively pliable issue views." *Id.*

*Genuine Issue Advertisements About Legislation and Public Policy Issues Are Run During the Sixty Days Before A Federal Election Notwithstanding the Competition for Air Time With Candidate–Centered Advertisements*

359. Notwithstanding the disadvantages of running genuine issue advertisements during the 60 day period leading up to a general election,[224] plaintiffs have demonstrated that it can be effective and necessary for them to run legislation-centered advertisements in the weeks before an election. Monroe Decl. ¶¶ 18–19 [10 PCS] ("The defendants in this proceeding have argued that ads run near the time of an election are evidence that the association's actual intent is to advocate the election of one candidate or another. However, there are other, more valid, explanations for the timing of our advertising. One is that serious legislative initiatives or regulatory proposals often are considered near the time of elections. Also, it is also clear that members of the public are generally more receptive to and engaged in considering government policy ideas and issues as elections near. If that is the time when people will listen, that is the time to speak. And once an election occurs, there seems to be a peri-

224. Some political consultants believe there is limited utility in running a genuine issue advertisement in the 60 days before a federal election. *See* Strother Decl. ¶ 7 [DEV 9–Tab 40]. ("[T]hese issue advertisements were run when there were no pending elections. For these true issue ads, we specifically avoided the months right before the election because (a) air time would be more expensive; and (b) each ad would just become part of the election season gumbo and viewers would assume that it was just another election-related ad."); Strother Cross Exam. at 70–71; Bailey Decl. ¶ 12 [DEV 6–Tab 2]. Dr. Goldstein also believes that it is ineffective to run genuine issue advertisements in the weeks leading up to an election. "Running genuine issue ads near an election does not increase the effectiveness of those ads; in fact, it is likely that the ads' effectiveness actually decreases.... In addition to being less effective at conveying their messages, issue ads run close to an election are also less cost-effective, since the price of scarce television and radio air time is higher near an election than during the rest of the year." Goldstein Expert Report at 32–33 [DEV 3–Tab 7]; Magleby Expert Report at 20 [DEV 4–Tab 8] ("In contrast, genuine issue ads are more likely to run earlier since rates are cheaper and proximity to an election is less important."); Krasno & Sorauf Expert Report at 57 [DEV 1–Tab 2] ("Pure issue ads are more likely to respond to the congressional calendar or an advertising strategy unrelated to an election.").

od of fatigue during which political matters are of less interest, making issue ads then less effective."); Huard Decl. ¶ 10 [10 PCS] ("NAM has run issue ads at times when no election was impending. In broad terms, however, Americans tend to have greater interest in political matters as an election approaches. At the same time, elected officials are most attuned to the views of their constituents in the pre-election period. Thus, for many purposes, the pre-election season is a critical time for issue ads. Conversely, after an election public interest in public policy matters fades, perhaps due to fatigue. Then, few issue ads are run soon after an election."); Murphy Decl. ¶ 12 [3 PCS] ("Finally, it is important to emphasize that the blackout periods imposed by the BCRA—60 days before a general election and 30 days before a primary—are often periods of intense legislative activity. During election years, the candidates stake out positions on virtually all of the controversial issues of the day. Much of this debate occurs against the backdrop of pending legislative action or executive branch initiatives. Some of the President's or Attorney General's boldest initiatives are advanced during election years-often within 60 days of a general election. This year, for instance, legislation creating a new federal department of Homeland Security is under consideration during this pre-election period."). Plaintiffs' expert Dr. Gibson agrees that running issue advertisements in proximity to federal elections is effective. *See* Finding 357, *supra.*

360. The legislative calendar can necessitate the running of issue advertisements during the final days of an election campaign. Edward Monroe states that "serious legislative initiatives or regulato-

ry proposals often are considered near the time of elections," without providing actual examples of advertisements run in response to the legislative activity. Monroe Decl. ¶ 18 [10 PCS]; *see also* Huard Decl. ¶ 11 [10 PCS] ("[I]ssue ads supporting a particular tax bill may well be needed as the bill approaches a vote. If it happens that primaries or elections are imminent, that does not diminish the need to be able to speak out right then."); Murphy Decl. ¶ 12 [3 PCS] (commenting that "the blackout periods imposed by the BCRA ... are often periods of intense legislative activity," noting consideration of the Homeland Security Department bill occurred within 60 days of the 2002 election, but listing activities that would not be affected by BCRA). Some deponents provide concrete examples of merging electoral and legislative calendars and their actions during those periods. The AFL–CIO aired advertisements regarding an "upcoming budget fight over education programs" in September 1996. Mitchell Decl. ¶ 41 & Exhibit 59 ("No Two Way"). The labor group ran another "genuine" issue advertisement between September 21 and 25, 1998, in eight congressional districts opposing "fast track" trade legislation which was scheduled for a vote in the House of Representatives on September 25, 1998. Mitchell Decl. ¶ 52 & Exhibit 116 ("Barker"). During the same month, the AFL–CIO ran a legislation-centered advertisements aimed at a scheduled Senate vote on HMO legislation that the AFL–CIO considered to be inadequate, *id.* ¶ 51 & Exhibits 105–07 ("Deny"),[225] and opposing the Taxpayer Relief Act which had been recently marked up by the House Ways and Means Committee, Mitchell Decl. ¶ 52 & Exhibits 108–09 [PCS 6] ("Spearmint" and "Spear"); Shea Decl. ¶ 43 [PCS 7]. In

---

**225.** According to Defendants, "Deny" continued to run "well after the legislative action the ad was supposedly timed to influence."

Gov't Opp'n Br. at 93. The AFL–CIO denies this point. AFL–CIO Reply Br. at 6 n. 6.

2002, the GOA ran a radio advertisement in New Hampshire within 30 days of the primary election for the New Hampshire Republican U.S. Senate nominee, which supported legislation allowing airline pilots to be armed. Pratt Decl. ¶ 5. *See also* Mann Cross Exam. at 176 (explaining that a flurry of legislative activity occurs near the end of a congressional session, therefore, often within the 60 day period preceding a general election).

361. The ACLU seeks to influence how members vote on pending legislation by educating the public about its concerns and using the public to communicate their concerns to their elected representatives. Murphy Decl. ¶ 8 [3 PCS/ACLU 9] ("Inevitably, many of the ACLU's statements involving legislation or executive branch policies, including print and broadcast communications, refer to a clearly identified candidate, member or executive branch official."). The ACLU cites as an example an advertising campaign directed at Speaker Dennis Hastert, who represents the fourteenth district of Illinois, in March of 2002 urging him to bring the Employment Non–Discrimination Act ("ENDA") to a full vote in the House. *Id.* ¶ 10; *see also* Text of Advertisement, 3 PCS/ACLU 14–17. The ad was broadcast on multiple Chicago and Aurora, Illinois radio stations throughout the weekend of March 15–March 17, 2002. *Id.* Since the advertisement was run within thirty days of a primary election, the commercial would have constituted an electioneering communication under BCRA and would have violated BCRA because it was paid for with the general treasury funds of a corporation. *Id.* (observing that the "ACLU also hoped to highlight the constitutional flaws of BCRA").

362. The text of the Hastert ad is as follows:

Sound Effect: Long Tympani/Drum Roll

Male announcer—Master of Ceremonies (during sound effect): *And now . . .*

Sound Effect: Drum Roll Ends with Cymbal Crash

Sound Effect: *2 Seconds of Silence*

Male Announcer: . . . . . . *We're waiting.*

Sound Effect: Long Tympani/Drum Roll Starts Again

Sound Effect: Drum Roll Ends with Cymbal Crash

Sound Effect: *2 Seconds of Silence*

Male Announcer: . . . . . . *Still waiting.*

Female Announcer: *Waiting for our Congressman,* (Sound Effect Music Up—Pop Goes the Weasel or Circus Music) *Dennis Hastert, to protect everyone from discrimination on the job.*

*As speaker of the House, Representative Hastert has the power to stop the delays and bring the Employment Non–Discrimination Act—ENDA—up for a vote in Congress. It's about fairness. It's time to ensure equal rights for all who work, including lesbians and gay men, and make sure that it's the quality of our work that counts, and nothing else.* (Music Out.)

Male Announcer: *So Congressman Hastert*

Sound Effect: Tympani/Drum Roll

Male Announcer—Master of Ceremonies (during sound effect): *What will it be?*

Sound effect: Drum Roll Ends with Cymbal Crash

Male Announcer: *Protecting Workers from discrimination, or more delays?*

Female Announcer: Take action now. Send Speaker Hastert a letter urging him to support fairness and bring ENDA to the floor by going to www.aclu.org/enda.

Male Announcer: Paid for by the American Civil Liberties Union.

Murphy Decl. Exhibit 15 (script of ACLU radio ad, "ENDA Delays").

363. The ACLU's purpose in running the advertisement was to create a commercial that would violate BCRA and thereby provide standing to challenge the constitutionality of the Act. A March 10, 2002, e-mail from Laura Murphy, legislative director of the ACLU, to colleagues explained why the ACLU's March 2002 Hastert ad was run:

> Anthony wants the ACLU to be in a position to challenge Shays–Meehan when it becomes law as early as during the Easter recess. As you know the issue advocacy restrictions would select groups like the ACLU if we want to take out and [sic] ad 30 days before a primary or 60 days before a general election in broadcast, satellite or cable outlets. These ads would have to reach 50,000 people or more and would have to mention the name of a candidate. *Steve thinks that the ads that we ran during the 2000 election cycle would not qualify to give us clear standing to challenge the law.*

Email Message Attached as Exhibit to Resps. of American Civil Liberties Union to Defendant's Second Set of Requests for Production of Documents, Exhibit B; USA–ACLU–00003 [DEV 130–Tab 4] (italics added).

364. The ACLU asserts that it does not engage in any federal election activity as defined by the FECA. A. Romero Decl. ¶ 3, 3 PCS/ACLU 2. The ACLU likewise asserts that it has never taken a position in a partisan political election in its 82–year history. A. Romero Decl. ¶ 3, 3 PCS/ACLU 2.

365. Krasno and Sorauf comment on the ACLU's Hastert advertisement:

> [T]he ACLU has demonstrated with a commercial about gay rights, aired in House Speaker Dennis Hastert's district last spring before the GOP primary, that it is possible to deliberately create a pure issue ad that runs afoul of BCRA.

Krasno & Sorauf Expert Report at 62 [DEV 1–Tab 2]; *see also* Text of ads, 3 PCS/ACLU 16–17 (noting script of advertisement that the ACLU ran in the print media over this issue).

366. The AFL–CIO's broadcast advertising campaigns were focused, in part, on issues of importance to AFL–CIO members. In her testimony, Denise Mitchell,[226] Special Assistant for Public Affairs to AFL–CIO President John J. Sweeney, explains how the AFL–CIO selected the particular issues discussed in the advertisements:

> In both election and non-election years, my goal in selecting the issues to be addressed in the AFL–CIO's broadcast advertising has been to focus attention

---

226. Denise Mitchell was appointed to the position of Special Assistant for Public Affairs to AFL–CIO President John J. Sweeney on November 1, 1995, shortly after Sweeney was elected President of the AFL–CIO. Mitchell Decl. ¶ 1 [6 PCS]. Prior to assuming this position, Mitchell had worked with Sweeney in a similar role for a number of years when he was President of the Service Employees International Union and she had assisted in his campaign for election to the position of AFL–CIO President. *Id.* Mitchell has worked in marketing and media relations for unions and other nonprofit organizations on working family issues for more than 20 years. *Id.* In her current position, Mitchell has the primary responsibility for overseeing all public relations activities of the AFL–CIO including all AFL–CIO use of broadcast and print media. *Id.* ¶ 2. Mitchell is responsible for making the operational decisions as to both the substance and the method of communication of the AFL–CIO's message to union members and to the general public. *Id.* Mitchell makes the strategic and logistical decisions regarding the AFL–CIO's media buys, and, within policy guidelines, makes the editorial decisions regarding the content of the AFL–CIO's communications.

**914**

on a series of national policy issues of importance to working families. I have been guided in selecting these issues by input from the Executive Council of the AFL–CIO, which regularly discusses and focuses on a legislative and policy agenda for the organization, the AFL–CIO's ongoing lobbying program, polling and other opinion research, conducted primarily by the Washington, D.C., firm of Peter Hart Associates, and the views of affiliated unions. Most of the issues addressed in our advertisements, such as budget priorities, tax fairness, Medicare, and health care, recur in virtually every session of Congress; others, such as fast-track trade legislation or the trade status of China, may be current for a period of years and then become inactive for awhile.

Mitchell Decl. ¶ 10 [6 PCS]; *see also id.* ¶ 70 [6 PCS] ("[The indirect effect on election outcomes] has never been the point of our broadcast advertising program, within or outside the 30–and 60–day periods.").

367. Plaintiff AFL–CIO has provided a number of examples of "genuine issue advertisements" which relate to pending legislation that BCRA would capture because the commercials ran on television and radio within 30 days of a primary election.

AFL–CIO Opening Br. at 10–11 (citing Mitchell Decl. ¶¶ 32, 34–36, 37–39, 40, 50, 58–59). The advertisements cited to by the AFL–CIO ran in "flights," aimed at particular legislation pending at the time. Practically all of these flights consisted of a variety of "cookie-cutter" advertisements, meaning advertisements that are virtually identical except that they reference different candidates. *See generally* Mitchell Decl. Exhibit 1. Ms. Mitchell describes advertising campaigns comprising 29 different sets of cookie-cutter advertisements, some of which were run within 30 days of a named candidate's primary election. Mitchell Decl. ¶¶ 32, 34–36, 37–39, 40, 50, 58–59.[227] In addition, Exhibit 1 shows that four more advertisements would have been captured by BCRA due to their airing within 30 days of the identified candidate's primary, but since all of the airings of three of these commercials would have been captured by BCRA's 60 day-window as well.[228]

***Representative Examples of Genuine Issue Advertisements Aired Within 30 Days of a Primary Election, or 60 Days of a General Election, and Mentioning the Name of a Federal Candidate***

368. The AFL–CIO aired a radio advertisement entitled "Barker" within 60

---

**227.** The advertisements are: "Too Far," Mitchell Decl. ¶ 32 & Exhibit 31; "1991," *id.* ¶ 34 & Exhibit 33; "Raise," *id.* ¶ 35 & Exhibit 35; "Votes," *id.* ¶ 35 & Exhibit 36; "People," *id.* ¶ 35 & Exhibit 38; "No," *id.* ¶ 35 & Exhibit 39; "Minimum Wage," *id.* ¶ 36 & Exhibit 42; "$5.15," *id.* ¶ 36 & Exhibit 44; "Couple," *id.* ¶ 37 & Exhibit 47; "Lady," *id.* ¶ 37 & Exhibit 48; "Peace," *id.* ¶ 37 & Exhibit 49; "Whither," *id.* ¶ 37 & Exhibit 50; "Another," *id.* ¶ 38 & Exhibit 53; "Edith," *id.* ¶ 40 & Exhibit 58; "Pass," *id.* ¶ 50 & Exhibit 94; "Support," *id.* ¶ 50 & Exhibit 95; "Call," *id.* ¶ 50 & Exhibit 98; "Failed," *id.* ¶ 50 & Exhibit 99; "Liable," *id.* ¶ 50 & Exhibit 100; "Soon," *id.* ¶ 50 & Exhibit 100; "Basic," *id.* ¶ 50 & Exhibit 102; "Label," *id.* ¶ 57 & Exhibit 127; "Trust," *id.* ¶ 57 & Exhibit 128; "Endure," *id.* ¶ 57 & Exhibit 129; "Stand," *id.* ¶ 57 & Exhibit 130; "Block," *id.* ¶ 58 & Exhibit 137; "Help," *id.* ¶ 58 & Exhibit 138; "Sky," *id.* ¶ 59 & Exhibit 139; and "Protect," *id.* ¶ 59 & Exhibit 140.

**228.** These four advertisements are: "Job," Mitchell Decl. ¶ 61 & Exhibits 1 (at 102), 141 (All airings of "Job" took place within 60 days of the 2000 general election); "Barker," *id.* ¶ 53 & Exhibit 116 (All airings of "Barker" took place within 60 days of the 2000 general election); "No Two Way," *id.* ¶ 41 & Exhibit 59 (All airings of "Job" took place within 60 days of the 2000 general election); and "Raiders," *id.* Exhibit 1 at 36, 38–39, Exhibit 58 at 10. "Job," "Barker," and "No Two Way" were captured by BCRA's 60–day window.

days of the 1998 general elections.[229] Mitchell Decl. Exhibit 1 at 86. The advertisement urged the candidates to Fast Track trade legislation, and only mentions that candidate's name with respect to asking the viewer to tell the candidate to "vote no on Fast Track." The following is the audio of the ad:

> Paid for by the Working Men and Women of the AFL–CIO. [Barker speaking]: Okay ladies and gents, step right up and see if you can follow the ball. Is it here? Is it there? Where could it be? [Voice over]: They're playing games again in Washington. Without discussion or debate, they're planning another vote on the controversial Fast Track law—special powers to ram through trade deals like NAFTA. Fast Track failed *last* year because working families don't want more trade deals that put big corporations first; deals that ignore our concerns about lost jobs; environmental problems on our borders, and dangerous, imported foods. But Newt Gingrich and the sponsors of Fast Track hope they can sneak it by this fall, while public attention is focused on other issues. [Barker speaking]: Keep your eyes on the ball now . . . [Voice over]: Call Representative _____ at xxx-xxx-xxxx and tell him to vote *no* on Fast Track. Tell him we're still paying attention. And Fast Track is *still* a bad idea.

Mitchell Decl. Exhibit 116. Defense Expert Magleby, examined "Barker" during his cross examination and stated that he would rate it as a "genuine" issue ad. Magleby Cross Exam. at 108–109. Even though "Barker" mentioned the name of a candidate, Magleby determined that it was a genuine issue advertisement because it "doesn't mention how [the candidate] voted. It doesn't represent what [the candidate] has said about the issue. The body of the ad has no referent to [the candidate] whatsoever. The only referent to [the candidate] is the call line." Magleby Cross Exam. at 103–105; *see also id.* at 106 (explaining that "a generic call your Congressman, call your Senator, when then linked to a legislation and call your Congressman or Senator about this legislation without a referent to their position on the issue, seems to me substantively different than when they are mentioned in view of what their position is on that issue. Q. When you say substantively different, are you referring to a difference with respect to whether the advertisement communicates an electioneering message? A. Yes.").

369. The AFL–CIO paid for the following television advertisement, entitled, "Call." "Call" aired within 30 days of the 1998 primary elections of Congressman Jim Tanner (TN–08) and Senator Kit Bond (MO). The ad urged the candidates to support the Patient Bill of Rights Act.[230] *See* Mitchell Exhibit 1 at 80. The following is the text of the advertisement:

> Nurse at nursing station, direct-to-camera: I love nursing. But it's so much harder that it's ever been. These bureaucrats from the insurance companies. They routinely deny care, and they make decisions that only the doctors should be making. Today the insurance

---

229. "Barker" aired in the districts of Congressman Chris John (LA–07); Congressman Scott Klug (WI–02); Congresswoman Jo Ann Emerson (MO–08); Congresswoman Anne Northup (KY–03); Congressman Jack Kingston (GA–01); and Congressman Rick White (WA–01). Mitchell Decl. Exhibit 1 at 86.

230. According to Ms. Mitchell, "Call" was one of "several flights of television and radio advertisements designed to generate support for HMO reform legislation" that were sponsored by the AFL–CIO. Mitchell Decl. ¶ 50. Seventeen versions of "Call" were broadcast, two of which named federal candidates within 30 days of their primary. *Id.* Exhibit 1 at 80–82.

industry is spending millions to block a law in Congress that would protect our rights—and our lives—in the new world of HMOs and managed care. Call Congresswoman Chenowith. Tell her to stand up for us and support the Patient Bill of Rights Act. "If Congress would just do their job ... then I can do mine."

Mitchell Exhibit 99 (while the script of "Call" produced by the AFL–CIO mentions Congresswoman Chenowith's name, a version of "Call" was broadcast on July 15–21, 1998, but using Congressman Tanner's name and Senator Bond's name).

370. The AFL–CIO paid for the following television advertisement, entitled, "Deny." "Deny" aired within 60 days of the 1998 general elections of Senator Kit Bond (MO), Senator Charles Grassley (IA), the late Senator Paul Coverdell (GA), and Senator Lauch Faircloth (NC). Mitchell Decl. Exhibit 1 at 83–84. The advertisement urges the candidates to oppose S, 2330, a patients' rights bill, and only mentioned that candidate's name with respect to asking the viewer to tell the candidate to vote "no" on the legislation. The following is the audio of the ad:

A young cancer victim needs an outside specialist ... But the HMO says no. A man with chest pains goes to the nearest emergency room ... But his HMO won't pay. An elderly patient needs more hospital time ... But her doctors are over-ruled [sic] by bureaucrats. Still, Republicans in Washington are pushing an empty HMO proposal that won't stop these abuses. Tell Senator __ to vote no on S. 2330 ...... and demand a real patient protection law.

[Chyron showing 1–800 number for viewers to call].

Mitchell Decl. Exhibit 105.

371. The AFL–CIO paid for the following television advertisement, entitled, "Spearmint." "Spearmint" aired within 60 days of the 1998 general elections of the following Members of Congress: Congressman Rick White (WA–01); Congressman Jim Leach (IA–01); Congressman Jim Nussle (IA–02); Congresswoman Anne Northup (KY–03); Congressman Jim Bunning (KY–04); Congressman Mike Parker (MS–04); Congressman Virgil Goode (VA–05); Congressman Scott Klug (WI–02); Congressman Steve Chabot (OH–01). Mitchell Decl. Exhibit 1 at 84–85. The advertisement urged the candidates to oppose tax cuts and to protect Social Security, and only mentioned that candidate's name with respect to asking the viewer to tell the candidate to "vote no on this tax scheme." The following is the audio of the ad:

After years of deficits, the politicians in Washington say we're *rolling* in money. But here's something they're *not* saying. Virtually every dollar of the budget surplus comes from Social Security. Now the Republican Congress wants to spend this Social Security surplus on an eighty billion dollar election-year tax cut ...... even as there's talk about cutting Social Security for future retirees. Call Congressman __, and tell him to vote no on this tax scheme. Tell __ to put Social Security first!

Mitchell Decl. Exhibit 108.[231]

372. The AFL–CIO paid for the following television ad, entitled, "Label." "La-

---

**231.** The AFL–CIO aired another advertisement entitled "Spear" that was virtually identical to "Spearmint." "Spear" aired within 60 days of the 1998 general elections of the following Members of Congress: Congressman Robert Aderholt (AL–04); Congressman Mike Crapo (ID–02); Congresswoman Helen Chenoweth (ID–01); and Congressman John Ensign (NV–01); Congressman Mark Neumann (WI–01). Mitchell Decl. Exhibit 1 at 85–86. Like "Spearmint," "Spear" urged the candidate to protect Social Security, and only mentioned the candidate's name with respect to asking the viewer to tell the candidate to

bel" aired within 30 days of the 2000 primary elections of the following Members of Congress: Congressman Silvestre Reyes (TX–16) and Congressman Ron Paul (TX–14). Mitchell Decl. Exhibit 1 at 92. The ad urged the candidates to oppose a trade bill to benefit China.[232] The following is the audio of the ad:

> Behind this label is a shameful story. Of millions herded into forced labor camps, and average working wages of just thirteen cents an hour. Of a nation that routinely violates trade agreements; flooding our markets with low-wage imports; undercutting American jobs. Yet know Congress is poised to reward China with permanent free trade status, instead of a one-year deal. Call Congressman _____, and tell him to keep China on probation. Until this label stands for fairness.

Mitchell Decl. Exhibit 127.[233]

373. The AFL–CIO paid for the following television advertisement, entitled, "Endure." "Endure" aired within 30 days of the primary elections of the following Members of Congress: Congressman Edward Whitfield (KY–01); Congressman Steve Buyer(IN–05); and Congresswoman

Eva Clayton (NC–01). Mitchell Decl. Exhibit 1 at 95–96. The advertisement urged the candidate to oppose a trade deal for China. The following is the audio of the ad:

> "I voiced my opinion that China ought to protect worker's rights, people ought to have human rights .... For that, I spent 18 years in prison and was very nearly executed." Wei Jingsheng endured years of torture for challenging a brutal system of slave wages and sweat shops, through which Chinese workers are exploited, and Americans lose jobs. But instead of pressuring China to stop these practices, Congress is set to scrap its annual review of China's record, and reward Beijing with a permanent trade deal, a permanent trade deal though China's broken every trade pact it's signed with the U.S. for the past decade. "If you give China permanent trade status, and don't talk about it once a year, every year, and evaluate how they treat the Chinese people, they'll feel they can do whatever they want, however they want. This will be incredibly detrimental to human rights in China." Tell your member of Congress to keep China on probation ... until China earns our

"vote no on this election-year tax scheme." Mitchell Decl. Exhibit 109.

232. "Label," as well as the advertisements entitled "Trust" and "Endure," *see infra* n. 233, were run in February through June 2002 as part of "several flights of ads ... in opposition to President Clinton's proposal to provide permanent normal trade relations to China." Mitchell Decl. ¶ 57. AFL–CIO ran 14 versions of "Label," two within 30 days of a named candidate's primary. *Id.* Exhibit 1 at 92–93.

233. The AFL–CIO also aired two other advertisements that were similar to "Label": "Trust" and "Endure." Sixteen versions of

"Trust" were aired, two within 30 days of the 2000 primary elections of Congressman Steve Buyer (IN–05) and Congresswoman Eva Clayton (NC–01). Mitchell Decl. Exhibit 1 at 94–97. "Trust," like "Label," urged the candidates to oppose the China trade bill, and only mentioned the candidate's name with respect to asking the viewer to tell the candidate to "keep China on probation." Mitchell Decl. Exhibit 128. "Endure" also aired within 30 days of the 2000 primary elections of Members of Congress (Congressman Edward Whitfield (KY–01), Congressman Steve Buyer (IN–05), and Congresswoman Eva Clayton (NC–01)), and urged candidates to oppose a trade deal for China. Mitchell Decl. Exhibit 129.

trust. [Text on screen reads: Call Your Member of Congress 800–378–1844].

Mitchell Decl. Exhibit 129.

*Representative Examples of Candidate-Centered Issue Advertisements Aired Within 30 Days of a Primary Election or 60 Days of a General Election*

374. The AFL–CIO paid for the following radio advertisement entitled "No Two Way," which aired in 35 congressional districts within 60 days of the 1996 general election. Mitchell Decl. ¶ 41. "No Two Way" targeted those candidates who, as Members of Congress, had voted "to cut the college loan program in October, 1995." *Id.*

> CAROLYN: My husband and I both work. And next year, we'll have two children in college. And it will be very hard to put them through, even with the two incomes. [Announcer]: Working families are struggling. But Congresswoman Andrea Seastrand voted with Newt Gingrich to cut college loans, while giving tax breaks to the wealthy. She even voted to eliminate the Department of Education. Congress will vote again on the budget. Tell Seastrand, don't write off our children's future. CAROLYN: Tell her, her priorities are all wrong.

Mitchell Decl. Exhibit 114.

375. The AFL–CIO paid for the following television advertisement entitled "Retire," which aired within 60 days of the 1996 general election. Mitchell Decl. ¶ 42. "Retire" was one of the " 'electronic voter guide[ ]' " advertisements run by the AFL–CIO "beginning in late September and continuing until the November election." *Id.*

> What's important to America's families? [middle-aged man, interview style]: "My pension is very important because it will provide a significant amount of my income when I retire." And where do the candidates stand? Congressman Char-

lie Bass voted to make it easier for corporations to raid employee pension funds. Arnie Arnesen opposes that plan. She supports new safeguards to protect employee pension funds. When it comes to your pension, there is a difference. Call and find out.

Mitchell Decl. Exhibit 63.

376. The AFL–CIO paid for the following television advertisement entitled "Job," which aired in fourteen congressional districts within 60 days of the 2000 general election. Mitchell Decl. ¶ 61 and Exhibit 1 at 101–102. The advertisement targeted Members of Congress who had voted "to prevent an important OSHA regulation intended to prevent repetitive motion injuries from being implemented." *Id.* at ¶ 61. The regulation was part of the Departments of Labor and Health and Human Services budget bill, which President Clinton had threatened to veto if it included a rider removing the OSHA regulation. *Id.* Initially, the House leadership had agreed to a compromise, but then "backed out in October 2000." *Id.*

> [Machine operator]: "Well when you're lifting 70 thousand pounds of castings a day and you do this for 24 years, you're gonna hurt yourself. I had surgery on both hands but I'll be in pain the rest of my life." Every year, tens of thousands of Americans suffer permanent and crippling repetitive motion injuries on the job. Yet Congressman _____ voted to block federal safety standards that would help protect workers from this risk. Tell _____ his/her politics causes pain. [Machine operator]: "We're all human beings we need to help each other so that this stuff doesn't happen to us."

Mitchell Decl. Exhibit 141.

\* \* \*

## VI. Conclusion

For the reasons set forth in my opinion, with regard to Title I of BCRA, I find constitutional: new FECA Section 323(a) only to the extent that it bans national parties from using nonfederal funds for Section 301(20)(A)(iii) activities; new FECA Section 323(b) as applied to Section 301(20)(A)(iii) only; new FECA Section 323(e) except to the extent that it prevents federal candidates from soliciting funds for their national parties; and new FECA Section 323(f). I find unconstitutional: new FECA Section 323(a) except to the extent it bans national parties from using nonfederal funds for Section 301(20)(A)(iii) activities; Section 323(b) as applied to Sections 301(20)(A)(i), (ii), and (iv); new FECA Section 323(d); and new FECA Section 323(e) to the extent that it prevents federal candidates from soliciting funds for their national parties. With regard to Title II, for the reasons set forth in my opinion, I find constitutional: Section 201's backup definition of electioneering communications as severed and Section 204 to the extent that it applies to non-*MCFL* organizations. I find unconstitutional: Section 201's primary definition; Section 204 insofar as it applies to *MCFL* organizations; and Section 213. For the reasons set forth in this opinion, I also find unconstitutional Section 318 and and Section 504. All of my other judgments are set forth in the Per Curiam opinion.